## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF JOR LAW, INTERIM CHIEF EXECUTIVE OFFICER AND PRESIDENT OF PRIME CORE TECHNOLOGIES INC., *ET AL.*, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Jor Law, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

### Introduction

1.     Prior to the recent cessation of their operations, the Company served as a market leader in the cryptocurrency industry. The Company offered a unique set of digital asset infrastructure tools that powered innovation in the digital economy by simplifying the complexity of building with digital assets, making it easier for its customers to build, launch, and scale quickly. Although each of the Company's product offerings is valuable on its own, when taken together, they create an all-in-one solution for customers that remains unmatched in the marketplace.

2.     Through these Chapter 11 Cases, the Debtors hope to achieve a number of goals, including fostering transparency, ensuring the protection of assets, working towards an equitable resolution of customer claims, maintaining the Company's Licenses, pursuing strategic

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number are:  Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). Prime Trust, LLC's service address is 330 South Rampart Blvd., Suite 260, Las Vegas, NV 89145.

alternatives, including a sale process, undertaking a targeted investigation into various aspects of the Wallet Event,[2] and investigating and potentially pursuing estate causes of action. Through these efforts, the Debtors hope to provide meaningful recoveries to customers and creditors.

### Background

3.      I am the Interim Chief Executive Officer and President of Prime Core Technologies Inc. ("Prime Core") and Prime Trust, LLC ("Prime Trust"), the ultimate parent and parent, respectively, of Prime Digital, LLC ("Prime Digital"), and Prime IRA LLC ("Prime IRA" and, together with Prime Core, Prime Trust, and Prime Digital, the "Debtors" or the "Company"). I have held these positions since November 29, 2022. From January 1, 2021 to March 16, 2022, I was a member of the board of directors of Prime Core (the "Board"), and from February 1, 2017 to May 3, 2022, I was a member of the board of managers of Prime Trust. Beginning on or about July 14, 2023, the Company was managed by the Receiver (as defined below) until approximately August 14, 2023, when the Company began to be managed by the Special Committee (as defined below).

4.      I hold a Bachelor of Arts degree in Rhetoric from the University of California, Berkeley and a Juris Doctor degree from Columbia Law School. Prior to my tenure as an officer of the Company, I spent nearly two decades practicing law, focusing on the areas of bank finance, securitization and derivatives, distressed debt, out-of-court workouts, emerging companies and technology, securities, mergers and acquisitions, and alternative finance. I also spent a number of years founding and growing a legaltech/regtech business that was ultimately acquired. In recent years, I have worked primarily as an investor, advisor, and consultant, including with companies in the blockchain industry. My advising and consulting services are

---

[2]      The term "Wallet Event" refers to series of events and circumstances described in Section III.B., *infra*.

targeted towards bringing additional depth to boards and management teams, and I am most often advising in the start-up phase of companies, with the formation and launch of new departments or products in more mature companies, and during significant events, such as turnaround, distressed, or special situations.

5.      In my capacity as Interim CEO and President of the Debtors, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors since taking on these roles, and I have been advised by counsel that I am authorized to submit this declaration (the "Declaration") on behalf of the Debtors. I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of the Chapter 11 Cases and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (ii) the relief that the Debtors have requested pursuant to the motions and applications (the "First Day Pleadings") filed on August 24, 2023 in the United States Bankruptcy Court for the District of Delaware (the "Court").[3] I am familiar with the contents of each of the First Day Pleadings and believe that the relief sought therein will allow the Debtors to fulfill their duties as debtors-in-possession, minimize the possible disruption to the Debtors' business that may be caused by the commencement of the Chapter 11 Cases, and position the Debtors for a seamless transition into chapter 11 and a successful restructuring.

6.      Except as otherwise indicated, the facts set forth in this Declaration are generally based upon information that I have learned since becoming Interim CEO and President of Prime Core and Prime Trust in late November 2022, including facts based on my personal knowledge, my review of relevant documents, information provided to me (including by the Board and the

---

[3]    The Debtors filed these Chapter 11 Cases on August 14, 2023 (the "Petition Date").

board of managers of Prime Trust, the Debtors' management, advisors, consultants, professional service providers, and employees, among others), my opinion based upon my experience, or my knowledge of the industry. If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

7.     To familiarize the Court with the Debtors and the relief the Debtors seek early in the Chapter 11 Cases, this Declaration is organized in seven separate sections.

- **Section I** provides detailed information regarding the Debtors' corporate history and business operations.

- **Section II** provides an overview of the Debtors' organizational structure, prepetition capital structure, prepetition equity structure, current cash position, and a history of the Company's management.

- **Section III** describes the circumstances leading to the commencement of the Chapter 11 Cases.

- **Section IV** describes the Company's efforts to course correct in response to certain of the events described in Section III.

- **Section V** describes the imposition of the Receivership (as defined below) and the appointment of the Special Committee.

- **Section VI** sets forth the Debtors' chapter 11 goals.

- **Section VII** sets forth the various First Day Pleadings filed in connection with the Chapter 11 Cases, which the Debtors believe are critical to administering the Chapter 11 Cases and preserving and maximizing the value of the Debtors' estates.

