**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO (A) PAY PREPETITION WAGES AND
(B) PAY EXPENSES ARISING UNDER EMPLOYEE BENEFITS PROGRAMS
AND PAY RELATED ADMINISTRATIVE OBLIGATIONS, (II) AUTHORIZING
BANKS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO
SUCH OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

Prime Core Technologies Inc. and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby move (the "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively), granting the relief described below. In support thereof, the Debtors rely upon the *Declaration of Jor Law, Interim Chief Executive Officer and President of Prime Core Technologies Inc., et al., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[2] filed concurrently herewith. In further support of the Motion, the Debtors respectfully represent as follows:

---

[1]  The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are:  Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 330 South Rampart Blvd., Suite 260, Las Vegas, NV 89145.

[2]  Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court")
has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended
Standing Order of Reference* from the United States District Court for the District of Delaware,
dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these
cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The legal predicates for the relief requested herein are sections 105(a), 362(d),
363(b), 507(a), 541(b)(1), 1107(a), and 1108 of title 11 of the United States Code (the
"Bankruptcy Code"), Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the
"Bankruptcy Rules"), and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and
Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local
Rules").

3.      The Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry
of a final order by the Court in connection with the Motion in the event that it is later determined
that the Court, absent consent of the parties, cannot enter final orders or judgments in connection
herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### I.      The Chapter 11 Cases

4.      On August 14, 2023 (the "Petition Date"), each Debtor commenced a case by
filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the
"Chapter 11 Cases"). The Debtors have requested that these Chapter 11 Cases be jointly
administered.

5.      The Debtors continue to manage their properties as debtors and debtors-in-
possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

6.     To date, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee in these Chapter 11 Cases, nor has any trustee or examiner been appointed.

7.     Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the First Day Declaration, which is incorporated by reference as if fully set forth herein.

## II.     The Debtors' Workforce, Ordinary Course Compensation, and Payroll

8.     As of the Petition Date, the Debtors employ 64 full-time employees (the "Full Time Employees"), all of which are salaried. The Full-Time Employees work either remotely or at the Debtors' location in Las Vegas, Nevada. From time to time, the Debtors retain anywhere between seven to approximately 100 independent contractors, with seven currently employed, (the "Independent Contractors" and, together with the Full Time Employees, the "Employees"), which are sourced through various contractor placement firms, including Robert Half International, Inc., Deel, Inc., and SoftServe, Inc. (collectively, the "IC Firms") or direct consultant contracts to provide engineering, product, accounting, and procurement services.

9.     Furthermore, the Debtors pay fees for certain of their boards of directors and/or managers (the "Boards") in the ordinary course of business, including members of the Special Restructuring Committee (the "Special Committee Members"). There are three independent directors on the Boards that receive compensation of $50,000.00 per year, paid monthly (the "Independent Director Compensation"). The Independent Director Compensation has not been paid since June 2023. The Debtors estimate that approximately $18,750.00 of Independent Director Compensation (i.e., $6,250 per independent director) is due and owing as of the Petition

3

Date.[3] Each of the Special Committee Members are paid $25,000 monthly. The Special

Committee Members' service is necessary for the continued management of the Debtors. There

are no accrued and unpaid fees on account of the Special Committee Members as of the Petition

Date.

10.    The Employees perform a wide variety of functions, which are mission-critical to

the preservation of value and the administration of the Debtors' estates. In many instances, the

Employees include personnel who are intimately familiar with the Debtors' businesses,

processes, and systems, who have developed relationships with the customers, suppliers and

other key counterparties that are essential to the Debtors' businesses and who cannot be easily

replaced. Without the continued, uninterrupted services of the Employees, the Debtors' going

concern value will be materially impaired.

11.    This is especially true following the workforce adjustments implemented in

August 2023 to preserve resources. Before the Petition Date, the Debtors were unfortunately

forced to reduce its workforce through terminations the "Terminated Employees")[4] and a

minimum five-month furlough the "Furloughed Employees" and, together with the Terminated

Employees, the "RIF Employees").  In addition, the Debtors have also faced a number of

resignations, including two Full-Time Employees that provided notice of resignation shortly

before the Petition Date with last days of August 25, 2023 and September 1, 2023.

