## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM AND (B) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS AND HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO; (II) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS AND (B) GRANTING ADMINISTRATIVE EXPENSE STATUS FOR POSTPETITION INTERCOMPANY CLAIMS; (III) EXTENDING THE TIME FOR THE DEBTORS TO COMPLY WITH REQUIREMENTS SET FORTH IN 11 U.S.C. § 345(b); AND (IV) GRANTING RELATED RELIEF**

Prime Core Technologies Inc. and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby move (the "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively), granting the relief described below. In support thereof, the Debtors rely on the *Declaration of Jor Law, Interim Chief Executive Officer and President of Prime Core Technologies Inc., et al., in Support of Chapter 11 Petitions and First Day Motions*

---

[1]  The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are:  Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 330 South Rampart Blvd., Suite 260, Las Vegas, NV 89145.

(the "First Day Declaration")[2] filed concurrently herewith. In further support of the Motion, the Debtors respectfully state as follows.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The legal predicates for the relief requested herein are sections 105(a), 345(b), 363, 364, and 503(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2015-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

3.      The Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### I.      The Chapter 11 Cases

4.      On August 14, 2023 (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

---

[2]     Capitalized terms used but not otherwise defined in the Motion have the meanings ascribed to them in the First Day Declaration.

5.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

6.      To date, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee in these Chapter 11 Cases, nor has any trustee or examiner been appointed.

7.      Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the First Day Declaration, which incorporated by reference as if fully set forth herein.

## II.      The Debtors' Cash Management System

8.      In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system (the "Cash Management System") through which funds are received, collected, consolidated, held, transferred, and disbursed to pay various business-related expenses. The Cash Management System is tailored to meet the Debtors' operating needs and is similar to those commonly employed by corporate enterprises of comparable size and complexity to manage cash flow between entities. The Cash Management System enables the Debtors to collect and disburse cash efficiently and effectively, pay their financial obligations, centrally control and monitor corporate and customer funds and available cash, reduce administrative expenses, safeguard customer funds, and obtain accurate balances and other financial data. Thus, it is critical that the Cash Management System remains intact during the Chapter 11 Cases to ensure seamless continuation of transactions and payment of the Debtors' financial obligations while the Debtors pursue their restructuring strategy.

9.       Prior to the Petition Date,[3] the Debtors processed a large number of transactions through the Cash Management System, the oversight of which was bifurcated between (a) the Debtors' chief financial officer and personnel in the Debtors' finance, accounting, and treasury departments, and (b) by the Debtors' head of financial and trust operations and personnel in the Debtors' financial and trust operation departments with respect to customer funds. In doing so, the Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between bank accounts by various methods, including by cash, check, wire transfer, automated clearing house ("ACH") transfer, and electronic funds transfer ("EFT"). The Debtors maintain controls relating to the Cash Management System and continue to improve upon these controls.  The Debtors further maintain current and accurate records of all transactions processed through the Cash Management System, including intercompany obligations. The Debtors' finance, accounting, and treasury departments regularly reconcile the Debtors' books and records to ensure that all such transfers are properly accounted for. A flowchart depicting the flow of funds in the Cash Management System is attached hereto as **Exhibit C**.

**B.       Bank Accounts**

10.       As of the Petition Date, the Cash Management System comprised two largely independent segments. The first, comprised of seven (7) bank and investment accounts is used for corporate purposes (the "Corporate Accounts"). The second, comprised of eighteen (18) bank accounts and lockbox accounts is used in connection with customer funds (the "Customer Accounts").[4]  All of the Bank Accounts are held at Debtor Prime Trust LLC. The Bank Accounts

---

[3]   The majority of the description of the Debtors' Cash Management System discussed herein relates to how the Cash Management System operated before the Debtors ceased operations as a result of the Cease and Desist Order, which is described in greater detail in the First Day Declaration.

[4]   Although the Cash Management System includes twenty-five (25) Bank Accounts as of the Petition Date, the Debtors request authority to close existing accounts or open new accounts in the ordinary course of business in their sole discretion.

are maintained at six (6) different banks, including BMO Harris Bank, N.A. ("BMO"), Lexicon

Bank ("Lexicon"), Cross River Bank ("Cross River"), Piermont Bank, N.A. ("Piermont"), and

J.P. Morgan Asset Management Inc. ("JPM Asset Management") (collectively, the "Banks").

The Debtors' relationships with Piermont and Cross River have been terminated, but the

accounts referenced herein remain open as of the date of the filing of this Motion. A list of the

Debtors' Bank Accounts is attached hereto as **Exhibit C**.

