<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                     .  Chapter 11
                                .  Case No. 23-11161 (JKS)
 4   PRIME CORE                 .
     TECHNOLOGIES, INC.,        .  (Joint Administration Requested)
 5   et al.,                    .
                                .  Courtroom No. 6
 6                              .  824 Market Street
                 Debtors.       .  Wilmington, Delaware 19801
 7                              .
                                .  Friday, August 25, 2023
 8   . . . . . . . . . . . . .  3:30 p.m.

 9

10                      TRANSCRIPT OF ZOOM HEARING
                 BEFORE THE HONORABLE J. KATE STICKLES
11                   UNITED STATES BANKRUPTCY JUDGE

12   APPEARANCES:

13   For the Debtors:          Maris J. Kandestin, Esquire
                               MCDERMOTT WILL & EMERY, LLP
14                             1007 North Orange Street
                               10th Floor
15                             Wilmington, Delaware 19801

16                             Darren T. Azman, Esquire
                               Joseph B. Evans, Esquire
17                             One Vanderbilt Avenue
                               New York, New York 10017
18

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Sean Moran, ECRO

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

```
 1 │ APPEARANCES (CONTINUED):
   │
 2 │ For the Debtors:          Gregg A. Steinman, Esquire
   │                           MCDERMOTT WILL & EMERY, LLP
 3 │                           333 SE 2nd Avenue
   │                           Suite 5400
 4 │                           Miami, Florida 33131
   │
 5 │ For Polaris Ventures:     Michael R. Nestor, Esquire
   │                           YOUNG CONAWAY STARGATT & TAYLOR, LLP
 6 │                           Rodney Square
   │                           1000 North King Street
 7 │                           Wilmington, Delaware 19801
   │
 8 │ For the U.S. Trustee:     Joseph F. Cudia, Esquire
   │                           UNITED STATES DEPARTMENT OF JUSTICE
 9 │                           OFFICE OF THE UNITED STATES TRUSTEE
   │                           J. Caleb Boggs Federal Building
10 │                           844 King Street
   │                           Suite 2207, Lockbox 35
11 │                           Wilmington, Delaware 19801
   │
12 │ For Kado Money:           David S. Forsh, Esquire
   │                           RAINES FELDMAN LITTRELL, LLP
13 │                           1350 Avenue of the Americas
   │                           22nd Floor
14 │                           New York, New York 10019
   │
15 │ For Bittrex, Inc.:        Razmig Y. Izakelian, Esquire
   │                           QUINN EMANUEL URQUHART
16 │                             & SULLIVAN, LLP
   │                           865 South Figueroa Street
17 │                           Floor 10
   │                           Los Angeles, California 90017
18 │
   │ For AnchorCoin, LLC:      Marcy J. McLaughlin Smith, Esquire
19 │                           TROUTMAN PEPPER HAMILTON
   │                             SANDERS, LLP
20 │                           Hercules Plaza
   │                           1313 Market Street
21 │                           Suite 5100
   │                           Wilmington, Delaware 19801
22 │
   │ For BMO Harris Bank:      Mia D. D'Andrea, Esquire
23 │                           CHAPMAN AND CUTLER, LLP
   │                           320 South Canal Street
24 │                           27th Floor
   │                           Chicago, Illinois 60606
25 │
```

| 1 | | | | INDEX | |
|---|---|---|---|---|---|

MOTIONS:                                                                PAGE

Agenda
Item 1:    Motion of Debtors for Entry of Order (I)          30
           Directing Joint Administration of Related
           Chapter 11 Cases and (11) Granting Related
           Relief [Filed 8/15/23; Docket No. 3].

           Court's Ruling:                                   31

Agenda     Debtors' Motion for Entry of an Order (I)
Item 2:    Authorizing Debtors to File a Consolidated        66
           Creditor Matrix and Top 50 Creditors List,
           (II) Authorizing Redaction of Certain
           Personally Identifiable Information, (III)
           Authorizing the Debtors to Serve Certain
           Parties by E-mail, (IV) Approving Certain
           Notice Procedures, and (V) Granting Related
           Relief [Filed 8/24/23; Docket No. 15].

           Court's Ruling:                                   77

Agenda
Item 3:    Debtors' Application for Entry of an Order         60
           Authorizing the Employment and Retention of
           Stretto, Inc. as Claims and Noticing Agent
           Effective as of the Petition Date
           [Filed 8/24/23; Docket No. 16].

           Court's Ruling:                                   60

Agenda
Item 4:    Debtors' Motion for Entry of Interim and Final     31
           Orders (I)(A) Approving Debtors' Proposed Form
           of Adequate Assurance of Payment for Future
           Utility Services, (B) Approving Debtors'
           Proposed Procedures for Resolving Additional
           Assurance Requests, and (C) Prohibiting
           Utility Providers from Altering, Refusing, or
           Discontinuing Service, and (II) Granting
           Related Relief
           [Filed 8/24/23; Docket No. 17].

           Court's Ruling:                                   35

1                                    INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 5:    Debtors' Motion for Entry of Interim and Final    63
4               Orders (I) Authorizing Debtors to Pay Certain
                Prepetition Taxes and Fees and (II) Granting
5               Related Relief [Filed 8/24/23; Docket No. 21].

6               Court's Ruling:                                   64

7    Agenda
     Item 6:    Debtors' Motion for Entry of Interim and Final    37
8               Orders (I) Authorizing the Debtors to (A)
                Maintain Existing Insurance Policies and Pay
9               All Insurance Obligations Arising Thereunder,
                (B) Continue to Pay Certain Brokerage Fees,
10              (C) Renew, Supplement, Modify, or Purchase
                Insurance Coverage, and (D) Maintain Their
11              Surety Bond Program, (II) Authorizing Banks to
                Honor Related Checks and Transfers, and (III)
12              Granting Related Relief
                [Filed 8/24/23; Docket No. 18]
13
                Court's Ruling:                                   40
14
     Agenda
15   Item 7:    Debtors' Motion for Entry of Interim and Final    64
                Orders (I) Authorizing Debtors to (A) Pay
16              Prepetition Wages and (B) Pay Expenses Arising
                under Employee Benefits Programs and Pay
17              Related Administrative Obligations, (II)
                Authorizing Banks to Honor and Process Checks
18              and Transfers Related to Such Obligations,
                and (III) Granting Related Relief
19              [Filed 8/24/23; Docket No. 19].

20              Court's Ruling:                                   66

21

22

23

24

25

1                                 INDEX

2  MOTIONS:                                                PAGE

3  Agenda
   Item 8:    Debtors' Motion for Entry of Interim and Final      41
4             Orders (I) Authorizing Debtors to (A) Continue
              to Operate Their Cash Management System and
5             (B) Maintain Existing Bank Accounts and
              Business Forms and Honor Certain Prepetition
6             Obligations Related Thereto; (II) Authorizing
              the Debtors to (A) Continue to Perform
7             Intercompany Transactions and (B) Granting
              Administrative Expense Status for Post-
8             petition Intercompany Claims; (III) Extending
              the Time for the Debtors to Comply with
9             Requirements Set Forth in 11 U.S.C. § 345(b);
              and (III) Granting Related Relief
10            [Filed 8/24/23; Docket No. 20].

11            Court's Ruling:                               50

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                               INDEX

2

WITNESSES CALLED
3   BY THE DEBTORS:                                      PAGE

4       JOR LAW

5       Direct examination by declaration               --

6       Cross-examination by Mr. Cudia                   74

7

8   DECLARATIONS:                                        PAGE

9   1) Declaration of Jor Law                            10

10

11  Transcriptionists' Certificate                       82

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 3:30 p.m.)

2          THE COURT:  Good afternoon, everyone.  This is

3  Judge Stickles.  We're on the record in the case of Prime

4  Core Technologies, Case Number 32-11161.  This is a first day

5  hearing.

6          I'll turn the virtual podium over to proposed

7  counsel to the debtors.

8          MS. KANDESTIN:  Good afternoon, Your Honor.  May I

9  please the Court?  Maris Kandestin of McDermott Will & Emery,

10  on behalf of Prime Core Technologies, Inc., and its

11  subsidiaries as debtors and debtors-in-possession.

12          I would like to thank the Court for accommodating

13  us this afternoon and would also like to extend thanks to

14  chambers for working with us and being so responsive and

15  courteous.

16          And last, but not least, I would like to extend

17  thanks to Mr. Cudia, who, you know, very quickly worked to

18  provide us comments to our first day pleadings and, you know,

19  worked us with to resolve his concerns over the past day.

20  And I'm pleased to report that, except for in -- with respect

21  to one motion, we were able to resolve the U.S. Trustee's

22  concerns with respect to the first day pleadings.

23          THE COURT:  Okay.  Great.

24          MS. KANDESTIN:  And, Your Honor, I just wanted to

25  let you know that we've uploaded our proposed orders and

1 | before doing that, we made two changes.  One was to remove

2 | the word "exclusive" from the jurisdictional paragraphs in

3 | the order and the other change was to add a second day

4 | hearing, which chambers provided us with September 19th at

5 | 10:00 a.m.

6 | THE COURT:  Okay.  Great.  Thank you.

7 | MS. KANDESTIN:  In the virtual courtroom with me

8 | today are my partners Darren Azman, Gregg Steinman, and

9 | Joseph Evans; each of them, you've admitted *pro hac vices*.

10 | Thank you for that of.

11 | And if it would please the Court, before we walk

12 | through today's agenda, I would propose turning the virtual

13 | podium over to Mr. Azman to provide the Court with some high-

14 | level background of the debtors' business, the circumstances

15 | leading to these cases, and what our plans are in Chapter 11.

16 | THE COURT:  Okay.  Great.  Thank you.

17 | Good afternoon, Mr. Azman.

18 | MR. AZMAN:  Hi, Your Honor.  Good afternoon.  This

19 | is Darren Azman from McDermott Will & Emery, proposed counsel

20 | to the debtors.  It's a pleasure to be before you for the

21 | first time.

22 | THE COURT:  Welcome.

23 | MR. AZMAN:  Your Honor, before I begin, I'd like

24 | to quickly introduce to you the debtors' other professionals

25 | and representatives who are on the line here today up on the

1 Zoom.  From M3, which is the debtors' financial advisor, we

2 have Rob Winning, Bill Murphy, and Cole Thieme.  From Galaxy,

3 which is the debtors' proposed investment banker, we have

4 Michael Ashe and Albert Chao.  From the Company, we have the

5 debtors' interim CEO and first day declarant Jor Law, as well

6 as Matt Parrella, the company's general counsel.  And,

7 finally, Your Honor, we have the three-member Special

8 Restructuring Committee, which is comprised of John Guedry,

9 John Wilcox, and Mike Wyse.

10         As Ms. Kandestin said, I want to also thank Your

11 Honor for scheduling this hearing on such short notice and

12 also for your patience while we got our first days on file.

13         Unless Your Honor has any questions, I'd like to

14 move into evidence Mr. Law's declaration.  Your Honor, that

15 was filed at Docket 14.  We are only seeking admission of

16 that declaration today for the first day motions that are on.

17 And as I mentioned before, Mr. Law is with us on Zoom, as I

18 noted.

19         THE COURT:  Okay.  Could Mr. Law please appear on

20 camera.  Thank you, Mr. Law.

21         Does anyone object to the admission into evidence

22 the declaration of Mr. Law at Docket 14 in support of the

23 first day motions?

24         MR. NESTOR:  Yeah.  Your Honor, Mike Nestor,

25 appearing on behalf of Polaris Ventures.  Just subject to

1  cross-examination, potentially.

2          THE COURT:  Okay.  Is there any -- bear with us,

3  we're having feedback.

4      (Pause)

5          MR. AZMAN:  Your Honor, it's not the courtroom's

6  audio; it's Mr. Nestor's, I believe.

7          MR. NESTOR:  I have an echo problem, Your Honor.

8  It usually helps when I go on mute, so I'm going to go back

9  on mute.

10         THE COURT:  Okay.  I'm just (indiscernible)

11  myself.

12         Is there anybody else appearing today who would

13  expect to cross-examine Mr. Law regarding the content of his

14  declaration?

