THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |

**DISCLOSURE STATEMENT PURSUANT TO
SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT
TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR
PRIME CORE TECHNOLOGIES INC. AND ITS AFFILIATED DEBTORS**

**MCDERMOTT WILL & EMERY LLP**
Maris J. Kandestin (No. 5294)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone:     (302) 485-3900
Facsimile:     (302) 351-8711
Email:     mkandestin@mwe.com

**MCDERMOTT WILL & EMERY LLP**
Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone:     (212) 547-5400
Facsimile:     (646) 547-5444
Email:     dazman@mwe.com
            jbevans@mwe.com

**MCDERMOTT WILL & EMERY LLP**
Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 5400
Miami, Florida 33131
Telephone:     (305) 358-3500
Facsimile:     (305) 347-6500
Email:     gsteinman@mwe.com

**MCDERMOTT WILL & EMERY LLP**
R. Jacob Jumbeck (admitted *pro hac vice*)
Rebecca E. Trickey (admitted *pro hac vice*)
444 W. Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:     (312) 372-2000
Facsimile:     (312) 984-7700
Email:     jjumbeck@mwe.com
            rtrickey@mwe.com

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated: September 8, 2023

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are:  Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). Prime Trust, LLC's service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, NV 89135.

**HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISERS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.**

**THE ISSUANCE OF AND THE DISTRIBUTION OF THE REORGANIZED EQUITY INTERESTS TO ARTICLE 6.6 OF THE PLAN SHALL BE EXEMPT, PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE, WITHOUT FURTHER ACT OR ACTIONS BY ANY PERSON, FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ALL RULES AND REGULATIONS PROMULGATED THEREUNDER, AND ANY OTHER APPLICABLE SECURITIES LAWS, TO THE FULLEST EXTENT PERMITTED BY SECTION 1145 OF THE BANKRUPTCY CODE.**

**WITH RESPECT TO THE FOREGOING SECURITIES ISSUED IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER, SUCH SECURITIES WILL BE CONSIDERED "RESTRICTED SECURITIES" AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUCH AS UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OF THE SECURITIES ACT.  WITH RESPECT TO THE FOREGOING SECURITIES ISSUED PURSUANT TO SECTION 1145(A) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(A)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE.  IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.**

**THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.**

**THE SECURITIES ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION (SUCH AS THAT REFERRED TO IN THE PRECEDING PARAGRAPH) AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED" BELOW, AS WELL AS CERTAIN OTHER RISKS INHERENT IN THE DEBTORS' BUSINESSES. PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THE DISCLOSURE STATEMENT.

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**THE PLAN PROVIDES THAT THE FOLLOWING PARTIES ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR THEREIN: (I) HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE TO ACCEPT THE PLAN, (II) HOLDERS OF ALL CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT THAT DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN, (III) HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE, OR ARE DEEMED, TO REJECT THE PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN, (IV) HOLDERS OF ALL CLAIMS AND INTERESTS THAT ARE GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN BUT DO NOT OPT OUT, AND (V) THE RELEASED PARTIES.**

**HOLDERS OF CLAIMS IN VOTING CLASSES (CLASS 3A, CLASS 3B, CLASS 3C, CLASS 3D, AND CLASS 4) THAT WISH TO OPT OUT OF THE RELEASE PROVIDED IN THE PLAN MAY DO SO BY CHECKING THE "OPT OUT BOX" ON THE BALLOT. HOLDERS OF CLAIMS IN NON-VOTING CLASSES (CLASS 1, CLASS 2, CLASS 5, CLASS 6, CLASS 7, AND CLASS 8) MAY OPT OUT OF THE RELEASES BY EITHER (I) TIMELY FILING WITH THE BANKRUPTCY COURT AN OBJECTION TO THE RELEASES SET FORTH IN <u>ARTICLE 10.5</u> OF THE PLAN BY THE DEADLINE ESTABLISHED TO FILE OBJECTIONS TO THE PLAN OR (2) COMPLETING THE OPT-OUT NOTICE ACCOMPANYING THE NOTICE OF NON-VOTING STATUS AND RETURNING IT IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH THEREON  SEE <u>ARTICLE VI.I</u> OF THIS DISCLOSURE STATEMENT FOR A DESCRIPTION OF THE RELEASES AND RELATED PROVISIONS.**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...........................................................................................................1

   A.    General .......................................................................................................1

   B.    Disclosure Statement Enclosures ..............................................................2

II. SOME FREQUENTLY ASKED QUESTIONS ..........................................................3

   A.    What is Chapter 11? ...................................................................................3

   B.    What is a Plan? ...........................................................................................3

   C.    What is a Disclosure Statement? ...............................................................3

   D.    How Does One Vote? .................................................................................4

       1.    Dates and Deadlines ......................................................................4

       2.    Who is Entitled to Vote? ...............................................................5

       3.    What Information Will I Receive about the Plan? .........................6

       4.    When is the Deadline to Vote? ......................................................6

   E.    Confirmation Hearing ................................................................................7

   F.    Recommendation of the Debtors ...............................................................7

III. OVERVIEW OF THE PLAN .......................................................................................7

IV. BACKGROUND OF THE DEBTORS AND CERTAIN EVENTS PRECEDING THE FILING OF THEIR CHAPTER 11 CASES ..............................................................10

   A.    Corporate History ....................................................................................10

   B.    Business Operations .................................................................................10

       1.    Custody Services ..........................................................................11

       2.    AML/KYC as a Service. ..............................................................12

       3.    Access to a Redundant Network of Fiat Banking Rails ..............12

       4.    Crypto Liquidity ..........................................................................13

       5.    Compliance and Regulatory Services. .........................................13

       6.    Settlement Services. .....................................................................14

       7.    Professional Services. ..................................................................14

       8.    Engagement Model. .....................................................................14

   C.    Debtors' Organizational and Capital Structure .......................................15

       1.    The Debtors' Prepetition Organizational Structure ....................15

       2.    Debtor Entities. ............................................................................15

|  | 3. | Intercompany Transactions. | 16 |
|--|----|----------------------------|----|
|  | 4. | Non-Debtor and Former Entities. | 16 |
|  | 5. | The Debtors' Prepetition Equity Structure. | 16 |
|  | 6. | The Debtors' Prepetition Capital Structure | 17 |
|  | 7. | The Debtors' Current Cash Position. | 18 |
| D. | | History of the Company's Management. | 18 |
| E. | | Events Leading Up to the Chapter 11 Cases | 18 |
|  | 1. | Lack of Operational and Spending Oversight by Prior Management. | 18 |
|  | 2. | The Wallet Event. | 19 |
|  | 3. | Regulatory Issues. | 21 |
| F. | | Corrective Efforts and Prepetition Turnaround Plan. | 21 |
|  | 1. | Wallet Corrective Efforts. | 21 |
|  | 2. | Prepetition Turnaround Plan. | 22 |
| G. | | Prepetition Receivership Proceedings and Appointment of the Special Committee. | 23 |
| V. EVENTS DURING THE CHAPTER 11 CASES | | | 24 |
| A. | | Commencement of the Chapter 11 Cases | 24 |
| B. | | First-Day Relief | 24 |
| C. | | Bid Procedures Motion | 25 |
| D. | | Appointment of Official Committee of Unsecured Creditors | 27 |
| E. | | The Committee's Investigation | 27 |
| F. | | Retention of Professionals | 27 |
| G. | | Rejection of Executory Contracts and Unexpired Leases | 28 |
| H. | | Claims Bar Date. | 28 |
| VI. PLAN. | | | 28 |
| A. | | Overview of the Plan. | 29 |
| B. | | Administrative Expense and Priority Claims. | 29 |
|  | 1. | Administrative Expense Claims. | 29 |
|  | 2. | Professional Fee Claims. | 30 |
|  | 3. | Priority Tax Claims. | 32 |
|  | 4. | U.S. Trustee Fees. | 32 |
| C. | | Classification of Claims and Interests. | 32 |

|   | 1.  | Classification in General. | 32 |
|---|-----|---------------------------|----|
|   | 2.  | Formation of Debtor Groups for Convenience Only. | 33 |
|   | 3.  | Summary of Classification. | 33 |
|   | 4.  | Special Provision Governing Unimpaired Claims. | 34 |
|   | 5.  | Subordinated Claims. | 34 |
|   | 6.  | Intercompany Interests. | 34 |
|   | 7.  | Controversy Concerning Impairment. | 34 |
| D. | | Treatment of Claims and Interests. | 34 |
|   | 1.  | Class 1—Secured Tax Claims. | 34 |
|   | 2.  | Class 2—Other Priority Claims. | 35 |
|   | 3.  | Class 3A—Prime Core General Unsecured Claims. | 35 |
|   | 4.  | Class 3B—Prime Trust General Unsecured Claims. | 35 |
|   | 5.  | Class 3C—Prime IRA General Unsecured Claims. | 36 |
|   | 6.  | Class 3D—Prime Digital General Unsecured Claims. | 36 |
|   | 7.  | Class 4—Convenience Claims. | 37 |
|   | 8.  | Class 5—Section 510(b) Claims. | 37 |
|   | 9.  | Class 6—Intercompany Claims. | 37 |
|   | 10. | Class 7—Intercompany Interests. | 38 |
|   | 11. | Class 8—Existing Equity Interests. | 38 |
| E. | | Means for Implementation. | 38 |
|   | 1.  | Joint Chapter 11 Plan. | 38 |
|   | 2.  | No Substantive Consolidation. | 38 |
|   | 3.  | General Settlement of Claims and Interests. | 39 |
|   | 4.  | Plan Transactions. | 39 |
|   | 5.  | Sources of Consideration for Plan Distributions. | 40 |
|   | 6.  | Reorganization Transaction. | 40 |
|   | 7.  | The Wind-Down Scenario. | 47 |
|   | 8.  | Elimination of Duplicate Claims. | 53 |
|   | 9.  | Corporate Action. | 53 |
|   | 10. | Directors, Officers, Managers, Members and Authorized Persons of the Debtors. | 54 |
|   | 11. | D&O Policies. | 54 |
|   | 12. | Indemnification of Directors, Officers and Employees. | 54 |

vii

13.   Withholding and Reporting Requirements. ...........................................55

14.   Exemption From Certain Transfer Taxes. .............................................55

15.   Cancellation of Notes, Instruments, Certificates, and Other
      Documents. ...........................................................................................56

16.   Effectuating Documents; Further Transactions. ...................................56

17.   Closing of the Chapter 11 Cases. .........................................................56

F.   Distributions. ....................................................................................................56

1.   Timing and Calculation of Amounts to Be Distributed. .......................56

2.   Rights and Powers of Distribution Agent. ............................................57

3.   Delivery of Distributions and Undeliverable or Unclaimed
     Distributions. .........................................................................................57

4.   Compliance Matters. .............................................................................59

5.   Foreign Currency Exchange Rate. .........................................................59

6.   Cryptocurrency Liquidation. .................................................................59

7.   Claims Paid or Payable by Third Parties. ..............................................60

8.   Setoffs and Recoupment. ......................................................................61

9.   Allocation between Principal and Accrued Interest. ..............................61

G.   Procedures for Disputed Claims. ......................................................................61

1.   Objections to Claims. ............................................................................61

2.   Allowance of Claims. ............................................................................61

3.   Estimation of Claims. ............................................................................62

4.   No Distributions Pending Allowance. ...................................................62

5.   Resolution of Claims. ............................................................................62

6.   Amendments to Claims and Late Filed Claims. ....................................62

7.   Insured Claims. ......................................................................................63

H.   Executory Contracts and Unexpired Leases. ....................................................63

1.   Assumption and Rejection of Executory Contracts and Unexpired
     Leases. ...................................................................................................63

2.   Preexisting Obligations to the Debtors Under Executory Contracts
     and Unexpired Leases. ..........................................................................63

3.   Determination of Cure Claims and Deemed Consent. ...........................64

4.   Payments Related to Assumption of Executory Contracts and
     Unexpired Leases. .................................................................................65

5.      Claims Based on Rejection of Executory Contracts or Unexpired Leases................................................................................................65

6.      Insurance Policies and Surety Bonds.................................................66

7.      Reservation of Rights..........................................................................67

8.      Nonoccurrence of Effective Date.......................................................67

9.      Contracts and Leases Entered into After the Petition Date................67

I.      Settlement, Releases, Injunctions, and Related Provisions.......................68

1.      Release of Liens..................................................................................68

2.      Discharge and Satisfaction of Claims.................................................68

3.      Term of Injunctions or Stays.............................................................69

4.      Releases by the Debtors......................................................................69

5.      Releases by Holders of Claims and Interests.....................................70

6.      Exculpation.........................................................................................71

7.      Injunction............................................................................................72

J.      Conditions Precedent to the Effective Date..............................................73

1.      Conditions Precedent to the Effective Date.......................................73

2.      Waiver of Conditions Precedent.........................................................74

3.      Substantial Consummation.................................................................74

4.      Effect of Vacatur of Confirmation Order...........................................74

VII. CERTAIN RISK FACTORS AFFECTING THE DEBTORS.................................75

A.      Certain Bankruptcy Law Considerations..................................................75

1.      Risk of Non-Confirmation or Delay of the Plan................................75

2.      Key Legal Issues Affecting Distributions..........................................75

3.      Risk of Failing to Satisfy Vote Requirement.....................................76

4.      Failure to Satisfy Administrative Expense Claims or Otherwise Agree to Alternative Treatment and Other Factors that May Impact Administrative Solvency.....................................................................76

5.      Non-Consensual Confirmation...........................................................76

6.      The Conditions Precedent to the Effective Date of the Plan May Not Occur..........................................................................................77

7.      Conversion to Chapter 7.....................................................................77

8.      Continued Risk Upon Confirmation and Potential Appeal of Confirmation........................................................................................77

9.      One Or More of the Chapter 11 Cases May Be Dismissed. ................77

10.   Risk of Non-Occurrence of the Effective Date.......................................78

11.   The Debtors May Object to the Amount or Classification of a
      Claim or Interest. ..........................................................................78

12.   Contingencies Could Affect Allowed Claims Classes..............................78

13.   Estimated Recoveries May Change Due to Litigation Arising Out
      of the Claims Allowance and Reconciliation Process. ...........................78

B.   Risks Related to Recoveries Under the Plan......................................................79

1.   If the Reorganization Transaction is Not Implemented, the Debtors
     Will Consider all Available Alternative Restructuring Proposals,
     and such Alternatives May Result in Lower Recoveries for Holders
     of Claims Against the Debtors...................................................................79

2.   Risk of Failure to Consummate a Reorganization Transaction. ...........................79

3.   The Debtors' Assets are Largely Based on, and Highly Correlated
     to, the Volatility of Cryptocurrency.............................................................79

4.   The Debtors May "Toggle" to the Wind-Down Scenario, which is
     Estimated to Result in Lower Recoveries. ..................................................79

5.   The Wind-Down Scenario May Take Longer and Cost More than
     Estimated, which May Decrease Recoveries. ..............................................80

6.   Regulatory Approvals May Not Be Granted. .......................................................80

7.   Certain Tax Implications of the Plan. ....................................................................80

8.   The Debtors' Substantial Ongoing Liquidity Needs May Affect
     Recoveries............................................................................................................80

C.   Additional Factors to be Considered..................................................................81

1.   The Debtors Have No Duty to Update...................................................................81

2.   No Representations Outside This Disclosure Statement Are
     Authorized..............................................................................................................81

3.   No Legal or Tax Advice Is Provided to You by This Disclosure
     Statement.................................................................................................................82

4.   No Admission Made. ..............................................................................................82

5.   Failure to Identify Litigation Claims or Projected Objections............................82

6.   No Waiver of Right to Object or Right to Recover Transfers and
     Assets. .....................................................................................................................82

7.   Risk Associated with Forward Looking Statements.............................................82

8.   Information Was Provided by Debtors and Was Relied Upon by
     Debtors' Advisors. ................................................................................................83

VIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES....................................83

A.      Consequences to The Company .......................................................84

    1.    Limitations on NOL Carryforwards and Other Tax Attributes. ............................84

    2.    Transfer of Assets to the Purchaser, the Plan Trust or the Wind-Down Trust; Dissolution of the Company. ................................................84

    3.    Cancellation of Debt ...............................................................84

B.      Consequences to Holders of Claims in Class 3A, Class 3B, Class 3C, and Class 3D. ...............................................................85

C.      Distributions in Respect of Accrued But Unpaid Interest ...........................................85

D.      Tax Treatment of the Plan Trust or the Wind-Down Trust and Holders of Beneficial Interests Therein ...............................................................86

    1.    General "Liquidating Trust" Tax Reporting by the Wind-Down Trust or the Plan Trust and Their Respective Beneficiaries ...............................................86

    2.    Tax Reporting for Assets Allocable to Disputed Claims .....................................87

E.      Withholding on Distributions and Information Reporting...........................................88

IX. VOTING PROCEDURES AND REQUIREMENTS ...........................................................88

A.      Parties Entitled to Vote ...............................................................89

B.      Voting Instructions and Voting...............................................................90

C.      Agreements Upon Furnishing Ballots...........................................................92

D.      Change of Vote. ...............................................................92

E.      Waivers of Defects, Irregularities, Etc...........................................................92

F.      Miscellaneous. ...............................................................92

G.      Further Information, Additional Copies ...............................................................93

X. CONFIRMATION OF THE PLAN...............................................................93

A.      Confirmation Hearing ...............................................................93

B.      Objections ...............................................................94

C.      Requirements for Confirmation of Plan...........................................................96

    1.    Requirements of Section 1129(a) of the Bankruptcy Code ...............................96

    2.    Application to the Plan...............................................................99

XI. CONCLUSION AND RECOMMENDATION OF THE DEBTORS ...................................100

## I.    **INTRODUCTION**

### A.    **General**

On August 14, 2023 (the "<u>Petition Date</u>"), Prime Core Technologies Inc. ("<u>Prime Core</u>"), Prime Trust, LLC ("<u>Prime Trust</u>"), Prime Digital, LLC ("<u>Prime Digital</u>"), and Prime IRA LLC ("<u>Prime IRA</u>"; and together with Prime Core, Prime Trust and Prime Digital, collectively, the "<u>Debtors</u>" or the "<u>Company</u>") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, §§ 101–1532 (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").

The Debtors jointly submit this *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with Respect to the Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors* (the "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of acceptances or rejections of the *Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors*, filed concurrently herewith (the "<u>Plan</u>") from certain holders of Claims against the Debtors.  A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.

All capitalized terms used in this Disclosure Statement that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

The ultimate goal of these Chapter 11 Cases has been to find a way to limit the harm to creditors and distribute as much value to creditors as possible as soon as possible.  To that end, from day one, the Debtors have been committed to preserving the value of their Estates by moving through these Chapter 11 Cases as quickly, and with as much flexibility in their exit strategy, as possible—as illustrated by the speed with which they filed the Plan and Disclosure Statement and the terms of the same.  Consistent with that approach, the Debtors commenced a marketing and sale process shortly after the Petition Date to identify party willing to either (1) buy all, or substantially all, their assets or (2) invest in the Company's potential enterprise value through a comprehensive plan sponsor transaction.  The Debtors, though their advisors, have contacted more than 200 potential counterparties and intend to contact approximately 200 additional potential counterparties.

The goal of this process is to identify a third-party with the wherewithal to consummate a Reorganization Transaction—a comprehensive restructuring that will preserve the Debtors as a going concern and deliver maximum value to the Debtors' creditors.

Although the Debtors are optimistic that a party willing to serve as the Plan Sponsor and fund a Reorganization Transaction will materialize, they recognize that certain parts of their business may appeal to third parties in a complementary way.  As such, the Debtors' marketing process is also focused on a potential buyer willing to buy all, or substantially all, their assets.

The Debtors are aware that there are risks that neither the Sale Transaction nor the Reorganization Transaction materialize.  Those potential risks are described in detail in this Disclosure Statement.  The Debtors believe that it is in the best interests of all stakeholders to prepare for a scenario where the Sale Transaction and the Reorganization Transaction cannot be completed.  The Plan contemplates an option for the Debtors to "toggle" to a Liquidation Event if

they determine in good faith that the Liquidation Event is in the best interests of the Debtors' Estates due to complications or inability to implement the Sale Transaction or the Reorganization Transaction.

The Liquidation Event contemplates providing distributions to creditors from three primary sources: (1) the Debtors' Cash on-hand; (2) the proceeds of liquidating the Debtors' Cryptocurrency holdings; and (3) the proceeds of certain Claims and Causes of Action with respect to the Debtors' prepetition operations that the Plan preserves and monetizes for the benefit of Holders of Claims of entitled to such litigation proceeds. The Liquidation Event, while hopefully a last resort, will deliver on the Debtors' goal to distribute significant value to creditors by providing them with both (a) near term distributions (i.e., cash and Cryptocurrency proceeds) and (b) additional distributions over time depending on the results of the litigation to be pursued by independent fiduciaries.

The Debtors urge all parties in interest to read this Disclosure Statement and the Plan carefully. This Disclosure Statement does not include a description of each and every term of the Plan. Accordingly, the description of the Plan set forth herein is qualified by the entirety of the Plan, which is incorporated by reference into this Disclosure Statement.[1]

### B. **Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are copies of:

1. The Plan.

2. A notice (the "Confirmation Hearing Notice"), including, among other things: (a) notice of the filing of the Disclosure Statement and Plan; (b) the deadline for the submission of Ballots to vote to accept or reject the Plan (the "Voting Deadline"); (c) the deadline for objecting to confirmation of the Plan and final approval of this Disclosure Statement; (d) information on how to object to confirmation of the Plan and final approval of the Disclosure Statement; (e) the time, date, and place of the Confirmation Hearing; and (f) information on the release, exculpation and injunction provisions included in the Plan.

3. The *Order (I) Approving The Disclosure Statement On an Interim Basis For Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Disclosures in the Disclosure Statement and Confirmation of the Plan; and (VI) Granting Related Relief*, dated [●], 2023 [D.I. ●] (the "Conditional Approval Order").

