# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Prime Core Technologies Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-11161 (JKS)<br><br>(Jointly Administered)<br><br>**Re: D.I. 93**<br><br>**Hearing Date**: October 5, 2023 at 2:00 pm E.T.<br>**Objection Deadline**: Extended to September 29, 2023 at 11:59 am E.T. with consent of the Debtors. |

### ANCHORCOIN LLC'S OBJECTION TO DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR PRIME CORE TECHNOLOGIES INC. AND ITS AFFILIATED DEBTORS

AnchorCoin LLC ("AnchorCoin"), by its undersigned attorneys, states as follows in support of its objection (this "Objection") to the *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with Respect to the Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* (D.I. 93) (the "Disclosure Statement")[2] filed by the above-captioned debtors and debtors in possession (the "Debtors")

## GENERAL BACKGROUND

1. Pre-petition, Debtor Prime Trust, LLC ("Prime Trust") and AnchorCoin entered into that certain Trust Agreement, dated July 12, 2018 (the "Trust Agreement"). Pursuant to the express language of the Trust Agreement, Prime Trust has no ownership interests in the funds deposited into the Trust (as defined in the Trust Agreement) but rather serves merely as a trustee

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 330 South Rampart Blvd., Suite 260, Las Vegas, NV 89145.

[2] Capitalized terms used but not defined herein shall be given the meanings ascribed to them in the Disclosure Statement or the Cash Management Motion (D.I. 20), as applicable.

163275476v4

with respect to the deposited funds. The funds deposited into the Trust are deposited at the direction of AnchorCoin by its customers who are cryptocurrency token holders (defined as the "<u>Holders</u>" in the Trust Agreement) and are held by Prime Trust for the exclusive benefit of the Holders.

> Specifically, paragraph 2(b) of the Trust Agreement provides:
>
> During the Trust Period, the parties agree that (i) **the funds will be held in trust for the benefit of the Holders**, and that (ii) **neither Company nor Prime Trust are entitled to any funds in the Trust at any time and that no amounts deposited into the Trust shall become the property of Company, Prime Trust, or any other entity**, or be subject to any debts, liens or encumbrances of any kind of Company, Prime Trust, or any other entity, **as they are held exclusively for the benefit of Holders.**

Trust Agreement, ¶ 2(b) (emphasis added).

2. Additionally, Prime Trust's own website reflects that:

> Customer assets are kept in a separate system and never confused with corporate assets. Assets held on behalf of customers are earmarked for each customer. Prime Trust assets and our customer's assets are either kept separate from the assets of other customers or are otherwise specifically identified as belonging to a particular customer, pursuant to NRS 669.220.1(a) and our internal processes and controls support this.

"How does Prime Trust treat my assets under custody?" https://support.primetrust.com/hc/en-us/articles/10425649977499-How-does-Prime-Trust-treat-my-assets-under-custody- (last accessed Sept. 6, 2023).[3]

3. Based on AnchorCoin's records, there should be more than $20 million in funds deposited within a trust account held by, but not owned by, Debtor Prime Trust and governed by the Trust Agreement.

---

[3] Section 669.2220 of the Nevada Revised Statutes provides "1. A retail trust company: (a) Shall keep all trust funds and investments separate from the assets of the retail trust company, and all investments made by the retail trust company as a fiduciary must be designated so that the trust or estate to which the investments belong may be clearly identified." Nev. Rev. Stat. Ann. § 669.220

163275476v4

4.      On August 14, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

5.      Attached to the voluntary petitions is a consolidated list of the Debtors' top 50 creditors (the "Creditors' List").  Although the customer names are sealed, AnchorCoin has confirmed with the Debtors that it is the third largest creditor on the Creditors' List.  The Debtors listed AnchorCoin as holding a $23,854,134 claim of which $13,943,921 is listed as secured and $9,910,213 is listed as unsecured.  Prior to filing this Objection, the Debtors informed AnchorCoin that the Creditors' List is inaccurate and that the Debtors will be filing an amended Creditors' List reflecting AnchorCoin's claim as unsecured.

