## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Obj. Deadline: November 27, 2023 at 4:00 p.m. ET**<br>**Hr'g Date: December 19, 2023 at 10:00 a.m. ET** |

### MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO SELL CERTAIN FOREIGN CURRENCY FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES PURSUANT TO BANKRUPTCY CODE SECTION 363

The debtors and debtors in possession (collectively, the "Debtors" or "Prime") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby move (the "Motion") pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order") authorizing the sale of certain of Prime's Foreign Currency (defined below) free and clear of all liens, claims, interests, and encumbrances, as more particularly set forth below. In support of this Motion, Prime relies upon the *Declaration of Timothy Bowman in Support of the Motion of the Debtors for Entry of an Order Authorizing the Debtors to Sell Certain Foreign Currency Free and Clear of all Liens, Claims, Interests, and Encumbrances Pursuant to Bankruptcy Code Section 363* (the "Bowman Decl.") and the *Declaration of Joseph B. Evans in Support of the Motion of the Debtors for Entry of an Order Authorizing the Debtors to Sell*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

*Certain Foreign Currency Free and Clear of all Liens, Claims, Interests, and Encumbrances Pursuant to Bankruptcy Code Section 363* (the "Evans Decl."). In further support of this Motion, Prime respectfully states as follows:

## PRELIMINARY STATEMENT

1.     Prime is seeking approval to convert $8,867,904 worth of its foreign currencies (the "Foreign Currency") to U.S. dollars. The conversion is appropriate because the Foreign Currency is property of Prime's estate. TrustToken, Inc. ("TrustToken")[2] deposited the Foreign Currency under Agreements[3] with Prime which explicitly permit Prime to "invest" and "rehypothecate" at will. Importantly, the Agreements make clear that they "do[] not create a . . . fiduciary . . . relationship between the Parties." MSA § 14.1. The Foreign Currency was deposited into Prime's corporate bank accounts held in Prime's name, which were not held "as trustee," "For the Benefit Of (FBO)," or "In Trust For." When Prime opened those corporate bank accounts it did so in its own name and listed Prime Trust, LLC, as the sole beneficiary in onboarding documents with its bank. Despite Prime's trust charter, the TrustToken Agreements formed a debtor-creditor and not a trust relationship. Accordingly, the Foreign Currency deposits are estate property and Prime is seeking authorization to sell the deposited Foreign Currency for U.S. dollars.[4]

---

[2]     In September 2022, TrustToken announced that it would be rebranding itself as "Archblock." *See* TrustToken (@TrustToken), X (Sep. 22, 2022 10:36 am ET), https://twitter.com/TrustToken/status/1572958000486445057 ("Starting today, @TrustToken is now @Archblock"). To avoid confusion, this Motion uses "TrustToken" but Prime acknowledges the name change.

[3]     The term "Agreements" collectively refers to: (i) the Prime Master Services Agreement last revised August 30, 2022 (the "MSA"), Bowman Decl., Ex. A; (ii) the Service Schedule for Prime Trust Custodial Services last revised May 13, 2022 (the "Custodial Agreement"), Bowman Decl., Ex. B; (iii) the Prime Trust Order Form dated May 23, 2022 between Prime Trust, LLC, and TrustToken, Inc. (the "Order Form"), Bowman Decl., Ex. C; and (iv) the Prime Trust Order Form for the Period of May 23, 2023 to May 22, 2024 between Prime Trust and Archblock (TrustToken, Inc.) (the "Renewal Form"), Bowman Decl., Ex. D.

[4]     This Motion seeks a specific determination concerning the Foreign Currency deposited by TrustToken and the specific Agreements between Prime and TrustToken only.

2.      Prime's primary goal in these Chapter 11 Cases is to maximize value for creditors. Due to significant liquidity issues, it is critical that Prime liquidates and uses the Foreign Currency immediately.

3.      Prime primarily serviced the crypto industry. Because Prime is a public trust company, Prime is exempt from the costly and time-consuming money-transmitter licenses (each, an "MTL") required by most states across the country to facilitate crypto and fiat transactions. Prime also holds eleven state MTLs authorizing it to conduct money transmission in various states across the country.[5] Few customers came to Prime for traditional trust services—such as retirement accounts or estate planning aimed at transferring wealth to future generations. Instead, Prime's customers capitalized on Prime's trust charter and MTLs by utilizing Prime to execute crypto and fiat transactions for the customers' "end-users," which were the individuals and corporate entities that Prime's customers serviced. This enabled Prime's customers to get to market quickly without the time, effort, and compliance procedures required to obtain their own MTLs. This practice is commonly referred to as "money-transmission-as-a-service" or "renting a license." While Prime held a trust charter, its customers primarily used Prime as a regulatory strategy to obviate the need to obtain MTLs across the country.

4.      One such customer was TrustToken. TrustToken used Prime to store and facilitate transactions in the Foreign Currency. TrustToken issued various "stablecoins," which are cryptocurrencies purportedly designed to track the value of a particular fiat currency. In its marketing materials, TrustToken promised its customers that its stablecoins would be "fully backed" by Foreign Currency reserves. *See* Evans Decl., Ex. A, Archblock Stablecoins Terms of

---

[5]    Arizona, Arkansas, Georgia, Idaho, Iowa, Maryland, Minnesota, Nebraska, North Dakota, Ohio, and West Virginia. *See* NMLS Consumer Access, https://www.nmlsconsumeraccess.org/EntityDetails.aspx/COMPANY/2240901.

Use last modified October 27, 2023 ("TrustToken Terms"). Those holding TrustToken stablecoins were told that they had the ability to "redeem" those stablecoins for the Foreign Currency. *Id.* TrustToken did not obtain its own trust charter or seek MTLs in each state for which it engaged in money transmission. Instead, TrustToken short-circuited the difficult state licensing process by paying Prime to hold the Foreign Currency and facilitate stablecoin-related transactions.

5.      Prime provided software services and regulatory coverage for TrustToken. Prime did not provide TrustToken with any trust or fiduciary services. In fact, Prime explicitly disclaimed that it had any fiduciary obligation to TrustToken. The Agreements did not form a trust relationship for ***four primary reasons***, any one of which is sufficient to conclude that a debtor-creditor relationship exists between the Parties.

6.      ***First***, Prime explicitly and unequivocally disclaimed any fiduciary relationship with TrustToken. The fundamental component in every trust relationship is the existence of a fiduciary relationship between trustee and beneficiary. Here, Prime explicitly stated that the Agreements **did not form** a fiduciary relationship: "***Relationship***. The Parties are independent contractors. ***The Agreement does not create a*** partnership, franchise, joint venture, agency, ***fiduciary*** or employment ***relationship between the Parties***. Except as set forth in the Agreement, ***nothing in the Agreement, expressed or implied is intended to give rise to any third-party beneficiary***." MSA § 14.1 (emphasis added). Accordingly, the Agreements did not form a trust relationship.

7.      ***Second***, the Agreements do not create a "trust instrument" under Nevada law. The Agreements do not identify any "trustee," "settlor," or "beneficiary," nor do they "manifest an intent to create a trust." According to TrustToken, the Foreign Currency was intended to be

"reserves" for TrustToken's stablecoin holders. If a TrustToken stablecoin holder opted to exchange its stablecoin for fiat, it could do so from the Foreign Currency reserves, a process commonly referred to as a "redemption." These unnamed TrustToken stablecoin holders are not identified as beneficiaries and are not mentioned at all in any of the Agreements between TrustToken and Prime.

8.     Unlike the Agreements with TrustToken, Prime did enter into trust relationships with a small distinct set of its other customers. *See* Bowman Decl., Ex. E, Prime Trust, LLC, Trustee of the [] 2018 Irrevocable Trust dated December 2018 (the "2018 Trust"). For those trust clients, Prime executed long-form trust agreements which explicitly identified Prime as the "trustee," identified by name the "beneficiaries" and "settlors," set forth the purpose of the trust, and contained a series of other provisions one would expect to see in a trust instrument. *See id.* In stark contrast to Prime's actual trust agreements, TrustToken's Agreements with Prime is a set of terms and conditions on Prime's website which are notably similar to the terms and conditions present on dozens of crypto exchanges operating in the United States. Prime explicitly recognized the distinction between its traditional trust services and services it provided to crypto companies like TrustToken, which it referred to as work performed in the "fintech and digital finance marketplace." *See* Bowman Decl., Ex. F, Prime Trust Asset Protection Trust Resignation Notification Email Thread beginning September 14, 2022 (the "2018 Trust Resignation Email"). For example, on September 14, 2022, Prime resigned from its position as trustee with one of its traditional trust clients stating the following:

> As Prime Trust looks to solidify our leadership position in the fintech and digital finance marketplace, we must prioritize our time and energy, and allocate resources where we see the greatest potential for return and for positive customer impact. With this in mind, we will be resigning as Trustee on our Asset Protection Trust portfolio, see the attached notice of resignation.

