UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                                    .  Chapter 11
IN RE:                              .
                                    .  Case No. 23-11161(JKS)
PRIME CORE TECHNOLOGIES,            .
INC., et al,                        .
                                    .
                                    .  824 Market Street
                                    .  Wilmington, Delaware 19801
                    Debtors. .
. . . . . . . . . . . . . . .  Tuesday, November 7, 2023
```

TRANSCRIPT OF HEARING RE:
DEBTORS' MOTION FOR ENTRY OF AN ORDER DIRECTING WITNESS TO
(I) SIT FOR A RULE 2004 EXAMINATION, (II) PRODUCE DOCUMENTS,
AND (III) PROVIDE SWORN INTERROGATORY RESPONSES IN RESPONSE
TO RULE 2004 REQUESTS
BEFORE THE HONORABLE J. KATE STICKLES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            Maris J. Kandestin, Esq.
                            MCDERMOTT, WILL & EMERY, LLP
                            1007 North Orange Street
                            10th Floor
                            Wilmington, Delaware 19801

                            Joseph B. Evans, Esq.
                            MCDERMOTT, WILL & EMERY, LLP
                            One Vanderbilt Avenue
                            New York, New York 10017

(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Madeline Dungey, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:  (Continued)

| | |
|---|---|
| For the U.S. Trustee: | Joseph Cudia, Esq.<br>OFFICE OF THE U.S. TRUSTEE<br>844 King Street, Suite 2207<br>Wilmington, Delaware 19801 |
| For the Official Committee<br>of Unsecured Creditors: | Donald J. Detweiler, Esq.<br>WOMBLE BOND DICKINSON (US), LLP<br>1313 North Market Street<br>Suite 1200<br>Wilmington, Delaware 19801 |
| For Alec Gorge: | James S. Green, Jr., Esq.<br>SEITZ, VAN OGTROP & GREEN, PA<br>222 Delaware Ave, Suite 1500<br>Wilmington, Delaware 19801 |

APPEARANCES VIA ZOOM:

| | |
|---|---|
| For Bittrex: | Kenneth J. Enos, Esq.<br>YOUNG, CONAWAY, STARGATT<br> & TAYLOR, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801 |
| For Polaris: | Ryan M. Bartley, Esq.<br>YOUNG, CONAWAY, STARGATT<br> & TAYLOR, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801 |
| For AnchorCoin, LLC: | Marcy J. McLaughlin Smith, Esq.<br>TROUTMAN PEPPER HAMILTON<br> SANDERS, LLP<br>Hercules Plaza<br>1313 Market Street, Suite 5100<br>Wilmington, Delaware 19801 |

APPEARANCES VIA ZOOM:

| | |
|---|---|
| For the Debtors: | Darren Azman, Esq.<br>Gregg Steinman, Esq.<br>MCDERMOTT, WILL & EMERY, LLP |

(Appearances Continued)

```
APPEARANCES VIA ZOOM:   (Continued)

For the Official Committee
of Unsecured Creditors:       Matthew Sawyer, Esq.
                              Bennett S. Silverberg, Esq.
                              Robert J. Stark, Esq.
                              Shari Dwoskin, Esq.
                              BROWN RUDNICK, LLP

For AnchorCoin, LLC:          Tori Remington, Esq.
                              TROUTMAN PEPPER

For Alec Gorge:               Katheryn Diemer, Esq.
                              DIEMER & WEI, LLP

For Polaris Ventures:         Ryan Bartley, Esq.
                              YOUNG, CONAWAY, STARGATT
                               & TAYLOR, LLP

For George Gerglades,
Kevin Lehtinlitty, and
Scott Purcell:                Jason Rosell, Esq.
                              PACHULSKI, STANG, ZIEHL
                               & JONES, LLP

Also Appearing:               Christopher Gastelu
                              CGA

                              Steven Eliscu
                              DMG BLOCKCHAIN SOLUTIONS, INC.

                              David Dunn
                              Jin Dong
                              Joseph Berman
                              PROVINCE, INC.

                              Peter Sprofera, Pro Se

                              Necdet Gundal, Interested Party

                              Alex Chen, Pro Se

                              Matt Parella, Interested Party on
                               behalf of the Debtors

                              Michael Wyse, Interested Party on
                               behalf of the Debtors

