**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*, [1] | Case No:  23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Hr'g Date: December 19, 2023 at 10:00 a.m. ET** |
| | **Re: Docket No. 413** |

**OPPOSITION OF TRUSTTOKEN, INC. AND TRUECOIN, LLC TO
DEBTORS' MOTION TO SELL CERTAIN FOREIGN CURRENCY
FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND
<u>ENCUMBRANCES PURSUANT TO BANKRUPTCY CODE SECTION 363</u>**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

I.    TrueCoin and TrustToken are distinct entities engaged in differing business activities and entered into separate agreements with Prime Trust. ........................................3

    A.    Prime Trust served as escrow agent for TrueCoin pursuant to Escrow Services Agreements. .................................................................................. 3

    B.    Prime Trust provided custodial services for TrustToken that were wholly distinct from the escrow services provided to TrueCoin. ................................ 5

II.    Prime Trust procured the alleged 2022 Agreements with TrustToken through fraud. ................................................................................................................6

ARGUMENT ....................................................................................................................... 8

I.    TrueCoin's Foreign Currency is not bankruptcy estate property ........................................8

II.    The 2022 Order Form updates are not enforceable against TrustToken—or any other entity—because they were procured through fraud. ...................................14

    A.    Prime Trust misrepresented or omitted material facts when it solicited TrustToken's execution of the 2022 Order Form. ................................. 15

    B.    Because the 2022 Order Form is void, TrustToken's prior custodial agreements with Prime Trust apply. ......................................................................... 19

    C.    If the Court does not set aside the 2022 Order Form as fraudulent, it should permit interested parties to pursue further discovery on this issue. ................................ 20

CONCLUSION .................................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Danzig v. Jack Grynberg & Assocs.*,
   161 Cal. App. 3d 1128 (Cal. App. 1984) ............................................................. 17

*Edwards v. FCA US LLC*,
   2022 WL 1814144 (N.D. Cal. June 2, 2022) ...................................................... 19

*Feinberg v. Saunders, Karp & Megrue, L.P.*,
   1998 WL 863284 (D. Del. Nov. 13, 1998) ......................................................... 17

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*,
   209 F.3d 252 (3d Cir. 2000) ............................................................................... 13

*Ikspan, Inc. v. Ruben*,
   2021 Cal. Super. LEXIS 114641 (Cal. Sup. Ct. Oct. 12, 2021) .......................... 17

*In re ANR Advance Transp. Co., Inc.*,
   247 B.R. 771 (Bankr. E.D. Wis. 2000) .............................................................. 9

*In re Atl. Gulf Cmtys. Corp.*,
   369 B.R. 156 (Bankr. D. Del. 2007) ............................................................... 8, 11

*In re Cedar Rapids Meats, Inc.*,
   121 B.R. 562 (Bankr. N.D. Iowa 1990) ............................................................. 9

*In re Celsius Network LLC*,
   647 B.R. 631 (Bankr. S.D.N.Y. 2023) ............................................................... 20

*In re Decade, S.A.C., LLC*,
   635 B.R. 735 (Bankr. D. Del. 2021) .................................................................. 17

*In re Dolphin Titan Int'l, Inc.*,
   93 B.R. 508 (Bankr. S.D. Tex. 1988) ................................................................ 9

*In re Dreier LLP*,
   527 B.R. 126 (S.D.N.Y. 2014) ............................................................... 9, 11, 14

*In re Expert S. Tulsa, LLC*,
   456 B.R. 84 (Bankr. D. Kan. 2011) ................................................................... 9

*In re Jazzland, Inc.*,
   322 B.R. 610 (E.D. La. 2005) ........................................................................... 9

*In re Majestic Star Casino, LLC*,
716 F.3d 736 (3d Cir. 2013) ................................................. 10

*In re Mansaray-Ruffin*,
530 F.3d 230 (3d Cir. 2008) ................................................. 14

*In re Mary Holder Agency, Inc.*,
2012 WL 6021481 (Bankr. D.N.J. Dec. 4, 2012) ................................. 13

*In re Millennium Lab Holdings II, LLC*,
562 B.R. 614 (Bankr. D. Del. 2016) ......................................... 20

*In re Quaker Distribs., Inc.*,
189 B.R. 63 (Bankr. E.D. Pa. 1995) ......................................... 13

*In re Royal Bus. Sch., Inc.*,
157 B.R. 932 (Bankr. E.D.N.Y. 1993) ........................................ 9

*In re Scanlon*,
239 F.3d 1195 (9th Cir. 2001) .............................................. 9

*In re The 1031 Tax Grp., LLC*,
439 B.R. 47 (Bankr. S.D.N.Y.2010) ......................................... 11

*In re Voyager Digital Holdings, Inc.*,
2022 WL 3146796 (Bankr. S.D.N.Y. Aug. 5, 2022) ............................. 20

*In re Werner*,
2019 WL 641411 (B.A.P. 9th Cir. Feb. 13, 2019) ............................. 18

*In re Whitehall Jewelers Holdings, Inc.*,
2008 WL 2951974 (Bankr. D. Del. July 28, 2008) ............................. 14

*Mark Props., Inc. v. Nat'l Title Co.*,
117 Nev. 941 (Nev. 2001) .................................................. 11

*Nav N Go Kft. v. Mio Tech. USA, Ltd.*,
2009 WL 10693414 (D. Nev. June 11, 2009) .................................. 9

*Rush Air Sports, LLC v. RDJ Grp. Holdings, LLC*, 2020 WL 757828,
2020 WL 757828 (E.D. Cal. Feb. 14, 2020) .................................. 17

*Simon v. FIA Card Servs., N.A.*,
732 F.3d 259 (3d Cir. 2013) ............................................... 20

*Truck Ins. Exch. v. Palmer J. Swanson, Inc.*,
    124 Nev. 629 (Nev. 2008) ..................................................................................... 9

*Trusa v. Nepo*,
    2017 WL 1379594 (Del. Ch. Apr. 13, 2017) .......................................................... 18

*Zurba v. FCA US LLC*,
    2022 WL 17363073 (C.D. Cal. Nov. 10, 2022) ............................................... 18, 19

