**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
|  | **Hr'g Date: December 19, 2023 at 10:00 a.m. ET** |
|  | **Re: Docket No. 413** |

**DECLARATION OF ALEX DE LORRAINE IN SUPPORT OF**
**OPPOSITION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**AUTHORIZING THE DEBTORS TO SELL CERTAIN FOREIGN**
**CURRENCY FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS,**
**AND ENCUMBRANCES PURSUANT TO BANKRUPTCY CODE SECTION 363**

I, Alex de Lorraine, hereby declare pursuant to section 1746 of title 28 of the United States

Code:

1.      I am the Interim Chief Executive Officer of Archblock, Inc. ("Archblock") and

have served in that role since June 1, 2023. I am also the Chief Operating Officer of Archblock

and have served in that role since December 2018.  TrustToken, Inc. ("TrustToken") is a wholly

owned subsidiary of Archblock. TrueCoin, LLC ("TrueCoin") is also a wholly owned subsidiary

of Archblock. I have been the Chief Operating Officer of TrustToken and TrueCoin since

December 2018 and the Interim Chief Executive Officer of TrueCoin since June 1, 2023.

2.      I submit this declaration (this "Declaration") in support of opposition to the *Motion*

*of Debtors for Entry of an Order Authorizing the Debtors to Sell Certain Foreign Currency Free*

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax
identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime
IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith
Peak Dr., #03-153, Las Vegas, Nevada 89135.

*and Clear of All Liens, Claims, Interests, and Encumbrances Pursuant to Bankruptcy Code Section 363* (the "Motion"). I have personal knowledge of the facts set forth in this Declaration based upon my own personal knowledge and my review of records kept in the ordinary course of business, and am competent to testify to these facts if called as a witness.

3. Archblock was founded in San Francisco, California in 2017 and is a blockchain technology company providing solutions and services to fund managers, stablecoin issuers, and decentralized autonomous organizations. To carry out its various business lines in the blockchain industry, Archblock created and owns TrustToken, TrueCoin, and several other companies. Since TrueCoin is a wholly owned subsidiary of Archblock, no other entity has ownership interest in TrueCoin or controls TrueCoin.

4. While both wholly owned by Archblock, TrustToken and TrueCoin have separate and distinct business arrangements with Debtor Prime Trust, LLC ("Prime Trust") to carry out different functions.

5. TrueCoin was founded in 2017 and is registered with the U.S. Financial Crimes Enforcement Network as a Money Service Business. TrueCoin has developed various digital currency products including stablecoins – a digital currency developed to be fully redeemable one-to-one in the applicable fiat currency and fiat currency equivalents. For example, a one-dollar stablecoin is intended to be redeemable for one U.S. dollar, at all times. TrueCoin's stablecoin products include TrueGBP (backed by British Pound), TrueAUD (backed by Australian dollar), TrueCAD (backed by Canadian dollar) and TrueUSD (backed by U.S. dollar).

6. Specifically, TrueCoin's users could deposit applicable fiat currency into an escrow account and receive an equivalent amount of stablecoins in return. This was accomplished through TrueCoin's technology system, which minted the stablecoins and transferred them to the users'

blockchain wallets. On the other hand, TrueCoin's users were also able to redeem stablecoins for the applicable fiat currency by sending its stablecoin tokens to a specific burn address, which would then destroy the stablecoins, and a corresponding amount of the applicable fiat currency would be transferred to the users' bank accounts. TrueCoin developed a thorough set of governance protocols and controls to maintain the integrity of the stablecoins. For the stablecoin process to work, TrueCoin had to engage independent financial institutions, such as Prime Trust, to maintain escrow accounts to hold fiat currency as collateral for the purpose of minting and redeeming the stablecoins.

7.     TrueCoin engaged Prime Trust to deposit the fiat currency held by its users into escrow accounts (the "Escrow Accounts") to be held by Prime Trust. In 2019, TrueCoin and Prime Trust entered into a series of Escrow Services Agreements, under which Prime Trust agreed to serve as the escrow agent for TrueCoin and to hold and manage the assets in the Escrow Accounts, including the fiat currency, as a fiduciary for the benefit of token holders, who are TrueCoin's users holding the various stablecoin tokens. The escrow agreements include the Escrow Services Agreement dated March 21, 2019 for British Pound-backed tokens, the Escrow Services Agreement dated April 22, 2019 for Canadian Dollar-backed tokens, the Escrow Services Agreement dated April 22, 2019 for U.S Dollar-backed tokens, and the Escrow Services Agreement dated April 23, 2019 for Austrian Dollar-backed tokens.

8.     A true and correct copy of each of the Escrow Services Agreements referenced in paragraph 7 is attached hereto as Exhibits 1 through 4.

9.     When the Escrow Accounts were opened in 2019, TrueCoin transferred funds from escrow accounts previously maintained by another financial institution. The prior financial institution transferred U.S. Dollar rather than the fiat currency and TrueCoin incurred fees

converting the funds back to the appropriate foreign currency. The differences between the deposited amount as of August 31, 2023 and the amount reflected in the Debtors' records (*see* BMO Harris account statements dated August 31, 2023, Exhibit G to Bowman Declaration [ECF No. 415-7]) in the table below were caused by the payment of conversion fees.

| TrueCoin Records | | The Debtors' Records | |
|---|---|---|---|
| **Account Name** | **Deposited Amount** | **Account Name** | **Statement Amount** |
| TrueCoin, LLC – TAUD Escrow | 6,793,737.39 AUD | Australian Dollar (AUD) | 6,793,581.39 AUD |
| TrueCoin, LLC – TCAD Escrow | 2,809,782.72 CAD | Canadian Dollar (CAD) | 2,810,029.40 CAD |
| TrueCoin, LLC – TGBP Escrow | 2,099,853.42 GBP | British Pound (GBP) | 2,096,887.69 GBP |

10.     When the Escrow Accounts were opened in 2019, Prime Trust representatives, including Leslie Constantinides and Victor Garza, told me that Prime was setting up new accounts with its bank, BMO Harris. They explained this was required because TrueCoin was the only customer for which Prime was providing the service. They told me that these accounts would be dedicated for this specific purpose and no other customer's funds were being held in these accounts.

11.     As of August 31, 2023, TrueCoin's three TUSD Escrow Accounts have $27,435.02 in balances.

12.     Attached hereto as Exhibit 5 is a true and correct copy of the account statement for the period of August 1, 2023 through August 31, 2023 for TrueCoin TSUD Escrow Account – Avalanche (account number ending 5355).

13.     Attached hereto as Exhibit 6 is a true and correct copy of the account statement for the period of August 1, 2023 through August 31, 2023 for TrueCoin TSUD Escrow Account - Ethereum (account number ending 5187).

14.     Attached hereto as Exhibit 7 is a true and correct copy of the account statement for the period of August 1, 2023 through August 31, 2023 for TrueCoin TSUD Escrow Account – Tron (account number ending 6880).

15.     As of August 31, 2023, TrueCoin's TAUD Escrow Account has $6,793,737.39 AUD in balances. Attached hereto as Exhibit 8 is a true and correct copy of the account statement for the period of August 1, 2023 through August 31, 2023 for TrueCoin TAUD Escrow Account (account number ending 8462).

16.     As of August 31, 2023, TrueCoin's TCAD Escrow Account has $2,809,782.72 CAD in balances. Attached hereto as Exhibit 9 is a true and correct copy of the account statement for the period of August 1, 2023 through August 31, 2023 for TrueCoin TCAD Escrow Account (account number ending 9536).

17.     As of August 31, 2023, TrueCoin's TGBP Escrow Account has £2,099,853.42 GBP in balances. Attached hereto as Exhibit 10 is a true and correct copy of the account statement for the period of August 1, 2023 through August 31, 2023 for TrueCoin TGBP Escrow Account (account number ending 1271).

18.     Unlike TrueCoin, which manages stablecoins, TrustToken is primarily engaged in the business of software development. TrustToken was founded in 2017 and is primarily responsible for developing and launching other Archblock product lines, including TrueFi, a decentralized protocol for uncollateralized on-chain lending, and Archblock Institutional Platform, a marketplace for portfolio managers.

19.     In 2018 and 2019, TrustToken engaged Prime Trust to custody Archblock's corporate funds in custodial accounts (the "Custodial Accounts") to be held by Prime Trust. These relationships were outlined in a series of Self-Directed Custodial Account Agreements entered by

TrustToken and Prime Trust, including the Self-Directed Custodial Account Agreement dated January 29, 2018.

20.    Attached hereto as Exhibit 11 is a true and correct copy of the Self-Directed Custodial Account Agreement entered between TrustToken and Prime Trust, dated January 29, 2018.

21.    Under the custodial agreement, TrustToken is the account holder and Prime Trust is the custodian that holds and processes as directed all the assets of TrustToken in the Custodial Accounts.

22.    As of August 31, 2023, TrustToken's USD Custodial Account has $4,931.08 USD in balances. Attached hereto as Exhibit 12 is a true and correct copy of the account statement for the period of August 1, 2023 through August 31, 2023 for TrustToken USD Custodial Account (account number ending 5420).

23.    In February 2022, Gretchen Dudon, who was then a Senior Account Manager at Prime Trust, reached out to me to update Prime Trust's User Agreements. Ms. Dudon sent me the proposed new User Agreements for all TrustToken's Custodial Accounts.

24.    Upon receiving the documents, I sent a Slack message to Ms. Dudon on February 1, 2022 to confirm the nature of the updates in the new User Agreements.

25.    Attached hereto as Exhibit 13 is a true and correct copy of the screenshot of the Slack message communications between Gretchen Dudon and me, Alex de Lorraine, from February 1, 2023 to February 3, 2023, with Ms. Dudon's messages deleted.

26.    In our Slack channel, I sent a message asking that, "Thanks @Gretchen Dudon are there any material changes in there?" Ms. Dudon replied to me on Slack that the updates were purported to align our agreements with the agreements that Prime Trust was using as standard

going forward. I responded in the same Slack thread that since the original agreements are part of the attestation and audit process on TrustToken's end, I needed to send the new User Agreements to TrustToken's legal department for review.

27.     That Slack message from Ms. Dudon, as referenced above in paragraph 26, was deleted by someone other than me and could not be retrieved on my end.

28.     On February 3, 2022, I sent Prime Trust's new User Agreements to TrustToken's legal department asking for feedback.

29.     Attached hereto as Exhibit 14 is a true and correct copy of the email communications between Michael G. Bland and me, Alex de Lorraine, from February 3, 2023 to February 4, 2023.

30.     Michael G. Bland, the Senior Corporate Counsel of TrustToken, emailed back to me, saying that "These look to be simple custodial account agreements and should not affect our TrueCurrency escrow accounts with TrueCoin, LLC. Can you either confirm that directly with whoever sent these to you or loop me in to the email thread?" I replied to Mr. Bland on the same day that "I will check with Gretchen and get back to you. I will check for the custodial agreement and see if I have it, but I think it was opened before my time, wasn't it?"

31.     Accordingly, on the same day, I sent Ms. Dudon a Slack message, relaying Mr. Bland's question: "Hi @Gretchen Dudon, legal has reviewed the contracts and is just asking of these new versions will have any impact on the escrow agreement in place for TrueCurrencies or not. Could you please confirm? All the best, Alex." Ms. Dudon responded that "Hi again Alex – The custodial account agreement is intended to only apply to your custody accounts and will have no impact on your escrow agreements currently in place. Gretchen." Then I replied, "thanks."

32.     That Slack message from Ms. Dudon, as referenced above in paragraph 31, was also deleted by someone other than me and could not be retrieved on my end.

33.     On the next day, February 4, 2022, I followed up with Mr. Bland with the confirmation from Prime Trust, in which email I copied and pasted Ms. Dudon's Slack message, as referenced above in paragraph 31.

34.     With the legal department's approval, I signed Prime Trust's new User Agreements for all the TrustToken Custodial Accounts. TrueCoin was not a party to any of the agreements.

35.     On April 19, 2022, Victor Garza, the Strategic Account Manager of Prime Trust, reached out to TrustToken and requested it to sign a Prime Trust Order Form. Mr. Garza represented that the Order Form was purported to update TrustToken's pricing model for Prime Trust's services for the next year. More senior Prime Trust managers, including Leslie Constantinides and Robert Desroches, were part of these discussions. In October 2023, I spoke to Mr. Garza and he told me that in early 2022 he was tasked by management to get TrustToken, and other customers, to sign new order form.  He was instructed to tell TrustToken that the purpose of the new order form was to renegotiate fees. Mr. Garza said that he was unaware that any other term of TrustToken's relationship would be changed. Mr. Garza mentioned that he and his colleagues were under a lot of pressure to get everything done quickly.

36.     In May 2022, Prime Trust and TrustToken discussed and negotiated the terms of the pricing model, during which time neither Mr. Garza, Ms. Dudon, nor any other Prime Trust employee or agent ever revealed that the updates were changing any material aspects of the Custodial Accounts other than pricing. In the belief that the Order Form was only ministerial in nature regarding the pricing updates and would not affect the Escrow Accounts, I signed the Order

Form on behalf of TrustToken on May 23, 2022. TrueCoin was not a party to the Order Form, and has not entered any Prime Trust Order Form.

37.     After discovering that Ms. Dudon's Slack messages were deleted, TrustToken reached out to Slack trying to recover them and was told that the messages could only be reinstated either with Prime Trust's written consent or in compliance with a subpoena.

38.     TrustToken did not agree to or sign any renewal form of the Order Form in 2023. The Debtors' Motion references a Prime Trust Order Form for the Period of May 23, 2023 to May 22, 2024 between Prime Trust and Archblock (TrustToken, Inc.), *see* ECF 413, ¶ 1 n.3, which is attached to their Motion as Bowman Declaration, Exhibit D. That 2023 Renewal Form was never signed by TrustToken.

39.     From early to mid 2023, Prime Trust's financial condition became increasingly deficient and state regulators started taking actions against it. After Prime Trust's failure to satisfy customer withdrawal request, on June 21, 2022, the Nevada Financial Institution Division ordered Prime Trust to halt all deposits and withdrawals of fiat and digital assets for custody. Subsequently, Prime Trust suspended all deposits and disbursements services and TrueCoin's customers would be unable to mint and redeem the foreign currency-backed stablecoins in the Escrow Accounts.

40.     On October 20, 2023, TrueCoin and TrustToken submitted Proofs of Claim in this action concerning the assets held by Prime Trust.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  November *21*, 2023
      Dublin, Ireland

_____
Alex de Lorraine

*Chief Operating Officer of TrustToken, Inc. and*
*Interim Chief Executive Officer of TrueCoin, LLC*

# Exhibit 1

## ESCROW SERVICES AGREEMENT

This Escrow Services Agreement (this "Agreement") is made and entered into as of ___03/21/2019___ by and between **Prime Trust, LLC**, located at 330 S. Rampart Blvd, Suite 260, Las Vegas, NV 89145 ("Prime Trust" or "Escrow Agent"), and **TrueCoin, LLC**, a Delaware limited liability company, located at 325 9th St., San Francisco, CA 94103 ("Company") for the benefit of holders ("Holders") of British Pound-backed tokens (each a "Token").

## RECITALS

**WHEREAS**, Company proposes to offer to interested persons, as disclosed in its public materials, virtualcurrency in the form of Tokens that are reflected on a blockchain, in exchange for British Pounds ("GBP" or "funds") deposited by Holders into an escrow account ("Escrow Account");

**WHEREAS**, each Token shall have a stated value of £1.00 and shall be redeemable for such amount per Token from the Escrow Amount (as defined below) by any Holder upon the request of such Holder in accordance with the terms of this Agreement;

**WHEREAS**, Company proposes to offer to interested persons holding Tokens the ability to redeem such Tokens for funds deposited in the Escrow Account; and

**WHEREAS**, Company desires to establish an Escrow Account in which funds received from select Holders will be held for the benefit of any Holders bearing such Tokens, indefinitely or if and when Tokens are redeemed by any such Holders, subject to the terms and conditions of this Agreement, and Prime Trust desires to serve as Escrow Agent ("Escrow Agent") for the Holders with respect to such Escrow Account in accordance with the terms and conditions set forth herein.

**NOW THEREFORE**, in consideration of the foregoing, it is hereby agreed as follows:

1.  **Establishment of Escrow Account.** Escrow Agent shall establish an account for the funds received from Holders of Tokens. For purposes of protection, communications and directives, Escrow Agent shall be the sole administrator of the Escrow Account but may rely on communications received from Holders via software created, maintained and managed by Company.

2.  **Escrow Period.** The Escrow Period shall begin with the commencement of the receipt of funds from, and clearance of Escrow Agent's KYC/AML on a Holder, and delivery of Tokens to such Holder and shall terminate in whole or in part upon the earlier to occur of the following:

    a.  The date upon which there are no funds in escrow as they have all been sent to cover redemptions by Holders; or

    b.  The termination of this Agreement pursuant to <u>Section 9</u> herein.

    During the Escrow Period, the parties agree that (i) the escrowed funds will be held for the benefit of Holders, and that (ii) Company and Prime Trust are not entitled to any funds at any

time and that no amounts deposited into the Escrow Account shall become the property of Company, Prime Trust, or any other entity, or be subject to any debts, liens or encumbrances of any kind of Company, Prime Trust, or any other entity, as they are held exclusively for the benefit of Holders.

3. **Deposits into, and Redemptions from, the Escrow Account.** Certain Holders transmit their data and funds, via Escrow Agent's API's and technology systems, which may be integrated into Company's software, directly to the Escrow Agent. Such Holders purchasing Tokens will be directed to transfer funds directly to Escrow Agent for deposit into the Escrow Account. Escrow Agent shall process all Escrow Amounts for collection through the banking system and shall maintain an accounting of each deposit posted to its ledger. All monies so deposited in the Escrow Account and which have cleared the banking system are hereinafter referred to as the "Escrow Amount." Each Holder seeking to redeem Tokens shall provide Escrow Agent with payment instructions along with any additional documents or information reasonably requested by the Escrow Agent. Company shall promptly, concurrent with any new or modified delivery or redemption of Tokens, provide Escrow Agent with a copy of the Holder's information as may be reasonably requested by Escrow Agent for its anti-money laundering program and in the performance of its duties under this Agreement. Escrow Agent is under no duty or responsibility to enforce collection of any funds delivered to it hereunder. Company shall be solely responsible for the 'minting' or creation the Tokens and, upon redemption, destroy or remove from circulation such Token being redeemed, such actions to be taken upon confirmation from of Escrow Agent of either cleared funds or funds transferred upon redemption through the API. Company shall ensure that at all times the value of Tokens issued is equal to the Escrow Amount and shall only create Tokens upon confirmation from the Escrow Agent that funds have been deposited and are fully cleared. Escrow Agent shall treat the Tokens as bearer instruments which are redeemable by any Holder with possession of the Token and Escrow Agent shall redeem Tokens without any obligation to  investigate such Holder's title, interest or right to any Tokens which the Escrow Agent is instructed to redeem. Escrow Agent reserves the right to deny, suspend or terminate a Holder's participation in the Escrow Account if the Escrow Agent reasonably deems it advisable or necessary to comply with applicable laws or to eliminate practices that are not consistent with laws, rules or regulations.

4. **Purchase and Redemption Minimums.** Escrow Agent shall not process any disbursements or redemptions for less than £1,000 GBP (1,000 Tokens) unless approved in writing, with email constituting an acceptable form of "writing" under this Agreement, by the Company. Escrow Agent shall initially refuse such requests and refer affected persons to the Company for resolution.

   a. **Investment of Escrow Amount**.  Escrow Agent may invest up to eighty five percent (85%) of the Escrow Amount in money market, demand deposit, government bonds, repurchase agreements and similar financial instruments in order to generate income exclusively as compensation of Escrow Agent and in a manner that manages principal risk on such funds, including any foreign exchange risk, while taking into account historic, typical and anticipated liquidity needs of the Escrow Account.

Doc ID: 6cea53b04cb4f62445ca25cc7d79afff2f48092a

b. **Reallocation**. Once Escrow Amounts are received by Escrow Agent, and so long as Tokens have not been minted and distributed against such funds, then Company may redirect such Escrow Amounts to a different properly regulated escrow agent without Escrow Agent's prior written consent by written notice to Escrow Agent.

