IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| | Obj. Deadline: Dec. 12, 2023 at 4:00 p.m. (ET)<br>Hr'g. Date: Dec. 19, 2023 at 10:00 a.m. (ET) |

**DEBTORS' MOTION TO FURTHER AMEND THE AMENDED ORDER (I) AUTHORIZING DEBTORS TO FILE A CONSOLIDATED CREDITOR MATRIX AND TOP 50 CREDITORS LIST; (II) AUTHORIZING REDACTION OF CERTAIN PERSONALLY IDENTIFIABLE INFORMATION; (III) AUTHORIZING THE DEBTORS TO SERVE CERTAIN PARTIES BY ELECTRONIC MAIL; (IV) APPROVING CERTAIN NOTICE PROCEDURES; AND (V) GRANTING RELATED RELIEF**

Prime Core Technologies Inc. and certain of its affiliates and subsidiaries, as debtors and debtor in possession in the above captioned chapter 11 cases (collectively, the "Debtors"), hereby move (the "Motion"), pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9013-1(k)(ii) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit A**, further amending the *Amended Order (I) Authorizing Debtors to File a Consolidated Creditor Matrix and Top 50 Creditors List; (II) Authorizing Redaction of Certain Personally Identifiable Information; (III) Authorizing the Debtors to Serve Certain Parties by Electronic Mail; (IV) Approving Certain Notice Procedures; and (V) Granting Related Relief* [Docket No. 189] (the "Amended Matrix Order"). In support thereof, the Debtors rely on the *Declaration of Alexa*

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, NV 89135.

1

*Westmoreland in Support of Debtors' Motion to Amend the Amended Order (I) Authorizing Debtors to File a Consolidated Creditor Matrix and Top 50 Creditors List; (II) Authorizing Redaction of Certain Personally Identifiable Information; (III) Authorizing the Debtors to Serve Certain Parties by Electronic Mail; (IV) Approving Certain Notice Procedures; and (V) Granting Related Relief; (IV) Approving Certain Notice Procedures; and (V) Granting Related Relief* (the "Westmoreland Declaration"), and the *Declaration of William Murphy in Support of Debtors' Motion to Amend the Amended Order (I) Authorizing Debtors to File a Consolidated Creditor Matrix and Top 50 Creditors List; (II) Authorizing Redaction of Certain Personally Identifiable Information; (III) Authorizing the Debtors to Serve Certain Parties by Electronic Mail; (IV) Approving Certain Notice Procedures; and (V) Granting Related Relief; (IV) Approving Certain Notice Procedures; and (V) Granting Related Relief* (the "Murphy Declaration," and together with the Westmoreland Declaration, the "Declarations").[2]  In further support of this Motion, the Debtors respectfully represent as follows:

**JURISDICTION AND VENUE**

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue in these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The legal predicates for the relief requested herein are Bankruptcy Code section 105(a) and Local Rule 9013-1(k)(ii).

---

[2] The Westmoreland Declaration and the Murphy Declaration are attached hereto as **Exhibit B** and **Exhibit C**, respectively.  The Declarations are incorporated herein as if set forth in full.

2

3. The Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final order or judgments in connection with Article III of the United States Constitution.

## BACKGROUND

**I.     General Background**

4. On August 14, 2023 (the "Petition Date"), each Debtor commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). These cases have been jointly administered for procedural purposes only.

5. The Debtors continue to manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

6. On August 29, 2023, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1101 of the Bankruptcy Code [Docket No. 51] (the "Committee"). The Committee is comprised of the following unsecured creditors: (a) Yousef Abbasi; (b) Allsectech, Inc.; (c) DMG Blockchain Solutions, Inc.; (d) Net Cents Technology, Inc.; (e) Polaris Ventures; (f) Stably Corporation; and (g) Austin Ward.

7. Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in *the Declaration of Jor Law, Interim Chief Executive Officer and President of Prime Core Technologies Inc., et al.*, *in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 14], which is incorporated by reference as if fully set forth herein.

**II.      The Matrix Motion**

8.      On August 15, 2023, the Debtors filed their *Motion for Entry of an Order (I) Authorizing Debtors to File a Consolidated Creditor Matrix and Top 50 Creditors List; (II) Authorizing Redaction of Certain Personally Identifiable Information; (III) Authorizing the Debtors to Serve Certain Parties by Electronic Mail; (IV) Approving Certain Notice Procedures; and (V) Granting Related Relief* [Docket No. 15] (the "Matrix Motion"), through which the Debtors sought entry of an order granting the Debtors authority to, among other things, serve creditors by email in certain instances.

