## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 485** |

## NOTICE OF FILING OF PLAN SUPPLEMENT
## WITH RESPECT TO DEBTORS' AMENDED JOINT CHAPTER 11 PLAN OF
## REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that, on October 5, 2023, Prime Core Technologies Inc. and certain of its affiliates and subsidiaries (collectively, the "Debtors") filed the *Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors* [Docket No. 258] (as amended, modified, or supplemented and including all exhibits and supplements thereto, the "Plan")[2] in the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on the date hereof and contemporaneously herewith, the Debtors filed the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors* (the "Amended Plan") with the Court.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file this *Plan Supplement with Respect to the Debtors' Amended Joint Chapter 11 Plan of Reorganization under Chapter 11 of the Bankruptcy* (as amended, modified, or supplemented, the "Plan Supplement") in support of confirmation of the Amended Plan. The documents contained in the Plan Supplement are integral to, part of, and incorporated by reference into the Amended Plan. The Plan Supplement documents have not yet been approved by the Court.

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement includes the following documents, as may be modified, amended, or supplemented from time to time by the Debtors in accordance with the Amended Plan, as set forth below:

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are:  Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, NV 89135.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

| Exhibit | Description |
|---|---|
| **Exhibit A** | Schedule of Assumed Executory Contracts and Unexpired Leases |
| **Exhibit B** | Schedule of Rejected Executory Contracts and Unexpired Leases |
| **Exhibit C** | Schedule of Vested Causes of Action |
| **Exhibit D** | Identity of Wind-Down Debtor |
| **Exhibit E** | Plan Administrator Agreement |
| **Exhibit F** | Identity of the Plan Administrator |
| **Exhibit G** | Identity of Wind-Down Debtor Oversight Committee |
| **Exhibit H** | Amended Organizational Documents |
| **Exhibit I** | Cryptocurrency Conversion Table |
| **Exhibit J** | Identity of the [PCT] Litigation Trustee |
| **Exhibit K** | Identity of [PCT] Litigation Trust Oversight Committee |
| **Exhibit L** | [PCT] Litigation Trust Agreement |

**PLEASE TAKE FURTHER NOTICE** that certain documents, or portions thereof, contained in this Plan Supplement remain subject to ongoing negotiations among the Debtors, the official committee of unsecured creditors appointed in these cases (the "Committee"), and other interested parties with respect thereto. The Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date, or any such other date in accordance with the Plan, the Confirmation Order, or any other order of the Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent so provided in the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Amended Plan, the Plan Supplement, and other documents and materials filed in the above-captioned chapter 11 cases may be examined by any party-in-interest (a) between the hours of 8:00 a.m. and 4:00 p.m., Monday through Friday, excluding federal holidays, at the Office of the Clerk of the Court (the "Clerk"), 824 N. Market St., 3rd Floor, Wilmington, Delaware 19801; (b) free of charge at the Debtors' case website (https://cases.stretto.com/primetrust/); or (c) for a fee at the Court's website (http://www.deb.uscourts.gov) (a PACER account is required). Such documents may also be obtained by written request to Stretto, Inc. (the "Voting Agent") at PrimeCoreInquiries@stretto.com or by telephoning the Voting Agent at (888) 533-4753 (toll-free) or (303) 536-6996 (if calling from outside the U.S. or Canada).

Dated: November 28, 2023
Wilmington, Delaware

**MCDERMOTT WILL & EMERY LLP**

/s/ Maris J. Kandestin
Maris J. Kandestin (No. 5294)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone:  (302) 485-3900
Facsimile:  (302) 351-8711
Email:       mkandestin@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone:  (212) 547-5400
Facsimile:  (646) 547-5444
Email:       dazman@mwe.com
             jbevans@mwe.com

-and-

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone:  (305) 358-3500
Facsimile:  (305) 347-6500
Email:       gsteinman@mwe.com

*Counsel to the Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Schedule of Assumed Executory Contracts and Unexpired Leases**

**Schedule of Assumed Executory Contracts and Unexpired Leases**

| Applicable Debtor Entity | Description of Contract | Contract Counterparty | Proposed Cure Amount ($) |
|---|---|---|---|
| Prime Trust LLC | Customer Agreement | Amazon Web Services, Inc. | $68,622.50 |
| Prime Trust LLC | Membership Agreement | WeWork | None |
| Prime Trust LLC | Month-to Month Contract | Cubesmart | None |
| Prime Trust LLC | Vendor Agreement | Atlassian | None |
| Prime Trust LLC | Vendor Agreement | GitHub | None |
| Prime Trust LLC | Vendor Agreement | Google (Workspace) | None |
| Prime Trust LLC | Vendor Agreement | Zendesk | None |

## **EXHIBIT B**

**Schedule of Rejected Executory Contracts and Unexpired Leases**

**Schedule of Rejected Executory Contracts and Unexpired Leases**

| No. | Applicable Debtor Entity | Description of Contract | Contract Counterparty |
|-----|--------------------------|------------------------|------------------------|
| 1 | Prime Trust LLC | 11/15/2022 - Cryptocurrency Recovery and Fund Tracing Services | AnChain.AI, Inc |
| 2 | Prime Trust, LLC | Vendor Agreement | Catamorphic Co. (dba LaunchDarkly) |
| 3 | Prime Trust, LLC | Vendor Agreement | Office Pride Las Vegas |
| 4 | Prime Trust, LLC | Vendor Agreement | Eco Gen Pest Control |
| 5 | Prime Trust, LLC | Vendor Agreement | First Choice Coffee Services |
| 6 | Prime Core Technologies, Inc. | Indemnification Agreement | Bob Zhao |
| 7 | Prime Core Technologies, Inc. | Indemnification Agreement | Bradford Epstein |
| 8 | Prime Core Technologies, Inc. | Indemnification Agreement | Brent Beeman |
| 9 | Prime Core Technologies, Inc. | Indemnification Agreement | David Ko |
| 10 | Prime Core Technologies, Inc. | Indemnification Agreement | David Pigott Jr. |
| 11 | Prime Core Technologies, Inc. | Indemnification Agreement | Elizabeth Bildner |
| 12 | Prime Core Technologies, Inc. | Indemnification Agreement | Eugene Lao |
| 13 | Prime Core Technologies, Inc. | Indemnification Agreement | J. Max Jiles |
| 14 | Prime Core Technologies, Inc. | Indemnification Agreement | Jennifer Blanco |
| 15 | Prime Core Technologies, Inc. | Indemnification Agreement | Joe Capone |
| 16 | Prime Core Technologies, Inc. | Indemnification Agreement | Jon P. Jiles |
| 17 | Prime Core Technologies, Inc. | Indemnification Agreement | Jor Law |
| 18 | Prime Core Technologies, Inc. | Indemnification Agreement | Kristin Smith |
| 19 | Prime Core Technologies, Inc. | Indemnification Agreement | Matthew Parrella |

| No. | Applicable Debtor Entity | Description of Contract | Contract Counterparty |
|---|---|---|---|
| 20 | Prime Core Technologies, Inc. | Indemnification Agreement | Melissa Bonner |
| 21 | Prime Core Technologies, Inc. | Indemnification Agreement | Melissa Westhoff |
| 22 | Prime Core Technologies, Inc. | Indemnification Agreement | Michael Garrett |
| 23 | Prime Core Technologies, Inc. | Indemnification Agreement | Michael Smith |
| 24 | Prime Core Technologies, Inc. | Indemnification Agreement | Robert Desroches |
| 25 | Prime Core Technologies, Inc. | Indemnification Agreement | Robert F. List |
| 26 | Prime Core Technologies, Inc. | Indemnification Agreement | Rodrigo Vicuna |
| 27 | Prime Core Technologies, Inc. | Indemnification Agreement | Scott Trainor |
| 28 | Prime Core Technologies, Inc. | Indemnification Agreement | Thomas Brandl |
| 29 | Prime Core Technologies, Inc. | Indemnification Agreement | Thomas Gonser |
| 30 | Prime Core Technologies, Inc. | Indemnification Agreement | Thomas Pageler |
| 31 | Prime Core Technologies, Inc. | Indemnification Agreement | Timothy Bowman |
| 32 | Prime Core Technologies, Inc. | Indemnification Agreement | Yi Patty Wang |
| 33 | Prime Core Technologies, Inc. | Indemnification Agreement | Yunan (Jeffrey) Ren |
| 34 | Prime Core Technologies, Inc. | Indemnification Agreement | Zane Busteed |
| 35 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Commerce Ventures III, L.P. |
| 36 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Decasonic Prime Trust, a series of Decasonic Opportunity Fund, LLC |
| 37 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Evan Rabinowitz |
| 38 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Fidelity Information Services, LLC |
| 39 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Fin VC Horizons II, LP – Series VIII |
| 40 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Gaingels Prime Trust 2022 LLC |

| No. | Applicable Debtor Entity | Description of Contract | Contract Counterparty |
|---|---|---|---|
| 41 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Gatecap Ventures II LP |
| 42 | Prime Core Technologies, Inc. | Stock Purchase Agreement | GC&H Investments, L.P. |
| 43 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Joe Sullivan |
| 44 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Kraken Ventures Fund I LP |
| 45 | Prime Core Technologies, Inc. | Stock Purchase Agreement | MERCATO PARTNERS TRAVERSE IV QP, L.P. |
| 46 | Prime Core Technologies, Inc. | Stock Purchase Agreement | MERCATO PARTNERS TRAVERSE IV, L.P. |
| 47 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Mercato Traverse SPV 2, A Series of Mercato Coinvestments, LLC |
| 48 | Prime Core Technologies, Inc. | Stock Purchase Agreement | OKCOIN USA INC. |
| 49 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Oleg, L.P. Limited Partnership |
| 50 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Palindrome Master Fund LP |
| 51 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Pegasus Growth Capital Fund I, LP |
| 52 | Prime Core Technologies, Inc. | Stock Purchase Agreement | PRI Gaingels Fund, a series of Zachary Ginsburg Funds, LP |
| 53 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Quantum Partners LP |
| 54 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Seven Peaks Ventures Fund II, LP |
| 55 | Prime Core Technologies, Inc. | Stock Purchase Agreement | SPV – Prime Core, LLC |
| 56 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Tagus Capital Multi-Strategy Fund SP acting by Starmark Investment Limited |
| 57 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Timus Capital, LLC |
| 58 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Tiny Orange, LLC |

| No. | Applicable Debtor Entity | Description of Contract | Contract Counterparty |
|---|---|---|---|
| 59 | Prime Core Technologies, Inc. | Stock Purchase Agreement | Triton Venture Capital Prime Trust Fund I LP |
| 60 | Prime Core Technologies, Inc. | Stock Purchase Agreement | UGF II Affiliates II, LLC |
| 61 | Prime Core Technologies, Inc. | Stock Purchase Agreement | University Growth Fund II, LP |
| 62 | Prime Core Technologies, Inc. | Stock Purchase Agreement | William Blair MB Investments, LP – [PCT]I |
| 63 | Prime Core Technologies, Inc. | Stock Purchase Agreement | William Blair MB Investments, LP – [PCT]I 2022 Series |

Furthermore, any Executory Contract or Unexpired Lease not listed **Exhibit A**, or in the above table, shall be rejected in accordance with the Plan.

# **EXHIBIT C**

**Schedule of Vested Causes of Action**

## Exhibit C

## Schedule of Vested Causes of Action[1]

Article 6.15 of the Plan provides (emphasis added):

> In accordance with section 1123(b) of the Bankruptcy Code, any and all Causes of Action that are not expressly released or waived or limited under the Plan are preserved and vested by the Debtors and the Wind-Down Debtor on the Effective Date (the "Vested Causes of Action"), and the Wind-Down Debtor shall succeed to all rights to commence, prosecute, pursue, and/or settle any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than the causes of action that are expressly released, waived, or limited under the Plan (the "Excluded Causes of Action"). The Excluded Causes of Action shall be deemed released and waived by the Debtors, the Wind-Down Debtor, and the [PCT] Litigation Trust as of the Effective Date.
>
> The Wind-Down Debtor may pursue such Vested Causes of Action or assign such Vested Causes of Action to the [PCT] Litigation Trust, as appropriate, in accordance with the best interests of the Holders of Allowed Claims against the Debtors' estates and in accordance with the Plan Administrator Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action as any indication that the Debtors, the Wind-Down Debtor, or the [PCT] Litigation Trust, as applicable, will not pursue any and all available Vested Causes of Action of the Debtors against it. The Wind-Down Debtor, on behalf of the Debtors, expressly reserves all rights to prosecute any and all Vested Causes of Action against any Entity, or to assign such rights to the [PCT] Litigation Trust, except as otherwise provided in the Plan, including Article 10.4 and Article 10.5 of the Plan.** Except with respect to Excluded Causes of Action, the Wind-Down Debtor, on behalf of the Debtors, and in accordance with the Plan Administrator Agreement, expressly reserves all such Vested Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Vested Causes of Action upon, after, or as a consequence of confirmation or Consummation of the Plan. The Wind-Down Debtor, on behalf of the Debtors, reserves and shall retain such Vested Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Vested Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning provided in the Plan.  Pursuant to the Plan, upon the Effective Date the Plan Administrator or the [PCT] Litigation Trustee, as applicable, shall be vested with the sole right and obligation to pursue the Vested Causes of Action.

Down Debtor, except as otherwise provided in the Plan, including Article 10.4 and Article 10.5 of the Plan. The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Vested Causes of Action. Subject to the provisions of the Plan Administrator Agreement, the Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Vested Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

Notwithstanding, and without limiting the generality of, Article 6.15 of the Plan, Exhibit C to this Plan Supplement includes specific types of Vested Causes of Actions expressly preserved by the Wind-Down Debtor, and/or the [PCT] Litigation Trust, as applicable, subject to the terms of the Plan, the Plan Administrator Agreement, and the [PCT] Litigation Trust Agreement. **Review of the Vested Causes of Action is ongoing. Except as otherwise provided in Article [•] of the Plan or to the extent a Cause of Action is designated as an Excluded Cause of Action on this Schedule [•], all Causes of Action are expressly preserved for later prosecution, adjudication, or settlement by the Wind-Down Debtor and/or the [PCT] Litigation Trustee, as applicable, including, without limitation, Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist. For the avoidance of doubt, the specific types of Vested Causes of Action listed in Exhibit C to this Plan Supplement are non-exclusive and are not intended to be a comprehensive list of all Vested Causes of Action retained in connection with the Plan. The Debtors and Wind-Down Debtor expressly reserve the right to alter, modify, amend, remove, augment, or supplement the Vested Causes of Action.**

### Exhibit C

Vested Causes of Action:

1.    All claims and Causes of Action under 11 U.S.C. §§ 547 and 550 (to the extent such claims arise solely in connection with claims under section 547), and any state law analogs (the "Preference Claims"), including any related claims or Causes of Action under 11 U.S.C. § 502 other than Released Preference Claims.[2]  For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, Released Preference Claims shall constitute Excluded Causes of Action.

2.    All claims and causes of action under 11 U.S.C. §§ 544, 548, 549, and 550, and any state law analogs, including any related claims and causes of action under 11 U.S.C. § 502, and all other Avoidance Actions not constituting Released Preference Claims or other Excluded Causes of Action.

3.    Any and all Causes of Action related to the Series A Financing and Series B Financing, including against then-existing equity holders who sold equity in the Debtors pursuant to the Series A Financing or Series B Financing, any equity holders who received distributions or other consideration on account of such equity, or against any other party, including but not limited to Causes of Action to avoid and recover transfers under chapter 5 of the Bankruptcy Code and any state law analogs, other than, for the avoidance of doubt, any Released Party.

