**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Prime Core Technologies, *et al.*,[1] | ) | Case No. 23-11161 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Re: Docket No. 485 |
| | ) | Obj. Deadline: December 5, 2023 at 4:00 p.m. ET |
| | ) | Hearing Date: December 19, 2023 at 10:00 a.m. ET |
| | ) | |

**OBJECTION OF SDM, INC. TO AMENDED JOINT CHAPTER 11 PLAN
OF REORGANIZATION FOR PRIME CORE TECHNOLOGIES INC.
AND ITS AFFILIATED DEBTORS**

SDM, Inc. ("SDM"),[2] a party in interest in the above-captioned bankruptcy cases (the "Bankruptcy Cases"), hereby submits this objection (the "Objection") to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors* [Docket No. 485] (the "Plan"),[3] and in support thereof, respectfully represents as follows:

**PRELIMINARY STATEMENT**

1. Section 1123 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") prescribes, among other things, the contents that a plan must include in order to be confirmed. Among the requirements is that a plan provide an adequate means for its implementation. *See* 11 U.S.C. § 1123(a)(5). While the Plan herein purports to provide a means for implementation in Article 6, it is missing a necessary component: how the Account Treatment Issues are to be resolved. Resolution of the Account Treatment Issues is crucial in determining:

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, NV 89135.

[2] SDM is the successor by amalgamation to, among others, 1983283 Ontario Inc. and Secure Digital Markets Canada Inc. References herein to SDM shall include the foregoing entities.

[3] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

(i) what assets are to be transferred to and vested in the Wind-Down Debtor free and clear of interests or surrendered to Account Holders; and (ii) whether the Plan cures the Debtors' default in returning funds and cryptocurrencies belonging to SDM and others Account Holders. Omitting a process that seeks to resolve this critical issue from the Plan creates confusion and uncertainty. To satisfy Section 1123(a)(5), the Plan must include a process for determining the rights of the parties with respect to customer funds.

## BACKGROUND

2.      SDM is a corporation organized under the laws of Ontario, Canada. SDM's principal place of business is 626 King Street W, Toronto, Ontario, Canada, M5V1M5.

3.      SDM provides comprehensive liquidity and settlement solutions for its customers who invest in cryptocurrency assets.

4.      SDM is party to three (3) contracts with Debtor Prime Trust, LLC ("Prime Trust"). Such contracts include: (a) API Technology Agreement Account Form dated May 28, 2020 (the "API Agreement"); (b) Prime Trust New Account Agreement dated January 8, 2021 (the "Account Agreement"); and (c) Prime Trust Order Form dated November 29, 2022 (the "Order Form").

5.      Pursuant to the Account Agreement, Prime Trust established and maintained custodial accounts for the benefit of SDM (collectively, the "Custodial Account").

6.      On June 21, 2023, Nevada Department of Business and Industry Division of Financial Institutions (the "Nevada FID") issued a cease and desist order (the "Cease and Desist Order"). *See Declaration of Jor Law, Interim Chief Executive Officer and President of Prime Core Technologies Inc., et al., In Support of Chapter 11 Petitions and First Day Motions, filed August 24. 2023* [Docket No. 14] (the "Law Declaration") at ¶ 57. According to the Debtors, the Cease and Desist Order prohibited them from operating and/or engaging in the trust company

business in violation of NRS Chapter 669, specifically 669.100(1) and NRS 669.2825(1)(a), (b), (c), (f) and (k), and further prohibited the Debtors "from accepting fiat currency from existing and new clients for custody purposes" and "from accepting cryptocurrency from existing and new clients for custody purposes." Law Declaration at ¶ 57 note 32.

7.  On June 21, 2023, a liquidity provider of SDM caused $301,440.33 US to be transferred to the Custodial Account as a part of a transaction settlement. SDM is informed that including the June 21 Transfer, the total amount of funds that Prime Trust holds for the benefit of SDM is $307,085.68 (the "Custodial Funds").

