## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies, Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtor. | (Jointly Administered) |
| | **Re:  D.I. 485, 508** |

### LIMITED OBJECTION AND RESERVATION OF RIGHTS
### OF 450 INVESTMENTS LLC TO CONFIRMATION
### OF AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
### FOR PRIME CORE TECHNOLOGIES INC. AND ITS AFFILIATED DEBTORS

450 Investments LLC ("**450**"), by and through its undersigned counsel, hereby submits this limited objection and reservation of rights (the "**Limited Objection**") and respectfully states as follows:

### Preliminary Statement

1.       450 is a customer of Debtor Prime Trust, LLC ("**Prime Trust**"), which is the custodian of approximately $248,000 worth of Bitcoin SV ("**BSV**") belonging to 450 (the "**450 BSV Assets**").  BSV is a cryptocurrency asset and a fork of Bitcoin Cash, which is itself a fork of the original Bitcoin.

2.       As set forth in greater detail below, the 450 BSV Assets are the property of 450 under applicable law and do not constitute assets of the Debtors' estates.  Section 2.5 of the Amended Plan provides that "Non-Estate Assets" shall be returned to the applicable owner in kind and shall not become property of the Reorganized Debtors or the Wind-Down Debtor, and that

---

[1]       The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, NV 89135.

distributions pursuant to the terms of the Amended Plan shall not be made out of such Non-Estate Assets.  To the extent that the Amended Plan and the Debtors recognize the 450 BSV Assets as Non-Estate Assets, and they are promptly returned to 450, and any other setoff and recoupment rights belonging to 450 are preserved, then 450 has no objection to the Amended Plan.  However, the Debtors to date have failed to provide 450 with adequate assurances that they recognize 450's ownership of the 450 BSV Assets, and their published filings create ambiguity with respect to their position.  Accordingly, 450 files this Limited Objection to eliminate any doubt as to 450's ownership of the 450 BSV Assets and forestall any attempted transfer or disposition of the 450 BSV Assets by the Debtors under the Amended Plan.

3.      In the event that any dispute arises between the Debtors and 450 as to the ownership of the 450 BSV Assets (an "**Ownership Dispute**"), such Ownership Dispute is subject to binding arbitration pursuant to the Custody Agreement.  For the avoidance of doubt, 450 does not consent to resolution by this Court of any Ownership Dispute with respect to the 450 BSV Assets and reserves all rights with respect to the same, including the right to seek relief from the automatic stay in order to submit any Ownership Dispute to arbitration in accordance with the terms of the Custody Agreement.

4.      Furthermore, on November 18, 2023, the Debtors objected – summarily, with a few lines in a chart located toward the end of a 120-page filing – to 450's proof of claim, apparently on the basis that the stated amount of the claim in US dollars was allegedly duplicative of the amount stated in BSV.  The Debtors seemingly do not object to amount of 450's claim in BSV or to the rate used for the conversion of BSV to US dollars.  450 intends to file a response to the Debtors' claim objection at a later date, but for the avoidance of doubt: (i) 450 seeks the return of the 450 BSV Assets; (ii) in the event that the Debtors fail to return the 450 BSV Assets to 450,

450 has every right to assert its properly-filed protective claims; and (iii) and 450 reserves all rights with respect thereto.[2]

## Background

### A.    General Background

5.    On August 14, 2023 (the "**Petition Date**"), Prime Core Technologies Inc. and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**") filed voluntary petitions in this Court commencing cases for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested in these cases.

6.    On September 8, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors* [D.I. 92].  On October 2, 2023, the Debtors filed a revised *Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors* [D.I. 235-1], and on October 4, 2023, the Debtors filed a further *Revised Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors* [D.I. 250-1].

7.    On November 28, 2023, and December 4, 2023, the Debtors filed plans titled, the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors* [D.I. 485-1; 508] (the "**Amended Plan**").[3]

---

[2]    On the morning of the deadline to file this objection the Debtors reached out to counsel for 450, indicating that they would be willing to remove the claim from the omnibus claim objection, but reserving rights to assert the objection another time.  450 is considering this offer.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Amended Plan.

8.      The Debtors intend to seek confirmation of the Amended Plan at a hearing scheduled for December 19, 2023, at 10:00 a.m. (prevailing Eastern Time).

