## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Obj. Deadline: Dec. 12, 2023 at 4:00 p.m. (ET)**<br>**Hearing Date: Dec. 19, 2023 at 10:00 a.m. (ET)** |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN SECURED PRIMING POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF

Prime Core Technologies Inc. and certain of its affiliates and subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), respectfully represent as follows in support of this motion (the "Motion")[2]:

### Relief Requested

1.     By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "DIP Order"), pursuant to sections 105, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), 552, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004(h), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 4001-2, 9006-1,

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are:  Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, NV 89135.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the DIP Term Sheet (as defined below), the First Day Declaration (as defined below), or the DIP Declarations (as defined below), as applicable.

9013-1, 9014-1, and 9014-2 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "Local Rules"):

    (i)    authorizing the Debtors, on the terms set forth in the *Superpriority Senior Secured Debtor In Possession Credit Facility Binding Term Sheet* (the "DIP Term Sheet"), a copy of which is attached to the DIP Order as **Exhibit 1**, to obtain postpetition financing pursuant to a single-draw, secured, superpriority postpetition term loan facility (the "DIP Facility" and, the loans under such facility, the "DIP Loans") in an aggregate principal amount of up to $10,000,000, the full amount of which shall be made available by the DIP Lender upon entry of this DIP Order);

    (ii)    authorizing the Debtors' incurrence of obligations under the DIP Loan Documents, including to borrow loans under, and pay fees in respect of, the DIP Facility (collectively, the "DIP Obligations");

    (iii)    authorizing the Debtors to use proceeds of the DIP Facility as permitted in the DIP Loan Documents and in accordance with the DIP Order and the Approved Budget (as defined in the DIP Order);

    (iv)    granting the DIP Lender an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in respect of the DIP Obligations, subject to the Carve-Out (as defined herein), as more fully set forth in this DIP Order;

    (v)    subject to the Permitted Liens (as defined in the DIP Term Sheet), granting the DIP Lender valid, enforceable, non-avoidable, automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, as applicable, on the DIP Collateral (as defined herein), including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral"), in accordance with the priorities set forth in the DIP Term Sheet;

    (vi)    authorizing the Debtors to pay the principal, interest, fees, expenses, indemnities, and other amounts payable under the DIP Loan Documents as they become due (subject to the provisions of paragraph 5 of the DIP Order), including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals actually incurred by the DIP Lender in connection with the DIP Facility;

    (vii)    Approving the Release;

    (viii)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this DIP Order;

    (ix)    authorizing the waiver by the Debtors of any right to seek to surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code;

(x)    waiving the "equities of the case" doctrine, to the extent that it could be applicable to the DIP Lender;

(xi)    waiving any applicable stay with respect to the effectiveness and enforceability of this DIP Order (including under Bankruptcy Rule 6004); and

(xii)    granting the Debtors such other and further relief as is just and proper.

2.    In support of this Motion, the Debtors submit the (a) *Declaration of Robert Winning in Support of Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Secured Priming Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, sworn to the date hereof and attached hereto as **Exhibit B** (the "Winning Declaration"), and (b) *Declaration of Michael Ashe in Support of Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Secured Priming Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, sworn to the date hereof and attached hereto as **Exhibit C** (the "Ashe Declaration," and together with the Winning Declaration, the "DIP Declarations"), which have been filed contemporaneously herewith and are incorporated by reference as if fully set forth herein.  In further support of this Motion, the Debtors respectfully state as follows:

**PRELIMINARY STATEMENT**[3]

3.    These Chapter 11 Cases stand on the edge of a precipice – the Debtors are close to bringing these Chapter 11 Cases to a conclusion, but due to unforeseen events, delays, and other circumstances, the Debtors lack the necessary funding to do so.  Enter Polaris Ventures ("Polaris"), a customer and significant unsecured creditor of the Debtors, who has agreed to provide the

---

[3]    Capitalized terms used by not otherwise defined in this preliminary statement have the meanings ascribed to such terms below.

Debtors with desperately needed liquidity in the form of a $10 million senior secured priming DIP Facility on extremely favorable terms.

4. The DIP Facility represents the best (and only) viable source of liquidity to bridge the Debtors to consummation of their Plan. The funds provided under the DIP Facility lay the foundation to ensure that the Wind-Down Debtor (as defined in the Plan) is appropriately capitalized following the Effective Date so that it may continue the Debtors' investigative efforts, analyze and reconcile claims, pursue claims and causes of action, and otherwise pursue avenues to maximize recoveries to the Debtors' creditors. Because of those benefits, the Debtors maintain that entry into the DIP Facility represents a sound exercise of their business judgment. And for those same reasons, the Committee generally supports the terms of the DIP Facility.

5. Conversely, without the funding being provided under the DIP Facility, these Chapter 11 Cases would be forced to convert to cases under chapter 7, potentially unraveling all of the progress the Debtors have made in these cases to date and creating more expense, uncertainty and delays for the Debtors' customers and other creditors at a time when these Chapter 11 Cases are so close to coming to a conclusion.

6. As set forth below, the Debtors' entry into the DIP Facility is the product of the reasonable exercise of their business judgment, is in in the best interest of the Debtors, their estates, creditors, and stakeholders, and should be approved.

## JURISDICTION AND VENUE

7. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

8.      The legal predicates for the relief requested herein are Bankruptcy Code sections 105, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), 552, and 507, Bankruptcy Rules 4001, 6004(h), and 9014, and Local Rules 4001-2 and 9013-1.

9.      The Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## **RELEVANT BACKGROUND**

### A.      **General Background**

10.      On August 14, 2023 (the "Petition Date"), each Debtor commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). These cases have been jointly administered for procedural purposes only.

11.      The Debtors continue to manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

12.      On August 29, 2023, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to Bankruptcy Code section 1102 (the "Committee") [Docket No. 51]. On November 29, 2023, the U.S. Trustee reconstituted the Committee [Docket No. 490]. The Committee is comprised of the following unsecured creditors: (a) Yousef Abbasi; (b) Allsectech, Inc.; (c) DMG Blockchain Solutions, Inc.; (d) Net Cents Technology, Inc.; (e) Stably Corporation; and (f) Austin Ward.

13.      Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the *Declaration of Jor Law, Interim Chief Executive Officer and President of Prime Core Technologies Inc., et al., in Support of Chapter 11*

*Petitions and First Day Motions* [Docket No. 14] (the "First Day Declaration"), which is incorporated by reference as if fully set forth herein.

**B.    The Debtors' Capital Structure**

14.    The Debtors have no institutional secured debt; however, prior to the Petition Date, the Debtors collateralized certain obligations related to their business operations.    More specifically, prior to entry of the Cease and Desist Order (as defined in the First Day Declaration), the Debtors operated a registered money service business through their Nevada trust charter (the "Nevada Trust Charter").    By virtue of their Nevada Trust Charter, the Debtors were able to engage in money transmission services in several states, and where states required a separate license to engage in such services, the Debtors held or applied for money transmitter licenses (each, an "MTL" and, collectively, the "MTLs" and, together with the Nevada Trust Charter, the "Licenses").

