## **EXHIBIT B**

**Winning Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Prime Core Technologies Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-11161 (JKS)<br><br>(Jointly Administered) |

**DECLARATION OF ROBERT WINNING IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN SECURED PRIMING POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

I, Robert Winning, hereby declare pursuant to section 1746 of title 28 of the United States Code:

1. I am a managing director at M3 Advisory Partners, LP ("M3"), which maintains its principal office at 1700 Broadway, New York, NY 10019. M3 has been retained by the above-captioned debtors and debtors in possession (the "Debtors") as their financial advisor. I have more than a decade of professional advisory experience in corporate restructurings, first as an attorney and then since 2020 as a financial advisor. I have been involved in dozens of chapter 11 proceedings, across all sizes and industries, advising creditors, companies, and acquirors of assets.

2. I am duly authorized to submit this declaration (the "Declaration") on behalf of the Debtors in support of the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Secured Priming Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the*

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, NV 89135.

*Automatic Stay, and (V) Granting Related Relief* filed contemporaneously herewith (the "DIP Motion").[2]

3. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management team and advisors. If I were called to testify, I could and would testify competently to the facts set forth herein.

### Necessity of Postpetition Financing

4. The Debtors stopped generating material revenue upon issuance of the Cease & Desist Order prior to the commencement of these Chapter 11 Cases. When the Debtors filed these Chapter 11 Cases, they held approximately $8.4 million in corporate treasury funds. With limited additional near-term sources of revenue, the Debtors moved quickly to advance these Chapter 11 Cases, including by (a) obtaining an order approving bidding and sale procedures (the "Sale/Financing Process") in connection with their sale and capital raising efforts on September 14, 2023 – one month into these cases, (b) filing their Plan and Disclosure Statement on September 8, 2023 – approximately three (3) weeks into these cases, and (c) obtaining conditional approval of their Disclosure Statement on October 6, 2023 – less than two (2) months after the commencement of these cases. The Debtors have also been negotiating with various parties to obtain the return of estate property, including from their surety bond providers, among others.

5. Nevertheless, the Debtors' Sale/Financing Process took longer than expected, which necessitated extensions of the timelines related to both the Debtors' Sale/Financing Process

---

[2] All capitalized terms used but not defined shall have the meanings ascribed to such terms in the DIP Motion.

and the Plan confirmation process. Through those processes, I understand that the Debtors' investment banker, Galaxy Digital Partners LLC ("Galaxy"), approached third parties with respect to the provision of financing sufficient to bridge the Debtors to a sale and to effectuate the reorganization or orderly wind-down of the Debtors' estates through their Plan, but those efforts were unsuccessful.[3] And while the Debtors remain in negotiations and/or litigation with third-parties with respect to the return of estate property, or questions of ownership of alleged estate property, the Debtors may not be able to realize any assets from those efforts in time to address their near-term liquidity issues.

6. As a result, the Debtors' liquidity situation has become dire. The estimated balance of accrued, unpaid professional fees was about $9.8 million as of the week ending November 18, 2023, which exceeded the Debtors' cash on-hand of about $7.5 million (inclusive of the trust license reserve) as of that same date.

7. The DIP Lender approached the Debtors with an offer of a $10 million senior secured debtor-in-possession term loan credit facility. After extensive negotiations, the parties aligned on the terms of the proposed DIP Facility that is before the Court for approval.

**The Terms of the DIP Facility are Fair and Reasonable and Should be Approved**

8. The proposed DIP Facility represents the best source of funding to help bridge these Chapter 11 Cases to consummation of the Debtors' Plan and the orderly wind down of the Debtors' estates. Specifically, the DIP Lender has agreed to provide $10 million of senior secured debtor in possession financing, all of which will be immediately available to the Debtors upon entry of the DIP Order. In exchange for providing the DIP Facility, the DIP Lender will receive the

---

[3] *See Declaration of Michael Ashe in Support of Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Secured Priming Post-Petition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, ¶¶ 6–7.

3

DIP Liens, which are subject to the Carve-Out and the Permitted Liens, as well as junior DIP Liens on any DIP Collateral that is subject to Permitted Liens, if any, and a springing lien on the Trust Charter Account.  The DIP Lender will also receive the Release under the DIP Term Sheet and pursuant to the DIP Order, and the payment-in-kind of the reasonable and documented professional fees of its counsel in connection with the provision of the DIP Facility.  The DIP Collateral expressly carves out non-estate assets.

9. The DIP Facility will bear no interest through the Maturity Date as long as the Debtors are not subject to a continuing default under the DIP Facility. The DIP Facility carries no commitment, letter of credit, or other fees, nor are there any prepayment penalties, such as a make-whole provision.

