**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Re: Dkt Nos. 258, 259, 485, 487, 508** |

**OBJECTION OF KADO SOFTWARE, INC. D/B/A KADO MONEY TO APPROVAL OF THE DISCLOSURE STATEMENT AND TO CONFIRMATION OF THE PLAN**

Kado Software, Inc. d/b/a Kado Money ("**Kado**") hereby objects to final approval of the Debtor's disclosure statement [Dkt. Nos. 259, 487] (the "**Disclosure Statement**") and to confirmation of the Debtors' joint plan of reorganization [Dkt. Nos. 258, 485, 508] (the "**Plan**"), and respectfully states as follows:

**OBJECTION**

1. Kado is a fiat to crypto on/off ramp platform for easy onboarding to decentralized finance and self-custody of cryptocurrencies. To facilitate its operations, Kado maintained with Prime Trust LLC ("**Prime Trust**") a demand account for fiat and cryptocurrency, and a custody account for U.S. dollars. The funds in this custody account are not property of the estate but are held in trust for and owned by the customer. Kado has claims against Prime Trust for the account balances that are based in trust and in contract, for damages based in fraud, and for other damages caused by Prime Trust's breaches. All of these claims are classified under the Plan in Class 3B.

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, NV 89135.

10084949.3

### A. The Disclosure Statement Is Not Adequate

2. The Disclosure Statement should not be approved on a final basis because it does not provide adequate information for an informed judgment as required by section 1125(a) of the Bankruptcy Code. The Debtors have failed to provide adequate information regarding, among other things, the custody account issue, how approximately $100 million of customer funds are missing when the 98f Wallet issue only accounts for about half that, the potential claims against current and former officers, directors or employees for claims relating to missing customer funds or lost cryptocurrency, or an explanation of the investigation into the 98f Wallet that has been ongoing since 2021, or the proposed postpetition financing and the intended uses of such funds. Under the circumstances, and particularly as the Debtors "**have not made any determination on the critical property of the estate issue**" (Dkt. 497-1 at 10, emphasis in original), the Disclosure Statement does not enable informed voting.

### B. The Plan Improperly Classifies and Treats Creditors

3. The Plan should not be confirmed because it fails to comply with section 1122(a) of the Bankruptcy Code by classifying custody account claims together with demand account claims in Class 3B, and without regard for whether the claims are for fiat or cryptocurrency. The Debtors are subject to claims by creditors for demand accounts, which claims are based in contract and are classified in Class 3B. In addition, the Debtors are subject to claims by creditors for custody accounts, which claims are based in trust, involve funds that are not the property of the estate, and may include claims sounding in fraud as well as claims for equitable relief. The custody account claims rely on substantially different factual bases and legal theories than demand account claims, and the recoveries on custody account claims may be different amounts and from different sources such as insurance or responsible persons. Accordingly, custody account claims are not substantially similar to and should be separately classified from demand account claims.

2
10084949.3

4.  The Plan also fails to comply with section 1123(a)(4) of the Bankruptcy Code because creditors in Class 3B do not receive the same treatment. Class 3B includes creditors subject to Released Preference Claims as well as creditors who are not subject to Released Preference Claims or who are subject to Exempted Preference Claims (as such terms are defined in the Plan Supplement filed on December 4, 2023). This is a material difference – given the total lack of visibility under the Plan on the timing or amounts of distributions on claims, for many creditors the only concrete benefit of the Plan is in avoiding the costs and delays of potential future preference litigation. In other words, creditors within Class 3B do not all receive the same treatment under the Plan. Kado submits that this classification scheme is gerrymandering.

5.  Further, the Plan does not adequately account or provide for a scenario where the "**the critical property of the estate issue**" is resolved adversely, in whole or in part, to the Debtors. Accordingly, the Plan is not feasible as required by section 1129(a)(11) of the Bankruptcy Code.

**C.    The Plan is Not in the Best Interests of Creditors**

6.  In addition, the Plan cannot be confirmed because it fails the best interests test of section 1129(a)(7) of the Bankruptcy Code. As described below, the Debtors' updated liquidation statement [Dkt. 497-1] (the "**Liquidation Analysis**") relies on questionable assumptions and speculation to manufacture a $4.7 million benefit for creditors under the Plan as compared to chapter 7. This does not meet the Debtors' burden to establish that Kado and other impaired creditors will not receive less under the Plan than in a chapter 7 liquidation.

