# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Related to Docket Nos. 94, 259, 264, 362, 485, 486, 487, 497, 508, 511, & 521** |

## DEBTORS' MEMORANDUM OF LAW (I) IN SUPPORT OF (A) APPROVAL OF THE DISCLOSURE STATEMENT ON A FINAL BASIS, AND (B) CONFIRMATION OF THE DEBTORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR PRIME CORE TECHNOLOGIES INC. AND ITS AFFILIATED DEBTORS, AND (II) IN RESPONSE TO REMAINING OBJECTIONS TO CONFIRMATION

**MCDERMOTT WILL & EMERY LLP**
Maris J. Kandestin (No. 5294)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone:    (302) 485-3900
Facsimile:    (302) 351-8711
Email:    mkandestin@mwe.com

**MCDERMOTT WILL & EMERY LLP**
Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone:    (212) 547-5400
Facsimile:    (646) 547-5444
Email:    dazman@mwe.com
    jbevans@mwe.com

**MCDERMOTT WILL & EMERY LLP**
Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone:    (305) 358-3500
Facsimile:    (305) 347-6500
Email:    gsteinman@mwe.com

**MCDERMOTT WILL & EMERY LLP**
R. Jacob Jumbeck (admitted *pro hac vice*)
Rebecca E. Trickey (admitted *pro hac vice*)
444 W. Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700
Email:    jjumbeck@mwe.com
    rtrickey@mwe.com

*Counsel to the Debtors and Debtors in Possession*

Dated:  December 12, 2023
    Wilmington, Delaware

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are:  Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, NV 89135.

# TABLE OF CONTENTS

RELIEF REQUESTED ................................................................................................................ 1

PRELIMINARY STATEMENT .................................................................................................. 2

BACKGROUND ......................................................................................................................... 4

    I.      Prepetition Events ................................................................................................ 4

          A.     Cease and Desist Order ......................................................................... 4

          B.     Receivership and Appointment of Special Committee ......................... 4

    II.     The Chapter 11 Cases ........................................................................................ 6

          A.     General Background ............................................................................. 6

          B.     Marketing and Sale Process ................................................................. 6

          C.     DIP Motion .......................................................................................... 8

          D.     Rejection of Executory Contracts and Unexpired Leases..................... 9

          E.     Objections to Claims ........................................................................... 10

          F.     Omnibus Rule 3018 Motion ................................................................ 11

          G.     Foreign Currency Motion .................................................................... 11

          H.     Motion to Approve Swan License Agreement...................................... 12

          I.     Audius Motion ..................................................................................... 12

          J.     Investigation into Prepetition Events ................................................... 13

          K.     The Plan and Disclosure Statement .................................................... 14

    III.    Solicitation of the Plan and Voting Results ...................................................... 18

ARGUMENT................................................................................................................................ 21

    I.      The Disclosure Statement Should be Approved on a Final Basis. ....................... 21

    II.     The Plan Complies with the Applicable Provisions of the Bankruptcy
          Code—Section 1129(a)(1). ................................................................................ 24

          A.     The Plan Satisfies the Classification Requirements of Section 1122 of the
               Bankruptcy Code. ............................................................................... 25

          B.     The Plan Satisfies the Applicable Mandatory Plan Requirements of
               Section 1123(a) of the Bankruptcy Code............................................. 28

|  | i. | Designation of Classes of Claims and Interests—Section 1123(a)(1). | 28 |
|  | ii. | Specification of Unimpaired Classes—Section 1123(a)(2). | 29 |
|  | iii. | Treatment of Impaired Classes—Section 1123(a)(3). | 29 |
|  | iv. | Equal Treatment of Similarly Situated Claims and Interests—Section 1123(a)(4). | 30 |
|  | v. | Adequate Means for Implementation—Section 1123(a)(5) | 31 |
|  | vi. | Prohibition of Issuance of Non-Voting Securities—Section 1123(a)(6). | 33 |
|  | vii. | Selection of Directors and Officers—Section 1123(a)(7). | 33 |

C. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code. ... 34

    i. Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code. ... 34

    ii. The Plan's Release, Exculpation, and Injunction Provisions Satisfy Bankruptcy Code Section 1123(b). ... 35

        1) The Debtor Release Complies with the Discretionary Provisions of Bankruptcy Code Section 1123(b) and Should be Approved. ... 36

        2) The Third-Party Release Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code and Should be Approved. ... 46

        3) The Exculpation is Appropriate and Should be Approved. ... 49

        4) The Injunction is Appropriate and Should be Approved. ... 50

    iii. The Plan Does Not Provide for a Sale of Substantially All or All of the Debtors' Assets—Section 1123(b)(4). ... 52

    iv. The Plan Modifies the Rights of Certain Classes—Section 1123(b)(5). ... 52

    v. The Plan Complies with Section 1123(d) of the Bankruptcy Code. ... 53

III. The Debtors Complied with the Applicable Provisions of the Bankruptcy Code—Section 1129(a)(2). ... 53

IV. The Plan is Proposed in Good Faith and Not by Any Means Forbidden by Law—Section 1129(a)(3). ... 54

V.       The Plan Provides that the Debtors' Payment of Professional Fees and Expenses is Subject to Court Approval—Section 1129(a)(4). ...........................56

VI.      The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders—Section 1129(a)(5). ........................................57

VII.     The Plan Does Not Require Governmental Regulatory Approval—Section 1129(a)(6). ...........................................................................58

VIII.    The Plan is in the Best Interests of All the Debtors' Creditors—Section 1129(a)(7). ...........................................................................59

IX.      The Plan is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ...............................................62

X.       The Plan Provides for Payment in Full of All Allowed Priority Claims— Section 1129(a)(9). ...........................................................63

XI.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan— Section 1129(a)(10). ..........................................................64

XII.     The Plan is Feasible—Section 1129(a)(11). ........................................64

XIII.    All Statutory Fees Have Been or Will Be Paid—Section 1129(a)(12)................65

XIV.     Sections 1129(a)(13)-(16) of the Bankruptcy Code Do Not Apply to the Plan. .............................................................................66

XV.      The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code. ......................................................66

         A.       The Plan Does Not Discriminate Unfairly with Respect to Impaired Classes that Have Not Voted to Accept the Plan—Section 1129(b)(1).............. 67

         B.       The Plan is Fair and Equitable—Section 1129(b)(2)(B)(ii)................................ 69

XVI.     The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code—Section 1129(c)-(e). ..............................................69

THE UNRESOLVED OBJECTIONS SHOULD BE OVERRULED........................................ 70

MODIFICATIONS TO THE PLAN.................................................................... 71

GOOD CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER...................... 72

RESERVATION OF RIGHTS ........................................................................ 73

CONCLUSION................................................................................... 73

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
  526 U.S. 434, 442 (1999) .......................................................................................... 56

*Beal Bank, S.S.B. v. Way Apts., D.T. (In re Way Apts., D.T.),*
  201 B.R. 444, 451, 451 n.6 (N.D. Tex. 1996) ........................................................ 27

*Century Glove, Inc. v. First Am. Bank of New York,*
  860 F.2d 94, 100 (3d Cir. 1988) ............................................................................ 24

*Del. Tr. Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.),*
  527 B.R. 157 (D. Del. 2015), aff'd, 648 F. App'x 277 (3d Cir. 2016) ................... 32

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship),*
  116 F.3d 790 (5th Cir. 1997) .................................................................................. 51

*In re Abeinsa Holding, Inc.,*
  562 B.R. 265, 274–75 (Bankr. D. Del. 2016) ......................................................... 27

*In re Adelphia Commc'ns Corp.,*
  361 B.R. 337 (S.D.N.Y. 2007) ............................................................................... 57

*In re Adelphia Commc'ns Corp.,*
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) .............................................................. 39, 57

*In re Affiliated Foods, Inc.,*
  249 B.R. 770 (Bankr. W.D. Mo. 2000) .................................................................. 57

*In re Aleris Int'l, Inc.,*
  Case No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ..... 39

*In re Alpha Latam Mgmt., LLC,*
  No. 21-11109 (JKS) (Bankr. D. Del. Mar. 16, 2022) ............................................. 47

*In re Ambanc La Mesa L.P.,*
  115 F.3d 650 (9th Cir. 1997) .................................................................................. 64

*In re American Eagle Delaware Holding Co.,*
  No. 22-10028 (JKS) (Bankr. D. Del. April 27, 2022) ............................................ 47

*In re American-CV Station Grp., Inc.,*
  56 F.4th 1302, 1308 (11th Cir. 2023) ..................................................................... 68

*In re Apex Oil Co.,*
  118 B.R. 683 (Bankr. E.D. Mo. 1990) .................................................................... 55

*In re Armstrong World Indus., Inc.,*
    348 B.R. 111, 120 (D. Del. 2006) ........................................................................ 22

*In re Armstrong World Indus., Inc.,*
    348 B.R. 111, 121 (D. Del. 2006) ........................................................................ 65

*In re Beyond.com Corp.,*
    289 B.R. 138 (Bankr. N.D. Cal. 2003) ................................................................ 55

*In re Burns & Roe Enters., Inc.,*
    No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ............................ 68

*In re Buttonwood Partners, Ltd.,*
    111 B.R 57, 63 (Bankr. S.D.N.Y. 1990) .............................................................. 65

*In re Carestream Health, Inc.,*
    No. 22-11778 (JKS) (Bankr. D. Del. Sep. 28, 2022) ........................................... 47

*In re Cent. Med. Ctr., Inc.,*
    122 B.R. 568 (Bankr. E.D. Mo. 1990) ................................................................. 31

*In re Dow Corning Corp.,*
    237 B.R. 374 (Bankr. E.D. Mich. 1999) ........................................................ 68, 69

*In re Dow Corning Corp.,*
    244 B.R. 634, 645 n.5 (Bankr. E.D. Mich. 1999) ................................................ 27

*In re Dow Corning Corp.,*
    255 B.R. 445 (E.D. Mich. 2000) .......................................................................... 31

*In re Exide Techs.,*
    303 B.R. 48 (Bankr. D. Del. 2003) ...................................................................... 40

*In re Flintkote Co.,*
    486 B.R. 99 (Bankr. D. Del. 2012) ...................................................................... 62

*In re Future Energy Corp.,*
    83 B.R. 470  (Bankr. S.D. Ohio 1988) ................................................................. 53

*In re Glob. Safety Textiles Holdings LLC,*
    No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) .............. 68

*In re Greate Bay Hotel & Casino, Inc.,*
    251 B.R. 213, 224 (Bankr. D.N.J. 2000) ............................................................. 26

*In re Heritage Org., L.L.C.,*
    375 B.R. 230, 302 (Bankr. N.D. Tex. 2007) ........................................................ 27

*In re Indianapolis Downs, LLC,*
   486 B.R. 286 (Bankr. D. Del. 2013) ................................................................. 40, 44

*In re Jersey City Med. Ctr.,*
   817 F.2d 1055, 1061 (3d Cir. 1987) ...................................................................... 26

*In re Johns-Manville Corp.,*
   68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) ............................................................ 65

*In re Johns-Manville Corp.,*
   78 B.R. 407 (S.D.N.Y. 1986) ................................................................................ 65

*In re Lason, Inc.,*
   300 B.R. 227 (Bankr. D. Del. 2003) ..................................................................... 56

*In re Legacy FSRD, Inc.,*
   No. 22-11051 (JKS) (Bankr. D. Del. Feb. 23, 2023) ............................................ 47

*In re Lernout & Hauspie Speech Prod., N.V.,*
   301 B.R. 651, 660 (Bankr. D. Del. 2003) aff'd, 308 B.R. 672 (D. Del. 2004) ........ 65

*In re Lisanti Foods, Inc.,*
   329 B.R. 491 (D.N.J. 2005), aff'd, 241 F. App'x 1 (3d Cir. 2007) ........................ 53

*In re Machne Menachem, Inc.,*
   233 F. App'x 119 (3d Cir. 2007) .......................................................................... 22

*In re Marvel Entm't Grp., Inc.,*
   273 B.R. 58 (D. Del. 2002) ................................................................................... 39

*In re Master Mortg. Inv. Fund, Inc.,*
   168 B.R. 930 (Bankr. W.D. Mo. 1994) ................................................................. 40

*In re Neff,*
   60 B.R. 448 (Bankr. N.D. Tex. 1985), aff'd, 785 F.2d 1033 (5th Cir. 1986) ......... 56

*In re New Midland Plaza Assocs.,*
   247 B.R. 877, 892 (Bankr. S.D. Fla. 2000) ......................................................... 27

*In re NII Holdings, Inc.,*
   288 B.R. 356 (Bankr. D. Del. 2002) ..................................................................... 51

*In re Nutritional Sourcing Corp.,*
   398 B.R. 816 (Bankr. D. Del. 2008) ..................................................................... 25

*In re Nuverra Envtl. Solutions, Inc.,*
   590 B.R. 75, 98–99 (D. Del. 2018) ....................................................................... 27

*In re Phoenix Petroleum Co.,*
278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ........................................................... 23

*In re Premier Int'l Holdings, Inc.,*
No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) .............................. 22

*In re Prussia Assocs.,*
322 B.R. 572 (Bankr. E.D. Pa. 2005) .................................................. 62

*In re Resorts Int'l, Inc.,*
145 B.R. 412 (Bankr. D.N.J. 1990) ........................................................... 53

*In re S & W Enter.,*
37 B.R. 153 (Bankr. N.D. Ill. 1984) ........................................................... 25

*In re Sherwood Square Assoc.,*
107 B.R. 872 (Bankr. D. Md. 1989) ........................................................... 55

*In re Stratford Assocs. Ltd. P'ship,*
145 B.R. 689, 696 (Bankr. D. Kan. 1992) .................................................. 55

*In re TCI 2 Holdings, LLC,*
428 B.R. 117 (Bankr. D.N.J. 2010) ........................................................... 22

*In re Tribune Co.,*
476 B.R. 843, 854–55 (Bankr. D. Del. 2012) ......................................... 26

*In re Tribune Co.,*
972 F.3d 228 (3d Cir. 2020) ........................................................... 64

*In re W.R. Grace & Co.,*
729 F.3d 311 (3d Cir. 2013) ................................................. 31, 52

*In re Wash. Mutual, Inc.,*
442 B.R. 314 (Bankr. D. Del. 2011) ......................................... 32, 40, 44

*In re WorldCom, Inc.,*
No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ......................... 65

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns),*
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ................................................. 39

*Kane v. Johns-Manville Corp.,*
843 F.2d 636 (2d Cir. 1988) ................................................. 56, 62, 65

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.,*
354 B.R. 1, 10 (D. Conn. 2006) ........................................................... 65

*U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.),*
  426 B.R. 114 (Bankr. D. Del. 2010), *appeal dismissed*, 2011 WL 3420441 (D. Del. Aug. 4,
  2011) ............................................................................................................ 39, 44

**Statutes**                                                                                    **Pages**

11 U.S.C. § 1122(a) ............................................................................................ 26

11 U.S.C. § 1122(b) ............................................................................................ 27

11 U.S.C. § 1123(a)(1) ........................................................................................ 30

11 U.S.C. § 1123(a)(2) ........................................................................................ 30

11 U.S.C. § 1123(a)(3) ........................................................................................ 30

11 U.S.C. § 1123(a)(4) ........................................................................................ 31

11 U.S.C. § 1123(a)(5) ........................................................................................ 32

11 U.S.C. § 1123(a)(6) ........................................................................................ 34

11 U.S.C. § 1123(a)(7) ........................................................................................ 35

11 U.S.C. § 1123(b) ............................................................................................ 35

11 U.S.C. § 1123(b)(3)(A) ................................................................................... 39

11 U.S.C. § 1123(b)(4 .......................................................................................... 49

11 U.S.C. § 1123(b)(5) ........................................................................................ 49

11 U.S.C. § 1123(d) ............................................................................................ 50

11 U.S.C. § 1127(a) ............................................................................................ 68

11 U.S.C. § 1129(a)(1) ........................................................................................ 25

11 U.S.C. § 1129(a)(10) ...................................................................................... 61

11 U.S.C. § 1129(a)(11) .................................................................................. 61, 62

11 U.S.C. § 1129(a)(12) ...................................................................................... 62

11 U.S.C. § 1129(a)(3) ........................................................................................ 51

11 U.S.C. § 1129(a)(4) ........................................................................................ 53

11 U.S.C. § 1129(a)(5)(A)(i) ............................................................................... 54

11 U.S.C. § 1129(a)(5)(A)(ii) ................................................................................ 55

11 U.S.C. § 1129(a)(5)(B) ..................................................................................... 54

11 U.S.C. § 1129(a)(7) .......................................................................................... 56

11 U.S.C. § 1129(a)(8) .......................................................................................... 59

11 U.S.C. § 1129(a)(9) .......................................................................................... 60

11 U.S.C. § 1129(b)(1) .......................................................................................... 64

11 U.S.C. § 1129(b)(2)(B)-(C) .............................................................................. 66

11 U.S.C. § 1129(c) ............................................................................................... 66

11 U.S.C. § 1129(d) ............................................................................................... 67

11 U.S.C. § 1129(e) ............................................................................................... 67

11 U.S.C. § 507(a)(2) ............................................................................................ 63

11 U.S.C. §1125(a)(1) ........................................................................................... 23

## Other Authorities                                                        Pages

H.R. Rep. No. 95-595, at 408–409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6364-65 ...... 24

H.R. Rep. No. 95-595, at 409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6364 ................... 23

H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368 ............................. 26

S. Rep. No. 95-989, at 126 *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 .................................... 25

## Rules                                                                    Pages

Fed. R. Bankr. P. 3019 .......................................................................................... 71

Fed. R. Bankr. P. 3020(e) ..................................................................................... 72

Fed. R. Bankr. P. 6004(h) ..................................................................................... 72

Fed. R. Bankr. P. 6006(d) ..................................................................................... 72

Fed. R. Bankr. P. 9019(a) ..................................................................................... 40

## RELIEF REQUESTED

Prime Core Technologies, Inc. and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, hereby submit this memorandum of law (i) in support of entry of an order (a) approving, on a final basis, the *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code With Respect to the Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Dockets No. 259 & 487] (as amended, modified, or supplemented and including all exhibits and supplements thereto, the "Disclosure Statement")[2] as having adequate information under section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), and (b) confirming the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 521-1] (as modified, amended, or supplemented from time to time, the "Plan"),[3] pursuant to section 1129 of the Bankruptcy Code, and (ii) in response to the Objections (as defined below) (this "Confirmation Brief").  In support of confirmation of the Plan and approval of the Disclosure Statement on a final basis, the Debtors rely on (i) the *Declaration of Brian Karpuk of Stretto Regarding Voting and Tabulation of Ballots Cast on the Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* filed contemporaneously herewith (the "Voting Declaration"); (ii) the *Declaration of Michael Wyse in Support of Confirmation of the Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* filed

---

[2]    On November 28, 2023, the Debtors filed their *Supplement to Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with Respect to the Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 487-1] (the "Disclosure Statement Supplement").  References herein to the Disclosure Statement are meant to include both the Disclosure Statement and the Disclosure Statement Supplement.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan and the Disclosure Statement.

contemporaneously herewith (the "Wyse Declaration"); and (iii) the *Declaration of William Murphy in Support of Confirmation of the Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* filed contemporaneously herewith (the "Murphy Declaration," and together with the Voting Declaration and the Wyse Declaration, the "Confirmation Declarations"), each of which are incorporated by reference as if fully set forth herein. In further support of confirmation of the Plan and final approval of the Disclosure Statement, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[4]

1.      The Debtors commenced these Chapter 11 Cases in a veritable free fall nearly four months ago in almost unprecedented circumstances. On June 21, 2023, following a series of cataclysmic events, the Debtors were ordered to cease and desist all retail trust activities by the Nevada FID, effectively shuttering the Debtors' operations and leaving the Debtors with a finite amount of available cash and no active source of revenue generation. On the heels of the Nevada FID's imposition of the Cease and Desist Order, the Nevada State Court granted its petition to place the Debtors in Receivership.

