# Exhibit B

## Account Treatment Procedures

## Account Treatment Procedures

As of the Petition Date, Prime Trust was party to nearly five million Customer Agreements, including various types of master service agreements between Prime Trust and its integrator customers (the "Integrator Customers"). These agreements fall into three general categories: (a) legacy agreements (the "Legacy Agreements"); (b) bespoke agreements (the "Bespoke Agreements"); and (c) those adhering to Prime Trust's standard master services agreement (the "Prime Trust MSAs," and together with the Legacy Agreements and the Bespoke Agreements, the "Integrator MSAs").[1] Legacy Agreements are those Customer Agreements entered into between Prime Trust and the applicable Customer prior to Prime Trust's adoption of the Prime Trust MSA form.[2] Bespoke Agreements are Customer Agreements that are based off of the Prime Trust MSA, but which include bespoke features tailored to the particularized needs of the applicable Customer. The remainder of the Customer Contracts are with customers of the Integrator Customers (the "End-User Customers"),[3] or with individual Customers.

In addition, certain Integrator Customers are authorized to act on behalf of the interests of their customers (i.e., Prime Trust's End-User Customers, pursuant to the terms of the agreements governing the relationship between the applicable Integrator Customer and the applicable End-User Customer.[4]

To ensure the uniform, orderly, and fair determination of the Account Treatment Issues, the Debtors or the Wind-Down Debtor, as applicable, intend to implement the following procedures (the "Account Treatment Procedures"):

1. No later the date that is one hundred twenty (120) days after the Effective Date, the Wind-Down Debtor shall (a) notify each Integrator Customer in writing (which writing may be via email, where possible, and otherwise by publication to the notice website to be established by the Plan Administrator for such purpose) as to which category its Integrator MSA falls under, and (b) provide an estimated date by which the Wind-Down Debtor will make a determination as to whether the fiat currencies and/or Cryptocurrencies (the "Currency") held in the Accounts associated with such Integrator Customer are property of the Estates or whether the Currency constitutes a Non-Estate Asset (the "Initial Notice"). To the extent not already subsumed in an Initial Notice delivered to an Integrator Customer via email and website publication per above, the Wind-Down Debtor shall provide an Initial Notice to the End-User Customers with respect to same. Upon receipt by an Integrator Customer of an Initial Notice, such Integrator Customer shall notify the Wind-Down Debtor as to whether it is authorized to act on behalf of or otherwise represent the interests of, its customers (the Prime Trust End-User Customer), and if such Integrator

---

[1] The Integrator MSAs and any agreements with End-User Customers are "Customer Agreements" within the meaning of Art. I.A.150. of the Plan.

[2] Certain of the Legacy Agreements may have bespoke features.

[3] The Integrator Customer and the End-User Customers are "Customers" within the meaning Art. I.A.1.49. of the Plan.

[4] Prime Trust is not privy to these agreements.

Customer responds in the affirmative, such Integrator Customer shall provide the Wind-Down Debtor will all relevant agreements and documentation establishing same.

2. To the extent that the Wind-Down Debtor determines that Currency held in an Account constitutes a Non-Estate Asset, the Wind-Down Debtor shall file a notice on the docket of the Bankruptcy Court (a) setting forth such determination, and (b) indicating the Wind-Down Debtor's intent to abandon any interest in such Currency and distribute such Currency to the applicable Customer (a "Notice of Intent to Distribute").  Parties in interest shall have ten (10) days to object to any Notice of Intent to Distribute (a "Distribution Objection") by filing an objection with the Bankruptcy Court.  If no Distribution Objections are received with respect to a Notice of Intent to Distribute, the Wind-Down Debtor shall be authorized to return the subject Currency to the applicable Customer(s) without further order of the Bankruptcy Court, subject to all procedures of the Wind-Down Debtor applicable to In-Kind Distribution Costs, and any other applicable costs and fees.  To the extent a party in interest files a Distribution Objection with the Bankruptcy Court within ten (10) days following the filing of a Notice of Intent to Distribute, the parties shall meet and confer for purposes of scheduling a hearing before the Bankruptcy Court with respect to the Notice of Intent to Distribute and any related Distribution Objections.

3. To the extent the Wind-Down Debtor determines that Currency held in an Account constitutes property of the Debtors' Estates, the Wind-Down Debtor shall notify the applicable Customer in writing (which writing may be by email, where possible, and otherwise by publication to the notice website to be established by the Plan Administrator for such purpose)) of same (the "Estate Property Determination Notice").  Upon such determination, the Wind-Down Debtor and such Customer shall meet and confer with respect to formulating a proposed scheduling order to govern, among other things, the date by which the Wind-Down Debtor will file a motion with the Bankruptcy Court with respect to the Account Treatment Issues for such Customer (an "Account Treatment Motion"), and dates and deadlines relating to discovery and the adjudication of the Account Treatment Motion.

4. Notwithstanding the deadline set forth above, the Wind-Down Debtor may extend the deadlines set forth in these Account Treatment Procedures by (a) agreement of the affected Customer, or (b) order of the Bankruptcy Court following notice and an opportunity for the affected Customer to object to such extension.

5. Nothing in the foregoing Account Treatment Procedures is intended to (a) foreclose a Customer's ability to petition the Bankruptcy Court for a more expedited timeline that set forth in these Account Treatment Procedures with respect to the adjudication of such Customer's Account Treatment Issues, or (b) constitute a waiver of a Customer's right to argue that its Account Treatment Issues should be adjudicated in another forum.

6. All distributions of Currency with respect to this section shall be subject to the provisions of Art. VII.1 of the Plan, including for the avoidance of doubt that unclaimed distributions shall revert to the Wind-Down Debtor automatically free and clear of any liens, claims or interests and without need for a further order of the Bankruptcy Court.