**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Hr'g Date: December 19, 2023 at 10:00 a.m. ET** |

## REPLY IN SUPPORT OF MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO SELL CERTAIN FOREIGN CURRENCY FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES PURSUANT TO BANKRUPTCY CODE SECTION 363

The debtors and debtors in possession (collectively, the "Debtors" or "Prime") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this reply (this "Reply")

in further support of the *Motion of the Debtors for Entry of an Order Authorizing the Debtors to*

*Sell Certain Foreign Currency Free and Clear of All Liens, Claims, Interests, and Encumbrances*

*Pursuant to Bankruptcy Code Section 363* [Doc. No. 413] (the "Motion")[2] and in response to the

*Opposition of TrustToken, Inc. and TrueCoin, LLC to Debtors' Motion to Sell Certain Foreign*

*Currency Free and Clear of All Liens, Claims, Interests, and Encumbrances Pursuant to*

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]  In support of the Motion, Prime also submitted the *Declaration of Timothy Bowman in Support of the Motion of the Debtors for Entry of an Order Authorizing the Debtors to Sell Certain Foreign Currency Free and Clear of all Liens, Claims, Interests, and Encumbrances Pursuant to Bankruptcy Code Section 363* [Doc. No. 415] (the "Bowman Decl.") and the *Declaration of Joseph B. Evans in Support of the Motion of the Debtors for Entry of an Order Authorizing the Debtors to Sell Certain Foreign Currency Free and Clear of all Liens, Claims, Interests, and Encumbrances Pursuant to Bankruptcy Code Section 363* [Doc. No. 416]. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

*Bankruptcy Code Section 363* [Doc. No. 462] (the "Objection"), together with the Declaration of *Declaration of Alex de Lorraine in Support of Opposition to Debtors' Motion for Entry of an Order Authorizing the Debtors to Sell Certain Foreign Currency Free and Clear of All Liens, Claims, Interests, and Encumbrance Pursuant to Bankruptcy Code Section 363* [Doc. No. 462-1] (the "de Lorraine Decl.") and exhibits thereto. In support of this Reply, Prime relies on the *Declaration of J. Greer Griffith in Support of the Debtors' Reply in Support of the Motion of the Debtors for Entry of an Order Authorizing the Debtors to Sell Certain Foreign Currency Free and Clear of all Liens, Claims, Interests, and Encumbrances Pursuant to Bankruptcy Code Section 363* (the "Griffith Decl.").

## PRELIMINARY STATEMENT

1.      TrustToken, Inc. ("TrustToken") and TrueCoin, LLC ("TrueCoin," and, collectively with TrustToken, the "TrustToken Parties"), effectively admit that the 2022 TrustToken Agreements[3] do not establish a trust relationship. This admission is consistent with documentary evidence and uncontroverted testimony that conclusively establishes that the 2022 TrustToken Agreements are not trust agreements. Importantly, the 2022 TrustToken Agreements cannot be "trust" agreements because they explicitly disclaim any "fiduciary" relationship and Prime is granted the power to "invest" or "rehypothecate" all assets at will and for Prime's own benefit.[4]

---

[3]    The Motion defined the "Agreements" to include the: (i) MSA, (ii) Custodial Agreement, (iii) Order Form, and (iv) Renewal Form. *See* Motion at 2 n.3; *see also* Bowman Decl., Exs. A–D. To avoid confusion with the agreements that the TrustToken Parties argue govern the Foreign Currency, this Reply will refer to what the Motion defined as the "Agreements" as the "2022 TrustToken Agreements."

[4]    As set forth in the *Debtors' Emergency Motion for Entry of an Order (I) Adjourning Certain Matters Set for Hearing on December 19, 2023; (II) Extending the Deadline for Debtors to File a Reply; and (III) Granting Related Relief* [Doc. No. 587], Prime is seeking to adjourn the

2.      Recognizing that the 2022 TrustToken Agreements did not form a trust relationship, the TrustToken Parties launch a series of baseless arguments in support of their argument that old and terminated escrow agreements govern the relationship between the TrustToken Parties and Prime concerning the Foreign Currency. The TrustToken Parties argue that (1) TrueCoin is the real party at interest even though TrustToken signed the Order Form related to the relevant Foreign Currency transfers and made those transfers; (2) a sales representative tricked then-Chief Operating Officer and current-Interim Chief Executive Officer of TrustToken, Alex de Lorraine ("de Lorraine"), and his sophisticated counsel into believing that notwithstanding the clear terms of the 2022 TrustToken Agreements, the previously terminated escrow agreements entered into in 2019 governed the relationship. Each of these arguments fail for Motion-dispositive reasons.

3.      *First*, the TrustToken Parties' contention that a series escrow services agreements entered into by TrueCoin and Prime in 2019 (the "2019 Escrow Agreements") control the Foreign Currency at issue in this Motion is demonstrably wrong. *See* de Lorraine Decl., Exs. 1–4. On October 3, 2019, Prime sent TrustToken an "Escrow Agent Notice of Resignation & Prime Trust Account Termination" which explicitly constituted "Prime Trust's formal resignation as escrow agent in accordance with the terms of our Escrow Services Agreements, termination of the Partnership Agreement dated February 23, 2018, as amended, and termination of each Prime Trust Custodial Agreements held by you and your affiliates." *See* Griffith Decl., Ex. A, Escrow Agent Notice of Resignation & Prime Trust Account Termination from Prime Trust to TrueCoin LLC dated October 3, 2019 (the "Resignation Notice").

---

Motion and the right to file an additional Reply due to critical issues concerning Prime witnesses. Unfortunately, despite efforts to resolve this timing dispute with the TrustToken Parties, Prime was unable to obtain a consensual resolution.

