**Exhibit 1**

**License Agreement**

DocuSign Envelope ID: 008DD51C-BCZD-43B9-9C53-789AB80EB4B0

*Execution Version*

# LICENSE AGREEMENT

This License Agreement ("**Agreement**"), executed on November 22, 2023 ("**Execution Date**"), is between Prime Core Technologies Inc., Prime Trust, LLC, Prime IRA LLC and Prime Digital, LLC (collectively "**Prime Trust**") and Electric Solidus Inc. ("**Swan**"). This Agreement sets forth the terms related to Prime Trust's license grant of the Technology (defined below) to Swan. Prime Trust and Swan may be collectively referred to as the "**Parties**," or singularly as a "**Party**."

1. **DEFINITIONS.**

Capitalized terms not defined elsewhere in this Agreement are defined in this Section 1 (Definitions). The terms, acronyms and phrases used in the information technology or other pertinent business context that are not defined will be interpreted in accordance with their then-generally understood meaning.

"**Affiliate**" means a business entity that controls (i.e., parent), is controlled by (i.e., subsidiary), or under common control with (i.e., sister company) a Party to this Agreement. For this purpose, "control" means, with respect to a given entity, the ownership of greater than 50 percent (50%) of the outstanding voting securities or other ownership interests of the entity.

"**Agreement**" has the meaning set forth in the preamble.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Component**" has the meaning set forth in Section 5.2 (Adjustments).

"**Confidential Information**" means information of a Party provided to the other Party that is not generally known to the public or that otherwise constitutes a trade secret under applicable law, including, without limitation, technical information, know-how, technology, software applications and code, prototypes, ideas, inventions, methods, improvements, data, files, information relating to supplier and customer identities and lists, accounting records, business and marketing plans, the terms of this Agreement, and proposals and all similar information, and all copies and tangible embodiments thereof (in whatever form or medium) including with respect to Prime Trust, the Prime Trust Materials and including, with respect to Swan, the Swan Materials; provided, however, Confidential Information does not include any of the foregoing information that: (a) enters into the public domain through no wrongful act or breach of any obligation of confidentiality by the Receiving Party or any Third-Party; (b) was in the lawful knowledge and possession of, or was independently developed by, the Receiving Party prior to the time it was disclosed to, or learned by, the Receiving Party hereunder as evidenced by written records; (c) was rightfully received by Receiving Party from a Third-Party without a breach of such Third-Party's obligations of confidentiality; or (d) was approved in writing for release by the Disclosing Party.

"**Disclosing Party**" means the Party who discloses or otherwise divulges its Confidential Information to the other Party.

"**Documentation**" means all user, operational, technical, development, installation, integration and training manuals, information, documents and all other materials related to the Technology or required or reasonably necessary to fully use, operate, engineer, test and maintain the Technology, as may be revised. For purposes of clarity, it is noted that Documentation does not include sales, marketing or similar materials.

"**Effective Date**" means the date on which this Agreement is approved by the Bankruptcy Court, which approval shall not be subject to any stay, modification, vacation on appeal and shall have become a "Final Order" as that term is defined in Joint Chapter 11 Plan or Reorganization for Prime Trust styled In re Prime Core Technologies Inc., et al., Case No. 23-11161 (JKS), pending before the Bankruptcy Court.

"**Governmental Authority**" means any of the United States, any foreign, domestic or international nation, country, government, province, territory, city, town, municipality, county, local or other political subdivision thereof, regulatory or administrative authority, court, tribunal, arbitral body, department, commission, board, bureau, agency or instrumentality that exercises executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Indemnified Party**" is defined in Section 9.2 (Indemnification Procedures).

"**Indemnifying Party**" is defined in Section 9.2 (Indemnification Procedures).

"**Intellectual Property Rights**" means any and all of the following as may be recognized by Law in any jurisdiction throughout the world: (a) rights under any United States and foreign patents, patent applications, and certificates of invention, and all continuations, continuations in part, extensions, renewals, divisions, re-issues and re-examinations relating to the same; (b) copyrights and moral rights in any work of authorship recognized by statute or at common law or otherwise, including all copyright registrations issued by the United States Register of Copyrights and copyright applications, together with any renewal or extension, and all rights deriving from such registration or application; (c) rights to any trademarks, service marks, domain names, trade names or trade dress, and all related goodwill; (d) rights to any trade secrets, know-how, and Confidential Information; and (e) other intellectual property or proprietary rights recognized under any Laws or international conventions and in each case including the right to apply for registrations, certificates, or renewals with respect to those intellectual property or proprietary rights and the right to prosecute, enforce, obtain damages relating to, settle or release any past, present, or future infringement or misappropriation of those intellectual property or proprietary rights.

