## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 523, 585, & 629** |

### ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364, 503, 506, 552 AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN SECURED PRIMING POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), pursuant to sections 105, 362, 363(b), 363(c)(2), 364(c), 364(d)(1), 364(e), 503, 506(c), 552, and 507, of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004-h, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 4001-2, 9006-1, 9013-1, 9014-1, and 9014-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of an order (this "DIP Order"):

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion and the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors* [Docket No. 521-1] (as amended, modified, or supplemented and including all exhibits and supplements thereto, the "Plan"), as applicable.

(i)      authorizing the Debtors, on the terms set forth in the *Superpriority Senior Secured Debtor In Possession Credit Facility Binding Term Sheet* (the "DIP Term Sheet"), a copy of which is attached hereto as Exhibit 1, to obtain postpetition financing pursuant to a non-amortizing single-draw, secured, superpriority postpetition term loan facility (the "DIP Facility" and, the loans under such facility, the "DIP Loans") in an aggregate principal amount of $10,000,000 (and such additional amounts to the extent fees are paid-in-kind as provided in paragraph 5 below), the full amount of which shall be made available by the DIP Lender upon entry of this DIP Order);

(ii)     authorizing the Debtors' incurrence of obligations under the DIP Loan Documents, including to borrow loans under, and pay fees in respect of, the DIP Facility (collectively, the "DIP Obligations");

(iii)    authorizing the Debtors to use proceeds of the DIP Facility as permitted in the DIP Loan Documents and in accordance with this DIP Order and the Approved Budget (as defined below);

(iv)     granting the DIP Lender an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in respect of the DIP Obligations, subject to the Carve-Out (as defined herein), as more fully set forth in this DIP Order;

(v)      subject to the Permitted Liens (as defined in the DIP Term Sheet), granting the DIP Lender valid, enforceable, non-avoidable, automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, as applicable, on the DIP Collateral (as defined herein), including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral"), in accordance with the priorities set forth in the DIP Term Sheet and this DIP Order;

(vi)     authorizing the Debtors to pay the principal, interest, fees, expenses, indemnities, and other amounts payable under the DIP Loan Documents as they become due (subject to the provisions of paragraph 5 of this DIP Order), including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals actually incurred by the DIP Lender in connection with the DIP Facility;

(vii)    Approving the Release;

(viii)   vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this DIP Order;

(ix)     authorizing the waiver by the Debtors of any right to seek to surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code;

(x)    waiving the "equities of the case" doctrine, to the extent that it could be applicable to the DIP Lender;

(xi)    waiving any applicable stay with respect to the effectiveness and enforceability of this DIP Order (including under Bankruptcy Rule 6004); and

(xii)    granting the Debtors such other and further relief as is just and proper.

The Court having considered the Motion, the exhibits attached thereto, the DIP Term Sheet, the DIP Financing Declarations, the First Day Declaration, the evidence submitted or adduced and the arguments of counsel made at the hearing on the Motion (the "Hearing"), and upon the record of these Chapter 11 Cases; and due and sufficient notice of the Motion being provided under the circumstances; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that granting the relief requested in the Motion is fair and reasonable and in the best interests of the Debtors, their estates, and creditors, and is essential for the preservation of value of the Debtors' assets;; and after due deliberation and consideration, and for good and sufficient cause appearing therefor,

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING BY THE DEBTORS AND THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    _Petition Date_:  On August 14, 2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

B.    _Debtors in Possession_.  Each Debtor is continuing in the management of its properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

C.    _Jurisdiction and Venue_.    This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334 and the _Amended Standing Order of Reference_, dated February 29,

2012, from the United States District Court for the District of Delaware over these proceedings, and over the persons and property affected hereby.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    *Creditors' Committee*.  On August 29, 2023, the United States Trustee for Region 3 (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 51].[3]

E.    *The Debtors' Release of Claims*.  The Release (as defined below) is a material condition to, and inducement for the DIP Lender to extend the DIP Facility to the Lenders.  The Debtors have considered the potential claims that the Debtors may assert against the Polaris Parties and have concluded that, under the circumstances and in the exercise of their business judgment, the Release and the other favorable terms and conditions provided by the DIP Lender under the DIP Facility are, as an overall package, fair, reasonable and appropriate, in light of the value of the DIP Facility to these cases and the ability to timely emerge from chapter 11.

F.    *Findings Regarding the Postpetition Financing*

(i)    *Need for Postpetition Financing and Use of Cash Collateral*.  Good and sufficient cause has been shown for the entry of this DIP Order and for authorization of the Debtors to obtain postpetition financing pursuant to and on the terms set forth in the DIP Loan Documents.  The Debtors' need to obtain credit pursuant to the DIP Facility and to continue to use the DIP Collateral, including the Cash Collateral, is critical to enable the Debtors to administer and to preserve the value of their estates.  The Debtors do not have sufficient readily available sources of

---

[3]    On November 29, 2023, the U.S. Trustee reconstituted the Committee [Docket No. 490].

working capital and financing to complete these chapter 11 cases and emerge pursuant to a chapter 11 plan in the near-term absent the funding under the DIP Facility. The Debtors need to obtain credit pursuant to the DIP Facility on a final basis to (i) preserve the value of their estates, (ii) investigate and pursue potential claims against third parties, and (iii) locate additional assets.

