# EXHIBIT 1

**DIP Term Sheet**

*Execution Version*

# PRIME CORE TECHNOLOGIES INC.

## SUPERPRIORITY SENIOR SECURED
## DEBTOR IN POSSESSION CREDIT FACILITY BINDING TERM SHEET

December 5, 2023

This binding term sheet (together with all annexes, exhibits and schedules referred to herein, this "DIP Facility Term Sheet" and together with the DIP Order, the Approved Budget, and the Budget Reports (each as defined below), collectively, the "DIP Loan Documents") sets forth the terms of the proposed DIP Facility (as defined below). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and Its Affiliated Debtors* [Docket No. 521-1] (the "Amended Plan").

| | |
|---|---|
| **Borrower** | Prime Core Technologies Inc. (the "Borrower"), in its capacity as a debtor and debtor in possession in the jointly administered chapter 11 cases (the "Chapter 11 Cases") commenced on August 14, 2023 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") captioned *In re Prime Core Technologies Inc., et al.*, Case No. 23-11161 (JKS) (Bankr. D. Del.). |
| **Guarantors** | The Borrower's affiliated debtors and debtors in possession, each in their respective capacities as debtors and debtors in possession (the "Loan Guarantors" and, together with the Borrower, the "Loan Parties" and the "Debtors") in the Chapter 11 Cases. |
| **DIP Lender** | Polaris Ventures, a Swiss association (the "DIP Lender"). |
| **Type and Amount of the DIP Facility** | A secured superpriority priming debtor in possession non-amortizing facility comprised of a new money term loan credit facility in an aggregate principal amount of $10 million (the "DIP Facility"; the loans provided thereunder the "DIP Loans"; the commitments with respect to such DIP Loans, the "DIP Commitment"; and proceeds received by the Borrower from the DIP Loans, the "DIP Proceeds"), to be available in a single draw loan upon satisfaction of the "Conditions to Closing and Funding."<br><br>Notwithstanding anything herein to the contrary, absent the consent of the DIP Lender, $3 million of the DIP Proceeds shall be held by the Debtors until the Effective Date of the Amended Plan (as defined herein) and shall be used solely for purposes of funding the Wind-Down Reserve under the Amended Plan and for no other purposes whatsoever (and the Carve-Out shall not attach to such amounts); *provided however* that up to $250,000 of the foregoing $3 million may be used to satisfy unpaid Permitted Variances (as defined below) as of the Effective Date of the Amended Plan to the extent that no other cash of the Debtors is available to do so. |
| **Final DIP Order** | The order approving the DIP Facility on a final basis shall be in form and substance, and upon terms and conditions, acceptable in all respects to the DIP Lender (the "Final DIP Order"). |
| **Carve-Out** | The liens on and security interests in the DIP Collateral and all super-priority administrative expense claims granted under the Final DIP Order, shall be |

| | subject and subordinate to the Carve-Out. |
|---|---|
| | For purposes hereof, "Carve-Out" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court under section 156(c) of title 28 of the United States Code and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the applicable statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "Statutory Fees"), which Statutory Fees shall not be subject to any budget, including the Approved Budget (as defined below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) in all cases subject to and limited to the amounts set forth for each Professional Person in the Approved Budget, and to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (collectively, the "Allowed Professional Fees") incurred by (a) persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals"), and (b) persons or firms retained by the Official Committee of Unsecured Creditors of the Debtors (the "Committee") pursuant to sections 327, 328, or 1103 of the Bankruptcy Code (collectively, the "Committee Professionals" and together with the Debtor Professionals, the "Professional Persons"), at any time before or on the day following delivery by the DIP Lender of the Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery by the DIP Lender of a Carve-Out Trigger Notice; and (iv) in all cases subject to the amounts set forth for each Professional Person in the Approved Budget, Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000.00 incurred after the day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"). |
| | For purposes of the foregoing, the "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below) and acceleration of the DIP Obligations (as defined below) under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked; *provided*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (ii), (iii) or (iv) above on any grounds. |
| | So long as no Event of Default has occurred and is continuing, on a weekly basis, the Debtors are authorized to deposit and hold amounts in a segregated account in trust for the benefit of the Professional Persons as part of the Carve-Out corresponding to the amounts set forth for each person in the Approved Budget, to the extent not paid to the Professional Person in the week budgeted (the "Professional Fee Escrow"). For the avoidance of doubt, (i) the Approved Budget shall include a "true up" to account for pre-Closing Date fees and expenses that have been incurred but not yet paid, and (ii) the DIP Lender's interest in the Professional Fee Escrow shall be subordinate to and subject to the |

