<table>
<tr><td>1</td><td></td></tr>
</table>

|   |   |   |
|---|---|---|
| 1 | | UNITED STATES BANKRUPTCY COURT |
| | | DISTRICT OF DELAWARE |
| 2 | | |
| 3 | IN RE: | . Chapter 11 |
| | | . Case No. 23-11161 (JKS) |
| 4 | PRIME CORE TECHNOLOGIES | . |
| | INC., *et al.*, | . (Jointly Administered) |
| 5 | | . |
| | | . |
| 6 | | . Courtroom No. 6 |
| | | . 824 Market Street |
| 7 | | . Wilmington, Delaware 19801 |
| | Debtors. | . |
| 8 | | . Tuesday, December 19, 2023 |
| | . . . . . . . . . . . . . . | . 10:00 a.m. |
| 9 | | |

```
 1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 23-11161 (JKS)
 4   PRIME CORE TECHNOLOGIES     .
     INC., et al.,               .  (Jointly Administered)
 5                               .
                                 .
 6                               .  Courtroom No. 6
                                 .  824 Market Street
 7                               .  Wilmington, Delaware 19801
               Debtors.          .
 8                               .  Tuesday, December 19, 2023
     . . . . . . . . . . . . . . .  10:00 a.m.
 9
                          TRANSCRIPT OF HEARING
10            BEFORE THE HONORABLE J. KATE STICKLES
                   UNITED STATES BANKRUPTCY JUDGE
11
     APPEARANCES:
12
     For the Debtors:          Maris J. Kandestin, Esquire
13                             MCDERMOTT WILL & EMERY LLP
                               1000 North West Street, Suite 1400
14                             Wilmington, Delaware 19801

15                             Darren Azman, Esquire
                               Joseph B. Evans, Esquire
16                             Lucas Barrett, Esquire
                               MCDERMOTT WILL & EMERY LLP
17                             One Vanderbilt Avenue
                               New York, New York 10017
18

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Jermaine Cooper, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email: gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For the Debtors:          Jake Jumbeck, Esquire
                          MCDERMOTT WILL & EMERY LLP
                          444 West Lake Street
                          Chicago, Illinois 60606

For the U.S. Trustee:     Joseph Cudia, Esquire
                          OFFICE OF THE UNITED STATES TRUSTEE
                          U.S. DEPARTMENT OF JUSTICE
                          844 King Street, Suite 2207
                          Lockbox 35
                          Wilmington, Delaware 19801

For the Committee:        Robert Stark, Esquire
                          BROWN RUDNICK LLP
                          7 Times Square
                          New York, New York 10036

                          Tristan Axelrod, Esquire
                          BROWN RUDNICK LLP
                          One Financial Center
                          Boston, Massachusetts 02111

For Zap Solutions:        Martin Beeler, Esquire
                          COVINGTON & BURLING LLP
                          The New York Times Building
                          620 Eighth Avenue
                          New York, New York 10018

For Polaris Ventures:     Ryan Bartley, Esquire
                          YOUNG CONAWAY STARGATT & TAYLOR LLP
                          One Rodney Square
                          1000 North King Street
                          Wilmington, Delaware 19801

For Tiki Labs:            David Newman, Esquire
                          HOLLAND & KNIGHT
                          701 Brickell Avenue
                          Suite 3300
                          Miami, Florida 33131

Pro Se Litigants:         Shyam Sundar Aswadhs Narayanan
                          Yi-Jou Chiang

1                                   INDEX

2       MOTIONS:                                                    PAGE

3       Agenda
        Item 11:  Notice to Contract Parties to Potentially          18
4                 Assumed Executory Contracts and Unexpired
                  Leases [Filed 9/19/2023; Docket No. 166]
5

6       Agenda
        Item 12:  Debtors' Objection to Proof of Claim No.           19
7                 416 Filed by Conor O'Brien Pursuant to
                  Section 502 of the Bankruptcy Code and
8                 Bankruptcy Rule 3007
                  [Filed 11/18/23; Docket No. 434]
9
                  Court's Ruling:                                    20
10

11      Agenda
        Item 15:  Debtors' Motion to Further Amend the               21
12                Amended Order (I) Authorizing Debtors to
                  File a Consolidated Creditor Matrix and
13                Top 50 Creditors List; (II) Authorizing
                  Redaction of Certain Personally
14                Identifiable Information; (III) Authorizing
                  the Debtors to Serve Certain Parties by
15                Electronic Mail; (IV) Approving Certain
                  Notice Procedures; and (V) Granting Related
16                Relief [Filed 11/27/23; Docket No. 474]

17                Court's Ruling:                                    104

18      Agenda
        Item 13:  Debtors' First (Substantive) Omnibus              53
19                Objection to Certain Filed Proofs of Claim
                  [REDACTED] [Filed 11/18/23; Docket No. 436]
20
                  Court's Ruling:                                    79
21

22      Agenda
        Item 14:  Debtors' Second (Non-Substantive) Omnibus         81
23                Objection to Certain Filed Proofs of Claim
                  [REDACTED] [Filed 11/18/23; Docket No. 438]
24
                  Court's Ruling:                                    82
25

1                                  INDEX

2   <u>MOTIONS</u>:                                          <u>PAGE</u>

3   Agenda
    Item 16: Debtors' Motion for Entry of an Order (I)      83
4            Authorizing the Debtors to Obtain Secured
             Priming Postpetition Financing, (II) Granting
5            Liens and Superpriority Administrative
             Expense Claims, (III) Authorizing the Use of
6            Cash Collateral, (IV) Modifying the Automatic
             Stay, and (V) Granting Related Relief
7            [Filed 12/5/23; Docket No. 523]

8            Court's Ruling:                                 94

9

10  WITNESSES CALLED
    BY THE DEBTORS:                                         <u>PAGE</u>

11
        <u>BRIAN KARPUK</u>
12      Cross-examination by Mr. Cudia                       32
        Redirect examination by Mr. Evans                    65

13

14
    <u>DECLARATIONS</u>:                                     <u>PAGE</u>

15
    1) William Murphy                                        19
16
    2) Brian Karpuk                                          22
17
    3) Robert Winning                                        85
18
    4) Michael Ash                                           85
19

20

21

22

23

24

25

1          (Proceedings commence at 10:07 a.m.)

2          (Call to order of the Court)

3               THE COURT:  Good morning.  Please be seated.

4               This is Judge Stickles, we're on the record in

5     Prime Core Technologies, Case Number 23-11161.  Excuse me.

6               Good morning, Counsel.

7          **(No Recording Microphone at Counsel Table and Lectern)**

8               MS. KANDESTIN:  Good morning, Your Honor.  May it

9     please the Court, Maris Kandestin of McDermott, Will & Emery

10    on behalf of the debtors.

11              THE COURT:  I'm sorry.  We're having trouble

12    picking you up.  You need to raise your voice a little bit.

13         (Participants confer)

14              MS. KANDESTIN:  I'm sorry.  I have a little

15    (indiscernible) a cold.

16              THE COURT:  Well, I can hear you up here.  Hold on.

17         (Participants confer)

18              MS. KANDESTIN:  Is this better?

19              THE COURT:  Yeah.  Thank you.

20         (Participants confer)

21              MS. KANDESTIN:  Is that better?  Yes.

22              UNIDENTIFIED:  (Indiscernible)

23              THE COURT:  Yes.

24              MS. KANDESTIN:  Great.  Sorry (indiscernible)

25              THE COURT:  No problem.

1          MS. KANDESTIN:  I would like to thank Your Honor's

2  and chambers staff for bearing with us these past five months

3  and being so accommodating and helping (indiscernible) these

4  cases to their conclusion, which I fervently hope happens to

5  day.

6          I would to start by making some introductions.  In

7  the courtroom with me today are my partners Darren Azman and

8  Joseph Evans, Gregg Steinman and Greer Griffith, as well as

9  my colleagues Jake Jumbeck and Luke Barrett.

10          Also in the courtroom with me today are various

11  declarants who wrote the declarations in support of matters

12  on today's agenda:

13          Michael Weiss of -- one of the three members of our

14  special committee;

15          Rob Winning of M3 Advisory Partners, who is our

16  financial advisor;

17          Also with M3, Mr. William Murphy;

18          And Michael Ashe of Galaxy Digital Partners, the

19  debtors' investment banker;

20          And Brian Karpuk of Stretto, the debtors' claims,

21  noticing and voting agent.

22          If it may please the Court, before I turn to the

23  agenda, I would like to cede the podium to my partner Darren

24  Azman to give a brief overview of the case and some updates.

25          THE COURT:  Okay.  Good morning and welcome,

1  everyone.

2         And let me just say I have read the pleadings

3  before the Court.  And before we begin, I would like to

4  discuss, generally, the plan that's before the Court, the

5  debtors' path forward, and the milestones that are set

6  forward.  So, since you intended to make an introductory

7  statement anyway, I'll let you proceed forward.

8         MR. AZMAN:  Sure.  Thank you, Your Honor.

9         Your Honor, it's been a while since we've been in

10 your court and provided an update, so, as Ms. Kandestin said,

11 I thought it would be helpful just to spend a few minutes

12 catching Your Honor up on what's happening and how we got to

13 where we are today.

14        Your Honor will remember that you approved bidding

15 procedures early in the case, and our goal was to sell this

16 company.

17        Galaxy, our investment banker, they spent a lot of

18 time talking to potential bidders.  Ultimately, there was

19 really just one party who was serious about an acquisition.

20 And I think, to this day, they're still serious about an

21 acquisition.  The problem is that that party did not have

22 capital to consummate the transaction.

23        They were on the cusp, we were told, of raising

24 capital to fund the transaction.  But on top of that, the

25 bidder that was raising that capital, that money was coming

1  from an investment fund that, itself, was in the middle of

2  raising its own capital, so we had sort of two different

3  financing contingencies involved there.  And so I don't know

4  where any of that landed, ultimately.  But what I do know is

5  that, at no point in time, including where we are today, did

6  we have a serious bidder who actually had the capital to

7  consummate the transaction.

8          So we immediately pivoted to two different things:

9          First, we pivoted to a wind-down.  This meant

10  terminating additional employees, rejecting contracts that we

11  no longer needed for an acquisition, and generally preparing

12  for the liquidation toggle that we contemplated by the plan,

13  if, ultimately, we were not successful with the sale process.

14          Second, Your Honor, Galaxy began exploring what

15  I'll call "transaction light alternatives."  And ultimately,

16  that came in the form of a license agreement that Your Honor

17  has already approved.  And thank you for that.

18          The license agreement is essentially a license to

19  the third party to use Prime's intellectual property in

20  perpetuity.  We have told the Court on several occasions the

21  value of this company is that they put together a bunch of

22  things that, independently, are not so valuable, but, when

23  put together, are valuable.  And that is what the third party

24  is licensing.  So that is good news and will ultimately yield

25  the estate $2.4 million.

1          The other good news is that this was a nonexclusive

2   deal.  So Galaxy is actually out there right now talking to

3   others who have expressed an interest in a similar licensing

4   deal for the same technology, and that looks promising.

5          Your Honor, the other noteworthy item on the agenda

6   besides plan confirmation is the DIP financing.

7          So, Your Honor, there were several ways here to

8   fund a liquidating plan.  However, along the way, one of the

9   committee members, Polaris, reached out to us and initiated

10  talks to provide the funding that we needed.  We're very

11  grateful for Polaris' support.  They're owed more than $30

12  million in this case, so they have every incentive to see

13  this case through to an orderly wind-down and to pursue

14  causes of action, and that is exactly what this plan will do.

15  Because of the Polaris DIP, we will be able to satisfy admin

16  expenses in full.  And probably just as importantly, there

17  will be significant funding to pursue causes of action.

18          Your Honor, we certainly would have like to have

19  accomplished more in this case during our short stay.  But as

20  you heard at the first-day hearing from me, we were hoping

21  that this would be the shortest crypto bankruptcy case that's

22  happened so far.  And assuming we get through today's hearing

23  successfully, we will have accomplished that.  And as you'll

24  hear in more detail later, we have the support of the

25  committee and also of the creditors in our various classes.

1          Your Honor, I know you had some questions.

2    Depending on what they are, I may turn them back over to Ms.

3    Kandestin, but I'm happy to try to answer them if you'd like.

4          THE COURT:  Well, I guess my -- you know, there are

5    multiple plans.  And the Court gets all of this 48 hours

6    before the hearing, and the plan initially provided for the

7    three toggles.

8          At what juncture did the debtor pivot to

9    liquidation, was that the end of November?

10         MR. AZMAN:  I think it was the end of November.  I

11   mean, basically, when we learned -- we made a decision when

12   we canceled -- we filed a notice of cancellation --

13         THE COURT:  Right.

14         MR. AZMAN:  -- of the auction.  And I'd say that,

15   leading up to that, we were certainly strongly considering

16   moving away, just given what we knew, but we didn't want to

17   publicize that fact because it could have had an adverse

18   impact on, you know, what was left of the sale process.

19         But certainly, by the time we filed that notice of

20   cancellation of auction, that is definitively when we said

21   we're not selling this business, we can't afford to keep

22   employing all the people we have employed, we need to reject

23   contracts that we were sort of holding back if there was a

24   buyer.

25         THE COURT:  Okay.  And --

1    MR. AZMAN:  And I don't remember the exact date of

2 --

3    THE COURT:  Well, I'm --

4    MR. AZMAN:  -- when we filed that notice.

5    THE COURT:  I'm thinking out of -- in the context

6 of -- at that point, the debtor had already solicited,

7 correct?

8    MR. AZMAN:  I believe solicitation must have gone

9 out by then.  I --

10    THE COURT:  Right.  So, in terms of notice to

11 parties of what the process was going to be going forward --

12 because, as I read your plan, the plan itself still speaks of

13 the toggle and still contains sections regarding a

14 reorganization transaction and a sale transaction.

15    MR. AZMAN:  I'm going to turn it now over to Ms.

16 Kandestin.

17    THE COURT:  Okay.

18    MS. KANDESTIN:  Your Honor, on November 28th, we

19 filed a supplement to our disclosure statement, that was

20 before the -- a week before the voting deadline, where we

21 explained that we were pursuing a liquidation toggle and that

22 the sale process had not been successful.

23    In our mind, it has -- you know, typically, you

24 don't see all the toggles (indiscernible) in the final plan.

25 And we thought it would be more confusing to creditors to

1  have so much red all over the plan.  We left the plan as is

2  and then included that information in the supplement to the

3  disclosure statement that we filed.

4        THE COURT:  So there's -- I just want to make sure

5  because that's exactly how I read it, that it was in a

6  disclosure statement.  But nowhere in the plan does it say

7  that the toggle was no longer in effect.

8        MS. KANDESTIN:  No.  But the plan, we did have --

9  everybody -- the voting parties did have notice that there

10 were multiple toggles and any one of them could have been

11 triggered.  And so, by putting the additional disclosure,

12 which we served out in the disclosure statement supplement,

13 that was providing notice that we were pursuing the

14 liquidation transaction.

15        It's our position that they always had notice that

16 this was a potential outcome (indiscernible)

17        THE COURT:  Okay.  So let me ask you this.  With

18 respect to sources to fund the plan, walk through -- I

19 appreciate that there is a proposed DIP for $3 million of

20 that 10 million to go to funding.  And I understand that

21 there's investigations with potential litigation, you know,

22 clawback, D&O, perhaps the 98f wallet.

23        MS. KANDESTIN:  Yes.

24        THE COURT:  So talk to me.  What are the sources to

25 fund this plan.

1          MS. KANDESTIN:  All of the things that you just

2    referred to, also the license fees under the swan [sic]

3    license agreement, the funds that we'll receive under the

4    Audius set -- the Tiki Lab settlement by liquidating the

5    audio.  And I think that's -- I think that's everything.

6          THE COURT:  And so, as I understand, walking into

7    this plan, the whole issue of ownership with respect to

8    customer accounts is unresolved and punted to another day.

9          MS. KANDESTIN:  Yes.  We did bring one motion, the

10   foreign currency sale motion, which is -- there's a status

11   conference this afternoon about that.  That was one motion we

12   brought on these account treatment issues.

13          The other was the settlement we entered into with

14   Tiki Labs.  That was (indiscernible) an account settlement

15   issue.

16          And then, in the plan, we've added -- to address

17   objections and just for a number of reasons, we've added

18   account treatment procedures.

19          THE COURT:  I saw -- that's 2.5?

20          MR. AZMAN:  Yes, 2.5(b).  To address concerns that

21   there was no clarity or (indiscernible) around how these

22   would be done, the timing, and what have you, and just giving

23   people an opportunity to look to these procedures, a time

24   line, an outside date by which they'll know which category of

25   contract they fall into, and then the next steps after that.

1          We also put those in there because we wanted to,

2    you know, produce -- promote judicial economy and avoid

3    having multiple people filing, you know, disparate motions,

4    even though they could be addressed at the same time or in an

5    omnibus fashion.  So we wanted to sort of provide a runway

6    for an orderly determination of these issues.

7          THE COURT:  So walk through for me how do you

8    anticipate -- so the debtor is going to send notice there is

9    a deadline for people to respond.

10         MS. KANDESTIN:  Uh-huh.

11         THE COURT:  And let's say, at that point -- first

12   of all, how many accounts are there to reconcile?

13         MS. KANDESTIN:  Contracts?

14         THE COURT:  Yeah.

15         MS. KANDESTIN:  Well, there are, I believe -- and

16   someone will correct me if I'm wrong -- under 500 integrator

17   contracts and then there are 4 million individual --

18         THE COURT:  Okay.

19         MS. KANDESTIN:  -- end user contracts.

20         THE COURT:  All right.  So how do you anticipate

21   proceeding forward to the extent that you get objections to

22   what the debtors propose as either being ownership or not

23   ownership?

24         MS. KANDESTIN:  So we would meet and confer with

25   those parties to come up with a schedule and hearing date

1  that we would like.  Then we would approach chambers to

2  schedule those matters for hearing.

3         THE COURT:  And so we're going to have potentially

4  millions of one-off disputes on ownership?

5         MS. KANDESTIN:  I don't think it's -- I think, for

6  the most part, the end user agreements are consistent.  I

7  think that the major issues are with those integrator

8  agreements because some are bespoke, some are, you know,

9  strictly under the form master services agreement, and some

10 are legacy agreements.  I think the big issue is going to be

11 sort of categorizing those and approaching those on an

12 omnibus basis.

13        Now the one-offs are going to come, I think, with

14 bespoke agreements that are so dissimilar to each other than

15 they need to be addressed individually.  I don't believe that

16 the individual end user agreements, the (indiscernible)

17 agreements, are going to be any different from the standard

18 version.  And if they are, I don't believe it's going to be

19 that big of a number.

20     (Pause in proceedings)

21        THE COURT:  Is there a time frame the debtors plan

22 to be resolved on all these issues?

23        MS. KANDESTIN:  Actually, we have an outside date

24 of 120 days, by which the wind-down debtor will notify

25 customers as to which bucket they fall into.  And then we --

1   and an estimate time frame for when, you know, that decision

2   will be made.

3          We -- I won't speak for the wind-down -- the wind-

4   down debtor or the plan administrator elect.  But just

5   walking through the issues with my team, it doesn't seem like

6   those would be going beyond a year.  I think that is a good

7   outside date.  I think it's probably a lot closer.  And we've

8   already been in talks with certain customers to set deadlines

9   that are well in advance of that.

10         THE COURT:  Okay.  I just had one other comment

11  before we proceed forward.  And I'm sorry, but I just want to

12  -- I want to make sure that I have a firm understanding of

13  what I've read.

14         The debtor has not done any cramdown analysis with

15  respect to rejection of Class B.  If the tab -- if this Court

16  accepts the tabulation that's on -- I forget the term you

17  used, the un ...

18         MS. KANDESTIN:  The treated?

19         THE COURT:  Yeah, untreated tabulation.  Is there a

20  reason?

21         MS. KANDESTIN:  No.  No, I --

22         THE COURT:  But you'll be prepared to address it

23  today?

24         MS. KANDESTIN:  Yes.  I will -- we have our voting

25  agent here with us and Mr. Karpuk will be prepared to address

1    it.

2              THE COURT:  Okay.  All right.  Thank you.

3         (Participants confer)

4              MS. KANDESTIN:  Okay.  So, with that, Your Honor,

5    we'll turn to our second amended agenda, which we filed --

6    excuse me -- this moring, at Docket Number 622.  Does Your

7    Honor have a copy?

8              THE COURT:  Bear with me a second.  It's the second

9    amended?

10             MS. KANDESTIN:  Yes.

11             THE COURT:  Okay.  I have a copy.  I'm assuming --

12   it doesn't have a docket number on it, but I have a copy.

13             MS. KANDESTIN:  So I'd like to thank Your Honor for

14   entering orders on Items 1 through 10 prior to today's

15   hearing.

16             And I would like to now cede the podium to my

17   colleague Luke Barrett who will present Item Numbers 11 and

18   12 and, with Your Honor's permission, Item Number 15

19   (indiscernible) order.

20             THE COURT:  Okay.  Bear with me a second, Mr.

21   Barrett.

22             MR. BARRETT:  (Indiscernible) Your Honor.

23             THE COURT:  Let me get the right binder.

24        (Pause in proceedings)

25             THE COURT:  Okay.  You may begin.

1          MR. BARRETT:  Good morning, Your Honor.  For the

2  record --

3          THE COURT:  Good morning.

4          MR. BARRETT:  -- Luke Barrett of McDermott, Will &

5  Emery on behalf of the debtor.

6          May I proceed?

7          THE COURT:  Yes.

8          MR. BARRETT:  Your Honor, the first item on the

9  agenda that I'll be handling, as my colleague noted, is Item

10  11, the notice to contract parties to potentially assume the

11  executory contract and unexpired leases filed at Docket

12  Number 166.

13          Your Honor, the debtors received two objections to

14  the notice.  However, in the time since the filing of the

15  notice and the filing of the objections, the debtors filed

16  their third amended plan supplement at Docket Number 595.

17  The third amended plan supplement identified the underlying

18  contracts for both objections in the schedule of rejected

19  contracts rendering these objections moot at this time.

20          Unless Your Honor has any questions, I'd proceed to

21  the next item on --

22          THE COURT:  Okay.  So --

23          MR. BARRETT:  -- the agenda.

24          THE COURT:  -- are the debtors withdrawing these

25  objections?

1          MR. BARRETT:  I'm sorry, Your Honor.  These are

2    objections filed by contract counterparties, not the debtors.

3          THE COURT:  Oh, I'm sorry.  I'm sorry.  I was look

4    -- you're just giving -- understood.  Continue.  I'm sorry.

5          MR. BARRETT:  Thank you.  No, not at all, Your

6    Honor.

7          Your Honor, the next item I'd like to address is

8    Item Number 12, and that is the debtors' objection to Proof

9    of Claim Number 416, filed by Conor O'Brien.  It was filed at

10   Docket Number 434.

11         Your Honor, attached to the debtors' objection is

12   the declaration of William Murphy in support of the debtors'

13   objection.  Unless Your Honor has any questions, I would like

14   to move Mr. Murphy's declaration into evidence at this time.

15         THE COURT:  Does anyone object to the admission of

16   the Murphy declaration at Docket Number 434?

17       (No verbal response)

18         THE COURT:  I hear none.  I don't see any hands on

19   Zoom.  So the declaration is admitted.

20       (Murphy Declaration received in evidence)

21         MR. BARRETT:  Thank you, Your Honor.

22         Your Honor (indiscernible) in contact with Mr.

23   Murphy over the past few weeks, both via email and telephone,

24   and explained to Mr. Murphy the need to file a written

25   response to the debtors' objection or to appear today or to

1   argue against it.  I'm not sure if Mr. Murphy -- excuse me -

2   Mr. O'Brien is in the courtroom or on the Zoom.

3          THE COURT:  Is Mr. O'Brien on Zoom or in the

4   courtroom?

5       (No verbal response)

6          THE COURT:  Mr. O'Brien, if you are present, would

7   you like to be heard?

8       (No verbal response)

9          THE COURT:  I see no hands.  I don't hear any

10  response.  So I do not believe Mr. O'Brien is here.

11         MR. BARRETT:  Thank you, Your Honor.

12         In that case, the debtors would request that the

13  Court sustain the debtors' objection and disallow and expunge

14  the O'Brien claim in its entirety.

15         THE COURT:  Okay.  Let me ask.  Does anyone wish to

16  be heard with respect to the objection and Mr. O'Brien's

17  claim?

18      (No verbal response)

19         THE COURT:  Okay.  Hearing none.

20         I have reviewed the objection.  Based on the

21  evidence presented in the Murphy declaration and no response

22  having been filed to the objection and Mr. O'Brien having not

23  appeared at the hearing, I will enter the proposed order

24  sustaining the objection.

25         MR. BARRETT:  Thank you, Your Honor.

1          Now, as my partner Ms. Kandestin noted, at this

2   time, I'd like to take the agenda slightly out of order with

3   Your Honor's permission.

4          THE COURT:  Okay.

5          MR. BARRETT:  I'd like to proceed with Item 15 on

6   the agenda, the debtors' motion to further amend the amended

7   creditor matrix order.

8          Your Honor, attached to the debtors' motion, which

9   was filed at Docket 474, is the declaration of William Murphy

10  in support.  In addition, the debtors filed an amended

11  declaration of Brian Karpuk in support at Docket 525.  At

12  this time, unless you have any questions, I'd like to move

13  both of those declarations into evidence.

