**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Prime Core Technologies Inc., *et al.*,[1] | ) | Case No. 23-11161 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |
| PCT Litigation Trust,[2] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Proc. No. 24-_____ (JKS) |
| v. | ) | |
| | ) | |
| Digital Asset Redemption, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

### DECLARATION OF JAMES P. BRENNAN IN SUPPORT OF
### PRIME'S COMPLAINT AGAINST DIGITAL ASSET REDEMPTION, LLC

Under 28 U.S.C. § 1746, I, James P. Brennan, declare as follows under the penalty of perjury:

---

[1]   The debtors in the above-referenced chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]   The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors. For purposes of this declaration (this "Declaration"), I will refer to the Debtors and PCT Litigation Trust collectively as "Prime" unless otherwise specified.

### A.    My Background

1.    I am a forensic accountant with over 20 years of experience conducting analyses and providing expert testimony in matters involving accounting fraud, ponzi-schemes, financial crimes, and asset-tracing and recovery.  I have experience in forensic accounting and investigations in fiat and cryptocurrency.

2.    I am a Senior Managing Director and the Global Head of Fintech, Payments, and Crypto Compliance and Investigations at J.S. Held.  J.S. Held is a global professional services firm which provides technical, scientific, and financial advisory services.

3.    Prior to working at J.S. Held, I held positions at other investigations firms, including FTI Consulting, Alvarez & Marsal, and Kroll.  In these positions, I managed teams responsible for investigations involving money laundering, terrorist financing, ponzi-schemes, asset theft, and other fraudulent activities, as well as asset tracing and recovery.

4.    I hold both a B.S. and M.S. in accounting from St. John's University.  I am a Certified Fraud Examiner and a Certified Bitcoin Professional.

5.    A copy of my resume is attached hereto as Exhibit 1.

6.    I specialize in accounting, forensic investigations, and disputes involving complex economic and financial transactions.  A significant amount of my practice and experience involves advising on crypto-related matters.

7.    I am routinely retained to analyze information related to financial crimes, which includes forensic investigations and flow-of-funds analyses related to crypto wallet addresses and fiat bank accounts.

8.      I am familiar with the forensic tools and methodologies used for conducting investigations related to both fiat and cryptocurrency in criminal, civil, bankruptcy, and regulatory matters.

9.      I also train domestic and international government entities concerning cryptocurrency and financial crimes.  These entities include, among others, the U.S. Department of Justice, the U.S. Department of Homeland Security, and U.S. bankruptcy courts.

10.     I submit this Declaration in support of Prime's complaint against Digital Asset Redemption, LLC ("DAR").

11.     Prime commingled fiat and crypto provided by customers with fiat and crypto provided by other customers, as well as with fiat and crypto Prime generated from its business operations.

12.     Based on my investigation, because of Prime's commingling of assets, it is impossible to trace, segregate, or otherwise identify the specific assets that DAR transferred to Prime from other assets provided to Prime or assets that Prime generated from its business operations.

13.     Except as otherwise indicated herein, all facts set forth in this Declaration are based on: (i) my personal knowledge and/or information provided to me by Prime and Prime's professionals; or (ii) my review of relevant documents.

14.     Except as otherwise indicated herein, all conclusions and opinions set forth in this Declaration are based on: (i) the facts as known to me, including those set forth herein; (ii) my experience and knowledge of Prime's operations; and (iii) my experience and training as a professional.

15.    This Declaration is based solely on the data, facts, and information that I reviewed to date.

**B.    Prime's Commingling of Fiat and Recordkeeping Processes**

16.    I reviewed records concerning the bank accounts held by Prime at BMO Harris Bank, N.A. ("BMO"), Cross River Bank ("CRB"), and Signature Bank ("Signature").

17.    The fiat customers transferred to Prime was not held in segregated bank accounts. Instead, fiat provided by customers was held in omnibus bank accounts containing fiat provided by thousands of Prime's customers and fiat Prime generated and used for its own business operations.

18.    Because Prime did not segregate one customer's fiat from other customers' fiat or from fiat generated from business operations, Prime maintained an internal spreadsheet which it referred to as a "ledger" which was supposed to keep track of transactions to identify how much each of Prime's customers were owed by Prime (the "Ledger").

19.    ██████████ ("██████████"), Prime's former Chief of Regulatory Affairs, testified that Prime would attempt to rely on this Ledger to determine the amounts owed to each customer since the bank accounts and digital wallets holding cryptocurrency were not segregated:[3]

> Q:    And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?
>
> A:    I would pull the general ledger record out of the Prime Trust Core system.[4]

---

[3]    Prime has redacted information categorized as "Confidential" and "Highly Confidential – Professionals' Eyes Only" in this Declaration pursuant to the *Stipulated Protective Order* approved by the Court in the Chapter 11 Cases [Docket No. 323].

[4]    Deposition of ██████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "████ Dep."), 89:19–25.

