## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PRIME CORE TECHNOLOGIES, INC.,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Objection Deadline**: Feb. 5, 2025 at 4:00 p.m. (ET)<br>**Hearing Date**: Feb. 14, 2025 at 10:00 a.m. (ET) |

## PLAN ADMINISTRATOR'S MOTION FOR ENTRY OF AN
## ORDER (I) APPROVING THE PLAN ADMINISTRATOR'S DETERMINATION THAT
## THE DEBTORS' ASSETS ARE PROPERTY OF THE BANKRUPTCY ESTATES;
## (II) APPROVING DISTRIBUTIONS OF ESTATE PROPERTY; (III) ESTABLISHING
## PROCEDURES FOR SETTING A DISPUTED CLAIMS RESERVE; AND
## (IV) GRANTING RELATED RELIEF

Province Fiduciary Services, LLC, as the Plan Administrator (the "Plan Administrator")

appointed pursuant to the confirmed Plan (as defined herein) of the above-captioned debtors (the

"Debtors" or "Prime"), hereby moves (the "Motion") for entry of an order under sections 105(a),

502, 541 and 1142(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the

"Bankruptcy Code") and Rule 3021 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), (i) approving the Plan Administrator's determination that the Debtors'

Currency[2] is property of the Debtors' estates; (ii) approving distributions of estate property to

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Prime, LLC (6823); Prime IRA, LLC (8346); and Prime Digital LLC (4528). The Debtors' mailing address is Prime Core Technologies, Inc. Plan Administrator, c/o Province Fiduciary Services, LLC, 2360 Corporate Circle, Suite 340, Henderson, Nevada 89074. For the sake of convenience, unless otherwise indicated, this Motion refers to the Debtors as "Prime."

[2]     For purposes of this Motion, "Cryptocurrency" is defined as a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens, and governance tokens. Further, "Currency" is defined as (i) Cryptocurrency and (ii) the USD (United States Dollar). For the avoidance of doubt, foreign currencies are not included and are not the subject of this Motion. On November 13, 2023, the Debtors filed their *Motion for Entry of an Order Authorizing the Debtors to Sell Certain Foreign Currency Free and Clear of All Liens, Claims, Interests, and Encumbrances Pursuant to Bankruptcy Code Section 363* [Docket No. 413] (the "Foreign Currency Sale Motion"). Several parties objected to the Foreign Currency Sale Motion [Docket

Holders of Allowed Claims; (iii) establishing procedures for setting a Disputed Claims Reserve; and (iv) granting related relief.

In support of the Motion, the Plan Administrator relies on the (i) *Declaration of David Dunn* (the "Dunn Declaration"); and (ii) *Declaration of James P. Brennan* (the "Brennan Declaration"), each filed contemporaneously herewith, and respectfully states as follows:

## PRELIMINARY STATEMENT[3]

As the Court is aware, these cases were filed on the heels of a receivership action commenced against Prime by the state of Nevada. The receivership became necessary because of the massive fraud and mismanagement by Prime's leadership that, as widely publicized, resulted in substantial shortfalls in Prime's Currency versus the amounts due to its creditors.  Following confirmation of the Plan, the issue of whether the Currency was property of creditors or the Debtors' estates and how to distribute such Currency was left to the Plan Administrator.  The Plan Administrator has worked with its team and professionals extensively to understand Prime's business and assets and make a final determination on how to address these complex issues.  By this Motion, the Plan Administrator seeks finality as to its proposed path forward.

After an extensive review of the agreements between Prime and their customers, it is clear to the Plan Administrator that there was no fiduciary or trust relationship between the parties. However, even if there was, all Currency held by the Debtors – both Currency that was transferred to the Debtors by customers and Currency that was generated from the Debtors' own business operations – was hopelessly commingled. Specifically, as set forth in more detail in the Brennan

---

Nos. 460 & 461] (together, the "Objections").  The Foreign Currency Sale Motion and the Objections remain pending. Accordingly, the Plan Administrator will seek a resolution regarding distribution of the Foreign Currency through the litigation of the Foreign Currency Sale Motion and/or a separately commenced adversary proceeding.

[3]     Capitalized terms not defined in the Preliminary Statement shall have the meanings ascribed to them in the remainder of the Motion.

Declaration, Prime's internal auditing functions reflected gross failures in asset segregation, reconciliation, and the ability to distinguish customer provided assets from company assets. As detailed below and in the supporting declarations, it is impossible to determine what Currency, if any, is property of any particular customer such that it could be provided back to that customer. Further, there remains a shortfall in Currency. Accordingly, a pro-rata distribution to all Holders (as defined in the Plan) in U.S. Dollars is the most cost effective and efficient mechanism by which to proceed with distributions. The Plan Administrator therefore seeks entry of an order approving its determination that the Currency is property of the Debtors' estates and authorizing a liquidation of such Currency, where necessary, to U.S. Dollars for distribution in accordance with the procedures set forth herein.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012, and Article 12 of the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core, Inc. and its Affiliated Debtors*, dated December 14, 2023 (Docket No. 592), as amended (the "Plan").[4]

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicate for the relief requested herein are sections 105(a), 502, 541, and 1142(a) of the Bankruptcy Code and Bankruptcy Rule 3021.

---

[4]      The *Amended Joint Chapter 11 Plan of Reorganization for Prime Core, Inc. and its Affiliated Debtors*, dated December 14, 2023 (Docket No. 592), as modified by the Initial Plan Supplement (Docket No. 486), the First Amended Plan Supplement (Docket No. 511), the Second Amended Plan Supplement (Docket No. 540), the Third Amended Plan Supplement (Docket No. 594), the Fourth Amended Plan Supplement (Docket No. 615), and the Fifth Amended Plan Supplement (Docket No. 620) (collectively with the exhibits thereto, the "Plan"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

4. This is a core proceeding under 28 U.S.C. § 157(b). Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware, the Plan Administrator consents to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## **BACKGROUND**

## I. **General Background**

5. On August 14, 2023 (the "<u>Petition Date</u>"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (together, the "<u>Chapter 11 Cases</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

6. Prior to filing the Chapter 11 Cases, Prime was one of the Cryptocurrency industry's largest market participants. Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets. In the years that followed, as the Cryptocurrency markets and industry grew substantially, Prime shifted its focus away from traditional financial assets towards providing services for Cryptocurrency and other digital assets. For example, thousands of customers used Prime to gain access to the U.S. banking system by converting Cryptocurrency to fiat, which is commonly referred to as an "on-and-off ramp". Prime provided these services through various contractual agreements with: (i) third party digital asset and Cryptocurrency companies (the "<u>Integrators</u>"), as well as secondarily with (ii) the Integrators' end-user (the "<u>End-Users</u>").

7. In general, Prime's Cryptocurrency and digital assets platform operated in the first instance as a business-to-business service platform— *i.e.*, Prime provided various Cryptocurrency, fiat, and digital assets services and support to the Integrators. Integrators primarily used Prime's services to engage in Cryptocurrency and fiat transmission without having to obtain state money

4

transmitter licenses (each, an "MTL"), as the process for obtaining such a license is expensive and capital intensive.

## II.     The Integrator Agreements and End-User Agreements

8.     The Integrators procured Prime's services by entering into various service-related agreements with Prime (collectively, the "Agreements").  Integrators directly accessed services provided on Prime's platform through an Application Programming Interface ("API") provided to the Integrator.

9.     The End-Users did not directly procure Prime's services.  Rather, after satisfying "Know Your Customer" requirements with an Integrator, End-Users accepted or agreed to a user agreement with Prime (the "End-User Agreement") that was presented to them by the Integrator through the Integrator's system, which connected to Prime's platform through the API technology and services supplied by Prime to the Integrator.

10.     As of the Petition Date, agreements were in place between Prime and approximately 140 Integrators and thousands of End-Users.  See Dunn Decl., at ¶ 9.   At its height, there were dozens of variations of the Agreements and End-User Agreements.  See id. The terms of the Agreements between the parties varied, however, as a general rule, the Agreements contained explicit language that no fiduciary relationship existed between the parties.

