IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PRIME CORE TECHNOLOGIES INC., *et al*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF DAVID DUNN IN SUPPORT
OF PLAN ADMINISTRATOR'S MOTION FOR ENTRY
OF AN ORDER (I) APPROVING THE PLAN ADMINISTRATOR'S
DETERMINATION THAT THE DEBTORS' ASSETS ARE PROPERTY OF
THE BANKRUPTCY ESTATES; (II) APPROVING DISTRIBUTIONS OF
ESTATE PROPERTY; (III) ESTABLISHING PROCEDURES FOR SETTING A
DISPUTED CLAIMS RESERVE; AND (IV) GRANTING RELATED RELIEF**

Under 28 U.S.C. § 1746, I, David Dunn, hereby declare under penalty of perjury:

1. I am a Principal of Province Fiduciary Services, LLC, the plan administrator (the "Plan Administrator") for Prime Core Technologies, Inc. and its affiliate debtors (collectively, the "Debtors") in the above-captioned Chapter 11 Cases.

2. I submit this declaration in support of the *Plan Administrator's Motion for Entry of An Order (I) Approving the Plan Administrator's Determination That the Debtors' Assets Are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief* (the "Distribution Motion").

3. On behalf of the Plan Administrator, I reviewed the Plan[2] and Distribution

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8346); and Prime Digital, LLC (4528). The Debtors' mailing address is Prime Core Technologies, Inc. Plan Administrator, c/o Province Fiduciary Services, LLC, 2360 Corporate Circle, Suite 340, Henderson, Nevada 89074.

[2] *Amended Joint Chapter 11 Plan of Reorganization for Prime Core, Inc. and its Affiliated Debtors*, dated December 14, 2023 (Docket No. 592), as modified by the Initial Plan Supplement (Docket No. 486), the First Amended Plan

Motion, and I am directly or through other personnel, agents, and attorneys, familiar with the information contained therein. To the best of my knowledge, information, and belief, and based on the information and records available to me (including as the post-confirmation custodian of the Debtors' records), the information contained in the Distribution Motion and the exhibits attached thereto is true and accurate.

4. If called upon to testify, I could and would competently testify to the facts set forth herein.

5. On behalf of the Plan Administrator, I—along with the Plan Administrator's team—have been personally involved in: (i) the investigation and determination that Currency[3] held in an Account (as defined in the Plan) constitutes property of the Debtors' Estates; (ii) the creation of the proposed Distribution Procedures; and (iii) the related relief to each of the foregoing as set forth in detail in the Distribution Motion.

A.   **Debtors' Historical Operations**

6. Prior to the Petition Date, the Debtors were one of the Cryptocurrency industry's largest market participants. Through various contractual agreements with: (i) third party digital asset and cryptocurrency companies (the "Integrators"), as well as secondarily with (ii) the Integrators' end-user customers (the "End-Users"), provided various Cryptocurrency, fiat, and digital assets services and support to the Integrators.

7. Based upon my understanding, in general, Prime's Cryptocurrency and digital assets platform operated, in the first instance as a business-to-business service platform—

---

Supplement (Docket No. 511), the Second Amended Plan Supplement (Docket No. 540), the Third Amended Plan Supplement (Docket No. 594), the Fourth Amended Plan Supplement (Docket No. 615), and the Fifth Amended Plan Supplement (Docket No. 620) (collectively with the exhibits thereto, the "Plan")

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Distribution Motion.

*i.e.,* Prime provided various Cryptocurrency, fiat, and digital assets services and support to the Integrators. Prime's customers procured Prime's services by entering into various service-related agreements with the Debtors (collectively, the "Agreements"). The vast majority of Integrators were subject to a Master Services Agreement (the "MSA")[4] and to a Services Schedule for Prime Custodial Services (the "Custodial Agreement"),[5] which explicitly stated that no fiduciary relationship existed between the parties, and provided Prime with the ability to re-invest, repledge, hypothecate, rehypothecate, sell and utilize cash or fiat Currency transferred to Prime in Prime's absolute discretion.