## I.     <u>Debtors' Corporate History and Business Operations</u>

### A.     **Corporate History**

8.     The Company was founded in 2016 by Scott Purcell as a trust and custodial services company with respect to fiat currency and other more traditional assets, with its primary product being college savings trusts. Following the emergence and exponential growth of the blockchain and cryptocurrency industry, the Company recalibrated its focus away from

providing more traditional fiat currency custodial services and towards providing custodial services for cryptocurrency and other digital assets. Eventually, the Company emerged as a market leader, providing a unique bundle of products and services that remain unparalleled in the industry.

**B.      Business Operations**

9.      Prior to issuance of the Cease and Desist Order (as defined and discussed below), the Company operated a software technology company that offered an all-in-one financial infrastructure platform to its customers.

10.      The Company's products and services were used widely throughout the cryptocurrency industry, providing critical infrastructure to notable companies within the space. Companies of all types within the blockchain ecosystem utilized the Company's products and services, including wealth management platforms, exchanges, savings apps, rewards apps, cryptocurrency IRAs, payment platforms, digital asset custodial services for RIAs, payroll companies, stablecoins, and more. Many market participants utilized the Company as their "back end." In some cases, the Company provided almost all of the infrastructure for companies, opening accounts for not only those companies, but each of their respective customers, providing compliance services, processing transactions through the Company's liquidity APIs, and storing their customers' fiat currency and cryptocurrency.

11.      By the end of 2021, the Company was processing over 308,000 transactions per day on average, had opened 2.8 million new custodial accounts, held over $3.8 billion in cryptocurrency and fiat currency assets under custody, and facilitated over $309 billion USD of

fiat currency movement. At its peak, the Company had approximately 540 full-time employees and independent contractors.[4]

12.　　To provide its customers with a broad range of regional operational options, the Company, through Prime Trust, was a registered money service business with FinCEN (an "MSB") and held a Nevada trust charter (the "Nevada Trust Charter"). Further, where a separate license was required to operate in a particular state, the Company held money transmitter licenses (each, an "MTL" and, collectively, the "MTLs" and, together with the Nevada Trust Charter, the "Licenses"). At the Company's peak, the Company provided services in most of the United States through a combination of states where it maintained Licenses, states where there was an express exemption of money transmitter requirements for out-of-state trust companies, and states where there was no license requirement. The Company also pursued licenses in states that did not provide for such an exemption and required licenses.

13.　　Prior to the Petition Date, the Company's suite of offerings included custody services, AML/KYC as a service, access to a redundant network of banking rails, crypto liquidity services, compliance and regulatory services, settlement services, Application Programming Interface ("API") integration, and professional services, each as described in more detail below.

---

[4]　　As of the Petition Date, the Company had approximately seventy full-time employees and independent contractors.

Prime Trust is the One-Stop Shop for Financial Infrastructure
A single ledger, open ecosystem providing the only full-suite platform purpose-built to launch FinTech offerings

(a)  **Custody Services**.

14.    The Company's custody services enable quick and secure custody or sub-custody of both fiat and digital assets supported by a variety of account types, all via the Company's API. In addition to USD and select foreign currencies, the Company supports custody of over 200 types of digital assets, including BTC, ETH, and LTC, stablecoins like USDT and USDC, and many ERC-20 compliant cryptocurrencies. The Company also provides flexible account types for storing assets in custodial or retirement accounts that match customer needs and risk profiles.

15.    The custodial relationship between the Company and many of its customers are governed by a Master Services Agreement (the "MSA") and Self-Directed Account Agreement (the "Account Agreement" and, together with the MSA, the "Customer Agreements"). As is often seen among custodians, the Customer Agreements provide that the Company will hold customer digital and fiat currency in commingled, omnibus-style accounts or wallets, and that once a contribution has been made and settled on the Company's ledger, the assets are fungible. With respect to fiat contributions, the MSA provides:

> Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such

securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency, subject to Prime Trust's obligation to return Fiat Currency to Customer in accordance with this Service Schedule.[5]

(b)     **AML/KYC as a Service**.

16.     Customers can avail themselves of the Company's bundle of AML/KYC services (the "AML/KYC Services"). In connection with its AML/KYC Services, the Company employs cutting-edge technology and a broad set of data sources, including watchlists, transaction monitoring systems, and document verification services to deliver effective, automated, and scalable financial crime detection via the Company's API. The Company's AML/KYC Services include comprehensive KYC and KYB[6] coverage and checks for global sanctions, adverse media, and PEP[7] screenings. These services also include an onboarding identity SDK[8] that allows customers to embed an all-in-one identity solution with ID submission, liveness checking, and automated confirmation.

---

[5]     MSA, § 2.7(b).

[6]     Know Your Client and Know Your Business, respectively.

[7]     Politically Exposed Persons.

[8]     Software Development Kit.



(c)    **Access to a Redundant Network of Fiat Banking Rails**.