12.    The RIF Employees no longer receive Wages, and their Employee Benefits (each

as defined below) will cease on September 1, 2023. The RIF Employees were provided with the

---

[3]    The Debtors are not seeking authority to pay the prepetition amounts due and owing to the independent directors, and do not intend to continue making such payments postpetition.

[4]    Prior to the Petition Date, the Terminated Employees that executed Severance Agreements were provided with severance payments of $500 (the "Severance Payments"), except for two members of the Debtors' management, which received severance payments of $71,905.00 and $55,183.90, respectively.

option to obtain healthcare insurance coverage through COBRA.[5] Subject to this Court's approval, the Debtors intend to reimburse the Furlough Employees for the employer portion of COBRA coverage plus a 2% administration fee during the five-month furlough (collectively, the "Furlough Expenses"). The Debtors estimate that the Furlough Expenses total approximately $360,000.

13.     The Debtors' remaining active Employees include those deemed essential to maintain the Debtors' reduced operations. In many cases, the Debtors' remaining Employees have been asked to take on additional responsibilities following the RIF. The Employees rely on their compensation and benefits to pay their daily living expenses. Not only will these workers be irreparably harmed if the Debtors are not permitted to continue paying compensation, including prepetition employee obligations, and providing health and other benefits during these Chapter 11 Cases, any interruption in payment will also likely jeopardize their continued performance and loyalty to the Debtors. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these Chapter 11 Cases.

14.     As is evident from the foregoing discussion, the Debtors' workforce is in a state of significant flux. In certain cases where it is necessary in this Motion to estimate the value or amount of prepetition employee obligations (the "Prepetition Employee Obligations"), the Debtors have made their best estimates based upon historical trends and other historical information and applied adjustments they deem appropriate to reflect current or projected future staffing levels or other factors affecting their estimates.

---

[5]     COBRA refers to Continuation Health Coverage under section 4980B of the Internal Revenue Code.

A.      **Wages**

15.      The Debtors incur obligations to their Employees for, among other things, wages, salaries, and other obligations described herein (collectively, "Wages"). The Debtors' payroll service provider is Paycor, Inc. ("Paycor"). Payroll is run on a bi-monthly basis. Payroll is made on the 15th and last day of each month, and the Debtors' Full-Time Employees receive their Wages, less any applicable withholdings and deductions, within the same day via direct deposit. Payroll is initiated two to four days before each pay day. The Debtors' average bi-monthly gross payroll is approximately $500,000.00.[6] The payroll for the period ending August 15, 2023 was approximately $1 million and was pre-paid before the Petition Date. The Debtors' next scheduled payroll date is August 31, 2023 for the payroll period ending August 31, 2023.[7]

16.      The Debtors pay their Independent Contractors through the IC Firms for services performed to support the operations of the Debtors' business (the "Independent Contractor Obligations"). On average, the Debtors pay the IC Firms approximately $85,000 per month for any wages and administrative fees required for the employment of the Independent Contractors. Continuing to pay the Independent Contractors is critical to minimizing any disruptions to the Debtors' business operations. As of the Petition Date, the Debtors estimate that Independent Contractors are owed an aggregate of approximately $80,000.00 on account of accrued but unpaid Independent Contractor Obligations (collectively, the "Unpaid Independent Contractor Obligations"). Accordingly, the Debtors seek authority to pay any accrued Unpaid Independent

---

[6]      The average weekly gross payroll amount does not include payroll taxes and fees paid to the payroll processor.

[7]      The Debtors do not believe that there are any accrued and owing wages that have not been paid as of the Petition Date ("Unpaid Wages"). Notwithstanding the foregoing, the Debtors seek relief to pay Unpaid Wages if it is later discovered that Unpaid Wages are due and owing; provided that the Debtors will not pay any Unpaid Wage Obligations that exceed $15,150.00 (the "Statutory Cap").

Contractor Obligations and to continue to pay Independent Contractor Obligations on a

postpetition basis in the ordinary course of business and consistent with past practices.