11.     The Corporate Accounts include the following:

    a)     A primary operating account at BMO to hold the majority of the Debtors'
           corporate funds (the "Corporate Operating Account");

    b)     An account at BMO to hold funds at a higher interest rate than otherwise
           available (the "Corporate Interest Account");

    c)     A revenue account at BMO to receive payments from customers (the
           "Revenue Account");

    d)     A zero-balance account at BMO that is swept from the Corporate
           Operating Account in order to fund payroll (the "Payroll Account");

    e)     A reserve account at Lexicon that is maintained in connection with the
           Debtors' Nevada Trust Charter (the "Lexicon Reserve Account");

    f)     A money market account at JPM Asset Management that is used to hold
           funds at a higher interest rate than otherwise available (the "Money
           Market Account"); and

    g)     A secondary operating account maintained at Cross River (the "Secondary
           Operating Account").

12.     The Customer Accounts include the following:

    a)     A series of accounts, maintained at BMO, for the purpose of facilitating
           foreign currency exchange transactions including:

        i.    An account holding Canadian Dollars (the "CAD Account");

        ii.   An account holding Australian Dollars (the "AUD Account");

        iii.  An account holding Japanese Yen (the "JPY Account");

        iv.   An account holding Euros (the "EUR Account");

    v.   An account holding Pounds sterling (the "<u>GBP Account</u>");

    vi.   An account holding Hong Kong Dollars (the "<u>HKD Account</u>" and, collectively with the foregoing i-v, the "<u>Foreign Currency Accounts</u>");

    vii.   An account holding U.S. Dollars (the "<u>USD Account</u>");

b)    An account at BMO enabling customers to fund individual retirement accounts (the "<u>IRA Cash Account</u>");

c)    An account at BMO holding tax funds related to individual retirement accounts (the "<u>IRA Tax Account</u>");

d)    An account at BMO utilized to earn interest on customer funds not needed for daily transaction processing (the "<u>Customer Interest Account</u>");

e)    An account at Lexicon utilized to process checks issued and paid in connection with the return of funds from the Debtors to end users (the "<u>T&C Clearing Account</u>");

f)    An account at Cross River utilized to process incoming and outgoing wires and ACH credit receipts (the "<u>Wire Clearing Account</u>");

g)    An account at Cross River utilized to process ACH origination (the "<u>ACH Clearing Account</u>");

h)    An account at Cross River holding the reserve amount required by Cross River in order to originate ACH transfers (the "<u>CRB Reserve Account</u>");

i)    An account at Cross River utilized to facilitate the identification of rejected wires (the "<u>Wire Reversal Settlement Account</u>");

j)    An account at Cross River utilized to process incoming and outgoing wires for Binance.US (the "<u>Binance Processing Account</u>");

k)    An account at Cross River utilized to settle the funding of end users custodial accounts with the Debtors via credit cards (the "<u>Card Settlement Account</u>"); and

l)    An account at Piermont holding the reserve amount required by Piermont in order to originate ACH transfers (the "<u>Piermont Reserve Account</u>").

13.    The following chart summarizes the current roles of the Debtors' Bank Accounts:

| Bank Account | Description |
|---|---|
| **Corporate Operating Accounts** BMO Account No. x1781; Cross River Account No. x8772 | The Corporate Operating Account serves to collect and hold the general corporate funds of the Debtors, primarily from the Revenue Account and the Investment Account. The Corporate Operating Account in turn disburses funds to apply to expenses and investments. These disbursements are primarily made to the Money Market Account, Lexicon Reserve Account, and Payroll Account when applicable.<br><br>The Secondary Operating Account is not used in the ordinary course of the Debtors' functions. |
| **Revenue Account** BMO Account No. x1807 | The Revenue Account serves to collect payments from the Debtors' customers. The Revenue Account in turn disburses these funds to the Corporate Operating Account. |
| **Corporate Interest Account** BMO Account No. x1815 | The Corporate Interest Account received funds generated from the Debtors' financings and payments related to the exercise of options or warrants by the Debtors' securityholders. Although the Corporate Interest Account is an investment account these funds are not invested, but instead are held in the account which bears a higher rate of interest than the Corporate Operating Account. The Corporate Interest Account in turn disburses funds to the Corporate Operating Account as necessary. |
| **Money Market Account** JPM Asset Management Account No. x1747 | The Money Market Account receives funds from the Corporate Operating Account and invests them exclusively in money market securities in order to generate a higher return on the funds while preserving them. The Money Market Account in turn disburses funds back to the Corporate Operating Account as necessary. |
| **Payroll Account** BMO Account No. x1823 | On each of the Debtors' payroll cycles, cash is swept from the Corporate Operating Account into the Payroll Account, which is used exclusively to fund payroll. The Debtors utilize the Payroll Account as a temporary zero-balance liability account to monitor and track payroll throughout the Debtors' businesses. |
| **Corporate Reserve Account** Lexicon Account No. x0795 | The Lexicon Reserve Account holds funds sufficient to maintain the Debtors' Nevada Trust Charter. These funds were originally disbursed to the Lexicon Reserve Account from the Corporate Operating Account. The Lexicon Reserve Account does not receive additional funds or make disbursements. |
| **Foreign Currency Accounts** BMO Account Nos. x23743077, x83743077, x33743077, x93743077, x53743077, x93743077 | The Foreign Currency Accounts hold customer funds and are used to facilitate the Debtors' incoming and outgoing domestic and international wires. The Foreign Currency Accounts are further used to settle currency exchange trades. Accordingly, the Foreign Currency Accounts each interact with the USD Customer Account and each other on a withdrawal or deposit basis as necessary. |
| **IRA Accounts** BMO Account Nos. x7947, x5479 | The IRA Cash Account and IRA Tax Account are used in tandem to enable the Debtors to offer individual retirement account options. These accounts interact with one another on a withdrawal or deposit basis as necessary but do not interact with the other Bank Accounts. |