15     (No verbal response)

16         THE COURT:  Okay.  I hear none.

17         The declaration is admitted, subject to

18  Mr. Nestor's ability to cross-examine him.  Thank you.

19     (Law Declaration received in evidence)

20         MR. AZMAN:  All right.  Your Honor, thank you.

21         With that, I'd like to provide a brief overview of

22  the company and summarize some of the contents that we had

23  already included in the first day declaration.

24         So, Your Honor, the debtors run a software

25  technology company that offers, essentially, an all in one

1 financial infrastructure platform in the cryptocurrency

2 space.  There's quite a long list of offerings that the

3 debtors provide so I won't go through them all, but I do want

4 to quickly touch on a few of them.

5          First and foremost, the debtors offer custody

6 services.  I think the simplest way to explain this service

7 is the debtors provide a platform for customers to transfer

8 their digital assets and fiat currency, including foreign

9 currencies.

10          Second, the debtors offer their customers the

11 ability to transact with the debtors' liquidity providers.

12 So, for example, a customer can convert Bitcoin to U.S.

13 dollars through the Prime platform.

14          Third, the debtors have built an enormous network

15 of integrated banks that provide what are described as

16 "payment rails."  This is, essentially, Your Honor, the

17 infrastructure that is needed to move money, like ACH

18 transfers, debit cards, credit cards, wire transfers.

19 Importantly, the debtors provide the bridge between

20 traditional banking institutions on the one hand and

21 customers in the cryptocurrency industry on the other.

22          And, fourth, the company also provides compliance

23 and regulatory services for customers, so services like AML,

24 KYC compliance, licensing guidance, audits, and other similar

25 activities.

1          Your Honor, in order for provide some of these

2    services to customers throughout the U.S., the debtor Prime

3    Trust is a registered money service business with FinCEN and

4    it also holds a Nevada trust charter, as well as various

5    state licenses, such as money-transmitter licenses, that are

6    required in certain states to conduct the business that they

7    engage in.

8          At their peak, the debtors were one of the most

9    widely used companies in the cryptocurrency industry with

10   close to $4 billion in crypto and fiat assets under custody.

11   And over time, the company has facilitated more than $300

12   billion of fiat currency movement through its system.

13          Your Honor, moving on the debtors' organizational

14   and capital structure.  There are four debtors here:  you

15   have Prime Core, which is the ultimate parent company; Prime

16   Trust, which is a subsidiary of Prime Core and holds the

17   Nevada trust charter; and, finally, you have Prime Digital

18   and Prime IRA.  Both of those are subsidiaries of Prime

19   Trust.

20          There is a DIP entity that you might have seen in

21   the org chart called "Prime New York Trust, LLC."  That

22   entity is not officially formed yet.  It has a pending

23   application with the State of New York, but they don't really

24   exist and, thus, they're not a debtor.

25          Your Honor, the debtors have no funded secured

1  debt.  They have raised capital solely through a Series A and

2  Series B raise, both of which occurred in 2021, and in the

3  aggregate, the company raised around $175 million through

4  those raises.

5         Your Honor, there are a number of reasons why we

6  are here today, but probably the most notable reason is what

7  we describe as the "Wallet Event" in Mr. Law's declaration.

8  And I'd like to walk through it briefly because, although it

9  is a bit complicated from a technical perspective, it is a

10 critical piece of the case.

11        In 2019, the debtors migrated their crypto assets

12 to a platform called "Fireblocks."  Fireblocks is a very

13 well-known wallet-managing provider; they manage digital

14 wallets.  In making this switch to Fireblocks, the debtors

15 intended to retire their older digital wallets, which we

16 refer to as the "legacy wallets."  Now, these wallets at

17 issue are wallets that the debtors' customers would transfer

18 crypto to when they were interacting in some way with the

19 company.

20        Around a year and a half after that migration

21 occurred, the debtors inadvertently provided customers with

22 the digital address for one of the old legacy wallets and

23 during 2021, certain customers transferred crypto to one

24 wallet, in particular, that we refer to as the "98f wallet."

25 We call it the 98f wallet just because that's the last three

1  digits of the digital address.

2       At the end of 2021, which again, was the year when

3  some customers transferred assets to the 98f wallet, at the

4  end of that year, a customer made a very large withdrawal

5  request and in order to fulfill that request, the company

6  needed access to the 98f wallet.  And it was at that time in

7  December 2021, that the company realized they didn't actually

8  have what was needed to access the 98f wallet.

9       We've included a far-detailed description of the

10 technical problem that we have and why we can't access that

11 wallet, but in short, the company does not currently have

12 access to that wallet, which has around $40 million worth of

13 crypto sitting in there.

14       The debtors reported these wallet issues to the

15 various state regulators, including the regulator in Nevada,

16 which is known as "FID," or F-I-D.  This, then, set off a

17 sequence of events that set the company down the path to

18 where we are today, including what amounted to a run on the

19 bank, with customers withdrawing crypto and fiat.

20       On June 21st, around two months ago, the Nevada

21 FID issued a cease and desist order of the company, which

22 effectively prevented the company from continuing its

23 operations.  Within a week after that, the company consented

24 to the imposition of a receivership and around a month ago,

25 John Guedry was installed by the Nevada State Court as the

1  interim receiver.

2          Earlier this month, the receivership order was

3  amended to appoint what is now the Special Restructuring

4  Committee that I mentioned earlier and the Special

5  Restructuring Committee is vested with all rights to manage

6  all aspects of the debtors during these Chapter 11 cases.

7  Again, that Committee is comprised of John Guedry, John

8  Wilcox, and Mike Wyse.  Mr. Guedry was most recently the

9  president of the Bank of Nevada for around a decade until he

10 retired last year.  Mr. Wilcox has around 35 years of

11 experience in banking.  And Mr. Wyse is a seasoned

12 restructuring professional, who regularly serves in fiduciary

13 roles, such as CRO and independent director.  None of these

14 individuals, Your Honor, have any other or prior relationship

15 to Prime; they are all independent.

16          So, Your Honor, that's where we are at right now.

17 Let me tell you a little bit about where we are going.  There

18 are really three primary workstreams ahead of us.  First is

19 the sale process.  The company, as I mentioned earlier, has

20 already hired a banker, Galaxy.  There was a prepetition

21 process run by a different banker.  Next week, we hope to

22 file a bid procedures motion, but that process is already

23 well underway.  Second, Your Honor, is the 98f wallet

24 recovery --

25          THE COURT:  Excuse me a second.

1          What would you be intending to sell?  What would

2    the debtors intend to sell?

3          MR. AZMAN:  Sure.  The crown jewel of this company

4    is really the Nevada trust charter.  That charter, among

5    other things, allows the company to operate a money-

6    transmitter business in approximately 30 states without

7    actually having to acquire licenses in those states.

8          Typically, if you want to engage in this type of

9    business around the country, you have to go to each state and

10   obtain what is called a "money-transmitter license."

11         The value in this business is likely reorganizing

12   around the Nevada trust charter, which somebody -- these --

13   the Nevada trust charter, alone, is very expensive and time-

14   consuming to obtain, but so are the money-transmitter

15   licenses.  And so, primarily, that is what's being sold, is

16   the ability for somebody to step into the shoes and have

17   these licenses.  This will obviously require some level of

18   cooperation with the various regulatory authorities, but that

19   is what I would put at the top of the list of what somebody

20   is "buying."  But with it comes a lot more, it's the

21   infrastructure that has been built here; the payment rails

22   that I mentioned earlier; the relationship that this company

23   has built with everyone in the crypto ecosystem to do all of

24   those things that I mentioned earlier.

25         Setting up a company, putting aside the regulatory

1  constraints on setting up a company to do all of these

2  things, just putting all of these things together

3  operationally is an incredibly expensive and time-consuming

4  endeavor and there really aren't many competitors in this

5  space right now.  And so, that's essentially what we're

6  looking to sell, Your Honor.  I hope that's helpful.

7          THE COURT:  No, that's helpful.  Thank you.

8          MR. AZMAN:  So, Your Honor, turning to the second

9  workstream for this case, it's the 98f wallet recovery

10 effort.  That is also well underway to locate either the

11 hardware devices or the seed phrases that are missing.  And

12 this includes discovery that we will be taking of former

13 employees and management who are no longer with the company.

14         Your Honor, we have already sent letters out to a

15 number of individuals requesting their voluntary compliance

16 with 2004.  A number of them have consented and we're still

17 waiting to hear from others, but my guess is that we will end

18 up filing 2004 motions early next week for those who are not

19 willing to comply.  But that process is already well

20 underway.

21         Third, Your Honor, is investigating and pursuing

22 claims, including avoidance actions.  Just for context, there

23 was around $900 million worth of transfers out of the estate

24 that occurred during the 90-day preference period.  So those

25 are certainly actions that we're going to be investigating,

1  along with other types of claims that you would traditionally

2  investigate in a Chapter 11 case, given the circumstances.

3           Your Honor, that's all I have.  Unless you have

4  any questions, I'd like to turn to the agenda.  Before I turn

5  things over to Mr. Steinman and Ms. Kandestin to present the

6  first days, I'd like to suggest to the Court that we take up

7  the pleading filed by Polaris Ventures a couple of hours ago

8  at Docket 30.  It's seemingly an objection to all of our

9  first days; at least, I think it is.  Candidly, I'm not

10 really sure what they are asking.  It seems like they maybe

11 are trying to convert today's hearing to an interim, interim

12 hearing, as opposed to what is done in every other case,

13 which is an interim hearing followed by a second day hearing.

14          But in any event, if Your Honor agrees with

15 tackling that now, maybe we can hear that objection and then

16 I can share some additional thoughts in response, but I'd

17 defer to Your Honor on how you'd like to proceed.

18          THE COURT:  Okay.  Well, let me hear from

19 Mr. Nestor.

20          MR. NESTOR:  Thank you, Your Honor.  Mike Nestor

21 for the record.

22          Am I echoing?

23          THE COURT:  No.

24          MR. NESTOR:  Okay.  Thank you.

25          THE COURT:  I am.

1          MR. NESTOR:  Oh, wait.  You are?

2          THE COURT:  That's okay.  (Audio interference.)

3          MR. NESTOR:  Can you hear me?

4     (No verbal response)

5          MR. NESTOR:  Okay.  Thank you, Your Honor.

6          So, we represent Polaris Ventures -- owed in

7 excess of $30 million in this case.  And my client's concern

8 here is that the debtor right now, as admitted by counsel, is

9 a steward for unsecured creditors.  The (indiscernible) is

10 (indiscernible) unsecured creditor.

11          What we have here, and what we would have in a

12 normal case is they would have filed their first days on the

13 day they filed on August 14th.  You would have had a hearing,

14 then.  What happened (audio interference) is they filed their

15 pleadings yesterday afternoon (audio interference) Friday

16 afternoon, several days after the -- you know, do the math --

17 11 days after the filing at a first day hearing.

18          And our concern is that, first of all, that is

19 unusual, but second, they're seeking a second day hearing,

20 which I just heard for the first time, on September 19th.

21 So, what they're seeking to do here is run this case for more

22 than five weeks without any input or opportunity for

23 unsecured creditors, who really are entitled to the cash

24 that's in the estate.  They haven't provided any opportunity

25 to weigh in for five weeks.

1                  THE COURT:  Mr. Nestor, could you hold on a

2    second?  We're having a technical issue.  Hold on one second.

3                  MR. AZMAN:  Your Honor, it's not just you.  I

4    think everyone is having a hard time hearing Mr. Nestor, if

5    that's what you're pausing for.

6                  MR. NESTOR:  Is that it?

7                  MR. AZMAN:  You're cutting in and out, Mike.

8                  THE COURT:  You're fading a little bit.  I've

9    never had any trouble --

10                 MR. NESTOR:  Is this better?

11                 THE COURT:  Yes.

12                 I was going to say, I've never had any trouble

13   hearing you until today.