---

[1] The summary of the Plan contained herein is qualified in its entirety by the terms the Plan, and in the event of any inconsistency, the Plan shall control in all respects.

4.     A Ballot, with a preaddressed, postage-prepaid return envelope for creditors within Voting Classes who are entitled to vote to accept or reject the Plan, a Notice of Non-Voting Status for Non-Voting Classes, and a Publication Notice.

## II.     SOME FREQUENTLY ASKED QUESTIONS

### A.     What is Chapter 11?

Chapter 11 is a chapter of the Bankruptcy Code permitting bankrupt companies a period in which to organize their affairs and to review their assets and obligations in order to reorganize or liquidate their businesses.

The commencement of the Debtors' Chapter 11 Cases triggered the application of the "automatic stay" under section 362 of the Bankruptcy Code.  The automatic stay halts, with certain exceptions, nearly all attempts to collect prepetition claims from debtors or to otherwise interfere with or control the debtors' property.

### B.     What is a Plan?

The consummation of a chapter 11 plan is the principal objective of a case under chapter 11 of the Bankruptcy Code. A chapter 11 plan sets forth how a debtor will treat claims and equity interests. A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the Plan.

To that end, a plan may provide for distribution of an estate's assets to creditors, and sometimes, to equityholders to satisfy the reorganized debtor's prepetition obligations.

The Plan contemplates the simultaneous pursuit of (1) a sale of all or substantially all of (a) the Assets of the Debtors (a "Sale Transaction") pursuant to Bankruptcy Code section 363 or (b) new equity interests in the Reorganized Debtors (the "Reorganization Transaction") or (2) in the event neither the Sale Transaction nor the Reorganization Transaction materialize, the winding down of the Debtors' Estates, the liquidation of the Debtors' Assets, and the distribution of cash (including proceeds of Causes of Action) to the Debtors' creditors as set forth in the Plan and described below.

### C.     What is a Disclosure Statement?

After a plan has been proposed, the holders of claims against, or equity interests in, the debtors that are impaired by and entitled to receive distributions under the plan are entitled to vote on whether to accept or reject the plan.  Section 1125 of the Bankruptcy Code requires disclosure of "adequate information" to all such voting creditors and equity holders by way of a court-approved "disclosure statement" before the debtors may solicit any votes on a plan.  Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an

informed judgment about the plan." Following a hearing held on September 22, 2023, the Bankruptcy Court entered an order on a conditional basis [D.I. ●] finding that this Disclosure Statement contains "adequate information" in accordance with section 1125 of the Bankruptcy Code.  The Court will consider final approval of the Disclosure Statement at the Confirmation Hearing (defined below).

The Debtors believe the Disclosure Statement provides each Holder of an Allowed Claim who is entitled to vote with sufficient information to make an informed decision as to whether to accept or reject the Plan.

**D.**    **How Does One Vote?**[2]

> **THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCESS IS ONLY A SUMMARY.  PLEASE REFER TO THE DISCLOSURE STATEMENT MOTION OR THE CONDITIONAL APPROVAL ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

**1.**    **Dates and Deadlines.**

The following table sets forth important dates and deadlines relating to voting and confirmation of the Plan.[3]

| Event | Date and Time (if any) |
|---|---|
| Deadline to Object to Solicitation Procedures and Conditional Approval of Disclosure Statement | September 15, 2023, at 4:00 p.m. (prevailing Eastern Time) |
| Conditional Approval Hearing | September 22, 2023, at [●] a.m./p.m. (prevailing Eastern Time) |
| Voting Record Date | September 22, 2023 |
| Deadline to Publish Notice of Confirmation Hearing | September 24, 2023 |
| Solicitation Date | September 28, 2023 |
| Deadline to File Rule 3018 Motions | October 16, 2023, at 4:00 p.m. (prevailing Eastern Time) |

---

[2]    Capitalized terms not otherwise defined in this section have the meaning ascribed to them in the Conditional Approval Order or the Debtors' *Motion for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis for Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Information in the Disclosure Statement and Confirmation of the Plan; and (VI) Granting Related Relief* (the "Disclosure Statement Motion"), as applicable.

[3]    These dates and deadlines are subject to the Bankruptcy Court's entry of the Conditional Approval Order.

| Confirmation Objection Deadline | October 23, 2023, at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to Object to Rule 3018 Motions | October 23, 2023, at 4:00 p.m. (prevailing Eastern Time) |
| Voting Deadline | October 23, 2023, at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to File Voting Affidavit | October 26, 2023, at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to File Declarations, Brief, in Support of Confirmation, Replies in Support of Rule 3018 Motions | October 26, 2023, at 4:00 p.m. (prevailing Eastern Time) |
| Confirmation Hearing | October 30, 2023, at [●] a.m./p.m. (prevailing Eastern Time) |

### 2.    Who is Entitled to Vote?

To vote on the Plan, a Holder of an Allowed Claim in a Class that is entitled to vote on the Plan must complete the Ballot (enclosed with this Disclosure Statement) and comply with the voting instructions outlined in <u>Article IX</u> of this Disclosure Statement.

This Disclosure Statement, along with a Ballot used for voting on the Plan, is being distributed to the Holders of Claims that are entitled to vote to accept or reject the Plan.  For a summary of the treatment of each Class of Claims and Interests, see <u>Article III</u> of this Disclosure Statement.

Under the Plan and as explained in the Disclosure Statement Motion, Holders of Claims in Class 3A (Prime Core General Unsecured Claims), Class 3B (Prime Trust General Unsecured Claims), Class 3C (Prime IRA General Unsecured Claims), Class 3D (Prime Digital General Unsecured Claims) and Class 4 (Convenience Claims) are Impaired and entitled to vote to accept or reject the Plan (i.e., the Voting Classes).  A creditor that holds a Claim in a Voting Class is nonetheless not entitled to vote to the extent that (a) as of the Voting Record Date, such creditor's Claim is zero ($0.00), (b) as of the Voting Record Date, such creditor's Claim has been disallowed, expunged, disqualified or suspended, (c) such creditor has not timely filed a proof of claim in accordance with the Bar Date Order as of the Voting Record Date and the Debtors have not scheduled such creditor's Claim or scheduled such creditor's claim in an undetermined amount or as contingent, unliquidated, or disputed; or (d) such creditor's Claim is subject to an objection or request for estimation, subject to the procedures set forth below.

Under the Plan, Holders of Claims in Class 5 (Section 510B Claims), Class 6 (Intercompany Claims), Class 7 (Intercompany Interests) and Class 8 (Existing Equity Interests) will either receive no distribution or are Unimpaired or Impaired and, accordingly, the Holders of Claims and Interests in such Classes are deemed to reject or to accept the Plan, as applicable. Therefore, their votes are not being solicited.

Under the Plan, Holders of Claims in Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired, and, therefore, the Holders of those Claims are presumed to have accepted the Plan.

For the avoidance of doubt, the Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 5, 6, 7, and 8.

Accordingly, Ballots to accept or reject the Plan are being provided only to Holders of Claims in Class 3A, Class 3B, Class 3C, Class 3D, and Class 4 and only such Holders who held their Claims on the Voting Record Date are entitled to vote to accept or reject the Plan.

### 3.      What Information Will I Receive about the Plan?

Contemporaneously herewith, the Debtors filed the proposed Conditional Approval Order. Pursuant to the Conditional Approval Order, Holders of Claims in the Voting Classes as of the Voting Record Date will receive appropriate solicitation materials (in paper or electronic form (i.e., flash-drive) or via email[4]) including (the following materials, collectively, the "Solicitation Package"):

- the Conditional Approval Order (excluding the exhibits attached thereto, except as set forth below);

- the conditionally approved Disclosure Statement and the exhibits attached thereto, including the Plan;

- the Confirmation Hearing Notice, in substantially the form annexed as Exhibit 1 to the Conditional Approval Order;

- an appropriate Ballot to Voting Classes, together with detailed voting instructions with respect thereto and a pre-addressed, postage prepaid return envelope (as applicable), in substantially the forms annexed as Exhibits 2-A, 2-B, 2-C, 2-D, and 2-E to the Conditional Approval Order; and

- any such other materials as the Bankruptcy Court may direct.

### 4.      When is the Deadline to Vote?

**October 23, 2023 at 4:00 p.m. (prevailing Eastern Time)** is the Voting Deadline.  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered as directed, so that your Ballot is actually received by the Claims Agent (as defined below) on or before the Voting Deadline.  Ballots returned by facsimile will not be counted.

---

[4]   Flash-drives will only be provided to Holders of Claims in Voting Classes that receive the Solicitation Package by mail (not email).

### E.    Confirmation Hearing

A hearing to consider Confirmation of the Plan and final approval of the Disclosure Statement will occur on **October 30, 2023 at [●] a.m./p.m. (prevailing Eastern Time)** in the United States Bankruptcy Court, 824 N. Market St., 5th Floor, Courtroom 6, Wilmington, DE 19801 (the "Confirmation Hearing"). Objections, if any, to Confirmation of the Plan and final approval of the Disclosure Statement must be filed and served on or before **October 23, 2023, at 4:00 p.m. (prevailing Eastern Time)**, in the manner described in the Confirmation Hearing Notice accompanying this Disclosure Statement. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned.

### F.    Recommendation of the Debtors

**The Debtors Believe that the Plan Provides the Greatest Possible Recovery to Creditors. The Debtors Urge All Creditors Entitled to Vote to Vote in Favor of the Plan.**

## III.    OVERVIEW OF THE PLAN

The following is a brief summary of the treatment of Claims and Interests under the Plan. Creditors and other parties in interest are urged to review the more detailed description of the Plan contained in this Disclosure Statement and the Plan itself, which is annexed as **Exhibit A** to this Disclosure Statement.

Set forth below is a table summarizing the classification and treatment of Claims and Interests under the Plan and the estimated distributions to be received by the Holders of such Claims and Interests thereunder. The actual distributions may differ from the estimates set forth in the table depending on, among other things, (a) key legal issues that must be resolved for the Debtors to successfully exit from bankruptcy, including, among others, whether the Cryptocurrency in the Debtors' possession is property of the estate[5] and (b) variations in the amounts of Allowed Claims and the existence of Disputed Claims.

### SUMMARY OF ESTIMATED DISTRIBUTIONS UNDER THE PLAN

| Class | Claim or Interest | Estimated Allowed Amounts (in $mm) | Treatment | Reorganization Transaction Estimated Recovery | Wind-Down Scenario— Sale Transaction Estimated Recovery | Wind-Down Scenario— Liquidation Event Estimated Recovery | Liquidation Recovery |
|---|---|---|---|---|---|---|---|
| 1 | Secured Tax Claims | N/A | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | N/A | N/A | N/A | N/A |

---

[5]    See generally *infra* Article VII for an expanded discussion of this issue.

| Class | Claim or Interest | Estimated Allowed Amounts (in $mm) | Treatment | Reorganization Transaction Estimated Recovery | Wind-Down Scenario—Sale Transaction Estimated Recovery | Wind-Down Scenario—Liquidation Event Estimated Recovery | Liquidation Recovery |
|---|---|---|---|---|---|---|---|
| 2 | Other Priority Claims | N/A | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | N/A | N/A | N/A | N/A |
| 3A | Prime Core General Unsecured Claims | $[●] | Except to the extent a Holder of an Allowed Prime Core General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each Holder of an Allowed Prime Core General Unsecured Claim will receive in exchange for such Allowed Prime Core General Unsecured Claim, following payment in full of, or reserve for, Allowed Administrative Expense Claims, funding the Professional Fee Escrow Account, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at Prime Core:<br><br>**If a Reorganization Transaction occurs**: its Pro Rata share of the Plan Trust Assets attributable to Prime Core; or<br><br>**If a Wind-Down Scenario occurs**: its Pro Rata share of the Wind-Down Trust Assets attributable to Prime Core. | [●]% | [●]% | [●]% | [●]% |
| 3B | Prime Trust General Unsecured Claims | $[●] | Except to the extent a Holder of an Allowed Prime Trust General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each Holder of an Allowed Prime Trust General Unsecured Claim will receive in exchange for such Allowed Prime Trust General Unsecured Claim, following payment in full of, or reserve for, Allowed Administrative Expense Claims, funding the Professional Fee Escrow Account, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at Prime Trust:<br><br>**If a Reorganization Transaction occurs**: its Pro Rata share of the Plan Trust Assets attributable to Prime Trust; or<br><br>**If a Wind-Down Scenario occurs**: its Pro Rata share of the Wind-Down Trust Assets attributable to Prime Trust. | [●]% | [●]% | [●]% | [●]% |
| 3C | Prime IRA General Unsecured Claims | $[●] | Except to the extent a Holder of an Allowed Prime IRA General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each Holder of an Allowed Prime IRA General Unsecured Claim will receive in exchange for such Allowed Prime IRA General Unsecured Claim, following payment in full of, or reserve for, Allowed Administrative Expense Claims, funding the Professional Fee Escrow Account, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at Prime IRA:<br><br>**If a Reorganization Transaction occurs**: its Pro Rata share of the Plan Trust Assets attributable to Prime IRA; or<br><br>**If a Wind-Down Scenario occurs**: its Pro Rata share of the Wind-Down Trust Assets attributable to Prime IRA. | [●]% | [●]% | [●]% | [●]% |

| Class | Claim or Interest | Estimated Allowed Amounts (in $mm) | Treatment | Reorganization Transaction Estimated Recovery | Wind-Down Scenario— Sale Transaction Estimated Recovery | Wind-Down Scenario— Liquidation Event Estimated Recovery | Liquidation Recovery |
|---|---|---|---|---|---|---|---|
| 3D | Prime Digital General Unsecured Claims | $[●] | Except to the extent a Holder of an Allowed Prime Digital General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each Holder of an Allowed Prime Digital General Unsecured Claim will receive in exchange for such Allowed Prime Digital General Unsecured Claim, following payment in full of, or reserve for, Allowed Administrative Expense Claims, funding the Professional Fee Escrow Account, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at Prime Digital: <br><br>**If a Reorganization Transaction occurs**: its Pro Rata share of the Plan Trust Assets attributable to Prime Digital; or <br><br>**If a Wind-Down Scenario occurs**: its Pro Rata share of the Wind-Down Trust Assets attributable to Prime Digital. | [●]% | [●]% | [●]% | [●]% |
| 4 | Convenience Claims | $[●] | Except to the extent a Holder of an Allowed Convenience Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each Holder of an Allowed Convenience Claim will receive in exchange for such Allowed Convenience Claim, Cash in an amount equal to [●]% of the amount of such Allowed Convenience Claim on or as reasonably practicable after the later of (i) the Effective Date or (ii) thirty (30) days after the date on which such Claim becomes Allowed. | [●]% | [●]% | [●]% | N/A |
| 5 | Section 510(b) Claims | $[●] | Holders of Section 510(b) Claims shall not receive or retain any distribution under the Plan on account of such Section 510(b) Claims; *provided, however*, that in the event Allowed Claims in Classes 3A, 3B, 3C, 3D, and 4 are paid in full, Holders of Section 510(b) Claims shall be entitled to receive distributions on account of such Section 510(b) Claims from the Plan Trust or the Wind-Down Trust, as applicable. | [●]% | [●]% | [●]% | N/A |
| 6 | Intercompany Claims | N/A | Each Intercompany Claim shall receive the treatment for such Intercompany Claim as determined by the Bankruptcy Court. | N/A | N/A | N/A | N/A |
| 7 | Intercompany Interests | N/A | On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (i) Reinstated in accordance with Article 3.6 of the Plan or (ii) set off, settled, addressed, distributed, contributed, merged, or cancelled. | N/A | N/A | N/A | N/A |
| 8 | Existing Equity Interests | N/A | On the Effective Date, all Existing Equity Interests shall be extinguished, cancelled and released, and Holders of Existing Equity Interests thereof shall not receive any distribution on account of such Existing Equity Interests; *provided, however*, that in the event Allowed Claims in Classes 3A, 3B, 3C, 3D, 4, and 5 are paid in full, Holders of Existing Equity Interests shall be entitled to receive distributions on account of such Existing Equity Interests from the Plan Trust or the Wind-Down Trust, as applicable | 0% | 0% | 0% | 0% |

The treatment and distribution provided to Holders of Allowed Claims and Interests pursuant to the Plan are in full and complete satisfaction of the Allowed Claims and Interests, as the case may be.

IV.    **BACKGROUND OF THE DEBTORS AND CERTAIN EVENTS PRECEDING THE FILING OF THEIR CHAPTER 11 CASES**

A.    **Corporate History**

The Company was founded in 2016 by Scott Purcell as a trust and custodial services company with respect to fiat currency and other more traditional assets, with its primary product being college savings trusts. Following the emergence and exponential growth of the blockchain and cryptocurrency industry, the Company recalibrated its focus away from providing more traditional fiat currency custodial services and towards providing custodial services for cryptocurrency and other digital assets. Eventually, the Company emerged as a market leader, providing a unique bundle of products and services that remain unparalleled in the industry.

B.    **Business Operations**

Before issuance of the Cease and Desist Order (as defined and discussed below), the Company operated a software technology company that offered an all-in-one financial infrastructure platform to its customers.

The Company's products and services were used widely throughout the cryptocurrency industry, providing critical infrastructure to notable companies within the space. Companies of all types within the blockchain ecosystem utilized the Company's products and services, including wealth management platforms, exchanges, savings apps, rewards apps, cryptocurrency IRAs, payment platforms, digital asset custodial services for RIAs, payroll companies, stablecoins, and more. Many market participants utilized the Company as their "back end." In some cases, the Company provided almost all of the infrastructure for companies, opening accounts for not only those companies, but each of their respective customers, providing compliance services, processing transactions through the Company's liquidity APIs, and storing their customers' fiat currency and cryptocurrency.

By the end of 2021, the Company was processing over 308,000 transactions per day on average, had opened 2.8 million new custodial accounts, held over $3.8 billion in cryptocurrency and fiat currency assets under custody, and facilitated over $309 billion USD of fiat currency movement. At its peak, the Company had approximately 540 full-time employees and independent contractors.[6]

To provide its customers with a broad range of regional operational options, the Company, through Prime Trust, was a registered money service business with FinCEN (an "MSB") and held a Nevada trust charter (the "Nevada Trust Charter"). Further, where a separate license was required to operate in a particular state, the Company held money transmitter licenses (each, an "MTL" and, collectively, the "MTLs" and, together with the Nevada Trust Charter, the "Licenses"). At the Company's peak, the Company provided services in most of the United States through a combination of states where it maintained Licenses, states where there was an express exemption of money transmitter requirements for out-of-state trust companies, and states where there was no

---

[6]    As of the Petition Date, the Company had approximately seventy full-time employees and independent contractors.

license requirement. The Company also pursued licenses in states that did not provide for such an exemption and required licenses.

Before the Petition Date, the Company's suite of offerings included custody services, AML/KYC as a service, access to a redundant network of banking rails, crypto liquidity services, compliance and regulatory services, settlement services, Application Programming Interface ("API") integration, and professional services, each as described in more detail below.



1.    **Custody Services.**

The Company's custody services enable quick and secure custody or sub-custody of both fiat and digital assets supported by a variety of account types, all via the Company's API. In addition to USD and select foreign currencies, the Company supports custody of over 200 types of digital assets, including BTC, ETH, and LTC, stablecoins like USDT and USDC, and many ERC-20 compliant cryptocurrencies. The Company also provides flexible account types for storing assets in custodial or retirement accounts that match customer needs and risk profiles.

The custodial relationship between the Company and many of its customers are governed by a Master Services Agreement (the "MSA") and Self-Directed Account Agreement (the "Account Agreement" and, together with the MSA, the "Customer Agreements"). As is often seen among custodians, the Customer Agreements provide that the Company will hold customer digital and fiat currency in commingled, omnibus-style accounts or wallets, and that once a contribution has been made and settled on the Company's ledger, the assets are fungible. With respect to fiat contributions, the MSA provides:

Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control

a like amount of cash or Fiat Currency, subject to Prime Trust's obligation to return Fiat Currency to Customer in accordance with this Service Schedule.[7]

## 2.    AML/KYC as a Service.

Customers can avail themselves of the Company's bundle of AML/KYC services (the "<u>AML/KYC Services</u>"). In connection with its AML/KYC Services, the Company employs cutting-edge technology and a broad set of data sources, including watchlists, transaction monitoring systems, and document verification services to deliver effective, automated, and scalable financial crime detection via the Company's API. The Company's AML/KYC Services include comprehensive KYC and KYB[8] coverage and checks for global sanctions, adverse media, and PEP[9] screenings. These services also include an onboarding identity SDK[10] that allows customers to embed an all-in-one identity solution with ID submission, liveness checking, and automated confirmation.



## 3.    Access to a Redundant Network of Fiat Banking Rails.

The Company has built a network of integrated banks[11] to provide "payment rails,"[12] including ACH, ACH-push, same-day ACH, debit card, credit card, and wire transfers in USD and select foreign currencies. The Company is known in the marketplace for having a higher number of banking partners than most other providers.[13] The Company has also developed special

---

[7]    MSA, § 2.7(b).

[8]    Know Your Client and Know Your Business, respectively.

[9]    Politically Exposed Persons.

[10]    Software Development Kit.

[11]    The Company is not a banking institution and does not provide banking services.

[12]    "Payment rails" refers generally to the infrastructure that moves money from one person to another.

[13]    The need for a redundant network of banks became apparent in the first quarter of 2023 when banks such as Silicon Valley Bank, Silvergate Bank, and Signature Bank ceased operations. Clients that banked directly with

expertise in providing a technological bridge between banking institutions that do not have their own APIs and customers in the cryptocurrency industry who require APIs. In addition, customers can achieve immediate settlement of their accounts through the Company's settlement network (described below) without the lag time that is attendant to ACH and wire transfers through traditional banking institutions. The Company's card transactions provide predictive approvals and fraud detection modeling via the 3D Secure 2.0 protocol. The Company also offers improved operational efficiency and automation through webhooks and batch transfers reducing the need for back office support.