6.      As part of its first-day relief, the Debtors sought authority to continue to operate their cash management system (D.I. 20) (the "Cash Management Motion").  Several parties objected at the first-day hearing and such objections were resolved by adding language to the Interim Cash Management Order providing that the Debtors would not use or transfers funds from Customer Accounts (as defined in Cash Management Motion).  *See* Interim Cash Management Order, D.I. 42 at ¶ 7.  Largely identical language was also included in the *Final Order (I) Authorizing Debtors to (A) Continue to Operate their Cash Management System, and (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related Thereto; (II) Authorizing the Debtors to (A) Continue to Perform Intercompany Transactions and (B) Granting Administrative Expense Status for Postpetition Intercompany Claims; (III) Extending the Time for the Debtors to Comply with Requirements Set Forth in 11 U.S.C. § 345(b); and (IV) Granting Related Relief* (D.I. 170) (the "Final Cash Management Order"), which provides:

> Notwithstanding anything to the contrary in this Final Order, the Debtors shall not use or transfer funds, except as otherwise required

> by Bankruptcy Code section 345, from Customer Accounts to honor any prepetition obligations or pay any postpetition obligations absent further order of the Court. All parties' rights are reserved regarding whether and to what extent any funds or other property are held by a Debtor in trust or constitute property of the Debtors' estates.

Final Cash Management Order at ¶ 8.

7. On September 8, 2023, the Debtors filed the *Disclosure Statement and the Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* (D.I. 92) (the "Plan").

8. On September 22, 2023, the Debtors filed their schedules of assets and liabilities (D.I. 175, 176, 177, 178) (the "Schedules").

## LEGAL STANDARD

9. A disclosure statement must contain "adequate information" about the debtor and must be provided to "each holder of a claim or interest of a particular class." 11 U.S.C. § 1125(c). Section 1125 broadly defines adequate information to mean: information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan . . . 11 U.S.C. § 1125(a)(1); *see In re Zenith Elecs. Corp.*, 241 B.R. 92, 99 (Bankr. D. Del. 1999). "Adequate information" is "information sufficient for parties" to make an informed voting decision. 11 U.S.C. § 1125(a); *Zenith*, 241 B.R. at 99; *see, e.g., In re Monroe Well Serv., Inc.*, 80 B.R. 324, 332 (Bankr. E.D. Pa. 1987); *In re Nw. Recreational Activities, Inc.*, 8 B.R. 10, 11 (Bankr.

N.D. Ga. 1980) (disclosure statement must "furnish . . . sufficient financial and operating information to enable each [party] to make an informed Judgment whether to approve or reject the proposed plan.")

## ARGUMENT

10. The Disclosure Statement lacks adequate information for creditors to make an informed voting decision.

11. *First*, the Disclosure Statement fails to disclose that a dispute exists as to whether the funds in the Customer Accounts constitute property of the Debtors' estates and that the Final Cash Management Order's restricts the Debtors from using or transferring such funds absent further order of this Court.[4] The Liquidation Event is premised on providing distributions to creditors from three primary sources including the Debtors' Cash, which is defined as the legal tender of the United States of America and equivalents thereof. The Plan contains several references to the use of Cash on hand without carving out the Cash in the Customer Accounts. For example, the definition of "Wind-Down Trust Assets" includes all "Cash on hand held by the Debtors" as of the Effective Date. Similarly, the Plan provides that the "Plan Administrator or the Wind-Down Trust, as applicable, shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates." *See Plan,* Article II, Section 2.2(c). Consistent with the terms of the Final Cash Management Order, language should be added to the Plan and Disclosure Statement to make it clear that Cash does not include the funds in the Customer Accounts absent further order of this Court.

---

[4] The Disclosure Statement explicitly discusses that one of the key issues that must be resolved is whether the Cryptocurrency in the Debtors' possession is property of the estate. *See* Disclosure Statement, Key Legal Issues Affecting Distributions.

12. *Second,* while the Disclosure Statement notes that the proceeds of certain Claims and Causes of Action with respect to the Debtors' prepetition operations are a primary source of distributions to creditors in a Liquidation Event, there is no information in the Disclosure Statement regarding these potential claims other than a statement that the Committee is investigating such Claims and Causes of Action. *See* Disclosure Statement, The Committee's Investigation. Before any decision can be made about a Plan or Disclosure Statement, creditors are entitled to information about these potential Claims and Causes of Action including:

- What, if any analysis, the Debtors have undertaken regarding the Claims and Causes of Action? Has this analysis been undertaken by a skilled and independent third party?

- A description of the potential Claims and Causes of Action.

- What is the range of the estimated value of such Claims and Causes of Action?

- What insurance policies do the Debtors currently hold?