Had Prime and TrustToken intended to create a trust agreement, they would have done so as Prime had done with its trust clients.  The fact that Prime entered into actual trust agreements with its trustee clients and actually moved away from this model to focus on providing services to "fintech and digital finance" companies like TrustToken strongly supports the conclusion that the TrustToken Agreements did not form a trust relationship.

9.      ***Third***, consistent with a debtor-creditor relationship, the Agreements permit Prime to "rehypothecate" the Foreign Currency, invest it in Prime's name, and keep the profits. *See* Custodial Agreement § 2.7(b). The Agreements explicitly permit Prime to "use such Fiat Currency to purchase securities or other assets that it may hold and register ***in its own name*** or in the name of its nominee and ***pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use*** any amount of such securities or other assets ***with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency***." *Id.* This language is nearly identical to the language in the relevant customer agreement in a series of other crypto bankruptcy cases, including *Celsius*, *Voyager*, and *Cred*. In each of those cases, because the debtor was contractually permitted to invest in its own name and take profits, the agreements were deemed to form a debtor-creditor and not a trust relationship. This Court should reach the same conclusion here with respect to the Agreements.

10.      ***Fourth***, Prime holds, and always has held, all of the Foreign Currency in corporate accounts held in Prime's own name. *See* Bowman Decl., Ex. G, Prime Trust LLC AUD, CAD, EUR, GBP, and JPY BMO Account Statements for the Period of August 1, 2023 to August 31, 2023 (the "Prime Trust LCC FX Accounts"). In its onboarding documents with its bank, Prime designated Prime Trust, LLC, as the sole "Legal Entity for Which Beneficial Ownership [of the Foreign Currency Accounts] is Being Provided." *See* Bowman Decl., Ex. H,

BMO Harris Bank N.A. Certification Regarding Beneficial Owners of Legal Entity Customers for Prime Trust, LLC, dated November 12, 2021 (the "Beneficial Ownership Certification"). If this were a trust relationship, bank accounts would be opened in the trustee's name, "As Trustee," "TTEE (Trustee)," "In Trust For," or "For the Benefit Of (FBO)" the beneficiary. In contrast with the corporate bank accounts that hold the Foreign Currency, Prime opened certain bank accounts as trustee for its trust clients. For example, with respect to one trust client, Prime opened a bank account at Morgan Stanley using the following account ownership construction: "Prime Trust, LLC TTEE, The [] 2018 Irrevocable Trust U/A." *See* Bowman Decl., Ex. I, Morgan Stanley Statement for Prime Trust, LLC TTEE, The [] 2018 Irrevocable Trust U/A for the Period of August 1, 2023 to August 31, 2023 (the "2018 Trust Statement"). If there were a trust relationship between TrustToken and Prime, the bank account holding the Foreign Currency would have been held in a trust account and not in Prime corporate accounts where Prime designated itself as the beneficial owner.

11.     For these reasons, Prime is not in possession of the Foreign Currency as a trustee for TrustToken or any other unnamed beneficiary. The Foreign Currency is property of Prime's estate. Thus, Prime should be permitted sell the Foreign Currency.

## JURISDICTION AND VENUE

12.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). In accordance with Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"), Prime confirms its consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The statutory predicates for the relief sought herein are Bankruptcy Code sections 105 and 363, Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 6004-1.

## BACKGROUND

15.     On August 14, 2023 (the "Petition Date"), Prime commenced these Chapter 11 Cases. These Chapter 11 Cases have been jointly administered for procedural purposes only. Prime continues to manage its properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

16.     Additional information regarding Prime and these Chapter 11 Cases, including the Prime's business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the *Declaration of Jor Law, Interim Chief Executive Officer and President of Prime Core Technologies Inc., et al., in Support of Chapter 11 Petitions and First Day Motions* [Doc. No. 14] (the "First Day Decl."), which is incorporated herein by reference as if set forth in full.

17.     On September 20, 2023, this Court issued its *Final Order (I) Authorizing Debtors to (A) Continue to Operate their Cash Management System, and (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related Thereto; (II) Authorizing the Debtors to (A) Continue to Perform Intercompany Transactions and (B)*

*Granting Administrative Expense Status for Postpetition Intercompany Claims; (III) Extending the Time for the Debtors to Comply with Requirements Set Forth in 11 U.S.C. § 345(b); And (IV) Granting Related Relief* [Doc. No. 170] (the "Cash Management Order"). The Cash Management Order provides that "the Debtors shall not use or transfer funds, except as otherwise required by Bankruptcy Code section 345, from Customer Accounts to honor any prepetition obligations or pay any postpetition obligations absent further order of the Court." Cash Management Order ¶ 8. Thus, this Motion is necessary for Prime to sell the Foreign Currency.

## A.    The Agreements

18.     One of Prime's primary services was "custody services [which] enable[d] quick and secure custody or sub-custody of both fiat and digital assets." *See* First Day Decl. ¶ 14. Prime's platform supported custody for "USD and select foreign currencies," as well as "over 200 types of digital assets, including BTC, ETH, and LTC, stablecoins like USDT and USDC, and many ERC-20 compliant cryptocurrencies." *Id.*

19.     Customers primarily used Prime's services to engage in crypto and fiat money transmission without having to obtain state-by-state MTLs. Most states require that a money transmitter be licensed,[6] but applying for an MTL is a lengthy, capital-intensive process and there is no guarantee that the applicant will be successful.[7] State bank regulators are traditionally more diligent when it comes to crypto companies and obtaining MTLs for those in the crypto

---

[6]    *See, e.g.*, Del. Code, tit. 5, § 2303 ("No person . . . shall engage in . . . the business of receiving money or transmitting the same without having first obtained a license hereunder."); Nev. Rev. Stat. § 671.040 ("A person shall not engage in the business of money transmission . . . unless the person . . . [h]as been issued a license pursuant to this chapter.").

[7]    For example, the (non-refundable) application fee to submit for an MTL in Texas is $10,000.    *See TX-DOB Money Transmission License New Application Checklist (Company)*, NMLS, https://mortgage.nationwidelicensingsystem.org/slr/PublishedStateDocuments/TX-DOB-Money_Transmission-Company-New-App-Checklist.pdf ("Texas NMLS Checklist") (last visited Nov. 10, 2023). Texas will also charge an investigation fee for processing applications "that take longer than normal or where an onsite investigation is necessary." *Id.* This does not include other fees and costs associated with satisfying and remaining in compliance with a state's licensure requirements.

industry is becoming increasingly more costly and time-consuming.[8] Many states have additional

MTL application requirements that only apply to applicants that intend to incorporate crypto in

their business model.[9] However, because many states contain exemptions from their MTL

requirements for trust companies,[10] Prime is permitted to conduct money-transmission services

for TrustToken and other customers in most U.S. jurisdictions. *See* First Day Decl. ¶ 12. By

contracting with Prime, TrustToken essentially purchased the right to conduct money

transmission across the country by having Prime facilitate those transactions. *See id.*

      20.     Prime's contractual relationship with TrustToken, is governed by the MSA. *See*

---

[8]    *See* Natalie Smolenksi, *Regulator Shutdown of Signature, SVB and Silvergate Banks Raises Questions About Neutrality*, FORBES (Mar. 17, 2023), https://www.forbes.com/sites/digital-assets/2023/03/17/regulators-shut-down-banks-raising-questions-about-neutrality/?sh=65d488e57185 (noting the "scrutiny under existing . . . money transmission . . . laws" faced by the crypto industry).