(Appearances Continued)
```

APPEARANCES VIA ZOOM:   (Continued)

Also Appearing:                     John Guedry, Interested Party on
                                     behalf of the Debtors

                                    Bob Zhao, Interested Party on
                                     behalf of the Debtors

                                    Jor Law, Interested Party on
                                     behalf of the Debtors

                                    Patty Wang, Interested Party on
                                     behalf of the Debtors

                                    John Wilcox, Interested Party on
                                     behalf of the Debtors

                                    Scott Flaherty
                                    DEBTWIRE

INDEX

PAGE

ARGUMENT BY MR. EVANS                                          7

ARGUMENT BY MS. DIEMER                                         14

COURT DECISION                                                17

FURTHER ARGUMENT AND COLLOQUY RE:   REQUESTS FOR              18
PRODUCTION OF DOCUMENTS

FURTHER ARGUMENT AND COLLOQUY RE:   INTERROGATORIES           36

1          (Proceedings commence at 2:05 p.m.)

2          (Call to order of the Court)

3               THE COURT:  Please be seated, everyone.

4               This is Judge Stickles.  We're on the record in

5     Prime Core Technologies, Case Number 23-11161.

6               Good afternoon.

7          **(No Recording Microphones at Counsel Table or Lectern)**

8               MS. KANDESTIN:  Good afternoon, Your Honor.  For

9     the record, Maris Kandestin of McDermott, Will & Emery on

10    behalf of the debtors.

11              We are operating off of our amended agenda this

12    morning.  Does Your Honor have a copy?

13              THE COURT:  I do.  Well, actually, I don't, but

14    I've seen it.

15              MS. KANDESTIN:  I have an extra copy if you'd like.

16    Thank you.

17              THE COURT:  I've seen the papers.

18              MS. KANDESTIN:  Your Honor, there's only one matter

19    going forward today, it's the debtors' motion for -- it's our

20    2004 motion with respect to Party 7, I believe.

21              With me in the courtroom today is Joseph Evans, my

22    partner.

23              THE COURT:  Hi.

24              MS. KANDESTIN:  He will be handling the motion on

25    behalf of the debtors.  I will cede the podium to him now.

1              THE COURT:  Okay.

2              MR. EVANS:  Good afternoon, Your Honor.

3              THE COURT:  Good afternoon.

4              MR. EVANS:  As you know, the debtors have been

5    conducting an investigation into the 98f wallet.  The 98f

6    wallet is where a significant amount of funds were deposited

7    into, specifically (indiscernible) and other cryptocurrencies

8    that debtors no longer have access to.  And in order to gain

9    access to the 98f wallet, there are really two primary ways

10   to do it:

11             One is to find the seed phrases, which are 12, 24

12   sets of words which provide you with access to what's called

13   a "signer."  You need a certain amount of singers to get

14   access to the wallet.

15             The other way is to get a hardware device, which

16   are physical devices that would allow you to get -- gain

17   access to that, a signer, which would allow you to effect the

18   transaction in the wallet.  We don't have that.

19             THE COURT:  Well --

20             MR. EVANS:  Because that was our mission, in part -

21   -

22             THE COURT:  The wallet is electronic.  Is that

23   right?

24             MR. EVANS:  Well, yes.  So the wallet --

25             THE COURT:  Okay.

1          MR. EVANS:  The wallet itself, the 98f wallet, is

2     on the blockchain.

3          THE COURT:  Okay.  That's what we thought.  We just

4     --

5          MR. EVANS:  Yeah.  So the 98f wallet is on the

6     blockchain.  It's called a "multisig wallet," which means it

7     requires multiples signers to execute a transaction into or

8     out of the wallet.

9          The problem is we don't have access to all of the

10    signers --

11         THE COURT:  Right.

12         MR. EVANS:  -- that we need.  And the hardware

13    element --

14         THE COURT:  Right.

15         MR. EVANS:  -- is they are physical devices that

16    allow you access to the signer, which would allow you to get

17    into the wallet.  If you have the seed phrases, you could

18    load those seed phrases onto a new hardware device and then

19    get access to the wallet.  We don't have enough.

20         THE COURT:  Okay.

21         MR. EVANS:  As a result, we sent 2004 discovery to

22    19 different witnesses, seeking information.  We identified

23    those witnesses who, either previously had a seed phrase, or

24    were involved in wallet management at prime, or for which

25    other witnesses identified as potentially having access to

1  the seed phrase, hardware devices, that kind of thing.

2          This particular witness that's at issue today was

3  the former chief technology officer at Prime.  He left Prime

4  in February 2021.  Right before he left, the decision was

5  made to offer this deposit digital address that went into

6  98f, which the company no longer has (indiscernible) there

7  are contemporaneous emails, as cited in our motion, that show

8  that he was involved in those communications.

9          As a result, we sent him a 2004 request, asking for

10  voluntary discovery.  We asked for documents, we asked for

11  interrogatories, and we asked for an examination.

12          The interrogatories we asked for.  They were aimed

13  at identifying whether he has the seed phrases, does he have

14  the hardware device.  For example, Interrogatory 1 is:

15          "Identify seed phrases concerning 98f."

16          Interrogatory 2:

17          "Identify the individuals or entities who are in

18  possession of hardware wallets."

19          Interrogatory 3:

20          "Identify the individuals or entities who are in

21  possession of seed phrases."

22          These were all narrowly tailored to our goal:  Give

23  access to 98f.  We're a little bit at a loss as to what we're

24  arguing about here today.

25          THE COURT:  Well, what is the basis for

1   interrogatories under a 2004 exam?

2          MR. EVANS:  That's -- it's true, Your Honor, the

3   statutory language in 2004 describes document production and

4   examinations.  There are multiple orders in this district and

5   others where interrogatories were ordered.  The Court has

6   broad discretion to issue 2004 orders that are efficient,

7   that would serve the purposes of 2004.

8          The primary purpose, the reason why we did this, is

9   we have a lot of witnesses and not a lot of money.  And we

10  served interrogatory responses that were narrowly tailored to

11  identify which ones we really need to sit down and spend the

12  time and we want to take a deposition of.

13         Out of the 19 witnesses that we've served 2004s

14  with, 14 responded voluntarily with interrogatories.  We have

15  5 left, this particular witness is one of them.

16         There was an offer made by this witness to provide

17  requests for admissions, stating that this particular witness

18  had no information in his possession.  We looked at that and

19  we considered that.  And the primary issue was we've already

20  received text messages from another witness with this witness

21  discussing issues critically relevant to this investigation,

22  including the wallet, wallet access, and the 98f

23  investigation.  So we know that, at least one time post-

24  employment, this particular witness had in his possession

25  relevant information.

1          THE COURT:  Can you step back a second --

2          MR. EVANS:  Sure.

3          THE COURT:  -- and give me a sense of timing?  So

4     this witness departed in February of 2021.

5          MR. EVANS:  Yes.

6          THE COURT:  Walk me through the --

7          MR. EVANS:  Chronology?

8          THE COURT:  Yeah, the chronology.

9          MR. EVANS:  Sure.

10         THE COURT:  When the information -- when it -- when

11    you became aware that there's an issue with the wallet and

12    then when was the receiver appointed, et cetera.

13         MR. EVANS:  So this wallet was actually predated,

14    in the beginning of 2020.

15         THE COURT:  Okay.

16         MR. EVANS:  It was previously used at Prime.  Then

17    there was a decision to what they call "migrate" the wallets

18    to a third party called Fireblocks.  Fireblocks is a place