**Statutes**

11 U.S.C. § 363 ................................................................................................................ 1

11 U.S.C. § 541 ................................................................................................................ 8

Nevada Revised Statute, 645A.010 ............................................................................... 11

**Rules**

Fed. R. Bankr. P. 2004 ................................................................................................... 21

Fed. R. Bankr. P. 7001 ................................................................................................... 14

Local Rule 9013-1 .......................................................................................................... 21

TrustToken, Inc. ("TrustToken") and TrueCoin, LLC ("TrueCoin") hereby file this opposition to the Debtors' November 13, 2023 Motion for Entry of an Order Authorizing the Debtors to Sell Certain Foreign Currency Free and Clear of All Liens, Claims, Interests, and Encumbrances Pursuant to Bankruptcy Code Section 363 [ECF No. 413] (the "Motion"), together with the Declaration of Alex de Lorraine (the "de Lorraine Decl.") and exhibits thereto.[2]

## PRELIMINARY STATEMENT

The Debtors' Motion is directed to the wrong entity, references the wrong contractual agreements, and discusses an irrelevant legal framework. TrustToken, the entity that the Debtors name as the account holder and the focus of the Debtors' Motion, does not have any active foreign currency accounts with the Debtors. It maintains a small USD account with Prime Trust, LLC ("Prime Trust," together with other debtors, "Prime" or the "Debtors") and the current balance of that account is at least $4,931.08. Because this account is a U.S. dollar denominated account, it would be inappropriate to treat it as foreign currency and sell it in the manner that Prime proposes. Prime's Motion should be denied for this reason alone.

TrustToken is wholly owned by Archblock, Inc. ("Archblock"). TrueCoin is also a wholly owned subsidiary of Archblock. TrueCoin has foreign currency-backed stablecoin accounts with Prime Trust with foreign currency worth at least $8,931,759.98. This foreign currency is the Foreign Currency that is the subject of the Debtors' Motion. However, TrueCoin never entered into any of the 2022 Agreements[3] that Prime claims authorizes it to commingle funds to facilitate the Ponzi scheme Prime was running in 2022. The Debtors' Motion makes no

---

[2] Capitalized terms not defined herein shall have that meaning ascribed to them in the Debtors' Motion.

[3] The "2022 Agreements" referenced in the Debtors' Motion are defined as a series of four documents, including the MSA, Custodial Agreement, Order Form, and Renewal Form. *See* Motion ¶ 1, n. 3 [ECF No. 413]. All of the Agreements are attached as Exhibits A-D of the Declaration of Timothy Bowman [ECF No. 415].

effort to suggest otherwise.

TrueCoin's relationship with Prime Trust is governed by the 2019 Escrow Services Agreements between Prime Trust and TrueCoin. These agreements provide that Prime Trust, in its capacity as the escrow agent, "shall hold and manage the Escrow Amount as a fiduciary for the benefit of Holders" (§§ 2, 6), can only invest the funds "[a]t the sole discretion of [TrueCoin]" (§ 4(a)), and must redeem the funds when instructed by any holder (§ 3). Significantly, "no amounts deposited into the Escrow Account shall become the property of [TrueCoin], Prime Trust, or any other entity, or be subject to any debts, liens or encumbrances of any kind of [TrueCoin], Prime Trust, or any other entity, as they are held exclusively for the benefit of Holders." (§ 2). Escrow accounts are not property of a debtor's estate because the debtor does not hold legal or equitable title to funds held in escrow. Accordingly, the funds in the TrueCoin escrow accounts are outside the reach of the Debtors' estate and the Debtors' lengthy discussion of whether a trust had been formed is entirely irrelevant.

Prime's failure to address the correct entity in their Motion is troubling because it appears to be a strategic choice to obscure the fact that TrueCoin never agreed to the 2022 terms that Prime contends allow it to treat client funds as an internal piggy bank. Regardless, Prime cannot enforce the 2022 Agreements even against TrustToken—or any other entity—because those agreements were procured by fraud. When Prime Trust sought TrustToken's agreement to the 2022 terms it did so because it knew of an impending financial collapse and wanted to use client funds to keep itself afloat. Prime Trust's representatives never disclosed this fact to TrustToken. Instead, they misled TrustToken representatives about the purpose and nature of the 2022 Agreements. As a result, even if TrustToken was the appropriate entity, Prime's Motion should be denied because the 2022 Agreements are void and Prime Trust is bound by its prior agreements with TrustToken, which provided that funds held by Prime Trust were held "for the

benefit of" TrustToken and thus cannot be considered property of the bankruptcy estate.

For these reasons, and those set forth below and the supporting Declaration of Alex de Lorraine, we respectfully submit that the Debtors' Motion should be denied.

## BACKGROUND

I. **TrueCoin and TrustToken are distinct entities engaged in differing business activities and entered into separate agreements with Prime Trust.**

TrueCoin and TrustToken are subsidiaries of Archblock. Although both companies are owned by Archblock, TrueCoin was engaged in business activities distinct from those of TrustToken during the relevant period and the two entities had different contractual relationships with Prime Trust.

### A.    Prime Trust served as escrow agent for TrueCoin pursuant to Escrow Services Agreements.

TrueCoin is registered as a money service business and develops stablecoins to, among other things, allow users to deposit foreign currency into an escrow account and receive an equivalent amount of stablecoins in return. *See* de Lorraine Decl. ¶¶ 5, 6. This was accomplished through TrueCoin's technology system, which minted the stablecoins and transferred them to the user's blockchain wallet. *Id.* ¶ 6. Users were also able to redeem stablecoins for their associated fiat currency by sending its stablecoin tokens to a specific burn address, which would then destroy the stablecoins, and cause a corresponding amount of the applicable fiat currency be transferred to the customer's bank account. *Id.* TrueCoin developed a thorough set of governance protocols and controls in order to maintain the integrity of the stablecoins. For its stablecoin business to work, TrueCoin had to engage independent financial institutions to manage the escrow accounts that would hold customers' fiat currency. *Id.* That is how TrueCoin was introduced to Prime Trust.