5. **Collection Procedure.** Escrow Agent is hereby authorized, upon receipt of Holder funds, to promptly deposit them in the Escrow Account. Any Holder funds which fail to clear or are subsequently reversed, including but not limited to ACH chargebacks and wire recalls, shall be debited to the Escrow Account, with such debits reflected on the Escrow Agent's ledger accessible to Company via Escrow Agent's API or dashboard technology. Any and all escrow fees paid by Company, including those for funds receipt and processing are non-refundable, regardless of whether ultimately cleared, failed, rescinded, returned or recalled.

6. **Escrow Amount.** Escrow Agent shall hold and manage the Escrow Amount as a fiduciary for the benefit of Holders.

7. **Tax Reporting.** All interest or other income earned by the parties under this Agreement shall be reported, as and to the extent required by law, to the Internal Revenue Service, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income earned, whether or not said income has been distributed during such year.

8. **Escrow Administration Fees; Compensation of Prime Trust.** Escrow Agent is entitled to escrow administration fees from Company as set forth in Exhibit A; provided, however, Escrow Agent may not collect any fees, reimbursement for costs and expenses, or indemnification for any damages incurred by Company from the principal balance of the Escrow Account.

9. **Representations and Warranties.** Each party covenants and makes the following representations and warranties:

a. It is duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, and has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

b. This Agreement has been duly approved by all necessary actions, including any necessary shareholder or membership approval, has been executed by its duly authorized officers, and constitutes its valid and binding agreement enforceable in accordance with its terms.

c. To the best of its knowledge, the execution, delivery and performance of this Agreement is in accordance with the delivery of Tokens to Holders and does not and will not materially violate, conflict with or cause a default under its articles of incorporation, bylaws, management agreement or other organizational document, as applicable, any applicable law, rule or regulation, any court order or administrative or regulatory ruling or decree to which it is a party or any of its property is subject, or any agreement, contract, indenture or other binding arrangement, including the agreements related to the delivery of Tokens to which it is a party or any of its property is subject.

3

Doc ID: 6cea53b04cb4f62445ca25cc7d79afff2f48092a

d. To the best of the its knowledge, its participation in the offer, delivery and redemption of Tokens complies in all material respects with any and all applicable laws, rules and regulations, to the extent that not being compliant would not reasonably be expected to cause a materially adverse effect.

All of its representations and warranties contained herein are made as of the date hereof and will be made at the time of any disbursement of Escrow Amount.

10. **Term and Termination.** This Agreement will remain in full force during the Escrow Period and shall terminate upon the following:

a. As set forth in <u>Section 2</u>.

b. Upon the mutual written agreement of both parties.

c. *Escrow Agent's Resignation*. Escrow Agent may resign by giving 90 days' advance written notice to Company. The parties shall cooperate in good faith to appoint a successor agent upon Escrow Agent's resignation and Escrow Agent's resignation shall not become effective until a successor escrow agent has been engaged by Company. Escrow Agent shall cooperate in good faith in transferring the Escrow Account accounts and all necessary items to the successor escrow agent and take all such other actions reasonably necessary to affect an orderly transfer of Escrow Account accounts to the successor escrow agent.

d. *Company Termination*. Company may terminate this agreement by giving 60 day's advance written notice to Escrow Agent. Escrow Agent shall cooperate in good faith in transferring the Escrow Account accounts and all necessary items to any successor escrow agent determined by Company and take all such other actions reasonably necessary to affect an orderly transfer of Escrow Account accounts to the successor escrow agent.

11. **Binding Arbitration, Applicable Law, Venue, and Attorney's Fees.** This Agreement is governed by, and will be interpreted and enforced in accordance with, the laws of the State of Nevada, as applicable, without regard to principles of conflict of laws. Any claim or dispute arising under this Agreement may only be brought in arbitration, pursuant to the rules of the JAMS Arbitration, with venue in Clark County in the State of Nevada. The parties consent to this method of dispute resolution, as well as jurisdiction, and consent to this being a convenient forum for any such claim or dispute and waive any right they may have to object to either the method or jurisdiction for such claim or dispute. Furthermore, the prevailing party shall be entitled to recover damages plus reasonable attorney's fees and costs and the decision of the arbitrator shall be final, binding and enforceable in any court.

12. **Limited Capacity of Escrow Agent.** This Agreement expressly and exclusively sets forth the duties of Escrow Agent with respect to any and all matters pertinent hereto, and no implied duties or obligations, other than those imposed by law or otherwise agreed to by separate agreement, shall be read into this Agreement against Escrow Agent. Escrow Agent acts hereunder as an escrow agent only and is not associated or affiliated with or involved in the

Doc ID: 6cea53b04cb4f62445ca25cc7d79afff2f48092a

business decisions or business activities of Company or any Holder. Notwithstanding anything to the contrary herein, Escrow Agent shall not be responsible for Company's performance, including the performance of its employees, agents and/or representatives, of the Agreement, the underlying transactions or for compelling compliance herewith. Escrow Agent's role and responsibilities are limited to (i) receiving and holding the Escrow Amount, and (ii) disbursing the Escrow Amount upon redemption of Tokens, in each case, in accordance with the terms of this Agreement. The responsibilities of the Escrow Agent in clauses (i) and (ii) of this Section [12] are ministerial in nature, and no implied duties of any kind shall be read into the terms of this Agreement. Escrow Agent has not and does not provide any legal, tax or investment advice or opine on the advisability of the underlying transactions and the Company as well as each Holder are acting upon the advice of their independent advisors. The services provided by Escrow Agent shall not be deemed or interpreted as an approval or endorsement of Company's business or regulatory compliance or the advisability of the transactions underlying this Agreement.

13. **Indemnification.** Each party (an "Indemnifying Party") shall defend, indemnify and hold harmless the other party and its affiliates and their respective officers, directors, managers, members, employees, agents, successors and assigns from and against any and all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind (excluding reasonable attorneys' fees) arising out of, relating to or resulting from: (a) any grossly negligent or fraudulent act or omission to act by such Indemnifying Party; or (b) the Indemnifying party's breach of any representation, warranty, covenant, agreement or obligation under this Agreement ((a) and (b) collectively, "Indemnifiable Matters"). The Indemnifying Party reserves the right to control the defense of any third party claim or action and all negotiations for settlement or compromise, and to select or approve defense counsel, and the other party agrees to reasonably cooperate with the Indemnifying Party in all reasonable respects in the defense of any such claim, action, settlement or compromise negotiations.

14. **Entire Agreement, Severability and Force Majeure.** This Agreement contains the entire agreement between Company and Escrow Agent regarding the Escrow Account. If any provision of this Agreement is held invalid, the remainder of this Agreement shall continue in full force and effect. Furthermore, no party shall be responsible for any failure to perform due to acts beyond its reasonable control, including acts of God, terrorism, shortage of supply, labor difficulties (including strikes), war, civil unrest, fire, floods, electrical outages, equipment or transmission failures, internet interruptions, vendor failures (including information technology providers), or other similar causes.

15. **Amendment, Waivers.** No provision of this Agreement may be amended unless such amendment is agreed to in writing and signed by both parties. No waiver by any party to this Agreement of any condition or breach of any provision of this Agreement will be effective unless in writing. No waiver by any party of any such condition or breach, in any one instance, will be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or breach of any other provision contained in this Agreement.

Doc ID: 6cea53b04cb4f62445ca25cc7d79afff2f48092a

16. **Notices.** Any email notice to Escrow Agent is to be sent to legal@primetrust.com. Any email notice to Company is to be sent to legal@truecoin.com. Either party may change its notice or email address by giving notice thereof in accordance with this <u>Section 16</u>. All notices hereunder shall be deemed given: (a) if served in person, when served; (b) if sent by email, on the date of transmission if before 6:00 p.m. Eastern time; (c) if by overnight courier, by a nationally recognized courier which has a system of providing evidence of delivery, on the first business day after delivery to the courier; or (d) if by U.S. Mail, on the third day after deposit in the mail, postage prepaid, certified mail, return receipt requested. Furthermore, all parties hereby agree that all current and future notices, confirmations and other communications regarding this Agreement specifically, and future communications in general between the parties, may be made by email, sent to the email address of record as set forth above or as otherwise from time to time changed, directly by the party changing such information, without necessity of confirmation of receipt, delivery or reading, and such form of electronic communication is sufficient for all matters regarding the relationship between the parties. If any such electronically-sent communication fails to be received for any reason, including but not limited to such communications being diverted to the recipients' spam filters by the recipients email service provider or technology, or due to a recipients' change of address, or due to technology issues by the recipients' service provider, the parties agree that the burden of such failure to receive is on the recipient and not the sender, and that the sender is under no obligation to resend communications via any other means, including but not limited to postal service or overnight courier, and that such communications shall for all purposes, including legal and regulatory, be deemed to have been delivered and received.

17. **Language; Drafting.** It is expressly agreed that it is the will of all parties, including Escrow Agent and Company, that this Agreement and all related pages, forms, emails, alerts and other communications have been drawn up and/or presented in English. Both parties agree that each has had an equal opportunity to participate in the drafting of this Agreement and that the Agreement shall not be interpreted in favor of either party as the drafter.

18. **Counterparts; Facsimile; Email; Signatures; Electronic Signatures.** This Agreement may be executed in counterparts, each of which will be deemed an original and all of which, taken together, will constitute one and the same instrument, binding on each signatory thereto. This Agreement may be executed by signatures, electronically or otherwise, and delivered by email in .pdf format, which shall be binding upon each signing party to the same extent as an original executed version hereof.

**Consent for Electronically Delivered Notices Is Hereby Given:** By signing this Agreement, the parties explicitly agree to receive documents electronically including its copy of this signed Agreement as well as ongoing statements, disclosures, communications and notices.

[*The rest of this page is intentionally blank, signature page follows*]

Doc ID: 6cea53b04cb4f62445ca25cc7d79afff2f48092a

Agreed as of the date set forth above by and between:

**Prime Trust:**                                    **Company:**


By: _____       By: _____
Name: Scott Purcell                         Name: Daniel An
Title:   CEO, Chief Trust Officer           Title:    Member

Doc ID: 6cea53b04cb4f62445ca25cc7d79afff2f48092a

## EXHIBIT A

**Escrow Agent's Fees:**

Prime Trust's Fees shall be limited to whatever income, if any, is earned by investing assets of the Escrow Account. The Escrow Agent shall not charge any wire, ACH, AML or other fees to the Escrow Account nor to any beneficial Token holder thereof.

Doc ID: 6cea53b04cb4f62445ca25cc7d79afff2f48092a

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | TrueGBP Escrow Agreement |
| **FILE NAME** | TrueGBP - Escrow Agreement.pdf |
| **DOCUMENT ID** | 6cea53b04cb4f62445ca25cc7d79afff2f48092a |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **03/20/2019**<br>19:18:02 UTC | Sent for signature to Daniel An (danny.an@trusttoken.com)<br>from legal@trusttoken.com<br>IP: 136.24.208.32 |
| **VIEWED** | **03/21/2019**<br>17:32:29 UTC | Viewed by Daniel An (danny.an@trusttoken.com)<br>IP: 69.181.106.139 |
| **SIGNED** | **03/21/2019**<br>17:32:45 UTC | Signed by Daniel An (danny.an@trusttoken.com)<br>IP: 69.181.106.139 |
| **COMPLETED** | **03/21/2019**<br>17:32:45 UTC | The document has been completed. |

# Exhibit 2

# ESCROW SERVICES AGREEMENT

This Escrow Services Agreement (this "Agreement") is made and entered into as of _____04/22/2019_____ by and between **Prime Trust, LLC**, located at 330 S. Rampart Blvd, Suite 260, Las Vegas, NV 89145  ("Prime Trust" or "Escrow Agent"), and **TrueCoin, LLC**, a Delaware limited liability company, located at 325 9th St., San Francisco, CA 94103 ("Company") for the benefit of holders ("Holders") of Canadian Dollar-backed tokens (each a "Token").

## RECITALS

**WHEREAS**, Company proposes to offer to interested persons, as disclosed in its public materials, virtualcurrency in the form of Tokens that are reflected on a blockchain, in exchange for Canadian Dollars ("CAD" or "funds") deposited by Holders into an escrow account ("Escrow Account");

**WHEREAS**, each Token shall have a stated value of C$1.00 and shall be redeemable for such amount per Token from the Escrow Amount (as defined below) by any Holder upon the request of such Holder in accordance with the terms of this Agreement;

**WHEREAS**, Company proposes to offer to interested persons holding Tokens the ability to redeem such Tokens for funds deposited in the Escrow Account; and

**WHEREAS**, Company desires to establish an Escrow Account in which funds received from select Holders will be held for the benefit of  any Holders bearing such Tokens, indefinitely or if and when Tokens are redeemed by any such Holders, subject to the terms and conditions of this Agreement, and Prime Trust desires to serve as Escrow Agent ("Escrow Agent") for the Holders with respect to such Escrow Account in accordance with the terms and conditions set forth herein.

**NOW THEREFORE**, in consideration of the foregoing, it is hereby agreed as follows:

1.  **Establishment of Escrow Account.** Escrow Agent shall establish an account for the funds received from Holders of Tokens. For purposes of protection, communications and directives, Escrow Agent shall be the sole administrator of the Escrow Account but may rely on communications received from Holders via software created, maintained and managed by Company.

2.  **Escrow Period.** The Escrow Period shall begin with the commencement of the receipt of funds from, and clearance of Escrow Agent's KYC/AML on a Holder, and delivery of Tokens to such Holder and shall terminate in whole or in part upon the earlier to occur of the following:

    a.  The date upon which there are no funds in escrow as they have all been sent to cover redemptions by Holders; or

    b.  The termination of this Agreement pursuant to Section 9 herein.

    During the Escrow Period, the parties agree that (i) the escrowed funds will be held for the benefit of Holders, and that (ii) Company and Prime Trust are not entitled to any funds at any

Doc ID: 2b42118a91906835b917693f005a03ab67c7b8d3

time and that no amounts deposited into the Escrow Account shall become the property of Company, Prime Trust, or any other entity, or be subject to any debts, liens or encumbrances of any kind of Company, Prime Trust, or any other entity, as they are held exclusively for the benefit of Holders.

3. **Deposits into, and Redemptions from, the Escrow Account.** Certain Holders transmit their data and funds, via Escrow Agent's API's and technology systems, which may be integrated into Company's software, directly to the Escrow Agent. Such Holders purchasing Tokens will be directed to transfer funds directly to Escrow Agent for deposit into the Escrow Account. Escrow Agent shall process all Escrow Amounts for collection through the banking system and shall maintain an accounting of each deposit posted to its ledger. All monies so deposited in the Escrow Account and which have cleared the banking system are hereinafter referred to as the "Escrow Amount." Each Holder seeking to redeem Tokens shall provide Escrow Agent with payment instructions along with any additional documents or information reasonably requested by the Escrow Agent. Company shall promptly, concurrent with any new or modified delivery or redemption of Tokens, provide Escrow Agent with a copy of the Holder's information as may be reasonably requested by Escrow Agent for its anti-money laundering program and in the performance of its duties under this Agreement. Escrow Agent is under no duty or responsibility to enforce collection of any funds delivered to it hereunder. Company shall be solely responsible for the 'minting' or creation the Tokens and, upon redemption, destroy or remove from circulation such Token being redeemed, such actions to be taken upon confirmation from of Escrow Agent of either cleared funds or funds transferred upon redemption through the API. Company shall ensure that at all times the value of Tokens issued is equal to the Escrow Amount and shall only create Tokens upon confirmation from the Escrow Agent that funds have been deposited and are fully cleared. Escrow Agent shall treat the Tokens as bearer instruments which are redeemable by any Holder with possession of the Token and Escrow Agent shall redeem Tokens without any obligation to  investigate such Holder's title, interest or right to any Tokens which the Escrow Agent is instructed to redeem. Escrow Agent reserves the right to deny, suspend or terminate a Holder's participation in the Escrow Account if the Escrow Agent reasonably deems it advisable or necessary to comply with applicable laws or to eliminate practices that are not consistent with laws, rules or regulations.

4. **Purchase and Redemption Minimums.** There shall be no purchase or redemption minimums. Company and Escrow Agent agree to review this paragraph at least annually and negotiate in good faith if a purchase or redemption minimum is requested in writing by either party.

   a. **Investment of Escrow Amount**.  At the sole direction of the Company, Escrow Agent may hold and invest the Escrow Amount in cash, cash equivalents, and short-term government treasuries in order to generate income exclusively as compensation of Escrow Agent and in a manner that manages principal risk on such funds, including any foreign exchange risk, while taking into account historic, typical and anticipated liquidity needs of the Escrow Account.

   b. **Reallocation**.  Once Escrow Amounts are received by Escrow Agent, and so long as Tokens have not been minted and distributed against such funds, then Company may

2

redirect such Escrow Amounts to a different properly regulated escrow agent without Escrow Agent's prior written consent by written notice to Escrow Agent.

   c. **Company Dissolution.** If the Company ceases operation for any reason including, but not limited to, business liquidation or bankruptcy, Escrow Agent shall be required to process any and all redemptions from Holders that have passed Escrow Agent's KYC procedures. Company agrees to work in good faith with Escrow Agent to develop a workflow for Escrow Agent to verify redemptions of Tokens on the blockchain.

5. **Collection Procedure.** Escrow Agent is hereby authorized, upon receipt of Holder funds, to promptly deposit them in the Escrow Account. Any Holder funds which fail to clear or are subsequently reversed, including but not limited to ACH chargebacks and wire recalls, shall be debited to the Escrow Account, with such debits reflected on the Escrow Agent's ledger accessible to Company via Escrow Agent's API or dashboard technology. Any and all escrow fees paid by Company, including those for funds receipt and processing are non-refundable, regardless of whether ultimately cleared, failed, rescinded, returned or recalled.

6. **Escrow Amount.** Escrow Agent shall hold and manage the Escrow Amount as a fiduciary for the benefit of Holders.

7. **Tax Reporting.** All interest or other income earned by the parties under this Agreement shall be reported, as and to the extent required by law, to the Internal Revenue Service, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income earned, whether or not said income has been distributed during such year.

8. **Escrow Administration Fees; Compensation of Prime Trust.** Escrow Agent is entitled to escrow administration fees from Company as set forth in Exhibit A; provided, however, Escrow Agent may not collect any fees, reimbursement for costs and expenses, or indemnification for any damages incurred by Company from the principal balance of the Escrow Account.

9. **Representations and Warranties.** Each party covenants and makes the following representations and warranties:

   a. It is duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, and has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

   b. This Agreement has been duly approved by all necessary actions, including any necessary shareholder or membership approval, has been executed by its duly authorized officers, and constitutes its valid and binding agreement enforceable in accordance with its terms.

   c. To the best of its knowledge, the execution, delivery and performance of this Agreement is in accordance with the delivery of Tokens to Holders and does not and will not materially violate, conflict with or cause a default under its articles of incorporation, bylaws, management agreement or other organizational document, as applicable, any applicable

3

Doc ID: 2b42118a91906835b917693f005a03ab67c7b8d3

law, rule or regulation, any court order or administrative or regulatory ruling or decree to which it is a party or any of its property is subject, or any agreement, contract, indenture or other binding arrangement, including the agreements related to the delivery of Tokens to which it is a party or any of its property is subject.

d.  To the best of the its knowledge, its participation in the offer, delivery and redemption of Tokens complies in all material respects with any and all applicable laws, rules and regulations, to the extent that not being compliant would not reasonably be expected to cause a materially adverse effect.

All of its representations and warranties contained herein are made as of the date hereof and will be made at the time of any disbursement of Escrow Amount.

10. **Term and Termination.** This Agreement will remain in full force during the Escrow Period and shall terminate upon the following:

a.  As set forth in Section 2.

b.  Upon the mutual written agreement of both parties.

c.  *Escrow Agent's Resignation*. Escrow Agent may resign by giving 90 days' advance written notice to Company. The parties shall cooperate in good faith to appoint a successor agent upon Escrow Agent's resignation and Escrow Agent's resignation shall not become effective until a successor escrow agent has been engaged by Company. Escrow Agent shall cooperate in good faith in transferring the Escrow Account accounts and all necessary items to the successor escrow agent and take all such other actions reasonably necessary to affect an orderly transfer of Escrow Account accounts to the successor escrow agent.

d.  *Company Termination*. Company may terminate this agreement by giving 60 day's advance written notice to Escrow Agent. Escrow Agent shall cooperate in good faith in transferring the Escrow Account accounts and all necessary items to any successor escrow agent determined by Company and take all such other actions reasonably necessary to affect an orderly transfer of Escrow Account accounts to the successor escrow agent.