9.      On August 25, 2023, the Court held a hearing on, among other things, approval of the Matrix Motion on an interim basis (the "First Day Hearing").  At the First Day Hearing, counsel for the Debtors proffered the testimony of Mr. Jor Law in connection with the Matrix Motion, which testimony was entered into evidence.  Aug. 25, 2023 Hr'g. Tr. 67:24-25 to 68:1-10.[3]

10.     Mr. Law testified that it was his understanding that "the debtors communicate with their customers via email and that there are very few instances, if any, where the debtors have communicated with customers through more traditional mail channels, and that their agreements provide that customers will receive statements via email and that they will not receive hard copies." *Id.*, at 71:19-25 to 72:1-2. He further testified that the Debtors' commercial agreements generally contain the following language:

> Each Party hereby agrees that all current and future notices, confirmations and other communications regarding the Agreement specifically, and future communications in general between the Parties, may be made by email, sent to the email address of record, without necessity of confirmation of receipt, delivery or reading, and such form of electronic communication is sufficient for all matters regarding the relationship between the Parties.

---

[3]     The relevant excerpts of the transcript from the First Day Hearing are attached hereto as **Exhibit D**.

*Id.*, at 72:6-13.

11.     Mr. Law also testified that the Debtors' customer agreements generally contain the following language:

> No physical, paper documents will be sent to Customer, and if Customer desires physical documents then it agrees to be satisfied by directly and personally printing, at Customer's own expense, either the electronically-sent communication(s) or the electronically available communications by logging on to Customer's Account and then maintaining such physical records in any manner or form that Customer desires.

*Id.*, at 72:17-24.

12.     Mr. Law further testified that it was his understanding that the Debtors have "approximately 50,000 non-customer creditors" and "approximately 5.4 million customers" are listed on the matrix, and that "serving customers with notices via regular mail and when necessary, through expedited means such as using Federal Express would [be] exorbitant and given the customers' expectations with respect to receiving communications from the company, such service would be a waste of the company's very limited resources." *Id.*, at 73:7-17.  Mr. Law also testified that the cost of serving the notice of commencement in the Chapter 11 Cases via regular mail would amount to "approximately $10.2 million." *Id.*, at 73:18-20.

13.     On August 25, 2023, the Court entered the *Interim Order (I) Authorizing Debtors to File a Consolidated Creditor Matrix and Top 50 Creditors List; (II) Authorizing Redaction of Certain Personally Identifiable Information; (III) Authorizing the Debtors to Serve Certain Parties by Electronic Mail; (IV) Approving Certain Notice Procedures; and (V) Granting Related Relief Procedures, and (V) Granting Related Relief* [Docket No. 39] (the "<u>Interim Matrix Order</u>"). Among other things, the Interim Matrix Order provided that:

> [t]he service requirements of Bankruptcy Rule 2002(g) hereby are modified to permit e-mail service to (i) customers that (a) have not designated a mailing address under Bankruptcy Rule 2002(g)(1) or

5

>    5003(e); (b) have not expressly requested to be served hard copies by
>    mail; and (c) have a valid e-mail address on file with the Debtors; and (ii)
>    non-customer creditors that (a) have not designated a mailing address
>    under Bankruptcy Rules 2002(g)(1) or 5003(e); (b) have not expressly
>    requested to be served hard copies by mail; and (c) have a valid e-mail
>    address on file with the Debtors, but no physical address information.

Interim Matrix Order, ¶ 5.

14.  On September 20, 2023, the Court entered the *Order (I) Authorizing Debtors to File a Consolidated Creditor Matrix and Top 50 Creditors List; (II) Authorizing Redaction of Certain Personally Identifiable Information; (III) Authorizing the Debtors to Serve Certain Parties by Electronic Mail; (IV) Approving Certain Notice Procedures; and (V) Granting Related Relief* [Docket No. 168] (the "Final Matrix Order"), which granted the relief requested in the Matrix Motion on a final basis. The Final Matrix Order provided, in relevant part, that:

>    [n]otwithstanding paragraphs 3 and 4 of this Final Order, to the extent that
>    an e-mail address is returned as undeliverable and the Debtors are unable
>    to locate an alternative working e-mail address, the Debtors shall serve
>    such parties at the physical mailing address that the Debtors have on file,
>    if any, by first-class mail, overnight courier, or hand delivery, as
>    appropriate.

Final Matrix Order, ¶ 5.