4.    Any and all 98f Wallet Causes of Action, including for illustrative purposes and without limitation, claims and Causes of Action for:  (i) the recovery of the 98f Wallet seed phrases and/or the cryptocurrency in the 98f Wallet; (ii) claims and Causes of Action concerning the 98f Wallet sounding in negligence, willful misconduct, breach of fiduciary duty, fraud, fraudulent transfer, unjust enrichment, breach of contract, or any other Cause of Action against any current or former

---

[2]    The term "Released Preference Claims" means all Preference Claims against any customer whose allowed, scheduled or stipulated Class 3B Claim (without giving effect to 11 U.S.C. § 502(d)) is in an amount that equals at least 10% of the total amount withdrawn by such customer during the 90-day period prior to the Petition Date, unless the customer: (a) is a current or former insider of any Debtor, or a relative of any such insider; (b) is a current or former employee or independent contractor of any Debtor, or a relative of any such employee or independent contractor; (c) is an entity of which any officer, director, manager or advisor is or was an insider of any Debtor; (d) is an officer, director, manager, or employee of an entity falling within clause (c); (e) received manual permission to facilitate withdrawals from the Debtors when withdrawals were otherwise halted; (f) withdrew an amount greater than $500,000.00 on or after June 21, 2023; or (g) is listed on Annex 1 hereto; *provided, however*, that Preference Claims for ordinary wages and compensation against the Released Employees shall constitute Released Preference Claims, and Preference Claims for ordinary wage and compensation payments to Current Employees shall constitute Released Preference Claims. **The Debtors, the Committee, and the DIP Lender are continuing to discuss the scope of the Released Preference Claims, as well as a list of parties to be included on Annex 1, which list of parties will be filed as part of an amendment to the Plan Supplement.**

director, officer, independent contractor, advisor, vendor, employee, customer, service provider, or agent of any of the Debtors, or any party that provided financial accommodations, goods, or services of any kind to any Debtor, other than, for the avoidance of doubt, any Released Party, subject to Article 6.9 of the Plan; (iii) claims and Causes of Action related to transactions, purchase, sale, deposit, and/or withdrawal of digital assets, including transactions to fund the shortfall related to the 98f Wallet, against any party other than, for the avoidance of doubt, any Released Party; (iv) claims and Causes of Action under chapter 5 of the Bankruptcy Code and any state law analogs, or for equitable subordination, unjust enrichment, or any other equitable remedies, on account of distributions from the 98f Wallet.

5.  Any and all Non-Released D&O Claims, including for illustrative purposes and without limitation, claims and Causes of Action sounding in negligence, gross negligence, willful misconduct, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conversion, fraud, fraudulent transfer, unjust enrichment, breach of contract, unfair competition, misappropriation of intellectual property, interference with prospective economic advantage, or any other Cause of Action against any current or former director, officer, or employee of the Debtors (including the Non-Released D&O the Former Directors and Officers), other than, for the avoidance of doubt, any Released Party, and subject to Article 6.9 of the Plan.

6.  Any and all claims and Causes of Action concerning spoliation of evidence.

7.  Any and all claims and Causes of Action against entities that provide liquidity, accessibility, and/or trading services, including, without limitation, liquidity providers.

8.  Any and all claims and Causes of Action related to agreements and contracts, to which any of the Debtors is or was a party or pursuant to which any of the Debtors has any rights whatsoever (regardless of whether such agreement or contract is specifically identified in the Plan, the Plan Supplement, or any amendments thereto), including claims and Causes of Action (a) for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff, (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations, (c) for failure to fully perform or to condition performance on additional requirements under contracts or leases with the Debtors before the assumption or rejection, if applicable, of such contracts or leases, (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party, (e) for any liens, including mechanic's, artisan's, materialman's, possessory, or

statutory liens held by the Debtors, (f) arising out of environmental or containment exposure matters against landlords, lessors, environmental, consultants, environmental agencies, or suppliers of environmental services or goods, (g) counter-claims and defenses related to any contractual obligations, (h) any turnover actions arising under sections 542 or 543 of the Bankruptcy Code, (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims, and (j) any and all indemnification rights.

9.      Any and all claims and Causes of Action concerning the issue of whether any particular assets are property of the Debtors' estates.

10.     Any and all claims and Causes of Action concerning actual and/or constructive fraudulent transfer(s).

11.     Any and all claims and Causes of Action related to accounts receivable and accounts payable.

12.     Any and all claims and Causes of Action related to audits conducted of the Debtors.

13.     Any and all claims and Causes of Action, including defenses, against any Governmental Unit, including any regulatory body involved in any way in the operation of the Debtors prior to the Effective Date.

14.     Any and all claims and Causes of Action related to insurance policies, insurance contracts, and/or surety bonds to which the Debtors are or were a party or pursuant to which the Debtors have any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, the Plan Supplement, or any amendments thereto, including, without limitation, claims and Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, indemnity, contribution, reimbursement, or any other matters.

15.     Any and all claims and Causes of Action related to tax obligations and refunds.

16.     Any and all claims and Causes of Action related to any type of deposit, prepayment, retainer, or collateral, regardless of whether such posting of deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral is specifically identified herein.

17.     Any and all claims and Causes of Action based in whole or in part upon any and all liens, regardless of whether such lien is specifically identified herein.

18.     Any and all claims and Causes of Action concerning setoff, regardless of whether such setoff rights are specifically identified herein.

19.     Any and all claims and Causes of Action against or involving any Person or Entity that owed any legal duty, no matter how arising, to any Debtor.

20.     Any and all claims and Causes of Action against or involving agents, service providers, vendors, independent contractors, or any party that provided financial accommodations, goods, or services of any kind to any Debtor.

21.     Any and all claims and Causes of Action against or involving entities that have filed, or may file, a proof of claim or request for payment of administrative expenses in these Chapter 11 Cases.

22.     Any and all claims and Causes of Action concerning the Debtors' ownership of equity in any Entity.

23.     Any and all other Causes of Action of the Debtors and/or the Debtors' Estates that are not Excluded Causes of Action, including without limitation, any and all claims, defenses, cross claims, and counterclaims against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial.

# EXHIBIT D

## Identity of Wind-Down Debtor

## **Wind-Down Debtors**

1.  Prime Core Technologies Inc.

2.  Prime Trust, LLC

**<u>EXHIBIT E</u>**

**Plan Administrator Agreement**

# PLAN ADMINISTRATOR AGREEMENT

This Plan Administrator Agreement (as it may be amended, modified, supplemented, or restated from time to time, this "Agreement" or the "Plan Administrator Agreement") dated as of [•], is made and entered into by and among the entities listed as "Debtors" on the signature pages hereto (each, a "Debtor"), and David Dunn, solely in his capacity as Plan Administrator for purposes of this Agreement (the "Plan Administrator"), and is executed in connection with and pursuant to the terms of the *Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* filed on October 5, 2023 [Docket No. 258] (as it may be amended, modified, supplemented, or restated from time to time, the "Plan").[1]

# RECITALS

WHEREAS, on August 14, 2023, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and their chapter 11 cases are being jointly administered as *In re: Prime Core Technologies Inc., et al.,* Case No. 23-11161 (JKS);

WHEREAS, on August 29, 2023, the United States Trustee for Region 3 (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors of the Debtors (the "Committee");[2]

WHEREAS, the Plan contemplates that a Plan Administrator will be appointed to perform its duties in accordance with the Plan and this Agreement;

WHEREAS, the Plan provides that the Plan Administrator will, among other things, retain, preserve, administer, and distribute certain assets of the Wind-Down Debtor[3] for the benefit of Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date;

WHEREAS, on [•], 2023, the Bankruptcy Court entered an order ("Confirmation Order")[4] confirming the Plan, which became effective on [•] ("Effective Date");

WHEREAS, this Agreement is entered into in accordance with, and to facilitate the implementation and execution of the Plan;

WHEREAS, on the Effective Date of the Plan, the Plan Administrator shall be appointed in accordance with the Plan;

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[2]   Docket No. 51.

[3]   References herein to the Wind-Down Debtor as a singular entity are without prejudice to the ability of the Debtors and/or the Plan Administrator to select multiple Debtors to serve as Wind-Down Debtors, as permitted by the Plan.

[4]   Docket No [•].

WHEREAS, the Plan provides that the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan;

NOW, THEREFORE, in accordance with the Plan and the Confirmation Order, and in consideration of the promises, and the mutual covenants and agreements of the Parties contained in the Plan and herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties agree and declare as follows:

## RECITALS, INTERPRETATION, AND CONSTRUCTION

1.1      <u>Recitals</u>. The Recitals are incorporated into and made terms of this Agreement.

1.2      <u>Interpretation; Headings</u>. All references herein to specific provisions of the Plan or Confirmation Order are without exclusion or limitation of other applicable provisions of the Plan or Confirmation Order. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Agreement.

1.3      <u>Construction of Agreement</u>. This Agreement shall not be construed to impair or limit in any way the rights of any Person under the Plan.

1.4      <u>Conflict Among Plan Documents</u>. In the event of any inconsistency between the terms of this Agreement and the terms of the Plan or the Confirmation Order, the terms of the Confirmation Order and Plan shall govern and control (in that order). In the event of any inconsistency between the authority given to the Wind-Down Debtor Oversight Committee pursuant to Article VI of this Agreement and any authority given to any other party pursuant to this Agreement, Article VI shall control and take precedence; provided, however, that in the event of any inconsistency between the authority given to the Majority Member pursuant to Article VI of this Agreement and any authority given to any other party pursuant to this Agreement, the authority given to the Majority Member shall control and take precedence.

1.4.1    The Plan provides for the opportunity to establish a Litigation Trust pursuant to that PCT Litigation Trust Agreement filed with the Plan Supplement, and further provides that the Plan Administrator and the Litigation Trustee shall be the same person and that the Litigation Trust Oversight Committee shall be comprised of the same members as the Wind-Down Debtor Oversight Committee. To the extent that a Litigation Trust is established, it is understood and anticipated that in the event of any inconsistency with this Agreement, the rights and powers of the Litigation Trustee as identified therein shall control.  For the avoidance of doubt, no provision of this Agreement is intended to authorize any party to act in connection with the administration of the Litigation Trust.

1.4.2    For the avoidance of doubt, following satisfaction in full of the DIP Loans pursuant to the Plan, the rights of the Majority Member provided at Section 6.7 hereof, and all other rights granted to the DIP Lender herein (to the extent the DIP Lender acts in its capacity as such, and without prejudice to the rights of the party identified as DIP Lender as a Holder of an

Allowed Claim other than any DIP Claims) shall terminate, and this Agreement shall be interpreted to exclude all references to authority granted to the Majority Member or DIP Lender.

## ARTICLE II
## ACCEPTANCE OF POSITION; OBLIGATION TO PAY CLAIMS; AND FIDUCIARY STATUS

2.1     Acceptance. (a) David Dunn hereby accepts appointment as the Plan Administrator; and (b) David Dunn agrees to observe and perform all duties and obligations imposed upon the Plan Administrator under the Plan, this Agreement, or other orders of the Bankruptcy Court, and applicable law.

2.2     Fiduciary. The Plan Administrator shall perform its obligations consistent with the Plan, this Agreement, applicable orders of the Bankruptcy Court, and applicable law. Subject to Sections 1.4 and 3.3 hereof, on and after the Effective Date, the Plan Administrator shall be the sole officer and director of the Wind-Down Debtor.  The Plan Administrator shall hold the equity of the Wind-Down Debtor, to the extent that any new equity is issued, in an agency capacity, for the benefit of and to facilitate the rights of Holders of Claims provided under the Plan. The Plan Administrator shall act for the Wind-Down Debtor in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions in the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of each Debtor shall be deemed to have terminated, and such directors and officers shall be deemed to have resigned, solely in their capacities as such. Subject to Sections 1.4 and 3.3 hereof, from and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors and the Wind-Down Debtor. For the avoidance of doubt, the foregoing shall not limit the authority of the Plan Administrator to continue the employment of any former director, officer, or employee.

## ARTICLE III
## GENERAL POWERS, RIGHTS AND OBLIGATIONS OF THE PLAN ADMINISTRATOR

3.1     Rights, Powers, and Privileges of the Plan Administrator Generally. Effective as of the Effective Date, the Plan Administrator is appointed under the Plan for purposes of implementing the terms and conditions of the Plan with respect to (i) effectuating the transactions beneficial and necessary to wind down the Debtors and the Wind-Down Debtor, (ii) administration of, and distributions with respect to, the claims asserted against the Debtors, (iii) solely to the extent that the Litigation Trust is not established, pursuing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant the Plan, and subject to the limitations set forth in the Plan, and (iv) such other matters agreed to by each Debtor and Plan Administrator in accordance with the terms of the Plan (collectively, the "Plan Administrator Responsibilities"), in each case, subject to the terms and conditions set forth in this Agreement, the Plan, and the Confirmation Order. The Plan Administrator, the Litigation Trustee, and/or a Distribution Agent are hereby authorized to make all disbursements and distributions under the Plan, subject to the terms and conditions set forth in this Agreement, the Plan, and the Confirmation Order.  The Debtors and the Wind-Down Debtor shall be managed, administered,

3

and wound down by the Plan Administrator in accordance with the terms of the Plan, in consultation with and subject to the rights and powers of the Wind-Down Debtor Oversight Committee (including, as applicable, the Majority Member) established pursuant to this Agreement (the "Wind-Down Debtor Oversight Committee") as set forth in this Agreement, and the Plan Administrator shall have full authority to administer the provisions of the Plan, subject to the terms and conditions of this Agreement, the Plan, and the Confirmation Order.  The Plan Administrator shall be deemed to be a judicial substitute and estate representative for each Debtor as the party-in-interest in these Chapter 11 Cases, under the Plan, or in any judicial proceeding or appeal that may directly or indirectly affect the Wind-Down Debtor Assets or their value, or that may recover or liquidate Wind-Down Debtor Assets. The Plan Administrator shall be deemed a "representative" of the estate as contemplated by Bankruptcy Code section 1123(b)(3)(B), and performance of certain services in connection with this Agreement shall be authorized by the execution of this Agreement to the extent not already authorized by the Plan or the Confirmation Order. In addition, the Plan Administrator shall have the rights and powers of a debtor in possession under section 1107 of the Bankruptcy Code and shall be vested with the rights, powers, and benefits afforded to a "trustee" under sections 704 and 1106 of the Bankruptcy Code.

      3.1.1   <u>Power to Contract; Attorney-in-Fact</u>. In furtherance of the purpose of each Debtor and the Wind-Down Debtor, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Plan Administrator is hereby irrevocably appointed as the attorney-in-fact for each Debtor and the Wind-Down Debtor, with full power of substitution, and with full power and authority, in the place and stead of each Debtor and the Wind-Down Debtor, or in the Plan Administrator's own name, for the purposes of carrying out the Plan, the Confirmation Order, and this Agreement and taking any action or executing any documents that may be necessary or useful to accomplish such purposes.  Without limiting the generality of the foregoing, the Plan Administrator may cause each Debtor or the Wind-Down Debtor to enter into any covenants or agreements binding each Debtor or the Wind-Down Debtor, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the Plan Administrator to be consistent with and advisable in furthering the purpose of the Plan or this Agreement.