8.  On June 22, 2023, the liquidity provider issued a recall notice with respect to the June 21 Transfer, and SDM communicated such request to Prime Trust in a series of emails that day. Prime Trust employees initially indicated that they would send the recall request to Prime Trust's funds processing team and would keep SDM updated regarding progress of the recall request. However, late on June 23, 2023, Prime Trust employees advised SDM that, due to the Cease and Desist Order, Prime Trust was not able to process wire recalls at that time.

9.  The June 21 Transfer has not been returned to SDM or its liquidity provider to date, and the Custodial Funds remain under the control of Prime Trust.

**THE CHAPTER 11 PROCEEDINGS**

10. On August 14, 2023 (the "Petition Date"), Prime Trust and its affiliated debtors (the "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Cases.

11. On August 24, 2023, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition*

*Obligations Related Thereto; (II) Authorizing the Debtors to (A) Continue to Perform Intercompany Transactions and (B) Granting Administrative Expense Status for Postpetition Intercompany Claims; (Iii) Extending the Time for the Debtors to Comply with Requirements Set Forth in 11 U.S.C. § 345(B); and (IV) Granting Related Relief* [Docket No. 20] (the "Cash Management Motion").

12. At the first day hearing on, *inter alia*, the Cash Management Motion, parties similarly situated with SDM raised concerns about the Debtors' ability to access and use funds in Customer Accounts.[4] As a result thereof, the Court's order granting the Cash Management Motion on an interim basis [Docket No. 42] included the following language (the "Customer Account Restriction") at decretal paragraph 7:

> Notwithstanding anything to the contrary in this Order, the Debtors shall not use or transfer funds from Customer Accounts to honor any prepetition obligations or pay for any postpetition obligations absent further order of the Court. All parties' rights are reserved regarding whether and to what extent any funds or other property are held by a Debtor in trust or constitute property of the Debtors' estates.

13. On September 20, 2023, the Court entered the *Final Order (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, aAnd (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related Thereto; (II) Authorizing the Debtors to (A) Continue to Perform Intercompany Transactions and (B) Granting Administrative Expense Status for Postpetition Intercompany Claims; (III) Extending the Time for the Debtors to Comply with Requirements Set Forth in 11 U.S.C. § 345(b); and (IV) Granting Related Relief* [Docket No. 170] (the "Final Cash Management Order"). The Final Cash Management Order reiterates the Customer Account Restriction, as follows,

---

[4] The Cash Management Motion defines "Customer Accounts" as "eighteen (18) bank accounts and lockbox accounts [ ] used in connection with customer funds" Cash Management Motion, ¶ 10.

> Notwithstanding anything to the contrary in this Final Order, the Debtors shall not use or transfer funds, except as otherwise required by Bankruptcy Code section 345, from Customer Accounts to honor any prepetition obligations or pay any postpetition obligations absent further order of the Court. All parties' rights are reserved regarding whether and to what extent any funds or other property are held by a Debtor in trust or constitute property of the Debtors' estates.

Final Cash Management Order, ¶ 8.

14. On November 15, 2023, the Debtors filed the *Debtors' Second Omnibus Motion for Entry of an Order (A) Authorizing the Debtors to Reject Certain Executory Contracts, Effective as of November 15, 2023, and (B) Granting Related Relief* [Docket No. 428] (the "Motion to Reject"). Schedule 1 to the proposed form of order for the Motion to Reject includes an agreement with SDM and identifies all of the agreements to be rejected as "Vendor Agreements."

15. On November 21, 2023, the Prime Trust filed its amended schedules of assets and liabilities [Docket No. 442-3]. The amended schedules employ confidential numbering that do not identify customers by name. SDM is informed that the amended schedules identify SDM and/or certain parties related to SDM as unsecured creditors in the aggregate amount of $ is $307,085.68 (together, the "SDM Claim"). Prime Trust did not designate the SDM Claim as disputed, contested or unliquidated.

16. On November 29, 2023, SDM filed a limited opposition to the Motion to Reject [Docket No. 491], asserting that the Motion to Reject fails to adequately identify the agreements that the Debtors seek to reject and fails to address the parties' rights to the Custodial Funds. The Motion to Reject and SDM's limited objection thereto, remain pending before the Court.