**B.      The Prime Trust Custody Agreement**

9.      On March 16, 2020, 450 and Debtor Prime Trust entered into that certain *Prime Trust New Account Agreement* (the "**Custody Agreement**").  Pursuant to the Custody Agreement, 450 appointed Prime Trust to be custodian of certain securities, currency, cryptocurrency, and other assets of 450, including the 450 BSV Assets (the "**Custodial Property**").

10.      The Custody Agreement directs Prime Trust to provide certain custodial services set forth in the Custody Agreement, "all of which are ministerial in nature."  Custody Agreement § 2(a); 4(c) ("Custodian is responsible for safekeeping only Custodial Property which is delivered into its possession"); 9(1)("[Custodian's] sole responsibility shall be for the holding and disbursement of the Custodial property in accordance with the terms of this agreement") (upper-case emphasis omitted).  Assets that may be delivered into custody include, among others, title to real estate, securities, and digital assets.  *Id*. at § 4(a).  The Custody Agreement specifically provides that, "The Account is not a brokerage account." *Id*. at § 4(j).

11.      450 retains its property interest in the Custodial Property under the Custody Agreement.  The Custody Agreement expressly provides that, "Prime Trust will act solely as custodian of the Custodial Property" and "will not exercise any investment . . . discretion regarding" the Custodial Property.  *Id.* at § 2(a).  The account holder is required to provide Prime Trust with information concerning "beneficial owners and other customer information."  *Id*. at § 22.  Any title that Prime Trust may acquire in the Custodial Property "in its own name or in the name of its nominee (commonly known as 'street name')" is "for convenience," is not automatic, and does not affect the beneficial ownership interests of 450, which "Account Holder ownership of Custodial Property" must be "segregated on [Prime Trust's] books and records."  *Id*. at § 4(c).

Prime Trust is required to transact with or disburse the Custodial Property at any time as 450 may direct. *Id*. at § 4(f).

12.     Administrative provisions reinforce the custodial nature of the relationship, directing the treatment of property in a manner consistent therewith. Prime Trust as custodian was required to "keep accurate records of segregation of customer accounts to show all receipts, disbursements, and other transactions involving the Account," keep those records "indefinitely," hold proceeds of any maturity, redemption or sale with respect to Custodial Property pending disbursement instructions from 450, and "collect into custody property delivered to Custodian" at agreement execution and "which may hereafter to [sic] be delivered to Custodian for your Account . . . together the with income . . . attributable to the investment of the Custodial Property. *Id*. at § 4(d), (e), (h). It requires delivery of the Custodial Property to 450 upon termination of the agreement, and, in specific deference to bankruptcy law, provides that upon any filing of a bankruptcy petition by 450 "Custodian shall deliver the Custodial Property to the Court appointed representative for Account Holder." *Id*. at § 6(d), (ii). The Custody Agreement disclaims any obligation of the Custodian to protect the property in the account absent an indemnity to its satisfaction, requires the account holder to "bear sole responsibility" for legal action "necessary for the protection of the investments in that Account" and for enforcing any relevant judgments, "including judgments rendered in the name of Prime Trust as Custodian of the Account," and expressly provides that "Account Holder understands that any legal filings made on behalf of this Investment [sic] are to be made on behalf of beneficial owners for whom Prime Trust acts as custodian." *Id*. at § 9(4), (5)(i), (5)(ii).

13.     This arrangement is consistent with Prime Trust's business as a licensed retail trust company and its duties under Nevada law as a retail trust company. *See* State of Nevada Dept. of

Business & Industry Financial Institutions Licensee Lists (listing "Prime Trust LLC");[4] Nev. Rev. Stat. Ann. § 669.220 ("A retail trust company:  (a) Shall keep all trust funds and investments separate from the assets of the retail trust company, and all investments made by the retail trust company as a fiduciary must be designated so that the trust or estate to which the investments belong may be clearly identified.").    Indeed, Prime Trust consistently portrayed itself as a traditional custodian, among other things, labeling the account as a "Custodial Account" and as a "Traditional Custodial" account in 450's account profile.

14.    On November 21, 2023, the Debtors filed amended schedules [D.I. 442], reflecting that the Debtors have possession of BSV worth $248,574.23, *see* [D.I. 442-3] at 25, as well as individual customer entitlements to BSV in an amount totaling less than the amount in Prime Trust's possession. *Id*. at 41 *et seq*.