15.    In accordance with applicable state law and regulations, the Debtors were required to maintain regulatory reserves and post varying amounts of collateral to maintain their Licenses. In connection therewith, the Debtors entered into surety bond agreements which required that the Debtors post collateral to backstop the surety bonds (the "Surety Obligations").    Philadelphia Indemnity Insurance Company ("Philadelphia Indemnity"), the Debtors' former surety bond provider, currently holds approximately $1.31 million in collateral (the "Philadelphia Surety Collateral"), and Allegheny Casualty Company ("Allegheny"), the Debtors' current surety bond provider, holds $5,726,250 in collateral (the "Allegheny Surety Collateral," and together with the Philadelphia Surety Collateral, the "Surety Collateral").[4]

---

[4]    The Debtors' surety bond relationship with Allegheny commenced on May 31, 2023.  The Cease and Desist Order was entered on June 21, 2023.  Thus, the Allegheny Surety Collateral collateralizes obligations over just a twenty-one-day period.

16.     Additionally, to obtain and maintain their Nevada Trust Charter, the Debtors were required to post collateral in the amount of at least $1 million.[5] Those funds are held in an account with Lexicon Bank (the "Trust Charter Account").  Further, certain of the Debtors' other bank accounts may be subject to contingent prepetition security interests to the extent of any unpaid bank fees, solely to the extent set forth in the applicable bank account agreements (the "Bank Fee Arrangements").[6]

17.     As set forth in greater detail below, the Surety Collateral and the Bank Fee Arrangements constitute Permitted Liens under the DIP Documents, and although the DIP Facility is a priming facility, the DIP Lender has agreed to take junior liens on the Surety Collateral and the Bank Fee Arrangements.  In addition, the DIP Lender has agreed that, for as long as the Debtors maintain their Nevada Trust Charter, the Trust Charter Account shall not constitute DIP Collateral.

## C.     The Debtors' Plan

18.     On October 5, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors* [Docket No. 258] (as amended, modified, or supplemented and including all exhibits and supplements thereto, the "Plan"),[7] and the *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code With Respect to the Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated*

---

[5]    *See* N.R.S. § 669.100 (providing that "[n]o retail trust company may be organized or operated with a stockholders' equity of less than $1,000,000, or in such greater amount as may be required by the Commissioner. The full amount of the initial stockholders' equity must be paid in cash, exclusive of all organization expenses, before the trust company is authorized to commence business.").

[6]    Nothing set forth in this Motion, any of the DIP Documents, or the DIP Order shall be construed as an admission as to the validity of any claims or liens arising from or related to the Surety Obligations, the Trust Charter Account, or the Bank Fee Arrangements, and the Debtors' rights with respect to same are fully reserved.

[7]    The Debtors filed prior versions of the Plan on September 8, 2023 [Docket No. 92] and October 2, 2023 [Docket No. 250].  The Debtors filed the further amended versions of the Plan on November 28, 2023 [Docket No. 485-1], December 4, 2023 [Docket No. 508-1], and December 5, 2023 [Docket No. 521-1].

*Debtors* [Docket No. 259] (as amended, modified, or supplemented and including all exhibits and supplements thereto, the "Disclosure Statement") with the Court.[8]

19.    On October 6, 2023, the Court entered an *Order (I) Approving the Disclosure Statement on an Interim Basis for Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Information in the Disclosure Statement and Confirmation of the Plan; and (V) Granting Related Relief* [Docket No. 264].

20.    A hearing to consider final approval of the Disclosure Statement and confirmation of the Plan is scheduled to take place on December 19, 2023 at 10:00 a.m. (prevailing Eastern Time).

**D.    The Debtors' Prepetition Relationship with Polaris**

21.    On May 20, 2022, Debtor Prime Trust, LLC ("Prime Trust") and Polaris executed that certain *Order Form* pursuant to which Polaris opened a custodial account with Prime Trust for purposes of storing fiat currency on the Debtors' platform.  Over the course of the parties' relationship, Polaris typically maintained very low account balances on the Debtors' platform, with withdrawals of a significant portion of the account balance often occurring several days to a week after being deposited.

22.    In April 2023, Polaris made a single large deposit.  While some amounts were withdrawn over the next several days, Polaris' made other withdrawals more gradually, thus maintaining a large balance with Prime Trust over a period of weeks instead of days.  Three such

---

[8]    The Debtors filed prior versions of the Disclosure Statement on September 8, 2023 [Docket No. 93] and October 2, 2023 [Docket No. 236].  The Debtors filed a Supplement to the Disclosure Statement on November 28, 2023 [Docket No. 487-1] and a revised Liquidation Analysis on December 1, 2023 [Docket No. 497-1].

withdrawals continued into the ninety days preceding the Petition Date (the "<u>Preference Period</u>").[9]

Between May 22, 2023 and June 12, 2023, Polaris withdrew approximately $30.9 million from its

accounts at Prime Trust while depositing approximately $150,000.  Accordingly, the Debtors may

have claims against Polaris with respect to withdrawals from the platform during the Preference

Period pursuant to Bankruptcy Code section 547 (the "<u>Preference Claims</u>").  As of the Petition

Date, Polaris holds a claim in excess of $31 million, and is one of, if not the, largest creditor of the

Debtors.  As discussed below, as part of the consideration under the DIP Facility, the Debtors have

agreed to release all claims and causes of action against Polaris, including any Preference Claims

that the Debtors may hold.

23.    Further, the DIP Lender is eligible to receive the same Release under the Plan.

Specifically, the Plan provides that subject to certain exceptions, the Debtors and their Estates will

release claims arising under Bankruptcy Code section 547 against any prepetition customer of the

Debtors whose allowed, scheduled, or stipulated Class 3B Claim (as defined in the Plan) (without

giving effect to Bankruptcy Code section 502(d)) is in an amount that equals at least 10% of the

total amount withdrawn by such customer during the Preference Period.[10]  The DIP Lender would

likely meet those criteria and be eligible for a release under the Plan.

---

[9]    The 90-day Preference Period in these Chapter 11 Cases covers the period May 16, 2023 through August 14, 2023.

[10]    *See* Plan, Art. 1.A1.148.