10. The DIP Facility contains reasonable Milestones that align with the Debtors' current case trajectory and schedule.  The Debtors need to exit chapter 11 as soon as possible given their limited liquidity and the cost of these Chapter 11 Cases.  The Milestones reflect that reality.

11. Critically, to the extent that the Debtors are unable to satisfy all outstanding DIP Obligations by the Maturity Date, the DIP Lender has agreed to roll the outstanding DIP Obligations under the Plan via the Plan Roll Over.  Under that construct, on the Effective Date of the Plan, in lieu of payment in full of the outstanding DIP Obligations, the DIP Lender would receive a first-priority right to payment from the Wind-Down Debtor Assets (subject to the funding of the Wind-Down Reserve in accordance with the Plan, the Plan Administrator Agreement, and the PCT Litigation Trust Agreement) before any distributions to holders of claims in Classes 3A through 8 of the Plan. Further, upon the occurrence of the Plan Roll Over, the DIP Lender has also agreed to defer interest for one year beginning on the Effective Date.  Following the one-year

anniversary of the Effective Date, interest of 7.50% will accrue until the DIP Obligations are paid in full.

12. Notwithstanding the terms of its retention, as approved by the Court, I understand that Galaxy has agreed to forgo the payment of a Financing Fee[4] in connection with the DIP Facility.

13. Importantly, I also understand that the Committee supports the Debtors' entry into the DIP Facility and the Release (discussed below).

## The Release is Reasonable and Appropriate Under the Circumstances and Should be Approved

14. The DIP Facility provides for a full release by the Debtors of all claims and causes of action that the Debtors and their estates may have against the DIP Lender and its related parties, including any preference recovery claims the Debtors may have against the DIP Lender on account of its transaction history during the 90-day period preceding the Petition Date (the "Statutory Lookback Period"). During the Statutory Lookback Period, the DIP Lender withdrew approximately $30.9 million from the Debtors' platform, while depositing approximately $150,000. While the face amount of these transfers is large, the Debtors believe there is uncertainty whether they can prevail on any preference claims due to the potential defenses that may be asserted by the DIP Lender.[5] This uncertainty regarding the Debtors' success on the merits, coupled with the time, expense, and delay attendant to prosecuting preference claims against the DIP Lender, lend to the reasonableness of the Release.

15. Moreover, separate and apart from the Release provided for in the DIP Documents, I understand that Plan contemplates a release of preference claims against certain customers that

---

[4] As defined in Docket No. 244.

[5] The DIP Lender has advised the Debtors that it believes it has complete defenses to any preference claim.

retained large claims against the Debtors' estates as of the Petition Date.[6] I further understand that the DIP Lender is such a customer. Accordingly, the DIP Lender is poised to receive a preference release pursuant to the Plan regardless of any Release granted in connection with the DIP Facility.

16. Finally, the economic terms and circumstances surrounding the DIP Facility support the Release. By lending money into a non-operating business with undetermined assets on the remarkably favorable terms set forth in the DIP Term Sheet, the DIP Lender is making a substantial contribution in respect of these Chapter 11 Cases. In particular, the DIP Facility bridges these cases to an exit and provides funding to preserve information, monetize remaining assets, pursue litigation, and otherwise wind down the Debtors' estates in a value-maximizing manner. And it does so in a uniquely cost-effective manner. For example, while it would be difficult for a commercial lender to lend into a situation like this one, if they did, in my experience they would charge millions more in fees and interest than the DIP Lender is charging. Looking at it another way, I understand that litigation funders often seek to recover a multiple of invested capital through their funding arrangements.[7] Here, that would mean that rather than a $10 million repayment, the estates would be looking at a repayment of at least $20 million.

17. Accordingly, when evaluated on the whole, the DIP Facility and the attendant Release are fair, reasonable, and appropriate given the facts and circumstances of these Chapter 11 Cases.

---

[6] *See* Plan, Art. I.A.1.148 (definition of "Released Preference Claims").

[7] *See, e.g.*, David J. Kerstein & Wendie Childress, *Mechanics of Litigation Finance*, Bloomberg Law, Nov. 2019, at 2–3 (and explaining that when a case resolves successfully, litigation funders generally expect returns equal to "a multiple of what [they] invested"), https://static.validityfinance.com/docs/LitigationFinanceMechanics.pdf.

## **Conclusion**

18.     Based on the foregoing, I believe that the terms of the proposed DIP Facility, including the Release, are fair, reasonable, and justified under the facts and circumstances of these Chapter 11 Cases and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: December 5, 2023

*/s/ Robert Winning*
By:     Robert Winning
Title:  Managing Director
        M3 Advisory Partners, LP