7.  The Liquidation Analysis assumes that the 98f Wallet cryptocurrency will be recovered and that this would entail the largest possible fee for a chapter 7 trustee ($1,505,250 using the Liquidation Analysis' value of the wallet). However, the Debtors have been attempting to recover the 98f Wallet since 2021. Kado submits that the most likely outcome, *by far,* remains

that the 98f Wallet cryptocurrency will not be recovered. The additional cost of this recovery in chapter 7 of $1,505,000 is not likely to ever be incurred.

8. More broadly, the Liquidation Analysis assumes the allowance and payment of all accrued professional fees in full even in a chapter 7 liquidation. However, those fees remain subject to objection and have yet to be allowed on a final basis. Because these cases have delivered no benefit for creditors despite exorbitant cost, and because pre-conversion professional fees would not be immediately paid in a chapter 7 liquidation, Kado submits that the total allowed amount of such fees can be expected to be materially lower in a chapter 7 liquidation as compared to the Plan, whether such reductions are imposed by the Court or taken voluntarily by the claimants. Using the Debtors' estimate of $9.2 million for professional fees through a liquidation date, even a 10% reduction in such fees would deliver a $920,000 improvement for unsecured creditors in a chapter 7 scenario.

9. While chapter 7 may involve new professionals requiring some additional time to get up to speed, such professionals may not have blended rates in excess of $1,000 per hour as currently being incurred by the estates. Indeed, creditors may benefit from a fresh perspective on the issues. Finally, as the estates have incurred $9.2 million in professional fees in approximately four months with little results for creditors, the Debtors' projection that all litigation claims will be resolved, and the 98f Wallet will be unlocked, and all distributions will be completed, all for additional professional fee costs of only $2.5 million is implausible. Kado submits that the professional fees in a chapter 7 scenario are unlikely to be significantly higher than in chapter 11 as suggested by the Debtors.

10. The Liquidation Analysis also assumes that the Debtor's investment banker Galaxy would receive a $0.8 million fee in a conversion to chapter 7 in addition to its monthly fees

(approximately $275,000 as of the hearing) and the failure of the Debtors' sale process to generate even one qualified bid. *See* Dkt. 432. Kado submits that this fee should not be binding on the chapter 7 trustee and/or payable in a chapter 7 as the retention agreement and order do not expressly so provide, or alternatively that the monthly fees serve to reduce any such payable amount. Kado further notes that the Galaxy fees remain subject to a reasonableness objection by the US Trustee or, in light of the failure to deliver even one qualified bid, should otherwise be reconsidered as improvident.

11. The Liquidation Analysis assumes that the proposed DIP is repaid "within a year . . . and therefore no interest accrues under the DIP . . ." Liquidation Analysis at 9. However, the post-confirmation estate may not be capable of repaying the DIP in full within a year, in which case the chapter 11 estate will incur interest charges of $750,000 each year (7.5%). The Liquidation Analysis fails to account for any such expense, which would not be incurred by the chapter 7 trustee.

12. The Liquidation Analysis also neglects to account for the chapter 11 quarterly fees that will remain payable to the United States Trustee under the Plan scenario. Under the Debtors' projection of $96.1 million available for disbursements, such fees could be $750,000.

13. The Liquidation Analysis assumes that the Solidus license agreement will provide only an initial $1.0 million payment to the chapter 7 estate but would also yield an additional $1.4 million payment in chapter 11. As an initial matter, the proposed Solidus license agreement is redacted such that creditors cannot evaluate this assertion. However, to the extent that this assertion reflects a reasonable risk assessment, the Solidus agreement is presently before the Court for approval and should be restructured to protect the estate and eliminate this risk rather than being used to tip the scales in favor of remaining in chapter 11. Kado submits that, if the Debtors'

5

risk assessment is plausible, their decision to structure the license agreement in such a manner is not a reasonable exercise of business judgment, is not in the best interests of creditors, and should be denied.