2.      In light of the circumstances leading to the imposition of Cease and Desist Order, the Debtors' cash position, and the state of uncertainty the Debtors' Customers found themselves in as a result, the Debtors filed these Chapter 11 Cases with three primary goals: (a) *Asset Protection*—put guardrails in place to protect assets and work towards an efficient and equitable resolution of customer claims in a single forum; (b) *Address Financial Condition*—pursue third-party financing, a recapitalization, and a potential sale pursuant to Bankruptcy Code section 363 or through a chapter 11 plan; and (c) *Undertake Focused Investigation*—launch a full investigation

---

[4]     Capitalized terms used but not defined in this Preliminary Statement are defined elsewhere in this Confirmation Brief.

into the whereabouts of the information necessary to access certain of the Debtors' Cryptocurrency holdings (e.g., the 98f) and Claims and Causes of Action against Persons and Entities responsible for the events and circumstances that contributed to the imposition of the Cease and Desist Order, the Receivership, and, ultimately, the filing of these Chapter 11 Cases.

3.      Throughout these Chapter 11 Cases, the Debtors engaged with parties in interest to further these goals and develop an exit strategy that would preserve the value of the Debtors' Estates, provide a meaningful distribution on account of Creditors' prepetition claims, and preserve claims against certain third parties for conducted related to the events preceding the Cease and Desist Order.  The Plan before the Bankruptcy Court is the culmination of these efforts. The Plan is the result of extensive negotiations and compromises, and enjoys broad support from the Committee, and other key constituents.  Most importantly, the Plan has received the overwhelming support of the most important constituency in these Chapter 11 Cases – the Customers.[5]

4.      For the reasons set forth herein, (a) the Disclosure Statement contains adequate information under section 1125 of the Bankruptcy Code and should be approved on a final basis, (b) the Plan satisfies the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the appliable orders of this Court, and should be confirmed.

---

[5]     The Debtors received only a handful of objections to confirmation of the Plan (each, an "Objection," and collectively, the "Objections"), of which only the Objections of the U.S. Trustee, 450 Investments, LLC, and SDM, Inc. remain extant.  For the reasons set forth herein, these Objections have been adequately addressed herein, through revisions or additions to the Plan, and should otherwise be overruled.

Kado Software, Inc. ("Kado") previously filed an Objection to the Plan, which it later withdrew its on December 11, 2023. *See* Docket No. 543.  Accordingly, the arguments raised in Kado's Objection are not addressed in this Confirmation Brief.  Further, Salesforce, Inc. has confirmed to counsel that its Objection to confirmation has been resolved through, among other things, the Bankruptcy Court's entry of the *Order Approving Stipulation Regarding Request for Allowance and Payment of Administrative Expense Claim of Salesforce, Inc.* [Docket No. 538]. The arguments raised by Salesforce likewise are not addressed in this Confirmation Brief.

# BACKGROUND

## I.    Prepetition Events

### A.    Cease and Desist Order

5.    As a result of a series of adverse events in the late Spring and early Summer of 2023, the Debtors found themselves in violation of Nevada trust regulations and certain other state regulations due generally to a failure to maintain an adequate amount of shareholder equity or capital in the form of permissible investments. The Debtors worked closely and cooperatively with the Nevada Department of Business and Industry Division of Financial Institutions (the "Nevada FID") to resolve these issues and bring the Debtors back into compliance. However, a series of events transpired[6] that caused the Debtors to experience multiple "runs on the bank," which led to the entry of a *Memorandum of Understanding* between the Debtors and the Nevada FID on June 16, 2023, pursuant to which the Nevada FID placed additional oversight over the Debtors. On June 21, 2023, the Nevada FID issued a cease and desist order (the "Cease and Desist Order") against the Debtors. Pursuant to the Cease and Desist Order, the Nevada FID ordered the Debtors to cease and desist all retail trust activities.  Thus, as of June 21, 2023, the Debtors ceased all business operations and had no active source of revenue generation.

### B.    Receivership and Appointment of Special Committee

6.    On June 26, 2023, the Nevada FID filed a *Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief* (the "Receivership Petition") with the Eighth Judicial District Court of the State of Nevada (the "Nevada State Court"), seeking, among other things, the appointment of a receiver pursuant to Nevada Revised Statute 669.2864.[7]  On July 14,

---

[6]    These events included license revocations by certain state licensing agencies, negative press, incorrect reporting, and the demise of the BitGo transaction.

[7]    Case No. A-23-872963-B.

2023, the Nevada State Court granted the Receivership Petition on an interim basis, placing the Debtors in receivership (the "Receivership") and installing John Guedry as receiver (the "Receiver") with respect to the Debtors (the "Interim Receivership Order").

7.      On August 3, 2023, the Receiver petitioned the Nevada State Court for a modification of the Interim Receivership Order (the "Motion to Modify"). Among other things, the Receiver requested that the Nevada State Court authorize (a) the formation of a special restructuring committee (the "Special Committee"); (b) appoint John Guedry, John Wilcox, and Michael Wyse as the sole members of the Special Committee; and (c) vest the Special Committee with requisite authority to direct the Debtors to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code and manage and oversee the Debtors in their capacities as debtors-in-possession during the pendency of their Chapter 11 Cases.

8.      On August 8, 2023, the Nevada State Court held a hearing (the "August 8 Hearing") on the Motion to Modify. At the close of the August 8, Hearing, the Nevada State Court approved the relief requested in Motion for Modify and approved the Receivership Petition on a final basis. On August 10, 2023, the boards of directors, boards of managers, or sole members, as applicable, of the Debtors ratified the decision of the Nevada State Court on the record at the August 8 Hearing, and further delegated to the Special Committee all decision-making authority with respect to the Debtors in their capacities as debtors-in-possession in connection with their anticipated chapter 11 cases. On August 14, 2023, the Nevada State Court entered an order memorializing the court's ruling on the record at the August 8 Hearing and, acting by unanimous written consent, the Special Committee authorized the filing of these Chapter 11 Cases.

II.     **The Chapter 11 Cases**

A.     **General Background**

9.      On August 14, 2023 (the "Petition Date"), each Debtor commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). These cases have been jointly administered for procedural purposes only.

10.     The Debtors continue to manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.     On August 29, 2023, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 51].  On November 29, 2023, the U.S. Trustee reconstituted the Committee [Docket No. 490].  The Committee is comprised of the following unsecured creditors: (a) Yousef Abbasi; (b) Allsectech, Inc.; (c) DMG Blockchain Solutions, Inc.; (d) Net Cents Technology, Inc.; (e) Stably Corporation; and (f) Austin Ward.

12.     Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the *Declaration of Jor Law, Interim Chief Executive Officer and President of Prime Core Technologies Inc., et al., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 14] (the "First Day Declaration"), which is incorporated by reference as if fully set forth herein.

B.     **Marketing and Sale Process**

13.     Prior to the Petition Date, the Debtors commenced a process to solicit interest in Sale Transaction (through which a third party would purchase some or all of the Debtors' Assets)

or a Reorganization Transaction (through which a third party would purchase 100% of the equity in the Debtors (the "Sale Process").[8]

14.    On August 30, 2023, the Debtors filed a motion [Docket No. 55] (the "Bid Procedures Motion") seeking, among other things, approval of bidding procedures (the "Bid Procedures") that would govern the Debtors' postpetition marketing efforts in connection with the Sale Process.  On September 14, 2023, the Bankruptcy Court entered an approving the Bid Procedures Motion [Docket No. 110] (the "Bid Procedures Order").

15.    Following entry of the Bid Procedures Order, the Debtors continued their Sale Process, running an extensive marketing process that resulted in expressions of interest from several parties with respect to a Sale Transaction and/or an Equity Transaction.  More specifically, the Debtors' professionals reached out to about 470 potential purchasers in an attempt to monetize their Assets and bring value into the Debtors' Estates.

16.    To foster a competitive bidding process and auction, the Debtors adjourned the auction several times to allow the Debtors and potential purchasers additional time to negotiate the terms of a Sale Transaction and/or a Reorganization Transaction, as well as to allow certain purchasers additional time to clear contingencies and otherwise improve their bids.  Despite these efforts, however, no Sale Transaction or Reorganization Transaction materialized, and on November 17, 2023, the Debtors cancelled the Auction and concluded the Sale Process.[9]

---

[8]    Among other things, the Plan provides for the following three toggles (the "Toggles"): (a) a Reorganization Transaction, pursuant to which a Plan Sponsor would purchase substantially all the Reorganized Equity Interests in the Reorganized Debtors through the Plan (*see* Plan, Art. 6.7), (b) a Sale Transaction, pursuant to which a potential purchaser would acquire all, or substantially all, the Assets of the Debtors in exchange for cash consideration under section 363 of the Bankruptcy Code (*see id.* Art. 1.A.1.157), (c) and Liquidation Transaction, which the Debtors would pursue in the event neither a Reorganization Transaction nor a Sale Transaction materialized (*see id.* Art. 6.8).  Every iteration of the Plan included these Toggles.

[9]    *See* Docket No. 432.

17.     As the Debtors were unable to consummate a Reorganization Transaction or a Sale Transaction, the Debtors have elected to purse a Liquidation Transaction under the Plan.

### C.     DIP Motion[10]

18.     The Debtors' dire financial circumstances were further exacerbated by the extension of the Sale Process, and with the Sale Process producing no purchaser for the Debtors' Assets or equity interests, the future of these Chapter 11 Cases was in jeopardy.  Polaris Ventures, a prepetition custodial account holder, Swiss nonprofit corporation, and former member of the Committee, offered the Debtors a lifeline in the form of a superpriority secured debtor-in-possession financing in the amount of $10,000,000.00 (the "DIP Facility").  The proposed DIP Facility's terms are overall favorable to the Debtors in an otherwise difficult interest rate environment:

- *DIP Facility is Interest-Free.* The DIP Lender has agreed to provide the DIP Facility on an interest-free basis through the maturity date (and so long as the Debtors are not in continuing default thereunder).[11]

- *Junior Liens on Certain Collateral.* The DIP Lender has agreed to take junior liens with respect to (a) certain permitted, senior liens arising under state law, (b) collateral pledged to the Sureties, and (c) purported security interests granted in connection with the Debtors' agreements with its depository banks.[12]

- *Exclusion of Trust Charter Account from DIP Collateral.* The DIP Lender has agreed to exclude the collateral the Debtors pledged to maintain their trust charter under Nevada law from the collateral securing the DIP Facility, until such time that the Debtors surrender their trust charter, thereby allowing the Debtors to ensure compliance with the requirements under applicable Nevada state law.[13]

- *No Fees.* The DIP Facility carries no commitment, facility, or other fees, and there are no make whole or other prepayment penalties.

---

[10]   The descriptions set forth in Sections C through I hereof are intended to be summaries only are qualified in their entireties by the motions they describe.

[11]   Docket No. 523, Ex. 1 to Ex. A, at 3.

[12]   *Id.* Ex. 1 to Ex. A, at 3–4.

[13]   *Id.* Ex. 1 to Ex. A, at 5.

- *Plan Roll Over Election.* In the event the Debtors are unable to satisfy the obligations under the DIP Facility on or before the maturity date, the DIP Lender has agreed to roll the obligations pursuant to the Plan and receive distributions on account of the DIP Claims from the first available distributions from the Wind-Down Debtor Assets. In so doing, the DIP Lender is providing the Debtors with the flexibility to ensure that the Wind-Debtor Budget is appropriately funded. Moreover, the Plan Roll Over includes a 12-month interest holiday; and even after that holiday, the interest rate of 7.5% is reasonable for distressed financing, especially in this interest rate environment.

19.     On December 5, 2023, the Debtors filed the *Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Secured Priming Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 523] (the "DIP Motion"), through which they seek approval of the DIP Facility. The DIP Motion is scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing.

### D.     Rejection of Executory Contracts and Unexpired Leases

20.     Since the inception of these Chapter 11 Cases, the Debtors have been focused on reducing costs. In that vein, early on in these cases, the Debtors began evaluating their Executory Contracts and Unexpired Leases to determine which such agreements should be rejected versus which contracts and leases were necessary to preserve the value of their Estates. To that end, the Debtors field motions to reject certain Executory Contracts and Unexpired Leases on August 28, 2023,[14] October 13, 2023,[15] October 31, 2023,[16] November 15, 2023,[17] and November 17, 2023 (collectively, the "Rejection Motions").[18]   On September 22, 2023,[19] November 8, 2023,[20]

---

[14]   *See* Docket No. 47.

[15]   *See* Docket No. 290.

[16]   *See* Docket No. 368.

[17]   *See* Docket Nos. 428, 429.

[18]   *See* Docket No. 430.

[19]   *See* Docket No. 187.

[20]   *See* Docket No. 399.

November 17, 2023,[21] and December 5, 2023,[22] the Bankruptcy Court entered orders granting the Rejection Motions. The remaining Rejection Motion is scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing.

### E.    Objections to Claims

21.    In consultation with their advisors, the Debtors performed a review of the proofs of claim that had been filed in connection with these Chapter 11 Cases. As the Voting Deadline was (as defined below) approaching, the Debtors grew concerned that certain proofs of claim, if able to vote in their face amounts (or at all) would dilute the votes of, and potentially disenfranchise legitimate creditors entitled to vote on the Plan.  On review, the Debtors and their advisors concluded that the Debtors should object to certain filed proofs of claim, and thus, on November 18, 2023, the Debtors filed (a) the *Debtors' Objection to Proof of Claim No. 416 Filed by Conor O'Brien Pursuant to Section 502 of the Bankruptcy Code and Bankruptcy Rule 3007* [Docket No. 434]  (the "O'Brien Claim Objection");[23]  (b) the *Debtors' First (Substantive) Omnibus Objection to Certain Filed Proofs of Claim* [Docket No. 435, 436] (the "First Omnibus Claim Objection")[24]; and (c) the *Debtors' Second (Non-Substantive) Omnibus Objection to Certain Filed Proofs of Claim* [Docket No. 437, 438] (the "Second Omnibus Claim Objection").[25]

---

[21]    *See* Docket No. 431.

[22]    *See* Docket No. 513.

[23]    As set forth in detail in the O'Brien Claim Objection, the Debtors have no record of any contract with Mr. O'Brien and the claim (in the amount of over $58 million), on its face, appears to be fraudulent in nature.

[24]    In the First Omnibus Claim Objection, the Debtors seek entry of an order (a) disallowing and expunging the claims listed on Exhibit 1 annexed to the proposed order on the basis that the Debtors are not liable for such claims, (b) reducing the amount of the claims listed on Exhibit 2 annexed to the proposed order, and (c) reclassifying certain claims (or portions thereof, as applicable) listed on Exhibit 3 annexed to the proposed Order.  *See* First Omnibus Claim Objection, ¶ 11.

[25]    In the Second Omnibus Claim Objection the Debtors seek entry of an order (a) disallowing and expunging certain duplicative claims, (b) disallowing and expunging certain claims for which an amended claim has been filed, and (iii) reclassifying certain claims as equity interests.  *See* Second Omnibus Claim Objection, ¶ 11.

### F.    Omnibus Rule 3018 Motion

22.    Subsequent to filing the Claim Objections, the Debtors located additional claims that should be addressed in connection with voting on the Plan, and on November 28, 2023, the Debtors filed an *Omnibus Determination Motion for Estimation and Temporary Allowance of Claim Nos. 173, 1319, 859, and 47 for Voting Purposes Pursuant to Bankruptcy Rule 3018* [Docket No. 484]. (the "Omnibus Rule 3018 Motion," and together with the O'Brien Claim Objection, the First Omnibus Claim Objection, and the Second Omnibus Claim Objection, the "Claim Objections").   The Omnibus Rule 3018 Motion is scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing.