4.      Notwithstanding the fact that Prime terminated the escrow relationship on October 3, 2019, the TrustToken Parties kept their foreign currency at Prime until 2021, when Prime returned all foreign currency held by Prime to the TrustToken Parties. It was not until 2022, when TrustToken executed the 2022 TrustToken Agreements and TrueCoin executed additional agreements with Prime that they transferred to Prime the Foreign Currency that is the subject to the Motion. *See* 2022 TrustToken Agreements; *see also* Griffith Decl., Ex. B, Prime Trust User Agreements, dated as of April 21, 2022 and April 22, 2022, between TrueCoin, LLC and Prime Trust, LLC (the "2022 TrueCoin Agreements," and collectively with the 2022 TrustToken Agreements, the "2022 Agreements") The 2022 Agreements—signed by TrueCoin and TrustToken—specifically state that they "supersede[] any prior written agreements or oral agreements between the Parties." 2022 TrueCoin Agreements, § 15.5; *See* Bowman Decl. Ex. C, Order Form.

5.      The TrustToken Parties concede TrustToken executed the Order Form. *See* Objection at 7. However, they argue that the Order Form does not bind TrueCoin, who they claim did not execute any agreements with Prime after it signed the 2019 escrow agreements. TrustToken's argument ignores the plain language of the Order Form which explicitly binds "Customer [TrustToken] ***and/or its affiliates*** and Prime Trust with respect to Prime Trust's services or a partnership with Prime Trust, including custody services, escrow services, and any and all partnership agreements." *See* Order Form. TrustToken and TrueCoin are plainly "affiliates" as they share common ownership, directors, management, and various account statements list TrustToken and TrueCoin interchangeably. Accordingly, TrueCoin is covered by the Order Form which incorporates the other 2022 TrustToken Agreements by reference.

6.     Furthermore, contrary to the TrustToken Parties' claims that TrueCoin never agreed to any agreements in 2022 that allowed Prime to use funds transferred by the TrustToken Parties, TrueCoin did execute the 2022 TrueCoin Agreements with Prime in 2022. *See* Objection at 2 (claiming "TrueCoin never agreed to the 2022 terms that Prime contends allow it to treat client funds as an internal piggy bank"). Those 2022 TrueCoin Agreements include the exact same language as the 2022 TrustToken Agreements which makes clear that the agreements did not form a trust relationship, including provisions stating that Prime was permitted to use the funds "user or invest such cash or Fiat Currency at Prime Trust's own risk" and that "Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any among of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency . . ." *See* TrueCoin Agreements, § 1.6(b); *Compare* Bowman Decl., Ex. B, Custodial Agreement, § 2.7.[5]

7.     ***Second***, the TrustToken Parties' arguments that they were tricked by a salesperson is belied by the plain terms of the 2022 TrustToken Agreements. The TrustToken Parties are sophisticated entities managing millions of dollars in reserves for their various stablecoins and, at all relevant times, represented by experienced and capable legal counsel. Yet they now claim to have been duped by a "deleted" Slack message from a Prime salesperson that signing the 2022 TrustToken Agreements would "not impact" the 2019 Escrow Agreements. As reflected in the

---

[5]     We understand that the TrustToken Parties will argue that those TrueCoin 2022 Agreements only relate to designated crypto deposits or Prime accounts. The language of the TrueCoin 2022 Agreements do not cabin the import of those agreements to one specific deposit or type of currency. *See* 2022 TrueCoin Agreements, Preamble (the parties agreed that Prime will "hold as custodian all ***property*** deposited") (emphasis added).

Objection, the TrustToken Parties were represented by sophisticated counsel who specifically reviewed these contracts and agreed to them. The 2022 TrustToken Agreements contain strict anti-reliance and merger provisions, which forbid relying on any outside statement, such as the "not impact" statement allegedly made by a sales-person. *See* Bowman Decl., Ex. A, MSA, § 14.16; Order Form.

8.      Even if the TrustToken Parties were tricked, the remedy would be a fraud or misrepresentation-type claim against the Prime estate, not reversion to agreements long since terminate. The TrustToken Parties would have a claim against the Prime estate like all other unsecured creditors.

9.      For these reasons, and those set forth below and in the supporting Griffith Decl., Prime respectfully submits that the Motion be granted.

## **ARGUMENT**

### A.      **Applicable Law**

10.      Property held by a debtor—such as the Foreign Currency currently held at Prime—is presumed to be property of the estate unless a creditor can prove otherwise. *See* Motion at 18; *see also* 11 U.S.C. § 541; *see also In re Amp'd Mobile*, 377 B.R. 478, 483 (Bankr. D. Del. 2007) ("Property held by a debtor is presumed to be property of the estate . . . and unrelated commercial entities are presumed by the Court to be in a debtor-creditor relationship, rather than a fiduciary relationship, absent evidence that the parties intended a more substantial relationship."). One way to defeat this presumption is to establish that assets are held in "trust." *See* 11 U.S.C. § 541(b)(1), (d). "[A]lleged beneficiaries of a trust . . . bear the burden of (1) demonstrating that the trust relationship and its legal source exist, and (2) identifying and tracing the trust funds if they have been commingled with non-trust funds." *In re Cath. Diocese of Wilmington, Inc.*, 432 B.R. 135, 147 (Bankr. D. Del. 2010).

**B.      Contrary to the TrustToken Parties' Contentions, the 2022 Agreements Govern the Relationship Between Prime and the TrustToken Parties**

11.      The TrustToken Parties argue that old, cancelled escrow agreements govern this dispute.  The TrustToken Parties are incorrect. As set forth below, the parties entered into a series of agreements, but the governing contracts are the 2022 Agreements.

**(1)      The 2019 Escrow Agreements Were Terminated Pursuant to a Notice Issued On October 3, 2019**

12.      The TrustToken Parties point out that TrustToken and Prime entered into a Self-Directed Custodial Account on January 29, 2018 (the "2018 Custodial Agreement") and that TrueCoin and Prime the 2019 Escrow Agreements. According to the TrustToken Parties, it is the 2019 Escrow Agreements which govern the Foreign Currency.