"**Laws**" means any federal, state, local, and international laws, rules, regulations, codes, constitutions or requirements of any Governmental Authority or applicable self-regulatory organization, as may be amended and in effect.

"**License Fee**" is defined in Section 5.1 (License Fee).

[REDACTED]

"**Open Source Software**" means any software that (a) requires as a condition of its use, modification or distribution, that such software: (i) be disclosed or provided in source code form; (ii) be licensed for the purpose of making derivative works; and/or (iii) can only be redistributed free of enforceable Intellectual Property Right (e.g. patents); and/or (b) any software that contains, is derived in any manner (in whole or in part) from, or statically or dynamically links to any part of the Technology specified under subsection (a) of this definition.

"**Party**" and "**Parties**" are defined in the preamble.

[REDACTED]

"**Prime Trust**" has the meaning set forth in the preamble.

"**Prime Trust Materials**" is defined in Section 6.3 (Prime Trust Materials).

"**Receiving Party**" means the Party to this Agreement who receives, develops or otherwise obtains Confidential Information from or of the Disclosing Party, whether such Confidential Information is obtained from the Disclosing Party or from the Disclosing Party's employees, agents, representatives, consultants, clients, contractors or suppliers, is obtained or developed as a result of the Receiving Party's access to the Disclosing Party's facilities or information systems, or is obtained as a result of performance under this Agreement.

[REDACTED]

"**Sales Tax**" is defined in Section 5.2 (Taxes).

"**Services Agreements**" is defined in Section **Error! Reference source not found.** (Prime Trust Responsibilities).

"**Source Materials**" means all source code of the Technology and all user Documentation, technical Documentation, data flows, Documentation of software operations, customer migration tools, database schema, maintenance utilities, automated test scripts, error logs, software development roadmaps, schematics, tools, proprietary code and all related Documentation necessary for the effective understanding and use of the source code or the development, maintenance, support and enhancement of the Technology.

"**Support Engineers**" is defined in Section 4.1(b) (Engineering Help).

"**Swan**" has the meaning set forth in the preamble.

"**Swan Materials**" is defined in Section 6.2 (Swan Materials).

"**Technology**" means all technology, intellectual property and proprietary information of Prime Trust related to payment rails, liquidity infrastructure, settlement, compliance, crypto IRA and custody and, with respect to such technology, intellectual property and proprietary information, the following (with accompanying parameters, as applicable):

    (a)    all Source Materials;

(b) all existing code repositories, proprietary and open source code, including the intellectual property involved in liquidity, payment rails, settlement, IRA, compliance, custody, internal tooling and back office, "infrastructure as code" repositories and .git folders and repositories;

(c) all patents, trademarks, trade names, trade secrets, and vendor lists;

(d) all Open Source Software;

(e) all Documentation, including:

  (i) all existing documentation related to such technology, intellectual property and proprietary information, including infrastructure, disaster recovery, and business continuity planning;

  (ii) all existing documentation related to controls, security, SOC2 compliance, and similar operation and/or infrastructure;

  (iii) all documentation regarding related database schema, models, and other related materials;

  (iv) all configuration files and/or documentation on configuration (screenshots or written documentation) for all existing software components and third party vendor systems;

  (v) all internal and external API documentation; and

  (vi) all documentation and runbooks for operational processes, including documentation related to manual exception handling in KYC, funding, and related functions.

"Third-Party" means any party other than Swan, Prime Trust and their respective Affiliates, employees, officers, directors, consultants, contractors and vendors.



"Wind-down Activities" is defined in ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

2. **TERM.**

  2.1 **Term.** The term of this Agreement will begin on the Effective Date and end on the earlier of ▬▬▬▬▬▬▬▬▬▬ the effective date of termination in accordance with the terms of this Agreement.

  2.2 **Termination.** This Agreement may be terminated upon written notice by either Party in the event that the other Party commits a material breach of this Agreement and does not cure such breach within thirty (30) days of receipt of written notice from the non-breaching Party.