(ii)     *No Credit Available on More Favorable Terms.*  Given their current financial condition, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility. The Debtors are unable to obtain unsecured credit allowable under sections 503(b), 507(a) and 507(b) of the Bankruptcy Code as an administrative expense or solely in exchange for the grant of a special administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors also are unable to obtain credit: (a) having priority over administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien pursuant to section 364(c)(2) of the Bankruptcy Code. Financing on a postpetition basis is not otherwise available without granting the DIP Lender the protections set forth in the DIP Order and the other DIP Loan Documents.

(iii)     *Use of Proceeds of the DIP Facility and Cash Collateral.*  The DIP Lender is providing the DIP Facility to fund the administration of the Chapter 11 Cases and preserve the value of the Debtors' assets. As a condition to the entry into the DIP Loan Documents and the extension of credit under the DIP Facility, the DIP Lender requires, and the Debtors have agreed, that proceeds of the DIP Facility and Cash Collateral shall be used, in each case in a manner consistent with the terms and conditions of the DIP Order, the Approved Budget (and as the same may be modified from time to time), and the other DIP Loan Documents, as applicable, solely for

(1) working capital and general corporate purposes, (2) bankruptcy-related costs and expenses (subject to the limitations of the Carve-Out, as set forth herein), and (3) for any other purpose agreed upon in the DIP Loan Documents, and as approved by the Court.

(iv)    *Sections 506(c).*  In light of the DIP Facility and the agreement of the DIP Lender to subordinate its right of payment, liens and superpriority/priority claims to the Carve-Out, the DIP Lender is entitled to and shall receive a waiver of the provisions of section 506(c) of the Bankruptcy Code.

G.    *Good Faith of the DIP Lender*

(i)    *Willingness to Provide Financing.*  The DIP Lender has indicated a willingness to provide financing to the Debtors subject to: (a) the entry of the DIP Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Lender is extending credit to the Debtors pursuant to the DIP Loan Documents in good faith and that the DIP Lender's claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to the DIP Order and the DIP Loan Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this DIP Order or any other order.

(ii)    *Business Judgment and Good Faith Pursuant to Section 364(e).*  The terms and conditions of the DIP Facility and the DIP Loan Documents and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP Facility was

negotiated in good faith and at arm's length between the Debtors and the DIP Lender. The funds advanced under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses within the meaning of section 364(e) of the Bankruptcy Code. Accordingly, the DIP Lender is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

(iii)    The DIP Order and any other order will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this DIP Order or any other order.

H.    Absent entry of this DIP Order, the Debtors will be unable to continue prosecuting these Chapter 11 Cases and will be forced to consider alternatives. Consummation of the DIP Facility and the continued use of the DIP Collateral (including the Cash Collateral) in accordance with this DIP Order and the other DIP Loan Documents are, therefore, in the best interest of the Debtors' estates.

Based upon the foregoing findings and conclusions, the Motion and the record at the Hearing, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, effective immediately, that:

1.    <u>Motion Granted</u>. The Motion is granted as set forth herein, the DIP Facility and the Debtors' entry into the DIP Loan Documents is authorized and approved. All objections to this DIP Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled on the merits.

2.    <u>Authorization to Use Cash Collateral</u>. The Debtors are authorized to use Cash Collateral as set forth in this DIP Order through and including the Maturity Date, subject to the terms and conditions of this DIP Order and in accordance with the Approved Budget and other DIP Loan Documents.

3.     <u>Authorization of the DIP Financing and DIP Loan Documents</u>.  The Debtors are hereby authorized to enter into, and perform all of their obligations under, the DIP Facility on the terms and conditions set forth in this DIP Order, the DIP Term Sheet, and the other DIP Loan Documents.  Upon entry of this DIP Order, the Debtors are authorized to borrow an original principal amount not to exceed $10 million pursuant to the DIP Loan Documents.  The terms of the DIP Facility, including without limitation, interest rate and the Maturity Date, shall be those set forth in the DIP Term Sheet, which is expressly incorporated herein by reference.  The Debtors are immediately authorized and empowered to execute and deliver such additional documentation as the DIP Lender may reasonably request and, subject to the terms of this DIP Order and the other DIP Loan Documents, to authorize or execute and deliver all instruments and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this DIP Order and the other DIP Loan Documents.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, shall be deposited and applied as required by the Approved Budget, this Final Order, and the other DIP Loan Documents.