| | |
|---|---|
| | Carve-Out. |
| **Treatment of DIP Obligations on Maturity Date** | On the Maturity Date, all DIP Obligations shall be indefeasibly paid in full, in cash. To the extent that all DIP Obligations cannot be indefeasibly paid in full in a manner that is consistent with the Approved Budget, and if the Effective Date of the Amended Plan will occur on or before the Maturity Date, then the DIP Lender will be deemed to have elected the Plan Roll Over (as defined below) for such unpaid amounts. <br><br> The "Plan Roll Over" treatment shall mean that in lieu of indefeasible payment in full, in cash of the DIP Obligations on the Effective Date of the Amended Plan, the DIP Obligations shall be paid from the first proceeds of the Wind-Down Debtor Assets, including prior to any distribution to holders of claims in Classes 3A through 8. |
| **DIP Interest Rate** | Interest will accrue at the rate of zero percent (0.0%) per annum (the "Base Rate") plus Default Interest, if applicable. |
| **Default Interest** | Principal, interest, fees, and other amounts due under the DIP Facility will bear interest at a rate that is seven and one-half percent (7.5%) per annum greater than the Base Rate (1) immediately upon and during the continuance of an Event of Default, or (2) if the Plan Roll Over occurs, from and after the one year anniversary of the Effective Date of the Amended Plan. |
| **Use of Proceeds** | The DIP Loans may only be used for (i) working capital and general corporate purposes of the Debtor, (ii) permissible bankruptcy-related costs and expenses, and (iii) any other purpose agreed upon in the DIP Loan Documents, in each instance subject to the Approved Budget and any applicable Permitted Variance. |
| **Closing Date** | The date of the satisfaction (or waiver by the DIP Lender) of each of the conditions precedent to the funding of the DIP Facility (the "Closing Date"). |
| **Maturity** | The "Maturity Date" means the earliest of (a) January 12, 2024, (b) the Effective Date of the Amended Plan, or (c) the acceleration of the DIP Loans and the termination of all commitments under the DIP Facility in accordance with the terms hereof; *provided that*, following any Plan Roll Over, the DIP Loans shall be satisfied as set forth in the Amended Plan and plan supplement. |
| **Mandatory Prepayments** | The following amounts shall be indefeasibly paid in satisfaction of the DIP Obligations within two (2) business days of receipt, except as such amounts are set forth in the Approved Budget and are necessary to satisfy the expenditures set forth in the Approved Budget: <br><br> (i)  100% of the net proceeds of asset sales. <br> (ii)  100% of the net proceeds of insurance and condemnation awards. <br> (iii)  100% of the net proceeds of any debt issuance or equity issuance. <br> (iv)  100% of proceeds of claims and causes of action. |
| **Voluntary Prepayments** | The Borrower may prepay the DIP Loans in whole or in part at any time without penalty or any prepayment fee. |

3

| | |
|---|---|
| **Collateral and Priority** | Subject to the Carve-Out, all obligations of the Loan Parties to the DIP Lender under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses, or any other amounts due (collectively, the "DIP Obligations"), shall be secured by the following liens and security interests (the "DIP Liens"): |
| | (i)  subject only to (a) existing liens that under applicable law, are senior to, and have not been subordinated to, the liens of the DIP Lender under the DIP Loan Documents, but only to the extent that such liens are valid, perfected, enforceable and non-avoidable liens as of the Petition Date or perfected following the Petition Date as permitted by section 546 of the Bankruptcy Code, including the security interests securing the Surety Collateral[1] (collectively, the "Permitted Liens"), and (b) the Carve-Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming lien on, and security interest in, all of each Loan Party's assets, wherever located, including those that may be subject to a validly perfected security interest in existence on the Petition Date, which shall be primed by, and made subject and subordinate to, the perfected first priority senior priming liens and security interests to be granted to the DIP Lender; |
| | (ii)  pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all present and after acquired property of each Loan Party, wherever located, not subject to a lien or security interest on the Petition Date; and |
| | (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, (a) all present and after-acquired property of each Loan Party, wherever located, that is subject to a Permitted Lien on the Petition Date or subject to a Permitted Lien in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code, and (b) the Surety Collateral. |
| | For the avoidance of doubt, the DIP Liens shall be junior to the liens and security interests of BMO Bank, N.A. f/k/a BMO Harris Bank N.A. ("BMO") solely to the extent (a) provided for under the applicable banking agreements, and (b) such liens are valid, perfected, enforceable and non-avoidable liens as of the Petition Date or perfected following the Petition Date as permitted by section 546 of the Bankruptcy Code (the "BMO Prior Lien"). |
| | The property referred to in the preceding clauses (i), (ii), and (iii) is collectively referred to as the "DIP Collateral" and shall include, without limitation, all assets (whether tangible, intangible, personal or mixed) of each Loan Party, whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all accounts, proceeds of leases, inventory, equipment, cash, cryptocurrency, including but not limited to the cryptocurrency held in the 98f Wallet, equity interests or capital stock in |