14         THE COURT:  Let me ask.  Does anyone object to the

15  admission of the Karpuk declaration at Docket Number 525 or

16  the Murphy declaration at Docket Number 474?

17       (No verbal response)

18         THE COURT:  I hear no one.  The declarations are

19  admitted.

20       (Murphy Declaration received in evidence)

21       (Karpuk Declaration received in evidence)

22         MR. BARRETT:  Thank you, Your Honor.

23         THE COURT:  Does anyone wish to cross-examine the

24  declarants.

25         MR. CUDIA:  Yes, Your Honor.  Joseph Cudia for the

1    United States Trustee.  I wish to cross-examine Mr. Karpuk.

2          THE COURT:  Okay.

3          MR. BARRETT:  Your Honor, by way of background,

4    through debtors' motion to further amend the amended order,

5    the debtors are seeking relief to carve out certain parties

6    that they do not believe are creditors from notice moving

7    forward.

8          Your Honor, by way of further background, earlier

9    in the case, at the interim order, Docket Number 39, you

10   authorized the debtors to, among other things, serve certain

11   parties via email, which is consistent with their prior

12   practices and the treatment of contract counterparties and

13   customers.

14         Your Honor, you entered the amended final order at

15   Docket Number 168, which contains substantially the same

16   relief.

17         Following the entry of the final order, in the

18   course of serving certain documents, including the bar date

19   notice, the confirmation -- and the confirmation hearing

20   notice, the debtors' claims and noticing agent identified

21   certain service-related (indiscernible) specifically, they

22   encountered certain undeliverable emails.

23         Your Honor, these emails are a little over 130,000

24   out of 4.5 million emails that were attempted to be served in

25   the first place, a success rate of approximately 97 percent.

1   And the debtors suspect that these parties are end users, not

2   integrators or aggregaters and, frankly, may be more familiar

3   with the integrators or aggregaters themselves, as opposed to

4   the debtors.

5           There were several causes identified with respect

6   to these issues that the claims and noticing agent found.

7   Some of these emails have been marked as spam.  Some were

8   blocked by the end users.  Some end users un-subscribed from

9   emails.  And yet others had full email inboxes, improperly

10  formatted email addresses, or had domain issues that caused

11  rejections of the emails.

12          Following discovery of these undeliverable email

13  and the issues underlying them, the claims and noticing agent

14  and the financial advisor to the debtors worked together with

15  the debtors' employees to reconcile the service list of

16  emails against the debtors' books and records.

17          In doing so, they identified a number of

18  (indiscernible) email addresses.  And the ultimate result is

19  that they found that the vast majority of these undeliverable

20  email addresses were not represented on the debtors' books

21  and records; in fact, such a vast majority that 99 percent of

22  the undeliverable email parties were not, in fact -- or

23  excuse me.  The debtors believe that 99 percent of

24  undeliverable email parties are not, in fact, creditors of

25  the debtors.

1            THE COURT:  So what are they?

2            MR. BARRETT:  These are (indiscernible) email

3    addresses --

4            THE COURT:  Or who are they?  What or who are they?

5            MR. BARRETT:  Your Honor, the debtors have been

6    unable to identify exactly who these parties are.  But the

7    reality of the matter is, due to the nature of the debtors'

8    business, there were substantially more touch points and

9    notice parties out there than there were actual creditors, to

10   the point that, as I noted, over four and a half million

11   parties were served via email, when, in reality, only 50,000

12   parties, unique and individual parties, were represented in

13   the books and records of the debtors.

14           So we suspect that the majority of these emails are

15   either duplicates or simply parties that the debtors may have

16   interacted with, but who do not have claims against the

17   debtors.

18           THE COURT:  Well, did the claims agent have the

19   ability to analyze and reduce duplicate claims -- I mean

20   duplicate emails?

21           MR. BARRETT:  Your Honor, exact duplicates, yes.

22   And I apologize if I was imprecise with my wording.  What I'm

23   referring to is parties that may have had more than one email

24   address that still reached the same individual party, such as

25   parties that have a Yahoo and a Gmail and a Hotmail.  I'm

1  just using that by way of example.

2          THE COURT:  Right.

3          MR. BARRETT:  But they all went to the same party.

4  So when I say "duplicates" in this instance, that's what I

5  mean.

6          THE COURT:  So was there a way to determine if a

7  party had multiple email addresses and one email address was

8  successful and, for example, another was not?

9          MR. BARRETT:  Yes, Your Honor.  That was part of

10 the reconciliation --

11         THE COURT:  Okay.

12         MR. BARRETT:  -- done by the -- done by the

13 financial advisor and the claims and noticing agent.

14         So, as I noted, Your Honor, the ultimate result is

15 1 percent of the roughly 130,000 undeliverable email parties

16 are believed by the debtors to be creditors.  That 1 percent,

17 roughly 1,300, were served by first-class mail in accordance

18 with Your Honor's order.

19         The debtors are now seeking relief to abstain from

20 serving this -- the remaining roughly 130,000 that they do

21 not believe are creditors of the debtors' estate.

22         THE COURT:  How many is it you're seeking relief

23 from?  I'm sorry.  The number?

24         MR. BARRETT:  Roughly 130,000, Your Honor, out of

25 the 4.5 million originally served.

1          Your Honor, serving the balance of the

2   undeliverable email creditor -- excuse me -- undeliverable

3   email addresses would cost the estates roughly $264,000, it's

4   estimated.

5          At base, Your Honor, the debtors are seeking to

6   balance the goals of preserving value to the estates and

7   using these funds for asset recovery efforts and other

8   Chapter 11 goals, as opposed to using these funds to receive

9   the first-class notice -- the first-class mail notice to

10  parties that they don't believe are creditors.

11         It's the debtors' position that this relief is

12  squarely authorized under Section 105 of the Bankruptcy Code,

13  as it plainly seeks to further the goals of the Bankruptcy

14  Code in presereving value and distributing that value to

15  creditors, as opposed to using it in a way that would be

16  inefficient.

17         THE COURT:  Is preserving value a higher standard

18  under the Bankruptcy Code than due process?

19         MR. BARRETT:  No (indiscernible) Your Honor.

20  However, it is the debtors' position that, here, these

21  creditors have received -- these creditors have received

22  notice.  They've received publication notice and the debtors

23  have attempted to serve them.  However, it's also the

24  debtors' position that these parties simply are not

25  creditors.

1          THE COURT:  Let me ask you this.  Did Stretto

2   attempt to email them more than once?  Like, for example, did

3   they email them from one Stretto account and, when that was

4   unsuccessful, set up a separate email for purposes of serving

5   them?  I was trying to understand this from the declaration.

6          MR. BARRETT:  Yes, Your Honor.  It's my

7   understanding that they attempted service through a multitude

8   of different ways within their system.

9          THE COURT:  Different domains?

10          MR. BARRETT:  That is my understanding, yes, Your

11  Honor.

12          Your Honor, I'd like to emphasize that the debtors

13  here are in a unique position that justifies this relief.

14  The estate is severely strained, as has been discussed,

15  having entered Chapter 11 under a cease and desist order with

16  an inability to generate revenue.

17          Further, as I noted previously, the nature of the

18  debtors' business resulted in an outside number of touch

19  points and counterparties that were not, in fact, creditors

20  of the debtors.  As I said earlier, there was roughly four

21  and a half to 5 million individual email addresses served,

22  compared to 50,000 parties represented in the debtors' claims

23  -- the debtors' books and records.

24          Further, Your Honor, it was the pre-petition

25  practice of the debtors to communicate with their

1  counterparties and their customers via email.  And it would
2  be the expectation of these parties that such email
3  communications would (indiscernible) as opposed to mail.
4      THE COURT:  Does the debtor even have mailing
5  addresses for all these parties?
6      MR. BARRETT:  No, Your Honor.
7      Your Honor, turning to these parties, these
8  undeliverable email addresses, the debtor would note that, as
9  discussed previously, some of these parties have, in fact,
10  opted out of notice.  They've either (indiscernible)
11      THE COURT:  They have?  I'm sorry.  I couldn't hear
12  you.  They have what?
13      MR. BARRETT:  They've effectively opted out of
14  notice, Your Honor.  They've either un-subscribed from the
15  claims and noticing agent's emails or they've blocked those
16  emails or they've flagged those emails as spam.  So, with
17  respect to those parties, they have effectively affirmatively
18  opted out off their own accord.
19      Even parties that have not opted out did receive
20  service.  The debtors publicized the confirmation -- the
21  debtors made publication notice in the national New York
22  Times, in the national version of the New York Times.
23      And Your Honor, even assuming for the sake of
24  argument that creditors do exist -- which the debtors do not
25  believe -- that have not been served, the harm they will

1  sustain is minimal, as they are carved out from the releases

2  in the plan explicitly at Article 1.152.  These parties that

3  did not receive email service are excluded from the

4  definition of "releasing parties."  And as Your Honor has

5  recognized, parties that don't receive notice are not bound

6  by the notices.

7          Your Honor, in light of the estate's limited

8  resources, the substantial attempts to serve these people to

9  date, and the debtors' belief that the undeliverable email

10  addresses are not, in fact, creditors, but duplicate email

11  addresses or parties that do not hold claims against the

12  estate, the debtors submit that the equitable solution here

13  is to permit them to forego the service and preserve the

14  value of over $260,000 to pursue asset recovery efforts

15  (indiscernible) estates.

16          THE COURT:  Well, that's actually what has already

17  happened.  You had foregone the service, right?  I mean, you

18  proceeded forward, we're going to confirmation, and these

19  parties haven't been served.

20          MR. BARRETT:  Yes, Your Honor, that's correct.

21  That's correct at the moment.  I mean, they have --

22          THE COURT:  So --

23          MR. BARRETT:  Service has been attempted.

24          THE COURT:  So is this a today issue or is this a

25  future issue?  Is this an issue that the Court should address

1  when it's ripe, when someone comes forward?

2          MR. BARRETT:  Your Honor, I would suggest that it

3  is both a today issue and a future issue.  I think the

4  question of whether service will be performed moving forward

5  is a today issue, and whether this value can be retained for

6  the value of the estates.  I think the question of whether a

7  creditor who comes forward later actually received notice is

8  certainly an issue for that time, should that occur, which

9  the debtors do not expect.

10          THE COURT:  Okay.  Thank you.

11          MR. BARRETT:  Thank you, Your Honor.

12          THE COURT:  Mr. Cudia.

13          Let me ask.  Does anyone else wish to be heard with

14  respect to this motion before Mr. Cudia?

15      (No verbal response)

16          THE COURT:  Okay.  Mr. Cudia.

17      (Pause in proceedings)

18          MR. CUDIA:  Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MR. CUDIA:  Joseph Cudia for the United States

21  Trustee.

22          I did have some questions for Mr. Karpuk.  I'd like

23  to start off with that.

24          MS. KANDESTIN:  I believe Mr. Karpuk has stepped

25  out to address the cramdown and voting declaration issues.

1   If we take a brief recess, I'll collect him.

2           THE COURT:  Certainly.  Let's take a five-minute

3   recess and we'll resume.

4           MS. KANDESTIN:  Thank you.

5           THE COURT:  Thank you.

6       (Recess taken at 10:40 a.m.)

7       (Proceedings resume at 10:48 a.m.)

8           THE COURT:  Okay.  Please be seated.

9           Is the witness available?  Can you swear in the

10  witness?

11          THE COURT OFFICER:  Yes.

12          THE COURT:  Thank you.  Thank you.

13      (Pause in proceedings)

14          THE COURT OFFICER:  Please stand.  Please raise

15  your right hand.  Please state your full name and state your

16  last name for the court record, please?

17          THE WITNESS:  Brian Karpuk, K-a-r-p-u-k.

18        BRIAN KARPUK, WITNESS FOR THE DEBTORS, AFFIRMED

19          THE COURT OFFICER:  You may be seated.

20          Your Honor.

21          THE COURT:  Mr. Cudia.

22          MR. CUDIA:  Yes.  Thank you, Your Honor.

23          I'm going to be referring to Mr. Karpuk's

24  declaration.  I have a copy for him if he does not have one.

25          THE WITNESS:  That would be great.

1          MR. CUDIA:  May I approach the witness?

2          THE COURT:  Yes.

3          THE WITNESS:  Thank you.

4                    CROSS-EXAMINATION

5    BY MR. CUDIA:

6    Q    Mr. Karpuk, you're thoroughly familiar with this --

7          THE COURT:  Mr. Cudia, I'm sorry to interrupt you,

8    but I can't locate that declaration.  Hold on a second.

9          MR. CUDIA:  May I approach, Your Honor?

10         THE COURT:  What --

11         MR. CUDIA:  I have an extra copy.

12         THE COURT:  Oh, that would be perfect.  Sorry.  I

13   was going to say what's the docket number, but thank you.

14      (Pause in proceedings)

15         THE COURT:  Thank you.  You may proceed.

16         MR. CUDIA:  Thank you.

17   BY MR. CUDIA:

18   Q    Mr. Karpuk, you're thoroughly familiar with the

19   declaration and the exhibits, correct?

20   A    I am.

21   Q    If you could, I'd like you to turn to Exhibit A of your

22   declaration.  And could you explain what Exhibit A is for the

23   Court?

24   A    Exhibit A is a detailed lists of the parties that were

25   unable to be emailed the notice of commencement.

1  Q     Okay.  And can you describe what each of the categories

2  is and what they mean?

3  A     Sure.

4        "Suppressed/un-subscribed" means that these parties --

5  so "suppressed" means they were -- they were -- the email was

6  not attempted because of an earlier communication from that -

7  - like "un-subscribe" means that the recipient had previously

8  indicated to Stretto that they had -- they wanted to be un-

9  subscribed from -- from future emails.

10        "Complained" means that they may have responded to the

11  email or reported to their IP, like their -- their email

12  provider that they did not want to receive emails.

13        And then "invalid" was, you know, there -- there's

14  something wrong with the email address itself that would not

15  allow it to be -- to be received.

16        "Unresolved" means that, ultimately, we attempted the

17  email, but it -- it just -- kind of no real like final

18  communication was received from their email provider as to

19  why it could not get through.

20        "Undeliverable address/formatting error," again, like a

21  bad email address.

22        "Undeliverable/invalid address," again, bad email

23  address.

24        "Undeliverable/rejected by the recipient domain," just

25  the -- the domain, the email provider would not accept the

1  email from us.

2      "Undeliverable/mailbox full," if you have a -- like a

3  Yahoo or a Gmail account, you can only have, you know, so

4  many gigabytes in your email address, and so it would not

5  make it -- it will no longer accept emails from them, from

6  anyone.

7      "Undeliverable/IP block," whether at the domain level or

8  by the individual user, they did not want to receive future

9  emails from -- from the Stretto domain.

10      "Undeliverable/suspected as spam," the -- you know, the

11  party -- the recipient itself or the email provider

12  identified it as spam.

13      And then "undeliverable/connection time out," it's

14  similar to the -- to the unresolved, where it -- it -- we --

15  you know, we would make one attempt.  And then, if -- it's

16  called like a "soft bounce," right?  So we'll -- like with a

17  -- if we have a bad email address, we'll get a hard bounce,

18  say this does not exist.  If it -- a "soft bounce" is it

19  doesn't really say it can't get through immediately, and so

20  we will attempt that usually like two more times over the

21  course of the next couple of days, in order to try and get

22  that email through.

23      And then "connection time out," ultimately, we're -- we

24  reach a point where we no longer make attempts.

25  Q    Thank you.  And that helps a lot.

1       So would it be fair to say that the categories of

2  "suppressed/un-subscribed," "suppressed/complained,"

3  "undeliverable/IP block," and "undeliverable/suspected as

4  spam" are the categories of returned emails that could have

5  involved an affirmative act by the recipient?

6  A     "Suppressed/un-subscribed," "suppressed/complained,"

7  "potentially rejected by recipient domain," "suspected as

8  spam," yes.  I -- those would be the ones.

9  Q     Thank you.

10      Can you please go to Exhibit B?  And I note that it

11  appears to be a similar chart, but there's a new category of

12  "suppressed/pre-excluded."  Can you explain what

13  "suppressed/pre-excluded" means?

14  A     So "suppressed/pre-excluded," it really involves kind of

15  the similar -- similar categories, but they were identified

16  from prior campaigns that they did -- they were either a bad

17  email address or they were reported as spam or they had un-

18  subscribed, and so they did -- you know, either they could

19  not be -- could not be reached or they did not want to be

20  reached.

21      And I think, primarily, it would be bad email addresses,

22  asked to un-subscribe, or reported as spam are the three

23  categories of undeliverable that would be categories within

24  that pre-suppressed -- "suppressed/pre-excluded."

25  Q     And that would be from the results of the sending of

1  notice of commencement, correct?  That you got the pre-

2  excluded?

3  A    Primarily, yes.  I mean, there are -- there are other,

4  you know, individual communications that would be ongoing,

5  you know, between the notice of commencement and -- and the

6  notice of bar date.  But that is, yes, primarily where that

7  would come from.

8  Q    So, again, if I'm understanding you correctly, this --

9  I'm sorry.  Let me go -- back up a second.

10     Exhibit B.  What does this chart show the results of?

11 A    This chart is the parties that could not be reached by

12 email for the notice of bar date.

13 Q    Thank you.

14     All right.  So the "pre-excluded," again, if I'm

15 understanding you correctly, is based off of the results from

16 the sending of the notice of commencement, so that everything

17 blow "suppressed/pre-excluded" is from the results of the bar

18 date notice?

19 A    That's correct.

20 Q    And would that description hold the same for Exhibit C?

21 A    Yes.  Exhibit C is the parties who could not be reached

22 by email for the notice of confirmation hearing.  The

23 categories, you know, described there are, you know, same --

24 more or less the same.

25     The "suppressed/pre-excluded," I know specifically are

1  related to three categories of undeliverable from, you know,

2  bad email address from prior campaign, that was like I think

3  60,000 of them; reported as -- or un-subscribed is about

4  24,000; and then the remainder were reported as spam.

5  Q    Okay.  And the total for that not receiving the notice

6  of confirmation hearing is 131,328?

7  A    The -- the total not received by email, that's -- that's

8  correct.

9  Q    Right.

10      And do you know how many of them were served by mail,

11 first-class mail?

12 A    I believe, for the notice of -- notice of confirmation

13 hearing, about -- I think in my declaration it says like

14 1,300 of them were served by mail subsequently --

15 Q    All right.

16 A    -- for the -- the scheduled parties.

17 Q    Thank you.

18         MR. CUDIA:  Your Honor, I have no further questions

19 for the witness.

20         THE COURT:  Thank you.

21         Does the debtor have any questions?

22         MR. BARRETT:  No, Your Honor.

23         THE COURT:  Thank you.

24         You're excused.  Thank you very much.

25         THE WITNESS:  Thank you.

1       (Witness excused)

2               THE COURT:  Okay.

3               MR. CUDIA:  Yes.  Thank you, Your Honor.  Again,

4    for the record, Joseph Cudia for the United States Trustee.

5               THE COURT:  Excuse me.

6               MR. CUDIA:  The Supreme Court in Mullane v. Central

7    Hanover Bank & Trust held that due process requires notice

8    reasonably calculated under the circumstances to apprise

9    interested parties of the pendency of the action.

10              Now, in a bankruptcy context, Bankruptcy Rule 2002

11   is the primary rule dealing with notice.  It requires notice

12   by mail to all creditors of several items in a bankruptcy

13   case.  Among those are notice of commencement, bar date

14   notice, confirmation hearing notice, and the supplemental

15   notice.  And it makes sense as the claims bar date in a

16   confirmed plan are intended to bind all creditors, and

17   creditors cannot be bound if they don't receive notice.

18              Here, all creditors, per the testimony of Mr. Law

19   at the August 25th hearing, are some 5.4 million customer

20   parties.

21              Per the final matrix order in these cases, the

22   debtors received permission of the Court to serve notices by

23   email for customers that did not request delivery of hard

24   copies by mail.  However, if a notice email is returned as

25   undeliverable and no working email address can be located,

1 that party must be served by traditional service methods,

2 including first-class mail.

3          THE COURT:  What happens if there isn't a mail

4 address?  Like just -- counsel just told me they don't have

5 mail addresses for all these parties.

6          MR. CUDIA:  I believe the order says for those

7 (indiscernible) addresses can be found.  So, in a case where

8 the debtors have a physical address, they would need to serve

9 them by mail.  If they don't have the address, publication

10 notice suffices.

11          Undeliverable or bounce-back emails are not a new

12 phenomenon.  Here, approximately three percent of the email

13 addresses that the debtors had for their customers were

14 undeliverable.  In other words, this problem was foreseeable

15 and to be expected.

16          THE COURT:  Mr. Cudia, how is this any different

17 than U.S. mail service of a notice of confirmation or

18 solicitation or confirmation hearing in which a debtor serves

19 the notice and the debtor receives mail as undeliverable or

20 never receives notice whether or not it's confirmed or

21 received?

22          MR. CUDIA:  Well, in the case of -- in the context

23 of email, I'm not sure that a -- if I -- if it has, I'm not

24 aware that the jurisprudence has really caught up with email.

25 People have multiple email addresses, they change email

1  providers.  You know, again, I'm not sure, again, that the

2  law has caught up with that.  I can see that -- I can see

3  where there may be some parallels, certainly.

4       THE COURT:  But don't we routinely enter orders

5  that -- for example, solicitation procedures that say the

6  debtor needs to make a reasonable effort to resend

7  undeliverable mail, or some orders say the debtor doesn't

8  need to make any effort to attempt re-service on

9  underliverable mail?

10       MR. CUDIA:  Yes, I recognize that, Your Honor.

11  However, though, in this matrix order, they are required to

12  attempt email service when they have an address.

13       THE COURT:  So let me ask you.  Is your concern

14  here that the Court is being asked to modify an order that

15  was entered early in a case that set forth procedures, or is

16  your concern here that actual mail service should be

17  effectuated?

18       MR. CUDIA:  Our concern is notice to affected

19  parties.  It was -- you know, the -- obviously, the Court

20  entered the order authorizing email service.  Our concerns

21  are -- well, we do have a concern, actually, about the --

22  about what -- the reconsideration of the matrix order.  But

23  primarily, it's notice.  It's notice to parties who may have

24  a claim against the debtors.

25       THE COURT:  So I guess here's my question back to

1   you.  You started this by saying due process requires notice

2   reasonably calculated under the circumstances.

3           MR. CUDIA:  Yes.

4           THE COURT:  So, under the facts of this case, the

5   circumstances of this -- and I think you'll -- we both agree

6   this is a unique industry -- don't we have evidence that

7   service here is electronic?  Isn't that the notice here that

8   would be reasonably calculated under the circumstances of

9   this case?

10          MR. CUDIA:  It may very well be, Your Honor.  As

11  has been stated earlier in this case, the parties dealing

12  with Prime have agreed, in most cases, to service by email.

13  And as I understand it, that's at least part of the reason

14  that email services has been authorized in the crypto cases.

15          Again, here, it's really a concern about notice and

16  about parties that may be out there that may have changed

17  their email address, their email provider may have gone down,

18  they may have switched mail providers, and it's not getting

19  notice of the case and not getting notice of what's going on

20  in the case.

21          THE COURT:  How is that different than people who

22  move and don't provide an email address -- I mean a post

23  office box or address, mailing address?

24          MR. CUDIA:  Sure.  As far as a mailing address,

25  people do have forwarding that they can use.  Also, at least

1  I know from my personal experience, I change email address

2  more often than -- you know, than a physical address change.

3          But again, I believe it's an areas where the

4  jurisprudence is not fully developed.

5          THE COURT:  I don't disagree with you.  On that, we

6  can agree.

7          MR. CUDIA:  Yes.

8          And the motion does state that over 100,000

9  customer parties didn't receive the confirmation hearing

10  notice or the supplemental notice.  If I understand now the

11  process correctly, once an email is bounced back, that

12  address is excluded from future email notices, which means

13  the lack of notice is compounded.

14          The debtors are now requesting court permission to

15  serve by first-class mail those undeliverable parties who the

16  debtors believe are actual creditors.  And they base that

17  request on cost, the number of service parties as compared to

18  scheduled creditors, potential refusal of service, and the

19  publication notice.  And I'd like to look at those in reverse

20  order.

21          THE COURT:  Uh-huh.

22          MR. CUDIA:  It's well established that publication

23  notice is insufficient where a party's address is known to

24  the debtors.  In fact, the Supreme Court in City of New York

25  v. New York, New Haven & Hartford Railroad said that much.

1   Publication cannot substitute for other forms of service when

2   the party is known to the debtors.

3         Refused service.  In Paragraph 35 of the motion,

4   the debtors assert that the unscheduled, un-deliverable email

5   parties have effectively opted out of receiving notices in

6   these Chapter 11 cases, some even doing so twice.  Again,

7   looking at the claims agent declaration, that appears to be a

8   small percentage of those that can be verified that took some

9   kind of affirmative step to decline service.

10         The large number of notice parties is a function of

11  the nature of the debtors' business.  The debtors concede in

12  the motion and by the filing of their matrix that the

13  customers total some 5.4 million, any of whom could have

14  claims against the debtors.