20.     Based on the records I have reviewed, it appears that Prime regularly made internal transfers between Prime's bank accounts which commingled fiat funds.  It appears that Prime would move funds between bank accounts that customers had transferred fiat into and bank accounts that primarily held fiat Prime had generated from its business activities.

21.     For example, it was Prime's regular practice to make internal transfers into an account at BMO ("BMO x3077") to provide fiat for outgoing wire transfers on an as-needed basis and to make internal transfers into a different account at BMO ("BMO x9934") to earn a higher rate of interest.

22.     It appears that BMO x3077 contained funds that had been transferred to it from Prime's other internal accounts as well as directly from customers.  Prime held these funds from different sources together in BMO x3077 in commingled fashion.

23.     A large volume of debits and credits occurred almost daily to and from BMO x3077.  Prime's bank statements for BMO x3077 only includes reference numbers regarding the movement of funds into or out of that account.  This makes it difficult to determine who was transferring funds into Prime and the recipients of outbound transfers.

24.     A review of Prime's bank statements demonstrates that many of the daily transfers into BMO x3077 came from BMO x9334.  Most of the unused funds left in BMO x3077 at the end of each day would then be transferred back to BMO x9934 as BMO x9934 provided a higher rate of interest than BMO x3077.  Transfers between the bank accounts were described in Prime's bank statements as "PC Transfers".

25.     It appears that the vast majority of funds contained in BMO x9934 were commingled funds that had been transferred to it from the commingled BMO x3077 account. BMO x9934 also contained some funds that had been transferred from other Prime bank accounts,

such as accounts at CRB and Signature, which further commingled the funds in BMO x9334. These CRB and Signature accounts operated in a largely similar manner as did BMO x3077—*i.e.*, they contained commingled funds that had been transferred to these CRB and Signature accounts from other Prime bank accounts containing funds provided by other Prime customers.

26.    These transfers also usually occurred in round dollars, as opposed to specific amounts based on specific transactions.  Based on my experience, this suggests that Prime likely transferred funds between its bank accounts based on its own estimation and on an as-needed basis, instead of in response to specific transaction activity.  This practice further adds to the difficulty in connecting transfers with specific transactions reflected on Prime's Ledger.

27.    One CRB account ("CRB x9892") consists primarily of internal transfers and operating payments via automated clearing house ("ACH").  This account operated similar to BMO x3077 by commingling funds that had been transferred to it from other Prime accounts and directly from different Prime customers.

28.    Thus, it appears that Prime utilized either BMO x3077 or CRB x9892 depending on whether it needed to make transfers via wire or ACH and moved funds around its different bank accounts accordingly.

29.    Prime also appears to have paid some of its corporate operating expenses from bank accounts which were primarily funded by Prime's customers

30.    Further complicating matters is the fact that Prime did not perform regular or timely reconciliations of accounts and, at least before March 2021, any reconciliations that Prime conducted were manual.[5]

---

[5]    *See* Deposition of ▮▮▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "▮▮▮ Dep."), 19:23–20:13.

31.     Reconciliation processes are a critical internal control for companies to identify potential errors or fraud so that their books and records are accurate and they can validate the amount of assets that the company holds.  They typically consist of comparing transaction or other financial activities between the company's internal records and bank records to verify data and the proper amounts for account balances.  For Prime's fiat, this generally consisted of comparing the amounts and transaction activity reflected on Prime's Ledger for a given period to the bank account activity during that same period to reconcile the accounts.

32.     In connection with this Declaration, I reviewed testimony from former Prime executives and employees.

33.     ████████ ("█████"), Prime's former SVP of Operations and Reconciliations, who largely designed the reconciliations processes that Prime used, explained that:

> Q:     Okay.  An when you moved into your new role in March of 2021 as operations and reconciliations, what was the reconciliations piece?
>
> A:     Prime Trust did not have reconciliation tools, essentially.  So my responsibility was in kind of designing the reconciliation tools.
>
> Q:     What's a reconciliation tool?
>
> A:     Somebody makes a request for a transaction: How can you basically reconcile that it occurred.  If that makes sense.
>
> Q:     Can you—can you expand a little bit?  So a customer says, I want to buy Bitcoin?
>
> A:     Yeah.  So, well, it wouldn't be necessarily for the purchases, but, for instance, a client's account says that they have one Bitcoin in their account.  Can you confirm that it was received on the Ledger.
>
> Q:     Okay.  So you're confirming that you actually have the assets that your client's accounts are reflecting they have; is that right?

> A:   In a way, yeah.  So it was assuming that if we had assets displayed, you know, do we actually have them.[6]

34.   ▮▮▮▮ explained "reconciliations" as "taking the general ledger and reconciling it to a bank statement; taking customer, you know, account statements and reconciling those to the bank statement wherever those assets may be held.  When I say assets, I'm talking about Fiat."[7]

35.   Both ▮▮▮▮ and ▮▮▮▮ testified as to the insufficiency of Prime's reconciliation processes during their tenures with Prime.