11.     Specifically, a vast majority of the Integrators were subject to a Master Services Agreement (the "MSA").  See Dunn Decl., Exhibit 1 (Sample Integrator Master Services Agreement).  The MSA specifically stated that the agreement did not "create a partnership, franchise, joint venture, agency, *fiduciary or employment relationship between the Parties*." See MSA § 14.1 (emphasis added).

12.     A vast majority of Prime's Integrators were also subject to a Services Schedule for Prime Custodial Services (the "Custodial Agreement"), which provided Prime with the ability to

5

invest, rehypothecate, and move cash or fiat Currency at its sole discretion.  See Dunn Decl.,

Exhibit 2 (Sample Custodial Agreement).  Specifically, the Custodial Agreement provided that

Prime could:

> [O]therwise use or invest such cash or Fiat Currency at Prime's own risk. Without limiting the foregoing, Prime may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency, subject to Prime's obligation to return Fiat Currency to Customer in accordance with this Service Schedule.

See Custodial Agreement § 2.7(b).

13.    The End-User Agreements also explicitly provided Prime with the ability to invest,

rehypothecate, and move cash or fiat Currency at Prime's sole discretion.  See Dunn Decl., Exhibit

3 (Sample End-User Agreement).  Specifically, the End-User Agreement stated:

> Prime may otherwise use or invest such cash or Fiat Currency at Prime's own risk.  Prime may use such Fiat currency to purchase securities or other assets that it may hold and register in its own name, and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash of Fiat Currency, subject to Prime's obligation to return Fiat Currency to Account Holder in accordance with this Agreement.  Prime may also receive earnings or income from using or investing cash or Fiat Currency and Account Holder agrees that any earnings or income or compensation shall be retained by Prime and no portion of such earning, income or compensation shall be paid to of for Account Holder.

See End-User Agreement, ¶ 1.6(b).

6

## III.    Prime's Prepetition Practices and Currency Procedures

14.    During Prime's peak operations, it was processing over 300,000 transactions a day and held over $3.8 billion in Cryptocurrency and fiat Currency. See Dunn Decl., at ¶ 9; see also *Declaration of Jor Law, Interim Chief Executive Officer and President of Prime Core Technologies Inc., et al., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 14] ¶ 11.   However, as set forth in detail below, Prime utilized omnibus accounts, poor and improper accounting practices, and errant and intentionally corrupted internal recordkeeping, resulting in the Currency being improperly tracked and hopelessly commingled prior to and upon the bankruptcy filing.

### i.    <u>Commingling of Fiat Currency</u>

15.    Prime did not segregate the fiat currency that customers transferred to it in separate bank accounts.  See Brennan Decl. ¶15.  Instead, Prime held the fiat currency in commingled, omnibus bank accounts, most of which was held at BMO Harris Bank, N.A. ("<u>BMO</u>") or Cross River Bank ("<u>CRB</u>").  See <u>id.</u> ¶¶14 & 22.

16.    Moreover, Prime regularly made transfers between its different commingled bank accounts, further commingling Prime's funds generated from its own business operations and what were originally funds transferred to Prime by customers.  See Brennan Decl. ¶15.  For example, Prime used one bank account held with BMO Harris primarily to make wire transfers ("<u>BMO x3077</u>").  See <u>id.</u>, ¶ 22.  Prime regularly transferred funds into BMO x3077 from a different account Prime held with BMO Harris ("<u>BMO x9934</u>") on an as-needed basis to permit Prime to make outgoing wire transfers from BMO x3077.  See <u>id.</u> ¶ 26.  At the end of each day, Prime typically transferred any unused funds remaining in BMO x3077 back to BMO x9934 because BMO x9934 provided a higher rate of interest.  See <u>id</u>

WBD (US) 4888-2608-2279v11

17.     Prime also had a separate account with Cross River Bank which it used to make transfers via automated clearing house ("ACH"). <u>See</u> <u>id.</u>, ¶ 32.  Thus, Prime appears to have used its different bank accounts depending on what type of transfer it needed to make.  <u>See</u> <u>id</u>.  Prime instructed its banks to move funds between different accounts, regardless of the source of the funds, on an as-needed basis to satisfy different wire and ACH transfer obligations.  <u>See</u> <u>id</u>.

18.     There also were some instances where Prime transferred funds between the bank accounts that held commingled funds transferred to Prime from its customers and Prime's own corporate accounts.  <u>See</u> <u>id.</u>, ¶ 19.  Additionally, there were some instances where Prime paid its own corporate expenses directly from the bank accounts that held commingled fiat currency that had been transferred to Prime by its customers.  <u>See</u> <u>id.</u>, ¶ 20.

19.     The only way Prime attempted to track the commingled assets and what it owed each of its customers was by noting the amounts on internal, omnibus ledgers (the "<u>Internal Ledger</u>").  <u>See</u> <u>id.</u> ¶ 16.  However, Prime's internal recordkeeping, including its maintenance of the Internal Ledger, was errantly and later intentionally corrupted.

20.     Further hindering any future reconciliation, key executives of Prime have admitted that Prime intentionally falsified internal records by submitting fake wire transfer entries to create the appearance that fiat currency was coming into Prime, when, in fact, it was not.  <u>See</u> Brennan Decl. ¶ 51.  These fake wire transfer entries were apparently designed to cover up the fact that Prime was using fiat currency provided by certain customers to satisfy crypto debts owed by Prime to other customers.  <u>See</u> <u>id.</u> ¶ 52.

21.     The third-party expert retained by the Debtors in this matter, James P. Brennan, has confirmed that it is virtually impossible to identify or distinguish the assets that Prime's customers

transferred to Prime from assets provided to Prime by other customers or from assets generated from Prime's own business operations.   See Brennan Decl., ¶¶ 71-74.

22.    Moreover, even when Prime had attempted to keep proper records, segregate assets, and maintain wire room controls, it was unable to do so.   Prime maintained substandard reconciliation processes throughout its history, including with respect to its Internal Ledger.  See Brennan Decl., ¶¶ 33-44.  Prime did not perform regular reconciliations of its assets and, at least prior to March 2021, the Debtors only conducted manual reconciliations.   See id. This further hindered the ability of Prime or anyone else to identify or trace funds, including to identify which specific funds were transferred to customers from Prime.  See id.

### ii.    Commingling of Cryptocurrency

23.    Prime, similar to fiat currency, commingled Cryptocurrency.   See generally Brennan Decl., § V.B.  Prime maintained omnibus digital wallets (the "Omnibus Wallets") that commingled Cryptocurrency that had been transferred to Prime from various customers with Cryptocurrency that Prime used for its own corporate operations and purposes.  See id. at ¶ 73. Prime did not maintain separate or segregated digital wallets for the Cryptocurrency that each of its customers had transferred to it.  See id.

24.    Prime maintained its Omnibus Wallets in Prime's vaults ("Vaults") at Fireblocks LLC ("Fireblocks"), a third-party Cryptocurrency security platform.  See id. at ¶ 74.  Prime used Vaults within the Fireblocks infrastructure to organize a myriad of wallets (including the Omnibus Wallets), to implement increased security measures, and to take advantage of efficiencies in transaction policies and other access controls.  See id.  Vaults at Fireblocks were not separated or segregated by digital wallet.  See id.

25.    Customers were assigned unique digital deposit addresses (the "Deposit Addresses") that were not shared with other customers and which the customer could use to send

Cryptocurrency to Prime.  See id. at ¶ 75.  Prime would then periodically conduct sweeps of the Deposit Addresses and transfer the Cryptocurrency contained in the Deposit Addresses into one or more of the shared Omnibus Wallets controlled by Prime.  See id.  This process commingled the Cryptocurrency Prime received from its various customers.  See id.