8. Based on my understanding, End-Users did not directly procure Prime's services. Rather, after satisfying "Know Your Customer" requirements with an Integrator, End-Users accepted or agreed to a user agreement with Prime (the "End-User Agreement")[6] that was presented to them by the Integrator through the Integrator's system, which connected to Prime's platform through the API technology and services supplied by Prime to the Integrator

9. Based on my understanding, Prime contracted with approximately 140 Integrators and thousands of End-Users, and, at its height, there were dozens of variations of the MSA, End-User Agreements, and other service-related agreements between Integrators and Prime. Furthermore, based on my understanding, at its peak, the Debtors were processing over 300,000 transactions a day and held over $3.8 billion in Cryptocurrency and fiat currency. See *Declaration of Jor Law, Interim Chief Executive Officer and President of Prime Core Technologies Inc., et al., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 14] ¶ 11.

---

[4] A sample Integrator Master Services Agreement is attached hereto as **Exhibit 1**.

[5] A sample Custodial Agreement is attached hereto as **Exhibit 2**.

[6] A sample End-User Agreement is attached hereto as **Exhibit 3**.

## B.     Property of the Estate Determination

10.     Following confirmation of the Plan and the appointment of Province as the Plan Administrator, I oversaw the investigation regarding whether the Debtors' Cryptocurrency is property of creditors or the Debtors' Estates. As set forth in detail in the Distribution Motion and the supporting declarations, the agreements between the Debtors and Integrators and End-Users did not create a trust relationship and, even if it did, the Currency is hopelessly commingled and not traceable by any particular creditor. Accordingly, it is the determination of the Plan Administrator that the Currency is property of the Debtors' Estates.

## C.     Liquidation of Cryptocurrency and Distributions in US Dollars

11.     I personally oversaw the determination and implementation of the optimal process for distributions to creditors. Following that, it is the Plan Administrator's determination that the length of time and process by which it would take to complete in-kind distributions is prohibitive. As an initial matter, the Debtors no longer maintains the appropriate licensure and systems to transfer any form of Currency to creditors. The Debtors would thus need to partner with a crypto exchange service with respect to in-kind crypto distributions. Accordingly, I reached out to several potential partners in anticipation of beginning distributions. The distribution partners who have assisted with other bankruptcy cases declined to participate in this case due to the relatively small amount of Cryptocurrency and creditors by comparison to other Cryptocurrency bankruptcy cases. I was able to locate one potential distribution partner, however, the costs associated with collecting the KYC information for in-kind distributions from that partner was projected to be substantially higher than the cost of the KYC collection needed for an ordinary U.S. Dollar ("USD") transfer—a cost that would necessarily be borne by the creditors. The KYC information would be compounded by the cost of the Cryptocurrency gas fees associated with in-

kind distributions. Adding to these difficulties, there exists a shortfall of Currency for creditors. The portfolio does not hold the types and amount of Cryptocurrency necessary to make full, in-kind distributions to all creditors. Consolidation and liquidation efforts of the currently held Cryptocurrency to make an in-kind Cryptocurrency distribution would result in creditors incurring the costs of multiple rounds of Cryptocurrency transaction fees.

12. Due to the difficulty and expense of engaging a Cryptocurrency exchange partner and KYC information collection, I estimate it would take another year and a half to begin distributions to creditors if distributions were made in Cryptocurrency. By comparison, following the bulk liquidation of Prime's Cryptocurrency portfolio to USD, distributions in USD to creditors may begin in less than six (6) months.

13. As part of the distribution process, Claims asserted against the Debtors in Cryptocurrency need to be converted into USD as of the Petition Date. While this conversion process was contemplated by the Plan and Confirmation Order, the Cryptocurrency Conversion Table attached to the Plan Supplement was missing six Cryptocurrencies held by the Debtors on the Petition Date. Those additional Cryptocurrencies and their USD conversion value as of the Petition Date are listed in the amended Cryptocurrency Conversion Table attached hereto as **Exhibit 4** (the "Amended Cryptocurrency Conversion Table").

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 15, 2025

                                                                                         /s/ David Dunn
                                                                                         David Dunn, Principal
Province Fiduciary Services, LLC
Solely in its capacity as Plan Administrator for Prime Core Technologies, Inc. and its affiliate debtors