17.    The Company has built a network of integrated banks[9] to provide "payment rails,"[10] including ACH, ACH-push, same-day ACH, debit card, credit card, and wire transfers in USD and select foreign currencies. The Company is known in the marketplace for having a higher number of banking partners than most other providers.[11] The Company has also developed special expertise in providing a technological bridge between banking institutions that do not have their own APIs and customers in the cryptocurrency industry who require APIs. In addition, customers can achieve immediate settlement of their accounts through the Company's settlement network (described below) without the lag time that is attendant to ACH and wire transfers through traditional banking institutions. The Company's card transactions provide predictive approvals and fraud detection modeling via the 3D Secure 2.0 protocol. The Company

---

[9]    The Company is not a banking institution and does not provide banking services.

[10]    "Payment rails" refers generally to the infrastructure that moves money from one person to another.

[11]    The need for a redundant network of banks became apparent in the first quarter of 2023 when banks such as Silicon Valley Bank, Silvergate Bank, and Signature Bank ceased operations. Clients that banked directly with those banks found themselves without banking services almost overnight. In contrast, the Company's customers who were accessing one of those banks via the Company's platform were simply re-allocated to other banks in the Company's redundant network of banks without the need to adjust their API integration.

also offers improved operational efficiency and automation through webhooks and batch transfers reducing the need for back office support.



(d)     **Crypto Liquidity**.

18.     The Company offers access to its multiple cryptocurrency liquidity partners, which enables customers to convert fiat currency to digital currency and vice versa through the Company's API. Integrators can choose between instant settlement or T+1 settlement to allow for flexible capital management. The Company also supports its customers' ability to request a quote in fiat currency based on the spot price of the digital asset. Off-chain transactions are also possible through the Company's settlement network (described below) to provide instant settlement without incurring gas fees (*i.e.*, transaction fees) and allowing customers to maintain the privacy of their transactions and positions.

(e)     **Compliance and Regulatory Services**.

19.     The Company assists its customers in navigating complex regulatory landscapes by providing licensed services in support of customers' business models, handling the portions of its customers' business which may require additional licenses, such as custody and money transmission. This allows its customers to focus on their core business and launch a legally

compliant business more quickly and with less capital. In support of these services that enable client transactions to be conducted within legal frameworks, the Company also handles extended compliance duties including several types of audits, SAR filings, and other related activities.

(f)     **Settlement Services**.

20.     The Company's "Prime Trust Settlement" service is an API-enabled solution for the transfer of fiat or digital assets between any account on the Company's network, including other customers, at any time. This enables unilateral or bilateral settlement, a proprietary ledger to ensure full privacy of movements and the potential to minimize market risk, and support for USD, select foreign currencies, and over 200 digital assets. The Company's settlement network also enables customers to transfer assets in-network at any time during regular hours, weekends, and holidays with funds available instantly.



1. Atomic swap completes - both parties have the necessary assets
2. Atomic swap fails - one or both parties **do not** have the necessary assets and the entire transactions fails

(g)     **Professional Services**.

21.     The Company offers a variety of professional services that assist customers with tasks such as API integration and AML/KYC resolutions with service-level agreements (SLAs), and generally offers advisory services for large, complex customers to provide prescriptive guidance, expert technical coverage, and a proactive engagement model (as described below).

(h)      **Engagement Model**.

22.     A common refrain among the Company's customers has been that one of the many values in working with the Company is the ability to launch their products to market quickly. In that vein, among other things and as depicted below, the Company's standard onboarding procedure provides an expeditious launch process for customers, including support implementation, certification, compliance, due diligence, and testing, with production rollout typically occurring within two or three months. In addition, white-glove service that includes access to compliance, integration, and other specialists provides the opportunity to support more complicated business models and/or the ability to launch even quicker.



II.    **Debtors' Organizational and Capital Structure**

    A.    **The Debtors' Prepetition Organizational Structure**



    B.    **Debtor Entities.**

23.    Debtor Prime Core is a corporation formed under the laws of Delaware and is the sole member and 100% owner of Debtor Prime Trust and non-Debtor Prime New York Trust, LLC ("Prime NY"). The formation of Prime NY had not been completed as of the Petition Date.

24.    Debtor Prime Trust is a Nevada limited liability company and the Debtors' primary operating entity. Prime Trust is the 100% owner and sole member of Debtors Prime Digital and Prime IRA. Prime Trust is a Nevada-chartered non-depository trust company that is subject to the jurisdiction of the Nevada Department of Business and Industry Division of Financial Institutions (the "Nevada FID") and is regulated under Nevada Revised Statutes Chapter 669 – Trust Companies. The Debtors operate a non-depository trust company that provides administrative and custodial services primarily to custodial and trust accounts.[12]  Prime Trust employs all Nevada-based employees and is the entity that owns the Debtors' material intellectual property.

---

[12]    Prime Trust previously provided escrow services primarily to issuers of private placements.

25.     Debtor Prime Digital is a Nevada limited liability company and the entity that employs all non-Nevada employees who support the business operations of Prime Trust.

26.     Debtor Prime IRA is a Nevada limited liability company that was formed to provide Prime Trust's historic personal checkbook IRA services; however, the Company previously off-boarded these services to alternative custodians. As a result, Prime IRA is no longer an operating entity.