        **B.**      **Payroll Costs**

      17.     Paycor supports the Debtors' payroll processing, payroll tax calculations and

filings, and other payroll-related services (collectively, the "Payroll Costs"). The Debtors'

average Payroll Costs are approximately $7,000.00 per month. The Debtors estimate that, as of

the Petition Date, they owe approximately $4,000.00 for Payroll Costs. The Debtors plan to

continue their use of Paycor for payroll administration during the pendency of these Chapter 11

Cases, and thus the Debtors seek authority to honor prepetition amounts owed to Paycor to

ensure continued access to Paycor's services.

**III.**    **Employee Expenses**

      18.     Prior to the Petition Date, the Debtors directly or indirectly reimbursed their Full-

Time Employees and members of the Boards for certain expenses (the "Employee Expenses")

incurred in the scope of their employment on behalf of the Debtors. The Employee Expenses are

incurred in the ordinary course of the Debtors' business operations and include, without

limitation, expenses for meals, travel, automobile mileage, and other business-related expenses.

All such expenses are incurred with the applicable Full-Time Employee's and members of the

Boards' understanding that he or she will not be held personally responsible for these costs and

that the amounts will be reimbursed or paid by the Debtors in accordance with the Debtors'

reimbursement policies. In all cases, reimbursement is contingent on the Debtors' determination

that the charges are for legitimate, reimbursable business expenses.

      19.     Many Full-Time Employees and board members initially incur the Employee

Expenses using personal credit cards or funds and subsequently seek reimbursement from the

Debtors. The Debtors have policies whereby the Full-Time Employees and board members seek reimbursement, or submit expense reports for, the Debtors' payment of Employee Expenses. These expenses are ordinary course expenses that the Full-Time Employees and board members incur in performing their job functions.

20.     Absent authority to pay the Employee Expenses, including amounts incurred prepetition, the Full-Time Employees and board members could be obligated to pay such amounts out of their personal funds. The Debtors therefore seek authority to pay all outstanding Employee Expenses in an amount not to exceed $15,000.00, and to continue the foregoing policy during the pendency of these Chapter 11 Cases.

**IV.     Employee Withholdings**

21.     The Debtors routinely deduct certain amounts from Full-Time Employees' compensation (the "Employee Withholdings") that represent earnings that judicial or government authorities or the Employees have designated for deduction, including, for example, various federal, state and local income, Federal Insurance Contribution Act ("FICA") and other taxes, support payments and tax levies, savings programs contributions, benefit plans insurance payments and other similar payments, and forward those amounts to various third-party recipients. In addition, the Debtors are responsible for remitting, for their own account, various taxes and fees associated with payroll pursuant to the FICA and federal and state laws regarding unemployment and disability taxes.

22.     Based on the most recent payroll, the Debtors paid approximately $361,563.75 on account of Employee Withholdings. The Debtors seek authority to deduct Employee Withholdings in the ordinary course of business and remit Employee Withholdings to the

appropriate third parties, including, without limitation, amounts determined to be related to the period prior to the Petition Date.

## V.     Employee Benefits

23.     In the ordinary course of business, the Debtors provide certain of their Full-Time Employees, directly or indirectly, with a number of benefits (the "Employee Benefits"), including but not limited to: (a) a range of medical, dental, vision, long and short-term disability, life and accidental death insurance coverage, and COBRA benefits (collectively, the "Health Care Benefits"); (b) vacation, holiday, sick, and other leave benefits (collectively the "Vacation and Leave Policies"); (c) workers' compensation benefits (the "Workers' Compensation Program"); and (d) a 401(k) retirement savings plan (the "Retirement Plan" and, together with the Health Care Benefits, Workers' Compensation Program, and the Vacation and Leave Policies, the "Employee Benefits Programs"). Full-Time Employee contributions for the Employee Benefits Programs, where applicable, are processed through payroll deductions from the participating Full-Time Employees.