| USD Customer Account BMO Account No. x3077 | The USD Customer Account functions as the Debtors' central account with respect to the Customer Accounts. It facilitates the settlement of currency exchanges as well as the transfer of amounts to and from the Customer Interest Account. The USD Customer Account further interacts with the other Customer Accounts as necessary, all on a withdrawal and deposit basis. |
|---|---|
| Customer Reserve Accounts Piermont Account No. x9193; Cross River Account No. x2069 | The Customer Reserve Accounts hold funds sufficient to maintain the amounts required by Cross River and Piermont, respectively, for ACH Origination.<br><br>The Reserve Accounts are in the process of being terminated. Following the conclusion of that process, the amounts held in the Piermont Reserve Account and the CRB Reserve Account will be returned to Prime Trust, LLC. |
| Customer Interest Account BMO Account No. x9934 | The Customer Interest Account holds funds not necessary for daily transactions and provides a higher rate of interest than the Debtors' other available Customer Accounts. The Customer Interest Account primarily interacts with the USD Customer Account, but also processes incoming and outgoing transfers from the other Customer Accounts and external accounts as necessary. |
| Transaction and Clearing Accounts Cross River Account Nos. x4453, x9892; Lexicon Account No. 0803 | The Transaction and Clearing Accounts are used to process incoming and outgoing wires as well as ACH receipt and origination. They interact primarily with the USD Customer Account on a withdrawal and deposit basis as necessary. |
| Settlement Accounts Cross River Account Nos. x9647, x3157 | The Wire Reversal Settlement Account is used to process incoming wires into the Wire Clearing Account which were rejected due to incorrect beneficiary name. The establishment of a separate account provided the Debtors greater visibility into the rejected wires. The Debtors do not initiate any activity with respect to the Wire Reversal Settlement Account.<br><br>The Card Settlement Account is used to settle the funding of end users' custodial accounts with the Debtors via credit card. It interacts primarily with the USD Customer Account on a withdrawal and deposit basis as necessary. |
| Binance Processing Account Cross River Account No. x6995 | The Binance Processing Account is used to process incoming and outgoing wires for Binance. The account provides greater visibility and access to information for the Debtors and Binance with respect to their financial relationship. The Binance Processing Account primarily interacts with the USD Customer Account on a withdrawal and deposit basis as necessary. |
| Professional Fee Escrow Account WAB No. xxxx | The Professional Fee Escrow Account is a segregated account that the Debtors propose will hold the professional fee escrow amounts accrued during the pendency of these Chapter 11 Cases.<br><br>On a weekly basis, the Debtors will deposit funds into the Professional Fee Escrow Account in the amounts set forth in the Debtors' 13-week cash flow forecast, which is attached hereto as **Exhibit C**. Funds deposited into the Professional Fee Escrow Account will be distributed to the Debtors' |

| | professionals retained pursuant to Bankruptcy Code sections 327 or 328 upon interim or final approval of each respective professionals' fee statements or applications. |
|---|---|
| **Utilities Account**<br>WAB No. xxxx | The Utilities Account is a segregated account that the Debtors propose will hold adequate assurance deposits for utility providers. |

14.     The Debtors propose to continue using their Cash Management System and maintain their existing Bank Accounts on postpetition basis, subject to their right to close certain accounts and open new accounts in their discretion. Because of the nature of the Debtors' businesses, it would take, at a minimum, several months for the Debtors to complete a transition to a different cash management system. Given the business disruption and significant expenses that would result if the Debtors were forced to close their existing Bank Accounts, it is critical that the Debtors' existing Cash Management System remain in place. Accordingly, pursuant to Bankruptcy Code sections 105(a) and 363(c), the Debtors seek authorization to maintain their existing Bank Accounts and continue their Cash Management System.

**C.    Bank Claims**

15.     In the ordinary course of business, the Debtors pay, honor, or allow the deduction of periodic service charges and other ordinary course fees (collectively, the "Bank Fees") from the appropriate Bank Account in connection with maintaining the Cash Management System. Historically, the Debtors incur approximately $4,020.00 in Bank Fees each month under the Cash Management System. As of the Petition Date, the Debtors estimate that they owe approximately $3,424.03 in prepetition Bank Fees, all of which are expected to become due and payable within the first 30 days of the Chapter 11 Cases. To maintain the integrity of their Cash Management System, the Debtors request authority, but not direction, to pay all prepetition Bank Fees in addition to any other Bank Fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course of business postpetition, consistent with historical practice.