14        (Laughter)

15                 MR. NESTOR:  Is this better or no?

16                 THE COURT:  Yes.

17                 MR. NESTOR:  Thank you.

18                 So, Your Honor, here's where we are stand.  The

19   case was filed 11 days ago.  The first days weren't filed

20   until yesterday.  So, is it strange to have a first day

21   hearing the day after you file the pleadings?  No.  Is it

22   strange and not normal to have the first day hearing, you

23   know, 11 or 12 days after you filed the case?  Yes.

24                 So, our request is really very simple.  The only

25   disbursements that we believe that should be made from this

1  estate are those that are absolutely necessary to avoid

2  irreparable harm.  And we believe -- and Mr. Cudia maybe can

3  weigh in with respect to when a formation meeting would be

4  held -- but we believe that he's close to forming a

5  committee.

6          And all we're asking, Your Honor, is to come

7  back --

8          Can you guys hear me or no?

9          THE COURT:  Yes.

10         MR. NESTOR:  -- is just to come back the end of

11 next week after a committee has been -- instead of coming

12 back three weeks from now or more, is to come back next week,

13 the end of next week.  Have a committee weigh in on the

14 pleadings, the relief (indiscernible) operations and have a

15 voice in the case sometime sooner than five-plus weeks into

16 the case.

17         So, that's what we're asking for, Judge.  And it

18 is an interim, interim hearing, but the interim, interim

19 hearing is not the fault of unsecured creditors; it's the

20 fact that -- and I'm not ascribing any blame -- but it's the

21 fact that the debtor did not file its pleadings, you know,

22 until 12 days after the petition date.  So, we're here.  We

23 are where we are.

24         But, ordinarily, the second day hearing would be

25 next week and the unsecured creditors would be able to weigh

1   in and we'd have an opportunity to be heard.  What the debtor

2   is seeking to do is go five-plus weeks into the case, spend

3   more than $6 million without any input from unsecured

4   creditors.  And I don't know why they wouldn't agree to that.

5          And that's our -- if that -- if the debtor will

6   limit and let Your Honor know specifically what needs to be

7   spent now and confirm that nothing, prepetition, has been

8   spent to date, and will agree to come back a week from now,

9   then our objection is resolved.

10          MR. AZMAN:  Your Honor?

11          THE COURT:  Yes?

12          MR. AZMAN:  The relief we are seeking today is

13  nothing more than the traditional relief sought in every

14  Chapter 11 case that shows up in your court.  Yes, it costs

15  money to run a Chapter 11 case, but that is within the

16  business judgment of the debtors to decide.

17          As I mentioned earlier, there is a Special

18  Restructuring Committee comprised of completely independent

19  professionals that have no incentive, other than to maximize

20  value for creditors in this case.

21          In every Chapter 11 case, you can say that the

22  available funds for creditors in the short term goes down as

23  administrative expenses accrue.  This case is no different.

24          This objection is really an attempt by one

25  creditor to substitute its business judgment for the debtors'

1 and they haven't introduced any evidence to support their

2 objection.

3         There will be a second day hearing at which the

4 Committee can raise issues to the final orders or, if the

5 Committee, or, frankly, any creditor, has a more pressing

6 issue, in three days, in a week, they can come to this Court

7 for emergency relief to modify any of the orders that are

8 entered today.

9         Your Honor, more substantively, the amount of

10 prepetition payments that we are asking approval for today is

11 relatively small.  I can walk through it if you'd like and we

12 can certainly go line-by-line for every motion.

13         THE COURT:  Yeah, I would --

14         MR. AZMAN:  I think it's something, like, less

15 than (indiscernible) --

16         THE COURT:  I would like to do that, because I

17 think the budget that's been presented that suggests, for

18 example, $2.3 million going to debtors' professionals in the

19 first five weeks and $120,000 going to a committee in the

20 first five weeks, I'm not sure how that plays with what is

21 actually reasonable and necessary for an interim period.

22         And I also want to hear from Mr. Cudia when he

23 thinks a committee is going to get appointed in this case.

24 So if I could hear from Mr. Cudia first and then I'll come

25 back to the debtors and you can walk through what's actually

1    needed, because that would probably help Mr. Nestor, as well.

2          MR. CUDIA:  Good afternoon, Your Honor.  Joseph

3    Cudia for the United States Trustee.

4          THE COURT:  Good afternoon, Mr. Cudia.

5          MR. CUDIA:  Yes, the committee formation has been

6    ongoing.  We did solicit the top-50 creditors and we have

7    already started that.  There was a substantial number of

8    bounce-backs of emails so the response date has slipped past

9    our original date of Wednesday, this past Wednesday.

10          At this point, my best estimate of committee

11   formation is Monday, possibly slip to Tuesday, but I'm going

12   to try everything I can to get it formed on Monday.  And

13   that's Monday the 28th.

14          THE COURT:  Okay.  Thank you.

15          So if I could hear from the debtors, can you tell

16   us what is absolutely necessary, with respect -- and we can

17   either go through each motion -- I mean here's my concern.

18   If you have a committee that's formed Monday or Tuesday, I'm

19   not sure what -- frankly, I only have availability on

20   Wednesday or Thursday, so I'm not sure what is going to be

21   able to be accomplished in those two days and I'm not

22   available at all the following week, so it would make sense

23   to me that the debtors communicate with the committee once

24   it's formed.  And if the committee wants to come in for an

25   emergency hearing, I would entertain that.

1           MR. AZMAN:   Absolutely.   And we'd be happy to do

2    that, as well.

3           Before we decide how we want to go through the

4    line items, I think that Mr. Nestor is asking for something

5    far more than that.  I think he's asking for no

6    disbursements, post-petition, to be made, even if in the

7    ordinary course of business.  But as Your Honor knows,

8    there's no authority needed to continue to make post-petition

9    payments in the ordinary course of business, so I think

10   Mr. Nestor's objection, unless you'd like to correct my

11   understanding, which is fine, is that he doesn't want a

12   dollar flung out even for ordinary course expenses like

13   monthly licensing fees to host the wallets that hold crypto

14   that is going to be distributed to customers in this case.

15          So, again, I don't even think that that needs

16   Court approval; I think it's ordinary course.  So Mr. Nestor

17   can clarify if he's only questioning prepetition payments,

18   which he's certainly welcome to, and we will walk the Court

19   through them and be welcomed to probe those, or if he's

20   asking for much more broader relief for the Court to prevent

21   the debtors from making ordinary course payables post-

22   petition.

23          MR. NESTOR:   Thank you, Your Honor.

24          And I obviously never said that.  I never said I

25   was -- what we'd said was those payments that absolutely had

1  to be made, pending formation of a committee and another

2  hearing before this Court.

3            And Your Honor pointed out the same issues that I

4  had.  Now, you know, first of all, no retention applications

5  have even been filed in this case.  So, in the budget, you

6  have, you know, professional fees of, for the debtors'

7  professionals -- one, two, three, four -- two to $3 million

8  over the first six weeks; $1.5 million through next week.

9  You have ordinary course professionals.  No motion's been

10  filed.  We don't even know if there are professionals at this

11  point.  And the timeline hasn't even run, obviously, because

12  they haven't been filed on an objection period, let alone,

13  declarations and whatnot.

14            So, we're not -- our statement doesn't relate to

15  those things that are necessary to operate the company

16  through.  And they'll make the record as to what's necessary;

17  that's their burden, not mine.  But there are things -- I

18  don't know what's happening with the debtors' professionals.

19  Is it being escrowed?  Is it -- if it's just an accrual,

20  subject to further order of the Court, no problem.  If

21  they're taking it out of the estate and putting it into an

22  escrow account or something like that, then I think we have a

23  problem.  So, that's it, Your Honor.  I never said that it

24  was an issue of no dollars go out of the estate.  It's only

25  ensuring that that, which has to be paid, is paid.

1          THE COURT:  And I think that's -- I think part of

2    this is there's a budget, but I don't know how this budget is

3    prepared.  I don't know if this is an accrual or these are

4    estimates, but the money is not being escrowed or if all

5    you're seeking in the interim period is what's set forth in

6    the motions.

7          MR. AZMAN:  Your Honor, all we're seeking today is

8    what's set forth in the motions.  The budget -- this is an

9    odd case.  It's not entirely unusual, but for crypto cases,

10   it's actually quite usual that they don't have funded debt.

11         So, typically, in every other case where you have

12   some funded debt, you'll often see the budget attached to a

13   cash collateral order or DIP order, right?  We wanted to be

14   transparent to show our creditors, our constituencies, Your

15   Honor, everyone, what the budget is looking like for this

16   case.  We're not asking for approval to pay any professional

17   fees today; of course not.  There are retention applications

18   that need to be filed.  There are monthly fee statements that

19   need to be filed.

20         I don't think there's any question that all we're

21   asking for here is, one, to pay certain prepetition payments,

22   which we'll walk through, and, two, to continue operating in

23   the ordinary course of business, which includes making

24   certain payments that are in the ordinary course of business.

25         So, I think what I'm hearing from Mr. Nestor is

1  he'd like for us to walk through line items of prepetition

2  payments and he's not contesting the estate's ability to pay

3  anything post-petition that's in the ordinary course.  And we

4  came prepared to do that today, so we're happy to do that.

5           THE COURT:  Okay.  I see Mr. Forsh has his hand

6  up.

7           MR. FORSH:  Thank you, Your Honor.  David Forsh of

8  Raines Feldman Littrell, LLP, on behalf of Kado Money, one of

9  the top-30 creditors in this case.

10          Your Honor, I'm afraid we haven't yet put a *pro*

11  *hac* application on file or obtained local counsel at the last

12  minute.  May I please be heard on the matters for today?

13          THE COURT:  Yes, you may.

14          MR. FORSH:  Thank you very much, Your Honor.

15          Your Honor, I wanted to chime in to provide,

16  perhaps, a little bit of support to Mr. Nestor, as well as to

17  Mr. Azman.  The first point, I think that this company should

18  be in bankruptcy.  If any company could benefit from the

19  automatic stay, it might be this one; however, there are very

20  limited funds available.

21          And as Mr. Nestor noted, the funds -- the budget

22  is extremely aggressive.  It's not at all clear talking about

23  operations in the ordinary course when actual operations are

24  going on today.  So, certainly, we support payment of rental

25  fees necessary to maintain equipment and even prepetition

1  wages, to the extent that that would be helpful to the sales

2  effort and we support that the debtor should have the

3  opportunity to attempt to sell its assets as a going-concern.

4       However, to the extent that this ice cube has

5  already melted, perhaps creditors would be better off in some

6  other type of structure.  And that's something that the

7  committee, if and when it's formed, especially early next

8  week, would be best able to chime in on, whether that's an

9  investigation or not.  I know that this investigation seems

10  to have commenced by the debtors more than a year ago.

11  There's nothing -- maybe there's stuff going on behind the

12  scenes -- but, certainly, there's little reason to assume

13  that the next couple of weeks will be crucial for the

14  committee.

15       The bottom line, I guess, is we've managed to keep

16  the situation as-is for 10 days up to this point, to the

17  extent that minimal cash expenditures would suffice to allow

18  the debtors to maintain in this state of limbo until a

19  committee can be formed to weigh in, certainly, that's

20  something that Kado would support.  Thank you, Your Honor.

21       THE COURT:  Thank you.

22       Okay.  Mr. Azman, with that, I think you should

23  proceed through your motions, obviously, subject to anyone's

24  right to object as you proceed through.

25       MR. AZMAN:  Okay.  Thank you, Your Honor.

1          I'm going to turn things over to my partner Gregg

2   Steinman.

3          MR. STEINMAN:  Good afternoon, Your Honor --

4          THE COURT:  Good afternoon.

5          MR. STEINMAN:  -- Gregg Steinman of McDermott

6   Will & Emery, on behalf of the debtors.  Thank you for

7   letting me appear *pro hac vice*.

8          Ms. Kandestin and I are going to be handling the

9   first day motions, but the matters that we're handling aren't

10  in consecutive order of the agenda.  If it's all right with

11  Your Honor, I think it would be more efficient for me to

12  handle all the motions I'm handling and then turn the podium

13  over to Ms. Kandestin so that we're not switching off.