4.      **Crypto Liquidity.**

The Company offers access to its multiple cryptocurrency liquidity partners, which enables customers to convert fiat currency to digital currency and vice versa through the Company's API. Integrators can choose between instant settlement or T+1 settlement to allow for flexible capital management. The Company also supports its customers' ability to request a quote in fiat currency based on the spot price of the digital asset. Off-chain transactions are also possible through the Company's settlement network (described below) to provide instant settlement without incurring gas fees (*i.e.*, transaction fees) and allowing customers to maintain the privacy of their transactions and positions.

5.      **Compliance and Regulatory Services.**

The Company assists its customers in navigating complex regulatory landscapes by providing licensed services in support of customers' business models, handling the portions of its customers' business which may require additional licenses, such as custody and money transmission. This allows its customers to focus on their core business and launch a legally compliant business more quickly and with less capital. In support of these services that enable

---

those banks found themselves without banking services almost overnight. In contrast, the Company's customers who were accessing one of those banks via the Company's platform were simply re-allocated to other banks in the Company's redundant network of banks without the need to adjust their API integration.

client transactions to be conducted within legal frameworks, the Company also handles extended compliance duties including several types of audits, SAR filings, and other related activities.

### 6.    Settlement Services.

The Company's "Prime Trust Settlement" service is an API-enabled solution for the transfer of fiat or digital assets between any account on the Company's network, including other customers, at any time. This enables unilateral or bilateral settlement, a proprietary ledger to ensure full privacy of movements and the potential to minimize market risk, and support for USD, select foreign currencies, and over 200 digital assets. The Company's settlement network also enables customers to transfer assets in-network at any time during regular hours, weekends, and holidays with funds available instantly.



1. Atomic swap completes - both parties have the necessary assets
2. Atomic swap fails - one or both parties do not have the necessary assets and the entire transactions fails

### 7.    Professional Services.

The Company offers a variety of professional services that assist customers with tasks such as API integration and AML/KYC resolutions with service-level agreements (SLAs), and generally offers advisory services for large, complex customers to provide prescriptive guidance, expert technical coverage, and a proactive engagement model (as described below).

### 8.    Engagement Model.

A common refrain among the Company's customers has been that one of the many values in working with the Company is the ability to launch their products to market quickly. In that vein, among other things and as depicted below, the Company's standard onboarding procedure provides an expeditious launch process for customers, including support implementation, certification, compliance, due diligence, and testing, with production rollout typically occurring within two or three months. In addition, white-glove service that includes access to compliance, integration, and other specialists provides the opportunity to support more complicated business models and/or the ability to launch even quicker.



## C. Debtors' Organizational and Capital Structure

### 1. The Debtors' Prepetition Organizational Structure



### 2. Debtor Entities.

Debtor Prime Core is a corporation formed under the laws of Delaware and is the sole member and 100% owner of Debtor Prime Trust and non-Debtor Prime New York Trust, LLC ("Prime NY"). The formation of Prime NY had not been completed as of the Petition Date.

Debtor Prime Trust is a Nevada limited liability company and the Debtors' primary operating entity. Prime Trust is the 100% owner and sole member of Debtors Prime Digital and Prime IRA. Prime Trust is a Nevada-chartered non-depository trust company that is subject to the jurisdiction of the Nevada Department of Business and Industry Division of Financial Institutions (the "Nevada FID") and is regulated under Nevada Revised Statutes Chapter 669 – Trust Companies. The Debtors operate a non-depository trust company that provides administrative and

custodial services primarily to custodial and trust accounts.[14] Prime Trust employs all Nevada-based employees and is the entity that owns the Debtors' material intellectual property.

Debtor Prime Digital is a Nevada limited liability company and the entity that employs all non-Nevada employees who support the business operations of Prime Trust.

Debtor Prime IRA is a Nevada limited liability company that was formed to provide Prime Trust's historic personal checkbook IRA services; however, the Company previously off boarded these services to alternative custodians. As a result, Prime IRA is no longer an operating entity.

### 3.    Intercompany Transactions.

The operations of the Debtor entities are interrelated, and transfers are regularly executed between the Debtor entities. The Company raises capital at the Prime Core level. Prime Core then contributes funds to Prime Trust for operational purposes, pursuant to an *Intracompany Contribution Agreement*, dated March 7, 2022 (the "Contribution Agreement"). Pursuant to the Contribution Agreement, Prime Core and Prime Trust maintain a centralized cash repository and cash management system. Third parties may make contributions directly to Prime Trust, with Prime Core contributing additional capital to Prime Trust on a go-forward, as-needed basis. All corporate bank accounts are legally held by Prime Trust, and the Company uses these accounts to pay the expenses of each of the Debtor entities.

### 4.    Non-Debtor and Former Entities.

Non-Debtor Prime NY, a wholly owned subsidiary of Prime Core, was intended to be a New York limited liability company for purposes of applying for a limited purpose trust charter in the State of New York. Prime NY's application remained pending as of the Petition Date, and therefore Prime NY has not been officially formed. Prime NY conducts no business and has no customers or revenue.

Additionally, the Debtors previously owned non-Debtor Banq, Inc. ("Banq"). Banq was a corporation formed under the laws of the state of Florida in 2019 and was a wholly owned subsidiary of Prime Trust. The Company executed a spin-off of Banq into a separately owned company, with then current members of Prime Trust receiving a *pro rata* distribution of Banq shares. As of October 2020, the Debtors understood their ownership interest in Banq to be less than 3%.[15] Banq filed for bankruptcy in the Bankruptcy Court for the District of Nevada on June 13, 2023.

### 5.    The Debtors' Prepetition Equity Structure.

In March 2021, the Company launched a Series A financing process (the "Series A Financing"). The Series A Financing was consummated through a series of closings between April 2021 and August 2021. Pursuant to the Series A Financing, the Company sold 22,699,052 shares

---

[14]  Prime Trust previously provided escrow services primarily to issuers of private placements.

[15]  Banq has not since provided a capitalization table to the Debtors and therefore, the Debtors do not have a current understanding of its equity position therein.

of Series A-1 preferred stock (the "Series A-1 Preferred Shares") and 4,390,371 shares of Series A-2 preferred stock (the Series A-2 Preferred Shares," and together, the "Series A Preferred Shares"). The Company received $68,522,059.34 in aggregate consideration in exchange for the Series A Preferred Shares. Up to about $34 million of the Series A funding was directed towards redeeming shares of common stock from existing shareholders, and between May 2021 and October 2021, the Company made a series of repurchases of Class A common stock and Class B common stock from the Company's original shareholders, ultimately redeeming $31,827,432.34 worth of shares of common stock.

In October 2021, the Company commenced a Series B financing process (the "Series B Financing"), which closed on March 16, 2022. Through the Series B Financing, the Company sold 19,486,876 of Series B Preferred Shares for an aggregate purchase price of $108,216,652.35.

In response to interest from outside investors and the desire of certain then-existing shareholders to sell their shares, the board of directors of Prime Core approved a secondary sale process through which then-existing shareholders could sell their shares directly to third-party investors through a third-party broker. Between October 2021 and January 2022, various shareholders participated in this secondary sale process, resulting in the sale of 22,240,997 shares of Class A and Class B common stock for $67,708,491.04 in the aggregate.

As of the Petition Date, Prime Core had the following shares and classes of stock outstanding: (a) 35,723,436 shares of Class A common stock; (b) 19,067,548 shares of Class B common stock;[16] (c) 22,699,052 shares of Series A-1 preferred stock; (d) 4,390,371 shares of Series A-2 preferred stock; and (e) 9,486,876 shares of Series B preferred stock.

Additionally, as of the Petition Date, 33,078,960 shares of common stock were available (but unissued) to eligible participants pursuant to that certain *Amended and Restated 2021 Equity Incentive Plan*, dated March 16, 2022 (the "Incentive Plan").[17]

### 6.    The Debtors' Prepetition Capital Structure.

The Debtors have no prepetition secured debt. However, as noted above, in the ordinary course of business, Prime Trust maintained Licenses in various states. In connection therewith, Prime Trust was required to maintain regulatory reserves and collateralized surety bonds, the amounts of which varied by state. As of the Petition Date, the Company had surety bonds in the aggregate amount of $7,645,000, for which the Company posted collateral in the aggregate amount of $5,726,250.

---

[16]    In addition, as of August 22, 2023, the Company has issued options to purchase approximately 1,987,992 shares of Class B common stock, which options remain outstanding and a warrant to purchase up to 100,000 shares of Class B common stock. In addition, the Company has promised but not issued options to purchase approximately 1,770,000 shares of Class B common stock.

[17]    Under the Incentive Plan, subject to certain conditions, Employees are eligible to receive Incentive Stock Options and Employees, Directors, and Consultants are eligible to receive Stock Awards other than Incentive Stock Options (each capitalized term as defined in the Incentive Plan).

7. **The Debtors' Current Cash Position.**

The Company stopped generating revenue upon issuance of the Cease and Desist Order. Before the Petition Date, the Special Committee worked with the Company and its professionals to develop a cash forecast for the first thirteen weeks of these Chapter 11 Cases (the "Preliminary Budget"). The Preliminary Budget reflects corporate treasury funds in the amount of $9,666,913 and contemplates the return to the Company of certain property held by third parties that the Company contends is property of the Company's bankruptcy estates.

D. **History of the Company's Management.**

From 2016 through August 2021, Scott Purcell, the founder of the Company, served as Chief Executive Officer. Tom Pageler served as Chief Operations Officer from May 2020 and August 2021, and as Chief Executive Officer from August 2021 through November 2022. From November 2022 until the imposition of the Receivership, as described more fully below, the Company's operations were managed by an almost entirely new management team, led by me serving as the Company's Interim Chief Executive Officer and President as of November 29, 2022 ("New Management").[18] Beginning on or about July 14, 2023, the Company was managed by the Receiver until approximately August 14, 2023 when the Company began to be managed by the Special Committee.

E. **Events Leading Up to the Chapter 11 Cases**

1. **Lack of Operational and Spending Oversight by Prior Management.**

The Company enjoyed success for a number of years and was viewed by the market as a critical and necessary component of the digital asset ecosystem. Lifted by industry-wide growth in the cryptocurrency market referred to as "crypto summer," the Debtors saw a tremendous rise in revenues and valuation. However, in 2022, several major liquidity events occurred in the cryptocurrency market, leading to a period of decline and a general weakening of the market, commonly referred to as "crypto winter."[19] Although crypto winter was not the precipitous event leading to the Receivership and these Chapter 11 Cases, the Company felt the ripple effect caused by crypto winter, which resulted in depressed revenues.

Despite these realities, the Company under prior management continued to ramp up spending, at times incurring seemingly excessive expenditures. By way of example, in October 2022, the Company under prior management spent approximately $10.5 million against revenues of approximately $3.1 million for a net loss of approximately $7.4 million. The next

---

[18]    Although a significant number of the members of the new management team are new to the Company, the Company determined, in the exercise of its business judgment, to retain certain members of former management teams as part of the new management team.

[19]    The implosion of Terra LUNA ("Terra") resulted in the loss of billions of dollars of value for Luna, the Terra's proprietary cryptocurrency used to execute transactions on Terra's blockchain and was a key catalyst in the acceleration of crypto winter. The collapse of Terra had a ripple effect through the cryptocurrency industry and was named as a causal event in the chapter 11 cases of Voyager Digital, Celsius, and others.

month, the Company under prior management spent approximately $11.1 million against revenues of approximately $2.7 million for a net loss of approximately $8.4 million.[20]

In addition, the Company under prior management invested funds in TerraUSD (UST)[21] using both customer funds and funds in the Company's corporate treasury, which resulted in a loss of approximately $6,000,000 in client funds and $2,000,000 in treasury funds.

## 2.    The Wallet Event.

In March of 2018, the Company created cold-storage wallets (the "Legacy Wallets") for purposes of maintaining cryptocurrency assets that included ETH, BTC, and ERC-20 compliant cryptocurrencies.

One of the Legacy Wallets, the 98f Wallet,[22] was set up as a "multi-sig" wallet with six total signers of which three signers were required to gain access and execute transactions. To enhance security, the Company set up the 98f Wallet so that those who can "sign" (*i.e.*, approve) transactions would need to be in physical possession of hand-held Trezor or Ledger hardware devices (the "Hardware Devices"). It is a relatively common practice to utilize hardware devices, such as the Hardware Devices, to enhance security of digital wallets. Representative images of the Hardware Devices are below:



If hardware devices are lost, there is a method by which a user can "mod" or otherwise transfer signing rights to another hardware device. To do so, the user needs "seed phrases." Seed phrases are a set of (typically twelve or twenty-four) randomly generated words that are created during the initial set-up of the hardware device. If, for example, a user lost a hardware device, that user could purchase a new hardware device (or even use non-hardware options such as software wallets) and gain access to the digital wallet as long as the user knew the seed phrase. Many users store seed phrases on hard copies of handwritten paper, images, and pictures. If a user loses both

---

[20]    In March 2023, at the peak of the Company's prepetition turnaround efforts under New Management, the Debtors had total expenses of approximately $4.5 million against total revenues of approximately $3.7 million, generating a net loss of approximately $800,000, representing a 65% decrease in operating expenses and a 60% decrease in total expenses compared to what the Company saw under prior management.

[21]    UST is the stablecoin used on the Terra blockchain.

[22]    The "98f Wallet" is a Legacy Wallet with an address ending in "98f".

the hardware device and the seed phrases, it is virtually impossible for that user to regain access to the digital wallet.

The Company used a seed storage system provided by "Cryptosteel" (the "Cryptosteel Hardware" and, together with the Hardware Devices, the "Wallet Access Devices"), which allows physical storage of a copy of the seed phrases on extremely durable hardware. This provides a method of storing seed phrases that is generally believed to be safer than storing seed phrases on paper hard copy, images, or pictures. Representative images of Cryptosteel Hardware are below.



In connection with the 98f Wallet, the Company provided customers with wallet addresses (the "Contribution Addresses") through which a customer's cryptocurrency contributions were forwarded to the 98f Wallet via a smart contract.

In or around July 2019, the Company migrated its cryptocurrency assets to the digital asset security platform (the "Fireblocks Platform") maintained by Fireblocks LLC ("Fireblocks"). The Company believed it had completed the migration of its cryptocurrency assets in the first quarter of 2020 and that all available wallet addresses actually being used on a go-forward basis were accessible on the Fireblocks Platform. As the Fireblocks Platform had the programmatic ability to generate wallet addresses, the Company sought to deprecate the Legacy Wallets, such that customers should no longer make contributions of cryptocurrency into the Legacy Wallets.[23]

In January 2021, the Company inadvertently provided customers with Contribution Addresses that allowed customers to make contributions of cryptocurrency into the 98f Wallet. Shortly thereafter, customers began sending cryptocurrency into the 98f Wallet.

It was not until December 2021,[24] when a customer requested a significant withdrawal of ETH that the Company could not fulfill using ETH from its omnibus wallets on the Fireblocks Platform, that certain Company employees discovered that cryptocurrency assets had been forwarded to the 98f Wallet, which was outside of the Fireblocks Platform. It was around this time that they discovered that the Company did not have the Wallet Access Devices and thus, could not access the cryptocurrency stored in the 98f Wallet.[25]

---

[23] Deprecation refers to a functionality that exists in software whose use is not recommended.

[24] Until then, the Company was able to automatically fulfill all ETH requests using ETH from its omnibus wallets on the Fireblocks Platform.

[25] As of August 22, 2023, the value of the cryptocurrency held in the 98f Wallet was approximately $38.9 million.

While undertaking extensive efforts to locate the Wallet Access Devices, certain Company employees used fiat currency from omnibus client accounts to purchase ETH to satisfy customer withdrawal requests. From December 2021 to March 2022, they caused the Company to use $76,367,247.90 in the aggregate to purchase ETH to fund customer withdrawals.[26] The Company remains unable to access the 98f Wallet. The investigation into these matters continues. These events were reported to the Board in August 2022, and the Company disclosed them to the Nevada FID and other state regulatory authorities between September and November 2022.

### 3.    Regulatory Issues.

As discussed below, the Company's Prepetition Turnaround Plan contemplated an additional capital raise. Indeed, the Company was in the midst of this capital raise when state regulators began taking actions that resulted in the revocation or suspension of certain of the Company's Licenses. This licensure loss restricted the Company's ability to do business, triggered negative publicity, and caused some customers to sever their relationships with the Company, all of which caused a precipitous decline in the Company's revenues, and led to the issuance of the Cease and Desist Order, the imposition of the Receivership, and ultimately, the filing of these Chapter 11 Cases.[27] As of date of the petition for Receivership, Prime Trust had deficits vis-à-vis customers in the amount of $82,766,000 in fiat currency and $861,000 in digital currency.

### F.    Corrective Efforts and Prepetition Turnaround Plan.

### 1.    Wallet Corrective Efforts.

The Company took corrective efforts to address the Wallet Event. Specifically, while the foregoing 98f Wallet accessibility issue is aberrant and extremely unlikely to recur, the Company undertook a series of corrective steps designed to ensure that this anomalous 98f Wallet event never happens again. These steps included:

- taking steps to restrict customer contributions to the Legacy Wallets through direct customer communication;[28]

- restricting new wallet creation to the Fireblocks Platform;

- making improvements to the Company's digital asset inventory procedures;

- overhauling the Company's treasury functions;

- improving employee off-boarding procedures; and

---

[26]    This amount represented less than 5% of the Company's fiat custodial assets and less than 2.5% of the Company's total custodial assets using December 31, 2021 values.

[27]    Before the issuance of the Cease and Desist Order, the Company's new client sales forecast for 2023 was $47,823,487 annual contract value (ACV).

[28]    Due to the nature of cryptocurrency wallets, they can only be deprecated and cannot be decommissioned or otherwise eliminated.

- updating the Company's communications protocols to foster more transparency.

Collectively, the foregoing procedures and controls provide multiple additional layers of security designed to ensure that the Company maintains access to, and the ability to recover, all custodied digital assets. Further, understanding that stagnancy is the enemy of progress, the Company continues to refine and improve upon these protocols to ensure that the Company maintains the highest level of integrity at all times.

### 2. Prepetition Turnaround Plan.

In addition to the corrective efforts undertaken by the Company in response to the Wallet Event, under New Management, the Company undertook a series of steps to improve operational and financial efficiencies at the Company, which steps included:

- the removal of all members of the C-Suite who were materially involved with the 98f Wallet issues and/or who were contributed to and otherwise fostered an unhealthy Company culture;

- the adoption of values centered around best-in-class products/service, teamwork, entrepreneurial, integrity, inclusive, and customer-centricity; and

- the institution of cost-cutting measures, including by right-sizing the Company's workforce, mandating the curtailment of business-related travel, reducing consulting and marketing related expenses, and optimizing software offerings to employees.

In addition, New Management developed a turnaround plan (the "Prepetition Turnaround Plan") designed to make customers whole and achieve profitability, targeting a cash flow break-even point in the fourth quarter of 2023. Among other things, the Prepetition Turnaround Plan contemplated capital raises and the potential merger and/or sale of the Company.

More specifically, on February 10, 2023, the Board approved the Company's launch of a Series C rights offering process (the "Series C Rights Offering"), which would be offered solely to the Company's then-existing shareholders. The Series C Rights Offering was to be capped at $60 million, subject to the Company's ability to raise at least $40 million before closing. To generate more interest, the Board approved revised terms, which included increasing the liquidation preference for the Series C Rights Offering.

In connection with the Series C Rights Offering, the Company received approximately $29 million, which was held in escrow subject to the Company's ability to raise $53 million. On top of the $29 million, the Company received an additional $6.36 million in funding commitments. However, by late March 2023, it became clear that the Company's existing shareholders would not be able to fund a sufficient amount to close on the Series C Rights Offering,[29] and the Board

---

[29] This was purportedly due to a lack of liquidity and other factors as opposed to a lack of interest in the Series C Rights Offering.

authorized the Company to approach third-party investors to bridge the delta. On or about April 11, 2023, J.V.B. Financial Group, LLC, acting through its Cohen & Company Capital Markets division ("Cohen"), commenced work on behalf of the Company as its financial advisor with respect to the Series C Rights Offering. On April 26, 2023, Cohen commenced its outreach. By June 6, 2023, Cohen had contacted 240 potential investors and 31 potential acquisition parties in connection with the capital raise for the Series C Right Offering.[30]

### G.    Prepetition Receivership Proceedings and Appointment of the Special Committee.

Despite the foregoing efforts, the Company was unable to return to profitability following the events described above. As a result of the Wallet Event, the Company found itself in violation of Nevada trust regulations and certain other state regulations due generally to a failure to maintain an adequate amount of shareholder equity or capital in the form of permissible investments. The Company worked closely and cooperatively with the Nevada FID to resolve these issues and bring the Company back into compliance. However, a series of events transpired[31] that caused the Company to experience multiple "runs on the bank," which led to the entry of a *Memorandum of Understanding* between the Company and the Nevada FID on June 16, 2023, pursuant to which the Nevada FID placed additional oversight over the Company. On June 21, 2023, the Nevada FID issued a cease and desist order (the "Cease and Desist Order") against the Company. Pursuant to the Cease and Desist Order, the Nevada FID ordered the Company to cease and desist all retail trust activities.[32]

On June 23, 2023, the Board and the board of managers of Prime Trust adopted resolutions, which, among other things, consented to the imposition of a receivership and authorized the Company's officers to take all such actions as a receiver deems necessary or appropriate.

On June 26, 2023, the Nevada FID filed a *Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief* (the "Receivership Petition") with the Eighth Judicial District Court of the State of Nevada (the "Nevada State Court"), seeking, among other things, the appointment of a receiver pursuant to Nevada Revised Statute 669.2864.[33]  On July 14, 2023, the Nevada State Court granted the Receivership Petition on an interim basis, placing the Company in receivership (the "Receivership") and installing John Guedry as receiver (the "Receiver") with respect to the Company (the "Interim Receivership Order").