- What insurance policies, if any, cover damages asserted by creditors arising from, or relating to, the Debtors' fraud, breach of contract, breach of fiduciary duty, conversion, tort, civil conspiracy, emotional distress, personal injury, misrepresentation, breach of the implied duty of good faith and fair dealing, unjust enrichment, negligence and lost profits?

13. *Finally*, the Plan proposes a release by the Debtors and the Releasing Parties of the Released Parties, which includes (through the definition of Related Parties) a release of the Debtors' current directors and officers. *See* Plan, Article 10, Art. 1.124, Art. 1.125. This release would include both the Debtors' derivative claims and any potential direct claims held by the creditors against the Debtors' current directors and officers. The Disclosure Statement does not discuss (i) what independent investigation or independent analysis, if any, was done in connection with any potential claims or causes of action that the Debtors may hold against current directors and officers and (ii) the potential value of estate claims against these directors and officers.

14. The Debtors bear the burden of proving that the Plan's proposed releases of current officers and directors is appropriate under the Bankruptcy Code and applicable law in this Circuit. See *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 214 (3d Cir. Del. 2000) (proponent bears burden of establishing propriety of proposed releases); *In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 43 (Bankr. D. Del. 2000) (noting that it is the debtors' burden to establish that releases are appropriate). "Determining the fairness of a plan which includes the release of non-debtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case." *In re Wash. Mut., Inc.*, 442 B.R. 314, 345 (Bankr. D. Del. 2011).

15. Courts in this district have identified five factors that are relevant in determining whether a debtor's release of a non-debtor is appropriate under a plan:

- an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;

- a substantial contribution to the plan by the non-debtor;

- the necessity of the release to the reorganization;

- the overwhelming acceptance of the plan and release by creditors and interest holders;

- the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

See *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *Wash. Mut.*, 442 B.R. at 346; *In re Exide Techs.*, 303 B.R. 48, 71-72 (Bankr. D. Del. 2003). The foregoing factors "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *Wash. Mut.*, 442 B.R. at 346. However, these factors "form the

foundation for such an analysis, with due consideration of other factors that may be relevant to [the] case." *Id*. at 347.

16.     In the present cases, neither the Plan nor the Disclosure Statement address whether any of the Zenith factors are met with respect to the current directors and officers who will receive releases from the Debtors and AnchorCoin submits that the Debtors are not able satisfy the Zenith factors. The Debtors have admitted that fiat currency from omnibus client accounts, which was to be held only for those clients, was used instead to pay other customers. *See* First-Day Declaration at ¶ 49. As a result, the Debtors have potential valuable claims against their current directors and officers. The Plan's release of these claims does not satisfy the five-factor Zenith test because, *inter alia*, there is no contribution, let alone a substantial contribution, to the Plan by the current officers and directors nor are there claims against the Debtors held by the current directors and officers that are being settled under the Plan in return for the releases. Moreover, the Debtors' shareholders are being wiped out under the Plan and will receive no distributions. The releases granted to the current directors and officers therefore do not satisfy the fifth Zenith factor, i.e., "payment of all or substantially all of the claims of the creditors and interest holders under the plan." *See Zenith*, 241 B.R. at 110.

17.     Accordingly, any release of current officers and directors is wholly inappropriate and should not be approved.

## RESERVATION OF RIGHTS

18.     AnchorCoin reserves all rights to supplement or amend this Objection to the Disclosure Statement.

WHEREFORE, AnchorCoin respectfully requests that the Court deny approval of the Disclosure Statement, unless the modifications set forth herein are made, and grant such other relief as this Court deems fair, appropriate, and just.

| | |
|---|---|
| Dated: September 29, 2023<br>Wilmington, Delaware | **TROUTMAN PEPPER HAMILTON SANDERS LLP**<br><br>*/s/ Evelyn J. Meltzer*<br>David M. Fournier (DE No. 2812)<br>Evelyn J. Meltzer (DE No. 4581)<br>Marcy J. McLaughlin Smith (DE No. 6184)<br>Hercules Plaza, Suite 5100<br>1313 North Market Street<br>Wilmington, Delaware 19801<br>Tel: (302) 777-6500<br>Facsimile: (302) 421-8390<br>Email:  david.fournier@troutman.com<br>         evelyn.meltzer@troutman.com<br>         marcy.smith@troutman.com<br><br>*Counsel to AnchorCoin LLC* |

163275476v4