[9]    In Connecticut, an applicant for an MTL who also engages in "virtual currency activities" must maintain a net worth of $1,000,000 and post a surety bond of $1,000,000. *See CT Money Transmission License New Applicant Checklist (Company)*, NMLS, https://mortgage.nationwidelicensingsystem.org/slr/PublishedStateDocuments/CT_Money_Transmission_License-New-App-Checklist.pdf (last visited Nov. 10, 2023). Applicants who do not engage in "virtual currency activities" are only required to post a surety bond of $1,000,000 if they have an anticipated transaction volume greater than $500,000 in a twelve-month period. *See id.*

In Louisiana, a company must obtain a separate virtual currency license if it wishes to conduct "virtual currency business activity" in addition to a traditional MTL. *See* LA. STAT. § 6:1384. This separate license fee alone is $5,000. *See LA Virtual Currency Business Activity License New Application Checklist (Company)*, NMLS, https://mortgage.nationwidelicensingsystem.org/slr/PublishedStateDocuments/Revised_LA_Virtual_Currency_Business_Activity_License___Company-New_App-Checklist.pdf (last visited Nov. 10, 2023).

North Carolina provides its banking "Commissioner . . . the discretion to require the applicant to obtain additional insurance coverage to address related cybersecurity risks inherent in the applicant's business model as it relates to virtual currency transmission and to the extent such risks are not within the scope of the required surety bond." N.C. GEN. STAT. § 53-208.47

Texas recently enacted the "Digital Asset Service Providers" law applicable to money transmitters with virtual currency in their business model. *See* TEX. FIN. CODE § 160.001 *et seq.* Although Texas does not require an entity to obtain a separate license, the statute contains numerous requirements, including how customer funds are to be maintained, the creation of a plan to allow a customer to quarterly view an accounting of their assets and liabilities owed, auditor access to same, and the filing of an annual report concerning assets (separate and apart from year-end audited financial statements of an entity). *See* TEX. FIN. CODE § 160.004. In addition, applicants "with business plans revolving around virtual currency" must submit an addendum to their business plans detailing the virtual currency products and services offered, including financials, customer agreements, and disclosures. *See* Texas NMLS Checklist.

[10]  *See, e.g.*, DEL. CODE, TIT. 5, § 2304 ("No license shall be required hereunder of . . . trust companies . . ."); N.Y. BANKING LAW § 641 ("No person shall engage in the business of . . . receiving money for transmission or transmitting the same, without a license . . . provided, however, that nothing in this article shall apply to a . . . trust company . . .").

MSA.; *see also* First Day Decl. ¶ 15. The MSA makes clear that ***no fiduciary relationship***

***existed*** between Prime and its customers:

> ***Relationship***. The Parties are independent contractors. ***The Agreement does not create a*** partnership, franchise, joint venture, agency, ***fiduciary*** or employment ***relationship between the Parties***. Except as set forth in the Agreement, nothing in the Agreement, expressed or implied is intended to give rise to any third-party beneficiary.

MSA § 14.1 (emphasis added).

21.     TrustToken was also subject to the Custodial Agreement. *See* Custodial

Agreement. The Custodial Agreement provides in relevant part:

> . . . If Prime Trust offers Fiat Services, and Customer accepts Fiat Services, Prime Trust may: . . . (b) ***otherwise use or invest such cash or Fiat Currency at Prime Trust's own risk***. Without limiting the foregoing, ***Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency***, subject to Prime Trust's obligation to return Fiat Currency to Customer in accordance with this Service Schedule. Prime Trust may receive earnings or compensation for an omnibus account either in the form of services provided at a reduced rate, the payment of any shareholder service fees, or similar compensation, and Prime Trust may receive earnings or income from using or investing cash or Fiat Currency as described herein. ***Customer agrees that any such earnings, income or compensation shall be retained by Prime Trust and no portion of any such earning, income or compensation shall be paid to or for Customer*** . . .

Custodial Agreement § 2.7(b) (emphasis added).

22.     The Custodial Agreement further permits:

> Prime Trust [to], for convenience, ***take and hold title to Custodial Property and any part thereof in its own name*** with Customer's ownership of Custodial Property segregated on Prime Trust's books and records.

Custodial Agreement § 2.9 (emphasis added).

23.     Thus, the Custodial Agreement authorized Prime to (i) use or invest fiat currency

that TrustToken and other customers deposited on Prime's platform, with all attendant rights of

ownership and without having to maintain equivalent amounts of such fiat currency in its

possession, (ii) retain any earnings derived from investing customer fiat currency, and (iii) take

and hold title to any custodial property TrustToken deposited. *See* Custodial Agreement §§

2.7(b), 2.9.

24.    TrustToken develops and provides to its customers stablecoins whose values are

supposed to be pegged to corresponding fiat currencies.[11] *See* TrustToken Terms. TrustToken

describes itself as "an online environment to mint '1CAD', '1GBP', '1AUD' and other stable

cryptocurrency tokens . . . for Canadian Dollars, British Pounds Sterling, Australian Dollars and

other fiat currencies, respectively."[12] TrustToken Terms, § 2.

25.    Customers obtain TrustToken's stablecoins by depositing fiat currency with

TrustToken and receiving corresponding TrustToken stablecoins in exchange.[13] According to

TrustToken, its stablecoins "are fully backed by the currency used to mint them at issuance, cash

equivalents, short-term government securities, or liquid investments denominated in the same

underlying currency." *See* TrustToken Terms, § 4. TrustToken further claims that customers

"may also redeem [TrustToken] Stablecoin tokens for the respective fiat currency on the

---

[11]    Stablecoins are "stable" because their value is purportedly "pegged" to a "stable" asset such as the U.S. dollar or, in the case of TrustToken's stablecoins, other fiat currencies. The purpose of stablecoins is to allow users to transact without the volatility of other cryptocurrencies.

[12]    TrustToken appears to be in the process of rebranding its stablecoins in conjunction with its overall rebrand as "Archblock." Previously, TrustToken referred to its stablecoins as "TrueUSD," "TrueGBP," *etc.*, as is demonstrated by a prior version of TrustToken's terms of use (which contains the same language as is quoted above from the current TrustToken Terms, with exceptions related to the "Archblock" rebrand). *See* Evans Decl., Ex. B, TrueCoin Terms of Use last modified November 12, 2020 (TrustToken describes itself as "an online environment to mint TrueUSD, TrueGBP, and other stable cryptocurrency tokens . . . for US Dollars, British Pounds Sterling, and other fiat currencies, respectively").

TrueUSD currently has a $3,330,735,733 market cap. *See* *TrueUSD*, COINMARKETCAP.COM, https://coinmarketcap.com/currencies/trueusd/ (last visited Nov. 9, 2023). TrueUSD is the fourth largest stablecoin in the world. *See* *Top Stablecoin Tokens by Market Capitalization*, COINMARKETCAP.COM, https://coinmarketcap.com/view/stablecoin/ (last visited Nov. 9, 2023).

[13]    *See Mint and Redeem TrueCurrencies*, TRUSTTOKEN.COM, https://app.trusttoken.com/signup-or-signin ("TrustToken Mint and Redeem App") (last visited Nov. 6, 2023).

Platform."[14] *Id.*; *see also* TrustToken Mint and Redeem App.

26.    TrustToken does not maintain any of its own MTLs.[15] Instead, TrustToken has

avoided the MTL application process by taking advantage of Prime's status as a trust company.

27.    On May 23, 2022, Prime and TrustToken executed the Order Form whereby

TrustToken engaged Prime's custodial services for the Foreign Currency reserves TrustToken

held for its customers who minted TrustToken's stablecoins. *See* Order Form. The parties also

agreed to the Renewal Form—a renewal of the Order Form for the period of May 23, 2023 to

May 22, 2024. *See* Renewal Form. Both the Order Form and Renewal Form are governed by the

MSA and the Custodial Agreement. *See* Order Form ("This Order Form is governed by the

Prime Trust Master Services Agreement . . . [and] the Service Schedule(s) and Attachment(s)

that are applicable based on the services provided by Prime Trust under this Order Form");

Renewal Form (same).

28.    Prime holds the Foreign Currency in bank accounts (the "BMO Accounts") with

BMO Harris Bank N.A. ("BMO"). [*See* Doc. No. 328-1 (the "BMO Treasury Services

Agreement")]; *see also* Prime Trust LCC FX Accounts. The BMO Accounts are identified as

"Prime Trust LLC [FX] Account" and the agreements between Prime and BMO for the BMO

Accounts do not designate the BMO Accounts as being held for the benefit of any party other

than Prime. *See* Prime Trust LCC FX Accounts.