19    where assets are -- crypto assets are traditionally stored.

20         THE COURT:  Right.

21         MR. EVANS:  There was then a decision made in late

22    December and early January to start reusing some of the old

23    wallets.

24         THE COURT:  This is December 2020.

25         MR. EVANS:  Correct.

1          THE COURT:  Okay.

2          MR. EVANS:  So December 2020, early January is when

3    the decision was made to use old wallets, including the 98f

4    wallet.  This particular witness was involved in that

5    discussion, was the chief technology at the time and

6    facilitated the issuance of this new deposit of digital

7    assets.

8          It is -- this is public information, it's on the

9    blockchain, but there has been a lack of access into that

10   wallet --

11         THE COURT:  Right.

12         MR. EVANS:  -- for a significant amount of time.

13   So it's not like someone is signing in every day and trying

14   to use that log-in.

15         And so what we're really looking for, Judge, are

16   pieces of paper that have 24 seed phrases, snapshots in

17   people's phones What's App images, Telegram images, that kind

18   of thing, something that somebody might forget they have it

19   and have it.  And we've made some progress, but there's still

20   more to be done.

21         I have nothing further, Your Honor, unless there's

22   any questions.

23         THE COURT:  No.  I'll hear from the objector.

24         And is this Party 1 or Party 7?

25         MR. EVANS:  It's Party 7.

1      THE COURT:  Okay.  All right.

2      MR. EVANS:  I know it was a little complicated, so

3 I apologize.

4      THE COURT:  No, that's okay.  I just -- I had 7 in

5 my notes and I wasn't sure if I wrote it down wrong.

6      MR. EVANS:  7.

7      THE COURT:  Okay.  Thank you.

8      MR. GREEN:  Good afternoon, Your Honor.

9      THE COURT:  Good afternoon.

10     MR. GREEN:  May it please the Court, Jim Green of

11 Seitz, Van Ogtrop & Green for -- I think we filed an

12 objection on his behalf, it's not -- his name is not secret -

13 - Alec Gorge.  Also representing Mr. Gorge is Katheryn

14 Diemer, who is on Zoom.

15     Your Honor, I'm prepared to address the Court, I

16 guess any questions the Court has.  But Ms. Diemer was

17 primarily involved in the communications back and forth.

18 She's counsel in California to Mr. Gorge, who is in

19 California.

20     There were some issues about the timeliness of the

21 objection.  I can answer those, if the Court has any

22 questions about that.  But it seems to me that the objection

23 was filed and the Court is considering it.  It wasn't

24 properly noticed, but I think we --

25     THE COURT:  Yeah.

1          MR. GREEN:  -- (indiscernible)

2          THE COURT:  I'm going to move past those issues.

3          MR. GREEN:  Okay.  Thank you, Your Honor.

4          THE COURT:  And I'd rather focus on the objections

5    at hand.

6          And so I don't know if the parties have had any

7    discussions regarding the objections.  What is left?  What is

8    being contested, or is all of it being contested.

9          MR. GREEN:  I'm going t-- I'm happy to answer, Your

10   Honor.  But with the Court's permission, I'll cede the podium

11   to Ms. Diemer, who is on Zoom.

12         THE COURT:  Okay.  Ms. Diemer.

13         MS. DIEMER:  Good afternoon, Your Honor.  It's

14   still morning here.  Good day, Your Honor.  This is Katheryn

15   Diemer, I represent Mr. Gorge.

16         We had multiple conversations with the debtor.  We

17   offered to debtor to allow Mr. Gorge to have a traditional

18   2004 examination, where, if there was a request for

19   production of documents that was appropriate, it be tailored,

20   we would provide such documents, and that they could question

21   Mr. Gorge under oath, as is traditional in a 2004

22   examination.

23         They have not, in any way, ceded any ground.  They

24   insist that they have a right to interrogatories.  They do

25   not.  They have not produced a single case which authorizes

1  them to do that.

2          And there are express cases cited in our brief that

3  prohibit the interrogatories being published to a 2004

4  recipient who is a third party to the dispute.  Mr. Gorge is

5  very clearly a third party to the dispute.  He is not a

6  claimant.  Until we filed this motion, he wasn't on the

7  service list, he's not identified anywhere.

8          The problem here is, as Mr. Evans has said, Mr.

9  Gorge left the company in 2021.  He has not been involved in

10  crypto in any way since 2021.  He works in a completely

11  technology field.  He does not have lots of documents or

12  information.

13          But I will be honest with you, my communications

14  with Mr. Evans and Ms. Griffith are such that there has been

15  no movement whatsoever.  There has been an insistence that

16  Rule 45(d), the proportional response, does not apply to Mr.

17  Gorge.

18          And what we are seeking here, Your Honor, is a

19  ruling from the Court that allows us to protect our witness

20  and limit the 2004 order, such that he -- that Mr. Evans and

21  the debtor follow the rules of Rule 45, which is the

22  mechanism which enforces Rule 45, which means --

23          THE COURT:  So --

24          MS. DIEMER:  -- that the order -- yes.  I'm sorry,

25  Your Honor.

1          THE COURT:  Well, so you don't dispute that the

2    debtor is entitled to a 2004 exam or the production of

3    documents.

4          MS. DIEMER:  No, we never have done so.  We just

5    believe that, because Mr. Gorge is a third party, that the

6    debtor must follow the rules in Rule 45(d), which requires

7    that they seek -- that they minimize the burden on the third

8    party, and that they minimize that burden, such that it is a

9    limited amount of documents and limited burden.  They have to

10   go -- under the law, they have to go and look to other third

11   parties for the information first, which apparently they're

12   doing --

13         THE COURT:  Right.

14         MS. DIEMER:  -- which is fine.

15         Once they have that, then they can come out to my

16   jurisdiction, where Mr. Gorge is a resident, the Northern

17   District of California, and enforce a proper subpoena.

18         I really must take issue with the way the debtor

19   has handled this matter.  The debtor sent out subpoenas

20   attached to a letter saying people had to respond within a

21   week or they would go to the Court to enforce.  And these

22   people weren't served, they didn't know.  Mr. Gorge just got

23   alarmed because he knew that Prime Core had filed bankruptcy

24   and he got alarmed and contacted counsel.

25         It was extremely overbearing if you were an

1    independent third party without a lot of litigation

2    experience to this individual.  It's just an individual who

3    happened to work at this company a couple of years ago.  It,

4    in no way, resembles the appropriate process that should

5    occur in a 2004 exam.

6            And we simply ask this Court to issue its order in

7    concurrence with the rules that govern 2004:  No

8    interrogatories, limited scope.  And you know, frankly, Your

9    Honor, he has -- Mr. Evans and debtor have to enforce in the

10   Northern District.  The rules are clear that enforcement, he

11   can't just send out -- he can send out the 2004 notice

12   through worldwide or --

13           THE COURT:  Right.

14           MS. DIEMER:  -- or countrywide service, but he

15   can't enforce.  He has to properly serve and subpoena here in

16   the Northern District and enforce in the Northern District.

17           So we think that a 2004 is fine, as long as it's

18   only documents and a request -- documents and testimony, but

19   that it must be limited and reasonable.  And frankly, he

20   should complete all of his other discovery first to see if he

21   even needs Mr. Gorge, the independent third party to this

22   dispute.

23           THE COURT:  Well, let me just say I believe, based

24   on the papers, the debtor has shown cause for a 2004 exam.

25   The debtors' examination seeks information related to the 98f

1    wallet, and that wallet issue is an important issue in this

2    case.  And Party 1 worked for Prime Trust and then Prime

3    Digital prior to February '21.  And so I'm going to permit a

4    2004 exam.  And it sounds to me, Ms. Diemer, that you don't

5    contest that.  And I'm going to also allow the production of

6    documents.

7              So what I'd like to do is -- it doesn't sound like