In 2019, TrueCoin entered into a series of Escrow Services Agreements with Prime Trust.

3

The "whereas" clauses succinctly state the purpose of the agreements. In the escrow agreement for the TrueCoin Australian dollar account, for example, the parties explained that TrueCoin "proposes to offer to interested persons . . . virtual currency in the form of Tokens that are reflected on a blockchain" in exchange for Australian dollars. *See* de Lorraine Decl., Ex. 4 (first whereas clause). "[E]ach Token shall have a stated value of A\$1.00 and shall be redeemable for such amount per Token from the Escrow Amount" and holders "could redeem such Tokens for funds deposited in the Escrow Account." *Id.* (second and third whereas clauses). And Prime Trust "desire[d] to serve as Escrow Agent ('Escrow Agent') for the Holders." *Id.* (fourth whereas clause).

The Escrow Services Agreement provides that Prime Trust holds funds "for the benefit of Holders," TrueCoin's customers that hold and own the stablecoin tokens, and that "no amounts" remitted to the account shall become property of Prime Trust. Specifically, Section 2 provides:

> During the Escrow Period, the parties agree that (i) the escrowed funds will be held *for the benefit of Holders*, and that (ii) Company and *Prime Trust are not entitled to any funds at any time* and that *no amounts deposited into the Escrow Account shall become the property of* Company, *Prime Trust*, or any other entity, or be subject to any debts, liens or encumbrances of any kind of Company, Prime Trust, or any other entity, as they are *held exclusively for the benefit of Holders*.

de Lorraine Decl., Ex. 4 § 2 (emphasis added). Section 6 of the Escrow Services Agreement further provides that Prime Trust acts in a fiduciary capacity. *Id.* § 6 ("Escrow Agent shall hold and manage the Escrow Amount as a fiduciary for the benefit of Holders.").

Prime Trust currently holds foreign currency in TrueCoin's escrow accounts worth at least \$8,931,759.98. *See* de Lorraine Decl., Exs. 5-10. The account statements with respect to the escrow accounts identify TrueCoin (not TrustToken) as the account holder. *Id.* And while the Debtors contend in their brief that TrustToken sent emails addressing Prime Trust's failure, the

body of the email reproduced by the Debtors shows that it was sent by TrueCoin, not

TrustToken. *See* Motion ¶ 32. Similarly, the Debtors falsely state that "TrustToken's COO

issued an Escrow Holdings Report" citing Exhibit C to the Evans Declaration. *Id.* ¶ 33. Exhibit C

to the Evans Declaration, however, is signed by "Alex de Lorraine, COO TrueCoin, LLC." *See*

*also* Motion ¶ 34 (incorrectly stating that "Prime acquired the Foreign Currency from

TrustToken").

     **B.**    **Prime Trust provided custodial services for TrustToken that were wholly distinct from the escrow services provided to TrueCoin.**

Unlike TrueCoin, which manages stablecoins, TrustToken is engaged in the business of

software development and is primarily responsible for developing and launching other

Archblock product lines, such as TrueFi, a decentralized protocol for uncollateralized on-chain

lending, and Archblock Institutional Platform, a marketplace for portfolio managers. *See* de

Lorraine Decl. ¶ 18. On January 29, 2018, TrustToken and Prime Trust entered into a Self-

Directed Custodial Account Agreement (the "2018 Custodial Agreement") to custody

Archblock's corporate funds in custodial accounts (the "Custodial Accounts"). *Id.* ¶ 19. Under

the 2018 Custodial Agreement, TrustToken is the "Account Holder" and Prime Trust is the

custodian that holds and processes as directed all the assets of TrustToken in the Custodial

Accounts. de Lorraine Decl., Ex. 11, Preamble. The agreement expressly established that Prime

Trust will "accept and hold [the funds] on Account Holder's behalf," *id*. § 4(a), "will act solely

as custodian of your Account and will not exercise any investment discretion regarding your

Account, as this is solely your responsibility," *id.* § 2(a), and "[a]ssets under custody are held for

benefit of Account holders and not together with other, non-custodial funds or property of Prime

Trust," *id.* § 4(c).

Notably, the 2018 Custodial Agreement also stated: "Non-USD currency . . . are

generally not accepted for custody at Prime Trust." *Id.* § 4(a). That is why TrueCoin entered into the separate Escrow Services Agreements in 2019 when it required an escrow agent to manage the non-USD foreign currency-backed stablecoin escrow accounts.

Prime Trust currently holds U.S. dollars in TrustToken's Custodial Accounts worth at least $4,931.08. *See* de Lorraine Decl., Ex. 12. The account statement provided by Prime Trust with respect to the custodial account identifies TrustToken as the account holder. *Id.*

## II.     Prime Trust procured the alleged 2022 Agreements with TrustToken through fraud.

According to Jor Law, the Debtors' Interim Chief Executive Officer and President, the Debtors were beset with a series of financial setbacks in late 2021 and early 2022 as a result of, among other things, the "crypto winter" and the inability to access approximately $38.9 million in cryptocurrency stored in the 98f Wallet. *See* Declaration of Jor Law, dated August 24, 2022 [ECF No. 14], ¶¶ 38, 48.  Instead of dealing with these setbacks responsibly and openly, the Debtors engaged in a Ponzi scheme by using customer funds to purchase cryptocurrency and fund customer redemptions.  For example, employees of the Debtors used "fiat currency from omnibus clients to purchase ETH to satisfy customer withdrawal requests," which led to the Debtors using "$76,367,247.90 in the aggregate to purchase ETH to fund customer withdrawals." *Id.* ¶ 49.  In addition, the Debtors invested in TerraUSD using customer funds and the Debtors' funds, "which resulted in a loss of approximately $6,000,000 in client funds and $2,000,000 in treasury funds." *Id.* ¶ 40.

As a result, by early 2022, the Debtors lost tens of millions of dollars in customer funds through their own negligence and outright fraud. The Debtors then sought to remedy the situation by deceiving customers into updating their agreements with the Debtors in such a way that the Debtors now claim gave them the power to use customer funds without customer knowledge.