11. **Binding Arbitration, Applicable Law, Venue, and Attorney's Fees.** This Agreement is governed by, and will be interpreted and enforced in accordance with, the laws of the State of Nevada, as applicable, without regard to principles of conflict of laws. Any claim or dispute arising under this Agreement may only be brought in arbitration, pursuant to the rules of the JAMS Arbitration, with venue in Clark County in the State of Nevada. The parties consent to this method of dispute resolution, as well as jurisdiction, and consent to this being a convenient forum for any such claim or dispute and waive any right they may have to object to either the method or jurisdiction for such claim or dispute. Furthermore, the prevailing party shall be entitled to recover damages plus reasonable attorney's fees and costs and the decision of the arbitrator shall be final, binding and enforceable in any court.

Doc ID: 2b42118a91906835b917693f005a03ab67c7b8d3

12. **Limited Capacity of Escrow Agent.** This Agreement expressly and exclusively sets forth the duties of Escrow Agent with respect to any and all matters pertinent hereto, and no implied duties or obligations, other than those imposed by law or otherwise agreed to by separate agreement, shall be read into this Agreement against Escrow Agent. Escrow Agent acts hereunder as an escrow agent only and is not associated or affiliated with or involved in the business decisions or business activities of Company or any Holder. Notwithstanding anything to the contrary herein, Escrow Agent shall not be responsible for Company's performance, including the performance of its employees, agents and/or representatives, of the Agreement, the underlying transactions or for compelling compliance herewith. Escrow Agent's role and responsibilities are limited to (i) receiving and holding the Escrow Amount, and (ii) disbursing the Escrow Amount upon redemption of Tokens, in each case, in accordance with the terms of this Agreement. The responsibilities of the Escrow Agent in clauses (i) and (ii) of this Section [12] are ministerial in nature, and no implied duties of any kind shall be read into the terms of this Agreement. Escrow Agent has not and does not provide any legal, tax or investment advice or opine on the advisability of the underlying transactions and the Company as well as each Holder are acting upon the advice of their independent advisors. The services provided by Escrow Agent shall not be deemed or interpreted as an approval or endorsement of Company's business or regulatory compliance or the advisability of the transactions underlying this Agreement.

13. **Indemnification.** Each party (an "Indemnifying Party") shall defend, indemnify and hold harmless the other party and its affiliates and their respective officers, directors, managers, members, employees, agents, successors and assigns from and against any and all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind (excluding reasonable attorneys' fees) arising out of, relating to or resulting from: (a) any grossly negligent or fraudulent act or omission to act by such Indemnifying Party; or (b) the Indemnifying party's breach of any representation, warranty, covenant, agreement or obligation under this Agreement ((a) and (b) collectively, "Indemnifiable Matters"). The Indemnifying Party reserves the right to control the defense of any third party claim or action and all negotiations for settlement or compromise, and to select or approve defense counsel, and the other party agrees to reasonably cooperate with the Indemnifying Party in all reasonable respects in the defense of any such claim, action, settlement or compromise negotiations.

14. **Entire Agreement, Severability and Force Majeure.** This Agreement contains the entire agreement between Company and Escrow Agent regarding the Escrow Account. If any provision of this Agreement is held invalid, the remainder of this Agreement shall continue in full force and effect. Furthermore, no party shall be responsible for any failure to perform due to acts beyond its reasonable control, including acts of God, terrorism, shortage of supply, labor difficulties (including strikes), war, civil unrest, fire, floods, electrical outages, equipment or transmission failures, internet interruptions, vendor failures (including information technology providers), or other similar causes.

15. **Amendment, Waivers.** No provision of this Agreement may be amended unless such amendment is agreed to in writing and signed by both parties. No waiver by any party to this Agreement of any condition or breach of any provision of this Agreement will be effective

5

Doc ID: 2b42118a91906835b917693f005a03ab67c7b8d3

unless in writing. No waiver by any party of any such condition or breach, in any one instance, will be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or breach of any other provision contained in this Agreement.

16. **Notices.** Any email notice to Escrow Agent is to be sent to legal@primetrust.com. Any email notice to Company is to be sent to legal@truecoin.com. Either party may change its notice or email address by giving notice thereof in accordance with this <u>Section 16</u>. All notices hereunder shall be deemed given: (a) if served in person, when served; (b) if sent by email, on the date of transmission if before 6:00 p.m. Eastern time; (c) if by overnight courier, by a nationally recognized courier which has a system of providing evidence of delivery, on the first business day after delivery to the courier; or (d) if by U.S. Mail, on the third day after deposit in the mail, postage prepaid, certified mail, return receipt requested. Furthermore, all parties hereby agree that all current and future notices, confirmations and other communications regarding this Agreement specifically, and future communications in general between the parties, may be made by email, sent to the email address of record as set forth above or as otherwise from time to time changed, directly by the party changing such information, without necessity of confirmation of receipt, delivery or reading, and such form of electronic communication is sufficient for all matters regarding the relationship between the parties. If any such electronically-sent communication fails to be received for any reason, including but not limited to such communications being diverted to the recipients' spam filters by the recipients email service provider or technology, or due to a recipients' change of address, or due to technology issues by the recipients' service provider, the parties agree that the burden of such failure to receive is on the recipient and not the sender, and that the sender is under no obligation to resend communications via any other means, including but not limited to postal service or overnight courier, and that such communications shall for all purposes, including legal and regulatory, be deemed to have been delivered and received.

17. **Language; Drafting.** It is expressly agreed that it is the will of all parties, including Escrow Agent and Company, that this Agreement and all related pages, forms, emails, alerts and other communications have been drawn up and/or presented in English. Both parties agree that each has had an equal opportunity to participate in the drafting of this Agreement and that the Agreement shall not be interpreted in favor of either party as the drafter.

18. **Counterparts; Facsimile; Email; Signatures; Electronic Signatures.** This Agreement may be executed in counterparts, each of which will be deemed an original and all of which, taken together, will constitute one and the same instrument, binding on each signatory thereto. This Agreement may be executed by signatures, electronically or otherwise, and delivered by email in .pdf format, which shall be binding upon each signing party to the same extent as an original executed version hereof.

**Consent for Electronically Delivered Notices Is Hereby Given:** By signing this Agreement, the parties explicitly agree to receive documents electronically including its copy of this signed Agreement as well as ongoing statements, disclosures, communications and notices.

*[The rest of this page is intentionally blank, signature page follows]*

Doc ID: 2b42118a91906835b917693f005a03ab67c7b8d3

Agreed as of the date set forth above by and between:

**Prime Trust:**                                    **Company:**

By: _Scott Purcell_____    By: _____
Name: Scott Purcell                                Name: Daniel "Jai" An
Title:   CEO, Chief Trust Officer                  Title:    Member

7

## EXHIBIT A

**Escrow Agent's Fees:**

Prime Trust's Fees shall be limited to whatever income, if any, is earned by investing assets of the Escrow Account. The Escrow Agent shall not charge any wire, ACH, AML or other fees to the Escrow Account nor to any beneficial Token holder thereof.

Doc ID: 2b42118a91906835b917693f005a03ab67c7b8d3

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | TrueCAD Escrow Agreement |
| **FILE NAME** | TrueCAD - Escrow Agreement.pdf |
| **DOCUMENT ID** | 2b42118a91906835b917693f005a03ab67c7b8d3 |
| **STATUS** | ● Completed |

## Document History

**SENT**
**04/22/2019**
17:24:46 UTC
Sent for signature to Daniel An (danny.an@trusttoken.com) and Scott Purcell (scott@primetrust.com) from legal@trusttoken.com
IP: 136.24.208.32

**VIEWED**
**04/22/2019**
17:57:36 UTC
Viewed by Scott Purcell (scott@primetrust.com)
IP: 67.129.13.34

**SIGNED**
**04/22/2019**
17:57:45 UTC
Signed by Scott Purcell (scott@primetrust.com)
IP: 67.129.13.34

**VIEWED**
**04/23/2019**
23:55:34 UTC
Viewed by Daniel An (danny.an@trusttoken.com)
IP: 136.24.208.32

**SIGNED**
**04/23/2019**
23:56:01 UTC
Signed by Daniel An (danny.an@trusttoken.com)
IP: 136.24.208.32

**COMPLETED**
**04/23/2019**
23:56:01 UTC
The document has been completed.

# Exhibit 3

## ESCROW SERVICES AGREEMENT,
## FIRST RESTATEMENT

This Escrow Services Agreement, First Restatement (this "Agreement") is made and entered into as of ___04/22/2019___ by and between **Prime Trust, LLC**, located at 330 S. Rampart Blvd, Suite 260, Las Vegas, NV 89145 ("Prime Trust" or "Escrow Agent"), and **TrueCoin, LLC**, a Delaware limited liability company, located at 325 9th St., San Francisco, CA 94103 ("Company") for the benefit of holders ("Holders") of United States Dollar-backed tokens (each a "Token").

## RECITALS

**WHEREAS,** Company and Prime Trust entered into the original Escrow Services Agreement on February 12, 2018 ("Original Agreement") and the First Amendment to Escrow Agreement on March 2, 2018 ("First Amendment");

**WHEREAS,** Company and Prime Trust now wish to exercise their rights of amendment and, to that end, do hereby amend those agreements by restating them in full in this Agreement;

**WHEREAS**, Company proposes to offer to interested persons, as disclosed in its public materials, virtualcurrency in the form of Tokens that are reflected on a blockchain, in exchange for United States Dollars ("USD" or "funds") deposited by Holders into an escrow account ("Escrow Account");

**WHEREAS**, each Token shall have a stated value of $1.00 and shall be redeemable for such amount per Token from the Escrow Amount (as defined below) by any Holder upon the request of such Holder in accordance with the terms of this Agreement;

**WHEREAS**, Company proposes to offer to interested persons holding Tokens the ability to redeem such Tokens for funds deposited in the Escrow Account; and

**WHEREAS**, Company desires to establish an Escrow Account in which funds received from select Holders will be held for the benefit of  any Holders bearing such Tokens, indefinitely or if and when Tokens are redeemed by any such Holders, subject to the terms and conditions of this Agreement, and Prime Trust desires to serve as Escrow Agent ("Escrow Agent") for the Holders with respect to such Escrow Account in accordance with the terms and conditions set forth herein.

**NOW THEREFORE**, in consideration of the foregoing, it is hereby agreed as follows:

1. **Restatement of Escrow Services Agreement.** The Company and Prime Trust agree that upon execution of this Agreement, the Original Agreement and First Amendment shall be replaced in whole, and the terms of this Agreement shall supersede the terms of the Original Agreement and First Amendment for all purposes.

2. **Establishment of Escrow Account.** Escrow Agent shall establish an account for the funds received from Holders of Tokens. For purposes of protection, communications and directives,

Doc ID: c3ef7d0284e2f85791086511d3dcc9978fcb73be

Escrow Agent shall be the sole administrator of the Escrow Account but may rely on communications received from Holders via software created, maintained and managed by Company.

3.  **Escrow Period.** The Escrow Period shall begin with the commencement of the receipt of funds from, and clearance of Escrow Agent's KYC/AML on a Holder, and delivery of Tokens to such Holder and shall terminate in whole or in part upon the earlier to occur of the following:

    a.  The date upon which there are no funds in escrow as they have all been sent to cover redemptions by Holders; or

    b.  The termination of this Agreement pursuant to Section 9 herein.

    During the Escrow Period, the parties agree that (i) the escrowed funds will be held for the benefit of Holders, and that (ii) Company and Prime Trust are not entitled to any funds at any time and that no amounts deposited into the Escrow Account shall become the property of Company, Prime Trust, or any other entity, or be subject to any debts, liens or encumbrances of any kind of Company, Prime Trust, or any other entity, as they are held exclusively for the benefit of Holders.

4.  **Deposits into, and Redemptions from, the Escrow Account.** Certain Holders transmit their data and funds, via Escrow Agent's API's and technology systems, which may be integrated into Company's software, directly to the Escrow Agent. Such Holders purchasing Tokens will be directed to transfer funds directly to Escrow Agent for deposit into the Escrow Account. Escrow Agent shall process all Escrow Amounts for collection through the banking system and shall maintain an accounting of each deposit posted to its ledger. All monies so deposited in the Escrow Account and which have cleared the banking system are hereinafter referred to as the "Escrow Amount." Each Holder seeking to redeem Tokens shall provide Escrow Agent with payment instructions along with any additional documents or information reasonably requested by the Escrow Agent. Company shall promptly, concurrent with any new or modified delivery or redemption of Tokens, provide Escrow Agent with a copy of the Holder's information as may be reasonably requested by Escrow Agent for its anti-money laundering program and in the performance of its duties under this Agreement. Escrow Agent is under no duty or responsibility to enforce collection of any funds delivered to it hereunder. Company shall be solely responsible for the 'minting' or creation the Tokens and, upon redemption, destroy or remove from circulation such Token being redeemed, such actions to be taken upon confirmation from of Escrow Agent of either cleared funds or funds transferred upon redemption through the API. Company shall ensure that at all times the value of Tokens issued is equal to the Escrow Amount and shall only create Tokens upon confirmation from the Escrow Agent that funds have been deposited and are fully cleared. Escrow Agent shall treat the Tokens as bearer instruments which are redeemable by any Holder with possession of the Token and Escrow Agent shall redeem Tokens without any obligation to  investigate such Holder's title, interest or right to any Tokens which the Escrow Agent is instructed to redeem. Escrow Agent reserves the right to deny, suspend or terminate a Holder's participation in the Escrow Account if the Escrow Agent reasonably deems it advisable or necessary to comply

Doc ID: c3ef7d0284e2f85791086511d3dcc9978fcb73be

with applicable laws or to eliminate practices that are not consistent with laws, rules or regulations.

5.  **Purchase and Redemption Minimums.** There shall be no purchase or redemption minimums. Company and Escrow Agent agree to review this paragraph at least annually and negotiate in good faith if a purchase or redemption minimum is requested in writing by either party.

    a.  **Investment of Escrow Amount**.  At the sole direction of the Company, Escrow Agent may hold and invest the Escrow Amount in cash, cash equivalents, and short-term government treasuries in order to generate income exclusively as compensation of Escrow Agent and in a manner that manages principal risk on such funds, including any foreign exchange risk, while taking into account historic, typical and anticipated liquidity needs of the Escrow Account.

    b.  **Reallocation**.  Once Escrow Amounts are received by Escrow Agent, and so long as Tokens have not been minted and distributed against such funds, then Company may redirect such Escrow Amounts to a different properly regulated escrow agent without Escrow Agent's prior written consent by written notice to Escrow Agent.

    c.  **Company Dissolution.** If the Company ceases operation for any reason including, but not limited to, business liquidation or bankruptcy, Escrow Agent shall be required to process any and all redemptions from Holders that have passed Escrow Agent's KYC procedures. Company agrees to work in good faith with Escrow Agent to develop a workflow for Escrow Agent to verify redemptions of Tokens on the blockchain.

6.  **Collection Procedure.** Escrow Agent is hereby authorized, upon receipt of Holder funds, to promptly deposit them in the Escrow Account. Any Holder funds which fail to clear or are subsequently reversed, including but not limited to ACH chargebacks and wire recalls, shall be debited to the Escrow Account, with such debits reflected on the Escrow Agent's ledger accessible to Company via Escrow Agent's API or dashboard technology. Any and all escrow fees paid by Company, including those for funds receipt and processing are non-refundable, regardless of whether ultimately cleared, failed, rescinded, returned or recalled.

7.  **Escrow Amount.** Escrow Agent shall hold and manage the Escrow Amount as a fiduciary for the benefit of Holders.

8.  **Tax Reporting.** All interest or other income earned by the parties under this Agreement shall be reported, as and to the extent required by law, to the Internal Revenue Service, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income earned, whether or not said income has been distributed during such year.

9.  **Escrow Administration Fees; Compensation of Prime Trust.** Escrow Agent is entitled to escrow administration fees from Company as set forth in Exhibit A; provided, however, Escrow Agent may not collect any fees, reimbursement for costs and expenses, or indemnification for any damages incurred by Company from the principal balance of the Escrow Account.

Doc ID: c3ef7d0284e2f85791086511d3dcc9978fcb73be

10. **Representations and Warranties.** Each party covenants and makes the following representations and warranties:

   a. It is duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, and has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

   b. This Agreement has been duly approved by all necessary actions, including any necessary shareholder or membership approval, has been executed by its duly authorized officers, and constitutes its valid and binding agreement enforceable in accordance with its terms.

   c. To the best of its knowledge, the execution, delivery and performance of this Agreement is in accordance with the delivery of Tokens to Holders and does not and will not materially violate, conflict with or cause a default under its articles of incorporation, bylaws, management agreement or other organizational document, as applicable, any applicable law, rule or regulation, any court order or administrative or regulatory ruling or decree to which it is a party or any of its property is subject, or any agreement, contract, indenture or other binding arrangement, including the agreements related to the delivery of Tokens to which it is a party or any of its property is subject.

   d. To the best of the its knowledge, its participation in the offer, delivery and redemption of Tokens complies in all material respects with any and all applicable laws, rules and regulations, to the extent that not being compliant would not reasonably be expected to cause a materially adverse effect.

   All of its representations and warranties contained herein are made as of the date hereof and will be made at the time of any disbursement of Escrow Amount.

11. **Term and Termination.** This Agreement will remain in full force during the Escrow Period and shall terminate upon the following:

   a. As set forth in <u>Section 2</u>.

   b. Upon the mutual written agreement of both parties.

   c. *Escrow Agent's Resignation*. Escrow Agent may resign by giving 90 days' advance written notice to Company. The parties shall cooperate in good faith to appoint a successor agent upon Escrow Agent's resignation and Escrow Agent's resignation shall not become effective until a successor escrow agent has been engaged by Company. Escrow Agent shall cooperate in good faith in transferring the Escrow Account accounts and all necessary items to the successor escrow agent and take all such other actions reasonably necessary to affect an orderly transfer of Escrow Account accounts to the successor escrow agent.

   d. *Company Termination*. Company may terminate this agreement by giving 60 day's advance written notice to Escrow Agent. Escrow Agent shall cooperate in good faith in

4

transferring the Escrow Account accounts and all necessary items to any successor escrow agent determined by Company and take all such other actions reasonably necessary to affect an orderly transfer of Escrow Account accounts to the successor escrow agent.

12. **Binding Arbitration, Applicable Law, Venue, and Attorney's Fees.** This Agreement is governed by, and will be interpreted and enforced in accordance with, the laws of the State of Nevada, as applicable, without regard to principles of conflict of laws. Any claim or dispute arising under this Agreement may only be brought in arbitration, pursuant to the rules of the JAMS Arbitration, with venue in Clark County in the State of Nevada. The parties consent to this method of dispute resolution, as well as jurisdiction, and consent to this being a convenient forum for any such claim or dispute and waive any right they may have to object to either the method or jurisdiction for such claim or dispute. Furthermore, the prevailing party shall be entitled to recover damages plus reasonable attorney's fees and costs and the decision of the arbitrator shall be final, binding and enforceable in any court.

13. **Limited Capacity of Escrow Agent.** This Agreement expressly and exclusively sets forth the duties of Escrow Agent with respect to any and all matters pertinent hereto, and no implied duties or obligations, other than those imposed by law or otherwise agreed to by separate agreement, shall be read into this Agreement against Escrow Agent. Escrow Agent acts hereunder as an escrow agent only and is not associated or affiliated with or involved in the business decisions or business activities of Company or any Holder. Notwithstanding anything to the contrary herein, Escrow Agent shall not be responsible for Company's performance, including the performance of its employees, agents and/or representatives, of the Agreement, the underlying transactions or for compelling compliance herewith. Escrow Agent's role and responsibilities are limited to (i) receiving and holding the Escrow Amount, and (ii) disbursing the Escrow Amount upon redemption of Tokens, in each case, in accordance with the terms of this Agreement. The responsibilities of the Escrow Agent in clauses (i) and (ii) of this Section [12] are ministerial in nature, and no implied duties of any kind shall be read into the terms of this Agreement. Escrow Agent has not and does not provide any legal, tax or investment advice or opine on the advisability of the underlying transactions and the Company as well as each Holder are acting upon the advice of their independent advisors. The services provided by Escrow Agent shall not be deemed or interpreted as an approval or endorsement of Company's business or regulatory compliance or the advisability of the transactions underlying this Agreement.