15.  On September 22, 2023, the Court entered the Amended Matrix Order, which included clarifications with respect to the Final Matrix Order.[4]

### III.  Undeliverable Email Parties

16.  As described in detail below, following entry of the Matrix Order, Stretto, Inc., the Debtors' claims, noticing, and administrative agent (the "Claims Agent"), made the Debtors' aware of certain service issues related to emails that had been blocked, reported as spam, or to which

---

[4] The Amended Matrix Order includes relief that was granted but which the Debtors inadvertently omitted from the form of Final Matrix Order submitted to the Court for approval.

Stretto was otherwise unable to complete delivery. More specifically, the Claims Agent informed the Debtors that, (i) certain customers, not readily recognizing the Debtors as a company with which they were currently, or had ever, done business with, had reported the service emails sent by the Claims Agent as spam or have unsubscribed from the Claim's Agent's service emails entirely, and/or (ii) certain customer emails were invalid, non-existent, or improperly formatted (collectively, the "Suppressed Email Parties"). *See* Westmoreland Declaration, ¶ 3. At present, there are nearly 100,000 Suppressed Email Parties, but this number is likely to increase pending further service and/or investigation. *See id*.[5] In addition, the Claims Agent notified the Debtors that if the Suppressed Email Parties declined service of the Bar Date Notice, it is likely that the outcome of an investigation would show that the Suppressed Email Parties likewise declined or otherwise did not receive the Claims Agent's service emails regarding the Confirmation Hearing Notice or the Supplemental Notice.[6] *See id.*, at ¶ 3 and Ex. A.[7]

17. Further, the Claims Agent was informed that, in order to protect the intellectual property it utilizes in connection with its business, continued attempts to serve the Suppressed Email Parties via email would result in Stretto's email servers completely blocking or otherwise preventing the Claims Agent from moving forward with any reattempted or further email service on

---

[5] The Suppressed Parties are included in the total number of undeliverable emails outlined in paragraph 22 below.

[6] *Notice of Order (I) Approving the Disclosure Statement on an Interim Basis for Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Information in the Disclosure Statement and Confirmation of the Plan* [Docket No. 265] (the "Confirmation Hearing Notice"). The Debtors, with the support of the Committee, extended their confirmation schedule to allow additional time for the Debtors to undertake their sale, financing, and investigative processes. To that end, the Debtors have sought entry of an amendment to the Conditional Approval Order for purposes of approving the Debtors' new confirmation schedule and manner of notice thereof through a supplement to the Confirmation Hearing Notice (the "Supplemental Notice"). *See* Docket No. 350.

[7] The Notice of Commencement, the Bar Date Notice, the Confirmation Hearing Notice, the Supplemental Notice (as defined below), solicitation packages, and any other notices to be served on the parties listed in the Debtors' matrix, collectively, the "Matrix Service Notices."

7

their servers, including future email service related to the Debtors' Chapter 11 Cases. *See id.*, at ¶ 3. To put a finer point on it, if the Claims Agent either (a) does not remove the Suppressed Email Parties' email addresses from the customer email address list, and/or (b) reattempting service on the Suppressed Email Parties via email without the recipient's or the customer's direct consent, it would have a strong negative consequence on the Claims Agent's domain, intellectual property, and/or its ability to serve all parties in these Chapter 11 Cases via email successfully on a go-forward basis. *See id*.

18. Moreover, reattempted service could potentially result in the revocation of the Claims Agent's right to use its licensed intellectual property. The Claims Agent informed that Debtors that, based on the foregoing, the Claims Agent has removed the email addresses associated with the Suppressed Email Parties from the email customer service list. *See id.*, Exs. A–C.

19. In addition to the Suppressed Parties, the Claims Agent informed the Debtors that a separate number of parties receiving email service were returned as undeliverable for the following reasons: (i) invalid email addresses; (ii) email domain rejection; (iii) full email mailboxes; (iv) blocked by the Claims Agent's intellectual property; (v) spam filters; or (vi) connection timeouts (collectively, with the Suppressed Email Parties, the "<u>Undeliverable Email Parties</u>"). *See id.*, Exs. A–C.[8] Specifically, 131,446 emails were initially returned to the Claims Agent as undeliverable in connection with its service of the Bar Date, which number was reduced to 10,932 through the use of an alternative domain address.[9] *See id.*, Ex. B. In connection with the Claims

---

[8] The majority of the Undeliverable Parties are end-user customers of the Debtors, as opposed to integrator or aggregator customers, and as such, may be more familiar with the names of the applicable integrator customers of the Debtors. *See* Murphy Declaration, ¶¶ 3–4.