      3.1.2   <u>Ultimate Right to Act Based on Advice of Counsel or Other Professionals</u>. Nothing in this Agreement shall be deemed to prevent the Plan Administrator from taking or refraining to take any action on behalf of each Debtor or the Wind-Down Debtor that, <u>based</u> upon the advice of counsel or other professionals, the Plan Administrator determines he is obligated to take or to refrain from taking in the performance of any duty under the Plan, Confirmation Order, or this Agreement.

      3.2   <u>Wind-Down Debtor Oversight Committee</u>. If a conflict arises that, in the opinion of the Plan Administrator, prevents the Plan Administrator from performing one or more of his duties, the Wind-Down Debtor Oversight Committee shall designate a member of the Wind-Down Debtor Oversight Committee (with such member's consent) to carry out such duties in the place of the Plan Administrator solely with respect to such conflict, subject to the rights of the Majority Member as set forth in Article VI below. During such time as Wind-Down Debtor Oversight Committee member is acting as Plan Administrator, such member shall not be entitled to vote on matters requiring Wind-Down Debtor Oversight Committee approval and the voting provisions set forth in Article VI hereof shall apply.

3.3     Powers of Plan Administrator. The Plan Administrator shall provide the post-Effective Date administration, wind down, dissolution, and liquidation services related to the Plan Administrator Responsibilities that are necessary, required, desirable, or advisable to effectuate the terms and conditions of the Plan and the wind down of each Debtor and the Wind-Down Debtor, in consultation and with the authority of the Wind-Down Debtor Oversight Committee as required by this Agreement and the Plan. Subject to the oversight and direction of the Wind-Down Debtor Oversight Committee set forth herein and in Article VI of this Agreement, the Plan Administrator shall have all duties, powers, and rights set forth herein, in the Plan, and in the Confirmation Order, including but not limited to, all powers and duties incidental to the following services related to each Debtor and the Wind-Down Debtor:

    3.3.1   taking such actions as are necessary to form the Wind-Down Debtor, and making distributions contemplated by the Plan;

    3.3.2   marshalling, marketing for sale, liquidating, selling, and winding down any of the Debtors' assets constituting Wind-Down Debtor Assets;

    3.3.3   overseeing the accounts of the Debtors and the Wind-Down Debtor and the wind down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum, as applicable;

    3.3.4   receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets;

    3.3.5   opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separating bank accounts for each of the Debtors;

    3.3.6   entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Plan Administrator Agreement, and to perform all obligations thereunder;

    3.3.7   solely to the extent that the Litigation Trust is established, taking such actions as are necessary to vest any Vested Causes of Action in the Litigation Trust;

    3.3.8   subject to the rights and duties of the Litigation Trustee in all respects, protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Vested Causes of Action) vested in the Wind-Down Debtor and Plan Administrator by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

    3.3.9   standing in the same position as the Debtors with respect to any claim the Debtors, their Estates, and/or the Wind-Down Debtor may have as to any attorney-client privilege, the work-product doctrine, or any other privilege attaching to any documents or communications (whether written or oral), and succeed to all of the rights of the Debtors, their Estates, and/or the Wind-Down Debtor to preserve, assert, or waive any such privilege;

    3.3.10  subject to the rights and duties of the Litigation Trustee in all respects, investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action;

3.3.11  seeking the examination of, and examining, any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

3.3.12  retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable compensation thereof, including, for the avoidance of doubt and in the discretion of the Plan Administrator, any third-party Distribution Agent, subject to the Initial Wind-Down Budget and solely from the Wind-Down Reserve except as otherwise provided in Section 3.10 below;

3.3.13  paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets, subject to the Initial Wind-Down Budget and solely from the Wind-Down Reserve except as otherwise provided in Section 3.10 below;

3.3.14  solely to the extent that the Litigation Trust is not established, reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action;

3.3.15  acquiring and prosecuting all litigation, claims, and Causes of Action held by any Holder against any Person (other than the Debtors) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Holder in their capacity as a creditor of the Debtors;

3.3.16  reviewing and compelling turnover of the Debtors' or the Wind-Down Debtor's property, including undertaking any and all actions to recover access to the 98f Wallet;

3.3.17  calculating and making all Distributions to the Holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to Holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement; provided that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make Distributions from the Wind-Down Debtor's Assets to the Holders of Claims and Interests (if applicable) against that specific Debtor;

3.3.18  establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve, subject to the Initial Wind-Down Budget and solely from the Wind-Down Reserve except as otherwise provided in Section 3.10 below;

3.3.19  withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under any income tax or other laws of the United States or of any state or political subdivision thereof;

3.3.20  in reliance upon any of the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor;

3.3.21 making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of each Debtor or the Wind-Down Debtor, and filing tax returns for each Debtor or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of each Debtor or the Wind-Down Debtor, as applicable; *provided, however*, that notwithstanding any other provision of this Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of each Debtor's income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

3.3.22 abandoning or donating to a charitable organization qualifying under section 501(c)(3) of the IRC any of the Wind-Down Debtor's Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

3.3.23 seeking a determination of tax liability or refund under Bankruptcy Code section 505;

3.3.24 establishing reserves for taxes, assessments, and other expenses of administration of each Debtor or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to each Debtor or the Wind-Down Debtor;

3.3.25 paying the Wind-Down Debtor's Expenses, subject to the Initial Wind-Down Budget and solely from the Wind-Down Reserve except as otherwise provided in Section 3.10 below;

3.3.26 if the Plan Administrator, in its sole discretion, deems it appropriate, to seek to establish a bar date for Filing Proofs of Interest in any Debtor or otherwise determine the Holders and extent of Allowed Interests in any Debtor;

3.3.27 filing and prosecuting any objections to Claims or Interests, including Professional Fee Claims, or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan;

3.3.28 purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs, subject to the Initial Wind-Down Budget and solely from the Wind-Down Reserve except as otherwise provided in Section 3.10 below;

3.3.29 undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out each Debtor's, the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, as applicable, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

3.3.30 retaining, terminating, appointing, or hiring employees, personnel, management, and directors of each Debtor to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without limitation, to address any disputes between the Debtors;

3.3.31 exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement;

3.3.32  subject to Section 3.10 below, obtaining additional funding for purposes of fulfilling the Plan Administrator's duties under the Plan, the Confirmation Order, and this Agreement; and

3.3.33  taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer each Debtor and the Wind-Down Debtor.

3.4     <u>Authority to Pursue Vested Causes of Action</u>. On the Effective Date, all property constituting the Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred to or vested in the Litigation Trust or otherwise, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. The Wind-Down Debtor shall be vested with and entitled to assert all setoffs and defenses of each Debtor or the Wind-Down Debtor to any counterclaims that may be asserted by any defendant with respect to any Vested Cause of Action. The Wind-Down Debtor shall also be vested with and entitled to assert all of each Debtors' and the Estates' rights with respect to any such counterclaims, under Bankruptcy Code section 558. All costs and expenses of pursuing the Vested Causes of Action shall be satisfied solely from the Wind-Down Reserve, subject to Section 3.10 below.  For the avoidance of doubt, the Plan Administrator (and, to the extent delegated and/or assigned by the Plan Administrator, any Litigation Trustee) shall stand in the same position as the Debtors, their Estates, and/or the Wind-Down Debtor as to all evidentiary privileges of any type or nature whatsoever, including attorney-client privilege, the work product privilege or doctrine, any other privilege attaching to any documents or communications (whether written or oral), and any other applicable evidentiary privileges of each Debtor, Estate, and Wind-Down Debtor, and shall succeed to all of the rights of the Debtors, their Estates, and/or the Wind-Down Debtor to preserve, assert, or waive any such privilege, and shall be deemed to be the assignee by each Debtor, its Estate, and the Wind-Down Debtor of each such privilege as of the Effective Date.

3.4.1    Solely to the extent that the Litigation Trust is not established, the Plan Administrator shall have the exclusive right, power, and interest to review, reconcile, enforce, collect, compromise, settle, or elect not to pursue the Vested Causes of Action on behalf of the Wind-Down Debtor.  If the Litigation Trust is established, on the Effective Date, the Vested Causes of Action shall vest in the Litigation Trust free and clear of all Claims, Interests, Liens, and other encumbrances. All provisions of the Plan regarding rights, powers, duties, and obligations vested in the Plan Administrator with respect to such Vested Causes of Action, including, but not limited to, all provisions in Article 6.10 hereof, shall instead be vested in the Litigation Trust.

3.5     <u>Authority to Enter into Settlement Agreements</u>. Solely to the extent that the Litigation Trust is not established, the Plan Administrator shall have the exclusive right to enter into settlements regarding the Vested Causes of Action, without requiring court approval, subject to obtaining approval from the Wind-Down Debtor Oversight Committee and the Majority Member for any such action as set forth in Article VI hereof.

3.5.1    <u>Authority to Litigate Preference Claims</u>. For the avoidance of doubt and notwithstanding any other provision hereof, provided that the Litigation Trust is not established, the Plan Administrator, in its business judgment, and subject to the approval of the Wind-Down

Debtor Oversight Committee and the Majority Member as may be required pursuant to Article VI hereof, shall have the exclusive right to determine whether and to what extent to prosecute any Vested Cause of Action under section 547 of the Bankruptcy Code, including within the Plan Administrator's discretion, subject to obtaining approval from the Wind-Down Debtor Oversight Committee and the Majority Member for any such action as set forth in Article VI hereof, by and through the implementation of omnibus amnesty or settlement procedures.

        3.5.2   <u>Abandonment</u>. If, in the Plan Administrator's reasonable judgment, subject to obtaining approval from the Wind-Down Debtor Oversight Committee and the Majority Member for any such action as set forth in Article VI hereof, the Wind-Down Debtor Assets cannot be sold in a commercially reasonable manner or the Plan Administrator believes in good faith that such property has inconsequential value, the Plan Administrator shall have the right, subject to obtaining approval from the Wind-Down Debtor Oversight Committee and the Majority Member for any such action as set forth in <u>Article</u> VI hereof, to cause the Wind-Down Debtor to abandon or otherwise dispose of such property, including by donation of such property to a charitable organization.

    3.6   <u>Responsibility for Administration of Claims</u>. From and after the Effective Date, the Plan Administrator shall be responsible for administering and paying Distributions to the holders of Allowed Claims and (if applicable) Allowed Interests. The Plan Administrator shall have the exclusive right on behalf of the Wind-Down Debtor, the Debtors and their Estates to object to the allowance of any Claim or Interest on any ground, to file, withdraw, or litigate to judgment objections to Claims or Interests, to settle or compromise any Disputed Claims or Disputed Interests without any further notice to or action, order, or approval by the Bankruptcy Court, and to assert all defenses of each Debtor and their Estates. The Plan Administrator may seek estimation of any Claims under and subject to Bankruptcy Code section 502(c).

    3.7   <u>Agents and Professionals</u>. The Plan Administrator may, but shall not be required to, consult with and retain attorneys, financial advisors, accountants, appraisers, and other professionals the Plan Administrator believes have qualifications necessary to assist in the administration of the Wind-Down Debtor, including professionals previously retained by each Debtor or the Committee. For the avoidance of doubt, and without limitation of applicable law, nothing in this Agreement shall limit the Plan Administrator from engaging counsel or other professionals, including the Plan Administrator himself, to do work for the Wind-Down Debtor. Subject to Section 3.10, the Plan Administrator may pay the reasonable salaries, fees, and expenses of such Persons out of the Wind-Down Reserve in the ordinary course of business.

    3.8   <u>Maintenance and Disposition of Wind-Down Debtor's Records</u>. The Plan Administrator shall maintain accurate records of the administration of the Wind-Down Debtor Assets, including receipts and disbursements and other activity of the Wind-Down Debtor. The Plan Administrator may, but has no obligation to, engage a claims agent (including, but not limited to, the Claims Agent) to continue to maintain and update the Claims Register maintained in the Chapter 11 Cases throughout the administration of the Wind-Down Debtor. The Plan Administrator shall be provided with originals or copies of or access to all documents and business records of each Debtor that are in the possession of each Debtor or its professionals and reasonably necessary for the administration and disposition of the Wind-Down Debtor Assets and objections to Claims or (if applicable) Interests. The Debtors and the Wind-Down Debtor shall use commercially reasonable efforts to cooperate with the Plan Administrator in connection with the

Plan Administrator's investigation and prosecution of the Vested Causes of Action and objections to Claims and Interests, as applicable, including with respect to providing evidence and information as reasonably requested by the Plan Administrator. Nothing in the Plan or the Confirmation Order shall affect the obligations of the Debtors, the Wind-Down Debtor, or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

3.9     Reporting Requirements. The Plan Administrator shall maintain books and records relating to the administration of the Wind-Down Debtor Assets and the Distributions by the Plan Administrator of the proceeds therefrom in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Plan Administrator shall also maintain books and records relating to the administration of the Wind-Down Debtor Assets, the income and expenses of the Wind-Down Debtor, and the payment of expenses of and liabilities of, claims against or assumed by, the Wind-Down Debtor in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  Except as otherwise provided herein or in the Plan, nothing in this Agreement requires the Plan Administrator to file any accounting or seek approval of any court with respect to the administration of the Wind-Down Debtor, or as a condition for making any payment or distribution out of the Wind-Down Debtor Assets.  The Plan Administrator shall provide the Wind-Down Debtor Oversight Committee and the DIP Lender with access to such books and records referenced herein upon request.

3.10     Funding. On the Effective Date, the Wind-Down Reserve shall vest in the Wind-Down Debtor.  All expenses incurred to administer the Wind-Down Debtor Assets and otherwise perform any rights, duties, and obligations by the Plan Administrator, the Debtors, the Wind-Down Debtor, and any Litigation Trust and Litigation Trustee shall be paid exclusively from the Wind-Down Reserve (and not from the Wind-Down Debtor Assets) in accordance with the Initial Wind-Down Budget.  Notwithstanding the foregoing, subject to obtaining approval from the Wind-Down Debtor Oversight Committee and the Majority Member as set forth in Article VI hereof with respect to the terms of such counsel's engagement, any contingency fees of any counsel retained by the Plan Administrator to pursue Vested Causes of Action may be paid from the proceeds of such Vested Causes of Action.  Subject to obtaining approval from the Wind-Down Debtor Oversight Committee and the Majority Member as set forth in Article VI hereof, the Plan Administrator may obtain further funding, which shall be added to the Wind-Down Reserve, in order to perform its duties under the Plan, the Confirmation Order, and this Agreement.  In the event the Plan Administrator obtains additional funding pursuant to this Section 3.10, the Plan Administrator shall obtain the consent of the Wind-Down Debtor Oversight Committee and the consent of the Majority Member, not to be unreasonably withheld, pursuant to Article VI hereof to modify the Initial Wind-Down Budget with respect to the use of such additional funding.

## ARTICLE IV
## DISTRIBUTIONS

4.1     Reserves; Pooling of Reserved Funds. On the Effective Date, the Plan Administrator shall, in his reasonable discretion but subject to the Initial Wind-Down Budget,

establish the Wind-Down Reserve and the Litigation Trust, as applicable. The Plan Administrator shall also establish a Disputed Claims Reserve in accordance with the Plan. For the avoidance of doubt, the Plan Administrator may withhold any Distribution pending the Plan Administrator's determination of whether to object to any Claim or Interest. Any such withheld distribution shall become part of the Disputed Claims Reserve and shall be distributed to the appropriate claimholder, at the time and in the manner that the Plan Administrator makes distributions to similarly situated Holders of Allowed Claims or Interests, after a decision is made not to object to the pertinent Claim or Interest, or the Claim or Interest becomes Allowed. The Plan Administrator need not maintain the Wind-Down Debtor's reserves in segregated bank accounts and may pool funds in the reserves with each other and other funds of the Wind-Down Debtor; *provided*, *however*, that the Wind-Down Debtor shall treat all such reserved funds as being held in a segregated manner in its books and records, by use of book entries, subledgers, or other means of recognizing the separateness of non-consolidated estates, such that the Wind-Down Debtor will be able to account for all distributions under the Plan separately for each Debtor, as expressly contemplated by the Plan.