17. On November 28, 2023, the Debtors filed the Plan. With respect to the Customer Account Restriction and the underlying issues related thereto, the Plan includes the following relevant definitions:

"Account" means any active account identified in the Debtors' books and records as having a balance as of the Petition Date. For the avoidance of doubt, Accounts as used herein are not "accounts" within the meaning of Article 9 of the Uniform Commercial Code.

"Account Holder" means any Person or Entity who maintains an Account with any of the Debtors as of the Petition Date.

"Account Treatment Issues" has the meaning set forth in Article 2.5 of the Plan.

Plan, §§ 1.1-1.3.

18. Section 2.5 of the Plan, in turn, provides as follows,

*Non-Estate Assets/Account Treatment Issues.* Any Assets of a Debtor that are determined by such Debtor or by the Bankruptcy Court not to be property of such Debtor's Estate (the "Non-Estate Assets") shall be (i) transferred, if necessary, to the Wind-Down Debtor; and/or (ii) returned to the owner or owners of such Non-Estate Assets in kind in accordance with Article 7 of the Plan, subject to set-off for (a) any negative Account balances, including for any ACH chargeback transactions and (b) any applicable withdrawal fees. For the avoidance of doubt, subject to the outcome of a final determination by the Debtors, the Wind-Down Debtors[5] or the Bankruptcy Court, as applicable, (w) any such Assets shall not be included as part of the Cash Allocation or the Cryptocurrency Allocation, (x) any General Unsecured Claim against a Debtor shall be net of Non-Estate Assets actually received by the Holder of such General Unsecured Claim, (y) in no circumstance shall any such Non-Estate Assets be transferred to or become property of the Reorganized Debtors or the Wind-Down Debtor, and (z) distributions pursuant to the terms of the Plan, including distributions made in accordance with Article 7.6 of the Plan, shall only be from Assets, or proceeds of Assets, determined to be property of such Debtor's Estate. For the avoidance of doubt, nothing set forth in the Plan, including in this Article 2.5, or the Disclosure Statement, is intended to indicate that the Debtors or the Wind-Down Debtor, as applicable, have made a determination or taken a position with respect to whether any Accounts or the fiat or Cryptocurrencies therein, are property of their respective Estates (collectively, the "<u>Account Treatment Issues</u>"). <u>Pending a determination of the Account Treatment Issues by the Bankruptcy Court, the Debtors or the Wind-Down Debtors, as applicable, will</u>

---

[5] For the avoidance of doubt, SDM objects to the Debtor's or the Wind-Down Debtors' ability to determine that Account funds are property of the estate. Such determination should be reserved for the Court.

> not use or transfer the funds subject to a Customer Agreement[6] absent an order of the Bankruptcy Court.

Plan, § 2.5 (emphasis added).

19. While § 2.5 of the Plan provides that the Debtors and Wind-Down Debtor, respectively, will not use or transfer the funds subject to a Customer Agreement absent an order of the Bankruptcy Court, the Plan does not provide a process to resolve the Account Treatment Issues, which will ultimately determine what funds and cryptocurrencies in the Debtors' custody are the property of respective Account Holders or property of the estate to be transferred to and vested in the Wind-Down Debtor free and clear. For instance, the Plan does not specify when or how the Debtors will make known their position regarding ownership of Account funds; which party (Debtors or Account Holders) will be required to seek a Court determination regarding ownership of Account balances; when the parties are required to initiate Court proceedings; what procedures (e.g., motion, adversary proceeding or arbitration) will be employed. Although the Plan implies that Account issues may be determined by the Court, the Plan ignores that at least one of the agreements between SDM and Prime Trust provides for arbitration of disputes.[7]

20. As the Debtors have elected to proceed with a Liquidation Transaction under the Plan, on the Effective Date, as defined in the Plan, the Debtors' interests in funds and cryptocurrencies (other than Customer funds) will vest in the Wind-Down Debtor. The Plan provides,

---

[6] "Customer Agreement" means any contract, agreement, or other document existing between a Debtor and a Person or Entity governing the custodial relationship between the Debtor and such Person or Entity." Plan, § 1.50. It would appear that SDM is a Customer and has Customer Agreements with the Debtors, but, as noted in SDM's limited opposition to the Motion to Reject, Schedule 1 to the proposed form of order for the Motion to Reject identifies one SDM contract as a "Vendor Agreement." **SDM asserts that it is a Customer and its agreements are Customer Agreements which create a custodial relationship and reserves all rights related thereto.**

[7] SDM reserves all rights with respect to enforceability of arbitration provisions in its agreements.