15.    Section 16 of the Custody Agreement provides that the Custody Agreement is governed by the laws of the State of Nevada and that any claim or dispute arising under the Custody Agreement may be brought only in arbitration, with venue in Clark County, Nevada.    Custody Agreement § 16.

C.    **The Debtors' Claim Objection**

16.    On October 17, 2023, 450 filed a proof of claim in accordance with the Court's *Order (I) Establishing Bar Dates to File Proofs of Claim; (II) Approving Form and Manner for Filing Proofs of Claim; (III) Approving Form and Manner of Notice of Bar Dates; and (IV) Granting Related Relief* [D.I. 169].

17.    On November 18, 2023, the Debtors filed *Debtors' First (Substantive) Omnibus Objection to Certain Filed Proofs of Claim* [D.I. 436] (the "**First Omnibus Objection**"), in which

---

[4]    *See* https://fid.nv.gov/uploadedFiles/fidnvgov/content/Licensing/Trust%20Company%20list.pdf (last accessed October 1, 2023).

the Debtors allege that the listing of both the amount of the 450 BSV Assets and United States dollar equivalent doubled the claim. This, however, is a misreading of the claim, which makes clear that the Debtors' claim is for the 450 BSV Assets, which should be returned in kind. If the Debtors fail to do so, then 450 retains its protective claims for the equivalent in value, and other claims arising as a result of the estate's conversion of 450's property. 450 will continue discussions with the Debtors regarding the First Omnibus Objection.

## Limited Objection

18.     As of the date hereof, the Debtors have not indicated clearly whether they recognize the Custodial Property as Non-Estate Assets, nor have the Debtors indicated whether they intend to distribute the Custodial Property under the Amended Plan. As mentioned previously, § 2.5 of the Amended Plan provides that Non-Estate Assets shall be returned to their respective owners. However, the Debtors list the 450 BSV Assets as a claim on their schedules and identify a nearly identical amount of BSV in their listed assets.

19.     450 submits this Limited Objection to clarify that the Custodial Property is not an asset of the Debtors' estates and, therefore, the Debtors may not make any distributions out of the Custodial Property in connection with the Amended Plan. To the extent that an Ownership Dispute arises between 450 and the Debtors, 450 submits that any such Ownership Dispute is subject to binding arbitration pursuant to § 16 of the Custody Agreement. 450 reserves all rights with respect to any such arbitration and does not consent to the resolution of an Ownership Dispute by this Court. In addition, while 450 intends, in due course, to respond more fully to the Debtors' cursory and ill-founded objection to 450's filed proof of claim set forth in their First Omnibus Objection, for the avoidance of doubt, 450 disputes in full the mischaracterization of its claim by the Debtors

and reserves all rights with respect to the same, including 450's right to protective claims in the event that the Debtors fail to return the 450 BSV Assets.

20.    Finally, 450 objects to the Plan to the extent that it imposes any release or any limitation on 450's setoff or recoupment rights, including section 10.7 of the Plan.

**A.    The Custodial Property is not an Estate Asset.**

21.    As described in detail above, the Debtors' rights with respect to the Custodial Property are limited to the provision of certain "ministerial" custodial services pursuant to the Custody Agreement.  Pursuant to the Custody Agreement, 450 retains its property interest in the Custodial Property.  The terms of the Custody Agreement unambiguously reflect that the parties intended for Prime Trust to hold the assets delivered into custody as custodian *only*, and there simply is nothing in the agreement to suggest that the parties intended to convey rights of ownership on Prime Trust.