## SUMMARY OF TERMS OF DIP FINANCING

24.     In accordance with Bankruptcy Rules 4001(b)–(d) and Local Rule 4001-2(a), the

below chart summarizes the salient terms of the proposed DIP Order and the DIP Loan Documents.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Prime Core Technologies Inc. | DIP Term Sheet, at 1. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | The Borrower's affiliated debtors and debtors in possession, each in their respective capacities as debtors and debtors in possession. | DIP Term Sheet, at 1. |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Polaris Ventures, a Swiss nonprofit corporation. | DIP Term Sheet, at 1. |
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(A) | A secured superpriority priming debtor in possession non-amortizing facility comprised of a new money term loan credit facility in an aggregate principal amount equal to $10.0 million. | DIP Term Sheet, at 1. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(iii) | The Approved Budget is attached to the DIP Order as **Exhibit 2**. | DIP Order, Ex. 2. |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i) | Applicable Rate: 0.00% per annum.<br>Default Interest Rate: 7.5% per annum. | DIP Term Sheet, at 3. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(K) | The reasonable fees and expenses, including the fees and expenses of counsel and other professionals, actually incurred by the DIP Lender in connection with the DIP Facility shall be DIP Obligations and due and payable by the Debtors upon presentment, subject to any notice and objection period set forth in the DIP Order, and amounts that are payable after the expiration of any notice and objection period and remain unpaid for a period of five (5) days shall accrue Default Interest; *provided*, *however*, the DIP Lender shall add such fees and expenses to the principal amount of the DIP Loans. | DIP Term Sheet, at 12; DIP Order, ¶ 5. |
| **Maturity Date** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii) | The earliest of (a) January 12, 2024, (b) the Effective Date of the Plan, or (c) the acceleration of the DIP Loans and the termination of all commitments under the DIP Facility in accordance with the terms hereof; *provided* that, following any Plan Roll Over, the DIP Loans shall be satisfied as set forth in the Plan and plan supplement. | DIP Term Sheet, at 3. |
| **Collateral and Priority** Bankruptcy Rule 4001(c)(1)(B)(i) & (ii); Local Rule 4001-2(a)(G) | Subject to the Carve-Out, all obligations of the Loan Parties to the DIP Lender under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses, or any other amounts due (collectively, the "<u>DIP Obligations</u>"), shall be secured by the following liens and security interests (the "<u>DIP Liens</u>"): (i)    subject only to (a) existing liens that under applicable law, are senior to, and have not been subordinated to, the liens of the DIP Lender under the DIP Loan Documents, but only to the extent that such liens are valid, perfected, enforceable and non-avoidable liens as of the Petition Date or perfected following the Petition Date as permitted by section 546 of the Bankruptcy Code, including the security interests securing the Surety Collateral (collectively, the "<u>Permitted Liens</u>"), and (b) the Carve-Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming lien on, and security interest in, all of each Loan Party's assets, | DIP Term Sheet, at 4–5. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY |
|---|

wherever located, including those that may be subject to a validly perfected security interest in existence on the Petition Date, which shall be primed by, and made subject and subordinate to, the perfected first priority senior priming liens and security interests to be granted to the DIP Lender;

(ii) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all present and after acquired property of each Loan Party, wherever located, not subject to a lien or security interest on the Petition Date; and

(iii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, (a) all present and after-acquired property of each Loan Party, wherever located, that is subject to a Permitted Lien on the Petition Date or subject to a Permitted Lien in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code, and (b) the Surety Collateral.

For the avoidance of doubt, the DIP Liens shall be junior to the liens and security interests of BMO Bank, N.A. f/k/a BMO Harris Bank N.A. ("BMO") solely to the extent (a) provided for under the applicable banking agreements, and (b) such liens are valid, perfected, enforceable and non-avoidable liens as of the Petition Date or perfected following the Petition Date as permitted by section 546 of the Bankruptcy Code (the "BMO Prior Lien").

The property referred to in the preceding clauses (i), (ii), and (iii) is collectively referred to as the "DIP Collateral" and shall include, without limitation, all assets (whether tangible, intangible, personal or mixed) of each Loan Party, whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all accounts, proceeds of leases, inventory, equipment, cash, cryptocurrency, including but not limited to the cryptocurrency held in the 98f Wallet, equity interests or capital stock in subsidiaries, investment property, instruments, chattel paper, real

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY |
|---|

estate, leasehold interests, contracts, commercial tort claims, claims and causes of action (including actions pursuant to Chapter 5 of Title 11 of the United States Code), intercompany receivables, claims and other rights to payment, patents, copyrights, trademarks and other general intangibles, and all products, offspring, profits and proceeds thereof.

The DIP Liens shall be effective and perfected as of the entry of the DIP Order (subject to the occurrence of the Closing Date) and without necessity of the execution, filing or recording of control agreements, financing statements or other agreements.  However, the DIP Lender may, in its reasonable discretion, require the execution, filing or recording of any or all of the documents described in the preceding sentence.

Notwithstanding anything to the contrary in the DIP Order or the DIP Term Sheet, DIP Collateral shall not include the bank account at Lexicon Bank ending 0795 (the "Trust Charter Account"); *provided, however*, that in the event the Debtors elect to relinquish their Nevada Trust Charter, the Trust Charter Account shall constitute DIP Collateral and the DIP Lender shall automatically, and without any further action, be granted a first priority perfected senior priming lien on, and security interest in the Trust Charter Account and any cash proceeds therein pursuant to section 364(d)(1) of the Bankruptcy Code.  The DIP Liens shall attach to any funds in the Trust Charter Account immediately upon withdrawal of such funds from the Trust Charter Account.  The Debtors shall not increase the balance (other than the accrual of interest) of the Trust Charter Account and are only permitted to remove funds from the Trust Charter Account if they are immediately deposited into another account upon which the DIP Lender has a security interest under the DIP Order.

For the avoidance of doubt, the DIP Liens shall attach to the Professional Fee Escrow but shall be subject to the Carve-Out.

Notwithstanding anything to the contrary herein, (i) the DIP Liens shall attach to claims and causes of action held by the Debtors under Chapter 5 of Title 11 of the United States Code, but the DIP Lender shall not be

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | permitted to exercise remedies against such claims and causes of action until the earlier of (x) the date pursuant to which all other DIP Collateral has been reduced to cash or abandoned and (y) eighteen (18) months after the Petition Date and (ii) the DIP Liens shall not attach to any property that is not property of the Debtors' estates.  Unless there has been a determination of the Account Treatment Issues (as defined in the Plan) by the Court, the DIP Lender shall be required to file a motion, on at least fourteen (14) days' notice, seeking such a determination with respect to funds subject to a Customer Agreement (as defined in the Plan) before it may exercise remedies against such funds.<br><br>For the avoidance of doubt, the Debtors shall have no obligation to characterize or seek adjudication of any property as being property of the Debtors' estates. | |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Affirmative and Negative Covenants:<br><br>*Affirmative Covenants*:<br><br>The Debtors shall:<br><br>(i)   satisfy, or cause to be satisfied, each Milestone; *provided*, that in the event that any order specified to be entered by the Court by a specified date is not entered by such date, or a hearing to be held by a certain deadline is not held by such date, in either case solely by reason of the unavailability of, or inaction by, the Court, then the Debtors and the DIP Lender shall negotiate in good faith for a reasonable extension of such deadline;<br><br>(ii)  timely deliver, or cause to be timely delivered, to the DIP Lender the Budget Reports, all in accordance with the provisions set forth above;<br><br>(iii) timely deliver, or cause to be delivered, to the DIP Lender written notice of the | DIP Term Sheet, at 6–9. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY |
| --- |

occurrence of any Event of Default (as defined below).