14. The Liquidation Analysis also assumes that a chapter 7 trustee would obtain the same avoidance action recoveries as under the Plan, despite the Plan's release of most preference claims. Moreover, the Debtors' proposed DIP financing includes waiver of a $30 million preference claim against the DIP lender, which claim would remain available for the benefit of creditors in a chapter 7 liquidation. Similarly, the lack of releases or exculpations in chapter 7, as compared to chapter 11, may also facilitate improved recoveries in chapter 7. Accordingly, the Liquidation Analysis projection of equal preference recoveries in chapter 11 and in chapter 7 is implausible. Notably, the Debtors' original liquidation analysis included $40 million of preference recoveries in a chapter 7 scenario, and the Debtors should be held to this estimate. However, even a 10% increase in projected recoveries would be an additional $1.2 million of recoveries in favor of a chapter 7 scenario.

15. With even some of the adjustments described above, the chapter 7 scenario delivers at least $2.6 million of value for unsecured creditors above the Plan.

### D. THE PLAN IS NOT CONSISTENT WITH DUE PROCESS

16. Kado further objects on due process grounds to approval of the Disclosure Statement and confirmation of the Plan on the timing here. After the initial Plan and Disclosure Statement were filed on September 8, 2023, the Debtors filed a plan supplement more than two months later, at the deadline of November 28, with material amendments to the Plan, including disclosure of the new postpetition financing (without associated documentation). Despite the Court-ordered deadline and the Plan requirement for the Plan Supplement to be filed "no later than seven (7) days before" the voting deadline (with neither contemplating updates to the disclosure

6

statement or liquidation analysis), the Debtors then filed a materially revised liquidation analysis on December 1, and also filed additional plan supplement documents on December 4 that were materially adverse to Kado and certain other creditors.[2] The Debtors gave notice to Kado of such changes in the morning of December 5, the nominal due date for creditor objections. This fails to provide Kado, or other creditors, with reasonable notice and an opportunity to object. In addition, although the Debtors failed to file all Plan documents by their deadline of November 28, counsel for the Debtors refused to consent to Kado's request of an objection deadline extension.

17.     Kado reserves all of its rights to file a supplemental objection prior to the confirmation hearing to further address the deficiencies of the Disclosure Statement and the Plan.

## **CONCLUSION**

These cases have had an exorbitant cost to creditors and have gone too long without any demonstrable progress or benefit for creditors. Converting these cases to chapter 7 would be in the best interests of creditors and the estates.

*[ remainder of page intentionally left blank ]*

---

[2] Kado also notes that the Liquidation Analysis, which is not a Plan Supplement document, was filed on December 1, 2023, after the November 28 deadline for Plan Supplement documents and just 2 business days before the voting deadline. Among other things, the Liquidation Analysis revises the projected recoveries in a chapter 11 winddown to $78.0 million, down from $154.1 million in the original liquidation analysis estimate. Kado submits that this is a material change and warrants resolicitation.

WHEREFORE, Kado respectfully requests that the Court deny final approval of the Disclosure Statement, deny confirmation of the Plan, and grant such other and further relief as is just and proper.

Dated: December 6, 2023　　　　　　　　　　**GELLERT SCALI BUSENKELL & BROWN, LLC**

　　　　　　　　　　　　　　　　　　　　　　*/s/ Michael Van Gorder*
　　　　　　　　　　　　　　　　　　　　　　Michael Van Gorder (DE 6214)
　　　　　　　　　　　　　　　　　　　　　　1201 North Orange Street, Suite 300
　　　　　　　　　　　　　　　　　　　　　　Wilmington, Delaware 19801
　　　　　　　　　　　　　　　　　　　　　　Telephone (302) 425-5800
　　　　　　　　　　　　　　　　　　　　　　Email: mvangorder@gsbblaw.com

- and -

David S. Forsh (admitted *pro hac vice*)
**RAINES FELDMAN LITTRELL LLP**
1350 Avenue of the Americas, 22nd Floor
New York, NY 10019
Telephone: 917.790.7100
Email: dforsh@raineslaw.com