### G.    Foreign Currency Motion

23.    On November 13, 2023, the Debtors filed the *Motion of the Debtors for Entry of an Order Authorizing the Debtors to Sell Certain Foreign Currency Free and Clear of All Liens, Claims, Interests, and Encumbrances Pursuant to Bankruptcy Code Section 363* [Docket No. 413] (the "Foreign Currency Motion").   Pursuant to the Foreign Currency Motion, the Debtors seek entry of an order (a) finding that $8,867,904.00 worth of their foreign currencies (the "Foreign Currency") constitute property of the Debtors' Estates, and (b) authorizing the Debtors to convert the Foreign Currency to U.S. dollars.   It is the Debtors' position that the Foreign Currency was deposited under agreements between Prime Trust and TrustToken, Inc. ("TrustToken") that permitted the Debtors to "invest" and "rehypothecate" the Foreign Currency and that explicitly did not create a trust relationship (but which instead created a debtor-creditor relationship).   The Foreign Currency Motion is currently scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing.

### H.    Motion to Approve Swan License Agreement

24.    During the Sale Process, Electric Solidus Inc. d/b/a Swan Bitcoin ("Swan") expressed interest in licensing certain technology from the Debtors (the "Technology"), and after extensive, arms'-length negotiations, the Debtors and Swan entered into that certain *License Agreement* (the "Swan License Agreement").    On November 28, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving Debtors' Entry into License Agreement with Electric Solidus Inc., and (II) Granting Related Relief* [Docket Nos. 482, 483] (the "Swan Motion").    As set forth in more detail in the Swan Motion, among other things, the Swan License Agreement provides the Debtors with the opportunity to monetize their technology at a time when it is not being utilized by the Debtors and when the Debtors are in desperate need of additional liquidity to further these Chapter 11 Cases.    The Swan Motion is currently scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing.

### I.    Audius Motion

25.    Prior to the Petition Date, the Debtors commenced the process of reviewing their more than four million Customer Agreements to, among other things, determine which assets held by Prime Trust pursuant to the Customer Agreements constitute property of the Debtors' Estates and which assets constitute Non-Debtor Assets.    In connection with this process, the Debtors identified certain assets they believed constituted property of the Estates and sent demand letters to the impacted Customers.[26]    After sending one such demand letter to Tiki Labs, Inc. (d/b/a Audius), the Debtors were able to reach a settlement concerning the AUDIO that is currently deposited with Prime Trust (the "Audius Settlement").    The Audius Settlement contemplates the

---

[26]    TrustToken was the target of one of these demand letters; however, the Debtors and TrustToken were unable to reach a resolution of their disputes, thereby necessitating the Debtors' filing of the Foreign Currency Motion.

Debtors' retention of a significant amount of AUDIO as well as the release and withdrawal of Audius' claims against the Debtors.

26.    On November 28, 2023, the Debtors filed a *Motion for Entry of an Order (I) Approving Settlement Agreement Among the Debtors, Tiki Labs, Inc. d/b/a Audius Inc., and the Settling AUDIO Holders; (II) Authorizing the Debtors to Sell Certain AUDIO Free and Clear of All Liens, Claims, Interests and Encumbrances; and (III) Granting Related Relief* [Docket No. 480] (the "Audius Motion") seeking Bankruptcy Court approval of the Audius Settlement and authority to convert to fiat currency the AUDIO that will remain with the Estates pursuant to the Audius Settlement.  The Audius Motion is currently scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing.

**J.    Investigation into Prepetition Events**

27.    In connection with these Chapter 11 Cases, the Debtors have been conducting investigations into, among other things: (a) the recovery of assets contained in the multi-signature wallet with the digital address ending in "98f" (the "98f Wallet"); (b) the recovery of assets that are property of the estate, including through claw-back actions under Chapter 5 of the Bankruptcy Code and applicable nonbankruptcy law equivalents; and (c) claims and causes of action against former directors and officers, certain third parties, and the Debtors' insiders (within the meaning of section 101(31) of the Bankruptcy Code), including the events and conduct precipitating the imposition of the Cease and Desist Order, the Receivership, and ultimately, these Chapter 11 Cases (collectively, the "Investigations").

28.    As part of these Investigations, the Debtors have conducted extensive discovery pursuant to Bankruptcy Rule 2004, deposed three parties (with additional depositions scheduled to occur in the near future), received sworn statements from eighteen individuals in response to

discovery requests, performed targeted review of documents collected from Debtors and third parties, analyzed historical cryptocurrency transactions, commenced the process of obtaining the return of estate property from third parties, and identified potential claims and causes of action that may be brought against individuals and entities, including former directors and officers and Debtors insiders (within the meaning of section 101(31) of the Bankruptcy Code).  In connection with these efforts, the Debtors collected significant amounts of discovery materials, which yielded a significant amount of information regarding the establishment, use, recycling, and accessibility of the 98f Wallet, the Wallet Event (as defined in the First Day Declaration), the Debtors' management of the 98f Wallet, and conduct of former officers and directors of the Debtors and Debtors' insiders (within the meaning of section 101(31) of the Bankruptcy Code.  The Debtors' discovery efforts have also identified additional witnesses who likely have information pertaining to the 98f Wallet, the Wallet Event, and the management of the 98f Wallet, but who have not previously been interviewed or contacted about these topics.  The Debtors or the Wind-Down Debtor, as applicable, intend to continue these Investigations following the Confirmation Hearing.

### K.      The Plan and Disclosure Statement

29.      On October 5, 2023, the Debtors filed solicitation versions of the Plan,[27] the Disclosure Statement,[28] and a liquidation analysis (as revised, the "Liquidation Analysis")[29] with the Bankruptcy Court.  On October 6, 2023, the Bankruptcy Court entered an *Order (I) Approving the Disclosure Statement on an Interim Basis for Solicitation Purposes Only; (II) Establishing*

---

[27]   *See* Docket No. 258. The Debtors filed prior versions of the Plan on September 8, 2023 [Docket No. 92] and October 2, 2023 [Docket No. 250].

[28]   The Debtors filed prior versions of the Disclosure Statement on September 8, 2023 [Docket No. 93] and October 2, 2023 [Docket No. 236].

[29]   *See* Docket No. 253-1.  On December 1, 2023, the Debtors filed a revised Liquidation Analysis. *See* Docket No. 497-1.

*Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Information in the Disclosure Statement and Confirmation of the Plan; and (V) Granting Related Relief* [Docket No. 264] (the "Initial Conditional Approval Order").[30]    Among other things, the Initial Conditional Approval Order approved certain solicitation and voting procedures  with respect to the Plan (together, the "Plan Procedures") and established certain dates and deadlines with respect to same (the "Confirmation Schedule").

30.    Following entry of the Initial Conditional Approval Order, the Debtors, in consultation with the Committee, determined that it was in the best interests of the Estates to extend to Confirmation Schedule to accommodate the extended Sale Process timeline (as discussed in Section II.B, *supra*), among other reasons.  On October 31, 2023, at the Debtors' request, the Bankruptcy Court entered an *Amendment to Order (I) Approving the Disclosure Statement on an Interim Basis for Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Information in the Disclosure statement and Confirmation of the Plan; and (V) Granting Related Relief* [Docket No. 362] (the "Amended Conditional Approval Order," and together with the Initial Conditional Approval

---

[30]    Prior to the hearing to approve the Disclosure Statement the following parties objected to the adequacy of the information in the Disclosure Statement:  (a) AnchorCoin LLC [Docket No. 93]; (b) Allegheny Casualty Company ("Allegheny") [Docket No. 194] (the "Allegheny DS Objection") and (c) Tiki Labs, Inc. d/b/a Audius Inc. ("Tiki Labs") [Docket No. 214] (the "Tiki Labs DS Objection"), which was joined by Coinbits, Inc. [Docket No. 219]. The Interim Conditional Approval Order provided that, "[a]ny objections to the adequacy of information contained in the Disclosure Statement on a final basis are expressly reserved for consideration at the Confirmation Hearing, unless overruled on the record at the Conditional Approval Hearing."  Initial Conditional Approval Order, ¶ 2. Thus, to the extent the foregoing parties are entitled to press these objections in connection with the Debtors' request for final approval of the Disclosure Statement at the Confirmation Hearing.

Order, the "Conditional Approval Order"), which approved a revised Confirmation Schedule (the "Revised Confirmation Schedule").[31]   Among other things, the Revised Confirmation Schedule extended the deadlines to vote to accept or reject the Plan, object to confirmation of the Plan, and scheduled the Confirmation Hearing for December 19, 2023, at 10:00 a.m. (prevailing Eastern Time).[32]

31.    On November 28, 2023, the Debtors filed the Disclosure Statement Supplement,[33] an amended version of the Plan,[34] and the initial plan supplement (the "Initial Plan Supplement"),[35] which contained (a) the Schedule of Assumed Contracts and Leases; (b) the Schedule of Rejected Contracts and Leases; (c) the Schedule of Vested Causes of Action; (d) identities of the Plan Administrator, the Wind-Down Debtor Oversight Committee, the PCT Litigation Trustee, and the PCT Litigation Trust Oversight Committee; (e) a form Plan Administrator Agreement; (f) a form PCT Litigation Trust Agreement; and (g) the Cryptocurrency Conversion Table.

32.    The Debtors amended the Initial Plan Supplement on December 4, 2023 [Docket No. 511] (the "First Amended Plan Supplement")[36] and December 8, 2023 [Docket No. 540] (the "Second Amended Plan Supplement," and together with the Initial Plan Supplement and the First Amended Plan Supplement, the "Plan Supplement").[37]

---

[31]   *See* Docket No. 362-1.

[32]   The Debtors agreed to extend the deadline to object to confirmation of the Plan to (a) December 6, 2023 for (i) Allegheny, (ii) Philadelphia Indemnity Insurance Company, and (iii) Kado and (b) December 12, 2023 for the U.S. Trustee.

[33]   *See* Docket No. 487-1.

[34]   *See* Docket No. 485-1.

[35]   *See* Docket No. 486.

[36]   The First Amended Plan Supplement contained an amended Schedule of Vested Causes of Action and the Amended Organizational Documents.

[37]   The Second Amended Plan Supplement contained a revised amended Schedule of Vested Causes of Action, revised Plan Administrator Agreement, revised Amended Organizational Documents, revised PCT Litigation Trust Agreement, and the schedule of Released Employees.

33.    The following Objections to confirmation of the Plan remain unresolved[38]:

- *Objection of SDM, Inc. to Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors* [Docket No. 516] (the "SDM Objection") filed by SDM, Inc. ("SDM"), filed on December 5, 2023;

- *Limited Objection and Reservation of Rights of 450 Investments LLC to Confirmation of Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 519] (the "450 Investments Objection") filed by 450 Investments LLC ("450 Investments"), filed on December 5, 2023; and

- The United States Trustee's Objection to the Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors [Docket No. 550] (the "U.S. Trustee Objection") filed by the U.S. Trustee filed on December 12, 2023.[39]

34.    The Debtors filed further revised versions of the Plan on December 4, 2023,[40] December 5, 2023,[41] and will be filing a further revised Plan consistent with arguments set forth in this Confirmation Brief, for purposes making modifications (the "Modifications") to memorialize settlements under the Plan, address concerns raised in the Objections, and otherwise narrow certain issues raised in the Objections, and make clarifying changes, among others. As discussed below, the Modifications do not adversely impact the treatment of any Class under the Plan and thus do not require resolicitation of the Plan.

---

[38]    In addition to the Objections, the following parties filed statements reserving their rights in connection with confirmation of the Plan: (a) David Maria, as plan administrator in the chapter 11 cases Bittrex, Inc., Desolation Holdings LLC, Bittrex Malta Holdings Ltd., and Bittrex Malta Ltd. [Docket No. 515]; and (b) TrustToken, Inc. and TrueCoin, LLC [Docket No. 514].

[39]    On December, 6, 2023, Kado filed the *Objection to Confirmation of Plan Objection of Kado Software, Inc. d/b/a Kado Money to Approval of the Disclosure Statement and to Confirmation of the Plan* [Docket No. 524]. Kado withdrew its objection on December 11, 2023. *See* Docket No. 543. Further, Salesforce, Inc. has confirmed to counsel that its Objection to confirmation has been resolved through, among other things, the Bankruptcy Court's entry of the *Order Approving Stipulation Regarding Request for Allowance and Payment of Administrative Expense Claim of Salesforce, Inc.* [Docket No. 538]. The arguments raised by Salesforce likewise are not addressed in this Confirmation Brief

[40]    *See* Docket No. 508-1.

[41]    *See* Docket No. 521-1

III.    **Solicitation of the Plan and Voting Results**

35.    In accordance with the Plan Procedures, on October 6, 2023, the Debtors caused their Claims Agent, Stretto, Inc., to commence solicitation of the Plan by distributing packages (the "Solicitation Packages") to Holders of Claims entitled to vote to accept or reject the Plan (the "Voting Classes").[42]   The Solicitation Packages included (a) the Disclosure Statement and all exhibits attached thereto (including the Plan), (b) the applicable Ballot, and (c) the Confirmation Hearing Notice.[43]   The instructions on the customized Ballots directed the Holders of such Claims to complete and submit their respective Ballots such that they were actually received by the Claims Agent by the Voting Deadline of December 5, 2023, at 4:00 p.m. (prevailing Eastern Time).

36.    The Ballots (delivered to Holders of Claims in the Voting Classes) and the notice of non-voting status (delivered to the Non-Voting Classes)[44] (the "Notice of Non-Voting Status") each included a procedure through which Holders of Claims could opt out of the Third-Party Release (as defined below) provided for in the Plan (collectively, the "Opt-Out Procedures").   In addition, the Confirmation Hearing Notice disclosed that the Plan contained the Third-Party

---

[42]   *See Affidavit of Service re: Solicitation Mailing* [Docket Nos. 552, 553, and 555].

[43]   The Debtors caused the Claims Agent to serve the Confirmation Hearing Notice on all known creditors of the Debtors in accordance with the Privacy Protection Order [Docket No. 205]. The Debtors also published the Confirmation Hearing Notice on October 13, 2023, in the National edition of *The New York Times* (the "Publication Notice"), consistent with the Conditional Approval Order and Bankruptcy Rule 2002(*l*). *See* Docket No. 288.  The Debtors endeavored to provide notice to any and all potential creditors, but they encountered an unexpected challenge when attempting to serve certain individuals via email in accordance with the Privacy Protection Order. Specifically, the Claims Agent was unable to serve over 130,000 individuals via email because of problems with those individuals' email addresses (e.g., the service emails were either suppressed or returned as undeliverable).  After further review, the Debtors determined that such individuals were not creditors of the Debtors, and the cost of serving those parties via first-class mail would amount to approximately $264,000.  For those reasons, on November 27, 2023, the Debtors filed a motion to further amend the Privacy Protection Order to eliminate their obligation to serve such parties [Docket No. 474].  And to avoid unwarranted scrutiny, the Debtors removed those parties from the Third-Party Release (as defined below) provisions in the Plan (i.e., those parties are not "Releasing Parties").

[44]   Holders of Claims and Interests were not provided a Solicitation Package if such Holders are either (a) Unimpaired and conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code, or (b) Impaired, entitled to receive no distribution on account of such Claims or Interests under the Plan, and deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code (collectively, the "Non-Voting Classes").

Release and notified creditors that they would be bound by such release provisions unless they followed the Opt-Out Procedures outlined in the Ballots or Notice of Non-Voting Status, as applicable.  In each instance, the Opt-Out Procedures were highlighted in bold, capitalized, and prominently displayed language.

37.     More specifically, the Ballots notified Holders of Claims in the Voting Classes must check the opt out box identified as "Item 2" of each Ballot or file an objection to the release provisions of the plan with the Bankruptcy Court by December 5, 2023, to opt out of the Third-Party Release.   The Notice of Non-Voting Status likewise included bold, capitalized, and prominently displayed language that Holders of Claims and Interests in the Non-Voting Classes that the Plan contained the Third-Party Release and that the Claim and Interest Holders would be bound by such provisions unless they either (a) returned to the Claims Agent by the Voting Deadline a Notice of Non-Voting Status with the "opt-out" box checked or (b) objected to such release provisions by filing an objection with the Bankruptcy Court. Attached as Exhibit 1 to the Notice of Non-Voting Status was the full language of each of the release, exculpation, and injunction provisions.