13.      On October 3, 2019, Prime terminated the 2019 Escrow Agreements and resigned as escrow agent when it served the Resignation Notice to TrueCoin. *See* Resignation Notice. The TrustToken Parties omit this fact entirely.

14.      The Resignation Notice from Prime to TrueCoin stated:

> This letter shall serve as notice of Prime Trust's ***formal resignation as escrow agent in accordance with the terms of our Escrow Services Agreements***, termination of the Partnership Agreement dated February 23, 2019, as amended, and ***termination of each Prime Trust Custodial Agreements held by you and your affiliates***.

*Id.* (Emphasis added).

15.      Prime decided to resign as escrow agent under the 2019 Escrow Agreements and terminate its other agreements with the TrustToken Parties, including the 2018 Custodial Agreement, based on its concerns about TrueCoin's compliance program. In the Resignation Notice, Prime explained that it "reviewed [TrueCoin's] compliance program, including [TrueCoin's] compliance policies and procedures as well as an audit of your onboarding of

prospective TUSD users." *Id.* Prime found that "[t]he results of [its] review were unsatisfactory and raise[d] significant regulatory compliance concerns." *Id.*

16.     Beginning in late 2021, Prime determined it could no longer offer custodial services for foreign currencies because it terminated its relationship with Western Alliance Bank, its then-banking partner with respect to foreign currency services. Although Prime planned on finding another banking partner through which it could offer custodial services for foreign currencies, Prime recognized that there would be a period of time during which Prime would not be able to hold any foreign currency.

17.     Prime thus converted the Foreign Currency in its custody to U.S. dollars and returned it to the TrustToken Parties. *See* Griffith Decl., Ex. C, Account Statement from Alliance Bank of Arizona, a division of Western Alliance Bank, dated December 3, 2021 ("<u>Alliance Bank Statement</u>"). By December 1, 2021, Prime had disbursed all the Foreign Currency it had previously custodied of TrueCoin, TrustToken, or any of their affiliates. *See* Alliance Bank Statement; Griffith Decl., Ex. D, Foreign Currency Account Balances at the Bank of Montreal Between January 2022 and August 2023 ("<u>BMO Account Balances</u>").

18.     Prime held no foreign currency of any of the TrustToken Parties or their affiliates between December 1, 2021 and April 21, 2022.

**(2)     When Prime Began Accepting Foreign Currency Transfers Again in 2022 it Required Customers to Execute New Agreements**

19.     Beginning in January 2022, Prime obtained a new foreign currency banking partner, the Bank of Montreal. *See* BMO Account Balances. This enabled Prime to begin to enter new agreements with customers that were interested in holding foreign currency at Prime.

20.     On April 21, 2022 and May 23, 2022, Prime and the TrustToken Parties executed a series of new agreements, which we have defined above as the 2022 Agreements. *See* Objection at 7.

### (3)     The Order Form Binds All TrustToken Parties Because it Covers "Affiliates"

21.     The TrustToken Parties admit executing the Order Form, which incorporates the MSA by reference. *See* Objection at 7. But the TrustToken Parties ignore that the Order Form explicitly binds *affiliates*.  Specifically, the Order Form states:

> The Prime Trust Master Services Agreement and any of its incorporated documents, including the Service Schedule(s), Attachment(s), Fee Schedule, ***shall supersede and replace any prior agreement(s) that may be in place between Customer and/or its affiliates and Prime Trust with respect to Prime Trust's services or a partnership with Prime Trust, including custody services, escrow services, and any and all partnership agreement***.

Order Form.

22.     TrustToken and TrueCoin are clearly affiliates because they both are under common ownership. *See* Griffith Decl., Ex. E, TrustLabs Inc., Company Organization/Ownership Chart (the "TrustLabs Organizational Chart"); *see also Revitch v. DIRECTV, LLC*, 977 F.3d 713, 717 (9th Cir. 2020) (defining an affiliate as "a company effectively controlled by another or associated with other under common ownership or control") (citations and quotations omitted).

23.     TrueCoin develops and manages stablecoins for the TrustToken Parties and their affiliates and TrustToken develops software for the TrustToken Parties and their affiliates. *See* Objection at 3, 5. The TrustLabs Organizational Chart provided to Prime from the TrustToken Parties and their affiliates indicates that the principal place of business for both TrueCoin and TrustToken is San Francisco, California. *See* TrustLabs Organizational Chart. The "managers" listed for TrueCoin are de Lorraine and Rafael Cosman ("Cosman"). *See id.* Both de Lorraine and Cosman are also listed as the "directors" of TrustToken. *See id.*

24.     While the TrustToken Parties now argue they are not affiliated with TrueCoin, this is contradictory to public statements and agreements that they sign with their own customers. For example, the TrustToken Privacy Policy specifically refers to TrustToken and TrueCoin as affiliates. *See, e.g.*, TrueCoin Privacy Policy last modified May 6, 2019, www.trusttoken.com/privacy-policy (defining "TrueCoin, LLC" as the "Company," stating that it may share collected data with affiliates, and that "***these affiliate companies include Trusttoken, Inc.***") (emphasis added).

    **(4)**    **The 2022 TrueCoin Agreements Bind TrueCoin Because They State That They Are The "Entire Agreement of the Parties" and Are Not Limited To Any Particular Sub-Account**

25.     TrueCoin executed three agreements with Prime on April 21, 2022, each of which contains explicit language that it "supersedes" all prior agreements between the Parties. Specifically, Section 15.5 states the following:

> **15.5 Entire Agreement**. This Agreement includes any exhibits, schedules, and attachments referenced herein, all of which are incorporated herein by this reference. ***This Agreement is the final, complete, and entire agreement <u>of the Parties</u>. This Agreement supersedes any prior written agreements or oral agreements <u>between the Parties</u>***.