3. **LICENSE TO TECHNOLOGY.**



4. **RELATED ACTIVITIES**

    4.1   **Swan Responsibilities.**

        (a)  **Swan Regulatory and Operational Responsibilities.** Except as set forth below in Section 4.2, as between the Parties, Swan will be solely responsible for the implementation and use of the Technology, and Prime Trust specifically disclaims any obligation to implement, host, maintain or enhance the Technology. Commencing on the Effective Date, Swan will be responsible for obtaining and maintaining all licenses and regulatory approvals (including money transmitter licenses) that governs Swan's use of the Technology, including the licenses and regulatory approvals that are required for Swan to (a) use, distribute, or transfer the Technology as permitted under this Agreement or (b) provide any goods and services using or in connection with the Technology.

        (b)  **Engineering Help.** Swan anticipates hiring two (2) engineers who have knowledge of the Technology to support Swan's review and integration of the Technology ("**Support Engineers**"). Except as otherwise set forth in this Agreement, Swan acknowledges and agrees that Prime Trust will have no responsibilities with respect to supporting Swan or the Technology after the Effective Date.

        (c)  **Assistance of Support Engineers.** Swan agrees that Prime Trust will have access to, and support from, the Support Engineers for 8 hours a week from each Support Engineer (16 hours total), for a period of 3 months, in order to support the Wind-down Activities of Prime Trust.

    4.2   **Prime Trust Responsibilities.**

        (a)  As specified in Exhibit A, Prime Trust will transfer the Technology Components listed in Schedule A (List of Technology Components) to Swan.

        (b)  Prime Trust hereby agrees and covenants to Swan that in any sale of the Technology, the Technology shall remain subject to the terms of this Agreement (i.e., Prime Trust shall not sell the Technology free and clear of all encumbrances).

5. **FEES AND PAYMENT.**







5.3 **Taxes.** The License Fee payable under this Agreement shall be exclusive of any applicable goods and service tax/harmonized sales tax (GST/HST), value added, sales, sales and use or other similar taxes (collectively, "**Sales Taxes**"). Swan shall be solely liable and responsible for the payment of all applicable Sales Taxes either directly to Prime Trust or to the appropriate Governmental Authority as required under Law.

6. **INTELLECTUAL PROPERTY RIGHTS.**

   6.1 **Pre-Existing Intellectual Property.** Except as expressly provided in this Agreement, (a) all Intellectual Property Rights of each Party owned by a Party prior to the Effective Date will remain the property of that Party and (b) neither Party grants the other Party or any Third-Party, expressly or by implication, any licenses or assignments of or under such Party's Intellectual Property Rights.

   6.2 **Swan Materials.** For the avoidance of doubt, all Intellectual Property Rights and other proprietary rights in and to any net new derivatives, enhancements, functionalities or customizations of the Source Materials or Technology that Swan develops or has developed on its behalf after the Effective Date ("**Swan Materials**"), will be owned by Swan and will immediately and automatically vest with Swan. To the extent any Swan Materials contain Prime Trust Materials, Prime Trust hereby grants Swan a worldwide, non-exclusive, royalty-free, transferable, sublicensable, perpetual, irrevocable right to use, reproduce, distribute, create derivative works of, digitally perform, make, have made, and import the incorporated Prime Trust Materials.

   6.3 **Prime Trust Materials.** Other than the Swan Materials, which shall be owned by Swan, Prime Trust will retain all Intellectual Property Rights and other proprietary rights in or to the Technology and Source Materials created by or for Prime Trust prior to the Effective Date ("**Prime Trust Materials**").

7. **CONFIDENTIALITY.**

   7.1 **Use and Disclosure.** Except as expressly permitted by this Agreement, neither Party will disclose the other Party's Confidential Information to, or use the other Party's Confidential Information for the benefit of, any Third-Party without the other Party's prior written consent. All Confidential Information relating to a Party will be protected against unauthorized use or disclosure by the other Party to the same extent and with at least the same degree of care as such Party protects its own confidential or proprietary information of like kind and import, but in no event using less than a reasonable degree of care. Each Party may disclose the other Party's Confidential Information to its officers, agents, subcontractors, and employees only to the extent not prohibited by Law and only as necessary to provide or use the Technology. Swan may disclose Prime Trust's Confidential Information to its Affiliates, subject to the same obligations of confidentiality as apply to Swan. Prime Trust may disclose Swan's Confidential Information to its Affiliates, subject to the same obligations of confidentiality as apply to Prime Trust.