4.     <u>Release</u>.  Subject to the occurrence of the Closing Date, each Debtor and its estate (the "<u>Releasors</u>") shall release Polaris Ventures, a Swiss association (formerly known as the Center for Emerging Risk Research) in any and all of its capacities whatsoever, as well as its past and present officers (including any president, vice president or financial officer), partners, members, principals, employees, agents, directors (including any managing director), predecessors, affiliated entities, subsidiaries, successors, assigns, attorneys, auditors, insurers, transferees, and representatives, each in their respective capacities as such (the foregoing individuals and entities

herein referred to as the "Polaris Parties"), from all manner of actions, and any and all claims, suits, damages, and causes of action, whether arising from statutory law, constitutional law, federal law, state law, or otherwise, including, without limitation, any claims and causes of action that could be brought in these chapter 11 cases or any Successor Cases (as defined below) by or on behalf of the Debtors and their estates under chapter 5 of the Bankruptcy Code or any state law analog, which the Releasors, as of the Petition Date, currently have or may have (whether known or unknown) against any one or more of the Polaris Parties of any kind or nature whatsoever (the "Release").  On the Closing Date, the Release shall become binding, effective, and irrevocable on the Debtors, their Estates, and any successor to any of them or any party claiming through them.

5. _Fees_.  All fees, costs and/or expenses payable or reimbursable by the Debtors as set forth in the DIP Loan Documents are hereby approved, subject to review for reasonableness consistent with the procedures set forth in this DIP Order.  The Debtors are hereby authorized to promptly pay (with payment in kind so long as no Event of Default has occurred) the fees, costs, and expenses incurred by the DIP Lender in connection with the DIP Facility, as set forth in the DIP Term Sheet, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals actually incurred by professionals retained by the DIP Lender in connection with the DIP Facility (the "DIP Lender Professional Fees"), in accordance with the terms of this DIP Order and the DIP Term Sheet, notwithstanding anything herein or in the Approved Budget to the contrary and without the DIP Lender or its counsel having to file any further application with this Court for approval or payment of such fees, costs, or expenses.  Any such DIP Lender Professional Fees incurred in connection with the DIP Facility shall be paid within fourteen (14) calendar days of delivery of an invoice with detail and redactions customary for this Court to the Debtors, with a copy to the U.S. Trustee and counsel to the Committee;

*provided*, *however*, that, if the Debtors, U.S. Trustee, or the Committee objects to the reasonableness of any DIP Lender Professional Fees, the Debtors, U.S. Trustee, or the Committee, as applicable, shall file and serve upon the DIP Lender, during such fourteen-day period, an objection with the Court (the "Fee Objection"); *provided*, *further*, that the Debtors shall timely pay in accordance with this DIP Order and the DIP Term Sheet the undisputed DIP Lender Professional Fees reflected on any invoice to which a Fee Objection has been timely filed; *provided, further*, that following the Effective Date of the Plan, such invoice shall be delivered solely to the Plan Administrator, and such fees shall be paid by the Plan Administrator subject to the rights of the Plan Administrator to prosecute a Fee Objection in accordance with the procedures set forth above. All such unpaid fees, costs and expenses of the DIP Lender (or, if there is a Fee Objection, to the extent such DIP Lender Professional Fees are determined to be reasonable by the Court), including, without limitation, all fees referred to in the DIP Loan Documents (including, without limitation, all DIP Lender Professional Fees), shall constitute DIP Obligations and shall be secured by the DIP Collateral and afforded all priorities and protections afforded to the DIP Obligations under this DIP Order and the other DIP Loan Documents.

6.    DIP Obligations.  The DIP Loan Documents, including this DIP Order, shall constitute and evidence the validity and binding effect of the DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Cases, or in any other proceeding superseding or related to any of the foregoing (collectively, "Successor Cases").  Upon entry of the DIP Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or

from time to time be owing by the Debtors to the DIP Lender under the DIP Loan Documents, including, without limitation, all principal, accrued interest, costs, fees, expenses, indemnities and other amounts owed pursuant to the DIP Loan Documents. The DIP Obligations shall be due and payable, without notice or demand, upon the occurrence of the Maturity Date.

7.    <u>DIP Liens and DIP Collateral</u>. As security for the DIP Obligations, the DIP Lender is granted, effective immediately upon the Closing Date (as defined in the DIP Term Sheet), pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected liens and security interests as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration, or otherwise) of all DIP Obligations, which liens and security interests shall have the following relative rank and priority (collectively, the "<u>DIP Liens</u>"):

(a)    subject only to (a) existing liens that under applicable law, are senior to, and have not been subordinated to, the liens of the DIP Lender under the DIP Loan Documents, but only to the extent that such liens are valid, perfected, enforceable and non-avoidable liens as of the Petition Date or perfected following the Petition Date as permitted by section 546 of the Bankruptcy Code, including the security interests securing the Surety Collateral[4] (collectively, the "<u>Permitted Liens</u>"), and (b) the Carve-Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming lien on, and security interest in, all of each Loan Party's assets, wherever located, including those that may be subject to a validly perfected security interest in existence on the Petition Date, which shall be primed by, and made subject and subordinate to, the perfected first priority senior priming liens and security interests granted to the DIP Lender in this DIP Order;

(b)    pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all present and after acquired property of each Loan Party, wherever located, not subject to a lien or security interest on the Petition Date; and

---

[4]    "<u>Surety Collateral</u>" means (i) with respect to Philadelphia Indemnity Insurance Company ("<u>Philadelphia Indemnity</u>"), cash collateral held by it in the approximate amount of $1.31 million, and (ii) with respect to Allegheny Casualty Company ("<u>Allegheny</u>," and together with Philadelphia Indemnity, the "<u>Sureties</u>"), cash collateral held by it in the amount of $5,726,250.