---

[1] Surety Collateral means cash collateral held by Philadelphia Indemnity Insurance Company, in the approximate amount of $1.31 million, and cash collateral held by Allegheny Casualty Company, in the amount of $5,726,250.

4

|  | subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, commercial tort claims, claims and causes of action (including actions pursuant to Chapter 5 of Title 11 of the United States Code), intercompany receivables, claims and other rights to payment, patents, copyrights, trademarks and other general intangibles, and all products, offspring, profits and proceeds thereof. |
|---|---|
|  | The DIP Liens shall be effective and perfected as of the entry of the Final DIP Order (subject to the occurrence of the Closing Date) and without necessity of the execution, filing or recording of control agreements, financing statements or other agreements. However, the DIP Lender may, in its reasonable discretion, require the execution, filing or recording of any or all of the documents described in the preceding sentence. |
|  | Notwithstanding anything to the contrary in the DIP Order or the DIP Term Sheet, DIP Collateral shall not include the bank account at Lexicon Bank ending 0795 (the "Trust Charter Account"); *provided, however*, that in the event the Debtors elect to relinquish their Nevada Trust Charter, the Trust Charter Account shall constitute DIP Collateral and the DIP Lender shall automatically, and without any further action, be granted a first priority perfected senior priming lien on, and security interest in the Trust Charter Account and any cash proceeds therein pursuant to section 364(d)(1) of the Bankruptcy Code. The DIP Liens shall attach to any funds in the Trust Charter Account immediately upon withdrawal of such funds from the Trust Charter Account. The Debtors shall not increase the balance (other than the accrual of interest) of the Trust Charter Account and are only permitted to remove funds from the Trust Charter Account if they are immediately deposited into another account upon which the DIP Lender has a security interest under the DIP Order. |
|  | For the avoidance of doubt, the DIP Liens shall attach to the Professional Fee Escrow but shall be subject to the Carve-Out. |
|  | Notwithstanding anything to the contrary herein, (i) the DIP Liens shall attach to claims and causes of action held by the Debtors under Chapter 5 of Title 11 of the United States Code, but the DIP Lender shall not be permitted to exercise remedies against such claims and causes of action until the earlier of (x) the date pursuant to which all other DIP Collateral has been reduced to cash or abandoned and (y) eighteen (18) months after the Petition Date and (ii) the DIP Liens shall not attach to any property that is not property of the Debtors' estates. Unless there has been a determination of the Account Treatment Issues (as defined in the Amended Plan) by the Court, the DIP Lender shall be required to file a motion, on at least fourteen (14) days' notice, seeking such a determination with respect to funds subject to a Customer Agreement (as defined in the Amended Plan) before it may exercise remedies against such funds. |
|  | For the avoidance of doubt, the Debtors shall have no obligation to characterize or seek adjudication of any property as being property of the Debtors' estates. |
| **Guarantees** | Each Loan Guarantor shall unconditionally guarantee, on a joint and several basis, all DIP Obligations arising under or in connection with the DIP Facility. |
| **DIP Superpriority** | Subject to the Carve-Out, the DIP Obligations shall be allowed super-priority administrative expense claims under section 364(c) of the Bankruptcy Code |