15         The motion, in Paragraph 33, contends that 99

16  percent of the parties they are required to give notice do

17  not hold claims against the debtors based on their books and

18  records.  That's not a proper (indiscernible) to limit the

19  notice.  The whole point of filing the creditor matrix is so

20  that they can assert their rights in the case if those

21  parties believe they have a claim against the debtors.  The

22  creditor matrix would be unnecessary if the pool of potential

23  claims was solely determined by what's in the debtors' books

24  and records.

25         THE COURT:  Mr. Cudia.

1          MR. CUDIA:  Yes.

2          THE COURT:  Is it the U.S. Trustee's position that

3   the confirmation hearing should not go forward because of

4   this issue?

5          MR. CUDIA:  Yes, that is our position, Your Honor.

6          I do acknowledge that, in the most recent version

7   of the plan, the definition of "releasing parties" has been

8   modified to carve out the undeliverable email parties from

9   the releases, which is helpful, but they likely would not be

10  bound anyway if they didn't receive notice.  Further, the

11  debtors should want all the customers bound by the bar date

12  and the plan for finality.

13         On the cost, when the debtors sought to serve

14  parties by email, they estimated the cost of even just

15  serving the notice of commencement by mail would cost the

16  debtors $10.2 million.  Serving all of the all creditor

17  notice by email has undoubtedly saved the debtors millions.

18  Saving money for creditors is not a bad thing; however, there

19  are certain costs that are incurred when running a bankruptcy

20  case.  One of them is the cost for providing required

21  notices.

22         These same costs pressures exist to a great or

23  lesser degree in every Chapter 11 case.  And by the way of

24  the relief already granted in this case, the debtors have

25  reduced the number of parties to be served by traditional

1  methods by 97 percent.  The additional expense is,

2  unfortunately, necessary to ensure parties get the notice

3  they are entitled to under the rules and the Code.

4          Lastly, I'd like to talk about the standard upon

5  which the motion to amend should be evaluated.  The U.S.

6  Trustee believes it's Federal Rule of Civil Procedure 60,

7  titled "Relief from a Judgment or Order."  And among the

8  grounds listed there for relief are:

9          Mistake, inadvertence, surprise, or excusable

10 neglect;

11          Newly discovered with reasonable diligence could

12 not have been discovered in time to move for a new trial;

13          Fraud, misrepresentation, or misconduct by an

14 opposing party;

15          The judgment is void;

16          The judgment has been satisfied, released, or

17 discharged;

18          Or any other reason that justifies relief.

19          Now the final matrix order in this case was the

20 subject of a contested hearing and the debtors did relieve --

21 did receive the relief they requested.  Now the debtors want

22 relief from the resulting order.

23          The only provision of Rule 60(b) that, in our

24 opinion, could conceivably apply is (b)(6):  Any other reason

25 that justifies relief.  However, even that provision requires

1   some -- and I quote:

2        "-- extraordinary circumstances where, without such

3   relief, an extreme and unexpected hardship would occur."

4        That's Satterfield v. District Attorney

5   Philadelphia, 872 F.3d 152 (3d Cir. 2017).

6        THE COURT:  Could you repeat that cite, 876?

7        MR. CUDIA:  Sure.  872 --

8        THE COURT:  F.3d?

9        MR. CUDIA:  -- F.3d 152.

10       THE COURT:  Thank you.

11       MR. CUDIA:  And the precise -- the pin is 158.

12       THE COURT:  Thank you.

13       MR. CUDIA:  Here, some level of undeliverable

14  emails was entirely predictable; in fact, it should have been

15  expected.  And the final matrix order made provisions for

16  that.  It's far from an extreme and unexpected hardship.

17       The U.S. Trustee asks that the Court deny the

18  requested relief and enforce the existing final matrix order

19  and delay confirmation of the plan until such time as all

20  parties who are entitled to notice receive same.  Thank you,

21  Your Honor.

22       THE COURT:  Thank you.

23       MR. BARRETT:  Good morning, Your Honor.  Once

24  again, Luke Barrett for the debtors.

25       Your Honor, the creditors, customers, and

1  counterparties almost exclusively interfaced with the debtors

2  through email prior to the petition date.  They had

3  obligations under their agreements with the debtors to keep

4  email addresses updated and current.  And they had every

5  expectation that email service would continue following the

6  petition date, as it is how they had always interacted with

7  the debtors.

8         Your Honor, the situation here is no different, as

9  you discussed briefly before, as it would be with mailing

10 addresses.  Parties have obligations to keep their mailing

11 addresses updated or include forwarding instructions if they

12 expect to receive their mail.  The same is with email, as is

13 the same with email addresses.

14        The fact that jurisprudence hasn't quite caught up

15 with the world of email should not impose additional burdens

16 on this Chapter 11 estate as they attempt to proceed to

17 confirmation and pursue asset recoveries for their -- for the

18 creditors.

19        I'd also like to address, Your Honor -- you've

20 heard about the exclusion of certain email addresses after

21 they had issued (indiscernible) there is an important reason

22 for this.  The debtors' claims and noticing agent maintains

23 valuable intellectual property.  This intellectual property

24 (indiscernible) suffer damage if it repeatedly is flagged as

25 spam or is blocked or is reported to certain email domain

1  administrators.  That's the reason for the ongoing exclusion,

2  as opposed to just continuing to attempt to serve these email

3  addresses over and over and over again.

4          THE COURT:  How many --

5          MR. BARRETT:  Your Honor --

6          THE COURT:  Excuse me.  I'm sorry.  How many email

7  addresses do you actually have out of the 130,000 customers

8  who email wasn't provided -- or the email was not effective,

9  I should say?

10          MR. BARRETT:  Your Honor, unfortunately, I don't

11  have that information available at this moment.

12          Your Honor, ultimately, here, we're looking at the

13  threat of real harm today to the debtors' estates in the

14  amount of $264,000 if they serve these parties moving

15  forward, who they don't believe have creditors -- are

16  creditors and they don't believe have claims against the

17  estate, compared against creditors that, as was noted, will

18  not be bound if they do not actually receive service and they

19  can seek relief at a later date.

20          Balancing those issues, we'd respectfully request

21  that you grant the motion to amend due to the unique

22  situation of the debtors and the harms that would befall in

23  this case.

24          THE COURT:  Let me ask you to address briefly the

25  U.S. Trustees argument that you haven't satisfied the grounds

1   required under Rule 60.

2          MR. BARRETT:  Yes, Your Honor.  It remains the

3   debtors position that this relief is squarely within

4   Bankruptcy Code Section 105 in the Court's inherent

5   declarable authority and the authority to address its own

6   lawyers, and maintain jurisdiction within (indiscernible).

7          That being said, assuming that the U.S. Trustee is

8   correct, we would argue that there is, in fact, new

9   information that has come to light in the time since the

10  original amended order was entered. As the analysis that the

11  financial advisor and the debtors' claims and noticing agent

12  revealed the realization that the vast majority of these

13  parties likely are not creditors.

14         We already (indiscernible).  So, a person would

15  argue that there has been a change in the situation and new

16  information has come to light. And further, we would argue

17  that there is a substantial hardship that is going to befall

18  this estate absent this relief. And we'd argue that it

19  satisfies into those grounds.

20         THE COURT:  Let me ask you, did at any time the

21  company try to serve from its domain from an email address

22  that, obviously, if that is, in fact, their course dealing,

23  did they ever try emailing from that domain?

24         MR. BARRETT:  Your Honor, I don't believe --

25

1        THE COURT:  I mean, I understand it might've been

2   unusual so.

3        MR. BARRETT:  Your Honor, I don't believe the

4   company did attempt service from its domain. However, I would

5   note that all addresses were received from the company and,

6   again, the company's agreements with creditors required

7   creditors to -- excuse me, with counterparties required

8   counterparties to keep their email addresses updated.

9        THE COURT:  Okay. Thank you.

10       MR. BARRETT:  Thank you, Your Honor.

11       MR. STARK:  Your Honor, the committee did not file

12  any papers in the connection with this.  Would Your Honor

13  entertain a brief argument from me notwithstanding.

14       THE COURT:  Yes. Brief.

15       MR. STARK:  Brief. Robert Stark from Brown Rudnick

16  on behalf of the committee.

17       It's a threatening situation that we find

18  ourselves in right now, so forgive me.  And thank you for

19  allowing me to speak because this is big.  And the key to all

20  of this -- and I think Your Honor asked a question, I think,

21  fairly bluntly (indiscernible) contextualization of this

22  issue on notice.  We've had a couple of different issues now

23  on notice and so I'm a bit worried about it, so I just wanted

24  to know if YOur Honor would allow me.

25

1          I remember (indiscernible) in law school and the

2   zillions of times I've heard it cited since.  It's a bit of a

3   dated case.  2002(l) talks about publication notice as

4   applying in bankruptcy's as well.  We did both here: email

5   and publication notice.  But forget that for a moment, Your

6   Honor, because I think we forgot what this case is somehow in

7   this discussion.  Okay.

8          This is a company that does not make widgets.  It

9   was a depository company for digital assets and it stopped

10  doing that a really long time ago.  It ceased doing business

11  and a receiver was appointed per Nevada law and Nevada system

12  in June of 2023.  Kaput, done.  What happens then?  People

13  who had deposited digital currencies with the company have

14  been standing around saying, when do I get my currencies

15  back?

16         This is not a situation where some AR department

17  lost the bill of lading and didn't get a notice to go figure

18  it out in a manila folder lost in some far off file cabinet.

19  These are people who are sitting around saying I want my

20  money back, please give it to me.  How much notice do you

21  think you really have to give under that circumstance to

22  people who are otherwise self-motivated to say I'd like my

23  money back please, right.

24         This whole argument confuses or conflates this

25  Chapter 11 case to virtually every other one we've done in

1  this Court and in all the other bankruptcy courts around the

2  country because we don't make anything.  We don't do

3  anything.  We're just trying to give people their money back

4  and we've been doing that for a really long time.

5            That is the context by which notice needs to be

6  reasonably calculated for the purposes by which we're trying

7  to go forward here today.  Publication is more than enough,

8  but I've been doing enough crypto cases over the last year to

9  kind of know a couple of things.  I think Your Honor can take

10 judicial notice of the entire case record on this one.

11           People don't rely on U.S. mail in the crypto

12 currency industry.  They communicate with each other by

13 electronic means: Makso (ph), Slack, and email.  And, in

14 fact, if you went ahead and you dotted the eye that's being

15 requested right now and sent U.S. mail to these people.  My

16 presumption is they won't read it because that's not how this

17 industry moves.  That too is the context by which we have to

18 evaluate stopping everything right now over the dotted eye

19 because the rule says other than Rule 2002(l) that we

20 shouldn't be sending things by mail, electronic mail is how

21 this industry operates.

22           If it fails because they don't want to receive the

23 email, that's not the debtors fault.  It still is trying.

24 It's just probably not really a creditor as the debtor is

25 saying that they're getting spam notes.  So, are we really

1  going to stop this case over the notion that the electronic

2  mail, the preferred way that the industry communicates in the

3  situation where people are sitting around waiting to get

4  their money back and there is no situation of the failed bill

5  of lading that was lost in the manila folder.  Are we going

6  to stop it over that?  Respectfully, Your Honor, if that is

7  the context of (indiscernible), that is more than sufficient

8  of what's been done today.

9          Anything further, YOur Honor?

10         THE COURT:  No, thank you.

11         Anything further?

12      (No verbal response)

13         THE COURT:  I'm going to take this under

14  advisement when we take a lunch break.  I'll rule after

15  lunch.  I think we can move ahead with the claim issues.

16         MR. JUMBECK:  Good morning, Your Honor.  For the

17  record, Jake Jumbeck with McDermott Will & Emery, counsel for

18  the debtors and debtors-in-possession in these Chapter 11

19  cases.  I will be taking up Item Numbers 13 and 14 on the

20  second amended agenda.  And if there's time before the lunch

21  break, also Item Number 16, the debtors' motion for post-

22  petition financing, but I understand time might be getting

23  tight if we take up that one beforehand.

24         With respect to the claim's objections for

25  context, Your Honor, around the bar date the debtors received

1  a large number of claims for which they had basically zero

2  information.  And in connection with the 3018 motion, that

3  Your Honor already granted, the concern was an outsized

4  impact on the voting results.  Folks that we did not know

5  really who they were, did not have records of.  The concern

6  was that this could materially affect the voting in an

7  adverse way.

8          So, stemming from that, the debtors, in connection

9  with their advisors, undertook an extensive evaluation of the

10 proofs of claim that were filed as well as trying to

11 reconcile those with the debtors' schedules and their books

12 and records.  That led to the filing of the debtors' first

13 substantive on this objection to certain filed proofs of

14 claim which is located at Docket 435.  That is the sealed

15 version as well as the redacted copy located at Docket 436.

16         In connection with the first omnibus objection,

17 attached is Exhibit A with a proposed order sustaining the

18 objection, and attached as Exhibit B the declaration of

19 William Murphy from M3 Advisory Partners, LP, the debtors'

20 financial advisor.  In his declaration, Mr. Murphy outlines

21 the process and review the debtors conducted to reach that

22 conclusion.  Mr. Murphy is in the courtroom and is available

23 to answer any questions.  At this time, I would move Mr.

24 Murphey's declaration into evidence.

25

1        THE COURT:  Does anyone object to the admission of

2  the Murphy declaration into evidence?

3      (No verbal response)

4        THE COURT:  I hear no one.  I see no one on Zoom.

5      (Murphy declaration received into evidence)

6        MR. JUMBECK:  Thank you, Your Honor.

7        Before I get into the relief that we're seeking,

8  we did receive a number of responses, both formal and

9  informal, to the first omnibus objection.  The debtors were

10  able to resolve some of those.  We were not able to resolve

11  all of them.  And as I will explain later, we are going to

12  seek to withdraw with respect to the unresolved ones for a

13  later date for reasons that I will explain.

14        THE COURT:  You know what, I think I should

15  interject here because I have substantial issue with the

16  first omnibus claim objection.

17        MR. JUMBECK:  Sure.

18        THE COURT:  First of all, I want you to be aware

19  that we have local rules that govern claim objections.  And

20  first of all, Local Rule 3071(e)(3)(d) requires that the

21  exhibits, the claim objections, be alphabetical.  Last time

22  of claimant or the name of the entity.  This exhibit is not

23  in alphabetical order.  Local Rule 3071(f) provides that an

24  objection, which is based on substantive ground, not contain

25  more than a hundred claims.  Exhibit 1 has 482 claims.

1  Exhibit 2 has 93 claims.  And Exhibit 3 has 86 claims.

2  That's 661 claims in one claim objection.

3         The claim binder that was provided to the Court is

4  redacted.  We can't even read claim names to correspond them

5  to the people.  The electronic claims have identification

6  numbers.  It's a PC number -- a PC filed by a number which is

7  not the claim number of the proof of claim.  So, we can't

8  even review these claims without being able to track the

9  proof of claim numbers.  Each claim -- some of these don't

10  have a proof claim number, they just have a PC claim.  Others

11  don't have a claimant name on them.

12         So, importantly to me, what was served on

13  claimants, because I have no idea when I look at this claim

14  objection how I find myself in here if I'm a claimant.

15         MR. JUMBECK:  So, taking each of those in turn --

16  and again, apologies for, you know, our inadvertence and, you

17  know, frankly, not being diligent in our process.

18         Taking each of those in turn, with respect to

19  Exhibit 1 and the large number that you mentioned there, I

20  think a large part of that is going out of the fact that with

21  respect to a number of the claims that are really attached to

22  the back of them, if the Judge will notice, many, many of

23  those are filed by, you know, yes, different individual names

24  but they're all also located at the exact same address and

25  filed on or about within several days of each other.  And if

1  the Court will also notice, though the amounts asserted in

2  those proofs of claim are just below the convenience class

3  amount that is in the debtors proposed plan of -- amended

4  plan.  And those claimants that are within that class are

5  entitled to a 70 percent distribution outright.

6        So, yes, we recognize that, you know, while we did

7  not file the local rule exactly to the letter, given sort of

8  these large, what we suspect are not, you know, potentially

9  valid claims and filed for maybe some other reason as well,

10  in the rush of a judgement call we decided to include them

11  all right there on the exhibit just for completeness so the

12  Court could really see the situation that, you know, we are

13  trying to assess and dig through.

14        With respect to the binders that were delivered,

15  you know --

16        THE COURT:  Well, I want to know, importantly,

17  before I can go anywhere because we're back to a due process

18  issue here.  I understand the importance of getting this case

19  through.  I appreciate all of that.  Okay.  But what I want

20  to know is what did these claimants get so I can determine

21  whether or not they even had notice of a claim objection to

22  object because some of these things, when I look at them, I

23  can't tell if I got it.  I don't know what the claimant got

24  if they can find themselves in here.  Did they get this

25  entire document electronically like what I received?  I don't

1 know electronically how many gigabytes this would be, but did

2 they get a five-volume document?

3          MR. JUMBECK:  No, Your Honor.  Our understanding

4 is that they received the first omnibus objection with the --

5 the unredacted versions which the exhibits attached to them

6 notifying them that there is an objection to their proof of

7 claim and --

8          THE COURT:  So, did they just get their -- did

9 they get the objection with their proof of claims

10 specifically, like customized, or did they get this objection

11 with everybody's and then they had to electronically go

12 through it and find where their claim was?

13          MS. KANDESTIN:  No, Your Honor.  They received an

14 email where it was highlighted where in the exhibit they were

15 located.  We did not serve the redacted exhibits on all the

16 parties.  We served the objection and then the claim agent

17 sent an individualized email explaining rejecting to your

18 claim, here's where you find it on the schedule, we're

19 objecting to this amount, and you know, here's the rest of

20 the objection.

21          THE COURT:  So, I just want to make sure I have

22 this correctly because this to me is a gating issue.  Okay.

23 So, you sent the whole objection, is that correct?  And then

24 a separate email?

25          MS. KANDESTIN:  We sent the objection proper --

1          THE COURT:  Without the exhibit?

2          MS. KANDESTIN:  -- without the exhibit.  Or with

3  just that exhibit.  No claim was attached with the exhibits.

4  And then in the email pointed out exactly where they could

5  find themselves in those exhibits.

6          THE COURT:  Okay, so the objection was sent --

7  let's just walk through this.  So, you sent the objection,

8  you sent exhibit A, which was a proposed order, and then you

9  sent the no liability claims chart, and then the other two

10  exhibit charts.  That's it.  And then a separate email, or

11  same email, was sent saying here's what?

12          MS. KANDESTIN:  Here's where you can find yourself

13  on the exhibit.  Please have notice we're objecting o your

14  claim.  You can find it on this exhibit at this line.

15          THE COURT:  So, was it a link to it?  How did they

16  get to the exhibit itself?

17          MS. KANDESTIN:  I believe --

18          THE COURT:  Like did it say Exhibit A Page 5 or

19  something like that?

20          MS. KANDESTIN:  So, they got an email explaining

21  where they were listed on the objection and it's a customized

22  email with only the details of their proof of claim, and the

23  objection details, and a copy of the redacted docket link

24  (indiscernible) hyperlink.

25

1          THE COURT:  Okay.  I mean this is another reason

2    our local rule also requires that you attach to the back of a

3    claim objection a chart that indicates to claimants where

4    they can find their claim within the exhibit.  The Court has

5    been through every one of these claims, but I'm very

6    concerned about process here and, frankly, it's a pretty

7    blatant rejection of the local rule.

8          MR. JUMBECK:  Again, our apologies, Your Honor.

9    In the rush we, you know, definitely were not as careful or

10   as diligent as the local rule requires with respect to the

11   binders that were delivered to Court.  Our understanding is

12   we had provided the unredacted copies to our servicer in that

13   regard.  Apparently in the line of communication it, you

14   know, one copy that was not supposed to be in there ended up

15   being the one that was printed off and delivered to the

16   Court.

17         THE COURT:  Did you get any rejected emails on the

18   claim objection?

19         MR. JUMBECK:  Not as far as I know, Your Honor.

20   And to that end, you know, we did receive responses from

21   several of the claimants whose claims we did object to.  So,

22   our understanding is that, you know, to an extent, the

23   process did work and that the affected creditors did receive

24   notice.

25

1            THE COURT:  Does the U.S. Trustee want to be heard

2   on this?

3            MR. CUDIA:  Thank you, Your Honor.  Joseph Cudia

4   for the United States Trustee.

5            Again, it comes back to also the failures of the

6   bar date notice and that's the second, Mr. Karpuk's

7   declaration.  That refers to parties that did not get the bar

8   date notice.

9            THE COURT:  Well, if they don't get bar date

10  notice, they're not bound.

11           MR. CUDIA:  Right.

12           THE COURT:  You're only as good as the notice you

13  give.

14           MR. CUDIA:  Yes, Your Honor.  Again, I have to

15  confess that, you know, that was something that I missed as

16  well, the not complying with the local rule and I'll try to

17  be a little more diligent with that with the Court.  Thank

18  you.

19           THE COURT:  Okay.

20           MR. JUMBECK:  With respect to the bar date notice,

21  these folks are the people that did submit the proofs of

22  claim.

23           THE COURT:  Understood.

24           MR. JUMBECK:  As the Court noted, there were a

25  large number of them to walk through.  Our understanding is

1  that these folks did receive the bar date notice and

2  submitted the proofs of claim, and that is the means of which

3  we communicated with them as well as at the address or

4  contact information that they provided in their proofs of

5  claim forms.

6       THE COURT:  Are there any of the claimants on the

7  phone today to be heard with respect to this motion -- this

8  claim objection, excuse me.

9       MR. NARAYANAN:  Yes, ma'am.  I'm here.  Yes, Your

10 Honor.

11      THE COURT:  Can you identify yourself, sir?

12      MR. NARAYANAN:  Yes, Your Honor.  My name is Shyam

13 Sundar, and I am on Docket NumberS 529, 530, and 531.

14      THE COURT:  Okay.  Thank you, sir.

15      Is there anyone else?

16      MR. BEELER:  Your Honor, it's Martin Beeler from

17 Covington & Burling for Zap Solutions, a creditor.

18      And I want to say to the debtor -- we reached out about

19 potential problems service or, you know, late service of the

20 objection and they've been good enough to adjourn the hearing

21 on our claim.

22      THE COURT:  Okay.

23      MR. BEELER:  To let you know, you know, in terms

24 of the issues that have been discussed today, knowing that my

25 client received a particularized email, they looked into

 1  this, they received a printed, you know, a hard copy notice

 2  that appeared to identify a different individual claimant and

 3  not my client.  So, that's the extent of the notice that

 4  we're able to provide any info on here.

 5          THE COURT:  Okay.  Thank you, Mr. Beeler.

 6          Do you have a copy of a sample email that was

 7  sent?

 8          MR. JUMBECK:  No, Your Honor.  We can get one.

 9  We're coordinating that now.

10          THE COURT:  Okay.  Why don't we take a break for a

11  half hour and let you coordinate getting an email and we'll

12  reconvene at quarter after noon.  Okay.  We will take a later

13  lunch break, but I want to get the information on this very

14  clear before we proceed further.  Okay.

15          So, we're going to stand in recess.  Thank you.

16      (Recess taken at 11:40 a.m.)

17      (Proceedings resumed at 12:54 p.m.)

18          THE COURT:  Please be seated.

19          MR. JUMBECK:  Good afternoon, Your Honor.

20          THE COURT:  Okay.  Let's proceed with the first

21  claim objection and I'll see where I am after I hear some of

22  it.

23          MR. JUMBECK:  For the record, Jake Jumbeck with

24  McDermott Will & Emery, counsel for the debtors and the

25  debtors-in-possession.

1          So, just to circle back on some of the issues that

2   we left off with, we received the customized emails from

3   Stretto the claims and noticing agent.  We forwarded some of

4   those to chambers.  Did Your Honor have a chance to review

5   those or see those by chance?

6          THE COURT:  I did get one.

7          MR. JUMBECK:  Okay.

8          THE COURT:  And maybe when you put your witness

9   on, he can actually go through this for the record.

10          MR. JUMBECK:  Yes.  We have Brian Karpuk here.  He

11   is ready and willing to testify so if that would be helpful,

12   I'm going to cede the podium to my colleague, Joseph Evans.

13          THE COURT:  Okay.  Thank you.  And just for the

14   claimants who are on Zoom, you will have your opportunity to

15   speak as we move forward.  I didn't want you to think when I

16   called on you earlier, that was your only opportunity.

17          MR. EVANS:  Your Honor, Joseph Evans on behalf of

18   the debtors.

19          THE COURT:  Good afternoon.

20          MR. EVANS:  We would call Brian Karpuk back to the

21   stand.

22          THE COURT:  Yes.

23          MR. EVANS:  Your Honor, Mr. Karpuk was previously

24   sworn in.  I don't know if you have to do it again.

25          THE COURT:  No.  You are still under oath, sir.

1                        REDIRECT EXAMINATION

2  BY MR. EVANS:

3  Q      Mr. Karpuk, did Stretto handle the service of the

4  claims objection?

5  A      We did.

6  Q      How was the claims objection served?

7  A      Each individual claimant was served by email.  That

8  email contained a link to the redacted document online,

9  maintained on Stretto's docket, as well as the customized

10 information relating to their proof of claim was imbedded

11 within the body of the email itself.  So, each -- and we

12 emailed them at the email address that was listed on their

13 proof of claim and then within the body of that email

14 indicated what claim number was being objected to.