36.   ▮▮▮▮ testified: "Reconciliations were not being done in a timely manner."[8]

37.   ▮▮▮▮ discussed Prime's reconciliations process both before and after March 2021:

> A:   There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated . . .
>
> Q:   Okay.  So you weren't—you weren't responsible for fixing whatever happened prior, you were responsible for forward-looking projects for reconciliation; is that the idea?
>
> A:   Yeah, I was—I was put in that position to essentially build the automated systems for transactions looking forward.  Once the system was, I guess you can say, built, you know, I was let go of the responsibilities of building it, and there were teams that were brought on to essentially do the reconciliation[.][9]

38.   I also reviewed some internal Prime communications concerning the commingling of assets and reconciliation.

---

[6]   ▮▮ Dep., 18:3–19:7.

[7]   ▮▮▮ Dep., 16:4–9.

[8]   *Id.*, 38: 23–24.

[9]   ▮▮▮ Dep., 19:25–20:5; 21:14–22:2

39.     For example, on December 17, 2022, ███████, Prime's former General Counsel, sent an email to several Prime employees concerning a Nevada Financial Institutions Division ("<u>Nevada FID</u>") request for information regarding Prime's statement that it "███████ ████████████████████████████████████████████."[10] Specifically, Nevada FID requested that Prime ███████████████████████████████████████ ████████████████████."[11]

40.     On December 19, 2022, ███████ responded: "████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████."[12]

41.     On December 28, 2022, ███████████, former SVP and Head of Banking and Trust Operations, responded: "████████████████████████████████████ █████████████████████████████████████████."[13]

42.     The most notable example of Prime commingling fiat is when Prime used fiat provided by its customers to make replacement purchases of ETH that was locked in one of Prime's "multi-sig" digital wallets that it could not access (the "<u>98f Wallet</u>").[14]

---

[10]   ████ Dep., Ex. 28 (internal quotations omitted).

[11]   *Id.*

[12]   *Id.* (emphasis added).

[13]   *Id.*

[14]   A "multi-sig" digital wallet requires that digital signatures of multiple individuals to access and transact with the crypto stored on the digital wallet.  The "98f Wallet" is referred to herein as such because it has a digital address ending in the characters "98f."

43.     In December 2021, a Prime customer ("Customer") requested a transfer from Prime of 5,867.71 ETH (approximately $23,600,000 at the time).   Prime quickly realized that the Customer had been depositing ETH to the 98f Wallet and that Prime no longer had access to the 98f Wallet.

44.     By December 2021, Customer had already transferred 11,081 ETH (approximately $44,550,000 at the time) to the 98f Wallet.

45.     Prime decided to satisfy Customer's December 2021 (and subsequent) ETH transfer requests by using fiat provided by other customers to purchase the requested ETH from a liquidity provider ("Liquidity Provider").

46.     Regarding this decision to use the commingled fiat to purchase the replacement ETH from Liquidity Provider, ████████, Prime's former Chief Operating Officer, testified as follows:

> Q:     So [Customer is] depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?
>
> A:     I would defer to ██ on that.  But essentially it was use of omnibus funds, is my understanding.
>
> Q:     What's use of omnibus funds?
>
> A:     As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.
>
> Q:     And which funds were used to make the purchases of the ETH to fund the transactions?
>
> A:     Funds from the fiat account.   Fiat omnibus account.   Is my understanding.  Once again, ██ would know specifically.[15]

---

[15]     Deposition of ████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023), 92:25–93:18.

47.     In total, Prime executed eight different purchases of ETH from Liquidity Provider between December 23, 2021 and March 19, 2022.  The replacement ETH purchases totaled 23,778 ETH worth $76,367,548 USD based on the value of ETH at the time of each respective purchase:

| Date | Cryptocurrency | USD Value as of Purchase Date |
|------|----------------|-------------------------------|
| 12/23/2021 | 3,000 ETH | $11,958,000 |
| 12/31/2021 | 3,250 ETH | $12,158,250 |
| 01/06/2022 | 2,900 ETH | $10,071,700 |
| 01/22/2022 | 1,930.5019305 ETH | $5,000,000 |
| 03/11/2022 | 1,800 ETH | $4,644,000 |
| 03/14/2022 | 3,250 ETH | $8,524,750 |
| 03/15/2022 | 3,000 ETH | $8,043,000 |
| 03/19/2022 | 4,647.22 ETH | $15,967,847.90 |

48.     Prime used the commingled fiat transferred to it by its customers to fully fund each of the ETH purchases from Liquidity Provider.

49.     Certain executives at Prime appear to have taken steps to corrupt Prime's internal records.

50.     Prime settled the ETH purchases from Liquidity Provider by "credit[ing]" Liquidity Provider's customer balance with Prime with fiat amounts equivalent to each ETH purchase.