26.     Prime utilized inconsistent methods for performing deposit sweeps.  See id. at ¶ 76. Prime maintained an application that could trigger the sweep based on certain unknown events occurring.  See id.  Further, an employee could manually perform a sweep at any given time.  See id.

27.     Prime also regularly transferred Cryptocurrency between its multiple Omnibus Wallets, thus further commingling the already commingled Cryptocurrency contained in each of those Omnibus Wallets. See id. at ¶ 77.

28.     Prime tracked the amount of Cryptocurrency that Prime owed to each of its customers via its Internal Ledger. See id. at ¶ 78. When Prime received Cryptocurrency from customer, Prime simply credited that amount on its Internal Ledger.  See id.  The Internal Ledger did not track which specific Omnibus Wallet held the specific Cryptocurrency that a customer initially had transferred to its Deposit Address and, thus, to Prime. See id. at ¶ 79.

29.     When a customer made a request to withdraw Cryptocurrency, Prime would first determine from the Internal Ledger if the customer had previously transferred to Prime sufficient Cryptocurrency to support the withdrawal amount.  See id. at ¶ 82. If the customer had transferred sufficient Cryptocurrency, Prime would then check its multiple Omnibus Wallets to determine which one(s) possessed the requisite amount of Cryptocurrency to satisfy the withdrawal request, regardless of the original source of that Cryptocurrency.  See id.  Prime would then transfer to its customer the amount of Cryptocurrency that had been requested.  See id.  In so doing, Prime did

WBD (US) 4888-2608-2279v11

not use the same Cryptocurrency that the specific customer had transferred to its respective Deposit Address because that Cryptocurrency was not separately tracked and thus could not be identified by Prime.  See id.  Thus, the Cryptocurrency that Prime would transfer to a customer to satisfy a withdrawal request was not the same Cryptocurrency that the customer had originally transferred to Prime.  See id.

30. To demonstrate the extensive commingling of Cryptocurrency that occurred at Prime, the Brennan Declaration discusses and illustrates several examples of commingling taken from transaction, blockchain, and other data.  See id. at § V.C.

31. For example, one of Prime's Omnibus Wallets ending in ~b2ea (the "b2ea Wallet") that was frequently used by Prime received Cryptocurrency from the Deposit Addresses through the periodic sweeps Prime conducted.  See id. at ¶ 85.

32. The Brennan Declaration provides one example of how three separate Integrators sent Cryptocurrency to their respective, unique Deposit Addresses which Prime subsequently swept into the b2ea Wallet:



See id. at ¶ 86.  Just this one example illustrates how Cryptocurrency transferred to Prime from three entirely different entities was commingled in a single Omnibus Wallet.  And that one example was repeated multiple times for this and other Omnibus Wallets.

33.    The Brennan Declaration also discusses how Cryptocurrency that customers had transferred to Prime became further commingled with Cryptocurrency that Prime used for its own business operations.  Again using the b2ea Wallet as the example, Brennan discusses how the b2ea Wallet received Cryptocurrency from a Prime digital wallet (that itself was funded from over 6,000 different digital wallets holding Prime's own Cryptocurrency), resulting in Cryptocurrency which Prime used for its own business operations becoming commingled with the already commingled Cryptocurrency transferred to Prime by its customers.  See id. at ¶ 88.

34.    The Brennan Declaration also discusses and illustrates (see id. at ¶ 90), using the b2ea Wallet as the centerpiece again for the real-world example, how Prime transferred already commingled Cryptocurrency from and between multiple Omnibus Wallets, further compounding the commingling:



35.     The Brennan Declaration also discusses and illustrates (see id. at ¶ 91) what commingling meant in terms of the Cryptocurrency that was transferred out of Prime's Omnibus Wallets.  In sum, it is impossible to determine whether any of the outgoing Cryptocurrency transferred from Prime to a customer to satisfy a withdrawal request included any of the original Cryptocurrency that customer had transferred to Prime because the Cryptocurrency was all commingled.

36.     The below illustration shows that while the b2ea Wallet received crypto from GTH and Prime's "PT Segregated Assets" wallet, the crypto it sent out was to satisfy withdrawal requests from two completely different Prime customers, DV Chain and Abra.  See id. at ¶ 90. Those outgoing crypto transfers may have included some or none of the crypto originally transferred to Prime by GTH, or from any of the myriad of other customers whose crypto also was swept into, or transferred into, this Omnibus Wallet.  See id. at ¶ 91.  In sum, it is impossible to determine whether any of the outgoing crypto included any of the original crypto GTH transferred to Prime because the crypto in the b2ea Wallet is so commingled.  See id. at ¶ 91.



37.     The Brennan Declaration also describes the ETH that Prime transferred to Abra after it discovered the issues with the 98f Wallet.  See id. at ¶ 97.  Prime made these ETH transfers through the b2ea Wallet, which, as noted above, contained Cryptocurrency commingled from multiple sources, as reflected below.  See id. at ¶ 98:

13



The ETH that Abra had initially transferred to Prime was (and still is to this day) locked away in the 98f Wallet.  See id. at ¶ 98.  Thus, it is indisputable that the ETH that Prime transferred to Abra to satisfy Abra's withdrawal requests could not be the same ETH that Abra had originally transferred to Prime.  See id.

38.    Prime swept Cryptocurrency from the Deposit Addresses into shared Omnibus Wallets to pool Cryptocurrency together to create and recognize certain efficiencies.  See id. at ¶ 99.

39.    For example, the pooling of Cryptocurrency allowed Prime and its customers to bypass and save on various gas fees[5] it would incur by conducting transactions on the blockchain. See id. at ¶ 100.  Specifically, for Cryptocurrency transfers within a single Prime Vault at Fireblocks, Prime could simply move the funds around on its Internal Ledger and avoid conducting any transactions on the blockchain which would otherwise incur gas fees.  See id. at ¶ 101. Moreover, when Prime did conduct on-chain transactions, it could reduce gas fees by pooling transactions and performing them during off-peak hours when the blockchain network was less congested. See id. at ¶ 103.  Thus, by pooling Cryptocurrency in shared Omnibus Wallets in Prime Vaults at Fireblocks, Prime was able to conduct bulk transactions for the purpose of incurring reduced gas fees.  See id.

---

[5]    Transactions occurring on the blockchain incur fees.  On the Ethereum blockchain, these are referred to as "gas fees".  Gas fees refer to the costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain.  In other words, they are fees charged by the blockchain itself for successfully completing a transaction.  See Brennan Decl. at ¶ 70.

40.     To help account for the gas fees Prime did incur, Prime set up additional digital wallets it referred to collectively as the "Gas Stations".  See id. at ¶ 104.  Prime funded the Gas Stations from various of its other wallets (including the Omnibus Wallets) and used the Gas Stations to pay gas fees when Prime conducted on-chain transactions.  See id.  Prime used a variety of sources to fund the Gas Stations, which resulted in Prime further commingling the Cryptocurrency transferred to it by its various customers and Prime further commingling the Cryptocurrency transferred to it by its various customers with Prime's own Cryptocurrency.

41.     As demonstrated below, funding sources for the Gas Stations (represented by orange nodes) included Prime's Omnibus Wallets (represented by the green-colored nodes) and several external digital addresses completely outside of Prime's ecosystem (represented by the blue-colored nodes):



42.     Because Prime records also contained inconsistent labels for the digital wallets it used to source the Gas Stations, the attribution and the sources of funding for the Gas Stations is further obfuscated.  See id. at ¶ 109.

43.     Prime's own internal data presents conflicting information regarding how certain wallet addresses were attributed to different entities.  See id.

44.     Prime communications also reflect instances where Prime operations personnel used fiat from one of Prime's commingled bank accounts to purchase Cryptocurrency to refill the Gas Stations.  See id. at ¶ 116.