### C.     Intercompany Transactions.

27.     The operations of the Debtor entities are interrelated, and transfers are regularly executed between the Debtor entities. The Company raises capital at the Prime Core level. Prime Core then contributes funds to Prime Trust for operational purposes, pursuant to an *Intracompany Contribution Agreement*, dated March 7, 2022 (the "Contribution Agreement"). Pursuant to the Contribution Agreement, Prime Core and Prime Trust maintain a centralized cash repository and cash management system. Third parties may make contributions directly to Prime Trust, with Prime Core contributing additional capital to Prime Trust on a go-forward, as-needed basis. All corporate bank accounts are legally held by Prime Trust, and the Company uses these accounts to pay the expenses of each of the Debtor entities.

### D.     Non-Debtor and Former Entities.

28.     Non-Debtor Prime NY, a wholly-owned subsidiary of Prime Core, was intended to be a New York limited liability company for purposes of applying for a limited purpose trust charter in the State of New York. Prime NY's application remained pending as of the Petition Date, and therefore Prime NY has not been officially formed. Prime NY conducts no business and has no customers or revenue.

29.     Additionally, the Debtors previously owned non-Debtor Banq, Inc. ("Banq"). Banq was a corporation formed under the laws of the state of Florida in 2019 and was a wholly-owned subsidiary of Prime Trust. The Company executed a spin-off of Banq into a separately owned company, with then current members of Prime Trust receiving a *pro rata* distribution of Banq shares. As of October 2020, the Debtors understood their ownership interest in Banq to be less than 3%.[13] Banq filed for bankruptcy in the Bankruptcy Court for the District of Nevada on June 13, 2023.

### E.     The Debtors' Prepetition Equity Structure

30.     In March 2021, the Company launched a Series A financing process (the "Series A Financing"). The Series A Financing was consummated through a series of closings between April 2021 and August 2021. Pursuant to the Series A Financing, the Company sold 22,699,052 shares of Series A-1 preferred stock (the "Series A-1 Preferred Shares") and 4,390,371 shares of Series A-2 preferred stock (the Series A-2 Preferred Shares," and together, the "Series A Preferred Shares"). The Company received $68,522,059.34 in aggregate consideration in exchange for the Series A Preferred Shares. Up to about $34 million of the Series A funding was directed towards redeeming shares of common stock from existing shareholders, and between May 2021 and October 2021, the Company made a series of repurchases of Class A common stock and Class B common stock from the Company's original shareholders, ultimately redeeming $31,827,432.34 worth of shares of common stock.

31.     In October 2021, the Company commenced a Series B financing process (the "Series B Financing"), which closed on March 16, 2022. Through the Series B Financing, the

---

[13]     Banq has not since provided a capitalization table to the Debtors and therefore, the Debtors do not have a current understanding of its equity position therein.

Company sold 19,486,876 of Series B Preferred Shares for an aggregate purchase price of $108,216,652.35.

32.      In response to interest from outside investors and the desire of certain then-existing shareholders to sell their shares, the board of directors of Prime Core approved a secondary sale process through which then-existing shareholders could sell their shares directly to third-party investors through a third-party broker. Between October 2021 and January 2022, various shareholders participated in this secondary sale process, resulting in the sale of 22,240,997 shares of Class A and Class B common stock for $67,708,491.04 in the aggregate.

33.      As of the Petition Date, Prime Core had the following shares and classes of stock outstanding: (a) 35,723,436 shares of Class A common stock; (b) 19,067,548 shares of Class B common stock;[14] (c) 22,699,052 shares of Series A-1 preferred stock; (d) 4,390,371 shares of Series A-2 preferred stock; and (e) 9,486,876 shares of Series B preferred stock.

34.      Additionally, as of the Petition Date, 33,078,960 shares of common stock were available (but unissued) to eligible participants pursuant to that certain *Amended and Restated 2021 Equity Incentive Plan*, dated March 16, 2022 (the "Incentive Plan").[15]

F.      **The Debtors' Prepetition Capital Structure**

35.      The Debtors have no prepetition secured debt. However, as noted above, in the ordinary course of business, Prime Trust maintained Licenses in various states. In connection therewith, Prime Trust was required to maintain regulatory reserves and collateralized surety

---

[14]    In addition, as of August 22, 2023, the Company has issued options to purchase approximately 1,987,992 shares of Class B common stock, which options remain outstanding and a warrant to purchase up to 100,000 shares of Class B common stock. In addition, the Company has promised but not issued options to purchase approximately 1,770,000 shares of Class B common stock.

[15]    Under the Incentive Plan, subject to certain conditions, Employees are eligible to receive Incentive Stock Options and Employees, Directors, and Consultants are eligible to receive Stock Awards other than Incentive Stock Options (each capitalized term as defined in the Incentive Plan).

bonds, the amounts of which varied by state. As of the Petition Date, the Company had surety

bonds in the aggregate amount of $7,645,000, for which the Company posted collateral in the

aggregate amount of $5,726,250.