24.     By this Motion, the Debtors seek authority, but not direction, to: (a) continue to provide certain of the Employee Benefits Programs for their Full-Time Employees in the ordinary course of business, as set forth below; (b) continue to honor obligations under certain of the Employee Benefits Programs, including any premiums and administrative fees; and (c) pay amounts owed under certain of the Employee Benefit Programs to the extent that they remain unpaid as of the Petition Date. Each of the Employee Benefit Programs are discussed below.

### A.     Paid Time Off Programs

25.     The Debtors maintain several paid leave benefit programs for their employees (collectively, "PTO"). The Debtors offer an unlimited paid time off policy to Full-Time

Employees, which provides the flexibility to take planned time off for vacation, sick, or personal reasons to the extent the Full-Time Employee's supervisors or managers have approved such leave. In addition, the Debtors provide PTO for: (i) ten National Holidays; (ii) one day for each respective Full-Time Employee's birthday; and (iii) bereavement, which includes three days for an immediate family member and one day for an extended family member. The Debtors' also provide unpaid leave: (i) under the Family and Medical Leave Act for: (a) birth, adoption, or foster care, (b) family care, (c) medical emergencies, (d) military exigencies, and (e) military caregiving needs; and (ii) for personal reasons, many of which are required by law, including missed work time in the ordinary course of business for bereavement leave, jury or court attendance, time spent voting, military leave, or salary continuation medical leave and unpaid leaves of absence for medical leaves, domestic abuse leaves, and personal leaves.

26.    As the Debtors employ an unlimited PTO policy, there is no accrual of unused PTO and thus Full-Time Employees will not receive compensation for "unused" vacation time should they stop working for the Debtors for any reason.

### B.    Health Care Benefits

27.    In the ordinary course of business, the Debtors offer their Full-Time Employees the opportunity to participate in a number of health benefits programs, including medical, prescription, dental, and vision plans, life and accident insurance, disability insurance, among others. Specifically, the Debtors' Health Care Benefits include:

a    Medical Plan:  The Debtors offer medical insurance (the "Medical Plan") through Anthem Blue Cross Blue Shield ("Anthem"), as well as the option to participate in a Health Savings Account. Under the Medical Plan, the Debtors make monthly premium payments to Anthem. The average monthly premium amount is approximately $55,000.00.

b    Vison and Dental Plan:  The Debtors provide vision coverage and dental coverage to Full-Time Employees through Anthem, and the Debtors cover 100% of the premiums of such plans.

10

    c       <u>Life and AD&D Insurance</u>. The Debtors offer Full Time Employees basic life insurance and matching basic accidental death and dismemberment insurance (the "<u>Life Insurance Plan</u>") through Principal at no cost to the Full-Time Employees. Full-Time Employees have the option to purchase additional coverage under the Life Insurance Plan.

    d       <u>Long-Term Disability Program</u>. The Debtors offer Full-Time Employees working at least 30 hours per week long-term disability benefits (the "<u>Long-Term Disability Program</u>"). The Debtors' Long-Term Disability Program insurance provider is Principal. The Long-Term Disability Program replaces 60% of monthly earnings up to $15,000.00 with an elimination period of ninety days.

    e       <u>Short-Term Disability Program</u>. The Debtors offer Full-Time Employees working at least 30 hours per week short-term disability benefits (the "<u>Short-Term Disability Program</u>"). The Debtors' Short-Term Disability Program insurance provider is Principal. The Short -Term Disability Program replaces 60% of weekly earnings up to $3,750.00 with an elimination period of eight days after accidents and sickness for up to twelve weeks.

28.      The Debtors are obligated to make certain reimbursements for employee paid medical premium deductions. The Debtors are currently investigating potential errors with respect to certain employees' prepetition medical deductions. To the extent the Debtors determine that errors were made, the Debtors seek authority to reimburse the employees. The Debtors do not believe that such reimbursements will exceed $10,000.00 in the aggregate. The Debtors do not believe there are any amounts currently due and owing for premiums and related costs under the Health Care Benefits as of the Petition Date, but, out of an abundance of caution, request authorization to pay any such outstanding prepetition amounts. The Debtors estimate that approximately $65,000.00 will come due and payable in the first thirty days after the Petition Date (the "<u>Interim Period</u>") for the Health Care Benefits in the aggregate.