16.     In addition to the Bank Fees, in connection with the Cash Management System, the Debtors may incur other charges (the "Bank and Processor Charges," and together with the Bank Fees, the "Bank Claims") in connection with (a) checks that have been dishonored or returned for insufficient funds in the applicable account, and (b) any reimbursement or other payment obligations, such as overdrafts, arising under any agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements. As of the Petition Date, the Debtors estimate that no Bank and Processor Charges are due and owing. Out of an abundance of caution, the Debtors request authority, but not direction, to pay any Bank and Processor Charges for prepetition transactions that are charged postpetition, and to continue to pay the Bank and Processor Charges in the ordinary course of business postpetition, consistent with historical practice.

**D.      Business Forms**

17.     In the ordinary course of business, the Debtors use various pre-printed documents such as checks, invoices, and letterhead (collectively, the "Business Forms"). Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors-in-possession. Nonetheless, most parties doing business with the Debtors will be aware of the Debtors' status as debtors-in-possession as a result of the publicity surrounding the Receivership, these Chapter 11 Cases, and the notice of commencement served on parties in interest. The Debtors request that the Court authorize their continued use of their Business Forms, rather than requiring the Debtors to incur the expense and delay of ordering new or modifying their current Business Forms, particularly their pre-printed check stock. However, as required under the Local Rules, the Debtors will use the designation "Debtor in Possession"

upon depletion of the Debtors' existing pre-printed check stock and with respect to checks issued by the applicable Bank following the Petition Date.

### F.    Intercompany Transactions

18.    In the ordinary course of business, the Debtors engage in intercompany transactions (collectively, the "Intercompany Transactions") with each other. The Debtors primarily engage in Intercompany Transactions for operational reasons. Specifically, Debtor Prime Trust, LLC receives cash and uses cash to pay certain expenses of the other Debtor entities. These transfers, which occur on a regular and as-needed basis are necessary to fund expenses across the Debtors' businesses and specifically to fund payroll for the Debtors' non-Nevada based employees. At any given time, there may be intercompany balances owing by one Debtor to Debtor Prime Trust, LLC (the "Intercompany Claims").[5]

19.    All Intercompany Transactions are conducted in the ordinary course of business and are an essential component to the Cash Management System. The Debtors currently track and will continue to monitor and record all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions. The Debtors anticipate that the Intercompany Transactions will continue postpetition in the ordinary course of business. Such transactions are necessary to the efficient operation of the Debtors' businesses, as the Intercompany Transactions reduce administrative costs and ensure the orderly and efficient operation of the Debtors' enterprise. If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' pursuit of a successful restructuring would be unnecessarily disrupted to the detriment of the Debtors' estates and their creditors.

---

[5]    To the extent that there are any outstanding prepetition obligations related to Intercompany Transactions not described herein, the Debtors, out of an abundance of caution, seek authority to honor such obligations.

20.     Because the Debtors engaged in Intercompany Transactions on a regular basis prepetition, and such transactions are common for enterprises like the Debtors', the Debtors believe that they may continue the Intercompany Transactions in the ordinary course under Bankruptcy Code section 363(c)(1), without court approval. Nevertheless, out of an abundance of caution, the Debtors seek express authority, but not direction, to continue engaging in the Intercompany Transactions. Thus, the Debtors seek authority to continue engaging in the Intercompany Transactions in the ordinary course of business and consistent with historical practices. Consistent with their prepetition practice, the Debtors will maintain records of all such transfers, enabling them to ascertain, trace, and account for all of the Intercompany Transactions. In addition, the Debtors request that the postpetition Intercompany Balances be granted administrative expense priority status, which will facilitate the orderly and efficient operation of the Debtors' enterprise.

## **RELIEF REQUESTED**

21.     The Debtors seek entry of the Interim Order and Final Order (a) authorizing, but not directing, the Debtors, in their sole discretion, to (i) continue to operate their existing Cash Management System, and (ii) maintain existing bank accounts and business forms and honor certain prepetition obligations related thereto, including payment of the Bank Claims; (b) authorizing, but not directing, the Debtors to (i) continue to engage in Intercompany Transactions through their existing Cash Management System consistent with historical practice, and (ii) grant administrative expense status for postpetition Intercompany Claims; (c) extending the time for the Debtors to comply with the deposit and investment requirements set forth by Bankruptcy Code section 345(b), to the extent necessary; and (d) granting related relief.