14         THE COURT:  Okay.  That's fine.  Just make sure

15  you identify which motion you're --

16         MR. STEINMAN:  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         MR. STEINMAN:  The first motion I'll address is

19  the joint administration motion, which is number one on the

20  agenda.  This is a procedural motion for administrative

21  efficiency and we're asking that the cases be administered

22  under Prime Core Technologies, Inc., Case Number 23-11161.

23         Unless Your Honor has any questions, we

24  respectfully request that the motion be granted.

25         THE COURT:  Does anyone wish to be heard with

1  respect to the joint administration motion?

2        (No verbal response)

3              THE COURT:  Okay.  I hear no one.

4              I've reviewed the motion.  The relief sought is

5  ministerial in nature and appropriate, so I will enter the

6  order.

7              I had one modification, but I understand the word

8  "exclusive" has been stricken from before "jurisdiction" and

9  uploaded; is that correct?

10             MR. STEINMAN:  Yes, Your Honor.

11             THE COURT:  Okay.  I will enter the order.

12             MR. STEINMAN:  The next motion, Your Honor, will

13  be the utilities motion, which is the fourth item on the

14  agenda.

15             THE COURT:  Okay.

16             MR. STEINMAN:  Through this motion -- sorry, Your

17  Honor.

18             THE COURT:  That's okay.

19             MR. STEINMAN:  Through this motion, the debtor --

20  the debtors are seeking authority to prohibit utilities from

21  altering or refusing or discontinuing services under certain

22  circumstances and establishing procedures for determining

23  adequate assurance of payment for future utility services.

24             The 12-month running average for utilities for the

25  debtors is around $200,000 a month.  As adequate assurance,

1 we propose depositing about half the monthly spend into a

2 segregated account and the proposed order establishes

3 procedures whereby utility companies can request additional

4 adequate assurance and the debtors can negotiate with them,

5 if necessary.

6          We think these procedures will be helpful as we

7 navigate through Chapter 11.  There were certain comments

8 that we received from the U.S. Trustee's Office, which have

9 been incorporated into the orders that we submitted to Your

10 Honor.  And unless you have any questions, we'd request that

11 that motion be granted, as well.

12          THE COURT:  Let me ask, the orders that are in the

13 binder that were -- that was delivered to the Court, do they

14 contain the United States Trustee's changes?

15          MR. STEINMAN:  I --

16          MS. KANDESTIN:  Yes, Your Honor.

17          MR. STEINMAN:  -- believe -- yeah, I believe that

18 they do.  I think the ones that were submitted to the Court

19 have the removal of the "exclusive jurisdiction."  I think

20 that's the only change.

21          THE COURT:  Okay.  Does anyone wish to be heard

22 with respect to the utilities motion?

23          MR. IZAKELIAN:  Good afternoon, Your Honor.

24 Razmig Izakelian --

25          THE COURT:  Yes, sir?

1          MR. IZAKELIAN:   -- from Quinn Emanuel for Bittrex,

2     Inc.

3          We don't really have an objection.  I have a

4     reservation of rights to make.  It applies to all the

5     motions.  But I think since payment is going to be made with

6     this one, it works just as well to say it now.

7          So, just by way of a very brief background,

8     Bittrex, Inc. operated a U.S. cryptocurrency exchange.  It's

9     currently the debtor-in-possession in a case pending from

10    this district.  So Bittrex, Inc. holds two accounts at Prime.

11    I've spoken with the debtors' counsel and we understand that

12    the funds in customer accounts are not going to be used to

13    make any interim payments.  With that understanding, we don't

14    have any objections to the first day motions.  But we just

15    want to reserve our rights in case this issue comes up again

16    in these cases.

17          THE COURT:  Okay.

18          MR. AZMAN:  Your Honor, real brief --

19          THE COURT:  Mr. Azman?

20          MR. AZMAN:  Yeah, Your Honor, real briefly, Darren

21    Azman; again, proposed counsel for the debtors.

22          We have proposed language that we've circulated.

23    This is not an issue that only Counsel has raised; other

24    creditors' counsel have also raised the same issue.  We

25    circulated some language to some folks.  I don't know if I've

1  gotten it out to Quinn Emanuel yet, but essentially, on the

2  cash management order, we're going to include a provision

3  that -- I'm just going to pull it up so I can read it into

4  the record and folks can -- and we're not at the cash

5  management order yet, but I agree, it does apply to all of

6  them, really.  Just a moment.

7       (Pause)

8            MR. AZMAN:  So, notwithstanding anything to the

9  contrary in this order -- again, this order being the cash

10 management order -- the debtor shall not use funds from

11 customer accounts -- "customer accounts" is a defined term --

12 to honor any prepetition obligations or pay for any post-

13 petition obligations, absent further order from the Court.

14 And then there's a second sentence for reservation of rights,

15 "All parties' rights are reserved regarding whether and to

16 what extent any funds or other property are held by a debtor

17 in trust or constitute property of the debtors' estates."

18            THE COURT:  Any comment on that order?

19            MR. AZMAN:  So, I don't know if folks want to let

20 me know now if that language works for them or if they have

21 comments?

22            MR. IZAKELIAN:  Razmig Izakelian with Quinn

23 Emanuel for Bittrex, Inc.

24            I can speak with Mr. Azman after the hearing.

25 That sounds generally fine, but the devil is in the details,

1  obviously, (indiscernible) account, that sort of thing, but

2  in broad terms, that seems okay.

3          THE COURT:  Anyone else?

4          Ms. McLaughlin Smith?

5          MS. MCLAUGHLIN SMITH:  Good afternoon, Your Honor.

6  I apologize for my camera setup.  It's my first time at this

7  desk, so I apologize for not looking directly into the

8  camera.  Marcy McLaughlin Smith of Troutman Pepper Hamilton

9  Sanders, on behalf of AnchorCoin, LLC.

10          We did discuss, prior to the hearing, we did

11  receive the language that debtors' counsel just read into the

12  record.  We did have some additional comments as to that.  I

13  don't know if you would like for me to talk about them now or

14  wait for the cash management.  I'm happy to do either.

15          THE COURT:  Can we wait until the cash management?

16          MS. MCLAUGHLIN SMITH:  Of course, Your Honor.

17          THE COURT:  Is there anybody that wants to be

18  heard, further, with respect to utilities, subject to any

19  language in the cash management order?

20      (No verbal response)

21          THE COURT:  Okay.  Let me -- I have a question

22  with respect to utilities.  The Western Alliance Bank that's

23  going to hold the deposit, is that a UDA bank?

24          MR. STEINMAN:  Yes, Your Honor.

25          THE COURT:  Okay.  Does anyone want to be heard on

1  this motion?  I want to make sure I'm not missing people,

2  because some people are raising their hands.  I don't see any

3  hands and I don't hearing anyone.

4          I have reviewed the motion and the proposed order.

5  I'm satisfied, based on the record presented, the relief is

6  appropriate.  The proposed procedures are reasonable and

7  consistent with procedures routinely granted in this

8  district.

9          I'm also satisfied the debtors have shown

10 immediate and irreparable harm would result if the relief

11 isn't granted.  So I'm going to enter the interim order with

12 modifications.

13         I see that the second day hearing has been

14 included.  This is more of a comment.  At paragraph 6, it

15 addresses the reduction of the utility deposit for

16 discontinuance of the utility service, but I would also like

17 the final order to reflect that any additional utilities

18 added to the list, that there will also be an increase in the

19 deposit.

20         In paragraph 11, the first line, I would ask that

21 you strike the word "and directed."  I'll authorize it, but

22 I'm not going to direct third parties who aren't before me on

23 the issue.

24         And with those modifications, I'll enter the

25 order.

1            MR. STEINMAN:  Thank you, Your Honor.

2            We'll make those modifications and submit a

3    revised order to the Court.

4            THE COURT:  Thank you.

5            MR. STEINMAN:  The next motion is the insurance

6    motion, which is the sixth matter on the agenda.

7            The debtors are seeking authority to keep their

8    insurance policies and coverage, as well as their surety bond

9    program in place in the ordinary course.  The debtors

10    currently have nine insurance policies and no insurance

11    premium financing.  The list of insurance policies, policy

12    numbers, terms, and premiums is attached to the motion as

13    Exhibit C.

14            And we're seeking on an interim basis to pay any

15    prepetition obligations under those policies, up to $18,000

16    on an interim basis.  Just to provide a little bit more

17    detail about that, given the conversations earlier in the

18    hearing, that's with respect to the debtors' property and

19    casualty insurance premium.

20            The debtors also have 23 surety bonds.  The

21    debtors are required to maintain these bonds in the ordinary

22    course of business, pursuant to various state regulations.

23    The list of surety bonds, the relevant state, the bond

24    amount, and the bond premiums are attached to the motion as

25    Exhibit D.  We do not believe at this time that there are any

1  prepetition amounts due on the surety bonds in the interim

2  period.

3        Unless Your Honor has any questions, we'd ask that

4  that motion be granted.

5        THE COURT:  Does anyone want to be heard on the

6  insurance motion?

7        Mr. Forsh?

8        MR. FORSH:  Thank you, Your Honor.

9        I'm not sure -- I didn't have the opportunity to

10 clarify this issue with the debtors before the hearing; we

11 were working on a few other matters -- but, Your Honor,

12 Exhibit C to the insurance motion identifies multiple

13 policies that appear to be expiring on September 4th and this

14 lists about $1.5 million in premiums associated with that.

15        This goes to the points that were made earlier

16 about the status of this case and the need for the Committee

17 to weigh in on the proper path for these cases.  Some of

18 these items (indiscernible) continue and others, perhaps,

19 not, depending on what path the case goes and whether this is

20 going to be an operating Chapter 11.

21        To the extent, I understand that the request was

22 for $18,000 in interim relief.  Kado has no objection to

23 that, to the extent that the request is somehow a

24 bifurcation, allowing the expenditure of $1.5 million to

25 renew its policies, no doubt at higher premiums, now that

1  we're in bankruptcy, I suppose that Kado is objecting to that

2  at this point.

3           THE COURT:  Okay.

4           MR. STEINMAN:  Your Honor, I'm happy to address

5  that issue.

6           THE COURT:  Please, thank you.

7           MR. STEINMAN:  And I apologize that this was not

8  articulated in the motion, but those policies are expiring,

9  but they've been effectively replaced by the exact same type

10 of policy and policy limits, which are the receivership, the

11 policies that are noted, receivership D&O, which were paid

12 prepetition and do not expire until July of 2024.

13           So, for purposes of disclosure, because we still

14 had policies in place that don't expire for a week, we

15 included them on this exhibit, but the fact that those

16 policies expire will not have any detriment to the debtors or

17 the estate because they've effectively been renewed through a

18 new policy.

19           THE COURT:  And there's no funds owing, with

20 respect to the receivership D&O policy; is that correct?

21           MR. STEINMAN:  That's correct, Your Honor.

22           THE COURT:  Mr. Forsh, does that respond to your

23 inquiry?

24           MR. FORSH:  It does.  Thank you very much for the

25 clarification.

1          THE COURT:  Thank you.

2          Does anyone else wish to be heard regarding the

3   insurance motion or the proposed form of order?

4       (No verbal response)

5          THE COURT:  I've reviewed the motion.  I'm

6   satisfied based on the record that the relief is necessary,

7   required by our rules and procedures, and is customary, so I

8   will enter the interim order.

9          MR. STEINMAN:  Thank you, Your Honor.

10          THE COURT:  Can you bear with me just one second,

11   because I'm -- some of the orders that I had in front of me

12   are a little different than what was on file.  So paragraph 3

13   of this order refers to this final order in the next-to-last

14   line of the paragraph.

15          Do you see where I'm referring to?

16          MR. STEINMAN:  Did you say paragraph 3, Your

17   Honor?

18          THE COURT:  Yes, the next-to-last line.  It says,

19   "And due and payable, and this final order shall not be

20   deemed to allow..." I think that should be "interim."

21          MR. STEINMAN:  Yes, I see it.

22          To the extent that that hasn't already been fixed

23   on the ones that we uploaded, we'll fix it and upload another

24   order.

25          THE COURT:  Yeah, because I didn't see this

1  particular one uploaded.