---

[30]    The Company entertained a merger offer from BitGo; however, the offer carried insurmountable contingencies and as a result, failed to garner support from investors.

[31]    These events included license revocations by certain state licensing agencies, negative press, incorrect reporting, and the demise of the BitGo transaction.

[32]    More specifically, the Cease and Desist Order prohibited the Company "from operating and/or engaging in the trust company business in violation of NRS Chapter 669, specifically 669.100(1) and NRS 669.2825(1)(a), (b), (c), (f) and (k)."  The Cease and Desist Order further prohibited the Company "from accepting fiat currency from existing and new clients for custody purposes" and "from accepting cryptocurrency from existing and new clients for custody purposes."

[33]    Case No. A-23-872963-B.

On August 3, 2023, the Receiver petitioned the Nevada State Court for a modification of the Interim Receivership Order (the "Motion to Modify"). Among other things, the Receiver requested that the Nevada State Court authorize (a) the formation of a special restructuring committee (the "Special Committee"); (b) appoint John Guedry, John Wilcox, and Michael Wyse as the sole members of the Special Committee; and (c) vest the Special Committee with requisite authority to direct the Company to file voluntary petitions for relief under chapter 11 of the Bankruptcy and manage and oversee the Prime Entities[34] in their capacities as debtors-in-possession during the pendency of their Chapter 11 Cases.

On August 8, 2023, the Nevada State Court held a hearing (the "August 8 Hearing") on the Motion to Modify, at the conclusion of which the Nevada State Court approved the relief requested in Motion for Modify and approved the Receivership Petition on a final basis. On August 10, 2023, the boards of directors, boards of managers, or sole members, as applicable (collectively, the "Boards") of the Prime Entities ratified the decision of the Nevada State Court on the record at the August 8 Hearing, and further delegated to the Special Committee all decision-making authority with respect to the Prime Entities in their capacities as debtors-in-possession in connection with their chapter 11 cases. On August 14, 2023, the Nevada State Court entered an order memorializing the court's ruling on the record at the August 8 Hearing (the "Final Receivership Order") and, acting by unanimous written consent, the Special Committee authorized the filing of these Chapter 11 Cases.

## V.    EVENTS DURING THE CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

The Debtors filed their voluntary chapter 11 petitions on the Petition Date. The Chapter 11 Cases were assigned to Bankruptcy Judge Kate J. Stickles. The Debtors have continued in the management and possession of their business and properties as debtors in possession since the Petition Date. Set forth below is a summary of material events that have occurred since the Petition Date.

### B.    First-Day Relief

Upon the commencement of the Chapter 11 Cases, the Debtors filed several motions seeking typical "first-day" relief in their Chapter 11 Cases (collectively, the "First Day Motions"), as well as the declaration of Jor Law, Chief Executive Officer of the Debtors [D.I. 14], in support thereof, in order to ensure a smooth transition into chapter 11 and to allow the Debtors to continue to operate their business and administer their estates. As set forth below, the Debtors obtained orders on the First Day Motions granting various forms of relief that the Debtors deemed essential to facilitating their transition into chapter 11. On August 25, 2023, the Debtors obtained the following orders:

- *Interim Order (I) Authorizing Debtors To (A) Continue To Operate Their Cash Management System, And (B) Maintain Existing Bank Accounts And Business Forms And Honor Certain Prepetition Obligations Related Thereto;*

---

[34]    The term "Prime Entities" refers to Prime Core, Prime Trust, Prime Digital, and Prime IRA.

*(II) Authorizing The Debtors To (A) Continue To Perform Intercompany Transactions And (B) Granting Administrative Expense Status For Postpetition Intercompany Claims; (II) Extending The Time For The Debtors To Comply With Requirements Set Forth IN 11 U.S.C. Section 345(b); And (IV) Granting Related Relief* [D.I. 42];

- *Interim Order (I) (A) Approving Debtors Proposed Form of Adequate Assurance Of Payment for Future Utility Services, (B) Approving Debtors Proposed Procedures For Resolving Additional Assurance Requests, And (C) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, And (II) Granting Related Relief* [D.I. 41];

- *Interim Order (I) Authorizing Debtors to File a Consolidated Creditor Matrix and Top 50 Creditors List; (II) Authoring Redaction of Certain Personally Identifiable Information; (III) Authorizing the Debtors to Serve Certain Parties by Electronic Mail; (IV) Approving Certain Notice Procedures; And (V) Granting Related Relief Procedures, and (V) Granting Related Relief* [D.I. 39];

- *Interim Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief* [D.I. 38];

- *Interim Order (I) Authorizing The Debtors To (A) Maintain Existing Insurance Policies And Pay All Insurance Obligations Arising Thereunder, (B) Continue To Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, Or Purchase Insurance Coverage, And (D) Maintain Their Surety Bond Program, (II) Authorizing Banks To Honor Related Checks And Transfers, And (III) Granting Related Relief* [D.I. 37];

- *Interim Order (I) Authorizing Debtor To (A) Pay Prepetition Wages And (B) Pay Expenses Arising Under Employee Benefits Programs And Pay Related Administrative Obligations, (II) Authorizing Banks To honor And Process Checks And Transfers Related To Such Obligations, And (II) Granting Related Relief* [D.I. 34]; and

- *Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief " An order has been entered in accordance with Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware directing joint administration for procedural purposes only of the chapter 11 cases of: : Prime Core Technologies Inc., Case No. 23-11161 (5317); Prime Trust, LLC, Case No. 23- 11162 (6823); Prime IRA, LLC, Case No. 23-11164 (8436); and Prime Digital LLC, Case No. 23-11168 (4528)* [D.I. 33].

## C.    **Bid Procedures Motion**

On August 30, 2023, the Debtors filed a motion (the "<u>Bid Procedures Motion</u>") seeking (1)(a) entry of an order approving the Bid Procedures in connection with the Sale Transaction;

(b) approving certain bid protections and authorizing the Debtors, in their discretion, and after consultation with the Creditors' Committee to select one or more bidders to act as stalking horse bidders (each, a "Stalking Horse Bidder") and, if a Sale Transaction, enter into purchase agreements or, if an Equity Transaction (as defined in the Bid Procedures Motion), agree to terms of the Plan with such Stalking Horse Bidder(s) (each such agreement, a "Stalking Horse Agreement"); (c) scheduling related bid deadlines and an auction (the "Auction"); (d) approving the form and manner of notice thereof (the "Transaction Notice"); and (e) approving procedures (the "Assumption and Assignment Procedures") related to the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases (the "Assumed Contracts"), and certain related notice, including the form and manner of cure notice (the "Cure Notice"); (2) if a Sale Transaction occurs, entry of an order (the "Sale Order"), authorizing and approving the Debtors' entry into a Purchase Agreement with the Successful Bidder(s) or Back-Up Bidder(s) (as defined therein), as applicable; and (3) authorizing the Sale Transaction, free and clear of all liens, claims and encumbrances, except for certain assumed liabilities.

They key dates in the sale process are as follows:

| Key Dates and Events for the Sale Transaction | |
|---|---|
| Date[35] | Event |
| At or prior to the Bid Procedures Hearing | Bid Procedures Motion Objection Deadline |
| September 13, 2023, at 3:00 p.m. | Bid Procedures Hearing |
| Within three business days after entry of Bid Procedures Order | Deadline to File Transaction Notice |
| Within three business days after entry of Bid Procedures Order | Deadline to File Assumption and Assignment Notice |
| September 25, 2023 | Deadline to Submit Stalking Horse Bid |
| September 26, 2023 | Deadline to Designate Stalking Horse Bidder(s) if selected by the Debtors, after consultation with the Committee |
| September 29, 2023, at [●] a.m./p.m. | Deadline to Object to Stalking Horse Bidder(s) Designation |
| October 2, 2023, at [●] a.m./p.m. | Cure/Assignment Objection Deadline |
| October 5, 2023 | Deadline to Submit Qualified Bids |
| October 10, 2023, at [●] a.m./p.m. | Auction (as necessary) |
| Promptly after Auction | Deadline to File Notice of Successful Bidder(s) and Backup Bidder(s) |
| October 12, 2023, at 4:00 p.m. | Adequate Assurance Objection Deadline |
| October 12, 2023, at 4:00 p.m. | If a Sale Transaction, Deadline to Object to Transaction(s) |
| October 13, 2023, at [●] a.m./p.m. | If a Sale Transaction, Sale Hearing |
| TBD | If an Equity Transaction, the Deadline to Object to Plan |

---

[35]   All times are prevailing Eastern Time.

| | Confirmation |
|---|---|
| **TBD** | If an Equity Transaction, the Confirmation Hearing |

As explained in the Bid Procedures Motion, in August 2023, the Debtors engaged Galaxy Digital Partners LLC ("Galaxy"), as investment banker, and M3Partners, LLC ("M3"), as financial advisor, to assist the Debtors in their pursuit of a dual-track marketing process to solicit interest in a Sale Transaction. Galaxy has contacted approximately 470 potential bidders. Over twenty parties have executed (or are in the process of executing) confidentiality agreements. Galaxy has also populated a data room and continues to provide additional information to potential bidders. Further, Galaxy is in the process of scheduling management presentations to potential bidders and developing a process for introducing potential bidders to relevant regulatory bodies.

The deadline final proposals is October 5, 2023, subject to Bankruptcy Court approval. Absent a proposal resulting from this process that would offer a higher or better value to the Estates and the Debtors' stakeholders, the Debtors may pursue a Liquidation Event, as outlined in Article 6.7 of the Plan.

### D.    Appointment of Official Committee of Unsecured Creditors

On August 29, 2023, the U.S. Trustee filed the *Notice of Appointment of Unsecured Creditors Committee* [D.I. 51], notifying parties in interest that the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in the Chapter 11 Cases. The Committee is comprised of seven members: (i) Yousef Abbasi; (ii) Allsectech, Inc.; (iii) DMG Blockchain Solutions, Inc.; (iv) Net Cents Technology, Inc.; (v) Polaris Ventures; (vi) Stably Corporation and (vii) Austin Ward. The Committee retained Brown Rudnick LLP and Womble Bond Dickson (US) LLP as co-counsel to the Committee, subject to Bankruptcy Court approval.

### E.    The Committee's Investigation

Since its appointment, the Committee has also been investigating various potential litigation claims involving parties that are proposed to be released under the Plan (including the current and former directors, officers, agents, members of management and other employees of the Debtors). The Committee's investigation into these potential claims and causes of action is ongoing and, therefore, the Committee has not yet formed a view as to whether the proposed releases under the terms of the Plan should be approved. The Committee reserves all rights with respect to the Plan pending the conclusion of its investigation.

### F.    Retention of Professionals

On August 24, 2023, the Debtors filed an application [D.I. 16] to retain Stretto, Inc. as the court-appointed claims and noticing agent for the Debtors. On August 29, 2023, the Court entered an order [D.I. 54] approving the retention application.

The Debtors selected following professionals to serve as their advisors in these Chapter 11 Cases, subject to Bankruptcy Court approval: (1) McDermott Will & Emery LLP ("McDermott"), as bankruptcy counsel to the Debtors; (2) Stretto, as administrative agent to the Debtors; (3) Galaxy, as investment banker to the Debtors; and (4) M3, as financial advisor to the Debtors.

### G.   Rejection of Executory Contracts and Unexpired Leases

On August 28, 2023, the Debtors filed a motion to reject, effective as of August 31, 2023, that certain Office Lease Agreement with Great Wash Park LLC for the premises located at 330 S. Rampart Boulevard, Suite D, Las Vegas, Nevada [D.I. 47].  Before the Petition Date, the Debtors used the used the premises for office space in connection with their business activities. The Debtors currently operate their businesses on almost an entirely remote basis, and thus, no longer required such a large footprint to serve their business needs.  The Debtors vacated the premises on August 31, 2023, returned the keys to the landlord, and relocated their headquarters to a much smaller and less expensive space.

As further discussed herein, to the extent not assumed and assigned in connection with the Sale Transaction or assumed in connection with the Reorganization Transaction, the Plan provides for the rejection of any remaining unexpired nonresidential leases and executory contracts pursuant to section 365 of the Bankruptcy Code in accordance with the terms of the Plan.

### H.   Claims Bar Date.

On September 5, 2023, the Debtors filed a motion (the "Bar Date Motion") [D.I. 74] seeking entry of an order establishing certain bar dates for filing proofs of claim against the Debtors (the "Bar Date Order").  In the Bar Date Motion, the Debtors requested the Bankruptcy Court's approval to establish (i) 4:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) calendar days following the Debtors' filing of their Schedules, as the last date by which creditors asserting prepetition claims (including claims based on section 503(b)(9) of the Bankruptcy Code) were required to file proofs of claim, with certain exceptions (the "General Bar Date"); (ii) February 10, 2024 as the bar date for governmental units (the "Governmental Bar Date"); (iii) the later of (x) the General Bar Date or Governmental Bar Date, if applicable, and (y) 4:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) calendar days following service of an order approving rejection of an executory contract or unexpired lease of the Debtors as the deadline for an entity asserting a claim for damages against any of the Debtors arising from such rejection to file a proof of claim on account of such damages; and (iv) the later of (x) the General Bar Date or Governmental Bar Date, if applicable, and (y) 4:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) calendar days following service of notice of an amendment to the Debtors' Schedules as the deadline for an entity whose claim is affected by such amendment to file, amend, or supplement a proof of claim with respect to such claim (the foregoing dates in clauses (i) through (iv), the "Bar Dates").[36]  Subject to Bankruptcy Court approval, the Debtors also proposed publishing the Bar Dates once in the national edition of either *The Wall Street Journal*, *The New York Times*, or *USA Today*.

## VI.   PLAN.

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the consideration that each class is to receive under the plan and (c) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity

---

[36]   The Bar Dates are subject to the Bankruptcy Court's entry of the Bar Date Order.

interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.

### A.    Overview of the Plan.

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE EXHIBITS AND SCHEDULES THERETO. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE SUMMARY CONTAINED HEREIN AND THE PLAN, THE PLAN SHALL GOVERN AND CONTROL IN ALL RESPECTS.**

The Plan constitutes a joint plan of reorganization for all of the Debtors.

This section summarizes the treatment of each of the Classes of Claims and Interests under the Plan and describes other provisions of the Plan. Only Holders of Allowed Claims—Claims that are not in dispute, contingent, or unliquidated in amount and are not subject to an objection or an estimation request—are entitled to receive distributions under the Plan. For a more detailed description of the definition of "Allowed," see Article I.A of the Plan. Until a Claim becomes Allowed, no distributions will be made to the Holder of such Claim. The Debtors believe that they will be able to perform their obligations under the Plan. The Debtors also believe that the Plan permits fair and equitable recoveries.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, and release of all Claims or Interests. The Debtors will make all payments and other distributions to be made under the Plan unless otherwise specified.

### B.    Administrative Expense and Priority Claims.

#### 1.    Administrative Expense Claims.

##### (a)    Deadline to File Administrative Expense Claims.

Holders of an Administrative Expense Claim, other than Holders of (i) Professional Fee Claims; (ii) Administrative Expense Claims that have been Allowed on or before the Effective Date; (iii) Administrative Expense Claims on account of fees and expenses incurred on or after the Petition Date but before the Effective Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court; (iv) Administrative Expense Claims arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date but before the Effective Date, but only to the extent that such Administrative Expense Claims are solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses; (v) U.S. Trustee Fees; and (vi) Intercompany Claims, must file with the Bankruptcy Court and serve upon the Debtors, Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, **proof of such Administrative Expense Claim so as to be received by 5:00 p.m. (prevailing Eastern Time) on the Administrative Expense Claims Bar Date**. Such proof of Administrative Expense Claim must include at a

minimum: (i) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim; (ii) the name of the Holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim.

Holders of Administrative Expense Claims that were required to file and serve a request for payment of such Administrative Expense Claims and that did not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or their property, the Reorganized Debtors or their property, the Plan Administrator, the Plan Trust, the Plan Trust Assets, the Wind-Down Trustee, the Wind-Down Trust or, the Wind-Down Trust Assets.  The Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, may file and serve objections to Administrative Expense Claims on or before the Administrative Claims Objection Bar Date.

(b)    **Treatment of Allowed Administrative Expense Claims**

Except to the extent that a Holder of an Allowed Administrative Expense Claim and the Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, agree to different treatment, and subject to Article 2.3 hereof, the Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, shall pay to each Holder of an Allowed Administrative Expense Claim in Cash in an amount equal to such Claim attributable to the applicable Debtor within, or as soon thereafter as is reasonably practicable, thirty (30) days after the Effective Date; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

2.    **Professional Fee Claims.**

(a)    **Deadline to File Professional Fee Claims.**

Any Professional seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall file, on or before the Professional Fee Claim Bar Date, final requests for payment of such Professional Fee Claims.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules.

(b)    **Payment of Professional Fee Claims.**

The Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trust, as applicable, shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order

of the Bankruptcy Court; provided, however, that the obligations of the Debtors, the Reorganized Debtors, the Plan Administrator, and the Wind-Down Trust Debtors, as applicable, to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

(c)     **Professional Fee Escrow Amount.**

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided, however,* that the Plan Administrator or the Wind-Down Trust, as applicable, shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(d)     **Professional Fee Escrow Account.**

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors, the Reorganized Debtors, the Wind-Down Trust, or the Plan Trust. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Trust or the Plan Trust, as applicable, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

(e)     **Post-Confirmation Date Fees and Expenses.**

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Plan Administrator or the Wind-Down Trustee, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors on and  after the

Effective Date. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Plan Administrator or the Wind-Down Trustee, as applicable, may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Wind-Down Trust, as applicable, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of (a) forty-five (45) calendar days after the Effective Date (or as soon as reasonably practicable thereafter), (b) the first Business Day after the date that is thirty (30) days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or as soon thereafter as is reasonably practicable, or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date. The Holders of Allowed Priority Tax Claims shall retain their tax liens on their collateral to the same validity, extent and priority as existed on the Petition Date until all validly determined taxes and related interest, penalties, and fees (if any) have been paid in full. To the extent a Holder of an Allowed Priority Tax Claim is not paid in the ordinary course of business, payment of the Allowed Priority Tax Claim shall include interest through the date of payment at the applicable state statutory rate, as set forth in sections 506(b), 511, and 1129 of the Bankruptcy Code.

### 4. U.S. Trustee Fees.

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date with respect to the Debtors shall be paid by the Debtors. On and after the Effective Date, the Plan Trust or the Wind-Down Trust shall pay from the Plan Trust Assets or the Wind-Down Trust Assets, as applicable, any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### C. Classification of Claims and Interests

### 1. Classification in General.

Except for the Claims addressed in Article 2 of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in Article 3 of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and section 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within

the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

### 2. Formation of Debtor Groups for Convenience Only.

The Plan (including, but not limited to, Article 2 and Article 3 of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Except as provided in Article 6 of the Plan, such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets.

### 3. Summary of Classification.

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart. The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors. All of the potential Classes for the Debtors are set forth below and in the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article 3 of the Plan. Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3A | Prime Core General Unsecured Claims | Impaired | Entitled to Vote |
| 3B | Prime Trust General Unsecured Claims | Impaired | Entitled to Vote |
| 3C | Prime IRA General Unsecured Claims | Impaired | Entitled to Vote |
| 3D | Prime Digital General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Convenience Claims | Impaired | Entitled to Vote |
| 5 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

4.    **Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

5.    **Subordinated Claims.**

Except as expressly provided for in the Plan, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors, the Plan Trust, the Wind-Down Trust, as applicable, reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

6.    **Intercompany Interests.**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the agreement by the Debtors, the Reorganized Debtors, the Plan Trust and/or the Wind-Down Trust, as appliable, under the Plan to make certain distributions to the Holders of Allowed Claims.

7.    **Controversy Concerning Impairment.**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

D.    <u>**Treatment of Claims and Interests.**</u>

1.    **Class 1—Secured Tax Claims.**

(a)    *Classification*:  Class 1 consists of all Secured Tax Claims.

(b)    *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the

Bankruptcy Code. Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

**2.    Class 2—Other Priority Claims.**

(a)    *Classification*: Class 2 consists of all Other Priority Claims.

(b)    *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

**3.    Class 3A—Prime Core General Unsecured Claims.**

(a)    *Classification*: Class 3A consists of all Prime Core General Unsecured Claims.

(b)    *Treatment*: Except to the extent a Holder of an Allowed Prime Core General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each Holder of an Allowed Prime Core General Unsecured Claim will receive in exchange for such Allowed Prime Core General Unsecured Claim, following payment in full of, or reserve for, Allowed Administrative Expense Claims, funding the Professional Fee Escrow Account, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at Prime Core:

(i)    If a Reorganization Transaction occurs: its Pro Rata share of the Plan Trust Assets attributable to Prime Core; or

(ii)    If a Wind-Down Scenario occurs: its Pro Rata share of the Wind-Down Trust Assets attributable to Prime Core.

(c)    *Voting*: Class 3A is Impaired under the Plan. Holders of Allowed Prime Core General Unsecured Claims are entitled to vote to accept or reject the Plan.

**4.    Class 3B—Prime Trust General Unsecured Claims.**

(a)    *Classification*: Class 3B consists of all Prime Trust General Unsecured Claims.

(b)    *Treatment*: Except to the extent a Holder of an Allowed Prime Trust General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each Holder of an Allowed Prime Trust General Unsecured Claim will receive in exchange for such Allowed Prime Trust General Unsecured Claim, following payment in full of, or reserve

for, Allowed Administrative Expense Claims, funding the Professional Fee Escrow Account, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at Prime Trust:

        (i)    <u>If a Reorganization Transaction occurs</u>:  its Pro Rata share of the Plan Trust Assets attributable to Prime Trust; or

        (ii)    <u>If a Wind-Down Scenario occurs</u>: its Pro Rata share of the Wind-Down Trust Assets attributable to Prime Trust.

        (c)    *Voting*: Class 3B is Impaired under the Plan.  Holders of Allowed Prime Trust General Unsecured Claims are entitled to vote to accept or reject the Plan.