---

[14]    In other words, TrustToken accepts fiat currency from its customers and in exchange provides them with stablecoins whose values are pegged to a corresponding fiat currency (*i.e.*, a customer provides one GBP to TrustToken and receives one TrueGBP in exchange). TrustToken also claims to its customers that it keeps the fiat currencies that customers deposit with TrustToken safe in the form of cash, cash equivalents, or highly liquid investments. Because TrustToken maintains that its stablecoins are "fully backed" by these reserves, it further claims that customers are at any time able to "redeem" the fiat currency they deposited in exchange for TrustToken's stablecoins (*i.e.*, a customer returns the one TrueGBP they received from TrustToken in exchange for the one GBP that they or someone else deposited with TrustToken to receive the TrueGBP in the first place).

[15]    As of November 2, 2023, a search for both "TrustToken" and "Archblock" on the NMLS consumer access revealed no state MTLs ever issued in either name. *See* NMLS Consumer Access, https://www.nmlsconsumeraccess.org/Home.aspx/SubSearch.

29.    In fact, in the Certification Regarding Beneficial Owners of Legal Entity
Customers that Prime completed on November 12, 2021 in connection with the BMO Accounts,
Prime identified "Prime Trust, LLC"—and no other party—as the "Legal Entity for Which
Beneficial Ownership is Being Provided." *See* Beneficial Ownership Certification. Moreover,
despite having the option to designate the BMO Accounts as eligible for "Pass-Through Deposit
Insurance"—that would allow for the deposit insurance covering the Foreign Currency to "pass
through" Prime to a beneficial owner of the Foreign Currency—Prime did not declare that the
BMO Accounts were opened "on behalf of [a] beneficiary owner." *See* Bowman Decl., Ex. J,
BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions dated July 2021
("BMO Terms") § 38.

30.    According to social media reports, it appears that the Foreign Currency deposited
by TrustToken constituted nearly the entirety of the reserves for TrustToken's stablecoins
pegged to non-USD fiat currencies.  Apparently, the ability for TrustToken's stablecoin holders
to "mint and redeem" was reliant on Prime's services.

31.     Following Prime's suspension of service, TrustToken issued the following

statement:



PrimeTrust has suspended all deposits of fiat and digital assets. #TrueUSD (#TUSD) is not affected by this situation. We have no exposure to Prime Trust and maintain multiple USD rails for minting and redemption. Rest assured, all your funds are safe with TUSD.

11:09 AM · Jun 22, 2023 · 373K Views                                                    [16]

32.     Media and social media reports posted supposed emails sent by TrustToken to its

clients on the same day, including the following:[17]

> **Dear TUSD User,**
>
> **We are reaching out to you to inform you that our banking partner, Prime Trust, is halting all deposits and disbursements. Unfortunately, this means that you will be unable to mint and redeem TUSD as well as any of our TrueCoin's including TAUD, TCAD, and TGBP while Prime Trust operations are suspended.**
>
> **This suspension of services at Prime Trust was issued by order of the Nevada Financial Institution Division, which was received on Wednesday, June 21st, 2023. We will be in regular contact with the team at Prime Trust to determine the next steps and will update you as we receive further clarification on the situation.**
>
> **We apologize for the inconvenience that this may cause. If you have any questions regarding TUSD, please contact support@trueusd.com and for our TrueCoins at support@truecoin.com.**
>
> **Sincerely,**
>
> **TrueUSD Team.**

---

[16]     TrueUSD (@tusdio), X (Jun. 22, 2023 11:09 am ET), https://twitter.com/tusdio/status/1671898163039596544. In December 2020, TrustToken sold TrueUSD to Techteryx, a firm incorporated in the British Virgin Islands. *See* Jamie Crawley, *Stablecoin TrueUSD Owner Techteryx to Take Full Control of Operation*, COINDESK (Jul. 13, 2023), https://www.coindesk.com/business/2023/07/14/stablecoin-trueusd-owner-techteryx-to-take-full-control-of-operation/. However, TrustToken still "continued to manage [TrueUSD's] operations" until July 13, 2023, when Techteryx announced that it was assuming "full management" over TrueUSD and its operations. *Id.* TrueUSD sent the above-referenced post on June 22, 2023, which is when TrustToken still controlled TrueUSD's operations.

[17]     Oluwapelumi Adejumo, *TrueUSD maintains it has no exposure to Prime Trust despite community claims*, CRYPTOSLATE (Jun. 23, 2023), https://cryptoslate.com/trueusd-maintains-it-has-no-exposure-to-prime-trust-despite-community-claims/.

33.    TrustToken issues "Independent Accountant Reports" comparing the fiat currencies held as reserves to the issuing stablecoin and evaluates whether the company-issued "Escrow Holdings Report" is accurate.[18] For example, on June 22, 2023, the same day of the post concerning Prime suspending withdrawals, TrustToken's COO issued an Escrow Holding Report stating that "the AUD balance held in escrow accounts are the total balance held by TrueCoin, LLC at federally insured U.S. depository institutions" and that it has "evaluated subsequent events through the date the report is available to be issued and has determined that there are no subsequent events that require disclosure." Evans Decl., Ex. C, TrustToken Independent Accountant's Report and TrueAUD Escrow Holdings Report dated June 22, 2023. At the time of that Escrow Holding Report and corresponding Independent Accountant Report, $6,798,403.98 AUD of the total reserves of $7,674,207.58 AUD were held in Prime's name in Prime's corporate bank account. *See id.*; *see also* Bowman Decl., Ex. K, Prime Trust LLC AUD BMO Account for the Period of June 1, 2023 to June 30, 2023. By June 22, 2023, Prime had already halted all withdrawals and transactions.

**B.    The Proposed Sale**

34.    Prime currently holds $8,867,904 million worth of AUD, CAD, EUR, GBP, and JPY.[19] *See* Prime Trust LCC FX Accounts. Prime acquired the Foreign Currency from TrustToken.

35.    Prime is seeking approval of the sale of the Foreign Currency under Bankruptcy

---

[18]    TrustToken makes these "Independent Accountant Reports" available to the public on its website. *See Archblock Stablecoins*, ARCHBLOCK.COM, https://www.archblock.com/stablecoins.

[19]    This figure is based on the conversion rates as of October 31, 2023. The Foreign Currency consisted of 6,793,581.39 AUD, 2,810,029.40 CAD, 410 EUR, 2,096,887.69 GBP, and 99 JPY. *See* Prime Trust LCC FX Accounts.

Code section 363(b).[20] The Foreign Currency's value is determined by established market prices at the time of each sale, and thus Prime would not benefit from a marketing and auction process for the sale of the Foreign Currency.[21] There is a liquid market for the Foreign Currency, and Prime's estate would benefit from Prime converting the Foreign Currency into U.S. dollars quickly and efficiently.

## RELIEF REQUESTED

36.     By this Motion, Prime seeks entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, authorizing Prime to sell the Foreign Currency, as appropriate, free and clear of all liens, claims, and encumbrances, without further notice or a hearing. Prime also requests authority to pay all necessary fees and expenses incurred with respect to the sales of the Foreign Currency.

## BASIS FOR RELIEF REQUESTED

### A.    The Foreign Currency is Estate Property

37.     The Foreign Currency constitutes property of Prime's estate because the Agreements between Prime and TrustToken make clear that the parties' contractual relationship was one of debtor-creditor, not a trust or fiduciary relationship. *See In re Amp'd Mobile, Inc.*, 377 B.R. 478, 485 (Bankr. D. Del. 2007) (holding that assets held by the debtor were property of the estate because "the parties' contractual relationship gave rise to a debtor-creditor, and not a fiduciary, relationship.").

38.     The Bankruptcy Code defines "property of the estate" as "all legal or equitable

---

[20]   Regardless of whether the sale of the Foreign Currency is considered a sale under Bankruptcy Code section 363(b) or under Bankruptcy Code section 363(c), because Prime is requesting an order authorizing the sale free and clear liens, claims and encumbrances under section 363(f), Prime is required to seek authority to sell the Foreign Currency through this Motion. *See* FED. R. BANKR. P. 6004(c).

[21]   *See Foreign Exchanges Rates – H.10*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, https://www.federalreserve.gov/releases/h10/current/

interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

The Third Circuit has emphasized "that Section 541(a) was intended to sweep broadly to include

all kinds of property, including tangible and intangible property . . . The term 'property' has been

construed most generously and an interest is not outside its reach because it is novel or

contingent or because enjoyment must be postponed." *In re Majestic Star Casino*, LLC, 716 F.3d

736, 750 (3d Cir. 2013) (citations omitted); *see also In re THG Holdings LLC*, 604 B.R. 154, 160

(Bankr. D. Del. 2019) (noting that "[i]t is well settled in the Third Circuit that section 541(a)(1)

was intended to sweep broadly"); *In re Street*, 214 B.R. 779, 780 (Bankr. W.D. Penn. 1997)

(stating that section 541 "defines property of the estate broadly enough to apply to a mere

possessory interest in personal property").