8    the parties have gotten any closer with respect to resolving

9    any issues.

10             So, with respect to production specifically, it

11   seems to me that -- and correct me if I'm wrong, please --

12   that the issues that are at hand are Requests 10, 11, 13, 14,

13   and then 20 through 23.  Is that correct?

14             MS. DIEMER:  Yes, Your Honor.

15             THE COURT:  Okay.  So I've read the parties'

16   papers.  But I would like -- I don't believe that the debtors

17   responded to Requests 10 and 11, so I'd like to focus on that

18   request for a minute, and let's just address those two

19   requests specifically for starters.

20             And Ms. Diemer, I think, since it's your objection,

21   you should go first.  I'm sorry.  I'm looking for your

22   objection in my papers.

23             MS. DIEMER:  All right.  Yes.  I believe it's on

24   Page 16, Your Honor.

25             So Requests 10, 11, 13, and 14, and particularly

1   Requests 10 and 11, seek documents relating to the exchange

2   of monies between vendors.  "Vendors" is defined in

3   Definition 21 as:

4           "Any entity contracted with or employed by the

5   Prime entities."

6           Whereas -- and we're only talking about 10 and 11

7   now, not 13 and 14, Your Honor.  Is that correct?

8           THE COURT:  Well, I was focusing first on 10 and

9   11.  But if you -- I mean, if you want to put them in one

10  bucket, I'm happy to do it that way.  I just want to focus

11  the parties on what's truly at issue.

12          MS. DIEMER:  Sure.

13          The problem I have when I read this as a litigator

14  is the definition of the term "records" is enormous.  It

15  broadens the term "seek documents relating to the exchange of

16  monies," which is already an extremely broad term, and then

17  identifies what that is, something on the order of 22

18  different things.

19          According to Mr. Evans' argument, he said that what

20  he's really interested in -- you know, I'm not -- I hope I

21  don't misquote him, I'm not sure I'm as facile with the

22  cryptocurrency issues as he is, although I have handled them

23  before.  If they're really only interested in the specific

24  migration of this one wallet to Fire Chain [sic] and whether

25  he has any physical things that would allow the -- what --

1   the piece of technology that would allow them to access it or

2   to use the old wallets, the identifier that would allow them

3   to use the old wallets, I don't think that's a problem.

4         But that's not at all what I got from Requests for

5   Production of Documents 10 and 11.  It was this wide-ranging

6   group of potential records.

7         And I'm happy to go on to 13 and 14.

8         THE COURT:  Wait.  Can I --

9         MS. DIEMER:  13 and --

10        THE COURT:  Would you like to respond to that right

11  now?

12        MR. EVANS:  I would, Your Honor.

13        THE COURT:  Okay.

14        MR. EVANS:  Yes.

15        THE COURT:  Let's see if we can ...

16        MR. EVANS:  Thank you.  Joseph Evans from

17  McDermott, Will & Emery for the debtor.

18        10 and 11 seek documents, communications, and

19  records concerning the payments made to any vendor of the

20  Prime entities, or compensation of any kind made by vendors

21  to Gorge or any of a certain group of former employees.

22        The reason for this request is that the decision

23  was made in December of 2020 to move away from the vendors

24  that were storing the wallets.  And the proffered reasons,

25  during the course of the internal investigation at the

1  company and in emails that we said -- that we saw don't make

2  any sense to us.  And so we're trying to understand the

3  reason by which the company decided to change from the

4  Fireblocks wallets to go back to the 98f wallets.  The stated

5  reason were complaints and issues with particular vendors

6  they were using.  This particular witness only dealt with

7  those vendors that concern wallet management.  That's the

8  reason for the requests.

9           I do take your point, Your Honor, that these are a

10 bit broader than the other requests at issue.  And so, if we

11 got everything else but those two, we would be okay.

12          THE COURT:  Okay.  Well, let me, before I rule --

13 is there any way you can limit the scope of time?

14          MR. EVANS:  Sure.  If we had documents,

15 communications, and records concerning payments made to any

16 vendor concerning wallet management.  That would ensure that

17 we're only seeking information relative to the 98f issue and

18 not --

19          THE COURT:  And can you --

20          MR. EVANS:  -- other vendors that we obviously --

21          THE COURT:  Is there a time period?

22          MR. EVANS:  The time period is the date when this

23 witness became employed at Prime to now, and so 2020 to now.

24 And I would note that this only relates to payments and

25 compensation, and so it's already limited by its terms for

1  transactions.

2          THE COURT:  Can I just ask a question?  Did this

3  person take business records with him?  I mean -- I'm saying

4  "him."  I don't know.  Did --

5          MR. EVANS:  So it --

6          THE COURT:  -- Number 7, Party 7 --

7          MR. EVANS:  It's a good question.  The off-boarding

8  process at Prime could use a little help.  The documents that

9  we received from others indicated there were a lot of

10  personal devices being used to discuss critical company

11  business; in particular, text messages with this witness

12  post-employment about the 98f wallet.

13          THE COURT:  Ms. Diemer, do you want to respond?

14          MS. DIEMER:  Yes, Your Honor.

15          I do not believe that, if you look at documents *qua*

16  documents; i.e., pieces of paper, I don't think so.  I don't

17  think there are any.

18          I don't believe that there's any emails after he

19  left the company.

20          I -- there might be some text messages or oral

21  communications because, as I stated in my papers, Mr. Gorge

22  and Mr. Lefkiminity (phonetic) -- I'm not sure I'm

23  pronouncing that right.

24          MR. EVANS:  Excuse me.  Your Honor, there's an

25  order by the Court to not describe former employees by name.

1          THE COURT:  Oh, yes.  Thank you.

2          MS. DIEMER:  Okay.  The person who somehow

3    designated -- the guys who founded this company were personal

4    -- at least one of them was personal friends of Mr. Gorge

5    since he was about eight years old.  So it's unlikely that he

6    doesn't have -- let me rephrase that.  He, for sure, has

7    communications with his childhood buddy about life.  But is

8    it about payments to vendors?  I don't think so, Your Honor.

9          But I don't have any heartburn about producing

10   payments or compensation related to that limited amount of

11   information.

12         THE COURT:  So it would be all documents,

13   communications, and records concerning any payments made to

14   any vendor of the Prime entities concerning wallet management

15   from the -- from his -- from your employment date to now?

16         MR. EVANS:  Your Honor --

17         MS. DIEMER:  Correct.

18         MR. EVANS:  -- that's -- Instruction Number 14

19   identifies the time period.

20         THE COURT:  Okay.  And so we're making it the same

21   time period.

22         MR. EVANS:  Right.

23         MS. DIEMER:  The time period from the time he was

24   employed until present.

25         THE COURT:  Okay.

1      MS. DIEMER:  That's fine, Your Honor, as long as

2  it's only compensation and payments.  That's okay, I don't

3  think that's a big deal.

4      THE COURT:  Okay.

5      MS. DIEMER:  I think 13 and 14 are unfortunately

6  not amenable --

7      THE COURT:  Okay.

8      MS. DIEMER:  -- to the same -- to the same solution

9  because, as I said, certainly the one gentleman --

10      THE COURT:  Uh-huh.

11      MS. DIEMER:  -- one of the founders was a --

12  literally a lifetime friend.  Okay?  The other two gentlemen

13  who were founders -- I think they were both founders -- are

14  people who also are friends, not of such long duration.

15      And so when, in 13 and 14, they seek broadband, all

16  communications between Mr. Gorge and these people, that

17  literally will get you their discussion of my client's

18  bachelor party, the discussion of my client's wedding and

19  who's getting there when and who's bringing what girlfriend.

20  That's ridiculous and inappropriate.

21      MR. EVANS:  Your Honor, if I may respond?

22      THE COURT:  Yes.