6

In or around February 2022, representatives from Prime Trust contacted representatives of TrustToken for what was described as a ministerial update to the Prime Trust-TrustToken User Agreements. *See* de Lorraine Decl. ¶¶ 23-34. Gretchen Dudon, who was then a Senior Account Manager of Prime Trust, contacted Alex de Lorraine, TrustToken's COO, to effectuate the updates. Ms. Dudon represented in a Slack message to Mr. de Lorraine that the updates in the User Agreements had no material changes and that "The custodial account agreement is intended to only apply to your custody accounts and will have no impact on your escrow agreements currently in place." *Id.*, Ex. 14 at 3. Shortly after that update, in May 2022, Victor Garza, Prime Trust's Strategic Account Manager, contacted TrustToken to effectuate other updates through a Prime Trust Order Form, again describing the changes as a ministerial update for the new pricing model for the next year. *Id.* ¶ 35. If the 2022 updates to the user agreements were intended to allow Prime Trust to siphon funds previously held in escrow, as the Debtors now contend, then Prime Trust acted fraudulently. Neither Ms. Dudon, nor Mr. Garza, nor any other Prime Trust employee or agent ever revealed the true purpose behind the contractual updates, which was to allow Prime Trust to access customer funds to remedy Prime's dire financial situation. *Id.* ¶ 36.

On May 23, 2022, TrustToken, in reliance upon Prime Trust's assurances that the escrow agreements would remain unchanged, signed the 2022 Order Form, which the Debtors argue in their Motion gave rise to the MSA and Service Schedule documents governing the dispute over the Foreign Currency. Again, TrueCoin is not a signatory to the 2022 Order Form.

It appears that Ms. Dudon (or someone else at Prime Trust) deleted her Slack message to Mr. de Lorraine in a blatant attempt to erase the record of the assurances she provided. The Slack communications platform allows one user to delete their messages to a recipient, which simultaneously deletes the message on the receiving party's end as well. Nevertheless, Mr. de Lorraine preserved Ms. Dudon's message contemporaneously with his receipt of it by pasting it

into an email to Michael G. Bland, TrustToken's Senior Corporate Counsel. *See* de Lorraine Decl., Ex. 14 at 3.

Representatives from TrustToken also reached out to Slack to recover the deleted messages from Ms. Dudon and were told that the messages could potentially be reinstated. *Id.* ¶ 37. However, before Slack could agree to reinstate the messages, Slack requested either Prime Trust's consent or a duly issued subpoena. *Id.* On November 13, 2023, counsel to TrustToken asked the Debtors to consent to restore the Slack messages. Tellingly, the Debtors have not consented to do so to date.

In their Motion, the Debtors reference a 2023 Renewal Form of the Prime Trust Order Form as part of the 2022 Agreements and attach an unsigned copy of it. Motion ¶ 1, n. 3 [ECF No. 413], Exhibit D to Bowman Declaration [ECF No. 415-4]. However, neither TrustToken nor TrueCoin has ever agreed to or signed the Renewal Form. *See* de Lorraine Decl. ¶ 38.

On October 20, 2023, TrustToken filed a proof of claim against Prime Trust seeking at least $4,931.08 with respect to securities, cash, and other assets custodied into four TrustToken Custodial Accounts with Prime Trust. *Id.* ¶ 40. Also on October 20, 2023, TrueCoin filed its proof of claim against Prime Trust seeking at least $8,931,759.98 with respect to currency deposited into seven TrueCoin Escrow Accounts. *Id.*

## ARGUMENT

### I.    **TrueCoin's Foreign Currency is not bankruptcy estate property.**

Funds held in escrow accounts are not property of the bankruptcy estate within the meaning of 11 U.S.C. § 541. *See e.g.*, *In re Atl. Gulf Cmtys. Corp.*, 369 B.R. 156, 164 (Bankr. D. Del. 2007) (monies held in escrow not property of the estate); *In re Dreier LLP*, 527 B.R. 126, 134 (S.D.N.Y. 2014) (money held in escrow by bankrupt law firm was not property of the debtor

law firm's estate).[4] This is true because an escrow agent, such as Prime Trust, does not hold legal title to the funds and does not have an equitable interest in the funds. *In re Dreier LLP*, 527 B.R. at 134; *see also In re Scanlon*, 239 F.3d 1195, 1198 (9th Cir. 2001) (funds deposited "for the benefit of others, cannot be characterized as property of the estate").

There can be no reasonable dispute that Prime Trust is holding the Foreign Currency at issue pursuant to its Escrow Services Agreements with TrueCoin. TrueCoin never agreed to the 2022 Order Form or any of the other 2022 Agreements involving TrustToken that are referenced in the Debtors' Motion. And the Debtors have indisputably not attached a version of the 2022 Agreements executed by TrueCoin.[5] If the Debtors contend that TrueCoin is bound by agreements allegedly executed by an affiliate, they are wrong. *See, e.g.*, *Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 124 Nev. 629, 634 (Nev. 2008) (non-signatory firm not bound by affiliate's agreement); *Nav N Go Kft. v. Mio Tech. USA, Ltd.*, 2009 WL 10693414, at *7 (D. Nev. June 11, 2009) (same). In addition, the Debtors cannot argue that TrueCoin is an affiliate of TrustToken within the meaning of the MSA. The MSA defines "affiliate" as "any entity that the Party directly or indirectly owns or controls more than fifty percent (50%) of the voting interests of the subject entity." Bowman Declaration, Ex. A [ECF No. 415-1], at 2. TrustToken does not have any ownership interest in TrueCoin and does not control TrueCoin. de Lorraine Decl. ¶ 3.