14. **Indemnification.** Each party (an "Indemnifying Party") shall defend, indemnify and hold harmless the other party and its affiliates and their respective officers, directors, managers, members, employees, agents, successors and assigns from and against any and all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind (excluding reasonable attorneys' fees) arising out of, relating to or resulting from: (a) any grossly negligent or fraudulent act or omission to act by such Indemnifying Party; or (b) the Indemnifying party's breach of any representation, warranty, covenant, agreement or obligation under this Agreement ((a) and (b) collectively, "Indemnifiable Matters"). The Indemnifying Party reserves the right to control the defense of any third party claim or action and all negotiations for settlement or compromise, and to select or approve defense counsel, and the other party agrees to reasonably cooperate with the

5

Doc ID: c3ef7d0284e2f85791086511d3dcc9978fcb73be

Indemnifying Party in all reasonable respects in the defense of any such claim, action, settlement or compromise negotiations.

15. **Entire Agreement, Severability and Force Majeure.** This Agreement contains the entire agreement between Company and Escrow Agent regarding the Escrow Account. If any provision of this Agreement is held invalid, the remainder of this Agreement shall continue in full force and effect. Furthermore, no party shall be responsible for any failure to perform due to acts beyond its reasonable control, including acts of God, terrorism, shortage of supply, labor difficulties (including strikes), war, civil unrest, fire, floods, electrical outages, equipment or transmission failures, internet interruptions, vendor failures (including information technology providers), or other similar causes.

16. **Amendment, Waivers.** No provision of this Agreement may be amended unless such amendment is agreed to in writing and signed by both parties. No waiver by any party to this Agreement of any condition or breach of any provision of this Agreement will be effective unless in writing. No waiver by any party of any such condition or breach, in any one instance, will be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or breach of any other provision contained in this Agreement.

17. **Notices.** Any email notice to Escrow Agent is to be sent to legal@primetrust.com. Any email notice to Company is to be sent to legal@truecoin.com. Either party may change its notice or email address by giving notice thereof in accordance with this <u>Section 16</u>. All notices hereunder shall be deemed given: (a) if served in person, when served; (b) if sent by email, on the date of transmission if before 6:00 p.m. Eastern time; (c) if by overnight courier, by a nationally recognized courier which has a system of providing evidence of delivery, on the first business day after delivery to the courier; or (d) if by U.S. Mail, on the third day after deposit in the mail, postage prepaid, certified mail, return receipt requested. Furthermore, all parties hereby agree that all current and future notices, confirmations and other communications regarding this Agreement specifically, and future communications in general between the parties, may be made by email, sent to the email address of record as set forth above or as otherwise from time to time changed, directly by the party changing such information, without necessity of confirmation of receipt, delivery or reading, and such form of electronic communication is sufficient for all matters regarding the relationship between the parties. If any such electronically-sent communication fails to be received for any reason, including but not limited to such communications being diverted to the recipients' spam filters by the recipients email service provider or technology, or due to a recipients' change of address, or due to technology issues by the recipients' service provider, the parties agree that the burden of such failure to receive is on the recipient and not the sender, and that the sender is under no obligation to resend communications via any other means, including but not limited to postal service or overnight courier, and that such communications shall for all purposes, including legal and regulatory, be deemed to have been delivered and received.

18. **Language; Drafting.** It is expressly agreed that it is the will of all parties, including Escrow Agent and Company, that this Agreement and all related pages, forms, emails, alerts and other communications have been drawn up and/or presented in English.  Both parties agree that each

Doc ID: c3ef7d0284e2f85791086511d3dcc9978fcb73be

has had an equal opportunity to participate in the drafting of this Agreement and that the Agreement shall not be interpreted in favor of either party as the drafter.

19. **Counterparts; Facsimile; Email; Signatures; Electronic Signatures.** This Agreement may be executed in counterparts, each of which will be deemed an original and all of which, taken together, will constitute one and the same instrument, binding on each signatory thereto. This Agreement may be executed by signatures, electronically or otherwise, and delivered by email in .pdf format, which shall be binding upon each signing party to the same extent as an original executed version hereof.

**Consent for Electronically Delivered Notices Is Hereby Given:** By signing this Agreement, the parties explicitly agree to receive documents electronically including its copy of this signed Agreement as well as ongoing statements, disclosures, communications and notices.

*[The rest of this page is intentionally blank, signature page follows]*

Doc ID: c3ef7d0284e2f85791086511d3dcc9978fcb73be

Agreed as of the date set forth above by and between:

**Prime Trust:**                                        **Company:**


By: _Scott Purcell_____        By: _____
Name:  Scott Purcell                                    Name: Daniel "Jai" An
Title:    CEO, Chief Trust Officer                    Title:    Member

8

## EXHIBIT A

**Escrow Agent's Fees:**

Prime Trust's Fees shall be limited to whatever income, if any, is earned by investing assets of the Escrow Account. The Escrow Agent shall not charge any wire, ACH, AML or other fees to the Escrow Account nor to any beneficial Token holder thereof.

Doc ID: c3ef7d0284e2f85791086511d3dcc9978fcb73be

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | TrueUSD Restated Escrow Agreement |
| **FILE NAME** | TrueUSD - Restated Escrow Agreement.pdf |
| **DOCUMENT ID** | c3ef7d0284e2f85791086511d3dcc9978fcb73be |
| **STATUS** | ● Completed |

## Document History

**SENT**
**04/22/2019**
17:32:06 UTC
Sent for signature to Daniel An (danny.an@trusttoken.com) and Scott Purcell (scott@primetrust.com) from legal@trusttoken.com
IP: 136.24.208.32

**VIEWED**
**04/22/2019**
17:56:36 UTC
Viewed by Scott Purcell (scott@primetrust.com)
IP: 67.129.13.34

**SIGNED**
**04/22/2019**
17:56:52 UTC
Signed by Scott Purcell (scott@primetrust.com)
IP: 67.129.13.34

**VIEWED**
**05/17/2019**
22:04:48 UTC
Viewed by Daniel An (danny.an@trusttoken.com)
IP: 69.181.106.139

**SIGNED**
**05/22/2019**
19:51:49 UTC
Signed by Daniel An (danny.an@trusttoken.com)
IP: 148.64.111.228

**COMPLETED**
**05/22/2019**
19:51:49 UTC
The document has been completed.

# Exhibit 4

# ESCROW SERVICES AGREEMENT

This Escrow Services Agreement (this "Agreement") is made and entered into as of _04/23/2019_ by and between **Prime Trust, LLC**, located at 330 S. Rampart Blvd, Suite 260, Las Vegas, NV 89145 ("Prime Trust" or "Escrow Agent"), and **TrueCoin, LLC**, a Delaware limited liability company, located at 325 9th St., San Francisco, CA 94103 ("Company") for the benefit of holders ("Holders") of Australian Dollar-backed tokens (each a "Token").

## RECITALS

**WHEREAS**, Company proposes to offer to interested persons, as disclosed in its public materials, virtualcurrency in the form of Tokens that are reflected on a blockchain, in exchange for Australian Dollars ("AUD" or "funds") deposited by Holders into an escrow account ("Escrow Account");

**WHEREAS**, each Token shall have a stated value of A\$1.00 and shall be redeemable for such amount per Token from the Escrow Amount (as defined below) by any Holder upon the request of such Holder in accordance with the terms of this Agreement;

**WHEREAS**, Company proposes to offer to interested persons holding Tokens the ability to redeem such Tokens for funds deposited in the Escrow Account; and

**WHEREAS**, Company desires to establish an Escrow Account in which funds received from select Holders will be held for the benefit of any Holders bearing such Tokens, indefinitely or if and when Tokens are redeemed by any such Holders, subject to the terms and conditions of this Agreement, and Prime Trust desires to serve as Escrow Agent ("Escrow Agent") for the Holders with respect to such Escrow Account in accordance with the terms and conditions set forth herein.

**NOW THEREFORE**, in consideration of the foregoing, it is hereby agreed as follows:

1. **Establishment of Escrow Account.** Escrow Agent shall establish an account for the funds received from Holders of Tokens. For purposes of protection, communications and directives, Escrow Agent shall be the sole administrator of the Escrow Account but may rely on communications received from Holders via software created, maintained and managed by Company.

2. **Escrow Period.** The Escrow Period shall begin with the commencement of the receipt of funds from, and clearance of Escrow Agent's KYC/AML on a Holder, and delivery of Tokens to such Holder and shall terminate in whole or in part upon the earlier to occur of the following:

   a. The date upon which there are no funds in escrow as they have all been sent to cover redemptions by Holders; or

   b. The termination of this Agreement pursuant to Section 9 herein.

   During the Escrow Period, the parties agree that (i) the escrowed funds will be held for the benefit of Holders, and that (ii) Company and Prime Trust are not entitled to any funds at any

Doc ID: f66742c5bb06d19d1605d201bfb110bf82714cc0

time and that no amounts deposited into the Escrow Account shall become the property of Company, Prime Trust, or any other entity, or be subject to any debts, liens or encumbrances of any kind of Company, Prime Trust, or any other entity, as they are held exclusively for the benefit of Holders.

3.  **Deposits into, and Redemptions from, the Escrow Account.** Certain Holders transmit their data and funds, via Escrow Agent's API's and technology systems, which may be integrated into Company's software, directly to the Escrow Agent. Such Holders purchasing Tokens will be directed to transfer funds directly to Escrow Agent for deposit into the Escrow Account. Escrow Agent shall process all Escrow Amounts for collection through the banking system and shall maintain an accounting of each deposit posted to its ledger. All monies so deposited in the Escrow Account and which have cleared the banking system are hereinafter referred to as the "Escrow Amount." Each Holder seeking to redeem Tokens shall provide Escrow Agent with payment instructions along with any additional documents or information reasonably requested by the Escrow Agent. Company shall promptly, concurrent with any new or modified delivery or redemption of Tokens, provide Escrow Agent with a copy of the Holder's information as may be reasonably requested by Escrow Agent for its anti-money laundering program and in the performance of its duties under this Agreement. Escrow Agent is under no duty or responsibility to enforce collection of any funds delivered to it hereunder. Company shall be solely responsible for the 'minting' or creation the Tokens and, upon redemption, destroy or remove from circulation such Token being redeemed, such actions to be taken upon confirmation from of Escrow Agent of either cleared funds or funds transferred upon redemption through the API. Company shall ensure that at all times the value of Tokens issued is equal to the Escrow Amount and shall only create Tokens upon confirmation from the Escrow Agent that funds have been deposited and are fully cleared. Escrow Agent shall treat the Tokens as bearer instruments which are redeemable by any Holder with possession of the Token and Escrow Agent shall redeem Tokens without any obligation to  investigate such Holder's title, interest or right to any Tokens which the Escrow Agent is instructed to redeem. Escrow Agent reserves the right to deny, suspend or terminate a Holder's participation in the Escrow Account if the Escrow Agent reasonably deems it advisable or necessary to comply with applicable laws or to eliminate practices that are not consistent with laws, rules or regulations.

4.  **Purchase and Redemption Minimums.** There shall be no purchase or redemption minimums. Company and Escrow Agent agree to review this paragraph at least annually and negotiate in good faith if a purchase or redemption minimum is requested in writing by either party.

    a.  **Investment of Escrow Amount**.  At the sole direction of the Company, Escrow Agent may hold and invest the Escrow Amount in cash, cash equivalents, and short-term government treasuries in order to generate income exclusively as compensation of Escrow Agent and in a manner that manages principal risk on such funds, including any foreign exchange risk, while taking into account historic, typical and anticipated liquidity needs of the Escrow Account.

    b.  **Reallocation**.  Once Escrow Amounts are received by Escrow Agent, and so long as Tokens have not been minted and distributed against such funds, then Company may

2

redirect such Escrow Amounts to a different properly regulated escrow agent without Escrow Agent's prior written consent by written notice to Escrow Agent.

c. **Company Dissolution.** If the Company ceases operation for any reason including, but not limited to, business liquidation or bankruptcy, Escrow Agent shall be required to process any and all redemptions from Holders that have passed Escrow Agent's KYC procedures. Company agrees to work in good faith with Escrow Agent to develop a workflow for Escrow Agent to verify redemptions of Tokens on the blockchain.

5. **Collection Procedure.** Escrow Agent is hereby authorized, upon receipt of Holder funds, to promptly deposit them in the Escrow Account. Any Holder funds which fail to clear or are subsequently reversed, including but not limited to ACH chargebacks and wire recalls, shall be debited to the Escrow Account, with such debits reflected on the Escrow Agent's ledger accessible to Company via Escrow Agent's API or dashboard technology. Any and all escrow fees paid by Company, including those for funds receipt and processing are non-refundable, regardless of whether ultimately cleared, failed, rescinded, returned or recalled.

6. **Escrow Amount.** Escrow Agent shall hold and manage the Escrow Amount as a fiduciary for the benefit of Holders.

7. **Tax Reporting.** All interest or other income earned by the parties under this Agreement shall be reported, as and to the extent required by law, to the Internal Revenue Service, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income earned, whether or not said income has been distributed during such year.

8. **Escrow Administration Fees; Compensation of Prime Trust.** Escrow Agent is entitled to escrow administration fees from Company as set forth in Exhibit A; provided, however, Escrow Agent may not collect any fees, reimbursement for costs and expenses, or indemnification for any damages incurred by Company from the principal balance of the Escrow Account.

9. **Representations and Warranties.** Each party covenants and makes the following representations and warranties:

a. It is duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, and has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

b. This Agreement has been duly approved by all necessary actions, including any necessary shareholder or membership approval, has been executed by its duly authorized officers, and constitutes its valid and binding agreement enforceable in accordance with its terms.

c. To the best of its knowledge, the execution, delivery and performance of this Agreement is in accordance with the delivery of Tokens to Holders and does not and will not materially violate, conflict with or cause a default under its articles of incorporation, bylaws, management agreement or other organizational document, as applicable, any applicable

3

Doc ID: f66742c5bb06d19d1605d201bfb110bf82714cc0

law, rule or regulation, any court order or administrative or regulatory ruling or decree to which it is a party or any of its property is subject, or any agreement, contract, indenture or other binding arrangement, including the agreements related to the delivery of Tokens to which it is a party or any of its property is subject.

d.  To the best of the its knowledge, its participation in the offer, delivery and redemption of Tokens complies in all material respects with any and all applicable laws, rules and regulations, to the extent that not being compliant would not reasonably be expected to cause a materially adverse effect.

All of its representations and warranties contained herein are made as of the date hereof and will be made at the time of any disbursement of Escrow Amount.

10. **Term and Termination.** This Agreement will remain in full force during the Escrow Period and shall terminate upon the following:

a.  As set forth in Section 2.

b.  Upon the mutual written agreement of both parties.

c.  *Escrow Agent's Resignation*. Escrow Agent may resign by giving 90 days' advance written notice to Company. The parties shall cooperate in good faith to appoint a successor agent upon Escrow Agent's resignation and Escrow Agent's resignation shall not become effective until a successor escrow agent has been engaged by Company. Escrow Agent shall cooperate in good faith in transferring the Escrow Account accounts and all necessary items to the successor escrow agent and take all such other actions reasonably necessary to affect an orderly transfer of Escrow Account accounts to the successor escrow agent.

d.  *Company Termination*. Company may terminate this agreement by giving 60 day's advance written notice to Escrow Agent. Escrow Agent shall cooperate in good faith in transferring the Escrow Account accounts and all necessary items to any successor escrow agent determined by Company and take all such other actions reasonably necessary to affect an orderly transfer of Escrow Account accounts to the successor escrow agent.

11. **Binding Arbitration, Applicable Law, Venue, and Attorney's Fees.** This Agreement is governed by, and will be interpreted and enforced in accordance with, the laws of the State of Nevada, as applicable, without regard to principles of conflict of laws. Any claim or dispute arising under this Agreement may only be brought in arbitration, pursuant to the rules of the JAMS Arbitration, with venue in Clark County in the State of Nevada. The parties consent to this method of dispute resolution, as well as jurisdiction, and consent to this being a convenient forum for any such claim or dispute and waive any right they may have to object to either the method or jurisdiction for such claim or dispute. Furthermore, the prevailing party shall be entitled to recover damages plus reasonable attorney's fees and costs and the decision of the arbitrator shall be final, binding and enforceable in any court.

Doc ID: f66742c5bb06d19d1605d201bfb110bf82714cc0

12. **Limited Capacity of Escrow Agent.** This Agreement expressly and exclusively sets forth the duties of Escrow Agent with respect to any and all matters pertinent hereto, and no implied duties or obligations, other than those imposed by law or otherwise agreed to by separate agreement, shall be read into this Agreement against Escrow Agent. Escrow Agent acts hereunder as an escrow agent only and is not associated or affiliated with or involved in the business decisions or business activities of Company or any Holder. Notwithstanding anything to the contrary herein, Escrow Agent shall not be responsible for Company's performance, including the performance of its employees, agents and/or representatives, of the Agreement, the underlying transactions or for compelling compliance herewith. Escrow Agent's role and responsibilities are limited to (i) receiving and holding the Escrow Amount, and (ii) disbursing the Escrow Amount upon redemption of Tokens, in each case, in accordance with the terms of this Agreement. The responsibilities of the Escrow Agent in clauses (i) and (ii) of this Section [12] are ministerial in nature, and no implied duties of any kind shall be read into the terms of this Agreement. Escrow Agent has not and does not provide any legal, tax or investment advice or opine on the advisability of the underlying transactions and the Company as well as each Holder are acting upon the advice of their independent advisors. The services provided by Escrow Agent shall not be deemed or interpreted as an approval or endorsement of Company's business or regulatory compliance or the advisability of the transactions underlying this Agreement.

13. **Indemnification.** Each party (an "Indemnifying Party") shall defend, indemnify and hold harmless the other party and its affiliates and their respective officers, directors, managers, members, employees, agents, successors and assigns from and against any and all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind (excluding reasonable attorneys' fees) arising out of, relating to or resulting from: (a) any grossly negligent or fraudulent act or omission to act by such Indemnifying Party; or (b) the Indemnifying party's breach of any representation, warranty, covenant, agreement or obligation under this Agreement ((a) and (b) collectively, "Indemnifiable Matters"). The Indemnifying Party reserves the right to control the defense of any third party claim or action and all negotiations for settlement or compromise, and to select or approve defense counsel, and the other party agrees to reasonably cooperate with the Indemnifying Party in all reasonable respects in the defense of any such claim, action, settlement or compromise negotiations.

14. **Entire Agreement, Severability and Force Majeure.** This Agreement contains the entire agreement between Company and Escrow Agent regarding the Escrow Account. If any provision of this Agreement is held invalid, the remainder of this Agreement shall continue in full force and effect. Furthermore, no party shall be responsible for any failure to perform due to acts beyond its reasonable control, including acts of God, terrorism, shortage of supply, labor difficulties (including strikes), war, civil unrest, fire, floods, electrical outages, equipment or transmission failures, internet interruptions, vendor failures (including information technology providers), or other similar causes.

15. **Amendment, Waivers.** No provision of this Agreement may be amended unless such amendment is agreed to in writing and signed by both parties. No waiver by any party to this Agreement of any condition or breach of any provision of this Agreement will be effective

Doc ID: f66742c5bb06d19d1605d201bfb110bf82714cc0

unless in writing. No waiver by any party of any such condition or breach, in any one instance, will be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or breach of any other provision contained in this Agreement.

16. **Notices.** Any email notice to Escrow Agent is to be sent to legal@primetrust.com. Any email notice to Company is to be sent to legal@truecoin.com. Either party may change its notice or email address by giving notice thereof in accordance with this <u>Section 16</u>. All notices hereunder shall be deemed given: (a) if served in person, when served; (b) if sent by email, on the date of transmission if before 6:00 p.m. Eastern time; (c) if by overnight courier, by a nationally recognized courier which has a system of providing evidence of delivery, on the first business day after delivery to the courier; or (d) if by U.S. Mail, on the third day after deposit in the mail, postage prepaid, certified mail, return receipt requested. Furthermore, all parties hereby agree that all current and future notices, confirmations and other communications regarding this Agreement specifically, and future communications in general between the parties, may be made by email, sent to the email address of record as set forth above or as otherwise from time to time changed, directly by the party changing such information, without necessity of confirmation of receipt, delivery or reading, and such form of electronic communication is sufficient for all matters regarding the relationship between the parties. If any such electronically-sent communication fails to be received for any reason, including but not limited to such communications being diverted to the recipients' spam filters by the recipients email service provider or technology, or due to a recipients' change of address, or due to technology issues by the recipients' service provider, the parties agree that the burden of such failure to receive is on the recipient and not the sender, and that the sender is under no obligation to resend communications via any other means, including but not limited to postal service or overnight courier, and that such communications shall for all purposes, including legal and regulatory, be deemed to have been delivered and received.