[9] The Claims Agent used a new domain to serve 53,630 Undeliverable Email Parties with the Bar Date Notice; however, continuing to do so could damage their intellectual property reputation and jeopardize their licenses with respect to email service in other cases. Further, many of the formerly undeliverable individual retail customers who received the Bar Date Notice have since unsubscribed from the Claims Agent's email service, meaning they will not be deliverable in the future from either of the domains that the Claims Agent has used to serve the Bar Date Notice

8

Agent's service of the Confirmation Hearing Notice, 131,328 unique emails were returned to the Claims Agent as undeliverable. *See id.*, Ex. C.

20. Prior to the filing of this Motion, the Claims Agent and the Debtors' financial advisor, M3 Advisory Partners, LP ("M3 Advisory"), worked to reconcile the Claims Agent's service email addresses with the Debtors' books and records. As a result, the Claims Agent and M3 Advisory were able to designate certain email addresses linked to Undeliverable Email Parties as duplicates – e.g., where the Claims Agent successfully served the Bar Date Notice through another email address at the grantor level (i.e., certain customers designated another party to receive notices related to their account on their behalf and/or be an authorized user to the account) – thereby rendering service on these Suppressed Email Parties superfluous. *See* Murphy Declaration, ¶ 6.

21. With respect to service of the Bar Date Notice, 77,816 of 131,446 undeliverable emails were reconciled and deemed to have duplicate grantors, which had the effect of reducing the number of Undeliverable Email Parties related to service of the Bar Date Notice to 53,630. *See* Westmoreland Declaration, Ex. B. With respect to the Claims Agent's service of the Confirmation Hearing Notice, 303 of the 131,328 of the email addresses were reconciled and deemed to have duplicate grantors within the list of Undeliverable Email Parties. *See id.*, Ex. C.

22. Of the Undeliverable Email Parties, only 1,358 unique Undeliverable Email Parties, or 1.0%, have been scheduled by the Debtors as holding claims against their estates. *See* Murphy Declaration, ¶ 3. Thus, the Debtors believe that 129,970, or 99.0%, of the Undeliverable Email Parties (the "Unscheduled Undeliverable Email Parties"), are not creditors of their estates based on their books and records. *See id.*, at ¶¶ 5–6. The costs associated with serving the Confirmation

---

on the Undeliverable Email Parties. The remaining 10,932 Undeliverable Email Parties in connection with the Bar Date service were subsequently noticed via first class mail.

Hearing Notice and the Supplemental Notice on the Unscheduled Undeliverable Email Parties via first-class mail would amount to approximately $264,000. *See* Westmoreland Declaration, ¶ 4.

23. Employees of the Debtors also analyzed their books and records to research the number of potential claimants within the Suppressed Email Parties and the Undeliverable Email Parties. The Debtors reviewed a list of 129,289 Undeliverable Email Parties (from the list of 131,328 emails that were expunged for grantors and duplicate email entries by the Claims Agent and M3 Advisory) related to the Notice of Confirmation Hearing and determined that the number of emails that potentially held claims was 8,788. This figure includes the emails of associated parties of large integrators, even if the associated party did not have a direct relationship with the Debtors or a potential claim. After excluding said associated parties, the Debtors' analysis indicated fewer than 700 unique email addresses with potential claims.

24. The Debtors believe that reducing the unique email addresses with potential claims to fewer than 700 could be undercounting the true number of email addresses with potential claims. In particular, the analysis performed by the Claims Agent and M3 Advisory set forth in paragraph 22 hereof that compares the claims reflected in the Debtors' schedules of assets and liabilities (the "Schedules")[10] with the Undeliverable Email Parties, indicated that only 1,358 of those parties were scheduled by the Debtors as potentially holding claims against their estate. *See* Murphy Declaration, ¶ 3. Nonetheless, the Debtors believe that their analysis corroborates and supports the assertion that the number of parties who may hold claims against the Debtors' estate is a small percentage of the sum of the Undeliverable Email Parties. *Id.*, ¶¶ 3, 6. The Debtors' employees reconciled this list, and to the extent that any new emails with potential new claims emerged from the Debtors' analysis, the Debtors concluded that these emails were alternate emails attached to

---

[10] *See* Docket Nos. 175-178.