4.2     Plan Distributions in General. Except as otherwise provided in the Plan, the Plan Administrator shall cause, on their own or by and through any third-party Distribution Agent selected pursuant to the authority granted herein, the Wind-Down Debtor to make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

4.3     Record Date of Distributions. On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests. The Plan Administrator shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure Claim or disputes over any Cure Claim, neither the Debtors, the Wind-Down Debtor, nor the Plan Administrator shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Claim.

4.4     Tax Identification Numbers. The Plan Administrator may require any Holder of any Claim or Interest to furnish its taxpayer identification number as assigned by the Internal Revenue Service, including without limitation by providing an executed current Form W-9, Form W-8 or similar tax form, as a prerequisite to receiving any distribution under the Plan or this Agreement. If a Holder does not timely provide the Plan Administrator with its taxpayer identification number in the manner and by the deadline established by the Plan Administrator and/or the Plan, the Holder shall be deemed to have forfeited its right to any current, reserved or future distributions provided for under the Plan and such Holder's Claim or Interest shall be disallowed and expunged without further order of the Bankruptcy Court. Any such forfeited distribution shall be deemed to have reverted back to the Wind-Down Debtor for all purposes, including for distributions to other Holders of Allowed Claims or Allowed Interests (as applicable) against the particular Debtor in respect of which the forfeited distribution was made, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property law to the contrary.

11

4.5     Unclaimed and Undeliverable Distributions. If any distribution to a Holders of any Claim or Interest is returned to the Plan Administrator as undeliverable and/or otherwise remains unclaimed, the Plan Administrator shall use reasonable efforts to contact such Holder; *provided* that no further Plan Distributions to such Holder shall be made unless and until the Plan Administrator has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, further*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date of the first undeliverable and/or unclaimed distribution to such Holder. A distribution shall be deemed unclaimed if a Holder has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Wind-Down Debtor of an intent to accept a particular distribution; (c) responded to requests by the Wind-Down Debtor for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

After the passage of the deadline set forth in Article VII of the Plan, such distribution shall be deemed unclaimed property under Bankruptcy Code section 347(b) and all title to and beneficial interest in such undeliverable Distribution shall revert to or remain in the Wind-Down Debtor automatically and without any need for further order by the Bankruptcy Court, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary, and shall be distributed in accordance with this Article IV and the Plan.

4.6     No Responsibility to Attempt to Locate Creditors. The Plan Administrator may, in his sole discretion, attempt to determine a Holder's current address or otherwise locate a Holder, but nothing in this Agreement or the Plan shall require the Plan Administrator to do so.

4.7     Disallowance of Claims and Interests. All Claims in respect of undeliverable or unclaimed Distributions that have been deemed to have reverted back to the Wind-Down Debtor for all purposes (including, but not limited to, for distribution to holders of other Allowed Claims or Allowed Interests, as applicable, against the particular Debtor in respect of which the unclaimed or undeliverable distribution was made) pursuant to Article VII of the Plan shall be deemed disallowed and expunged without further action by the Wind-Down Debtor or Plan Administrator and without further order of the Bankruptcy Court. The Holder of any such disallowed Claim or Interest shall no longer have any right, claim, or interest in or to any distributions in respect of such Claim or Interest, and further, such Holder is forever barred, estopped, and enjoined from receiving any distributions under the Plan or this Agreement and from asserting such disallowed Claim or Interest against the Wind-Down Debtor.

4.8     Inapplicability of Escheat, Abandoned, or Unclaimed Property Laws.  Unclaimed property held by the Wind-Down Debtor shall not be subject to the escheat, abandoned or unclaimed property laws of the United States, any state, any local or any foreign governmental unit.

4.9     Delivery of Distributions.  Subject to the terms of this Agreement, the Plan Administrator shall cause the Wind-Down Debtor to make Distributions to Holders in the manner provided in the Plan.

## ARTICLE V
## THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY

5.1     Parties Dealing with the Plan Administrator. In the absence of actual knowledge to the contrary, any Person dealing with the Wind-Down Debtor or the Plan Administrator shall be entitled to rely on the authority of the Plan Administrator or any of the Plan Administrator's agents to act in connection with the Wind-Down Debtor Assets. There is no obligation of any Person dealing with the Plan Administrator to inquire into the validity or expediency or propriety of any transaction by the Plan Administrator or any agent of the Plan Administrator.

5.2     Limitation of Liability. In exercising the rights granted herein, the Plan Administrator shall exercise the Plan Administrator's best judgment with respect to the affairs of the Wind-Down Debtor and the interests of creditors. However, notwithstanding anything herein to the contrary, neither (a) the Plan Administrator; (b) the Wind-Down Debtor Oversight Committee including the Majority Member; (c) the DIP Lender; nor (d) their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Debtor Party" and collectively, the "Wind-Down Debtor Parties") shall be liable for losses, claims, damages, liabilities, or expenses in connection with the affairs of the Wind-Down Debtor or for the act or omission of any other Wind-Down Debtor Party, nor shall the Wind-Down Debtor Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Plan Administrator Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's criminal conduct, willful misconduct, gross negligence, or actual fraud. Subject to this Plan Administrator Agreement, the Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities, and privileges applicable to a chapter 7 trustee, and the Wind-Down Debtor Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.

5.3     No Liability for Acts of Predecessors. No successor Plan Administrator shall be in any way responsible for the acts or omissions of any Plan Administrator in office prior to the date on which such successor becomes the Plan Administrator unless a successor Plan Administrator expressly assumes such responsibility.

5.4     No Liability for Good Faith Error of Judgment. The Plan Administrator shall not be liable for any error of judgment made in good faith, unless it shall be determined by a final judgment of a court of competent jurisdiction (not subject to further appeal or review) that the Plan Administrator was grossly negligent in ascertaining the pertinent facts.

5.5     Reliance on Documents and Advice of Counsel or Other Persons. The Plan Administrator, the Majority Member, or the Wind-Down Debtor Oversight Committee, as applicable, may, in connection with the performance of their respective functions, and in their respective sole and absolute discretion, consult with their respective attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Plan Administrator, the Majority Member, nor the Wind-Down Debtor Oversight Committee shall be under any obligation to consult with their respective attorneys, accountants, financial

advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Administrator, the Majority Member, the Wind-Down Debtor Oversight Committee, or their respective members and/or designees, unless such determination is based on criminal conduct, willful misconduct, gross negligence, or actual fraud.

5.6     No Liability for Acts Approved by Bankruptcy Court. The Plan Administrator shall have the right at any time to seek instructions from the Bankruptcy Court concerning the administration or disposition of the Wind-Down Debtor and Creditors Litigation Trust, as applicable. The Plan Administrator, the Majority Member, and the Wind-Down Debtor Oversight Committee shall not be liable for any act or omission that has been approved by the Bankruptcy Court, and all such actions or omissions shall conclusively be deemed not to constitute fraud, gross negligence, or willful misconduct.

5.7     No Personal Obligation for Wind-Down Debtor's Liabilities. Persons dealing or having any relationship with the Wind-Down Debtor Parties shall have recourse only to the Wind-Down Debtor Assets and shall look only to the Wind-Down Debtor Assets to satisfy any liability or other obligations incurred by the Wind-Down Debtor or the Wind-Down Debtor Parties to such Person in carrying out the terms of the Plan Administrator Agreement, and the Wind-Down Debtor Parties shall not have any personal obligation to satisfy any such liability.

5.8     Indemnification. The Wind-Down Debtor (on an attribution and/or allocation basis) shall indemnify and hold harmless the Wind-Down Debtor Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Debtor or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of criminal conduct, willful misconduct, gross negligence, or actual fraud. The foregoing indemnity in respect of any Wind-Down Debtor Party shall survive the termination of such Wind-Down Debtor Party from the capacity for which they are indemnified. The Bankruptcy Court shall hear and finally determine any dispute arising out of this Section 5.8.

5.8.1     Expense of Wind-Down Debtor; Limitation on Source of Payment of Indemnification. All indemnification liabilities of the Wind-Down Debtor under this Section 5.8 shall be expenses of the Wind-Down Debtor (on an attribution and/or allocation basis). The amounts necessary for such indemnification and reimbursement shall be paid by the Wind-Down Debtor out of the available Wind-Down Debtor Assets after reserving for all other actual and anticipated expenses and liabilities of the Wind-Down Debtor.

5.8.2     Procedure for Current Payment of Indemnified Expenses; Undertaking to Repay. The Wind-Down Debtor (on an attribution and/or allocation basis) shall promptly pay expenses reasonably incurred by any Wind-Down Debtor Party in defending, participating in, or settling any action, proceeding, or investigation in which such Wind-Down Debtor Party is a party or is threatened to be made a party or otherwise is participating in connection with this Agreement or the duties, acts or omissions of the Plan Administrator or otherwise in connection with the affairs

of the Wind-Down Debtor, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Debtor Party hereby undertakes, and the Wind-Down Debtor hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Wind-Down Debtor Party is not entitled to be indemnified therefor under the Plan Administrator Agreement.

  5.9 <u>No Implied Obligations</u>. Neither the Plan Administrator, the Majority Member, nor the Wind-Down Debtor Oversight Committee members shall be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Plan Administrator Agreement against any of them.

  5.10 <u>Confirmation of Survival of Provisions</u>. Without limitation in any way of any provision of this Plan Administrator Agreement, the provisions of this Article V shall survive the death, dissolution, liquidation, incapacity, resignation, replacement, or removal, as may be applicable, of the Plan Administrator, or the termination of the Wind-Down Debtor or this Plan Administrator Agreement and shall inure to the benefit of the Wind-Down Debtor Parties' heirs and assigns.

## ARTICLE VI
## WIND-DOWN DEBTOR OVERSIGHT COMMITTEE

  6.1 <u>Appointment, Composition, and Governance of Wind-Down Debtor Oversight Committee</u>. As provided for in Article VI of the Plan, the Wind-Down Debtor Oversight Committee shall consist of those initial members identified on **Exhibit A** hereto. The Wind-Down Debtor Oversight Committee shall consist of (a) not more than five (5) members (who shall be the members of the TOC as identified in and pursuant to the PCT Litigation Trust Agreement) (the "**UCC Members**")[5] plus (b) a majority member (the "**Majority Member**"), subject to Section 1.4.2. To the extent that a UCC Member of the TOC elects to resign from the Wind-Down Debtor Oversight Committee in accordance with Section 6.2.2 below or is removed pursuant to Section 6.2.3 below, a successor shall be appointed pursuant to Section 6.2.5.

  6.2 <u>Resignation/Removal of Oversight Committee Members</u>.

    6.2.1 Each member of the Wind-Down Debtor Oversight Committee shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2.2 below, (iii) his or her removal pursuant to Section 6.2.3 below, (iv) the winding up of the Wind-Down Debtors pursuant to Article VIII hereof, or (v) solely with respect to the Majority Member, the lapsing of the Majority Member position upon satisfaction of all DIP Claims as set forth at Section 6.7 hereof.

    6.2.2 A member of the Wind-Down Debtor Oversight Committee may resign at any time by written notice to the other members of the Wind-Down Debtor Oversight Committee and the Plan Administrator. Such notice shall specify a date when such resignation shall take effect, which shall not be less than thirty (30) days after the date such notice is given, where practicable.

---

[5] The initial members of the TOC shall be: [TBD].

6.2.3   A member of the Wind-Down Debtor Oversight Committee may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or, in the case of a UCC Member, a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause. Such removal may be made by the recommendation of the remaining members of the Wind-Down Debtor Oversight Committee with the approval of the Plan Administrator.

6.2.4   The initial Majority Member shall be Ruairi Donnelly. In the event of a vacancy in the position of the Majority Member for any reason, Polaris Ventures, a Swiss association, shall designate a replacement Majority Member.

6.2.5   If a UCC Member dies, resigns pursuant to Section 6.2.2 above, or is removed pursuant to Section 6.2.3 above, the vacancy shall be filled with an individual selected by a majority of the remaining Wind-Down Debtor Oversight Committee members with the approval of the Plan Administrator, provided however, that if the remaining Wind-Down Debtor Oversight Committee members and the Plan Administrator cannot agree on the successor the matter shall be resolved pursuant to Section 6.6 below.

6.2.6   Each successor Wind-Down Debtor Oversight Committee member shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2.2 above, (iii) his or her removal pursuant to Section 6.2.3 above, (iv) the lapsing of the Majority Member position upon the satisfaction of all DIP Claims, or (v) the winding up of the Wind-Down Debtors pursuant to Article VIII hereof.

6.2.7   No successor Wind-Down Debtor Oversight Committee member shall be liable personally for any act or omission of his or her predecessor Wind-Down Debtor Oversight Committee member. No successor Wind-Down Debtor Oversight Committee member shall have any duty to investigate the acts or omissions of his or her predecessor Wind-Down Debtor Oversight Committee member.

6.3     Fiduciary Duties. Members of the Wind-Down Debtor Oversight Committee shall have fiduciary duties to Holders of Allowed Claims and Interests in the same manner that members of an official committee of creditors appointed pursuant to Bankruptcy Code section 1102 have fiduciary duties to the constituents represented by such a committee, and shall be entitled to indemnification from each Wind-Down Debtor in the same manner as the Plan Administrator for service as members of the Wind-Down Debtor Oversight Committee from and after the Effective Date of the Plan under or in connection with this Agreement.

6.4     Limitations on Plan Administrator's Actions. In the event that the Litigation Trust is not established, the Plan Administrator shall obtain the approval of the Wind-Down Debtor Oversight Committee by at least a majority vote prior to taking any action regarding the compromise, resolution, settlement, or litigation of any Claim or Vested Cause of Action (as determined by the Plan Administrator in his sole discretion) where the face amount of the asserted Claim or Vested Cause of Action exceeds $500,000.  For the avoidance of doubt, in the event the Litigation Trust is established, the Plan Administrator shall have no authority with respect to the Vested Causes of Action.

6.5     Recusal.  Each member of the Wind-Down Debtor Oversight Committee shall recuse itself from taking any action otherwise permitted by this Agreement to the extent pertaining

16

directly and particularly to the administration, reconciliation, objection to, compromise, resolution, settlement, prosecution or litigation of, or Distribution upon, any Claim held by such member, or any affiliate, family member, majority-owned entity, agent, or other insider of such member, or the resolution, settlement, prosecution or litigation of any Vested Cause of Action against any such member, or any affiliate, family member, majority-owned entity, agent, or other insider of such member.

6.6    <u>Other Decision-making</u>.  The Wind-Down Debtor Oversight Committee may act by majority vote or resolution of those members who have not recused themselves, unless otherwise expressly stated herein.  The Wind-Down Debtor Oversight Committee shall otherwise be empowered to enact its own bylaws, including concerning resolution of decision-making disputes, provided that such bylaws do not contradict this Agreement, the Plan or the Confirmation Order.