7

> Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, the Debtors shall be deemed, subject to the Plan Administrator Agreement, to have automatically transferred to the Wind-Down Debtor all of their right, title, and interest in and to all of the Wind-Down Debtor Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Debtor free and clear of all Claims, Liens, and other interests. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind-Down Debtor.

Plan, § 6.10(b).  The Plan provides further,

> Vesting of Assets in Wind-Down Debtor.  Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors, and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

Plain, § 6.10(m).

21. Section 10.5 of the Plan provides for "Releases by Holders of Claims and Interests" (the "Creditor Release"), for the benefit of "Released Parties" which includes, among others, the Debtors and the Wind-Down Debtor.  *See* Plan, § 1.144.  The Plan defines "Releasing Parties" as follows:

> "Releasing Parties" means collectively, and in each case, solely in their respective capacities as such: (a) the Released Parties; (b) all Holders of Claims and Interests that are deemed to accept this Plan and who do not either affirmatively opt out of the releases provided by the Plan or file an objection with the Bankruptcy Court objecting to the releases set forth in Article 10.5 of the Plan; (c) all Holders of Claims who (i) vote to accept or reject the Plan, or (ii) abstain from voting and, in the case of either (i) or (ii), do not affirmatively opt out of the voluntary release contained in Article 10.5 of the Plan by checking the "opt-out" box on the ballot and returning it in accordance with the instructions set forth thereon or file an objection

8

>with the Bankruptcy Court objecting to the releases set forth in Article 10.5 of the Plan; *provided, however,* that if (i) the Asset Purchase Agreement is terminated, the Purchaser shall not be a "Releasing Party" under the Plan and (ii) the Plan Sponsorship Agreement is terminated, the Plan Sponsor shall not be a "Releasing Party" under the Plan. For the avoidance of doubt, no Holder of any Claim or Interest that is deemed to reject this Plan shall be a Releasing Party.

Plan, § 1.147.

22. The scope of the Creditor Release is expansive and, but for the Customer Account Restriction and the reservation of rights incorporated into § 2.5 of the Plan, could be construed to apply to the Account Treatment Issues and Account Holders' rights to assert an interest in Account funds or cryptocurrencies.

## OBJECTION

### A. The Proposed Means for Implementation Are Inadequate.

23. Section 1123(a) of the Bankruptcy Code prescribes the contents of a plan necessary for confirmation. In particular, and relevant to the instant matter, § 1123(a) provides, in pertinent part,

> Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—
>
> \*   \*   \*
>
> (5) provide adequate means for the plan's implementation, such as—
>   (A) retention by the debtor of all or any part of the property of the estate;
>   (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;
>   (C) merger or consolidation of the debtor with one or more persons;
>   (D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;
>   (E) satisfaction or modification of any lien;

  (F) cancellation or modification of any indenture or similar instrument;
  (G) curing or waiving of any default;
  (H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;
  (I) amendment of the debtor's charter; or
  (J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose; . . .

11 U.S.C. 1123(a)(5).

  24. While § 1123(a)(5) expressly identifies some means for implementing a plan, the listed options are "merely illustrative rather than exclusive," *1199SEIU Nat'l Benefit Fund v. Akorn, Inc. (In re Akorn, Inc.)*, C.A. No. 20-1254 (MN), 2021 U.S. Dist. LEXIS 180788, *34 (D. Del. Sept. 22, 2021). While plan proponents may enjoy discretion in choosing an adequate means of implantation, *see id.*, the proposed means of implantation must always be <u>adequate</u>. *See In re Continental Airlines*, 932 F.2d 282, 287 (3d Cir. 1991) ("As the Supreme Court has noted, 'the plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters'") (citations omitted).