22.    The Custody Agreement created, at a minimum, a bailment under Nevada law, whereby 450, as bailor, delivered the Custodial Property to Prime Trust, as bailee, for safekeeping. "A bailment exists when there is a 'delivery of personal property by one person (the bailor) to another (the bailee) who holds the property for a certain purpose under an express or implied-in-fact contract.'"  *Borenstein v. Animal Found.*, 526 F. Supp. 3d 820, 838 (D. Nev. 2021) (internal citations omitted).  "The basic elements of a bailment are the delivery of personal property from one person to another for a specific purpose, the acceptance by the transferee of delivery, an agreement that the purpose will be fulfilled, and an understanding that the property will be returned to the transferor or dealt with as the transferor directs."  8 C.J.S. Bailments § 18.  "Where a bailee, either for hire or gratuitously, is entrusted with care and custody of goods, it becomes his duty at the end of the bailment to return the goods or show that their loss occurred without negligence on his part.  Failing in this, there arises a presumption that the goods have been converted by him, or

lost as a result of his negligence, and he is accountable to the owner for them." *Kula v. Karat, Inc.*, 91 Nev. 100, 104, 531 P.2d 1353, 1355 (1975). 450's delivery of property into custody also gives rise to trust and constructive trust arrangements, as it retained beneficial ownership of the Custodial Property.

23.     Pursuant to the Custody Agreement, 450 delivered the Custodial Property to Prime Trust and directed Prime Trust "to hold as custodian" all Custodial Property. Custody Agreement Preamble. Prime Trust accepted this delivery and agreed that it would "act solely as custodian of the Custodial Property," according to the terms of the Custody Agreement. *Id*. at § 2(a). Prime Trust is required to "process the investment and reinvestment of Custodial Property as directed by Account Holder or its Agents," so long as such requests do not impose an unreasonable administrative burden. *Id*. at § 2(c). 450 is entitled, at any time, to direct the "purchase, sale, exchange, investment, disbursement or reinvestment of Custodial Property." *Id*. at § 4(f). Even if Prime Trust takes title of Custodial Property, "for convenience," 450 retains beneficial ownership of such assets, which must be segregated, cannot be commingled with Prime Trust's own, and must be accounted for separately. *Id*. at § 4(c), (d). Finally, as set out above in the description of the Custody Agreement, the parties repeatedly reflected their intention that beneficial ownership would remain with 450 and allocated rights accordingly—hence Prime Trust's inability to invest, or even disburse assets, other than at the direction of 450 or its successors, its disclaimer of the responsibility to protect such property absent an undertaking of 450 to prosecute any necessary litigation, and the lack of any terms providing for consideration consistent with a title transfer or an investment relationship.

24.     Given these clear indicia of a custodial relationship, there can be no doubt that 450 retains ownership of the Custodial Property under the Custody Agreement. Unlike certain other

cases involving cryptocurrency, the Custody Agreement involves no transfer of title.  It strains

credulity to suggest that 450 and Prime Trust, having executed an agreement that *provides for no*

*consideration to 450* for a transfer of title, or for any putative right to "use" the assets delivered

into custody, and which so plainly refers throughout to 450's ongoing beneficial ownership of the

assets custodied, and provides Prime Trust only the limited rights necessary to the administration

of those assets, and having delivered those custodied assets to a "*trust company," not an investment*

*platform,* would have intended to transfer ownership by such agreement.  Even in the event that

*legal* title to some of the Custodial Property had passed to Prime Trust, 450 would retain its

beneficial ownership, and courts recognize that section 541(d) of the Bankruptcy Code expressly

provides that property in which a debtor holds only bare legal title is not property of the estate.

*Golden v. Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 100 (Bankr. D. Del. 2006); *see*

*also In re S.W. Bach & Co.*, 435 B.R. 866, 878 (Bankr. S.D.N.Y. 2010) (holding that property held

in trust, escrow, or as part of bailment is not property of the estate).

      25.     Nor is this analysis affected by the fungible character of BSV and other crypto

assets.  A bailment of fungible assets is well recognized in the law.  *See*, *e.g.*, *Kula v. Karat, Inc.*,

91 Nev. 100, 103, 531 P.2d 1353, 1354 (1975) ("A bailment of money is as well recognized as the

bailment of any other personal property."); *State v. Rogers*, 320 Mo. 260, 265, 7 S.W.2d 250, 251

(1928) ("The fact that the money could be paid back in a different form would not alter the

character of the transaction as a bailment."); *Knapp v. Knapp*, 118 Mo. App. 685, 96 S.W. 295,