(iv)    deliver to DIP Lender any and all financial and other data, documents, and information requested by the DIP Lender and provide access to any and all such other data, documents, and information (including, without limitation, historical data, documents, and information) and to personnel (including, without limitation, through in-person, telephonic, or videoconference meetings), all as may be reasonably requested by the DIP Lender; *provided*, that with respect to access to the Debtors' personnel, the DIP Lender shall provide the Debtors and their restructuring counsel with written notice (email being sufficient) at least three (3) business days before the proposed date of such meeting;

(v)    (a) upon the request of DIP Lender, during normal business hours, and on reasonable prior notice (provided no prior notice is required if an Event of Default has occurred and is continuing), make the Debtors' inventory, equipment, other DIP Collateral, and books and records concerning the DIP Collateral (including software used in the Debtors' business) available to DIP Lender for inspection at the place where it is located and (b) take all reasonable action necessary to correctly and completely maintain such books and records;

(vi)    upon request of the DIP Lender, obtain additional insured and loss payee endorsements, as applicable, to the Loan Parties' insurance policies with respect to the DIP Collateral that name the DIP Lender as an additional insured and loss payee, as applicable, in form and substance reasonably acceptable to the DIP Lender;

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY |
| --- |

|  | (vii) | provide to the DIP Lender and its counsel substantially final drafts of the Plan Documents (including the Plan, the plan supplement for the Plan, and any proposed confirmation order, as well as any amendments to the operative filed versions of such documents) and any pleadings in connection with the DIP Facility or any sale of all or a material portion of the Debtors' assets or business (a "<u>Sale Transaction</u>") at least three calendar days prior to filing; |  |
|  | (viii) | deliver to the DIP Lender and its counsel, within two business days of receipt, all letters of intent, term sheets, and definitive agreements concerning any potential Sale Transaction, and consult with the DIP Lender regarding the terms of any proposed Sale Transaction and any potential Purchaser's financial and other ability to close any potential Sale Transaction; |  |
|  | (ix) | comply with the provisions of the DIP Loan Documents; and |  |
|  | (x) | take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Lender to carry out the provisions of the DIP Loan Documents. |  |

*Negative Covenants*:

The Debtors shall not, without the prior written consent of the DIP Lender, do, cause to be done, or agree to do or cause to be done, any of the following:

|  | (i) | create, incur, assume or suffer to exist any indebtedness that is equal to or senior in priority to the DIP Loan, except indebtedness expressly contemplated by this DIP Facility Term Sheet, or cause, |  |