38.     The Ballots and Notice of Non-Voting Status also included the full language of the Third-Party Release, the Exculpation (as defined below), and the Injunction (as defined below) along with hyperlinks to custom pages on the Debtors' case-designated website that included the definitions of "Released Parties" and "Releasing Parties."[45]

39.     Following the Voting Deadline established under the Revised Confirmation Schedule, the Debtors, through their Claims Agent, conducted an audit of all Ballots received and

---

[45]     The Debtors caused the Claims Agent to serve the Notice of Non-Voting Status on Holders of Claims and Interests in the Non-Voting Classes [Docket Nos. 552, 553, and 555].

completed a final tabulation of votes (the "Voting Results").  These audited Voting Results are set

forth below and on **Exhibit A** hereto.[46]

| Chart 1 - Total Ballots Counted | | | | |
|---|---|---|---|---|
| (WITHOUT Taking Into Account Effect of the Claim Objections, reduction of the Excessive Claim, and Removal of Insider votes) | | | | |
| **Voting Class** | **Accept** | | **Reject** | |
| | **Amount** | **Number** | **Amount** | **Number** |
| Class 3A (Prime Core General Unsecured Claims) | $3,523,601,895.14 99.992% | 33 91.7% | $289,348.83 0.008% | 3 8.3% |
| Class 3B (Prime Trust General Unsecured Claims) | $39,861,195.91 6.0% | 205 83.7% | $622,064,263.36 94.0% | 40 16.3% |
| Class 3C (Prime Digital General Unsecured Claims)[47] | $0.00 0.0% | 0 0.0% | $0.00 0.0% | 0 0.0% |
| Class 3D (Prime IRA General Unsecured Claims) | $1,824,484.04 100.0% | 3 100.0% | $0.00 0.0% | 0 0.0% |
| Class 4 (Convenience Claims) | $2,413.45 88.6% | 63 92.6% | $310.92 11.4% | 5 7.4% |

---

[46]  The Voting Results depicted in Chart 1 below and on **Exhibit A** hereto reflect two sets of Voting Results. The Voting Results set forth in Chart 1 below and as set forth on the left-hand side of **Exhibit A** are the Voting Results without giving effect to reductions in voting amounts or elimination of votes by virtue of the Claim Objections. The Voting Results set forth on Chart 2 below and the right-hand side of **Exhibit A** reflect the outcome of the votes to accept or reject the Plan after accounting for the reductions in voting amounts or elimination of votes by virtue of the Claim Objections. Following the filing of the Claim Objections, the Debtors discovered a Claim in the amount of $440 million that should have been included in a Claim Objection (such claim, the "Excessive Claim").  The Debtors' books and records reflect that the claimant that submitted the Excessive Claim does not have a Claim against the Debtors.  The Voting Results set forth in Chart 2 below and on the right-hand side of **Exhibit A** also eliminate the vote of Excessive Claim in the amount of $440 million.  As that claimant voted to accept the Plan, the Debtors have eliminated this vote so as to present Voting Results that are the more accurate based on the Debtors books and records (as so as not to skew the Voting Results in the Debtors' favor). In the end, whether the Excessive Claim is or is not accounted for in the tabulation results, Class 3B still votes in favor of the Plan in both amount and numerosity.  In addition, the Debtors' books and records reflect a potential Claim owed to Kado in the amount of $683,135.64 (comprised of 1 USD Coin (Stellar) and 382.2285 units of the Lumens Cryptocurrency), but in populating its Ballot, Kado inadvertently omitted a decimal point.  The result was that Kado voted a claim in the amount of over $68 million.

[47]  The Plan provides that "[a]ny Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class." Plan, Art. 5.4.  Thus, as there were no votes cast in Class 3C, it was disregarded for purposes of tabulation and under section 1129(a)(8) of the Bankruptcy Code.

| Chart 2 - Total Ballots Counted | | | | |
|---|---|---|---|---|
| (WITH Taking Into Account Effect of the Claim Objections, the reduction of the Excessive Claim, and removal of Insider votes) | | | | |
| **Voting Class** | **Accept** | | **Reject** | |
| | **Amount** | **Number** | **Amount** | **Number** |
| Class 3A (Prime Core General Unsecured Claims) | $447,194.02 99.2% | 14 93.3% | $3,744.14 0.8% | 1 6.7% |
| Class 3B (Prime Trust General Unsecured Claims) | $34,989,084.87 97.3% | 182 85.4% | $965,840.36 2.7% | 31 14.6% |
| Class 3C (Prime Digital General Unsecured Claims) | $0.00 0.0% | 0 0.0% | $0.00 0.0% | 0 0.0% |
| Class 3D (Prime IRA General Unsecured Claims) | $278.96 100% | 1 100.0% | $0.00 0.0% | 0 0.0% |
| Class 4 (Convenience Claims) | $2,413.45 88.6% | 63 92.6% | $310.92 11.4% | 5 7.4% |

40.     Given the support for the Plan and the Debtors' satisfaction of the standard set forth by the Bankruptcy Code and governing case law in this jurisdiction, as discussed herein, the Debtors respectfully request that the Bankruptcy Court confirm the Plan.

## **ARGUMENT**

41.     A proponent of a plan must prove by a preponderance of the evidence that each element of sections 1129(a) and 1129(b) of the Bankruptcy Code has been satisfied.[48]  The Debtors are prepared to demonstrate, and will do so through this Confirmation Brief, the Confirmation Declarations, and through testimony and argument at the Confirmation Hearing, that the Plan satisfies each element of sections 1129(a) and 1129(b) of the Bankruptcy Code.

**I.      The Disclosure Statement Should be Approved on a Final Basis.**

42.     Section 1125(b) of the Bankruptcy Code requires that, before soliciting votes on a plan, the plan proponent must provide a disclosure statement that contains adequate information

---

[48]  *See e.g.*, *In re Machne Menachem, Inc.*, 233 F. App'x 119, 120 (3d Cir. 2007); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006) ("[T]he debtors' standard of proof that the requirements of § 1129 are satisfied is preponderance of the evidence."); *In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010).

regarding the proposed plan.    Section 1125(a) of the Bankruptcy Code defines "adequate information" as:

> information of the kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.[49]

43.    The amount and type of information required to satisfy section 1125(a) of the Bankruptcy Code must be evaluated on a case-by-case basis.    The legislative history of section 1125 indicates that the threshold of what constitutes "adequate information" is flexible and based on the circumstances of each case.[50]    Courts also have broad discretion to determine what constitutes adequate information necessary to satisfy the requirements of section 1125(a).[51]    This grant of discretion was intended to facilitate a debtor's effective emergence from chapter 11 in the broad range of businesses in which chapter 11 debtors engage.[52]    A disclosure statement must

---

[49]    11 U.S.C. §1125(a)(1).

[50]    H.R. Rep. No. 95-595, at 409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6364.

[51]    *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("The general language of the statute and its surrounding legislative history make clear that the determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court.") (internal quotations omitted).

[52]    *See* H.R. Rep. No. 95-595, at 408–409 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6364-65.

provide creditors entitled to vote on the plan with information that is "reasonably practicable" to permit a creditor to make an informed evaluation of the merits of the plan.[53]

44.     For the reasons set forth herein and below, the Debtors submit that the Disclosure Statement contains adequate information under section 1125 of the Bankruptcy Code and should be approved on a final basis.  *First*, the Disclosure Statement and the Disclosure Statement Supplement provide the Debtors' creditors with detailed information concerning, among other things:  (a) the Debtors' business operations, organizational structure, and existing capital structure (Article IV); (b) the key events leading to the commencement of the Debtors' Chapter 11 Cases (Article IV(E)); (c) an overview of the major events that occurred during the course of these Chapter 11 Cases (Article V); (d) an overview of the Plan, including a summary of the classification and treatment of all classes of Claims and Interests, the means for implementation of the Plan, and the provisions governing distributions under the Plan (Article VI); (e) a description of the Debtor Release (each as defined below), Third-Party Release, Exculpation, and Injunction Provisions (Article VI.I.) and (f) risk factors related to the Plan (Article VII).

45.     Further, on November 28, 2023, the Debtors filed the Disclosure Statement Supplement, through which the Debtors (a) made additional disclosures regarding the conclusion of the Sale Process and the Debtors' decision to pursue a Liquidation Transaction,[54] (b) provided information and updates with respect to material events that occurred in the Chapter 11 Cases since the Bankruptcy Court entered the Initial Conditional Approval Order,[55] (c) provided updates with respect to the Investigation,[56] and (d) provided detailed explanations with respect to what Claims

---

[53]   *See Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988); *Phoenix Petroleum*, 278 B.R. at 392

[54]   *See* Disclosure Statement Supplement, § II.A.i–ii.

[55]   *Id.* §§ II.A.iii–vii.

[56]   *Id.* § II.B.

and Causes of Action were proposed to be released under the Plan, including modifications to such provisions since the Initial Conditional Approval Order.[57]

46.     Therefore, for the reasons set forth herein and in the Debtors' motion to approve the Disclosure Statement [Docket No. 94], the Debtors further submit that the Disclosure Statement, as supplemented through the Disclosure Statement Supplement, contains more than sufficient detail to permit holders of Claims entitled to vote on the Plan to make an informed judgment on whether to accept or reject the Plan.    Indeed, the Voting Classes voted overwhelmingly in favor of the Plan.

47.     Accordingly, the Debtors request that the Bankruptcy Court approve the Disclosure Statement on a final basis.

## II.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code—Section 1129(a)(1).

48.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[58]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the content of a plan of reorganization, respectively.[59]  As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

---

[57]   *Id.* § II.C.i.

[58]   11 U.S.C. § 1129(a)(1).

[59]   S. Rep. No. 95-989, at 126 *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) (determining that the provisions of section 1129(a)(1) of the Bankruptcy Code are aimed most directly at Bankruptcy Code sections 1122 and 1123).

A.    **The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

49.    The classification requirements of section 1122(a) of the Bankruptcy Code provide, in pertinent part, that "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[60]  The Third Circuit "permits the grouping of similar claims in different classes[]" as long as those classifications are reasonable.[61]    The classifications, however, cannot be "arbitrarily designed" to secure the approval of an impaired class when "the overwhelming sentiment of the impaired creditors [is] that the proposed reorganization of the debtor would not serve any legitimate purpose."[62]  Accordingly, the Third Circuit has held that the only requirement for classification is that it be "reasonable."[63]

50.    Separate classes of similar claims are reasonable when each class represents "a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed."[64]  Courts have recognized that this gives both the debtor and the bankruptcy court considerable discretion in determining whether similar claims may be separately classified.[65]  Furthermore, if it is evident based on the voting results that the debtor would have an impaired accepting class regardless of the chosen classification scheme,

---

[60]    11 U.S.C. § 1122(a).

[61]    *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987); *see also In re Tribune Co.*, 476 B.R. 843, 854–55 (Bankr. D. Del. 2012).

[62]    *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993).

[63]    *In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014) ("Although not explicit in § 1122, a corollary to that rule is that the 'grouping of similar claims in different classes' is permitted so long as the classification is 'reasonable.'") (internal citation omitted).

[64]    *John Hancock*, 987 F.2d. at 159.

[65]    *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000).

then any challenge to the classification scheme is moot because the plan would have been accepted even if the classes were constituted differently.[66]

51.    Section 1122 of the Bankruptcy Code also expressly permits a plan to "designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience."[67]

52.    The Plan's classification of Claims and Interests into twelve Classes satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests in each Class based on relevant criteria, including legal or factual distinctions.  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

| Class | Claim or Interest |
|---|---|
| Class 1A | Secured Tax Claims |
| Class 1B | Other Secured Claims |
| Class 2 | Other Priority Claims |
| Class 3A | Prime Core General Unsecured Claims |
| Class 3B | Prime Trust General Unsecured Claims |
| Class 3C | Prime IRA General Unsecured Claims |
| Class 3D | Prime Digital General Unsecured Claims |
| Class 4 | Convenience Claims |
| Class 5 | Section 510(b) Claims |
| Class 6 | Intercompany Claims |
| Class 7 | Intercompany Interests |
| Class 8 | Existing Equity Interests |

---

[66]    *See, e.g.*, *In re Heritage Org., L.L.C.*, 375 B.R. 230, 302 (Bankr. N.D. Tex. 2007) (rejecting challenge to classification scheme where voting results would be the same regardless of whether classes were combined or separate); *In re New Midland Plaza Assocs.*, 247 B.R. 877, 892 (Bankr. S.D. Fla. 2000) ("The Court holds that because the City, like the general trade creditors, voted in favor of the Plan, the issue of gerrymandering is moot, i.e., if the classes were combined, the Debtor would still have an impaired accepting class, and only one such class is necessary under § 1129(a)(10)."); *In re Dow Corning Corp.*, 244 B.R. 634, 645 n.5 (Bankr. E.D. Mich. 1999) (noting that a conclusion of gerrymandering would be counterintuitive where 24 of 33 classes had voted to accept a plan, most by overwhelming margins); *Beal Bank, S.S.B. v. Way Apts., D.T. (In re Way Apts., D.T.)*, 201 B.R. 444, 451, 451 n.6 (N.D. Tex. 1996) (finding that separation of claims of large trade creditors and small trade creditors into two separate classes did not constitute gerrymandering because the "votes of the combined class would have resulted in acceptance"); *see also In re Abeinsa Holding, Inc.*, 562 B.R. 265, 274–75 (Bankr. D. Del. 2016) (rejecting challenge to separate classification in part on the basis that, even without the challenged classification, the voting results would not change); *In re Nuverra Envtl. Solutions, Inc.*, 590 B.R. 75, 98–99 (D. Del. 2018) (district court dismissing claimants' appeal, determining the overwhelming acceptance within the claimant's class rendered argument moot

[67]    11 U.S.C. § 1122(b).

53.     Claims and Interests assigned to each particular Class listed above are substantially similar to the other Claims or Interests, as applicable, in such Class.  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  Namely, the Plan separately classifies the Claims and Interests because each Holder of such Claims or Interests may hold (or may have held) rights in the Debtors' Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.

54.     For example, the classification scheme distinguishes Holders of Secured Tax Claims (Class 1A) and Other Secured Claims (Class 1B) based on differing statutory or other underlying entitlements in collateral.  Other Priority Claims (Class 2) are classified separately due to their required treatment and specific priority under the Bankruptcy Code.  The Prime Core General Unsecured Claims (Class 3A), Prime Trust General Unsecured Claims (Class 3B), Prime IRA General Unsecured Claims (Class 3C), and Prime Digital General Unsecured Claims (Class 3D) are classified separately due to the distinct recourse Holders of Claims in each Class have against the applicable Debtor.[68]

55.     Further Convenience Claims (Class 4) are separately classified because of the substantial administrative simplicity that results from addressing Holders of Claims in an amount less than or equal to $300 in a uniform, expeditious, and cost-effective manner before the claims administration process begins in earnest.  Importantly, the Plan does not provide for the substantive consolidation of the Debtors because most creditors hold Claims against Prime Trust.

---

[68]     For example, the Plan does not provide for the substantive consolidation of the Debtors because most creditors hold Claims against Prime Trust.  *See* Plan, Art. 6.2.

56.     Section 510(b) Claims (Class 5) are Claims that are subject to subordination under Bankruptcy Code section 510(a).  Intercompany Claims (Class 6) are Claims or Causes of Action by a Debtor against another Debtor, and Intercompany Interests (Class 7) are the equity interests of a Debtor held by another Debtor. Finally, Existing Equity Interests (Class 8) represent equity Interests in the Debtor Entities, and as such, are classified separately from Claims in Classes 1 through 7.  In addition, the treatment of each Claim or Interest within a Class is the same as the treatment of each other Claim or Interest in such Class, unless the Holder of a Claim or Interest agrees to less favorable treatment on account of its Claim or Interest.[69]

57.     Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and legal distinctions.  Such classifications are in the best interests of creditors, foster the Debtors' restructuring efforts, and do not violate the absolute priority rule.  Thus, the Debtors submit that the Plan fully complies with and satisfies the classification requirements of section 1122 of the Bankruptcy Code.

**B.      The Plan Satisfies the Applicable Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

58.     Section 1123(a) of the Bankruptcy Code sets forth eight criteria that every chapter 11 plan must satisfy.[70]  As set forth below, the Plan satisfies each of these requirements.

**i.      Designation of Classes of Claims and Interests—Section 1123(a)(1).**

59.     Section 1123(a)(1) of the Bankruptcy Code requires a plan to "designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section

---

[69]   *See* Plan, Art. 4.

[70]   However, Bankruptcy Code section 1123(a)(8) is inapplicable to the Plan because the Debtors are not "individuals" (as that term is defined in the Bankruptcy Code).

507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests[.]"[71]   As discussed in the previous section, Article 3 of the Plan designates twelve separate Classes and each Class contains Claims or Interests that are substantially similar,[72] thus satisfying section 1123(a)(1) of the Bankruptcy Code.

### ii.        Specification of Unimpaired Classes—Section 1123(a)(2).

60.        Section 1123(a)(2) of the Bankruptcy Code requires a plan to "specify any class of claims or interests that is not impaired under the plan[.]"[73]   Article 4 of the Plan identifies each Class that is Unimpaired, including Class 1A (Secured Tax Claims), Class 1B (Other Secured Claims), and Class 2 (Other Priority Claims), thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

### iii.       Treatment of Impaired Classes—Section 1123(a)(3).

61.        Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan[.]"[74]   Articles 3 and 4 of the Plan identify each Class that is Impaired, including Class 3A (Prime Core General Unsecured Claims), Class 3B (Prime Trust General Unsecured Claims), Class 3C (Prime IRA General Unsecured Claims), Class 3D (Prime Digital General Unsecured Claims), Class 4 (Convenience Claims), Class 5 (Section 510B Claims), Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), and Class 8 (Existing Equity Interests) and specifies the treatment of these Impaired Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

---

[71]   11 U.S.C. § 1123(a)(1).

[72]   *See* Plan, Art. 3.

[73]   11 U.S.C. § 1123(a)(2).

[74]   11 U.S.C. § 1123(a)(3).

iv.    **Equal Treatment of Similarly Situated Claims and Interests—Section 1123(a)(4).**

62.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[75]  Although neither the Bankruptcy Code nor the legislative history precisely defines the standards of equal treatment, courts have interpreted the "same treatment" requirement under section 1123(a)(4) of the Bankruptcy Code to mean that all claimants in a class must have "the same opportunity for recovery."[76]  What matters is not that claimants recover the same amount but that they have equal opportunity to recover on their claims.[77]  Courts are also in agreement that section 1123(a)(4) of the Bankruptcy Code "does not require precise equality, only approximate equality."[78]  Put another way, section 1123(a)(4) of the Bankruptcy Code does not require a plan to provide strict proportional equality of payments within a class of unliquidated claims, nor does it require the Bankruptcy Court to weigh the strengths and weakness of each and every claim so that each claim receives equal value.[79]  The Third Circuit has indicated that "[d]ifferences in the timing of distributions and other procedural variations that have a legitimate basis do not generally violate section 1123(a)(4) unless they produce a substantive difference in a claimant's opportunity to

---

[75]   11 U.S.C. § 1123(a)(4).