2022 TrueCoin Agreements, § 15.5 (emphasis added).

26.     Notably absent from the TrustToken Parties' Objection and supporting declaration is any mention of the 2022 TrueCoin Agreements. To the contrary, the Objection claims that TrueCoin signed no agreements in 2022 allowing Prime to use funds transferred to it. See Objection at 2. While we understand that the TrustToken Parties will argue that those 2022 TrueCoin Agreements relate to some sort of sub-account only, the plain language of these contracts make it clear that they govern the relationship ***"of the Parties"***, supersede all prior agreements "***between the Parties***", and are not limited to any specific sub-account.

**(5)** **Contract Summary**

27.    This plain language is clear evidence that the parties intended that the 2022 Agreements would govern the Foreign Currency held at Prime after the 2022 Agreements were executed—not the 2019 Escrow Agreements as the TrustToken Parties now contend. Objection at 9.

28.    Courts give broad deference to sophisticated parties entering into contractual relationships to negotiate the terms of the contract, including contracting parties' right to stipulate that an agreement supersedes and replaces any prior written agreements or oral agreements. *See, e.g.*, *Bridge Group Investments, LLC v. Big Dollar Stores*, LLC, No. 14A711763, 2017 WL 2560670, at *20-21 (Nev. Dist. Ct. Apr. 13, 2017) (holding that sophisticated parties cannot "rely on a representation when that party can protect itself by conducting its own investigation"; "Based upon the evidence and testimony adduced at trial, the Court concludes that this deal was an arms' length transaction involving parties that were sophisticated business people who were represented by counsel during the entirety of the transaction, and, therefore no special relationship existed between the parties."); *Canfora v. Coast Hotels & Casinos, Inc.*, 121 P.3d 599 (Nev. 2005) (internal citation omitted) ("Generally, when a contract is clear on its face, it 'will be construed from the written language and enforced as written.' The court has no authority to alter the terms of an unambiguous contract."); *Lewis v. State of Nevada*, No. 2:07-CV-01109, 2010 WL 3860642, at *3 (D. Nev. Sept. 28, 2010) (citing *Canfora* for same proposition).

29.    These sophisticated Parties entered into the 2022 Agreements and the relationship should be governed by that language.

30.     Because there are a series of contracts between the Parties, we have provided below

a table with a timeline setting forth the various arrangements:

| Date | Material Event |
|------|----------------|
| 1/29/2018 | Custodial Agreement for USD between TrustToken, Inc. and Prime Trust, LLC |
| F3/21/2019 | Escrow Agreement for GBP between TrueCoin, LLC and Prime Trust, LLC |
| 4/22/2019 | Escrow Agreement for CAD between TrueCoin, LLC and Prime Trust, LLC |
| 4/23/2019 | Escrow Agreement for AUD between TrueCoin, LLC and Prime Trust, LLC |
| 10/3/2019 | Escrow Agent Notice of Resignation & Prime Trust Account Termination sent to Alex de Lorraine at TrueCoin, LLC by George Georgiades at Prime Trust, LLC |
| 11/30/2021 | Prime Trust, LLC returns all foreign currency to its customers, including the TrustToken Parties. |
| 4/21/2022 | Prime Trust User Agreement between TrueCoin, LLC and Prime Trust, LLC |
| 4/21/2022 | Prime Trust User Agreement between TrueCoin, LLC and Prime Trust, LLC |
| 4/21/2022 | Prime Trust User Agreement between TrueCoin, LLC and Prime Trust, LLC |
| 5/22/2022 | Order Form establishing Master Services Agreement and ancillary schedules between TrustToken, Inc. and Prime Trust, LLC |

**(6)    All of the 2022 TrustToken Agreements Contain the Language For Which the TrustToken Parties Have Conceded Does Not Form a Trust Agreement**

31.    Importantly, the 2022 TrueCoin Agreements contain the ***same exact language*** as the 2022 TrustToken Agreements that Prime pointed out in its Motion as demonstrating that Prime and TrustToken did not create a trust relationship and that therefore the Foreign Currency is property of the Prime estate. The below chart is illustrative of this language:

| 2022 TrueCoin Agreements | 2022 TrustToken Custodial Agreement |
|---|---|
| "[Prime may] *otherwise use or invest such cash or Fiat Currency at Prime Trust's own risk. Without limiting the foregoing, Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency . . .*" See 2022 TrueCoin Agreements, § 1.6(b) (emphasis added). | "[Prime may] *otherwise use or invest such cash or Fiat Currency at Prime Trust's own risk. Without limiting the foregoing, Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency . . .*" See Custodial Agreement § 2.7(b) (emphasis added). |

32.    The TrustToken Parties contend that the 2019 Escrow Agreements should govern the Foreign Currency currently held at Prime because TrueCoin did not execute the 2022 TrustToken Agreements. Objection at 9.[6] This argument is nonsensical. If the Foreign Currency is

---

[6]    The TrustToken Parties also gloss over the interconnectedness between TrueCoin and TrustToken. For example, TrueCoin develops and manages stablecoins for the TrustToken Parties and their affiliates and TrustToken develops software for the TrustToken Parties and their affiliates. *See* Objection at 3, 5. An organizational chart provided to Prime from the TrustToken Parties and their affiliates indicates that the principal place of business for both TrueCoin and TrustToken is San Francisco, California. *See* TrustLabs Inc., Company Organization/Ownership Chart. The "managers" listed for TrueCoin are de Lorraine and Rafael Cosman ("Cosman"). *See id.* Both de Lorraine and Cosman are also listed as the "directors" of TrustToken. *See id.*

held at Prime by TrueCoin (as the TrustToken Parties contend), then the 2022 TrueCoin Agreements govern the foreign currency—not the 2019 Escrow Agreements.