   7.2 **Required Disclosure.** If a Party is requested or required by any Governmental Authority to disclose any of the other Party's Confidential Information, such Party may disclose the requested Confidential Information provided that such Party provides prompt notice of such disclosure to the other Party if permitted by Law and, if the other Party requests, provides reasonable assistance in obtaining an appropriate protective order or other similar relief.

   7.3 **Unauthorized Acts.** Each Party will: (a) promptly notify the other Party of any unauthorized possession, use or knowledge, or attempt thereof, of the other Party's Confidential Information while in such Party's possession or control by any person or entity that may become known to such Party; (b) promptly furnish to the other Party full details of the unauthorized possession, use or knowledge, or attempt thereof, and assist the other Party in investigating or preventing the recurrence of any unauthorized possession, use or knowledge, or attempt thereof, of the other Party's Confidential Information; (c) cooperate with the other Party in any litigation and investigation against Third-Parties deemed necessary by the other Party to protect its rights in Confidential Information to the extent such litigation or investigation relates to the unauthorized possession, use or knowledge, or attempt thereof, of the other Party's Confidential Information while in such Party's possession or control; and (d) use diligent efforts to prevent a recurrence of any such unauthorized possession, use or knowledge, or attempt thereof, of the other Party's

Confidential Information while in such Party's possession or control. Each Party will bear the cost it incurs as a result of compliance with this Section 7.3 (Unauthorized Acts).

7.4   **Safeguarding**. Swan will safeguard the Technology using commercially reasonable industry-standard security controls that prevent against any unauthorized access, use or disclosure of the Technology, including any related Source Materials.

8.  **REPRESENTATIONS, WARRANTIES AND OTHER OBLIGATIONS.**

    8.1   **Prime Trust**. Prime Trust hereby represents and warrants to Swan that (a) it is the owner or licensor of all Intellectual Property Rights in the Technology; (b) it has full power and authority to grant the rights granted by this Agreement; (c) the execution and delivery of this Agreement have been duly authorized by Prime Trust and this Agreement constitutes a valid and binding agreement of Prime Trust, enforceable against Prime Trust in accordance with its terms; (d) Prime Trust has obtained all rights and licenses required from Third-Parties to perform its obligations under this Agreement; and (f) Prime Trust is not aware of, or has not been provided notice of, any Third-Party claims related to the Intellectual Property Rights of the Technology.

    8.2   **Swan**. Swan hereby represents and warrants to Prime Trust that (a) it has full power and authority to grant the rights granted by this Agreement, to perform its obligations under this Agreement without the consent of any other person; (b) the execution and delivery of this Agreement have been duly authorized by Swan and this Agreement constitutes a valid and binding agreement of Swan, enforceable against Swan in accordance with its terms; and (c) Swan is not under any obligation of a contractual or other nature to any person or entity which is inconsistent or in conflict with this Agreement or which would prevent, limit or impair in any way the performance by Swan of its obligations under this Agreement.

    8.3   **Other Obligations**. Swan will at all times comply in all material respects with all Laws in its use of the Technology and will obtain all licenses, consents, permits and other required or prudent authorizations necessary for it to satisfy its obligations under this Agreement.

9.  **INDEMNITIES.**

    9.1   **Swan Indemnity Obligations**. Swan will defend and indemnify Prime Trust and its Affiliates, and their respective directors, officers, employees, agents, attorneys, representatives, successors and assigns, from and against any and all Third-Party claims, demands, or notices (direct or indirect) in whatever form and regardless of the merits thereof, asserted against the Party seeking indemnification with respect to actual or alleged liabilities, damages, losses, claims, demands, assessments, actions, causes of action, and costs (including attorneys' fees and expenses), arising out of or resulting from any claim arising from Swan's misuse or provision of the Technology which is in breach of this Agreement.

    9.2   **Indemnification Procedures**. If any Third-Party claim is commenced against Prime Trust that is subject to indemnification under Section 9.1 (Swan Indemnity Obligations), Prime Trust will notify Swan as promptly as practicable. Swan will promptly, and in no event less than seven (7) days before the date on which a response to such claim is due, assume and diligently pursue the defense and settlement of such claim, engaging attorneys with appropriate expertise to handle and defend the same, at Swan's sole cost and expense. Prime Trust will cooperate, at Swan's cost, in all reasonable respects with Swan and its attorneys in the investigation and defense of such claim and any appeal arising therefrom. No settlement of a claim that involves a remedy other than the payment of money by Swan will be entered into without the consent of Prime Trust. So long as Swan timely assumes, and diligently pursues, the defense of any such claim, Swan will not be liable to Prime Trust for any legal expenses incurred thereafter by Prime Trust in connection with

the defense of that claim. If Swan fails to timely assume, or ceases to diligently pursue, such defense, Prime Trust may defend or settle the claim in such manner as it may deem appropriate at Swan's cost.