(c)     pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, all present and after-acquired property of each Loan Party, wherever located, that is subject to a Permitted Lien on the Petition Date or subject to a Permitted Lien in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code.

For the avoidance of doubt, the DIP Liens shall be junior to the liens and security interests of BMO Bank, N.A. f/k/a BMO Harris Bank N.A. ("BMO") solely to the extent (a) provided for under the applicable banking agreements, and (b) such liens are valid, perfected, enforceable and non-avoidable liens as of the Petition Date or perfected following the Petition Date as permitted by section 546 of the Bankruptcy Code (the "BMO Prior Lien").

8.     The property referred to in the clauses (a), (b), and (c) of the preceding paragraph is collectively referred to as the "DIP Collateral" and shall include, without limitation, all assets (whether tangible, intangible, personal or mixed) of each Debtor, whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all accounts, proceeds of leases, inventory, equipment, cash, cryptocurrency, including but not limited to the cryptocurrency held in the 98f Wallet, equity interests or capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, commercial tort claims, claims and causes of action (including actions pursuant to Chapter 5 of Title 11 of the United States Code), intercompany receivables, claims and other rights to payment, patents, copyrights, trademarks and other general intangibles, and all products, offspring, profits, and proceeds thereof; *provided*, that the DIP Lender shall not be permitted to exercise remedies against actions pursuant to Chapter 5 of Title 11 of the United States Code until the earlier of (x) the date pursuant to which all other DIP Collateral has been reduced to cash or abandoned and (y) eighteen (18) months after the Petition Date.

9.     Notwithstanding anything to the contrary in the DIP Order or the DIP Term Sheet, DIP Collateral shall not include the bank account at Lexicon Bank ending 0795 (the "Trust Charter

Account"); provided, however, that in the event the Debtors elect to relinquish their Nevada Trust Charter, the Trust Charter Account shall constitute DIP Collateral and the DIP Lender shall automatically, and without any further action, be granted a first priority perfected senior priming lien on, and security interest in the Trust Charter Account and any cash proceeds therein pursuant to section 364(d)(1) of the Bankruptcy Code. The DIP Liens shall attach to any funds in the Trust Charter Account immediately upon withdrawal of such funds from the Trust Charter Account. The Debtors shall not increase the balance (other than the accrual of interest) of the Trust Charter Account and are only permitted to remove funds from the Trust Charter Account if they are immediately deposited into another account upon which the DIP Lender has a security interest under the DIP Order.

10.    For the avoidance of doubt, the DIP Liens shall not attach to any property that is not property of the estate, and the Debtors shall have no obligation to characterize or seek adjudication of any property as being property of the Debtors' estates. Notwithstanding anything herein to the contrary, unless there has been a determination of the Account Treatment Issues (as defined in the Plan) by the Court, the DIP Lender shall be required to file a motion, on at least fourteen (14) days' notice, seeking such a determination with respect to funds subject to a Customer Agreement (as defined in the Plan) before it may exercise remedies against such funds.

11.    DIP Lien Priority.

(a)    The DIP Liens securing the DIP Obligations shall be junior in priority only to (i) the Carve-Out and (ii) any Permitted Liens. Other than as set forth herein and in the DIP Term Sheet, the DIP Liens shall be senior to, and shall not be made subject to or *pari passu* with, any lien or security interest hereinafter granted in the Chapter 11 Cases or any Successor Case. The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the

Chapter 11 Cases or any Successor Case, upon the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Cases or a Successor Case. The DIP Liens shall not be subject to sections 506(c), 510, 549, 550 or 552 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

(b)      To the fullest extent permitted under the Bankruptcy Code, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent, or the payment of any fees or obligations to, any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest in any property or the proceeds thereof, is and shall hereby be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by the Debtors, in favor of the DIP Lender in accordance with the terms of the DIP Loan Documents and this DIP Order.

12.      <u>DIP Superpriority Claim</u>. The DIP Lender is hereby granted, effective immediately upon entry of this DIP Order and the occurrence of the Closing Date (as defined in the DIP Term Sheet), pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Chapter 11 Cases and any Successor Case (collectively, the "<u>DIP Superpriority Claim</u>") for all DIP Obligations. The DIP Superpriority Claim shall be subordinate in payment and priority only to the Carve-Out and shall otherwise have priority over any and all administrative expenses of any kind, including those specified in section 503(b) or 507

14

of the Bankruptcy Code, against the Debtors or their estates in the Chapter 11 Cases and any Successor Case, at any time existing or arising, of any kind or nature whatsoever.