5

| | |
|---|---|
| **Claims** | against each of the Loan Parties, on a joint and several basis, which claims shall have priority over any and all administrative expense claims against the Loan Parties and their estates, as well as the claims of any trustee appointed for such estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 1113 and 1114 of the Bankruptcy Code (the "DIP Superpriority Claims"). |
| **Representations and Warranties** | Each Loan Party shall ensure that each of the following representations and warranties is true and correct as of the Closing Date: <br><br> (i) *Collateral Title*. Each Loan Party has the organizational power to transfer each item of the collateral upon which it has granted a DIP Lien pursuant to the DIP Loan Documents, free of all liens whatsoever, except for Permitted Liens and DIP Liens. <br><br> (ii) *Conflict*. Subject to the approval of the Bankruptcy Court, the DIP Loan Documents do not (a) violate any provisions of any Loan Party's organizational documents or bylaws, or any material law, regulation, order, injunction, judgment, decree or writ to which any Loan Party is subject or (b) other than the commencement of the Chapter 11 Cases and as a reasonable consequence of the commencement of the Chapter 11 Cases, conflict with or result in the material breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any material lease, agreement or other contract to which any Loan Party is a party or by which any Loan Party or any of its property is bound which is not subject to the automatic stay. |
| **DIP Budget** | A detailed weekly budget covering the period beginning on the proposed Closing Date and ending on the proposed Effective Date of the Amended Plan, in form and substance satisfactory to the DIP Lender (with such supporting detail as the DIP Lender may reasonably request), attached hereto as **Exhibit A** (the "Approved Budget"). Beginning on the first full week following the Closing Date, the Debtors will provide a weekly variance analysis on the fourth business day of each week showing actual versus budgeted receipts and operating disbursements for the preceding week (the "Budget Reports"). |
| **Affirmative and Negative Covenants** | The Debtors shall: <br><br> (i) satisfy, or cause to be satisfied, each Milestone; *provided*, that in the event that any order specified to be entered by the Bankruptcy Court by a specified date is not entered by such date, or a hearing to be held by a certain deadline is not held by such date, in either case solely by reason of the unavailability of, or inaction by, the Bankruptcy Court, then the Debtors and the DIP Lender shall negotiate in good faith for a reasonable extension of such deadline; <br><br> (ii) timely deliver, or cause to be timely delivered, to the DIP Lender the Budget Reports, all in accordance with the provisions set forth above; |

6

|   |   |
|---|---|
| (iii) | timely deliver, or cause to be delivered, to the DIP Lender written notice of the occurrence of any Event of Default. |
| (iv) | deliver to DIP Lender any and all financial and other data, documents, and information requested by the DIP Lender and provide access to any and all such other data, documents, and information (including, without limitation, historical data, documents, and information) and to personnel (including, without limitation, through in-person, telephonic, or videoconference meetings), all as may be reasonably requested by the DIP Lender; *provided*, that with respect to access to the Debtors' personnel, the DIP Lender shall provide the Debtors and their restructuring counsel with written notice (email being sufficient) at least three (3) business days before the proposed date of such meeting; |
| (v) | (a) upon the request of DIP Lender, during normal business hours, and on reasonable prior notice (provided no prior notice is required if an Event of Default has occurred and is continuing), make the Debtors' inventory, equipment, other DIP Collateral, and books and records concerning the DIP Collateral (including software used in the Debtors' business) available to DIP Lender for inspection at the place where it is located and (b) take all reasonable action necessary to correctly and completely maintain such books and records; |
| (vi) | upon request of the DIP Lender, obtain additional insured and loss payee endorsements, as applicable, to the Loan Parties' insurance policies with respect to the DIP Collateral that name the DIP Lender as an additional insured and loss payee, as applicable, in form and substance reasonably acceptable to the DIP Lender; |
| (vii) | provide to the DIP Lender and its counsel substantially final drafts of the Plan Documents (including the Amended Plan, the plan supplement for the Amended Plan, and any proposed confirmation order, as well as any amendments to the operative filed versions of such documents) and any pleadings in connection with the DIP Facility or any sale of all or a material portion of the Debtors' assets or business (a "Sale Transaction") at least three calendar days prior to filing; |
| (viii) | deliver to the DIP Lender and its counsel, within two business days of receipt, all letters of intent, term sheets, and definitive agreements concerning any potential Sale Transaction, and consult with the DIP Lender regarding the terms of any proposed Sale Transaction and any potential Purchaser's financial and other ability to close any potential Sale Transaction; |
| (ix) | comply with the provisions of the DIP Loan Documents; and |

7

(x) take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Lender to carry out the provisions of the DIP Loan Documents.

The Debtors shall not, without the prior written consent of the DIP Lender, do, cause to be done, or agree to do or cause to be done, any of the following:

(i) create, incur, assume or suffer to exist any indebtedness that is equal to or senior in priority to the DIP Loan, except indebtedness expressly contemplated by this DIP Facility Term Sheet, or cause, permit to be caused, or agree to cause or permit to be caused, any direct or indirect subsidiary that is not a Debtor to, create, incur, assume or suffer to exist any such indebtedness other than trade payables created or incurred in the ordinary course of the Debtors' business, unless the proceeds of such indebtedness are immediately used to indefeasibly pay in full, in cash all DIP Obligations;