15 Q      The emails used to serve the claims objection were the

16 same emails used by the claimants when they filed the

17 objections.  Is that right?

18 A      That is correct.

19 Q      And in the body of the email, you said it contained a

20 hyperlink?

21 A      It contained a hyperlink to the document -- the docket

22 number that the -- the omnibus objection that was available

23 online at Stretto's case website.

24 Q      And did the body of the email contain a claim number?

25 A      Yes, it did.

1  Q     And when you clicked on the link and you went online,

2  there was a long list of claim numbers and that would

3  correspond to the claim number that was in the cover email?

4  A     That's correct.

5  Q     Was there any description in the cover email of a claim

6  amount?

7  A     Yes, I believe that information was contained within

8  the email.

9  Q     And in the body of the cover email, there was also a

10  modified claim amount, wasn't there?

11  A     That's correct.

12  Q     So, if there was an objection to a claim or reduction

13  of the amount, that was embedded in the body of the email?

14  A     That is correct.

15  Q     Were there any reasons provided in the body of the

16  email to the modification of the claim amount from claim

17  amount to the modified claim amount?

18  A     Yes.  There was a short paragraph describing the basis

19  for the objection.

20  Q     So, a claimant that received this objection in the body

21  of the email would have the reduced claim amount and their

22  reasons for their reduced claim amount.  Isn't that, right?

23  A     That is correct.

24

25

1  Q      For the service of the claim objection, the first

2  omnibus claim objection, did you have this non-deliverable

3  email issue that we had talked about previously?

4  A    I'm not aware of any undeliverable emails with respect

5  to the first omnibus claim objection.

6  Q      I have nothing further.

7            THE COURT:  Does anyone wish to cross-examine the

8  witness?

9       (No verbal response)

10            THE COURT:  Let me ask for those on Zoom, because

11 claimants who are pro se can appear by Zoom, is there anyone

12 on Zoom who wishes to cross-examine the witness?

13            MR. NARAYANAN:  Yes, Your Honor.

14            THE COURT:  Okay.  Sir, can you identify yourself?

15            MR. NARAYANAN:  Yes.  My name is Shyam Sundar

16 Aswadha Narayanan and I'm on Dockets 529, 530, and 531.

17            THE COURT:  Okay.  Did you have questions for the

18 witness?

19            MR. NARAYANAN:  I do have a question, a brief

20 question, as to why the initial notices that I received would

21 go in spam when previously when I had corresponded with the

22 debtors none of them would go into spam. It was only the

23 court notices that would go into my spam and nothing else.

24 Is there an explanation for it?

25

1           UNIDENTIFIED SPEAKER:  Your Honor, objection.

2   Lack of foundation for this particular witness as to the spam

3   (indiscernible).  If he knows he can answer.

4           THE WITNESS:  That's an individual email provider

5   or a recipient issue, right, as to why they would, you know,

6   mark one email spam and a different email as not spam.

7           THE COURT:  Okay.  Thank you.

8           Sir, is there anything else for the witness?

9           MR. NARAYANAN:  That's all we had, Your Honor.

10           THE COURT:  Okay.  You will still get a chance to

11  speak, sir.

12           Is there anyone else who wishes to cross examine

13  the witness?

14      (No verbal response)

15           THE COURT:  I have a question for the witness.

16  There was a comment made earlier about wrong information

17  being sent to the wrong claimant -- the wrong claimant being

18  referenced in an email.  What type of procedure did you have

19  in place for insuring that the correct claimant was

20  identified with an email?  Are you familiar with that

21  situation?

22           THE WITNESS:  I'm not familiar.  I've had -- we

23  were attempting to look into it based upon the comment

24  earlier.  And I didn't have enough time to investigate it.

25  Generally speaking, right, our emails are, you know,

1  effectively like a mail merge, right, and so you have, you

2  know, a full omnibus objection list where it has email

3  address tied to all of the data.  And then that information

4  is merged into a custom email that is, you know, sent to the

5  individual claimant.

6          THE COURT:  So, if I could stop you there.  So,

7  the email sample that I was provided with, what you're

8  telling me is the individualized claimant information is an

9  automated process?

10          THE WITNESS:  It's manual in that it is the -- the

11  file is prepared manually by, you know, Stretto, or the

12  debtors, or financial advisors, right.  And then when that,

13  you know -- essentially is a mail merge similar to Microsoft

14  Word or, you know, Excel to Word, but it's all merged within

15  the email itself.  So, you know, I'm not aware of any issues

16  with respect to, you know, the merge of that data.

17          THE COURT:  Okay.  And the data that was set forth

18  in the email, am I correct that it is essentially the

19  extracted Exhibit 1 information with respect to that

20  particular claimant?

21          THE WITNESS:  That is correct, Your Honor.

22          THE COURT:  Okay.  I just saw somebody appear on

23  my screen.  Are you -- I think you might have answered this

24  but I just want to make sure.  Are you aware of anyone other

25

1  than the reference made at this morning's hearing about

2  notice or a mix-up with the claimant?

3            THE WITNESS:  I am not aware of any mix-up.

4            THE COURT:  I have no further questions -- I do.

5  Actually, I'm sorry.  I have one more question.  So, if the

6  claimant files four claims in this case, did they get four

7  separate emails?

8            THE WITNESS:  They did.

9            THE COURT:  Okay.  Thank you.

10           MR. EVANS:  Your Honor, we have no further

11 questions for this witness.  And so, unless there's cross,

12 I'll cede the podium to my colleague.

13           THE COURT:  Does anyone else wish to cross the

14 witness?

15        (No verbal response)

16           THE COURT:  You're excused, sir.  Thank you.

17           THE WITNESS:  Thank you, Your Honor.

18        (Witness excused)

19           MR. JUMBECK:  May I proceed, Your Honor?

20           THE COURT:  Yes.

21           MR. JUMBECK:  Again, for the record, Jake Jumbeck

22 with McDermott Will & Emery, counsel for the debtors.

23           I just want to touch on, you know, the mix-up

24 issue briefly before continuing.

25

1          With respect to Zap Solutions that information was

2   sent to -- so, Zap Solutions, our understanding, is one of

3   the integrators and for whatever reason, the information that

4   was on file with respect to them was for an individual

5   customer name, not underneath the Zap Solutions name.  When

6   this issue came to light, Mr. Beeler emailed us.  We agreed

7   the course will adjourn and accommodated that request.  And

8   as Mr. Karpuk testified, we're not aware of any other mix-ups

9   of that nature with respect to the service here.

10          THE COURT:  Okay.  Thank you.

11          MR. JUMBECK:  And, you know, while we're sort of

12  touching on some of those responses received, I believe Mr.

13  Sundar, those responses fall into the unresolved responses to

14  the first omnibus objection we received.  Again, I would

15  like, sort of, some background on that situation in our

16  proposed, sort of, solution here.

17          THE COURT:  That would be great.  Thank you.

18          MR. JUMBECK:  For sure.  So, you know, we have a

19  number of unresolved objections, you know, really two buckets

20  here.  The first are with respect to (indiscernible) LLC

21  which is more commonly known as MyConstant.  MyConstant was a

22  prepetition customer of Prime Trust that utilized Prime

23  Trust's banking and custody services.  On November 17th, 2022,

24  MyConstant ceased operating and subsequently, about five

25  months later, they posted a notice on their website saying

1  that essentially Prime Trust has your money, go talk to prime

2  trust about it.

3       We only really found out this information very,

4  very recently so several of their responses to the first

5  omnibus objection we received are concerned with confidential

6  claimant number 4 for proof of claim 280, confidential

7  claimant number 5 with proof of claim 876, confidential

8  claimant number 6 for proof of claim 610, Mr. Sundar for

9  proof of claim 239, Latha Narayanan proof of claim 240, James

10 Hoffman who filed a response at Docket Number 570 as with

11 respect to proof of claim 283, and James Copherd (ph) filed a

12 response at Docket Number 572 concerning proofs of claim 247

13 and 248, and one more.  Apologies.  Mr. Scott Mason who filed

14 a response at Docket Number 570 and as of respect to proof of

15 claim 1385.

16       Since filing the objection and receiving those

17 responses from the MyConstant claimants, the debtors received

18 additional information that required further investigation.

19 Specifically, the reason we objected was because based on the

20 debtors books and records, which just reflected sort of an

21 account with MyConstant as well as, you know, individual

22 lines, it just had, under the ledger, you know, MyConstant.

23 We had those balances at zero dollars.

24     So, the debtors' understanding was that they were not

25 liable and that there really wasn't a contract with any of

1   those individuals.  Based on the information and

2   documentations submitted with respect to each of the

3   MyConstant claimants, that appears that may not be the case.

4   And again, we really only found out about it as the deadline

5   approached to respond to our claim objection.  So, for that

6   reason, we propose that we withdraw those objections without

7   prejudice with respect to these MyConstant claims just

8   because we really need to develop a deeper understanding of

9   the relationship between Prime Trust and MyConstant as well

10  as sort of what the further investigation into those facts

11  will ultimately entail.

12          THE COURT:  Have you discussed that approach with

13  the claimants?

14          MR. JUMBECK:  We did reach out to them.  A couple

15  of them did agree to -- well, initially we proposed to

16  adjourn and several of them were agreeable to that, several

17  were not.  And based on the information that we have and

18  clearly there needs to be more of an investigation, we

19  determined that it was in the best interest just to withdraw

20  without prejudice at this point.

21          THE COURT:  Okay.  Well, let me ask you, as I

22  reviewed the exhibit, there were a couple other MyConstant

23  claimants identified.  What are you going to do with those?

24  Are they also going to be -- put them in the same bucket?

25

1          MR. JUMBECK:  Yes.  We'll put them in the same

2    bucket as well.

3          THE COURT:  Does anybody -- and can you tell me

4    those -- if you go off the agenda, if you can tell me which

5    ones we're talking about again.  I just want to make sure I

6    got them all.

7          MR. JUMBECK:  Squaring away with my notes here

8    momentarily.  That is under Item Number 13, lowercase f,

9    lowercase g, lowercase i, lowercase k, lowercase l, lowercase

10   m, lowercase n, lowercase o, lowercase p, lowercase q.  And

11   of those individuals, our understanding is that only four of

12   them voted for the plan.  The others abstained and that is

13   why we filed the supplemental voting declaration this morning

14   to reflect revised tabulations accounting for those

15   rejections -- accounting for their votes being

16   (indiscernible), I should say.

17         THE COURT:  Okay.  Does anyone wish to be heard

18   with respect to the debtors' proposal to withdraw its

19   objection with respect to the MyConstant claimants, both the

20   ones identified here today and others set forth on the

21   objection?

22         MR. NARAYANAN:  My name is Shyam.

23         THE COURT:  You may be heard?

24         MR. NARAYANAN:  So, my response here is that the

25   debtors contacted me yesterday, through their counsel, and

1  they said they wanted me to postpone the hearing to January

2  the 17th.  I was not pliable to that because of the simple

3  fact that they gave me hardly any notice. It was just one day

4  before. I had tried to talk to them several times in the

5  past.

6          The issues have been ongoing for over one year

7  right now with the debtors.  The CEO of -- the ex-CEO of

8  Prime Trust, Mr. Scott Purcell, had signed an agreement, a

9  forged agreement like I had noted in my response, and we were

10 not aware of it.  MyConstant was not aware of it either.

11         The reason for my objection is because they said

12 that they have no record of me being on the ledger when, in

13 fact, they had sent me statements with my name, the Prime

14 Trust logo, and MyConstant account number, and with the

15 transactions when I had filed a complaint to the Nevada

16 Financial Institutions Division against Prime Trust.  So, I

17 am not willing to accept their claim that they don't have my

18 name on the ledger at all.

19         THE COURT:  Bear with us a second, sir.

20         MR. JUMBECK:  To me, our understanding is that

21 ledger is with MyConstant.  We do not have access to that

22 ledger.  Again, this -- they were as being one of the

23 integrator customers.  You know, our information on our end

24 just, sort of, reflected very vanilla just MyConstant line

25 items for who exactly, you know, these accounts were.

1       Again, this information coming out in response to

2  the documents that they filed is the reason that we are

3  seeking to withdraw just because these agreements, you know,

4  we were not aware of them.  He indicated; Mr. Sundar

5  indicated that there might be some issues with them.  Again,

6  these are all things that we need to vet far more fully

7  before we can, you know, begin to assess these claims.

8       THE COURT:  Sir, given what the debtor has

9  represented today, and I understand that you were just

10  contacted yesterday, do you have any objection -- the debtors

11  want to withdraw their objection without prejudice to bring

12  it later so they can further investigate based on the

13  information you provided.

14       MR. NARAYANAN:  I will be okay with that, Your

15  Honor.

16       THE COURT:  Okay, sir.  So, Your -- the objection

17  that is currently pending to Your claim is going to be

18  withdrawn without prejudice meaning it could be refiled again

19  in the future, but I would think in the meantime that there

20  will be communication between you and the company or the

21  debtors' counsel.

22       MR. NARAYANAN:  Thank you, Your Honor.

23       THE COURT:  Okay.  Thank you, sir, for

24  participating.

25       Is there anyone else who wishes to be heard with

1  respect to the first omnibus claim objection?

2      (No verbal response)

3          THE COURT:  Okay. I have a couple of questions.

4          MR. JUMBECK:  And just to put a finer point on the

5  MyConstant issue --

6          THE COURT:  Yes.

7          MR. JUMBECK:  -- anything that happened with prior

8  management, I think as we all know throughout the course of

9  these cases, the prior management's active investigation, we

10  are trying to preserve everybody's rights.  You know, these

11  will be investigated and conclusions brought forth.  So, its

12  just to preserve that at this juncture.

13          I'm happy to take up any of Your Honor's questions

14  now.

15          THE COURT:  Okay.  So, to the extent that parties

16  attach, and I think this is pretty much the MyConstant

17  claimants, to the extent that they have attached agreements,

18  that being in response to the debtors' objection saying you

19  have no books and records, you are going to go and revisit

20  those claims.

21          MR. JUMBECK:  Yes, Your Honor.

22          THE COURT:  Claim No. 339, which is Environmental

23  Corporation of America, and I need to -- this claim, it

24  attaches an invoice to Prime Core Technologies.  So, I am

25  curious -- well, I need more information to rebut a books and

1  records objection when the claimants attached information.

2  So, I am not how this can be part of Your first omnibus.

3          MR. JUMBECK:  You said that is with respect to

4  Claim 339?

5          THE COURT:  Yeah, Environmental Corporation of

6  America.  Do you have a copy?  I'm happy to show you it in

7  the binder.

8          MR. JUMBECK:  No, I have it.  Thank you, Your

9  Honor.

10         THE COURT:  Without sounding snarky, this is why we

11  try not to put 600 of them in one objection because its

12  really hard to manage.

13         MR. JUMBECK:  Understood.  So, to the extent there

14  is documentation in connection with that we can take that off

15  as well, and that is the books and records objection.

16         THE COURT:  Claim No. 419, which is at Tab 103,

17  this says the creditors is MyConstant, but it looks like its

18  actually Michael Fleming.  Does this fall within the

19  MyConstant claim objections that are being adjourned?

20         MR. JUMBECK:  Yes, Your Honor.

21         THE COURT:  Okay.  There are certain claims that I

22  indicated the debtors -- I mean the claimants have attached

23  Prime Trust agreements.  I don't know if you have had an

24  opportunity to review those, but are they MyConstant

25  claimants?

1          MR. JUMBECK:  We would have to go back and review

2   closer.  To the extent that they are -- yeah, we actually

3   have revised exhibits here that we were going to propose

4   submitting with a revised order, essentially, taking off a

5   number of the MyConstant individuals.  To the extent helpful

6   I can hand that up to the Court.

7          THE COURT:  Yes.  Would you, please.  Thank you.

8          MR. JUMBECK:  May I approach?

9          THE COURT:  Yes, of course.  Thank you.  Do you

10  have an extra copy of this?

11         MR. JUMBECK:  We do, Your Honor.

12         THE COURT:  Okay.  Is there anyone else who wishes

13  to be heard with respect to the first omnibus objection to

14  claims?

15      (No verbal response)

16         THE COURT:  Okay.  I want to review this, but

17  subject to my review I am going to enter it.  I do want to

18  caution, and I think you guys probably already know this, but

19  it is very important to me that practitioners comply with the

20  rules and particularly claim objections because it's to

21  protect the claimants as well. Its also a huge burden on the

22  Court and this Chambers reviews claim objections.

23         So, I am going to give you Your get out of jail

24  card free on this one, but in the future please comply with

25  the local rules when dealing with claim objections. If there

1   is a reason you are not going to or can't, please file a

2   motion asking for a waiver of the local rule rather than

3   saying we think these comply, but to the extent they don't we

4   ask for a waiver.  Please do it in advance.

5          So, in the future, you know, please address the

6   things we talked about: limitation of the rules, alphabetical

7   order, make sure the Court, when it comes to binders, gets

8   the unredacted copy.  So, with that --

9          MR. JUMBECK:  Again, not to belabor the point, a

10  big part of this was disenfranchising, you know, legitimate

11  creditors.  Again, if I could direct the Court to, you know,

12  some of the later pages of Exhibit 1 regarding the individual

13  or potentially more who submitted claims at this address in

14  Waldorf, Maryland this is something that was really

15  concerning to us.

16         THE COURT:  Actually, that would have been very

17  beneficial had that been included in the text of the

18  objection because you kind of go blurry-eyed once you start

19  looking at 600 claims. So, the focus, you know, frankly, from

20  our perspective we don't look at claim addresses.  We look at

21  the merit of the claim, and the claim numbers, and that type

22  of thing.  So, that would have been helpful, but I appreciate

23  Your concern.

24         MR. JUMBECK:  (Indiscernible).

25         THE COURT:  So, I will look at that when we break,

1  but let's see if we can get through the next omnibus claim

2  objection.

3          MR. JUMBECK:  I'd like to say that we are finished

4  with claim objections, but we have one more with the second

5  omnibus claim objection.  These are -- this is Item No. 14 on

6  the second amended agenda, the sealed version located at

7  Docket No. 437.  The redacted version is located at Docket

8  No. 438.  Similar with the first objection, attached is

9  Exhibit A which is the proposed order along with the

10  supporting exhibits.  Attached as Exhibit B is the

11  declaration of William Murphy with M3 Advisory Partners, LP,

12  in support.  Mr. Murphy is present in the courtroom and is

13  available to answer any questions that any party may have.

14  At this point I move Mr. Murphy's declaration into evidence.

15          THE COURT:  Does anyone object to the admission of

16  the Murphy declaration into evidence?

17      (No verbal response)

18          THE COURT:  Okay. I hear no one.

19      (Murphy declaration received into evidence)

20          MR. JUMBECK:  So, the relief that we requested

21  there is with respect to, again, three categories of claims:

22          The first category are the so-called duplicative

23  claims, claims asserted against the debtor, against any of

24  the debtors' reliabilities that are already covered by a

25  corresponding claim.  As set forth in Exhibit 1, there is

1  maintained for this reason the duplicative claim should be

2  disallowed and only the duplicative surviving claim column

3  that information should survive.

4        With respect to the second category, the so-called

5  superseded claims, these are comprised of claims that have

6  been amended, superseded by a subsequently filed proof of

7  claim.  As set forth on Exhibit 2, the originally filed claim

8  should be disallowed and replaced with the amount set forth

9  with respect to the surviving claim amount column.

10        Last is the misclassified equity interest.  This

11  concerns proof of claim No. 1277.  The debtors determined

12  that the claim represented by this proof of claim is actually

13  not a claim. It is an equity interest. So, we just seek to

14  reclassify that appropriately.

15        For these reasons, as more fully set forth in the

16  second omnibus objection and the Murphy declaration, we

17  request that the Court sustain the second omnibus objection

18  and enter an order substantiating the form (indiscernible).

19        THE COURT:  Does anyone wish to be heard with

20  respect to the second omnibus objection to claims?

21     (No verbal response)

22        THE COURT:  Okay. I hear no one in the courtroom

23  and no one on Zoom. I have reviewed the objection and the

24  Murphy declaration. I am prepared to sustain the objection as

25  to Exhibit 1, the duplicative claims, and Exhibit 3,

1  misclassified claims, and Exhibit 2, the superseded claims.

2  But let me just caution again that Exhibit 2 was very

3  difficult to review given the presentation of the exhibit.

4  So, I think we have said enough on that and we will move

5  forward.

6          MR. JUMBECK:  Understood, Your Honor.  So,

7  depending on how the Court wants to proceed, the next item on

8  the agenda that I propose to take up is the debtors' motion

9  for post-petition financing. It is on an uncontested basis.

10  So, unless the Court thinks that there are a number of

11  questions or clarifications perhaps we can move through it

12  relatively efficiently, but I defer to you overall.

13          THE COURT:  Okay.  Go ahead.

14          MR. JUMBECK:  So, as I said, Item No. 16 on the

15  second amended agenda is the debtors' motion for post-

16  petition financing. The DIP motion is located at Docket No.

17  523.  We are pleased to report, as I said, that we are here

18  on a fully consensual basis to seek approval of the DIP

19  facility on a final basis pursuant to the terms of the

20  proposed final DIP order located at Docket No. 585.

21          I would like to thank Mr. Cudia from the U.S.

22  Trustees Office and committee counsel for working with us

23  through this process.  We were able to resolve all of the

24  comments and questions that they had with respect to the DIP

25  order and the DIP facility.  So, we are here on a final basis

1   uncontested.

2        Before beginning the formal presentation, we have

3   two witnesses in the courtroom.  The first is Mr. Robert

4   Winning from M3 Advisory Partners, LP, the debtors' financial

5   advisor.  His declaration is attached to the DIP motion as

6   Exhibit D, Docket No. 523-2.  It addresses, among other

7   things, the necessity of the proposed DIP facility, the

8   reasonableness of the terms, and the reasonableness of the

9   release proposed thereunder.  Mr. Winning is present in the

10  Court and available to answer any questions that the Court or

11  any party may have.

12        The second witness is Mr. Michael Ash from Galaxy

13  Digital Partners, LLC, the debtors' investment banker. His

14  declaration is attached to the DIP motion as Exhibit C,

15  Docket No. 523-3.  It addresses the robust marketing process

16  the debtors undertook in being able to secure the DIP

17  facility.  Again, Mr. Ash is present in the courtroom and is

18  available to answer any questions that the Court or any party

19  may have.  At this time, I move to offer both declarations

20  into evidence.

21        THE COURT:  Does anyone object to the admission

22  into evidence of the Winning declaration at Docket No. 523-3

23  or the Ash declaration at Docket No. 523-3?

24     (No verbal response)

25        THE COURT:  I hear no one.  The declarations are

1  admitted.

2       (Winning declaration received into evidence)

3       (Ash declaration received into evidence)

4       MR. JUMBECK:  The original DIP motion was filed at

5  Docket No. 523 and as exhibits it included the proposed final

6  DIP order which was subsequently amended at Docket No. 585,

7  the executed DIP term sheet which was attached to the

8  proposed DIP order as Exhibit 1, the DIP budget which was

9  attached to the DIP order as Exhibit 2, Mr. Winning's

10 declaration, and Mr. Ash's declaration.

11      As indicated in those declarations and in the

12 motion itself, we have obtained a commitment to fund a

13 proposed $10 million debtor-in-possession financing credit

14 facility that lays the foundation to ensure the winddown

15 debtor is appropriately capitalized following the effective

16 date.  We believe the evidence supports the debtors' decision

17 to pursue the DIP financing and to enter into it was made in

18 the debtors' exercise of their sound business judgment and

19 that the debtors could not obtain a proposed financing on

20 equal or better terms from another source.

21      I think it's important to note that as reflected in

22 Mr. Ash's declaration and Mr. Winning this is not only the

23 best source of post-petition financing, it's the only source.

24 Really the only viable one that the debtors were able to

25 secure.  That's important because Polaris, as my colleague,

1   Mr. Evans, said earlier, is one of the debtors' largest

2   creditors and is taking a significant credit risk in

3   connection with this. The reason is because I think, you

4   know, when we were seeking additional sources of financing

5   both were very reluctant to put forth any proposals because

6   of the questionable nature of the debtors' assets.  They were

7   reluctant to move forward because it was unclear what sort of

8   collateral package there would actually be.  Again, the only

9   party that was willing to step up and give us this lifeline

10  was Polaris.

11          I think the Court has heard enough about the

12  debtors' limited liquidity entering into these cases.  You

13  know, we thought we would be out of here with a much better

14  result, but unfortunately because of unexpected delays in the

15  process, as well as other issues that popped up, the debtors'

16  liquidity situation quickly became even more stressed.  Then

17  Polaris entered.

18          So, I think it's important to also note that

19  although the debtors' liquidity situation is very dire and

20  Polaris is the only option, the DIP lender was willing to

21  provide financing on pretty favorable terms to the estate.