51.     To "credit" the Liquidity Provider's fiat customer balance with Prime, Prime had to input a "contribution" on Prime's Ledger to make it appear as if the Liquidity Provider had wired fiat to Prime.  In reality, Liquidity Provider did not provide a wire transfer to Prime in connection with the ETH purchases.  ████████ testified on this subject as follows:



A:

A:

Q:



52.    This method of settlement of the ETH purchases from Liquidity Provider resulted in a discrepancy between the amount of assets Prime's Ledger reflected that Prime had and the actual amount of fiat that Prime held in its bank accounts:



53.    Executives at Prime seem to have undertaken efforts to make Ledger entries appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for the Liquidity Provider.

---

[16]    ███ Dep., 155:11–156:9.

[17]    ███ Dep., 144:11–20; 146:7–15.

54.    The below entries to Prime's Ledger state falsely that there were "incoming" wire transfers to Liquidity Provider that were equivalent to the amounts of the replacement ETH purchases and that these "incoming" wire transfers went to a Prime Signature account, but there were no such wire transfers:



55.    Prime's bank account statements for this Signature account do not reflect any of the above wire transfers ever occurring.

56.    For example, the above Ledger entries reflect that Prime received the following incoming wire transfers: (i) $11,958,000 on December 23, 2021; and (ii) $12,158,250 on December 31, 2021.  These transfers correspond exactly to the first two of the replacement ETH purchases from Liquidity Provider.

57.    These transfers are not reflected in Prime's December 2021 bank account statement for the identified Signature account.[18]

58.    ▮▮▮▮▮▮ confirmed that these purported incoming wire transfers would not be identifiable in any Prime bank account statements:

Q:    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A:    ▮▮

Q:    ▮▮▮▮▮▮▮▮▮▮▮

---

[18]    The relevant portions of Prime's December 2021 Signature account statement are attached to this Declaration as Exhibit 2 and Exhibit 3.



59.     Thus, given how Prime commingled its fiat, constantly transferred funds between bank accounts, and maintained poor Ledger records and reconciliation processes, it is impossible to identify and distinguish the specific assets that DAR transferred to Prime from other commingled assets transferred to Prime by other customers or Prime itself.

**C.     DAR's Transfers During Prime's Preference Period**

60.     Using data sourced from Prime's bank accounts, internal Ledger, and API log audit data, I will provide an overview of the process by which Prime commingled the assets transferred to it by DAR and will identify the movement of funds in connection with Prime's transfers to DAR during the Preference Period.[20]

61.     As referenced above, the BMO bank statements for Prime's bank accounts do not identify the sender or recipient of transfers.  However, additional bank detail data[21] from the BMO

---

[19]    ▮▮▮▮, 164:22–165:10; 166:5–15.

[20]    Prime's preference period (the "Preference Period") began on May 16, 2023 and lasted until the petition date of August 14, 2023.

[21]    Extracts of bank data are included in the daily BMO reconciliations.

reconciliations and API log audit data[22] provide details sufficient to piece together this information.

62.    In my review of Prime's Ledger, I was able to observe customers' transactions. These transactions are supported by bank data, but only in the case of incoming or outgoing wire transfers.

63.    For the period of May 15, 2021 to August 14, 2023,[23] DAR executed 42 incoming wires to Prime totaling $70,851,699.75 and requested 11 outgoing wires from Prime totaling $13,485,596.73.

64.    It was uncommon for DAR to receive outgoing wire transfers from Prime. Over the course of more than two years, there were only 11 outgoing wire transfers, 9 of which occurred between May 20, 2021 and July 15, 2021.

65.    The other two outgoing wire transfers occurred during the Preference Period— specifically, on June 20, 2023 and June 21, 2023 (collectively, the "Preference Period Transfers").

66.    On June 16, 2023, the Ledger reflects an incoming wire transfer to Prime totaling $10,000,000.00. This incoming wire transfer came from an account at Texas Capital Bank NA. It is my understanding that this is DAR's bank account. In the "Settlement Details" column of the Ledger, the initiator is noted as "DDA Clearing."[24] This $10,000,000.00 amount was transferred into BMO x3077 on June 16, 2023. The incoming transfer is depicted below:

---

[22]    API Log Audit data identifies the customer email that initiates a transaction providing an audit trail. Customers interacted with Prime through an API (Application Program Interface). The API Log Audit data logged certain information to keep track of who sent requests.

[23]    I was able to identify the subsection of Prime's Ledger concerning DAR by filtering for DAR's customer number (#███████5983). I was able to observe incoming and outgoing DAR transactions during the period of May 15, 2021 to August 14, 2023, and understand how DAR typically interacted with Prime.

[24]    The "Settlement Details" refer to the BMO reconciliation that pulled the detailed bank data. *See* Excerpt 1 from BMO DetailReport 20230616 EV.xlsx., attached as Exhibit 4.



67.    However, this specific $10,000,000.00 transferred from DAR to Prime was not the same fiat that Prime subsequently used to make the Preference Period Transfers to DAR.