45.     Similar to Prime's handling of fiat, Prime also did not conduct regular or timely reconciliations to compare the Cryptocurrency recorded in its Internal Ledger with the Cryptocurrency that Prime actually held in its Omnibus Wallets.  See id. at ¶ 81.

46.     All Cryptocurrency of value held by Prime is in Prime's Vaults with Fireblocks, and none of that Cryptocurrency has clear ownership provenance.  See id. at ¶ 124-125.  Because of the commingling and poor reconciliations processes described above and confirmed in the Brennan Declaration, it is impossible to specifically identify, trace, or segregate Cryptocurrency that specific customers transferred to Prime from Cryptocurrency provided by other customers or Cryptocurrency generated from Prime's business operations. See id

## IV.    Plan Confirmation and Establishment of the Wind-Down Debtor and Plan Administrator

47.     On October 5, 2023, the Debtors filed the *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with Respect to the Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 259].  On December 14, 2023, the Debtors filed the Plan, which was confirmed on December 21, 2023 with the entry of the *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code*

16

[Docket No. 644] (the "<u>Confirmation Order</u>").  The Plan became effective on January 5, 2024 (the

"<u>Effective Date</u>").  <u>See</u> Docket No. 694.

48.    Pursuant to the Plan, on the Effective Date, the Wind-Down Debtor was formed,

and each of the Debtors transferred "the Wind-Down Debtor Assets to the Wind-Down Debtor for

distribution in accordance with the terms of the Plan and the Plan Supplement."  Plan, Art. 6.10(a);

<u>see also</u> Plan, Art. 6.10(b) (Wind-Down Debtor Assets automatically vest in Wind-Down Debtor

free and clear of all Claims, Liens, and other interests.).[6]

49.    Pursuant to the Plan, the Plan Administrator is the manager of the Wind-Down

Debtor, vested with the powers of a debtor in possession and trustee under sections 1107,

1123(b)(3), 704, and 1106 of the Bankruptcy Code and is authorized to implement the Plan.  <u>See</u>

Plan, Art.6.10(a), (c), (d), Art. 8.7; <u>see also</u> Confirmation Order, ¶¶ Q(d), 8.[7]

50.    The Plan provides for four classes of general unsecured Claims—Class 3A (Prime

Core General Unsecured Claims), Class 3B (Prime General Unsecured Claims), Class 3C (Prime

IRA General Unsecured Claims), and Class 3D (Prime Digital General Unsecured Claims).[8]  <u>See</u>

Plan, Art. 4.4-4.7.  For each of these Class 3 General Unsecured Claims, Holders of Allowed

Claims are entitled to receive, following satisfaction of the DIP Claims[9], their *pro rata* share of

---

[6]    The Wind-Down Debtor is a successor to the Debtors' rights, title and interest to the Wind-Down Debtor Assets, which are defined in the Plan to include "all of the Debtors' Assets remaining in and/or transferred to, and vesting in, the Wind-Down Debtor pursuant to the Plan Administrator Agreement, which shall include, without limitation, (a) except as otherwise may be provided for in a Plan Supplement document, all Cash and Cryptocurrency, including the Wind-Down Reserve and the Cryptocurrency in the 98f Wallet; . . . ." Plan, Art. 1.186, 6.10(a).

[7]    The Wind-Down Debtor is also "subject to the oversight of the Wind-Down Debtor Oversight Committee and, as applicable, the Majority Member." Plan, Art. 6.10(a).

[8]    The Plan also created the Class 4 Convenience Class, whereby a Holder of a Claim in either Class 3A, 3B, 3C or 3D scheduled or filed in an amount less than or equal to $300.00, can elect Convenience Class treatment where they are entitled to payment, in Cash, in an amount equal to 70% of the lesser of the (i) Allowed amount of their filed Claim; or (ii) $300.00 (*i.e.*, where a Holder of a Claim in either Class 3A, 3B, 3C or 3D has an allowed claim and elects Convenience Class treatment, thereby reducing the allowed portion of their Claim to $300.00). *See* Plan, Art. 1.39, 1.40, 4.8(b).  Payment of Convenience Class Claims is to be paid from the Wind-Down Debtor Assets attributable to the applicable Debtor. *See id.*

[9]    "DIP Claims" means any and all Claims of the DIP Lender, Polaris Ventures, arising under the DIP Order [Docket No. 631].

either (i) the Cash Allocation;[10] or (ii) the Cryptocurrency Allocation—in each case as the allocation is attributable to the Debtor against which the Claim is Allowed[11] and subject to Article 7.6 of the Plan.  See Plan, Art. 4.4(b), 4.5(b), 4.6(b), 4.7(b).

51.    Article 7.6 of the Plan relates to the dollarization of Account Holder's Claims. Specifically, Article 7.6 provides that "each Account Holder's Claim is determined by the fair market value of the Cryptocurrency (based in United States dollars pursuant to the Cryptocurrency Conversion Table) held by the Account Holder at the Debtors as of the Petition Date at 11:59 p.m. UTC."  Plan, Art. 7.6.

52.    The Debtors filed the Cryptocurrency Conversion Table with the Plan Supplement during the Confirmation process.   Accordingly, the Cryptocurrency Conversion Table was approved as part of the Plan and Confirmation Order and establishes the appropriate rates for conversion of the Cryptocurrency into U.S. dollars as of the Petition Date.  See Plan, Art. 1.45; Plan Supplement, Exh. I.[12]  Given that Account Holders asserted Claims against the Debtors based on various Cryptocurrency tokens, the dollarization of its Integrators and/or End-Users Claims enables all Claims to be valued in U.S. dollars for purposes of distribution under the Bankruptcy Code.  See Plan, Art. 7.6.

---

[10]    "Cash Allocation" is defined in the Plan as "all Cash at the Wind-Down Debtor and all Cash proceeds of Wind-Down Debtor Assets, net of (a) the Wind-Down Reserve; and (b) distributions on account of (i) Allowed Administrative Expense Claims; (ii) Allowed Secured Tax Claims; (iii) Allowed Other Secured Claims; and (iv) Allowed Other Priority Claims."  Plan, Art. 1.27.

[11]    If any portion of the Cash Allocation or Cryptocurrency Allocation attributable to a specific Debtor remains after Holders of Class 3 Claims against such Debtor receive payment in full, any such residual Cash Allocation or Cryptocurrency Allocation is to be added to the Cash Allocation and/or Cryptocurrency Allocation available to satisfy Allowed Class 3 Claims against the other Debtors.  See Plan, Art. 4.4(e), 4.5(e), 4.6(e), 4.7(e).

[12]    The Cryptocurrency Conversion Table attached to the Plan Supplement was missing six Cryptocurrency tokens held by the Debtors on the Petition Date.  Those additional Cryptocurrency tokens and their U.S. dollar conversion value as of the Petition Date are listed in the amended Cryptocurrency Conversion Table attached to the Dunn Declaration as Exhibit 4 and to the Proposed Order as Exhibit 2. (the "Amended Cryptocurrency Conversion Table").

53.     Article 7.6 of the Plan also discusses whether distributions on account of Allowed Class 3 Claims will be in kind in Cryptocurrency or in Cash and provides that "the Wind-Down Debtor shall liquidate Cryptocurrency solely to the extent it determines, within its reasonable business judgment, that such liquidation is reasonable and necessary to make payments in Cash as otherwise required under the Plan."  Plan, Art. 7.6.

54.     As set forth in more detail below, the Plan Administrator has determined that liquidation of the Cryptocurrency and distributions in USD is in the best interest of all creditors.

## V.     Claims Reconciliation Process

55.     On September 20, 2023, the Court entered the *Order (I) Establishing Bar Dates to File Proofs of Claim; (II) Approving Form and Manner for Filing Proofs of Claim; (III) Approving Form and Manner of Notice of Bar Dates; and (IV) Granting Related Relief* [Docket No. 169] (the "Bar Date Order").  The Bar Date Order established, among other deadlines, (i) October 22, 2023 as the deadline for each person or entity other than governmental units to file (a) proofs of prepetition Claims, including administrative expense Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code (the "General Bar Date"), and (b) proofs of administrative expense Claims arising on or after the Petition Date through September 15, 2023 (the "Administrative Bar Date"); and (ii) February 10, 2024 as the last date for governmental units to file proofs of claim that arose before the Petition Date (the "Governmental Bar Date").