### G.    The Debtors' Current Cash Position

36.    The Company stopped generating revenue upon issuance of the Cease and Desist

Order. Prior to the Petition Date, the Special Committee worked with the Company and its

professionals to develop a cash forecast for the first thirteen weeks of these Chapter 11 Cases

(the "Preliminary Budget").[16] The Preliminary Budget reflects corporate treasury funds in the

amount of $9,666,913 and contemplates the return to the Company of certain property held by

third parties that the Company contends is property of the Company's bankruptcy estates.[17]

### H.    History of the Company's Management

37.    From 2016 through August 2021, Scott Purcell, the founder of the Company,

served as Chief Executive Officer. Tom Pageler served as Chief Operations Officer from May

2020 and August 2021, and as Chief Executive Officer from August 2021 through November

2022. From November 2022 until the imposition of the Receivership, as described more fully

below, the Company's operations were managed by an almost entirely new management team,

led by me serving as the Company's Interim Chief Executive Officer and President as of

November 29, 2022 ("New Management").[18] Beginning on or about July 14, 2023, the Company

---

[16]    The Preliminary Budget is attached hereto as **Exhibit A**.

[17]    The Company has requested the return of some of the professional fee retainers issued by the Company prior to
the Receivership, as well as the return of other property that the Company contends are estate assets.

[18]    Although a significant number of the members of the new management team are new to the Company, the
Company determined, in the exercise of its business judgment, to retain certain members of former management
teams as part of the new management team.

was managed by the Receiver until approximately August 14, 2023 when the Company began to be managed by the Special Committee.

**III.**    **Events Leading Up to the Chapter 11 Cases**

    **A.**    **Lack of Operational and Spending Oversight by Prior Management**

38.    The Company enjoyed success for a number of years and was viewed by the market as a critical and necessary component of the digital asset ecosystem. Lifted by industry-wide growth in the cryptocurrency market referred to as "crypto summer," the Debtors saw a tremendous rise in revenues and valuation. However, in 2022, several major liquidity events occurred in the cryptocurrency market, leading to a period of decline and a general weakening of the market, commonly referred to as "crypto winter."[19] Although crypto winter was not the precipitous event leading to the Receivership and these Chapter 11 Cases, the Company felt the ripple effect caused by crypto winter, which resulted in depressed revenues.

39.    Despite these realities, the Company under prior management continued to ramp up spending, at times incurring seemingly excessive expenditures. By way of example, in the month of October 2022, the Company under prior management spent approximately $10.5 million against revenues of approximately $3.1 million for a net loss of approximately $7.4 million. In November 2022, the Company under prior management spent approximately $11.1 million against revenues of approximately $2.7 million for a net loss of approximately $8.4 million.[20]

---

[19]    The implosion of Terra LUNA ("Terra") resulted in the loss of billions of dollars of value for Luna, the Terra's proprietary cryptocurrency used to execute transactions on Terra's blockchain and was a key catalyst in the acceleration of crypto winter. The collapse of Terra had a ripple effect through the cryptocurrency industry and was named as a causal event in the chapter 11 cases of Voyager Digital, Celsius, and others.

[20]    In March 2023, at the peak of the Company's prepetition turnaround efforts under New Management, the Debtors had total expenses of approximately $4.5 million against total revenues of approximately $3.7 million, generating a net loss of approximately $800,000, representing a 65% decrease in operating expenses and a 60% decrease in total expenses compared to what the Company saw under prior management.

40.     In addition, the Company under prior management invested funds in TerraUSD (UST)[21] using both customer funds and funds in the Company's corporate treasury, which resulted in a loss of approximately $6,000,000 in client funds and $2,000,000 in treasury funds.

### B.     The Wallet Event

41.     In March of 2018, the Company created cold-storage wallets (the "<u>Legacy Wallets</u>") for purposes of maintaining cryptocurrency assets that included ETH, BTC, and ERC-20 compliant cryptocurrencies.

42.     One of the Legacy Wallets, the 98f Wallet,[22] was set up as a "multi-sig" wallet with six total signers of which three signers were required to gain access and execute transactions. To enhance security, the Company set up the 98f Wallet so that those who can "sign" (*i.e.*, approve) transactions would need to be in physical possession of hand-held Trezor or Ledger hardware devices (the "<u>Hardware Devices</u>"). It is a relatively common practice to utilize hardware devices, such as the Hardware Devices, to enhance security of digital wallets. Representative images of the Hardware Devices are below:

 

---

[21]     UST is the stablecoin used on the Terra blockchain.

[22]     The "98f Wallet" is a Legacy Wallet with an address ending in "98f".

43.     If hardware devices are lost, there is a method by which a user can "mod" or otherwise transfer signing rights to another hardware device. In order to do so, the user needs "seed phrases." Seed phrases are a set of (typically twelve or twenty-four) randomly generated words that are created during the initial set-up of the hardware device. If, for example, a user lost a hardware device, that user could purchase a new hardware device (or even use non-hardware options such as software wallets) and gain access to the digital wallet as long as the user knew the seed phrase. Many users store seed phrases on hard copies of handwritten paper, images, and pictures. If a user loses both the hardware device and the seed phrases, it is virtually impossible for that user to regain access to the digital wallet.

44.     The Company used a seed storage system provided by "Cryptosteel" (the "Cryptosteel Hardware" and, together with the Hardware Devices, the "Wallet Access Devices"), which allows physical storage of a copy of the seed phrases on extremely durable hardware. This provides a method of storing seed phrases that is generally believed to be safer than storing seed phrases on paper hard copy, images, or pictures. Representative images of Cryptosteel Hardware are below.