**C.**    **Workers' Compensation Program**

29.      The Debtors provide the Workers' Compensation Program to Full-Time Employees. In particular, under the laws of the various jurisdictions in which they operate, the

Debtors are required to maintain policies and programs to provide Full-Time Employees with workers' compensation benefits. In accordance with this obligation, the Debtors maintain workers' compensation insurance policies in all jurisdictions where they operate. The workers' compensation benefits provided by the Debtors are covered primarily under the Debtors' workers' compensation insurance program administered by Woodruff-Sawyer & Co. ("Broker") as the broker, and Hartford Insurance Company, as the administrator of claims (the "Administrator"). Payment is made annually to the Administrator on account of workers' compensation premium payments. In 2022, premiums to the Administrator for workers' compensation and employers' liability coverage, including administrative fees, totaled approximately $48,000.00. The Debtors estimate that, as of the Petition Date, there is approximately $600.00 due and owing for costs under the Workers' Compensation Program. Moreover, the Debtors estimate that approximately $51,000.00 will come due and payable during these Chapter 11 Cases for premiums under the Workers' Compensation Program.

30.     Failure to maintain workers' compensation insurance could result in administrative or legal proceedings against the Debtors and their officers and directors and could cause employee departures, which would disrupt the business. Accordingly, the Debtors respectfully request authority to (a) lift the automatic stay to permit Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum and (b) pay all workers' compensation obligations, including any outstanding insurance premiums and any other amounts related to prepetition workers' compensation claims, as they become due in the ordinary course of the Debtors' business.

**D.** **Retirement Plan**

31.     The Debtors sponsor the Retirement Plans for eligible Full-Time Employees.
There are currently two unique plans offered to eligible Employees. The Debtors currently do not
contribute any additional monies to the employee's Retirement Plan accounts. As plan sponsor of
the Retirement Plans, the Debtors have a fiduciary duty arising under Title IV of the Employee
Retirement Income Security Act of 1974, as amended to administer the Retirement Plans in
accordance with their terms. Moreover, the failure of the plan sponsor to administer the plans in
accordance with their terms would be a violation of the qualification standards of Section 401(a)
of the Internal Revenue Code. Disqualification of the plans, which cover a large number of
Employees of the Debtors, would generally cause the trust under the plans to lose their tax
exempt status under Section 501(a) of the Internal Revenue Code causing participants to be
currently taxed on their balances under the plans, and would adversely affect the Debtors' ability
to take a current tax deduction under Section 404(a)(5) of the Internal Revenue Code. As of the
Petition Date, the Debtors estimate that approximately $1,000.00 is due and owing to the
administrator of the Retirement Plan. The Employees make certain safe harbor contributions (the
"Safe Harbor Contributions") to the Retirement Plans. On average, the Safe Harbor
Contributions total approximately $48,000.00 per month. The Debtors currently hold
approximately $55,000.00 in Safe Harbor Contributions for the benefit of Employees. Although
the Safe Harbor Contributions are not property of the Debtors' estates, for the avoidance of
doubt, the Debtors seek authority to release the Safe Harbor Contributions.

32.     The Debtors believe that maintaining the Retirement Plans is important to
maintaining Employee morale. Accordingly, the Debtors request authority, but not the direction,

13

to pay outstanding amounts due and to continue to administer the Retirement Plan in the ordinary course of business.

## RELIEF REQUESTED

33.     The Debtors seek entry of the Interim Order and the Final Order: (i) authorizing, but not directing, the Debtors, in accordance with their stated policies and in their discretion, to pay, honor, or otherwise satisfy certain of the Prepetition Employee Obligations, and continue certain of their Employee Benefits in the ordinary course of business; (ii) continue the Workers' Compensation Program and honor obligations related thereto, regardless of when accrued; (iii) authorizing Banks to honor and process related checks and electronic transfers; and (iv) granting related relief.