22.     The Debtors also request that their Banks be entitled to rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this or any other first day motion or application. Moreover, should a Bank honor a prepetition check or other item drawn on any of the Debtors' bank accounts (a) at the direction of the Debtors to honor such prepetition check or item, (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as the result of an innocent mistake made, despite implementation of customary item-handling procedures, the Debtors request that the Bank shall not be liable to the Debtors, their estates, or any other party on account of such prepetition check or other item being honored postpetition.

23.     For the reasons set forth herein, the Debtors submit that the relief requested is in the best interests of the Debtors, their estates, creditors, and other parties in interest and therefore should be granted.

## BASIS FOR RELIEF

### I.     The Court Should Authorize the Debtors to Maintain Their Existing Bank Accounts, Continue Using Their Existing Cash Management System, and Modify Any Requirement to Close Existing Accounts

24.     The Debtors' continued use of their Cash Management System is permitted pursuant to Bankruptcy Code section 363(c)(1), which authorizes debtors in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of Bankruptcy Code section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court. *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting

secured creditors and others from dissipation of the estate's assets.") (alteration in original) (citations omitted); *Vision Metals, Inc. v. SMS Demag, Inc. (In re Vision Metals, Inc.)*, 325 B.R. 138, 145 (Bankr. D. Del. 2005) (same). Thus, the authority granted by Bankruptcy Code section 363(c)(1) extends to a debtor in possession's ability to continue the "routine transactions" necessitated by its Cash Management System and, thus, supports the relief requested. *See Charter Co. v. Prudential Ins. Co. Am. (In re Charter Co.)*, 778 F.2d 617, 621 (11th Cir. 1985) (indicating that an order authorizing the debtor to employ a cash management system that was "usual and customary in the past" was "entirely consistent" with Bankruptcy Code section 363(c)(1)); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (noting that courts have shown a "reluctance to interfere" in a debtor's making of routine, day-to-day business decisions); *see also In re Vision Metals*, 325 B.R. at 142 ("[W]hen a chapter 11 debtor in possession continues to operate its business, as permitted by section 1108, no court authorization is necessary for the debtor to enter transactions that fall within the ordinary course of its business.") (citation omitted).

25.    To the extent that use of the existing Cash Management System falls outside the ordinary course of business, such use is permitted by Bankruptcy Code section 363(b)(1), which provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve the use of assets outside the ordinary course of business pursuant to Bankruptcy Code section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).

14

Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

26.     In addition, the Court has the authority, pursuant to its equitable powers under Bankruptcy Code section 105(a), to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under Bankruptcy Code section 1107(a). Bankruptcy Code section 105(a) provides that "the court may issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a); *see also In re Friedman's Inc.*, 738 F.3d 547, 560–61 (3d Cir. 2013) (applying Bankruptcy Code section 105(a) to justify an order authorizing the payment of certain prepetition wages, salaries, medical benefits, and business expense claims to a debtor's employees). The Court may also authorize the payment of prepetition claims in appropriate circumstances under Bankruptcy Code section 105(a) and the doctrine of necessity when such payment is essential to the continued operation of a debtor's business. *See, e.g., In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) (holding that Bankruptcy Code section 105(a) provides a statutory basis for payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994)

(confirming that the doctrine of necessity is standard for enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan).

27.     Bankruptcy courts treat requests like these for authority to continue utilizing existing cash management systems as a relatively "simple matter," *see In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987), and have recognized that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). As a result, courts have concluded that the requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

28.     Maintaining the existing Cash Management System is in the best interests of the Debtors' estates and all parties in interest and, therefore, should be approved. The Cash Management System constitutes an ordinary course and essential business practice of the Debtors and provides significant benefits to the Debtors, including the ability to (a) control corporate funds, (b) ensure the maximum availability of funds when and where necessary, (c) reduce costs and administrative expenses by facilitating the movement of funds and the development of timely and accurate account information, and (d) efficiently track deposits, withdrawals, and disbursements, including intercompany funding. Authorizing the Debtors to continue operating under the existing Cash Management System is necessary to preserve and maximize value, and avoid disruptions that would frustrate the Debtors' ability to effectuate their

restructuring strategy. Thus, the Debtors' request to maintain their existing Cash Management

System and Bank Accounts should be granted, as it is in the best interests of their estates and

creditors.

29.     Unless otherwise ordered by the Court, the U.S. Trustee, through its *Operating*

*Guidelines for Chapter 11 Cases* (the "U.S. Trustee Guidelines"), requires that the Debtors, as

debtors in possession to: (a) establish one debtor-in-possession account for all estate monies

required for the payment of taxes, including payroll taxes; (b) close all existing bank accounts

and open new debtor-in-possession accounts; (c) maintain a separate debtor-in-possession

account for cash collateral; and (d) obtain checks that bear the designation "debtor-in-

possession" and reference the bankruptcy case number and the type of account on such checks.