2        But -- and then the other question I had is

3  paragraph 4 deals with straddle taxes.  Is that necessary in

4  this interim order?

5        Oh, I'm sorry, I skipped ahead.

6        MR. AZMAN:  I think that's in the taxes motion,

7  Your Honor.

8        THE COURT:  Yeah, I'm sorry, I skipped ahead.

9  Sorry.

10       All right.  So, when -- I don't see that it's

11 uploaded, though, the order, and it may --

12       MR. STEINMAN:  We'll make sure to upload it as

13 soon as the hearing is over.

14       THE COURT:  Okay.  Great, thank you.

15       MR. STEINMAN:  The next motion is the cash

16 management motion, which is the eighth matter on the agenda.

17       As Mr. Azman noted in his presentation, the debtor

18 ceased operations in June.  Since then, the cash management

19 system has been simplified.  All the debtors' accounts are

20 held by debtor Prime Trust, LLC.  The main operating account

21 at BMO Bank is being used to pay expenses and payroll.

22       It is our understanding that most, if not all, of

23 the intercompany transfers that currently occur in the

24 ordinary course are the payment of payroll expenses by Prime

25 Trust, LLC, for the benefit of debtor Prime Digital.  Prime

1    Digital employs the debtors' employees that live outside of

2    Nevada.   Prime Trust employs the employees that live inside

3    of Nevada.

4         Through this motion, the debtors are seeking

5    authority to continue utilizing their centralized cash

6    management system.   We're also seeking approval to pay

7    certain pre-petition obligations related to the cash

8    management system.   We ask for an interim cap of $8,000.   To

9    provide a little bit more detail, the actual amount of bank

10   fees that we believe are outstanding is around $3600.   We

11   added an extra cushion in case there was anything that was

12   discovered that we did not find in our review.

13        We're also asking the Court to authorizes the

14   continued payment of bank fees in the ordinary course, the

15   use of the company's business forms, and to continue to honor

16   the intercompany transactions that I just noted.   And to the

17   extent that we're not in compliance with Bankruptcy Code

18   Section 345, we request a 30-day extension to come into

19   compliance.

20        We've received a number of informal and formal

21   comments to this motion.   We initially received some comments

22   from the U.S. Trustee's Office.   All of those have been

23   incorporated in the orders that were submitted to Your Honor.

24        The other comments that we received, Mr. Azman

25   noted earlier, we have proposed language to most of the

1   parties that have raised that issue.  We're happy to take

2   that up now or we can continue to work with the parties after

3   the hearing to finalize language to include in the order.

4          THE COURT:  Well, let me ask, does anyone wish to

5   be heard regarding the motion or the proposed order?

6          MS. D'ANDREA:  Your Honor, Mia D'Andrea on behalf

7   of BMO Harris Bank.  Your Honor, I am not licensed in

8   Delaware and have not had the opportunity to retain local

9   counsel and get my *pro hac* on file, however, if I could be

10  heard briefly?

11         THE COURT:  Certainly.

12         MS. D'ANDREA:  Your Honor, we had a limited

13  opportunity to review the proposed order and the motion.  We

14  would reserve all of our rights.  We do object to the interim

15  cap, Your Honor.  There's certainly no cap on our client's

16  liability in the event of a dishonored check that occurs or

17  other dishonored item.  So, with that in mind, we do object

18  to the concept of the cap.

19         THE COURT:  The $8,000 is the objection or the

20  $3600?

21         MS. D'ANDREA:  The $8,000.

22         THE COURT:  Okay.

23         MR. STEINMAN:  Your Honor, we're happy to raise

24  the cap to satisfy whatever concerns the bank has.  Just

25  based on a review of our records, the only prepetition

1  obligations that we were able to find is the $3600 in bank

2  fees.

3          THE COURT:  Well, I think given that this is a

4  first day and the debtor has made an assessment, I'm going to

5  allow the cap where it stands and if there's an issue, you

6  can come in on an emergency basis and we'll address it.

7          MS. D'ANDREA:  Understood, Your Honor.

8          THE COURT:  Is there anyone else who wants to be

9  heard?

10          MR. NESTOR:  Your Honor, Mike Nestor again.

11          THE COURT:  Yes?

12          MR. NESTOR:  I just want to be clear.  We spoke

13  earlier -- am I echoing?  I apologize for asking that

14  repeatedly -- we -- rather than saying this one we're okay to

15  have on the 19th and this one, we're not, I think what we'll

16  do -- and, obviously, there's not a committee formed yet, but

17  I think it's sufficed to say Your Honor said all rights of

18  the committee are reserved with respect to any of these

19  pleadings to seek Your Honor's attention Wednesday or

20  Thursday of next week.

21          So, rather than appear on each motion and raise

22  that point, I think we'll just deal with the general

23  reservation of rights and hopefully we won't have to see you

24  next week, but at least we'll have the opportunity.  Thank

25  you.

1         THE COURT:  Okay.  Are there any other comments

2   with respect to the cash management motion?

3         MS. D'ANDREA:  And, Your Honor, one further item.

4   Just with respect to the debtors' request to treat

5   intercompany transfers as admin claims, I think that's

6   premature at this point in time, Your Honor, so I don't know

7   that the debtors met the burden that those intercompany

8   transfers should proceed at admin claims at this juncture.

9         MR. STEINMAN:  Your Honor, those are -- as noted,

10  the intercompany transfers are primarily related to payroll,

11  which would fall squarely within Section 507 as an

12  administrative claim that benefits the estate.

13        THE COURT:  I'm looking for the provision.  Bear

14  with me a second.

15     (Pause)

16        THE COURT:  Can you point me to the paragraph in

17  the order?

18     (Pause)

19        MS. MCLAUGHLIN SMITH:  Your Honor?

20        THE COURT:  Paragraph 11 --

21        MS. MCLAUGHLIN SMITH:  Sorry, Your Honor.  Marcy

22  McLaughlin Smith of Troutman Pepper, on behalf of AnchorCoin,

23  again.

24        It is paragraphs 10 and 11.  We also had an

25  objection to the intercompany transfer authorization on an

1  interim basis.  I didn't know if you wanted me to jump in

2  here or wait?

3          THE COURT:  No, I'm going to address it all at

4  once.  So, if you have an issue, please, raise it now.

5          MS. MCLAUGHLIN SMITH:  Okay.  So, Your Honor, we

6  also would request that on an interim basis intercompany

7  transfer not be authorized to be paid, whether that is a

8  prepetition or a post-petition amount in this case.

9  Obviously, we discussed a lot about the cash issues and

10 there's a customer shortfall of $82 million and the committee

11 has yet to be appointed.

12         Specifically with the intercompany transaction or

13 transfers I don't believe there was a disclosure in the

14 motion of the total amount anticipated to be incurred in this

15 interim period or an amount of the prepetition intercompany

16 transfers that have been incurred or any interim cap amount.

17 So, those would be our objections as well to the payment of

18 intercompany transfers on an interim basis.

19         MR. STEINMAN:  Your Honor, I'm happy to propose a

20 resolution.

21         THE COURT:  Certainly.

22         MR. STEINMAN:  We propose just to limit the

23 authorization to intercompany transfers that relate to

24 payroll.  Payroll is, obviously, very necessary in this case

25 in the ordinary course.  Prime Trust, LLC pays for employees

1  that are actually employed by the debtor, Prime Digital.

2  Without the authority to pay those we're not going to be able

3  to pay our employees, but I am happy to limit intercompany

4  transactions to just that relief in order to resolve any

5  concerns of the parties.

6          THE COURT:  Does anybody want to be heard?

7          MR. STEINMAN:  On an interim basis.

8          MS. MCLAUGHLIN SMITH:  Your Honor, Marcy

9  McLaughlin Smith again for the record.

10         We didn't have an objection to the interim wage

11 motion, so if this relief is tying into that with respect to

12 payroll, I don't believe we have a further objection.

13         THE COURT:  Okay. I am going to overrule the

14 objections and allow it on a limited basis and on an interim

15 basis.  Limited to payroll.

16         With respect to the form of order, does anybody

17 else have any further comments before I make some comments on

18 the order?

19         MR. IZAKELIAN:  Good afternoon, again, Your Honor.

20 Razmig Izakelian, Quinn Emanuel, for Bittrex, Inc.

21         The only comment I had was the one we spoke about

22 earlier.  I can speak with Mr. Steinman and Mr. Azman

23 afterwards on the specifics of the language.

24         THE COURT:  Okay. Understood.

25         MS. MCLAUGHLIN SMITH:  Your Honor, Marcy

1  McLaughlin Smith from Troutman Pepper again.

2          AnchorCoin also had some language to that proposed

3  language on trust payments and customer accounts language.

4  So, if debtors' counsel is willing to work with us after the

5  hearing we would appreciate that as well.  That was one of us

6  our issues.

7          MR. STEINMAN:  Your Honor, we will make sure to

8  include everyone that has raised that issue as we work

9  through the language.

10         THE COURT:  Okay.  A couple of questions.  First

11  of all, are all the debtors' banks UDA banks?

12         MR. STEINMAN:  Your Honor, three of them are not.

13  We are working through that.  We're going to try to work

14  through that with the United States Trustee.  Two of the

15  three are banks that we no longer use, the relationship has

16  been terminated.  There is just the account is still open.

17  So, I think one of them has zero dollars in it and the other

18  one has $9,000.  So, we are working on fixing that issue.

19  The third one is Lexicon Bank which has around $1 million in

20  it and we are working to either bring Lexicon up to have them

21  execute a UDA or we will figure out a solution to move those

22  funds into a UDA approved bank.

23         THE COURT:  Okay. Thank you.  The other question I

24  have is with respect to intercompany transactions are there

25  any non-debtor affiliates that have access to debtor accounts

1  who can sweep accounts?

2          MR. STEINMAN:  Sorry, Your Honor, can you repeat

3  the question?

4          THE COURT:  Are there any non-debtor entity

5  affiliates that have access to debtor accounts who can sweep

6  the accounts?

7          MR. STEINMAN:  No, Your Honor.  There are no non-

8  debtor affiliates other than the New York entity which is not

9  actually a formed entity.

10          THE COURT:  Right, that's not operating.  Okay. I

11  just wanted to make sure.

12          In Paragraph 17, it requires service of an order

13  as soon as possible in the banks.  Does the United States

14  Trustee have a time limit they want that completed by?

15          MR. CUDIA:  Your Honor, Joseph Cudia for the

16  United States Trustee.

17          Since the Silicon Valley Bank incident, that is

18  the language that we have been asking to be inserted is as

19  soon as possible.

20          THE COURT:  Okay.  With respect to Paragraph 20 in

21  the form of order, that paragraph I'm curious how it differs

22  from Paragraph 13.

23          MR. STEINMAN:  Your Honor, if I could have one

24  second. I think I'm looking at the wrong order.

25          THE COURT:  I want to make sure I'm not looking at

1 || the wrong order.  This is just a provision regarding the

2 || banks being authorized to honor.  It appears to me they are

3 || somewhat duplicative.

4 ||          MR. STEINMAN:  You said this is Paragraph 13 and

5 || 20?

6 ||          THE COURT:  Yes.  Let me just put it this way, I

7 || don't mean to put you on the spot right here and now, I know

8 || you have discussions to have with other people. When you are

9 || having those discussions consider whether you need both of

10 || these paragraphs.

11 ||          MR. STEINMAN:  Will do, Your Honor.

12 ||          THE COURT:  With that I will enter the order.

13 ||          MR. STEINMAN:  Your Honor?

14 ||          THE COURT:  Yes.

15 ||          MR. STEINMAN:  Before we move forward, I was just

16 || informed that my understanding of our intercompany transfers

17 || was not a hundred percent correct.  We also would need that

18 || authority to pay some of the other payments that we're

19 || seeking in the other motions like taxes and insurance.  So,

20 || we would ask that that relief be expanded to authorize

21 || intercompany transfers on an interim basis only in connection

22 || with the motions that we're seeking today.

23 ||          THE COURT:  I'm going to allow it on an interim

24 || basis subject to committee coming back and reviewing it.