**5.    Class 3C—Prime IRA General Unsecured Claims.**

        (a)    *Classification*: Class 3C consists of Prime IRA General Unsecured Claims.

        (b)    *Treatment*:  Except to the extent a Holder of an Allowed Prime IRA General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each Holder of an Allowed Prime IRA General Unsecured Claim will receive in exchange for such Allowed Prime IRA General Unsecured Claim, following payment in full of, or reserve for, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims:

        (i)    <u>If a Reorganization Transaction occurs</u>:  its Pro Rata share of the Plan Trust Assets attributable to Prime IRA.

        (ii)    <u>If a Wind-Down Scenario occurs</u>: its Pro Rata share of the Wind-Down Trust Assets attributable to Prime IRA.

        (c)    *Voting*: Class 3C is Impaired under the Plan.  Holders of Allowed Prime IRA General Unsecured Claims are entitled to vote to accept or reject the Plan.

**6.    Class 3D—Prime Digital General Unsecured Claims.**

        (a)    *Classification*:  Class 3D consists of Prime Digital General Unsecured Claims.

        (b)    *Treatment*:  Except to the extent a Holder of an Allowed Prime Digital General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each Holder of an Allowed Prime Digital General Unsecured Claim will receive in exchange for such Allowed Prime Digital General Unsecured Claim, following payment in full of, or reserve for, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims:

        (i)    <u>If a Reorganization Transaction occurs</u>:  its Pro Rata share of the Plan Trust Assets attributable to Prime Digital; or

(ii)    <u>If a Wind-Down Scenario occurs</u>:  its Pro Rata share of the Wind-Down Trust Assets attributable to Prime Digital.

(c)    *Voting*:  Class 3D is Impaired under the Plan.  Holders of Allowed Prime Digital General Unsecured Claims are entitled to vote to accept or reject the Plan.

**7.    Class 4—Convenience Claims.**

(a)    *Classification*:  Class 4 shall consist of all Convenience Claims against Prime Trust.

(b)    *Treatment*:  Except to the extent a Holder of an Allowed Convenience Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each Holder of an Allowed Convenience Claim will receive in exchange for such Allowed Convenience Claim, Cash in an amount equal to [●]% of the amount of such Allowed Convenience Claim to be paid from the Plan Trust Assets or the Wind-Down Trust Assets, as applicable, attributable to Prime Trust.

(c)    *Voting*:  Class 4 is Impaired under the Plan.  Holders of Allowed Convenience Claims are entitled to vote to accept or reject the Plan.

**8.    Class 5—Section 510(b) Claims.**

(a)    *Classification*:  Class 5 consists of all Section 510(b) Claims against Prime Core.

(b)    *Allowance*:  Notwithstanding anything to the contrary in the Plan, a Section 510(b) Claim against Prime Core, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c)    *Treatment*:  Holders of Section 510(b) Claims shall not receive or retain any distribution under the Plan on account of such Section 510(b) Claims; *provided, however*, that in the event Allowed Claims in Classes 3A, 3B, 3C, 3D, and 4 are paid in full, Holders of Section 510(b) Claims shall be entitled to receive distributions on account of such Section 510(b) Claims from the Plan Trust or the Wind-Down Trust, as applicable.

(d)    *Voting*:  Class 5 is Impaired, and the Holders of Section 510(b) Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

**9.    Class 6—Intercompany Claims.**

(a)    *Classification*:  Class 6 consists of all Intercompany Claims.

(b)    *Treatment*:  Each Intercompany Claim shall receive the treatment for such Intercompany Claim as determined by the Bankruptcy Court.

(c)      *Voting*:   Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10.      **Class 7—Intercompany Interests.**

(a)      *Classification*:  Class 7 consists of all Intercompany Interests.

(b)      *Treatment*:  On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (i) Reinstated in accordance with Article 3.6 of the Plan or (ii) set off, settled, addressed, distributed, contributed, merged, or cancelled.

(c)      *Voting*:   Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.   Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.      **Class 8—Existing Equity Interests.**

(a)      *Classification*:  Class 8 consists of all Existing Equity Interests.

(b)      *Treatment*:  On the Effective Date, all Existing Equity Interests shall be extinguished, cancelled and released, and Holders of Existing Equity Interests thereof shall not receive any distribution on account of such Existing Equity Interests; *provided, however*, that in the event Allowed Claims in Classes 3A, 3B, 3C, 3D, 4, and 5 are paid in full, Holders of Existing Equity Interests shall be entitled to receive distributions on account of such Existing Equity Interests from the Plan Trust or the Wind-Down Trust, as applicable.

(c)      *Voting*:   Class 8 is Impaired under the Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

E.      <u>**Means for Implementation**</u>.

1.      **Joint Chapter 11 Plan.**

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.

2.      **No Substantive Consolidation.**

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes hereof.  Except as specifically set forth in the Plan, nothing in the Plan shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor.  Notwithstanding the foregoing, solely for

distribution purposes, Holders of Allowed General Unsecured Claims shall be entitled to a single Claim with respect to any particular debt owed.

### 3.    General Settlement of Claims and Interests.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Subject to Article 7 of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

### 4.    Plan Transactions.

On or about the Effective Date, the Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, may take all actions as may be necessary or appropriate to effectuate the Plan Transactions, including: (a) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree, including the documents comprising the Plan Supplement; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (c) the execution, delivery, and filing, if applicable, of appropriate certificates or certificates of incorporation, formation, reincorporation, merger, amalgamation, consolidation, conversion, arrangement, continuance, or dissolution pursuant to applicable Law; (d) such other transactions that are required to effectuate the Plan Transactions in the most efficient manner for the Debtors, including in regard to tax matters and any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (e) the authorization, issuance, and distribution of the Reorganized Equity Interests, if applicable; (f) the creation and formation of the Plan Trust, if applicable; (g) the appointment of the Plan Administrator, if applicable; (h) the creation and formation of the Wind-Down Trust, if applicable; (i) the appointment of the Wind-Down Trustee, if applicable; (j) the execution, delivery, and adoption of the Amended/New Organizational Documents, if applicable; and (k) all other act or actions contemplated or reasonably necessary or appropriate to promptly consummate the Plan Transactions, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Plan Transactions.

        **5.**        **Sources of Consideration for Plan Distributions.**

The Distribution Agent shall fund distributions under the Plan with the Plan Trust Assets or the Wind-Down Trust Assets, as applicable.

        **6.**        **Reorganization Transaction.**

In the event a Reorganization Transaction is consummated, the following provisions shall apply.

        (a)        **Implementation Pursuant to the Plan.**

If the Debtors pursue a Reorganization Transaction, the Debtors or the Reorganized Debtors, as applicable, shall implement the Reorganization Transaction as set forth in this Plan.

        (b)        **Continued Corporate Existence.**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Reorganized Debtor, as applicable, shall continue to exist as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which the particular Debtor is incorporated or formed and pursuant to their respective certificate of incorporation and bylaws (or other similar formation and governance documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other similar formation and governance documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified in accordance with their terms without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

        (c)        **Issuance of Reorganized Debtor Equity; Section 1145 Exemption.**

On the Effective Date, the Reorganized Debtor Equity shall be issued and distributed as provided for in the Plan Sponsorship Agreement and the Plan to the Entities entitled to receive the

Reorganized Debtor Equity pursuant to, and in accordance with, the Plan Sponsorship Agreement and the Plan.  On the Effective Date, the issuance of Reorganized Debtor Equity shall be authorized without the need for any further corporate action and without any action by the Holders of Claims or other parties in interest.  All of the Reorganized Debtor Equity issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable consistent with the terms of the Amended/New Organizational Documents.

Each distribution and issuance of the Reorganized Debtor Equity as of the Effective Date shall be governed by the terms and conditions set forth in the Plan applicable to such distribution, issuance, and/or dilution, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, and/or dilution, as applicable, including the Amended/New Organizational Documents, the terms and conditions of which shall bind each Entity or Person receiving such distribution of the Reorganized Debtor Equity. Any Entity's or Person's acceptance of Reorganized Debtor Equity shall be deemed as its agreement to the Amended/New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The Reorganized Debtor Equity will not be registered on any exchange as of the Effective Date and shall not meet the eligibility requirements of DTC.

All units of Reorganized Debtor Equity, issued and distributed pursuant to the Plan, will be issued and distributed without registration under the Securities Act or any similar federal, state, or local law in reliance upon (1) section 1145 of the Bankruptcy Code; (2) section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder; or (3) such other exemption as may be available from any applicable registration requirements.

The offering, issuance, and distribution of all shares of Reorganized Debtor Equity pursuant to the Plan in reliance upon section 1145 of the Bankruptcy Code is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. Such units of Reorganized Debtor Equity to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) subject to the terms of the Amended/New Organizational Documents, are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the Reorganized Debtor Equity through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Final Order with respect to the treatment of such applicable portion of the Reorganized Debtor Equity, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the Reorganized Debtor Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Reorganized Debtor Equity is exempt from registration.

(d)    **Amended/New Organizational Documents.**

On or immediately prior to the Effective Date, the Amended/New Organizational Documents shall be adopted automatically by the Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy law, the Reorganized Debtors shall file their respective Amended/New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. The Amended/New Organizational Documents shall, among other things: (1) authorize the issuance of the Reorganized Equity Interests; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities of the Debtors. After the Effective Date, each Reorganized Debtor may amend and restate its limited liability company agreement, certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the Amended/New Organizational Documents.

(e)    **Vesting of Assets in the Reorganized Debtors.**

Except as otherwise provided in the Plan, or in any agreement, instrument or other document incorporated in the Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Debtor's Estate, all Causes of Action of the Debtors' Estates (other than any Causes of Action that are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or Causes of Action that comprise Plan Trust Assets) and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges and/or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action with respect to the Debtors without further notice to, action, or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(f)    **Plan Trust/Plan Administrator.**

Establishment of the Plan Trust.  Pursuant to the Plan Trust Agreement, the Plan Trust will be established.  In the event of the consummation of a Reorganization Transaction, the Plan Trust shall be the successor-in-interest to the Debtors, and the Plan Trust shall be a successor to the Debtors' rights, title, and interest to the Plan Trust Assets. The Plan Trust will conduct no business operations and will be charged with winding down the Debtors' estates.  The Plan Trust shall be

managed by the Plan Administrator and shall be subject to a Plan Trust Oversight Committee. The Plan Trust shall be administered in accordance with the terms of the Plan Trust Agreement. For the avoidance of doubt, the Plan Trust shall not have any right or interest in any Cause of Action or Claim that does not constitute a Plan Trust Asset.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date, in the event the Reorganization Transaction is consummated, the Plan Trust Assets shall, subject to the Plan Trust Agreement, be transferred to and vest in the Plan Trust. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article 6.6 of the Plan.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Plan Trust and the Plan Administrator, shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Plan Trust Agreement, compromise or settle any Plan Trust Assets transferred to the Plan Trust. On and after the Effective Date, the Plan Trust and the Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Plan Trust Assets transferred to the Plan Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Plan Trust, or Plan Administrator on or after the Effective Date, except as otherwise expressly provided in the Plan and in the Plan Trust Agreement. The Plan Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Plan Administrator shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Plan Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors, and the Plan Administrator shall execute the Plan Trust Agreement and shall have established the Plan Trust pursuant hereto. In the event of any conflict between the terms of Article 6.6 of the Plan and the terms of the Plan Trust Agreement, the terms of the Plan Trust Agreement shall control.

Vesting of Plan Trust Assets. Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Plan Trust Assets become available, the Debtors shall be deemed, subject to the Plan Trust Agreement, to have automatically transferred to the Plan Trust all of their right, title, and interest in and to all of the Plan Trust Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Plan Trust free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Plan Trust as set forth herein and in the Plan Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Plan Trust Assets or the Plan Trust.

Treatment of the Plan Trust for Federal Income Tax Purposes; No Successor-in-Interest. The Plan Trust shall be established for the primary purpose of liquidating and distributing the Plan

Trust Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust. Accordingly, the <u>Plan Administrator</u> may, in an expeditious but orderly manner, liquidate the Plan Trust Assets, make timely distributions to the Plan Trust Beneficiaries and not unduly prolong its duration. The Plan Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Plan Trust Agreement. The record Holders of beneficial interests shall be recorded and set forth in a register maintained by the Plan Administrator expressly for such purpose.

The Plan Trust is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Plan Trust Beneficiaries treated as grantors and owners of the Plan Trust. However, with respect to any of the assets of the Plan Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

<u>Appointment of Plan Administrator</u>. The Plan Administrator shall be selected by the Debtors, in consultation with the Creditors' Committee, and shall be identified in the Plan Supplement. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date. The Plan Administrator shall administer the distributions to the Plan Trust Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred to Purchaser pursuant to the Plan and subject to the limitations set forth in the Plan, including Article 6.6 of the Plan.

<u>Responsibilities of Plan Administrator</u>. Responsibilities of the Plan Administrator shall be as identified in the Plan Trust Agreement and shall include, but are not limited to:

(i)     Implementing the Plan Trust and making the distributions contemplated by the Plan;

(ii)    Marshalling, marketing for sale, and winding down of any of the Debtors' assets constituting Plan Trust Assets;

(iii)   Filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan hereof;

(iv)    Commencing, prosecuting, or settling claims and Vested Causes of Action;

(v)     Recovering and compelling turnover of the Debtors' property;

(vi)    Paying Plan Trust Expenses;

(vii)   Abandoning any Debtor assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Plan Administrator's reasonable judgment;

(viii)  Preparing and filing post-Effective Date operating reports (including the month in which the Effective Date occurs);

(ix)    Filing appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations;

(x)     Retaining such Professionals as are necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations; and

(xi)    Taking such actions as are necessary and reasonable to carry out the purposes of the Plan Trust, including winding down the Debtors' business affairs.

The Plan Trust Oversight Committee. The Plan Trust Oversight Committee shall consist of those parties selected by the Committee, in consultation with the Debtors, and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Plan Trust Oversight Committee shall have the responsibility to review and advise the Plan Administrator with respect to the liquidation and distribution of the Plan Entity Assets transferred to the Plan Trust in accordance herewith and the Plan Trust Agreement. For the avoidance of doubt, in advising the Plan Administrator, the Plan Trust Oversight Committee shall maintain the same fiduciary responsibilities as the Plan Administrator. Vacancies on the Plan Trust Oversight Committee shall be filled by a Person designated by the remaining member or members of the Plan Trust Oversight Committee from among the Holders of Customer Claims. The Plan Administrator shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Plan Trust Oversight Committee for cause.

Expenses of Plan Administrator. The Plan Trust Expenses shall be paid from the Plan Trust Assets.

Insurance; Bond. The Plan Administrator may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Plan Administrator, the Plan Trust Oversight Committee under the Plan Trust Agreement. Unless otherwise agreed to by the Plan Trust Oversight Committee, the Plan Administrator shall serve with a bond, the terms of which shall be agreed to by the Plan Trust Oversight Committee, and the cost and expense of which shall be paid by the Plan Trust.

Fiduciary Duties of the Plan Trustee. Pursuant hereto and the Plan Trust Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

Termination of the Plan Trust.  The Plan Trust will terminate on the earlier of:  (a) (i) the final liquidation, administration and distribution of the Plan Trust Assets in accordance with the terms of the Plan Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth in the Plan or in the Plan Trust Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Plan Administrator determines in its reasonable judgment that the Plan Trust lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Plan Trust Agreement.  After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Plan Trust of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Plan Administrator, the Plan Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

Liability of Plan Administrator; Indemnification.  No Plan Trust Party shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Plan Trust or for the act or omission of any other Plan Trust Party, nor shall the Plan Trust Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Plan Trust Agreement or the Plan other than for specific acts or omissions resulting from such Plan Trust Party's willful misconduct, gross negligence or actual fraud.  Subject to the Plan Trust Agreement, the Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Plan Trust Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.   The Plan Administrator, or the Plan Trust Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the Plan Administrator nor the Plan Trust Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Administrator, the Plan Trust Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Plan Trust shall indemnify and hold harmless the Plan Trust Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Plan Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud.  Persons dealing or having any relationship with the Plan Administrator shall have recourse only to the Plan Trust Assets and shall look only to the Plan Trust Assets to satisfy any liability or other obligations incurred by the Plan Administrator or the Plan Trust Oversight Committee, to such Person in carrying out the terms of the Plan Trust Agreement, and neither the Plan Administrator, nor the Plan Trust Oversight Committee, shall have any personal obligation to satisfy any such liability.   The Plan Administrator, and/or the Plan Trust Oversight Committee members, shall not be liable whatsoever

except for the performance of such duties and obligations as are specifically set forth in the Plan, and no implied covenants or obligations shall be read into the Plan Trust Agreement against any of them. The Plan Trust shall promptly pay expenses reasonably incurred by any Plan Trust Party in defending, participating in, or settling any action, proceeding or investigation in which such Plan Trust Party is a party or is threatened to be made a party or otherwise is participating in connection with the Plan Trust Agreement or the duties, acts or omissions of the Plan Administrator or otherwise in connection with the affairs of the Plan Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Plan Trust Party hereby undertakes, and the Plan Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Plan Trust Agreement. The foregoing indemnity in respect of any Plan Trust Party shall survive the termination of such Plan Trust Party from the capacity for which they are indemnified.

Full and Final Satisfaction Against Plan Trust. On and after the Effective Date, the Plan Trust shall have no liability on account of any Claims or Interests except as set forth in the Plan and in the Plan Trust Agreement. All payments and all distributions made by the Plan Administrator hereunder shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Interests against the Debtors.

## 7.    The Wind-Down Scenario.

In the event that the Debtors pursue a Wind-Down Scenario, the Wind-Down Trust shall be formed for the benefit of the Wind-Down Trust Beneficiaries, and each of the Debtors shall transfer to the Wind-Down Trust Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

Establishment of the Wind-Down Trust. Pursuant to the Wind-Down Trust Agreement, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement. For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the

Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article 6.7 of the Plan.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee, shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust. On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Trust, or Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided in the Plan and in the Wind-Down Trust Agreement. The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors, and the Wind-Down Trustee shall execute the Wind-Down Trust Agreement and shall have established the Wind-Down Trust pursuant hereto. In the event of any conflict between the terms of Article 6.7 of the Plan and the terms of the Wind-Down Trust Agreement, the terms of the Wind-Down Trust Agreement shall control.

Vesting of Wind-Down Trust Assets. Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Trust Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Trust, free and clear of all Liens, Claims, charges, or other encumbrances.

Treatment of Wind-Down Trust for Federal Income Tax Purposes; No Successor-in-Interest. The Wind-Down Trust shall be established for the primary purpose of liquidating and distributing the Wind-Down Trust Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Trust. Accordingly, the Wind-Down Trustee may, in an expeditious but orderly manner, liquidate the Wind-Down Trust Assets, make timely distributions to the Wind-Down Trust Beneficiaries and not unduly prolong its duration. The Wind-Down Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Wind-Down Trust Agreement. The record Holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Trustee expressly for such purpose.

48

The Wind-Down Trust is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Trust Beneficiaries treated as grantors and owners of the Wind-Down Trust. However, with respect to any of the assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

Appointment of the Wind-Down Trustee. The Wind-Down Trustee shall be selected by the Debtors, in consultation with the Creditors' Committee, and shall be identified in the Plan Supplement. The appointment of the Wind-Down Trustee shall be approved in the Confirmation Order, and the Wind-Down Trustee's duties shall commence as of the Effective Date. The Wind-Down Trustee shall administer the distributions to the Wind-Down Trust Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred to Purchaser pursuant to the Plan and subject to the limitations set forth in the Plan, including Article 6.7 of the Plan.

Responsibilities of the Wind-Down Trustee. On and after the Effective Date, and subject to the Wind- Down Budget, the Wind-Down Trustee shall carry out the functions set forth Article 6.7(e) of the Plan and may take such actions without further approval by the Bankruptcy Court, in accordance with the Wind-Down Trust Agreement. Such functions may include any and all powers and authority to:

(i)     Implementing the Wind-Down Trust, liquidating the Debtors' Cryptocurrency holdings, distributing the Cryptocurrency Proceeds in accordance with the Plan, and making the distributions contemplated by the Plan;

(ii)    Marshalling, marketing for sale, and winding down of any of the Debtors' assets constituting Wind-Down Trust Assets;

(iii)   Filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan hereof;

(iv)    Commencing, prosecuting, or settling claims and Vested Causes of Action;

(v)     Recovering and compelling turnover of the Debtors' property;

(vi)    Paying Wind-Down Trust Expenses;

(vii)   Abandoning any Debtor assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Wind-Down Trustee's reasonable judgment;

(viii)  Preparing and filing post-Effective Date operating reports (including the month in which the Effective Date occurs);

(ix)    Filing appropriate tax returns in the exercise of the Wind-Down Trustee's fiduciary obligations;

(x)     Retaining such Professionals as are necessary and appropriate in furtherance of the Wind-Down Trustee's fiduciary obligations; and

(xi)    Taking such actions as are necessary and reasonable to carry out the purposes of the Wind-Down Trust, including winding down the Debtors' business affairs.

The Wind-Down Trust Oversight Committee shall consist of those parties selected by the Committee, in consultation with the Debtors, and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Trust Oversight Committee shall have the responsibility to review and advise the Wind-Down Trustee with respect to the liquidation and distribution of the Wind-Down Entity Assets transferred to the Wind-Down Trust in accordance herewith and the Wind Down Trust Agreement.  For the avoidance of doubt, in advising the Wind-Down Trustee, the Wind Down Trust Oversight Committee shall maintain the same fiduciary responsibilities as the Wind Down Trustee.  Vacancies on the Wind-Down Trust Oversight Committee shall be filled by a Person designated by the remaining member or members of the Wind-Down Trust Oversight Committee from among the Holders of Customer Claims.  The Wind-Down Trustee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Trust Oversight Committee for cause.

Expenses of Wind-Down Trustee.  The Wind-Down Trust Expenses shall be paid from the Wind-Down Trust Assets.