39.     Property held by a debtor is presumed to be property of the estate unless a creditor

can establish that an exception applies. *See* 11 U.S.C. § 541; *see also In re Amp'd Mobile*, 377

B.R. at 483 ("Property held by a debtor is presumed to be property of the estate . . . and unrelated

commercial entities are presumed by the Court to be in a debtor-creditor relationship, rather than

a fiduciary relationship, absent evidence that the parties intended a more substantial

relationship.").

40.     Bankruptcy Code section 541 creates an exception to this presumption where a

debtor holds property in trust for the benefit of another party, such as a where the parties

intended to establish a trust relationship. *See* 11 U.S.C. § 541(b)(1), (d). "[A]lleged beneficiaries

of a trust . . . bear the burden of (1) demonstrating that the trust relationship and its legal source

exist, and (2) identifying and tracing the trust funds if they have been commingled with non-trust

funds." *In re Cath. Diocese of Wilmington, Inc.*, 432 B.R. 135, 147 (Bankr. D. Del. 2010).

41.     For the reasons that follow, the Agreements here do not form a trust relationship

between Prime and TrustToken and instead form a debtor-creditor relationship.

**(1)    Prime Disclaimed Any Fiduciary Relationship**

42.    Prime explicitly disclaimed any fiduciary relationship with TrustToken in the

Agreements. A trust relationship necessarily is a fiduciary relationship. *See, e.g.*, *See* NEV. REV.

STAT. § 162.020(1)(b) ("'Fiduciary' includes a trustee under any trust, expressed, implied,

resulting or constructive . . ."); *Wishengrad v. Carrington Mortg. Servs.*, 529 P.3d 880, 886

(Nev. Adv. Op. 2023) (stating that "traditionally, a trust was not considered a distinct legal

entity, but a fiduciary relationship between multiple people") (alteration omitted) (quoting

*Americold Realty Trust v. Conagra Foods, Inc.*, 577 U.S. 378, 383 (2016)); *Thomas & Kathleen*

*Garland Fam. Tr. v. Melton*, 460 P.3d 31 (Nev. App. 2020) (noting that "a trust is not a person

but rather a fiduciary relationship with respect to property") (quotations and citation omitted);

*see also In re Penn Cent. Transp. Co.*, 486 F.2d 519, 524 (3d Cir. 1973) (noting that "[a] trust is

defined" as "a fiduciary relationship with respect to property, subjecting the person by whom the

title to the property is held to equitable duties to deal with the property for the benefit of another

person, which arises as a result of a manifestation of an intention to create it.") (alteration

omitted) (quoting RESTATEMENT (SECOND) OF TRUSTS § 2 (1959). Put simply, without a

fiduciary relationship there can be no trust.

43.    In *Koken v. First Hawaiian Bank*, the court held that a "[c]ustodial [a]greement"

did not create a trust relationship between an insurance company and a bank. 230 F.3d 1367 (9th

Cir. 2000). In rejecting the insurance company's claim that the bank violated fiduciary duties

towards it, the court noted that the custodial agreement between the parties limited the duties that

the bank owed to the insurance company and "specifically disclaim[ed] [the bank] from any

implied duties owed to [the insurance company]." *Id.* By "plac[ing] limits on [the bank's] alleged

fiduciary responsibilities," the custodial agreement in *Koken* "thereby negat[ed] the existence of

a fiduciary relationship." According to the court, both parties were "sophisticated institutions" and "fiduciary relationships should not be inferred absent unequivocal contractual language." *Id.* (quoting *First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co.*, 919 F.2d 510, 514 (9th Cir. 1990)). Thus, "[a]lthough the term 'trust' [was] used in several places in the [c]ustodial [a]greement, this [was] insufficient to establish the requisite intent" required to create a trust relationship between the parties. *Id.*

44.     Here, the MSA does far more than limit the duties that Prime owed to TrustToken. The MSA explicitly states that it "does ***not*** create a . . . fiduciary . . . relationship between the Parties." MSA § 14.1 (emphasis added). Both Prime and TrustToken are "sophisticated institutions" that were perfectly capable of including language necessary to evince an intent to form a fiduciary relationship if the parties intended to create such a relationship. They instead chose to include language unequivocally disclaiming any fiduciary responsibilities. This therefore negates any argument that the parties ever intended to or did in fact create a fiduciary relationship. Accordingly, because there is no fiduciary relationship between Prime and TrustToken, there can be no trust relationship between the parties.

### (2)     The Agreements Are Not Trust Agreements Under Nevada Law

45.     The Agreements do not form a trust relationship under Nevada law. [22] Bankruptcy courts "look to state law to determine whether [a] claimant has shown a trust relationship" for purposes of determining whether property is part of a debtor's estate. *See City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994). The Agreements are governed

---

[22]     As a trust company, Prime can enter into any number of contracts, including a debtor-creditor agreement with its customers. *See* NEV. REV. STAT. § 669.210(j) ("Each retail trust company may, in the conduct of its business, within and outside this State . . . [e]xercise the powers of a business corporation or limited-liability company organized or qualified as a foreign corporation or limited-liability company under Nevada law and any incidental powers that are reasonably necessary to enable it to fully exercise, in accordance with commonly accepted customs and usages, a power conferred in this chapter.").

under the laws of the State of Nevada. *See* MSA § 13.1 ("The [MSA] is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws."). Nevada maintains a statutory framework governing the law of trusts, which contains strict requirements to establish a trust. *See* NEV. REV. STAT. §§ 163.001, *et seq.*

46.     Nevada law defines the term "[t]rust" to "mean[] an express trust created by a trust instrument, including a last will and testament." NEV. REV. STAT. § 163.490. Thus, for the Agreements to establish a trust relationship between Prime and TrustToken, they must constitute a "trust instrument" that "creates or defines the duties and powers of a trustee." *See* NEV. REV. STAT. § 163.00185. Every trust under Nevada law must also have a "trustee," "settlor," and "beneficiary." *See* NEV. REV. STAT. § 163.006. Furthermore, "[a] trust is created ***only if*** there is a beneficiary." *Id.* (emphasis added). This "requirement is satisfied if the trust instrument provides for . . . a beneficiary or class of beneficiaries that is ascertainable with reasonable certainty or that is sufficiently described so that it can be determined whether a person meets the description or is within the class." *Id.* Nevada law also provides that a trust settlor must "manifest[] an intention to create a trust." NEV. REV. STAT. § 163.003(1). The Agreements here do not satisfy any of these requirements to establish a trust relationship under Nevada law.

47.     The Agreements do not identify a "trustee" nor purport to "create[] or define[] the duties and powers of a trustee." Instead, the Agreements authorize Prime to undertake certain actions involving the Foreign Currency that are fundamentally ***antithetical*** to the authority afforded to a trustee in a trust relationship, such as using and investing the Foreign Currency in Prime's own name while retaining the profits derived therefrom and holding the Foreign Currency in bank accounts in Prime's own name and that designate only Prime as the beneficial

21

owner—as is explained in further detail below.

48.    The Agreements also do not to identify a "settlor." The Agreements further do not identify TrustToken (or any other) "beneficiary" or "class of beneficiaries." In fact, the terms "beneficiary," "trustee," and "settlor" are not used in any of the Agreements. [23]

49.    Moreover, the Agreements here look nothing like the agreements Prime has executed where Prime actually intended to create a trust relationship. *See* 2018 Trust; *see also* Bowman Decl., Ex. L, Prime Trust, LLC, Signature Page to the 2018 [] Irrevocable Trust dated December 21, 2018. A comparison of the 2018 Trust and the Agreements here is illuminating. The 2018 Trust begins unmistakably by stating: "***I intend that this instrument create a valid trust under the laws of Nevada***[.]" 2018 Trust, Article One (emphasis added). In its very first sentence, the 2018 Trust identifies its "Grantor" and Prime as its "Trustee." *Id.* In its second article, the 2018 Trust explicitly identifies who its beneficiaries are. *See* 2018 Trust, Article Two. The 2018 Trust further dedicates, among other provisions, (i) seven (7) sections intended to "Establish[] the Trust," (ii) twenty-five (25) sections describing "Trust Administration," and (iii) twenty-three (23) sections outlining "My Trustee's Powers." *See* 2018 Trust, Articles One, Twelve, and Thirteen.[24]

---

[23]    It is Prime's understanding that TrustToken held the Foreign Currency for its customers who deposited the Foreign Currency in exchange for stablecoins offered by TrustToken and possess the right to redeem their deposits with TrustToken. However, TrustToken's customer have absolutely no relationship with Prime. They do not have their own agreements with Prime. They are also not identified in any sections of the Agreements and are not identified as beneficiaries in the BMO Treasury Services Agreement, the Beneficial Ownership Certification, or the BMO Accounts. Moreover, the MSA expressly states that "nothing in the [MSA], expressed or implied is intended to give rise to any third-party beneficiary." MSA § 14.1. Thus, they have no claim over the Foreign Currency.