23      MR. EVANS:  13 and 14 don't seek any information

24  like that about weddings or girlfriends or anything else.  13

25  and 14 are limited to communications concerning the Prime

1    entities, that's it.  So I'm not interested in any

2    communications about his personal life, that's not what we're

3    seeking.

4            MS. DIEMER:  I have to disagree with Mr. Evans.  It

5    specifically asks for communications between Mr. Gorge and

6    all these people.  And the problem is, because they're

7    lifelong friends, there are a lot of communications.

8            THE COURT:  But it says "concerning the Prime

9    entities."  So I -- Ms. Diemer, can you connect the dots for

10   me?  I'm not sure what I -- I'm missing something.

11           MS. DIEMER:  So let me give you some examples.  Do

12   they want any time the word "prime" is mentioned because it's

13   mentioned, it's my understanding it's quite a bit.  Hey, I'm

14   at the company right now.  Oh, I'm going to do X, leaving the

15   company to come to your party.  That sort of thing is

16   included.

17           That would be -- under the definitions that they

18   have put forth, which includes everything known to mankind,

19   over 22 categories, those would fall within it, even if it

20   just had -- if it was a communication using, as part of the

21   identifier in the email or in one of the other forms of

22   communication mentions Prime.  So it's Mr. X, founder at

23   Prime dot com or whatever their email address is, that would

24   fall under their definitions.

25           I suspect Mr. Evans is not interested in the man's

1    private life.  But you know, the way these are drafted,

2    they're so vastly over-broad.

3         MR. EVANS:  Your Honor, we limited the requests

4    purposefully just for information concerning the Prime

5    entities with these three particular individuals, who were

6    the executives at the company.

7         This particular witness, as I stated, was the chief

8    technology officer at the time when the 98f wallet issue was

9    born.  Information that he has in his possession concerning

10   the Prime entities with three key executives at the company

11   is highly relevant and well within the scope of 2004.

12        MS. DIEMER:  May I make this suggestion, Your

13   Honor?

14        THE COURT:  Of course.

15        MS. DIEMER:  If Mr. Evans is only concerned about

16   the time when this decision was made, let's limit the

17   communications to the year before, say, you know, January

18   2020, through the time, you know, I guess maybe a year after.

19   That should cover everything.  And then let's limit the topic

20   to communications about the issue of the transfer of the 98f,

21   any transfers of the 98f.  And then you're going to limit it

22   to what's to be limited.

23        MR. EVANS:  Your Honor, that's not acceptable to

24   the debtors.  We've already uncovered communications from

25   other witnesses more than a year after his employ directly

1    relevant to the 98f investigation and the wallet,

2    communications he had with former executives when this all

3    became public and whether they have a seed phrase and who has

4    a seed phrase and where the hardware devices are.  Whatever

5    happened at Prime is highly relevant here.  We are looking

6    for the 98f wallet.  We're also looking to see if there are

7    causes of action against individuals.  We'd like to do that

8    on 2004.  So his communications about Prime with the three

9    key executives, a relevant response and covered by 2004.

10        MS. DIEMER:  And Your Honor, under Rule 45, he can

11   go to those other parties that he's already uncovered and he

12   can be specific and limited because he has that information

13   from the third parties.  45(d) requires that he specify.

14        MR. EVANS:  Your Honor, Joe Evans for the debtor.

15        I'm a little -- I'm a little confused as to why

16   this particular witness believes that all other witnesses

17   should have to participate before he does.

18        THE COURT:  Well, he's not.  I mean, this is a

19   simultaneous investigation of multiple people and you've

20   indicated there are five left.  So we're not going to -- we

21   need to move promptly on this issue.

22        MR. EVANS:  I agree.  Thank you.

23        THE COURT:  So -- but my concern here is that,

24   while 2004s have been referred to as "fishing expeditions,"

25   this language is really -- it is broad.  I'm not as troubled

1   by the time period as I am that it's concerning the Prime

2   entities.  I don't know if that's I'll meet you in the

3   parking lot to get lunch at the Prime entities or if it has

4   something to do with the wallet.  And I'm wondering if there

5   is a way to craft this to make it more specific to the

6   investigation that's ongoing.

7           MR. EVANS:  Your Honor, we could.  We could limit

8   it to -- we could create definitions; for example, "wallet

9   management," and limit it concerning wallet management, if

10  that would be acceptable.  We could limit that.

11          My concern is having to go back and seek more

12  information if we see one thing or see another thing and it's

13  -- I'd rather do this once instead of twice.  It's already

14  been pretty -- it's pretty truncated, given the process here.

15  But if that's what Your Honor is comfortable with, we'd be

16  happy to that make that amendment.  We'd have to have a

17  defined term for --

18          THE COURT:  I was going to say you're going to have

19  to come up with a defined term.

20          MR. EVANS:  A defined term for "wallet management."

21  Well, that could be --

22          THE COURT:  I mean --

23          MR. EVANS:  -- something along --

24          THE COURT:  -- I'm certainly --

25          MR. EVANS:  -- the lines of --

1          THE COURT:  -- going to let you explore this.

2          MR. EVANS:  Right.

3          THE COURT:  It's just the way it's written, it's

4    broad.

5          MR. EVANS:  Okay.  We could define "wallet

6    management" as issues concerning digital wallets at Prime.

7          THE COURT:  Seed phrases, migration.

8          MR. EVANS:  We could say digital wallets at Prime,

9    seed phrases, hardware devices, 98f, Fireblocks, and Bitco.

10          THE COURT:  I mean, is this something -- I know

11    it's difficult because obviously the parties could not agree

12    on the motion.  But is this something the parties could work

13    --

14          MS. DIEMER:  Yes, Your Honor.

15          THE COURT:  I'm not going to sit here and do it, if

16    that's --

17          MR. EVANS:  I --

18          THE COURT:  -- easier.

19          MR. EVANS:  I hope so.  My hesitation is we have --

20    we've tried, we haven't really haven't been able to work that

21    well.

22          THE COURT:  Okay.

23          MR. EVANS:  And we --

24          THE COURT:  Well, why don't we do this?  Why don't

25    -- let's continue going through this --

1          MR. EVANS:  Okay.

2          THE COURT:  -- and know that we have to come back

3     to 13 and 14, but we're going to take a break.

4          MR. EVANS:  Sure.

5          THE COURT:  And I'm not going to go home until I

6     have the definition.

7          MR. EVANS:  Okay.

8          THE COURT:  How's that?

9          MR. EVANS:  That will be great, Your Honor.  Thank

10    you.

11         THE COURT:  All right.  Sorry, Maddy.

12         Okay.  And then, so the next issues as I read the

13    pleadings -- and please correct me if I'm wrong -- but they

14    are Requests 20 to 23.

15         MS. DIEMER:  Yes, Your Honor.  These all identify

16    requests for information about public events that happened

17    after, long after, almost two -- more than two years after

18    Mr. Gorge left the company.  And they all resolve -- revolve

19    around things like filings in courts, which violate Rule

20    45(d)'s requirements that they seek the information in least

21    intrusive manners, and frankly, is not something that Mr.

22    Gorge likely would have any information about.  He wasn't at

23    the company and hadn't been for two years.

24         THE COURT:  Let me hear from the debtor.

25         MR. EVANS:  Your Honor, '20 to '23 for aiming to

1    capturing communications when these issues became public

2    between mister -- this particular witness and other people

3    about what happened at Prime:  Oh, my god, look what happened

4    at Prime, I have a seed phrase on my deck.  All right?

5         THE COURT:  Right.

6              MR. EVANS:  That happened.