---

[4] *See also In re Expert S. Tulsa, LLC*, 456 B.R. 84, 87 (Bankr. D. Kan. 2011), *aff'd*, 522 B.R. 634 (B.A.P. 10th Cir. 2014), *aff'd*, 619 F. App'x 779 (10th Cir. 2015) (escrow funds not property of the estate); *In re Jazzland, Inc.*, 322 B.R. 610, 616 (E.D. La. 2005) ("[g]enerally, under bankruptcy law funds held in escrow are not property of the estate"); *In re ANR Advance Transp. Co., Inc.*, 247 B.R. 771, 774 (Bankr. E.D. Wis. 2000) (same); *In re Royal Bus. Sch., Inc.*, 157 B.R. 932, 941-42 (Bankr. E.D.N.Y. 1993) (same); *In re Cedar Rapids Meats, Inc.*, 121 B.R. 562, 567-69 (Bankr. N.D. Iowa 1990) (same); *In re Dolphin Titan Int'l, Inc.*, 93 B.R. 508, 512 (Bankr. S.D. Tex. 1988) (same).

[5] The Debtors' claim that TrustToken "agreed to the Renewal Form" in May 2023 is even more specious. *See* Motion ¶ 27. The attached "Renewal Form" is not executed by TrustToken. *Id.* ¶ 1, n. 3 [ECF No. 413], Bowman Declaration, Ex. D [ECF No. 415-4]. And TrustToken never otherwise agreed to it. de Lorraine Decl. ¶ 38.

As noted above, *see* Background Part I.A, Prime Trust expressly agreed to hold funds in as a fiduciary on behalf of holders of TrueCoin stablecoins and to pay holders when certain specified conditions have been met.[6] It further agreed that it did not obtain any ownership interest in the escrowed funds. To this end, Section 2 of the Escrow Services Agreement provides:

> During the Escrow Period, the parties agree that (i) the escrowed funds will be held for the benefit of Holders, and that (ii) Company and Prime Trust are not entitled to any funds at any time and that no amounts deposited into the Escrow Account shall become the property of Company, Prime Trust, or any other entity, or be subject to any debts, liens or encumbrances of any kind of Company, Prime Trust, or any other entity, as they are held exclusively for the benefit of Holders.

de Lorraine Decl., Ex. 4 § 2.

Section 3 of the agreements describes the conditions governing redemptions:

> Each Holder seeking to redeem Tokens shall provide Escrow Agent with payment instructions along with any additional documents or information reasonably requested by the Escrow Agent. . . . Escrow Agent shall treat the Tokens as bearer instruments which are redeemable by any Holder with possession of the Token and Escrow Agent shall redeem Tokens without any obligation to investigate such Holder's title, interest or right to any Tokens which the Escrow Agent is instructed to redeem.

*Id.* § 3. And under Section 6, Prime Trust expressly agreed it was acting as a fiduciary. *Id.* § 6.

The Escrow Services Agreements gave rise to an escrow arrangement under applicable law. To determine whether an escrow arose, the Court should refer to state law. *See In re Majestic Star Casino, LLC*, 716 F.3d 736, 751 (3d Cir. 2013).

The Escrow Services Agreements are governed by Nevada law. de Lorraine Decl., Exs. 1,

---

[6] Notably, TrueCoin executed the Escrow Services Agreements rather than the custodial type agreements entered into by TrustToken because the custodial agreements expressly provided that "[n]on-USD currency . . . are generally not accepted for custody at Prime Trust." de Lorraine Decl., Ex. 11 § 4(a).

2, 4 § 11; Ex. 4 § 12. Under Nevada law, an escrow arrangement is created in "any transaction wherein one person, for the purpose of effecting or closing the sale, purchase, exchange, transfer, encumbering or leasing of real or personal property to another person or persons, delivers any written instrument, money, evidence of title to real or personal property, or other thing of value to a third person to be held by such third person until the happening of a specified event or the performance of a prescribed condition, when it is then to be delivered by such third person, in compliance with instructions under which he or she is to act, to a grantee, grantor, promisee, promisor, obligee, obligor, lessee, lessor, bailee, bailor or any agent or employee thereof." Nevada Revised Statute, 645A.010 (defining "escrow").[7] It is undisputed that the Escrow Services Agreements wherein Prime Trust agreed to act as escrow agent to TrueCoin' customers satisfied the requirements of the creation of an escrow under Nevada law.

Accordingly, because the Foreign Currency was held pursuant to an escrow arrangement, it cannot qualify as property of the bankruptcy estate because Prime Trust does not hold legal title to the property and third parties hold an equitable interest in the property. *See In re Atl. Gulf Cmtys. Corp.*, 369 B.R. at 164; *In re Dreier LLP*, 527 B.R. at 134; *see also In re The 1031 Tax Grp., LLC*, 439 B.R. 47, 64 n. 4 (Bankr. S.D.N.Y.2010) ("The Court agrees that funds held in trust by a debtor for the benefit of a third party are not funds of the estate."). As a result, Prime's Motion to sell the Foreign Currency must be denied and the Court should enter an order clarifying that the Foreign Currency accounts are not property of the estate.[8]

---

[7] *See also Mark Props., Inc. v. Nat'l Title Co.*, 117 Nev. 941, 947 n. 16 (Nev. 2001) ("a bailee may not, in any case, dispute or deny the title of the bailor, or his ultimate right to possession").

[8] The Debtors' brief erroneously focuses on whether a trust arrangement was created under Nevada law pursuant to the TrustToken Custodial Agreements. Motion ¶¶ 45-52. But the Escrow Services Agreements govern the Foreign Currency, not the Custodial Agreements. Further, the Escrow Services Agreements give rise to an escrow arrangement that preclude the Foreign Currency from being property of the bankruptcy estate, which the Debtors' Motion fails to address.