17. **Language; Drafting.** It is expressly agreed that it is the will of all parties, including Escrow Agent and Company, that this Agreement and all related pages, forms, emails, alerts and other communications have been drawn up and/or presented in English. Both parties agree that each has had an equal opportunity to participate in the drafting of this Agreement and that the Agreement shall not be interpreted in favor of either party as the drafter.

18. **Counterparts; Facsimile; Email; Signatures; Electronic Signatures.** This Agreement may be executed in counterparts, each of which will be deemed an original and all of which, taken together, will constitute one and the same instrument, binding on each signatory thereto. This Agreement may be executed by signatures, electronically or otherwise, and delivered by email in .pdf format, which shall be binding upon each signing party to the same extent as an original executed version hereof.

**Consent for Electronically Delivered Notices Is Hereby Given:** By signing this Agreement, the parties explicitly agree to receive documents electronically including its copy of this signed Agreement as well as ongoing statements, disclosures, communications and notices.

*[The rest of this page is intentionally blank, signature page follows]*

Doc ID: f66742c5bb06d19d1605d201bfb110bf82714cc0

Agreed as of the date set forth above by and between:

**Prime Trust:**                              **Company:**

By: _Scott Purcell_____          By: _____
Name:  Scott Purcell                          Name:  Daniel "Jai" An
Title:   CEO, Chief Trust Officer             Title:    Member

Doc ID: f66742c5bb06d19d1605d201bfb110bf82714cc0

## EXHIBIT A

**Escrow Agent's Fees:**

Prime Trust's Fees shall be limited to whatever income, if any, is earned by investing assets of the Escrow Account. The Escrow Agent shall not charge any wire, ACH, AML or other fees to the Escrow Account nor to any beneficial Token holder thereof.

Doc ID: f66742c5bb06d19d1605d201bfb110bf82714cc0

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | TrueAUD Escrow Agreement |
| **FILE NAME** | TrueAUD - Escrow Agreement.pdf |
| **DOCUMENT ID** | f66742c5bb06d19d1605d201bfb110bf82714cc0 |
| **STATUS** | ● Completed |

## Document History

**SENT**
**04/22/2019**
17:22:58 UTC
Sent for signature to Daniel An (danny.an@trusttoken.com) and Scott Purcell (scott@primetrust.com) from legal@trusttoken.com
IP: 136.24.208.32

**VIEWED**
**04/22/2019**
17:57:00 UTC
Viewed by Scott Purcell (scott@primetrust.com)
IP: 67.129.13.34

**SIGNED**
**04/22/2019**
17:57:30 UTC
Signed by Scott Purcell (scott@primetrust.com)
IP: 67.129.13.34

**VIEWED**
**04/23/2019**
04:45:06 UTC
Viewed by Daniel An (danny.an@trusttoken.com)
IP: 69.181.106.139

**SIGNED**
**04/23/2019**
23:55:26 UTC
Signed by Daniel An (danny.an@trusttoken.com)
IP: 136.24.208.32

**COMPLETED**
**04/23/2019**
23:55:26 UTC
The document has been completed.

# Exhibit 5

# Prime Trust

For the Account of: TrueCoin, LLC TUSD Escrow Avalanche
Account Number: ███5355
Period: 2023-08-01 through 2023-08-31

# Account Balances

| ASSET | BEGINNING BALANCE | ENDING BALANCE |
|---|---|---|
| USD | 24268.83 | 24268.83 |

**Prime Trust**

For the Account of: TrueCoin, LLC TUSD Escrow Avalanche
Account Number: ███████5355
Period: 2023-08-01 through 2023-08-31

# NOTICE TO ACCOUNT HOLDERS AND BENEFICIARIES

YOU HAVE 180 DAYS FROM YOUR RECEIPT OF THIS STATEMENT TO MAKE AN OBJECTION TO ANY ITEM SET FORTH IN THIS STATEMENT. ANY OBJECTION YOU MAKE MUST BE IN WRITING; IT MUST BE DELIVERED TO PRIME TRUST WITHIN THE PERIOD STATED ABOVE; AND IT MUST STATE YOUR OBJECTION IN FULL DETAIL. YOUR FAILURE TO DELIVER A WRITTEN OBJECTION TO PRIME TRUST WITHIN THE SPECIFIED PERIOD STATED ABOVE WILL PERMANENTLY PREVENT YOU FROM LATER ASSERTING THIS OBJECTION AGAINST PRIME TRUST, IF THE NOTICE OF DISCREPANCIES IS NOT RECEIVED WITHIN THE 180 DAY TIME FRAME, IT WILL SIGNIFY YOUR APPROVAL OF THE STATEMENT AND PRECLUDES YOU FROM MAKING FUTURE OBJECTIONS OR EXCEPTIONS REGARDING THE INFORMATION CONTAINED IN THIS STATEMENT. SUCH APPROVAL BY YOU SHALL BE FULLY ACQUITTAL AND DISCHARGE PRIME TRUST REGARDING THE TRANSACTIONS AND INFORMATION ON SUCH STATEMENT.

## ASSET VALUE REPORTING POLICY

TO VALUE DIGITAL ASSETS IN THE ACCOUNT, PRIME TRUST WILL ELECTRONICALLY OBTAIN USD EQUIVALENT PRICES FROM DIGITAL CURRENCY MARKET DATA PROVIDERS OR OTHER SOURCES AS OF THE LAST DATE OF THE STATEMENT. PRIME TRUST DOES NOT GUARANTEE THE ACCURACY OR TIMELINESS OF PRICES RECEIVED AND THE PRICES ARE NOT TO BE RELIED UPON FOR ANY INVESTMENT DECISIONS FOR YOUR ACCOUNT.

## ASSIGNED COST BASIS

COST INFORMATION FOR ASSETS HELD IN THE ACCOUNT IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY TO TRACK ASSETS WITHIN YOUR PRIME TRUST ACCOUNT. WHEN AN ASSET IS TRANSFERRED OUT, THE COST BASIS USED FOR THE TRANSFER IS DETERMINED ON A FIRST IN FIRST OUT METHODOLOGY. PRIME TRUST MAKES NO REPRESENTATION OF THE ACCURACY OF THIS DATA FOR ANY USE INCLUDING REGULATORY REPORTING PURPOSES.

## INVESTMENT TRANSACTION FEES

THE FEES DIRECTLY ASSOCIATED WITH EACH TRANSACTION WILL NOT APPEAR ON THIS STATEMENT.

## INVESTMENT RESPONSIBILITY

YOU OR YOUR FINANCIAL ADVISOR OR MANAGER HAVE SOLE DISCRETION AND RESPONSIBILITY TO MANAGE THE INVESTMENTS/ASSETS OF THE ACCOUNT. PRIME TRUST IS A DIRECTED CUSTODIAN. WE PROVIDE CUSTODY SERVICE FOR THE ASSETS OF THE ACCOUNT AND WE ACT ON THE DIRECTION OF THE ACCOUNT HOLDER. PRIME TRUST IS NOT RESPONSIBLE FOR THE PERFORMANCE OF THE ASSETS HELD IN THE ACCOUNT AND IT IS YOUR RESPONSIBILITY TO UNDERSTAND THE RISKS ASSOCIATED WITH THESE ASSETS.

◆ **Prime Trust**

For the Account of: TrueCoin, LLC TUSD Escrow Avalanche
Account Number: ███████5355
Period: 2023-08-01 through 2023-08-31

**FDIC INSURANCE**

UNINVESTED USD FIAT DEPOSITS HELD IN YOUR ACCOUNT ARE ON DEPOSIT WITH ONE OR MORE THIRD-PARTY FDIC-INSURED COMMERCIAL FINANCIAL INSTITUTIONS THAT ARE CATEGORIZED BY THE FDIC AS "WELL CAPITALIZED". SUCH USD FIAT DEPOSITS ARE INSURED BY THE FDIC THROUGH SUCH COMMERCIAL INSTITUTION(S) TO THE LEGAL LIMIT PER DEPOSITOR. NOTE: OTHER ASSETS IN OUR ACCOUNT ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR OBLIGATIONS OF AND ARE NOT GUARANTEED BY PRIME TRUST; AND THEY ARE SUBJECT TO INVESTMENT RISK, INCLUDING THE POSSIBLE LOSS OF YOUR INVESTMENT VALUE.

**MISCELLANEOUS**

PRIME TRUST DOES NOT PROVIDE INVESTMENT, LEGAL OR TAX ADVICE. PLEASE CONSULT YOUR FINANCIAL ADVISOR, LEGAL OR TAX ACCOUNTANT WHEN NECESSARY.

**QUESTIONS**

IF YOU HAVE ANY QUESTIONS RELATING THE ABOVE, PLEASE FEEL FREE TO CONTACT YOUR SERVICE PROVIDER.

# Exhibit 6

# ◈ Prime Trust

For the Account of: TrueCoin, LLC TUSD Escrow - Ethereum
Account Number: ▉ 5187
Period: 2023-08-01 through 2023-08-31

# Account Balances

| ASSET | BEGINNING BALANCE | ENDING BALANCE |
|---|---|---|
| CAD | 0.00 | 0.00 |
| AUD | 0.00 | 0.00 |
| USD | 2164.99 | 2164.99 |
| GBP | 0.00 | 0.00 |
| Cash Reserve CC | 0.000000000000000000 | 0.000000000000000000 |
| FDIC Insured Cash | 0.000000000000000000 | 0.000000000000000000 |
| TrueUSD | 0.000000000000000000 | 0.000000000000000000 |
| USD Coin | 0.000000000000000000 | 0.000000000000000000 |
| Tether USD | 0.000000000000000000 | 0.000000000000000000 |
| US Treasury Repo | 0.000000000000000000 | 0.000000000000000000 |

**♦ Prime Trust**

For the Account of: TrueCoin, LLC TUSD Escrow - Ethereum
Account Number: ▉▉▉5187
Period: 2023-08-01 through 2023-08-31

# NOTICE TO ACCOUNT HOLDERS AND BENEFICIARIES

YOU HAVE 180 DAYS FROM YOUR RECEIPT OF THIS STATEMENT TO MAKE AN OBJECTION TO ANY ITEM SET FORTH IN THIS STATEMENT. ANY OBJECTION YOU MAKE MUST BE IN WRITING; IT MUST BE DELIVERED TO PRIME TRUST WITHIN THE PERIOD STATED ABOVE; AND IT MUST STATE YOUR OBJECTION IN FULL DETAIL. YOUR FAILURE TO DELIVER A WRITTEN OBJECTION TO PRIME TRUST WITHIN THE SPECIFIED PERIOD STATED ABOVE WILL PERMANENTLY PREVENT YOU FROM LATER ASSERTING THIS OBJECTION AGAINST PRIME TRUST. IF THE NOTICE OF DISCREPANCIES IS NOT RECEIVED WITHIN THE 180 DAY TIME FRAME, IT WILL SIGNIFY YOUR APPROVAL OF THE STATEMENT AND PRECLUDES YOU FROM MAKING FUTURE OBJECTIONS OR EXCEPTIONS REGARDING THE INFORMATION CONTAINED IN THIS STATEMENT. SUCH APPROVAL BY YOU SHALL BE FULLY ACQUITTAL AND DISCHARGE PRIME TRUST REGARDING THE TRANSACTIONS AND INFORMATION ON SUCH STATEMENT.

## ASSET VALUE REPORTING POLICY

TO VALUE DIGITAL ASSETS IN THE ACCOUNT, PRIME TRUST WILL ELECTRONICALLY OBTAIN USD EQUIVALENT PRICES FROM DIGITAL CURRENCY MARKET DATA PROVIDERS OR OTHER SOURCES AS OF THE LAST DATE OF THE STATEMENT. PRIME TRUST DOES NOT GUARANTEE THE ACCURACY OR TIMELINESS OF PRICES RECEIVED AND THE PRICES ARE NOT TO BE RELIED UPON FOR ANY INVESTMENT DECISIONS FOR YOUR ACCOUNT.

## ASSIGNED COST BASIS

COST INFORMATION FOR ASSETS HELD IN THE ACCOUNT IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY TO TRACK ASSETS WITHIN YOUR PRIME TRUST ACCOUNT. WHEN AN ASSET IS TRANSFERRED OUT, THE COST BASIS USED FOR THE TRANSFER IS DETERMINED ON A FIRST IN FIRST OUT METHODOLOGY. PRIME TRUST MAKES NO REPRESENTATION OF THE ACCURACY OF THIS DATA FOR ANY USE INCLUDING REGULATORY REPORTING PURPOSES.

## INVESTMENT TRANSACTION FEES

THE FEES DIRECTLY ASSOCIATED WITH EACH TRANSACTION WILL NOT APPEAR ON THIS STATEMENT.

## INVESTMENT RESPONSIBILITY

YOU OR YOUR FINANCIAL ADVISOR OR MANAGER HAVE SOLE DISCRETION AND RESPONSIBILITY TO MANAGE THE INVESTMENTS/ASSETS OF THE ACCOUNT. PRIME TRUST IS A DIRECTED CUSTODIAN. WE PROVIDE CUSTODY SERVICE FOR THE ASSETS OF THE ACCOUNT AND WE ACT ON THE DIRECTION OF THE ACCOUNT HOLDER. PRIME TRUST IS NOT RESPONSIBLE FOR THE PERFORMANCE OF THE ASSETS HELD IN THE ACCOUNT AND IT IS YOUR RESPONSIBILITY TO UNDERSTAND THE RISKS ASSOCIATED WITH THESE ASSETS.

◆ **Prime Trust**

For the Account of: TrueCoin, LLC TUSD Escrow - Ethereum
Account Number: ▇▇▇▇5187
Period: 2023-08-01 through 2023-08-31

## FDIC INSURANCE

UNINVESTED USD FIAT DEPOSITS HELD IN YOUR ACCOUNT ARE ON DEPOSIT WITH ONE OR MORE THIRD-PARTY FDIC-INSURED COMMERCIAL FINANCIAL INSTITUTIONS THAT ARE CATEGORIZED BY THE FDIC AS "WELL CAPITALIZED". SUCH USD FIAT DEPOSITS ARE INSURED BY THE FDIC THROUGH SUCH COMMERCIAL INSTITUTION(S) TO THE LEGAL LIMIT PER DEPOSITOR. NOTE: OTHER ASSETS IN OUR ACCOUNT ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR OBLIGATIONS OF AND ARE NOT GUARANTEED BY PRIME TRUST; AND THEY ARE SUBJECT TO INVESTMENT RISK, INCLUDING THE POSSIBLE LOSS OF YOUR INVESTMENT VALUE.

## MISCELLANEOUS

PRIME TRUST DOES NOT PROVIDE INVESTMENT, LEGAL OR TAX ADVICE. PLEASE CONSULT YOUR FINANCIAL ADVISOR, LEGAL OR TAX ACCOUNTANT WHEN NECESSARY.

## QUESTIONS

IF YOU HAVE ANY QUESTIONS RELATING THE ABOVE, PLEASE FEEL FREE TO CONTACT YOUR SERVICE PROVIDER.

# Exhibit 7

# Prime Trust

For the Account of: TrueCoin, LLC TUSD Escrow - Tron
Account Number: 6880
Period: 2023-08-01 through 2023-08-31

# Account Balances

| ASSET | BEGINNING BALANCE | ENDING BALANCE |
|---|---|---|
| USD | 1001.20 | 1001.20 |

♦ **Prime Trust**

For the Account of: TrueCoin, LLC TUSD Escrow - Tron

Account Number: ████ 6880

Period: 2023-08-01 through 2023-08-31

# NOTICE TO ACCOUNT HOLDERS AND BENEFICIARIES

YOU HAVE 180 DAYS FROM YOUR RECEIPT OF THIS STATEMENT TO MAKE AN OBJECTION TO ANY ITEM SET FORTH IN THIS STATEMENT. ANY OBJECTION YOU MAKE MUST BE IN WRITING; IT MUST BE DELIVERED TO PRIME TRUST WITHIN THE PERIOD STATED ABOVE; AND IT MUST STATE YOUR OBJECTION IN FULL DETAIL. YOUR FAILURE TO DELIVER A WRITTEN OBJECTION TO PRIME TRUST WITHIN THE SPECIFIED PERIOD STATED ABOVE WILL PERMANENTLY PREVENT YOU FROM LATER ASSERTING THIS OBJECTION AGAINST PRIME TRUST. IF THE NOTICE OF DISCREPANCIES IS NOT RECEIVED WITHIN THE 180 DAY TIME FRAME, IT WILL SIGNIFY YOUR APPROVAL OF THE STATEMENT AND PRECLUDES YOU FROM MAKING FUTURE OBJECTIONS OR EXCEPTIONS REGARDING THE INFORMATION CONTAINED IN THIS STATEMENT. SUCH APPROVAL BY YOU SHALL BE FULLY ACQUITTAL AND DISCHARGE PRIME TRUST REGARDING THE TRANSACTIONS AND INFORMATION ON SUCH STATEMENT.

## ASSET VALUE REPORTING POLICY

TO VALUE DIGITAL ASSETS IN THE ACCOUNT, PRIME TRUST WILL ELECTRONICALLY OBTAIN USD EQUIVALENT PRICES FROM DIGITAL CURRENCY MARKET DATA PROVIDERS OR OTHER SOURCES AS OF THE LAST DATE OF THE STATEMENT. PRIME TRUST DOES NOT GUARANTEE THE ACCURACY OR TIMELINESS OF PRICES RECEIVED AND THE PRICES ARE NOT TO BE RELIED UPON FOR ANY INVESTMENT DECISIONS FOR YOUR ACCOUNT.

## ASSIGNED COST BASIS

COST INFORMATION FOR ASSETS HELD IN THE ACCOUNT IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY TO TRACK ASSETS WITHIN YOUR PRIME TRUST ACCOUNT. WHEN AN ASSET IS TRANSFERRED OUT, THE COST BASIS USED FOR THE TRANSFER IS DETERMINED ON A FIRST IN FIRST OUT METHODOLOGY. PRIME TRUST MAKES NO REPRESENTATION OF THE ACCURACY OF THIS DATA FOR ANY USE INCLUDING REGULATORY REPORTING PURPOSES.

## INVESTMENT TRANSACTION FEES

THE FEES DIRECTLY ASSOCIATED WITH EACH TRANSACTION WILL NOT APPEAR ON THIS STATEMENT.

## INVESTMENT RESPONSIBILITY

YOU OR YOUR FINANCIAL ADVISOR OR MANAGER HAVE SOLE DISCRETION AND RESPONSIBILITY TO MANAGE THE INVESTMENTS/ASSETS OF THE ACCOUNT. PRIME TRUST IS A DIRECTED CUSTODIAN. WE PROVIDE CUSTODY SERVICE FOR THE ASSETS OF THE ACCOUNT AND WE ACT ON THE DIRECTION OF THE ACCOUNT HOLDER. PRIME TRUST IS NOT RESPONSIBLE FOR THE PERFORMANCE OF THE ASSETS HELD IN THE ACCOUNT AND IT IS YOUR RESPONSIBILITY TO UNDERSTAND THE RISKS ASSOCIATED WITH THESE ASSETS.

## ◈ Prime Trust

For the Account of: TrueCoin, LLC TUSD Escrow - Tron
Account Number: ▉▉▉6880
Period: 2023-08-01 through 2023-08-31

## FDIC INSURANCE

UNINVESTED USD FIAT DEPOSITS HELD IN YOUR ACCOUNT ARE ON DEPOSIT WITH ONE OR MORE THIRD-PARTY FDIC-INSURED COMMERCIAL FINANCIAL INSTITUTIONS THAT ARE CATEGORIZED BY THE FDIC AS "WELL CAPITALIZED". SUCH USD FIAT DEPOSITS ARE INSURED BY THE FDIC THROUGH SUCH COMMERCIAL INSTITUTION(S) TO THE LEGAL LIMIT PER DEPOSITOR. NOTE: OTHER ASSETS IN OUR ACCOUNT ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR OBLIGATIONS OF AND ARE NOT GUARANTEED BY PRIME TRUST; AND THEY ARE SUBJECT TO INVESTMENT RISK, INCLUDING THE POSSIBLE LOSS OF YOUR INVESTMENT VALUE.