claims that were already reflected in the Debtors' Schedules, and either notified successfully or were already included in the revised notice list for mail service. *See* Murphy Declaration, ¶¶ 6–7. Therefore, the Debtors, after conducting their own analysis, support the conclusion that the appropriate number of Undeliverable Parties they should serve with the Confirmation Hearing Notice and the Supplemental Notice via first class mail is 1,358 (the "Mail Service Parties").[11]

25.     On November 27, 2023, the Claims Agent reported that in connection with the Notice of Amendment to Confirmation Schedule, 152,347 emails from an initial list of over 5,000,000 of the Debtors' customers' emails were classified as Undeliverable Email Parties. The Claims Agent is continuing to review and compile the complete list of Undeliverable Email Parties, after which the Debtors and M3 Advisory will analyze the Undeliverable Email Parties in connection with the Notice of Amendment to Confirmation Schedule to identify emails listed in the Debtors' Schedules and subsequently serve them via first class mail.

## RELIEF REQUESTED

26.     The Debtors seek entry of the Proposed Order further amending the Amended Matrix Order providing that (a) the Debtors are not required to reattempt service, or attempt service on a go-forward basis, through any means, upon the Unscheduled Undeliverable Email Parties, and (b) granting such other related relief that the Court deems just and proper.

## BASIS FOR RELIEF

27.     The relief requested herein is authorized under this Court's general equitable powers, as codified in section 105(a) and 105(d) of the Bankruptcy Code. *See* 11 U.S.C. §§ 105(a), (d). Pursuant to section 105(a) of the Bankruptcy Code, the court "may issue any order, process or

---

[11] The Debtors completed this service prior to the filing of this Motion. *See* Docket No. 424.

judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." *Id.* § 105(a).

28.     Section 105(a) "authorizes a court to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'" *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (citing 11 U.S.C. § 105(a)); *see also Joubert v. ABN Mortg. Grp., Inc. (In re Joubert)*, 411 F.3d 452, 454-455 (3d Cir. 2005) ("Section 105(a) empowers bankruptcy courts … to fashion orders in furtherance of Bankruptcy Code provisions."). As long as the Court does not create substantive rights not found in the Code, 105(a) "authorizes the bankruptcy court … to fashion such orders as are required to further the substantive provisions of the Code." *In re Morristown & Erie Railroad Co.*, 885 F.2d 98, 100 (3d Cir. 1990)); *see also Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 211 (3d Cir. 2000) (citing *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992)) ("Section 105(a) … supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code. However, section 105(a) … does not 'create substantive rights that would otherwise be unavailable under the Bankruptcy Code.'").  Further, pursuant to Local Rule 9013-1(k)(ii), any request for amendment of an order entered by the Court may be made "[b]y motion under this Local Rule."

29.     By reason of the considerations outlined below, the Court should grant the relief requested in this Motion.

30.     ***First***, as the Court is aware, the Debtors had limited and finite resources when they entered chapter 11.  More specifically, the Debtors have been subject to a cease and desist order issued by the Nevada Financial Institutions Division since June 21, 2023. Thus, when they filed these Chapter 11 Cases, the Debtors had no means of generating revenue.  In other words, the

Debtors entered these cases with a fixed amount of cash that would only diminish as the Chapter 11 Cases progressed. To address their liquidity constraints, the Debtors worked as quickly as possible to achieve their chapter 11 goals; namely, to protect assets, maintain and reinstate suspended, revoked, or terminated licenses, preserve value moving forward, conduct an investigation into inaccessible cryptocurrency assets, and otherwise maximize the value of their assets and estates.

31. In that vein, three (3) weeks into these Chapter 11 Cases, the Debtors filed their Plan[12] and Disclosure Statement,[13] and one month later, the Court entered the Conditional Approval Order and the Debtors commenced solicitation of their Plan.[14] Additionally, four (4) weeks into these Chapter 11 Cases, the Debtors sought and received approval of bidding procedures[15] and quickly commenced the process of soliciting bids for the sale of the Debtors' assets and/or the provision of capital.

32. And while the Debtors moved as quickly as practicable to proceed to consummating one or more transactions, the Debtors found themselves in a position of having to extend certain deadlines under their bid procedures to help ensure a highly competitive auction and secure the highest and best offer for their assets or equity. Specifically, the Debtors and potential bidders required additional time to negotiate the terms of, clear contingencies related to, and otherwise improve upon, the bids that the Debtors had received. As these bids implicated consummation of a transaction through the Plan (as opposed to pursuant to Bankruptcy Code section 363), extending the Debtors' sale process timeline likewise necessitated an extension of the Debtors' confirmation

---

[12] The Debtors filed their *Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* (the "Plan") on September 8, 2023. *See* Docket Nos. 92 & 258.