6.7    <u>Majority Member Consent Rights</u>.  Notwithstanding any provision of the Plan, the Confirmation Order, or this Agreement to the contrary, from the Effective Date until such time as each Allowed DIP Claim has been paid in full in Cash (including all accrued and unpaid principal, interest, fees, expenses, and noncontingent indemnification obligations on account of the DIP Claim), the Wind-Down Debtor, the Plan Administrator and/or the Wind-Down Debtor Oversight Committee, as applicable, shall not take any of the following actions without the consent of the Majority Member, not to be unreasonably withheld:  (a) file a Removal Motion (as defined below); (b) appoint a successor Plan Administrator; (c) remove a member of the Wind-Down Debtor Oversight Committee; (d) appoint or replace any member of the Wind-Down Debtor Oversight Committee; (e) amend, restate, or otherwise modify the Initial Non-Released D&O Claim Budget or the Initial Wind-Down Budget; (f) modify the compensation provided to the Plan Administrator pursuant to this Agreement; (g) amend, restate, or otherwise modify this Agreement or any other documents identified in Article 6.7(b) of the Plan other than the PCT Litigation Trust Agreement; (h) implement any omnibus amnesty or settlement procedures as set forth in Section 3.5.1 above; (i) sell, lease, license, assign, or otherwise transfer any Wind-Down Debtor Assets with a value of $500,000 or more; (j) take any action regarding the compromise, resolution, settlement, or litigation of any Claim or Vested Cause of Action (as determined by the Plan Administrator in his sole discretion) where the face amount of the asserted Claim or Vested Cause of Action exceeds $500,000; (k) obtain additional funding, pursuant to Section 3.10 above, that is entitled to payment senior to or *pari passu* with the Allowed DIP Claim; (*l*) retain any attorneys, financial advisors, accountants, appraisers, and other professionals; (m) determine whether and to what extent to prosecute Vested Causes of Action, including Causes of Action pursuant to section 547 of the Bankruptcy Code; (n) abandon or otherwise dispose of any Wind-Down Debtor Asset that the Plan Administrator determines cannot be sold in a commercially reasonable manner or believes in good faith to have inconsequential value; and (o) seek to modify, amend, or obtain any other relief regarding any provisions of the Plan, Confirmation Order, this Agreement, or the other documents included in the plan supplement that would impact these Majority Member Consent Rights.

**ARTICLE VII**
**REMOVAL, REPLACEMENT AND COMPENSATION OF THE PLAN ADMINISTRATOR**

7.1      Initial Plan Administrator. The Initial Plan Administrator shall be David Dunn. The Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.

7.2      Term of Service. The Plan Administrator shall serve until: (a) the completion of the administration of the Wind-Down Debtor Assets and the Wind-Down Debtor, including the winding down of each of the Debtors and the Wind-Down Debtor, in accordance with this Agreement and the Plan; (b) the termination of the Wind-Down Debtor in accordance with the terms of this Agreement and the Plan; or (c) the Plan Administrator's resignation, death, dissolution, incapacity, liquidation, or removal. In the event that the Plan Administrator's appointment terminates by reason of resignation, death, dissolution, incapacity, liquidation, or removal, the Plan Administrator shall be immediately compensated for all reasonable fees and expenses accrued but unpaid through the effective date of termination, whether or not previously invoiced, subject to the terms of this Agreement. The provisions of Articles V through VII of this Agreement shall survive the resignation or removal of any Plan Administrator.

7.3      Removal of Plan Administrator for Cause: Upon a majority vote of the Wind-Down Debtor Oversight Committee, subject to Section 6.7 above, the Wind-Down Debtor Oversight Committee may seek to remove the Plan Administrator in the event the Plan Administrator becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause by filing a motion (the "Removal Motion") with the Bankruptcy Court upon not less than thirty (30) days prior written notice to the Plan Administrator, who, upon receipt of such written notice, shall have an opportunity to be heard. For purposes of this Agreement, "other good cause" means:

7.3.1    arrest or conviction (or plea of guilty or nolo contendere) of the Plan Administrator for any felony, or any other crime involving dishonesty or moral turpitude;

7.3.2    a finding by the Wind-Down Debtor Oversight Committee that the Plan Administrator engaged in fraud, self-dealing, intentional misrepresentation, willful misconduct, or a consistent pattern of neglect and failure to perform or participate in performing the duties of Plan Administrator hereunder; or

7.3.3    a determination, in good faith, by the Wind-Down Debtor Oversight Committee that the Plan Administrator has a material and direct conflict of interest, not previously disclosed or specifically waived in advance by the Wind-Down Debtor Oversight Committee, that prevents the Plan Administrator from performing a material portion of its obligations under this Agreement.

7.4      Resignation of Plan Administrator. The Plan Administrator may resign at any time upon no less than sixty (60) days' prior written notice to the Wind-Down Debtor Oversight Committee and the DIP Lender. The resignation shall be effective on the later of (i) the date specified in the notice of resignation or (ii) the date that a successor Plan Administrator is appointed pursuant to this Agreement. In the event of a resignation, the resigning Plan Administrator shall render to the Wind-Down Debtor Oversight Committee and the DIP Lender a

full and complete accounting of monies and assets received, disbursed, and held during the term of office of such Plan Administrator, and shall reasonably assist and cooperate in effecting the assumption of the duties by any successor Plan Administrator.

7.5    Appointment of Successor Plan Administrator. Upon the resignation, death, or removal of the Plan Administrator, the Wind-Down Debtor Oversight Committee shall appoint a successor, subject to Section 6.7 above. In the event the Wind-Down Debtor Oversight Committee does not seek the appointment of a successor Plan Administrator, the Majority Member may appoint a successor Plan Administrator.  In the event neither the Wind-Down Debtor Oversight Committee nor the Majority Member seek the appointment of a successor Plan Administrator, the Bankruptcy Court may do so on its own motion or on the motion of any party in interest. Any successor Plan Administrator so appointed (a) shall consent to and accept his, her, or its appointment as successor Plan Administrator, which may be done by e-mail or through acquiescence in not objecting to a motion for approval of his, her, or its appointment as successor Plan Administrator and (b) shall not have any liability or responsibility for the acts or omissions of any predecessor(s).

7.6    Powers and Duties of Successor Plan Administrator. A successor Plan Administrator shall have all the rights, privileges, powers, and duties of his, her, or its predecessor under this Agreement, the Plan, Confirmation Order and, and be bound by their terms.

7.7    Compensation of Plan Administrator and Costs of Administration. The Plan Administrator shall receive fair and reasonable compensation for his services in accordance with the terms and conditions of the Plan, which shall be a charge against and paid out of the Wind-Down Reserve and shall be subject to the Initial Wind-Down Budget. All costs, expenses, and obligations incurred by the Plan Administrator (or professionals who may be employed by the Plan Administrator in administering the Wind-Down Debtor, in carrying out its other responsibilities under this Agreement, or in any manner connected, incidental, or related thereto) shall be paid by the Wind-Down Debtor from the Wind-Down Reserve, subject to the Initial Wind-Down Budget. The terms of the compensation of the initial Plan Administrator are set forth on **Exhibit B** hereto. The Wind-Down Debtor Oversight Committee, subject to Section 6.7 above, may modify the Plan Administrator's compensation as agreed by a majority vote.

## ARTICLE VIII
## CLOSING OF THE CHAPTER 11 CASES

8.1    Termination. When each of the following have occurred or will have occurred by the hearing on a motion to close the Chapter 11 Cases, the Plan Administrator shall promptly seek authority from the Bankruptcy Court to close the Chapter 11 Cases for the Wind-Down Debtor and each of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules: (a) all Claims against the Wind-Down Debtor and the Estate entitled to payment under the Plan (i) have been satisfied in accordance with the Plan or (ii) have been disallowed by Final Order; (b) all Wind-Down Debtor Assets have been liquidated (other than those assets abandoned by the Wind-Down Debtor pursuant to the terms of this Agreement), and converted into distributable assets and/or Cash to the extent required by the Plan, and such distributable assets and Cash have been distributed in accordance with the Plan; and (c) all wind-down costs and expenses have been paid in full in Cash to the extent permitted by this Agreement. Notwithstanding the foregoing, the Plan

Administrator may seek authority from the Bankruptcy Court to close the Chapter 11 Cases of one or more of the Debtors individually, prior to the requirements above being met with respect to all of the Chapter 11 Cases and may seek to close the Chapter 11 Cases in the event the Debtors lack sufficient funding for further administration. Subject to further order of the Court, this Agreement shall terminate when the Bankruptcy Court enters a final decree contemplated by Bankruptcy Code section 350 and Bankruptcy Rule 3022 closing the Debtors' Chapter 11 Cases with respect to each Debtor.

8.2     Winding Up, Discharge, and Release of the Plan Administrator and Wind-Down Debtor Oversight Committee. For the purposes of winding up the affairs of each Debtor and/or the Wind-Down Debtor, as applicable, the Plan Administrator shall continue to act as Plan Administrator and the Wind-Down Debtor Oversight Committee shall continue their duties under this Agreement until such duties have been fully discharged or their respective roles as Plan Administrator and Wind-Down Debtor Oversight Committee are otherwise terminated under this Agreement and the Plan. Upon a motion or notice by the Plan Administrator and/or the Wind-Down Debtor Oversight Committee, the Bankruptcy Court may enter an order relieving the Plan Administrator and Wind-Down Debtor Oversight Committee, its members, agents, and employees of any further duties and discharging and releasing the Plan Administrator and the Wind-Down Debtor Oversight Committee, provided that under no circumstances shall the Wind-Down Debtor Oversight Committee, its members, agents or employees be deemed discharged or their roles terminated unless and until the Plan Administrator is likewise deemed discharged and his role terminated by like action.

## ARTICLE IX
## MISCELLANEOUS

9.1     Cumulative Rights and Remedies. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

9.2     Notices. All notices to be given to creditors may be given by electronic mail, first class mail, or may be delivered personally, to the addresses of such creditors appearing on the books kept by the Plan Administrator. Any notice or other communication that may be or is required to be given, served, or sent to the Plan Administrator shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) addressed as follows:

> If to the Plan Administrator:
> [                    ]
>
> with a copy to counsel:
> [                    ]

or to such other address as may from time to time be provided in written notice by the Plan Administrator.

9.3     Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware.

9.4    <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

9.5    <u>Particular Words</u>. Reference in this Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Agreement. The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

9.6    <u>Execution</u>. All funds in the Wind-Down Debtor shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a creditor, and no creditor or any other Person can execute upon, garnish or attach the Wind-Down Debtor Assets or the Plan Administrator in any manner or compel payment from the Wind-Down Debtor except by Final Order of the Bankruptcy Court. Payments will be solely governed by the Plan and this Agreement.

9.7    <u>Amendment</u>. This Agreement may be amended by written agreement of the Plan Administrator and the Wind-Down Debtor Oversight Committee, subject to Section 6.7 above, or by order of the Bankruptcy Court; *provided*, *however*, that such amendment may not be inconsistent with the Plan or the Confirmation Order.

9.8    <u>No Waiver</u>. No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver thereof.

9.9    <u>No Relationship Created</u>. Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership or joint venture of any kind.

9.10    <u>Severability</u>. If any term, provision, covenant, or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

9.11    <u>Further Assurances</u>. The Parties agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes and provide for the full implementation of this Agreement and the pertinent provisions of the Plan, and to consummate the transactions contemplated hereby.

9.12    <u>Counterparts</u>. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

9.13    <u>Dispute Resolution</u>.

9.13.1 Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 9.13 shall be the exclusive mechanism to resolve any dispute arising under or with respect to this Agreement. For the avoidance of doubt, the following parties, and only the following parties, shall be entitled to seek enforcement of this Agreement, including by

and through the dispute resolution procedures set forth herein: (i) each Wind-Down Debtor, (ii) the Plan Administrator, (iii) the Wind-Down Debtor Oversight Committee, (iv) members of the Wind-Down Debtor Oversight Committee in such capacity including the Majority Member; and (v) the DIP Lender.

9.13.2  <u>Informal Dispute Resolution</u>. Any dispute under this Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("<u>Notice of Dispute</u>").  Such Notice of Dispute shall clearly state the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

9.13.3  <u>Formal Dispute Resolution</u>. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("<u>Statement of Position</u>"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 9.13.4 below.

9.13.4  <u>Judicial Review</u>. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court and serving on the counterparty or counterparties and the Plan Administrator a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the Wind-Down Debtor. Each counterparty shall respond to the motion within the time period allowed by the rules of the Bankruptcy Court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the Bankruptcy Court.

9.14  <u>Jurisdiction</u>. The Bankruptcy Court shall have exclusive jurisdiction regarding the Debtors, the Wind-Down Debtor, the Plan Administrator, the Wind-Down Debtor Oversight Committee, and the Wind-Down Debtor Assets, including, without limitation, the determination of all disputes arising out of or related to administration of the Wind-Down Debtor. The Bankruptcy Court shall have continuing exclusive jurisdiction and be the exclusive venue to hear and finally determine all disputes and related matters among the Parties arising out of or related to this Agreement or the administration of the Wind-Down Debtor. The Parties expressly consent to

the Bankruptcy Court hearing and exercising such judicial power as is necessary to finally determine all such disputes and matters. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Agreement, the provisions of this Agreement shall have no effect on and shall not control, limit or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter, and all applicable references in this Agreement to an order or decision of the Bankruptcy Court shall instead mean an order or decision of such other court of competent jurisdiction. Notwithstanding any other provision in this Section 9.14, the Plan Administrator may pursue any Vested Cause of Action, if at all pursuant to this Agreement, in any court of competent jurisdiction, which need not be the Bankruptcy Court.

* * * * *

IN WITNESS WHEREOF, the Parties have or are deemed to have executed this Agreement as of the day and year written above.

Prime Core Technologies Inc.

By: _____

Name_____

Title:_____

Prime Digital, LLC

By: _____

Name_____

Title:_____

Prime IRA LLC

By: _____

Name_____

Title:_____

Prime Trust, LLC

By: _____

Name_____

Title:_____


David Dunn, as Plan Administrator

By: _____

Name_____

Title:_____

## EXHIBIT A

**Wind-Down Debtor Oversight Committee Members**

## **Wind-Down Debtor Oversight Committee Members**

1. Ruairi Donnelly

2. Ivan Inchauste

3. Steven Eliscu

# **EXHIBIT B**

**Plan Administrator Compensation**

**Plan Administrator Compensation**

| Plan Administrator | Compensation |
|---|---|
| David Dunn | [TBD] |

## **EXHIBIT F**

### **Identity of the Plan Administrator**

| Plan Administrator | Compensation |
|---|---|
| David Dunn | [TBD] |

## **EXHIBIT G**

### **Identity of Wind-Down Debtor Oversight Committee**

| **Wind-Down Debtor Oversight Committee** | **Compensation** |
|---|---|
| Ruairi Donnelly | [TBD] |
| Ivan Inchauste | [TBD] |
| Steven Eliscu | [TBD] |

## EXHIBIT H

### Amended Organizational Documents

Certain documents, or portions thereof, contained and/or referred to in this Exhibit H and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained or referred to herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Court.  Each of the documents and/or designations contained or referred to in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan.