  25. One option for implementing a plan is by way of "transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan," 11 U.S.C. § 1123(a)(5)(B), which is precisely what the Plan proposes to do by transferring the Debtors' assets to the Wind-Down Debtor free and clear. However, the means of implementation is meaningless when the critical threshold issue of what funds and cryptocurrencies are to be transferred, and how and when that determination is to be made, are missing from the Plan, particularly when funds and cryptocurrencies comprise such a large percentage of the Debtors' assets.

26. Another option for plan implementation is by way of "curing or waiving of any default." 11 U.S.C. § 1123(a)(5)(G). Although not explicitly defined, curing a default has been interpreted to mean the reversal of an event triggering the alleged default so as to return to pre-default conditions during the reorganization period. *See In re W.R. Grace & Co.*, 475 B.R. 34, 158 (D. Del. 2012) (citation omitted). That is what could occur if it is determined that the Account funds are the property of Account Holders and such funds are returned to their rightful owners.

27. Thus, under this means of implementation, if a contractual default occurred, it would have to be cured or waived in order for the Plan to be properly implemented. *See id.* This means that the triggering event of default—for example, the Debtors' failure to return the Custodial Funds to SDM—would be reversed and a return to the pre-default status quo would be required. *See id.*

28. Resolution of the Account Treatment Issues is necessary for the implementation of the Plan to be adequate. The resolution of the Bankruptcy Cases should not require indefinite reliance solely on the Customer Account Restriction in the Final Wage Order and a reservation of rights in section 2.5 of the Plan. Rather, the Plan should propose a process for addressing and resolving the Account Treatment Issues.

    B.    **SDM Objects to the Release by Holders of Claims and Interests and Injunction**

29. With respect to the Creditor Release in section 10.5 of the Plan, whether the Custodial Funds are deemed to be the property of SDM or property of the estate, which will determine whether SDM may vote as a Class 3B creditor, SDM objects to and hereby opts out of any voluntary release, including, but not limited to, the Creditor Release set forth in section 10.5 of the Plan, with respect to any claims or causes of action against any Released Parties.

30. Notwithstanding the fact that the releases set forth in section 10.5 of the Plan do not release any post-Effective Date obligations of or under any party or Entity under the Plan, for the avoidance of doubt, SDM does not release the Debtors or the Wind-Down Debtor from their obligation to refrain from transferring or using any Custodial Funds, pending the Bankruptcy Court's adjudication as to whether Custodial Funds are property of the respective Account Holder or property of the estate.

31. SDM further objects to the Injunction provisions set forth in section 10.7 of the Plan to the extent they seek to interfere with SDM's ability to seek a determination of ownership of Custodial Funds and/or seek possession thereof.

## **RESERVATION OF RIGHTS**

32. This objection is subject to further diligence of SDM's contractual relationship with the Debtors. SDM reserves the right to modify or amend this Objection in the event the Debtors seek to further modify the Plan, or SDM determines that additional facts and circumstances are at issue. In addition, SDM reserves all rights with respect to the Debtors and other parties, including the right to seek relief from this Court (i) to compel payment of Account funds to SDM and, alternatively, (ii) to seek allowance and payment of Customer Claim. Nothing herein shall be considered a waiver or release of any rights, claims or defenses that SDM has against anyone, including but not limited to the Debtors or the Wind-Down Debtor.

WHEREFORE, SDM, Inc. respectively objects to the Plan as set forth herein.

Dated: December 5, 2023
Wilmington, Delaware

Respectfully submitted,

/s/ *Stephen B. Gerald*
Richard W. Riley (No. 4052)
Stephen B. Gerald (No. 5857)
WHITEFORD, TAYLOR & PRESTON LLC[8]
600 King Street, Suite 300
Wilmington, Delaware 19801
Phone: (302) 353-4144
E-mail: rriley@whitefordlaw.com
　　　　 sgerald@whitefordlaw.com

-and-

Bradford F. Englander, Esq. (admitted *pro hac vice*)
WHITEFORD TAYLOR & PRESTON L.L.P.
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia 22042
Phone: (703) 280-9081
E-mail: benglander@whitefordlaw.com

*Counsel for SDM, Inc.*

---

[8] Whiteford, Taylor & Preston LLC operates as Whiteford Taylor & Preston L.L.P. in jurisdictions outside of Delaware.