297 (1906) ("It has been repeatedly held in circumstances where the identical grain commingled

with other grain is not to be returned to the depositor, but a like quantity of the same kind and

quality is to be returned, are not sufficient to convert the transaction from a bailment into a contract

of sale. The same rule has been applied in replevin suits . . . though an actual separation cannot be

made by identifying each particle, if a division of equal value can be made, it has been repeatedly held the plaintiff may seize his aliquot part."); *In re McCarthy's Funds*, 139 Misc. 147, 248 N.Y.S. 335 (Sur. 1930); *Glenshaw Glass Co. v. Ontario Grape Growers' Mktg. Bd.*, 67 F.3d 470 (3d Cir. 1995) (finding that the product of grapes that had been delivered for processing was subject to bailment); *In re Medomak Canning Co.*, No. BK 75 936, 1977 WL 25603 (Bankr. D. Me. Aug. 31, 1977) (finding a bailment where pork and beans were sent to a processor for canning).  In this case, however, the Custodial Property was maintained in a segregated account in 450's name, and Prime Trust was and is required to "keep accurate records of segregation" and to keep them "indefinitely."  Custody Agreement at § 4(d).  There can therefore be no doubt that the Custodial Property did not become property of the Debtors' estates.

26.    Accordingly, the Custodial Property is not property of the Debtors' estates and, thus, may not be distributed or transferred to a third party in connection with the Amended Plan. *See Official Comm. of Unsecured Creditors of the Columbia Gas Transmission Corp. v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys.)*, 997 F.2d 1039, 1054 (3d Cir. 1993) ("A bankruptcy estate includes all property of the debtor, but only to the extent of the debtor's equitable interest in such property."); *Glenshaw Glass Co.*, 67 F.3d at 477 (finding that property delivered under bailment never became part of the recipient's bankruptcy estate).  In other cases involving custodial relationships, courts have found that the custodial assets are not property of the bankruptcy estate because the custodian serves merely as an agent to carry out the instructions of the beneficial owner.  *See, e.g., In re Joliet-Will Cnty. Cmty. Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988) (finding that certain government grants and property purchased with them were not property of the recipient's bankruptcy estate, because it had acted merely as the custodian of such funds).  450 objects to confirmation of the Amended Plan to the extent that the Debtors intend to treat the

Custodial Property as estate assets, make distributions out of the Custodial Property under the Amended Plan, or otherwise transfer the Custodial Property to a third party. Other than as set forth in this Limited Objection, 450 does not object to confirmation of the Amended Plan.

**B.**      **Any Ownership Dispute Regarding the Custodial Property is Subject to Binding Arbitration.**

27.      Section 16 of the Custody Agreement expressly provides that any claim or dispute arising thereunder "may only be brought in arbitration, with venue in Clark County, Nevada, pursuant to the rules of the American Arbitration Association." Custody Agreement § 16. The Federal Arbitration Act (the "**FAA**") expresses Congress's strong interest in maintaining the enforceability of arbitration agreements.

28.      "The Third Circuit has ruled that the FAA applies to bankruptcy cases just as it does to non-bankruptcy cases." *In re Fruehauf Trailer Corp.*, 2007 WL 676248, at \*7 (Bankr. D. Del. Mar. 2, 2007) (citing *In re Mintze*, 434 F.3d 222, 230 (3d Cir. 2006)). Thus, bankruptcy courts, like other courts, "rigorous[ly] enforce[]" arbitration agreements in accordance with the FAA's "strong policy in favor of arbitration." *Mintze*, 434 F.3d at 229; *see, e.g.*, *In re Hyman Companies, Inc.*, 2011 WL 2632431, at \*2 (Bankr. E.D. Pa. July 1, 2011) ("The Third Circuit Court has ruled that federal courts are unflinchingly obliged to honor appropriately drafted arbitration clauses in contracts between the parties.").

29.      In *Mintze*, the Third Circuit held that, "[w]here an otherwise applicable arbitration clause exists, a bankruptcy court lacks the authority and discretion to deny its enforcement, unless the party opposing arbitration can establish congressional intent . . . to preclude waiver of judicial remedies for the statutory rights at issue." 434 F.3d at 231 (emphasis in original). The Court went on to "find no evidence of such intent in either the statutory text or the legislative history of the Bankruptcy Code" and rejected the Bankruptcy Court's conclusion that there was "an inherent

conflict between the Bankruptcy Code's underlying purposes and arbitration." *Id*. *Mintze* also expressly overruled a line of decisions holding that courts had discretion to decline enforcement of arbitration clauses in core bankruptcy proceedings. *Id*. at 230–31; *cf. In re GWI, Inc.*, 269 B.R. 114, 119 (Bankr. D. Del. 2001) ("There is no evidence that permitting arbitration of claims is a threat to the bankruptcy process. . . .").