| | | SUMMARY OF MATERIAL TERMS OF DIP FACILITY | |
|---|---|---|---|
| | | permit to be caused, or agree to cause or permit to be caused, any direct or indirect subsidiary that is not a Debtor to, create, incur, assume or suffer to exist any such indebtedness other than trade payables created or incurred in the ordinary course of the Debtors' business, unless the proceeds of such indebtedness are immediately used to indefeasibly pay in full, in cash all DIP Obligations; | |
| | (ii) | create, incur, assume or suffer to exist any lien that is equal to or senior in priority to the DIP Liens upon any of their property, assets, income or profits, whether now owned or hereafter acquired, except Permitted Liens, and shall not cause, or permit to be caused, any direct or indirect subsidiary that is not a Debtor to, create, incur, assume or suffer to exist any such liens other than liens arising in connection with trade payables created or incurred in the ordinary course of the Debtors' business; or | |
| | (iii) | without the prior written consent of the DIP Lender, incur or make any expenditure (including, without limitation, any capital expenditure), investment or other payment, other than in accordance with the Approved Budget, measured for the period from the Closing Date to the date of such measurement, and at all times subject to a permitted variance (the "Permitted Variance") of (a) 15% on a line item basis exclusive of payments to Professional Persons, and (b) $500,000 in the aggregate for payments to Professional Persons; *provided*, *however*, that the Permitted Variances for Professional Persons shall not be available for (i) fees payable to Galaxy Digital and (ii) the amounts in the Approved Budget reflecting accruals through and including November 18, 2023. For the | |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | avoidance of doubt, Professionals Persons may apply any retainer held as of the Closing Date and such application shall not be treated as a payment by the Debtors for purpose of the Approved Budget or Permitted Variances.<br><br>(iv)    The Debtors shall not, without prior consent of the DIP Lender, convey, sell, lease, assign, transfer, compromise or otherwise dispose of (including through a transaction of merger or consolidation) or cause, permit to be caused, or agree to cause or permit to be caused, any direct or indirect subsidiary that is not a Debtor to convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property (including any claim and causes of action), business or assets, whether now owned or hereafter acquired, out of the ordinary course of business<br><br>Financial Reporting Requirements:  The Loan Parties shall be required to adhere to the Approved Budget. Beginning on the first full week following the Closing Date, the Debtors will provide a weekly variance analysis on the fourth business day of each week showing actual versus budgeted receipts and operating disbursements for the preceding week (the "Budget Reports"). | |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(M) | The following shall constitute events of default under the DIP Facility (the "Events of Default"):<br><br>(i)     failure by the Debtors to be in compliance in all respects with any provision of the DIP Loan Documents or the DIP Order;<br><br>(ii)    reversal, modification, amendment, stay or vacation of the DIP Order, each as entered by the Court, without the prior written | DIP Term Sheet, at 10–11. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | | consent of the DIP Lender (which consent shall not be unreasonably withheld); |
| | (iii) | Other than the plan and plan supplement filed on November 28, 2023, the filing with the Court of a plan of reorganization or liquidation in the Chapter 11 Cases, or any plan supplement thereto, other than the Amended Plan, or the filing of any amendments to the Plan, any Amended Plan, or any plan supplement documents for the Amended Plan that cause the Plan Conditions to no longer be satisfied; |
| | (iv) | the filing of any pleading in connection with the DIP Facility or any Sale Transaction (unless the Sale Transaction will result in indefeasible payment in full of the DIP Obligations at the closing thereof) that is not acceptable to the DIP Lender; |
| | (v) | the appointment of (a) an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code, or (b) a trustee pursuant to section 1104(a) of the Bankruptcy Code in one or more of the Chapter 11 Cases; |
| | (vi) | the filing of a motion by the Debtors seeking dismissal of any Chapter 11 Case or the conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; |
| | (vii) | the granting of relief from the automatic stay by the Court as to any material assets of the Debtors to any other creditor or party in interest in the Chapter 11 Cases; |
| | (viii) | failure of all amounts due and owing to the DIP Lender under, in respect of or in connection with the DIP Facility to be paid in full in cash on the Maturity Date, unless the Maturity Date is the Effective Date of |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | the Amended Plan and the Plan Roll-Over has been elected; <br><br> (ix) any provision in this DIP Facility Term Sheet shall cease to be binding on or enforceable against the parties hereto; or <br><br> (x) any third party has exercised a right of set-off or recoupment against the DIP Collateral and such set-off or recoupment has not been cured or remedied to the satisfaction of the DIP Lender in its reasonable discretion within seven (7) business days. <br><br> Upon the occurrence and during the continuation of an Event of Default, without further order from or application to the Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to (A) deliver to the Borrower and the Guarantors a notice declaring the occurrence of an Event of Default, (B) [omitted], (C) declare the DIP Loans then outstanding to be due and payable, (D) terminate the DIP Facility, (E) charge the default rate of interest under the DIP Facility, (F) exercise any and all rights of setoff, (G) exercise any right or remedy with respect to the DIP Collateral or the DIP Liens, or (H) take any other action or exercise any other right or remedy permitted under the DIP Loan Documents, the DIP Order or applicable law; *provided, however*, that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (F), (G), or (H) above, (i) the DIP Lender shall provide counsel to the Debtors, counsel to the Committee, and the Office of the United States Trustee with five (5) business days' prior written notice (such period, the "Remedies Notice Period"), and (ii) during the Remedies Notice Period, the Loan Parties and/or Committee shall be permitted to request an emergency hearing before the Court (which request must be made prior to the conclusion of the Remedies Notice Period and shall seek consideration of such request on an expedited basis) solely to consider on an expedited basis whether (a) an Event of Default has occurred or is continuing and (b) any appropriate relief | |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | relating to the nonconsensual use of cash collateral; *provided, further*, that in any such hearing following such notice, the only issue that may be raised by any party in opposition to the actions proposed or available to be taken by the DIP Lender shall be whether, in fact, an Event of Default has occurred and is continuing or the appropriate relief relating to the nonconsensual use of cash collateral; *provided, further*, that during the Remedies Notice Period, the Loan Parties are permitted to use cash collateral solely to fund expenses critically necessary to preserve the value of the Loan Parties' businesses. | |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi); Local Rule 4001-2(a)(H) | The Debtors shall comply with the following milestones (the "Milestones") unless otherwise modified or waived: (i) by December 8, 2023, the Debtors shall have filed the plan supplement for the Amended Plan, the contents of which shall be acceptable in form and substance to the DIP Lender with respect to matters concerning repayment of the DIP Loans in the event of the Plan Roll Over, including providing for the DIP Lender's consent with respect to (a) the identification of the Plan Administrator and any PCT Litigation Trustee, (b) the vesting of assets pursuant to the Amended Plan (which shall not be inconsistent with the releases in the Amended Plan or this Term Sheet), (c) the governance of the Wind-Down Debtors and any PCT Litigation Trust, (d) the payment of expenses of the Wind-Down Debtor, Plan Administrator, and  PCT Litigation Trust, and (e) the distribution of assets by the Wind-Down Debtor, Plan Administrator and/or  PCT Litigation Trustee, as applicable (the "Plan Conditions"); (ii) by no later than December 19, 2023, the Court shall have commenced a hearing on confirmation of the Amended Plan; and (iii) by no later than December 27, 2023, the Court shall have entered an order confirming the Amended Plan. | DIP Term Sheet, at 9; DIP Order, ¶ 27. |
| **Carve-Out** Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-(a)(F) | "Carve-Out" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Court under section 156(c) of title 28 of the United States Code and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the | DIP Order, ¶ 28. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | applicable statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "Statutory Fees"), which Statutory Fees shall not be subject to any budget, including the Approved Budget (as defined below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) in all cases subject to and limited to the amounts set forth for each Professional Person in the Approved Budget, and to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (collectively, the "Allowed Professional Fees") incurred by (a) persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals"), and (b) persons or firms retained by the Committee pursuant to sections 327, 328, or 1103 of the Bankruptcy Code (collectively, the "Committee Professionals" and together with the Debtor Professionals, the "Professional Persons"), at any time before or on the day following delivery by the DIP Lender of the Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery by the DIP Lender of a Carve-Out Trigger Notice; and (iv) in all cases subject to the amounts set forth for each Professional Person in the Approved Budget, Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000.00 incurred after the day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap").