[76]   *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (citing *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008)); *see also In re Cent. Med. Ctr., Inc.*, 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990) (concluding that a plan that "subjects all members of the same class to the same process for claim payment" is "sufficient to satisfy the requirements of section 1123(a)(4)").

[77]   *In re W.R. Grace & Co.*, 729 F.3d at 327 (citing *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992), *opinion modified on rehearing*, 993 F.2d 7 (2d Cir. 1993) ("Without question, the 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money.").

[78]   *In re W.R. Grace & Co.*, 729 F.3d at 327 (citing *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)).

[79]   *In re Dow Corning Corp.*, 255 B.R. 445, 505 (E.D. Mich. 2000) ("Section 1123(a)(4) is not to be interpreted as requiring precise equality of treatment, but rather some approximate measure [of equality].").

recover."[80]  This Court has previously held that "[p]roviding different treatment to a creditor who agrees to settle instead of litigating is permitted by section 1123(a)(4) . . . [w]hat is important is that each claimant within a class have the same opportunity to receive equal treatment."[81]

63.      Here, Article 4 of the Plan provides that Holders of Allowed Claims or Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holder's respective Class, except as otherwise agreed to by a Holder of a particular Claim or Interest.  Therefore, the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

### v.      Adequate Means for Implementation—Section 1123(a)(5).

64.      Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[82]  "Adequate means" includes but is not limited to, "transfer of all or any part of the property of the estate to one or more entities," "sale of all or any part of the property of the estate," and "issuance of securities of the debtor . . . in exchange for claims or interests, or for any other appropriate purpose."[83]  Article 6 of the Plan (Means for Implementation of the Plan), as well as other provisions thereof, provides adequate means for the Plan's implementation, including, among other things:

(a)      the general settlement of Claims and Interests;

(b)      the sources of consideration required for distributions to be made under the Plan on the Effective Date;

---

[80]  *Id.*

[81]  *In re Wash. Mutual, Inc.*, 442 B.R. 314, 355-56 (Bankr. D. Del. 2011) (*citing In re Dana Corp.,* 412 B.R. 53, 62 (S.D.N.Y. 2008)); *Del. Tr. Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157, 168 (D. Del. 2015) ("[C]ourts have interpreted the same treatment requirement to mean that all claimants in a class must have the same opportunity for recovery." (*quoting In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)), *aff'd*, 648 F. App'x 277 (3d Cir. 2016).

[82]  11 U.S.C. § 1123(a)(5).

[83]  *Id.*

(c)     the execution and delivery of the Plan Administrator Agreement and the appointment of the Plan Administrator;

(d)     the vesting of assets in the Wind-Down Debtor;

(e)     the execution and delivery of the PCT Litigation Trust Agreement and the creation of the PCT Litigation Trust;

(f)     the cancellation of certain existing securities and other documents evidencing or creating any indebtedness or obligation or ownership in the Debtors, and the release and discharge of all obligations thereunder or in any way related thereto (subject to certain exceptions as set forth in the Plan);

(g)     the continued existence of the Debtors as separate entities;

(h)     the amendment of the governing documents of the Debtors as required to be consistent with the provisions of the Plan and the Bankruptcy Code;

(i)     the actions necessary to effectuate or implement certain contracts, securities, instruments, releases, indentures, and other agreements or documents;

(j)     the funding of the Professional Fee Escrow Account;

(k)     the funding of the Wind-Down Debtor Reserve;

(l)     the preservation of Vested Causes of Action;

(m)     exemption from certain transfer taxes and recording fees; and

(n)     all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

65.     In addition, the Debtors' Plan provides for a means to address the Account Treatment Issues pursuant to the Account Treatment Procedures, which are attached hereto as **Exhibit B**.[84]   The Account Treatment Procedures provide Customers with clarity concerning, among other things, (a) when the Wind-Down Debtor will notify Customers of how the Wind-Down Debtor proposes to resolve the question of whether assets in Accounts constitute property

---

[84]   The Debtors are discussing the exact parameters of the Account Treatment Procedures with the Committee and the DIP Lender.  The Debtors intend to include the Account Treatment Procedures in Article 2.5 of the Plan.

of the estate, (b) what steps Customers can take if they disagree with the Wind-Down Debtor's conclusion, (c) where the issue will be decided, and (d) to the extent applicable when Customers can expect a distribution of the subject Currency.[85]

66.     The terms governing the execution of the foregoing transactions are (or shortly will be) set forth in the applicable Plan Documents.  Additionally, various other provisions of the Plan, including Article 7 (Distributions) and Article 9 (Executory Contracts and Unexpired Leases), also provide adequate means for the Plan's implementation.  The Debtors, therefore, believe that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

### vi.     Prohibition of Issuance of Non-Voting Securities—Section 1123(a)(6).

67.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.[86]  Article 6.7(e) of the Plan provides that in the event the Debtors sought to consummate a Reorganization Transaction through the Plan, the organizational documents of the Debtors would be amended to include, among other things, a provision prohibiting the issuance of non-voting equity securities.  The Plan, however, contemplates a Liquidation Transaction.  Accordingly, the Plan does not contemplate the issuance of non-voting equity securities and thus satisfies section 1123(a)(6) of the Bankruptcy Code.

### vii.     Selection of Directors and Officers—Section 1123(a)(7).

68.     Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto,

---

[85]     *See* Account Treatment Procedures, ¶¶ 1–6.  In the SDM Objection, SDM maintains that the Plan fails to satisfy section 1123(a)(5) because of the lack of clarity on how the Debtors propose to resolve the Account Treatment Issues.  *See* SDM Obj. ¶¶ 25–28.  The Debtors submit that by formulating the Account Treatment Procedures, the SDM Objection in this regard has been adequately addressed, and to the extent SDM's Objection remains, it should be overruled.

[86]     *See* 11 U.S.C. § 1123(a)(6).

be "consistent with the interests of creditors and equity security holders and with public policy."[87]

Pursuant to Article 6.10(n) of the Plan, each of the Current Directors and Current Officers will be deemed to have resigned on the Effective Date and the Plan Administrator[88] will serve as the sole officer and director of the Wind-Down Debtor, consistent with the interests of all Holders of Claims and Interests and public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

> ### C.   The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.
>
> #### i.   Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code.

69.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[89]

70.     The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under Article 4 of the Plan, Classes 1A, 1B, and 2 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims and Interests within such Classes.  On the other hand, Classes 3A through 8 are Impaired because the Plan modifies the rights of the Holders of Claims within such Classes as contemplated by section 1123(b)(1) of

---

[87]   11 U.S.C. § 1123(a)(7).

[88]   The Plan Supplement provides that David Dunn will serve as the Plan Administrator.  *See* Docket No. 486.

[89]   11 U.S.C. § 1123(b).

the Bankruptcy Code.  In addition, Article 9.1 of the Plan provides for the rejection of all Executory

Contracts and Unexpired Leases, except to the extent set forth in the Plan and Plan Supplement.[90]

With respect to the Schedule of Assumed Contracts, the Debtors, with the assistance of their

advisors, undertook a thorough review of their Executory Contracts to determine which were

critically necessary—e.g., were, among other things, associated with the Debtors' technology

infrastructure or hardwired into the Debtors' operating platform—to effectuate a Liquidation

Transaction.  Those agreements are reflected on the Schedule of Assumed Contracts filed as part

of the Initial Plan Supplement.[91]  Therefore, the Plan satisfies section 1123(b)(2) of the Bankruptcy

Code.

71.     Finally, as discussed below, the release, exculpation, and injunction provisions

contained in the Plan satisfy the governing standard and are permissible under section 1123 of the

Bankruptcy Code.

        **ii.**        **The Plan's Release, Exculpation, and Injunction Provisions Satisfy Bankruptcy Code Section 1123(b).**

72.     The Plan includes certain release, exculpation, and injunction provisions, including

the Debtor Release, the Third-Party Release, the Exculpation, and the Injunction, each as defined

below.  These discretionary provisions are proper because, among other things, (a) they are the

product of extensive good faith, arm's-length negotiations, (b) were a material and necessary

precondition for parties to support the Plan, (c) are supported by the Debtors, the Committee, and

their key economic stakeholders, and (d) are consistent with applicable precedent.  Further, these

provisions were fully and conspicuously disclosed to all Voting Classes (through the Ballots), and

---

[90]     *See* Plan, Art. 9.1; Initial Plan Supplement, Exs. A, B.

[91]     *See* Initial Plan Supplement, Ex. A.

Non-Voting Classes through the Notice of Non-Voting Status, as discussed in detail in Section III, *supra*.

73.     In addition to the Debtor Release, the Debtors propose to grant a more expansive release of Preference Claims against a very narrow subset of employees (i.e., Persons employed by the Debtors as of November 15, 2023 through the Effective Date of the Plan), and expand the limitation of recoveries to insurance proceeds to all Non-Released D&O Claims (as opposed to just 98f Wallet Causes of Action), all as described in more detail below.[92]

> 1)     **The Debtor Release Complies with the Discretionary Provisions of Bankruptcy Code Section 1123(b) and Should be Approved.**

74.     A debtor's authority under section 1123(b)(3)(A) of the Bankruptcy Code to settle or adjust "any claim or interest belonging to the debtor or to the estate" necessarily includes the debtor's right to settle or release claims against third parties belonging to the estate.[93]   Bankruptcy Rule 9019(a) further provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."[94]   Courts in the Third Circuit generally approve settlements proposed by a debtor if the settlement "exceed[s] the lowest point in the range of reasonableness."[95]   To that end, a debtor may release claims under section 1123(b)(3)(A) "if the release is a valid exercise of the debtor's business judgment, is fair,

---

[92]   Although this information was not included on the Ballots or the Notice of Non-Voting Status, as explained in more detail below, the Debtors submit that revised treatment of Released Employees is appropriate, including because any potential Preference Claims belong to the Debtors and thus do not impact the direct rights of third parties.

[93]   11 U.S.C. § 1123(b)(3)(A); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("Debtors are authorized to settle or release their claims in a chapter 11 plan."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007).

[94]   Fed. R. Bankr. P. 9019(a).

[95]   *In re Exaeris, Inc.*, 380 B.R. 741, 746-47 (Bankr. D. Del. 2008) (*In re Coram Healthcare Corp.*, 315 B.R. 321, 334 (Bankr. D. Del. 2004)).

reasonable, and in the best interests of the estate."[96]  As an exercise of its business judgment, a

debtor's decision to release claims against third parties under a plan is afforded deference.[97]

Additionally, under Third Circuit precedent, a release by a debtor is appropriate if, in the debtor's

judgment, any claims of the estate being released are of only marginal viability.[98]

75.    In addition to analyzing debtor releases under the business judgment standard, some

courts within the Third Circuit assess the propriety of a "debtor release" in light of five "*Zenith*

factors" in the context of a chapter 11 plan:

(a)    Whether the non-debtor has made a substantial contribution to the debtor's reorganization;

(b)    Whether the release is critical to the debtor's reorganization;

(c)    Agreement by a substantial majority of creditors to support the release;

(d)    Identity of interest between the debtor and the third party; and

(e)    Whether a plan provides for payment of all or substantially all of the classes of claims in the class or classes affected by the release.[99]

---

[96]    *U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010), *appeal dismissed*, 2011 WL 3420441 (D. Del. Aug. 4, 2011); *see also In re Aleris Int'l, Inc.*, Case No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (finding that where a debtor release is "an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of a plan").

[97]    *See, e.g.*, *In re Spansion, Inc.*, 426 B.R. at 140 ("It is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors . . . ."); *In re Marvel Entm't Grp., Inc.*, 273 B.R. 58, 78 (D. Del. 2002) ("[U]nder the business judgment rule . . . a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching.  Thus, under the business judgment rule, a board's decisions will not be disturbed if they can be attributed to any rational purpose and a court will not substitute its own notions of what is or is not sound business judgment.") (internal quotation marks and citations omitted); Hr'g Tr. at 45:8-9, *In re AAIPharma, Inc.*, No. 05-11341 (PJW) (Bankr. D. Del. Jan. 18, 2006) [Docket No. 893] ("[T]he debtor should be given considerable latitude in addressing" whether to release claims as part of its plan.).

[98]    *See In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (approving release by debtor of potential avoidance claims in connection with a prepetition leveraged recapitalization because the claims were "of only marginal viability" and not worth pursuing).

[99]    *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *Spansion, Inc.*, 426 B.R. at 143 n.47 (citing the *Zenith* factors)

76.     Not all of the above factors need to be satisfied for a court to approve a debtor release, nor do these factors comprise a rigid test; rather, the court should "engage[] in a fact specific review, weighing the equities of [the individual] case."[100]

77.     Article 10.4 of the Plan provides for releases by the Debtors, as of the Effective Date, of, among other things, certain Claims and Causes of Action that the Debtors and their Estates may have against the Released Parties[101] (the "Debtor Release") with several important exceptions.[102]  For example, the Debtors are not proposing to release any Claim or Cause of Action included in the Schedule of Vested Causes of Action.  Further, under the Plan, with certain limited exceptions pertaining to Preference Claims against the Current Directors, Current Officers, and the Released Employees, none of the Former Directors and Officers, Current Directors, Current Officers, or the Non-Released D&O are receiving a release through the Debtor Release, and all such Claims and Causes of Action are preserved under the Plan.[103]  However, recoveries on account of Non-Released D&O Claims against certain employees will be limited to the Debtors' available proceeds under their Insurance Policies.[104]  The following chart demonstrates the limited nature of the Debtor Release:

---

[100]   *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303-04 (Bankr. D. Del. 2013) ("These factors are neither exclusive nor are they a list of conjunctive requirements."); *In re Wash. Mut., Inc.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that these factors are not exclusive or conjunctive requirements); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).

[101]   "Released Parties" means, subject to the outcome of the Debtors' investigation, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors, (c) the Wind-Down Debtor; (d) the Special Committee, and each of the members thereof, solely in their capacity as such; (e) the Creditors' Committee, and each of the current and former members thereof, solely in their capacity as such; and (f) each of the Released Professionals; (g) the DIP Lender in its capacity as such; *provided, however*, that (x) the Non-Released D&O shall not be a "Released Party" under the Plan, and (z) notwithstanding the foregoing, the Directors and Officers against whom the Debtors hold Non-Released D&O Claims as of the Petition Date shall not be "Released Parties" under the Plan.

[102]   *See* Plan, Art. 10.4.  The description of the Debtor Release is a summary and for convenience only.  The terms of Article 10.4 of the Plan shall control in all respects.

[103]   *See,id.* Art. 6.9, 10.4; Second Amended Plan Supplement, Ex. 1 to Ex. C, ¶¶ 4, 6.

[104]   See *id.*

| Party | Scope of Releases/Exculpation |
|---|---|
| Current Directors[105] | o  Release of Preference Claims, solely to the extent the payment of ordinary course wages and benefits. *See* Plan, Art. 6.9.<br><br>o  No releases; *however*, recoveries against Current Directors with respect to 98f Wallet Causes of Action to be satisfied solely from the proceeds of the Debtors' available Insurance Policies.  *See* Plan, Art. 6.9. |
| Current Employees[106] | o  Release of Preference Claims, solely to the extent the payment of ordinary course wages and benefits. *See* Plan, Art. 1.149. |
| Current Officers[107] | o  Exculpation for actions taken in connection with the Chapter 11 Cases, including preparing to file same.  *See* Plan, Art. 6.9, 10.6.<br><br>o  No releases; *however*, recoveries against Current Officers with respect to 98f Wallet Causes of Action to be satisfied solely from the proceeds of the Debtors' available Insurance Policies.  *See* Plan, Art. 6.9. |
| Former Directors and Officers[108] | o  No releases.<br><br>o  No exculpation. |
| Non-Released D&O[109] | o  No releases.<br><br>o  No exculpation. |
| Released Employees[110] | o  Release of Preference Claims. *See* Plan, Art. 6.9. |

---

[105]  "Current Directors" means the directors of the Debtors as of the Petition Date and continuing through the Effective Date unless otherwise set forth in the Plan.  For the avoidance of doubt, the Non-Released D&O is not a Current Director.

[106]  "Current Employees" means those Persons employed by the Debtors as of November 15, 2023 through the Effective Date.  For the avoidance of doubt, (a) the Former Directors and Officers, the Current Officers, the Former Employees, and the Non-Released D&O are not Current Employees and (b) the Current Employees were not offered or promised releases or any other compensation or consideration in exchange for being Current Employees.

[107]  "Current Officers" means the officers of the Debtors as of the Petition Date and continuing through November 14, 2023 unless otherwise set forth in the Plan.  For the avoidance of doubt, the Non-Released D&O is not a Current Officer.

[108]  "Former Directors and Officers" means the Directors and Officers of the Debtors who are not Current Directors or Current Officers.

[109]  "Non-Released D&O" means Mr. Jor Law.

[110]  "Released Employees" means the Current Employees, solely to the extent listed in the Plan Supplement, which list shall be filed under seal, consistent with the Privacy Protection Order.  For the avoidance of doubt, the Former Directors and Officers, the Current Officers, the Former Employees, and the Non-Released D&O are not Released Employees.

|  | o No releases; *however*, recoveries against Released Employees with respect to all Non-Released D&O Claims (expanded from just 98f Wallet Causes of Action) to be satisfied solely from the proceeds of the Debtors' available Insurance Policies. *See* Plan, Art. 6.9 |
|---|---|

78.    The Debtor Release is an integral component of the Plan and complies with the Bankruptcy Code and applicable law.  As discussed below, the scope of the Debtor Release, including the proposed treatment of the Released Employees and Preference Amnesty Program (as defined below), is the product of lengthy, deliberation by the members of the Special Committee and extensive negotiations with, and analysis by, the Committee over the course of several months.