33.     Regardless of whether the Foreign Currency is held at Prime pursuant to the 2022 TrueCoin Agreements or the 2022 TrustToken Agreements, both agreements explicitly contain provisions stating that they replace and supersede any prior written agreements or oral agreements between the parties:

## C.     The TrustToken Parties Concede That The 2022 Agreements Are Not Trust Agreements

34.     The Motion sets forth in detail why the 2022 TrustToken Agreements are not trust agreements, including because they disclaim any fiduciary duty between Prime and TrustToken, do not constitute a "trust instrument" under Nevada law, permit Prime to use and invest the Foreign Currency in its own discretion, and allow Prime to hold the Foreign Currency in bank accounts in Prime's own name without designating that the Foreign Currency is held "for the benefit of" any other party.

35.     In the Objection, the TrustToken Parties do not dispute that the 2022 TrustToken Agreements are not trust agreements. Instead, they attempt to avoid having the Foreign Currency governed by the 2022 TrustToken Agreements by claiming that Debtors "reference[] the wrong contractual agreements." Objection at 1. However, even assuming as true the TrustToken Parties' contention that the contractual agreements that govern the Foreign Currency held at Prime should be those that were executed by TrueCoin (as compared to TrustToken), then it would be the 2022 TrueCoin Agreements that govern the foreign currency—not the 2019 Escrow Agreements.

36.     The 2022 TrueCoin Agreements contain nearly identical language as the 2022 TrustToken Agreements that make it clear that they are not trust agreements, including a provision permitting Prime to use and invest the Foreign Currency in its own discretion and a provision

allowing Prime to hold the Foreign Currency in bank accounts in Prime's own name without designating that the Foreign Currency is held "for the benefit of" any other party. *See* 2022 TrueCoin Agreements, § 1.6(b). Thus, for the same reasons set forth in the Motion as to why the 2022 TrustToken Agreements are not trust agreements (a point the TrustToken Parties do not dispute), the 2022 TrueCoin Agreements are also not trust agreements.

### D. TrustToken Parties Rely On Self-Named Account Titles Which Have No Legal Significance

37.     TrustToken's arguments that only the "TrueCoin" agreements govern relies on customer chosen account names. This disregards Prime's business and account management function, which treats the "integrators"—in this case TrustToken—as the "Account Organization" that owns and controls the accounts.

38.     When TrustToken executed the Order Form in 2022 and assented to the new MSA and Custodial Agreement, it became the account "integrator." Integrators, under Prime's API system, are the "organization" accounts that serve as the central relationship managers. *See* Griffith Decl., Ex. F, Prime PowerPoint Presentation Entitled "API Deep Dive: Integrating with the Prime Trust API" ("API Deep Dive"). These integrators, such as TrustToken here, implement the automated API system that instructs Prime when users wish to send and receive funds. *See id.* Rather than allowing each user to directly instruct Prime, users log into their accounts with the integrator and enter commands which are then passed on by the integrator to Prime. *See id.*

39.     As noted on the API Deep Dive, "Global policies are managed at the organization level." API Deep Dive. This means that organization-level entities such as TrustToken sign the Prime agreements and the underlying customers/users are then subject to End User agreements that are created via the API system.

40.    The TrustToken Parties contend that "the account statements Prime sent to TrueCoin confirm that the accounts were TrueCoin specific based upon the relevant account names listed such as 'TrueCoin, LLC – TAUD Escrow." Objection at 12–13; *see also* de Lorraine Decl., Exs. 5–10. The account name (*e.g.*, "TrueCoin, LLC – TAUD Escrow") is just a descriptor created by the account holder (*i.e.*, the TrustToken Parties). Here, the TrustToken Parties elected to name their different Foreign Currency Accounts in a way that identified the foreign currency deposited to the account: *e.g.*, "TrueCoin, LLC – AUD Escrow" (Australian dollar), "TrueCoin LLC – GBP Escrow" (Great Britain Pound). The account names chosen by the TrustToken Parties have no legal significance.

## TrueCoin, LLC - TAUD Escrow    Frozen

| Account Number: | Account Type: | Account Owner: | Account Organization: |
|---|---|---|---|
| [blacked out] | Manually Created Account | *name*    *payment reference* | TrustToken, Inc |
| Created At: | Account Subtype: | TrueCoin, LLC    QCPTMZ79F | |
| May 3, 2019 | Other ✎ | | |
| Last Updated At: | | | |
| June 23, 2023 | | | |

41.    As noted on the API Deep Dive, "Global policies are managed at the organization level." API Deep Dive. This means that organization-level entities such as TrustToken sign the Prime agreements and the underlying customers/users are then subject to End User agreements that are created via the API system.

42.    TrustToken, Inc. was the organization-level integrator and TrueCoin, LLC was a user. Accordingly, on all Prime databases, the "Account Organization" for each of the Foreign Currency accounts is identified as "TrustToken, Inc." Sometimes, but not always, the relevant Foreign Current Account also will identify an "Account Subtype," in this case "TrueCoin, LLC" or "TrustLabs, Inc.," another affiliate of the TrustToken Parties.

16

43.      Every Foreign Currency Account at issue here identifies "TrustToken, Inc." as the "Account Organization."

44.      In short, the self-named account title is completely irrelevant. The contracts are the only thing that have legal significance. But even if one were to consider the "account statements" as being meaningful, it would support the notion that "TrustToken, Inc." and the respective contracts with that entity govern the relationships as they are the "Account Organization."

**E.      The TrustToken Parties' Claim That They Were Tricked by a Salesperson Does Not Impact this 363 Motion**

45.      In a last-ditch effort to avoid falling under the purview of the 2022 Agreements, the TrustToken Parties contend that the 2022 Agreements are unenforceable because they were procured through fraud. *See* Objection at 14–20. Specifically, the TrustToken Parties claim that Prime "committed fraud by concealing the true nature of the 2022 updates, which were undertaken in the midst of tens of millions of dollars in losses at Prime as a result of the 98f wallet event and failed investments in TerraUSD using Prime funds and customer funds." Objection at 15. They also claim that Prime "sought to remedy the situation by deceiving customers into updating their agreements with [Prime] in such a way that [Prime] now claim[s] gave them the power to use customer funds without customer knowledge." Objection at 15.