10. **LIMITATION OF LIABILITY.**

EXCEPT FOR INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT, A PARTY'S INFRINGEMENT OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, OR A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (A) IN NO EVENT WILL EITHER PARTY, ITS AFFILIATES OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, AGENTS, REPRESENTATIVES, SUCCESSORS OR ASSIGNS BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (B) NEITHER PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT FOR DIRECT DAMAGES, COSTS, AND EXPENSES WILL EXCEED THE LICENSE FEE PAID OR PAYABLE UNDER THIS AGREEMENT.

11. **MISCELLANEOUS PROVISIONS.**

    11.1 **Relationship Between the Parties.** This Agreement does not create or evidence a partnership, joint venture or any other fiduciary relationship between the Parties. The Parties are independent, and each has sole authority and control of the manner of, and is responsible for, its performance of this Agreement. Neither Party may create or incur any liability or obligation for or on behalf of the other Party, except as described in this Agreement.

    11.2 **Assignment.** This Agreement will be binding on the Parties and their successors and permitted assigns. Neither Party may assign any of its rights or delegate any of its duties or obligations under this Agreement without the other Party's consent, except that a Party may (a) assign its rights or delegate its obligations under this Agreement to an Affiliate without the other Party's consent or (b) assign or novate this Agreement to a Third-Party in connection with a merger or a sale of all or substantially all of the assets of such Party. Any attempted assignment or delegation of any rights, duties, or obligations in violation of this Section 11.2 (Assignment) will be invalid and without effect.

    11.3 **Applicable Law and Venue.** This Agreement will be governed by and construed in accordance with the substantive Laws of the Delaware, without giving effect to any choice-of-law rules that may require the application of the Laws of another jurisdiction. The Parties consent to venue in the state of Delaware in any court situated in Delaware, for all litigation which may be brought regarding the terms of, and the transactions and relationships contemplated by, this Agreement.

    11.4 **Severability.** If any term, provision or part of this Agreement is to any extent held invalid, void or unenforceable by a court of competent jurisdiction, the remainder of this Agreement will not be impaired or affected, and each remaining term, provision and part will continue in full force and effect, and will be valid and enforceable to the fullest extent permitted by Law.

    11.5 **Notices.** Any notice, request, agreement, consent, demand or other communication required or permitted to be given by this Agreement must be in writing and must be: (a) personally delivered (which will be deemed to have been received on day it is personally delivered); (b) sent by registered mail (which notice will be deemed to have been received on the fifth (5th) day following the date on which it is mailed); or (c) by Federal Express or other reputable overnight delivery service which maintains a record of delivery (which will be deemed to have been received on the day it is so delivered), to the Parties at the addresses set forth on the signature page hereto (or such other designee or address a Party may provide by giving notice to the other Party in compliance with this Agreement).

    11.6 **Amendment and Waiver.** No amendment, modification, supplement or addendum to this Agreement will be effective unless in writing and signed by duly authorized representatives of both Parties. No term or provision of this Agreement will be deemed waived and no breach excused unless the waiver is in writing

and signed by an authorized representative of the Party claimed to have waived the condition or excused the breach. No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provision of this Agreement.

11.7 **Cumulative Remedies.** No specified remedies under this Agreement are exclusive. All rights, remedies and warranties set forth in this Agreement are cumulative of and in addition to any other rights, remedies and warranties and remedies made available to the Parties in this Agreement, at Law, in equity or otherwise.

11.8 **Construction.** Each Party to this Agreement has reviewed and revised this Agreement. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party will not be employed in the interpretation of this Agreement. In this Agreement, the word "including" and its derivatives are not used as words of limitation and, whether or not accompanied by such clarification, are deemed followed by words such as "without limitation."

11.9 **Entire Agreement; Counterparts.** This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter contained in this Agreement and supersede all prior and contemporaneous agreements and understandings of the Parties with respect to the matter addressed in this Agreement. This Agreement may be signed in one or more counterparts, each of which will be deemed to be an original and all of which when taken together will constitute the same Agreement. Any copy of this Agreement made by reliable means is considered an original.