13.    <u>Discharge Waiver</u>. Unless the DIP Lender otherwise agrees in writing (including pursuant to the DIP Term Sheet and in accordance with the treatment of DIP Claims as provided in the Plan) and subject to the terms of the DIP Term Sheet, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of Bankruptcy Code section 1141(d), unless the DIP Obligations have been indefeasibly paid in full, in cash, and the DIP Facility has been terminated on or before the effective date of a confirmed plan of reorganization or liquidation.

14.    <u>No Obligation to Extend Credit</u>.  The DIP Lender shall not have any obligation to make any loan or advance under the DIP Loan Documents unless the conditions precedent to the making of such extension of credit under the DIP Term Sheet or other applicable DIP Loan Documents have been satisfied in full or waived by the DIP Lender in its reasonable discretion.

15.    <u>Amendment of the DIP Loan Documents</u>.  The DIP Loan Documents may from time to time be amended, modified, or supplemented by the parties thereto without notice or a hearing if the amendment, modification, or supplement is (a) in accordance with the DIP Loan Documents, (b) not material to the Debtors, and (c) not prejudicial in any material respect to the rights of third parties.  The parties to the DIP Loan Documents are not required to request whether the U.S. Trustee or the Committee has any objection to, or seek further approval of the Court to effectuate, any such non-material amendment, modification, or supplement otherwise permitted under this paragraph, but such amendment, modification, or supplement shall be filed with the Court.    Except for a non-material amendment, modification, or supplement that satisfies subsections (a)–(c) set forth above, any amendment, modification, or supplement to the DIP Loan

Documents may be entered into but shall only become effective upon the later of (i) five (5) business day after filing with the Court or (ii) if any objection is timely made within such (5) business day period, resolution of such objection, including by Court order.

16.     Approved Budget.  Attached hereto as **Exhibit 2** is the budget (the "Approved Budget"), which has been consented to by the DIP Lender.  The Approved Budget reflects, on a line-item basis, anticipated cash receipts and expenditures on a weekly basis and includes all necessary and required expenses that the Debtors expect to incur during each week of the Approved Budget.  From and after the Closing Date and until the Effective Date of the Amended Plan (as defined in the DIP Term Sheet), the Debtors shall use loans under the DIP Facility only for the purposes specifically set forth in this DIP Order and the other DIP Loan Documents and in compliance with the Approved Budget. The Approved Budget may not be amended by the Debtors without the consent of the DIP Lender.

17.     Modification of Automatic Stay.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this DIP Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens and the DIP Superpriority Claim; (b) permit the Debtors to incur all liabilities and obligations under the DIP Loan Documents; (c) permit the Debtors to perform such other acts as are necessary to effectuate the terms of this DIP Order; and (d) authorize the Debtors to pay, including payment in kind, the DIP Lender the DIP Lender Professional Fees in accordance with the terms of this DIP Order.

18.     Proceeds of Subsequent Financing.  If the Debtors, an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code, a trustee appointed pursuant to section 1104(a) of the Bankruptcy Code, or any responsible officer or any

other estate representative subsequently appointed in the Chapter 11 Cases or any Successor Case shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents and this DIP Order at any time prior to (a) the indefeasible repayment in full in cash of all DIP Obligations and (b) the termination of the DIP Lender's obligations to extend credit under the DIP Facility, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be applied to the DIP Obligations owing to the DIP Lender.

19.    <u>Maintenance of DIP Collateral</u>.    Until the payment in full in cash of all DIP Obligations, and the termination of the DIP Lender's obligations to extend credit under the DIP Facility, the Debtors shall maintain customary insurance on the DIP Collateral as required under the DIP Term Sheet.  The DIP Lender shall automatically be substituted as an additional insured, loss payee or similar destination with respect to such insurance.

20.    <u>Disposition of DIP Collateral: Rights of DIP Lender</u>.  The Debtors and the DIP Lender agree that the Debtors shall not sell, lease, assign, transfer, compromise, or otherwise dispose of (including through a transaction of merger or consolidation) or cause, permit to be caused, or agree to cause or permit to be caused, any direct or indirect subsidiary that is not a Debtor to convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any DIP Collateral (including any claim and causes of action), business or assets, whether now owned or hereafter acquired, out of the ordinary course of business without the prior written consent of the DIP Lender.  The DIP Lender shall be permitted to credit bid the DIP Obligations pursuant to section 363(k) of the Bankruptcy Code in any sale of the DIP Collateral.

21.   <u>DIP Termination; Termination of Consent to Use Cash Collateral</u>.  Subject to the Plan Roll-Over, upon the occurrence of the Maturity Date, (a) all DIP Obligations shall be immediately due and payable and all commitments to extend credit under the DIP Facility will terminate and (b) the DIP Lender's consent to the Debtors' use of Cash Collateral will terminate; *provided, however*, that during the Remedies Notice Period (as defined below), the Loan Parties are permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' assets.