(ii) create, incur, assume or suffer to exist any lien that is equal to or senior in priority to the DIP Liens upon any of their property, assets, income or profits, whether now owned or hereafter acquired, except Permitted Liens, and shall not cause, or permit to be caused, any direct or indirect subsidiary that is not a Debtor to, create, incur, assume or suffer to exist any such liens other than liens arising in connection with trade payables created or incurred in the ordinary course of the Debtors' business; or

(iii) without the prior written consent of the DIP Lender, incur or make any expenditure (including, without limitation, any capital expenditure), investment or other payment, other than in accordance with the Approved Budget, measured for the period from the Closing Date to the date of such measurement, and at all times subject to a permitted variance (the "Permitted Variance") of (a) 15% on a line item basis exclusive of payments to Professional Persons, and (b) $500,000 in the aggregate for payments to Professional Persons; *provided*, *however*, that the Permitted Variances for Professional Persons shall not be available for (i) fees payable to Galaxy Digital and (ii) the amounts in the Approved Budget reflecting accruals through and including November 18, 2023. For the avoidance of doubt, Professionals Persons may apply any retainer held as of the Closing Date and such application shall not be treated as a payment by the Debtors for purpose of the Approved Budget or Permitted Variances.

(iv) The Debtors shall not, without prior consent of the DIP Lender, convey, sell, lease, assign, transfer, compromise or otherwise dispose of (including through a transaction of

| | | |
|---|---|---|
| | | merger or consolidation) or cause, permit to be caused, or agree to cause or permit to be caused, any direct or indirect subsidiary that is not a Debtor to convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property (including any claim and causes of action), business or assets, whether now owned or hereafter acquired, out of the ordinary course of business. |
| **Milestones** | | The Debtors shall comply with the following milestones (the "<u>Milestones</u>") unless otherwise modified or waived: |
| | (i) | by December 8, 2023, the Debtors shall have filed the plan supplement for the Amended Plan, the contents of which shall be acceptable in form and substance to the DIP Lender with respect to matters concerning repayment of the DIP Loans in the event of the Plan Roll Over, including providing for the DIP Lender's consent with respect to (a) the identification of the Plan Administrator and any PCT Litigation Trustee, (b) the vesting of assets pursuant to the Amended Plan (which shall not be inconsistent with the releases in the Amended Plan or this Term Sheet), (c) the governance of the Wind-Down Debtors and any PCT Litigation Trust, (d) the payment of expenses of the Wind-Down Debtor, Plan Administrator, and PCT Litigation Trust, and (e) the distribution of assets by the Wind-Down Debtor, Plan Administrator and/or PCT Litigation Trustee, as applicable (the "<u>Plan Conditions</u>"); |
| | (ii) | by no later than December 19, 2023, the Bankruptcy Court shall have commenced a hearing on confirmation of the Amended Plan; and |
| | (iii) | by no later than December 27, 2023, the Bankruptcy Court shall have entered an order confirming the Amended Plan. |
| **Conditions Precedent to Closing and Funding** | | The obligations of the DIP Lender to fund the DIP Loan on the Closing Date will be subject to satisfaction, or waiver by the DIP Lender in its sole and absolute discretion, of the following conditions precedent: |
| | (i) | delivery of the Approved Budget; |
| | (ii) | entry of the Final DIP Order, which shall approve this DIP Facility Term Sheet and otherwise be in form and substance acceptable to the DIP Lender; |
| | (iii) | the Final DIP Order, as entered by the Bankruptcy Court, shall not have been reversed, modified, amended, stayed or vacated without the consent of the DIP Lender (which consent shall not be unreasonably withheld); |
| | (iv) | the DIP Lender shall have a valid and perfected lien on and security interest in the DIP Collateral on the basis and with the priority set forth herein; |
| | (v) | as of the date of such Borrowing, all representations and warranties shall be true and correct as of such date and no facts and circumstances shall exist as of such date that would result in, or give |