22  There are things that I want to highlight for the Court.

23          The first is that the DIP facility is interest free

24  for a period of time.  The DIP lender has agreed to provide a

25  DIP on an interest free basis through the maturity date so

1  long as the debtors are not in continuing default.  The DIP

2  lender has also agreed to take junior liens with respect to

3  certain permitted liens that arise under applicable non-

4  bankruptcy law as well as with respect to certain collateral

5  pledged by the debtors' surety providers, and certain

6  security interests that may be held by BMO Harris Bank as the

7  debtors' banking institution under the banking fee

8  arrangements.

9        The DIP lender has also agreed to exclude the

10  debtors' trust charter account from the DIP collateral. That

11  account is $1 million of collateral that the debtors were

12  required to pledge to as part of receiving their Nevada trust

13  charter.  By agreeing to exclude that collateral from the

14  account the debtors were able to ensure compliance with their

15  requirements under applicable Nevada state law and maintain

16  their trust charter as well.  There are no fees associated

17  with the DIP facility.  So, there is no commitment fee, no

18  exit fee, no sort of ticking fee or anything like that

19  typically associated with the DIP commitment.

20        Finally, the DIP also contains what is called the

21  plan rollover election.  So, instead of requiring payment in

22  full of all outstanding DIP obligations at the maturity date,

23  the DIP lender has agreed to an alternative treatment.

24  Specifically, in the event the debtors are unable to satisfy

25  the DIP obligations on or before the maturity date the DIP

1  lender has agreed to roll those obligations, essentially,

2  into a quasi-exit facility and receive first priority

3  security interest on the winddown debtor assets.

4         In doing so, the DIP lender is providing the

5  debtors with the flexibility to ensure that the winddown

6  budget is appropriately funded.  And to the interest point

7  earlier, again, the rollover includes a 12-month interest

8  holiday and even after interest begins to accrue on the DIP

9  loan, that interest rate of 7.5 percent is quite reasonable

10 especially, one, for distressed financing period and, two, in

11 this interest rate environment that we are in now.

12        Now, I think something that we want to highlight

13 here that is really important and we want to be fully

14 transparent is the DIP lenders commitment to provide the DIP

15 facility did come with a condition that is relatively common

16 in post-petition financing.  It came with a release.  So,

17 while not typically, you know, too controversial as we

18 detailed in the DIP motion and the Winning declaration

19 Polaris was a customer of the debtors prepetition.

20        In the 90 days preceding the petition date Polaris

21 withdrew approximately $30.9 million from its account at

22 Prime Trust while depositing approximately $150,000.  Again,

23 those three withdrawals occurred in the 90 days proceeding

24 the petition date.  As I noted, a condition of the DIP was

25 the release of those claims.

1          The debtors release is appropriate based on the

2   facts and circumstances here, namely because of the facts of

3   these Chapter 11 cases, the beneficial terms that the DIP

4   lender is going to provide credit on, a significant credit

5   risk that the DIP lender is taking in connection with these

6   cases, combined with expensive potentially time consuming

7   litigation that would result, as well as potential viable

8   defenses that Polaris has asserted it has and will defend

9   aggressively.

10          THE COURT:  Can I stop you there a second to ask

11   you a couple of questions.

12          MR. JUMBECK:  Sure.

13          THE COURT:  One, what is Polaris priming?

14          MR. JUMBECK:  So, this a good question. The

15   debtors' understanding is because we do not have Your typical

16   all-asset prepetition secured credit facility that there

17   really are no valid prepetition liens encumbering the

18   debtors' assets, as is pointed out by the investigation and,

19   you know, due diligence process as well; however, Polaris was

20   not willing to lend other then on a priming basis.  So, to

21   the extent that there are liens out there that, you know,

22   they are priming to that extent.  Again, our understanding is

23   that we don't believe that there are any.  Again, that is why

24   there is certain language with respect to the 552 waivers.

25          Again, to the extent applicable those apply.

1  Overall, we are not willing to lend other then on a priming

2  basis and with respect to things that have already been

3  pledged as collateral, like the surety collateral and any

4  property or assets held by BMO Harris Bank that may be

5  subject to their security interests, they are going to be

6  taking, and agreed to take, a junior lien on those assets.

7          THE COURT:  Right.  Those parties received notice.

8          MR. JUMBECK:  Yes.

9          THE COURT:  Okay.  So, it appears in this

10  transaction that Polaris is settling its ownership issue.  Is

11  that without prejudice to other parties arguments relating to

12  ownership?

13          MR. JUMBECK:  In that -- so, is the Polaris

14  situation solely confined to Polaris itself?

15          THE COURT:  Yes.

16          MR. JUMBECK:  Yes, Your Honor.

17          THE COURT:  Does it have any collateral impact?

18          MR. JUMBECK:  No, no.  The facts here are fully

19  confined to a motion before the Court and this proposed DIP

20  facility.  Now, I am more than happy to --

21          THE COURT:  Talk to me about the milestones.

22          MR. JUMBECK:  Okay.  As the Court noted, the DIP

23  does (indiscernible) certain milestones that the debtors are

24  required to meet.

25          One of which, as already heard and hopefully one of

1  which we are currently satisfying, but the first is by

2  December 8th the debtor shall file the amended plan

3  supplement to the amended plan that provides for certain

4  information and documentation.  That is in form and substance

5  to agreeable -- acceptable to the DIP lender.  We have met

6  that milestone in connection with our various plan

7  supplements that we have filed with respect to the plan

8  administrator agreement, identity of the plan administrator,

9  identity of the PCT litigation trustee and oversight

10 committee there.

11        The second is by December 19th the confirmation

12 hearing shall have commenced.  So, hopefully once I turn the

13 podium back over to Ms. Kandestin we will get there to the

14 extent we have not already.

15        Last is by December 27th the Court shall enter an

16 order confirming the amended plan.

17        THE COURT:  So, here is my question: What if the

18 Court doesn't amend the plan?  If the Court doesn't confirm

19 the plan, what happens with this DIP?

20        MR. JUMBECK:  So, in that situation --

21        THE COURT:  Is the plan confirmation condition

22 precedent to approval for the DIP?

23        MR. JUMBECK:  It is not, Your Honor.  So, to that

24 hypothetical there is potentially a world where the Court

25 does not confirm the plan, but Polaris will be obligated to

1   fund under the conditions preceding to this DIP facility.

2          THE COURT:  Okay.  Does anyone wish to be heard

3   with respect to the DIP?  The Trustee?  The committee?

4   Anyone?

5          MR. STARK:  Your Honor, Robert Stark from Brown

6   Rudnick on behalf of (indiscernible) in support of

7   (indiscernible).

8          This was actually negotiated with the committee as

9   well as negotiated with the company.  So, we did have say in

10  this.  We think its reasonable under the circumstances and I

11  am happy to answer any questions that Your Honor may have.

12         THE COURT:  No.  Thank you, Mr. Stark.

13         Anyone else wish to be heard?

14     (No verbal response)

15         THE COURT:  Okay.  So --

16         MR. JUMBECK:  Your Honor, if I may, and again for

17  the record Jake Jumbeck, McDermott Will & Emery for the

18  debtors, there are two points I want to make with respect to

19  collateral and the property of the estate.

20         The first is with respect to the collateral.  Given

21  that this came about late in the game after the Swan license

22  agreement that the Court already approved was pretty much

23  (indiscernible) and we are just waiting for Court approval

24  there.  Counsel for Swan reached out and requested that we

25  make a statement on the record just to the effect that its

 1  own interest in the license agreement and certain terms

 2  thereunder are protected and that the DIP lender is not

 3  seeking to interfere with those rights.  So, we were able to

 4  negotiate a statement on the record that I will read in now.

 5          THE COURT:  Okay.

 6          MR. JUMBECK:  "The DIP lender confirms that it has

 7  reviewed an unredacted copy of the license agreement between

 8  the debtors and Electric Solidus, Inc., d/b/a as Swan

 9  Bitcoin, and confirms that it will not exercise rights with

10  respect to its collateral in a manner that will interfere

11  with Swan's rights under the license agreement or Swan's

12  exercise of its rights under Section 5.4 of the license

13  agreement".

14          Counsel for the DIP lender is in the room, so I

15  don't want to speak for them, but they did confirm that they

16  agreed with this statement as well as local counsel to Swan

17  is here as well to the extent the Court would like

18  confirmation from them.

19          THE COURT:  Does the DIP lender consent to that?

20  Good afternoon.

21          MR. BARTLEY:  Good afternoon.  Ryan Bartley of

22  Young Conaway on behalf of Polaris.

23          Yes, we do confirm that that representation is

24  correct.

25          THE COURT:  Okay.  Thank you.

1          MR. JUMBECK:  For the record Jake Jumbeck.  The

2     last point is that I just really want to put a fine point on

3     the Court's question earlier.  This does not resolve property

4     of the estate issues. This is entirely new funding.  This is

5     solely confined to (indiscernible) and this situation right

6     here.

7          THE COURT:  Okay.  Thank you.

8          Does anyone else wish to be heard?

9      (No verbal response)

10         THE COURT:  Okay.  Based on the facts a presented

11    and the uncontroverted Winning declaration at Docket 423-3

12    and the uncontroverted Ash declaration at Docket 523-3, the

13    debtors have demonstrated that they don't have sufficient

14    available sources of working capital and financing.  The DIP

15    financing bridges the case to an exit, provides funding to

16    preserve information, monetize assets, and preserve

17    litigation pursuant to a potential plan.

18         The proposed financing is the only available

19    financing the terms of the DIP facility are most favorable

20    terms debtor can secure and are fair and reasonable.  The

21    terms of the DIP facility were negotiated in good faith and

22    no objections have been filed to the motion.  Informal

23    comments have been resolved.  Importantly, the creditors

24    committee supports the relief here.

25         So, I will enter the proposed order subject to a

1  couple of questions on the form of order.

2          MR. JUMBECK:  Does Your Honor have a copy?

3          THE COURT:  I do -- well, I'm working off of Docket

4  585.

5          MR. JUMBECK:  Yes.  Are you working off the redline

6  or the clean?

7          THE COURT:  I am working off the redline.  Some of

8  this just may be the speed of reading things, and you all are

9  a lot more familiar with these documents.

10          This order refers consistently to the term "DIP

11  loan documents" and I never saw that as a defined term. I

12  think the documents here were just referred to as a term

13  sheet, but I don't know what DIP loan documents are. I might

14  have just missed it.

15          MR. JUMBECK:  It's defined in the term sheet and

16  it's really just the term sheet, the DIP order, and the

17  approved budget.

18          THE COURT:  Okay.

19          MR. JUMBECK:  Those are the three.

20          THE COURT:  Thank you.  Paragraph 1, now that I

21  know what the DIP loan documents are, okay, that is fine. Now

22  that I understand exactly what we are talking about.

23          Paragraph 5, this was just -- I am assuming this is

24  negotiated between the parties, but in line 5 in Paragraph 5,

25  customary redactions -- redactions customary for this Court,

1  I don't even know what that means.  Are we just saying

2  reasonable redactions?  I mean as long as the parties

3  understand what that means.

4        MR. BARTLEY:  Yes, Your Honor, there is obviously -

5  - this is Ryan Bartley again.  There is a well-trodden path

6  for submitting fee requests that the DIP lender most,

7  obviously, will comply with what the U.S. Trustee

8  (indiscernible).

9        THE COURT:  Okay.  Paragraph 8, we are talking

10  about DIP collateral.  The references made to all accounts in

11  line 5.  How does this interplay with customer accounts?

12        MR. JUMBECK:  So, good question. Hopefully we have

13  been able to sort of really address that.

14        THE COURT:  In 10?

15        MR. JUMBECK:  Yes, really throughout.  We are happy

16  to add even more additional clarifying language there that

17  this is not with respect to any of those property of the

18  estate issues that are still undetermined or anything of that

19  nature.

20        THE COURT:  Yeah, because I think what -- so, I

21  assumed that that was the purpose of 10 to address that

22  issue, but then (indiscernible) because I don't know how -- I

23  don't really know what it means the debtors have no

24  obligation to characterize or seek adjudication when if the

25  plan is confirmed 2.5 sets forth a mechanism, and maybe I am

1  misreading these provisions or trying to merge provisions

2  that shouldn't even be merged.

3        MR. JUMBECK:  So, I think it is slightly cleaner to

4  keep them separate in a way.  The new language from 10 came

5  in a response to comments from the committee and I really

6  think that the intent there is to avoid a situation where the

7  DIP lender is, you know, in that universe (indiscernible) for

8  a period of time before the plan rollover occurs --

9        THE COURT:  Right.

10        MR. JUMBECK:  -- where the DIP lender is

11  potentially trying to say, no, like -- go -- this type of

12  collateral, this account looks funky, you should lodge an

13  objection or file some type of motion to adjudicate that

14  issue to increase the collateral package.  That language,

15  while maybe not as clear as it could have been is really the

16  intent of that.

17        MR. BARTLEY:  Your Honor, Ryan Bartley.

18        THE COURT:  Yes, thank you.

19        MR. BARTLEY:  I just want to add one thing and I

20  might have misheard Mr. Jumbeck earlier. If we do the

21  rollover our liens actually go away. So, the universe where

22  we're in the plan account treatment protocol we will have

23  ceded our liens and we are just simply a senior creditor

24  under the plan getting paid before the unsecured creditor.

25        So, in our view there is, hopefully, a very short

1   period of time where we actually are a secured creditor as

2   opposed to a priority creditor under the plan.  So, if Your

3   concern is whether there is a conflict with the plan's

4   provisions for account treatment, we won't have collateral

5   interest once the plan is confirmed and becomes effective

6   because our liens go away and we just get a senior priority

7   lien.

8            MR. AXELROD:  Your Honor, Tristan Axelrod, Brown

9   Rudnick, for the committee.  May I be heard very briefly?

10           THE COURT:  Yes, of course.

11           MR. AXELROD:  The language that is being discussed,

12  I believe is taken directly from the term sheet the debtor

13  shall have no obligation in Paragraph 10.  I believe its

14  being addressed unanimously here so that the debtors are --

15  not the debtors, the debtors or the plan administrator is not

16  pushed into any particular decision as to what is at

17  Paragraph 10.  Thank you.

18           THE COURT:  Thank you.

19           I have a question about Paragraph 21, and maybe

20  this is what you were just addressing, because I understood

21  if the debtor couldn't satisfy the DIP obligations on the

22  maturity date then the DIP lender had agreed to the plan

23  rollover treatment.

24           MR. JUMBECK:  Yes.  We (indiscernible), I believe,

25  in Paragraph 13 where we added, in response to the committee,

1  in accordance with the treatment of DIP claims as provided in

2  the plan.  We can add clarifying language there to reflect,

3  you know, that plan rollover concept as well to address that.

4          THE COURT:  Yeah, because it looks inconsistent to

5  me.

6          MR. JUMBECK:  We will add clarifying language

7  there.

8          THE COURT:  I am assuming that the Polaris parties

9  are defined in the term sheet. I didn't go back and

10 doublecheck.

11         MR. JUMBECK:  They are, Your Honor.

12         THE COURT:  I'm getting nods.

13         MR. JUMBECK:  Y3es, they are.

14         THE COURT:  So, if you would -- oh, I did have one

15 other and this is a easy question, but I am just curious.

16 So, Paragraph 3 talks about borrowing an original principal

17 amount not to exceed $10 million. Is it anticipated there

18 will be additional borrowings thereafter?

19         MR. JUMBECK:  No, its $10 million single draw.

20         THE COURT:  Okay.  So, if you will get that

21 blacklined and uploaded we will get it entered.

22         MR. JUMBECK:  Just to confirm too, in the DIP

23 motion and in, I believe, (i) there is an additional kind of

24 clarification there of $10 million and such additional

25 amounts to the extent the fees are paid in kind.  So, any

1   sort of, you know, uptick in the principal amount is going to

2   be as a result of picking those reasonable attorney's fees

3   from DIP lender.

4           THE COURT:  Okay.  Thank you.  Let's take a break

5   until 2:30 and then we will come back.

6           Let me ask, with respect to confirmation, are there

7   any witness time constraints?  I mean, I'm sure everybody

8   wants out.  And let me just say to the parties that I very

9   much appreciate the process of making sure that we adhere to

10  a due process and procedures.  So, to the extent that I have

11  questions I very much appreciate you taking the time to look

12  into things and respond even if it requires a little bit of

13  delay in the hearing.

14          MS. KANDESTIN:  Your Honor, we are happy to

15  (indiscernible).  I would like to personally apologize for

16  the claim objection by (indiscernible).

17          THE COURT:  I can tell you all have plenty to do.

18  I appreciate that.

19          MS. KANDESTIN:  I will do a better job of

20  explaining those.

21          THE COURT:  So, do we have witness constraints?

22          MS. KANDESTIN:  We do not.

23          THE COURT:  So, we will start back up at 2:30.

24          MS. KANDESTIN:  Thank you, Your Honor.

25          THE COURT:  Okay.  Terrific.  Thank you.

1      (Recess taken at 1:25 p.m.)

2       (Proceedings resumed at 3:28 p.m.)

3          THE COURT:  Please be seated.  We're back on the

4   record in Prime Core Technologies, case number 23-11161.  I'm

5   sorry to interrupt you.  If you are on Zoom, please mute your

6   line.  Thank you.

7          MS. KANDESTIN:  Your Honor, as we previewed a

8   little bit earlier in chambers, when we removed the cost

9   claims from the same objection and applied their votes to our

10  voting results, we ran into an issue and it was the reason

11  why we objected to that particular claim.  There seemed to be

12  an error in how the ballot was submitted.

13         There's a disconnect between the ballot and the

14  supporting documentation.  Our understanding that the --

15  instead of using units, I mean, dollar amounts, the Bitcoin

16  and the Eth, the claimant just put in a unit.  Put them as

17  units, which inflated those claims to a very high degree.

18  The Bitcoin claim was today at $709,000,000, and the Eth

19  claim is $33 million.  And those were votes against the plan,

20  which is a clear gating issue.  May I approach with the --

21         THE COURT:  Yes.  There was a gating thing I

22  wanted to address before we started as well today.

23         MS. KANDESTIN:  It is my understanding the

24  claimant is on Zoom today and is willing to clarify what her

25  intention was when she submitted the claim and accept that we

1  are going to seek to reduce her claim for voting purposes.

2           THE COURT:  Okay, bear with me a second.  I'm just

3  looking at the detailed statement that's been provided.

4           MS. KANDESTIN:  The two charts I provided you, one

5  takes that claim into account and one doesn't.

6           THE COURT:  Okay.  Is the claimant online?

7           MS. KANDESTIN:  Can the claimant confirm that

8  she's online, please.

9           MS. CHIANG:  Yes, I am.

10          THE COURT:  Could you identify yourself, please?

11 Do you have a camera?  Can you be shown on Zoom?

12          MS. CHIANG:  Yeah, I can.  One second.  Hello.

13          THE COURT:  Hi.  Good afternoon.  Thank you for

14 appearing today.

15          MS. CHIANG:  Yes, thank you so much.  Yes, my last

16 name is Chiang, and my first name is Yi-Jou.

17          MS. KANDESTIN:  And with respect to the claim you

18 filed, did you intend to file the 16,757 as units of Bitcoin

19 or the dollar value of your Bitcoin?

20          MS. CHIANG:  The dollar (inaudible).

21          MS. KANDESTIN:  And same for the Eth, 15,352?

22 That was -- you meant to include that as the dollar value,

23 not the units you hold?

24          MS. CHIANG:  Yes, that is correct.  The dollar

25 value.

1          MS. KANDESTIN:  And do you have any objection to

2  us adjusting your vote to reflect that?

3          MS. CHIANG:  No objection.  Thank you.

4          THE COURT:  So, ma'am, just to confirm that your

5  vote is in U.S. Dollars of $16,757.153?

6          MS. CHIANG:  Yes, for Bitcoin.  That is correct.

7          THE COURT:  Okay.

8          MS. CHIANG:  And then there's a separate claim for

9  Ethereum, which is, I think --

10          THE COURT:  $15,352.14 in U.S. Dollars?

11          MS. CHIANG:  (Inaudible).

12          THE COURT:  Okay.  And that's how you wish to vote

13  your claim, in those dollar amounts, ma'am?  I'm sorry, I

14  couldn't hear you.

15          MS. CHIANG:  Yes.

16          THE COURT:  And you are voting in favor of the

17  plan; is that correct?

18          MS. CHIANG:  I don't believe I submitted a

19  rejection, so, yes.

20          MALE VOICE:  It was a vote to reject.

21          THE COURT:  Oh, I'm sorry.  It was a vote to

22  reject the plan.  I'm sorry.  Is that accurate?

23          MS. CHIANG:  Yes.

24          THE COURT:  Okay.

25          MS. KANDESTIN:  I don't have any further

1  questions.  Does Your Honor have any?

2            THE COURT:  I do not.  Does anyone else?  Let me

3  ask, ma'am, if the debtors were asked to file with the Court

4  a stipulation that just indicated that your vote was in U.S.

5  Dollars that we just stated on the record, would you sign

6  that stipulation for purposes of the record?

7            MS. CHIANG:  Sorry, could you repeat that?

8            THE COURT:  Yes.  If the Court asked the debtors

9  to file a stipulation indicating what your claim is in dollar

10  amount that it was supposed to be in dollars, would you sign

11  that stipulation?

12            MS. CHIANG:  Yes.

13            THE COURT:  Yes?  Okay.  Thank you, ma'am.

14            MS. KANDESTIN:  We'll prepare that, Your Honor,

15  and we'll (inaudible).

16            THE COURT:  Thank you very much, ma'am.

17            MS. KANDESTIN:  Thank you.  Thank you very much.

18            MS. CHIANG:  Thank you very much.

19            MS. KANDESTIN:  Your Honor mentioned another

20  gating item.

21            THE COURT:  Yes.  Before we even started today, I

22  wanted to rule on the creditor matrix because I think this is

23  a gating issue after this afternoon.  The evidence here today

24  and previously before the Court established that debtors

25  communicate with their customers via email agreements or via

1    email.  An agreement stated that future communications could

2    be by email and no paper documents would be sent to

3    customers.  As a result, this court previously permitted

4    email service.

5           The debtors established they made electronic or

6    commercially reasonable efforts to serve consistent with its

7    business practices and the agreements between the parties.

8    But some email has been returned, just like in some cases,

9    regular mail is returned.

10          The evidence showed that after receiving

11   undeliverable email and analyzing the email service and

12   assessing service issues, the debtors determined to service

13   via mail those parties they identified as creditors in their

14   statements and schedules.  The debtors determined, based on

15   their analysis, not to serve the remaining customers by mail,

16   some of whom they do not have mail addresses.

17          The Court thinks these efforts were commercially

18   reasonable in light of the matrix order and this industry.

19   Due process requires notice reasonably calculated under the

20   circumstances.  I am considering the debtor's motion as a

21   supplemental motion under 105 Bankruptcy Rule 3018 and

22   Bankruptcy Rule 2002 and not a motion to amend.

23          I am not willing to vacate a prior order under

24   these circumstances, particularly when mail service was made

25   in part.  Under the specific facts of this case and the

1  evidence presented to the Court, I will enter a supplemental

2  order waiving the requirement that the debtors serve by mail

3  those parties the debtors established through uncontroverted

4  testimony were not creditors or for whom the debtors do not

5  have a mail address.  This ruling is without prejudice to the

6  parties who may later challenge notice.  All their arguments

7  are reserved.

8         That said, the relief you receive is only as good

9  as the notice you provide, so that to the extent a party does

10 not receive notice, it will not be bound.  So I'd like to ask

11 the trustee and the debtor to confer and submit a form of

12 order, and with that we can proceed forward with

13 confirmation.

14         MS. KANDESTIN:  Thank you, Your Honor.  So Your

15 Honor, Item Number 17 on the agenda is the debtor's request

16 for the Court to approve the disclosure statement on a final

17 basis and confirm the debtor's Chapter 11 plan.

18         I'm pleased to report after the call we just had

19 with the claimant that we have a nearly consensual plan

20 before your court with overwhelming support from our

21 creditors as well as the support of the committee and the DIP

22 lender.

23         At the top of the hearing, I introduced Mr. Weiss,

24 Mr. Murphy, and Mr. Karpuk, each of whom has submitted

25 declarations in support of confirmation.  Mr. Weiss's

1 declaration is in support of the plan that was filed on

2 December 12th, and it appears at Docket No. 558.  We have

3 some changes to that which we'll go through in a little bit,

4 but with all additional concerns, I'm happy to hand up the

5 red lines now.

6 　　　　　THE COURT:  Okay, that would be great.  Thank you.

7 Thank you.

8 　　　　　MS. KANDESTIN:  Mr. Weiss's declaration speaks to

9 the terms of the plan, including that they were the product

10 of extensive funds like good-faith negotiations and represent

11 the sound exercise of the debtor's business judgment.  It

12 also speaks to the justification for the release,

13 exculpation, third-party release, and injunction provisions,

14 including the proposed treatment of the released employees,

15 as well as all of the ways that the plan satisfies the

16 applicable elements of Sections 1122, 1123, and 1129 of the

17 Bankruptcy Code.

18 　　　　　Mr. Murphy's declaration was filed on September

19 12th and appears at Docket No. 559.  And his declaration

20 focuses on the revised (inaudible) analysis, best interest

21 test, and speaks to feasibility of the plan.

22 　　　　　Lastly, Mr. Karpuk's declaration.  There are now

23 three.  The first one appeared at 582.  It was supplemented

24 this morning at Docket No. 618.  And it was just supplemented

25 to address everything that we just discussed at Docket No.