68.    Prime did not place this $10,000,000.00 in an account segregated for DAR.

69.    When DAR requested transfers on June 20, 2023 and June 21, 2023, Prime needed to pull together fiat from its commingled bank accounts which contained fiat transferred to Prime by multiple of its customers—not only DAR.

70.    Monthly account statements for BMO x3077 summarize the transaction information associated with BMO x3077 for each month.  Below is a chart illustrating the number, total amount, and general description of the transfers in and out of BMO x3077 for the month of June 2023:



71.    In total, the account activity for BMO x3077 included 147 incoming and outgoing transfers on the day of June 16, 2023. This consisted of 56 incoming transfers—including the $10,000,000.00 incoming transfer attributed to DAR—and 91 transfers out.

72.    The beginning cash balance on June 16, 2023 was $638,436.23 and the ending bank cash balance was $295,980.74. This means that at least $9,704,019.26 of the $10,000,000.00 provided by DAR was transferred from BMO x3077 to other customers and Prime accounts the very same day. The total value of cash movement on June 16, 2023 is summarized in the following table:

| June 16, 2023 Activity | | |
|---|---|---|
| **Transaction** | **Count** | **Amount** |
| Transfer In | 56 | 31,730,544.81 |
| Transfer Out | 91 | (32,073,000.30) |

73.     I traced one outgoing transfer of $11,000,000.00 on June 16, 2023 to BMO x9934[25] described as "PC TRANSFER DEBIT PTFM-685" and the funds transfers identification of "Internal Transfer (PTFM-685) MOVE $11M FROM BMO 3077 to BMO 9934":[26]



---

[25]   BMO reference number ████ 3037.

[26]   *See* Excerpt 2 from BMO DetailReport 20230616 EV.xlsx., attached as <u>Exhibit 5</u>.

74.    Additionally, I found an incoming transfer of $6,500,000.00[27] on June 16, 2023

from BMO x9934 to BMO x3077 described as "PC TRANSFER CREDIT PTFM-679", with the

funds transfers identification of "Internal Transfer (PTFM-679) Move $6.5M from BMO 9344 to

BMO 3077":[28]



---



75.    I did not see any record of the transfers between BMO x9934 and BMO x3077 on the Ledger reflecting or otherwise suggesting that DAR's funds were identifiable or segregated from any other fiat held by Prime.

76.    On June 16, 2023, only one incoming transfer for $10,000,000.00 is attributable to DAR.  The remaining incoming and outgoing transfers are attributable to other customers or are transfers between different Prime bank accounts, which demonstrates the commingling of the $10,000,000.00 DAR transferred into BMO x3077 with funds from other sources.

77.    Using the BMO Detail Report for June 16, 2023 "Details" column, I extracted the beneficiary identified ("BNF=") for the outgoing transfers, noting transfers to numerous customers.

78.    Using the BMO Detail Report for June 16, 2023 "Details" column, I extracted the sender of the transfer ("INFO=ORG="), noting transfers from numerous other customers.  I noted transfers from Prime's CRB x9892.  I traced the transfers to Prime's June 2023 bank statement for CRB x9892.

79.    On June 20, 2023, pursuant to DAR's request, Prime made the first Preference Period Transfer in the form of an outgoing wire transfer from BMO x3077 in the amount of $5,000,000.00.[29]  The outgoing transfer to DAR is reflected below:



80.    On June 21, 2023, pursuant to DAR's request, Prime made the second Preference Period Transfer in the form of another outgoing wire transfer from BMO x3077 in the amount of $4,497,500.00.[30]  The outgoing transfer to DAR is reflected below:

---

[29]   BMO Harris Bank statement Fed wire reference ███████ 8934.

[30]   BMO Harris Bank statement Fed wire reference ██████ 0199.



81.     As demonstrated by the above excerpts from BMO x3077, Prime did not include any descriptions of the outgoing Preference Period Transfers.  Therefore, I had to utilize several sources, including Prime's internal account records and bank details from Prime's internal reconciliations, to match the detailed entries to the bank account transaction details for these two Preference Period Transfers totaling $9,497,500.00.

82.     Using API log audit data, I confirmed DAR directed the June 20, 2023 transaction by identifying the user email associated with the transaction as a DAR email address:[31]



---

[31]     API Log Audit data for id: ████████████████ c395. The id agrees to the Funds Transfer ID from the bank data.

83. Using the API log audit data, I confirmed DAR directed the June 21, 2023 transaction by identifying the user email associated with the transaction as a DAR email address:[32]



84. To have enough funds available in BMO x3077 to satisfy the Preference Period Transfers, Prime needed to transfer funds from other sources.

85. Prime transferred funds primarily from BMO x9934 to BMO x3077 to satisfy the Preference Period Transfers. As discussed above, BMO x9934 contained commingled funds from BMO x3077, CRB bank accounts, and Signature bank accounts—all of which commingled funds from other Prime accounts and various Prime customers.