56.     On September 22, 2023, the Debtors filed notices of the General Bar Date, Administrative Bar Date and Governmental Bar Date [Docket Nos. 185, 186].

57.     On September 26, 2023, the Debtors published notice of the General Bar Date, Administrative Bar Date and Governmental Bar Date in the National Edition of *The New York Times* in the form approved by the Bar Date Order. *See Affidavit of Publication of the Notice of Bar Dates for Filing Proofs of Claim in* The New York Times [Docket No. 199].

19

58.     To date, (i) 1,839 unsecured Claims have been filed against the Debtors in the aggregate amount of over $62.9 billion (of which 538 Claims are unliquidated); and (ii) 804 Claims have been filed against the Debtors with a claim amount asserted in Cryptocurrency.

59.     On September 22, 2023, the Debtors filed their *Schedules of Asset and Liabilities* [Docket Nos. 175-78] (collectively, the "Schedules") and *Statements of Financial Affairs* [Docket Nos. 179-82]. As part of their Schedules, the Debtors scheduled 46,594 unsecured Claims in the aggregate amount of $154 million that were not contingent, unliquidated or disputed, which included 81 Claims on account of Account Holders [Docket No. 442].

60.     Thus far, the Debtors and the Plan Administrator have filed six omnibus objections to Claims [Docket Nos. 436, 438, 761, 762, 763, 799] (redacted omnibus claim objections); [Docket Nos. 640, 643, 677, 786, 787, 811, 818] (orders sustaining omnibus Claims objections). These omnibus objections, as sustained by the Court, reconciled 798 Claims asserted against the Debtors' estates decreasing the Claims pool against the Debtors' estates by $66.7 million.

**VI.     Establishment of a Disputed Claims Reserve as Needed**

61.     Despite these efforts, the Plan Administrator anticipates the need to file substantially more claim objections to ensure that each of the Debtors' creditors are afforded the proper *pro rata* distribution.

62.     Accordingly, on October 8, 2024, the Plan Administrator filed its *Motion for Entry of an Order (I) Granting Leave From Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections and (II) Granting Related Relief* [Docket No. 880] (the "Claim Objection Procedures Motion"), seeking relief from certain of the Local Rules' requirements for omnibus objections to Claims to streamline the process for filing the Plan Administrator's remaining objections to Claims in order to expedite a distribution.  On October 25, 2024, the Court entered

20

an order approving Claim Objection Procedures Motion [Docket No. 895] (the "Claims Objection Procedures Order").

63.     Following the resolution of this Motion and the issues presented herein, the Plan Administrator intends to file its remaining Claim objections in an expeditious manner.  However, given the magnitude of objections that remain, the Plan Administrator believes it may be necessary to establish a reserve to ensure distributions for disputed claims (the "Disputed Claims Reserve") prior to make distributions so that creditors can receive a distribution more quickly.

64.     The Plan and Plan Administrator Agreement authorize the Plan Administrator to establish a Disputed Claims Reserve.  See Plan, Art. 6.10(d)(xx), Plan Administrator Agreement, §§ 3.3.18, 4.1.  The Plan Administrator is also tasked with filing a notice of distribution record date.   Accordingly, the Plan Administrator proposes to file, at least 30 days before distributions commence, a notice setting forth (i) the distribution record date and (ii) if necessary, the establishment of a disputed claims reserve and a list of disputed claims covered by such reserve (the "Distribution Notice").  The Distribution Notice shall be served on all Holders of Claims that have not been disallowed via email (or first class mail where no email is available).  It shall provide that claimants subject to any Disputed Claims Reserve will have an opportunity to respond and object.  The Plan Administrator will attempt to resolve any responses and if unable to do so, will seek a Court hearing to resolve the objection.

## VII.    Proposed Distribution Procedures

65.     As set forth in detail below, the Plan Administrator has broad authority under applicable law, the Plan and the Plan Administrator Agreement to take all necessary actions to make distributions.  To aid in ensuring that the distribution process is prompt and efficient, the Plan Administrator seeks entry of an order establishing procedures that will assist with the distribution process.  Specifically, the Plan Administrator seeks to establish procedures for: (i) the

marketing and liquidation of the Cryptocurrency, (ii) collection of W9 tax withholding information from U.S. creditors, (iii) collection of know-your-client ("KYC") information from foreign creditors to ensure that the distributions do not violate the U.S. Treasury Department's Office of Foreign Assets Control's ("OFAC") economic and trade sanctions, and (iv) commencement of distributions via check, wire, or ACH.

66.    The specific proposed procedures (the "Distribution Procedures") are as follows:

| Procedure | Description |
|---|---|
| Marketing and Liquidation of Cryptocurrency<br><br>See Plan, Art. 7.6 | The Plan Administrator shall contact no less than three (3) Cryptocurrency liquidity providers in solicitation of offers for the marketing and liquidation of the Debtors' entire Cryptocurrency portfolio.<br><br>Following solicitation of offers, the Plan Administrator will liquidate the Cryptocurrency portfolio and place the U.S. Dollar proceeds in an interest-bearing account. |
| Tax Withholding Information<br><br><br><br><br><br>See Plan, Art. 6.18(b); 7.4 | Holders of Allowed Claims with Email Address on File:<br><br>Will receive a unique code and instructions via email and repeated contact 75 days and 140 days later with the same information. The correspondence will include instructions to upload requested W9 and KYC information, as applicable, to the Plan Administrator's Wind-Down Website.<br><br>Holders of Allowed Claims with Only a Physical Address on File:<br><br>Will receive a unique code and instructions via first class mail and repeated contact 75 days and 140 days later with the same information. The correspondence with include instructions to upload requested W9 and KYC information, as applicable, to the Plan Administrator's Wind-Down Website.<br><br>Holders of Allowed Claims that do not submit the requested tax information to the Plan Administrator's Wind-Down Website on the 151st day will be forever barred from receiving a distribution. |
| Establishment of Disputed Claims Reserve | The Plan Administrator will file, at least 30 days before distributions commence, a notice setting forth (i) the distribution record date (discussed below) and (ii) if necessary, |

22

| | |
|---|---|
| See Plan, Art. 6.10(d)(xx) | the establishment of a disputed claims reserve and a list of disputed claims covered by such reserve (the "Distribution Notice"). |
| | The Distribution Notice shall be served on all Holders of Allowed Claims via email (or first class mail where no email is available). It shall provide that claimants subject to any disputed claims reserve will have an opportunity to respond and object. The Plan Administrator will attempt to resolve any responses and if unable to do so, will seek a Court hearing to resolve the objection. |
| Distribution Cap<br><br>See Plan, Art. 7.3(e) | Any Holder of an Allowed Claim where their distribution would be less than $10.00 will not receive a distribution |
| Distribution Record Date<br><br>See Plan, Art. 7.3(c) | The Plan Administrator shall file on the docket the Distribution Notice which includes the distribution record date at least 30 days before distributions commence and such notice shall be served on all Holders of Allowed Claims via email. |
| Distributions<br><br>See Plan, Art. 7.3(g) | The Plan Administrator shall commence distributions to Holders of Allowed Claims by check, ACH, or wire, in its sole discretion, on Allowed Claims in U.S. Dollars.<br><br>The Plan Administrator reserves the right to provide End-User Distributions to Integrators who are authorized by agreement between the End-User and the Integrator to act on behalf of the End-User. |
| Undeliverable Distributions<br><br>See Plan, Art. 7.3(f); Confirmation Order, ¶ 33 | In the event that either a distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Distribution Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in such property shall not be entitled to any distributions under the Plan. |

WBD (US) 4888-2608-2279v11

**RELIEF REQUESTED**

67.    The Plan Administrator seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) approving the Plan Administrator's determination that the Debtors' Currency is property of the Debtors' estates; (ii) approving the Distribution Procedures, including liquidation and distributions of estate property to Holders of Allowed Claims; (iii) establishing procedures for setting a Disputed Claims Reserve; and (iv) granting related relief.