45.     In connection with the 98f Wallet, the Company provided customers with wallet addresses (the "Contribution Addresses") through which a customer's cryptocurrency contributions were forwarded to the 98f Wallet via a smart contract.

46.     In or around July 2019, the Company migrated its cryptocurrency assets to the digital asset security platform (the "Fireblocks Platform") maintained by Fireblocks LLC ("Fireblocks"). The Company believed it had completed the migration of its cryptocurrency assets in the first quarter of 2020 and that all available wallet addresses actually being used on a go-forward basis were accessible on the Fireblocks Platform. As the Fireblocks Platform had the programmatic ability to generate wallet addresses, the Company sought to deprecate the Legacy Wallets, such that customers should no longer make contributions of cryptocurrency into the Legacy Wallets.[23]

47.     In January 2021, the Company inadvertently provided customers with Contribution Addresses that allowed customers to make contributions of cryptocurrency into the 98f Wallet. Shortly thereafter, customers began sending cryptocurrency into the 98f Wallet.

48.     It was not until December 2021,[24] when a customer requested a significant withdrawal of ETH that the Company could not fulfill using ETH from its omnibus wallets on the Fireblocks Platform, that certain Company employees discovered that cryptocurrency assets had been forwarded to the 98f Wallet, which was outside of the Fireblocks Platform. It was around this time that they discovered that the Company did not have the Wallet Access Devices and thus, could not access the cryptocurrency stored in the 98f Wallet.[25]

49.     While undertaking extensive efforts to locate the Wallet Access Devices, certain Company employees used fiat currency from omnibus client accounts to purchase ETH to satisfy customer withdrawal requests. From December 2021 to March 2022, they caused the Company

---

[23]   Deprecation refers to a functionality that exists in software whose use is not recommended.

[24]   Until then, the Company was able to automatically fulfill all ETH requests using ETH from its omnibus wallets on the Fireblocks Platform.

[25]   As of August 22, 2023, the value of the cryptocurrency held in the 98f Wallet was approximately $38.9 million.

to use $76,367,247.90 in the aggregate to purchase ETH to fund customer withdrawals.[26] The Company remains unable to access the 98f Wallet. The investigation into these matters continues. These events were reported to the Board in August 2022, and the Company disclosed them to the Nevada FID and other state regulatory authorities between September and November 2022.

### C.    Regulatory Issues

50.    As discussed below, the Company's Prepetition Turnaround Plan contemplated an additional capital raise. Indeed, the Company was in the midst of this capital raise when state regulators began taking actions that resulted in the revocation or suspension of certain of the Company's Licenses. This licensure loss restricted the Company's ability to do business, triggered negative publicity, and caused some customers to sever their relationships with the Company, all of which caused a precipitous decline in the Company's revenues, and led to the issuance of the Cease and Desist Order, the imposition of the Receivership, and ultimately, the filing of these Chapter 11 Cases.[27] As of date of the petition for Receivership, Prime Trust had deficits vis-à-vis customers in the amount of $82,766,000 in fiat currency and $861,000 in digital currency.

### IV.    Corrective Efforts and Prepetition Turnaround Plan

### A.    Wallet Corrective Efforts

51.    The Company took corrective efforts  to address the Wallet Event. Specifically, while the foregoing 98f Wallet accessibility issue is aberrant and extremely unlikely to recur, the

---

[26]    This amount represented less than 5% of the Company's fiat custodial assets and less than 2.5% of the Company's total custodial assets using December 31, 2021 values.

[27]    Prior to the issuance of the Cease and Desist Order, the Company's new client sales forecast for 2023 was $47,823,487 annual contract value (ACV).

Company undertook a series of corrective steps designed to ensure that this anomalous 98f

Wallet event never happens again. These steps included:

- taking steps to restrict customer contributions to the Legacy Wallets through direct customer communication;[28]

- restricting new wallet creation to the Fireblocks Platform;

- making improvements to the Company's digital asset inventory procedures;

- overhauling the Company's treasury functions;

- improving employee off-boarding procedures; and

- updating the Company's communications protocols to foster more transparency.

52.     Collectively, the foregoing procedures and controls provide multiple additional

layers of security designed to ensure that the Company maintains access to, and the ability to

recover, all custodied digital assets. Further, understanding that stagnancy is the enemy of

progress, the Company continues to refine and improve upon these protocols to ensure that the

Company maintains the highest level of integrity at all times.

**B.      Prepetition Turnaround Plan**

53.     In addition to the corrective efforts undertaken by the Company in response to the

Wallet Event, under New Management, the Company undertook a series of steps to improve

operational and financial efficiencies at the Company, which steps included:

- the removal of all members of the C-Suite who were materially involved with the 98f Wallet issues and/or who were contributed to and otherwise fostered an unhealthy Company culture;

- the adoption of values centered around best-in-class products/service, teamwork, entrepreneurial, integrity, inclusive, and customer-centricity; and

---

[28]     Due to the nature of cryptocurrency wallets, they can only be deprecated and cannot be decommissioned or otherwise eliminated.

- the institution of cost-cutting measures, including by right-sizing the Company's workforce, mandating the curtailment of business-related travel, reducing consulting and marketing related expenses, and optimizing software offerings to employees.