34.     The Debtors estimate that, as of the Petition Date, the Prepetition Employee Obligations total approximately $174,600.00, approximately $167,600.00 of which will become due and payable during the Interim Period.[8] Specifically, the Debtors seek authority to pay the following aggregate amounts related to the Prepetition Employee Obligations:

| RELIEF SOUGHT | INTERIM AMOUNT | FINAL AMOUNT |
|---|---|---|
| **Compensation, Payroll, and Expenses** | | |
| Unpaid Wages | -- | -- |
| Unpaid Independent Contractor Obligations | $80,000.00 | $80,000.00 |
| Unpaid Director Compensation | -- | -- |
| Employee Withholdings | $55,000.00 | $55,000.00 |
| Severance Payments | $1,000.00 | $1,000.00 |
| Payroll Costs | $5,000.00 | $8,000.00 |
| Employee Expenses | $15,000.00 | $15,000.00 |

---

[8]     The Debtors request authority to make payments on account of the Prepetition Employee Obligations to the extent that the Debtors believe they are necessary to prevent immediate and irreparable harm to the Debtors' businesses and will not pay any amounts on account of compensation obligations that are in excess of the Statutory Cap.

| | | |
|---|---|---|
| **Total Compensation, Payroll, and Expenses:** | $156,000.00 | $159,000.00 |
| **Employee Benefits** | | |
| Health Care Benefits | $10,000.00 | $10,000.00 |
| Workers' Compensation Program | $600.00 | $600.00 |
| Retirement Plans | $1,000.00 | $5,000.00 |
| Paid and Unpaid Leave | -- | -- |
| **Total Employee Benefits:** | $11,600.00 | $15,600.00 |
| **Overall Total:** | $167,600.00 | $174,600.00 |

35.     The Debtors further request entry of orders (a) authorizing all applicable banks and other financial institutions (collectively, the "Banks"), when requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers, on account of the Prepetition Employee Obligations, whether such checks or other requests were submitted before, on, or after the Petition Date, (b) authorizing the Banks to rely on the representations of the Debtors as to which checks and payments are subject to this Motion, (c) providing that the Banks shall, at the sole discretion of the Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Prepetition Employee Obligations that had not been honored and paid as of the Petition Date, (d) prohibiting the Banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations, and (e) authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts, and other forms of payment which may be inadvertently dishonored or rejected.

**BASIS FOR RELIEF**

I.    **The Court Should Authorize the Continuation of the Employee Benefits Programs and Payment of the Prepetition Employee Obligations and Payroll Costs.**

    **A.    Payment of Certain Prepetition Employee Obligations Is Required by Law.**

36.    Bankruptcy Code sections 541(b)(7) and 541(d) provide grounds for granting the relief requested with respect to withholdings and deductions. These amounts include amounts earmarked by law, including for taxes and support payments, and Employee contributions to Employee Benefits Programs. These amounts are held in trust and not part of the Debtors' estates and are required to be paid. *See* 11 U.S.C. § 541(b), (d); 26 U.S.C. § 7501(a); *see also City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes). Failure to pay could subject the Debtors' directors and officers to personal liability. *See In re DuCharmes & Co.,* 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).

37.    Because many of the withholdings and deductions are not property of the Debtors' estates, their application or payment for their intended purposes will not adversely affect the Debtors' estates or their creditors. To prevent potentially irreparable harm to Employee morale and, in certain cases, to comply with the clear and unambiguous requirements of Bankruptcy Code section 541(b)(7), the Debtors desire to apply and remit the withholdings and deductions for the purposes for which the withholdings and deductions were taken.

    **B.    Payment of Prepetition Employee Obligations Is Appropriate Under Bankruptcy Code Sections 507(a)(4) and 507(a)(5)**

38.    Bankruptcy Code sections 507(a)(4) and 507(a)(5) entitle the majority of the Prepetition Employee Obligations to priority treatment. Accordingly, the Debtors are required to

pay such claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Prepetition Employee Obligations at this time enhances value for the benefit of all interested parties. The relief sought through this Motion is to allow the Debtors to continue in the ordinary course of business and avoid disruption to their operations. Especially now, as the Debtors pursue an orderly chapter 11 process, it is crucial that the Debtors are able to retain their Employees that are familiar with their operations and have valuable relationships with vendors and customers and can otherwise help facilitate the Debtors' restructuring. Disruptions to the Debtors' business, including spending time to identify new potential Employees and training new Employees, would be detrimental to the Debtors' success of these Chapter 11 Cases.