*See* U.S. Trustee Guidelines, at ¶ 2. These requirements are designed to provide a clear line of

demarcation between prepetition and postpetition transactions and help protect against the

inadvertent postpetition payment of prepetition claims. The Debtors submit, however, that a

modification of certain requirements is warranted, as strict enforcement of the U.S. Trustee

Guidelines would severely disrupt the ordinary financial operations of the Debtors, leading to

increased operating costs and delays in payments that would negatively impact the Debtors'

ability to maximize value on behalf of their estates, creditors, and parties in interest. Indeed, as

explained in more detail above, the Bank Accounts are integral to the Debtors' Cash

Management System and allow the Debtors to centrally manage cash collection and

disbursements. The Debtors' current Cash Management System also enables the Debtors to trace

funds and ensure that all transactions are adequately documented and readily ascertainable.

30.     The Debtors submit that parties in interest will not be harmed by the Debtors'

maintenance of the Cash Management System, including the Bank Accounts, because the

Debtors have implemented appropriate mechanisms, in coordination with their Banks, to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date. Thus, to maintain the seamless operation of the Debtors' businesses, to ensure a smooth transition into chapter 11, and to maximize the value of their estates, the Debtors submit that (a) they should be permitted to continue to maintain their existing Bank Accounts and open new or close existing Bank Accounts, as needed; and (b) the requested relief should extend to any new accounts by providing that such accounts are deemed to be Bank Accounts of the Debtors and are similarly submitted to the rights, obligations, and relief granted by the Court.

## II.     The Court Should Authorize the Debtors to Honor Certain Prepetition Obligations Related to the Cash Management System

31.     As part of the Motion and in other motions that have been concurrently filed herewith, the Debtors request authority to pay, in their sole discretion, certain prepetition obligations. With respect to certain of these obligations, the Debtors may have issued checks prior to the Petition Date that have yet to clear the banking system. The Debtors intend to inform the Banks which such checks should be so honored. Therefore, the Debtors request that the Banks be authorized and directed to rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored. The Debtors further request that the Interim Order and the Final Order specify that the Banks shall not have any liability to any party for relying on such representations. This relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular prepetition check may be honored in accordance with an order by the Court or otherwise.

32.     Moreover, in connection with the Cash Management System, the Debtors may incur Bank Fees or Bank and Processor Charges, including in connection with (a) checks which

have been dishonored or returned for insufficient funds in the applicable account, and (b) any reimbursement or other payment obligations, such as overdrafts, arising under any agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements. The Debtors seek authority pursuant to Bankruptcy Code sections 105(a) and 363(b), in their sole discretion, to pay and/or reimburse the Banks in the ordinary course of business for any Bank Fees and Bank and Processor Charges arising prior to, on, or after the Petition Date.

**III.    The Court Should Authorize the Debtors to Continue Using Debit, Wire, And ACH Transfers**

33.    The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check. The Debtors conduct a number of transactions on a daily basis through ACH transfers and other similar methods. If the Debtors' ability to conduct transactions by debit, wire, ACH transfer, or other similar methods is impaired, the Debtors' day-to-day activities may be unnecessarily disrupted, and the estates will incur additional costs. The Debtors maintain records of all electronic disbursements and are able to account for such payments the same as if they were made by check. Therefore, the Debtors submit that authorizing the continuation of using debit, wire, and ACH transfers is warranted.

**IV.    The Court Should Authorize the Debtors to Continue to Use Existing Business Forms and Checks**

34.    To minimize expenses to their estates, the Debtors also seek authorization to continue using the Business Forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession. Modifying existing Business Forms would be burdensome and expensive and would confer no corresponding benefit upon those dealing with the Debtors, most of whom, as noted above, will be aware of the commencement of

these Chapter 11 Cases. The Debtors therefore request authorization to use their existing

Business Forms without adding a "Debtors-in-Possession" or similar legend. The Debtors will

obtain new check stock bearing the designation "Debtors-in-Possession" after depleting their

current check stock. To the extent that Business Forms are prepared electronically, the Debtors

will add a "Debtors-in-Possession" designation to such Business Forms following the Petition

Date.

**V.      Cause Exists to Modify Certain Requirements of Bankruptcy Code Section 345(b)**

35.      Bankruptcy Code section 345 governs a debtor's cash deposits during a chapter

11 case and authorizes deposits of money "as will yield the maximum reasonable net return on

such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a).

For deposits or investments that are not "insured or guaranteed by the United States or by a

department, agency, or instrumentality of the United States or backed by the full faith and credit

of the United States," section 345(b) requires the estate to obtain, from the entity with which the

money is deposited, a bond in favor of the United States and secured by the undertaking of an

adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of

title 31; unless the court for cause orders otherwise." *Id.* at § 345(b). In the alternative, a debtor

may require the entity to deposit governmental securities in accordance with 31 U.S.C. § 9303,

which provides that when a person is required by law to give a surety bond, such person may

instead provide an eligible obligation, designated by the Secretary of the Treasury, as an

acceptable substitute for a surety bond. *See* 31 U.S.C. § 9303. Additionally, the U.S. Trustee

Guidelines generally require chapter 11 debtors, among other things, to deposit all estate funds

into an account with an authorized depository that agrees to comply with the requirements of the

U.S. Trustee.