25 ||          MR. STEINMAN:  Thank you, Your Honor.

1       THE COURT:  Let me ask a quick question before we

2   proceed further, do you need a form of cash management order

3   today?

4       MR. STEINMAN:  Yes, Your Honor.

5       THE COURT:  Okay.  So, let me -- I know you have

6   some discussions and negotiations to do with other parties.

7   That form of order needs to be in our Chambers by 5:30 today.

8       MR. STEINMAN:  Understood, Your Honor.

9       THE COURT:  Okay.

10       MR. AZMAN:  Your Honor, could we maybe take a

11   brief recess? I am a little concerned that if we run too late

12   here and we don't get a consensus, and then we have to come

13   back to Your Honor, to adjudicate a dispute that we have if

14   not all of the objecting parties agree.  Does it make --

15       THE COURT:  That's fine because, unfortunately, I

16   just at some point I lose staff to docket orders and what

17   have you. So, I am happy to take a quick recess.

18       MR. AZMAN:  If we could take 15 minutes now and we

19   can work with the parties, if that's okay with Your Honor.

20       THE COURT:  That's fine.  We will reconvene at

21   4:45.

22       MR. NESTOR:  If you could send the language around

23   to everybody.  I know you are planning to do that, but just

24   if you could include us that would be great. Thank you.

25       MR. AZMAN:  Yup.  We will make sure to include

1  everyone.  Thanks.

2          THE COURT:  Thank you.  We are in recess.

3      (Recess taken at 4:29 p.m.)

4      (Proceedings resumed at 4:46 p.m.)

5          THE COURT:  Okay.  We're back on the record in

6  Prime Core Technologies.

7          MR. AZMAN:  Hi, Your Honor.  Darren Azman for the

8  record from McDermott, proposed counsel for the debtors.

9          So, I believe we have four objecting parties.  Mr.

10 Forsh has accepted the proposed language, which I will go

11 through in just a moment, Your Honor.

12         THE COURT:  Okay.

13         MR. AZMAN:  Mr., and I will not get this

14 pronunciation correct, so, I'm sorry, Izakelian from Quinn

15 Emanuel. They are okay with the language as well.

16         We have not heard back from Mr. Nestor, but I am

17 hopeful that he can maybe give us his comments while we're on

18 the line here.

19         The fourth -- I'm sorry, Ms. Smith, Ms. Smith does

20 not agree to the language.  Ms. Smith has some additional

21 language she wants to add which is not workable for the

22 debtors.  Why don't I read again to Your Honor, it's the same

23 language that I read before, but let me bring it into your

24 memory fresh --

25         THE COURT:  Okay.

1           MR. AZMAN:  -- and then maybe Ms. Smith can tell
2  you what her issues are and then hopefully Mr. Nestor can let
3  us know if he's okay or not.
4           MR. NESTOR:  Your Honor, we are okay.  My client
5  is okay with this.  We're trying not to let the perfect get
6  in the way of the good.
7           THE COURT:  Thank you, Mr. Nestor.
8           MR. NESTOR:  Thank you.
9           MR. AZMAN:  Thank you, Mr. Nestor.  We appreciate
10 that.
11          So, the language is as follows:
12          "Notwithstanding anything to the contrary in this
13 order, the debtors shall not use funds from customer accounts
14 to honor any prepetition obligations or pay for any post-
15 petition obligations absent further order of the Court."
16          Before I tell you the second sentence, again,
17 customer accounts is a defined term and it references to the
18 same defined term in the motion.  The second sentence is:
19          "All parties rights are reserved regarding whether
20 and to what extent any funds or other property are held by a
21 debtor in trust or constitute property of the debtors'
22 estates."
23          THE COURT:  Okay.  Thank you.
24          MR. AZMAN:  And maybe the last sentence I should
25 just give you some context for very briefly.  I think the

1  idea there is that the estate may ultimately come to the

2  conclusion that some of the assets in the customer deposit

3  accounts are property of the estate.  This is an issue that

4  is front and center in every single crypto case that has been

5  filed.  I'm sure Your Honor is familiar with that generally.

6  Likewise, I'm sure that the customers want to preserve the

7  right to argue that other funds are not property of the

8  estate. So, it's designed to allow parties the time they need

9  to figure those issues out.

10         MS. MCLAUGHLIN SMITH:  Your Honor, Marcy

11  McLaughlin Smith, again, on behalf of AnchorCoin LLC.

12         For some additional context that I think will be

13  helpful as to our position, AnchorCoin is party to a trust

14  agreement dated July 12th, 2018 with the debtor, Prime Trust.

15  This is not one of the master services agreements that is

16  referenced in the first day declaration that the debtors are

17  party to as certain customers.  It's expressly called a trust

18  agreement.

19         Pursuant to that agreement Prime Trust serves

20  merely as a trustee with respect to certain deposited trust

21  accounts and those funds are deposited at the direction of

22  AnchorCoin by its customers who are crypto token holders.

23  There is a circular relationship there between deposit of the

24  funds with Prime Trust as the trustee, and then AnchorCoin

25  recognizes that it issues tokens back out to the holders who

1  it is the holders who have the property interest with Prime

2  Trust.

3          That agreement expressly provides that Prime Trust

4  is not entitled to any funds in that trust account at any

5  time, nor shall any of those amounts deposited in the trust

6  become property of Prime Trust or subject to any debts,

7  liens, or other encumbrances of Prime Trust.  They are

8  exclusively held for the benefit of holders.  So, based on

9  AnchorCoin's records there should be approximately $20

10 million of funds deposited with a trust account held by, but

11 not owned by the debtor.

12         So, it's AnchorCoin's position that any language

13 added to the order should expressly provide that the funds

14 that were to be held in trust by the debtors are not to be

15 used or transferred unless in accordance with applicable law

16 or an applicable contract.  This aligns with Supreme Court

17 precedent that if a debtor does not own an equity interest in

18 property, holds a trust for another, it is not estate

19 property. And that is Begier v. IRS, 496 U.S. 53.

20         So, our proposal is to add to the end of the first

21 sentence that debtors' counsel read into the record:

22         "Nor shall any debtor use or transfer property

23 (including funds) held by it in trust other than in

24 compliance with any applicable law or contract."

25         We think that that is sufficiently protected

1   language for both the debtors and AnchorCoin because only the

2   debtors know what accounts the funds to be held in trust by

3   it were deposited into.  We have no idea whether the customer

4   accounts contain the funds that were deposited by our

5   customers in trust or if those funds were deposited into

6   other accounts.  Customer deposits is simply, I think,

7   defined as the 17 customer accounts of the cash management

8   order.

9          So, in conclusion, Your Honor, we think its well

10  settled law that property held in trust by a debtor for

11  another is not property of the estate and we had less than 24

12  hours' notice of this hearing, Your Honor, and we don't think

13  that we should be prejudiced going forward if there are funds

14  that were deposited and to be held in trust by the debtors in

15  an account that is not a customer account.

16          THE COURT:  This is very difficult without having

17  the language in front of me.  Can somebody share a screen and

18  put your respective language on screen?

19          MR. STEINMAN:  Yes, Your Honor.

20          THE COURT:  Thank you.

21          MR. STEINMAN:  Is it up on the screen?

22          THE COURT:  It is.  Thank you.

23          MS. MCLAUGHLIN SMITH:  Your Honor, I have a

24  marked-up version as well for you.

25          THE COURT:  Marked up with your edit to his

1  language?

2           MS. MCLAUGHLIN SMITH:  That is correct.

3           THE COURT:  Can you show me that, please?

4           MR. AZMAN:  Your Honor, whenever you're ready I

5  have some responses, but I think it might be easier for you

6  to see the language first.

7           THE COURT:  Thank you.

8           MS. MCLAUGHLIN SMITH:  Are you able to see just

9  the word document, Your Honor?

10          THE COURT:  I can.  Let me hear from the debtor.

11          MR. AZMAN:  Your Honor, the issue we have with

12 this language is that there is inherent uncertainty in it.

13 If they believe that there are any amounts, right, the

14 language we are proposing makes clear that we are not going

15 to use any funds absent Court order that is sitting in the

16 client deposit -- the customer deposit accounts.  If any

17 creditor believes that amounts held in another account is

18 held in trust, they have the burden of demonstrating that.

19          We are, again, agreeing to not use funds held in

20 the customer accounts right now.  That may change later, but

21 no one has put forth any evidence that any funds in the non-

22 customer deposit accounts are not property of the estate.

23 And I think the really important here to focus on, Your

24 Honor, the agreement is one thing.  The agreement may say,

25 and this is played out in FTX and other crypto cases, that

1   client funds, customer funds are to be segregated and held in

2   trust, but the real test in the Third Circuit and every other

3   circuit, frankly, is whether the person that is asserting a

4   trust exists can identify and trace the trust funds if they

5   have been comingled.  And certainly, there is no evidence of

6   that today.

7           So, to insert this language just creates ambiguity

8   and its almost circular in that it says the debtors can't use

9   trust funds, but there's no articulation about where this

10  creditor believes trust funds are other than in the customer

11  deposit account.

12          THE COURT:  Ms. Smith.

13          MS. MCLAUGHLIN SMITH:  Your Honor, its my

14  understanding from my client that they have been trying to

15  get information on where their trust funds are located and in

16  which account through the receivership action, and that they

17  haven't yet been provided that information from the debtors.

18          So, I am certain that, you know, this will be the

19  top of our list to try to get that information, but I don't

20  think that it should be a prejudice to us that the debtors

21  request this relief, the debtors know the language of this

22  express trust agreement, and that we should be prejudiced in

23  this interim period because of information that we have not

24  yet been able to obtain despite our best efforts.

25          THE COURT:  Well, it's first day relief. I am

1  going to allow the debtors' language to maintain status quo.

2  All rights are reserved for parties to present evidence at a

3  later date.

4        MR. AZMAN:  Thank you, Your Honor.

5        MS. MCLAUGHLIN SMITH:  Thank you, Your Honor.

6        MR. AZMAN:  Your Honor, we are going to upload

7  that revised order shortly.  And then, I guess, in the

8  meantime, if it makes sense, we can continue on.

9        THE COURT:  Yes, please.  One other thing, with

10 respect to submission of the revised order please submit a

11 clean and a blackline under certification of counsel.  Thank

12 you.

13       MR. STEINMAN:  Of course, Your Honor.  I'd like to

14 turn things over to Ms. Kandestin now to finish the rest of

15 the matters on the agenda.

16       MS. KANDESTIN:  Thank you, Mr. Steinman.

17       Your Honor, again, for the record Maris Kandestin

18 of McDermott Will & Emery on behalf of the debtors. If it

19 would please the Court, I would suggest proceeding with the

20 matters that are uncontested in the first instance and leave

21 the one contested matter, as I understand it, with respect to

22 the U.S. Trustee towards the end.

23       THE COURT:  Okay.  Which matter is contested by

24 the U.S. Trustee?

25       MS. KANDESTIN:  There are a few things that the

1  U.S. Trustee is contesting with respect to our motion, the

2  creditor matrix motion we're calling it.

3            THE COURT:  Okay.

4            MS. KANDESTIN:  So, I will -- oh, sorry, Your

5  Honor.

6            THE COURT:  No, that's okay.  You can proceed with

7  the uncontested matters.

8            MS. KANDESTIN:  Thank you.  Item No. 3 on the

9  agenda is the debtors' application for the appointment of

10  Stretto as the debtors' Court appointed claims and noticing

11  agent which was filed at Docket No. 15.  Prior to engaging

12  Stretto the debtors solicited proposals from two other claims

13  agents consistent with the claims agent protocol and the

14  debtors selected Stretto based on its experience, competitive

15  rates and qualifications.

16            As the debtors have over 200 creditors, the

17  appointment of a claims and noticing agent is required by the

18  local rules.  The U.S. Trustee had no comments to this

19  proposed form of order.  And unless Your Honor has any

20  questions, we would ask that you enter the order approving

21  this application.

22            THE COURT:  Does anyone want to be heard on the

23  motion to retain Stretto?