Insurance; Bond.  The Wind-Down Trustee may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Wind-Down Trustee, the Wind-Down Trust Oversight Committee under the Wind-Down Trust Agreement. Unless otherwise agreed to by the Wind-Down Trust Oversight Committee, the Wind-Down Trustee shall serve with a bond, the terms of which shall be agreed to by the Wind-Down Trust Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Trust.

Fiduciary Duties of the Wind-Down Trustee.  Pursuant hereto and the Wind-Down Trust Agreement, the Wind-Down Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

Termination of the Wind-Down Trust.  The Wind-Down Trust will terminate on the earlier of:  (a) (i) the final liquidation, administration and distribution of the Wind-Down Trust Assets in

accordance with the terms of the Wind-Down Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth in the Plan or in the Wind-Down Trust Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Wind Down Trustee determines in its reasonable judgment that the Wind-Down Trust lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Wind Down Trust Agreement.  After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Trust of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Wind-Down Trustee, the Wind-Down Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

Liability of Wind-Down Trustee; Indemnification.  No Wind-Down Trust Party shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Trust or for the act or omission of any other Wind-Down Trust Party, nor shall the Wind-Down Trust Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Wind-Down Trust Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Trust Party's willful misconduct, gross negligence or actual fraud.  Subject to the Wind-Down Trust Agreement, the Wind Down Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Trust Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.  The Wind-Down Trustee, or the Wind-Down Trust Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Wind-Down Trust shall indemnify and hold harmless the Wind-Down Trust Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud.  Persons dealing or having any relationship with the Wind-Down Trustee shall have recourse only to the Wind-Down Trust Assets and shall look only to the Wind-Down Trust Assets to satisfy any liability or other obligations incurred by the Wind-Down Trustee or the Wind-Down Trust Oversight Committee, to such Person in carrying out the terms of the Wind-Down Trust Agreement, and neither the Wind-Down Trustee, nor the Wind-Down Trust Oversight Committee, shall have any personal obligation to satisfy any such liability.  The Wind-Down Trustee, and/or the Wind-Down Trust

51

Oversight Committee members, shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth in the Plan, and no implied covenants or obligations shall be read into the Wind-Down Trust Agreement against any of them. The Wind-Down Trust shall promptly pay expenses reasonably incurred by any Wind-Down Trust Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Trust Party is a party or is threatened to be made a party or otherwise is participating in connection with the Wind-Down Trust Agreement or the duties, acts or omissions of the Wind-Down Trustee or otherwise in connection with the affairs of the Wind-Down Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Trust Party hereby undertakes, and the Wind Down Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Wind-Down Trust Agreement. The foregoing indemnity in respect of any Wind-Down Trust Party shall survive the termination of such Wind-Down Trust Party from the capacity for which they are indemnified.

Full and Final Satisfaction Against Wind-Down Trust. On and after the Effective Date, the Wind-Down Trust shall have no liability on account of any Claims or Interests except as set forth in the Plan and in the Wind-Down Trust Agreement. All payments and all distributions made by the Wind-Down Trustee hereunder shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Interests against the Debtors.

Corporate Existence and Dissolution. Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down Trust will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Trust shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Trust shall be deemed to be dissolved without any further action by the Debtors or the Wind-Down Trust, including the

Filing of any documents with the secretary of state for the state in which the Wind-Down Trust are formed or any other jurisdiction.  The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Debtors or the Wind-Down Trust in and withdraw the Wind-Down Trust from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Trust shall take such actions as the Wind-Down Trustee may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Wind-Down Trust on behalf of any Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor.  On and after the Effective Date, the Debtors or the Wind Down Trust (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to the Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## 8.    Elimination of Duplicate Claims.

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court; provided that, if any such modification results in a claim in excess of $1,000,000, such modification shall become effective only after notice and an opportunity for parties-in-interest to object.   If a Claim has been satisfied, the Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, or the applicable claimant, as applicable, may amend the Claims register indicating that such Claim has been satisfied.

## 9.    Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan (including any action to be undertaken by the Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

10.     **Directors, Officers, Managers, Members and Authorized Persons of the Debtors.**

On the Effective Date, each of the Debtors' directors and officers shall be discharged from their duties and terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and, unless subject to a separate agreement with the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.

11.     **D&O Policies.**

As of the Effective Date, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, shall be deemed to have assumed all of the D&O Policies pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, and coverage for defense and indemnity under any of the D&O Policies shall remain in full force and effect subject to the terms and conditions of the D&O Policies.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each D&O Policy.  Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an order of the Bankruptcy Court, confirmation of the Plan shall not impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Policies, and each such obligation will be deemed and treated as an executory contract that has been assumed by the Debtors under the Plan as to which no proof of Claim need be filed.  For the avoidance of doubt, the D&O Policies provide coverage for those insureds currently covered by such policies for the remaining term of such policies and runoff or tail coverage after the Effective Date to the fullest extent permitted by such policies.  On and after the Effective Date, the Reorganized Debtors, the Plan Administrator, the Plan Trust, the Wind-Down Trust, or the Wind-Down Trustee, as applicable, shall not terminate or otherwise reduce the coverage under any of the D&O Policies in effect or purchased as of the Petition Date.

12.     **Indemnification of Directors, Officers and Employees.**

For purposes of the Plan, the obligation of the Debtors to indemnify and reimburse any Person or entity serving at any time on or after the Petition Date as one of its directors, officers or employees by reason of such Person's or entity's service in such capacity, or as a director, officer or employee of any of the Debtors or any other corporation or legal entity, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor(s), in accordance with any applicable law, or any combination of the foregoing, shall survive confirmation of the Plan and the Effective Date solely to the extent of available insurance. For the avoidance of doubt, nothing in the Plan shall be construed as the Debtors assuming any obligation with respect to any self- insured retention for which the applicable insurer has the ability to assert a prepetition Claim against the applicable Debtor in accordance with the Bar Date Order or other order of the Bankruptcy Court.  On and after the Effective Date, the coverage under any of the D&O Policies in effect on the Petition Date shall not be terminated or otherwise reduced by or on behalf of the Debtors, and all directors and officers of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

13.    **Withholding and Reporting Requirements.**

*Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, provincial or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each Holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall be liable for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

*Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Plan Administrator or the Wind-Down Trustee, as applicable, or such other Person designated by the Plan Administrator or the Wind-Down Trustee, as applicable (which entity shall subsequently deliver to the Plan Administrator or the Wind-Down Trustee, as applicable, any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8 or any other form or document as reasonably requested by the Plan Administrator or the Wind-Down Trustee, as applicable, or such other Person designated by the Plan Administrator or the Wind-Down Trustee, as applicable, to eliminate or reduce any tax (including withholding tax), unless the Wind-Down Trustee or such other Person designated by it determines it is not required to eliminate or reduce any tax (including withholding tax).  If such request is made by the Plan Administrator or the Wind-Down Trustee, as applicable, or such other Person designated by the Plan Administrator or the Wind-Down Trustee, as applicable (which entity shall subsequently deliver to the Plan Administrator or the Wind-Down Trustee, as applicable, and the Holder fails to comply before the date that is 150 days after the request is made, the amount of such distribution shall irrevocably revert to the Plan Trust or the Wind-Down Trust, as applicable, and any Claim in respect of such distribution shall be forever barred from assertion against any Debtor and its respective property.

14.    **Exemption From Certain Transfer Taxes.**

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code or similar filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate federal, state, provincial or local government officials or agents shall forego collection of any such

tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

15.    **Cancellation of Notes, Instruments, Certificates, and Other Documents.**

Except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, any Sale Transaction Document, or any Plan Document (including, without limitation, the Plan Sponsorship Agreement, the other Reorganization Transaction Documents, or any other Definitive Document), on the Effective Date, all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

16.    **Effectuating Documents; Further Transactions.**

On and after the Effective Date, the Plan Administrator, Wind-Down Trustee, the Debtors, or the Reorganized Debtors, as applicable, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

17.    **Closing of the Chapter 11 Cases.**

The Plan Administrator or the Wind-Down Trustee, as applicable, shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

F.    **Distributions.**

1.    **Timing and Calculation of Amounts to Be Distributed.**

Except (1) as otherwise provided in the Plan, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent on the Distribution Date.  In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall

be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

      **2.**      **Rights and Powers of Distribution Agent.**

      (a)      **Powers of the Distribution Agent.**

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

      (b)      **Expenses Incurred on or after the Effective Date.**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable.

      **3.**      **Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

      (a)      **Distributions Generally.**

Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

      (b)      **Distributions on Account of Obligations of Multiple Debtors.**

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

      (c)      **Record Date of Distributions.**

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there

shall be no further changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

(d)     **Special Rules for Distributions to Holders of Disputed Claims and Interests.**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided, however,* that, if the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

(e)     **De Minimis Distributions; Minimum Distributions.**

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article 4 of the Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan.

(f)     **Undeliverable Distributions and Unclaimed Property.**

In the event that either (i) a distribution to any Holder is returned as undeliverable or (ii) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to

58

the Debtors or the Wind-Down Trust, as applicable, automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

(g)    <strong>Manner of Payment Pursuant to the Plan.</strong>

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

4.    <strong>Compliance Matters.</strong>

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Trust, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; provided, however, that the Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

5.    <strong>Foreign Currency Exchange Rate.</strong>

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

6.    <strong>Cryptocurrency Liquidation.</strong>

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in Cryptocurrency shall be automatically deemed converted to the equivalent U.S. dollar value using the rate of conversion based upon the type of Cryptocurrency being converted as of 12:00 a.m. UTC as of the Petition Date.

7.     **Claims Paid or Payable by Third Parties.**

(a)     **Claims Paid by Third Parties.**

The Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be Disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not the Plan Administrator or the Wind-Down Trustee (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction.  To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a the Plan Administrator or the Wind-Down Trustee (or other Distribution Agent), as applicable, including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten (10) Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the Plan Administrator or the Wind-Down Trustee to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the Plan Administrator or the Wind-Down Trustee, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

(b)     **Claims Payable by Third Parties.**

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims Agent to the extent of any such payment without an objection to such Claim or Interest having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)     **Applicability of Insurance Policies.**

Except as otherwise provided in the Plan, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Plan Trust, the Wind-Down Trust, or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any rights or defenses, including

coverage defenses, held by such insurers under the applicable Insurance Policies, agreements related thereto, and applicable non-bankruptcy law.

### 8.    Setoffs and Recoupment.

Except as otherwise expressly provided for in the Plan, each Debtor, each Reorganized Debtor, the Wind-Down Trust, or the Plan Trust, or such Entity's designee as instructed by such Debtor, Reorganized Debtor, the Plan Trust, or the Wind-Down Trust, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise).  Notwithstanding the foregoing, except as expressly stated in <u>Article 10</u> of the Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust of any such Claims, rights, or Causes of Action the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust may possess against such Holder.

### 9.    Allocation between Principal and Accrued Interest.

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

### G.    <u>Procedures for Disputed Claims.</u>

### 1.    Objections to Claims.

As of the Effective Date, objections to, and requests for estimation of Claims against the Debtors may only be interposed and prosecuted by the Plan Administrator or the Wind-Down Trustee, as applicable.  Such objections and requests for estimation shall be served and filed on or before the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable.

### 2.    Allowance of Claims.

After the Effective Date, the Reorganized Debtors, the Plan Administrator or the Wind-Down Trustee, as applicable, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim against a Debtor, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed

under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

### 3.    Estimation of Claims.

The Debtors, the Reorganized Debtors, the Plan Administrator, or the Wind-Down Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party in interest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limit of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors, the Plan Administrator or the Wind-Down Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4.    No Distributions Pending Allowance.

No payment or Distribution provided under the Plan shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 5.    Resolution of Claims.

Except as otherwise provided in the Plan (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Plan Administrator or the Wind-Down Trustee, as applicable, may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Plan Trust or the Wind-Down Trust, as applicable, may hold against any Entity, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  From and after the Effective Date, the Plan Administrator or the Wind-Down Trustee, as applicable, may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; *provided, however,* that any settlement of a Disputed Claim that results in an Allowed Claim in excess of $1,000,000 must be made after notice and an opportunity for parties-in-interest to object.

### 6.    Amendments to Claims and Late Filed Claims.

Following the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, the Plan Trust Agreement, or Wind-Down Trust Agreement, as applicable, no Claim may be filed, amended, or supplemented without the approval of the Bankruptcy Court or without the prior written authorization of the Plan Administrator or the Wind-Down Trustee, as applicable.

7.    **Insured Claims.**

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the Holder of such Allowed Claim has exhausted all remedies with respect to any applicable Insurance Policies.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

H.    **Executory Contracts and Unexpired Leases**.

1.    **Assumption and Rejection of Executory Contracts and Unexpired Leases**.

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any Employee Arrangements, and other Executory Contracts under which employee obligations arise, shall be deemed (a) in the event a Reorganization Transaction is consummated, automatically assumed pursuant to sections 365 and 1123 of the Bankruptcy Code, and (b) in the event the Debtors pursue a Wind-Down Scenario, and to the extent not assumed and assigned in connection with the consummation of the Sale Transaction, automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, in each case unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed or rejected, as applicable, in connection with confirmation of the Plan, or is specifically scheduled to be assumed, assumed and assigned, or rejected, as applicable, pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume or reject such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with a Sale Transaction pursuant to the Bid Procedures Order; or (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption, assumption and assignment, or rejection of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

2.    **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, under such Executory Contract or Unexpired Lease.  Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance

obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

### 3.    Determination of Cure Claims and Deemed Consent.

Except as otherwise provided in the Bid Procedures Order, the Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts and Leases. At least seven calendar days before the deadline to object to confirmation of the Plan, the Debtors shall serve a notice on parties to Executory Contracts or Unexpired Leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Claim (if any) to the extent not already notified pursuant to the Bid Procedures Order. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be filed, served, and actually received by the Debtors within the time periods set forth in the Bid Procedure Order, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court**. Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the notice of the proposed assumption of such Executory Contract or Unexpired Lease shall be deemed to have assented to assumption of the applicable Executory Contract or Unexpired Lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by this Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, any Reorganized Debtor, or the Purchaser, as applicable, under such Executory Contract or Unexpired Lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor,  Reorganized Debtor, the Plan Trust, or the Wind-Down Trust, as applicable. Each such provision shall be deemed to not apply to the assumption of such Executory Contract or Unexpired Lease pursuant to this Plan and counterparties to assumed Executory Contracts or Unexpired Leases that fail to object to the proposed assumption in accordance with the terms set forth in this Article 9.3 shall forever be barred and enjoined from objecting to the proposed assumption or assumption and assignment, or the validity of such assumption or assignment (including with respect to any Cure Claims or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by this Plan.

If there is a dispute pertaining to the Assumption Dispute regarding the assumption or assignment of an Executory Contract or Unexpired Lease (other than a dispute pertaining to a Cure Claim), such dispute shall be heard by the Bankruptcy Court prior to such assumption or assumption and assignment being effective, *provided, however*, that the Debtors, the Reorganized Debtors, or the Purchaser, as applicable, may settle any dispute regarding the Cure Claim or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent an Assumption Dispute relates solely to the Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of the Assumption Dispute; *provided, however*, that the Debtors, the Reorganized

Debtors, or the Purchaser, as applicable, reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to such Executory Contract or Unexpired Lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtors, the Reorganized Debtors, or the Purchaser, as applicable.

Notwithstanding anything to the contrary herein, in the event of a Sale Transaction, the terms of the Bid Procedures, the Sale Transaction Documents, or any other related orders of the Bankruptcy Court, to the extent inconsistent with the terms of this Plan, shall govern the assumption and assignment of the relevant Executory Contracts or Unexpired Leases with respect to the Sale Transaction; *provided, however*, that if the Bid Procedures, the Sale Transaction Documents, and any other related order of the Bankruptcy Court do not provide for the assumption or assumption and  assignment of an Executory Contract or Unexpired Lease, the terms of this Plan shall govern the assumption or rejection of an Executory Contract or Unexpired Lease.

### 4.    Payments Related to Assumption of Executory Contracts and Unexpired Leases.

Any Cure Claim shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim by the Reorganized Debtors or the Purchaser, as applicable, as reflected in the applicable Cure Notice, in Cash on the Effective Date or promptly thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors, the Reorganized Debtors, or the Purchaser, as applicable, may otherwise agree.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease.  Any proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such Executory Contract or Unexpired Lease.

### 5.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.

In the event that the rejection of an Executory Contract or Unexpired Lease hereunder results in damages to the other party or parties to such Executory Contract or Unexpired Lease, any Claim for such damages shall be classified and treated in Class 3A (Prime Core General Unsecured Claims), Class 3B (Prime Trust General Unsecured Claims), Class 3C (Prime IRA General Unsecured Claims), or Class 3D (Prime Digital General Unsecured Claims), as applicable. Such Claim shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, their respective Estates, the Plan Trust, or the Wind-Down Trust, as applicable, or their respective properties or interests in property as agents, successors, or assigns,

unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors, the Reorganized Debtors, Plan Administrator, or the Wind-Down Trustee, as applicable, by the later of (i) forty-five (45) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.

### 6. Insurance Policies and Surety Bonds.

#### (a) D&O Policies.

On the Effective Date, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, shall be deemed to have assumed all D&O Policies with respect to the Debtors' directors, managers, officers, and employees, as applicable, who served in such capacity at any time on or before the Effective Date pursuant to sections 105 and 365 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the D&O Policies. After the Effective Date, the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as appliable, shall not terminate or otherwise reduce the coverage under any D&O Policies in effect on the Effective Date with respect to conduct occurring before the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date; *provided, however,* that nothing in this paragraph shall preclude a reduction in the amount of available policy proceeds under the D&O Policies through payment of claims under any D&O Policies to or on behalf of the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable.

#### (b) Assumption of Insurance Policies.

On the Effective Date, each Insurance Policy shall be assumed by the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, pursuant to sections 105 and 365 of the Bankruptcy Code, unless such Insurance Policy (i) was identified on the Rejected Contracts Schedule, (ii) was rejected by the Debtors pursuant to an order of the Bankruptcy Court, or (ii) is the subject of a motion to reject pending on the Effective Date. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtor's assumption of such Insurance Policies.

#### (c) Insurance Neutrality.

Nothing in the Plan or the Confirmation Order, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (i) the rights or obligations of any Insurer or (ii) any rights or obligations of the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, arising out of or under any Insurance Policy. The Insurers, the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds

and the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, in the same manner and according to the same terms and practices applicable to the Debtors, as existed before the Effective Date. Further, for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control.

(d)    **Surety Bonds.**

In the event of an Reorganization Transaction, on the Effective Date, (i) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Reorganized Debtors; (ii) surety bonds and related indemnification and collateral agreements entered into by the Debtors will be vested and performed by the Reorganized Debtors and will survive and remain unaffected by entry of the Confirmation Order; and (iii) the Reorganized Debtors shall be authorized to enter into new surety bond agreements and related indemnification and collateral agreements, or to modify any such existing agreements, in the ordinary course of business. Nothing in the Plan or Confirmation Order shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of the Debtors or any surety bond provider with respect to any unexpired surety bond agreement or related indemnification or collateral agreement.

## 7.    Reservation of Rights.

Nothing contained in the Plan or the Plan Documents (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as appliable, has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Plan Administrator or the Wind-Down Trustee, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

## 8.    Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## 9.    Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor, the Reorganized Debtor, the Plan Trust, or the Wind-Down Trust, as applicable, liable thereunder in the ordinary course of its business.  Such

contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

## I.       Settlement, Releases, Injunctions, and Related Provisions

The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The release, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts, and their inclusion in the Plan is subject to ongoing investigation into potential prepetition claims against any Released Party.   The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

### 1.       Release of Liens

Except as otherwise provided in the Plan or in any Plan Document, or in any Sale Transaction Document, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Debtors and vest in the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, on the Effective Date.

### 2.       Discharge and Satisfaction of Claims.

In the event a Reorganization Transaction is consummated, pursuant to sections 105 and 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in respect of, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any Claims for withdrawal liability that relate to services  performed by employees of the Debtor before the Effective Date or that arise from a termination of employment, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim has voted to accept or reject the Plan. Any default or "event of default" by the Debtors with respect to any Claim that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring.

For the avoidance of doubt, in the event the Debtors pursue a Wind-Down Scenario, pursuant to the provisions of section 1141(d)(3) of the Bankruptcy Code, the Debtors shall not be entitled to a discharge and shall be wound down as set forth in the Plan and the applicable Plan Documents.

### 3.    Term of Injunctions or Stays.

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 4.    Releases by the Debtors.

**Notwithstanding anything in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by each of the Debtors, their respective Estates, and any Person seeking to exercise the rights of any of the Debtors or their Estates (including any successors to any of the Debtors or their Estates or any estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons who may purport to assert any Cause of Action, derivatively, by, through, for, or because of any of the foregoing Persons, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, that any of the Debtors, their Estates, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, or any successors to or representatives of the foregoing appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or that any holder of any Claim against or any Interest in, any of the Debtors could have asserted on behalf of any of the Debtors, the Reorganized Debtors, their Estates, the Plan Trust, or the Wind-Down Trust, as applicable based on, relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership, or operations thereof), any Security of any of the Debtors, the subject matter of, or the transactions or events giving rise to, any such Claim, Cause of Action or Interest, the business or contractual arrangements between any Debtor and a Released Party, any of the Debtors' restructuring efforts, any Avoidance Actions held by any of the Debtors or their Estates, any intercompany transactions performed by any of the Debtors, the Chapter 11 Cases (including the Filing thereof and any relief obtained by the Debtors therein), the formulation, preparation, dissemination, negotiation, or Filing of the Plan (including the Plan Supplement), the Disclosure Statement, the Bid Procedures Order (and the procedures approved thereby), any Definitive Document, any Plan Transaction, or any other contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the**

Confirmation Order with respect to the Plan in lieu of such legal opinion) created or entered into, whether before or during the Chapter 11 Cases, in connection with the Filing of the Debtors' Chapter 11 Cases, the Bid Procedures Order, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), any Plan Transaction, any Definitive Document, the solicitation of votes with respect to the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, and the administration implementation of the Plan, and the administration and the implementation of the Plan, including the issuance or distribution of Securities or any other property pursuant to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date other than Claims and liabilities resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, in each case, solely to the extent determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date Claims or obligations of any Person under the Plan, the Confirmation Order with respect to the Plan, any Plan Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article 10.4 of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article 10.4 of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article 6.7 and Article 6.8 of the Plan, a bar to any Debtor, the Reorganized Debtor, the Plan Trust, or the Wind-Down Trust, as applicable, or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained in the Plan, nothing in the Plan shall release, waive, or otherwise limit the rights, duties, or obligations of, if applicable, the Purchaser under the Asset Purchase Agreement or the Plan Sponsor under the Plan Sponsorship Agreement.