[24]    Referring back to section (A)(1) of this Motion's Basis for Relief Requested, the 2018 Trust references the term "fiduciary(ies)" sixty-five (65) times. *See, e.g.*, 2018 Trust Section 1.01 ("Any description that contains . . . an indication that my Trustee is holding the trust property in a fiduciary capacity will be sufficient to reasonably identify my trust."); Section 3.01 ("During any period in which this trust is sitused in Nevada, the office of Trustee must be filled by at least one individual or corporate fiduciary that satisfies all the requirements of Nev. Rev. Stat. § 166.015(2)."); Section 12.07 ("An individual serving as Trustee is entitled to fair and reasonable compensation for the services provided as a fiduciary."); Section 14.04(g) ("The term *my Fiduciary* or *Fiduciary* means a

50.     This is in stark contrast to the Agreements between Prime and TrustToken. For example, the MSA and Custodial Agreement were featured on Prime's website and consist of general terms that could apply to any of Prime's customers. The MSA and Custodial Agreement are unmistakably similar to various terms and conditions that crypto exchanges across the country provide to their customers. The Order Form and the Renewal Form are simple, boilerplate forms naming the parties and outlining certain fees to be paid to Prime. These Agreements are a far cry from the 2018 Trust, which is highly individualized and carefully drafted to ensure that it obtains the protections afforded under the Nevada trust laws.

51.     Indeed, in November 2022, Prime notified its client under the 2018 Trust that it was "w[ould] be resigning as [t]rustee" of the 2018 Trust. *See* 2018 Trust Resignation Email. The reason provided by Prime was that "[a]s Prime look[ed] to solidify [its] leadership position in the fintech and digital finance marketplace, [it] must prioritize [its] time and energy, and allocate resources where [it saw] the greatest potential for return and for positive customer impact." *Id.* Here, Prime is stating that, in November 2022, it was deciding to pivot away from traditional trust services. But more importantly, Prime is making a clear and conscious distinction between: (i) traditional trust services (*i.e.*, those services Prime provided under instruments like the 2018 Trust), and (ii) services "in the fintech and digital finance marketplace" (*i.e.*, to clients such as TrustToken under the Agreements here) which Prime did not consider to be trust services. *See id.*

52.     Prime is a public trust company and when it intended to create a trust relationship, it did so. Those trust relationships were memorialized in long-form, individualized trust

---

Trustee, Distribution Trust Advisor or Investment Trust Advisor, and refers to singular or plural, as the context may require.") (emphasis in original).

agreements—such as the 2018 Trust. Nobody would mistake the 2018 Trust as anything other than an instrument designed to create a trust relationship. TrustToken's Agreements, on the other hand, were general fintech services agreements which look nothing like the trust agreements that Prime entered with its trust clients. The Agreements between TrustToken and Prime do not contain the requisite terms necessary to establish a trust agreement. Accordingly, this Court should hold that Prime and TrustToken created a debtor-creditor relationship.

### (3) The Agreements Permit Prime to Use and Invest the Foreign Currency in Prime's Own Name and to Retain the Profits Derived from the Foreign Currency

53.     The Custodial Agreement explicitly permits Prime to use the Foreign Currency for its own benefit, including to "purchase securities or other assets" in Prime's "own name," and to "pledge, repledge, hypothecate, rehypothecate, sell" or otherwise invest the Foreign Currency "with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash of Fiat Currency." Custodial Agreement § 2.7(b). Moreover, it was Prime—and not TrustToken—that retained the right to earn profits from investment activities using the Foreign Currency. *See id.* ("Customer agrees that any such earnings, income or compensation shall be retained by Prime Trust and no portion of any such earning, income or compensation shall be paid to of for Customer . . .").

54.     Bankruptcy courts have held that where a crypto debtor possesses the right to transfer assets deposited by customers on its platform in its own discretion with all attendant rights of ownership and without any obligation to retain a like amount of assets in its possession or control, such assets are property of the debtor's estate. *See In re Celsius Network LLC*, 647 B.R. 631 (Bankr. S.D.N.Y. 2023), *leave to appeal denied*, No. 23-CV-523, 2023 WL 2648169 (S.D.N.Y. Mar. 27, 2023); *see also In re Voyager Digital Holdings, Inc. et al.*, No.22-10943 (Bankr. S.D.N.Y. Jul. 5, 2022); *Cred Inc., et al.*, No. 20-12836 (Bankr. D. Del. Nov. 7, 2020).

55.     In *Celsius*, the court held that customer crypto deposited in Celsius' interest-earning accounts was property of the Celsius estate. *See* 647 B.R. at 651. The provisions from the Celsius terms of use that the court in *Celsius* found persuasive in holding that customer crypto deposits were property of the Celsius estate are as follows:

> Celsius maintains the "the right . . . to **pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets** . . . **with all the attendant rights of ownership and to use or invest such Digital Assets** in Celsius' full discretion."

*See id.* at 640 (citing Celsius Terms of Use, Version 8 § 13) (emphasis added).

56.     Similarly, in the *Voyager* bankruptcy, the customer agreement between Voyager and its customers provided that:

> Customer grants Voyager the right . . . to hold Cryptocurrency held in Customer's Account in Voyager's name or in another name, and to **pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Cryptocurrency** . . . **with all attendant rights of ownership** . . . and **without retaining a like amount of Cryptocurrency**, or to **use and invest such Cryptocurrency at Customer's sole risk**.

*See* Evans Decl., Ex. D, Voyager Digital, LLC, Customer Agreement last updated January 7, 2022 ("Voyager Customer Agreement") § 5(D) (emphasis added).

57.     In Voyager's confirmed chapter 11 plan, Voyager did not treat its customer deposits as being held in trust. Voyager treated its customer claims the same as it treated its general unsecured claims: entitled to pro rata shares of distributions made by Voyager to creditors. *See* Evans Decl., Ex. E, *In re Voyager Digital Holdings, Inc. et al.*, No.22-10943, Doc. No. 1166-1 at 23–25 (Bankr. S.D.N.Y. Mar. 10, 2023).[25]

---

[25]     The court in *Voyager* also issued an order on consent in which it held that a very small subset of customer fiat deposits were not property of the Voyager estate. *See In re Voyager Digital Holdings, Inc.*, No. 22-10943, 2022 WL 3146796 (Bankr. S.D.N.Y. Aug. 5, 2022). In Voyager, the Debtors, the UCC, and Metropolitan Commercial Bank ("MC Bank") jointly sought this relief and no has opposed. *Id.* This "decision [was] not intended to be a ruling as to the rights that customers might have in cryptocurrency cases generally" because its decision "ha[d] been rendered without the kind of vigorous opposition by competing creditors." *Id.* at *3. With respect to this small subset of assets in the Voyager case, customer fiat was deposited into "two 'for the benefit of' (or 'FBO')

58.    The provisions from the agreements in both *Celsius* and *Voyager* are almost

identical to those found in the Custodial Agreement here:

| Prime Custodial Agreement | Celsius/Voyager Customer Agreements |
|---|---|
| Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and *pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership* and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency." *See* Custodial Agreement § 2.7(b) (emphasis added). | Celsius maintains the "the right . . . to *pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets* . . . *with all the attendant rights of ownership* and to use or invest such Digital Assets in Celsius' full discretion." *See Celsius*, 647 B.R. at 640 (citing Celsius Terms of Use, Version 8 § 13) (emphasis added). <br><br> Customer grants Voyager the right . . . to hold Cryptocurrency held in Customer's Account in Voyager's name or in another name, and to *pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Cryptocurrency* . . . *with all attendant rights of ownership* . . . and *without retaining a like amount of Cryptocurrency*, or to *use and invest such Cryptocurrency at Customer's sole risk*. See Voyager Customer Agreement § 5(D) (emphasis added). |