7              We're not seeking any public information.  We're

8    not seeking copies of articles and that kind of thing.  We

9    want to know if he has communications about this that

10   happened recently concerning these events because, as counsel

11   knows, he wasn't at the company for sometime and then this

12   became public.  I don't know how much he knew or didn't now

13   at two different points in time.  But this would capture

14   those sorts of communications.

15             THE COURT:  It would seem to me -- and Ms. Diemer,

16   obviously you can comment.  But it would seem to me, if he

17   truly doesn't have anything, this is not an overly burdensome

18   search.

19             MS. DIEMER:  Your Honor, I have asked him, I do not

20   believe he has anything; and, therefore, I don't think it is

21   particularly burdensome.  I just think it's not something

22   that's appropriate.

23             I think -- I would say to you, Your Honor, there's

24   no need for you to (indiscernible) I'm fairly confident, with

25   your direction, that Mr. Evans and I can work this out.  The

1    problem to date has been very specific.  Mr. Evans and Ms.

2    Griffith would not agree unless we agreed to the

3    interrogatories and didn't limit the scope.  So, when they

4    took that very hardline position, we had no room to give.

5         I am quite confident that, given the information

6    Mr. Evans has told the Court today, that, if he sent me an

7    appropriate -- you know, a couple of definitions, we're going

8    to come to an answer.  But of course, it's up to you, Your

9    Honor.

10        MR. EVANS:  Your Honor, I'm happy to respond.

11        The communications are not about specific requests

12   10 (indiscernible) 11, the communications were I refuse to do

13   interrogatories, I refuse to provide documents in advance of

14   the deposition, I'll only provide requests for admission if I

15   don't have to produce any documents and I'm not subject to

16   examination.  None of those were acceptable.

17        So we always try to work something out.  We've been

18   trying to work this out since mid-August.  We've spent a lot

19   of time and money kind of going back and forth with this.

20   That's why I'm hoping we come to a resolution today.

21        I do have a proposed definition for "wallet

22   management."

23        THE COURT:  Okay.

24        MR. EVANS:  "Wallet management" means issues

25   concerning digital wallets at Prime, including digital

1  addresses, hardware devices, seed phrases, Fireblocks, Bitco,

2  98f, and self-hosted wallets.

3          MS. DIEMER:  I don't have any problems with that.

4          But I must disagree with what Mr. Evans said.  We

5  offered Mr. Gorge, both document production and for dep --

6  for 2004 examination.  But I draw the line at something that

7  is absolutely unavailable under the law.

8          THE COURT:  Okay.  Well, I appreciate both parties'

9  arguments, but the point of today is to move forward.

10         And I think then we have resolved the issues with

11 respect to requests for production, correct?

12     (No verbal response)

13         THE COURT:  Okay.  So I think the only other issue

14 is with respect to interrogatories.  Is that correct?

15         MR. EVANS:  I think so, Your Honor, and except for

16 the timing of the document productions versus the deposition.

17 This witness has refused to provide documents in advance of

18 the deposition.  They want to show up at the deposition with

19 the documents.

20         THE COURT:  I --

21         MS. DIEMER:  That is absolutely not true, Your

22 Honor.

23         THE COURT:  Okay.

24         MS. DIEMER:  We have absolutely agreed that, if we

25 could limit the number of documents or the scope, and if we

1    could pick a consensual date and have it out here, that we

2    would provide the documents in advance.  The sticking point

3    was the interrogatories and the scope.

4              THE COURT:  Okay.

5              MR. EVANS:  Well, that's great.  Then it's

6    resolved.

7              THE COURT:  Okay.  All right.  So we're resolved on

8    the subpoena and the document production, correct?

9              MR. EVANS:  I -- yes.  I -- we haven't set a date

10   for document production?  Do you want to do that at the end?

11             MS. DIEMER:  No, Your Honor, because I have to ask

12   my client what is convenient for him.  I happen to know that

13   my client is traveling at the moment.  And the overbearing

14   way in which this matter has been teed up makes me concerned

15   that we would be unable to identify a mutually agreeable

16   date.

17        (Participants confer)

18             MR. EVANS:  I'm sorry, Your Honor.  I think -- I

19   believe the proposed date was -- I'm sorry.  Let me check the

20   order.

21             THE COURT:  This is -- is the proposed date the

22   date Ms. Diemer says she needs to check with her client?

23             MR. EVANS:  Yes.  Yeah.  So we can -- I'd like to

24   set an outside date if we could, 14 days, 21 days.

25             THE COURT:  What date did you propose?

1              MR. EVANS:  Fourteen days --

2              THE COURT:  Or it's stale?

3              MR. EVANS:  -- from today.

4              MS. DIEMER:  Your Honor, I cannot, I absolutely

5    cannot do anything the week of the --

6              THE COURT:  It's Thanksgiving.  How about the end

7    of the month?

8              MR. EVANS:  That works for me.

9              THE COURT:  Ms. Diemer, how about November 30th?

10             MS. DIEMER:  I believe that that's fine for my

11   calendar.  Hold on just a minute.  I have a -- I just need to

12   double-check.  I have a jury trial in early December, and I

13   need to double-check that that date is -- could we make it

14   December 1st?  I have an all-day mediation that's been set

15   for nine months --

16             THE COURT:  Yes.

17             MS. DIEMER:  -- on the 30th.

18             THE COURT:  December 1st, Friday --

19             MS. DIEMER:  And I --

20             THE COURT:  -- December 1st.

21             MS. DIEMER:  And I will have to talk to my client

22   because I do know the man is traveling, so I will have to

23   check --

24             THE COURT:  Okay.

25             MS. DIEMER:  -- if he's available.

1      MR. EVANS:  Just to be -- that's for the production

2  of documents --

3          THE COURT:  Yes.

4          MR. EVANS:  -- right?  Okay.

5          THE COURT:  And then are you going to re-serve --

6          MR. EVANS:  Well, the --

7          THE COURT:  -- a dep --

8          MR. EVANS:  The next two orders of business, I

9  think, are the interrogatories --

10         THE COURT:  Yes.

11         MR. EVANS:  -- and the deposition, both date and

12  the objection related to the interrogatories, in general.

13         THE COURT:  Okay.  So I'm going to let you both

14  present your arguments with respect to interrogatories

15  because, frankly -- well, let -- go ahead and present your

16  arguments.

17         MR. EVANS:  Your Honor, I'll keep it short.

18         THE COURT:  No --

19         MR. EVANS:  2004 has been described as a "fishing

20  expedition."  Orders -- courts have the ability to order

21  efficient discovery to make sure the debtors and creditors'

22  committees and others can examine the assets and the

23  liabilities concerning the debtors.

24         We have nine narrowly tailored interrogatories

25  directly relevant to the 98f wallet issue only.  If he does

1    not, for example, any seed phrases, the answer is I don't

2    have any.  If he doesn't know who has the seed phrases, the

3    answer is I don't have any.

4            Each of these interrogatories are narrowly

5    tailored.  And we did this to be efficient.  We did this to

6    determine which witnesses are we going to have to spend the

7    time and money and effort on a limited budget to take

8    depositions for six, seven hours of counsel for the debtors,

9    counsel for the creditors' committee, and everyone else

10   present.  And so that's why the interrogatories in this case

11   are the most efficient means of determining does he have the

12   seed phrases, does he know who else has them.

13           And one of the other issues, the reason why this

14   has been helpful in this process is because interrogatories

15   from other witnesses have revealed new targets that may have

16   the seed phrases.  We're looking for a needle in a haystack,

17   or really a piece of paper in a safe deposit box.  And so

18   identifying new witnesses with very narrowly tailored