11

The Debtors appear to argue that because Prime purportedly commingled the funds, the Foreign Currency is property of the estate. This argument is wrong for multiple reasons. First, the evidence presented by the Debtors contradicts the notion that the Foreign Currency was commingled. The sole evidence that the Debtors rely upon is the fact that "all of the Foreign Currency in corporate accounts [was] held in Prime's own name," and citing to Exhibit G of the Bowman Declaration. Motion ¶ 10. However, Exhibit G to the Bowman Declaration merely attaches BMO Harris account statements dated August 31, 2023. *See* Bowman Decl. Ex. G [ECF No. 415-7]. The amounts reflected in these purportedly "commingled" accounts from the Debtors' records are almost identical to the amounts of TrueCoin fiat currency deposited with Prime Trust. The small differences are due to the fact that when the funds were delivered to Prime, TrueCoin incurred conversion fees. *See* de Lorraine Decl. ¶ 9. The chart below reflects the account names and amounts from TrueCoin's records as of August 31, 2023 compared with the Debtors' records, also dated August 31, 2023.

| TrueCoin Records | | The Debtors' Record | |
|---|---|---|---|
| Account Name | Deposited Amount | Account Name | Statement Amount |
| TrueCoin, LLC – TAUD Escrow | 6,793,737.39 AUD | Australian Dollar (AUD) | 6,793,581.39 AUD |
| TrueCoin, LLC – TCAD Escrow | 2,809,782.72 CAD | Canadian Dollar (CAD) | 2,810,029.40 CAD |
| TrueCoin, LLC – TGBP Escrow | 2,099,853.42 GBP | British Pound (GBP) | 2,096,887.69 GBP |

*Compare* de Lorraine Decl., Exs. 8-10 *with* Bowman Decl., Ex. G.  When TrueCoin transferred the Foreign Currency to Prime, Prime officials indicated that Prime was opening dedicated accounts at BMO Harris specifically to hold the escrowed funds. *See* de Lorraine Decl. ¶ 10. In fact, Prime officials stated that TrueCoin was the only customer that Prime was providing this service to. *Id.* And the account statements Prime sent to TrueCoin confirm that the accounts were

TrueCoin specific based upon the relevant account names listed such as "TrueCoin, LLC – TAUD Escrow." *Id.*, Exs. 5-10.

The Debtors' conclusory argument that "Prime holds, and always has held, all of the Foreign Currency in corporate accounts held in Prime's own name," Motion ¶ 10, does not hold water. Because the TrueCoin Foreign Currency was in fact segregated and not in a commingled account, it is not bankruptcy estate property and must be returned to TrueCoin in full. *See Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 263 (3d Cir. 2000) (recognizing that property not part of the bankruptcy estate is not subject to a Section 363 sale); *In re Mary Holder Agency, Inc.*, 2012 WL 6021481, at *2 (Bankr. D.N.J. Dec. 4, 2012) (Bankruptcy Court unaware of any "authority which places an affirmative burden on a creditor to trace funds that have not been commingled"); *In re Quaker Distribs., Inc.*, 189 B.R. 63, 72 (Bankr. E.D. Pa. 1995) (finding that creditor funds "retained their status as segregated, secured funds upon their deposit into the escrow account" based upon documentary and testimonial evidence submitted by creditor).[9]

Second, the Debtors' commingling argument falls flat because even if the relevant accounts were in fact commingled, the relevant question is whether the funds that the Debtors hold are traceable. *In re Dreier LLP*, 527 B.R. at 135 (commingled escrow funds can be recovered if traceable). The Debtors' Motion demonstrates that the funds are in fact traceable as they are specifically identified and the Debtors have failed to present any evidence to the

---

[9] The Debtors argue in a footnote that "Prime has also previously commingled foreign currency assets— including foreign currency assets deposited by *TrustToken* under prior agreements," citing Exhibit M of the Bowman Declaration. Motion ¶ 62 n. 26 (emphasis added).  However, while Exhibit M of the Bowman Declaration appears to reflect a number of transfers into and out of an Alliance Bank of Arizona account, it is not clear whether this account actually contained commingled funds. In any event, even if the Arizona account involved commingled funds, it has nothing to do with the *TrueCoin* escrow accounts holding the relevant Foreign Currency, which was held by a completely different bank (BMO Harris) under completely different circumstances pursuant to an escrow arrangement.

contrary. Moreover, Prime Trust sent periodic statements to TrueCoin specifically identifying

such funds in particular accounts. de Lorraine Decl., Exs. 5-10.

The Debtors also appear to argue that because they failed to notify BMO Harris that the

funds were being held in escrow on behalf of third-party holders, Motion ¶ 29, the Debtors can

keep the funds. That assertion is absurd. If true, it would mean that a debtor could convert a third

party's property simply by making representations that were not true.

Finally, if the Debtors actually raise a factual issue related to this dispute – which the

Debtors have been unable to raise to date – the more appropriate forum for adjudication may be

an adversary proceeding.  Indeed, Federal Rule of Bankruptcy Procedure 7001, which lists the

types of matters subject to an adversary proceeding, includes Section 363 sales involving co-

owners with the bankruptcy estate in property, as well as proceedings to determine the validity of

property interests. Fed. R. Bankr. P. 7001(2), (3); *see also In re Mansaray-Ruffin*, 530 F.3d 230,

234-37 (3d Cir. 2008) (recognizing adversary proceeding as appropriate forum to adjudicate

certain property interests, including invalidation of liens); *In re Whitehall Jewelers Holdings,*

*Inc.*, 2008 WL 2951974, at *7 (Bankr. D. Del. July 28, 2008) (rejecting 363 sale motion because

debtors failed to meet burden establishing that goods were property of the bankruptcy estate and

stating that debtors "utilized the wrong procedural tool" by failing to file adversary proceeding).

## II.    The 2022 Order Form updates are not enforceable against TrustToken—or any other entity—because they were procured through fraud.

If the Court concludes that the Debtors' Motion should be denied because TrueCoin's

Foreign Currency was not property of the estate, the Court need not rule on the issues relating to

enforceability of the 2022 Agreements. However, if the Court concludes that the 2022

Agreements are somehow relevant despite the fact that TrueCoin was not a party to them, the

terms of the 2022 Order Form, and other related 2022 Agreements, cannot be enforced against

TrustToken—or any other entity—because they were procured through fraud. If any questions arise relating to TrustToken accounts, they are governed by TrustToken's prior agreements which do not permit the commingling the Debtors contend is permissible under the 2022 Agreements. And, in any event, prior to any ruling on this issue, TrustToken and TrueCoin should be permitted to pursue discovery relating to the 2022 Agreements.

### A. Prime Trust misrepresented or omitted material facts when it solicited TrustToken's execution of the 2022 Order Form.