## MISCELLANEOUS

PRIME TRUST DOES NOT PROVIDE INVESTMENT, LEGAL OR TAX ADVICE. PLEASE CONSULT YOUR FINANCIAL ADVISOR, LEGAL OR TAX ACCOUNTANT WHEN NECESSARY.

## QUESTIONS

IF YOU HAVE ANY QUESTIONS RELATING THE ABOVE, PLEASE FEEL FREE TO CONTACT YOUR SERVICE PROVIDER.

# Exhibit 8

**Prime Trust**

For the Account of: TrueCoin, LLC - TAUD Escrow
Account Number: 8462
Period: 2023-08-01 through 2023-08-31

# Account Balances

| ASSET | BEGINNING BALANCE | ENDING BALANCE |
| --- | --- | --- |
| AUD | 6793737.39 | 6793737.39 |

◆ **Prime Trust**

For the Account of: TrueCoin, LLC - TAUD Escrow
Account Number: ████ 8462
Period: 2023-08-01 through 2023-08-31

# NOTICE TO ACCOUNT HOLDERS AND BENEFICIARIES

YOU HAVE 180 DAYS FROM YOUR RECEIPT OF THIS STATEMENT TO MAKE AN OBJECTION TO ANY ITEM SET FORTH IN THIS STATEMENT. ANY OBJECTION YOU MAKE MUST BE IN WRITING; IT MUST BE DELIVERED TO PRIME TRUST WITHIN THE PERIOD STATED ABOVE; AND IT MUST STATE YOUR OBJECTION IN FULL DETAIL. YOUR FAILURE TO DELIVER A WRITTEN OBJECTION TO PRIME TRUST WITHIN THE SPECIFIED PERIOD STATED ABOVE WILL PERMANENTLY PREVENT YOU FROM LATER ASSERTING THIS OBJECTION AGAINST PRIME TRUST. IF THE NOTICE OF DISCREPANCIES IS NOT RECEIVED WITHIN THE 180 DAY TIME FRAME, IT WILL SIGNIFY YOUR APPROVAL OF THE STATEMENT AND PRECLUDES YOU FROM MAKING FUTURE OBJECTIONS OR EXCEPTIONS REGARDING THE INFORMATION CONTAINED IN THIS STATEMENT. SUCH APPROVAL BY YOU SHALL BE FULLY ACQUITTAL AND DISCHARGE PRIME TRUST REGARDING THE TRANSACTIONS AND INFORMATION ON SUCH STATEMENT.

## ASSET VALUE REPORTING POLICY

TO VALUE DIGITAL ASSETS IN THE ACCOUNT, PRIME TRUST WILL ELECTRONICALLY OBTAIN USD EQUIVALENT PRICES FROM DIGITAL CURRENCY MARKET DATA PROVIDERS OR OTHER SOURCES AS OF THE LAST DATE OF THE STATEMENT. PRIME TRUST DOES NOT GUARANTEE THE ACCURACY OR TIMELINESS OF PRICES RECEIVED AND THE PRICES ARE NOT TO BE RELIED UPON FOR ANY INVESTMENT DECISIONS FOR YOUR ACCOUNT.

## ASSIGNED COST BASIS

COST INFORMATION FOR ASSETS HELD IN THE ACCOUNT IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY TO TRACK ASSETS WITHIN YOUR PRIME TRUST ACCOUNT. WHEN AN ASSET IS TRANSFERRED OUT, THE COST BASIS USED FOR THE TRANSFER IS DETERMINED ON A FIRST IN FIRST OUT METHODOLOGY. PRIME TRUST MAKES NO REPRESENTATION OF THE ACCURACY OF THIS DATA FOR ANY USE INCLUDING REGULATORY REPORTING PURPOSES.

## INVESTMENT TRANSACTION FEES

THE FEES DIRECTLY ASSOCIATED WITH EACH TRANSACTION WILL NOT APPEAR ON THIS STATEMENT.

## INVESTMENT RESPONSIBILITY

YOU OR YOUR FINANCIAL ADVISOR OR MANAGER HAVE SOLE DISCRETION AND RESPONSIBILITY TO MANAGE THE INVESTMENTS/ASSETS OF THE ACCOUNT. PRIME TRUST IS A DIRECTED CUSTODIAN. WE PROVIDE CUSTODY SERVICE FOR THE ASSETS OF THE ACCOUNT AND WE ACT ON THE DIRECTION OF THE ACCOUNT HOLDER. PRIME TRUST IS NOT RESPONSIBLE FOR THE PERFORMANCE OF THE ASSETS HELD IN THE ACCOUNT AND IT IS YOUR RESPONSIBILITY TO UNDERSTAND THE RISKS ASSOCIATED WITH THESE ASSETS.

◆ **Prime Trust**

For the Account of: TrueCoin, LLC - TAUD Escrow
Account Number: ████ 8462
Period: 2023-08-01 through 2023-08-31

## FDIC INSURANCE

UNINVESTED USD FIAT DEPOSITS HELD IN YOUR ACCOUNT ARE ON DEPOSIT WITH ONE OR MORE THIRD-PARTY FDIC-INSURED COMMERCIAL FINANCIAL INSTITUTIONS THAT ARE CATEGORIZED BY THE FDIC AS "WELL CAPITALIZED". SUCH USD FIAT DEPOSITS ARE INSURED BY THE FDIC THROUGH SUCH COMMERCIAL INSTITUTION(S) TO THE LEGAL LIMIT PER DEPOSITOR. NOTE: OTHER ASSETS IN OUR ACCOUNT ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR OBLIGATIONS OF AND ARE NOT GUARANTEED BY PRIME TRUST; AND THEY ARE SUBJECT TO INVESTMENT RISK, INCLUDING THE POSSIBLE LOSS OF YOUR INVESTMENT VALUE.

## MISCELLANEOUS

PRIME TRUST DOES NOT PROVIDE INVESTMENT, LEGAL OR TAX ADVICE. PLEASE CONSULT YOUR FINANCIAL ADVISOR, LEGAL OR TAX ACCOUNTANT WHEN NECESSARY.

## QUESTIONS

IF YOU HAVE ANY QUESTIONS RELATING THE ABOVE, PLEASE FEEL FREE TO CONTACT YOUR SERVICE PROVIDER.

# Exhibit 9

# Account Balances

◈ **Prime Trust**

For the Account of: TrueCoin, LLC - TCAD Escrow
Account Number: ▮▮▮ 9536
Period: 2023-08-01 through 2023-08-31

| ASSET | BEGINNING BALANCE | ENDING BALANCE |
| --- | --- | --- |
| CAD | 2809782.72 | 2809782.72 |

♦ Prime Trust

For the Account of: TrueCoin, LLC - TCAD Escrow
Account Number: ▇▇▇▇ 9536
Period: 2023-08-01 through 2023-08-31

# NOTICE TO ACCOUNT HOLDERS AND BENEFICIARIES

YOU HAVE 180 DAYS FROM YOUR RECEIPT OF THIS STATEMENT TO MAKE AN OBJECTION TO ANY ITEM SET FORTH IN THIS STATEMENT. ANY OBJECTION YOU MAKE MUST BE IN WRITING; IT MUST BE DELIVERED TO PRIME TRUST WITHIN THE PERIOD STATED ABOVE; AND IT MUST STATE YOUR OBJECTION IN FULL DETAIL. YOUR FAILURE TO DELIVER A WRITTEN OBJECTION TO PRIME TRUST WITHIN THE SPECIFIED PERIOD STATED ABOVE WILL PERMANENTLY PREVENT YOU FROM LATER ASSERTING THIS OBJECTION AGAINST PRIME TRUST. IF THE NOTICE OF DISCREPANCIES IS NOT RECEIVED WITHIN THE 180 DAY TIME FRAME, IT WILL SIGNIFY YOUR APPROVAL OF THE STATEMENT AND PRECLUDES YOU FROM MAKING FUTURE OBJECTIONS OR EXCEPTIONS REGARDING THE INFORMATION CONTAINED IN THIS STATEMENT. SUCH APPROVAL BY YOU SHALL BE FULLY ACQUITTAL AND DISCHARGE PRIME TRUST REGARDING THE TRANSACTIONS AND INFORMATION ON SUCH STATEMENT.

## ASSET VALUE REPORTING POLICY

TO VALUE DIGITAL ASSETS IN THE ACCOUNT, PRIME TRUST WILL ELECTRONICALLY OBTAIN USD EQUIVALENT PRICES FROM DIGITAL CURRENCY MARKET DATA PROVIDERS OR OTHER SOURCES AS OF THE LAST DATE OF THE STATEMENT. PRIME TRUST DOES NOT GUARANTEE THE ACCURACY OR TIMELINESS OF PRICES RECEIVED AND THE PRICES ARE NOT TO BE RELIED UPON FOR ANY INVESTMENT DECISIONS FOR YOUR ACCOUNT.

## ASSIGNED COST BASIS

COST INFORMATION FOR ASSETS HELD IN THE ACCOUNT IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY TO TRACK ASSETS WITHIN YOUR PRIME TRUST ACCOUNT. WHEN AN ASSET IS TRANSFERRED OUT, THE COST BASIS USED FOR THE TRANSFER IS DETERMINED ON A FIRST IN FIRST OUT METHODOLOGY. PRIME TRUST MAKES NO REPRESENTATION OF THE ACCURACY OF THIS DATA FOR ANY USE INCLUDING REGULATORY REPORTING PURPOSES.

## INVESTMENT TRANSACTION FEES

THE FEES DIRECTLY ASSOCIATED WITH EACH TRANSACTION WILL NOT APPEAR ON THIS STATEMENT.

## INVESTMENT RESPONSIBILITY

YOU OR YOUR FINANCIAL ADVISOR OR MANAGER HAVE SOLE DISCRETION AND RESPONSIBILITY TO MANAGE THE INVESTMENTS/ASSETS OF THE ACCOUNT. PRIME TRUST IS A DIRECTED CUSTODIAN. WE PROVIDE CUSTODY SERVICE FOR THE ASSETS OF THE ACCOUNT AND WE ACT ON THE DIRECTION OF THE ACCOUNT HOLDER. PRIME TRUST IS NOT RESPONSIBLE FOR THE PERFORMANCE OF THE ASSETS HELD IN THE ACCOUNT AND IT IS YOUR RESPONSIBILITY TO UNDERSTAND THE RISKS ASSOCIATED WITH THESE ASSETS.

**Prime Trust**

## FDIC INSURANCE

UNINVESTED USD FIAT DEPOSITS HELD IN YOUR ACCOUNT ARE ON DEPOSIT WITH ONE OR MORE THIRD-PARTY FDIC-INSURED COMMERCIAL FINANCIAL INSTITUTIONS THAT ARE CATEGORIZED BY THE FDIC AS "WELL CAPITALIZED". SUCH USD FIAT DEPOSITS ARE INSURED BY THE FDIC THROUGH SUCH COMMERCIAL INSTITUTION(S) TO THE LEGAL LIMIT PER DEPOSITOR. NOTE: OTHER ASSETS IN OUR ACCOUNT ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR OBLIGATIONS OF AND ARE NOT GUARANTEED BY PRIME TRUST; AND THEY ARE SUBJECT TO INVESTMENT RISK, INCLUDING THE POSSIBLE LOSS OF YOUR INVESTMENT VALUE.

## MISCELLANEOUS

PRIME TRUST DOES NOT PROVIDE INVESTMENT, LEGAL OR TAX ADVICE. PLEASE CONSULT YOUR FINANCIAL ADVISOR, LEGAL OR TAX ACCOUNTANT WHEN NECESSARY.

## QUESTIONS

IF YOU HAVE ANY QUESTIONS RELATING THE ABOVE, PLEASE FEEL FREE TO CONTACT YOUR SERVICE PROVIDER.

# Exhibit 10

# ◈ Prime Trust

For the Account of: TrueCoin, LLC - TGBP Escrow
Account Number: ▊1271
Period: 2023-08-01 through 2023-08-31

# Account Balances

| ASSET | BEGINNING BALANCE | ENDING BALANCE |
|---|---|---|
| GBP | 2099853.42 | 2099853.42 |

## ◆ Prime Trust

For the Account of: TrueCoin, LLC - TGBP Escrow
Account Number: ███████1271
Period: 2023-08-01 through 2023-08-31

# NOTICE TO ACCOUNT HOLDERS AND BENEFICIARIES

YOU HAVE 180 DAYS FROM YOUR RECEIPT OF THIS STATEMENT TO MAKE AN OBJECTION TO ANY ITEM SET FORTH IN THIS STATEMENT. ANY OBJECTION YOU MAKE MUST BE IN WRITING; IT MUST BE DELIVERED TO PRIME TRUST WITHIN THE PERIOD STATED ABOVE; AND IT MUST STATE YOUR OBJECTION IN FULL DETAIL. YOUR FAILURE TO DELIVER A WRITTEN OBJECTION TO PRIME TRUST WITHIN THE SPECIFIED PERIOD STATED ABOVE WILL PERMANENTLY PREVENT YOU FROM LATER ASSERTING THIS OBJECTION AGAINST PRIME TRUST. IF THE NOTICE OF DISCREPANCIES IS NOT RECEIVED WITHIN THE 180 DAY TIME FRAME, IT WILL SIGNIFY YOUR APPROVAL OF THE STATEMENT AND PRECLUDES YOU FROM MAKING FUTURE OBJECTIONS OR EXCEPTIONS REGARDING THE INFORMATION CONTAINED IN THIS STATEMENT. SUCH APPROVAL BY YOU SHALL BE FULLY ACQUITTAL AND DISCHARGE PRIME TRUST REGARDING THE TRANSACTIONS AND INFORMATION ON SUCH STATEMENT.

## ASSET VALUE REPORTING POLICY

TO VALUE DIGITAL ASSETS IN THE ACCOUNT, PRIME TRUST WILL ELECTRONICALLY OBTAIN USD EQUIVALENT PRICES FROM DIGITAL CURRENCY MARKET DATA PROVIDERS OR OTHER SOURCES AS OF THE LAST DATE OF THE STATEMENT. PRIME TRUST DOES NOT GUARANTEE THE ACCURACY OR TIMELINESS OF PRICES RECEIVED AND THE PRICES ARE NOT TO BE RELIED UPON FOR ANY INVESTMENT DECISIONS FOR YOUR ACCOUNT.

## ASSIGNED COST BASIS

COST INFORMATION FOR ASSETS HELD IN THE ACCOUNT IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY TO TRACK ASSETS WITHIN YOUR PRIME TRUST ACCOUNT. WHEN AN ASSET IS TRANSFERRED OUT, THE COST BASIS USED FOR THE TRANSFER IS DETERMINED ON A FIRST IN FIRST OUT METHODOLOGY. PRIME TRUST MAKES NO REPRESENTATION OF THE ACCURACY OF THIS DATA FOR ANY USE INCLUDING REGULATORY REPORTING PURPOSES.

## INVESTMENT TRANSACTION FEES

THE FEES DIRECTLY ASSOCIATED WITH EACH TRANSACTION WILL NOT APPEAR ON THIS STATEMENT.

## INVESTMENT RESPONSIBILITY

YOU OR YOUR FINANCIAL ADVISOR OR MANAGER HAVE SOLE DISCRETION AND RESPONSIBILITY TO MANAGE THE INVESTMENTS/ASSETS OF THE ACCOUNT. PRIME TRUST IS A DIRECTED CUSTODIAN. WE PROVIDE CUSTODY SERVICE FOR THE ASSETS OF THE ACCOUNT AND WE ACT ON THE DIRECTION OF THE ACCOUNT HOLDER. PRIME TRUST IS NOT RESPONSIBLE FOR THE PERFORMANCE OF THE ASSETS HELD IN THE ACCOUNT AND IT IS YOUR RESPONSIBILITY TO UNDERSTAND THE RISKS ASSOCIATED WITH THESE ASSETS.

## ◈ Prime Trust

For the Account of: TrueCoin, LLC - TGBP Escrow
Account Number: ▓▓▓▓ 1271
Period: 2023-08-01 through 2023-08-31

## FDIC INSURANCE

UNINVESTED USD FIAT DEPOSITS HELD IN YOUR ACCOUNT ARE ON DEPOSIT WITH ONE OR MORE THIRD-PARTY FDIC-INSURED COMMERCIAL FINANCIAL INSTITUTIONS THAT ARE CATEGORIZED BY THE FDIC AS "WELL CAPITALIZED". SUCH USD FIAT DEPOSITS ARE INSURED BY THE FDIC THROUGH SUCH COMMERCIAL INSTITUTION(S) TO THE LEGAL LIMIT PER DEPOSITOR. NOTE: OTHER ASSETS IN OUR ACCOUNT ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR OBLIGATIONS OF AND ARE NOT GUARANTEED BY PRIME TRUST; AND THEY ARE SUBJECT TO INVESTMENT RISK, INCLUDING THE POSSIBLE LOSS OF YOUR INVESTMENT VALUE.

## MISCELLANEOUS

PRIME TRUST DOES NOT PROVIDE INVESTMENT, LEGAL OR TAX ADVICE. PLEASE CONSULT YOUR FINANCIAL ADVISOR, LEGAL OR TAX ACCOUNTANT WHEN NECESSARY.

## QUESTIONS

IF YOU HAVE ANY QUESTIONS RELATING THE ABOVE, PLEASE FEEL FREE TO CONTACT YOUR SERVICE PROVIDER.

# Exhibit 11

## *Self-Directed Custodial Account Agreement*

TrustToken, Inc. _____ ("Account Holder", "I", "my", "you", "your") hereby requests and directs that Prime Trust, LLC ("Prime Trust", "Custodian", "we", "our", "us"), a Nevada chartered financial institution and licensed trust company, establish a **Custodial Account** ("Account") for and in the name of Account Holder, and to hold, as Custodian, all assets deposited to, or collected with respect to such Account, upon the following terms and conditions:

### 1. APPOINTMENT OF CUSTODIAN:

Account Holder hereby appoints Prime Trust to be custodian of and to hold or process as directed all securities, cash and other assets of Account Holder (hereinafter referred to as "Custodial Property") that are delivered to Custodian by Account Holder or Account Holder's Agent(s) as custodian for the Account, and in accordance with the terms of this Agreement.