[13] The Debtors filed their *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with Respect to the Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* (the "Disclosure Statement") on September 8, 2023. *See* Docket Nos. 93 & 259.

[14] *See* Docket No. 264.

[15] *See* Docket No. 119.

timeline. As a result, the Debtors' already limited liquidity has been placed under additional, unexpected strain.

33.     ***Second***, by virtue of the nature of the Debtors' business – operating a cryptocurrency platform – the number of current and former potential creditors is disproportionate to the size of the Debtors' business enterprise.  Indeed, the Debtors have in excess of 5 million potential current and former customers.  *See supra*, ¶ 12.  Of this number, the Debtors scheduled claims for 50,515 customers on their Schedules based on their books and records.  *See* Murphy Declaration, ¶¶ 3–4.  Thus, the vast majority of the Undeliverable Email Parties (99.0%) do not hold claims against the Debtors based on their books and records and thus, were not included in the Debtors' Schedules.

34.     ***Third***, there is uncontroverted testimony in these cases that the Debtors' customers understood that any communications they received from the Debtors would be transmitted by email.  *See supra*, ¶¶ 10-11.  Further, the majority of the Undeliverable Parties are end-user customers of the Debtors, as opposed to integrator or aggregator customers, and as such, may be more familiar with the names of the applicable integrator customers of the Debtors.  *See* Murphy Declaration, ¶¶ 3, 6.

35.     ***Fourth***, by blocking the Claims Agent's service emails or reporting them as spam, the Unscheduled Undeliverable Email Parties have effectively opted out of receiving notices in these Chapter 11 Cases, some even doing so twice.  *See supra*, ¶ 16.

36.     ***Fifth***, the Debtors published the Notice of Commencement, the Bar Date Notice, and the Confirmation Hearing Notice in the National Edition of The New York Times.[16]  Thus, the Undeliverable Email Parties received publication notice of the Matrix Service Notices.

---

[16]  *See* Docket Nos. 199, 288.

37. Against this backdrop, the cost of serving the Unscheduled Undeliverable Email Parties with the applicable Matrix Service Notices would amount to approximately $264,000 if served via first-class mail.[17] The Debtors submit that the Debtors' limited resources should be directed towards their asset-recovery efforts and otherwise be used to further their chapter 11 goals for the benefits of the Debtors' estates, creditors, and stakeholders. Indeed, when weighed against the costs of serving parties who have effectively opted out of service in connection with these Chapter 11 Cases and/or who are not creditors of the Debtors' estates based on their books and records, the harm to the Debtors' estates outweighs any harm to the Unscheduled Undeliverable Email Parties by virtue of not receiving paper copies of the Matrix Service Notices by first-class mail or through expedited means of delivery.

## **NOTICE**

38. The Debtors will provide notice of the Motion to: (a) the U.S. Trustee; (b) the counsel to the Committee; and (c) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that no other notice is required.

*[Remainder of page intentionally left blank.]*

---

[17] This number does not include service of the notice of the effective date of the Plan, which would add to these costs.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as may be just and proper.

| | |
|---|---|
| Dated: November 27, 2023<br>Wilmington, Delaware | **MCDERMOTT WILL & EMERY LLP**<br><br>*/s/ Maris J. Kandestin*<br>Maris J. Kandestin (No. 5294)<br>1000 N. West Street, Suite 1400<br>Wilmington, Delaware 19801<br>Telephone: (302) 485-3900<br>Facsimile: (302) 351-8711<br>Email: mkandestin@mwe.com<br><br>-and-<br><br>Darren Azman (admitted *pro hac vice*)<br>Joseph B. Evans (admitted *pro hac vice*)<br>Jessica Greer Griffith (admitted *pro hac vice*)<br>One Vanderbilt Avenue<br>New York, New York 10017-3852<br>Telephone: (212) 547-5400<br>Facsimile: (646) 547-5444<br>Email: dazman@mwe.com<br>jbevans@mwe.com<br>ggriffith@mwe.com<br><br>-and-<br><br>Gregg Steinman (admitted *pro hac vice*)<br>333 SE 2nd Avenue, Suite 4500<br>Miami, Florida 33131<br>Telephone: (305) 358-3500<br>Facsimile: (305) 347-6500<br>Email: gsteinman@mwe.com<br><br>*Counsel to the Debtors and Debtors in Possession* |