# __EXHIBIT I__

**Cryptocurrency Conversion Table**

| CRYPTOCURRENCY | | CONVERSION RATE | VALUE AS OF PETITION DATE |
|---|---|---|---|
| AUDIO | Audius | $0.19 | $62,002,108.33 |
| ETH | Ethereum | $1,841.60 | $43,952,804.86 |
| BTC | Bitcoin | $29,348.52 | $8,771,564.98 |
| USDC | USD Coin | $1.00 | $1,156,094.49 |
| FLEXUSD | flexUSD | $0.28 | $329,371.30 |
| GALA2 | Gala V2 | $0.23 | $268,133.83 |
| BSV | Bitcoin SV | $35.71 | $248,574.23 |
| LTC | Litecoin | $81.88 | $66,391.37 |
| LUNA2 | Terra Luna 2.0 | $0.56 | $40,021.35 |
| USDC_AVAX | USD Coin (Avalanche) | $1.00 | $39,023.65 |
| XLM_USDC_5F3T | USD Coin (Stellar) | $1.00 | $28,288.67 |
| BCH | Bitcoin Cash | $229.10 | $24,347.76 |
| XEC | eCash | $0.00 | $22,408.76 |
| SOL | Solana | $24.89 | $20,442.64 |
| TUSD | TrueUSD | $1.00 | $19,795.47 |
| RVUSD_ETH_ZV32 | Recover Value USD | $0.09 | $14,570.11 |
| ATOM_COS | Cosmos Hub | $8.53 | $14,368.84 |
| SOL_USDC_PTHX | USD Coin (Solana) | $1.00 | $13,676.69 |
| ZYTARAUSD | Zytara USD | $1.00 | $9,976.00 |
| ADA | ADA (Cardano) | $0.29 | $8,809.49 |
| MATIC | Matic Token (Ethereum) | $0.68 | $8,398.98 |
| XLM | Stellar | $0.14 | $6,548.00 |
| DOGE | Doge Coin | $0.07 | $4,693.06 |
| LINK | Chainlink | $7.39 | $4,068.76 |
| ESH | Switch | $0.01 | $3,511.24 |
| 7UT | 7EVEN Utility Token | $0.00 | $2,837.11 |
| SNX | Synthetix Network Token | $2.48 | $2,816.31 |
| GUSD | Gemini USD | $0.99 | $2,218.46 |
| CEL | Celsius | $0.16 | $1,545.19 |
| DAI | Dai | $1.00 | $1,499.20 |
| SAI | Sai Stableco | $8.23 | $1,071.10 |
| ENJ | Enjin Coin | $0.29 | $957.61 |
| COMP | Compound Token | $55.50 | $887.39 |
| XRP | XRP (Ripple) | $0.6342 | $809.58 |
| FLEX | FLEX Coin | $6.85 | $722.98 |
| UNI | Uniswap | $6.23 | $643.48 |
| BNB_BSC | BNB Smart Chain | $239.91 | $516.77 |
| EOS | EOS | $0.72 | $486.43 |
| SPRA | Spera | $0.00 | $472.56 |
| BAT | Basic Attn. | $0.21 | $318.04 |
| USDT_BSC | Binance-Peg Tether (BSC) | $1.00 | $302.29 |
| ZRX | 0x | $0.22 | $257.77 |
| MC | Monkeycoin | $0.39 | $231.60 |
| MKR | Maker | $1,233.32 | $231.15 |
| YFI | Yearn Finance | $6,257.12 | $221.19 |
| DOT | Polkadot | $4.98 | $183.43 |
| ALGO | Algorand | $0.11 | $170.29 |

| CRYPTOCURRENCY | | CONVERSION RATE | VALUE AS OF PETITION DATE |
|---|---|---|---|
| FTM | Fantom | $0.24 | $169.05 |
| CELO | Celo | $0.50 | $164.72 |
| CELR | Celer Network | $0.01 | $132.97 |
| USDS | StableUSD | $1.00 | $119.08 |
| MATIC_POLYGON | Matic Gas Token (Polygon) | $0.68 | $103.05 |
| DASH | Dash | $31.68 | $93.15 |
| SHIB | SHIBA INU | $0.00 | $77.80 |
| PAX | PAX Dollar | $1.00 | $61.70 |
| MANA | Decentraland | $0.37 | $56.25 |
| CUSDC | Celer USD | $0.02 | $54.32 |
| LRC | Loopring | $0.22 | $33.65 |
| HBAR | Hedera Hashgraph | $0.07 | $33.39 |
| DYDX | dYdX | $2.16 | $28.13 |
| POS_USDT_POLY | (PoS) Tether USD (Polygon) | $1.00 | $25.53 |
| AAVE | Aave Token | $65.41 | $20.95 |
| AXS | Axie Infinity Shard | $5.80 | $20.66 |
| BNT | Bancor | $0.48 | $18.23 |
| CVC | Civic | $0.09 | $16.88 |
| STORJ | Storj | $0.29 | $14.49 |
| USDC_POLYGON | USDC (Polygon) | $1.00 | $13.87 |
| SUSHI | Sushi Token | $0.78 | $13.78 |
| CHZ | Chiliz (ETH) | $0.07 | $12.84 |
| XDB | DigitalBits | $0.00 | $11.32 |
| UST_ETH | Terra USD | $0.01 | $11.21 |
| HYFI | hyfi.token | $0.05 | $7.84 |
| ACH | Alchemy Pay | $0.02 | $7.14 |
| XTZ | Tezos | $0.80 | $3.87 |
| LODE_AVAX_74OH | LODE Token | $3.79 | $3.79 |
| ALCX | Alchemix | $13.28 | $2.76 |
| OXT | Orchid | $0.07 | $2.46 |
| RNDR | Render Token | $1.71 | $2.13 |
| ARPA | ARPA Token | $0.05 | $1.82 |
| WBTC | Wrapped BTC | $29,379.86 | $1.76 |
| TRIBE | Tribe | $0.29 | $1.56 |
| TERRA_USD | TERRA USD | $0.02 | $1.47 |
| BIT | BitDAO | $0.47 | $1.40 |
| POND | Marlin POND | $0.01 | $1.38 |
| KEEP | Keep Token | $0.11 | $1.26 |
| BLZ | Bluzelle | $0.09 | $1.25 |
| MTV | Multivac | $0.00 | $1.23 |
| GTC | Gitcoin | $1.17 | $1.17 |
| SUPER | SuperFarm | $0.10 | $1.16 |
| POWR | Power Ledger | $0.16 | $1.15 |
| QNT | Quant | $100.97 | $1.11 |
| ANKR | Ankr Network | $0.02 | $1.06 |
| KNC | Kyber Network Crystal v2 | $0.68 | $0.93 |
| IDEX | IDEX Token | $0.05 | $0.92 |

| CRYPTOCURRENCY | | CONVERSION RATE | VALUE AS OF PETITION DATE |
|---|---|---|---|
| MLN | Melon | $17.93 | $0.86 |
| TRX | Tron | $0.08 | $0.83 |
| COTI | COTI Token | $0.05 | $0.82 |
| BUSD | Binance USD | $1.00 | $0.80 |
| API3 | API3 | $1.18 | $0.72 |
| BCT | Toucan Protocol: Base Carbon Tonne (Polygon) | $0.71 | $0.71 |
| RAD | Radicle | $1.62 | $0.68 |
| AGX_AVAX_WOIF | AGX Coin | $0.66 | $0.65 |
| BAND | BandToken | $1.19 | $0.64 |
| BAL | Balancer | $4.26 | $0.64 |
| AMPL | Ampleforth Governance | $1.09 | $0.53 |
| HEX | HEX | $0.01 | $0.52 |
| SPELL | Spell Token | $0.00 | $0.50 |
| HSF | Hillstone.Fi... | $0.48 | $0.48 |
| KSM | Kusama | $23.65 | $0.42 |
| UMA | UMA Voting Token v1 | $1.62 | $0.28 |
| DUDE_POLYGON_UBJO | DuDe Peoples Money (metalbacked money) (Polygon) | $0.00 | $0.21 |
| CRE | CarryToken | $0.00 | $0.06 |
| AUX_AVAX_2QSM | AUX Coin | $0.06 | $0.06 |
| SHEESHA_BEP20 | Sheesha Fina | $5.27 | $0.05 |
| TST | TestToken | $0.01 | $0.01 |
| CPRX | Crypto Perx | $0.00 | $0.00 |
| LND | Lendingblock | $0.00 | $0.00 |
| QBT | QBT | $0.00 | $0.00 |
| SLV | Silverway | $0.00 | $0.00 |
| GALA | Gala V1 | $0.00 | $0.00 |
| TUIT_POLYGON_5L1B | Tuition Coin | $0.00 | $0.00 |
| B21 | B21 Token | $0.00 | $0.00 |
| CFV | CoinFLEX Vote Token | $0.00 | $0.00 |
| $ USDC... | $ USDCDrop.c | $0.00 | $0.00 |
| JL | JiuLove | $0.00 | $0.00 |
| SHAG | Shaggy Coin | $0.00 | $0.00 |
| TIX | Lottery Tick | $0.00 | $0.00 |
| FXT | FXtrading | $0.00 | $0.00 |
| MRO | Mero Currenc | $0.00 | $0.00 |
| FGP | Fingerprint | $0.00 | $0.00 |
| UKR | UKR Chain | $0.00 | $0.00 |
| AVVP | Andrey Voron | $0.00 | $0.00 |
| Amber | Amber | $0.00 | $0.00 |
| BNB_ERC20 | BNB (ERC20) - Deprecated | $0.00 | $0.00 |
| ETH-OPT | Optimistic Ethereum | $0.00 | $0.00 |
| ETH_BSC | Binance-Peg Ethereum (BSC) | $0.00 | $0.00 |
| ETH-AETH | Ethereum (Arbitrum) | $0.00 | $0.00 |

| CRYPTOCURRENCY | | CONVERSION RATE | VALUE AS OF PETITION DATE |
|---|---|---|---|
| IOT5 | Internet of Things 5th-Generation | $0.00 | $0.00 |
| UKR | UKR Chain | $0.00 | $0.00 |
| PRV | Incognito | $0.134701 | $0.00 |

## EXHIBIT J

### Identity of the [PCT] Litigation Trustee

| [PCT] Litigation Trustee | Compensation |
|---|---|
| David Dunn | [TBD] |

**EXHIBIT K**

**Identity of [PCT] Litigation Trust Oversight Committee**

| [PCT] Litigation Trust Oversight Committee | Compensation |
|---|---|
| Ruairi Donnelly | [TBD] |
| Ivan Inchauste | [TBD] |
| Steven Eliscu | [TBD] |

# EXHIBIT L

**[PCT] Litigation Trust Agreement**

**Draft 11/28/23**

## PCT LITIGATION TRUST

**PCT LITIGATION TRUST AGREEMENT**

**Dated as of __, 2023**

*Pursuant to the Amended Joint Plan of Reorganization*
*of Prime Core Technologies Inc. and its Debtor Affiliates under*
*Chapter 11 of the Bankruptcy Code Dated November [  ], 2023*

# TABLE OF CONTENTS

**Page**

ARTICLE I AGREEMENT OF TRUST ........................................................................2

    1.1        Creation and Name ........................................................................2

    1.2        Purposes........................................................................2

    1.3        Transfer of Assets ........................................................................3

    1.4        Trust Acceptance of Assets. ........................................................................3

    1.5        Jurisdiction ........................................................................4

    1.6        Construction. ........................................................................4

ARTICLE II POWERS AND TRUST ADMINISTRATION ........................................................................4

    2.1        Powers. ........................................................................4

    2.2        General Administration. ........................................................................7

ARTICLE III ACCOUNTS, INVESTMENTS, AND PAYMENTS ........................................................................9

    3.1        Accounts. ........................................................................9

    3.2        Investment Guidelines. ........................................................................10

    3.3        Payment of Operating Expenses........................................................................11

    3.4        Distributions to Beneficial Owner. ........................................................................12

ARTICLE IV TRUSTEE; DELAWARE TRUSTEE ........................................................................12

    4.1        Number ........................................................................12

    4.2        Term of Service. ........................................................................12

    4.3        Compensation and Expenses of the Trustee. ........................................................................14

    4.4        Standard of Care; Exculpation. ........................................................................15

    4.5        Protective Provisions. ........................................................................16

    4.6        Indemnification. ........................................................................17

    4.7        No Bond ........................................................................19

    4.8        Delaware Trustee. ........................................................................19

ARTICLE V TRUST OVERSIGHT COMMITTEE........................................................................24

    5.1        Members ........................................................................24

i

5.2       Duties........................................................................................................24

5.3       Term of Office...........................................................................................24

5.4       Appointment of Successors........................................................................25

5.5       Compensation and Expenses of the TOC...................................................26

5.6       No Bond ....................................................................................................26

5.7       Procedures for Obtaining Consent of the TOC. .........................................26

5.8       Recusal. .....................................................................................................28

5.9       Majority Member Consent Rights..............................................................28

ARTICLE VI GENERAL PROVISIONS .........................................................................29

6.1       Irrevocability ............................................................................................29

6.2       Term; Termination. ...................................................................................29

6.3       Amendments..............................................................................................30

6.4       Severability...............................................................................................31

6.5       Notices......................................................................................................31

6.6       Successors and Assigns .............................................................................32

6.7       Limitation on Interests for Securities Laws Purposes ................................32

6.8       Exemption from Registration ....................................................................32

6.9       Entire Agreement; No Waiver....................................................................33

6.10     Headings....................................................................................................33

6.11     Governing Law..........................................................................................33

6.12     Dispute Resolution ...................................................................................34

6.13     Effectiveness ............................................................................................36

6.14     Counterpart Signatures .............................................................................36

EXHIBIT 1 CERTIFICATE OF TRUST OF PCT LITIGATION TRUST ............... EXHIBIT 1-1

EXHIBIT 2 INVESTMENT GUIDELINES ................................................ EXHIBIT 2-1

EXHIBIT  3 TRUSTEE COMPENSATION ………………………………........ EXHIBIT 3-1

# PCT LITIGATION TRUST AGREEMENT

This PCT Litigation Trust Agreement (this "**Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into pursuant to the *Amended Joint Plan of Reorganization of Prime Core Technologies Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 285] (as may be further amended or modified, the "**Plan**"),[1] in Case No. 23-11161(JKS) in the United States Bankruptcy Court for the District of Delaware ("**Bankruptcy Court**") by Prime Core Technologies Inc., Prime Trust, LLC, Prime IRA LLC, and Prime Digital, LLC (collectively, the "**Settlor**"), [Wilmington Trust, National Association] (the "**Delaware Trustee**"), the Trustee identified on the signature pages hereof (the "**Trustee**"), and the members of the Trust Oversight Committee identified on the signature pages hereof (the "**TOC**" and, together with the Settlor, the Delaware Trustee and the Trustee, the "**Parties**").

## RECITALS

**WHEREAS,** the Plan contemplates the creation of a Litigation Trust (the "**Trust**");

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS,** pursuant to the Plan, the Trust is established to collect assets and make distributions to the Wind-Down Debtor in accordance with the Plan, the Confirmation Order and this Trust Agreement;

**WHEREAS,** the Trustee shall administer the Trust in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement (the "**Governing Documents**"); and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

**WHEREAS,** pursuant to the Plan, the Trust is intended to qualify a "grantor trust" and the Settlor is intended to qualify as the "grantor" under the provisions of Sections 671 et seq. of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code").

**NOW, THEREFORE,** it is hereby agreed as follows:

## ARTICLE I

## AGREEMENT OF TRUST

1.1  **Creation and Name.**  There is hereby created a trust known as the "PCT Litigation Trust." The Trustee of the Trust may transact the business and affairs of the Trust in the name of the Trust, and references herein to the Trust shall include the Trustee acting on behalf of the Trust. It is the intention of the Parties that the Trust constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that this Trust Agreement constitutes the governing instrument of the Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 1**.