25.    *Mintze* goes on to posit a two-part test to determine if a bankruptcy court has discretion to deny a request to arbitrate, provided that a valid arbitration clause exists that governs the dispute between the parties:

(1)    Are the claims/causes of action at issue "statutory claims that were created by the Bankruptcy Code"?

(2)    Is "there is an inherent conflict between arbitration and the Bankruptcy Code"?

*Id.* at 231.  If the answer to both parts of the *Mintze* test are answered in the affirmative, then the court has the discretion to deny a request to arbitrate.  Neither part of the *Mintze* analysis is satisfied in this case.

30.    Any Ownership Dispute, and any other claims arising from the estate's failure to return to assets to 450, would arise out of the Custody Agreement and 450's property rights under Nevada law.  They would not be "statutory claims that were created by the Bankruptcy Code." Submitting such a dispute to arbitration would not implicate any rights of the Debtors or any third parties under the Bankruptcy Code.  450 does not expect any Ownership Dispute to arise, given the clarity of the documents here, but reserves all rights with respect to any such Ownership Dispute.  450 does not consent to the adjudication by this Court of any Ownership Dispute, claims arising from the estate's failure to return to assets to 450, or any other dispute arising out of the Custody Agreement.

**C.      The Plan Should Not Release or Alter any Claims or Rights that 450 may have.**

31.      Finally, 450 observes that as recently as today, the deadline to object to confirmation of the Plan, the Debtors further amended their Plan, including section 10.7 pertaining to the plan injunction.  For the avoidance of doubt, there should not be any appropriate basis to limit any claims or rights of setoff or recoupment that 450 may have, as until 450 resolves any Ownership Dispute, it is not clear which claims and rights 450 may need to assert, in what context they will arise, or whether they will be pre or postpetition claims.  Additionally, the Debtors have not provided any basis for limiting a creditor's right to offset or recoup any amounts owing to it. Accordingly, to the extent that the Plan purports to release or enjoin any claims by 450, or limit its setoff or recoupment rights, 450 objects to the confirmation of the Plan.

<u>**Reservation of Rights**</u>

32.      450 reserves all rights, claims, or defenses with respect to the Custody Agreement and the Custodial Property, including the right to assert the Debtors' obligation to return the Custodial Property to 450, as well as the right to assert any claims arising from the Debtors' failure to do so, including but not limited to any claims that may arise under the Custody Agreement, the right to submit any dispute with respect to the Custodial Property to binding arbitration pursuant to the Custody Agreement, and the right to seek stay relief in connection therewith.  450 further reserves all rights in connection with the Amended Plan and all other pending pleadings in these chapter 11 cases.  450 further reserves the right to amend or supplement this Limited Objection at any time prior to confirmation of the Amended Plan, and to assert further arguments as the evidence may allow at any hearing thereon.  450 further reserves all rights in connection with its proof of claim and the First Omnibus Objection.

### Conclusion

33.     For the reasons set forth above, 450 respectfully objects to the confirmation of the

Amended Plan to the extent that it would distribute, transfer, or otherwise infringe upon 450's

rights in the Custodial Property.  450 further respectfully submits that any dispute between 450

and the Debtors is subject to binding arbitration pursuant to the Custody Agreement, and 450 does

not consent to the resolution of any such dispute by this Court.  450 respectfully reserves all rights

in connection with its proof of claim and the First Omnibus Objection and expects to respond more

fully to the Debtors' assertions in due course.


Dated: December 5, 2023
       Wilmington, Delaware

*/s/  Paul N. Heath*
Paul N. Heath (No. 3704)
Michael J. Merchant (No. 3854)
Alexander R. Steiger (No. 7139)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Email:  heath@rlf.com
      merchant@rlf.com
      steiger@rlf.com

-and-

Sara Coelho
William S. Holste
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, New York 10022
Telephone:  (212) 848-4000
Email: sara.coelho@shearman.com
      william.holste@shearman.com

*Counsel to 450 Investments LLC*