For purposes of the foregoing, the "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating | |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | that the Post-Carve-Out Trigger Notice Cap has been invoked; *provided*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (ii), (iii), or (iv) above on any grounds.<br><br>So long as no Event of Default has occurred and is continuing, on a weekly basis, the Debtors are authorized to deposit and hold amounts in a segregated account in trust for the benefit of the Professional Persons as part of the Carve-Out corresponding to the amounts set forth for each person in the Approved Budget, to the extent not paid to the Professional Person in the week budgeted (the "Professional Fee Escrow"). For the avoidance of doubt, (i) the first week of the Approved Budget shall include a "true up" to account for pre-Closing Date fees and expenses that have been incurred but not yet paid, and (ii) the DIP Lender's interest in the Professional Fee Escrow shall be subordinate to and subject to the Carve-Out.<br><br>The liens on and security interests in the DIP Collateral and all super-priority administrative expense claims granted under the DIP Order, shall be subject and subordinate to the Carve-Out. | |
| **Prepayments**<br>Bankruptcy Rule 4001(c)(1)(B) | Voluntary Prepayments:  Permitted at any time, without premium or penalty.<br><br>Mandatory Prepayments:  The DIP Loan Documents contain customary mandatory prepayment events for financings of this type and others agreed to by the DIP Lender and the Borrower, including, without limitation, (i) 100% of the net proceeds of asset sales, (ii) 100% of the net proceeds of insurance and condemnation awards, (iii) 100% of the net proceeds of any debt issuance or equity issuance, and (iv) 100% of proceeds of claims and causes of action. | DIP Term Sheet, at 3. |
| **Conditions to Closing of DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B); | The obligations of the DIP Lender to fund the DIP Loan on the Closing Date will be subject to satisfaction, or waiver by the DIP Lender in its sole and absolute discretion, of the following conditions precedent: | DIP Term Sheet, at 9–10. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| Local Rule 4001-2(a)(E) | (i) | delivery of the Approved Budget; |
| | (ii) | entry of the DIP Order, which shall approve this DIP Facility Term Sheet and otherwise be in form and substance acceptable to the DIP Lender; |
| | (iii) | the DIP Order, as entered by the Court, shall not have been reversed, modified, amended, stayed or vacated without the consent of the DIP Lender (which consent shall not be unreasonably withheld); |
| | (iv) | the DIP Lender shall have a valid and perfected lien on and security interest in the DIP Collateral on the basis and with the priority set forth herein; |
| | (v) | as of the date of such Borrowing, all representations and warranties shall be true and correct as of such date and no facts and circumstances shall exist as of such date that would result in, or give rise to the occurrence of, an Event of Default; |
| | (vi) | unless the DIP Lender has agreed to add such amounts to the principal balance of the DIP Loans, the Debtors shall have paid or caused to be paid the reasonable attorneys' fees of the DIP Lender incurred in connection with negotiating and documenting the DIP Facility and obtaining entry of the DIP Order; |
| | (vii) | the Debtors shall have filed the Amended Plan or a chapter 11 plan otherwise acceptable in form and substance to the DIP Lender with respect to the Plan Conditions, and if the plan supplement documents have been filed prior to the closing, the Plan Conditions shall have been, and continue to be, satisfied with respect to the plan supplement documents; |
| | (viii) | Galaxy Digital Partners, LLC shall have waived, in a manner acceptable to the DIP Lender, payment of any Financing Fee in |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | connection with the DIP Facility; and<br><br>(ix)  the Closing Date shall have occurred on or before the date that is two (2) calendar days after the date of entry of the DIP Order. | |
| **DIP Superpriority Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | All DIP Claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 1113 and 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out.<br><br>Subject to the Carve-Out, the DIP Claims will, at all times during the period that the DIP Loans remain outstanding, remain, in right of payment, senior in priority to all other claims or administrative expenses. | DIP Term Sheet, at 6; DIP Order, ¶ 12. |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi) | DIP Collateral shall include liens on avoidance actions. | DIP Term Sheet, at 5. |
| **Waiver or Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay is modified as necessary to effectuate the terms and provisions of the DIP Order, including, without limitation, to (i) permit the Debtors to grant the DIP Liens and the DIP Superpriority Claims; (ii) permit the Debtors to perform such acts as the DIP Lender may request to assure the perfection and priority of the liens granted herein; (iii) permit the Debtors to incur all liabilities and obligations to the DIP Lender under the DIP Loan Documents, the DIP Term Sheet and the DIP Order; and (iv) authorize the Debtors to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of the DIP Order, the DIP Loan Documents and the Approved Budget. | DIP Term Sheet at 10–11; DIP Order, ¶ 23. |
| **Waiver or Modification of Applicability of Non- Bankruptcy Law Relating to the Perfection or** | The DIP Liens are valid, binding, enforceable, non-avoidable, and automatically perfected. | DIP Term Sheet, at 4–5; DIP Order, ¶ 7. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | | |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Subject to the occurrence of the Closing Date, each Debtor and its estate (the "<u>Releasors</u>") shall release Polaris Ventures, a Swiss association (formerly known as the Center for Emerging Risk Research) in any and all of its capacities whatsoever, as well as its past and present officers (including any president, vice president or financial officer), partners, members, principals, employees, agents, directors (including any managing director), predecessors, affiliated entities, subsidiaries, successors, assigns, attorneys, auditors, insurers, transferees, and representatives, each in their respective capacities as such (the foregoing individuals and entities herein referred to as the "<u>Polaris Parties</u>"), from all manner of actions, and any and all claims, suits, damages, and causes of action, whether arising from statutory law, constitutional law, federal law, state law, or otherwise, including, without limitation, any claims and causes of action that could be brought in these chapter 11 cases or any Successor Cases (as defined in the DIP Order) by or on behalf of the Debtors and their estates under chapter 5 of the Bankruptcy Code or any state law analog, which the Releasors, as of the Petition Date, currently have or may have (whether known or unknown) against any one or more of the Polaris Parties of any kind or nature whatsoever (the "<u>Release</u>"). On the Closing Date, the Release shall become binding, effective, and irrevocable on the Debtors, their Estates, and any successor to any of them or any party claiming through them. | DIP Term Sheet, at 11; DIP Order, ¶ 4 |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify, pay and hold harmless the DIP Lender (and its respective directors, officers, employees and agents) against any loss, liability, cost, or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). | DIP Term Sheet, at 12; DIP Order, ¶ 39. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | | |
| **Section 506(c) and Section 552(b) Waivers** Bankruptcy Rule 4001(c)(1)(B)(x) | Effective upon entry of the DIP Order, the DIP Lender shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral, and all proceeds shall be received and applied pursuant to the DIP Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary.<br><br>Effective upon entry of the DIP Order, the Debtors (on behalf of themselves and their estates) shall waive and shall not assert in the Chapter 11 Cases or any successor cases, any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender.<br><br>Effective upon entry of the DIP Order, the DIP Lender shall not be subject to the "equities of the case" doctrine, to the extent it may otherwise be applicable. | DIP Term Sheet, at 12; DIP Order, ¶¶ 34–36. |

## PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2

25.     In addition to the provisions highlighted above, the Debtors make the following disclosures pursuant to Local Rule 4001-2:

(a)     DIP Facility Fees (Local Rule 4001-2(a)(i)(B)).  There are no letter of credit, commitment, or other fees under the DIP Facility.

(b)     Limitations on Court's Discretion or Power to Enter Future Orders in Case (Local Rule 4001-2(a)(i)(C)).  Not applicable.

(c)     Funding of Non-Debtor Affiliates (Local Rule 4001-2(a)(i)(D)). Not applicable.

(d)     Joint and Several Liability of Debtors (Local Rule 4001-2(a)(i)(J)).  The Debtors are jointly and severally liable for the DIP Obligations.  DIP Term Sheet, at 5.

(e)     Prohibition on Use of Estate Funds to Investigate Liens and Claims of Prepetition Lender (Local Rule 4001-2(a)(i)(L).  Not applicable.

(f)     Cross-Collateralization (Local Rule 4001-2(a)(i)(N)).  Not applicable.

(g)     Provisions That Deem Prepetition Debt to be Postpetition Debt (Local Rule 4001-2(a)(i)(O)).  There is no roll-up of prepetition debt under the proposed DIP Facility.

(h)     Provisions that Prime any Secured Liens Without Consent of the Lienholder (Local Rule 4001-2(a)(i)(P)).  Not applicable; the Debtors did not have a prepetition senior secured credit facility, and the few assets subject to prepetition liens are not being primed.

(i)     Binding the Estate to Validity, Perfection, or Amount of Prepetition Secured Debt or Waiver of Claims Against Secured Creditor (Local Rule 4001-2(a)(i)(Q)).  Not applicable.

(j)     Immediate Approval of Terms and Conditions of DIP Loan Documents (Local Rule 4001-2(a)(i)(R)).  Upon entry of the DIP Order and the occurrence of the Closing Date, the DIP Order shall become valid and biding upon the DIP Lender, all other creditors of the Debtors, the Committee, and all other parties in interest, and their successors thereto.  *See* DIP Order, ¶ 41.

(k)     Remedies Notice Period of Less Than Five Days (Local Rule 4001-2(a)(i)(S)). Not applicable; the DIP Term Sheet provides for a Remedies Notice Period requiring five business days' written notice of the occurrence of an Event of Default. *See* DIP Term Sheet, at 11.