79.    The releases proposed to be granted through the Debtor Release, including the proposed treatment of the Released Employees and the grant of Released Preference Claims, are grounded in the significant contributions, concessions, and compromises made by the Released Parties and the Released Employees in the process of formulating and supporting the Plan, and are consistent with applicable law.  As set forth below, each of the categories of the Released Parties has contributed significantly to the Debtors' chapter 11 efforts, including negotiating and formulating the Plan and facilitating the progress made during these Chapter 11 Cases.  Such efforts include the following, among others.

| Released Party | Consideration Provided |
|---|---|
| **The Special Committee, and each of the members thereof, solely in their capacity as such.** | • Significant efforts on behalf of the Debtors prior to, and continuing throughout, these Chapter 11 Cases to effectuate the transactions set forth in the Plan.  These efforts included, among other things, overseeing the marketing process—all while working with a skeletal staff and significantly fewer resources given employee turnover.<br><br>• Assisted in substantial discovery efforts to permit the Debtors and the successor to their Estates to efficiently identify assets that can be used to fund distributions under the Plan. |

| The Committee, and each of the current and former members thereof, solely in their capacity as such. | • Expended time and effort to represent the interests of the general unsecured creditors.<br><br>• Actively supported a consensual liquidation of the Debtors through the implementation of the Plan.<br><br>• Negotiated in good faith the terms of the PCT Liquidation Trust Agreement and the Plan Administrator Agreement, among other Plan Documents. |
|---|---|
| The Released Professionals. | • Active participation, negotiation, and documentations of the transactions during the postpetition period. |
| The DIP Lender, in its capacity as such. | • Provided the Debtors and their Estates with a vital lifeline in the form of the $10 million DIP Facility.<br><br>• Ensuring the Wind-Down Debtor has adequate funding to wind down the Debtors' affairs.<br><br>• Agreeing to forgo payment in full of the DIP Claims on the Effective Date pursuant to the Plan-Roll Over. |

80.    As noted above, the Plan contemplates the release of Preference Claims against the Released Employees.[111]    The Plan also provides that the recoveries against the Released Employees on account of Non-Released D&O Claims[112] will be limited to available proceeds under the Debtors' Insurance Policies.[113]

81.    *Released Employees*. The Released Employees have made a substantial contribution to the success of these Chapter 11 Cases and the Debtors' ability to put forth the Plan

---

[111]    The solicitation version of the Plan contemplated the release of Preference Claims against Current Directors and Current Officers on account of payments of ordinary wages and compensation.  The Plan before the Bankruptcy Court expands this release to cover all Preference Claims against the Released Employees.

[112]    Non-Released D&O Claims are comprised of "[a]ny Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' Directors and Officers (other than any Claims or Causes of Action against the Special Committee), including any Claims or Causes of Action, including, without limitation, any 98f Wallet Causes of Action and any Claims and Causes of Action related to or arising from the Debtors' redemption of equity prior to the Petition Date, are not released pursuant to the Plan . . . ." Plan, Art. 6.9(a).

[113]    The solicitation version of the Plan contemplated a limitation of recoveries on account of 98f Wallet Causes of Action – a subset of Non-Released D&O Claims – with respect to Current Directors and Current Officers.  The Plan before the Bankruptcy Court expands this limitation to all Non-Released D&O Claims.

before the Bankruptcy Court for approval.  The Released Employees are comprised of twenty-four (24) employees and independent contractors (including former employees who have agreed to serve in a contractor capacity), hand-selected by the Special Committee after substantial deliberation, to remain with the Debtors following the reduction in force that went into effect on November 14, 2023.

82.    The Special Committee determined that the Released Employees were critical to, among other things (a) identifying the Executory Contracts and Unexpired Leases that were necessary to effectuate an orderly wind down of the Debtors' business; (b) the preservation of the Debtors' books and records, including records related to Customer Accounts and Customer Agreements, for the Plan Administrator; (c) evaluating Claims for purposes of formulating the Claims Objections (to prevent the disenfranchisement of legitimate creditors with respect to voting on the Plan); and (d) engaging in the extremely complicated process of shuttering the Debtors' expensive API platform—something the Debtors absolutely could not have accomplished without the assistance of the Released Employees, and, if left unfinished, would have put the Plan Administrator in the unenviable position of hiring engineers and other contractors to accomplish this result).

83.    At the Debtors' peak, they had over five hundred (500) employees and contractors. As of the Petition Date, the Debtors had approximately seventy (70) employees, following a reduction in force that occurred on or near the Petition Date.  Following the reduction in force that went into effect on November 14, 2023, the only employees and contractors who remained at the Debtors were the twenty-four (24) Released Employees.  Thus, the Released Employees, with no promise of any expanded release of Preference Claims or expanded recovery limitations, and no pecuniary benefit outside their ordinary wages and benefits, agreed to undertake these Herculean

tasks with a fraction of the support they had as of the Petition Date, all while simultaneously engaging in job searches.

84.     But for the efforts of the Released Employees, conversion of these Chapter 11 Cases would have been a very real possibility, the Debtors' Investigations would have been stalled and likely irretrievably damaged, and creditor recoveries, including the determination Account Treatment Issues, would have been thrown into chaos.  Further, the efforts of these Released Employees were critical to ensuring the orderly transition of the Debtors' Estates to the Wind-Down Debtor on the Effective Date.

85.     Critically, the Released Employees are not receiving broad releases through the Debtor Release—they are receiving a release of Preference Claims, which, based on the Debtors' Statement of Financial Affairs, are of little or no value to the Debtors' Estates, contrary to the U.S. Trustee's arguments to the contrary.[114]  Further, the Debtors have determined, in their exercise of their sound business judgment, that expanding the limitation of recoveries to insurance proceeds for the Released Employees to cover all Non-Released D&O Claims (beyond 98f Wallet Causes of Action), is appropriate and warranted under the facts and circumstances of these Chapter 11 Cases.  Importantly, the Committee supports the proposed treatment of the Released Employees.

86.     The U.S. Trustee objects to the Plan's proposed treatment of the Released Employees.  Relying on *In re Tribune Company*, 464 B.R. 126 (Bankr. D. Del. 2011), where the court rejected the debtors' proposed release their "Related Persons"—countless unidentified persons and entities affiliated with the debtors—the U.S. Trustee maintains that the Released Employees have not made a substantial contribution to these Chapter 11 Cases that would justify

---

[114]   U.S. Trustee Obj. ¶¶ 35–37.

even the limited release the Debtors propose.[115]    Instead, the U.S. Trustee asserts their contributions are akin to an impermissible retention bonus.[116]  Not so.

87.    The contributions proposed twenty-four Released Employees made to these cases goes well and beyond "merely staying employed," as the U.S. Trustee puts it.  As explained above, but for the efforts of the Released Employees, the Debtors entire operating platform would not only have shut down, the platform and the data stored on the platform—e.g., account data, transaction records, Cryptocurrency holdings—would have been irretrievably lost.  In return for those efforts, the Debtors determined that the only thing of tangible value they could offer the Released Employees was the release from Preference Claims.[117]    Accordingly, the proposed limited release of the Released Employees is warranted here, and the Court should overrule the U.S. Trustee's objection.

88.    *Preference Amnesty Program.*  As noted above, following lengthy, arms'-length discussions with the Committee, the Debtors have agreed to release Preference Claims against certain of the Debtors' Customers whose Allowed, scheduled, or stipulated Class 3B Claim (without giving effect to section 502(d) of the Bankruptcy Code) is in an amount that equals at least 10% of the total amount withdrawn by such Customer during the 90-day period prior to the Petition Date (the "Preference Amnesty Program").[118]    The Preference Amnesty Program is designed to release from potential Preference Claims those Customers that Debtors have determined had no advanced notice of the issues that precipitated the imposition of the Cease and

---

[115]   U.S. Trustee Obj. ¶¶ 33, 34.

[116]   U.S. Trustee Obj. ¶ 34.

[117]   The U.S. Trustee opines in a footnote that because the Released Employees are not Released Parties, the carve outs for actual fraud, willful misconduct, or gross negligence contained in the releases by the Debtors would not apply to Released Employees.  U.S. Trustee Obj. ¶ 32 n.5.  The U.S. Trustee's concern is misplaced because the plain language of the Plan provides that the only release the Released Employees receive is from Preference Claims.

[118]   Plan, Art. 1.A.1.148.

Desist Order.  Doing so therefore provides closure and comfort to those Customers, who have consistently expressed concern over being the target of preference actions and for whom these Chapter 11 Cases have been particularly challenging.

89.     In short, the Debtor Release is necessary, appropriate, and critical to the Plan as a whole and is the product of valid and appropriate settlements of Claims and Causes of Action reached after extensive arm's-length negotiations among the Debtors and the Committee.  Absent the releases described herein, the Plan may not have garnered the necessary support of the requisite parties, making it impossible for the Debtors to have moved through these Chapter 11 Cases.

90.     Moreover, the Debtor Release is limited in scope and exceedingly narrow.  Unlike the typical formulation in other chapter 11 plans—*e.g.*, releases for countless unidentified persons and entities affiliated with a debtor and other stakeholders—the scope of Released Parties is a finite universe of identifiable parties: (a) the Debtors; (b) the Wind-Down Debtor; (c) the Special Committee; (d) the Committee and its current and former members; (e) Professionals of the Debtors' Estates; and (f) the DIP Lender.[119]  Further, as is customary, the releases do not extend to claims arising out of or relating to any act or omission of a Released Party that constitute willful misconduct, actual fraud or gross negligence.  Additionally, the Debtor Release does not release direct claims held by third parties against any Released Party—such claims are preserved to the extent stakeholders object to, or opt out of, the Third-Party Release.

91.     In consideration for the Debtor Release, the Debtors and their Estates will receive mutual releases from potential Claims and Causes of Action of each of the Released Parties.  The Debtor Release reflects the important and substantial contributions, concessions, and compromises

---

[119]  *See* Plan, Art. 1.A.1.147.

made by the Released Parties and the Released Employees in the process of formulating and supporting the Plan.

92.     Further supporting the Debtor Release is the fact that, having received notice of the scope of the Debtor Release and being advised of their opportunity to object to same, none of the Voting Parties or Non-Voting Parties lodged an objection to the Debtor Release.  Indeed, the Voting Parties overwhelmingly voted in favor of the Plan, including the Debtor Release.  This reinforces and affirms the Debtors' determination that the Debtor Release is in the best interests of the Debtors' Estates.  Accordingly, for foregoing reasons, the Debtor Release (including the proposed treatment of the Released Employees and the Customer Preference Amnesty Program), should be approved.

93.     Accordingly, because the Debtor Release is a sound exercise of the Debtors' business judgment, a valid compromise of litigation, a critical component of the Plan, and in the best interests of the Debtors, their Estates, and their creditors, the Debtor Release should be approved pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

      **2)**      **The Third-Party Release Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code and Should be Approved.**

94.     Article 10.5 of the Plan also provides for a release (the "Third-Party Release") that is an essential component of the Plan.  As a general matter, third-party releases are consensual when a creditor affected by the release contractually agrees to the release or votes in favor of a

plan.[120]  Courts in the Third Circuit routinely approve consensual third-party releases contained in

plans.[121]

95.     Here, the Third-Party Release is a limited consensual release in favor of the

Released Parties[122] only by and among the Releasing Parties, which are comprised of: (a) the

Released Parties; (b) all Holders of Claims and Interests that are deemed to accept this Plan and

who do not either affirmatively opt out of the releases provided by the Plan or file an objection

with the Bankruptcy Court objecting to the Third-Party Release; (c) all Holders of Claims who

(i) vote to accept or reject the Plan, or (ii) abstain from voting and, in the case of either (i) or (ii),

do not affirmatively opt out of the voluntary Third-Party Release by checking the "opt-out" box

on the Ballot and returning it in accordance with the instructions set forth thereon or file an

objection with the Bankruptcy Court objecting to the Third-Party Release or follow the Opt-Out

Procedure in the Notice of Non-Voting Status.[123]

96.     As described in detail in Section III, *supra*, Holders of Claims and Interests had the

opportunity to opt out of the Third-Party Release contained in the Plan by either filing an objection

to such Third-Party Release with the Bankruptcy Court or by checking the opt-out box on the

appropriate Notice of Non-Voting Status or Ballot, as applicable.  The Ballots, Confirmation

---

[120]  *See In re Wash. Mut. Inc.*, 442 B.R. at 352 (finding that creditors may consent to third-party releases "by contract or the mechanism of voting in favor of the plan"); *In re Spansion, Inc.*, 426 B.R. at 144 (finding that a third-party release "binds . . . creditors voting in favor of the plan").

[121]  *See In re Indianapolis Downs, LLC*, 486 B.R. at 305–06; *In re Wash. Mut. Inc.*, 442 B.R. at 355; *In re Spansion, Inc.*, 426 B.R. at 144.

[122]  As noted in Section II.C.ii.1, *supra*, this is not the typical situation where the Debtors seek to obtain releases for a host of unidentified persons and entities affiliated with the Debtors (i.e., a typical, expansive list of "related parties").  Rather, the Third-Party Release here is exceedingly narrow and limited.

[123]  Notably, the release of Preference Claims related to the Current Directors, Current Officers, the Released Employees, and the beneficiaries of the Preference Amnesty Program, do not impact the direct rights of third parties, as preference claims are unique to the Bankruptcy Code and are held solely by the Debtors' estates.  *In re Lucasa Intern., Ltd.*, 13 B.R. 596, 601 (Bankr. S.D.N.Y. 1981) ("However, the trustee's power to void preferential transfers is derived from the Code itself and not from any rights granted under applicable state or federal law to actual unsecured creditors.").

Hearing Notice, and the Notice of Non-Voting Status, among other documents, conspicuously telegraph the existence of the Third-Party Release and describe the Opt-Out Procedures that Holders of Claims and Interests can follow to opt out of the Third Party Release.  Thus, the Holders of Claims and Interests received comprehensive and detailed notices of the Third-Party Release, their impact on the rights of Holders of Claims and Interests, the Opt-Out Procedures, and notice of their opportunity to object to confirmation of the Plan.

97.     The law is clear that a release is consensual where parties have received sufficient notice of a plan's release provisions and have had an opportunity to manifest consent to the release, whether by failing to object to, or opt out of, the applicable third-party release or by, in certain other courts, affirmatively opting into the release.  Indeed, this Court has held on several occasions that the procedures substantially similar to the Opt-Out Procedures here constitute consensual releases.[124]

98.     Here, all parties in interest had ample opportunity to evaluate and exercise their right to manifest consent to the Third-Party Release.  The Ballots for Holders of Claims in the Voting Classes included the entirety of the Third-Party Release and links to the Debtors' case website containing applicable definitions from the Plan, and clearly informed such Holders of the

---

[124]   *See, e.g.*, *In re Clovis Oncology, Inc., et al.*, Case No. 22-11292 (JKS), [Docket No. 470], § 1.A.1.117, "Releasing Parties" definition; Dec. 14, 2022 Hr'g Tr. 21:12-16, *In re Legacy Ejy, Inc., et al.*, No. 22-105800 (JKS) (Bankr. D. Del.) [Docket No. 695] ("[A]n opt-out mechanism and an opportunity to object are a valid means for obtaining consent, so these releases are consensual, and I would ask that you please strike the reference to non-consensual releases in that subparagraph."); Feb. 22, 2023 Hr'g Tr. 41:10-15, *In re Legacy FSRD*, No. 22-11051 (JKS) (Bankr. D. Del.) [Docket No. 332] ("[T]he third-party releases are consensual. The Class 4 and 5 ballots, the notice of unimpaired non-voting status, the combined hearing notice, and the publication notice contain the release language and instructed how to opt out or object to the third-party releases contained in Section 8.4. of the plan."); Jan. 25, 2022 Hr'g Tr. 88:22-89:13, *In re Alpha Latam Mgmt., LLC*, No. 21-11109 (JKS) (Bankr. D. Del.) [Docket No. 511] ("As I have previously ruled, an opt-out mechanism is a valid means of obtaining consent. The court can imply consent from a creditor, not opting out or objecting to releases contained in a plan. Creditors have an obligation to read their mail and respond if appropriate. This procedure is not unique and it's routinely utilized in the law."); Feb. 16, 2022 Hr'g Tr. 44:11-44:19, *In re Corp. Grp. Banking S.A.*, No. 21-10969 (JKS) (Bankr. D. Del.) [Docket No. 543] ("I have been persuaded that as a general proposition parties in a bankruptcy case are effected by provisions of a plan and if parties have an issue with a plan provision, including releases, that party, it's incumbent upon them to object. So I have approved opt-out in prior cases.").

steps they should take if they disagreed with the scope of the Third-Party Release or otherwise desired to opt out.  In fact, as seen in the Voting Declaration, over 100 creditors elected to opt out of the Third-Party Release.[125]  As such, it is apparent that Holders of Claims received adequate of the release and had an opportunity to manifest consent thereto under the circumstances of these Chapter 11 Cases.

99.    In short, the Third-Party Release is sufficiently narrow, is being granted consensually, does not provide a blanket immunity, and provides a specific carve-out for acts or omissions that constitute fraud, gross negligence or willful misconduct.    Accordingly, this Court should find the Third-Party Release is consensual as to all Holders of Claims or Interests who either voted to accept the Plan and do not opt out of the Third-Party Release, or who did not otherwise object to the Third-Party Release or timely return the Notice of Non-Voting Status pursuant to the Opt-Out Procedures.