46.      Specifically, the TrustToken Parties contend that Prime "misrepresented or omitted material facts when it solicited TrustToken's execution of the 2022 Order Form." Object at 15. Their fraudulent inducement claim is primarily based on the recollection of the TrustToken Parties' current-Interim Chief Executive Officer, de Lorraine, who refers to a partially "deleted" Slack conversation he had with a Prime employee two years ago in February 2022 in his declaration. *See* Objection at 15–17; de Lorraine Decl., ¶ 26–27. The TrustToken Parties' focus on this extra-contractual Slack conversation is a red herring. Not only is the February 2022 Slack conversation

17

incomplete because some of the messages were allegedly "deleted", but they also predate the relevant contracts that govern the Foreign Currency. The 2022 Agreements—both executed after any Slack conversation that may (or may not have) occurred in February 2022—govern the TrustToken Parties' relationship with Prime. As set forth above, the 2022 Agreements each contain explicit provisions stating that the 2022 Agreements replace and supersede any prior written agreements or oral agreements between the parties. *See* 2022 TrueCoin Agreements, § 15.5; *see also* MSA, § 14.16. *See also Road & Highway Builders v. N. Nev. Rebar*, 128 Nev. 384, 381 (Nev. 2012) ("the purported inducement cannot be something that conflicts with the Subcontract's express terms, as the terms of the contract are the embodiment of *all* oral negotiations and stipulations.").

47.     Moreover, de Lorraine's statements that he "signed the Order Form on behalf of TrustToken on May 23, 2022" based on his "belief that the Order Form was only ministerial in nature regarding the pricing updates" does nothing to impact the enforceability of the 2022 Agreements or to support a fraudulent inducement claim. de Lorraine Decl. ¶ 36. Prime and the TrustToken Parties are sophisticated parties. They were each represented by counsel during the negotiation and execution of the 2022 Agreements. De Lorraine even admits that he sent "Prime Trust's new User Agreements to TrustToken's legal department asking for feedback" on February 3, 2022, that he discussed the Prime Agreements with counsel for TrustToken, and that he received the legal department's "approval" to sign Prime's new agreements. de Lorraine Decl. ¶¶ 28-34.

48.     It was the TrustToken Parties' responsibility to read, review, understand, and diligence the plain language of the 2022 Agreements that they negotiated and executed. *See Martinez-Gonzalez v. Elkhorn Packing Co. LLC*, 25 F.4th 613, 624–25 (9th Cir. 2022) ("Martinez-

Gonzalez claims he didn't know he could revoke the agreements because he never read them, but a 'cardinal rule of contract law' in California is that 'a party's failure to read a contract . . . before signing it is no defense to the contract's enforcement.'"); *Brown v. Wells Fargo Bank, NA*, 168 Cal. App. 4th 938, 958 (2008) ("[I]t is not reasonable to fail to read a contract; this is true even if the plaintiff relied on the defendant's assertion that it was not necessary to read the contract.") (internal citations omitted).

49.     The TrustToken Parties cite *Edwards v. FCA US LLC*, 2022 WL 1814144 (N.D. Cal. June 2, 2022) as evidence of their ability to establish a fraudulent inducement claim. However, in *Edwards*, unlike here, the element of justifiable reliance was not at issue. Because of California's "cardinal rule of contract law" that "a party's failure to read a contract . . . before signing it is no defense to the contract's enforcement," the TrustToken Parties cannot establish the requisite lack of negligence that undergirds the justifiable reliance element of a fraudulent inducement claim. *See Brown*, 168 Cal. App. 4th at 958.

50.     The 2022 Agreements should not be voided due to "fraud" when the TrustToken Parties had every opportunity to analyze and perform basic diligence on the express terms set forth in the 2022 TrustToken Agreements. *See Brown*, 168 Cal. App. 4th at 958-59 ("[W]hen a plaintiff asserts that the defendant misrepresented the nature of the contract, the contract is not considered void due to fraud if the plaintiff had a reasonable opportunity to discover the true terms of the contract. The contract is only considered void when the plaintiff's failure to discover the true nature of the document executed was without negligence on the plaintiff's part."). The "facts" that the TrustToken Parties claim that Prime "misrepresented" and "omitted" are directly contradicted in the express terms of the written 2022 Agreements. *See Soffer v. Five Mile Cap. Partners, LLC*, No. 2:12-CV-1407, 2013 WL 638832, at *9 (D. Nev. Feb. 19, 2013) (dismissing fraudulent

inducement claim as a matter of law "where it directly contradict[ed] the terms of an express written contract"); *D.E. Shaw Laminar Portfolios, LLC v. Archon Corp.*, 570 F. Supp. 2d 1262, 1268-1269 (D. Nev. 2008) (holding that "extraneous evidence cannot be used to explain the meaning of a contract that is unambiguous on its face" to create an ambiguity); *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kriby, LLP*, 440 F. Supp. 2d 1184, 1191 (D. Nev. 2006) ("It is well settled that a court should enforce a contract as it was written, should not create a new contract by rewriting unambiguous terms, and has no power to create a new contract."). If the TrustToken Parties and their legal counsel did not read the 2022 Agreements, this is negligence on the part of the TrustToken Parties—not fraudulent inducement by Prime.