11.10 **Compliance Verification** Upon Prime Trust's request, Swan will, within thirty (30) days of such request, provide documentation to Prime Trust verifying that Swan is using the Technology in compliance with the terms of this Agreement and that the Technology is not being used for commercial resale purposes by Swan.

\* \* \* \* \*

Signature Page to Follow

\* \* \* \* \*

The Parties have executed and delivered this License Agreement, by their authorized representatives, as of the Execution Date.

| | |
|---|---|
| **PRIME CORE TECHNOLOGIES INC.** | **ELECTRIC SOLIDUS INC.** |
| By: *Michael Wyse* | By: *CK* |
| Name: Michael Wyse | Name: Cory Klippsten |
| Title: Member, Special Committee of the Debtors and Debtors in Possession, solely in his capacity as such | Title: Chief Executive Officer |
| Date: 11/22/2023 | Date: 11/22/2023 |

**PRIME TRUST, LLC**

By: *Michael Wyse*

Name: Michael Wyse

Title: Member, Special Committee of the Debtors and Debtors in Possession, solely in his capacity as such

Date: 11/22/2023

**Address for Notices:**

> 26565 W. Agoura Rd, Suite 200
> Calabasas, CA  91302
> Attention: Bill Belitsky, General Counsel
> Phone: 646.425.3597
> Email: bill@swanbitcoin.com

With copy to:

> Manatt, Phelps & Phillips, LLP
> One Embarcadero Center
> 30th Floor
> San Francisco, CA  94111
> Attention: Richard G. J. McDerby
> Phone: 415.291.7427
> Email: rmcderby@manatt.com

**PRIME IRA LLC**

By: *Michael Wyse*

Name: Michael Wyse

Title: Member, Special Committee of the Debtors and Debtors in Possession, solely in his capacity as such

Date: 11/22/2023

**PRIME DIGITAL, LLC**

Name: Michael Wyse

Title: Member, Special Committee of the Debtors and Debtors in Possession, solely in his capacity as such

Date: 11/22/2023

**Address for Notices:**

> McDermott Will & Emery LLP
> 2501 North Harwood Street
> Suite 1900
> Dallas, TX  75201
> Attention: Shawn Helms
> Phone: 214.295.8090
> Email: shelms@mwe.com

With copy to:

> McDermott Will & Emery LLP
> 333 SE 2nd Avenue
> Suite 4500
> Miami, FL  33131
> Attention: Greg Steinman
> Phone: 305.329.4473
> Email: gsteinman@mwe.com

**SCHEDULE A**
**List of Technology Components**

| Component | Brief Description of Component | Delivery Location |
|---|---|---|
| 1. Copy of Github Software ** | Copy of Github software backup (deliverable is a Github repository backup file) | Google Drive shared folder |
| 2. Github Software Documentation ** | Documentation related to various Arch and design documents in the form and format in which they exist (or an equivalent form) as of the Effective Date, including all architecture diagrams such as product, security, data, and infrastructure diagrams. | Google Drive shared folder |
| 3. Database Structure Procedure Document *** | Produce a document which establishes a procedure to establish a database instance with the schema and base configuration (empty and ready to start populating) | Google Drive shared folder |
| 4. Policy Document Table of Contents *** | A word document identifying the table of contents for applicable policies, but not the policies themselves, including all security vulnerability reports and results of internal or external audits. | Google Drive shared folder |
| 5. Vendor List/Dependency Documentation *** | A list of associated vendors as of the Effective Date and dependency documentation in the form and format (word/excel) in which they exist as of the Effective Date, including any applicable change documentation and/or historical release notes. | Google Drive shared folder |
| 6. Bug List and Roadmap *** | A list of known bugs and the roadmap for the software as they exist as of the Effective Date | Google Drive shared folder |
| 7. Banking/Operations Process Documentation *** | Documents reflecting banking and operations processes in the form and format in which they exist as of the Effective Date, including any and all documentation on operational controls and any manual process related to administrative operations | Google Drive shared folder |
| 8. Testing Documentation ** | Documentation reflecting test cases and related test information in the form and format in which they exist as of the Effective Date | Google Drive shared folder |

** To be provided on the Effective Date.
*** To be delivered not later than 3 months after the Effective Date.

DocuSign Envelope ID: 008DD51C-BC7D-42B9-9C53-780AB80EB1B0