22.   <u>Events of Default</u>.  (a) The occurrence of an "Event of Default" under the DIP Term Sheet (subject to any extensions or waivers as permitted under the DIP Loan Documents), or (b) a default under the terms of this DIP Order, shall constitute an event of default under this DIP Order and the DIP Term Sheet, unless expressly waived in writing by the DIP Lender (collectively, the "<u>Events of Default</u>").  Furthermore, an Event of Default hereunder shall occur if, until and unless the DIP Obligations have been indefeasibly paid in full in cash, and all commitments to extend credit under the DIP Facility have been terminated, the Debtors seek or consent to, directly or indirectly, without the prior written consent of the DIP Lender: (a) any modification, stay, vacatur, amendment, or supplement to this DIP Order (provided that the modified, amended, or supplemented order is not in form and substance expressly consented to by DIP Lender in writing (email being sufficient) in its sole discretion); (b) without the express written (email being sufficient) consent of the DIP Lender, a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in the Chapter 11 Cases or any Successor Case, equal or superior to the DIP Superpriority Claim, other than the Carve-Out; or (c) without the express

written consent of the DIP Lender, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, other than the Permitted Liens.

23.    <u>Rights and Remedies Upon Event of Default</u>.  Upon the occurrence and during the continuation of an Event of Default, without further order from or application to the Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to (a) deliver to the Debtors a notice declaring the occurrence of an Event of Default; (b) [omitted]; (c) declare the DIP Loans then outstanding to be due and payable; (d) terminate the DIP Facility; (e) charge the default rate of interest under the DIP Facility; (f) exercise any and all rights of setoff; (g) exercise any right or remedy with respect to the DIP Collateral or the DIP Liens; or (h) take any other action or exercise any other right or remedy permitted under the DIP Loan Documents, the DIP Order or applicable law; *provided*, *however*, that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses <u>(f)</u>, <u>(g)</u>, or <u>(h)</u> above, (x) the DIP Lender shall provide counsel to the Debtors, counsel to the Committee, and the U.S. Trustee with five (5) business days' prior written notice (such period, the "<u>Remedies Notice Period</u>"), and (y) during the Remedies Notice Period, the Debtors, the U.S. Trustee, and/or Committee shall be permitted to request an emergency hearing before the Court (which request must be made prior to the conclusion of the Remedies Notice Period and shall seek consideration of such request on an expedited basis); *provided*, *however*, that during the Remedies Notice Period, the Debtors are permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses.

24.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this DIP Order</u>.  The DIP Lender has acted in good faith in connection with negotiating the DIP Loan Documents and making loans under the DIP Facility and consenting to the Debtors' use of

Cash Collateral, and its reliance on this DIP Order is in good faith.  Based on the findings set forth in this DIP Order and the record made during the Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this DIP Order are hereafter reversed or modified by a subsequent order of this Court or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code.

25.    _Reporting, Access and Information Requirements_.  The Debtors shall observe and comply with all of the financial reporting, access and informational covenants and conditions set forth in the DIP Loan Documents, including, without limitation, the Budget Reports, all of which are approved.

26.    _[Omitted]_

27.    _Milestones_.  It shall be an Event of Default if the Milestones are not satisfied or waived by the DIP Lender in its discretion.

28.    _Carve-Out_.

(a)    _Carve-Out._  As used in the DIP Order, the "_Carve-Out_" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Court under section 156(c) of title 28 of the United States Code and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the applicable statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "_Statutory Fees_"), which Statutory Fees shall not be subject to any budget, including the Approved Budget; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) in all cases subject to and limited to the amounts set forth for each Professional Person (as defined below) in the Approved Budget, and to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses

(collectively, the "Allowed Professional Fees") incurred by (a) persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals"), and (b) persons or firms retained by the Committee pursuant to sections 327, 328, or 1103 of the Bankruptcy Code (collectively, the "Committee Professionals" and together with the Debtor Professionals, the "Professional Persons"), at any time before or on the day following delivery by the DIP Lender of the Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery by the DIP Lender of a Carve-Out Trigger Notice; and (iv) in all cases subject to the amounts set forth for each Professional Person in the Approved Budget, Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000.00 incurred after the day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap").   For purposes of the foregoing, the "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked; provided, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (ii), (iii) or (iv) above on any grounds.   So long as no Event of Default has occurred and is continuing, on a weekly basis, the Debtors are authorized to deposit and hold amounts in a segregated account in trust for the benefit of the Professional Persons as part of the Carve-Out corresponding to the amounts set forth for each person in the Approved Budget, to the extent not paid to the Professional Person in the

week budgeted (the "Professional Fee Escrow").  For the avoidance of doubt, (i) the first week of the Approved Budget shall include a "true up" to account for pre-Closing Date fees and expenses that have been incurred but not yet paid, and (ii) the DIP Lender's interest in the Professional Fee Escrow shall be subordinate to and subject to the Carve-Out in all respects.