| | | |
|---|---|---|
| | | rise to the occurrence of, an Event of Default; |
| | (vi) | unless the DIP Lender has agreed to add such amounts to the principal balance of the DIP Loans, the Debtors shall have paid or caused to be paid the reasonable attorneys' fees of the DIP Lender incurred in connection with negotiating and documenting the DIP Facility and obtaining entry of the Final DIP Order; |
| | (vii) | the Debtors shall have filed the Amended Plan or a chapter 11 plan otherwise acceptable in form and substance to the DIP Lender with respect to the Plan Conditions, and if the plan supplement documents have been filed prior to the closing, the Plan Conditions shall have been, and continue to be, satisfied with respect to the plan supplement documents; |
| | (viii) | Galaxy Digital Partners, LLC shall have waived, in a manner acceptable to the DIP Lender, payment of any Financing Fee in connection with the DIP Facility; and |
| | (ix) | the Closing Date shall have occurred on or before the date that is two (2) calendar days after the date of entry of the Final DIP Order. |
| **Events of Default** | \multicolumn{2}{l|}{The following shall constitute events of default under the DIP Facility (the "<u>Events of Default</u>"):} |
| | (i) | failure by the Debtors to be in compliance in all respects with any provision of the DIP Loan Documents or the Final DIP Order; |
| | (ii) | reversal, modification, amendment, stay or vacation of the Final DIP Order, each as entered by the Bankruptcy Court, without the prior written consent of the DIP Lender (which consent shall not be unreasonably withheld); |
| | (iii) | Other than the plan and plan supplement filed on November 28, 2023, the filing with the Bankruptcy Court of a plan of reorganization or liquidation in the Chapter 11 Cases, or any plan supplement thereto, other than the Amended Plan, or the filing of any amendments to the Plan, any Amended Plan, or any plan supplement documents for the Amended Plan that cause the Plan Conditions to no longer be satisfied; |
| | (iv) | the filing of any pleading in connection with the DIP Facility or any Sale Transaction (unless the Sale Transaction will result in indefeasible payment in full of the DIP Obligations at the closing thereof) that is not acceptable to the DIP Lender; |
| | (v) | the appointment of (a) an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code, or (b) a trustee pursuant to section 1104(a) of the Bankruptcy Code in one or more of the Chapter 11 Cases; |
| | (vi) | the filing of a motion by the Debtors seeking dismissal of any Chapter 11 Case or the conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; |
| | (vii) | the granting of relief from the automatic stay by the Bankruptcy |

10

|  |  |  |
|---|---|---|
|  |  | Court as to any material assets of the Debtors to any other creditor or party in interest in the Chapter 11 Cases; |
|  | (viii) | failure of all amounts due and owing to the DIP Lender under, in respect of or in connection with the DIP Facility to be paid in full in cash on the Maturity Date, unless the Maturity Date is the Effective Date of the Amended Plan and the Plan Roll-Over has been elected; |
|  | (ix) | any provision in this DIP Facility Term Sheet shall cease to be binding on or enforceable against the parties hereto; or |
|  | (x) | any third party has exercised a right of set-off or recoupment against the DIP Collateral and such set-off or recoupment has not been cured or remedied to the satisfaction of the DIP Lender in its reasonable discretion within seven (7) business days. |
|  | Upon the occurrence and during the continuation of an Event of Default, without further order from or application to the Bankruptcy Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to (A) deliver to the Borrower and the Guarantors a notice declaring the occurrence of an Event of Default, (B) [omitted], (C) declare the DIP Loans then outstanding to be due and payable, (D) terminate the DIP Facility, (E) charge the default rate of interest under the DIP Facility, (F) exercise any and all rights of setoff, (G) exercise any right or remedy with respect to the DIP Collateral or the DIP Liens, or (H) take any other action or exercise any other right or remedy permitted under the DIP Loan Documents, the Final DIP Order or applicable law; *provided, however*, that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (F), (G), or (H) above, (i) the DIP Lender shall provide counsel to the Debtors, counsel to the Committee, and the Office of the United States Trustee with five (5) business days' prior written notice (such period, the "Remedies Notice Period"), and (ii) during the Remedies Notice Period, the Loan Parties and/or Committee shall be permitted to request an emergency hearing before the Bankruptcy Court (which request must be made prior to the conclusion of the Remedies Notice Period and shall seek consideration of such request on an expedited basis) solely to consider on an expedited basis whether (a) an Event of Default has occurred or is continuing and (b) any appropriate relief relating to the nonconsensual use of cash collateral; *provided, further*, that in any such hearing following such notice, the only issue that may be raised by any party in opposition to the actions proposed or available to be taken by the DIP Lender shall be whether, in fact, an Event of Default has occurred and is continuing or the appropriate relief relating to the nonconsensual use of cash collateral; *provided, further*, that during the Remedies Notice Period, the Loan Parties are permitted to use cash collateral solely to fund expenses critically necessary to preserve the value of the Loan Parties' businesses. | |
| **Releases** | The Final DIP Order shall contain a full and complete release of any and all claims and cause of action that the Debtors and their estate have or may have against Polaris Ventures and its past and present directors, officers, employees, managers, affiliates, subsidiaries, and related parties, in form and substance acceptable to the DIP Lender in its sole and absolute discretion. | |