1   624.  And that discusses solicitation, balloting, the

2   tabulation of votes, and sets forth the results of those

3   votes.

4             THE COURT:  And what's the number of that?

5             MS. KANDESTIN:  624.  At this time, I would ask

6   that the Court enter these declarations into the evidentiary

7   record of the hearing.  As noted, each of these declarants is

8   present in the courtroom and available for cross examination

9   if the need arises.

10             THE COURT:  Okay, does anyone object to the Weiss

11   declaration in support of confirmation at Docket No. 558, the

12   Murphy declaration regarding best interest test at Docket

13   559, or the Karpuk voting declaration at Docket No. 624?

14   Okay, I hear no one.  Does anybody wish to cross examine any

15   of the witnesses regarding the content of their declarations?

16   I hear no one.  You may proceed.

17             MS. KANDESTIN:  Thank you.  I'd also note that

18   debtors filed a brief and supportive confirmation and

19   approval of a disclosure statement on a final basis, and that

20   appears at Docket No. 557.

21             If it's acceptable to the Court, I will commence

22   my presentation on the final approval of a disclosure

23   statement.

24             THE COURT:  Yes.

25             MS. KANDESTIN:  Your Honor approved the disclosure

1  statement on a conditional basis on October 5th, a little

2  less than two months into the cases that we entered in our

3  free fall.  At the conditional approval hearing, several

4  parties objected or raised concerns with respect to the

5  disclosures in the disclosure statement that was going to be

6  solicited, and specifically those disclosures relating to the

7  debtor's ongoing investigations and what we're calling the

8  account treatment issues, the (inaudible) issues.

9         To address these concerns, the debtors committed

10 to supplementing their disclosure statement prior to the

11 December 5th deadline and specifically one week prior, and on

12 November 28th, they filed this supplement which appears at

13 Docket No. 487.

14        The supplement included the following additional

15 information: updates with respect to the termination of the

16 debtor's sale process and its pursuit of a liquidation

17 transaction under that toggle in the plan; descriptions of

18 key case updates and filings, including these claims

19 objections and debtor's -- the debtor's motion seeking

20 authority to enter into the swan (phonetic) license agreement

21 and the DIP facility.

22        And it had updates with respect to the debtor's

23 investigations and the status of looking into property estate

24 issues, including the settlement with Tiki Labs described and

25 also the debtor's filing of the foreign currency sale motion

1   (inaudible).

2           We endeavored to include a more user friendly

3   breakdown of exactly who of the debtor's employees and

4   directors and officers, current and former, were being

5   released and to what extent under the plan.

6           So we created two charts that we filed as part of

7   that.  The first chart showed the treatment under the version

8   of the plan that was already solicited.  The second version

9   included the updates that have since been made to the plan

10  and introduced the concept of these released employees.  And

11  in addition, we filed the revised liquidation analysis on

12  December 1st.

13          Because all of the parties who raised objections

14  at the conditional approval hearing, those objections were

15  carried forward to this hearing.  We reached out to those

16  parties to see whether the updates to supplement that we

17  provided resolved their concerns or anything that we did in

18  the plan.

19          So it's my understanding that all of these and all

20  of these were resolved but for the joinder of Coinbits to the

21  disclosure statement, objection that Tiki Labs filed, which

22  Tiki Labs' objection has since been withdrawn.  We contacted

23  Mr. Newman, but he was unwilling to withdraw or let us mark

24  his objection as resolved.  So I will ask if Mr. Newman is

25  present.

1          THE COURT:  Is Mr. Newman?

2          MR. NEWMAN:  I am, Your Honor.  I am right here,

3   Your Honor.

4          THE COURT:  Okay.  Would you like to proceed with

5   your objection?

6          MR. NEWMAN:  Oh, yes, Your Honor.

7          THE COURT:  Your objection --

8          MR. NEWMAN:  I don't plan on doing much.  I'm on

9   video.  I'm not in the presence of the Court.  So I just

10  wanted to make sure that the issues which are before the

11  Court, my client is Coinbits.  Coinbits is one of the

12  earliest on ramp.  I think it's the earliest on ramp for

13  Bitcoin investing, Bitcoin, BTC.  My client's users, there's

14  about 4500 of them.  And so those customers each have

15  agreements with the debtor.  Actually, my client also has an

16  account with the debtor as well as other agreements.

17         The concerns that I've had, really, I'm looking

18  forward to confirmation today, but the current concerns that

19  I have is that the ongoing investigation, we still don't know

20  is it ongoing?  Has it concluded?  We know that there are

21  deals being cut, like with Tiki Labs, and I know there was an

22  analysis done probably with regards to foreign currency.

23         My clients, all they have are Bitcoin and Bitcoin

24  today -- I mean, it's about $44,000 a coin.  So we're the

25  substantially -- my users are the holders of substantially

1  the largest portion of Bitcoin.  But I don't know because

2  we've never seen the analysis done.

3          I'm just hoping that the debtor is prepared right

4  out the gate to deal with BTC issues, because I know that the

5  most important thing in this case actually is not what the

6  debtor is doing, but the debtor has a piece of software.

7  It's called Fireblocks and Fireblocks -- and I'm not a paid

8  advertisement for Fireblocks, but it's a key grid, a key

9  technology that's key to making sure that individual

10 ownership can match up to specific digital assets.  And it's

11 an important, very expensive agreement.

12         I think it was just added to the list of

13 agreements that's going to be assumed.  It's a seven figure

14 cure amount.  And so the longer this case goes, especially

15 holding Bitcoin, where there's really no basis to continue to

16 hold that Bitcoin.  And if the debtor has already done their

17 analysis, it should be pretty clear that that Bitcoin should

18 be then back to the owners of it.  That was the whole purpose

19 of this process.

20         I'm just hoping now that the procedures aren't

21 going to go out artificially for 120 days.  I think BTC being

22 the most valuable digital asset, in fact, it's the recognized

23 currency of El Salvador that this specific currency that's so

24 valuable needs to be dealt with right away.  Right out of the

25 gate.  It's too much risk for the estate to hold.  It's too

1  expensive for them to continue to hold under Fireblocks,

2  which is critical to the success of this case.  And the

3  sooner they get these assets to holders, the better.

4           And this is not talking about fiat, it's talking

5  about BTC.  I've had communications with the parties here.  I

6  just wanted to make sure that everybody knew.  And it's very

7  important that even though we don't have full disclosure as

8  to the analysis that was done, it must have been done

9  already.  So I'm hoping the debtor is ready to go and get

10  these digital assets out to owners like what they wanted to

11  do in Nevada, and that I think it's time to do it.  The

12  sooner they can do it, the better, Your Honor.

13           THE COURT:  Mr. Newman -- yes, go ahead.  I'm

14  sorry, I interrupted you.

15           MR. NEWMAN:  Oh, no, just with that.  I think that

16  we're just getting the full disclosures now.  The procedures

17  were only disclosed just recently.  I think there were just

18  changes recently with regards to sharing of costs.  And in

19  light of all the moving pieces and parts, I just wanted to

20  hold out my objection and make sure and clear that there's a

21  lot of incentive for this estate to deal with Bitcoin first,

22  the most valuable digital asset here, where people have not

23  been able to exercise their property rights for eight months

24  now.

25           Okay, so with that, Your Honor, I'm fine with

1  having my objections resolved.  I think it was an important

2  opportunity for me to express the concerns I think a lot of

3  customers in our customer base --

4          THE COURT:  I appreciate you wanted an audience,

5  and I think you've got it today.  I think that everyone has

6  heard you, Mr. Newman.  So if I understand you correctly,

7  your objection to the disclosure statement is resolved?

8          MR. NEWMAN:  Yes, Your Honor.  I look forward to

9  resolving the return of digital assets as promptly as we can

10  in a post confirmation world.

11          THE COURT:  Okay, terrific.  Thank you very much,

12  Mr. Newman.

13          MR. NEWMAN:  Thank you so much, Your Honor.

14          MS. KANDESTIN:  To put Mr. Newman's mind at ease

15  with respect to the Fireblocks issue, we were able to, as he

16  mentioned, we added them to the assumed list that we filed

17  yesterday, and we made a correction today, this morning.  We

18  were able to secure a two-year contract at a reasonable

19  amount and resolve their claims at the same time.  So we're

20  good there.  You know, it's not a hugely expensive item

21  anymore that we won't be able to maintain.

22          THE COURT:  Mr. Newman, I hope that satisfies your

23  inquiry this afternoon.

24          MR. NEWMAN:  Thank you, Your Honor.  And I do

25  appreciate all the time that was spent by counsel in this

1   case.

2           THE COURT:  Thank you.  Have a great afternoon.

3           MS. KANDESTIN:  Your Honor, based upon the record

4   established at the conditional approval hearing, the reasons

5   set forth in our brief, in consideration of the Weiss

6   declaration and the Murphy declaration, in consideration of

7   the disclosure statement supplement, and given the lack of

8   any remaining objections, we would ask that you approve the

9   disclosure statement on a final basis as having adequate

10   information under 1125 of the Bankruptcy Code.

11           THE COURT:  Okay, I will rule when I rule it once.

12   And if you like a cough drop, help yourself.  Welcome to the

13   contagious courtroom.

14           MS. KANDESTIN:  Thank you, Your Honor.

15           THE COURT:  You're welcome.  Anyone else?  Please

16   help yourself.

17           MS. KANDESTIN:  So that brings us to our request

18   that the Court confirm the plan filed at Docket No. 592-1

19   with the red lines I've handed you that's some changes that

20   I'll walk through in a bit.

21           So Your Honor, the plan includes 12

22   classifications of claims and interests.  Classes 1A and B

23   and 2 were unimpaired into the plan, deemed to accept under

24   1126(f), they were not entitled to vote.  Classes 5 through 8

25   are impaired (inaudible), and so were not entitled to vote

1  under 1126(g).  Classes 3A, 3B, 3C, and 3D, which are the

2  general unsecured claim classes at each of the debtor

3  entities were impaired under the plan, and were able to vote.

4  There were no votes in Class (inaudible).

5           So under the plan, we treated as a vacant class

6  and there wasn't counted in the tabulation of votes.  Class 4

7  is our convenience class, also entitled to vote on the plan.

8  As set forth in the voting declaration, the debtors caused

9  the voting agent to distribute solicitation packages,

10  ballots, confirmation hearing notice, supplemental

11  confirmation hearing notice to the voting classes, and they

12  also sent a notice of non-voting status to the non-voting

13  classes.

14           And there are affidavits on file as Docket Nos.

15  424, 459, 552, 553, 555, 556, 562, 564, and 575.  Your Honor,

16  all of these are noted on our agenda as well.

17           The debtors also provided publication notice at

18  the confirmation hearing in the national edition of the New

19  York Times and was published on October 11th.  And an

20  affidavit of publication appears on the docket at No. 288.  I

21  would ask now that Your Honor move into evidence these

22  affidavits of service and the affidavit of publication into

23  the record.

24           THE COURT:  Does anyone object to admission in the

25  affidavits into the admission -- into the record, excuse me?

1   All right, they're admitted.

2           MS. KANDESTIN:  I'd like to now go over the opt

3   out procedures that we included.  So the plan provides for

4   consensual third-party release in favor of the released

5   parties.  The debtors provided holders of claims and interest

6   with notice of third-party release, as well as the procedures

7   for opting out in several ways.

8           Each ballot distributed to voting classes included

9   in full, conspicuous text on the first page of the ballot

10  notice that the plan contains third-party releases, advising

11  parties of the consequences of failing to opt out, and

12  directing the voting classes to the particular space on the

13  ballot where they could exercise that right to opt out with a

14  box they could check.

15          The confirmation of the hearing notice, also in

16  conspicuous, bold text, included the full text of the

17  release, exculpation, and injunction provisions and explained

18  the consequences of failing to opt out of them.  And to

19  ensure the nonvoting classes also had an opportunity to opt

20  out of the releases, we included an opt out procedure in the

21  notice of non-voting status, and again in bold conspicuous

22  text, we included the full text of the release, exculpation,

23  and injunction provisions and explained the consequences,

24  again, of failing to opt out, and included not only the same

25  opt out box that voting classes received in the ballot, but

1    also informed them that they could also file an objection to

2    the releases and opt out in that manner.  And an instruction

3    with respect to checking the box was just to merely return it

4    to the voting agent.  And there are parties who availed

5    themselves of this procedure, both of those procedures.

6              In addition, the publication notice included both

7    conspicuous language of the existence of the releases and

8    exculpation provision and injunction provision.

9              Turning now to the voting results, there are five

10   classes of claims entitled to vote.  As I just mentioned, all

11   of the subclasses in 3 and Class 4, the convenience class

12   claim, and we disregarded 3C because it had no votes.

13             The most recent second supplemental voting

14   declaration.

15             THE COURT:  This is 624.  Right?

16             MS. KANDESTIN:  Yes.

17             THE COURT:  Okay.

18             MS. KANDESTIN:  The four classes that actually

19   have cast votes voted overwhelmingly in favor of the plan in

20   both number and amount.  The treated voting results set forth

21   in the declaration, which removes the 45, (inaudible) end

22   user, or it includes -- sorry, it includes those users that

23   we've removed from the claim objection exhibit, and also the

24   environmental claim that person didn't vote.  So that doesn't

25   matter for this purpose.  But we also took them off of the

1  claim objection.  It was claim number 339.  You asked us to

2  remove them from the claim objection.

3          THE COURT:  All right, I'm going to have to step

4  back a minute.  So untreated is absolutely what you received.

5          MS. KANDESTIN:  Um-hum.

6          THE COURT:  Okay.  And then treated in Docket 624

7  reflects, specifically, claims that were addressed earlier

8  today.

9          MS. KANDESTIN:  Yes.  Or through the 3018 motion.

10 And we added back in my cost claims with the adjustment of

11 the claim that we just discussed with the claimant.  So the

12 treated results that are in the current voting declaration

13 changed her vote from being a $550,000,000 vote to what it's

14 like a 30 something thousand dollar vote.

15          And the results are 83.5 percent of voting parties

16 (inaudible) voted to accept the plan and 96 percent in amount

17 voted in favor of the plan.

18          I would note, and we included this in a footnote

19 in our brief, that there was a $440,000,000 claim that was in

20 favor of the plan in Class 3A.  We were not able to meet the

21 deadline.  This came after we filed the 3018, after we filed

22 the claim objections.  We were not able to include that in

23 the objection.  We did not want to burden the Court further

24 with an emergency motion or claim objection and then motion

25 to shorten the docket was already so full.

1          So what we did was we asked Strato to not include

2   that to give -- because it voted in favor of the plan.  But

3   we believe that the (inaudible) goes to zero based on our

4   analysis of the actual calculations.  51 units of B21 coins.

5   I'm not going to pretend I know what those are, which have a

6   value of zero.  So we want to be completely transparent with

7   the Court and not have this vote stand, even though it was a

8   vote in favor of the plan.

9          So the results that you have and the treated

10  results do not account for that claim, although technically

11  it's still live.  If you were to include it, obviously, the

12  class would pass by even more.

13          THE COURT:  And that's reflected in the untreated

14  results.

15          MS. KANDESTIN:  The treated.  The treated results

16  do not include that claim.

17          THE COURT:  Right.

18          MS. KANDESTIN:  (Inaudible) yes.

19          THE COURT:  But the untreated results include it.

20          MS. KANDESTIN:  Yes.

21          THE COURT:  So were there any other modifications

22  or I don't want to say modifications -- treatments made in

23  Class 3A, other than that treatment?

24          MS. KANDESTIN:  No, Your Honor.

25          THE COURT:  What about Class D?

1        MS. KANDESTIN:  Class D.  I don't believe we made

2   any adjustments in Class D.

3        THE COURT:  Okay.  And Class C is vacant.  Class

4   B.  So the only modifications that were made in the treated

5   results are modifications that were based on court order.

6        MS. KANDESTIN:  Yes.

7        THE COURT:  There were no -- I just want to make

8   sure because I was troubled by the prior voting ballot to the

9   extent that I didn't truly understand a 400 million dollar

10  claim.  And I don't believe that debtors have the authority

11  to unilaterally address claims voting -- within a voting

12  ballot.  So I was concerned, but based on the hearing we had

13  earlier today and counsel's representation, so that the only

14  modifications to 3B are those that have been court ordered.

15       MS. KANDESTIN:  Yes.  We are happy to add the

16  $440,000,000 claim back into --

17       THE COURT:  Well, I would just revert back to --

18       MS. KANDESTIN:  Yes, exactly.

19       THE COURT:  So if I wanted that analysis, I just

20  go to the first column.

21       MS. KANDESTIN:  Absolutely, Your Honor.  That's

22  correct.

23       THE COURT:  And I appreciate the debtor's point

24  with respect to that claim, but regardless, it's accepted.

25       MS. KANDESTIN:  Right.  We absolutely understand

1  unilaterally, do not have authority to do that, which is why

2  we just wanted to bring it to your attention.

3           THE COURT:  Right.

4           MS. KANDESTIN:  Wanted to clarify the record in

5  case this comes up, Your Honor.

6           THE COURT:  And I do appreciate that there are

7  several judges on this bench who very much appreciate and

8  want to see the analysis of claims voting.  I appreciate the

9  effort and the fact that you distinguish between treated and

10 untreated to me as very transparent, and I appreciate that.

11          MS. KANDESTIN:  Thank you, Your Honor.  Happy to

12 do so.  Glad it's helpful.  Now, Your Honor, if it's okay

13 with you, I would like to turn to the informal comments and

14 objections we received.

15          THE COURT:  Yes.

16          MS. KANDESTIN:  And I'd like to thank all the

17 parties for working with us to get to where we are today.  As

18 I said, we're nearly consensual.  As noted in the agenda,

19 Allegheny's concerns, those have been resolved through

20 language that was added to the plan that was also agreed to

21 by Philadelphia Indemnity, the other surety provider.  Anchor

22 Coin, we reached out to them in connection with their

23 disclosure statement objection, which also included

24 confirmation issues, and Anchor Coin's counsel (inaudible)

25 that on the disclosure statement basis they were resolved,

1    but asked for additional language in the confirmation order

2    with respect to the account treatment procedures, which will

3    get to in the red line.

4                Salesforce filed an objection.  Their concerns

5    will resolve through a stipulation approved by the Court at

6    Docket 538.  And then there's going to be a second

7    stipulation coming to you shortly.  Even though if that has

8    not been approved, they have conveyed to counsel that they're

9    not pressing their objection and they're fine.  They're

10   resolved.

11               The objection filed by SDM has been resolved

12   through the inclusion of the treatment procedures and also

13   language added (inaudible).

14               THE COURT:  I'm sorry, could you repeat that?

15               MS. KANDESTIN:  The language we added for SDM is

16   actually the same language Anchor Coin requested.

17               THE COURT:  Okay.

18               MS. KANDESTIN:  The objection of 405 Investments

19   has been resolved with language added to the confirmation

20   order.  In addition, we've received informal comments from

21   the SEC and we've incorporated those into the plan

22   confirmation order.  So other than the U.S. Trustee's

23   objection, which I'll discuss in a second, all the other

24   objections were either reservations of rights, which weren't

25   formal objections to the plan, or have been resolved.

1        The U.S. Trustee filed an objection at Docket No.

2   550.  Prior to his filing the objection, we worked with him

3   to resolve comments/concerns that he had left, and we did a

4   few things for him.  Several things.

5        One of them was to remove the concept of related

6   parties from attaching that to the release, the debtor

7   release, and the third-party release as a (inaudible).  And

8   we also removed all of the language in the plan that spoke to

9   the plan being a settlement.  And then following the filing

10  of the objection, we worked with him to make additional

11  changes to the plan.

12       The primary change was to scale back what we had

13  in the exculpated parties definition to not include,

14  consistent with what I understand is your judge's prior

15  rulings, not to include prospective exculpation for entities

16  that aren't in existence yet, and also to remove the released

17  employees.  Only the officers, the current officers, would be

18  included.  And we also -- we just gave them back to all the

19  fiduciaries, and we can go through that language as well?

20            THE COURT:  So the employees are out?

21            MS. KANDESTIN:  They're out.

22            THE COURT:  Okay.

23            MS. KANDESTIN:  It's only officer.  The current

24  officers, and they were in there before.  It's just we sort

25  of added the released employees as a --

1          THE COURT:  Right.

2          MS. KANDESTIN:  But they're not in there anymore.

3          THE COURT:  Okay.  So it was like 24 of them?

4          MS. KANDESTIN:  Yes.

5          THE COURT:  That are -- okay.

6          MS. KANDESTIN:  The debtor's understanding that

7  the U.S. Trustee's remaining objections relates to this

8  released employee concept.  Basically, the release of the

9  preference claims that the debtor holds against these 24

10 employees, and the expanded scope of limitation of liability

11 to insurance proceeds from just -- not just 98F (inaudible)

12 causes of action, but all non release DNO claims, which 98F

13 is a subset of those.

14         And acknowledging that some of these employees

15 never received any of that treatment.  Some did that are

16 receiving expanded treatment, officers did, but to the extent

17 they were not a current officer, they're now receiving that

18 treatment.  So --

19         THE COURT:  Can I interrupt you for a second?

20         MS. KANDESTIN:  Please.

21         THE COURT:  I just got a ping that it's the time

22 for the TrueCoin status conference.  Is TrueCoin on the line?

23         MALE VOICE:  It may be a separate dial-in --

24         THE COURT:  I was going to say, if Mr. Legano

25 (phonetic) is on the line, can you please reach out to

1  counsel and tell them we'll reschedule and we'll proceed?

2  Let's proceed with confirmation.

3          MS. KANDESTIN:  Thank you.  So Your Honor, as I

4  mentioned, the plan is the product of extensive good-faith,

5  arms-length negotiations between the debtors, the committee,

6  the DIP lender, and various parties in interest, including

7  creditors and customers.

8          In our brief in support of confirmation, we laid

9  out all of the compromises, reasons why the plan satisfies

10  1122, 1123, and 1129, and therefore should be confirmed.  And

11  I'm happy to go through each element, if Your Honor would

12  want me to.  Otherwise, I would propose to highlight some key

13  features of the plan.

14          THE COURT:  You may highlight key features.

15          MS. KANDESTIN:  Thank you.  So we talked about at

16  the beginning of the hearing this concept of account

17  treatment procedures and why we filed them to address

18  concerns that customers were explaining or conveying to us

19  both informally and formally that there was not a lot of

20  clarity on when these issues would be decided and who had to

21  bring the motion and any of that sort of process.

22          So by doing this, these procedures were heavily

23  negotiated between the committee, the debtors, and the DIP

24  lender.  And I want to thank them for bearing with us and

25  working so hard to make -- put these in a good spot and that

1 the plan administrator elect also participated in these

2 discussions.

3          And the second was to make sure that there was an

4 orderly process that would not sort of result in a run on the

5 bank, but a run on the Court.  You know, we were also

6 thinking of you.

7          THE COURT:  Thank you.

8          MS. KANDESTIN:  Among other things, these account

9 treatment procedures, they provide an outside date of 120

10 days (inaudible) wind down debtor will notify customers as to

11 which category of contract they belong in, whether it's a

12 legacy contract, a bespoke agreement, or a standard MSA that

13 the debtors use, as well as providing an estimate as to when

14 the wind down debtor expects to come to a conclusion with

15 respect to those issues (inaudible).

16          They also include notice and the opportunity to

17 object to both the wind down debtor's determination that

18 something is property of the estate and also that it's not

19 property of the estate, and that to object both to the

20 finding that it's not property of the estate and also the

21 intent to distribute the currency, whether fiat or

22 cryptocurrency, to the customer.

23          And we felt like those procedures appropriately

24 redressed the concerns, but also -- while also giving

25 flexibility for the parties to meet and confer so that they

1  could work together to bring an orderly, even more orderly

2  process to the Court.

3          Turning now to the releases and exculpation, the

4  debtor released -- in Article 10.4 of the plan, these are the

5  releases granted by the debtor to the released parties.

6  Under the plan, the released parties (inaudible) debtors, the

7  wind down debtor, the special committee, the creditors

8  committee, the released professionals, and the DIP lender.

9  That's it.  No employees, no directors or officers.  Nothing.

10         And as I mentioned earlier, we removed all related

11 parties that could have captured all these people.  We ripped

12 all that from the definition.  So these are the only parties

13 eligible to be the beneficiaries of the third party release.

14         I would like to walk through the treatment of the

15 employees, officers, and directors quickly.  The following

16 parties are not being released and are therefore not able to

17 get a third-party release.  The former directors and

18 officers, the non-release DNO, the current directors and

19 current officers.  However, the current directors and current

20 officers will receive a limited preference release solely to

21 the extent of ordinary wages and compensation.

22         This was in the plan that we filed, I think, that

23 was solicited.  And also this was in the plan that we

24 solicited.  A limitation on recovery of the proceeds of 98F

25 insurance proceeds on account of 98F wallet causes of action.

1          But those are not being released, they're just

2    limited to insurance, and direct claims held by third parties

3    on account of 98F wallet causes of action or any causes of

4    action are not enjoined, limited, or otherwise impaired under

5    the plan, unless that party elects to be a releasing party.