86. BMO x3077 also received some smaller transfers on the dates of the Preference Period Transfers which further commingled the funds held in BMO x3077 on these dates. These transfers came from other Prime accounts at CRB and Signature which, like BMO x3077 commingled funds from various different Prime accounts and customers. BMO x3077 also received some transfers directly from Prime customers on the dates it made the Preference Period Transfers from BMO x3077.

87. As detailed in this Declaration, Prime's internal auditing functions reflected gross failures in asset segregation, reconciliation, and the ability to distinguish customer provided assets from company assets.

---

[32] API Log Audit data for id: ▮▮▮▮▮▮▮▮▮▮▮ c470. The id agrees to the Funds Transfer ID from the bank data.

88.     As a result, neither DAR nor Prime can specifically identify or segregate the assets

that DAR transferred to Prime from other assets held by Prime.

Dated:  October 7, 2024
        Jupiter, Florida

                                    */s/ James P. Brennan*
                                    James P. Brennan
                                    Senior Managing Director
                                    J.S. Held, LLC

# Exhibit 1

# JP Brennan

Senior Managing Director, Global Investigations, Cryptocurrency



## Key Expertise



- Forensic Accounting
- Anti-money Laundering ("AML")
- Compliance
- Investigations
- Damages
- Financial Crime
- Fraud
- Asset Tracing (Crypto + Traditional)
- Money Services Business ("MSBs")
- Operational Due Diligence
- Cryptocurrency Security Standard ("CCSS")
- KYC / Onboarding
- Managed / Outsourced Services

## Education

Master of Science (MS), St. John's University, 2002

Bachelor of Science (BS), St. John's University, 2001

## Project Geographical Experience

U.S., UK, Singapore, Bermuda, Canada, Bahamas, Gibraltar, Cyprus, Switzerland

## Languages

English

## Summary of Experience

JP Brennan is the Global Head of Fintech, Payments, Crypto Compliance and Investigations at J.S. Held. He brings over 20 years of experience in forensic accounting, damage calculation, auditing, litigation consulting, anti-money laundering ("AML") compliance, cryptocurrency regulatory compliance, OFAC/sanctions review, complex enhanced and operational due diligence, and bankruptcy. He has an in-depth understanding of the complexities that many FinTech's are faced with concerning their regulatory framework as well as those issues from a financial crime compliance perspective.

Mr. Brennan has substantial experience in providing complex forensic accounting and financial fraud investigative services, cryptocurrency asset / wallet tracing, development and implementation of AML programs, outsourced Chief Compliance Officer services, as well as providing managed services for large scale remediation and compliance projects. His clients include major law firms, cryptocurrency exchanges (centralized / decentralized), digital asset issuers, custodians, multinational banks, funds, payment processors, financial institutions, and investors.

His expert experience includes such high-profile matters such as Bernard L. Madoff Investment Securities (investigation), Lehman Brothers (bankruptcy investigation), Caesars Entertainment Operating Corp. (examiner report), Bank of New York-Mellon (compliance monitorship), Quadriga CX (crypto asset tracing), and LUNA Foundation Guard (crypto asset tracing).

## Speaking Engagements

Mr. Brennan has presented in various forums as well as moderated multiple cryptocurrency related panels that included topics such as investigations, risk and regulatory, asset recovery, crypto in bankruptcy as well as complex forensic tracing.

## Professional Affiliations/Memberships/Licenses/Training

Association of Certified Fraud Examiners

Certified Bitcoin Professional

## Role at J.S. Held

JP is involved with matters in consulting as well testifying expert capacity. These matters include fiat and digital asset forensic and tracing investigations, recovery of assets, the development, implementation and assessment of regulatory programs, monitorships, training for law enforcement agencies, government licensing, investigations on behalf of examiners, receivers, forensic accounting, and trustees.

## Contact

48 Wall Street, New York, NY 100436 | +1 212-952-5000 (O) | +1 917-244-8931 (M) | jp.brennan@jsheld.com

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

## JP Brennan
Senior Managing Director, Global Investigations, Cryptocurrency



## Work Experience

J.S. Held, LLC, Senior Managing Director, 2022 – Present

Kroll, LLC (f/k/a Duff & Phelps), Associate Managing Director, 2017 – 2022

Alvarez & Marsal Holdings, LLC, Director, 2012 – 2017

FTI Consulting, Inc., Director, 2004 – 2012

Deloitte & Touche LLP, Audit Staff, 2002 – 2004

## Select Litigation and Project Experience

### Cryptocurrency and Blockchain Related:

- Retained as the cryptocurrency expert in the Chapter 11 Bankruptcy Proceedings for Prime Trust due to insolvency. Provides litigation consulting and expert witness services, related to the investigation of the company as well as performance of other analysis including but not limited fraudulent conveyances and preference payments.