**BASIS FOR RELIEF**

**I.    All Currency is Property of the Estate**

68.    Section 105(a) of the Bankruptcy Code provides bankruptcy courts with broad equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  Similarly, section 1142 of the Bankruptcy Code provides that "the debtor and any entity organized . . . for the purpose of carrying out the plan shall carry out the Plan and shall comply with any orders of the court," 11 U.S.C. § 1142(a), and that the court may direct any necessary party to perform any other act necessary for the consummation of the plan.  See id., § 1142(b).  Further, Bankruptcy Rule 3021 provides that "after a plan is confirmed, distribution shall be made to creditors whose Claims have been allowed."  Fed. R. Bankr. P. 3021.

69.    The Plan, Confirmation Order, and Plan Administrator Agreement do not require the Plan Administrator to obtain Court approval prior to making distributions.  Article 12 of the Plan and paragraphs OO and 46 of the Confirmation Order, however, give the Court expansive jurisdiction post-confirmation to grant the relief requested in this Motion.  While such distributions are chiefly among the Plan Administrator's duties and are typically made without Court approval, the Confirmation Order requires a further Court Order in order for the Wind-Down Debtor to "use

24

or transfer funds . . . from Customer Accounts to honor any prepetition obligations or pay any postpetition obligations . . . ."  See Confirmation Order, ⁋ 38.  Furthermore, the Confirmation Order also does not authorize the Plan Administrator to transfer or distribute any Non-Estate Assets or include such assets in the Cash or Cryptocurrency Allocation until a "final determination by the Debtors, the Wind-Down Debtors or the Bankruptcy Court, as applicable, in accordance with the Account Treatment Procedures" that such assets are property of the Debtors' estates.  See Confirmation Order, ⁋ 36.

70.     Accordingly, the Plan Administrator seeks entry of an order determining that the Currency is property of the Debtors' estates prior to commencing distributions.  As set forth below, there is ample legal and factual support for such a finding.

A.     **The Bankruptcy Code Presumes that Property Held by a Debtor on the Petition Date is Property of the Estate**

71.     All property held by a debtor at the time of the filing is presumed to be property of the estate.  See In re Amp'd Mobile, Inc., 377 B.R. 478, 483 (Bankr. D. Del. 2007) ("Property held by a debtor is presumed to be property of the estate . . . ."); In re Catholic Diocese of Wilmington, Inc., 432 B.R. 135, 147 (Bankr. D. Del. 2010) (finding that, where pooled investment account was held solely in debtor's name, such account funds were estate property, unless, alleged trust beneficiaries could establish account held traceable trust funds); Skilled Nursing Professional Services, A Division of Skilled Nursing Home Care, Inc. v. Sacred Heart Hosp. of Norristown (In re Sacred Heart Hospital of Norristown), 175 B.R. 543, 555 (Bankr. E.D. Pa. 1994) (noting a presumption runs in favor of the debtor "that the Receivables belong to the Debtor and are properly included in its estate"); Danning v. Bozek (In re Bullion Reserve of North America), 836 F.2d 1214, 1217 (9th Cir. 1988) (finding that  money held in a bank account under the debtor's control presumptively constitutes property of the debtor's estate, because it represents funds that can be

25

used to pay creditors of the estate).  Moreover, "unrelated commercial entities are presumed by the Court to be in a debtor-creditor relationship, rather than a fiduciary relationship, absent evidence that the parties intended a more substantial relationship." See In re Amp'd Mobile, 377 B.R. at 483.  To this end, an aggrieved creditor bears the burden to establish a more substantial relationship existed.  See id. at 485 ([the purported trust beneficiary] must "establish a fiduciary or conduit relationship . . . ."); see also Waldman v. Maini, 124 Nev. 1121, 1131 (2008) (In Nevada, imposition of a constructive trust requires, among other factors "[that] a confidential relationship exists between the parties . . . .").

72.    Beyond this presumption, Bankruptcy courts have the inherent power to determine if a particular asset constitutes property of the bankruptcy estate:

> As one bankruptcy court stated, the determination of what constitutes property of the bankruptcy estate is inherently an issue to be determined by the bankruptcy court. Another bankruptcy court rightly indicated that, . . . the bankruptcy court always has jurisdiction to determine what is, or is not, property of the bankruptcy estate under 11 U.S.C. § 541. Furthermore, various courts have concluded that matters requiring a declaration of whether a certain asset comes within the definition of property of the estate, as set forth in section 541 of the Bankruptcy Code, are core proceedings.

In re Affirmative Ins. Holdings, Inc., 565 B.R. 566, 583 (Bankr. D. Del. 2017) (internal quotations and citations omitted).

73.    Section 541(d) of the Bankruptcy Code further addresses what constitutes property of the estate in the context of legal interest in property versus an equitable interest in property. Specifically, section 541(d) provides:

> [p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

26

11 U.S.C. § 541(d).  Section 541(d) has often been applied to a debtor's interest in assets held by the debtor in a trust, where the debtor holds legal title to the assets but not an equitable interest in the assets.  In such cases, courts have held that trust assets are not property of the debtor's estate.  See, e.g., Begier v. Internal Revenue Service, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); U.S. v. Whiting Pools, Inc., 462 U.S. 198, 205 n. 10 (1983) (noting that "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition" from the bankruptcy estate).

B.      **Prime Had a Debtor-Creditor Relationship With its Customers – Not a Trust Relationship**

74.      The Plan Administrator anticipates certain creditors may argue that the Currency is not estate property but rather property that was held by the Debtors in trust for the benefit of such customer.  After an exhaustive investigation, the Plan Administrator has determined that is not the case based on fact and law.

75.      To establish rights as a trust beneficiary, a customer bears the burden of proving both: (1) the existence and legal source of the trust relationship; and (2) the identity of the specific funds or property allegedly held in trust and, if those assets have been commingled with other assets, that the customer's specific assets can be traced.  See City of Farrell v. Sharon Steel Corp., 41 F.3d 92, 95 (3d Cir. 1994); see also Goldberg v. New Jersey Lawyers' Fund for Client Protection, 932 F.2d 273, 280 (3d Cir. 1991) (same); Old Rep. Nat'l Title Ins. Co. v. Tyler (In re Dameron), 155 F.3d 718, 723 (4th Cir. 1998) (party claiming entitlement to a trust ordinarily must be able to trace its assets into the fund or property that is the subject of the trust); Bullion Reserve of North America, 836 F.2d at 1218 (tracing is required under federal bankruptcy law to further the Bankruptcy Code's policy of equal distribution among similarly situated creditors); In re

Catholic Diocese of Wilmington, 432 B.R. at 147.  Whereas the first showing is generally a question of state law, the second showing, when it pertains to the distribution of assets from an entity in federal bankruptcy proceedings, is exclusively a question of federal law.  See Goldberg, 932 F.2d at 280 (quoting Connecticut General Life Ins. Co. v. Universal Ins. Co., 838 F.2d 612, 618-19 (1st Cir. 1988)); see also Official Comm. v. Columbia Gas Systems Inc. (In re Columbia Gas Systems Inc.), 997 F.2d 1039, 1063 (3d Cir. 1993) (to protect interests of secured and unsecured creditors, federal law requires that beneficiaries of trust funds bear the burden of identifying and tracing trust property); Dameron, 155 F.3d at 723 (tracing is an issue of federal rather than state law).