54.     In addition, New Management developed a turnaround plan (the "Prepetition Turnaround Plan") designed to make customers whole and achieve profitability, targeting a cash flow break-even point in the fourth quarter of 2023. Among other things, the Prepetition Turnaround Plan contemplated capital raises and the potential merger and/or sale of the Company.

55.     More specifically, on February 10, 2023, the Board approved the Company's launch of a Series C rights offering process (the "Series C Rights Offering"), which would be offered solely to the Company's then-existing shareholders. The Series C Rights Offering was to be capped at $60 million, subject to the Company's ability to raise at least $40 million prior to closing. To generate more interest, the Board approved revised terms, which included increasing the liquidation preference for the Series C Rights Offering.

56.     In connection with the Series C Rights Offering, the Company received approximately $29 million, which was held in escrow subject to the Company's ability to raise $53 million. On top of the $29 million, the Company received an additional $6.36 million in funding commitments. However, by late March 2023, it became clear that the Company's existing shareholders would not be able to fund a sufficient amount to close on the Series C Rights Offering,[29] and the Board authorized the Company to approach third-party investors to bridge the delta. On or about April 11, 2023, J.V.B. Financial Group, LLC, acting through its Cohen & Company Capital Markets division ("Cohen"), commenced work on behalf of the

---

[29] This was purportedly due to a lack of liquidity and other factors as opposed to a lack of interest in the Series C Rights Offering.

Company as its financial advisor with respect to the Series C Rights Offering. On April 26, 2023, Cohen commenced its outreach. By June 6, 2023, Cohen had contacted 240 potential investors and 31 potential acquisition parties in connection with the capital raise for the Series C Right Offering.[30]

## V.    Prepetition Receivership Proceedings and Appointment of the Special Committee

57.    Despite the foregoing efforts, the Company was unable to return to profitability following the events described above. As a result of the Wallet Event, the Company found itself in violation of Nevada trust regulations and certain other state regulations due generally to a failure to maintain an adequate amount of shareholder equity or capital in the form of permissible investments. The Company worked closely and cooperatively with the Nevada FID to resolve these issues and bring the Company back into compliance. However, a series of events transpired[31] that caused the Company to experience multiple "runs on the bank," which led to the entry of a *Memorandum of Understanding* between the Company and the Nevada FID on June 16, 2023, pursuant to which the Nevada FID placed additional oversight over the Company. On June 21, 2023, the Nevada FID issued a cease and desist order (the "Cease and Desist Order") against the Company. Pursuant to the Cease and Desist Order, the Nevada FID ordered the Company to cease and desist all retail trust activities.[32]

---

[30]    The Company entertained a merger offer from BitGo; however, the offer carried insurmountable contingencies and as a result, failed to garner support from investors.

[31]    These events included license revocations by certain state licensing agencies, negative press, incorrect reporting, and the demise of the BitGo transaction.

[32]    More specifically, the Cease and Desist Order prohibited the Company "from operating and/or engaging in the trust company business in violation of NRS Chapter 669, specifically 669.100(1) and NRS 669.2825(1)(a), (b), (c), (f) and (k)." The Cease and Desist Order further prohibited the Company "from accepting fiat currency from existing and new clients for custody purposes" and "from accepting cryptocurrency from existing and new clients for custody purposes."

58.     On June 23, 2023, the Board and the board of managers of Prime Trust adopted

resolutions, which, among other things, consented to the imposition of a receivership and

authorized the Company's officers to take all such actions as a receiver deems necessary or

appropriate.

59.     On June 26, 2023, the Nevada FID filed a *Petition for Appointment of Receiver,*

*Temporary Injunction, and Other Permanent Relief* (the "Receivership Petition") with the Eighth

Judicial District Court of the State of Nevada (the "Nevada State Court"), seeking, among other

things, the appointment of a receiver pursuant to Nevada Revised Statute 669.2864.[33]  On July

14, 2023, the Nevada State Court granted the Receivership Petition on an interim basis, placing

the Company in receivership (the "Receivership") and installing John Guedry as receiver (the

"Receiver") with respect to the Company (the "Interim Receivership Order").

60.     On August 3, 2023, the Receiver petitioned the Nevada State Court for a

modification of the Interim Receivership Order (the "Motion to Modify"). Among other things,

the Receiver requested that the Nevada State Court authorize (a) the formation of a special

restructuring committee (the "Special Committee"); (b) appoint John Guedry, John Wilcox, and

Michael Wyse as the sole members of the Special Committee; and (c) vest the Special

Committee with requisite authority to direct the Company to file voluntary petitions for relief

under chapter 11 of the Bankruptcy and manage and oversee the Prime Entities[34] in their

capacities as debtors-in-possession during the pendency of their Chapter 11 Cases.

61.     On August 8, 2023, the Nevada State Court held a hearing (the "August 8

Hearing") on the Motion to Modify, at the conclusion of which the Nevada State Court approved

---

[33]   Case No. A-23-872963-B.