C.    **Maintaining Compensation and Benefits Programs and Paying Prepetition Employee Obligations and Related Payroll Costs Is a Sound Exercise of the Debtors' Business Judgment.**

39.    Bankruptcy Code section 363 permits a debtor to "enter into transactions . . . in the ordinary course of business" and use estate property "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. §§ 363(b)(1), (c). Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to the Employee Benefits Programs as such actions are in the ordinary course of business. Out of an abundance of caution, however, the Debtors request entry of an order granting the relief requested herein to avoid any disruptions to their business.

17

40.     Under Bankruptcy Code section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp*., 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also In re Phoenix Steel Corp*., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). Further, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.,* 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

41.     The Debtors have determined, in the sound exercise of their business judgment, that continuing their Employee Benefits Programs and paying the Prepetition Employee Obligations (and related Payroll Costs) is critical to the success of these Chapter 11 Cases. Any delay or disruption in the provision of the Employee Benefits Programs likely will seriously harm the Debtors' relationships with the Employees and irreparably impair workforce morale at the very time when the dedication, confidence and cooperation of the Employees is most critical. In addition, bolstering the morale of the Employees and ensuring the uninterrupted availability of their services will assist the Debtors in maintaining a "business as usual" atmosphere to the extent possible and preserving the Debtors' ability to continue to operate their businesses and preserve relationships with customers and other important constituencies. Finally, the Debtors must continue their corporate policies of permitting certain Full-Time Employees to incur business-related expenses and thereafter seek reimbursement by submitting appropriate invoices

to maintain necessary oversight and quality control and enable many key Full-Time Employees
to perform their jobs effectively.

42.     Accordingly, the Debtors respectfully request that the Court authorize the Debtors
to honor all wage, benefit and related obligations, including any amounts arising under the
Employee Benefits Programs that accrued prepetition, and that will accrue in the Interim Period.

## II.    The Court May Also Grant the Motion Pursuant to Bankruptcy Code Section 105(a) and the Doctrine of Necessity.

43.     Bankruptcy Code section 105(a) empowers the Court to "issue any order, process,
or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §
105(a). Under Bankruptcy Code section 105(a), courts may permit payments of prepetition
obligations prior to confirmation of a plan and emergence from chapter 11 when essential to the
continued operation of a debtor's business. Specifically, the Court may use its power under
Bankruptcy Code section 105(a) to authorize payment of prepetition obligations pursuant to the
"doctrine of necessity."

44.     Under the "doctrine of necessity," bankruptcy courts may authorize the payment
of prepetition claims if such payment is essential to the continued operation of the debtor.
*In re Lehigh and New England Railway Co.,* 657 F.2d 570, 581 (3d Cir. 1981) (stating courts
may authorize payment of prepetition claims when there "is the possibility that the creditor will
employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent.
Transp. Co.,* 467 F.2d 100, 102 n.1 (3d Cir. 1972) (recognizing necessity of payment doctrine
permits "immediate payment of claims of creditors where those creditors will not supply services
or material essential to the conduct of the business until its pre-reorganization claims have been
paid"); *In re Just for Feet, Inc.,* 242 B.R. 821, 824–25 (D. Del. 1999) (noting that, in the Third

Circuit, debtors may pay prepetition claims that are essential to continued operation of business);
*In re Columbia Gas Sys., Inc.,* 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