36.     In chapter 11 cases such as these, strict adherence to the requirements of section

Bankruptcy Code 345(b) would be inconsistent with the value-maximizing purpose of chapter 11

by creating additional administrative expense and burden, and unduly hampering a debtor's

ability under Bankruptcy Code section 345(a) to invest money such "as will yield the maximum

reasonable net return on such money[.]" 11 U.S.C. § 345(a). As a result, in 1994, to avoid

"needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b)

to provide that its strict investment requirements may be waived or modified if the court so

orders "for just cause." H.R. Rep. 103-834, 103rd Cong., 2d Sess. 210 (Oct. 4, 1994); 140 Cong.

Rec. H10767 (Oct. 4, 1994).

37.     In evaluating whether "cause" for modification or waiver of these requirements

exists, courts have considered a number of factors, including, among others, the sophistication

and size of a debtor's business, the amounts of the investments involved, bank ratings, the

complexity of the case, the debtor's safeguards for the funds, the debtor's ability to reorganize in

the face of failure of one or more of the financial institutions, the benefit to the debtor of a

waiver or modification of the requirements set forth by Bankruptcy Code section 345(b), the

potential harm to the estate, and the reasonableness of such waiver of modification under the

circumstances. *See In re Serv. Merchandize Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn.

1999). Here, these factors warrant a modification of the requirements of Bankruptcy Code

section 345 to the extent the Cash Management System does not already strictly comply with

such requirements.

38.     Here, the Debtors' primary Bank Accounts are maintained at financial institutions

that have executed a Uniform Depository Agreement ("UDA") with, and are designated as

authorized depositories by, the U.S. Trustee.[6] To the extent that any of the Debtors' Bank Accounts are located at financial institutions that have not executed a UDA with the U.S. Trustee, the aggregate account balances with any such institution are not expected to exceed the current FDIC insurance limit of $250,000. Thus, the Debtors believe that any funds that are deposited in the Bank Accounts are secure, and, therefore, the Debtors are in compliance with Bankruptcy Code section 345 with respect to such Bank Accounts.

39.      To the extent that the Bank Accounts do not comply with the requirements set forth in Bankruptcy Code section 345, the Debtors seek a 45-day extension to comply with Bankruptcy Code section 345(b) for "cause," without prejudice to the Debtors' right to seek a waiver in a final order or further extensions of time. During the extension period, the Debtors will engage in discussions with the U.S. Trustee regarding what, if any, modifications to their current practices would be appropriate under the circumstances. The Debtors believe that the benefits of the requested extension far outweigh any harm to the estates. *See In re Serv. Merch. Co.*, 240 B.R. at 896 (noting that a factor to consider in determining whether "'cause' exists for relief from the strictures of § 345(b)" is whether benefits to the debtor outweigh harm, if any, to the estate).

40.      Pursuant to Local Rule 2015-2(b), and subject to certain exceptions not relevant here, a waiver of the requirements set forth in Bankruptcy Code section 345(b) may not be granted without notice and a hearing. However, Local Rule 2015-2(b) provides that "if a motion

---

[6]      The Debtors' Bank Accounts which are not maintained at a financial institution that has executed a UDA with the U.S. Trustee are as follows: the Secondary Operating Account, the Lexicon Reserve Account, the T&C Clearing Account, the CRB Reserve Account, the ACH Clearing Account, the Wire Clearing Account, the Wire Reversal Settlement Account, the Binance Processing Account, the Card Settlement Account, and the Piermont Reserve Account.

for such a waiver is filed on the first day of a chapter 11 case in which there are more than 200 creditors, or otherwise with cause shown, the Court may grant an interim waiver until a hearing on the debtor's motion can be held." Del. Bankr. L.R. 2015-2(b). Here, the Debtors satisfy both the procedural and substantive requirements necessary to obtain an interim waiver of Bankruptcy Code section 345(b). The Debtors have filed this Motion on the ninth day of the Chapter 11 Cases, and the Debtors, collectively, have more than 45,000 creditors. Accordingly, the Debtors' present request for an interim waiver is appropriate.

**VI.   The Court Should Authorize the Debtors to Continue Engaging in Intercompany Transactions and Grant Administrative Expense Priority Status to the Related Intercompany Claims**

41.     The Debtors' funds move through the Cash Management System as described above. As part of the Cash Management System, Intercompany Transactions are made between and among the Debtors in the ordinary course. Thus, at any given time, there may be Intercompany Balances owing by one Debtor to another. The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions previously described. The Debtors, moreover, will continue to maintain records of such Intercompany Transactions.