24        (No verbal response)

25            THE COURT:  Okay. I see no one. I have reviewed

1  the application, the declaration, the proposed order, and the

2  relief is customary and required under the local rules.  In

3  addition, the debtors have complied with the claim's agent

4  protocol having considered, at least, two other Court

5  approved claims agents.

6          So, I will enter the order granting the

7  application subject to a clarification and modification.

8  First, I may have missed it, but I didn't see a

9  representation or a disclosure that Stretto is not a party to

10 any agreement to provide claims data in exchange for

11 compensation.  Was that in there or someone from Stretto is

12 on the line if they can make a representation in that regard.

13         MS. KANDESTIN:  Your Honor, I'm not sure someone

14 from Stretto is on the line.  I would be happy to confer with

15 them after the hearing and maybe include something in the

16 proposed order to that effect.

17         THE COURT:  Yeah, or supplemental declaration;

18 that would be fine.

19         MS. KANDESTIN:  Okay.

20         THE COURT:  The other question I have, and I don't

21 know if perhaps this was changed with the U.S. Trustee, but

22 Paragraphs 12, 13, 16, and 17 all relate to indemnification.

23 I was wondering if the Trustee's office had any comment with

24 respect to those paragraphs.  And I'm trying to pull up the

25 order that was uploaded.  Bear with me one second.

1          Mr. Cudia, do you see what I'm referring to?

2          MR. CUDIA:  Yeah, Your Honor, I am trying to pull

3    that up myself at this point.

4          THE COURT:  I mean, Paragraph 12 refers to

5    indemnification under the engagement as modified by the

6    order.  Then Paragraph 13 indicates they're entitled to

7    indemnification.  Then Paragraph 16 says notwithstanding

8    anything in the engagement letter.  Then Paragraph 17, again,

9    refers to indemnification.

10         MR. CUDIA:  As standard procedure, Your Honor, we

11   normally if there is an indemnification procedure in the

12   engagement agreement, we would modify it to conform with the

13   United Artists standards.

14         THE COURT:  Right.

15         MR. CUDIA:  Like I said, I'm trying to find that

16   order right now myself.

17         THE COURT:  And while you're looking for that the

18   other question I had is the relevance of Paragraph 14 in

19   connection with the retention of a claims agent.

20         MS. KANDESTIN:  Your Honor, I think is likely just

21   boilerplate for orders.  I am happy to remove it.

22         THE COURT:  Yeah, I think it should be removed in

23   the context of this retention.

24         With respect to indemnification, the reason I

25   bring it up is because it doesn't seem consistent with what

1   is generally required by the United States Trustees Office

2   or, at least, it should be modified so that its in one or two

3   paragraphs.  It creates a little bit of ambiguity being in

4   four different paragraphs.

5         MS. KANDESTIN:  Your Honor, we're happy, subject

6   to Mr. Cudia agreeing to synthesize those paragraphs.

7         THE COURT:  Thank you.  I think that would be

8   appropriate.  Do you need that order today?

9         MS. KANDESTIN:  I don't believe so.  I think

10  Monday would be fine.

11        THE COURT:  Okay. I just want to make sure you

12  have ample time to look at it.  So, if you could just look at

13  that, that would be great.

14        MR. CUDIA:  Yes, Your Honor.  I'm happy to work

15  with Ms. Kandestin on the order.

16        THE COURT:  Thank you.  Okay, Ms. Kandestin.

17        MS. KANDESTIN:  Thank you.  Your Honor, Item No. 5

18  on the agenda is the debtors' motion to pay certain

19  prepetition taxes and fees which was filed at Docket No. 5.

20  In the ordinary course of the debtors' business the debtors

21  incur various types of taxes including franchise, property,

22  commerce, and income taxes, and they also pay various

23  regulatory and licensing fees.  For the reasons set forth in

24  our motion the debtors are seeking authority to pay taxes and

25  fees that accrued prior to the petition date in an aggregate

1  amount not to exceed $75,000 on the interim basis.

2          Your Honor, the U.S. Trustee didn't have any

3  comments to this proposed form of interim order.  So, we do

4  ask Your Honor to enter the order subject to any questions or

5  concerns you have.

6          THE COURT:  I only had two questions with respect

7  to taxes.  One was, and maybe I'm just reading this sentence

8  wrong, in Paragraph 3 it references the final order. In the

9  second to last sentence, it says this final order.  I think

10  that --

11          MS. KANDESTIN:  Yes, Your Honor.  We will fix

12  that.

13          THE COURT:  Then the only other question I had is

14  Paragraph 4 that deals with straddle taxes, is that necessary

15  in an interim order or is that something that can wait till

16  the final order?

17          MS. KANDESTIN:  Your Honor, we would be happy to

18  push that to the final order.

19          THE COURT:  I mean given the comments that have

20  been raised today let's put that off till final order.  With

21  that I have no other comments and I will enter the order.

22          MS. KANDESTIN:  Thank you, Your Honor.  The next

23  item that I'm handling is Item No. 7 on the agenda, it's the

24  debtors' motion to pay employee wages and other benefits

25  which appears at Docket No. 19.  The debtors' employees are

1  really the lifeblood of this business and are critical to the

2  success of these cases.  Debtors currently have about 70

3  employees and independent contractors.

4          As Mr. Law testified to in his declaration,

5  following entry of the cease-and-desist order by the Nevada

6  Division of Financial Institutions on June 21st, the debtors

7  reduced the size of their workforce including through

8  executing furloughs.  As a result, many of the debtors'

9  current employees have been forced to take on additional

10  workloads and responsibilities.

11          The amounts that the debtors are seeking authority

12  to pay are set forth in a chart appearing on Pages 14 and 15

13  of the motion, as well as in Paragraph 3 of the proposed

14  interim order.  As provided, the debtors are seeking

15  authority to pay compensation and related expenses in an

16  amount not to exceed $156,000 in the aggregate on the interim

17  basis.  And the debtors are also seeking to make payments on

18  account of employee benefits in an amount not to exceed

19  $167,600 in the interim.

20          Your Honor, the U.S. Trustee didn't have any

21  comments with respect to this order.  I did want to make note

22  of one thing though.  We erroneously listed employees as

23  notice parties in this motion and I wanted to make it clear

24  on the record that we are not intending to serve this motion

25  or any of the orders approving it on employees.  We made the

1 U.S. Trustee aware of this prior to the hearing as well.  So,

2 with that, Your Honor, unless you have any questions, we ask

3 that you enter an order approving the motion on an interim

4 basis.

5         THE COURT:  Does anyone want to be heard with

6 respect to the employee motion?

7     (No verbal response)

8         THE COURT:  Okay. I see no hands. I hear no one. I

9 have reviewed the motion.  Based on the facts and

10 circumstances described in the motion, as supported by the

11 first day declaration I am prepared to approve the motion.

12 The facts and circumstances of the case establish the

13 importance of the employees to the debtor's business.  Also,

14 Rule 6003(b) standard is met. I find that immediate and

15 irreparable harm would result if the interim order isn't

16 entered.  So, I will enter the order and I believe that all

17 the comments I had have already been addressed.

18         Thank you.  And thank you for putting --

19         MS. KANDESTIN:  Thank you, Your Honor.

20         THE COURT:  -- it together.  I appreciate the

21 charts and the form of order.

22         MS. KANDESTIN:  I will make a note of that going

23 forward.  And, Your Honor, the remaining item on the agenda

24 is Item No. 2 which is the debtors' motion seeking entry of

25 an order authorizing the debtors to a few things: file a

1  consolidated creditor matrix as well as a consolidated list

2  of their top 50 unsecured creditors, redact the personally

3  identifiable information of the debtors current and former

4  employees and customers from public filings in this case, and

5  to serve parties solely through electronic means.

6          Specifically, the debtors seek to serve customers

7  by email in instances where the debtors have a valid email

8  address on file and the customer has neither designated a

9  physical mailing address nor have they requested to be served

10  with hard copies of notices in this case.  Then the debtors

11  also seek to serve non-customers via email in instances where

12  the debtors have a valid email address, but no physical

13  address on file, and where the customer has neither

14  designated a mailing address nor requested to be served with

15  hard copies of pleadings in this case.

16          As I mentioned earlier, the U.S. Trustee has two

17  objections to the relief requested in the motion.  My

18  understanding is that, first, the U.S. Trustee objects to the

19  debtors' request to seal the names of their customers and

20  employees.  Its our understanding that the U.S. Trustee has

21  no objection to our request to seal the physical and email

22  addresses of these parties.  And second, the U.S. Trustee has

23  an objection to our request to serve parties via email.

24          Your Honor, at this point I would like to proffer

25  the testimony of Jor Law, who is still in the virtual

1  courtroom, in connection with the debtors' request to seal as

2  well as to serve parties via email.

3       THE COURT:  Let me ask, does anybody object to the

4  use of a proffer?

5       MR. CUDIA:  Your Honor, Joseph Cudia for the

6  United States Trustee.  I don't object to the use of a

7  proffer provided its subject to cross-examination should I

8  need.

9       THE COURT:  Certainly.  You may proffer subject to

10  cross-examination.

11       MS. KANDESTIN:  Thank you, Your Honor.  If called

12  to the stand Mr. Law would testify as follows:

13       With respect to the debtors' request to seal the

14  names of its employes he would testify that he has been

15  informed that while the company was operating there were

16  instances of employees being threatened physically and/or

17  electronically by crypto enthusiasts and that these threats

18  triggered security changes at the debtors' corporate

19  headquarters.  Mr. Law would further testify that he has been

20  informed that one such example of this was when a crypto

21  enthusiast posted a message hoping that the company's

22  employees would "go to jail or go die."

23       He would also testify that his understanding is

24  that targeted attacks such as this are not uncommon among

25  crypto enthusiasts.  Mr. Law would testify that he has been

1  informed that members of the debtors' support team have used

2  pseudonyms in the past when responding to support tickets due

3  to individuals attempting to contact them on personal

4  communication channels.

5          He would further testify that he would not expect

6  these circumstances to improve by virtue of the bankruptcy

7  filing.  Mr. Law would also testify that creating a

8  centralized public list identifying the debtors' current and

9  former employees would unnecessarily put employees at risk

10  for receiving additional physical threats and/or cyber-

11  attacks.  Mr. Law would also testify that the debtors

12  initiated some reduction in force and furloughs following the

13  issuance of the cease-and-desist order by the Nevada

14  Financial Institutions Division in June of this year.

15          He would testify that the debtors' current

16  workforce is compensating for the loss of these employees by

17  taking on additional responsibilities and workload.  He would

18  also testify that the crypto industry is experiencing a

19  period of consolidation and that employees with specific

20  skills or knowledge are at a premium.  Mr. Law would testify

21  that the debtors' current and furloughed employees have

22  irreplaceable institutional knowledge and specialized skills

23  that are critical to the success of the debtors'

24  restructuring efforts.  He would also testify that creating a

25  centralized public list of these employees would open them up

1  to poaching by competitors and other companies during its

2  critical stage.

3         With respect to the debtors' request to seal the

4  names of customers he would testify that some of the debtors

5  corporate and institutional clients act as integrators and

6  that they contract with the debtors for services that

7  ultimately benefit the customers of these integrators. In

8  other words, the end users of these services are customers of

9  the integrators. He would further testify that given the

10 nature of the debtors' custodial business and commercial

11 agreements the debtors often enter into contracts directly

12 with these end users.

13         Mr. Law would further testify that in many

14 instances the debtors' commercial agreements maintain that

15 customer data and confidential information constitute

16 property of the integrators, not Prime Trust, and that the

17 agreements provide that the integrators retain all legal

18 rights with respect to any customer data including

19 confidential information of the end users.

20         He would also testify that the debtors are

21 required to maintain the confidentiality of such customer

22 data and that the debtors' agreements provide that the

23 debtors are required by law to disclose this information they

24 must provide notice to the integrators prior to making any

25 such disclosure and work with them to obtain entry of an

1  order protecting the information.  He would further testify

2  that the public disclosure of customer data and confidential

3  information could trigger a post-petition violation of these

4  agreements.