5.    **Releases by Holders of Claims and Interests.**

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity,

contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership, or operation thereof), any security of any of the Debtors or any of the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against any of the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions held by any of the Debtor(s) or their Estates, intercompany transactions between or among an Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Chapter 11 Cases, the Bid Procedures Order, Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), any Definitive Document, any Plan Transaction contemplated by the Plan, any contract, instrument, release, or other agreement or document created or entered into, whether before or during the Chapter 11 Cases, in connection with the Filing of the Debtors' Chapter 11 Cases, the Bid Procedures Order, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), any Plan Transaction, any Definitive Document, the solicitation of votes with respect to the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, and the administration implementation of the Plan. Notwithstanding anything to the contrary to the foregoing, the release set forth above does not release any post-Effective Date obligations of any Person under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Moreover, the foregoing release shall have no effect on the liability of, or any Causes of Action against, any Entity that results from any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

6.    **Exculpation.**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Bid Procedures Order, the Plan, any Definitive Document, any Plan Transaction, any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan or any Plan Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the administration of the Chapter 11 Cases, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction

to have constituted actual fraud, willful misconduct, malpractice, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the exculpations set forth in Article 10.6 of the Plan.

7.    Injunction.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, members, managers, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan in relation to any Claim extinguished, or released pursuant to the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a Holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, members, managers, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, or the property of any of the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable; or the property of any of the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, or the property of any of the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable; (iv) asserting any right of setoff, directly

or indirectly, against any obligation due from the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable, or against property or interests in property of any of the Debtors, the Reorganized Debtors, the Plan Trust, or the Wind-Down Trust, as applicable except as contemplated or allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim or Interest extinguished, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this Article 10.7 of the Plan.

The injunctions in Article 10.7 of the Plan shall extend to any successors of the Debtors, the Reorganized Debtors, the Plan Trust, and the Wind-Down Trust, as applicable, and their respective property and interests in property.

### J. Conditions Precedent to the Effective Date

1. **Conditions Precedent to the Effective Date.**

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a) the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall not be subject to any stay, modification, vacation on appeal, and shall have become a Final Order;

(b) all funding, actions, documents and agreements necessary to implement and consummate the Plan and the transactions and other matters contemplated thereby, shall have been effected or executed, including the funding of the Plan Trust Reserve, if applicable;

(c) all funding, actions, documents and agreements necessary to implement and consummate the Plan and the transactions and other matters contemplated thereby, shall have been effected or executed, including the funding of the Wind-Down Reserve, if applicable;

(d) the Sale Transaction shall have been consummated in accordance with Asset Purchase Agreement, if applicable;

(e) the transactions contemplated under the Plan Sponsorship Agreement shall have been consummated in accordance with the terms thereof, if applicable;

(f) the Wind-Down Trust shall be established and validly existing and the Wind-Down Trust Agreement shall have been executed, if applicable;

(g) the Plan Trust shall be established and validly existing and the Plan Trust Agreement shall have been executed, if applicable;

(h)    all professional fees and expenses of the Debtors and the Creditors' Committee that, as of the Effective Date, were due and payable under an order of the Bankruptcy Court shall have been paid in full, other than any Professional Fee Claims subject to approval by the Bankruptcy Court;

(i)    the Debtors shall have funded the Professional Fee Escrow Account in accordance with Article 2.3 of the Plan;

(j)    no governmental entity or federal or state court of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any law or order (whether temporary, preliminary or permanent), in any case which is in effect and which prevents or prohibits consummation of the Plan or any of the other transactions contemplated hereby and no governmental entity shall have instituted any action or proceeding (which remains pending at what would otherwise be the Effective Date) seeking to enjoin, restrain or otherwise prohibit consummation of the transactions contemplated by the Plan;

(k)    all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan as of the Effective Date shall have been received, waived or otherwise resolved; and

(l)    all documents and agreements necessary to implement the Plan, including those set forth in the Plan Supplement, shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

### 2.    Waiver of Conditions Precedent.

Each of the conditions precedent in Article 11.1 of the Plan other than the condition set forth in Article 11.1(a) of the Plan may be waived in writing by the Debtors with, if applicable, the consent of the Purchaser, which shall not be unreasonably withheld.  Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

### 3.    Substantial Consummation.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 4.    Effect of Vacatur of Confirmation Order.

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner

the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

## VII.   CERTAIN RISK FACTORS AFFECTING THE DEBTORS.

Holders of Claims and Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors are not the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.   Certain Bankruptcy Law Considerations.

It is impossible to predict with certainty the amount of remaining time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. The occurrence or non-occurrence of any or all of the following contingencies and any others could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes.

#### 1.   Risk of Non-Confirmation or Delay of the Plan.

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.

#### 2.   Key Legal Issues Affecting Distributions.

As noted above, one of the key legal issues that must be resolved to determine the amount of distributions available to the Holders of Claims is whether the Cryptocurrency in the Debtors' possession is property of the estate.  A debtor's filing for bankruptcy brings into existence the bankruptcy estate under section 541(a)(1) of the Bankruptcy Code. The bankruptcy estate is, with limited exceptions "comprised of the debtor's property as of the commencement of the case."  11 U.S.C. § 541(a).

Despite this general rule, section 541 contains numerous exceptions. Among the listed exceptions is section 541(b)(1), which excludes from property of the estate any power that the debtor may exercise solely for the benefit of another. Similarly, section 541(d) provides that the estate does not include "any power that the debtor may exercise solely for the benefit of an entity other than the debtor," including the power to distribute assets of a trust.

These issues come to light when certain companies hold Cryptocurrency assets for third parties.  If the third party that stored its cryptocurrency assets with a debtor transferred ownership (i.e., a beneficial interests) of such assets to the debtor, then the cryptocurrency assets constitute property of the debtor's estate.  The result is the debtor can use those assets to, among other things, fund distributions to creditors.  If, however, the debtor merely holds the cryptocurrency assets in

trust for the third party (i.e., the debtor only has legal, but not equitable title, to the cryptocurrency), then cryptocurrency assets belong to the third party.

The Debtors are actively investigating this issue.  The overall result will determine the amount of property the Debtors have available to distribute to Holders of Claims.

### 3. Risk of Failing to Satisfy Vote Requirement.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan as promptly as practicable thereafter. However, if sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Claims as those proposed in the Plan.

### 4. Failure to Satisfy Administrative Expense Claims or Otherwise Agree to Alternative Treatment and Other Factors that May Impact Administrative Solvency.

To confirm a chapter 11 plan, section 1129(a)(9) of the Bankruptcy Code requires, among other things, that "except to the extent that the holder of a particular claim has agreed to a different treatment of such claim," claims entitled to administrative priority under section 507(a)(2) or 507(a)(3) must be paid in full in order for a debtor to confirm a chapter 11 plan.  To the extent that a Debtor is unable to pay such claims in full or otherwise agree to treatment with the applicable Holder, such Debtor may be unable to confirm a chapter 11 plan.  Furthermore, certain factors could also impact the Debtors' administrative solvency, including reconciliation of Administrative Expense Claims, which may impact the Debtors' ability to confirm a chapter 11 plan for all or certain of the Debtors.  If no plan can be confirmed, one or more of these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.

### 5. Non-Consensual Confirmation.

If any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  The pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation and delays in the Confirmation schedule.  Notwithstanding such efforts, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan is fair and equitable or does not unfairly discriminate against a dissenting impaired class.

6.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

Article 11 of the Plan contains the conditions that must be satisfied before the Effective Date of the Plan can occur.  Conditions precedent to the Effective Date include:  that the final version of the Plan Supplement and related documents will have been executed and Filed; that the Plan Trust Agreement or Wind-Down Trust Agreement, as applicable, shall have been executed; that the Assets shall have been transferred to Purchaser in accordance with the Asset Purchase Agreement and other Sale Transaction Documents, as applicable; that the Reorganization Transaction Documents shall have been executed and the transactions thereunder consummated; and numerous others.  If such conditions precedent are not waived or not met, the Effective Date will not take place and the Plan will not be in force.

7.      **Conversion to Chapter 7.**

If the Plan cannot be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, one or more of the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed or elected to liquidate the applicable Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  *See* Article IX.C.2 hereof, as well as the liquidation analysis annexed hereto as **Exhibit B**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests (the "Liquidation Analysis").

8.      **Continued Risk Upon Confirmation and Potential Appeal of Confirmation.**

Even if the Plan is consummated, there may be continued risks, including certain risks that are beyond the control of the Debtors or the Reorganized Debtors, such as further deterioration or other changes in economic conditions, changes in the Cryptocurrency industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for Cryptocurrency, and increase in expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

Even if the Plan is confirmed, there is no guarantee that the Reorganization Transaction, the Sale Transaction, or the Wind-Down Scenario will be implemented, and the Debtors will continue to face uncertainty.  Specifically, it is possible that the Plan's confirmation is appealed and its implementation subsequently paused until further litigation takes place.

9.      **One Or More of the Chapter 11 Cases May Be Dismissed.**

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial consummation of a confirmed plan or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or

Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

### 10. Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date will occur at least several weeks after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will, in fact, occur. The Effective Date will occur on the date that (a) all conditions precedent to the occurrence of the Effective Date set forth in Article 11 of the Plan have been satisfied or waived in accordance with Article 11.1 of the Plan, and (b) the Plan is declared effective by the Debtors.

### 11. The Debtors May Object to the Amount or Classification of a Claim or Interest.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. Any Holder of a Claim or Interest where such Claim or Interest is subject to an objection cannot rely on the estimates in the Disclosure Statement. As a result, any Holder of a Claim or Interest that is subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 12. Contingencies Could Affect Allowed Claims Classes.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, including that the actual Allowed amounts of Claims equals the scheduled amount of those Claims. The actual Allowed amounts of Claims may significantly differ from the estimates and would affect the recovery estimates in this Disclosure Statement. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 13. Estimated Recoveries May Change Due to Litigation Arising Out of the Claims Allowance and Reconciliation Process.

Only Allowed Claims will receive distributions pursuant to the Plan. If the Holder of a Claim pursues litigation and seeks an Allowed Claim in excess of the amount of the Holder's Claim on the Debtors' books and records, the Holder will not receive any recovery until such dispute is fully and finally resolved. To account for such litigation and Holders who are asserting

Allowed Claims for more value, the Debtors and the Post-Effective Date Debtors will need to reserve sufficient resources to account for Holders that are asserting Allowed Claims of greater value. Accordingly, the estimated distributions will likely occur over time as Claims are resolved and reserves can be distributed.

**B.    Risks Related to Recoveries Under the Plan**

**1.    If the Reorganization Transaction is Not Implemented, the Debtors Will Consider all Available Alternative Restructuring Proposals, and such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors.**

If neither the Reorganization Transaction nor the Sale Transaction occur, the Debtors will consider all other restructuring alternatives available, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors.

**2.    Risk of Failure to Consummate a Reorganization Transaction.**

The Debtors commenced these cases with little to no prepetition preparations. The Debtors' ability to find a Plan Sponsor and consummate a Reorganization Transaction is therefore uncertain. The identity of the Plan Sponsor, if any, will be disclosed in the Plan Supplement, which the Debtors will not File until at least fourteen (14) days before the Confirmation Hearing.

**3.    The Debtors' Assets are Largely Based on, and Highly Correlated to, the Volatility of Cryptocurrency.**

The volatility of the Cryptocurrency market may adversely affect the fair market value of the Debtors' assets, which could result in lower recoveries for Holders of Claims than the Debtors' current estimates.

**4.    The Debtors May "Toggle" to the Wind-Down Scenario, which is Estimated to Result in Lower Recoveries.**

In the event neither a Reorganization Transaction nor a Sale Transaction occur, the Debtors may determine that it is in the best interests of the Estates to "toggle," or pivot, to the pursuit of the Wind-Down Scenario. The Wind-Down Scenario is an alternative to the Reorganization Transaction and the Sale Transaction. Recoveries under the Wind-Down Scenario are estimated to be lower than the recoveries estimated under the Reorganization Transaction and the Sale

Transaction.  Further, the Wind-Down Scenario does not include any go-forward business, thus terminating any potential for future upside.

5.      **The Wind-Down Scenario May Take Longer and Cost More than Estimated, which May Decrease Recoveries.**

The Wind-Down Scenario also presents risks for interested parties.  The Wind-Down Scenario is estimated to take up to five years to be completed.  This is merely an estimate, however, and it is entirely possible that it could take longer to complete the organized liquidation contemplated by the Wind-Down Scenario.  In the event the Wind-Down Scenario takes longer than estimated to be completed, the associated costs, such as professional fees, could also be higher than estimated.  Accordingly, estimated recoveries pursuant to the Wind-Down Scenario could also be lower than estimated.

6.      **Regulatory Approvals May Not Be Granted.**

Consummation of the Reorganization Transactions may depend on obtaining Regulatory Approvals. Failure by any governmental authority to grant a necessary or advisable regulatory approval could prevent or impose limitations or restrictions on Consummation of the Reorganization Transactions and Confirmation of the Plan.

The Debtors are currently engaging with the applicable Governmental Units and regulatory bodies, many of whom, while reserving all rights, have expressed an openness to working with the Debtors towards achieving the Consummation of a Reorganization Transaction.  Due to the complex and rapidly evolving environment in which the Debtors operate, however, no assurances can be made as to whether the Debtors will receive all required U.S. federal and state regulatory approvals.  Cryptocurrency has developed quickly, and regulators have taken different approaches to regulating the industry.  The Debtors cannot assess with any certainty that the SEC or other regulators will not take actions that would prevent the Debtors from effectuating a Reorganization Transaction or otherwise prevent Confirmation.  Moreover, in the wake of the FTX bankruptcy and a general "crypto winter" that has seen retail investors lose billions in value, the SEC has taken a more active approach to enforcement with respect to the Cryptocurrency industry.

7.      **Certain Tax Implications of the Plan.**

Holders of Claims should carefully review Article VIII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors and/or have an impact on creditors' personal tax obligations.  The Debtors do not know your specific tax situation.  If you have any questions about the discussion of taxes in this Disclosure Statement, you should consult a tax professional.

8.      **The Debtors' Substantial Ongoing Liquidity Needs May Affect Recoveries.**

Although the Debtors' operations with respect to their core business model have been completely paused since June 2023, and although the Debtors' workforce has been significantly reduced as a result, the Debtors have nonetheless had to use significant resources to comply with

the demands of the chapter 11 process and the negotiation of the contemplated Plan Transactions and Plan.  Accordingly, depending on how long the Chapter 11 Cases are, the recoveries that Holders of Claims are estimated to receive will be impacted by the Debtors' ongoing liquidity requirements.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources.  In addition to the Cash necessary to fund the ongoing operations necessary to comply with the demands of these Chapter 11 Cases, the Debtors have incurred significant Professional Fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant Professional Fees and costs throughout the remainder of the Chapter 11 Cases.  The Debtors cannot guarantee that Cash on-hand will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing obligations, will be dependent upon, among other things:  (a) their ability to maintain adequate Cash on hand; (b) their ability to confirm and consummate the Plan; and (c) the ultimate cost, duration, and outcome of the Chapter 11 Cases.  The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that Cash on hand is not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to raise liquidity in different ways, including by selling assets or seeking additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

## C.    Additional Factors to be Considered.

### 1.    The Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 2.    No Representations Outside This Disclosure Statement Are Authorized.

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court, or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.       **No Legal or Tax Advice Is Provided to You by This Disclosure Statement.**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or Interests should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

4.       **No Admission Made.**

Nothing contained in the Plan or Disclosure Statement will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests, or on the rights of any other Person or Entity.

5.       **Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation Claim of the Debtors or Cause of Action or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement or in the Plan or Plan Supplement.  The Debtors or the Wind-Down Trustee, as applicable, may seek to investigate, file, and prosecute Causes of Action, Claims and objections to Claims and Interests after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Causes of Action, Claims, or objections to such Claims or Interests.

6.       **No Waiver of Right to Object or Right to Recover Transfers and Assets.**

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or for the Debtors or the Wind-Down Trust to recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified in this Disclosure Statement, the Plan, or the Plan Supplement.

7.       **Risk Associated with Forward Looking Statements.**

The financial information contained in this Combined Disclosure Statement and Plan has not been audited.  In preparing the Disclosure Statement and Plan, the Debtors relied on financial data derived from its books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in the Disclosure Statement and Plan, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

8.     **Information Was Provided by Debtors and Was Relied Upon by Debtors' Advisors.**

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

## VIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Company and to Holders of certain Claims. This discussion does not address the U.S. federal income tax consequences to (i) creditors whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan or (ii) Holders who are deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the U.S. Internal Revenue Code of 1986, as amended from time to time (the "Tax Code"), Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Company has not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. No assurance can be given that the IRS will not take a position contrary to the description of U.S. federal income tax consequences of the Plan described below.

This discussion does not address non-U.S., state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction. In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.

The following discussion generally assumes that the Plan implements the reorganization or liquidation of the Company for U.S. federal income tax purposes and that all distributions by the Company in connection with such reorganization or liquidation will be taxed accordingly. Additionally, this discussion assumes that (i) the various arrangements to which the Company is a party are and will be respected for U.S. federal income tax purposes in accordance with their form and (ii) except if otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

The following discussion of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon a Holders 's individual circumstances.  Each Holder of a Claim or Interest is urged to consult its own tax advisor for the U.S. federal, state, provincial, local and other tax consequences applicable under the Plan.

### A.     Consequences to The Company

#### 1.     Limitations on NOL Carryforwards and Other Tax Attributes.

The Company' ability to utilize its net operating losses, if any, and certain other tax attributes could be subject to limitation if the Company underwent or were to undergo an ownership change within the meaning of section 382 of the Tax Code after the Petition Date.

#### 2.     Transfer of Assets to the Purchaser, the Plan Trust or the Wind-Down Trust; Dissolution of the Company.

Pursuant to the Plan, the Plan Trust or the Wind-Down Trust will be established.  On the Effective Date, in the event of (a) the Reorganization Scenario, the Company will transfer all of the Plan Trust Assets held by it to the Plan Trust and (b) in the Wind-Down Scenario, the Company will transfer all of the Wind-Down Trust Assets held by it to the Wind-Down Trust, and all such assets shall vest in the Wind-Down Trust or the Plan Trust, as applicable, on such date, to be administered by the Wind-Down Trustee or the Plan Trustee, in accordance with the Plan and the Wind-Down Trust Agreement or the Plan Trust Agreement after the Company, the Wind-Down Trustee or the Plan Administrator, as applicable, has paid or reserved for any amounts necessary to fund the Wind-Down Budget and the Plan Trust Budget and pay all Allowed Claims in accordance with the Plan and the Company will thereafter be dissolved.  For U.S. federal income tax purposes, the transfer of the Company' assets to the Wind-Down Trust or the Plan Trust generally is treated as equivalent to a sale of such assets at their then fair market value.  *See* Article VIII.D of this Disclosure Statement.

Although the Company may recognize taxable income in connection with the transfer of assets to the Wind-Down Trust or the Plan Trust and their liquidation in the taxable year of such transfer, the Company expects to have sufficient current deductions for such year, available NOL carryforwards and/or other tax attributes for such year to avoid any meaningful U.S. federal income tax liability for such year.

#### 3.     Cancellation of Debt

The Tax Code provides that a debtor must recognize cancellation of debt ("COD") income upon the elimination or reduction of debt for insufficient consideration.  The Tax Code provides an exception to such income recognition treatment for any COD arising by reason of the discharge of the debtor's indebtedness in a bankruptcy case or to the extent of the debtor's insolvency immediately before the cancellation of the debt.  In such case, the Tax Code generally requires the debtor to reduce certain of its tax attributes—such as current year NOLs, NOL carryforwards, tax credits, capital losses and tax basis in assets—by the amount of any such excluded COD income. COD income generally is the amount by which the adjusted issue price of cancelled debt exceeds the sum of the amount of cash and the fair market value of any other property given in exchange

therefor. In general, any reduction in tax attributes under the COD rules does not occur until the end of the tax year, after such attributes have been applied to determine the tax for the year. In the event of a Wind-Down Scenario, the Company may be liquidated before end of the taxable year and all of its remaining tax attributes would be eliminated (in which case the potential reduction of tax attributes from excluded COD incomed should not have a material adverse federal tax impact on the Company), In the event that the Plan is a plan of reorganization for U.S. federal income tax purposes, the Company believes that no COD should be incurred by the Company as a result of the implementation of the Plan prior to the distribution thereunder. In such case, the reduction of tax attributes resulting from such COD (which, as indicated above, only occurs as of the end of the tax year in which the COD occurs) generally should not result in a material adverse federal tax impact for the Company during the year of the reorganization, and would only impact the tax attributes of the company surviving the reorganization in future tax years.