59.    Moreover, in Cred's confirmed chapter 11 plan, Cred similarly did not treat its

customer deposits as being held in trust. Instead, Cred's plan stated: "For the avoidance of any

doubt . . . *any Customer Claim is a General Unsecured Claim* to the extent that it is not secured

by a valid and enforceable right of setoff under section 553 of the Bankruptcy Code or for any

portion that is in excess of any such right of setoff[.]" *See* Evans Decl., Ex. F, *Cred Inc., et al.*,

---

accounts held at Metropolitan Commercial Bank ('MC Bank')." *Id.* at *1. "The bank statements for the main FBO Account were issued in the name of 'Metropolitan Commercial Bank FBO Voyager Customers.'" *Id.* at *2. At a court hearing on the issue of the ownership of the Voyager fiat accounts, MCB "acknowledged that 'FBO' accounts generally hold funds that are administered by one entity but that belong to someone else." *Id.* at *3. MCB also confirmed at the hearing that "pursuant to the terms of the FBO Agreement, Voyager itself [was] not permitted to hold or to take ownership of customer funds." *Id.* Finally, Voyager's customer agreement provided, in relevant part, that "each Customer is a customer of [MCB]." *Id.* at *1.

No. 20-12836, Doc. No. 629-1 at 8 (Bankr. D. Del. Mar. 11, 2021) (emphasis added). Cred characterized its agreements with customers as "a loan of assets" to Cred which "function[ed] in some ways like a bank deposit account"—in other words, Cred could use the crypto loaned to it under these agreements to earn interest. *See* Evans Decl., Ex. G, Cred, LLC, Sample Enhanced Yield Agreement.

60.     The court in *Celsius* did not hold that Celsius held the crypto deposited on its platform in trust for its customers because of the provisions of its customer agreement. The confirmed chapter 11 plans in *Voyager* and *Cred* also did not treat customer crypto deposits as being held in trust for customers and instead treated customers the same as unsecured creditors. This Court should hold similarly based on the Agreements here.

### (4)     Prime Holds the Foreign Currency in Bank Accounts in Prime's Own Name and Did Not Designate TrustToken as Beneficiary

61.     Prime held the Foreign Currency in bank accounts in Prime's own name and did not hold them "FBO" any party other than Prime. The Custodial Agreement expressly permits "Prime Trust [to], for convenience, take and hold title to Custodial Property or any part thereof in its own name with Customer's ownership of Custodial Property segregated on Prime Trusts' books and records." Custodial Agreement § 2.9. In line with the Custodial Agreement, Prime did in fact take and hold title to the Foreign Currency. Prime has always held, and currently holds, the Foreign Currency in accounts at BMO that are identified as "Prime Trust LLC [FX] Accounts." *See* Prime Trust LCC FX Accounts.

62.     Neither the agreements governing the BMO Accounts nor the BMO Accounts themselves indicate that TrustToken or any party other than Prime are the owners of the BMO Accounts. *See* BMO Treasury Services Agreement; BMO Terms. Instead, Prime designated itself—and only itself—as the beneficial owner of the BMO Accounts. *See* Beneficial Ownership

Certificate. Indeed, Prime was even presented with the option to designate the BMO Accounts for "Pass-Through Deposit Insurance" "on behalf of the beneficial owner" and chose not to do so. *See* BMO Terms.[26]

63.     When Prime actually formed trust agreements with its customers it banked those customers in an entirely different way. For example, in connection with the 2018 Trust, Prime opened up its corresponding bank account under the following name: "Prime Trust, LLC ***TTEE, The [] 2018 Irrevocable Trust U/A***." *See* 2018 Trust Statement (emphasis added). When Prime wanted to open a bank account for property Prime was holding as trustee on behalf of another, it knew how to do so. When Prime wanted to open a bank account for its own property, it did so in its own name and designated itself as the beneficial owner. And that is exactly what Prime did with the BMO Accounts holding the Foreign Currency.

64.     In sum, all of the above factors demonstrate that the parties clearly had no intention to create—and, in fact, did not create—a trust relationship. *See In re Foster's Est.*, 411 P.2d 482, 484 (Nev. 1966) ("It is essential to the validity of a trust, whether express or precatory, that the language employed definitely indicate an intention to create a trust, that the subject matter thereof be certain, and that the beneficiaries be certain."); *see also Washoe Cnty. Sch. Dist. v. White*, 396 P.3d 834, 838 (Nev. 2017) ("When interpreting a contract, this court looks to the language of the agreement and the surrounding circumstances in order to discern the intent of

---

[26] Prime has also previously commingled foreign currency assets—including foreign currency assets deposited by TrustToken under prior agreements—with company and other customer assets. *See* Bowman Decl., Ex. M, Prime Trust LLC Alliance Bank of Arizona Statement for the Period of December 1, 2021 to December 31, 2021. While the commingling occurred under prior agreements with TrustToken, this further demonstrates that Prime never intended to hold these assets in any trust or fiduciary relationship. *See In re Amp'd Mobile*, 377 B.R. at 485 ("Substantial indicia supporting an inference of a fiduciary or trust relationship—such as clear and explicit language in the governing documents, affirmative statements in governing documents that the Debtor would have no interest in the Premiums, segregation of Premiums, a chronology of payments requiring the Debtor to remit only those Premiums actually received from its customers—are lacking here. Accordingly, the Court concludes that the parties' contractual relationship gave rise to a debtor-creditor, and not a fiduciary, relationship.").

the contracting parties.").

65.     None of the circumstances surrounding the relationship between Prime and

TrustToken evidence an intent to form a trust relationship because TrustToken's actual intent

was to take advantage of Prime's status as a trust company and Prime's MTLs. TrustToken did

not engage Prime's services because TrustToken was seeking out a trustee to hold the Foreign

Currency on behalf of TrustToken or its stablecoin holders. Instead, TrustToken—which held no

MTLs of its own—engaged Prime's custodial services so that TrustToken could bypass the

lengthy and costly process of applying for MTLs in jurisdictions throughout the United States.

By engaging Prime's custodial services, TrustToken was able to leverage Prime's regulatory

status and engage in money transmission via Prime. Prime was one of the very few market

participants that could provide this service for TrustToken. Creating a trust relationship with

Prime was never part of the equation for TrustToken and the circumstances of their relationship

make this apparent. Thus, because the parties did not—and never intended to—create a trust

relationship, they formed only a debtor-creditor relationship.[27] As such, the Foreign Currency is

---

[27]     Imposition of a constructive trust would also be inappropriate here. Under Nevada law, a constructive trust "redresses unjust enrichment." *Bemis v. Est. of Bemis*, 967 P.2d 437, 441 (Nev. 1998) (internal quotations and citation omitted). Nevada courts have held that a "constructive trust 'exists where: (1) a confidential relationship exists between the parties; (2) the retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice.'" *Id.* (quoting *Locken v. Locken*, 650 P.2d 803, 805 (Nev. 1982)). None of these factors are satisfied here.

First, the case law suggests that a "confidential relationship" is the same or akin to a fiduciary relationship. *See Locken*, 650 P.2d at 805 (defining "confidential relationship" as a "close familial relationship of trust and confidence"); *see also In re Opus E., LLC*, 528 B.R. 30, 106 (Bankr. D. Del. 2015) (constructive trust may "aris[e] from breach of fiduciary duty"); *In re Amp'd Mobile*, 377 B.R. at 484 (holding that the "imposition of a constructive trust" was not warranted where there was no fiduciary relationship). Here, Prime explicitly disclaimed any fiduciary obligations towards TrustToken. Bankruptcy courts are hesitant to impose constructive trusts because "the practical effect of a constructive trust in a bankruptcy case is to elevate a plaintiff's claim above the claims of all other creditors." *In re Vaughan*, 471 B.R. 263, 287 (Bankr. D.N.M. 2012) (internal citations omitted). Bankruptcy courts also will not impose a constructive trust when there is exists another adequate remedy at law. *See In re Ikon Weapons*, 650 B.R. at 688 ("[T]he plaintiff must also establish that it is without an adequate remedy at law unless a constructive trust is imposed."). Here, TrustToken has another adequate remedy at law: the bankruptcy process. As a creditor of Prime, TrustToken will be entitled to its pro rata share of Prime's remaining assets. To treat TrustToken differently than other creditors would not effectuate justice in these Chapter 11 Cases. For these reasons, a constructive trust is not warranted.

estate property.[28]

## B.    The Foreign Currency Sales are Appropriate Under Bankruptcy Code Section 363(b)

66.    Prime is seeking approval of the sale of the Foreign Currency under Bankruptcy

Code section 363(b).[29] Bankruptcy Code section 363(b)(1) provides, in relevant part, that a

debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Bankruptcy

Code section 363 does not specify a standard for determining when it is appropriate for a court to

authorize the use, sale, or lease of property of the estate, bankruptcy courts routinely authorize

sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.