19   interrogatories is the most efficient way to go about this.

20           MR. DETWEILER:  Your Honor?

21           MS. DIEMER:  Your Honor, the -- I apologize, Mr.

22   Evans.

23           THE COURT:  I'm sorry.  Committee's counsel wants

24   to be heard, and then we'll get to you, Ms. Diemer.

25           MR. DETWEILER:  Good afternoon.  May it please the

1   Court --

2           THE COURT:  Good afternoon.

3           MR. DETWEILER:  -- Donald Detweiler of Womble Bond

4   on behalf of the committee, along with Shari Dwoskin of Brown

5   Rudnick.

6           The committee has been working closely with the

7   debtor on a number of these issues, Your Honor.  And Ms.

8   Dwoskin would like to briefly present a statement to the

9   Court --

10          THE COURT:  Okay.

11          MR. DETWEILER:  -- with regard to the

12  interrogatories and discovery.

13          THE COURT:  Okay.  Good afternoon.

14          MS. DWOSKIN:  Thank you, Your Honor.  And for the

15  record, Sharon Dwoskin from Brown Rudnick on behalf of the

16  committee.  My motion for *pro hac* admission was filed at

17  Docket Number 389.  And I appreciate Your Honor allowing me

18  to speak and allowing me to participate by Zoom.

19          Look, Your Honor, from the committee's perspective,

20  regarding the 98f wallet seed phrases is of utmost importance

21  to the committee, right?  It's of utmost importance to the

22  case.  It's tens of millions of dollars of ETH that are

23  currently unavailable to the estate and its creditors.

24          But preserving estate assets is also of utmost

25  importance.  Your Honor is well aware of the thin margins of

1      this case right now.  Depositions are expensive.  If they're

2      necessary, they're necessary.  But if the debtors are able to

3      get the information that they need through interrogatories,

4      depositions can be streamlined or avoided entirely.

5              And frankly, Your Honor, we think that that is most

6      efficient for the debtor and less burdensome for this

7      particular witness.  You know, we think that the procedure

8      requested by the debtors, right?  Interrogatories and

9      documents, followed by a deposition, if necessary, reduces

10     the fee burden on the estate and on the witness.  And so,

11     Your Honor, I think that, you know, this Court has the

12     ability to craft orders in its discretion under 2004 that

13     minimize the fee burn of the estate, and we would ask Your

14     Honor to do so.

15             THE COURT:  Where -- let me -- I'm going to ask you

16     the same question that I asked the debtors.  What is the

17     basis under 2004 for permitting interrogatories?

18             MS. DWOSKIN:  Your Honor, I don't have a good

19     answer to the question.  I think that 105 gives this Court

20     broad powers.  And I think that the overall equities of the

21     Court, like the ability to look at what would be most cost-

22     effective for the estate while protecting everybody's rights

23     is the way to go here.

24             But Your Honor, I agree, this is a gray area.  And

25     you know, other courts have done it, other courts have

1    ordered it, and other witnesses in this case have done it.

2    But frankly, from -- if the concern is what would be most

3    burdensome on this witness, in the committee's view,

4    answering nine interrogatories may be less burdensome than

5    not doing so and having to sit for a deposition.

6              THE COURT:  Well, I don't think that's the position

7    that the witness is taking here.  I mean, I'll hear from Ms.

8    Diemer.  But I think Ms. Diemer's position is different.

9              MS. DWOSKIN:  I'm not intending to put words into

10   Ms. Diemer's mouth.  Our view is that reducing the burden on

11   the estate is absolutely critical here.  We think that

12   interrogatories would do that.  And as a side benefit, it

13   would reduce the fee burn for the witness.  I understand that

14   the witness has other concerns about whether interrogatories

15   are appropriate at all.

16             THE COURT:  And let me ask you:  Are you aware of

17   any precedent from this court where, in a contested scenario,

18   the court has permitted interrogatories under a 2004 exam?

19             MS. DWOSKIN:  I believe, Your Honor, that the

20   debtors have quoted some in their response, but I would let

21   Mr. Evans speak to that.

22             THE COURT:  Okay.

23             MR. EVANS:  Your Honor, on Page 10 -- 9 and 10 of

24   our brief, we identify orders issued pursuant to 2004

25   requiring interrogatories, but they were not contested.

1          THE COURT:  Well, they were non-contested.  And

2     they were parties, weren't they?

3          MR. EVANS:  Yes.  Yes.

4          THE COURT:  And --

5          MR. EVANS:  One was a --

6          THE COURT:  And I don't --

7          MR. EVANS:  One was a nonparty seeking information

8     from a debtor, but yes.

9          THE COURT:  And I don't disagree with you, it

10     happens all the time because parties don't contest it.  But I

11     have a different scenario here.

12          MR. EVANS:  If I had one, I'd give it to you, but I

13     don't.

14          THE COURT:  Okay.  Thank you.  I appreciate it.

15          Ms. Diemer?

16          MS. DIEMER:  Yes, Your Honor.  I would have had no

17     problem if the request was answer these interrogatories,

18     these nine quite broad interrogatories, which are not

19     narrowly tailored because the definitions that accompany them

20     are extremely broad-based, but I wouldn't have had any

21     problem answering nine interrogatories if what I was being

22     offered on behalf of my client was answer these nine

23     interrogatories and then we'll get back to you and see if we

24     need the requests for production of documents and the exam.

25          A hundred percent of the response from the debtor

1    was answer the interrogatories -- produce the documents,

2    answer the interrogatories, and then I'm going to take your

3    2004 exam.  This is of an independent individual who has no

4    party -- no -- who is not involved in this case at all.

5          And they kept telling me, well, here, look at these

6    cases.  The cases they cite were -- the two cases they cited

7    are two cases where the Court said no, and they involved

8    parties.  This is -- there is clear precedent under Rule 45

9    that, under the SEC v. Tsai case that I cited that says

10   absolutely, you cannot get interrogatories from an

11   independent third party, the Rouse case, it's all cited at

12   Pages 7 and 8.

13         There is no authority to get interrogatories from a

14   witness who is a third party to the dispute.  The only choice

15   they have is the subpoenaed 2004 examination; or, if they

16   were in a disputed matter or an adversary proceeding, they

17   could then issue the interrogatories.  They're not available

18   under Rule 45 of a third party.

19         And if, in fact, this were a situation where they

20   said, hey, look at the responses to those interrogatories and

21   see if we really need to go any farther, I probably would

22   have reacted differently.  But that has never been their

23   position.  Their position was you give me the answers to the

24   interrogatories and all the documents under the wider scope,

25   and then we're going to take your examination.

1           I think the problem here -- I, too, do debtors'

2   work out here in the Ninth Circuit --

3           THE COURT:  I'm sorry.

4           MS. DIEMER:  -- and I will --

5           THE COURT:  I didn't hear that.

6           MS. DIEMER:  -- tell the Court --

7           THE COURT:  What did you say?

8           MS. DIEMER:  I also do debtors' work here in the

9   Ninth Circuit and -- in California.  And I am sympathetic to

10  the fact that this is a tight budget, and I understand that

11  this is a court of equity.  But the court of equity is bound

12  also by the rules.  The rules are that they cannot do what

13  they are asking you to do, there is no authority for it.

14          And I will tell you that, had they not wasted so

15  much time and energy trying to get something they didn't have

16  a right to, then I suspect we would not be before you today.

17          MR. EVANS:  Well, Your Honor, I -- Joe Evans,

18  counsel for the debtor.  The cases cited by this witness, not

19  a single one of them deals with 2004 discovery, not one.

20  Each of them are just traditional litigation and have efforts