As set forth in the Debtors' Motion, all of the alleged "Agreements" governing the parties' dispute were dated on or after May 23, 2022, the date that the 2022 Prime Trust Order Form was signed. *See* Motion ¶ 1 n. 3. It appears that the Debtors are arguing that TrustToken's execution of the May 23, 2022 Order Form amounted to an assent to the MSA and Service Schedule. However, the Debtors committed fraud by concealing the true nature of the 2022 updates, which were undertaken in the midst of tens of millions of dollars in losses at Prime as a result of the 98f wallet event and failed investments in TerraUSD using Prime funds and customer funds. *See supra* Background Part II. The Debtors then sought to remedy the situation by deceiving customers into updating their agreements with the Debtors in such a way that the Debtors now claim gave them the power to use customer funds without customer knowledge. That is what happened to TrustToken.

The Order Form update was first raised by Gretchen Dudon of Prime Trust in February 2022. The update was raised within the context of a ministerial need to update the pricing for TrustToken accounts. *See* de Lorraine Decl. ¶¶ 23-31, 35, 36. Moreover, there are messages between Ms. Dudon and Mr. de Lorraine, discussing the contract updates, with Ms. Dudon confirming the ministerial nature of the updates, as well as the fact that the updates would not have any effect on the escrow agreements governing the custody of TrueCoin's Foreign

Currency. *Id.* ¶ 31; *see also id.*, Exs. 13-14.

However, the individual messages sent via the Slack communications platform by Ms. Dudon to Mr. de Lorraine were deleted by someone at Prime Trust, presumably Ms. Dudon, to hide the misrepresentations made to Mr. de Lorraine. The Slack messages as they exist today reveal the following communications concerning the 2022 contract updates:

- **A. de Lorraine to G. Dudon (2-1-2022) (9:05 a.m.):**

   Thanks @Gretchen Dudon are there any material changes in there?

- **A. de Lorraine to G. Dudon (2-3-2022) (8:31 p.m.):**

   Hi @Gretchen Dudon , legal has reviewed the contracts and is just asking of these new versions will have any impact on the escrow agreements in place for TrueCurrencies or not. Could you please confirm?

- **A. de Lorraine to G. Dudon (2-3-2022) (8:59 p.m.):**

   thanks

de Lorraine Decl., Ex. 13.

Notwithstanding the deletion of Ms. Dudon's responses to Mr. de Lorraine's query, Mr. de Lorraine was simultaneously emailing his colleagues to relay Ms. Dudon's messages. According to those internal communications, which includes a cut-and-paste of Ms. Dudon's response to Mr. de Lorraine's query on February 3, 2023, Ms. Dudon stated that the update would only affect the custody agreements, but not TrueCoin's escrow agreements governing the Foreign Currency. The contemporaneous internal emails between TrustToken employees were as follows:

- **Michael Bland to A. de Lorraine and others (2-3-22) (10:57 a.m.):**

   Hi AdL,

   These look to be simple custodial account agreements and should not affect our TrueCurrency escrow agreements with TrueCoin, LLC.  Can you either confirm that directly with whoever sent these to you or loop me in to the

email thread?

. . .

- **A. de Lorraine to M. Bland and others (2-3-2022) (12:32 p.m.):**

   Hi Michael,

   I will check with Gretchen and get back to you.

- **Alex de Lorraine to M. Bland and others (2-4-2022) (12:09 a.m.):**

   This is what Gretchen said:

   Hi again Alex – The custodial account agreement is intended to only apply to your custody accounts and will have no impact on your escrow agreements currently in place.  Gretchen

de Lorraine Decl., Ex. 14 at 3.

California law recognizes omission-based fraud claims. *Rush Air Sports, LLC v. RDJ Grp. Holdings, LLC*, 2020 WL 757828, at *11 (E.D. Cal. Feb. 14, 2020); *Danzig v. Jack Grynberg & Assocs.*, 161 Cal. App. 3d 1128, 1138 (Cal. App. 1984).[10] Upon a successful showing of fraud, the contract is voidable and unenforceable. *Danzig*, 161 Cal. 3d at 1138 (finding the subscription agreement unenforceable and rescindable since it was procured by defendants by fraudulent misrepresentations and nondisclosures); *Ikspan, Inc. v. Ruben*, 2021 Cal. Super. LEXIS 114641 (Cal. Sup. Ct. Oct. 12, 2021) (plaintiff has sufficiently alleged fraudulent concealment that made the at-issue settlement agreement voidable). "To plead fraud by omission under California law, a plaintiff must show (1) the concealment or suppression of

---

[10] TrustToken is a California entity and, thus, California law applies to TrustToken's fraud theories. *See Feinberg v. Saunders, Karp & Megrue, L.P.*, 1998 WL 863284, at *11 (D. Del. Nov. 13, 1998)) ("the domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant" because "the loss is of 'greatest concern to the state with which the person suffering the loss has the closest relationship'") (quoting Restatement § 148(2) cmt. i); *In re Decade, S.A.C., LLC*, 635 B.R. 735, 761 (Bankr. D. Del. 2021) (applying California law to fraud claims where relevant parties located in California).

material fact, (2) a duty to disclose the fact to the plaintiff, (3) intentional concealment with intent to defraud, (4) justifiable reliance, and (5) resulting damages." *Zurba v. FCA US LLC*, 2022 WL 17363073, at *3 (C.D. Cal. Nov. 10, 2022).[11]  The key element is whether there was a duty to disclose, which arises when "matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading" and "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." *In re Werner*, 2019 WL 641411, at *7 (B.A.P. 9th Cir. Feb. 13, 2019), *aff'd*, 817 F. App'x 432 (9th Cir. 2020).

Here, the Debtors admit that the 2022 Agreement updates arose in the midst of a massive financial downturn at Prime, which Prime Trust previously tried to remedy by engaging in a series of Ponzi schemes to use customer funds to continue funding Prime Trust's operations and fund ongoing customer withdrawals. *See* Background Part II (summarizing admissions from Declaration of Jor Law). As a result, Prime Trust had an obligation to disclose the reason for the contract updates, which was plainly a material piece of information under the circumstances. Prime Trust was also obliged to reveal the true nature of the updates, which was not to merely update pricing for the TrustToken custodial agreements. *In re Werner*, 2019 WL 641411, at *8 (finding defendant's omission of the status of financing related to underlying loan that was fundamental to plaintiff's investment justifying fraudulent omission claim).