### 2. SELF-DIRECTED INVESTMENTS:

a.  This Account is a self-directed Account. Prime Trust will act solely as custodian of your Account and will not exercise any investment discretion regarding your Account, as this is solely your responsibility. You acknowledge and agree that Prime Trust is not a "fiduciary" with respect to this Account under applicable state or federal law except with regards to protecting the assets therein. If you desire to have Prime Trust act as your fiduciary then you must open an asset protection trust account.

b.  As a self-directed Account you recognize and accept the risks associated with investments in general and in private securities in particular, and that:

  i.  The value of your Account will be solely dependent upon the performance of any investment instrument chosen by you.

  ii.  Prime Trust shall have no duty or responsibility to review or perform due diligence on any investment and will make absolutely no recommendation of investments. You will perform your own due diligence on all investments and take sole responsibility for all decisions made for your Account.

  iii.  Prime Trust does not provide valuations of any securities, nor does it hire or seek valuations or appraisals on any securities held on Account, though it may, at its option and with no obligation, if available for any particular security, include recent price quotations from a nationally recognized, SEC-registered trading system on your statement for any such securities that you own, if readily available via API's from the trading system or any custodian used by Prime Trust. If any third party which we have been enabled to receive data from does provide us with valuations or price quotations on any securities held on Account, Prime Trust will not be expected or obligated to attempt to verify the validity, accuracy or reliability of any such valuations or price quotations and you agree that Prime Trust shall in no way be held responsible nor Accountable for any such valuations or price quotations, and that we simply acted in a passive, pass-through capacity in providing these (if any) on your statements and that such valuations or price quotations are neither verified, substantiated nor to be relied upon in any way, for any purpose.

  iv.  Account Holder will always seek and rely solely on the professional assistance from properly licensed financial, legal, and Accounting professionals. Account Holder agrees that under no circumstance will it ever construe any written, oral or other communications from Prime Trust to be legal, accounting or investment advice.

c.  Account Holder will not direct the purchase or sale of any security which is not marketable under the securities laws of the Account Holder's place of residence, nor, without limiting the generality of the foregoing, direct any investment that would be illegal under federal, state or local law. The Account Holder hereby warrants that he will not enter into a transaction, or cause a transaction to be entered into, which is prohibited under Section 4975 of the Internal Revenue Code. Pursuant to the directors of the Account Holder or Account Holder's Agent(s), Prime Trust shall invest and reinvest the assets of Custodial Property as

© Copyright 2018 by Prime Trust, All Rights Reserved

Doc ID: 874d99053e9b3b9e7fa8d861b28eca052db7d7b4



directed by Account Holder or Account Holder's Agents(s) only so long as, in the sole judgment of Prime Trust, such requested investments will not impose an unreasonable administrative burden on Prime Trust (which such determination by Prime Trust shall not to be construed in any respect as a judgment concerning the prudence or advisability of such investment).

d.    Securities purchased may be the equity or debt securities of any legally organized and operating issuer. This includes, without limitation, investments in real estate, automotive, aerospace, technology, cannabis, gambling and other industries. However, Account Holder warrants and represents that you are not directly involved in any business or services related to the cannabis, gambling, adult or firearms industries, and if so then you agree to the Prime Trust Enhanced Services custodial agreement.

e.    Buy and sell orders may be made orally, including via telephone, or electronically, including email and internet-enabled devices and systems. Account Holder bears complete and absolute responsibility for all buy and sell orders for this Account, and will immediately (within one day) notify Prime Trust of any unauthorized transactions.

**3. SCHEDULE OF FEES:**
The Custodian shall receive reasonable compensation in accordance with its usual Schedule of Fees in effect. The fees and charges initially connected with this Account include:

- Account Fees: As detailed on Prime Trusts current fee schedule, which may change from time to time and is published on [www.primetrust.com](www.primetrust.com). Changes to the fee schedule shall not affect any charges for prior periods, and will only be effective as of the date the changes were published.
- Statement Fee: $0.00 – there are no fees for electronically delivered and available statements
- Third-Party Fees – in the event that we are charged any fees by a third party in performing services on your behalf (e.g. transfer agent fee, legal fees, Accounting or auditor fees, notary fee, etc) then you agree to reimburse us for such reasonable charges at cost plus 25%, and that no prior approval is required from you in incurring such expense. Approval from you to exceed such amount may be verbal or via email.

The Account Holder agrees to pay all fees to Prime Trust either via deduction from cash available in the Account, via ACH debit to Account Holders bank, or via credit card, or via liquidation of securities or investments in the Account at Prime Trust's sole and absolute discretion. Unpaid fees are subject to interest at a rate of 1.50% per month on the outstanding balance and may be applied as a first lien on any assets in my Account.

**Right to change this fee schedule**
Prime Trust reserves the right to make changes to its fees for custodial services in its sole and absolute discretion. Fees may be modified upon 60 days' notice to you and shall become effective on the 61st day after emailing the notice of such revision to your email address on record in your Account.

**4. ASSETS AND CUSTODY:**

a.    Assets which Prime Trust will generally agree to accept and hold on Account Holders behalf include cash (USD), private equity and debt securities issued pursuant to laws and regulations of the United States, as well as equity and debt securities which are listed on any US exchange, ATS or bulletin board (e.g. OTC, NASDAQ, NYSE, AMEX, etc). Securities issued pursuant to regulations of countries other than the US or which are listed on non-US trading systems may be acceptable for custody on a case by case basis. Non-USD currency, as well as commodities, options, and physical assets such as art, coins, rare books, etc are generally not accepted for custody at Prime Trust. Cryptocurrencies may or may not be accepted into custody, at the discretion of Prime Trust.

b.    During the term of this Agreement, Custodian is responsible for safekeeping only those documents which are delivered into its possession by the Account Holder or Account Holder's Agent(s). Custodian may for

© Copyright 2018 by Prime Trust, All Rights

Doc ID: 874d99053e9b3b9e7fa8d861b28eca052db7d7b4



convenience take and hold title to Custodial Property or any part thereof in its own name or in the name of its nominee (commonly known as "street name"), with ownership of assets segregated on its books and records.

c.   Assets under custody are held for benefit of Account holders and not together with other, non-custodial funds or property of Prime Trust. Though Prime Trust may, of course, commingle the Custodial Property with assets of other Accounts and segregate each Account holder's ownership of such assets on Prime Trusts books and records.

d.   Custodian shall keep accurate records showing all receipts, disbursements, and other transactions involving this Account. All such records shall be the property of Custodian, but shall be available for inspection by Account Holder pursuant to Section 5 herein.

e.   Custodian shall collect and hold all funds when Custodial Property may mature, be redeemed or sold. Custodian shall hold the proceeds of such transaction until receipt of written or electronic (via our systems) instructions from Account Holder.

f.   Custodian shall make any purchase, sale, exchange, investment, disbursement or reinvestment of Custodial Property under this Agreement that Account Holder may at any time in writing direct, provided that sufficient funds of Account Holder are available for such transaction. In the event that cash is received by Custodian for which there is no investment direction, the Custodian shall, and is expressly authorized by Account Holder, to handle such cash in accordance with Account Holder's directives, if any.

g.   Funds received in any currency other than USD shall, at your direction, which such direction is being explicitly given hereby, be converted to USD at exchange rates set by our correspondent bank and with applicable fees as are customary for such special handling (not to exceed 2.00%).

h.   Without limiting the generality of the foregoing, Prime Trust is authorized to collect into custody all property delivered to Custodian at the time of execution of this Agreement, as well as all property which is hereafter purchased for Client's Account or which may hereafter be delivered to Custodian for Client's Account pursuant to this Agreement, together with the income, including but not limited to interest, dividends, proceeds of sale and all other monies due and collectable attributable to the investment of the Custodial Property.


**5. ACCOUNT ACCESS AND COMMUNICATIONS:**

a.   Custodian shall provide access to your Account via our website at www.PrimeTrust.com, as well as via API's that third-party websites can write into (e.g. broker-dealers, funding portals, trading platforms, investment advisors, registered transfer agents, etc).

b.   Statements of assets, along with receipts and disbursements if Custodial Property shall be available online at www.PrimeTrust.com, in your Account, as well as emailed to you on not less than a quarterly basis.

c.   Custodian shall be under no obligation to forward any proxies, financial statements or other literature received by it in connection with or relating to Custodial Property held under this agreement. Custodian shall be under no obligation to take any action with regard to proxies, stock dividends, warrants, rights to subscribe, plans of reorganization or recapitalization, or plans for exchange of securities.

d.   Account Holder agrees that Custodian may contact you for any reason. No such contact will be deemed unsolicited. Custodian may contact Account Holder at any address, telephone number (including cellular numbers) and email addresses as Account Holder may provide from time to time. Custodian may use any means of communication, including but not limited to, postal mail, email, telephone, or other technology to reach Account Holder.

e.   **ELECTRONIC STATEMENTS ELECTION:**
Account Holder agrees that Prime Trust may email statements to it on a periodic basis, at intervals and on a schedule set entirely at the Custodian's discretion. Account Holder further agrees that it can and will log onto its Account at www.primetrust.com at its discretion to view current or historic statements, as well as transaction history, securities positions and cash balances. Account Holder understands and agrees that

© Copyright 2018 by Prime Trust, All Rights
Doc ID: 874d99053e9b3b9e7fa8d861b28eca052db7d7b4



under no circumstances may it request to have statements printed and mailed to it. If Account Holder desires printed statements then it agrees to log onto its Account at www.primetrust.com and print them itself.

## 6. TERM AND TERMINATION, MODIFICATION:

a. This Agreement is effective as of the date set forth below and shall continue in force until terminated as provided herein.

b. This Agreement may be terminated by either party at any time upon 60 days written notice to the other party (with email being an agreed upon method of such notice).

c. This Agreement may be amended or modified only by the Custodian, or with the written agreement from the Custodian. Such amendment or modification shall be effective on the 30th day after the Account Holder receives notice of such revision electronically via the email address shown on the records of Prime Trust.

d. If this Agreement is terminated then Custodian shall deliver the Custodial Property to Account Holder as soon as practicable or, at Account Holder's request to a Successor Custodian. Account Holder acknowledges that Custodial Property held in Custodian's own name or nominee may require a reasonable amount of time to be transferred. Upon delivery of Custodial Property, Custodian's responsibility under this Agreement ceases.

e. This agreement shall also terminate upon the occurrence of any of the following events:

i. Upon death of the Account Holder, subsequent to which, in a reasonable timeframe at the sole discretion of Custodian, all assets in this Account will be distributed to the beneficiary or beneficiaries of the Account Holder, generally to one or more Prime Trust self-directed Accounts in their name(s). In the event that no beneficiaries claim this Account then the assets may be preserved in the Account for so long as possible, until a beneficiary makes itself known or as may be subject to "unclaimed property" regulations as promulgated by state and federal regulators (at which time assets on Account may be transferred or liquidated and proceeds forwarded to such authorities as required by law or regulation).

ii. Filing of a petition in bankruptcy (by the Account Holders or by a creditor of the Account Holders). If this Agreement terminates due to the filing of a petition in bankruptcy, termination or dissolution of Account Holder, Custodian shall deliver the Custodial Property to the Court appointed representative for Account Holder. If no representative has been appointed by the Court, Custodian may deliver the Custodial Property to the person it deems to be an agent of the Account Holder and such delivery will release Custodian from any further responsibility for said Custodial Property.

iii. The legal incompetency of Account Holder, unless there is in existence a valid durable power of attorney or trust agreement authorizing another to succeed or act for Account Holder with respect to this agreement.

## 7. TERMS OF USE, PRIVACY POLICY:

Except as set forth in this Agreement, Account Holder agrees to be bound by the Prime Trust the most current, then in effect, Terms of Use and Privacy Policy, as available via links at the bottom of the www.primetrust.com website. In the event of any conflict between any terms or provisions of the website Terms of Use or Privacy Policy and the terms and provisions of this Agreement, the applicable terms and provisions of this Agreement shall control.

## 8. DISCLAIMER:

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, PRIME TRUST MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHETHER EXPRESS, IMPLIED (EITHER IN FACT OR BY OPERATION OF LAW). PRIME TRUST EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, TITLE, AND NON-INFRINGEMENT. PRIME TRUST DOES NOT WARRANT AGAINST INTERFERENCE WITH THE USE OF THE SERVICES OR AGAINST INFRINGEMENT. PRIME TRUST DOES NOT WARRANT THAT THE SERVICES OR SOFTWARE ARE ERROR-FREE OR THAT OPERATION OR DATA WILL BE SECURE OR UNINTERRUPTED.

© Copyright 2018 by Prime Trust, All Rights Reserved

Doc ID: 874d99053e9b3b9e7fa8d861b28eca052db7d7b4



PRIME TRUST EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY ARISING OUT OF THE FLOW OF DATA AND DELAYS ON THE INTERNET, INCLUDING BUT NOT LIMITED TO FAILURE TO SEND OR RECEIVE ANY ELECTRONIC COMMUNICATIONS (e.g. EMAIL). ACCOUNT HOLDER DOES NOT HAVE THE RIGHT TO MAKE OR PASS ON ANY REPRESENTATION OR WARRANTY ON BEHALF OF PRIME TRUST TO ANY THIRD PARTY. ACCOUNT HOLDER'S ACCESS TO AND USE OF THE SERVICES ARE AT ACCOUNT HOLDER'S OWN RISK. ACCOUNT HOLDER UNDERSTANDS AND AGREES THAT THE SERVICES ARE PROVIDED TO IT ON AN "AS IS" AND "AS AVAILABLE" BASIS. PRIME TRUST EXPRESSLY DISCLAIMS LIABILITY TO ACCOUNT HOLDER FOR ANY DAMAGES RESULTING FROM ACCOUNT HOLDER'S RELIANCE ON OR USE OF THE SERVICES.

**9. LIMITATION OF LIABILITY:**
1.  Disclaimer of Consequential Damages.
    ACCOUNT HOLDER HEREBY ACKNOWLEDGES AND AGREES, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, PRIME TRUST WILL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO ACCOUNT HOLDER FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO ANY INVESTMENT OR TRANSACTION OCCURRING UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO, LOST PROFITS OR LOSS OF BUSINESS.
2.  Cap on Liability.
    ACCOUNT HOLDER HEREBY ACKNOWLEDGES AND AGREES UNDER NO CIRCUMSTANCES WILL PRIME TRUST'S TOTAL LIABILITY OF ANY AND ALL KINDS ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING BUT NOT LIMITED TO WARRANTY CLAIMS), REGARDLESS OF THE FORM AND REGARDLESS OF WHETHER ANY ACTION OR CLAIM IS BASED ON CONTRACT, TORT, OR OTHERWISE, EXCEED THE TOTAL AMOUNT OF FEES PAID, IF ANY, BY ACCOUNT HOLDER TO PRIME TRUST UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTH PERIOD PRIOR TO THE OCCURRENCE OF THE EVENT GIVING RISE TO SUCH LIABILITY.
3.  General Indemnification.
    Account Holder hereby agrees to indemnify, protect, defend and hold harmless Prime Trust and its officers, directors, members, shareholders, employees, agents, partners, vendors, successors and assigns from and against any and all third party claims, demands, obligations, losses, liabilities, damages, regulatory investigations, recoveries and deficiencies (including interest, penalties and reasonable attorneys' fees, costs and expenses), which Prime Trust may suffer as a result of: (a) any breach of or material inaccuracy in the representations and warranties, or breach, non-fulfillment or default in the performance of any of the conditions, covenants and agreements, of Account Holder contained in this Agreement or in any certificate or document delivered by Account Holder or its agents pursuant to any of the provisions of this Agreement, or (b) any obligation which is expressly the responsibility of Account Holder under this Agreement, or (c) any other cost, claim or liability arising out of or relating to operation or use of the license granted hereunder, or, (d) any breach, action or regulatory investigation arising from Account Holder's failure to comply with any state blue sky laws or other securities laws, and/or arising out of any alleged misrepresentations, misstatements or omissions of material fact in the Account Holders' offering memoranda, general solicitation, advertisements and/or other offering documents. Account Holder is required to immediately defend Prime Trust including the immediate payment of all attorney fees, costs and expenses, upon commencement of any regulatory investigation arising or relating to Account Holder's offering and/or items in this Section 6.3(a) through (d) above. Any amount due under the aforesaid indemnity will be due and payable by Account Holder within thirty (30) days after demand thereof.
4.  Limitation on Prime Trust's Duty to Litigate.
    Without limiting the foregoing, Prime Trust shall not be under any obligation to defend any legal action or engage in any legal proceedings with respect to the Account or with respect to any property held in the Account unless Prime Trust is indemnified to Prime Trust's satisfaction. Whenever Prime Trust deems it

© Copyright 2018 by Prime Trust, All Rights Reserved

Doc ID: 874d99053e9b3b9e7fa8d861b28eca052db7d7b4



reasonably necessary, Prime Trust is authorized and empowered to consult with its counsel in reference to the Account and to retain counsel and appear in any action, suit or proceeding affecting the Account or any of the property of the Account. All fees and expenses so incurred shall be for the Account and shall be charged to the Account.

5.     Third Party Claims.

i.      Account Holder agrees to bear sole responsibility for the prosecution or defense, including the employment of legal counsel, of any and all legal actions or suits involving the Account, which may arise or become necessary for the protection of the investments in that Account, including any actions lodged against the Custodian. Account Holder also agrees to bear sole responsibility for enforcing any judgments rendered in favor of the Account, including judgments rendered in the name of Prime Trust as Custodian of the Account.

ii.     Account Holder agrees to be responsible for any and all collection actions, including contracting with a collection agency or institutional legal action, and bringing any other suits or actions which may become necessary to protect the rights of the Account. Account Holder understands that any legal filings made on behalf of this Investment are to be made on behalf of beneficial owners for whom Prime Trust acts as custodian. Account Holder agrees not to institute legal action on behalf of the Account without Custodian's written consent to litigate and that Account Holder shall prosecute any legal action. Account Holder agrees that any such legal action will be carried out in a manner that does not cause Custodian to incur any costs or legal exposure.

## 10. NOTICES:

All notices permitted or required by this Agreement will be via electronic mail ("email"), and will be deemed to have been delivered and received upon sending via any SMTP delivery service chosen by Prime Trust. Notices shall be delivered to the addresses on record which, if to Prime Trust shall be to support@primetrust.com and if to Account Holder shall be to the email address on file in your Account.

## 11. SEVERABILITY:

If any provision of this Agreement is for any reason found to be ineffective, unenforceable, or illegal by any court having jurisdiction, such condition will not affect the validity or enforceability of any of the remaining portions hereof.

## 12. NO LEGAL, TAX OR ACCOUNTING ADVICE:

Account Holder agrees without reservation that Prime Trust is NOT providing any legal, tax or Accounting advice in any way, nor on any matter, regardless of the tone or content of any communication (oral, written or otherwise). Account Holder unconditionally agrees to rely solely on its own legal, tax and Accounting professionals for any such advice and on all matters.

## 13. NO INVESTMENT ADVICE OR RECOMMENDATIONS:

Account Holder agrees that Prime Trust is not providing any investment advice, nor do we make any recommendations to any Account Holder of, or investor in, any securities. Account Holder agrees that it will not construe any communications from Prime Trust or any person associated with Prime Trust, whether written or oral, to be legal, investment or accounting advice and agrees to only and exclusively rely on the advice of Account Holders attorneys, accountants and other professional advisors, including any investment advisers or registered broker-dealers acting on its behalf.

## 14. ELECTRONIC COMMUNICATIONS NOTICE AND CONSENT:

Each of Account Holder and Prime Trust hereby agree that all current and future notices, confirmations and other communications regarding this Agreement specifically, and future communications in general

© Copyright 2018 by Prime Trust, All Rights Reserved

Doc ID: 874d99053e9b3b9e7fa8d861b28eca052db7d7b4



between the parties, may be made by email, sent to the email address of record as set forth in the Notices section above or as otherwise from time to time changed or updated and disclosed to the other party, without necessity of confirmation of receipt, delivery or reading, and such form of electronic communication is sufficient for all matters regarding the relationship between the parties. If any such electronically-sent communication fails to be received for any reason, including but not limited to such communications being diverted to the recipients' spam filters by the recipients email service provider, or due to a recipients' change of address, or due to technology issues by the recipients' service provider, the parties agree that the burden of such failure to receive is on the recipient and not the sender, and that the sender is under no obligation to resend communications via any other means, including but not limited to postal service or overnight courier, and that such communications shall for all purposes, including legal and regulatory, be deemed to have been delivered and received. No physical, paper documents will be sent to Account Holder, and if Account Holder desire physical documents then it agrees to be satisfied by directly and personally printing, at Account Holder's own expense, either the electronically-sent communication(s) or the electronically available communications by logging onto Account Holder's Account at www.primetrust.com and then maintaining such physical records in any manner or form that Account Holder desire. Account Holder's Consent is Hereby Given: By signing this Agreement electronically, Account Holder explicitly agrees to this Agreement and to receive documents electronically, including a copy of this signed Agreement as well as ongoing disclosures, communications and notices.

### 15. ASSIGNMENT:

No party may transfer or assign its rights and obligations under this Agreement without the prior written consent of the other parties. Notwithstanding the foregoing, without the consent of the other parties, any party may transfer or assign its rights and obligations hereunder in whole or in part (a) pursuant to any merger, consolidation or otherwise by operation of law, and (b) to the successors and assigns of all or substantially all of the assets of such assigning party, provided such entity shall be bound by the terms hereof. This Agreement will be binding upon and will inure to the benefit of the proper successors and assigns.

### 16. NON-ABSOLUTE STANDARDS:

All of the services are provided under a "reasonability" standard. This means that no service may be held to an absolute or perfect standard. All services are provided "as is" and in such a manner that they are reasonable, and not perfect or flawless. Account Holder acknowledges this and agrees that this is fair and acceptable, and that all applicable sections of this Agreement apply to this concept.