1.2  **Purposes**.  The purposes of the Trust are to:

(a)  receive the Vested Causes of Action pursuant to the terms of the Plan and the Confirmation Order;

(b)  hold, manage, protect and monetize the Vested Causes of Action, together with any income or gain earned thereon and proceeds derived therefrom (collectively, the "**Trust Assets**") in accordance with the terms of the Governing Documents for the benefit of the Beneficial Owner (as defined herein);

2

(c)     engage in any lawful activity that is appropriate and in furtherance of the purposes of the Trust to the extent consistent with the Governing Documents; and

(d)     make or cause to be made distributions of Trust Assets in accordance with and subject to the terms of the Governing Documents.

1.3     **Transfer of Assets.**  Pursuant to, and in accordance with Article VI of the Plan and the Confirmation Order, the Trust has received the assignment of the Vested Causes of Action.  Except as otherwise provided in the Plan and Confirmation Order, the Vested Causes of Action and any other assets to be transferred to the Trust under the Plan will be transferred to the Trust free and clear of any liens or other claims by any Person.

1.4     **Trust Acceptance of Assets.**

(a)     In furtherance of the purposes of the Trust, the Trust hereby expressly accepts the transfer to the Trust of the Vested Causes of Action as, and subject to the terms, contemplated in the Plan.

(b)     In furtherance of the purposes of the Trust, except as otherwise provided in this Trust Agreement, the Trust shall have and retain any and all rights and defenses the Debtors had immediately before the Effective Date in accordance with the Governing Documents.

(c)     To the extent required by the Act, the beneficial owner (within the meaning of the Act) of the Trust (the "**Beneficial Owner**") shall be deemed to be the Settlor.

3

1.5     **Jurisdiction**. The Bankruptcy Court shall have continuing jurisdiction over the Trust provided, however, that the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Trust.

1.6     **Construction.** In this Trust Agreement, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

**ARTICLE II**

**POWERS AND TRUST ADMINISTRATION**

2.1     **Powers.**

(a)     The Trustee is and shall act as a fiduciary to the Trust in accordance with the provisions of the Governing Documents. The Trustee shall, at all times, administer the Trust in accordance with the purposes set forth in Section 1.2 above and the Governing Documents. Subject to the limitations set forth in this Trust Agreement and the Plan, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)     Except as required by applicable law or as otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

4

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited below or by the Plan, the Trustee shall have the power to:

(i)     receive the Vested Causes of Action and exercise all rights with respect thereto, including by reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action;

(ii)     invest monies held from time to time by the Trust in accordance with the Investment Guidelines pursuant to Section 3.2 below;

(iii)    make or arrange to make payment of expenses and other obligations of the Trust as set forth in the Governing Documents, in accordance with the Initial Wind-Down Budget and solely from the Wind-Down Reserve;

(iv)    establish such funds, reserves, and accounts within the Trust, as the Trustee deems useful in carrying out the purposes of the Trust, but subject to the Initial Wind-Down Budget;

(v)     make or cause to be made distributions to the Beneficial Owner pursuant to the terms of this Trust Agreement and the Plan;

(vi)    appoint such officers and retain such employees, consultants, advisors, independent contractors, experts, and agents and engage in such legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the Trust requires, and delegate to such persons such powers and

authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

        (vii)   compensate the Trustee, the Delaware Trustee, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustee and the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder, in accordance with the Initial Wind-Down Budget and solely from the Wind-Down Reserve;

        (viii)  record all expenses incurred by the Trust on the books and records of the Trust;

        (ix)   enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement or the Plan;

        (x)   in accordance with Section 4.4 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 4.4 below), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives; provided, however, no party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 below;

        (xi)   obtain the consent of the TOC with respect to the matters set forth herein;

6

(xii)  stand in the same position as the Debtors with respect to any claim the Debtors, their Estates, and/or the Wind-Down Debtor may have as to any attorney-client privilege, the work-product doctrine, or any other privilege attaching to any documents or communications (whether written or oral), and succeed to all of the rights of the Debtors, their Estates, and/or the Wind-Down Debtor to preserve, assert, or waive any such privilege;

(xiii) investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action;

(xiv)  seeking the examination of, and examining, any Person pursuant to Federal Rule of Bankruptcy Procedure 2004; and

(xv)  exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(d)  The Trustee shall not have the power to guarantee any debt of other persons.

(e)  The Trustee shall endeavor to make timely distributions and not unduly prolong the duration of the Trust.

2.2  **General Administration.**

(a)  The Trustee shall act in accordance with the Governing Documents. In the event of a conflict between the terms or provisions of the Plan or this Trust Agreement, the terms of the Plan shall have first priority, followed by the Trust Agreement. For the avoidance of

7

doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)     The Trustee shall (i) timely file such income tax and other returns and statements required to be filed and shall cause to be paid timely all taxes required to be paid by the Trust, if any, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the Trust as a grantor trust. The Trustee may request an expedited determination of taxes under Bankruptcy Code section 505(b) for all tax returns filed by or on behalf of the Trust for all taxable periods through the dissolution thereof.

(c)     The Trustee shall timely account to the Bankruptcy Court as follows:

(i)     The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event no later than one hundred and twenty (120) days following the end of each calendar year, an annual report (the "**Annual Report**") containing special-purpose financial statements of the Trust (including, without limitation, a special-purpose statement of assets, liabilities and net claimants' equity, a special-purpose statement of changes in net claimants' equity and a special-purpose statement of cash flows). The Trustee shall not be required to obtain an audit of the Annual Report by a firm of independent certified public accountants. The Trustee shall provide a copy of such Annual Report to the TOC when such report is filed with the Bankruptcy Court.

(d)     The Trustee shall be required to obtain the consent of the TOC, pursuant to the consent process set forth in Section 5.7 below:

8

(i)    to settle any Vested Cause of Action where the face amount of the asserted Vested Cause of Action exceeds $500,000;

(ii)    to commence and/or participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding that exceeds $500,000;

(iii)    to modify the compensation of the Trustee;

(iv)    to acquire an interest in and/or merge with and/or contract with another trust; or

(v)    to effectuate any material amendment of this Trust Agreement, which shall be in accordance with Section 6.3; provided that no such amendment shall be in contravention of the Plan.

(e)    Notwithstanding anything to the contrary in this Article II, the Trustee shall be required to obtain the consent of the Majority Member, not to be unreasonably withheld, as and when set forth in Section 5.9 below.

## ARTICLE III

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

3.1    **Accounts.**

(a)    The Trustee shall maintain one or more accounts (the "**Trust Accounts**") on behalf of the Trust with one or more financial depository institutions (each a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Trustee any interest in or relationship with the Debtors or their affiliated persons. Any such

9

interest or relationship shall not be an automatic disqualification for the position, but the Trustee shall take any such interest or relationship into account in selecting a Financial Institution.

(b)    The Trustee may replace any retained Financial Institution with a successor Financial Institution at any time, and such successor shall be subject to the considerations set forth in Section 3.1(a).

(c)    The Trustee may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as he or she may deem necessary, prudent or useful in order to provide for distributions to the Beneficial Owner and, subject to the Initial Wind-Down Budget, the payment of Trust operating expenses from the Wind-Down Reserve, and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the IRC or Treasury Regulations.

3.2    **Investment Guidelines.**

(a)    The Trustee may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 2** (the "**Investment Guidelines**").

(b)    In the event the Trust holds any non-liquid assets, the Trustee shall protect, oversee, and monetize such non-liquid assets in accordance with the Governing Documents. This Section 3.2(b) is intended to modify the application to the Trust of the "prudent

person" rule, "prudent investor" rule, and any other rule of law that would require the Trustee to diversify the Trust Assets.

(c)    Cash proceeds received by the Trust in connection with its monetization of the non-liquid Trust Assets shall be invested in accordance with the Investment Guidelines until needed for the purposes of the Trust as set forth in Section 1.2 above.

(d)    All income of the Trust shall be distributed or held for future distribution to the Wind-Down Debtor, consistent with Section 677 of the Internal Revenue Code.

3.3    **Payment of Operating Expenses**

All operating expenses of the Trust shall be in accordance with the Initial Wind-Down Budget and shall be paid by the Trust except that, pursuant to the Plan, the Wind-Down Debtor shall fund the operating expenses of the Trust on a monthly basis solely from the Wind-Down Reserve for the duration of the Trust. The Trust may periodically provide to the Plan Administrator invoices or other documentation with respect to such operating expenses of the Trust to be paid and the Plan Administrator shall timely pay such expenses or shall timely remit to the Trust such amounts as are necessary to enable the Trust to timely pay such expenses, in each case subject to the Initial Wind-Down Budget, and solely from the Wind-Down Reserve. None of the Trustee, Delaware Trustee, the TOC, nor any of their officers, agents, advisors, professionals or employees shall be personally liable for the payment of any operating expense or other liability of the Trust. Notwithstanding any provision of this Agreement to the contrary, the Initial Wind-Down Budget and the Wind-Down Reserve may be increased in accordance with the terms of the Plan Administrator Agreement at the request of the Trustee and with the consent, not to be unreasonably withheld, of the parties identified in the Plan Administrator

11

Agreement. Thereafter, all references to the Initial Wind-Down Budget and the Wind-Down Reserve, including any limitations thereof, in this Agreement shall include the increased amounts authorized in the accordance with the preceding sentence, provided, such increase amounts to the Initial Wind-Down Budget and Wind-Down Reserve authorized for Trust operating expenses or the administration of the Trust may be subject to reasonable conditions imposed on the specific uses of such increased amounts by the Trust.

3.4     **Distributions to Beneficial Owner.**

The Trustee will make or cause to be made distributions to the Beneficial Owner in accordance with the Governing Documents.

## ARTICLE IV

## TRUSTEE; DELAWARE TRUSTEE

4.1     **Number**. In addition to the Delaware Trustee appointed pursuant to Section 4.8, there shall be one (1) Trustee who shall be the person named on the signature pages hereof. The Trustee shall also serve as the Plan Administrator of the Wind-Down Debtor.

4.2     **Term of Service.**

(a)     The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) below, (iii) his or her removal pursuant to Section 4.2(c) below, or (iv) the termination of the Trust pursuant to Section 6.2 below.

(b)     The Trustee may resign at any time upon written notice to the TOC with such notice filed with the Bankruptcy Court. Such notice shall specify a date when such

12

resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)   The Trustee may be removed by the unanimous consent of the TOC in the event the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause, provided the Trustee has received reasonable notice and an opportunity to be heard. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Trust, or a consistent pattern of neglect and failure to perform or participate in performing the duties of Trustee hereunder. For the avoidance of doubt, any removal of a Trustee by the TOC pursuant to this Section 4.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

(d)   In the event of any vacancy in the office of the Trustee, including the death, resignation, or removal of the Trustee, such vacancy shall be filled by the unanimous consent of the TOC, subject to the approval of the Bankruptcy Court. In the event the TOC cannot agree on a successor Trustee, the provisions of Section 6.12 below shall apply.

(e)   Immediately upon the appointment of any successor Trustee pursuant to Section 4.2(d) above, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in and undertaken by the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No predecessor Trustee shall be liable personally for any act or omission of his or her

successor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(f)     Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) above, (iii) his or her removal pursuant to Section 4.2(c) above, and (iv) the termination of the Trust pursuant to Section 6.2 below.

4.3     **Compensation and Expenses of the Trustee.**

(a)     The Trustee shall receive compensation for his or her services as Trustee on matters related to the operation of the Trust as set forth on **Exhibit 3** hereto and subject to the Initial Wind-Down Budget. The Trust will reimburse the Trustee for fees and expenses incurred prior to the Effective Date in connection with this Trust Agreement and effectuating a timely, orderly, and efficient transition of duties and obligations to the Trustee as of the Effective Date, solely from the Wind-Down Reserve and in accordance with the Initial Wind-Down Budget, which shall be paid promptly after the Effective Date.

(b)     The Trust will promptly reimburse the Trustee for all reasonable and documented out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his or her duties hereunder solely from the Wind-Down Reserve and in accordance with the Initial Wind-Down Budget.

(c)     The Trust shall include in the Annual Report a description of the amounts paid under this Section 4.3.

14

4.4    **Standard of Care; Exculpation.**

(a)    As used herein, the term "**Trust Indemnified Party**" shall mean each of (i) the Trustee, (ii) the Delaware Trustee, (iii) the TOC and its members, and (iv) the officers, employees, consultants, advisors, and agents of each of the Trust, the Trustee, and the TOC.

(b)    To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the Trust, except those acts found by a final order of a court of competent jurisdiction ("**Final Order**") to be arising out of their criminal conduct, willful misconduct, gross negligence, or actual fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs, and expenses arising out of or due to the implementation or administration of the Plan or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case except for any actions or inactions found by Final Order to be arising out of their criminal conduct, willful misconduct, gross negligence or actual fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust.

(c)    To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Trust or the Beneficial Owner, it is hereby understood and agreed by the Parties that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified

Parties; provided, however, that with respect to the Trust Indemnified Parties other than the Delaware Trustee the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 4.4 and its subparts.

(d)     The Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustee at his or her discretion.

4.5     **Protective Provisions.**

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 4.5.

(b)     In the event the Trustee retains counsel (including at the expense of the Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder. A successor Trustee shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Party or other person may raise any exception to the attorney-client privilege described herein as any such exceptions are hereby waived by all Parties.

(c)     No Trust Indemnified Party shall be personally liable under any circumstances, except for his or her own willful misconduct, bad faith, gross negligence or fraud as determined by a Final Order.

16

(d)      No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(e)      In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

4.6      **Indemnification.**

(a)      To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs, and expenses arising out of or due to the implementation or administration of the Plan or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful

misconduct, bad faith, gross negligence, or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Trust shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the Trust. The Trustee may, in his or her discretion, authorize an advance of reasonable expenses, costs, and fees (including attorneys' fees and costs) to be incurred by or on behalf of the Trust Indemnified Parties, as set forth herein.

(c)     The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(d)      The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

4.7      **No Bond.**  Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

4.8      **Delaware Trustee.**

(a)      There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible to serve as the Delaware Trustee in accordance with the provisions of this Section 4.8, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.8(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustee shall have no liability for the acts or omissions of any Delaware Trustee.

(b)      The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustee set forth herein. The Delaware Trustee shall be a trustee of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary

duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the Trust or the Beneficial Owner, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of the Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith, gross negligence or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustee or any other person pursuant to the provisions of this Trust Agreement unless the Trustee or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustee and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustee. The Delaware Trustee may, at the expense of the Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and

shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.8(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; _provided_ that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.8(d) below; _provided_ _further_ that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustee. If the Trustee does not act within such sixty (60) day period, the Delaware Trustee, at the expense of the Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee

21

under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of the Trust in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion, or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the Trust and the Delaware Trustee, which compensation shall be paid by the Trust. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or

inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the Trust, the Trustee or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority, acts of God, earthquakes, fires, floods, wars, terrorism, civil or military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service, accidents, labor disputes, acts of civil or military authority or governmental actions, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

23

## ARTICLE V

## TRUST OVERSIGHT COMMITTEE

5.1    **Members**.  The TOC shall consist of (a) not more than five (5) members (who shall be the members of the Wind-Down Debtor Oversight Committee) (the "**UCC Members**")[2] plus (b) a majority member (the "**Majority Member**"). To the extent that a UCC Member of the TOC elects to resign from the TOC in accordance with Section 5.3(b) below or is removed pursuant to Section 5.3(c) below, a successor shall be appointed pursuant to Section 5.4(a).

5.2    **Duties**.  The members of the TOC shall serve in a fiduciary capacity, representing the interests of the Beneficial Owner. The TOC shall have no fiduciary obligations or duties to any party other than the Beneficial Owner. The Trustee must obtain the consent of the TOC on matters identified in Section 2.2(d) above. Except for the duties and obligations expressed in the Governing Documents, there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TOC. To the extent that, at law or in equity, the TOC has duties (including fiduciary duties) and liabilities relating thereto to the Trust, the other Parties hereto or the Beneficial Owner of the Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TOC expressly set forth in the Governing Documents.