(l)     Provisions that Seek to Limit What Parties in Interest (other than the Debtors) May Raise at Emergency Hearing During Remedies Notice Period (Local Rule 4001-2(a)(i)(T).  Not applicable.

(m)     Provisions that Seek to Immediately Waive, Without Notice, Rights Under Section 506(c) (Local Rule 4001-2(a)(i)(V)).  The proposed DIP Order contains a customary 506(c) waiver, subject to entry of the DIP Order.  *See* DIP Order, ¶ 34.

(n)     Provisions that Affect the Court's Power to Consider the Equities of the Case under Section 552(b)(1) (Local Rule 4001-2(a)(i)(W)).  The proposed DIP Order contains a customary 506(c) waiver, subject to entry of the DIP Order.  *See* DIP Order, ¶ 35.

(o)     Provisions that Immediately Shield Lender from Equitable Doctrine of Marshalling (Local Rule 4001-2(a)(i)(X)). The DIP Lender shall not be subject to the equitable doctrine of 'marshaling' or any similar doctrine with respect to the DIP Collateral and any such claims are expressly waived by the Debtors on behalf of itself and other parties in interest, except as expressly set forth in the DIP Term Sheet under the heading "Collateral and Priority" with respect to claims and causes of action held by the Debtors under Chapter 5 of title 11 of the United States Code. *See* DIP Order, ¶ 36.

## RELIEF REQUESTED

**A.    Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment and Should be Approved**

26.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents and obtain access to the proceeds of the DIP Facility.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances, as discussed in detail below.

27.    Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, among other things, an exercise of "sound and reasonable business judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage

the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

28.     Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc*., No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

29.     In determining whether a debtor has exercised its sound business judgment in entering into a debtor-in-possession financing facility, courts should evaluate the economic terms of such facility based upon the totality of circumstances. *See* Hr'g Tr. at 734-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as they once were previously); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). Moreover, the Court may appropriately take into consideration noneconomic benefits to the Debtors offered under the proposed postpetition facility. *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (holding that "a business decision to obtain credit from a particular lender is almost never based

purely on economic terms" and that "[r]elevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization").

30.      For the reasons set forth below, the Debtors' decision to enter into the DIP Facility – a decision that the Committee supports – represents the sound exercise of the Debtors' reasoned business judgment and is in the best interests of the Debtors and their estates, creditors, and stakeholders.

31.      *The Debtors' Require Immediate Access to Liquidity*.  As further discussed in the DIP Declarations, the DIP Facility represents the best (and only) viable source of much-needed funding at this critical stage in the Debtors' Chapter 11 Cases.  *See* Ashe Declaration, ¶ 7; Winning Declaration, ¶¶ 7–8.  The Debtors commenced these cases with a finite amount of cash, and unexpected delays in the projected trajectory of these Chapter 11 Cases have placed a further strain on the Debtors' liquidity.  Based on the Debtors' current cash forecast, they are out of cash on an accrual basis.  *See* Winning Declaration, ¶ 6.  Thus, the Debtors' need for the liquidity available through the DIP Facility is incontrovertible.

32.      *The DIP Facility Represents the Best Available Source of Credit*.  As noted in the Ashe Declaration, the Debtors conducted a process to solicit interest from third parties, including with respect to the extension of credit.  *See* Ashe Declaration, ¶¶ 5–6.  The DIP Facility was market-tested and the product of extensive, arms'-length negotiations between the Debtors and the DIP Lender.  *See id.* ¶ 7; Winning Declaration, ¶ 7.  Based on the facts and circumstances of these cases, the Debtors believe that they have obtained the best terms currently available.

33.      *The Terms of the DIP Facility Are Favorable*.  Among other things, the DIP Facility contains the following favorable terms:

- *DIP Facility is Interest-Free.* The DIP Lender has agreed to provide the DIP Facility on an interest-free basis through the Maturity Date (and so long as the Debtors are not in continuing default thereunder). *See* DIP Term Sheet, at 3.

- *Junior Liens on Certain Collateral.* The DIP Lender has agreed to take junior liens with respect to the Permitted Liens, including the Surety Collateral and the Bank Fee Arrangements. *See id.* at 3–4.

- *Exclusion of Trust Charter Account from DIP Collateral.* The DIP Lender has agreed to exclude the Trust Charter Account from the DIP Collateral, until such time that the Debtors surrender their Nevada Trust Charter, thereby allowing the Debtors to ensure compliance with the requirements under applicable Nevada state law to maintain their Nevada Trust Charter. *See id.* at 5.

- *No Fees.* The DIP Facility carries no commitment, facility, or other fees, and there are no make whole or other prepayment penalties. *See generally id.*

- *Plan Roll Over Election.* Instead of requiring payment in full of all outstanding DIP Obligations on the Maturity Date, the DIP Lender has agreed to alternative treatment. Specifically, in the event that the Debtors are unable to satisfy the DIP Obligations on or before the Maturity Date, the DIP Lender has agreed to roll the DIP Obligations pursuant to the Plan and receive distributions on account of the DIP Obligations from the first available distributions from the Wind-Down Debtor Assets (as defined in the Plan). In so doing, the DIP Lender is providing the Debtors with the flexibility to ensure that the Wind-Debtor Budget is appropriately funded. Moreover, the Roll Over includes a 12-month interest holiday; and even after that holiday, the interest rate of 7.5% is reasonable for distressed financing, especially in this interest rate environment.

34.     In exchange for providing the Debtors with this critical lifeline, the DIP Lender will receive the payment of the reasonable and documented fees of its professionals and a full release of claims, including any Preference Claims against, Polaris and its related parties. For the following reasons, the Debtors' release of is appropriate based on the facts and circumstances of these Chapter 11 Cases and the beneficial terms and provisions of the DIP Facility.

35.     *First*, pursuing litigation on account of the Preference Claims against Polaris would prove expensive and time-consuming, taking years to litigate to conclusion.

36.     *Second*, while the Debtors appear to have *prima facie* Preference Claims against Polaris, it appears that Polaris may have viable defenses to such claims for at least some portion thereof.

37.     *Third*, there is no guarantee that the Debtors' pursuit of the Preference Claims against Polaris would be successful or result in a meaningful net recovery for the Debtors' estates.

38.     *Fourth*, Polaris is a Swiss nonprofit corporation, thereby complicating (and delaying) the Debtors' collection of any judgment against Polaris on account of the Preference Claims.

39.     *Fifth*, the DIP Lender is willing to lend money to the Debtors – a borrower with no source of revenue generation and no fixed assets – on extremely favorable terms, including by exchanging the DIP Liens for a right to payment from first proceeds of the Wind-Down Debtor Assets (which are primarily litigation claims).  The DIP Lender is therefore taking a significant risk in extending credit to the Debtors, and making a substantial contribution to these Chapter 11 Cases, and the grant of releases in such context is reasonable and appropriate.