### 3)    The Exculpation is Appropriate and Should be Approved.

100.    Article 10.6 of the Plan contains an exculpation provision (the "Exculpation"), which exculpates only certain estate fiduciaries.  The Exculpation exculpates the Exculpated Parties[126] from claims arising out of or related to, among other things, the administration of these Chapter 11 Cases; the postpetition Sale Process; the formulation and negotiation of the Plan and Disclosure Statement, and the solicitation and prosecution thereof; the negotiation of various transactions and settlements contemplated under the Plan and otherwise.

---

[125]    *See* Voting Declaration.

[126]    "Exculpated Parties" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) the Wind-Down Debtor; (d) the Special Committee, and each of the members thereof, solely in their capacity as such; (e) the Creditors' Committee, and each of the current and former members thereof, solely in their capacity as such; (f) each of the Released Professionals; (g) the Current Officers; (h) the Released Employees; (i) Cooley LLP; and (j) J.S. Held LLC.

101.    The Exculpation seeks exculpation solely for Estate fiduciaries, consistent with applicable Third Circuit law.[127]  Thus, the scope of the Exculpation is appropriate under both the applicable law and the facts of these Chapter 11 Cases.  This Court has approved similar exculpation provisions for Estate fiduciaries in connection with acts taken in connection with a debtor's restructuring efforts where such acts were not the product of fraud, gross negligence, or willful misconduct.[128]

102.    Therefore, the Debtors submit that the Exculpation set forth in Article 10.6 of the Plan should be approved.[129]

### 4)    The Injunction is Appropriate and Should be Approved.

103.    Article 10.7 of the Plan implements the Debtor Release, the Third-Party Release, and the Exculpation of the Plan, in part, by permanently enjoining all entities from, with respect to any Claims or Interests, (a) commencing or maintaining any action; (b) enforcing, attaching, collecting, or recovering any judgment; (c) creating, perfecting, or enforcing any encumbrance; (d) asserting any right of setoff, subrogation, or recoupment, unless such Holder has filed a motion requesting the right to perform such setoff; or (e) acting or proceeding in any manner that does not conform to or comply with the Plan (the "Injunction").[130]  The Injunction is a key provision of the

---

[127]    *See In re PWS Holding Corp.,* 228 F.3d 224 (3d Cir. 2000).

[128]    *See, e.g., In re Legacy FSRD, Inc.,* No. 22-11051 (JKS) (Bankr. D. Del. Feb. 23, 2023) [Docket No. 322] (confirming a bankruptcy plan that included debtors, the unsecured creditors' committee, and their professionals as exculpated parties); *In re Legacy Ejy, Inc.,* No. 22-10580 (JKS) (Bankr. D. Del. Dec. 14, 2022) [Docket No. 689] (same).

[129]    The U.S. Trustee objected to including Released Employees, J.S. Held LLC, the Reorganized Debtors, and the Wind-Down Debtor as part of the Exculpation.  The Debtors submit that they have resolved this aspect of the U.S. Trustee Objection by removing those parties from the definition of Exculpated Parties.  That change will be reflected in an updated Plan filed in the near-term.

[130]    *See* Plan, Art. 10.7.  The description of the Injunction is a summary and for convenience only.  The terms of Article 10.7 of the Plan shall control in all respects.

Plan because it enforces the Debtor Release, the Third-Party Release, and the Exculpation that are centrally important to the Plan, as discussed above.

104.    Both 450 Investments and SDM have asserted objections to the Injunction on similar grounds related to Account Treatment Issues.  450 Investments asserts that the Injunction is improper to the extent it impinges on 450 Investments' setoff or recoupment rights, or its ability to arbitrate the Ownership Dispute (as defined in the 450 Investments Objection) – *i.e.*, the Account Treatment Issues.[131]  And SDM maintains the Injunction is improper to extent it seeks to interfere with SDM's ability to seek a determination of ownership of Custodial Funds (as defined in the SDM Objection)—*i.e.*, the Account Treatment Issues.[132]

105.    The complaints lodged by 405 Investments and SDM about the Injunction are misplaced for two reasons.  *First*, the plain language of the Injunction only limits 450 Investments' and SDM's respective rights to set off prepetition claims against Estate property.[133]  As both 450 Investments and SDM conceded, the Bankruptcy Court has not yet determined whether Cryptocurrency in Customer Accounts is property of the estate.  And if, for example, the Bankruptcy Court determines that those assets are not property of the Debtors' Estates, then the Injunction does not apply to either 450 Investments or SDM.

106.    *Second*, the Account Treatment Procedures attached hereto as **Exhibit B** adequately address these concerns.  More specifically, the Account Treatment Procedures provide Customers with the opportunity to seek to enforce any arbitration provisions (if any) in their underlying Customer Agreements by filing a motion with the Bankruptcy Court of such Customer's intent to enforce the underlying arbitration provisions (if any) within fourteen (14)

---

[131]    *See* 450 Investments Obj. ¶¶ 30–31.

[132]    *See* SDM Obj. ¶ 31.

[133]    *See* Plan, Art. 10.7(b).

days of delivering its Jurisdictional Notice to Wind-Down Debtor.[134]  More broadly, the Account

Treatment Procedures provide that each affected Customer will have the opportunity to be heard

if it disagrees with the Wind-Down Debtor's proposed conclusion regarding the Customer's

Account and its inclusion or exclusion as property of the Debtors' Estates.[135]  Accordingly, the

Debtors submit that inclusion of the Account Treatment Procedures adequately address the

concerns raised in the 450 Investments Objection and the SDM Objection with respect to the

Injunction.

### iii.    The Plan Does Not Provide for a Sale of Substantially All or All of the Debtors' Assets—Section 1123(b)(4).

107.    Section 1123(b)(4) of the Bankruptcy Code provides that a plan may provide for

the "sale of all or substantially all of the property of the estate, and the distribution of such sale

among holders of claims or interests."[136]  Because the Debtors are not engaging in a sale of all or

substantially all of their assets through which proceeds will be distributed to Holders of Claims or

Interests, section 1123(b)(4) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

### iv.    The Plan Modifies the Rights of Certain Classes—Section 1123(b)(5).

108.    Section 1123(b)(5) of the Bankruptcy Code provides that a plan may "modify the

rights of holders of secured claims, other than a claim secured only by a security interest in real

property that is the debtor's principal residence, or of holders of unsecured claims, or leave

unaffected the rights of holders of any class of claims."[137]  Article 4 of the Plan modifies the rights

of Holders of Claims in Classes 3A through 8.  The Plan leaves unaffected the rights of Holders

---

[134]    *See* Account Treatment Procedures, ¶ 3.

[135]    *Id.* ¶¶ 2–6.

[136]    11 U.S.C. § 1123(b)(4).

[137]    11 U.S.C. § 1123(b)(5).

of Claims in Classes 1A, 1B, and 2.   Therefore, the Plan satisfies section 1123(b)(5) of the Bankruptcy Code.

### v.   The Plan Complies with Section 1123(d) of the Bankruptcy Code.

109.   Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."[138]   The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan, by payment of the default amount in Cash on the Effective Date, in the ordinary course of business, or on such other terms as the parties may otherwise agree, subject to the limitations described in Article 9 of the Plan.[139]   Further, pursuant to the Plan, because the Debtors are pursuing a Liquidation Transaction, unless the Debtors listed an Executory Contract or Unexpired Lease on the Schedule of Assumed Contracts filed as part of the Plan Supplement, Executory Contracts or Unexpired Leases will be automatically rejected pursuant to the Plan.[140]   The Plan therefore satisfies section 1123(d) of the Bankruptcy Code.

## III.   The Debtors Complied with the Applicable Provisions of the Bankruptcy Code— Section 1129(a)(2).

110.   The Debtors have complied with the applicable provisions of the Bankruptcy Code in accordance with section 1129(a)(2) of the Bankruptcy Code.   A principal purpose of section 1129(a)(2) is to ensure that plan proponents have complied with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[141]   As

---

[138]   11 U.S.C. § 1123(d).

[139]   *See* Initial Plan Supplement, Ex. A (providing for the Cure of each Executory Contract and Unexpired Lease).

[140]   *See* Plan, Art. 9.1.

[141]   S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

discussed in Section III *supra*, the Debtors have complied with all applicable notice, solicitation, and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Conditional Approval Order, and therefore, the Debtors submit that the Plan satisfies section 1129(a)(2) of the Bankruptcy Code.

## IV.    The Plan is Proposed in Good Faith and Not by Any Means Forbidden by Law— Section 1129(a)(3).

111.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[142]  The Third Circuit has held that for a plan to be proposed in good faith, it must "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[143]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[144]  Accordingly, the examination must be done on a case-by-case basis and the court is given "considerable discretion in finding good faith."[145]

112.    Here, the Plan was negotiated, developed, and proposed in good faith by the Debtors with the legitimate and honest purpose of preserving the value of the Debtors' assets, subsequently winding down the Debtors' affairs, and maximizing both the value of the Debtors' Estates and recoveries to the Debtors' creditors on account of their Allowed Claims.  The Plan was not proposed by any means forbidden by law, has a high likelihood of success (if confirmed), and will achieve a result consistent with the objectives of the Bankruptcy Code.  Therefore, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

---

[142]   11 U.S.C. § 1129(a)(3).

[143]   *See In re PWS Holding Corp.*, 228 F.3d at 242; *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[144]   *See, e.g., In re W.R. Grace & Co.*, 475 B.R. at 87; *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997).

[145]   *In re W.R. Grace & Co.*, 475 B.R. at 87 (citing *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001)).

113.    The important point of an inquiry into good faith is whether the plan will "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[146]  These purposes include (a) preserving going concerns and maximizing property available to satisfy creditors; (b) giving debtors a fresh start; (c) discouraging debtor misconduct; (d) the expeditious liquidation and distribution of the bankruptcy estate to its creditors; and (e) achieving fundamental fairness and justice.[147]

114.    Here, the Plan advances these purposes, as applicable to the Chapter 11 Cases. *First*, the Plan maximizes the recoveries available to the Debtors' stakeholders, including the Debtors' Customers—the parties most harmed by the events precipitating these Chapter 11 Cases. *Second*, the Plan, with the assistance of the Special Committee and the Released Employees, will position the Wind-Down Debtor for a seamless winddown process.  The Debtors' proposed DIP Facility will provide the Wind-Down Debtor with an initial budget of $3,000,000, thus allowing the Plan Administrator to among other things, (a) immediately begin the process of identifying viable Claims and Causes of Action, (b) satisfy obligations under assumed Executory Contracts, and (c) preserve the Wind-Down Debtor Assets. Third, nothing in the Plan encourages misconduct on the part of the Debtors, nor is the principal purpose of the Plan the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 (15 U.S.C. § 77(e)).

115.    Finally, the Plan achieves fundamental fairness as no party is receiving more than what it is entitled to, and the Plan is built on concessions and good-faith give-and-take by the parties involved.[148]  Indeed, the Plan is the outcome of extensive, good-faith, arm's-length negotiations with, and is supported by the, Debtors' key stakeholders, including the Committee.

---

[146]  *In re W.R. Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013).

[147]  *Id.*

[148]  *See* Plan, Art. 7.1, 7.2(b).

These parties, each with diverging interests, were able to reach global consensus only after countless weeks of intense, arm's-length negotiations in which each party advocated for its own interests.  The significant agreements that are embodied in the Plan, and the resulting support that has been garnered to date from the Committee, among others, are a testament to the overall fairness of the Plan and an acknowledgement that the Plan has been proposed in good faith and for proper purposes.

116.    In sum, throughout the negotiation of the Plan and the Chapter 11 Cases, the Debtors upheld their fiduciary duties to stakeholders, acted in good faith at all times, and protected the interests of all constituents with an even hand.  Accordingly, the Plan and the Debtors' conduct throughout the Chapter 11 Cases comply with and satisfy section 1129(a)(3) of the Bankruptcy Code.

## V.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses is Subject to Court Approval—Section 1129(a)(4).

117.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent or by the debtor be subject to approval by the Bankruptcy Court as reasonable.[149]  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the court as to their reasonableness.[150]

118.    The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  The Debtors submit that payment of Professional Fee Claims is the only category of payments that falls within the ambit of section 1129(a)(4) of the Bankruptcy Code in the Chapter 11 Cases, and the Debtors may not pay Professional Fee Claims absent Court approval.  Further, pursuant to Article 2.2(a) of the

---

[149]    *See* 11 U.S.C. § 1129(a)(4).

[150]    *See In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 475-76 (Bankr. D.N.J. 1990); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988).

Plan, all such Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and 330 of the Bankruptcy Code.[151]  Moreover, Article 2.2(a) of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 60 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.[152]  Finally, as of the Effective Date, funds in the Professional Fee Escrow Account shall be held in trust solely for the Allowed Professional Fee Claims and maintained by the Wind-Down Debtor.[153]  Therefore, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

## VI.    The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders—Section 1129(a)(5).

119.    Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of a reorganized debtor.[154] Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31)) of the Bankruptcy Code to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[155] Additionally, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[156]  Section 1129(a)(5)(A)(ii) of the Bankruptcy Code directs this Court to ensure

---

[151]    *See* Plan, Art. 2.2(a).

[152]    *See* Plan, Art. 2.2(a).

[153]    *See* Plan, Art. 2.2(d).  It should be noted that "any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Debtor and shall constitute Wind-Down Debtor Assets" only in the event that such funds remain after all Allowed Professional Fee Claims have been paid in full.  *Id.*

[154]    *See* 11 U.S.C. § 1129(a)(5)(A)(i).

[155]    *See* 11 U.S.C. § 1129(a)(5)(B).

[156]    *See* 11 U.S.C. § 1129(a)(5)(A)(ii).

that the post-confirmation governance of a reorganized debtor is in "good hands," which courts have interpreted to mean (a) experience in the reorganized debtor's business and industry; (b) experience in financial management matters; (c) that the debtors and creditors believe control of the entity by the proposed individuals will be beneficial; and (d) that the proposed individuals will not perpetuate incompetence, lack of discretion, inexperience, or affiliations with groups unfavorable to the best interests of the debtor.[157]

120.    The Plan satisfies section 1129(a)(5) of the Bankruptcy Code.  In accordance with Article 6.10(n) of the Plan, on the Effective Date, the Current Directors and Current Officers will be discharged from their duties and the Plan Administrator will serve as the sole officer of the Wind-Down Debtor.[158]  Further, the Debtors have disclosed, as part of the Plan Supplement, that David Dunn of Province, LLC will serve as Plan Administrator and the PCT Litigation Trustee. David Dunn is qualified for this role based on his significant experience in serving in a similar capacity in connection with wind-down vehicles in other large, complex chapter 11 cases.  The Plan therefore satisfies section 1129(a)(5) of the Bankruptcy Code.

## VII.    The Plan Does Not Require Governmental Regulatory Approval—Section 1129(a)(6).

121.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change (*e.g.*, the price of utility services) provided for in the plan.  No rate changes are provided for in the Plan, meaning that section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

---

[157]    *See*, *e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992); *In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); *In re Sherwood Square Assoc.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989); *In re Apex Oil Co.*, 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990); *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

[158]    *See* Plan, Art. 6.10(n).

## VIII.   The Plan is in the Best Interests of All the Debtors' Creditors—Section 1129(a)(7).

122.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either (a) accepted the plan, or (b) will receive or retain property having a value not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.[159]

123.    The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes[160] and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[161]  As the language of section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to non-accepting Impaired claims or interests; if a class of claims or interests unanimously approves a plan, the best interests test is deemed satisfied for all members of that class.[162]

124.    Under the best interests test, "the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7."[163]  Therefore, a plan proponent satisfies its evidentiary burden with

---

[159]  *See* 11 U.S.C. § 1129(a)(7); *In re PWS Holding Corp.*, 228 F.3d 224, 230 (3d Cir. 2000); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).

[160]  *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

[161]  *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the plan"), *aff'd*, 785 F.2d 1033 (5th Cir. 1986); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'").

[162]  *Drexel Burnham*, 138 B.R. at 761.

[163]  *In re Adelphia Commc'ns Corp.*, 368 B.R. at 252; *In re W.R. Grace & Co.*, 475 B.R. 34, 141 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 532 F. App'x 264 (3d Cir. 2013), and *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 729 F.3d 311 (3d Cir. 2013) (finding that

respect to the best interests test by providing "a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions."[164]  Courts must evaluate such liquidation analysis, keeping in mind the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7."[165]

125.   As an initial matter, the best interests test does not apply to Class 1A (Secured Tax Claims), Class 1B (Other Secured Claims), or Class 2 (Other Priority Claims) because such Classes are Unimpaired under the Plan.  Therefore, to satisfy the best interest of creditors test, the Debtors must demonstrate that Holders in (a) Class 3A (Prime Core General Unsecured Claims), (b) Class 3B (Prime Trust General Unsecured Claims), (c) Class 3D (Prime Digital General Unsecured Claims), and (d) Class 4 (Convenience Claims) have either (x) voted to accept the Plan or (y) will receive an amount under the Plan as of the Effective Date that is not less than the amount that such Holders would receive in a hypothetical chapter 7 liquidation as of such date.[166]  Indeed, as discussed above and set forth in the Voting Declaration, each Voting Class overwhelmingly voted in favor of the Plan.

---

the best interests test requires that "every creditor to a Chapter 11 reorganization receive at least the liquidation value of its claim under the plan as it would in a Chapter 7 proceeding against the debtor").

[164]   *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 366 (S.D.N.Y. 2007).

[165]   *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (citation omitted); *In re W.R. Grace & Co.*, 475 B.R. at 142 ("[T]he court need only make a well-reasoned estimate of the liquidation value that is supported by the evidence on the record.  It is not necessary to itemize or specifically determine precise values during this estimation procedure.  Requiring such precision would be entirely unrealistic because exact values could only be found if the debtor actually underwent Chapter 7 liquidation.").