51.     Moreover, to the extent the TrustToken Parties argue that Prime's omission of material fact stemmed from Prime's failure to inform the TrustToken Parties that Prime had used customer funds in the past, this claim also fails. The Order Form explicitly provides that it is governed by the MSA and the Custodial Agreement. *See* Order Form ("This Order Form is governed by the Prime Trust Master Services Agreement . . . [and] the Service Schedule(s) and Attachment(s) that are applicable based on the services provided by Prime Trust under this Order Form"). The Custodial Agreement explicitly states that "Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency." *See* Bowman Decl., Ex. B, § 2.7(b). Thus, Prime was not concealing form TrustToken that it had used customer, as the very agreements Prime was seeking TrustToken to sign expressly contemplated that Prime would use customer assets.

52.     Even if the TrustToken Parties were able to establish a claim for fraud which resulted in the 2022 TrustToken Agreements becoming void (which they cannot), the prior terminated agreements still would not govern. *See* Objection at 19–20. As demonstrated above, the TrustToken Parties' agreements with Prime prior to 2021 were terminated and the Foreign Currency that is currently held at Prime was transferred to Prime pursuant to new agreements (*i.e.*, the 2022 Agreements). The remedy for an agreement that is fraudulently obtained is for the agreement to be voided – not for a previous agreement that was terminated and abandoned by the parties to be revived. *See San Francisco Culinary, Bartenders & Serv. Emps. Welfare Fund v. Lucin*, 15 F.3d 1089 (9th Cir. 1993) ("Most important, the Agreement was properly terminated according to its own terms, and the Trust Funds can point to no precedent in which a terminated agreement is revived by subsequent conduct.").

**F.      Even If The 2019 Escrow Agreements Governed, They Did Not Create A Trust Or Escrow Relationship Between Prime and the TrustToken Parties Under Nevada Law**

53.     The reason the TrustToken Parties argue that the Foreign Currency is governed by the 2019 Escrow Agreements is because they assert that funds held pursuant to escrow agreements are not property of the bankruptcy estate under section 541 of the Bankruptcy Code.

54.     Putting aside the fact that the 2019 Escrow Agreements do not control the relationship between Prime and the TrustToken Parties, as detailed above, the TrustToken Parties' claim that the 2019 Escrow Agreements prohibit Prime from selling the Foreign Currency also fails because the 2019 Escrow Agreements do not create a trust or escrow relationship under Nevada law.

55.     Courts have noted that "[f]unds held in escrow or trust present difficult property of the estate questions" and that "[t]he cases are divided on the question of whether escrow funds are property of the estate." *In re Cedar Rapids Meats, Inc.*, 121 B.R. 562, 567 (Bankr. N.D. Iowa

1990). Courts have generally held, however, that the determination is governed under principles of state law. *See, e.g.*, *In re Majestic Star Casino, LLC*, 716 F.3d 736, 751 (3d Cir. 2013) (noting that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law") (quoting *Butner v. United States*, 440 U.S. 48, at 54 (1979)); *Matter of TTS, Inc.*, 158 B.R. 583 (D. Del. 1993) (to determine whether funds in an escrow account are property of a bankrupt's estate, the court "must look to state law to determine if a property right exists and to stake out its dimensions") (quotation and citation omitted); *In re Cedar Rapids Meats*, 112 B.R. at 567 (noting the "difficult property of the estate questions" posed by escrow funds and that "[a] debtor's rights in property for property of the estate purposes are determined by state law").

56.     As the TrustToken Parties point out, the 2019 Escrow Agreements are governed under the laws of Nevada. *See* de Lorraine Decl., Exs. 1, 2, 4 § 11; Ex. 4 § 12. Under Nevada law:

> "Escrow" means any transaction wherein one person, ***for the purpose of effecting or closing the sale, purchase, exchange, transfer, encumbering or leasing of real or personal property to another person or persons***, delivers any written instrument, money, evidence of tile to real or personal property, or other thing of value to a third person ***to be held by such person until the happening of a specified event or the performance of a prescribed condition***, when it is then to be delivered by such third person, in compliance with instructions under which her or she is to act, to a grantee, grantor, promise, promisor, oblige, obligor, lessee, lessor, bailee, bailor, or any agent or employee thereof. The term includes the performance of the services of a construction control.

NEV. REV. STAT. § 645A.010(7) (emphasis added).

57.     Nevada courts have further held that "[a]n escrow agreement exists when a buyer and seller agree to conditions for a deposit, the escrow agent agrees to receive and distribute the deposit under the conditions, and the agent receives the deposit." *Horner v. Semenza*, No. 58574, 2013 WL 3257963, at *3 (Nev. 2013). Moreover, "[a]n escrow agreement and the status of an escrow agent do not require a written agreement; the agreement and status stem from the parties' intent and conduct." *Id.*

22

58.     Nevada's escrow laws contemplate a very specific type of arrangement between parties that is not present here. They contemplate an arrangement whereby two parties intend to consummate a sale or transfer of certain property and the buyer/transferee delivers something of value to a third party who is to hold such value "until the happening of a specified event or the performance of a prescribed condition," whereafter the third party will disburse the item of value to the seller/transferor. The quintessential example of such an arrangement is a purchase of real property: a buyer will deposit a down payment for the property with the third-party escrow agent and the escrow agent will hold the down payment and only disburse it to the seller upon the closing of the sale (*i.e.*, the "happening of a specified event or the performance of a prescribed condition").

59.     That is not the type of arrangement created between Prime and TrueCoin under the 2019 Escrow Agreements. Prime and TrueCoin did not enter the 2019 Escrow Agreements "for the purpose of effecting or closing the sale, purchase, exchange, transfer, encumbering or leasing of real or personal property to another person or persons." More importantly, the 2019 Escrow Agreements do not delineate "the happening of a specified event or the performance of a prescribed condition" by which Prime would have been required to disburse the Foreign Currency to another party.

60.     Thus, even under the TrustToken Parties' view that the 2019 Escrow Agreements control the relationship between Prime and TrueCoin (which they do not), this still does not create an escrow arrangement between the parties.