(b)      *No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.*  The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Case.  Nothing in this DIP Order or otherwise shall be construed (i) to obligate the DIP Lender in any way to pay compensation to or to reimburse expenses of any Professional Persons, or to guarantee that the Debtors or their estates have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve-Out if actual fees of Professional Persons exceed the applicable Carve-Out limitation; or (iii) as consent to the allowance of any fees of any Professional Persons, with the rights of the DIP Lender to object to any fees of any Professional Persons expressly reserved.  For the avoidance of doubt, the Carve-Out does not constitute a cap on the allowance or payment as an administrative expense of any fees or expenses of any Professional Persons.

29.    Cash Collateral.  For purposes of this DIP Order, the term "Cash Collateral" shall mean and include all "cash collateral" as defined by section 363(a) of the Bankruptcy Code and shall include and consist of, without limitation, all of the cash proceeds of the accounts receivable, inventory and other property constituting cash in which the DIP Lender has an interest (including, without limitation, any adequate protection lien or security interest), whether such interest existed as of the Petition Date or arises thereafter pursuant to this DIP Order, any other order of this Court, applicable law or otherwise.

30.  <u>Limitations on the DIP Facility, DIP Collateral, and Carve-Out</u>.  The DIP Facility, DIP Collateral, Cash Collateral, and Carve-Out may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion, or other litigation of any type (i) materially adverse to the interests of the Polaris Parties, including as DIP Lender, or their rights and remedies under the DIP Loan Documents, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations, (ii) for monetary, injunctive or other affirmative relief against the Polaris Parties, or (iii) preventing, hindering or otherwise delaying the exercise by the DIP Lender of any rights and remedies under the DIP Order, the DIP Loan Documents, or applicable law, or the enforcement or realization  by the DIP Lender upon any of the DIP Collateral; (b) to make any distribution under a chapter 11 plan inconsistent with the terms of the DIP Loan Documents; (c) to object to, contest, or interfere with in any way the DIP Lender's enforcement or realization upon any of the DIP Collateral that is in accordance with the DIP Loan Documents, once an Event of Default has occurred; (d) to incur indebtedness outside the ordinary course of business without the prior written consent of the DIP Lender; (e) to object to or challenge in any way the claims, security interests, liens, or other interests (including interests in the DIP Collateral) held by the Polaris Parties; (f) to assert, commence, or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the Polaris Parties; (g) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority,

or enforceability of any of the DIP Obligations or DIP Liens or any other rights or interests of the DIP Lender; or (h) to prevent (or attempt to prevent), hinder or otherwise delay the exercise by the DIP Lender of any rights and remedies granted under the DIP Order.

31.     Perfection of DIP Liens.  This DIP Order shall be sufficient and conclusive to provide for, and evidence of, the grant, validity, attachment, perfection, and priority of the DIP Liens without executing or entering into any other instrument, agreement or document or the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to grant, validate, attach or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Lender to the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender is authorized to file, as it deems necessary in its sole discretion, such financing statements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the applicable DIP Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create, attach or perfect the DIP Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Lender, all such financing statements, mortgages, notices, and other documents as the DIP Lender may reasonably request.  The DIP Lender, in its discretion, may file photocopies of this DIP Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.

32.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this DIP Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

33.    <u>No Deemed Control</u>.  In making decisions to issue funds under the DIP Facility, consenting to the use of Cash Collateral, or in taking any other actions related to the DIP Order or the other DIP Loan Documents, the DIP Lender shall have no liability to any third party and shall not be deemed to be in control of the assets of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act as amended, or any similar federal or state statute), and the DIP Lender's relationship with Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind.

34.    <u>Section 506(c) Claims</u>.  No costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Case at any time shall be charged against (i) any of the DIP Lender, (ii) any of its claims arising under the DIP Facility, or (iii) the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.

35.    <u>Equities of the Case Doctrine</u>. The DIP Lender shall not be subject to the "equities of the case" doctrine, to the extent it may otherwise be applicable.

36.    <u>Waiver of Marshaling</u>.  The DIP Lender shall not be subject to the equitable doctrine of 'marshaling' or any similar doctrine with respect to the DIP Collateral and any such claims are expressly waived by the Debtors on behalf of itself and other parties in interest, except

as expressly set forth in the DIP Term Sheet under the heading "Collateral and Priority" with respect to claims and causes of action held by the Debtors under Chapter 5 of title 11 of the United States Code.

37.     <u>No Subrogation</u>.  In no event shall any person or entity who pays (or through the extension of credit to the Debtors, causes to be paid) any of the DIP Loans be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted in favor of, or conferred upon, the DIP Lender by the terms of this DIP Order, the other DIP Loan Documents, or otherwise at law or contract or in equity, unless and until such time as all of the DIP Loans have been indefeasibly paid in full in cash on a final basis and all lending commitments have been terminated under the DIP Facility.

38.     <u>Rights Preserved</u>.  Other than as expressly set forth in this DIP Order, any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Lender are preserved.