11

| | |
|---|---|
| **Waivers and Protections** | Upon entry of the Final DIP Order:<br><br>(i) The Loan Parties shall waive any right to surcharge pursuant to section 506(c) of the Bankruptcy Code the DIP Collateral with respect to the DIP Lender.<br><br>(ii) The Loan Parties shall waive the "equities of the case" doctrine, if applicable, and the equitable doctrine of "marshalling" against the DIP Collateral with respect to the DIP Lender.<br><br>(iii) No proceeds of the DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to or contest the extent, validity, enforceability, security, perfection or priority of any of the DIP Liens, or DIP Obligations, (b) investigate or initiate any claim or cause of action against the DIP Lender, (c) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the DIP Lender, or (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the DIP Facility Documents and the Final DIP Order) that are senior to or *pari passu* with the DIP Liens or the DIP Superpriority Claims.<br><br>(iv) The DIP Lender shall be entitled to good faith protection under section 364(e) of the Bankruptcy Code. |
| **Indemnification** | The Debtors shall indemnify, pay and hold harmless the DIP Lender (and its respective directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). |
| **Fees and Expenses** | The reasonable fees and expenses, including the fees and expenses of counsel and other professionals, actually incurred by the DIP Lender in connection with the DIP Facility shall be DIP Obligations and due and payable by the Debtors upon presentment, subject to any notice and objection period set forth in the Final DIP Order, and amounts that are payable after the expiration of any notice and objection period and remain unpaid for a period of five (5) days shall accrue Default Interest; *provided, however*, the DIP Lender shall add such fees and expenses to the principal amount of the DIP Loans. |
| **Governing Law** | This DIP Facility Term Sheet and the DIP Loan Documents will be governed by the laws of the State of New York (except as otherwise set forth therein). During the pendency of the Chapter 11 Cases, the Bankruptcy Court shall maintain exclusive jurisdiction with respect to the interpretation and enforcement of the DIP Facility Documents and the exercise of the remedies by the DIP Lender and preservation of the value of the DIP Collateral. |

**[Signature Pages Follow]**

IN WITNESS HEREOF, the parties hereto have caused this DIP Facility Term Sheet to be executed as of the date set forth above.

PRIME CORE TECHNOLOGIES INC., as Borrower

By: *Michael Wyse*
Name: Michael Wyse
Its: Member, Special Committee of the Debtors and Debtors in Possession


PRIME TRUST, LLC, as a Guarantor

By: *Michael Wyse*
Name: Michael Wyse
Its: Member, Special Committee of the Debtors and Debtors in Possession


PRIME DIGITAL, LLC, as a Guarantor

By: *Michael Wyse*
Name: Michael Wyse
Its: Member, Special Committee of the Debtors and Debtors in Possession

PRIME IRA LLC, as a Guarantor

By: *Michael Wyse*
Name: Michael Wyse
Its: Member, Special Committee of the Debtors and Debtors in Possession

[Signature Page to DIP Facility Term Sheet]

POLARIS ENTURES,
as DIP ender

By: _Ruairi Donnelly_
Name: **Ruairi Donnelly**
Its: **President**

[Signature Page to DIP Facility Term Sheet]

## **EXHIBIT A**

**Approved Budget**

200332175

Exhibit A

Prime Core Technologies Inc., et al. (Case # 23-11161)
DIP Budget (11/27/2023)