6    And that's just the way it's structured in 6.9.

7          With respect to the released employees, and this

8    is a small subset of the 24 employees, current employees,

9    were not being released by the debtor under the plan, but

10   they're receiving similar but a little bit expanded treatment

11   as I just described to the current directors and current

12   officers.  So they will receive a release by the debtor of

13   the preference claims the debtor holds against them, a full

14   release, not just ordinary compensation and wages, and a

15   limitation on recoveries to all non-release DNO claims as

16   opposed to that subset of 98F wallet.

17         The released employees were identified under seal

18   in the second amended plan supplement at Docket No. 540, and

19   this was shared and discussed at length with the creditors

20   committee.

21         In addition, with respect to the release of the

22   preference claims, I want to note that this is a very limited

23   release of a claim only held by the debtor.  Preference

24   claims are unique to the Bankruptcy Code and they're not

25   something where you have (inaudible) standing to bring them.

1  A successor in interest, the debtor may bring them, but a

2  third party cannot come and bring these.  And as laid out in

3  the Weiss declaration in our brief, we've evaluated these

4  preference claims to see if they had any value and determined

5  that they had little to no value.  And I believe it's one of

6  the reasons why the committee supported these releases.

7       With respect to the non-released DNO causes of

8  action, you know, we don't believe -- it's our -- based on

9  our preliminary investigation -- let me just say this.  These

10  24 employees were handpicked by the special committee to

11  remain at the company.  They obviously would not have

12  retained people who they thought were engaged in wrongdoing.

13  So these are people that we do not believe have any liability

14  on account of any non-released DNO claims.

15       The plan now also contemplates the release of

16  preference claims against certain customers.  It was a key

17  component to the committee's support for the plan.  It's a

18  preference amnesty program.  It's designed to release those

19  preference claims against customers that the debtors

20  determined had no advance notice that the cease-and-decease

21  order would be entered in June, and that whatever withdrawals

22  they made were likely ordinary course and didn't want to sort

23  of leave them in limbo.

24       There's been a lot of concerns raised at the

25  committee level about this uncertainty of the preference

1    claims, not only having their crypto or fiat tied up in the

2    accounts of the debtors, but also this exposure on top of it.

3    So as a compromise under the plan to garner the committee's

4    support, and it's also had the support of the DIP lender, we

5    agreed to this preference amnesty program.

6           There are people carved out, and that was filed at

7    Docket No. 540 as part of our second amended plan supplement.

8    And these are people that we don't believe should be the

9    beneficiaries of the preference amnesty program based on our

10   investigation at the amount that they withdrew, the amount

11   that remained after they withdrew it, and various other

12   factors.  And again, the committee and DIP lender support

13   that carving out so that value is preserved for creditors.

14          I'd like to address a few of the U.S. Trustee's

15   arguments.  I don't know if Mr. Cudia would like to first --

16          MR. CUDIA:  Either way.  It's fine with me.

17          MS. KANDESTIN:  Okay.  So the U.S. Trustee in his

18   objection raised concerns about the released employees not

19   being held accountable for willful misconduct, actual fraud,

20   and the like, that a released party would be held accountable

21   for under Article 210.4 under the debtor release.  I think --

22   I think he and I discussed it.  He was not focused on the

23   fact that Article 6.9(b) provide a more expansive carve out

24   for the released employees.  It covers criminal conduct,

25   willful misconduct, gross negligence, and actual fraud.

1  Those are not protected.  There's no release --

2        THE COURT:  For the employees.

3        MS. KANDESTIN:  Right.  And they're not limited to

4  the insurance.  Those are carve outs.  The U.S. Trustee also

5  has -- takes issue with the consideration provided to the

6  released employees and characterized their actions as merely

7  being -- doing their job.  They got compensated.  Citing

8  Genesis Health.  And also argues that we have not met the

9  Master Mortgage and Zenith factors.

10       As initial matter, based on how these releases are

11  structured, just a release by the debtor, not tied to a third

12  party release.  I'd argue that the appropriate lens to view

13  these through is the debtor's business judgment under

14  1123(b)(3)(A) and not an application of Master Mortgage.

15  That said, we did cover these in our brief, and --

16  (inaudible) -- as outlined in the Weiss declaration and the

17  brief, we feel like we have met our burden under Zenith as

18  judge (inaudible), the Zenith factors are neither exclusive

19  nor conjunctive requirements, but simply provide guidance for

20  the Court's determination of fairness.

21       Here, the debtors would argue that the treatment

22  of the released employees is appropriate based on the

23  substantial contribution they've made to these cases, which

24  were essential to the consummation of the plan and the

25  transition -- the orderly transition to the wind down debtor.

1          Among other things, these employees have

2    irreplaceable institutional knowledge of vendor and customer

3    relationships and contracts, which has proven essential to

4    several things: determining which contracts were necessary

5    for the orderly wind down of the estates and leveraging

6    vendor relationships to renegotiate the terms of key

7    agreements, such as the Fireblocks agreement we just

8    discussed at the top, resulting in substantial savings to the

9    estates.

10          They have protected and ensured that the

11    availability of customer account information and data and

12    contracts that are critical to the post effective date

13    efforts of the wind down debtor, especially with respect to

14    investigative efforts and account treatment issues.

15          Also, they have prepared more than a dozen

16    transition memos for the plan administrator, identifying

17    where data is stored and how to access it.  They reengineered

18    the debtor's sophisticated bespoke database, driving several

19    millions of dollars in annual savings and software costs.

20    They also ensured that the debtors are compliant with their

21    legal and regulatory obligations.

22          Part of the compromise to get the committee to

23    support the plan was this ability that they wanted to make in

24    kind distributions, and that meant we had to retain our

25    Nevada Trust charter and our MTLs, our money transition

1  licenses.  That required a lot of individual know-how and

2  finesse to keep those going and do an orderly handoff to the

3  wind down debtor.

4          They also prepared and packaged the debtor's

5  technology.  This is not something someone could have come

6  off the street and done.  None of this is actually.  In

7  connection with the Swan license agreement, if they had not

8  stayed to do that, had not agreed to remain, we wouldn't have

9  been able to consummate the Swan license agreement and would

10  have left those lucrative licensees on the floor.

11          And then also, as my colleagues mentioned earlier,

12  the Swan license is not exclusive.  So it also has left the

13  ability open to take that package technology and monetize it

14  further by the wind down debtor.  And we already have parties

15  interested who have approached us, who are also interested in

16  licensing that technology.

17          And these employees (inaudible) all of this,

18  notwithstanding the fact that they had a reduction in force

19  that went into effect on November 14 and that more than half

20  the debtor's workforce went from 70 employees to 24, and they

21  received the same notices as the other employees that were

22  riffed on the 14th.  They received the same notices.  They

23  were asked I think two days, three days before the riff to

24  remain with the company.

25          THE COURT:  Okay, so these are people who

1  otherwise, as part of a non-operating business, would not

2  have a job, would not have worked.  There was nothing for

3  them to do other than the things that you just recited and

4  are in Mr. Weiss's declaration.

5          MS. KANDESTIN:  Yes.  The only other thing they

6  could do is locate new employment.  But they agreed to stay

7  on to do this.  They worked nights and weekends.  They went

8  above and beyond on a skeleton crew to do all these

9  complicated things.

10          And as educed at the first day of hearing, through

11  testimony, these released employees have highly specialized

12  skills and are in high demand.  So they didn't need to stay.

13  They could find other jobs.  And they did stay.  Not because

14  we promised them anything.  They didn't get any extra

15  compensation.  They are not getting severance.  In fact, they

16  didn't know that we were going to even push for these

17  releases for them or releases for them until the plan was

18  filed on the 28th.  They agreed to stay on the 14th.  So they

19  had no knowledge of any of this until this plan was on file.

20  I'm not even sure all of them have knowledge of it now.

21          It's our position that without the help of these

22  24 released employees that these cases most certainly would

23  have converted.

24          THE COURT:  What is the value of their release

25  preference claim?

1           MS. KANDESTIN:  We value them at zero to be

2    honest.  There was one questionable expense reimbursement

3    that I discussed with our financial advisor, and I got

4    comfortable with it after that.  It was just someone who

5    enjoyed expensing things.  But that was approved by the

6    company.  It wasn't, you know, these were the legitimate

7    company expenses where I don't know if I would have done

8    that, but not something -- and it was around $20,000 in the

9    aggregate and not something we would expect to be pursued.

10   So we assigned no value to those.

11          THE COURT:  Okay.

12          MS. KANDESTIN:  And then further supporting -- and

13   so Mr. Cudia will argue that these were incentives.  This was

14   some sort of incentive for them to stay.  As I mentioned,

15   they didn't know about this until after they agreed to stay.

16          And I will also note that the voting classes

17   overwhelmingly voted to support the plan, which has this

18   concept of released employees.

19          I'll go through the third-party release next

20   location quickly, and then I'll turn over, Mr. Cudia.

21          So, Your Honor, the third-party release is also in

22   the plan and Article 10.6.  And as I explained earlier today,

23   third parties were presented with multiple opportunities to

24   opt out.  We went a little bit extra to give the opportunity

25   to non-voting parties to opt out, which some of them did.

1  And we carved out the undeliverable parties from the third-
2  party release expressly.

3        We know that it would have applied anyway, but we
4  thought it was important to make that very clear in the plan
5  that these undeliverable parties we talked about -- my
6  colleague talked about earlier -- would not be included.  And
7  it's our position the plan is not -- the injunction did not
8  apply to them.

9        And then, consistent with the Court's rulings in
10 other cases, we designed these releases to be consistent.
11 And also there are no objections lodged to the third-party
12 released, which I don't think I've ever seen.  So I was
13 pleased with that.  And on exculpation, Mr. Cudia did object.
14 As I mentioned, we harked back to the exculpation to just the
15 state fiduciaries for actions taken during cases when they
16 were acting in a fiduciary capacity.  And we believe that
17 that is consistent with Third Circuit law and Your Honor's
18 prior ruling.  So I will turn it over to Mr. Cudia to argue
19 his objections (inaudible).

20        MALE VOICE:  (Inaudible).

21        THE COURT:  Yeah, why don't -- yeah.  Sorry, Mr.
22 Cudia.  I recognize you probably should have gone first.

23        MS. KANDESTIN:  I offered.

24        MR. CUDIA:  It's fine.

25        THE COURT:  Being a gentleman.

1          MR. CUDIA:  Your Honor, I will be very brief so as

2     not to (inaudible).  But I do think it's important to talk

3     and lend the committee's voice specifically on these issues

4     before the Court.

5          THE COURT:  Agreed.

6          MR. CUDIA:  Retract the lens just a moment, if you

7     will, Your Honor.  This is what I call a transition plan.  We

8     went into bankruptcy very recently.  We're coming out of

9     bankruptcy very, very rapidly.  Part of that is the nature of

10    a company when its receivership ceased business operations

11    well before the filing.

12         The bankruptcy is in its own way kind of mopping

13    up the mess, repositioning it with customer representatives

14    and (inaudible) administrator of their selection overseeing

15    in a streamlined fashion the resolution of all issues.  That

16    when receivership is now consolidated in the federal action,

17    we're going to get people their property, if it wasn't

18    property of the estate, back to them relatively quickly.

19    We'll deal with preference issues and an amnesty program.

20    We'll deal with others who may be defendants.  And we're

21    wrapping it up in full and moving forward and getting this

22    company's issues resolved quickly.

23         That's a very unique kind of Chapter 11 plan.  We

24    don't see it very often.  Usually we have POT plans, we have

25    reorganization plans, we even have sales and we distribute

1  out the proceeds.  But a transition plan that streamlines

2  various, myriad issues into a consolidated process that will

3  resolve itself over time has a special sort of workout

4  mechanic in my experience.

5          There are remarkably limited releases in a plan

6  like this.  I've been doing this for nearly 30 years.  This

7  may be the plan that on the farthest end of continuum in my

8  experience that I've seen with such few releases because in a

9  transition kind of plan construct, the plan administrator is

10  going to be suing an awful lot of people.  There's an awful

11  lot of things to be investigated and potential litigations to

12  happen here.

13          So from our vantage point, certainly in comparison

14  to most Chapter 11 cases before this court and the courts in

15  Delaware, the bandwidth of releases that we're talking about

16  is really, really small.  The window of potential targets is

17  really, really wide.  And that's because the plan

18  administrator will finish the investigatory work, will make

19  the proper decisions based upon the evidence that it presents

20  itself.

21          And so I think it's really important if we're

22  thinking about how narrow the release question is that we

23  contextualize it.  Because it really isn't that big of a deal

24  in terms of (inaudible).  Okay.

25          The people that are getting the releases, okay,

1  few and a far between.  Now they're going to include a

2  certain number of employees.  I don't remember exactly.  24.

3          MS. KANDESTIN:  Officers.

4          MR. CUDIA:  Okay, 24.  Three of them are officers.

5  Okay.  Not three people.  24 people.  When you are preparing

6  a transition plan, negotiating, from our perspective, a

7  transition plan, I think the worst thing that we could do is

8  hand over the estate kit and caboodle with some files, with

9  some computer, to the wind down administrator and say, figure

10 it out.  Okay.  Talk about massive value erosion, waste of

11 time, and it won't be effective.

12          So we are in the mindset when negotiating this

13 that very, very few people are getting releases here.  We're

14 only going to make sure that the people who get releases are

15 people who are critical to doing this work transitionally.

16 That's what we diligence.  That's what we negotiate.  To make

17 sure that when the plan administrator takes over, those

18 people who are absolutely critical to doing the job

19 efficiently, effectively, and value accretively are there and

20 they ain't working if they don't get releases.  That's

21 pragmatism.  That's the pragmatic attribute of what we do.

22 So bankruptcy is very theoretical.  We're having a

23 theoretical discussion about releases in the context of

24 notice and a plan.  And there's a (inaudible).

25          I think Your Honor can take comfort in the fact

1  that contextually looking at this plan, looking at the job

2  that the committee was focused on doing and how they were

3  trying to do it that we did sufficient diligence to make sure

4  that only people who were critical for the next stage got the

5  releases and that the releases were very narrowly tailored to

6  the circumstances of what we're intending to do in the next

7  phase of this bankruptcy and wrap resolution of this case.

8  And that from the committee's perspective, this is a fair and

9  appropriate outcome.

10         I grant you, and I did read with a fair amount of

11  sensitivity the fact that this was announced at the end of

12  November, around Thanksgiving time period.  But in my

13  experience, as well, just again trying to contextualize this,

14  we do releases and plan supplements.  That's not an unusual

15  context that people find this out towards the end as we're

16  heading towards confirmation.  Because among other things,

17  this type of stuff is the stuff that you figure out just

18  before you go to confirmation and effective date.  So this is

19  not an unusual situation, frankly, it's very, very common.

20  And with that context, Your Honor, I hope that Your Honor

21  will evaluate the objection.  Any questions for me?

22             THE COURT:  No, thank you.

23             MR. CUDIA:  Thank you.

24             THE COURT:  Thank you.

25             MS. KANDESTIN:  Your Honor, before Mr. Cudia makes

1  his argument, I just wanted to make two clarifications.  That

2  the special committee proposed this treatment.  They voted on

3  it and determined that in the best interest of the estate, in

4  the exercise of their sound business judgment, that this was

5  the appropriate thing to do.  Also consistent, I was just

6  informed, consistent with the company's ordinary course

7  practice, these employees will receive a small severance of

8  $1000 to $1500.  They would have received that if they left

9  on the 14th.  The other --

10            THE COURT:  Everybody else got that as well.

11            MS. KANDESTIN:  Everybody else got it.  But I

12  wanted to clarify because I did say no severance.  Thank you.

13            THE COURT:  Mr. Cudia.

14            MR. CUDIA:  Again, Your Honor, Joseph Cudia for

15  the United States Trustee.  First off, I'd be remiss if I

16  didn't thank debtor's counsel for working hard with us to

17  resolve several of our issues both before and after we filed

18  our objection.  And I can confirm that our objection, as it

19  relates to the exculpated parties provision, has been

20  resolved.

21            THE COURT:  And on behalf of the Court, I thank

22  you for raising that issue.

23            MR. CUDIA:  The remaining parts of our objection

24  concern recent changes to the plan, including whether the

25  addition of released employees to those parties receiving

1  debtor releases is proper and whether parties of interest

2  when they're evaluating the plan, got adequate notice and

3  information regarding that addition.

4         On November 28, 2023, a week before the voting

5  deadline, the debtors filed their amended joint Chapter 11

6  plan and a disclosure statement supplement.  That is the

7  first time that the concept of released employees was added.

8         THE COURT:  A week before.

9         MR. CUDIA:  A week before the voting deadline,

10 which stated that the list of them will be filed under seal,

11 consistent with the privacy protection order.  Article 2C of

12 the disclosure statement supplement talked about the revised

13 releases to be provided to -- and I'm quoting -- a small

14 subset of employees and officers who agreed to remain

15 employed or who have agreed to provide services as a

16 contractor through the effective date of the plan following

17 the departure of the majority of debtor's employees on

18 November 14th, 2023.

19        The released employees are critical to the

20 successful winding up of the debtor's business arms, the

21 preservation of critical data, some as required by applicable

22 law, and the general preservation of and transferred to the

23 plan administrator and creditors' liquidation trustee of the

24 debtor's books and records, which is critical to their post

25 effective date efforts.

1        So I'm not standing up here to degrade or diminish

2   the contributions of the employees.  But again, it's the

3   position of the United States Trustee that that reason is not

4   appropriate one for the granting of releases.  That

5   essentially reads like a Keep Kurt (phonetic) motion.

6        The released employees are being released from all

7   preference, exposure, and personal financial responsibility

8   for any non-released DNO claims, including the 98F causes of

9   action.  I do acknowledge that the released employees are not

10  being released for criminal conduct, willful misconduct,

11  gross negligence, or actual fraud.  I missed that addition

12  and nine date of the November 28th revised plan.

13        The appropriate way to analyze the releases here

14  by debtors of non-debtor entities is by looking at the

15  Zenith/Master Mortgage factors.  Identity of interest between

16  the debtor and non-debtor releasee so that suit against the

17  non-debtor will deplete the estate's resources, substantial

18  contribution to the plan by non-debtor, necessity of the

19  release to the organization, overwhelming acceptance of the

20  plan and release by creditors, and payment of all or

21  substantially all of the claims to creditors.  I'll take them

22  one at a time.

23        Identity of interests.  It is possible that some

24  of the released employees may have indemnification agreements

25  that could apply perhaps to the three officers, but I am not

1  aware of any evidence of the same.

2              Substantial contribution to the plan.  In the

3  Genesis Health Venture Case, the court looked at a proposed

4  release of directors, officers, and employees and in

5  rejecting those releases, it found that performance of their

6  duties, even those engaged in the bankruptcy process, do not

7  provide a substantial contribution -- that's in quotes --

8  without the contribution of assets to the reorganization.

9              To quote as in Zenith, the officers and directors

10  of the debtors no doubt made meaningful contribution to the

11  reorganization by designing and implementing operational

12  restructuring of the companies and negotiating the financial

13  restructuring with parties of interest.  However, the

14  officers, directors, and employees have been otherwise

15  compensated for their contributions, and the management

16  functions they perform do not constitute contributions of

17  assets to their organization.

18              And I think that's key.  I believe the defined

19  term substantial contribution in the context of Genesis and

20  Zenith refers to a financial contribution or some other type

21  of contribution that makes the reorganization possible from

22  financial standpoint.

23              THE COURT:  Does it make a difference in this case

24  based on what the debtor does what's being contributed?

25              MR. CUDIA:  It may be a distinction without a

1   difference, but it is a distinction.  They're not here on a,

2   let's say, Keep Kurt motion.

3          THE COURT:  Right.  But also what these employees

4   contributed.

5          MR. CUDIA:  I'm sorry, I missed the last word.

6   You said --

7          THE COURT:  What these employees contributed.

8          MR. CUDIA:  The employees here contributed their

9   labor.

10         THE COURT:  Right.  But it's unique, is it not?

11  This is not an industry where they could have gone out and

12  found replacement people easily to do what these people did

13  in terms of renegotiating these agreements, protecting

14  account information, packaging license, working on the Nevada

15  Trust charter, that type of thing.  Does it make a

16  difference?  Zenith doesn't talk about this, right?

17         MR. CUDIA:  Correct.  I believe it makes a

18  difference in that they're not here for a Keep Kurt motion,

19  which is out on notice.  This was added to the plan a week

20  before parties were able to vote on it, and I think -- and

21  quite frankly, our office does not always oppose Keep Kurt

22  motions.

23         One other point I'd like to make on that, as it

24  refers to the officers, this could very well be an

25  impermissible retention bonus pursuant to 503(c)(1) of the

1  Bankruptcy Code.

2           Necessity of the release.  In Continental, the

3  Court looked at the necessity of the releases to the

4  organization, found there was no necessity based on lack of

5  financial contribution to the plan by the released parties in

6  exchange for the release and a lack of evidence of indemnity

7  exposure to the debtors.  This plan was accepted by

8  sufficient number and amount of impaired classes.  However,

9  as I'll discuss later, we contend the acceptance was based on

10 inadequate information as to the economic consequences of the

11 released employees provision.

12          THE COURT:  So can I just ask -- the U.S.

13 Trustee's office, if you were posturing this, you would have

14 put it forward as some type of bonus plan?

15          MR. CUDIA:  Yes.

16          THE COURT:  And can a bonus plan provide that your

17 bonus is release of a preference claim?

18          MR. CUDIA:  That's a good question.  Again, the

19 stated reasons by the debtor for giving these are they're

20 staying on and doing their jobs.  The U.S. Trustee feels that

21 that's appropriate in the context of some type of Keep Kurt

22 motion, whether again, honestly I would have to ask for help

23 on whether release of preferences would be an appropriate --

24          THE COURT:  It might be an unfair question.

25          MR. CUDIA:  Yeah.

1          THE COURT:  So you can --

2          MR. CUDIA:  But again, if they had been more

3   better quantified, I might be able to answer that question as

4   well.

5          And my last point is on inadequate information as

6   far as the revised releases.  The addition of the released

7   employees provision was made only one week before the

8   deadline to object and without the disclosure as to the

9   economic effects, and they were not part of the original --

10  the released employees provision was not part of the original

11  solicitation.  The number and identity of the released

12  employees was not filed with the Court until four days after

13  the objection deadline.  It was filed under seal.

14         THE COURT:  But that's not unusual that you don't

15  know who's being released.

16         MR. CUDIA:  In my experience, usually releases get

17  pared back as it nears confirmation, not people get added,

18  although my experience is rather limited.

19         Now, in the declaration of Michael Weiss, which

20  was, again, filed after the objection deadline, indicated

21  that the releases are of little or no value to the debtor's

22  estates I believe is the quote.  Parties evaluating whether

23  to support the plan should be given this information and the

24  backup behind it and the opportunity to reconsider their

25  support.

1          In conclusion, the U.S. Trustee requests that

2   confirmation of the plan not occur until such time as parties

3   in interest have had time to consider these changes.  Thank

4   you.

5          THE COURT:  Mr. Cudia, just articulate for me

6   which changes.  The release --

7          MR. CUDIA:  The addition of the released

8   employees.

9          THE COURT:  That's the only --

10         MR. CUDIA:  Yes.

11         MS. KANDESTIN:  Your Honor, Maris Kandestin, for

12   the record.  Just a few clarifying points.

13         The Weiss declaration was filed on December 12th.

14   That was the date provided in the court order as the date

15   when we were required to file it.  We have testimony through

16   Mr. Weiss's declaration that these were of little to no

17   value.  That is in paragraph 25 of the declaration.

18         And yes, I think it's a bit of semantics, but we

19   say that they agreed to stay.  They actually did agree to

20   stay, but they didn't agree to stay in exchange for this.

21   This was something that we put into the plan because we

22   thought it was the right thing to do.

23         And in terms of the timing of it just coming on

24   November 28th, the riff happened on the 14th.  They were

25   asked to stay on, these 24 employees, to do all of this extra

1  work.  They weren't just doing their jobs.  They were doing

2  the jobs of twice as many of them.  This isn't something that

3  -- and they didn't receive any additional compensation for

4  it.  And they knew that their employment would end at the end

5  of the year.

6           If this were a keep, these employees would have to

7  sign something that they were staying on.  They would have to

8  achieve milestones.  They did all of this without the promise

9  of anything.  We submit that it's not a Keep or a Kurt

10  because it's a carrot and stick situation.  There was no

11  carrot in this that we're dealing with.

12           THE COURT:  How do you get past Genesis and

13  Zenith?

14           MS. KANDESTIN:  You know, Genesis focused on an

15  ordinary reorganization where employees were just doing their

16  jobs to help get to a successful reorganization.  This is not

17  the same situation.  They're not merely doing their jobs.

18  They're doing the jobs of many people and for nothing.  They

19  weren't promised a single thing.

20           I feel like I explained or I laid out for the

21  Court all of the contributions that they made (inaudible).

22  The committee, Mr. Stark stood up and explained that without

23  the assistance of these people, their agreement to stay on,

24  even though they had a (inaudible) termination as of November

25  14, that going into the orderly transition of determining all

1   these key issues for creditors, for customers, the account

2   treatment issues, continuing the investigations, all of that

3   would have been thrown into turmoil, and you would have had

4   to convert the cases.