- Retained by a U.S. cryptocurrency exchange as an expert to defend against customer allegations involving the exchanges breach of fiduciary duty and lack of an appropriate AML program.

- Retained in the Voyager Digital Bankruptcy to investigate and recover fraudulent ACH customer payments.

- Retained by a Web3 company that provides infrastructure and applications to be built using its platform. Perform expert and litigation services to defend against allegations of market manipulations, inappropriate disclosure for sources and uses of funds, unjust enrichment, and breach of fiduciary duty.

- Luna Foundation Guard / Terraform Labs / Do Kwon – retained to produce an audit report and cryptocurrency tracing of the assets used to defend the peg of the UST algorithmic stablecoin. Additional work related to market manipulation, wash trading, improper public disclosures, and manipulation of transactions on the Terra network.

- Retained by the Brazilian gov't to conduct the cryptocurrency asset tracing and recovery in the INDEAL pyramid scheme.

- Retained as the expert in a cryptocurrency employment dispute related to the payment of assets at genesis and calculation the associated staking rewards and airdrops on the Cosmos Network.

- Retained as the expert by the Cred Inc. Liquidation Trust to trace and investigate the theft and fraudulent transfer of assets by Company executives.

- Retained by Bo Shen in the recovery of over $40 million stolen from his personal wallet.

- QuadrigaCX – retained by the receiver (E&Y) to conduct the tracing of cryptocurrency assets.

- Retained as the financial adviser in the EminiFX bankruptcy and investigation.

- Retained by the Canadian courts in the Index Finance hack as the custodian for the cryptocurrency assets stolen.

- Retained as the expert in a well-known international gambling site dispute.

- Retained in the USA v. Ian Freeman (formerly Ian Bernard) and Aria DiMezzo (formerly James Baker) to assist with various litigation support services.

- Conducted and performed operational due diligence for financial and crypto related platforms including but not limited to: trade execution, custody, and third-party providers.

- Often retained by bitcoin atm operators, crypto lenders, crypto funds, crypto exchanges, payment processors, and funds to conduct independent AML reviews.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



- Developed and implemented tracing and monitoring processes and technologies for a crypto money servicer business ("MSBs").
- Retained by the receiver in a Canadian cryptocurrency exchange investigation and recovery of assets.
- Retained by a large Seychelles-based cryptocurrency exchange to provide a report on proper OTC related procedures.
- Successfully performed an investigation into the fraudulent theft of cryptocurrency related assets of a crypto lender.
- Member of an international FATF committee working on the Travel Rule for Virtual Asset Providers ("VASPs").
- Performed the outsourcing of cryptocurrency asset reviews for a major US Cryptocurrency Exchange.
- Provide Managed Services for enhanced due diligence procedures for a major US Cryptocurrency Exchange.
- Retained by a U.S. Cryptocurrency Exchange to address regulatory concerns regarding their geo-fencing of IP addresses.
- Retained by a U.S. crypto lender in connection with their 2017 initial coin offering ("ICO") to provide recission payments to investors.
- Conducted cryptocurrency security standard ("CCSS") implementations and assessments.
- Conduct annual FBI Training – "How to Conduct Cryptocurrency Investigations."

**Non-Cryptocurrency and Blockchain Related:**

- Provided investigative services and litigation support to the court-appointed trustee for the liquidation of Bernard L. Madoff Investment Securities and his counsel.  Engagement assistance to date has included the day-to-day direction and supervision of teams in areas including forensic investigation, data analysis and litigation consulting.
- Retained by the US Federal Reserve Bank to review AML Programs for their 12 branches.
- Served on the team selected by the U.S. Attorney offices in the Eastern and Southern Districts of New York and Western Pennsylvania to support the monitoring of the non-prosecution agreements of both The Bank of New York and Mellon Financial Corporation, to monitor and report on the state of the banks' suspicious activity reporting practices and AML procedures.
- Served on the monitorship team for the Standard Chartered Bank.
- Provided litigation consulting and expert witness services, including expert report preparation and deposition and trial preparation for a multi-billion-dollar accounting malpractice case filed in a class action against one of the major accounting firms. The case involved review and analysis of several years of audit work papers as well as research and analysis.
- Provided litigation consulting, including expert report preparation and deposition and trial preparation for an oil and gas company to determine whether a series of corporate transactions constituted a fraudulent conveyance and as a result rendered the company insolvent.
- Created onboarding policies and procedures for banks, hedge funds, as well as crypto funds and exchanges.
- Served on the investigations team, retained by Caesars Entertainment Operating Company, Inc. ("CEOC"), Richard J. Davis, to investigate and determine whether fifteen transactions between CEOC and the leveraged buyout sponsors ("LBO") arose to constituted constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary duty.
- Expert support work on the determination of payments to creditors in the Nortel Networks bankruptcy.
- Expert support work on the calculation of damages / lost profits for a pharmaceutical dispute.
- Expert support in the investigation into various matters within the Lehman bankruptcy.
- Expert support in the investigation of Allen Stanford.
- Provided and oversaw a team of 350+ compliance professionals to help meet a New York State Department of Financial Services remediation for a large US-based cryptocurrency exchange.
- Hired as the outsourced CCO multiple payment processors that are going through the money transmission licensing process.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