76.    The Agreements between Prime and its customers are clear that no fiduciary relationship existed (so no trust relationship existed).  Specifically, as previously explained, the Agreements explicitly stated that no such fiduciary relationship existed or was intended to exist between the parties, permitted Prime to hold fiat currency transferred to Prime by customers in accounts in Prime's own name, and/or permitted Prime to re-invest, pledge, repledge, hypothecate, and utilize the fiat currency transferred to Prime in Prime's absolute discretion.  Accordingly, Prime's customers should have known that no trust or fiduciary relationship was ever established between them and Prime.

### C.    Even if a Trust Relationship Did Exist, the Currency is Commingled and Cannot be Traced

77.    For the reasons already stated, neither Integrators nor End-Users can show that a trust relationship was legally created or intended by the parties here.  However, even if such an alleged relationship did exist (and it did not), Prime's Integrators and End-Users would not be able to prove the second requirement for establishing a fiduciary or trust exception to the presumption that all creditor assets in the Debtors' possession at the time of the filing are property of the estate:

28

*i.e.*, that each creditor's assets can be separately identified and specifically traced. Prime's creditors cannot prove this second requirement because the Cryptocurrency at Prime was hopelessly commingled and cannot be traced. Therefore, the Currency must be distributed on a pro rata basis to all creditors.

78.    Even if a trust relationship existed and could be established, a trust beneficiary still has the burden to identify its specific trust property or trust funds and, if commingled with other assets, to trace its particular property or funds. Where purported trust funds have been commingled with other funds in an account held by an alleged trustee, the mere showing that the purported trust funds were deposited into the trustee's commingled account is not sufficient to establish an exception to the presumption that assets are property of the estate. See First Federal of Michigan v. Barrow, 878 F.2d 912, 915 (6th Cir. 1989) (beneficiaries must trace trust funds beyond deposits into debtor's central account). Instead, the purported beneficiaries must trace the specific property allegedly held in trust. See United States v. Henshaw, 388 F.3d 738 (10th Cir. 2004) ("the district court properly turned to equitable tracing principles, which are means 'used by courts in many different areas of law to identify and segregate property that has been mingled with other property in such a manner that it has lost its identity.'"); In re Schick, 234 B.R. 337, 343–44 (Bankr. S.D.N.Y. 1999) ("The burden then shifts to the defendant (1) to show that the debtor held only legal title and (2) ***to trace the equitable owner's interest to the specific property at issue***." (emphasis added)); Connecticut General Life Ins., 838 F.2d at 620 (the "point of tracing is to follow the *particular* entrusted assets, not simply to identify *some* assets") (emphasis in original). There can be no recovery "where all that can be shown is enrichment of the trustee. [The trust property] must be clearly traced and identified in specific property. It is insufficient to show that

29

trust property went into the general estate and increased the amount and value thereof." Id. at 619

(quoting In re United Cigar Stores Co., 70 F.2d 313, 316 (2d Cir. 1934)).

79.    In the Third Circuit, a purported trust beneficiary must identify specific trust

property or trust funds and, if the funds have been commingled with non-trust property, trace its

specific trust property. See, e.g., In re Green Field Energy Services, Inc., 585 B.R. 89, 105 (Bankr.

D.Del. 2018) ("While the Third Circuit has not formally adopted a procedure to trace commingled

funds, the lowest intermediate balance test ("LIBT") has routinely been applied by the Court and

other federal courts around the country."); In re Catholic Diocese of Wilmington, 432 B.R. at 150-

51 (applying LIBT):[13]

> In cases where the trust property has been commingled, courts
> resolve the issue with reference to the so-called "lowest intermediate
> balance" rule, which is grounded in the fiction that, when faced with
> the need to withdraw funds from a commingled account, the trustee
> withdraws non-trust funds first, thus maintaining as much of the
> trust's funds as possible.  Hence, pursuant to the lowest intermediate
> balance rule, if the amount on deposit in the commingled fund has
> at all times equaled or exceeded the amount of the trust, the trust's
> funds will be returned in their full amount. Conversely, if the
> commingled fund has been depleted entirely, the trust is considered
> lost.  Finally, if the commingled fund has been reduced "below the
> level of the trust fund but not depleted, the claimant is entitled to the
> lowest intermediate balance in the account."  In no case is the trust
> permitted to be replenished by deposits made subsequent to the
> lowest intermediate balance.

In re Catholic Diocese of Wilmington, 432 B.R. at 151 (quoting In re Dameron, 155 F.3d at 724

(internal citations omitted)); see also Columbia Gas Systems, 997 F.2d at 1063-64 ("The lowest

intermediate balance rule, a legal construct, allows trust beneficiaries to assume that trust funds

are withdrawn last from a commingled account. Once trust money is removed, however, it is not

---

[13]    In City of Farrell v. Sharon Steel Corp., 41 F.3d 92 (3d Cir. 1994), the Third Circuit applied the nexus test
for the identification and tracing of trust property related to city income trust fund taxes.  The Delaware Bankruptcy
Court in In re Catholic Diocese of Wilmington, however, limited the Sharon Steel Corp. decision applying the nexus
test, instead of the LIBT, to the facts of the case.  See 432 B.R. at 150-51.

WBD (US) 4888-2608-2279v11

replenished by subsequent deposits. Therefore, the lowest intermediate balance in a commingled account represents trust funds that have never been dissipated and which are reasonably identifiable.").

80.     Here, Prime's creditors cannot identify any specific trust property or trust funds held by the Debtors.  The Debtors held Currency that had been transferred to them from customers in omnibus bank accounts in Prime's own name (for fiat currency) and in Omnibus Wallets contained in Prime's Vaults with Fireblocks (for Cryptocurrency).  Prime routinely swept Currency from one omnibus, commingled account to other omnibus, commingled accounts without regard to the source, and the Internal Ledger that was improperly maintained, inadequately reconciled, and ultimately falsified was Prime's only attempt at tracking such transfers and customer balances.  See Brennan Decl., at ¶ 82.

81.     Fiat Currency that was transferred to Prime was custodied in omnibus bank accounts, and commingled with fiat Currency deposited from various other Prime customers and fiat Currency generated from Prime's own business operations.  See Brennan Decl., at ¶ 15. Prime's records demonstrate that, pre-petition, Prime repeatedly moved funds between the different omnibus bank accounts that were used to hold the fiat Currency transferred to Prime by customers as well as Prime's own funds.  See id., at ¶ 19.  The records also show that Prime paid certain of its corporate expenses directly from bank accounts that also held fiat currency transferred to Prime by customers.  See id., ¶ 20.

82.     As to Cryptocurrency, as set forth in the Brennan Declaration, Prime would move Cryptocurrency from the Deposit Addresses provided to Prime's customers into one or more of Prime's commingled, Omnibus Wallets contained in Prime's Vaults with Fireblocks, where it was further commingled with crypto that Prime used for its own corporate operations and purposes.

31

See Brennan Decl., at ¶ 73.  Prime also regularly transferred Cryptocurrency between its Omnibus Wallets, further commingling the Cryptocurrency.  See Brennan Decl., at ¶ 77.

83.    Integrators and End-Users simply cannot trace, either generally or specifically, the commingled Currency.  Because the Currency was commingled in omnibus bank accounts and Omnibus Wallets and is not separately identifiable, tracing is impossible.  Such tracing is also impossible because Prime's Internal Ledger was poorly maintained and ultimately falsified. Simply put, Prime's records cannot be relied on for any purpose much less to identify and trace where any Currency originally came from or was subsequently transferred.

84.    It is impossible to identify a specific Cryptocurrency that was owned and transferred by a specific customer to Prime once there is commingling—the tokens are fungible, just like fiat currency, and do not have identifying characteristics.  See Brennan Decl., at ¶ 71. Even though Bitcoin employs the Unspent Transaction Output ("UTXO") model, which allows for identification of certain Bitcoin involved in a transaction, the practicalities of how UTXOs are created, coupled with, among other things, the volume of Bitcoin at Prime, renders it impossible to trace specific Bitcoin currently held by Prime to any specific Bitcoin that a specific customer had transferred to Prime.  See id.