[34]   The term "Prime Entities" refers to Prime Core, Prime Trust, Prime Digital, and Prime IRA.

the relief requested in Motion for Modify and approved the Receivership Petition on a final

basis. On August 10, 2023, the boards of directors, boards of managers, or sole members, as

applicable (collectively, the "<u>Boards</u>") of the Prime Entities ratified the decision of the Nevada

State Court on the record at the August 8 Hearing, and further delegated to the Special

Committee all decision-making authority with respect to the Prime Entities in their capacities as

debtors-in-possession in connection with their chapter 11 cases. On August 14, 2023, the Nevada

State Court entered an order memorializing the court's ruling on the record at the August 8

Hearing (the "<u>Final Receivership Order</u>") and, acting by unanimous written consent, the Special

Committee authorized the filing of these Chapter 11 Cases.

**VI.**     **<u>Chapter 11 Goals</u>**

62.     In broad strokes, the Debtors initiated these Chapter 11 Cases to achieve several

goals, the most critical of which are described below.

63.     **Protect Assets**. First and foremost, the Company filed these Chapter 11 Cases to

put guardrails in place to protect assets and work towards an efficient and equitable resolution of

customer claims in a single forum.

64.     **Maintain and Reinstate Licenses**. As described herein, as a result of the fallout

from the Wallet Event, certain of the Debtors' Licenses have been suspended, revoked, or

terminated by state regulatory agencies, while others the Debtors voluntarily relinquished prior

to the Petition Date. Through these Chapter 11 Cases, the Debtors will seek to retain and/or

restore their Licenses.

65.     **Address Financial Condition**. To preserve value and ensure the Company's

future as a go-forward entity, the Company intends to pursue third-party financing, a

recapitalization, and a potential sale pursuant to Bankruptcy Code section 363 or through a chapter 11 plan.

66.     **Undertake Focused Investigation**. Through these Chapter 11 Cases, with the assistance of its professionals, the Company intends to launch a full investigation into the whereabouts of the Wallet Access Devices. The Company will also investigate potential estate claims and causes of action, including those related to the Wallet Event and chapter 5 causes of action.

## VII.    <u>First Day Pleadings</u>

67.     To minimize the possible adverse effects on the Company's business, the Debtors have filed various First Day Pleadings to allow the Debtors to meet necessary obligations and fulfill their duties as debtors-in-possession for the purposes of preserving value for all of the Debtors' stakeholders. I am familiar with the contents of each First Day Pleading and believe that the relief sought therein is necessary to enable the Debtors to operate during the pendency of the Chapter 11 Cases with minimal disruption or loss of productivity and value; (b) constitutes a critical element in furthering the Debtors' chapter 11 goals; and (c) is in the best interests of the Debtors' estates, creditors, and stakeholders. The facts set forth in each First Day Pleading are incorporated herein by reference.

68.     The First Day Pleadings that are sought to be heard at the first day hearing include:

(a)     Motion of Debtors for Entry of an Order (I) Directing the Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief [Docket No. 3];

(b)     Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and Top 50 Creditors List, (II) Authorizing Redaction of Certain Personally Identifiable Information, (III)

Authorizing the Debtors to Serve Certain Parties by Electronic Mail, (IV) Approving Certain Notice Procedures, and (V) Granting Related Relief;

(c)    Debtors' Application for Entry of Order Appointing Stretto, Inc. as Claims and Noticing Agent Effective as of the Petition Date;

(d)    Debtors' Motion for Entry of Interim and Final Orders (I)(A) Approving Debtors' Proposed Form of Adequate Assurance of Payment for Future Utility Services; (B) Approving Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (II) Granting Related Relief;

(e)    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief ;

(f)    Debtors' Motion for Entry of Interim and Final (I) Orders Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase insurance Coverage, and (D) Maintain Their Surety Bond Program, and (II) Authorizing Banks to Honor Related Checks and Transfers, and (III) Granted Related Relief;

(g)    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages and (B) Pay Expenses Arising Under Employee Benefits Programs and Pay Related Administrative Obligations, and (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations, and (II) Granting Related Relief; and

(h)    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Existing Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related to the Use Thereof, (II) Authorizing the Debtors to (A) Continue to Perform Intercompany Transactions and (B) Granting Administrative Expense Status for Post-Petition Intercompany Claims; (III) Extending the Time for the Debtors to Comply with Requirements Set Forth in 11 U.S.C. § 345(b); and (IV) Granting Related Relief.

69.    I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) listed above and, to the best of my knowledge, I believe the facts set forth in the First Day Pleadings are true and correct. If I were called upon to testify, I could and

would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

70.      Further, based on my personal knowledge, information supplied to me by other members of the Debtors' management and my colleagues that perform services for the Debtors, my review of relevant documents, and my opinion based on my experience, discussions with the Debtors' advisors, and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First Day Pleadings is necessary for the Debtors to effectuate a smooth transition into chapter 11 and to avoid irreparable harm to their businesses and estates during the pendency of the Chapter 11 Cases, and is in the best interests of the Debtors' creditors, estates, and other stakeholders.

71.      Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I believe that the relief sought in the First Day Pleadings should be granted by the Court in its entirety, together with such other and further relief for the Debtors as this Court deems just and proper, in the most expeditious manner possible.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 24, 2023

_/s/ Jor Law_

By:   Jor Law

Title:  Interim Chief Executive Officer
and President