45.     Although the "doctrine of necessity" predates the Bankruptcy Code,
*see Miltenberger v. Logansport Ry. Co.,* 106 U.S. 286, 309 (1882), the modern application of the
doctrine of necessity is grounded in specific provisions of the Bankruptcy Code, including
sections 105(a), 1107(a) and 1108. *See In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D.
Tex. 2002) (fiduciary duties implicit in section 1107(a) of the Bankruptcy Code justify the
"preplan satisfaction of a prepetition claim" where necessary to preserve going concern value).
The doctrine, largely unchanged from the Court's reasoning in *Miltenberger,* is a widely
accepted component of bankruptcy jurisprudence. *See Just for Feet, Inc.,* 242 B.R. at 826
(approving payment of key inventory suppliers' prepetition claims when such suppliers could
destroy the debtor's business by refusing to deliver new inventory on the eve of debtor's key
sales season); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re
Chateaugay Corp.),* 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (affirming order authorizing payment
of prepetition wages, salaries, expenses and benefits); *In re Payless Cashways, Inc.,* 268 B.R.
543, 546–47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers'
claims when such suppliers agreed to provide postpetition trade credit).

46.     Paying Prepetition Employee Obligations and any prepetition Payroll Costs will
benefit the Debtors' estates and their stakeholders by allowing the Debtors' business operations
to continue without interruption. The Debtors believe that without these payments, the
Employees may become demoralized and unproductive because of the significant financial strain
and other hardship many of the Employees will experience as a result. Indeed, the Debtors
believe that without the requested relief, it is possible that Employees at all levels of the Debtors'

organization will leave for alternative employment. Such a development would deplete the Debtors' workforce, hindering the Debtors' ability to implement their chapter 11 strategy. The loss of valuable Employees and the resulting need to recruit new personnel to replenish the Debtors' workforce would be distracting and counterproductive at this critical time, during which the Debtors are stabilizing operations and restructuring their obligations in chapter 11. Further, if the Debtors lose valuable Employees, they will incur significant expenses in locating, recruiting and training replacements that would far exceed the costs of the Employee Benefits Programs for a lost Full-Time Employee.

47.    In light of the foregoing, the Debtors respectfully submit that the continuation of their Employee Benefits Programs and payment of the Prepetition Employee Obligations and the Payroll Costs is essential to the success of these Chapter 11 Cases, represents an exercise of the Debtors' sound business judgment, and is in the best interests of the Debtors' estates, their creditors and all stakeholders.

**THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED**

48.    Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. As described above, any disruption of the Employee Benefits Programs would substantially diminish or impair the Debtors' efforts in these Chapter 11 Cases to preserve and maximize the value of their estates. For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

**RESERVATION OF RIGHTS**

49.    Nothing in this Motion or any order granting the relief requested in this Motion, and no action take pursuant to the relief requested or granted (including any payment made in

accordance with any such order):  (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to Bankruptcy Code section 365 or an admission as to the basis for or the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the sole discretion of the Debtors; (e) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (f) an admission to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law. Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim

## WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)

50.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

51.     The Debtors will provide notice of this Motion to:  (a) the U.S. Trustee; (b) the

holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the

Internal Revenue Service; (d) the Securities and Exchange Commission; (e) the United States

Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in

which the Debtors conduct business; (g) the Employees; (h) the IC Firms; (i) the Banks; and (j)

any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking

"first day" relief, the Debtors will service copies of this Motion and any order entered in respect

to this Motion as required by Local Rule 9013-1(m). The Debtors submit that no other or further

notice is required.

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order

and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**,

respectively, granting the relief requested herein and such other and further relief as may be just

and proper.

Dated:  August 24, 2023          **MCDERMOTT WILL & EMERY LLP**
        Wilmington, Delaware

        _/s/ Maris J. Kandestin_
        Maris J. Kandestin (No. 5294)
        1007 North Orange Street, 10th Floor
        Wilmington, Delaware 19801
        Telephone:  (302) 485-3900
        Facsimile:  (302) 351-8711
        Email:      mkandestin@mwe.com

        -and-

        Darren Azman (admitted _pro hac vice_)
        Joseph B. Evans (admitted _pro hac vice_)
        One Vanderbilt Avenue
        New York, New York 10017-3852
        Telephone:  (212) 547-5400
        Facsimile:  (646) 547-5444

Email:      dazman@mwe.com
                 jbevans@mwe.com

-and-

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 5400
Miami, Florida 33131
Telephone:  (305) 358-3500
Facsimile:  (305) 347-6500
Email:      gsteinman@mwe.com

*Proposed Counsel to the Debtors and Debtors in Possession*