42.     If the Debtors cannot continue the Intercompany Transactions, the Cash Management System, related administrative controls, and funding of the Debtors' ordinary-course operations would be unnecessarily disrupted to the Debtors' and their estates' detriment. The cessation of the Intercompany Transactions would require an increase in estate expenses because the Debtors would not be able to consolidate or manage the flow of funds as they have done historically. Accordingly, the Debtors respectfully request the authority, in their sole discretion, to continue engaging in the Intercompany Transactions in the ordinary course of business and in compliance with past practices without need for further Court order.

43.    As with the Cash Management System, authorizing the Debtors to continue the Intercompany Transactions is appropriate under Bankruptcy Code sections 363(b) or 363(c) and is an appropriate exercise of the Court's equitable powers under Bankruptcy Code section 105(a). *See, e.g.*, *Charter*, 778 F.2d at 621 (indicating that order authorizing continued use of cash management system that involved fund transfers to non-debtor affiliates was "entirely consistent" with Bankruptcy Code section 363(c)(1) because the practice was "usual and customary in the past"); *In re Gen. Growth Props.*, 412 B.R. 609, 610 (Bankr. S.D.N.Y. 2009) (authorizing debtors to continue prepetition cash management practices, including intercompany transactions, pursuant to Bankruptcy Code sections 105(a) and 363(c)). Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like those of the Debtors, the Debtors submit that the Intercompany Transactions are ordinary course transactions within the meaning of Bankruptcy Code section 363(c)(1) and, thus, do not require the Court's approval. Nonetheless, out of an abundance of action, the Debtors are seeking express authority to engage in such transactions on a postpetition basis.

44.    Additionally, pursuant to Bankruptcy Code sections 105(a) and 503(b), the Debtors request that any intercompany claims (the "Intercompany Claims") arising after the Petition Date, as a result of ordinary course Intercompany Transactions, be accorded administrative expense priority status. If the Intercompany Claims are accorded administrative expense priority status, each entity using funds that flow through the Cash Management System will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby protecting the interests of the Debtors' creditors.

## VII.    Authorizing and Directing Banks is Appropriate

45.      The Debtors also request that the Court authorize and direct the Banks when requested by the Debtors, in their discretion, to receive, process, honor, and pay all checks or electronic fund transfers drawn on the Debtors' bank accounts presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on, or after the Petition Date, provided that sufficient funds are available in the applicable bank accounts to cover the checks and electronic fund transfers. The Debtors also request that the Banks be authorized to rely on the Debtors' designation or representation that any particular check or electronic payment request has been approved pursuant to the Interim Order and the Final Order.

46.      The Debtors have sufficient liquidity to pay the amounts set forth in this Motion in the ordinary course of business and have implemented controls to ensure that prepetition claims will not be paid out except as authorized by this Court.[7] The Debtors therefore submit that the payment-processing procedures described in this Motion are appropriate.

47.      In addition, under the Debtors' existing Cash Management System, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

---

[7]   Immediately following the Petition Date $2,010.44 was transferred out of the Debtors' Bank Accounts as a result of auto-debits. The Debtors have taken steps to ensure that all such auto-debits have since been halted.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

48.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. As described above, any disruption of the Cash Management System would substantially diminish or impair the Debtors' efforts in these Chapter 11 Cases to preserve and maximize the value of their estates. For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)

49.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

50.     Nothing in this Motion or any order granting the relief requested in this Motion, and no action take pursuant to the relief requested or granted (including any payment made in accordance with any such order):  (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to Bankruptcy Code section 365 or an admission as to the basis for or the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the sole discretion of the Debtors;

(e) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (f) an admission to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) an admission, finding, or implication as to whether any assets constitute property of the estate; or (h) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law. Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## <u>NOTICE</u>

51.    The Debtors will provide notice of this Motion to:  (a) the U.S. Trustee; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Internal Revenue Service; (d) the Securities and Exchange Commission; (e) the United States Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in which the Debtors conduct business; (g) the Banks; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, the Debtors will service copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m). The Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order and the Final Order, substantially in the form annexed hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: August 24, 2023
      Wilmington, Delaware

**MCDERMOTT WILL & EMERY LLP**

  _/s/ Maris J. Kandestin_
Maris J. Kandestin (No. 5294)
1007 North Orange Street, 10th Floor
Wilmington, Delaware 19801
Telephone:  (302) 485-3900
Facsimile:   (302) 351-8711
Email:      mkandestin@mwe.com

-and-

Darren Azman (admitted _pro hac vice_)
Joseph B. Evans (admitted _pro hac vice_)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone:  (212) 547-5400
Facsimile:   (646) 547-5444
Email:      dazman@mwe.com

-and-

Gregg Steinman (admitted _pro hac vice_)
333 SE 2nd Avenue, Suite 5400
Miami, Florida 33131
Telephone:  (305) 358-3500
Facsimile:   (305) 347-6500
Email:      gsteinman@mwe.com

_Proposed Counsel for the Debtors and Debtors in Possession_