5        Mr. Law would testify that disclosure of the names

6  of these indirect and direct customers would severely

7  jeopardize their lucrative relationships with their corporate

8  and institutional clients.  He would testify that since the

9  filing of these Chapter 11 cases he has been informed that

10  the debtors have received inbound requests from integrator

11  customers requesting that the debtors not publish their names

12  in the public domain.

13        Mr. Law would further testify that the debtors'

14  customer lists are highly proprietary and the public

15  disclosure of the identities of their direct and indirect

16  customers would give their competitors an unfair advantage

17  and cause irreparable harm to the debtors' restructuring

18  efforts.

19        With respect to the debtors' request to serve the

20  debtors direct and indirect -- with respect to serve parties

21  via electronic mail Mr. Law would testify that he has been

22  informed that the debtors communicate with their customers

23  via email and that there are very few instances, if any,

24  where the debtors have communicated with customers through

25  more traditional mail channels, and that their agreements

1  provide that customers will receive statements via email and

2  that they will not receive hard copies.

3         Mr. Law would testify that the debtors' commercial

4  agreements generally contain the following language, I will

5  quote:

6         "Each party hereby agrees that all current and

7  future notices, confirmations, and other communications

8  regarding the agreement specifically, and future

9  communications in general between the parties may be made by

10 email, sent to the email address of record without necessity

11 of confirmation of receipt, delivery or reading and such a

12 form of electronic communication is sufficient for all

13 matters regarding the relationship between the parties."

14        He would further testify that the agreements

15 further contain language to the effect of, again I'm going to

16 quote here:

17        "No physical paper documents will be sent to

18 customer and if customer desires physical documents, then it

19 agrees to be satisfied by directly and personally printing,

20 at customers own expense, either the electronically sent

21 communications or the electronically available communications

22 by logging onto the customer's account.  Then maintaining

23 such physical records in any manner or form that the customer

24 desires."

25        Mr. Law would testify that it is his understanding

1   that the debtors have email addresses for their customers on

2   file and that service by email is not only the means by which

3   customers expect to be served, but it's the quickest, most

4   reliable, and effective means of reaching the highest number

5   of customers with important notices in these Chapter 11

6   cases.

7            He would also testify that it is his understanding

8   that there are approximately 50,000 non-customer creditors

9   listed on the matrix in this case and that there are

10  approximately 5.4 million customers listed on the creditor's

11  matrix. He would further testify that the costs associated

12  with serving customers with notices via regular mail and when

13  necessary, through expedited means such as using Federal

14  Express would exorbitant and given the customers'

15  expectations with respect to receiving communications from

16  the company, such service would be a waste of the company's

17  very limited resources.

18           Mr. Law would testify that he has been informed

19  that the cost to serve the notice of commencement in this

20  case would come to approximately $10.2 million.  He would

21  further testify that he has been informed that the cost to

22  serve these parties via email is drastically less than the

23  service by regular mail.

24           That would conclude Mr. Law's testimony with

25  respect to this motion.

1              THE COURT:  Thank you.

2              Mr. Cudia, cross-examination.

3              MR. CUDIA:  Yes, Your Honor. I have just a couple

4    of questions for the witness.

5              THE COURT:  You may proceed.

6                   JOR LAW, DEBTOR WITNESS, SWORN

7              THE COURTROOM DEPUTY:  Please state your name and

8    spell your last name for the record.

9              THE WITNESS:  Jor Law, last name L-A-W.

10             THE COURTROOM DEPUTY:  Thank you.

11             MR. AZMAN:  Your Honor, I don't mean to interrupt.

12   I just wanted to briefly introduce my partner, Joe Evans, who

13   is here on Zoom. He is going to be defending the cross. I

14   didn't want you to be confused as to who he was or why he was

15   objecting if there is any objections.

16             THE COURT:  Okay.  Thank you.

17             MR. EVANS:  Good afternoon, Your Honor.

18             THE COURT:  Good afternoon.  Mr. Cudia.

19                      CROSS-EXAMINATION

20   BY MR. CUDIA:

21   Q    Good afternoon, Mr. Law.

22   A    Good afternoon.

23   Q    My first question is there's a substantial amount of

24   the creditors in this case that are not directly in privity

25   with the debtors here.  Is that correct?

1   A     I am not sure that that is correct.  We have agreements

2   with integrators and the integrators have end users.  In many

3   cases we have direct contracts with those end users.

4   Q    Okay.  But you would agree that there are creditors

5   that are not directly -- that do not directly contact the

6   debtors on a regular basis.

7   A     (Inaudible).

8           THE COURT:  Mr. Law, for the record, can you

9   confirm you're in the room by yourself and you're not looking

10  at anything when you are answering Mr. Cudia's questions.

11          THE WITNESS:  Yes.

12          THE COURT:  Okay.  I assume you are looking at the

13  ceiling, but go ahead.

14          THE WITNESS:  I was being (indiscernible) minded

15  looking up.

16          I am not sure how to answer that.  You know, if a

17  customer has a relationship with us they usually have an

18  agreement with us.

19  BY MR. CUDIA:

20  Q    Okay.  Maybe I can rephrase it.  I believe you stated

21  earlier that the debtors do contract with other entities who

22  have their own end users. Is that correct?

23  A    That is correct.

24  Q    And the heart of my question is do those end -- do you

25  know if those other end users have also consented to service

1  via mail -- I mean by email.

2  A     If we have a direct engagement with them then, in

3  general, yes.

4  Q     But you don't supply -- you don't make customers of

5  your end users aware of the policies that you have for

6  customers, correct?

7  A     It is my understanding that most end users of

8  integrators are aware of this and enter into a direct

9  relationship with us.

10          MR. CUDIA:  Thank you.  Those were my questions,

11  Your Honor.

12          THE COURT:  Okay. Thank you.

13          MS. KANDESTIN:  Your Honor, with that, based on

14  the proffered testimony of Mr. Law and for the reasons set

15  forth in our motion, the debtors respectfully request that

16  the Court overrule the objections of the U.S. Trustee and

17  approve the relief requested in the motion as fully set forth

18  therein.

19          THE COURT:  I would like to hear argument from Mr.

20  Cudia.

21          MR. CUDIA:  Thank you, Your Honor.  Joseph Cudia

22  for the United States Trustee.

23          As far as the email issue, as I'm sure you are

24  aware, Rule 2002 requires notice to be sent by mail.  Rule

25  9036 does allow for mail notices to be sent by email, but

1  parties have to consent in writing to such service.  And it's

2  not the absence of assistance -- insistence on mail that it

3  is the standard there.

4         As far as the redaction of the names the U.S.

5  Trustee generally objects to the redaction of names, not

6  email addresses or addresses, basically on a general right of

7  access to Court records.  I don't believe that the debtors

8  can demonstrate undue risk of identity theft or unlawful

9  injury merely due to exposure of the names without other

10 identifying information.

11        Now as far as the proffer that was given, I was

12 made aware of that just a few hours ago that the proffer was

13 going to be made and the contents of same.  To the extent

14 Your Honor is inclined to grant these I would ask that it

15 only be on an interim basis so that the U.S. Trustee may be

16 heard on full notice and fulsome briefing.

17        THE COURT:  Okay.

18        MR. CUDIA:  That is all I have, Your Honor.

19        THE COURT:  Mr. Cudia, I recall, and I might be

20 wrong about this, that other crypto cases have permitted

21 service by email.  Is that your understanding as well?

22        MR. CUIDA:  That is my understanding, Your Honor.

23        THE COURT:  Okay.  I am going to overrule the

24 Trustee's objection, but I am only going to allow this on an

25 interim basis to allow a fulsome hearing on this on notice.

1  So, I would ask that the order be an interim order and that

2  this be scheduled for a fulsome hearing at the second day.

3          MS. KANDESTIN:  Yes, Your Honor.  Thank you.  We

4  will make those changes and upload the order.

5          THE COURT:  Okay.

6          MS. KANDESTIN:  With that, Your Honor, I believe

7  that concludes our agenda for today.

8          THE COURT:  I had one other comment, I'm sorry,

9  but in Paragraph 9 of the matrix order the first sentence

10 didn't make sense to me. I think there is a word missing. I

11 think it should be "Notwithstanding the above, the debtor

12 shall file publicly without redacting."

13         MS. KANDESTIN:  The debtor shall file -- yes, it

14 should be file any public filings which is a defined term in

15 the motion.

16         THE COURT:  Oh, take out "the."

17         MS. KANDESTIN:  Yes.

18         THE COURT:  Okay.

19         MS. KANDESTIN:  We will clean that up.

20         THE COURT:  That would make sense.  That is

21 terrific.  Thank you.  And if you will just put in a hearing

22 date and objection deadline, and make it interim we will have

23 a final hearing on it.

24         MS. KANDESTIN:  Will do.

25         THE COURT:  Thank you very much.

1          Mr. Cudia, thank you very much for working with

2   the debtors on their first days on shortened notice.

3   Particularly, I appreciate your concerns with respect to the

4   notice issue and I want to give you a more fulsome

5   opportunity to address that issue.

6          MR. CUDIA:  Thank you, Your Honor.

7          THE COURT:  Is there anything further for today?

8          MR. NESTOR:  Your Honor, it's Mike Nestor again.

9          THE COURT:  Yes.

10          MR. NESTOR:  Just getting back to the budget and

11   we appreciate Your Honor's guidance on coming back to you

12   next week.  Hopefully we don't go there, but we will see what

13   happens. With respect to the professional fee line items that

14   don't exist at this time, because no retentions have been

15   filed or orders entered, etc., I assume those are just

16   accruals that nothing is being done and money is still

17   staying with the debtor. So, if I am incorrect let me know,

18   but I assume that is the case since, you know, no one has

19   really been retained at this point. If that is true then

20   we're done for the day.

21          MR. AZMAN:  Your Honor, its Darren Azman from

22   McDermott, proposed counsel to the debtors.

23          The accruals are being funded.  Unless Ms.

24   Kandestin or Mr. Steinman corrects me, I believe the accruals

25   are being funded into an escrow, but they certainly are not

1 being paid to any professionals absent retention

2 applications, fee applications, of course, that are required.

3          MS. KANDESTIN:  That is correct.

4          MR. NESTOR:  Sorry, is it a segregated account at

5 the debtor, is it a separate escrow account with a separate

6 bank with an escrow agreement? I am just trying to understand

7 if the funds are out of the estate or in the estate, and what

8 the basis would be to take them out of the estate if they are

9 out of the estate.

10          MS. KANDESTIN:  Your Honor, the debtors are in the

11 process of finalizing agreements to set up that account.  So,

12 I mean we don't have -- we're not sure what type of form it

13 will take.

14          THE COURT:  I guess -- we all appreciate there

15 will be no payment of professionals absent a retention and

16 some type of payment mechanism, whether it be interim

17 compensation or fee order, right.  The question I think Mr.

18 Nestor is asking is, is this an account that is being set up

19 and held by the debtor that's simply segregating fees or are

20 these fees being transferred out of the estate.

21          MS. KANDESTIN:  It is a new segregated account to

22 be held by the debtors.

23          THE COURT:  Is that acceptable?

24          MR. NESTOR:  That's fine, Your Honor. If it's just

25 a segregated account over which the debtor has control

1   completely fine.  Thank you very much.

2               THE COURT:  Okay.

3               MR. NESTOR:  You said it better than I did.

4               THE COURT:  Is there anything else pending for

5   today or anything else we need to address?

6               MR. AZMAN:  No, Your Honor.  I think we're all

7   done here.  We did just upload the revised cash management

8   order, I believe.  So, we appreciate Your Honor sticking

9   around to enter that.

10              THE COURT:  Certainly.  I don't mind being here. I

11  really very much appreciate the Court's staff for sticking

12  around.

13              So, I hope you all have a great weekend.  We stand

14  adjourned.  If you should need the Court, you know where to

15  reach us.  Thank you all.  Have a good weekend.

16          (A chorus of "Thank you, Your Honor")

17          (Proceedings concluded at 5:27 p.m.)

18

19

20

21

22

23

24

25

1                            CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    August 29, 2023

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Mary Zajaczkowski                     August 29, 2023

13   Mary Zajaczkowski, CET-531

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25