### B.  Consequences to Holders of Claims in Class 3A, Class 3B, Class 3C, and Class 3D.

Pursuant to the Plan, each Holder of Allowed Claims in Classes 3A through 3D, will receive, in full and final satisfaction of its applicable claim, either its Pro Rata share of either (1) the Plan Trust Units or (2) the Wind-Down Trust Units, representing such Holder's right to receive its Pro Rata share of the proceeds of the Plan Assets or Wind-Down Trust Assets, as applicable. As discussed below (*see* Article VII.C of this Disclosure Statement), such Holders that receive a beneficial interest in the Plan Trust or the Wind-Down Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, an undivided interest in the assets transferred to the Plan Trust or the Wind-Down Trust consistent with its Pro Rata interest in the Plan Trust or the Wind-Down Trust, and subject to any portion(s) of the Plan Trust or the Wind-Down Trust being treated as a "disputed ownership fund" for U.S. federal income tax purposes.

### C.  Distributions in Respect of Accrued But Unpaid Interest

In general, to the extent any amount received (whether in cash or other property) by a holder of a debt instrument is received in satisfaction of interest that accrued during its holding period, such amount will be taxable to the holder as ordinary interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

Pursuant to Article 7.9 of the Plan, distributions in respect of any Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any. However, the IRS may object to such allocation, and thus there is no assurance that such allocation would ultimately be respected by the IRS for U.S. federal income tax purposes. A Holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

D.      **Tax Treatment of the Plan Trust or the Wind-Down Trust and Holders of Beneficial Interests Therein**

The Wind-Down Trust or the Plan Trust are each intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Wind-Down Trust and the Plan Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Plan Administrator, the Wind-Down Trustee and beneficiaries of the Wind-Down Trust or the Plan Trust) must treat the transfer of assets to the Wind-Down Trust and the Plan Trust as (1) a transfer of such assets (subject to any obligations relating to those assets) directly to recipients of beneficial interests in the Wind-Down Trust or the Plan Trust, followed by (2) a transfer by such beneficiaries to the Wind-Down Trust or the Plan Trust of such assets in exchange for beneficial interests in the Wind-Down Trust or the Plan Trust, as applicable. Accordingly, except in the event of contrary definitive guidance, Holders of beneficial interests in the Wind-Down Trust or the Plan Trust shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the assets transferred by the Company to the Wind-Down Trust or the Plan Trust, as applicable.

No ruling is currently being requested from the IRS concerning the tax status of the Wind-Down Trust or the Plan Trust, as applicable, as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Wind-Down Trust or the Plan Trust, as applicable, as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Wind-Down Trust or the Plan Trust, as applicable, and the Holders of Claims could vary from those discussed herein. Certain U.S. federal income tax consequences of the Wind-Down Trust or the Plan Trust, as applicable, or portions thereof being treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-9 are also discussed below.

1.      **General "Liquidating Trust" Tax Reporting by the Wind-Down Trust or the Plan Trust and Their Respective Beneficiaries**

For all U.S. federal income tax purposes, all parties must treat the Wind-Down Trust or the Plan Trust as a grantor trust of which the Holders of Wind-Down Trust Units or Plan Trust Unit, as applicable, are the owners and grantors, and treat such Holders as the direct owners of an undivided interest in the assets transferred to the Wind-Down Trust or the Plan Trust, consistent with their Pro Rata interests therein. The Wind-Down Trustee or the Plan Administrator, as applicable, will file tax returns for the Wind-Down Trust or the Plan Trust, as applicable, treating the Wind-Down Trust or the Plan Trust, as applicable, as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations. The Wind-Down Trustee or the Plan Administrator, as applicable, also shall annually send to each Holder of Wind-Down Trust Units or Plan Trust Units a separate statement regarding the receipts and expenditures of the Wind-Down Trust or the Plan Trust as relevant for U.S. federal income tax purposes.

All taxable income and loss of the Wind-Down Trust or the Plan Trust will be allocated among, and treated as directly earned and incurred by, the Holders of Wind-Down Trust Units with respect to such Holder's interest in the assets of the Wind-Down Trust or the Plan Trust (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income.  The character of any income and the character and ability to use any loss would depend on the particular situation of the Holder of Wind-Down Trust Units or Plan Trust Units.  The U.S. federal income tax consequences to U.S. beneficiaries of U.S. grantor trusts with foreign corporate subsidiaries is not entirely clear.  Holders of Wind-Down Trust Units or Plan Trust Units may be taxed on certain income of foreign corporate subsidiaries of the Wind-Down Trust or the Plan Trust, but the amount of such income, if any, is not expected to be material.

As soon as reasonably practicable after the transfer of the Company's assets to the Wind-Down Trust or the Plan Trust, the Wind-Down Trustee or the Plan Administrator shall make a good faith valuation of the fair market value of such assets.  All parties to the Wind-Down Trust or the Plan Trust (including, without limitation, the Company, Holders of Allowed Claims, and the beneficiaries of the Wind-Down Trust or the Plan Trust) must consistently use such valuation for all U.S. federal income tax purposes.

The U.S. federal income tax obligations of a Holder with respect to its beneficial interest in the Wind-Down Trust or the Plan Trust are not dependent on the Wind-Down Trust or the Plan Trust distributing any cash or other proceeds.  A Holder may incur a U.S. federal income tax liability with respect to its allocable share of the Wind-Down Trust's income or the Plan Trust's income even if the Wind-Down Trust or the Plan Trust does not make a concurrent distribution to the Holder.  In general, a distribution of cash by the Wind-Down Trust or the Plan Trust will not be separately taxable to a beneficiary of the Wind-Down Trust or the Plan Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Wind-Down Trust or the Plan Trust.

The Wind-Down Trust or the Plan Trust will comply with all applicable governmental withholding requirements.

### 2.    Tax Reporting for Assets Allocable to Disputed Claims

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by a Wind-Down Trustee or the Plan Administrator of an IRS private letter ruling if the Wind-Down Trustee or the Plan Administrator so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Wind-Down Trustee or the Plan Administrator), the Wind-Down Trustee or the Plan Administrator may elect to treat any Disputed Claims reserves as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury Regulations, if applicable.

Accordingly, if a "disputed ownership fund" election is made with respect to any Disputed Claims reserves, such reserve will be subject to tax annually as if the fund were  a separate entity and the amounts taxable would be based  on any net income earned with respect to the assets allocable thereto (including any gain recognized upon the disposition of such assets).   All distributions from such reserves (which distributions will be net of the expenses, including taxes,

relating to the retention or disposition of such assets) will be treated as received by Holders in respect of their Claims as if distributed by the Company. All parties (including, without limitation, the Company, the Wind-Down Trustee and the beneficiaries of the Wind-Down Trust, or the Plan Administrator and the beneficiaries of the Plan Trust) will be required to report for tax purposes consistently with the foregoing.

A reserve will be responsible for payment, out of the assets of the reserve, of any taxes imposed on the reserve or its assets. In the event, and to the extent, any cash in the reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the reserve may be sold to pay such taxes.

### E.      Withholding on Distributions and Information Reporting

All distributions to a Holder of Allowed Claims under the Plan are generally subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax. Rather, the amount of backup withholding can be credited against the U.S. federal income tax liability of the Holder of Allowed Claims subject to backup withholding, provided that the required information is timely provided to IRS. If backup withholding results in an overpayment of taxes, a refund may be obtained, provided that the required information is timely provided to the IRS. A Holder of Allowed Claims is urged to consult its own tax advisor regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. A Holder of Allowed Claims is urged to consult its own tax advisor regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

The foregoing summary has been provided for informational purposes only. A Holder of Claims and Interests is urged to consult its own tax advisor concerning the federal, state, local and other tax consequences applicable under the Plan.

## IX.      VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each Holder of Allowed Claims or General Unsecured Claims should carefully review the Plan attached hereto as **Exhibit A**. All descriptions

of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

## A.    Parties Entitled to Vote

Under the Bankruptcy Code, only Holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan.  Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an Impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or Interest, the Bankruptcy Code deems such holder to have rejected the Plan, and, accordingly, holders of such Claims and Interests do not vote on the Plan and will not receive a Ballot.  If a Claim or Interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or Interest to have accepted the Plan and, accordingly, holders of such Claims and Interests are not entitled to vote on the Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (2) interests as acceptance by interest holders in that class that hold at least two- thirds (2/3) in amount of the interests that cast ballots for acceptance or rejection of the plan.

Holders of Claims in Class 3A (Prime Core General Unsecured Claims), Class 3B (Prime Trust General Unsecured Claims), Class 3C (Prime IRA General Unsecured Claims), Class 3D (Prime Digital General Unsecured Claims) and Class 4 (Convenience Claims) are impaired under the Plan and entitled to vote to accept or reject the Plan.

Holders of Claims in all other Classes are either unimpaired and presumed to accept or will not receive a distribution under the Plan and deemed to reject the Plan, and therefore are not entitled to vote.  For a detailed description of the treatment of Claims and Interests under the Plan, see Article VI.C of this Disclosure Statement.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all Holders of Claims or Interests in Classes 5 (Section 510(b) Claims), 6 (Intercompany Claims), 7 (Intercompany Interests), and 8 (Existing Equity Interests).  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article VII.A of this Disclosure Statement.

B.    **Voting Instructions and Voting**.

Holders in Class 3A (Prime Core General Unsecured Claims), Class 3B (Prime Trust General Unsecured Claims), Class 3C (Prime IRA General Unsecured Claims), Class 3D (Prime Digital General Unsecured Claims), and Class 4 (Convenience Claims) are entitled to vote to accept or reject the Plan except to the extent that (i) as of the Voting Record Date, such creditor's Claim is zero ($0.00), (ii) as of the Voting Record Date, such creditor's Claim has been disallowed, expunged, disqualified or suspended, (iii) such creditor has not timely filed a proof of claim in accordance with the Bar Date Order as of the Voting Record Date and the Debtors have not scheduled such creditor's Claim or scheduled such creditor's claim in an undetermined amount or as contingent, unliquidated, or disputed; or (iv) such creditor's Claim is subject to an objection or request for estimation, subject to the procedures set forth below.

All Holders within such Classes have been sent a Ballot together with this Disclosure Statement.  Such Holders should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

**If you have any questions regarding the Ballot, did not receive a return envelope with your Ballot, did not receive an electronic copy of the Disclosure Statement and the Plan, or need physical copies of the Ballot or other enclosed materials, please contact the Debtors' Claims Agent, Stretto, in writing at  Prime Core Technologies Inc.,** *et al.* **Ballot Processing, c/o Stretto 410 Exchange, Suite 100, Irvine, CA 92602, or by email at primecoreinquiries@stretto.com with a reference to "Prime Core Technologies Inc. Solicitation" in the subject line, or by calling (303) 536-6996 (International) or (888) 533-4753 (U.S./Canada Toll-Free) and request to speak with a member of the solicitation team.**

Each Ballot contains detailed voting instructions.  Each Ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots.  The Voting Record Date for determining which Holders are entitled to vote on the Plan is **September 22, 2023**.  The Voting Deadline is **October 23, 2023 at 4:00 p.m. (prevailing Eastern Time)**.

**The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from Holders of Claims within Class 3A (Prime Core General Unsecured Claims), Class 3B (Prime Trust General Unsecured Claims), Class 3C (Prime IRA General Unsecured Claims), Class 3D (Prime Digital General Unsecured Claims), and Class 4 (Convenience Claims) who are entitled to a vote with respect thereto.  Accordingly, in voting on the Plan, please use only the Ballot sent to you with this Disclosure Statement.  For your Ballot to be counted, please complete and sign your Ballot, and submit it so as to be received by 4:00 p.m. (prevailing Eastern Time), on October 23, 2023 using** *one* **of the following methods:**

**If by First Class Mail, Overnight Courier or Hand Delivery**:

> **Prime Core Technologies Inc., *et al.* Ballot Processing**
> **c/o Stretto**
> **410 Exchange, Suite 100**
> **Irvine, CA 92602**
>
> **If you would like to coordinate hand delivery of your Ballot, please email primecoreinquiries@stretto.com at least twenty-four (24) hours in advance and provide the anticipated date and time of your delivery.**

**If by Electronic, Online Submission**:

> **Ballots will be accepted if properly completed through the E- Ballot system maintained by the Claims Agent (the "E-Ballot Portal"). To submit your Ballot via the E-Ballot Portal:**
>
> - **visit https://cases.stretto.com/primetrust/.**
>
> - **Click on the "Submit E-Ballot" section of the Debtors' website and follow the directions to submit your Ballot.**
>
> **IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**
>
> **Unique E-Ballot Password: _____**
>
> **The E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**
>
> **If you choose to submit your Ballot via the E-Ballot Portal, you should *not* also return a hard copy of your Ballot.**

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY TELECOPY, FACSIMILE, OR EMAIL BE ACCEPTED**. Following the Voting Deadline, the Claims Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan. Ballots submitted to the Debtors or any of its agents and advisors (other than the Claims Agent) will not be counted.

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT (A) WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, (B) PARTIALLY ACCEPTS AND PARTIALLY REJECTS THE PLAN, OR (C) INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU ARE AN ELIGIBLE HOLDER AND YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT, OR LOST YOUR BALLOT, OR IF YOU HAVE ANY

QUESTIONS CONCERNING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AGENT BY CALLING (303) 536-6996 (INTERNATIONAL) OR (888) 533-4753 (U.S./CANADA TOLL-FREE) OR BY EMAILING PRIMECOREINQUIRIES @STRETTO.COM.

### C.    **Agreements Upon Furnishing Ballots**.

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this solicitation; and (ii) to the extent such accepting Ballot does not opt out of the voluntary releases contained in Article 10.6 of the Plan by checking the "opt out" box on the Ballot, the terms of the Plan including the injunction, releases, and exculpations set forth in Articles 10.5, 10.6, 10.7, and 10.8 therein.  All parties in interest retain their right to object to confirmation of the Plan.

### D.    **Change of Vote**.

Any party who has previously submitted to the Claims Agent prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Claims Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

### E.    **Waivers of Defects, Irregularities, Etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Claims Agent and/or the Debtors, as applicable, in their sole reasonable discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### F.    **Miscellaneous**.

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Claims Agent is authorized, but not required, to contact parties that submit incomplete or otherwise deficient votes to make a reasonable effort to cure such deficiencies.  If you simultaneously return duplicative Ballots that are voted inconsistently, those Ballots will not

be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of the Claims or Interests, as applicable, who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Claims Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Claims Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to include it in the tabulation of votes for or against the Plan.

As a cost saving measure, the Debtors are authorized to distribute the Plan, the Disclosure Statement, and the Conditional Approval Order (without exhibits) to Holders of Claims in Classes 3A through 3D and Class 4 in electronic format (i.e., flash drive), with the Ballots and the Confirmation Hearing Notice to be provided in paper format (unless such Holder already received such documents via email). Additionally, for purposes of serving the Solicitation Packages, Confirmation Hearing Notice, and Notice of Non-Voting Status, the Debtors are authorized to rely on the address information for Voting and Non-Voting Classes as compiled, updated, and maintained by the Claims Agent as of the Voting Record Date. The Debtors and the Claims Agent are not required to conduct any additional research for updated addresses based on undeliverable Solicitation Packages, Confirmation Hearing Notices, and Notices of Non-Voting Status.

### G.    **Further Information, Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Claims Agent.

### X.    **CONFIRMATION OF THE PLAN**

### A.    **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan. The Bankruptcy Court has scheduled the Confirmation Hearing to commence on October 30, 2023, at [●] a.m./p.m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time-to-time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

B. **Objections**

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules for the Bankruptcy Court, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon the parties listed below no later than the Plan Objection Deadline of October 23, 2023 at 4:00 p.m. (prevailing Eastern Time):

| *Debtors* | *Counsel to the Debtors* |
|---|---|
| Prime Core Technologies Inc. | **McDermott Will & Emery LLP** |
| 10845 Griffith Peak Dr., #03-153, | Maris J. Kandestin |
| Las Vegas, NV 89135 | 1000 N. West Street, Suite 1400 |
| | Wilmington, Delaware 19801 |
| | Telephone:  (302) 485-3900 |
| | Facsimile:  (302) 351-8711 |
| | Email:        mkandestin@mwe.com |
| | |
| | -and- |
| | |
| | Darren Azman |
| | Joseph B. Evans |
| | One Vanderbilt Avenue |
| | New York, New York 10017-3852 |
| | Telephone:  (212) 547-5400 |
| | Facsimile:  (646) 547-5444 |
| | Email:        dazman@mwe.com |
| | jbevans@mwe.com |
| | |
| | -and- |
| | |
| | Gregg Steinman |
| | 333 SE 2nd Avenue, Suite 5400 |
| | Miami, Florida 33131 |
| | Telephone:  (305) 358-3500 |
| | Facsimile:  (305) 347-6500 |
| | Email:        gsteinman@mwe.com |

| | |
|---|---|
| ***Office of the United States Trustee*** | ***Counsel to the Creditors' Committee*** |

| | |
|---|---|
| 844 N. King Street, Room 2207, | **Brown Rudnick LLP** |
| Wilmington, DE 19801 | Robert Stark |
| Attn:     Joseph F. Cudia | Kenneth Aulet |
| Telephone:  (302) 573-6491 | Bennett Silverberg |
| Facsimile:   (302) 573-6497 | 7 Times Square |
| | New York, New York 10036 |
| | Telephone: (212) 209-4800 |
| | Facsimile: (212) 209-4801 |
| | Email:     rstark@brownrudnick.com |
| |               kaulet@brownrudnick.com |
| |               bsilverberg@brownrudnick.com |
| | |
| | -and- |
| | |
| | Tristan Axelrod |
| | Matthew Sawyer |
| | One Financial Center |
| | Boston, Massachusetts 02111 |
| | Telephone: (617) 856-8200 |
| | Facsimile: (617) 856-8201 |
| | Email:     taxelrod@brownrudnick.com |
| |               msawyer@brownrudnick.com |
| | |
| | -and- |
| | |
| | **Womble Bond Dickinson (US) LLP** |
| | Donald J. Detweiler |
| | Elazar A. Kosman |
| | 1313 North Market Street, Suite 1200 |
| | Wilmington, Delaware 19801 |
| | Telephone: (302) 252-4320 |
| | Facsimile: (302) 252-4330 |
| | Email:     don.detweiler@wbd-us.com |
| | Email:     elazar.kosman@wbd-us.com |

---

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

C.    **Requirements for Confirmation of Plan**

      1.    **Requirements of Section 1129(a) of the Bankruptcy Code**

        (a)    **General Requirements.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

      a)    the Plan complies with the applicable provisions of the Bankruptcy Code;

      b)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

      c)    the Plan has been proposed in good faith and not by any means forbidden by law;

      d)    any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

      e)    the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy;

      f)    with respect to each Class of Claims or Interests, each Holder of an Impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such Holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

      g)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

      h)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

      i)    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

j)      confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation is proposed in the Plan; and

k)      all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b)      **Best Interests Test**

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan, all Holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit B**.

The Liquidation Analysis is a comparison of (i) the estimated recoveries for creditors and equity holders of the Debtors that may result from the Plan and (ii) an estimate of the recoveries that may result from a hypothetical chapter 7 liquidation.  The Liquidation Analysis is based upon a number of significant assumptions which are described therein.  The Liquidation Analysis is solely for the purpose of disclosing to Holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Bankruptcy Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. The Debtors will put on evidence at the Confirmation Hearing that they will be able to meeting their respective obligations under the Plan post-confirmation.

(d)    **No Unfair Discrimination**

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other Classes of Claims and Interests having the same priority. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

(e)    **Fair And Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class. In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

a)    *Secured Creditors*. With respect to a class of impaired secured claims, a proposed plan must provide the following: (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estates' interest in such property, or (b) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) or (c) of this paragraph, or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim. There are no Impaired Classes of creditors holding Secured Claims under the Plan.

b)    *Unsecured Creditors*. With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

98

c)      *Holders of Equity Interests*.  With respect to a class of equity interests, a proposed plan must provide the following: (i) that each holder of an equity interest receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest or (ii) that the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the Plan on account of such junior interest any property.

Pursuant to the Plan, no junior Class junior will receive or retain property on account of their Claims or Interests.  Accordingly, the Debtors believe that the Plan meets the "fair and equitable" test with respect to all Claims and Interests.

## 2.      Application to the Plan.

As to any Class that may reject, or be deemed to reject, the Plan, the Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirements, because, as to any such dissenting Class, there is no Class of equal priority receiving more favorable treatment, and such Class will either be paid in full, or no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

### (a)      Alternatives To Confirmation And Consummation of the Plan.

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative chapter 11 plan, or (ii) a liquidation under chapter 7 of the Bankruptcy Code.

*Alternative Chapter 11 Plan.*  If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a Chapter 11 plan has expired, any other party in interest) could attempt to formulate a different plan.

*Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law.*  If no plan can be confirmed, one or more of these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of Holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit B**.

The Debtors believe that liquidating the Debtors' Estates under the Plan will provide Holders of Allowed Claims with a larger, more timely recovery because of the fees and expenses that would be incurred in a chapter 7 liquidation, including the potential added time and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors and their estates.  The Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the

value of the Debtors' assets and that the assets available for distribution to creditors would be reduced by such additional expenses.  Further, a liquidation would result in the Debtors receiving less proceeds for certain assets the Debtors expect to recover following the Effective Date of the Plan.

Accordingly, the Debtors believe that a chapter 7 liquidation or other bankruptcy would result in smaller distributions being made to creditors than those provided for under the Plan because of additional expenses and claims that would be generated during the liquidation, as well as lower recoveries on certain assets of the Debtors.  Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

## XI.    CONCLUSION AND RECOMMENDATION OF THE DEBTORS

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urges Holders of Impaired Claims in Class 3A (Prime Core General Unsecured Claims), Class 3B (Prime Trust General Unsecured Claims), Class 3C (Prime IRA General Unsecured Claims), Class 3D (Prime Digital General Unsecured Claims), and Class 4 (Convenience Claims) to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than the Voting Deadline, October 23, 2023 at 4:00 p.m. (prevailing Eastern Time).

Dated: September 8, 2023

Respectfully submitted,

By: */s/ Michael Wyse*

Name:  Michael Wyse
Title:  Member, Special Committee of the
Debtors and Debtors in Possession

## Exhibit A

**Plan**

**[to be filed]**

## Exhibit B

**Liquidation Analysis**

**[to be filed]**