*See Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (the court will typically

"defer to the trustee's judgment so long as there is a legitimate business justification"); *see also*

*In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir.1992) (approval of section 363(b) sale is

appropriate if good business reasons exist for such sale); *Stephens Indus. Inc. v. McClung*, 789

F.2d 386, 390 (6th Cir. 1986) (approving a sale of assets pursuant to section 363(b)); *In re Lionel*

---

[28]    Any claim of a principal-agent relationship would fail because an essential element of a principal-agent relationship is a fiduciary duty on behalf of the agent towards the principal and Prime here explicitly disclaimed any fiduciary relationship towards TrustToken. *See LeMon v. Landers*, 402 P.2d 648, 649 (Nev. 1965) ("An agent, such as respondent in these circumstances, owes to the principal the highest duty of fidelity, loyalty and honesty in the performance of the duties by the agent on behalf of the principal."); *see also Hoopes v. Hammargren*, 725 P.2d 238, 242 (Nev. 1986) ("A fiduciary relationship is deemed to exist when one party is bound to act for the benefit of the other party. Such a relationship imposes a duty of utmost good faith.").

A bailment theory fails too. *See Borenstein v. Animal Found.*, 526 F. Supp. 3d 820, 838 (D. Nev. 2021) ("A bailment exists when there is a delivery of personal property by one person (the bailor) to another (the bailee) who holds the property for a certain purpose under an express or implied-in-fact."); *see also Kula v. Karat, Inc.*, 531 P.2d 1353, 1355 (Nev. 1975) ("[A]s long as the [bailment] relationship exists a bailee may not, in any case dispute or deny the title of the bailor . . ."). Here, any claim of a bailor-bailee relationship fails because Prime was authorized to use the property for any purpose, even for its own benefit. This fails the "express purpose" requirement of a bailor-bailee relationship.

[29]    Through this Motion, Prime is seeking to convert (or sell) the Foreign Currency pursuant to Bankruptcy Code section 363, thereby triggering Local Rule 6004-1. However, the "sale" contemplated here is not a sale in the traditional sense, and as such, the requirements set forth in Local Rule 6004-1(b) do not apply.

*Corp.*, 722 F.2d 1063,1071 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R.

147, 153 (Bankr. D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (Bankr.

D. Del. 1991); *In re Trans World Airlines, Inc.*, Case No. 01- 00056, 2001 Bankr. LEXIS 980, at

*29 (Bankr. D. Del. Apr. 2, 2001).

      67.    Courts in this Circuit have wide latitude to approve a sale of a debtor's assets in

the exercise of the debtor's discretion where a sound business purpose dictates such action. As

this Court has recognized:

> The Bankruptcy Court has "considerable discretion" in deciding whether to
> approve a sale. "In determining whether to authorize use, sale or lease of property
> of the estate under [Section 363], courts require the [Trustee] to show that a sound
> business purpose justifies such actions." If the bankruptcy trustee's decision
> evidences a sound business purpose, then the Bankruptcy Court should approve the
> sale.

*In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) (quoting *In re Montgomery Ward Holding Corp.*,

242 B.R. 147, 152–53 (D.Del.1999)) (citations omitted) (alterations in original); *see also*

*Stephens Indus., Inc.*, 789 F.2d at 388 ("Determining whether a sale should be approved under §

363 falls within the sound discretion of the trial court.").

      68.    Moreover, Bankruptcy Rule 6004(f) authorizes debtors to sell assets outside the

ordinary course of business by private sale. FED. R. BANKR. P. 6004(f). A debtor is obligated to

maximize the return to its estate resulting from an asset sale, whether public or private. *See In Re*

*Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *11 (Bankr. D. Del. Apr. 2,

2001) ("The purpose of a § 363(b) sale is to maximize the benefit to the debtor's entire estate.");

*In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) ("When a debtor or trustee conducts a

sale under § 363(b), it has an obligation to maximize revenues for the estate."); *In re Nepsco,*

*Inc.*, 36 B.R. 25, 26 (D. Me. 1983) ("Clearly, the thrust of the statutory scheme is to provide

maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts,

*i.e.*, the creditors of the estate."). Accordingly, if a debtor in possession concludes that a particular private purchase offer is the "most advantageous of the estate," a court should defer to the debtor in possession's business judgment. *Bakalis*, 220 B.R. at 532.

69.     Additionally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g.*, *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Tr., Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that the bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

70.     Prime submits that the proposed sale of the Foreign Currency reflects a reasonable exercise of its business judgment. By selling the Foreign Currency, Prime will be able to convert the value of these assets into a more readily fungible medium so that they can help achieve Prime's goals in these Chapter 11 Cases, which will ultimately inure to the benefit of its estate and creditors. Further, selling such assets in the secondary market will ensure that Prime obtains

the highest and best price in an efficient and cost-effective manner.

**C.    The Sale of the Foreign Currency Should Be Approved Under Section 363(f)**

71.    Pursuant to Bankruptcy Code section 363(f), a debtor in possession may sell

property of the estate "free and clear of any interest in such property of an entity other than the

estate" if

> (1) applicable non-bankruptcy law permits the sale of such property free and
> clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is
> greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept
> a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)–(5). Because these requirements are listed in the disjunctive, Prime only

needs to satisfy one of the five requirements to permit the Foreign Currency to be sold "free and

clear" of liens and interests. *In re Wolverine Radio Co*., 930 F.2d 1132, 1147 n.24 (6th Cir.

1991) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding

that the court may approve the sale "free and clear" provided at least one of the subsections of

section 363(f) of the Bankruptcy Code is met).

72.    The only entity asserting an interest in the Foreign Currency is TrustToken. As set

forth above, there is a bona fide dispute regarding whether TrustToken has any interest in the

Foreign Currency. Indeed, it is Prime's view that the Foreign Currency is indisputably property

of the estate. Accordingly, the requirements of Bankruptcy Code section 363(f) have been

satisfied.

**D.      Bankruptcy Rule 6004(h) Should Be Waived**

73.      Bankruptcy Rule 6004(h) provides that an order authorizing the use, sale, or lease of property is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise. *See* FED. R. BANKR. P. 6004(h). Prime, however, requests that the Proposed Order, and any sale consummated pursuant thereto, be effective immediately. It is in the best interests of Prime's estate to facilitate the closing of the sale transaction, thereby expediting the receipt of related sale proceeds into the estate. Accordingly, Prime submits that the fourteen-day stay set forth in Bankruptcy Rule 6004(h) should be waived with respect to the Proposed Order and in connection with the sale of the Foreign Currency.

## NOTICE

74.      Notice of the Motion has been provided to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) TrustToken or its counsel; and (iv) parties that have requested notice pursuant to Bankruptcy Rule 2002. Prime submits that no other or further notice is required.

*[Remainder of Page Intentionally Left Blank]*

34

## CONCLUSION

**WHEREFORE**, Prime requests entry of an order pursuant to Bankruptcy Code sections

105 and 363, and Bankruptcy Rule 6004, substantially in the form attached hereto as **Exhibit A**,

(i) authorizing the sale of the Foreign Currency, and (ii) granting related relief.

Dated:  November 13, 2023
        Wilmington, Delaware

**MCDERMOTT WILL & EMERY LLP**

*/s/ Maris J. Kandestin*
Maris J. Kandestin (No. 5294)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711
Email:      mkandestin@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444
Email:      dazman@mwe.com
            jbevans@mwe.com
            ggriffith@mwe.com

-and-

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Facsimile:  (305) 347-6500
Email:      gsteinman@mwe.com

*Counsel to the Debtors and Debtors in Possession*