21  to enforce a subpoena upon a third party, but that's neither

22  here, nor there.

23          This -- you know, what I'm trying to avoid is

24  having to come back and have another argument like this.  And

25  so, if the way to resolve this is we get our documents, we

1    get our interrogatories, the UCC and the debtors meet and

2    confer and decide whether it's a useful use of resources to

3    pursue the deposition, I'm fine with that.  I just don't want

4    to have to come back to court and file another motion in

5    order to compel such a deposition.

6              MS. DIEMER:  We are not willing to give Mr. Evans

7    interrogatory responses that he is absolutely not entitled

8    to.

9              He is correct, Rule 45 -- the cases I cited are

10   under Rule 45.  The Code is clear, under 916 is the

11   enforcement mechanism that causes Rule 45 to be the

12   enforcement policy for Rule 2004, and it absolutely does not

13   allow interrogatories.

14             If what he meant to say was he was comfortable with

15   the requests for production of documents as limited and the

16   testimony of a 2004, then that would be fine, if he wished to

17   withdraw his request for interrogatories.

18             MR. EVANS:  Your Honor, that's not what -- that's

19   not what I was offering.

20             THE COURT:  I --

21             MR. EVANS:  We --

22             THE COURT:  I think you just talked past each

23   other.

24             THE COURT:  Let me ask:  Does the U.S. Trustee have

25   a position on this issue?

1        MR. CUDIA:  Good afternoon, Your Honor.  Joseph

2    Cudia for the United States Trustee.

3        The United States Trustee does not have a position

4    on this matter.

5        THE COURT:  Okay.  Thank you, MR. Cudia.

6        (Pause in proceedings)

7        THE COURT:  There isn't a mechanism to have a third

8    party respond to interrogatories in a 2004, so I'm not going

9    to allow the interrogatories at this time, unless the parties

10   reach an alternative agreement amongst them.

11       MR. EVANS:  Okay.

12       MS. DIEMER:  Thank you, Your Honor.

13       MR. EVANS:  Your Honor, Joe Evans for the debtor.

14       One request.  If we're not going to do

15   interrogatories, as we and the UCC felt was the most

16   efficient way to do this, if we're going to be doing a

17   deposition -- and it sounds like we're going to --

18       THE COURT:  I think you are.

19       MR. EVANS:  -- the request is that the deposition

20   be conducted via Zoom, so we don't waste time and estate

21   assets out to California to meet Mr. Gorge.

22       MS. DIEMER:  That's fine, Your Honor.  We don't

23   have any opposition to that.  I, frankly, assumed that would

24   be true.

25       THE COURT:  Okay.  So you're going to consent to

1     all the parties being on Zoom.

2               MS. DIEMER:  Yes.

3               THE COURT:  Okay.  Is there anything further for

4     today?

5               MS. DIEMER:  Not from me, Your Honor.  I appreciate

6     your time in this matter.

7               MR. EVANS:  Your Honor, just an outside date for

8     the deposition.

9               THE COURT:  Oh.

10              MR. EVANS:  I believe the documents were December

11    1st --

12              THE COURT:  The -- yeah.

13              MR. EVANS:  -- if I remember correctly.

14              THE COURT:  Let me pull up a calendar.

15              MR. EVANS:  We're getting close to the holidays.

16    But maybe December 14th?

17              THE COURT:  The --

18              MS. DIEMER:  Your Honor, I am in a two-week jury

19    trial, at least we believe it will only be two weeks.  That

20    starts on the 7th and continues to the 25th of December.  And

21    I am chief trial counsel (indiscernible)

22              THE COURT:  How much longer do you expect the

23    investigation to go?

24              MR. EVANS:  It --

25              THE COURT:  And how does that fit in with like

1    confirmation and the timing of the case?

2         MR. EVANS:  It's a good question, Your Honor.  We

3    would have a number of targets.  We are likely not going to

4    have all the depositions done in advance of the confirmation

5    hearing, and so we anticipate a mechanism to continue

6    investigating, but I don't know where we are in terms of when

7    the confirmation hearings are.  Our first step is issuing a

8    schedule for Friday.

9         THE COURT:  So you're in trial until the 25th of

10   December?

11        MS. DIEMER:  No, the 20th, Your Honor --

12        THE COURT:  Oh.

13        MS. DIEMER:  -- we hope, fingers crossed.  It is a

14   jury trial with 17 plaintiffs and we are the -- one of the

15   defendants, and so I can't promise you that it won't go

16   closer to Christmas.  I am profoundly hoping we will all be

17   expeditious, as all three of our children will be returning

18   to California for the holiday and I'd like to see them.

19        THE COURT:  What is the debtor proposing?

20        MR. EVANS:  I'm sorry, Your Honor.  I didn't --

21        THE COURT:  What is the debtor proposing, in terms

22   of deposition outside date?

23        MR. EVANS:  And I believe, if I heard Ms. Diemer

24   correctly, the trial (indiscernible) through the 20th?

25        MS. DIEMER:  Yes.

1          MR. EVANS:  21st, I guess.

2          MS. DIEMER:  Because I will have so much time to

3    prepare my witness and go over the documents while I'm in the

4    middle of a two-week jury trial, Mr. Evans?

5          THE COURT:  How about January 5th?

6          MR. EVANS:  What's that?

7          MS. DIEMER:  Thank you --

8          THE COURT:  How about --

9          MS. DIEMER:  -- Your Honor.

10         THE COURT:  -- January 5th?

11         MS. DIEMER:  That's fine.

12         MR. EVANS:  January 5th, you said?  That's

13   acceptable, Your Honor.  Thank you.

14         THE COURT:  There are just so many holidays --

15         MR. EVANS:  Yeah.

16         THE COURT:  -- and I'm -- of course, the parties

17   can obviously confer and agree to a time before that.  That's

18   the outside date.

19         MR. EVANS:  Okay.

20         MS. DIEMER:  Thank you, Your Honor.

21         THE COURT:  Okay.

22         MR. EVANS:  Thank you.

23         THE COURT:  Could you confer and submit a form of

24   order?

25         Mr. Detweiler, do you want to be heard?

1          MR. DETWEILER:  May it please the Court.  Your

2     Honor, on behalf of the committee, the committee is reserving

3     all rights with respect to seeking discovery, if necessary,

4     under any other appropriate means --

5          THE COURT:  Uh-huh.

6          MR. DETWEILER:  -- that are allowable under the

7     Bankruptcy Code.  Hopefully, the parties could be practical

8     and pragmatic and get the answers to the issues and we move

9     forward.  But otherwise, we're going to reserve our rights

10     after listening to the colloquy today.  And I wanted to just

11     stand and make that known to the Court.  We reserve the

12     rights --

13          THE COURT:  Okay.

14          MR. DETWEILER:  -- for discovery in any other way.

15          THE COURT:  Okay.  Understood.  All rights --

16          MR. DETWEILER:  Thank you --

17          THE COURT:  -- reserved.

18          MR. DETWEILER:  -- Your Honor.

19          THE COURT:  And I do encourage the parties to be

20     practical.  There will be an examination, so --

21          MS. DIEMER:  That's fine, Your Honor.  We never

22     opposed that.

23          THE COURT:  All right.  Well, I just want to be

24     clear.

25          So is there anything further for this afternoon?

1        MS. DIEMER:  I would only ask that we be able to

2    review the order before it be submitted to the Court.

3        THE COURT:  Yes, I asked the parties to confer and

4    agree on a form of order.  And if you can't agree on a form

5    of order, submit competing orders and I'll pick one.

6        MS. DIEMER:  Absolutely, Your Honor.

7        THE COURT:  And please share it with Mr. Cudia and

8    the committee, as well.

9        MR. EVANS:  Thank you, Your Honor.

10       THE COURT:  Okay.  Thank you all very much.  We

11   stand in recess.  Have a great afternoon.

12       COUNSEL:  Thank you, Your Honor.  Thank you, Your

13   Honor.

14       (Proceedings concluded at 3:02 p.m.)

15                           *****

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10   _____        November 11, 2023

11   Coleen Rand, AAERT Cert. No. 341

12   Certified Court Transcriptionist

13   For Reliable

14

15

16

17

18

19

20

21

22

23

24

25