Further, Ms. Dudon affirmatively represented that the updates "will have no impact on your escrow agreements" governing the Foreign Currency. If the Debtors contend that the

---

[11] The elements for a civil fraud claim under Delaware law are substantially similar to California law. *Trusa v. Nepo*, 2017 WL 1379594, at *9 (Del. Ch. Apr. 13, 2017).

updates did in fact materially alter the terms of any escrow agreements, then Ms. Dudon was lying and that misrepresentation is actionable fraud. *See, e.g.*, *Zurba*, 2022 WL 17363073, at *5 (recognizing that fraudulent omission claims are permissible, even with allegations of defendant's affirmative misrepresentation). Prime Trust's deletion of the problematic Slack messages would be further evidence of its fraud if this is truly the Debtors' position. In justifiable reliance upon Prime Trust's representation, TrustToken – but not TrueCoin – signed the 2022 Order Form, which demonstrates TrustToken understood that the updates would not affect TrueCoin's escrow agreements governing the Foreign Currency.[12]

### B. Because the 2022 Order Form is void, TrustToken's prior custodial agreements with Prime Trust apply.

Because the 2022 Order Form was procured through fraud, TrustToken's relationship with Prime Trust is governed by the 2018 Custodial Agreement. de Lorraine Decl., Ex. 11.[13] That agreement states that Prime Trust will "accept and hold [the funds] ***on Account Holder's behalf***" (§ 4(a)); "will act solely as custodian of your Account and ***will not exercise any investment discretion*** regarding your Account, as this is solely your responsibility" (§ 2(a)); and "[a]ssets under custody are ***held for benefit of Account holders and not together with other, non-custodial funds or property of Prime Trust***" (§ 4(c)). *Id.* (emphasis added). This level of autonomy and control vested in the account holders – not Prime Trust – shows that the Foreign

---

[12] These same facts support a claim for fraudulent inducement under California law. "To prove a claim of fraudulent inducement, a plaintiff must show (a) a misrepresentation, false representation, concealment or nondisclosure, (b) knowledge of falsity; (c) intent to defraud or to induce plaintiff to enter into a contract; (d) justifiable reliance; and (e) resulting damage." *Edwards v. FCA US LLC*, 2022 WL 1814144, at *2 (N.D. Cal. June 2, 2022). Fraud in the inducement "occurs when the promisor knows what he is signing but his consent is induced by fraud" and renders the underlying contract "voidable and can be rescinded by the plaintiff." *Id.*

[13] As established above in Argument Part I, TrueCoin's relationship is governed by the Escrow Services Agreements.

Currency cannot be part of the Debtors' estate. *See In re Voyager Digital Holdings, Inc.*, 2022 WL 3146796, at *2-3 (Bankr. S.D.N.Y. Aug. 5, 2022) (finding funds deposited in custodial accounts "for the benefit of" account holders not bankruptcy estate property).[14]

> **C.      If the Court does not set aside the 2022 Order Form as fraudulent, it should permit interested parties to pursue further discovery on this issue.**

As set forth above, the Court should deny the Debtors' Motion.  Nevertheless, if the Court is at all sympathetic to the Debtors' argument that the 2022 Order Form is binding on TrustToken—or any other entity—it should not rule until it has permitted all interested parties the opportunity to obtain discovery related to 2022 Order Form negotiations, including discovery of internal Prime documents and communications and depositions of current or former employees of the Debtors.

TrustToken and TrueCoin have already requested documents in an informal capacity from the Debtors' counsel related to the 2022 updates, but to date, the Debtors' counsel have not yet responded to the request. If the Debtors do not voluntarily produce the requested information, then the Court should permit TrueCoin to pursue Rule 2004 discovery from the Debtors and any related individuals. *See* Fed. R. Bankr. P. 2004(a) ("[o]n motion of any party in interest, the court may order the examination of any entity."); *Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 278 (3d Cir. 2013) (recognizing that creditors can conduct Rule 2004 examination); *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 630 (Bankr. D. Del. 2016) (recognizing use of Rule 2004 discovery by trustee of creditor trust established under confirmed Chapter 11 plan). Among other things, TrueCoin would seek the recovery of the deleted Slack messages from Ms. Dudon, which

---

[14] The Debtors' frequent citations to *In re Celsius Network LLC*, 647 B.R. 631 (Bankr. S.D.N.Y. 2023) can be easily disregarded. That case involved the wholesale transfer of title and "all ownership interest to Celsius in the cryptocurrency assets," *id.* at 657-58, whereas here, ownership in the Foreign Currency was never transferred to the Debtors, which the Debtors held "for the benefit of" account holders.

representatives from Slack have indicated would be possible if either Prime Trust consents to

their recovery or Slack was served with a properly issued subpoena.

## CONCLUSION

TrueCoin and TrustToken respectfully request that the Court deny the Motion and enter

such other and further relief as it deems just and proper, including ordering 2004 discovery

related to TrueCoin and TrustToken's fraud theories.[15]

Dated:   November 27, 2023
       Wilmington, Delaware

*/s/ Gregory A. Taylor*
Gregory A. Taylor (DE Bar No. 4008)
ASHBY & GEDDES, PA
500 Delaware Avenue
Wilmington, Delaware 19899
Telephone: (302) 504-3710
Facsimile: (302) 654-2067
gtaylor@ashbygeddes.com

-and-

WOLLMUTH MAHER & DEUTSCH LLP
Steven S. Fitzgerald (*pro hac vice* forthcoming)
Fletcher W. Strong (*pro hac vice* forthcoming)
Yating Wang (*pro hac vice* forthcoming)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
sfitzgerald@wmd-law.com
fsrong@wmd-law.com
ywang@wmd-law.com

*Attorneys for TrueCoin, LLC and TrustToken, Inc.*

---

[15] Pursuant to Local Rule 9013-1(h), TrustToken and TrueCoin hereby do not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.