### 17. BINDING ARBITRATION, APPLICABLE LAW AND VENUE, ATTORNEYS FEES:

This Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws. Any claim or dispute arising under this Agreement may only be brought in arbitration, with venue in Clark County, Nevada, pursuant to the rules of the American Arbitration Association. Account Holder and Prime Trust each consent to this method of dispute resolution, as well as jurisdiction, and consent to this being a convenient forum for any such claim or dispute and waives any right it may have to object to either the method or jurisdiction for such claim or dispute. In the event of any dispute among the parties, the prevailing party shall be entitled to recover damages plus reasonable costs and attorney's fees and the decision of the arbitrator shall be final, binding and enforceable in any court.

### 18. COUNTERPARTS, FACSIMILE, EMAIL, SIGNATURES:

This Agreement may be executed in counterparts, each of which will be deemed an original and all of which, taken together, will constitute one and the same instrument, binding on each signatory thereto. This

© Copyright 2018 by Prime Trust, All Rights

Doc ID: 874d99053e9b3b9e7fa8d861b28eca052db7d7b4



Agreement may be executed by signatures, electronically or otherwise, delivered by facsimile or email, and a copy hereof that is properly executed and delivered by a party will be binding upon that party to the same extent as an original executed version hereof.

**19. FORCE MAJEURE:**

No party will be liable for any default or delay in performance of any of its obligations under this Agreement if such default or delay is caused, directly or indirectly, by fire, flood, earthquake or other acts of God; labor disputes, strikes or lockouts; wars, rebellions or revolutions; riots or civil disorder; accidents or unavoidable casualties; interruptions in transportation or communications facilities or delays in transit or communication; supply shortages or the failure of any person to perform any commitment to such party related to this Agreement; or any other cause, whether similar or dissimilar to those expressly enumerated in this Section, beyond such party's reasonable control.

**20. INTERPRETATION:**

Each party to this Agreement has been represented by or had adequate time to obtain the advice and input of independent legal counsel with respect to this Agreement and has contributed equally to the drafting of this Agreement. Therefore, this Agreement shall not be construed against either party as the drafting party. All pronouns and any variation thereof will be deemed to refer to the masculine and feminine, and to the singular or plural as the identity of the person or persons may require for proper interpretation of this Agreement. And it is the express will of all parties that this Agreement is written in English and uses the font styles and sizes contained herein.

**21. CAPTIONS:**

The section headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

**22. ENTIRE AGREEMENT, AMENDMENTS:**

This Agreement sets forth the entire understanding of the parties concerning the subject matter hereof, and supersedes any and all prior or contemporaneous communications, representations or agreements between the parties, whether oral or written, regarding the subject matter of this Agreement, and may not be modified or amended, except by a written instrument executed after the effective date of this Agreement by the party sought to be charged by the amendment or modification.

**23. CAPACITY:**

Account Holder hereby warrants that the signer(s) of this Agreement are over the age of 18 and have all proper authority to enter into the Agreement. Furthermore, if Account Holder is an entity (e.g. corporation, trust, partnership, etc and not an individual) then the entity is in good standing in its state, region or country of formation; which Account Holder agrees to produce evidence of such authority and good standing if requested by Custodian.

**24. SUBSTITUTE IRS FORM W-9**

***Under penalties of Perjury, Account Holder certifies that:*** (1) The tax identification number shown on this Agreement, if Account Holder is a US person, is the correct taxpayer identification number and **(2) Account Holder is not subject to backup withholding because:** (a) Account Holder is exempt from backup withholding, or, (b) Account Holder has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding.

***Notification Obligation:*** Account Holder agrees to immediately inform Prime Trust in writing if it has been, or at any time in the future is notified by the IRS that Account Holder is subject to backup

© Copyright 2018 by Prime Trust, All Rights Reserved

Doc ID: 874d99053e9b3b9e7fa8d861b28eca052db7d7b4



withholding.

**25. ACCOUNT & CONTACT INFORMATION:**

This Account is initially vested as:

ACCOUNT NAME: TrustToken, Inc. Custodial Account

CONTACT PERSON & TITLE (if different) Daniel An, Co-Founder/CEO

STREET ADDRESS: 248 Cumberland St.

CITY: San Francisco    STATE: CA    COUNTRY: United States of America

EMAIL: daniel.an@trusttoken.com

PHONE: 214-683-5978

TAX ID: 38-4046585

Future changes to vesting name(s) will generally require supporting documentation and can only be accommodated directly by Prime Trust's customer service personnel.

Agreed as of ___29th___ day of ___January___, 2018 by and between:

ACCOUNT NAME: TrustToken, Inc. Custodial Account

SIGNATURE: *TSA*

TITLE, if any: Co-Founder/CEO

Prime Trust, LLC

*Scott Purcell*

Scott Purcell

CEO, Chief Trust Officer

© Copyright 2018 by Prime Trust, All Rights Reserved

Doc ID: 874d99053e9b3b9e7fa8d861b28eca052db7d7b4

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Prime Trust Custodial Account Agreement |
| **FILE NAME** | Prime Trust Custodial Agreement.pdf |
| **DOCUMENT ID** | 874d99053e9b3b9e7fa8d861b28eca052db7d7b4 |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SIGNED** | **01/30/2018**<br>02:35:26 UTC | Signed by Michael Bland (legal@trusttoken.com)<br>IP: 73.170.208.201 |
| **SENT** | **01/30/2018**<br>02:35:40 UTC | Sent for signature to Danny An (danny.an@trusttoken.com)<br>from legal@trusttoken.com<br>IP: 73.170.208.201 |
| **VIEWED** | **01/30/2018**<br>19:24:56 UTC | Viewed by Danny An (danny.an@trusttoken.com)<br>IP: 73.170.208.201 |
| **SIGNED** | **01/30/2018**<br>19:25:51 UTC | Signed by Danny An (danny.an@trusttoken.com)<br>IP: 73.170.208.201 |
| **COMPLETED** | **01/30/2018**<br>19:25:51 UTC | The document has been completed. |

# Exhibit 12

# Prime Trust

For the Account of: TrustToken, Inc. - USD Custodial Account
Account Number: 5420
Period: 2023-08-01 through 2023-08-31

# Account Balances

| ASSET | BEGINNING BALANCE | ENDING BALANCE |
|---|---|---|
| USD | 4931.08 | 4931.08 |

♦ Prime Trust

For the Account of: TrustToken, Inc. - USD Custodial Account

Account Number: ____5420

Period: 2023-08-01 through 2023-08-31

# NOTICE TO ACCOUNT HOLDERS AND BENEFICIARIES

YOU HAVE 180 DAYS FROM YOUR RECEIPT OF THIS STATEMENT TO MAKE AN OBJECTION TO ANY ITEM SET FORTH IN THIS STATEMENT. ANY OBJECTION YOU MAKE MUST BE IN WRITING; IT MUST BE DELIVERED TO PRIME TRUST WITHIN THE PERIOD STATED ABOVE; AND IT MUST STATE YOUR OBJECTION IN FULL DETAIL. YOUR FAILURE TO DELIVER A WRITTEN OBJECTION TO PRIME TRUST WITHIN THE SPECIFIED PERIOD STATED ABOVE WILL PERMANENTLY PREVENT YOU FROM LATER ASSERTING THIS OBJECTION AGAINST PRIME TRUST. IF THE NOTICE OF DISCREPANCIES IS NOT RECEIVED WITHIN THE 180 DAY TIME FRAME, IT WILL SIGNIFY YOUR APPROVAL OF THE STATEMENT AND PRECLUDES YOU FROM MAKING FUTURE OBJECTIONS OR EXCEPTIONS REGARDING THE INFORMATION CONTAINED IN THIS STATEMENT. SUCH APPROVAL BY YOU SHALL BE FULLY ACQUITTAL AND DISCHARGE PRIME TRUST REGARDING THE TRANSACTIONS AND INFORMATION ON SUCH STATEMENT.

## ASSET VALUE REPORTING POLICY

TO VALUE DIGITAL ASSETS IN THE ACCOUNT, PRIME TRUST WILL ELECTRONICALLY OBTAIN USD EQUIVALENT PRICES FROM DIGITAL CURRENCY MARKET DATA PROVIDERS OR OTHER SOURCES AS OF THE LAST DATE OF THE STATEMENT. PRIME TRUST DOES NOT GUARANTEE THE ACCURACY OR TIMELINESS OF PRICES RECEIVED AND THE PRICES ARE NOT TO BE RELIED UPON FOR ANY INVESTMENT DECISIONS FOR YOUR ACCOUNT.

## ASSIGNED COST BASIS

COST INFORMATION FOR ASSETS HELD IN THE ACCOUNT IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY TO TRACK ASSETS WITHIN YOUR PRIME TRUST ACCOUNT. WHEN AN ASSET IS TRANSFERRED OUT, THE COST BASIS USED FOR THE TRANSFER IS DETERMINED ON A FIRST IN FIRST OUT METHODOLOGY. PRIME TRUST MAKES NO REPRESENTATION OF THE ACCURACY OF THIS DATA FOR ANY USE INCLUDING REGULATORY REPORTING PURPOSES.

## INVESTMENT TRANSACTION FEES

THE FEES DIRECTLY ASSOCIATED WITH EACH TRANSACTION WILL NOT APPEAR ON THIS STATEMENT.

## INVESTMENT RESPONSIBILITY

YOU OR YOUR FINANCIAL ADVISOR OR MANAGER HAVE SOLE DISCRETION AND RESPONSIBILITY TO MANAGE THE INVESTMENTS/ASSETS OF THE ACCOUNT. PRIME TRUST IS A DIRECTED CUSTODIAN, WE PROVIDE CUSTODY SERVICE FOR THE ASSETS OF THE ACCOUNT AND WE ACT ON THE DIRECTION OF THE ACCOUNT HOLDER. PRIME TRUST IS NOT RESPONSIBLE FOR THE PERFORMANCE OF THE ASSETS HELD IN THE ACCOUNT AND IT IS YOUR RESPONSIBILITY TO UNDERSTAND THE RISKS ASSOCIATED WITH THESE ASSETS.

**◆ Prime Trust**

For the Account of: TrustToken, Inc. - USD Custodial Account
Account Number: ▮▮▮5420
Period: 2023-08-01 through 2023-08-31

## FDIC INSURANCE

UNINVESTED USD FIAT DEPOSITS HELD IN YOUR ACCOUNT ARE ON DEPOSIT WITH ONE OR MORE THIRD-PARTY FDIC-INSURED COMMERCIAL FINANCIAL INSTITUTIONS THAT ARE CATEGORIZED BY THE FDIC AS "WELL CAPITALIZED". SUCH USD FIAT DEPOSITS ARE INSURED BY THE FDIC THROUGH SUCH COMMERCIAL INSTITUTION(S) TO THE LEGAL LIMIT PER DEPOSITOR. NOTE: OTHER ASSETS IN OUR ACCOUNT ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR OBLIGATIONS OF AND ARE NOT GUARANTEED BY PRIME TRUST; AND THEY ARE SUBJECT TO INVESTMENT RISK, INCLUDING THE POSSIBLE LOSS OF YOUR INVESTMENT VALUE.

## MISCELLANEOUS

PRIME TRUST DOES NOT PROVIDE INVESTMENT, LEGAL OR TAX ADVICE. PLEASE CONSULT YOUR FINANCIAL ADVISOR, LEGAL OR TAX ACCOUNTANT WHEN NECESSARY.

## QUESTIONS

IF YOU HAVE ANY QUESTIONS RELATING THE ABOVE, PLEASE FEEL FREE TO CONTACT YOUR SERVICE PROVIDER.

# Exhibit 13



**Gretchen Dudon** ⌄

earning on the balances for TUSD? I know before I left they went down quite a bit

6 January 2022 ⌄

**Alex de Lorraine** 17:01
Brilliant, thank you. And thanks 

 1

1 February 2022 ⌄

**Alex de Lorraine** 09:05
Thanks @Gretchen Dudon are there any material changes in there?

1 reply   2 years ago

3 February 2022 ⌄

**Alex de Lorraine** 20:31
Hi @Gretchen Dudon ,

legal has reviewed the contracts and is just asking of these new versions will have any impact on the escrow agreements in place for TrueCurrencies or not. Could you please confirm?

All the best,

Alex *(edited)*

**Alex de Lorraine** 20:59
thanks

---

**Thread**   


**Alex de Lorraine** 2 years ago
Thanks @Gretchen Dudon are there any material changes in there?

1 reply


**Alex de Lorraine** 2 years ago
Thanks Gretchen, it sounds like I need to run this by the legal department. As you can imagine the original agreements are part of the attestation and audit process on our side so I can't change them without making sure it won't break anything else

  1

# Exhibit 14



**archblock**                      **Michael Bland <michael.bland@archblock.com>**

# New user agreements from PrimeTrust
9 messages

---

**Alex de Lorraine** <alex.delorraine@trusttoken.com>        Thu, Feb 3, 2022 at 3:05 AM
To: Michael Bland <michael.bland@trusttoken.com>, Timothy Welsh <tim.welsh@trusttoken.com>, David Scahill <david.scahill@trusttoken.com>

Hi legal team,

PrimeTrust sent over new user agreements for all of our accounts. Before I sign them I would love your feedback. They all seem to be the same and when I asked I was told that is to align our agreements to the agreements that they are using as standard going forward.

All the best,
Alex

--

**Alexander de Lorraine, MBA, DBA**
COO
+1-650-284-8547

**TrustToken** - **TrueFi** - **We're Hiring**

This message is intended only for the designated recipient(s). It may contain confidential, privileged or proprietary information. If you are not the designated recipient, you may not review, copy or distribute this message. If you receive this message in error, please notify the sender by reply e-mail and delete this message. Thank you.

---

**4 attachments**

📄 **Please_DocuSign_Prime_Trust_User_Agreement_v (1).pdf**
    171K

📄 **Please_DocuSign_Prime_Trust_User_Agreement_v (2).pdf**
    170K

📄 **Please_DocuSign_Prime_Trust_User_Agreement_v.pdf**
    171K

📄 **Please_DocuSign_Prime_Trust_User_Agreement_v (3).pdf**
    170K

---

**Michael Bland** <michael.bland@trusttoken.com>        Thu, Feb 3, 2022 at 10:56 AM
To: David Scahill <david.scahill@trusttoken.com>, Timothy Welsh <tim.welsh@trusttoken.com>, Alex de Lorraine <alex.delorraine@trusttoken.com>

Hi David,

Can you go through these new user agreements from Prime Trust and pull out any material terms that affect our accounts with them? I've attached our currently in-force custodial agreements for reference. If this review could be done before Weds of next week, that would be great!

@Alex de Lorraine do you have the custodial account agreement for **TrustLabs, Inc.** I don't think I have a signed version of that.

Any questions, just let me know.

Best,
Michael

--

**Michael G. Bland**
Senior Corporate Counsel

**TrustToken** - **TrueFi** - **We're Hiring**

This message is intended only for the designated recipient(s). It may contain confidential, privileged or proprietary information. If you are not the designated recipient, you may not review, copy or distribute this message. If you receive this message in error, please notify the sender by reply e-mail and delete this message. Thank you.

[Quoted text hidden]

---

**13 attachments**

📄 **Please_DocuSign_Prime_Trust_User_Agreement_v (1).pdf**
171K

📄 **Please_DocuSign_Prime_Trust_User_Agreement_v (2).pdf**
170K

📄 **Please_DocuSign_Prime_Trust_User_Agreement_v.pdf**
171K

📄 **Please_DocuSign_Prime_Trust_User_Agreement_v (3).pdf**
170K

📄 **TrueTrading Custodial Account Application - Signed.pdf**
2211K

📄 **TrustToken - Prime_Trust_Custodial_Account_Agreement- signed.pdf**
216K

📄 **TrustToken GBP - Prime Trust Custodial Account - Fully Executed.pdf**
341K

📄 **Prime Trust Custodial Agreement - CAD - Signed.pdf**
402K

📄 **AUD_Custodial_Agreement - Signed.pdf**
403K

📄 **Prime_Trust_Custodial_Agreement_-_CAD - Executed.pdf**
340K

📄 **Prime_Trust_Custodial_Agreement_-_GBP - Executed.pdf**
340K

📄 **Prime_Trust_Custodial_Agreement_-_AUD - Executed.pdf**
340K

📄 **TrueTrading_USD Custodial_Agreement - Executed.pdf**
413K

---

**Michael Bland** <michael.bland@trusttoken.com>                Thu, Feb 3, 2022 at 10:57 AM
To: Alex de Lorraine <alex.deloraine@trusttoken.com>
Cc: Timothy Welsh <tim.welsh@trusttoken.com>, David Scahill <david.scahill@trusttoken.com>

Hi AdL,

These look to be simple custodial account agreements and should not affect our TrueCurrency escrow accounts with TrueCoin, LLC. Can you either confirm that directly with whoever sent these to you or loop me in to the email thread?

Thanks!
Michael

--

**Michael G. Bland**
Senior Corporate Counsel

**TrustToken** - **TrueFi** - **We're Hiring**

This message is intended only for the designated recipient(s). It may contain confidential, privileged or proprietary information. If you are not the designated recipient, you may not review, copy or distribute this message. If you receive this message in error, please notify the sender by reply e-mail and delete this message. Thank you.

[Quoted text hidden]

---

**David Scahill** <david.scahill@trusttoken.com>                    Thu, Feb 3, 2022 at 12:31 PM
To: Michael Bland <michael.bland@trusttoken.com>

No problem, I'll start on this tomorrow.

David
[Quoted text hidden]
--

**David Scahill**
**Legal Operations Analyst**

[Quoted text hidden]

---

**Alex de Lorraine** <alex.delorraine@trusttoken.com>                    Thu, Feb 3, 2022 at 12:32 PM
To: Michael Bland <michael.bland@trusttoken.com>
Cc: Timothy Welsh <tim.welsh@trusttoken.com>, David Scahill <david.scahill@trusttoken.com>

Hi Michael,

I will check with Gretchen and get back to you. I will check for the custodial agreement and see if I have it, but I think it was opened before my time, wasn't it?

Alex

[Quoted text hidden]

---

**Alex de Lorraine** <alex.delorraine@trusttoken.com>                    Fri, Feb 4, 2022 at 12:09 AM
To: Michael Bland <michael.bland@trusttoken.com>
Cc: Timothy Welsh <tim.welsh@trusttoken.com>, David Scahill <david.scahill@trusttoken.com>

This is what Gretchen said

Hi again Alex - The custodial account agreement is intended to only apply to your custody accounts and will have no impact on your escrow agreements currently in place.  Gretchen

Does this mean I can sign them?

All the best,
Alex
[Quoted text hidden]

---

**Michael Bland** <michael.bland@trusttoken.com>                    Fri, Feb 4, 2022 at 11:58 AM
To: Alex de Lorraine <alex.deloraine@trusttoken.com>
Cc: Timothy Welsh <tim.welsh@trusttoken.com>, David Scahill <david.scahill@trusttoken.com>

David is doing a quick review just to make sure there are no red flags.

--

**Michael G. Bland**
Senior Corporate Counsel

**TrustToken** - **TrueFi** - **We're Hiring**

This message is intended only for the designated recipient(s). It may
contain confidential, privileged or proprietary information. If you are
not the designated recipient, you may not review, copy or distribute
this message. If you receive this message in error, please notify the
sender by reply e-mail and delete this message. Thank you.


[Quoted text hidden]

---

**David Scahill** <david.scahill@trusttoken.com>                    Wed, Feb 9, 2022 at 1:33 AM
To: Michael Bland <michael.bland@trusttoken.com>

Hi Michael,

I'm running a little bit behind on this. As I'm visiting the office in Dundalk today, realistically it should be tomorrow before
this is complete.

Best,

David
[Quoted text hidden]
--

**David Scahill**
**Legal Operations Analyst**

[Quoted text hidden]

---

**Michael Bland** <michael.bland@trusttoken.com>                    Wed, Feb 9, 2022 at 10:14 AM
To: David Scahill <david.scahill@trusttoken.com>

No worries! Thanks for the update.

--

**Michael G. Bland**
Senior Corporate Counsel

**TrustToken** - **TrueFi** - **We're Hiring**

This message is intended only for the designated recipient(s). It may
contain confidential, privileged or proprietary information. If you are

not the designated recipient, you may not review, copy or distribute
this message. If you receive this message in error, please notify the
sender by reply e-mail and delete this message. Thank you.

[Quoted text hidden]