5.3    **Term of Office.**

(a)    Each member of the TOC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) below, (iii) his or her removal pursuant to Section 5.3(c) below, (iv) the termination of the Trust pursuant to Section 6.2 below,

---

[2] The initial UCC Members of the TOC shall be: [TBD]. The initial Majority Member shall be: Ruairi Donnelly.

or (v) solely with respect to the Majority Member, the date on which all DIP Claims are paid in full pursuant to the Plan, at which time, the Majority Member position shall lapse.

(b)     A member of the TOC may resign at any time by written notice to the other members of the TOC and the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than thirty (30) days after the date such notice is given, where practicable.

(c)     A member of the TOC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause. Such removal may be made by the recommendation of the remaining members of the TOC with the approval of the Trustee.

(d)     In the event of a vacancy in the position of the Majority Member for any reason, Polaris Ventures, a Swiss association, shall designate a replacement Majority Member until the position of Majority Member lapses.

5.4     **Appointment of Successors.**

(a)     If a member of the TOC dies, resigns pursuant to Section 5.3(b) above, or is removed pursuant to Section 5.3(c) above, the vacancy shall be filled with an individual selected by the remaining TOC members with the approval of the Trustee, provided however, that if the remaining TOC members and the Trustee cannot agree on the successor the matter shall be resolved pursuant to Section 6.12 below.

25

(b)    Each successor TOC member shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) above, (iii) his or her removal pursuant to Section 5.3(c) above, (iv) the lapsing of the Majority Member position upon the satisfaction of all DIP Claims, or (v) the termination of the Trust pursuant to Section 6.2 below.

(c)    No successor TOC member shall be liable personally for any act or omission of his or her predecessor TOC member. No successor TOC member shall have any duty to investigate the acts or omissions of his or her predecessor TOC member.

5.5    **Compensation and Expenses of the TOC.**  The members of the TOC shall not receive compensation from the Trust for their services as TOC members, but shall be reimbursed for all reasonable out-of-pocket costs or expenses incurred in connection with the performance of such member's duties hereunder, subject to the Initial Wind-Down Budget. A description of the amounts paid under this Section 5.5 shall be included in the Annual Report. **No Bond.**  The members of the TOC shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

5.7    **Procedures for Obtaining Consent of the TOC.**

(a)    Where the Trustee is required to obtain the consent of the TOC pursuant to Section 2.2(d) above, the Trustee shall provide the TOC with a written notice (e-mail is sufficient) stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TOC as much relevant information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the TOC with reasonable access to the

professionals or experts retained by the Trust and its staff (if any) as the TOC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TOC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(b)     The TOC must consider in good faith and in a timely fashion any request for its consent by the Trustee and must in any event advise the Trustee in writing (e-mail is sufficient) of its consent or objection to the proposed action within five (5) business days of receiving the original request for consent from the Trustee, or, in the event of exigent circumstances, such shorter period as the Trustee may reasonably request. The TOC may not withhold its consent unreasonably. If the TOC decides to withhold consent, it must explain in detail its objections to the proposed action. If the TOC does not advise the Trustee in writing of its consent or objections to the proposed action within five (5) days of receiving notice regarding such request, then consent of the TOC to the proposed action shall be deemed to have been affirmatively granted.

(c)     If, after following the procedures specified in this Section 5.7, the TOC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TOC shall resolve their dispute pursuant to Section 6.12. The TOC shall bear the burden of proving that it reasonably withheld its consent. If the TOC meets that burden, the Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TOC's reasonable objection.

(d)     Action by the TOC shall require the affirmative vote of the majority of the TOC members then in office who have not recused themselves, unless otherwise expressly

27

stated, plus the affirmative vote of the Majority Member until the position of Majority Member lapses as set forth herein.

5.8     **Recusal.** Each member of the TOC shall recuse itself from taking any action otherwise permitted by this Agreement to the extent pertaining directly and particularly to the resolution, settlement, prosecution or litigation of any Vested Cause of Action against any such member, or any affiliate, family member, majority-owned entity, agent, or other insider of such member.

5.9     **Majority** Member Consent Rights. Notwithstanding any provision of the Plan, the Confirmation Order, or this Agreement to the contrary, from the Effective Date until such time as the position of Majority Member lapses, the consent of the Majority Member, not to be unreasonably withheld, shall be required to: (a) remove a Trustee under Section 4.2(c); (b) appoint a successor Trustee under Section 4.2(d); (c) remove a UCC Member of the TOC under Section 5.3(c); (d) appoint or replace any UCC Member of the TOC under Section 5.4(a); (e) modify the compensation provided to the Trustee pursuant to this Agreement; (f) amend, restate, or otherwise modify this Agreement under Section 6.3; (g) take any action regarding the administration, reconciliation, objection to, compromise, resolution, settlement, or litigation of any Vested Cause of where the face amount of the asserted Vested Cause of Action exceeds $500,000; (h) retain any attorneys, financial advisors, accountants, appraisers, and other professionals; (i) determine whether and to what extent to prosecute Vested Causes of Action, including Causes of Action pursuant to section 547 of the Bankruptcy Code; and (j) take any action specified in Section 2.2(d) above.

## ARTICLE VI

## GENERAL PROVISIONS

6.1    **Irrevocability**.  To the fullest extent permitted by applicable law, the Trust is irrevocable.

6.2    **Term; Termination.**

(a)    The term for which the Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)    The Trust shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution upon the satisfaction of the purposes of the Trust, wherein (i) all reasonably expected assets have been collected, (ii) all payments under Section 3.4 above have been made, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining obligations and operating expenses in a manner consistent with the Governing Documents, and (iv) a final accounting has been filed with the Bankruptcy Court (the "**Dissolution Date**").

(c)    On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of the affairs of the Trust by the Trustee and payment of all of the Trust's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the Trust shall be distributed in accordance with Section 3.4.

(d)    Following the dissolution and distribution of the assets of the Trust, the Trust shall terminate, and the Trustee shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the Trust to be filed in accordance with the Act. Notwithstanding anything

29

to the contrary contained in this Trust Agreement, the existence of the Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation. A certified copy of the Certificate of Cancellation shall be given to the Delaware Trustee for its records promptly following such filing.

6.3    **Amendments**.  Any amendment to or modification of this Trust Agreement may be made in writing and only pursuant to an order of the Bankruptcy Court; provided, however, the Trustee may amend this Trust Agreement with the unanimous consent of the TOC, including the Majority Member, in each case not to be unreasonably withheld, from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity.  Notwithstanding the foregoing: (i) no amendment or modification of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order, other than to make minor modifications or clarifying amendments as necessary to enable the Trustee to effectuate the provisions of this Trust Agreement; (ii) neither this Trust Agreement nor any Exhibit to this Trust Agreement shall be modified or amended in any way that could jeopardize, impair, or modify the Trust's grantor trust status under the Internal Revenue Code; and (iii) any amendment or modification of this Trust Agreement, or Exhibit hereto, affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

6.4     **Severability**. Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

6.5     **Notices.**

(a)     Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

To the Settlor:

With a copy (which shall not constitute notice) to:

To the Trust:

[                    ]

With a copy (which shall not constitute notice) to:

[                    ]

To the Delaware Trustee;

[                    ]

With a copy (which shall not constitute notice) to:

[                    ]

To the TOC:

[                    ]

To the Majority Member:

[                    ]

31

(b)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses.

6.6    **Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trust, the TOC, the Delaware Trustee, the Trustee, and their respective successors and assigns, except that neither the Trust, the TOC, the Delaware Trustee, nor the Trustee, may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Delaware Trustee in accordance with Section 4.8(d), and in the case of the Trustee in accordance with Section 4.2(d) above, and in the case of the TOC members in accordance with Section 5.4(a) above.

6.7    **Limitation on Interests for Securities Laws Purposes**. Interests in the Trust (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will, under the laws of descent and distribution or otherwise by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

6.8    **Exemption from Registration**. The Parties hereto intend that the interests of the Beneficial Owner under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Bankruptcy Code Section 1145 will be satisfied and the offer and sale under the Plan of the beneficial interests in the Trust will be exempt from registration under the

Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

6.9    **Entire Agreement; No Waiver**. The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein (including the Plan), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

6.10    **Headings.**    The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

6.11    **Governing Law**. The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and there shall not be applicable to the Trust, the Trustee, the Delaware Trustee, the TOC, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges;

33

(b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, or the TOC, set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the Trust.

6.12 **Dispute Resolution**.

(a) Unless otherwise expressly provided for herein or in Article VIII of the Plan, the dispute resolution procedures of this Section 6.12 shall be the exclusive mechanism to resolve any dispute arising under or with respect to this Trust Agreement. For the avoidance of doubt, this Section 6.12 shall not apply to the Delaware Trustee.

(b) **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of

Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)     **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.12(d).

(d)     **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over such dispute, such court as has jurisdiction pursuant to Section 1.5 above) and serving on the counterparty or counterparties and the Trustee, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the

35

last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the Trust. Each counterparty shall respond to the motion within the time period allowed by the rules of the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

6.13    **Effectiveness**. This Trust Agreement shall become effective on the Effective Date.

6.14    **Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this _____ day of _____, 2023.

**SETTLOR**

_____

**TRUSTEE**

_____

**DELAWARE TRUSTEE**

**[WILMINGTON TRUST, NATIONAL ASSOCIATION]**

By:_____

**TRUST OVERSIGHT COMMITTEE**

**EXHIBIT 1**

**CERTIFICATE OF TRUST OF THE PCT LITIGATION TRUST**

Exhibit 1 – Page 1 of 3

**CERTIFICATE OF TRUST OF THE PCT  LITIGATION TRUST**

  This Certificate of Trust of the PCT LITIGATION TRUST (the "*Trust*") is being duly executed and filed by the undersigned Trustee and Delaware Trustee of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

  <u>Name</u>. The name of the statutory trust formed hereby is:

**PCT LITIGATION TRUST**

  <u>Delaware Trustee</u>. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

> [Wilmington Trust, National Association
> Rodney Square North, 1100 North Market Street
> Wilmington, DE 19890
> Attention: ]

  <u>Effective Date</u>. This Certificate of Trust shall be effective on [ ], 2023.

Exhibit 1 – Page 2 of 3

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

TRUSTEE:                                      DELAWARE TRUSTEE:

[WILMINGTON TRUST, NATIONAL ASSOCIATION, not in its individual capacity, but solely as Delaware Trustee]

By: _____          By: _____

Exhibit 1 – Page 3 of 3

**EXHIBIT 2**

**INVESTMENT GUIDELINES**

**In General**. Only the following investments will be permitted:

(i)      Demand and time deposits, such as certificates of deposit, in banks or other savings institutions whose deposits are federally insured;

(ii)     U.S. Treasury bills, bonds, and notes, including, but not limited to, long-term U.S. Treasury bills, bonds, notes, and other Government Securities as defined under Section 2(a)(16) of the Investment Company Act of 1940, 15 U.S.C. § 80a-2(a)(16), including, but not limited to, Fannie Mae, Freddie Mac, Federal Home Loan Bank, and Federal Farm Credit;

(iii)    Repurchase agreements for U.S. Treasury bills, bonds, and notes;

(iv)    AA or AAA corporate bonds (with the rating awarded by at least two of the three major rating agencies (Standard & Poor's, Moody's, or Fitch)); or

(v)     Open-ended mutual funds owning only assets described in subparts (i) through (iv) of this subsection.

The value of bonds of any single company and its affiliates owned by the Trust directly rather than through a mutual fund shall not exceed 10% of the investment portfolio at time of purchase; this restriction does not apply to any of the following: Repurchase Agreements; Money Market Funds; U.S. Treasuries; and U.S. Government Agencies.

Any such investments shall be made consistently with the Uniform Prudent Investor Act. The determination of the rating of any investments shall be made by the Trust's financial advisor on the date of acquisition of any such investment or on the date of re-investment. The Trust's financial advisor shall reconfirm that all investments of Trust Assets still meet the original rating requirement on a quarterly basis. If the Trust's financial advisors determine that any particular investment no longer meets the rating requirement, there shall be a substitution of that investment with an investment that meets the ratings requirement as promptly as practicable, but in no event later than the next reporting period. Previously purchased securities downgraded below AA may be held for a reasonable and prudent period of time if the Trust's financial advisor believes it is in the interest of the Trust to do so.

The borrowing of funds or securities for the purpose of leveraging, shorting, or other investments is prohibited. Investment in non-U.S. dollar denominated bonds is prohibited. The standing default investment instruction for all cash in any account or subaccount that holds any Trust Assets in cash shall be invested in the BlackRock Fed Fund (CUSIP 09248U809).

See example fund-level requirements table on following page.

Exhibit 2 – Page 1 of 2

## Fund Level Requirements

1. OTC Derivatives Counterparty Exposure – Not allowed
2. Non-U.S. dollar denominated bonds – Not allowed

| TYPE OF INVESTMENT | ELIGIBLE | PROHIBITED | COMMENTS |
|---|---|---|---|
| | | | |
| U.S. Treasury Securities | X | | |
| U.S. Agency Securities | X | | |
| Mortgage-Related Securities | | x | |
| Asset-Backed Securities | | x | |
| Corporate Securities (public) | X | | |
| Municipal bonds | x | | |
| | | | |
| **DERIVATIVES:** | | No investment, including futures, options and other derivatives, may be purchased if its return is directly or indirectly determined by an investment prohibited elsewhere in these guidelines. | |
| Futures | | x | |
| Options | | x | |
| Currency Forwards | | x | |
| Currency Futures | | x | |
| Currency Options | | x | |
| Currency Swaps | | x | |
| Interest Rate Swaps | | x | |
| Total Return Swaps | | x | |
| Structured Notes | | X | |
| Collateralized Debt Obligations | | x | |
| Credit Default Swaps | | X | |
| Mortgage-Related Derivatives | | X | |
| | | | |
| **FOREIGN / NON-U.S. DOLLAR:** | | | |
| Foreign CDs | | X | |
| Foreign U.S. Dollar Denominated Securities | | X | |
| Non-U.S. Dollar Denominated Bonds | | X | |
| Supranational U.S. Dollar Denominated Securities | | X | |
| | | | |
| **COMMINGLED VEHICLES (except STIF):** | | | |
| Collective Funds | | X | |
| Commingled Trust Funds (open ended mutual funds only) | | X | |
| Common Trust Funds | | X | |
| Registered Investment Companies | | X | |
| | | | |
| **MONEY MARKET SECURITIES:** | | | |
| Qualified STIF | | x | |
| Interest Bearing Bank Obligations Insured by a  Federal or State Agency | X | | |
| Commercial Paper | | x | |
| Master Note Agreements and Demand Notes | | x | |
| Repurchase Agreements | | x | |
| | | | |
| **OTHER:** | | | |
| Bank Loans | | x | |
| Convertibles (e.g., Lyons) | | x | |
| Municipal Bonds | X | | |
| Preferred Stock | | x | |
| Private Placements (excluding 144A) | X | | |
| Rule 144A Issues | X | | |
| Zero Coupon Bonds | X | | |
| Commodities | | X | |
| Catastrophe Bonds | | X | |

Exhibit 2 – Page 2 of 2

**EXHIBIT 3**

**TRUSTEE COMPENSATION**

Exhibit 3 – Page 1 of 1