40.     *Sixth*, by providing the DIP Facility, the DIP Lender is helping to ensure that the Wind-Down Debtor is appropriately capitalized following the Effective Date so that it may continue the Debtors' investigative efforts, analyze and reconcile claims, and pursue claims and causes of action, and otherwise pursue avenues to maximize recoveries to the Debtors' creditors.

41.     *Finally*, in the event the Court confirms the Plan, the DIP Lender is poised to receive the same release under the Plan as the release in the DIP Order.  The Debtors' potential preference claim against the DIP Lender constitutes a Released Preference Claim (as defined in the Plan) because the DIP Lender's Class 3B Claim equals at least 10% of the total amount Polaris

withdrew during the Preference Period. Thus, the Debtors' agreement to release Polaris under the DIP Order is a reasonable exercise of the Debtors' business judgment.

42.     Based on the foregoing, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' estates, is necessary to preserve the value of estate assets and is a reasonable exercise of their business judgment.

**B.      The DIP Liens and the DIP and Superpriority Claims Should be Approved**

43.     Section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

44.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (finding that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584

(S.D.N.Y. 2001) (finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense).

45.     When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also Snowshoe*, 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused to grant unsecured loans was sufficient to support the conclusion that the requirements of section 364 were met); *Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

46.     In determining whether to approve debtor-in-possession financing under section 364(c) of the Bankruptcy Code, courts consider whether:

- the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (i.e., by allowing an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

47.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides

that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

48.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  Consent of the secured creditors to liens priming their interests in collateral obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

49.     Here, the requirements for relief under section 364 of the Bankruptcy Code are satisfied and the Court should approve the DIP Liens and DIP Superpriority Claims.  *First*, as described above and in the DIP Declarations, the Debtors are not able to obtain financing on an unsecured basis.  *Second*, the DIP Facility is critical to the preservation of estate assets and the Debtors' plan confirmation and asset recovery efforts.  *Third*, as described herein and in the Declarations, the terms of the DIP Facility are fair, reasonable, and adequate to bridge the Debtors to consummation of their Plan and ensures that the Wind-Down Debtor (as defined in the Plan) is adequately funded to continue the pursuit of sources of creditor recoveries. *Finally*, the DIP Lender has agreed not to prime the Permitted Liens and the DIP Collateral does not extend to the Trust

Charter Account unless and until the Debtors relinquish their Nevada Trust Charter. Thus, the holders of the Permitted Liens and the State of Nevada are not prejudiced in any way and are adequately protected under section 364(d) of the Bankruptcy Code.

**C.      Debtors Should Be Authorized to Use Cash Collateral**

50.      For the reasons set forth herein and as described in the DIP Declarations, the Debtors require immediate use of the Cash Collateral to preserve the value of their assets and recover additional ones.

51.      Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral. Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease
> in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

52.      As noted above, upon entry of the DIP Order, the DIP Lender will have consented to the Debtors' use of Cash Collateral. Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

**D.      The Carve-Out is Appropriate**

53.      The Carve-Out shall be senior to the DIP Liens and DIP Superpriority Claims. Absent the Carve-Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated is restricted. *See Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of U.S.

Trustee fees and professional fees, notwithstanding the grant of the DIP Superpriority Claims. For these reasons, the Carve-Out should be approved.

**E.      The DIP Lender Should Be Deemed a Good Faith Lender under Section 364(e)**

54.      Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

55.      Here, the DIP Facility was the product of extensive arm's-length, good-faith negotiations between the Debtors and the DIP Lender. The result of those efforts are the favorable terms on which the DIP Lender is willing to lend. Importantly, the Committee, whose constituents comprise the largest creditor body in these Chapter 11 Cases, is generally supportive of the terms of the DIP Facility. Under the circumstances, the terms and conditions of the DIP Loan Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Order and the DIP Loan Documents. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lender is entitled to all of the protections afforded thereby.

**F.      Modification of Automatic Stay is Warranted**

56.      The relief requested herein contemplates a modification and vacating of the automatic stay to permit the DIP Lender to exercise, upon the occurrence and during the continuance of any Event of Default under the DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents.  However, the DIP Lender must provide the Debtors with five (5) business days' written notice before exercising any enforcement rights or remedies.

57.      The relief requested herein further contemplates a modification and vacating of the automatic stay to permit the Debtors to, among other things, (a) grant the DIP Liens and DIP Superpriority Claims and to perform such acts as may be requested to assure the perfection and priority of such DIP Liens, and (b) implement the terms of the proposed DIP Order, including payment of all amounts referred to in the DIP Loan Documents.

58.      Stay modifications of this kind are customary features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances. Accordingly, the Debtors request that the Court modify the automatic stay solely to the extent contemplated by the DIP Loan Documents and the DIP Order.

## REQUEST FOR BANKRUPTCY RULE 6004(h) WAIVER

59.      To implement the foregoing successfully, the Debtors seek a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the DIP Declarations, the relief requested herein is necessary given the Debtors' increasingly limited liquidity. Accordingly, ample cause exists to justify the waiver of

the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## **RESERVATION OF RIGHTS**

60.     Except as expressly set forth in the DIP Loan Documents, nothing in this Motion or any order granting the relief requested in this Motion, and no action take pursuant to the relief requested or granted (including any payment made in accordance with any such order):  (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to Bankruptcy Code section 365 or an admission as to the basis for or the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the sole discretion of the Debtors; (e) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) an admission, finding, or implication as to whether any assets constitute property of the estate; or (h) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law. Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor

should it be construed as an admission as to the validity of any claim or a waiver of the Debtors'
rights to subsequently dispute such claim.

## NOTICE

61.    The Debtors will provide notice of this Motion to: (a) the U.S. Trustee; (b) counsel
to the Committee; (c) counsel to the DIP Lender; (d) counsel to Philadelphia Indemnity;
(e) counsel to Allegheny; (f) the Nevada Department of Business and Industry, Division of
Financial Institutions; (g) all state agencies where the Debtors maintain MTLs; (h) the Debtors'
cash management banks; (i) all parties filing financing statements against the Debtors; (j) all
landlord counterparties to leases that have not yet been rejected; and (k) any party that has
requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further
notice is required.

## NO PRIOR REQUEST

62.    No prior request for the relief sought in this Motion has been made to this or any
other court.

WHEREFORE the Debtors respectfully request entry of the DIP Order granting the relief

requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: December 5, 2023
Wilmington, Delaware

**MCDERMOTT WILL & EMERY LLP**

*/s/ Maris J. Kandestin*
Maris J. Kandestin (No. 5294)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone:  (302) 485-3900
Facsimile:  (302) 351-8711
Email:       mkandestin@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone:  (212) 547-5400
Facsimile:  (646) 547-5444
Email:       dazman@mwe.com
              jbevans@mwe.com
              ggriffith@mwe.com

-and-

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone:  (305) 358-3500
Facsimile:  (305) 347-6500
Email:       gsteinman@mwe.com

*Counsel to the Debtors and Debtors in Possession*