[166]   Pursuant to Article 5.4 of the Plan, Class 3C was eliminated because Class 3C had no Holders of Claims entitled to vote for the Plan.

126.    The Liquidation Analysis demonstrates that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code and that under a chapter 7 liquidation holders of Claims and Interests would receive less than is projected under the Plan.[167]

127.    The uncontroverted assumptions and estimates in the Liquidation Analysis are appropriate in the context of these Chapter 11 Cases and are based upon the knowledge and expertise of the Debtors' professionals and personnel who have extensive knowledge of the Debtors' business and financial affairs as well as relevant industry and financial experience.[168]  In light of the foregoing, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

128.    The Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the Debtors' assets and claims, such as (a) the additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's fees and retention of new professionals, (b) the delay and erosion of value that would be caused to the Debtors' assets, (c) the reduced recoveries caused by an accelerated sale or disposition of the Debtors' assets by the chapter 7 trustee, and (d) other potential claims that may arise in a chapter 7 liquidation.  The estimates regarding the Debtors' assets and liabilities that are incorporated into the Liquidation Analysis are based upon the knowledge and familiarity of the Debtors' advisors with the Debtors' business and their relevant experience in chapter 11 proceedings.  As such, the Debtors' Liquidation Analysis should be afforded deference.[169]

129.    Here, as set forth in the Liquidation Analysis and the Murphy Declaration, all rejecting holders of Impaired Claims or Interests will receive or retain property value, as of the

---

[167]  *See* Murphy Decl. ¶¶ 6, 9–13.

[168]  *See id.* ¶¶ 4–5.

[169]  *See id.* ¶¶ 4–5.

Effective Date, in an amount that is at least equal to the value of what they would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.[170]   Accordingly, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.[171]

## IX.    The Plan is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

130.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests under a plan must either accept a plan or be unimpaired under a plan.[172]   As discussed above, Class 3A (Prime Core General Unsecured Claims), Class 3B (Prime Trust General Unsecured Claims), Class 3D (Prime Digital General Unsecured Claims), and Class 4 (Convenience Claims), are Impaired and entitled to vote.   Each of those Classes have voted to accept the Plan.[173]   Additionally, the Holders of Claims in Class 1A (Secured Tax Claims), Class 1B (Other Secured Claims), and Class 2 (Other Priority Claims) are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code and are conclusively presumed to have accepted the Plan.

131.    Even though Holders of Claims and Interests in Classes 5, 6, 7, and 8 (collectively, the "Deemed Rejecting Classes") are deemed to reject the Plan, and accordingly, the requirements of section 1129(a)(8) of the Bankruptcy Code have not been met, the Bankruptcy Court may "cram down" the Plan over the deemed rejection by such Classes, subject to further protections specified in section 1129(b) of the Bankruptcy Code, as discussed in Section XV *infra*.

---

[170]   *See id.* ¶ 12.

[171]   *See id.* ¶ 12–13.

[172]   *See* 11 U.S.C. § 1129(a)(8).

[173]   *See* Voting Decl.

X.      **The Plan Provides for Payment in Full of All Allowed Priority Claims—Section 1129(a)(9).**

132.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.[174]   In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[175]   Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) of the Bankruptcy Code or (4) through (7)—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[176]   Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.[177]

133.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code. *First*, Article 2.1(b) of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Administrative Claim on the later of the Effective Date and the date on which such Claim becomes

---

[174]    *See* 11 U.S.C. § 1129(a)(9).

[175]    *See* 11 U.S.C. § 1129(a)(9)(A).

[176]    *See* 11 U.S.C. § 1129(a)(9)(B).

[177]    *See* 11 U.S.C. § 1129(a)(9)(C).

an Allowed Claim (or as soon as reasonably practicable thereafter).[178]  *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the Claims specified in section 1129(a)(9)(B) of the Bankruptcy Code are Impaired under the Plan.  *Third*, Article 2.3 of the Plan specifically provides that Holders of Allowed Priority Tax Claims shall be treated in accordance with the terms of section 1129(a)(9)(C) of the Bankruptcy Code.[179]  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

## XI.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan—Section 1129(a)(10).

134.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider."[180]  Here, Holders of Claims in Classes 3A, 3B, 3D, and 4—which are Impaired Classes entitled to vote on the Plan—voted to accept the Plan independent of any votes cast by insiders (within the meaning of section101(31) of the Bankruptcy Code), satisfying section 1129(a)(10) of the Bankruptcy Code.

## XII.    The Plan is Feasible—Section 1129(a)(11).

135.    Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that a plan is feasible as a condition precedent to confirmation.[181]  Specifically, the Bankruptcy Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[182]  To

---

[178]   *See* Plan, Art. 2.1(b).

[179]   *See* Plan, Art. 2.3.

[180]   11 U.S.C. § 1129(a)(10).

[181]   *See* 11 U.S.C. § 1129(a)(11).

[182]   *Id.*

demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[183]  Rather, a debtor must provide only a reasonable assurance of success, which requires a relatively low threshold of proof.[184]

136.    Here, because the Debtors elected to pursue a Liquidation Transaction, the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code are satisfied.  As reflected in the "Approved Budget" attached to the DIP Motion, after the funding of the DIP Facility, the receipt of the initial payment required under the Swan License Agreement, the payment of the settlement amounts under the Adius Settlement, the Debtors will have sufficient cash on-hand to pay all Allowed Administrative Expense Claims in full on the Effective Date.  Further, under the terms of the Debtors' proposed DIP Facility, the Wind-Down Debtor will be sufficiently capitalized with an initial budget of $3,000,000.  Accordingly, the Plan is a feasible plan of liquidation with a reasonable likelihood of success, satisfying section 1129(a)(11) of the Bankruptcy Code.

## XIII.   All Statutory Fees Have Been or Will Be Paid—Section 1129(a)(12).

137.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[185]  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title

---

[183]   *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *In re W.R. Grace & Co.*, 475 B.R. at 115.

[184]   *See In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (noting that the Bankruptcy Code does not require a debtor to prove that success is inevitable and a relatively low threshold of proof will satisfy section 1129(a)(11), as long as adequate evidence supports a finding of feasibility); *In re Tribune Co.*, 464 B.R. at 185, *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011).

[185]   11 U.S.C. § 1129(a)(12).

28" are afforded priority as administrative expenses.[186]  Article 2.6 of the Plan provides that all fees and charges under 28 U.S.C. § 1930(a), to the extent not previously paid and due and owing, will be paid for each quarter (or any fraction thereof) until the applicable chapter 11 case of each of the applicable Debtors is converted, dismissed, or closed, whichever occurs first.[187]  Therefore, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

## XIV. Sections 1129(a)(13)-(16) of the Bankruptcy Code Do Not Apply to the Plan.

138.    Section 1129(a)(13) of the Bankruptcy Code is inapplicable because the Debtors do not provide "retiree benefits" within the meaning of Bankruptcy Code section 1114.  Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations—since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as the term is defined in the Bankruptcy Code.  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, none of the Debtors is a nonprofit corporation and, therefore, section 1129(a)(16) of the Bankruptcy Code does not apply.

## XV. The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.

139.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.[188]  To confirm a plan that has not been accepted by

---

[186]    11 U.S.C. § 507(a)(2).

[187]    *See* Plan, Art. 2.6.

[188]    *See* 11 U.S.C. § 1129(b)(1).

all impaired classes (thereby failing to satisfy section 1129(a)(8)) of the Bankruptcy Code, the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[189]  The Third Circuit has recognized that cramdown plans "are an antidote to one or more classes of claims holding up confirmation of an otherwise consensual plan."[190]

140.    The Plan satisfies section 1129(b) of the Bankruptcy Code.  As set forth in the Voting Declaration, four of the five Impaired Classes of Claims entitled to vote on the Plan—Classes 3A, 3B, 3D, and 4—overwhelmingly voted to accept the Plan.    Holders of Claims in Classes 5 through 8 will receive no recovery and are deemed to reject the Plan.  The Plan is nonetheless confirmable because, as discussed in greater detail below, it satisfies the "cram down" requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 3C, 5, 6, 7, and 8, because the Plan does not unfairly discriminate and complies with the absolute priority rule.

### A.    The Plan Does Not Discriminate Unfairly with Respect to Impaired Classes that Have Not Voted to Accept the Plan—Section 1129(b)(1).[191]

141.    The unfair discrimination standard of section 1129(b)(1) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly situated

---

[189]   *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *In re Zenith Elecs.*, 241 B.R. at 105 (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'"); *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997).

[190]   *In re Tribune Co.*, 972 F.3d 228, 237 (3d Cir. 2020).

[191]   Because all Impaired Classes either voted to accept the Plan or were not entitled to vote on the Plan, the Debtors do not need to satisfy the "cramdown" requirements of Bankruptcy Code section 1129(b).  However, for the sake of completion and in response to the various objections to Plan confirmation, the Debtors have analyzed the Plan's satisfaction of the "cramdown" requirements, including whether it unfairly discriminates Impaired Classes and whether it is fair and equitable.  As discussed herein, the Plan does not discriminate unfairly and is fair and equitable, satisfying the "cramdown" standards of Bankruptcy Code section 1129(b).

classes.[192]   Accordingly, as between two classes of claims or two classes of interests, there is no unfair discrimination if (a) the classes are comprised of dissimilar claims or interests,[193] or (b) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.[194]

142.    The Plan does not discriminate unfairly against the Deemed Rejected Classes (*i.e.*, Classes 5, 6, 7, and 8).  Section 1129(b) of the Bankruptcy Code does not prohibit differences in treatment between the classes.  To the contrary, as explained in Section II.A *supra*, the very premise of any chapter 11 plan with multiple impaired classes is to differentiate among classes. Section 1129(b) of the Bankruptcy Code thus permits a debtor's chapter 11 plan to provide for unequal treatment of separately classified creditors with similar legal rights, so long as the discriminatory treatment of the impaired dissenting class is not "unfair."[195]

143.    Accordingly, the Plan does not discriminate unfairly against such Classes.

---

[192]   *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (noting that the "hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.") (citing *In re Lernout & Hauspie Speech Prod., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003) *aff'd*, 308 B.R. 672 (D. Del. 2004)); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at \*59 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *In re Buttonwood Partners, Ltd.*, 111 B.R 57, 63 (Bankr. S.D.N.Y. 1990)); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds, In re Johns-Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1986), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[193]   *See, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. at 636.

[194]   *See, e.g.*, *In re Drexel Burnham Lambert Grp.*,138 B.R. at 715 (separate classification and treatment was rational where members of each class "possesse[d] different legal rights"), *aff'd sub nom. Lambert Brussels Assocs, L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (approving classification of general unsecured creditors into different classes with different legal bases: doctors' indemnification claims, medical malpractice claims, employee benefit claims and trade claims); *see also In re Abeinsa Holding, Inc.*, 562 B.R. 265, 274–75 (Bankr. D. Del. 2016) (rejecting challenge to separate classification in part on the basis that, even without the challenged classification, the voting results would not change); *In re Nuverra Envtl. Solutions, Inc.*, 590 B.R. 75, 98–99 (D. Del. 2018) (district court dismissing claimants' appeal, determining the overwhelming acceptance within the claimant's class rendered argument moot).

[195]   *See Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 10 (D. Conn. 2006).

### B.    The Plan is Fair and Equitable—Section 1129(b)(2)(B)(ii).

144.    A plan is considered "fair and equitable" pursuant to sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code if, with respect to a class of impaired unsecured claims or interests, the plan provides that either (a) an impaired rejecting class of claims or interests be paid in full, or (b) a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.[196]  This is referred to as the "absolute priority rule," which requires that if the holders of claims in a particular rejecting class receive less than full value for their claims, no holders of claims or interests in a junior class may receive any property under the plan.

145.    Here, the Plan satisfies the absolute priority rule with respect to the Deemed Rejecting Classes.  *First*, no Class of Claims or Interests junior to such Classes will receive or retain any property under the Plan.[197]  *Second*, no Class of Claims or Interests will receive or retain property under the Plan that has a value greater than 100% nor has any party asserted as such.[198] Accordingly, the Plan satisfies the requirements of sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code and, therefore, is fair and equitable with respect to Classes 5, 6, 7, and 8.

### XVI.   The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code—Section 1129(c)-(e).

146.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Coe. *First*, section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans,[199] is not implicated here because the Plan is the only plan filed in these Chapter 11 Cases.

---

[196]  *See* 11 U.S.C. § 1129(b)(2)(B)-(C).

[197]  *See* Plan, Art. 4.9–4.12.

[198]  *Id.* Art. 3.3, 4.1–4.12.

[199]  *See* 11 U.S.C. § 1129(c).

69

147.    *Second*, section 1129(d) of the Bankruptcy Code provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[200]  Here, the purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933 and no government unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds, satisfying section 1129(d) of the Bankruptcy Code.

148.    Finally, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case."[201]  Therefore, the Plan satisfies the remaining provisions of sections 1129(c)–(e) of the Bankruptcy Code.

149.    In sum, because all factors under section 1129 of the Bankruptcy Code as well as other related factors under the Bankruptcy Code are satisfied, the Debtors submit that confirmation of the Plan is both appropriate and merited, and all outstanding Objections suggesting otherwise should be overruled, as discussed below.

## THE UNRESOLVED OBJECTIONS SHOULD BE OVERRULED

150.    The Debtors received several formal and informal objections or comments to the Plan with respect to approval of the Disclosure Statement on a final basis and confirmation of the Plan.  The Debtors also received and responded to numerous informal questions and information requests from parties that had no objection to the Plan.  To date, the Debtors believe that they have successfully resolved all objections to the Plan and addressed all articulated concerns with respect to the adequacy of the disclosures contained in the Disclosure Statement.  For the reasons set forth

---

[200]  11 U.S.C. § 1129(d).

[201]  11 U.S.C. § 1129(e).

herein, any remaining objections to the adequacy of the disclosures in the Disclosure Statement or confirmation of the Plan should be overruled.

## **MODIFICATIONS TO THE PLAN**

151.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[202]   Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.[203]  Bankruptcy Rule 3019 provides that modifications to a plan after such plan has been accepted will be deemed to have been accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[204]

152.    Interpreting Bankruptcy Rule 3019, courts have consistently held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[205]  Resolicitation following the modification of a plan is not automatically required, as this would require unnecessary delay where a plan has already been accepted and was not materially altered and could create perverse incentives for creditors to change votes for strategic purposes.[206] Moreover, courts have found that "there is no practical reason to undertake this expensive

---

[202]   *See* 11 U.S.C. § 1127(a).

[203]   *See In re American-CV Station Grp., Inc.*, 56 F.4th 1302, 1308 (11th Cir. 2023) ("Easy modification allows negotiated outcomes to quickly become part of the plan.").

[204]   Fed. R. Bankr. P. 3019.

[205]   *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009).

[206]   *In re Dow Corning Corp.*, 237 B.R. 374, 378-79 (Bankr. E.D. Mich. 1999).

proposition" of resolicitation of every dissenting creditor where a portion of the class necessary to carry the class voting has already consented in writing to the modifications.[207]

153.    The Debtors will file a further modified version of the Plan in a form consistent with the arguments set forth this Confirmation Order, which implements certain technical Modifications.  The Modifications do not adversely affect the treatment of any Holder of Claims or Interests.   Additionally, the Modifications have been reviewed and consented to by the Committee and the DIP Lender, among others.  The purpose of the Modifications was to further narrow certain issues raised in certain of the Objections.  Given that the Modifications do not adversely affect creditors and stakeholders, and the support for the Modifications expressed by the Committee and the DIP Lender, the Modifications comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the Modifications, and that such Modifications should be deemed accepted by all creditors that previously accepted the Plan.

## **GOOD CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER**

154.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."[208] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays of orders authorizing the sale of property and assignments of executory contracts or unexpired leases, respectively.[209]  These rules also permit modification of the stay upon court order.

155.    Good cause exists for waiving any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order may

---

[207]   *Id*. at 379.

[208]   Fed. R. Bankr. P. 3020(e).

[209]   Fed. R. Bankr. P. 6004(h); Fed. R. Bankr. P. 6006(d).

become effective immediately upon its entry. As noted above, the Chapter 11 Cases have been conducted in good faith and with a high degree of transparency and public dissemination of information. The sooner the proposed Confirmation Order becomes effective, the sooner Holders of Allowed Claims can receive distributions and the Debtors can wind down their affairs. The Plan should therefore take effect as quickly as possible to facilitate the distribution process. Thus, the Debtors request a waiver of the stay imposed by Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order may become effective immediately upon its entry.

## **RESERVATION OF RIGHTS**

156.    The Debtors reserve the right to supplement this Confirmation Brief prior to and at the Confirmation Hearing, including, without limitation, to further address and/or respond to the Objections.

## **CONCLUSION**

157.    For all the reasons set forth herein, in the Confirmation Declarations, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Bankruptcy Court (a) approve the Disclosure Statement on a final basis; (b) confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order; (c) overrule any remaining Objections to confirmation of the Plan to the extent not withdrawn or resolved prior to or at the Confirmation Hearing; (d) waive the stay of the proposed Confirmation Order; and (e) grant such other and further relief as is just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: December 12, 2023
     Wilmington, Delaware

**MCDERMOTT WILL & EMERY LLP**

*/s/ Maris J. Kandestin*
Maris J. Kandestin (No. 5294)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone:  (302) 485-3900
Facsimile:  (302) 351-8711
Email:        mkandestin@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone:  (212) 547-5400
Facsimile:  (646) 547-5444
Email:        dazman@mwe.com
            jbevans@mwe.com

-and-

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone:  (305) 358-3500
Facsimile:  (305) 347-6500
Email:        gsteinman@mwe.com

*Counsel to the Debtors and Debtors in Possession*