61.     Moreover, the 2019 Escrow Agreements do not satisfy the requirements to create a trust under Nevada law. The 2019 Escrow Agreements do not identify Prime as serving as a "trustee." *See* NEV. REV. STAT. § 163.006. They do not purport to "create[] or define[] the duties

and powers of a trustee." *See* NEV. REV. STAT. § 163.00185. They also do not "manifest[] an intention to create a trust." *See* NEV. REV. STAT. § 163.003(1).

62.     Whatever relationship may have been created by Prime and TrueCoin under the 2019 Escrow Agreements, they did not create an escrow or trust relationship because the 2019 Escrow Agreements do not satisfy the requirements for either arrangement under Nevada law.[7]

63.     Moreover, the deposition testimony taken from former Prime executives thus far in these Chapter 11 Cases demonstrates that Prime generally did not act as a trustee for customers or treat customer assets in a way that would be consistent with a trust or escrow arrangement.

64.     For example, one former Prime executive testified that he could not recall whether Prime provided traditional trust services such as "wealth management related services to families" and "services where [Prime] advised on tac efficient structures from generation to generation." *See* Griffith Decl., Ex. G, Excerpts of Deposition Transcript of Former Prime Executive No. 1 ("Former Prime Executive No. 1 Dep."), 22:19–23:3.

65.     Former Prime Executive No. 1 further testified that it was Prime's practice to hold customer assets in "omnibus" wallets—*i.e.*, wallets that commingled and did not segregate

---

[7]     To the extent the TrustToken Parties argue that the 2018 Custodial Agreement with TrustToken governs the Foreign Currency (it does not), the 2018 Custodial Agreement does not create an escrow or trust relationship for the same reasons set forth above. The Custodial Agreement is also governed under Nevada law. *See* de Lorraine Decl., Ex. 11 § 17. The 2018 Custodial Agreement does not create the specific arrangement contemplated under Nevada escrow laws and does not identify "the happening of a specified event or the performance of a prescribed condition" requiring Prime to disburse funds. *See* NEV. REV. STAT. § 645A.010(7). Indeed, it does not even purport to be an escrow agreement. Further it does not purport to create a trust relationship and does not identify Prime as a "trustee," purport to "create[] or define[] the duties and powers of a trustee," or "manifest[] an intention to create a trust." *See* NEV. REV. STAT. §§ 163.006; 163.00185; 163.003(1). In fact, the 2018 Custodial Agreement specifically disclaims any fiduciary relationship. *See* de Lorraine Decl., Ex. 11 § 2(a). Thus, if the 2018 Custodial Agreement were to govern the relationship between Prime and the TrustToken Parties concerning the Foreign Currency, this would not mean that the Foreign Currency is not property of Prime's estate.

customer assets.  *See* Former Prime Executive No. 1 Dep., 26:7–21. When asked directly if "a number of [Prime's] customers' crypto assets would be put in one wallet," Former Prime Executive No. 1 responded, "[c]orrect, yes." *Id.*, 26:19–21.

66.     Additionally, a former Prime executive testified that Prime typically did not offer traditional trust or escrow services to customers and that those "services" Prime offered to customers were really, in essence, merely custody services. *See* Griffith Decl., Ex. H, Excerpts of Deposition Transcript of Former Prime Executive No. 2 ("Former Prime Executive No. 2 Dep."). Specifically, the executive testified as follows:

> **Q:** I see. What's the difference between the escrow and the T and C reconciliation?
>
> **A:** The escrow—the company had different account types. One was an escrow offering for the Crowd Funding business that the company supported, and the other was referred to as trust and custody, which was primarily custody. The company really didn't have any traditional trust accounts. I think there might have been a couple of college savings trusts, but it was primarily custody.
>
> **Q:** And can you expand on that? What do you mean when you say the company doesn't have traditional trust accounts?
>
> **A:** There were no accounts that they managed directly. A traditional trust company, you have somebody come in to you, sit across from you at the desk, and they want to put the family farm in a trust and ask you to manage it. That's a traditional trust company. Prime Trust was a non traditional trust company because, one, all of the accounts being opened were done through API technology. You just didn't sit down across from the desk from your trust officer and tell them, here's my assets. I want you manage these, you know, pay the taxes on the family farm, send me my statement at the end of the year, invest whatever proceeds our family farm has in XYZ security.
>
> **Q:** And you're saying Prime didn't do any of those things?
>
> **A:** No. Correct.

Former Prime Executive No. 2 Dep., 61:16–62:20.

67.     And similar to Former Prime Executive No. 1, Former Prime Executive No. 2 also testified to Prime's practice of commingling customer assets:

**Q:** And what does that mean to you, a client to have an omnibus account?

**A:** It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

**Q:** And was that done at Prime Trust?

**A:** It was done at Prime Trust. It wasn't done very frequently, but there were—there were omnibus accounts at Prime Trust.

*Id.*, 206:3–13.

68.     The testimony from both former Prime executives provide ample support for the notion that Prime did not serve as a trustee or escrow agent for its customers, as it did not with respect to the prior agreements with the TrustToken Parties.[8]

*[Remainder of Page Intentionally Left Blank]*

---

[8]    The identities of both Former Prime Executive No. 1 and Former Prime Executive No. 2 have previously been disclosed to the Court under seal at Doc. Nos. 344 and 419.

## CONCLUSION

**WHEREFORE**, Prime respectfully requests that the Court overrules the Objection and

approve the Motion.

Dated:   December 14, 2023
        Wilmington, Delaware

MCDERMOTT WILL & EMERY LLP

*/s/ Maris J. Kandestin*
Maris J. Kandestin (No. 5294)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711
Email:      mkandestin@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444
Email:      dazman@mwe.com
            jbevans@mwe.com
            ggriffith@mwe.com

-and-

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Facsimile:  (305) 347-6500
Email:      gsteinman@mwe.com

*Counsel to the Debtors and Debtors in Possession*