39.     <u>Indemnification</u>.  The Debtors shall indemnify, pay, and hold harmless the DIP Lender (strictly in its capacity as such) (and its respective directors, officers, employees and agents, strictly in their capacities as such) against any loss, liability, cost or expense incurred in respect of the financing contemplated by the DIP Loan Documents, the use or the proposed use of the DIP Loans (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).

40.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this DIP Order, the other DIP Loan Documents,

or applicable law, as the Chapter 11 Cases may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

41.    <u>Binding Effect of DIP Order</u>.   Immediately upon entry by this Court and the occurrence of the Closing Date, the terms and provisions of this DIP Order shall become valid and binding upon and inure to the benefit of the DIP Lender, all other creditors of the Debtors, the Committee, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Case, or upon dismissal of the Chapter 11 Cases or Successor Case.

42.    <u>DIP Order Controls</u>.   In the event of any inconsistency between the terms and conditions of the DIP Loan Documents or this DIP Order, the provisions of this DIP Order shall govern and control.

43.    <u>Notice</u>.  All notices required or permitted under the DIP Loan Documents shall be sent to the respective party's attorney at the address listed below (unless substitute counsel is identified by a filing on the Docket which shall also be mailed to all counsel for each party) by electronic mail and, at the election of the notifying party, any other of the following certified mail, return receipt requested, recognized overnight courier, or hand-delivery.  In the event of notice by certified mail, notice shall be effective upon receipt or refusal of delivery as shown by the return receipt.   In the event of notice by electronic mail, notice shall be effective upon successful transmission.  In the event of notice by hand-delivery, notice shall be effective upon receipt. In the event of notice by overnight courier, notice shall be effective upon delivery, without the necessity of acknowledgement of receipt.

If notice is given to the Debtors, it shall be sent to counsel only as follows:

**McDermott Will & Emery LLP**
Maris J. Kandestin
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone:          (302) 485-3900
Facsimile:          (302) 351-8711
Email:                mkandestin@mwe.com

-and-

Darren Azman
Joseph B. Evans
J. Greer Griffith
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone:          (212) 547-5400
Facsimile:          (646) 547-5444
Email:                dazman@mwe.com
                        jbevans@mwe.com
                        ggriffith@mwe.com

-and-

Gregg Steinman
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone:          (305) 358-3500
Facsimile:          (305) 347-6500
Email:                gsteinman@mwe.com

-and-

R. Jacob Jumbeck
444 W. Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:          (312) 372-2000
Email:                jjumbeck@mwe.com

If notice is given to the DIP Lender, it shall be sent to counsel only as follows:

**Young Conaway Stargatt & Taylor, LLP**
Michael R. Nestor
Ryan M. Bartley
Rodney Square
1000 North King Street

Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
Email:          mnestor@ycst.com
                rbartley@ycst.com

-and-

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**
Joseph R. Dunn
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Telephone:      (858) 314-1500
Email:          jrdunn@mintz.com

-and-

Abigail O'Brient
2049 Century Park East, Suite 300
Los Angeles, CA 90067
Telephone:      (310) 586-3200
Email           aobrient@mintz.com

44.    <u>Survival</u>.  The provisions of this DIP Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Chapter 11 Cases; (b) converting the Chapter 11 Cases to Case under chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Cases or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases or a Successor Case.  The terms and provisions of this DIP Order, including the claims, liens, security interests and other protections granted to the DIP Lender, pursuant to this DIP Order and/or the other DIP Loan Documents, notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided by this DIP Order until all DIP Obligations have been indefeasibly paid in full, which shall include the treatment provided for under the Plan Roll Over. The terms and provisions concerning the indemnification of the DIP Lender shall continue in the

Chapter 11 Cases, in any Successor Case, following dismissal of the Chapter 11 Cases or any Successor Case, following termination of the DIP Loan Documents, and/or the repayment of the DIP Obligations.  The DIP Lender, solely in its capacity as such, shall not be subject to any bar dates or similar deadlines and shall not be required to file proof of the DIP Obligations and DIP Liens as a result of any such bar date or similar deadline.

45.     <u>Effect of this DIP Order</u>.  This DIP Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.   Notwithstanding the relief granted herein and any action taken pursuant to such relief, other than as expressly provided in the DIP Loan Documents, nothing in this DIP Order shall be deemed: (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this DIP Order or the Motion (including any exhibits attached thereto); (e) a request or authorization to assume any agreement, contract, or lease pursuant to Bankruptcy Code section 365; (f) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) to create any rights in favor of, or enhance the status of, any claim held by any person or entity.

46.     <u>Waiver of Stay of Effectiveness of the Final Order</u>.  Notwithstanding Bankruptcy Rules 6003 and 6004 or any other Bankruptcy Rule, this DIP Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this DIP Order.

47.     The Debtors are authorized to take all actions necessary to implement the relief granted in this DIP Order.

48.    <u>Retention of Jurisdiction</u>.  The Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this DIP Order.

**J. KATE STICKLES**
**UNITED STATES BANKRUPTCY JUDGE**

**Dated: December 20th, 2023**
**Wilmington, Delaware**