| Actual / Forecast | Act. | Act. | Act. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | 10-Wk. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| Week Ending | 10/28 | 11/4 | 11/11 | 11/18 | 11/25 | 12/2 | 12/9 | 12/16 | 12/23 | 12/30 | Total |
| **Total Receipts** | $35,838 | $35,605 | $16,993 | $150 | – | – | – | – | $13,000,000 | – | $13,088,586 |
| **Disbursements** | | | | | | | | | | | |
| Software | – | $201,021 | – | $12,000 | $123,864 | $100,000 | $420,300 | $397,494 | – | – | $1,254,679 |
| Payroll & Benefits | 404,759 | 91,908 | 380,842 | 75,500 | – | 295,750 | – | 137,000 | – | 152,000 | 1,537,758 |
| Other | 64,778 | 15,727 | 3,574 | 68,928 | 30,869 | 225,391 | 94,700 | 94,553 | 25,750 | 96,110 | 720,378 |
| Special Committee | – | – | – | 75,000 | – | – | 75,000 | – | – | – | 150,000 |
| US Trustee | – | – | 17,436 | – | – | – | – | – | – | 12,564 | 30,000 |
| Stretto Prepayment | – | – | – | – | – | 350,000 | – | 130,000 | – | – | 480,000 |
| **Total Disbursements** | $469,537 | $308,655 | $401,852 | $231,428 | $154,733 | $971,140 | $590,000 | $759,047 | $25,750 | $260,673 | $4,172,816 |
| **Pro Fee Disbursement / Carveout** | | | | | | | | | | | |
| Debtor Professionals | | | | | | | | | | | |
| McDermott Will & Emery | – | – | – | – | – | $2,201,795 | – | – | $4,065,449 | $100,000 | $6,367,244 |
| M3 Partners | – | – | – | – | – | 723,818 | – | – | 1,514,182 | 50,000 | 2,288,000 |
| Galaxy Digital | – | – | – | – | – | – | – | – | 175,000 | – | 175,000 |
| Stretto | – | – | – | 174,498 | – | – | – | – | 733,552 | 50,000 | 958,050 |
| JS Held | – | – | – | – | – | – | – | – | 181,000 | 5,000 | 186,000 |
| **Pro Fee Disbursements / Carveout (Debtor)** | – | – | – | $174,498 | – | $2,925,613 | – | – | $6,669,183 | $205,000 | $9,974,294 |
| UCC Professionals | | | | | | | | | | | |
| Brown Rudnick (Lead Counsel) | – | – | – | – | – | $430,461 | – | – | $1,341,939 | $75,000 | $1,847,400 |
| Womble (Local Counsel) | – | – | – | – | – | 18,614 | – | – | 96,628 | 7,500 | 122,742 |
| Province | – | – | – | – | – | 254,596 | – | – | 732,144 | 50,000 | 1,036,740 |
| **Pro Fee Disbursements / Carveout (UCC)** | – | – | – | – | – | $703,671 | – | – | $2,170,711 | $132,500 | $3,006,882 |
| **Total Pro Fee Disbursements / Carveout** | – | – | – | $174,498 | – | $3,629,284 | – | – | $8,839,894 | $337,500 | $12,981,176 |
| **Net Cash Flow** | ($433,698) | ($273,050) | ($384,859) | ($405,776) | ($154,733) | ($4,600,424) | ($590,000) | ($759,047) | $4,134,356 | ($598,173) | ($4,065,406) |
| **Change in Cash** | | | | | | | | | | | |
| Beginning Cash | $9,016,909 | $8,583,211 | $8,310,160 | $7,925,302 | $7,519,525 | $7,364,792 | $2,764,368 | $2,174,368 | $1,415,320 | $5,549,676 | $9,016,909 |
| Net Cash Flow | (433,698) | (273,050) | (384,859) | (405,776) | (154,733) | (4,600,424) | (590,000) | (759,047) | 4,134,356 | (598,173) | (4,065,406) |
| **Ending Cash** | $8,583,211 | $8,310,160 | $7,925,302 | $7,519,525 | $7,364,792 | $2,764,368 | $2,174,368 | $1,415,320 | $5,549,676 | $4,951,503 | $4,951,503 |
| Trust License Reserve | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| **Available Liquidity** | $7,583,211 | $7,310,160 | $6,925,302 | $6,519,525 | $6,364,792 | $1,764,368 | $1,174,368 | $415,320 | $4,549,676 | $3,951,503 | $3,951,503 |
| Estimated Emergence Costs | $3,922,000 | $3,922,000 | $3,922,000 | $3,922,000 | $3,922,000 | $3,922,000 | $3,922,000 | $3,922,000 | $3,922,000 | $3,922,000 | $3,922,000 |
| **Funding Surplus (Deficit)** | $3,661,211 | $3,388,160 | $3,003,302 | $2,597,525 | $2,442,792 | ($2,157,632) | ($2,747,632) | ($3,506,680) | $627,676 | $29,503 | $29,503 |
| **DIP** | | | | | | | | | | | |
| Beginning DIP Balance | – | – | – | – | – | – | – | – | – | $10,300,000 | – |
| (+) Accrued DIP Interest | – | – | – | – | – | – | – | – | – | – | – |
| (+) DIP Professional Fees | – | – | – | – | – | – | – | – | 300,000 | – | 300,000 |
| (+) DIP Funding | – | – | – | – | – | – | – | – | 10,000,000 | – | 10,000,000 |
| (-) DIP Interest Paid | – | – | – | – | – | – | – | – | – | – | – |
| **Ending DIP Balance** | – | – | – | – | – | – | – | – | $10,300,000 | $10,300,000 | $10,300,000 |