5             THE COURT:  What would have happened if the

6   employees hadn't shuttered the debtor's API platform?

7             MS. KANDESTIN:  Enormous costs would have been

8   incurred.  There would have been additional -- the ability of

9   parties to go on there and make requests and they would be

10  unanswered because there wasn't the staff to be there.  And

11  so this skeleton crew took apart, dismantled the API

12  platform.  And you know --

13            THE COURT:  How else would it have been done?

14  Would it have been an outsourcing thing?

15            MS. KANDESTIN:  It would have to be outsourced,

16  and you'd be starting from a deficit, to say the very least.

17  These are the architects of this platform are the ones who

18  dismantled it.  Those were all of the points I wanted to make

19  in rebuttal.  I would propose to now run through the red

20  lines.

21            THE COURT:  Okay.  If I have questions, is this

22  the time that I can raise them as well?

23            MS. KANDESTIN:  Yes.  Yes.

24            THE COURT:  Okay.

25            MS. KANDESTIN:  I'm sorry, Your Honor.  Questions

1  for?

2            THE COURT:  Oh, I --

3            MS. KANDESTIN:  With respect to the plan?

4            THE COURT:  Are you going through plan edits?

5            MS. KANDESTIN:  Yes.

6            THE COURT:  Okay.  Yeah.

7            MS. KANDESTIN:  Okay.  Your Honor, earlier today I

8  handed you a red line change pages only of the changes we've

9  made since we filed the plan on December 14th and the current

10 plan, which has not been filed.

11           THE COURT:  It has not been filed?

12           MS. KANDESTIN:  No.  The changes I'm going to

13 discuss with you right now have not been filed.

14           THE COURT:  It's this?

15           MS. KANDESTIN:  It's the skinny one.

16           THE COURT:  Okay.

17           MS. KANDESTIN:  The first change is to definition

18 1.75 exculpated parties.

19           THE COURT:  And Mr. Cudia is okay with this

20 definition?

21           MS. KANDESTIN:  Yes.  I believe he said it was --

22 resolved his consent.

23           MR. CUDIA:  Yes, Your Honor.  It did resolve our

24 consent.

25           THE COURT:  Yes.  Okay.

1          MS. KANDESTIN:  In looking at your past precedent,

2    we added additional language that provided, to the extent

3    they are not acting, because then they are acting as estate

4    fiduciaries at the time between the condition date and the

5    effective date.  We added that in a few places.

6          THE COURT:  Okay.  Limited as to scope.  Thank

7    you.

8          MS. KANDESTIN:  In the definition of released

9    parties, 1.149, we removed the reorganized debtors.  They

10   don't exist.  So it makes sense.

11         On the next page, on page 625 of the PDF, this is

12   the account treatment procedures.  At the request of SDM, we

13   extended these response deadlines that customers would have

14   to the various notices.  So the notice of intent of

15   distribute went from 10 to 14 days, and the timeline for them

16   to file an estate property determination objection was

17   extended from 14 days to 21 days.

18         Those were the recent changes to the plan.  I'm

19   happy to answer any other plan comments, or I could run

20   through the changes to the confirmation order.

21         THE COURT:  Okay.  Well, first of all, let me ask,

22   are there any other objections to confirmation that have not

23   been raised?  Because now is your opportunity.  Okay.  I hear

24   none.  So I am going to close the record on it with one

25   exception.  With respect to the testimony that we heard

1  earlier -- excuse me -- the comments we heard earlier this

2  afternoon from Ms. Chiang, I believe, with respect to her

3  claim.  I'm going to ask, did she receive anything for

4  appearing today at the hearing and --

5          MS. KANDESTIN:  Compensation?

6          THE COURT:  Yes, or --

7          MS. KANDESTIN:  No, but we're happy to compensate

8  her for that.

9          THE COURT:  No, no, no, I'm not -- I'm saying you

10 did not provide her anything for commenting today.

11         MS. KANDESTIN:  No, no, absolutely not.

12         THE COURT:  Okay, I'm assuming you're joking.

13 Okay.

14         MS. KANDESTIN:  (Inaudible).

15         THE COURT:  It's been a very long day, and I

16 appreciate everybody's patience.

17         MS. KANDESTIN:  Compensate her (inaudible).

18         THE COURT:  Pardon?

19         MS. KANDESTIN:  How would Your Honor like to

20 proceed?  Would you like to provide comments to the plan?  Or

21 --

22         THE COURT:  Well --

23         MS. KANDESTIN:  -- should we go through the

24 confirmation order?

25         THE COURT:  First of all, why don't I give you a

1  ruling, and then let's talk about some modifications.  So

2  just for the record, prior to the confirmation hearing, I did

3  review the disclosure statement, the third amended plan, the

4  plan supplements, related documents, as well as the

5  objections to confirmation, some of which have been resolved

6  or withdrawn prior to this hearing.

7       I also reviewed the debtor's memorandum of law in

8  support of approval, the disclosure statement, and

9  confirmation of plan at Docket 557.  And while that

10  memorandum isn't evidence, it is part of the record before

11  the Court.  And the memorandum lays out with specificity how

12  this debtor -- the debtor's statutory burdens and

13  requirements.

14       I listened to -- I mean, excuse me, I weighed the

15  arguments of counsel and the evidence presented, including

16  the Weiss declaration in support of confirmation at Docket

17  558, the Murphy declaration at Docket 559 regarding the best

18  interest test, and the Karpuk voting declaration at Docket

19  624.

20       With respect to the disclosure statement, I'm

21  satisfied the debtors have carried their burden under Section

22  1125 of the Bankruptcy Code.  All objections to the

23  disclosure statement were resolved or overruled.  The

24  disclosure statement, as amended, describes, among other

25  things, the background of the debtor's, events leading to

1  Chapter 11, filing, the events in this case, the debtor's

2  election to pursue the liquidation transaction under the

3  plan, and various provisions including classification,

4  treatment of claims, (inaudible) for implementing the plan,

5  as well as the releases, injunction, and exculpation.

6          So I find that the disclosure statement does

7  contain information adequate to permit a hypothetical

8  stakeholder to make an informed decision to vote for or

9  against a plan.  So the disclosure statement is approved on a

10  final basis.

11          With respect to the plan, the debtors have also

12  met their burden, and all of the applicable subsections of

13  1129 of the Bankruptcy Code are satisfied to confirm the

14  third amended plan.  I am not going to address each standard.

15  I just will note that no one has challenged good faith, no

16  one's challenged classification.  Based on the Murphy

17  Declaration and the liquidation analysis, the plan satisfies

18  the best interest test of Section 1129(a)(7), and based on

19  the evidence educed here today at the hearing, specifically

20  Ms. Chiang's representation that her vote in Class 3B to

21  reject the plan is in U.S. Dollars.

22          The Court finds that the vote is adjusted.  As a

23  consequence, the second supplemental voting declaration

24  reflects that all voting class have voted to accept the plan.

25          With respect to objections to the plan, the U.S.

1  Trustee objects to the plan's proposed released employees for

2  any preference exposure.  A debtor may release claims under

3  1123(b)(3)(A) if the release is a valid exercise of the

4  debtor's business judgment, is fair, reasonable, and in the

5  best interest of the estates.

6          The Weiss declaration establishes that the debtor

7  releases are limited in scope, the product of arm's-length

8  negotiations, and reflect the substantial contribution made

9  by the released parties and released employees.  His

10 uncontroverted declaration identifies these employees

11 contributions which counsel reiterated in detail today, and

12 he believes absent these releases, the plan may not have

13 garnered the necessary support.  And I think that's supported

14 today by comments of the committee's counsel.  No contrary

15 evidence has been presented.  So I'm going to overrule the

16 United States Trustee's objection.

17         So I think that's it, except I have some comments

18 on the plan and maybe a few on the form of order.

19         MS. KANDESTIN:  Okay.  (Inaudible) start, Your

20 Honor.

21         THE COURT:  I'm going to start with the plan and

22 I'll try to go through these expediently.  I must admit that

23 as you amend things, then my comments kind of shrink.  So

24 I'll try to truncate.

25         So one of the comments that I had when we started

1 today was how this toggle plan had ultimately resulted in a

2 liquidation transaction.  So to me, that Sections 5 and --

3 6.5, excuse me, and 6.7, they contradict or they don't apply.

4 And I appreciate your comment about confusing people with a

5 lot of edit on a document.  But I do think the confirmation

6 order itself, and I don't recall seeing it, should make --

7 there should be a paragraph in the confirmation order

8 explaining that while the plan referred to a toggle, that

9 you're not proceeding in that way.  And I think you could

10 probably pull the language directly from the disclosure

11 statement that was filed on the 27th that made that clear.

12　　　　　So to the extent, and I'll just generally speak

13 about this because I think it's a modification you can all

14 get together and agree on, but there's references to the

15 restructuring transaction memo and the plan support

16 agreement, and there's references to the issuance of

17 securities and that type of thing that that's all --

18　　　　　MS. KANDESTIN:  Gone away.

19　　　　　THE COURT:  Yeah, and so those provisions don't

20 apply, but in some ways you're going to have to carve it out

21 because 6.5 talks about the toggle.  But then, you know, 6.7

22 talks about reorg transaction, and 6.7(d) talks about equity.

23 So I don't want to sit here this afternoon and take up your

24 time, but I'm certain, you know, that you all can slice that

25 up so that the confirmation order reflects what's accurately

1  going forward.

2          MS. KANDESTIN:  So Your Honor (inaudible), and in

3  the confirmation order, we'll add a provision that explains

4  that we're pursuing a liquidation toggle, and that Sections

5  X, Y, and Z are not applicable.

6          THE COURT:  Okay, so in Section 6.10, and this may

7  be semantics, but there's a reference, and I'm not sure where

8  it is off top of my head.  It says there's a reference to

9  crypto being transferred.  And my question was, why is crypto

10 being transferred if there's a question about ownership?  How

11 is it not a violation of cash management order?  And maybe it

12 could be that I'm misreading something, and I'm not sure

13 exactly where I found this in 6.10.

14         MS. KANDESTIN:  Your Honor, I would say that the

15 confirmation order restates paragraph 8 of the final cash

16 management order.

17         THE COURT:  Okay.

18         MS. KANDESTIN:  So to the extent it was an

19 inconsistency, we have -- we thought it was important for

20 customers to see that it's says in the confirmation order.

21         THE COURT:  In 6.I --

22         MS. KANDESTIN:  This is the termination of the

23 wind down debtor?

24         THE COURT:  Yeah.

25         MS. KANDESTIN:  Okay.

1          THE COURT:  What happens if there's a termination?

2   What happens to all the accounts?  That's a doomsday

3   scenario.

4          MS. KANDESTIN:  Right.  Well, it's the final

5   liquidation, administrative, and distribution of the wind

6   down debtor assets.  That would include determining what the

7   --

8          THE COURT:  There's no way it could happen without

9   --

10          MS. KANDESTIN:  Yes.

11          THE COURT:  Okay.

12          MS. KANDESTIN:  They can't decide to terminate and

13   leave all that behind.

14          THE COURT:  Okay.  So 6.10(j) deals with the

15   liability of the plan administrator and indemnification.  And

16   6.10(k) deals with no liability of the wind down debtor.  And

17   I will not prospectively grant indemnification.  And so I

18   would propose that -- and so what I say to people, and I

19   think most of the judges on this bench do this now, it's part

20   of your case closing motion.

21          So rather than take it out, maybe put in here and

22   consult with Mr. Cudia, subject to entry of a final order of

23   the court.  But it previews it for parties.  This is what

24   you're going to be asking for.  So for both of those, it

25   would be subject to entry of a final order of the Court.

1          MS. KANDESTIN:  Okay.  For the closing of the

2   cases and the indemnification.

3          THE COURT:  Yeah.  For the liability of the plan

4   administrator indemnification.  It's subsection J and K for

5   the wind down debtor.

6          MS. KANDESTIN:  So Your Honor, one question, the

7   wind down debtor is -- it's the two debtor entities that are

8   --

9          THE COURT:  Oh, they're existing.

10          MS. KANDESTIN:  Yes.

11          THE COURT:  Oh, sorry.

12          MS. KANDESTIN:  No, thank you.  I think that maybe

13   it's just the plan administrator.

14          THE COURT:  Yeah.  Thank you.  7.1 deals with

15   distributions, and it talks about undeliverable

16   distributions, and I need to find the comment, but I have

17   down undeliverable distribution one year after the -- I have

18   down effective date.  Is that accurate?

19          MS. KANDESTIN:  I can't find it.

20          THE COURT:  I'm sorry.  Do you find it?  I can't

21   even find it.

22          MS. KANDESTIN:  Yes.  It's in 7.3(f).

23          THE COURT:  Oh, three.  Okay, so my question is,

24   should that be after the effective date or a distribution

25   date?

1            MS. KANDESTIN:  It should be distribution date.

2            THE COURT:  Okay.

3            MS. KANDESTIN:  We're happy to clarify that.

4            THE COURT:  Okay.

5            MR. AXELROD:  Your Honor, Tristan Axelrod for the

6  committee.  Could we go back for just a moment to the

7  indemnity paragraph?  I just wanted to clarify on the record

8  so there's no misunderstanding, and maybe I did misunderstand

9  some of this, but the wind down debtor is these two corporate

10 entities that do continue?

11           THE COURT:  Right.

12           MR. AXELROD:  And they're permitted under Delaware

13 law to indemnify their officers and directors.  The plan

14 administrator is the sole officer and director.  So we didn't

15 see any issue with providing for indemnification of that

16 individual through the plan.

17           THE COURT:  You do have separate authority for it,

18 is what you're saying.  You don't need the Bankruptcy Court

19 authority for it.

20           MR. AXELROD:  As long as the plan doesn't forbid

21 any kind of indemnification, I'm sure we can be on board.

22           THE COURT:  Maybe you should clarify that.  I'm

23 not trying to limit any right you have, otherwise have.

24           MR. AXELROD:  Okay.

25           THE COURT:  So -- but this court doesn't

1  prospectively indemnify, so maybe you all should collectively

2  tweak that language.

3         MR. AXELROD:  We will.  Thank you, Your Honor.

4         MR. STARK:  Your Honor, it concerns only a

5  conflict between the order and what the corporate documents

6  do.

7         THE COURT:  Right.

8         MR. STARK:  It cannot be at that conflict.

9         THE COURT:  Exactly.  That's exactly what you want

10  to do, Mr. Stark.  Exactly.  I did appreciate that the

11  corporate, you know, that you had the agreement, and that

12  makes perfect sense to me.  And just to avoid any conflict.

13  Yeah.

14         I only have, like, three more comments.  This is

15  8.6.  Says there was going to be no interest.  Right?  So 7.9

16  talks about allocation between principal and accrued

17  interest.  Are they inconsistent or am I missing something?

18  And you can tell me I'm missing something.

19         MS. KANDESTIN:  I believe interest -- it says

20  unless specifically provided herein or by final order of the

21  Bankruptcy Court, there's no interest.  But you approved a

22  DIP facility, and there is interest under there at some

23  point.

24         THE COURT:  Okay, 8.8, disallowance of claims.  I

25  think you can withhold distributions, but you can't disallow

1   under 502(d).  You can't disallow a claim until you have a

2   judgment under Worldwide Direct.

3            MS. KANDESTIN:  (Inaudible).

4            THE COURT:  I think those are all my comments on

5   the plan.

6            MS. KANDESTIN:  Did you have comments to the

7   order?  What is it?

8            THE COURT:  I have to find my order.

9            MS. KANDESTIN:  (Inaudible) red line comments.

10           THE COURT:  Of the order.  Yes.

11           MS. KANDESTIN:  Yes.

12           THE COURT:  And I don't -- do I have a red line

13  order?  Apparently, I do.

14           MS. KANDESTIN:  Yes.  It's -- the first change is

15  on page 14.

16           THE COURT:  Bear with me because I'm going to go

17  through mine simultaneously.

18           MS. KANDESTIN:  Okay.

19           THE COURT:  So I'm going to turn page -- two of

20  them at the same time.

21           MS. KANDESTIN:  Okay.  If you have something

22  before page 14, let me know.

23           THE COURT:  I had some comments, but they have

24  been satisfied by what transpired today.  So.  Okay, I'm on

25  14.

 1            MS. KANDESTIN:  Consistent with what I understand

 2   Your Honor's preference is we remove 3C, the empty class,

 3   from the voting paragraph.

 4            THE COURT:  Okay.  I had it underlined.

 5            MS. KANDESTIN:  We did it in -- I guess this is --

 6            THE COURT:  In AA.

 7            MS. KANDESTIN:  Y and AA.

 8            THE COURT:  Yep, I see it.  Thank you.

 9            MS. KANDESTIN:  And CC, we added -- I believe this

10   change was from Mr. Cudia, the U.S. Trustee.

11            THE COURT:  Okay.

12            MS. KANDESTIN:  My next page is not till page 19,

13   which is, again --

14            THE COURT:  Yeah, bear with me a second.  I had a

15   comment, but it might have been taken care of.  I'm sorry,

16   what was your next one?

17            MS. KANDESTIN:  Oh, it's just paragraph -- new

18   paragraph 6.  And this was, again, just to clarify that 3C

19   was not a tabulated class.  That it's a vacant that was

20   eliminated for voting purposes.

21            THE COURT:  Okay.

22            MS. KANDESTIN:  I don't have anything until 26,

23   page 26.

24            THE COURT:  Okay, hold on one second.  So I just

25   wanted to note that paragraph 3 -- and I realized that ones

1  are finding of fact and the others are orders, but paragraph

2  A and 3 are the same, and paragraph 4 is the same as M, if I

3  can read my own writing.

4              MS. KANDESTIN:  Yes, we tend to include that in

5  both places.

6              THE COURT:  Okay.

7              MS. KANDESTIN:  If you'd like us remove one --

8              THE COURT:  That's fine.  Okay, where are you now?

9  I'm sorry, I'm at 12.

10             MS. KANDESTIN:  You're at 12?

11             THE COURT:  Paragraph 12.

12             MS. KANDESTIN:  Okay.  All right, I'm there.

13             THE COURT:  In light of what was represented today

14 about resolutions with the U.S. Trustee, was that language

15 okay with the U.S. Trustee?

16             MS. KANDESTIN:  This is just for the released

17 professionals, not released employees.

18             THE COURT:  No, I was talking about the settlement

19 provision.

20             MS. KANDESTIN:  Oh, I'm sorry.  Oh, it's 13.

21             THE COURT:  Oh, sorry.

22             MR. CUDIA:  Yes, Your Honor, we typically object

23 to when there's a provision in the plan or the confirmation

24 order that has plans as a settlement overall.  To the extent

25 there are any 9019 settlements that are contained within it,

1  we're fine with the paragraph.  It may be extraneous.

2            THE COURT:  All right, thank you.

3            MS. KANDESTIN:  I'm on page 26.

4            THE COURT:  Yes.

5            MS. KANDESTIN:  These are just additional changes

6  with respect to the (inaudible) provisions that Mr. Cudia

7  wanted us to verify, which we were happy to do.  And then I

8  don't have anything until page 31.

9            THE COURT:  Okay.

10            MS. KANDESTIN:  This language in new paragraph 33

11  was the language requested by Anchor Coin and also by SDM.

12  And this is just to note that the notices that are sent to

13  customers through the account statement procedures also be

14  sent to counsel of record.

15            THE COURT:  Okay.

16            MS. KANDESTIN:  On the next page, new paragraph 35

17  is a compromise that resolved the objection of 450.  I think

18  it should say 405.  Change that.  405 Investments.

19  (Inaudible) I'll fix that.  The only other changes to the

20  notice is the effective date, which is attached to the order,

21  and these are comments from the committee and the plan

22  administrator elect, basically, you know, pointing with

23  respect to the account treatment procedures and the website

24  that is mentioned there, just giving customers, pointing them

25  to their appropriate provision of the plan.  And also before

1    we serve this, they're going to give the URL for that website

2    so it's out, you know, to everybody with the effective date

3    notice.

4              THE COURT:  Okay, so post effective date, there'll

5    be a website?

6              MS. KANDESTIN:  Yes.  And those are all the

7    changes I had.

8              THE COURT:  Okay.  Let me ask, does anybody wish

9    to be heard with respect to the form of the confirmation

10   order?  Okay, I'll enter the confirmation order when it's

11   filed under certification with the modifications we addressed

12   with the clean and a black line and a representation of the

13   parties who participated here today have signed off on it.

14             MS. KANDESTIN:  Yes, Your Honor.

15             THE COURT:  Including Mr. Cudia.

16             MS. KANDESTIN:  Of course.  Always Mr. Cudia.

17             THE COURT:  And let me just say to the parties, it

18   is really important that you all work well together.  And it

19   is apparent to the Court here that the parties have spent a

20   lot of time working together to get to this point today.  So

21   it's not lost on me how much effort this has taken.

22             MS. KANDESTIN:  Thank you, Your Honor.

23             THE COURT:  So is there anything else for today?

24             MS. KANDESTIN:  No, no.

25             THE COURT:  Okay, well, we're going to conclude

1 this, but I'd ask the debtors to stay a second.

2          MS. KANDESTIN:  Okay.  Yes.

3          THE COURT:  I don't know what was done with what

4 we were supposed to do at 4 o'clock.  And so I can -- no, I

5 was going to say I can find out, but I -- obviously I can't

6 do something without all the parties here, but I may have to

7 -- I suspect you guys are done for the day.

8          MS. KANDESTIN:  I certainly am.

9          THE COURT:  So --

10          MALE VOICE:  Your Honor, I think we were just

11 going to reach out to them to see if we could essentially

12 come up with a schedule.

13          THE COURT:  Would you do that?  And if you guys

14 want, we'll just get on Zoom.  But because we're getting into

15 holidays, so I have hearings starting at noon tomorrow,

16 including a first day, so I could probably hop on for a quick

17 call in the morning.  Or on Wednesday I could get on at

18 10:00.

19          MS. KANDESTIN:  Tomorrow is Wednesday.

20          THE COURT:  I'm sorry, am I messed up?

21          MALE VOICE:  Tomorrow is Wednesday.

22          THE COURT:  Okay.  Tomorrow is Wednesday.

23          MALE VOICE:  I guess my only question for Your

24 Honor, did you want to have the status conference because you

25 felt you were needed to help us with scheduling or --

1          THE COURT:  I don't have that much ego.  I'm not

2   that needed.

3          MALE VOICE:  Because I think we can just try to

4   work it out with Trust Token in terms of scheduling.  But if

5   you want to have a conference, that's fine.  Up to you.

6          THE COURT:  Well, you know what?  I don't know if

7   the parties want to be heard because I know that you filed

8   pleadings, and then I just entered an order.  So maybe you

9   could talk about scheduling.  Maybe we could then schedule a

10  status conference or we could get on to talk about it.  But a

11  meet-and-confer preliminarily would be very helpful.

12         MALE VOICE:  We can do that.

13         THE COURT:  And then, so Thursday I could do 10:00

14  a.m. and I could do 9:00 or 10:00 on Thursday.

15         MALE VOICE:  10:00 a.m. works for debtors.  I

16  don't know if it works for trustee.

17         THE COURT:  Yeah, and I have a bunch of --

18  honestly, I'm doing end-of-year fee hearings so they could

19  possibly start coming off, but we could reach out just why

20  don't you confer first and then let's reach out.

21         MALE VOICE:  I think because the motion to adjourn

22  was granted, so it's going to be a supplemental reply I think

23  for granting the motion.  So I think really the only issues

24  to discuss are what the date is for that reply and when the

25  next hearing is going to be.  I know next hearing (inaudible)

1  schedule in this case, I believe.

2          THE COURT:  I think so.  But you know what, we

3  need witness availability issues.

4          MALE VOICE:  We'll be conferring with Trust Token

5  about (inaudible) and then see (inaudible).

6          THE COURT:  All right, thank you.

7          THE COURT:  Thank you, Your Honor.

8          THE COURT:  Mr. Detweiler?

9          MR. DETWEILER:  Your Honor, may it please the

10  Court.  Donald J. Detweiler on behalf of the committee.  The

11  motion that was to be heard at the status conference dealt

12  with the foreign currency motion.  The committee would like

13  to participate in the conference if it goes us forward.

14          We were very close to getting a stipulation with

15  the parties that was going to set forth the schedule.  We'll

16  go back to Trust Token and see if we can do that, but it's

17  contemplated that the plan administrator will work with Trust

18  Token in good faith to try to resolve the issues and then set

19  forth a process ultimately, have it adjudicated by the court

20  if it's not resolved.

21          THE COURT:  Okay.  All right.  I appreciate it,

22  the updates.  I don't want to have too much more conversation

23  without them participating.

24          MR. DETWEILER:  Right.  Thank you, Your Honor.

25          THE COURT:  So okay, thank you all very much.  I

1  appreciate everybody's efforts.  Sorry for the long day and

2  safe travels everyone.  And if I don't see you, everyone have

3  a really good holiday.  We stand adjourned.

4           (End of Proceedings.)

1                    CERTIFICATION

2           We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ Tracey J. Williams                 December 20, 2023

8    Tracey J. Williams, CET-914

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Coleen Rand                        December 20, 2023

13   Coleen Rand, CET-341

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25