## Speaking Engagements and Articles

- Law360 article, Using Data To Arm Against Future Crypto Market Turbulence", December 16, 2022.
- Luna Foundation Guard release, "Today, LFG releases the technical audit report conducted by JS Held, an experienced third-party auditing firm, providing full transparency into the trading, blockchain records, and efforts of LFG and TFL to defend the price of TerraUSD ($UST) between May 8th & May 12th, 2022", November 16, 2022.
- Brave NewCoin article, "The Cryptocurrency Regulatory Framework: How Countries are Approaching the Virtual Currency", March 2022.
- Wolters Kluwer Banking and Financial Services Policy Report – April 30, 2019, "The Curios Case of Crypto."
- Kroll article, "Cryptocurrencies: Protecting Your Downside in the Face of Uncertainty", May 2018.
- Medium Article Contributor: https://medium.com/@james.p.brennan1.
- Official Monetary and Financial Institutions Forum ("OMFIF") Digital Monetary Institute Symposium 2021, "Cryptocurrency's Regulatory Impact", September 2021.
- MIT: Center for Real Estate," Real Disruption - How Technology is Changing and Challenging Real Estate", 2017.
- Kroll, "Examining the Anti-Money Laundering (AML) Risks and Red Flags of Crypto Exchanges", October 2021.
- BPP Continuing Education, "What you need to know when your clients are considering crypto", 2021.
- Association of Certified Fraud Examiners, "The Future of AML and Blockchain", May 2021.
- JS Held Thought Leadership Related Articles.

## Testimony

- *Michael Sofaer v. BKCM, LLC, Supreme Court of the State of New York, Country of New York.*
- *Paul Merkley v. Gemini Trust Company, LLC,* JAMS Arbitration.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

# Exhibit 2

**[REDACTED]**

# Exhibit 3

**[REDACTED]**

# Exhibit 4

**Exhibit 4: Excerpt 1 from BMO DetailReport 20230616 EV.xlsx**.

[Columns hidden in picture below were blank or repeat information: credit, availability, reference, master reference, Bank AMT, Bank to looker, CAL and N2 columns]



PRIME TRUST LLC USD Account - 3743677 USD (BMO US - DDA)

| Date | Transaction Description | Bank Reference | Credit | Details | Funds Transfer ID |
|---|---|---|---|---|---|
| 06/15/23 | Incoming Money Transfer | ████5662 | $10,000,000.00 | FED REF=██1217    LTN=MMQFMP6M    TTM=2023/06/16 16:39 RECEIVED AT=2023/06/16 16:39    ORIG BANK ABA=111017979 ORIG BANK=TEXAS CAPITAL BANK    REC BANK ABA=071006288 REC BANK=BMO HARRIS BANK NA    TRANS TYPE=CTP    WIRE TYPE=FWI    USD AMOUNT=000000000000000000    VALUE DATE=20230616    SRC=██████████████51400 SSR=316709649727    INFO=ORG=DDA CLEARING 2350 LAKESIDE BLVD. SUITE 800 RICHAR    DSON TX 750082 US /AC-021001000001 OGB=TEXAS CAPITAL BANK /FW-    111017979 BNF=PRIME TRUST LLC USD ACCOUNT 330 S RAMPART BLVD  SUITE 26    0 LAS VEGA S NV,89145 US /AC-00000374307700D28 OBI=REF: QCCUSAQW3 DIGITAL ASSET    REDEM PTIO    N LLC 420058085983 | |

# Exhibit 5

**Exhibit 5: Excerpt 2 from BMO DetailReport 20230616 EV.xlsx**.

[Columns hidden in picture below were blank or repeat information: column, availability, reference, master reference, Bank AMT, Bank to looker]



PRIME TRUST LLC USD Account - 3741077 USD (BMO US - DDA)

| Date | Transaction Description | Bank Reference | Debit | Credit | Details | Funds Transfer ID | CAL | hz |
|------|------------------------|----------------|-------|--------|---------|-------------------|-----|-----|
| 06/16/23 | Miscellaneous Credit | ████0005 | | $6,500,000.00 | PC TRANSFER CREDIT PTFM-679 | Internal Transfer (PTFIA479) Move $6.5M from BMO 9344 to BMO 3077 | Internal Transfer | Move $6.5M from BMO 9344 to BMO 3077 |
| 06/16/23 | Miscellaneous Debit | ████012 | $11,000,000.00 | | PC TRANSFER DEBIT PTFM-685 | Internal Transfer (PTFIA485) MOVE $11M FROM BMO 3077 to BMO 9934 | Internal Transfer | MOVE $11M FROM BMO 3077 to BMO 9934 |