85.    Because Prime creditors are unable to separately identify and specifically trace any trust asset that was held for their benefit, they cannot meet their burden of proof of establishing a fiduciary or trust exception to the presumption that all such assets in the Debtors' possession at the time of the filing are property of the estates.  Therefore, all of the Debtors' USD and Cryptocurrency assets are property of the Debtors' estates and subject to liquidation and distribution pursuant to the Distribution Procedures and Plan on a *pro rata* basis to all Holders of Allowed Claims against the Debtors pursuant to the Plan.

WBD (US) 4888-2608-2279v11

**VIII.    The Distribution Procedures and Liquidation of the Cryptocurrency to USD for Purposes of Distribution is Appropriate**

86.    As noted above, Article 7.6 of the Plan addresses whether distributions on account of Allowed Class 3 Claims will be in kind in Cryptocurrency or in Cash and provides the determination for such to the Plan Administrator.  See Plan, Art. 7.6.  The Plan Administrator conducted an extensive investigation with respect to the best method to distribute the Cryptocurrency to creditors on account of Allowed Claims.  Ultimately, the cost and time required to make in kind distributions outweigh any benefit to creditors and accordingly, liquidating the Cryptocurrency and distributing in USD is the best path forward.

87.    Specifically, as set forth in the Dunn Declaration, the length of time and process by which it would take to complete in-kind distributions is extremely challenging.  First, the Debtors no longer maintain the appropriate licensure and systems to transfer any form of Currency to creditors.  The Debtors would thus need to partner with a crypto exchange service with respect to in-kind crypto distributions.  Accordingly, the Plan Administrator reached out to several potential partners in anticipation of beginning distributions.  The distribution partners who have assisted with other bankruptcy cases declined to participate in this case due to the relatively small amount of Cryptocurrency and creditors in comparison with other cryptocurrency bankruptcy cases. See Dunn Decl., at ¶ 11.  The Plan Administrator did locate one potential distribution partner, however, the costs associated with collecting the KYC information for in-kind distributions was projected to be substantially higher than the cost of the KYC collection needed for an ordinary USD transfer – a cost that would necessarily be borne by the creditors.  See id.  The KYC would be compounded by the cost of the Cryptocurrency transaction fees associated with in-kind distributions.  See id. Adding to these difficulties, as discussed above, there exists a shortfall of Currency for creditors. Due to the commingling and fraudulent Internal Ledger, the portfolio does not hold the types and

33

amount of Cryptocurrency necessary to make full, in-kind distributions to all creditors.  See id.
Accordingly, creditors would incur the costs of multiple rounds of Cryptocurrency transaction fees
in order to consolidate and liquidate the remaining Cryptocurrency.  See id.

88.     Due to the difficulty of a crypto exchange partner and KYC collection, the Plan
Administrator estimates it would take another year and a half to begin distributions to creditors in
cryptocurrency.  See id. at ¶ 12. Similar in-kind distributions following a bankruptcy case have
resulted in years long delays concluding in litigation. See Celsius Network LLC, et al., Case No.
22-10964 (MG), Docket No. 4911 (Bankr. S.D.N.Y June 3, 2024) (motion filed by certain creditors
seeking additional distribution to account for cryptocurrency distribution delays and other issues).
By comparison, the Plan Administrator estimates that following the bulk liquidation of Prime's
Cryptocurrency portfolio to USD, distributions to creditors may begin in less than six (6) months.
See id. at ¶ 12.

89.     For all these reasons, the Plan Administrator believes that the Distribution
Procedures set forth herein, including liquidation of the Cryptocurrency to allow for a distribution
in USD, is the most efficient and economical path forward for distribution of Prime's assets.

## IX.    Establishing a Disputed Claims Reserve is Appropriate and May Be Necessary to Allow the Interim Distribution Without Delay

90.     The Plan Administrator intends to diligently continue claims reconciliation.
However, creditors have waited for a distribution from the Debtors on outstanding claims for an
extended period of time.  Accordingly, to the extent that claims remain disputed when the Plan
Administrator is otherwise prepared to commence distributions, it would be appropriate to
establish a Disputed Claims Reserve.  As set forth above, the Plan Administrator proposes to
provide notice to any claimants subject to any Disputed Claims Reserve of the proposed amount
of the Disputed Claims Reserve and with an opportunity to respond and be heard.

34

91.     This Court has authority to establish reserves for unresolved Claims in connection with an interim distribution pursuant to sections 502(a) and 502(c) of Bankruptcy Code, in conjunction with section 105(a) of the Bankruptcy Code, as well as Article 6.10(d)(xx) of the Plan. Specifically, section 105(a) of the Bankruptcy Code grants this Court broad authority and discretion to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, and section 502(c) of the Bankruptcy Code provides that "[t]here shall be estimated for purposes of allowance under this section . . . any contingent or unliquidated claim, the fixing of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. §§ 105(a), 502(c)(1).

92.     "Estimation by the Court is mandatory, provided that the movant establishes that fixing or liquidation of the claim would unduly delay the administration of the case." In re RNI Wind Down Corp., 369 B.R. 174, 191 (Bankr. D. Del. 2007) (noting that the purpose of section 502(c) is to prevent the debtor's estate from "being held hostage by the fixing or liquidation of an unliquidated or contingent claim"). This Court has broad discretion to estimate Claims, and estimation can be used for the purpose of allowing timely distributions under a chapter 11 plan. See, e.g., Bittner v. Borne Chemical Co., Inc., 691 F.2d 134, 137 n.9 (3d Cir. 1982) (explaining "Congress has given the bankruptcy courts broad discretion to estimate a claim pursuant to section 502(c)(1)."); In re Adelphia Commc'ns Corp., 368 B.R. 140, 279 (Bankr. S.D.N.Y. 2007) (estimating claim for distribution reserves); In re Enron Corp., No. 01-16034 (AJG), 2006 WL 544463, at *8 (Bankr. S.D.N.Y. Jan. 17, 2006) (same); In re C.F. Smith & Assoc., Inc., 235 B.R. 153, 159 (Bankr. D. Mass. 1999) ("[a] section 502(c) estimation is often employed for purposes other than adjudicating the merits of claim . . . In some cases courts have estimated the value of a claim for all purposes, including distribution") (internal citations omitted).

## **RESERVATION OF RIGHTS**

93.      Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the validity of any particular claim against the Wind-Down Debtor, the Debtors or the Debtors' estates, (b) a waiver of the Wind-Down Debtor's or Plan Administrator's rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a waiver or limitation of the Wind-Down Debtor's or Plan Administrator's rights under the Bankruptcy Code or any other applicable law.

## **NOTICE**

94.      Notice of this Motion will be served upon: (i) the Office of the United States Trustee; (ii) all parties that have requested notice and service of pleadings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; and (iii) all Holders of Claims scheduled or filed against the Debtors that have not been paid, otherwise satisfied, or expunged as reflected in the Claims register.  In light of the nature of the relief requested herein, the Plan Administrator submits that no other or further notice is required.

## **CONCLUSION**

WHEREFORE, the Plan Administrator seeks entry of the Proposed Order granting the

relief requested herein and such further relief as is just and proper.


Dated: January 15, 2025                 **WOMBLE BOND DICKINSON (US) LLP**
       Wilmington, Delaware

                                      */s/ Morgan L. Patterson*
                                        Donald J. Detweiler (Del. Bar No. 3087)
                                        Morgan L. Patterson (Del. Bar No. 5388)
                                        1313 North Market Street, Suite 1200
                                        Wilmington, Delaware 19801
                                        Telephone:    (302) 252-4320
                                        Facsimile:     (302) 252-4330
                                        Email:          don.detweiler@wbd-us.com
                                                              morgan.patterson@wbd-us.com

                                        *Counsel to the Plan Administrator*