## <u>EXHIBIT 1</u>

**Sample Integrator Master Services Agreement**



**PRIME TRUST**
**MASTER SERVICES AGREEMENT**

This Prime Trust Master Services Agreement ("**MSA**") is made between Prime Trust, LLC, a chartered Nevada trust company ("**Prime Trust**"), and the contracting party identified on the Order Form and/or SOW ("**Customer**"), together referred to as the "**Parties**" and each individually as a "**Party**." The Parties hereby agree to the terms and conditions of this MSA, including any specific services terms, product details and any applicable license and/or subscription terms will be set forth in applicable Prime Trust Service Schedules and Attachments (located at: https://www.primetrust.com/legal/msa-service-schedules), Order Form(s) and SOW(s), each of which become binding on the Parties and are incorporated into this MSA upon execution of an Order Form and/or SOW. Each Order Form and/or SOW is governed by and incorporates the following documents in effect as of the effective date of the applicable Order Form or SOW, collectively referred to as the "**Agreement**", that consists of:

1. the Order Form and/or Statement of Work;
2. any attachments, addenda, and/or appendix(ices) to this MSA or a Service Schedule;
3. Service Schedule(s); and
4. this MSA.

The applicable attachment(s), addenda, appendix(ices), and Service Schedule(s) is determined by the Prime Trust Service(s) purchased on the Order Form and/or SOW. In the event of a conflict, the order of precedence is as set out above in descending order of control.

**MSA revision date:** August 30, 2022

**TABLE OF CONTENTS**

1. Definitions
2. Registration
3. Access Rights
4. Ownership
5. Security and Customer Data
6. Payment of Fees
7. Taxes
8. Term and Termination
9. Warranties and Disclaimers
10. Third-Party Claims
11. Limitation of Liability
12. Confidentiality
13. Governing Law and Venue
14. General
15. Appendix 1



## 1. DEFINITIONS

"**Account(s)**" means a unique account established by Customer to enable its Authorized Users to access and use a Prime Trust Service. Customer may have more than one Account depending on the Prime Trust Services used by Customer.

"**Account Administrator**" is an Authorized User who is assigned and expressly authorized by Customer as its agent to manage Customer's Account, including, without limitation, to configure administration settings, assign access and use authorizations, request different or additional services. Customer may change its Account Administrator designation at any time through its Account.

"**Affiliate**" of a Party means any entity that the Party directly or indirectly owns or controls more than fifty percent (50%) of the voting interests of the subject entity. Any legal entity will be considered a Party's Affiliate as long as that interest is maintained.

"**AML/OFAC Policy**" means anti-money laundering ("**AML**") and the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**") compliance policy that Customer will ensure its use of Prime Trust Services by Customer complies with Applicable Law, including any AML and economic and trade sanctions requirements applicable to Prime Trust or Customer. The AML/OFAC Policy and any subsequent changes to it must be approved by Prime Trust.

"**API**" means one or more Application Programming Interfaces that support interoperation of applications with Prime Trust Services.

"**API Materials**" means any API libraries, integration keys, software, source files, sample code, reference documentation, how-to guides, and template materials.

"**API Services**" means the proprietary tools and technology, negotiated third-party integrations, and operational processes to provide certain back-end tools, technology and compliance services, which are accessible via the Prime Trust API.

"**Applicable Law**" means any federal, foreign, provincial, state and local laws, statutes, rules, regulations, executive orders, supervisory requirements or guidance, directives, interpretive letters,  and other official releases of any Regulatory Authority, Supervisory Objection, judicial or administrative interpretations, Network Rules, including PCI DSS (to the extent any card is issued to a Customer in connection with a Prime Trust Service), and any, consents, permissions, authorizations, approvals, licenses, registrations, declaration, filings rules or requirements established by a Regulatory Authority or other organization having jurisdiction over a Party, in each case as amended, consolidated, supplemented or replaced from time to time, that are related to, or otherwise applicable, to the Agreement, the Prime Trust Services and/or the services to be provided by a Party hereunder.

"**Authorized User**" means one individual natural person, whether an employee, business partner, contractor, or agent of Customer or its Affiliates who is registered by Customer in Customer's Account to use the Prime Trust Services. An Authorized User must be identified by a unique email address and user name, and two or more persons may not use the Prime Trust Services as the same Authorized User. If the Authorized User is not an employee of Customer, use of the Prime Trust Services will be allowed only if such user is under confidentiality obligations with Customer at least as restrictive as those in the Agreement and is accessing or using the Prime Trust Services solely to support Customer's internal business purposes.

DocuSign Envelope ID: A1E14A9F-6295-4A3F-A7F7-B25A69943946

▲ Prime Trust

"**Confidential Information**" means: (a) for Prime Trust and its Affiliates, the Prime Trust Services and other related technical information, security policies and processes, product roadmaps, and pricing; (b) for Customer and its Affiliates, Customer Data; (c) any other information of a Party or its Affiliates that is disclosed in writing or orally and is designated as confidential or proprietary at the time of disclosure to the Party, including its Affiliates, receiving Confidential Information ("**Recipient**") (and, in the case of oral disclosures, summarized in writing and delivered to the Recipient within thirty (30) days of the initial disclosure), or that due to the nature of the information the Recipient should reasonably understand it to be confidential information of the disclosing Party; and (d) the terms and conditions of the Agreement between the Parties. Confidential Information does not include any information that: (i) was or becomes generally known to the public through no fault or breach of the Agreement by the Recipient; (ii) was rightfully in the Recipient's possession at the time of disclosure without restriction on use or disclosure as demonstrated by written evidence; (iii) was independently developed by the Recipient without use of or reference to the disclosing Party's Confidential Information as demonstrated by written evidence; or (iv) was rightfully obtained by the Recipient from a third party not under a duty of confidentiality and without restriction on use or disclosure.

"**Customer Custody Account**" means a Prime Trust asset custody account for and in the name of the Customer.

"**Customer Data**" means any content, materials, data and information that Customer or its Authorized Users enter into the Prime Trust Services, including, but not limited to, any Customer or Authorized User personal data and information contained in Transactions entered into the Prime Trust Services by Customer or its Authorized Users.

"**Digital Assets**" means supported digital currencies and digital tokens which are a digital representation of value based on a cryptographic protocol of a computer network.

"**Documentation**" means Prime Trust's then-current technical and functional documentation for the Prime Trust Services as made generally available to Customer by Prime Trust, including those materials made available on Prime Trust's developer portal.

"**Fiat Currency**" means USD, Euros, Pounds Sterling, Canadian Dollars, Australian Dollars or Japanese Yen, or any other government-issued currencies supported by Prime Trust.

"**Network**" means, individually and collectively, Mastercard International Incorporated and its affiliates, Visa, Inc. and its affiliates, Cirrus, Plus, Pulse, MAC, NYCE, SHAZAM, STAR, Accel, SWIFT, National Automated Clearing House Association ("**NACHA**"), and any other payment network accepted by Prime Trust for Transactions.

"**Network Rules**" means any and all rules, bylaws, standards, protocols, operating regulations, guidelines, or procedures, and any amendment, interpretation, or modification of any such rule, bylaw, standard, protocol, operating regulation, guideline, or procedure, promulgated by a Network that govern or apply to Prime Trust Services, including, without limitation, PCI DSS and the rules, bylaws, standards, protocols, operating regulations, guidelines, and procedures of NACHA.

"**Order Form**" means the ordering document provided by Prime Trust that sets forth the pricing and the Prime Trust Services selected by Customer.

"**Order Start Date**" means the start date of the applicable Order Form as defined in that Order Form.

"**Order End Date**" means the end date of the applicable Order Form as defined in that Order Form.

DocuSign Envelope ID: A1E14A95-6295-4A3F-A7F7-B925A69943946

**Prime Trust**

"**PCI DSS**" means the Payment Card Industry Data Security Standards administered by the PCI Standards Council that are in effect as of the Order Start Date of the applicable Order Form and as they may be amended from time to time.

"**Person**" means any natural or legal person, including any individual, corporation, partnership, limited liability company, trust or unincorporated association or other entity.

"**Prime Trust Service(s)**" means the products and services provided by Prime Trust under an Order Form or SOW, and may include software, source code, or other technology licensed to Prime Trust from third parties and embedded into the services that Prime Trust provides to Customer. Notwithstanding the foregoing, Prime Trust Services do not include Third-Party Services (defined below).

"**Professional Services**" means any integration, consulting, architecture, training, transition, configuration, administration, and similar ancillary Prime Trust Services that are set forth in an Order Form or Statement of Work ("**SOW**").

"**Regulatory Authority**" means any of the following Persons with actual or apparent administrative, executive, judicial, legislative, police, regulatory or taxing authority or power that asserts such authority over the Agreement either Party or their Affiliates, or any of their respective subcontractors, Customers, or Authorized Users: (a) a country, state, county, city, town, borough, village, district or other jurisdiction; (b) federal, state, local, municipal governmental body; (c) any agency, branch, department, board, commission, court, tribunal or any other governmental or regulatory authority of any nature; (d) any official body or self-regulatory body that supervises or otherwise exercise control over any Party; and (e) the Nevada Financial Institutions Division.

"**Representative**" means the natural person or people submitting the registration application for a Prime Trust Account on behalf of Customer.

"**Service Schedule**" means the service-specific terms and conditions applicable to the Prime Trust Service(s).

"**Supervisory Objection**" means (a) an objection, criticism, or guidance, orally or in writing (including, but not limited to an interpretive letter or official release), raised by a Regulatory Authority having supervisory or regulatory authority over Prime Trust that expresses the Regulatory Authority's opinion that one or more provisions of the Agreement is likely to constitute or result in a violation of Applicable Law or unsafe or unsound practices, (b) any cease-and-desist or other similar formal written order of a Regulatory Authority, or (c) a written directive or requirement by Regulatory Authority to cease or limit performance of material obligations under the Agreement.

"**System**" means the software systems and programs, the communication and network facilities, and the hardware and equipment used by Prime Trust or its agents to make available the Prime Trust Services via the Internet.

"**Third-Party Services**" means services, software, products, applications, integrations and other features or offerings that are provided by Customer or obtained by Customer from a third party.

"**Transactions**" means any transactions that Customer facilitates using Prime Trust Services, including using a Prime Trust Service to do any of the following: (a) to make a purchase of goods or services; (b) to obtain a credit for a previous purchase; (c) to contribute or disburse Digital Assets or Fiat Currency from

## Prime Trust

or to the Customer Custody Account(s); (d) to make a transfer or other payment to a third party; or (e) to transfer value to another Customer Custody Account.

"**USD**" means United States Dollars.

## 2.  REGISTRATION

**2.1  Account Registration**. Customer shall first register for an Account by providing Prime Trust with Customer's information that includes but is not limited to business or trade name, physical address, email, phone number, tax identification number, URL, the nature of Customer's business or activities, and certain other information about Customer that Prime Trust may require. Prime Trust may also collect personal information (including name, birthdate, and government-issued identification number) about Customer's beneficial owners, principals, and Customer's Account Administrator. Until Customer submits, and Prime Trust reviews and approves, all required information, Customer's Account will be available to Customer on a preliminary basis only, and Prime Trust may terminate it at any time and for any reason.

**2.2  Representative Authorization**. Customer and Representative individually affirm to Prime Trust that (a) Representative is authorized to provide the information described in Section 2.1 (Account Registration) on behalf of Customer and to bind Customer to the Agreement, and (b) Representative is an executive officer, senior manager or otherwise has significant responsibility for the control, management, or direction of Customer's business. Customer or Representative agrees to provide additional information or documentation demonstrating Representative's authority as requested by Prime Trust. Without the express written consent of Prime Trust, neither Customer nor Representative may register or attempt to register for an Account(s) on behalf of a user Prime Trust previously terminated from use of the Prime Trust Services. If Customer is a sole proprietor, Customer and Representative also affirm that Representative is personally responsible and liable for Customer's use of the Prime Trust Services and Customer's obligations to its customers, including payment of any amounts owed under the Agreement.

**2.3  Registration Information Updates**. Customer will keep its Account information current. Customer shall promptly update Prime Trust with any changes affecting Customer, the nature of its business activities, Representatives, beneficial owners, principals, or any other pertinent information. Prime Trust may suspend Customer's Account(s) or terminate the Agreement or applicable Service Schedule if Customer fails to keep this information current. Customer also shall promptly notify Prime Trust in writing no more than three (3) days after any of the following occurrences: (a) Customer is the subject of any voluntary or involuntary bankruptcy or insolvency application, petition or proceeding, receivership, or similar action (any of the foregoing, a "**Bankruptcy Proceeding**"); (b) there is an adverse change in Customer's financial condition; (c) there is a planned or anticipated liquidation or substantial change in the basic nature of Customer's business; (d) Customer transfers or sells 25% or more of Customer's total assets, or there is any change in the control or ownership of Customer's business or parent entity; or (e) Customer receives a judgment, writ or warrant of attachment or execution, lien or levy against 25% or more of Customer's total assets.

## 3.  ACCESS RIGHTS

**3.1  Right to Use**. Prime Trust will provide the Prime Trust Services to Customer as set forth in the Order Form and/or SOW and applicable Service Schedule(s) and Attachment(s). Subject to the terms and conditions of the Agreement, Prime Trust grants to Customer a worldwide, limited, non-exclusive, non-transferable right and license during the Term, solely for its and its Affiliates' internal business purposes, and in accordance with the Documentation, to: (a) access and use the Prime Trust Services; (b) implement, configure, and through its Account Administrator, permit its Authorized Users to access and

DocuSign Envelope ID: A1E14A9F-6295-4A3F-A7F7-B25A69943946

## Prime Trust

use the Prime Trust Services; and (c) access and use the Documentation. Customer will ensure that its Affiliates and all Authorized Users using the Prime Trust Services under its Account comply with all of Customer's obligations under the Agreement, and Customer is responsible for their acts and omissions relating to the Agreement as though they were those of Customer. A Customer Affiliate may enter into an Order Form or SOW directly with Prime Trust under this MSA by a mutually executed Order Form or SOW that references this MSA subject to such Customer Affiliate providing all information required to be provided pursuant to Section 2.1 (Account Registration) and approval by Prime Trust of such Customer Affiliate. In such event: (i) the Customer Affiliate will be bound by this MSA and will be fully responsible for its liabilities and obligations under the applicable Order Form or SOW; and (ii) all references to "**Customer**" in the Agreement will be deemed references to the Customer Affiliate set forth on the Order Form or SOW for purposes of defining the rights and obligations of the Parties hereunder.

**3.2    Restrictions**. Customer shall not, and shall not permit its Authorized Users or others under its control, to use, or allow the use of, the Prime Trust Services in violation of Section 14.7 (Trade Restrictions) or Prohibited Use, Prohibited Business and Conditional Use as set forth in Appendix 1 to this MSA below.

**3.3    Suspension of Access and/or Use**. Prime Trust may suspend any access to and/or use of the Prime Trust Services or remove or disable any Account and/or Authorized User that Prime Trust reasonably and in good faith believes (a) violates the terms or intent of the Agreement, (b) is necessary to prevent or eliminate difficulties in the operation of the Prime Trust Services, (c) will harm Prime Trust's reputation, or (d) is necessary to prevent potential litigation or other controversies. Prime Trust will use all reasonable efforts to notify Customer prior to any such suspension or disablement, unless Prime Trust reasonably believes that: it is prohibited from doing so under Applicable Laws or under legal process (such as court or government administrative agency processes, orders, mandates, and the like); or (ii) it is necessary to delay notice in order to prevent imminent harm to the Prime Trust Services or a third party.. Under circumstances where notice is delayed, Prime Trust will provide notice if and when the related restrictions in the previous sentence no longer apply.

**3.4    Third-Party Services**. Customer may choose to obtain Third-Party Services from third parties ("**Third-Party Provider**") and/or Prime Trust (for example, through a reseller arrangement or otherwise). Any acquisition by Customer of Third-Party Services is solely between Customer and the applicable Third-Party Provider and Prime Trust does not warrant, support, or assume any liability or other obligation with respect to such Third-Party Services, unless expressly provided otherwise in the Order Form or the Agreement. In the event Customer chooses to integrate or interoperate Third-Party Services with Prime Trust Services in a manner that requires Prime Trust or the Prime Trust Services to exchange Customer Data with such Third-Party Service or Third-Party Provider, Customer: (a) grants Prime Trust permission to allow the Third-Party Service and Third-Party Provider to access Customer Data and information about Customer's usage of the Third-Party Services as appropriate and necessary to enable the interoperation of that Third-Party Service with the Prime Trust Services; (b) acknowledges that any exchange of data between Customer and any Third-Party Service is solely between Customer and the Third-Party Provider and is subject to the Third-Party Provider's terms and conditions governing the use and provision of such Third-Party Service (the presentation and manner of acceptance of which is controlled solely by the Third-Party Provider); and (c) agrees that Prime Trust is not responsible for any disclosure, modification or deletion of Customer Data resulting from access to such data by Third-Party Services and Third-Party Providers.

**3.5.    Transactions**. Customer acknowledges and agrees that (a) Prime Trust is not responsible for the products or services that Customer publicizes or sells; (b) Customer is solely responsible for the nature and the quality of the products or services Customer provides, supports and for any other ancillary

DocuSign Envelope ID: A1E14A9F-6295-4A3F-A7E7-825A69943946

## Prime Trust

services Customer provides; and (c) Customer is solely responsible for any losses Customer incurs due to erroneous or fraudulent Transactions in connection with Customer's use of the Prime Trust Services.

### 4.  OWNERSHIP

**4.1  Prime Trust Services**. Prime Trust, its Affiliates, or its licensors own all right, title, and interest in and to any and all copyrights, trade secrets, trademark rights, patent rights, database rights, and other intellectual property or other rights in and to the Prime Trust Services, Documentation, Usage Data, Derived Data, any improvements, design contributions, or derivative works thereto, and any knowledge or processes related thereto (including any machine learning algorithms output from the Prime Trust Services) and/or provided hereunder. Unless otherwise specified in the applicable SOW, all deliverables provided by or for Prime Trust in the performance of Professional Services, excluding Customer Data and Customer Confidential Information, are owned by Prime Trust and constitute part of the Prime Trust Services under the Agreement.

**4.2  Feedback**. Prime Trust encourages Customer to provide suggestions, proposals, ideas, recommendations, or other feedback regarding improvements to Prime Trust Services and related resources ("**Feedback**"). To the extent Customer provides Feedback, Customer grants to Prime Trust and its Affiliates a royalty-free, fully paid, sub-licensable, transferable (notwithstanding Section 14.2 (Assignability)), non-exclusive, irrevocable, perpetual, worldwide right and license to make, use, sell, offer for sale, import, and otherwise exploit Feedback (including by incorporation of such feedback into the Prime Trust Services) without restriction. Customer shall ensure that: (a) Feedback does not identify Customer, its Affiliates, or Authorized Users, or include any Confidential Information; and (b) Customer has obtained requisite authorization from any Authorized User or other third party to grant the license described herein. For the avoidance of doubt, Feedback does not constitute Customer Confidential Information. Such Feedback is provided on an "As Is" basis without representations or warranties of any kind by Customer.

### 5.  SECURITY AND CUSTOMER DATA

**5.1  Information Security**. Prime Trust will use commercially reasonable security technologies in providing the Prime Trust Services. Prime Trust has implemented and will maintain appropriate technical and organizational measures, including information security policies and safeguards, designed to preserve the security, integrity, and confidentiality of Customer Data and to protect against unauthorized or unlawful disclosure or corruption of or access to such data (the "**Information Security Program**"). As part of the Information Security Program, (a) Prime Trust utilizes commercial-grade data center service providers in the provision of Prime Trust Services that maintain on-site security operation that is responsible for all physical data center security functions and formal physical access procedures in accordance with PCI DSS, ISO 27001 and SOC 2, or equivalent, standards, (b) Prime Trust maintains system security, vulnerability management, application backups, managed firewalls and DDoS mitigation, and (c) Prime Trust secures data through using AES-256 encryption for sensitive data and SSL encryption for all database connections. However, no Information Security Program or security system is impenetrable and Prime Trust cannot guarantee that unauthorized parties will never be able to defeat Prime Trust's security measures or misuse any Customer Data in Prime Trust's possession. In Prime Trust's sole discretion, Prime Trust may take any action, including suspension of the Account(s) and/or access to Prime Trust Services, to maintain the integrity and security of the Prime Trust Services or Customer Data, or to prevent harm to Customer or others. Customer waives any right to make a claim against Prime Trust for losses Customer incurs that may result from such actions.

**5.2  Privacy Policy**. Customer acknowledges the most current, then in effect, Prime Trust Privacy Policy (located at: https://www.primetrust.com/legal/privacy-policy), which may be updated from time to

## Prime Trust

time without prior notice or liability ("**Privacy Policy**"). In the event of any conflict between any terms or provisions of the Privacy Policy and the terms and provisions of the Agreement, the applicable terms and provisions of the Agreement shall control.

**5.3   Customer's Security**. Customer is responsible for the security of any data on its website, servers, in its possession, or that the Customer is otherwise authorized to access or handle. Customer is responsible for implementing access and use controls and configuring certain features and functionalities of the Prime Trust Services that Customer may elect to use in the manner that Customer deems adequate to maintain appropriate security, confidentiality, and integrity. Further, Customer must notify Prime Trust within twenty-four (24) hours after becoming aware of: (a) any suspected or actual data security breach; or (b) any noncompliance by Customer with the security requirements set forth herein. Customer shall, at its own expense, perform or cause to be performed (a) an independent investigation of any data security breach of card or Transaction data by an authorized assessor acceptable to Prime Trust; (b) take all such remedial actions recommended by such investigation, Prime Trust or Network; and (c) cooperate with Prime Trust in the investigation and resolution of any security breach.

**5.4   Customer Data**. Customer is responsible for Customer Data (including Customer personal data) as entered into, supplied or used by Customer and its Authorized Users in the Prime Trust Services. Further, Customer is solely responsible for determining the suitability of the Prime Trust Services for Customer's business and complying with any applicable data privacy and protection regulations, laws or conventions applicable to Customer Data and Customer's use of the Prime Trust Services. Customer grants to Prime Trust the non-exclusive right to process Customer Data (including personal data) for the sole purpose of and only to the extent necessary for Prime Trust: (a) to provide the Prime Trust Services; (b) to verify Customer's compliance with the restrictions set forth in Section 3.2 (Restrictions) if Prime Trust has a reasonable belief of Customer's non-compliance; and (c) as otherwise set forth in the Agreement.

**5.5   Usage Data**. Prime Trust may collect and use data, information, or insights generated or derived from the use of the Prime Trust Services ("**Usage Data**") for its business purposes, including industry analysis, benchmarking, analytics, marketing, and developing, training and improving its products and services. Customer consents to all actions taken by Prime Trust with respect to such Usage Data in compliance with Prime Trust's Privacy Policy. For the avoidance of doubt, Prime Trust may create derivative works of Customer Data to create aggregate statistical and database compilations ("**Derived Data**"). Prime Trust's use of Usage Data (including any Derived Data) will not include Customer's personal data.

## 6.   PAYMENT OF FEES

**6.1   Fees**. Except as expressly set forth in the applicable Order Form or SOW, Customer will pay all fees without offset or deduction, payable as set forth in the Order Form or SOW ("**Fees**") in accordance with the following: (a) Fees for setup are non-refundable; (b) Fees and other penalties, fines or other reimbursements under Section 6.2 (Penalties, Fines; Third-Party Fees) are due on the first of the month following the month in which the Fees are incurred by Customer; (c) for Professional Services the first invoice will coincide with the effective date of a SOW; (d) payment for Professional Services will be due within fifteen (15) days from the date of the invoice; (e) Prime Trust is hereby authorized, at its option, in its sole discretion, to electronically debit the Customer Custody Account(s) for payment of Fees and expenses, including charging any linked credit or debit card, pulling funds from any linked bank account, or liquidating any of the Custodial Property (as defined in the Service Schedule for Prime Trust Custodial Services); and (f) all amounts will be denominated and payable in the currency specified in the Order Form and/or SOW. Unless otherwise agreed to by the Parties and expressly noted in the Order Form and/or SOW, any invoices for Fees or penalties, fines or other reimbursements under Section 6.2 (Penalties, Fines; Third-Party Fees) will be sent to Customer via email. Upon execution by Customer and

 **Prime Trust**

Prime Trust, each Order Form and/or SOW is non-cancellable and non-refundable except as provided in the Agreement, and the Term as set forth in the Order Form for Prime Trust Services is a continuous and non-divisible commitment for the full duration of the Term regardless of any invoice schedule. Prime Trust may revise the Fees at any time. However, the revisions will not affect any charges for prior periods and Prime Trust will provide Customer with reasonable prior notice before revisions become effective.

**6.2.    Penalties, Fines; Third-Party Fees**. In addition to the Fees, (a) Customer is responsible for any penalties or fines imposed in relation to the Account(s) resulting from Customer's use of Prime Trust Services in a manner not permitted by the Agreement or applicable rules and regulations; and (b) Customer agrees to reimburse Prime Trust for any expenses by a third party in performing services on behalf of Customer that include but are not limited to transfer agent fees, tax preparation fees, notary fees, exchange fees, brokerage fees, bank fees, blockchain settlement fees, at  cost and that no prior approval is required from Customer in incurring such expense(s).

**6.3    Late Charges; Attorneys' Fees**. In addition to all other remedies that may be available, Prime Trust may assess late charges equal to the lesser of one and one-half percent (1.5%) of the unpaid balance per month calculated daily and compounded monthly or the highest rate permitted by applicable law and may be applied as a first lien on any Custodial Property (as defined in the Service Schedule for Prime Trust Custodial Services). Customer will be responsible for any reasonable attorneys' fees, costs, and expenses incurred by Prime Trust to collect any amounts that are not paid when due. If Customer fails to timely pay any amounts due under the Agreement, then without limitation of any of its other rights or remedies, Prime Trust may suspend performance of those Prime Trust Services until Prime Trust receives all past due amounts from Customer.

## 7.    TAXES

**7.1    Tax Responsibility.** All payments required by the Agreement are stated exclusive of all taxes, duties, levies, imposts, fines or similar governmental assessments, including sales and use taxes, value-added taxes ("**VAT**"), goods and services taxes ("**GST**"), excise, business, service, and similar transactional taxes imposed by any jurisdiction and the interest and penalties thereon (collectively, "**Taxes**"). Without limiting the foregoing, Customer shall be responsible for and bear Taxes associated with its purchase of, payment for, access to or use of the Prime Trust Services. Taxes shall not be deducted from the payments to Prime Trust, except as required by law, in which case Customer shall increase the amount payable as necessary so that after making all required deductions and withholdings, Prime Trust receives and retains (free from any Tax liability) an amount equal to the amount it would have received had no such deductions or withholdings been made. If Customer claims tax exempt status for amounts due under the Agreement, it shall provide Prime Trust with a valid tax exemption certificate (authorized by the applicable governmental authority) to avoid application of Taxes to Customer's invoice. Each Party is responsible for and shall bear Taxes imposed on its net income. Customer hereby confirms that Prime Trust can rely on address set forth in the Order Form(s) or SOW Customer places directly with Prime Trust as being the place of supply for Tax purposes. The Parties' obligations under this Section 7.1 (Tax Responsibility) shall survive the termination or expiration of the Agreement.

**7.2    Substitute IRS Form W-9 Taxpayer Identification Number Certification, Backup Withholding Statement.**

(a) Prime Trust: Under penalties of perjury, Prime Trust hereby certifies that (i) the Prime Trust Taxpayer Identification Number shown below is correct, (ii) Prime Trust is not subject to backup withholding, and (iii) Prime Trust is a U.S. entity.

Company Name: Prime Trust, LLC



Attention: Chief Financial Officer
Address: 330 S. Rampart Blvd., Suite 260, Summerlin, NV 89145
Tax ID Number (EIN): 81-2236823
[X] We are exempt from backup withholding.

(b) Customer: Under penalties of perjury, Customer hereby certifies that (i) the tax identification number provided to Prime Trust by Customer, if Customer is a U.S. Person, is the correct taxpayer identification number, and (ii) Customer is not subject to backup withholding because**:** (x) Customer is exempt from backup withholding, or, (y) Customer has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding. Customer agrees to immediately inform Prime Trust in writing if it has been, or at any time in the future is notified by the IRS that Customer is subject to backup withholding. Customer acknowledges and agrees that failing to provide accurate information may result in civil penalties.

## 8.    TERM AND TERMINATION

**8.1    Term**. The term of an Order Form and any associated Service Schedule(s) is the period of time, including all renewals thereto, that begins on the Order Start Date and, unless terminated sooner as provided herein, will continue until the Order End Date, both dates as specified on the Order Form (the "**Term**"). In the case of a SOW for Professional Services, if no end date is specified in the SOW, then the SOW shall expire upon completion of Professional Services or early termination as permitted by the Agreement. The term of this MSA shall continue as long as an Order Form or SOW referencing or incorporated into this MSA remains valid and in effect. Termination or expiration of any Order Form or SOW shall leave other Order Forms or SOWs unaffected.

**8.2    Termination for Breach; Termination for Insolvency**. If either Party commits a material breach or default in the performance of any of its obligations under the Agreement and has not cured such material breach within thirty (30) days after the defaulting Party receives notice thereof, then the other Party may terminate the Agreement in its entirety by giving the defaulting Party written notice of termination. Either Party may terminate the Agreement in its entirety upon ten (10) days' prior written notice if the other Party becomes the subject of a petition in bankruptcy or any proceeding related to its insolvency, receivership or liquidation, in any jurisdiction, that is not dismissed within sixty (60) days of its commencement, or an assignment for the benefit of creditors.

**8.3    RESERVED**.

**8.4    Termination for Regulatory Requirement**. Prime Trust may terminate the Agreement following direction from any Regulatory Authority or any other authority with regulatory supervision over Prime Trust to cease or materially limit the exercise or performance of Prime Trust's rights or obligations under the Agreement.

**8.5    Agreement Subject to Applicable Law**. If (a) Prime Trust has been advised by legal counsel of a change in Applicable Law or any judicial decision of a court having jurisdiction over Prime Trust or any interpretation of a Regulatory Authority that, in the view of such legal counsel, would have a materially adverse effect the rights or obligations of Prime Trust under the Agreement or the financial condition of Prime Trust; (b) Prime Trust  receives a Supervisory Objection or lawful written request of any Regulatory Authority having jurisdiction over Prime Trust, including any letter or directive of any kind from any such Regulatory Authority, that prohibits or restricts Prime Trust from carrying out its obligations under the Agreement; (c) Prime Trust has been advised by legal counsel that there is a material risk that Prime Trust's continued performance under the Agreement would violate Applicable Law or otherwise possess an unsafe or unsound practice; (d) any Regulatory Authority shall have



determined and notified Prime Trust that the arrangement between the Parties contemplated by the Agreement constitutes an unsafe or unsound banking practice or is in violation of Applicable Law; or (e) a Regulatory Authority has commenced an investigation or action against a Party which Prime Trust, in its reasonable judgment, determines that it threatens such Party's ability to perform its obligations under the Agreement, then, in each case, the Parties shall meet and consider in good faith any modifications, changes or additions to the Agreement that may be necessary to eliminate such result. Notwithstanding any other provision of the Agreement, if the Parties, after using commercially reasonable efforts, are unable to reach agreement regarding modifications, changes or additions to the Agreement after the Parties initially meet, Prime Trust may terminate the impacted Agreement upon thirty (30) days' prior written notice to Customer and without payment of a termination fee or other penalty. Thirty (30) days after the Parties meet and consider in good faith any modifications, changes or additions to the Agreement that may be necessary to eliminate such result, Prime Trust shall be able to suspend performance of its obligations under the Agreement, or require Customer to suspend its performance of its obligations under the Agreement, if (i) any event described in Section 8.5 (Agreement Subject to Applicable Law) above occurs and (ii) Prime Trust reasonably determines that continued performance hereunder may result in a fine, penalty or other sanction being imposed by the applicable Regulatory Authority, or in material civil liability. For the avoidance of doubt, nothing in this Section 8.5 (Agreement Subject to Applicable Law) shall obligate a Party to disclose, share, or discuss any information to the extent prohibited by Applicable Law or a Regulatory Authority.

**8.6    Post-Termination Obligations**. If the Agreement expires or is terminated for any reason: (a) Customer will pay to Prime Trust any amounts that have accrued before, and remain unpaid as of, the effective date of the expiration or termination; (b) any and all liabilities of either Party to the other Party that have accrued before the effective date of the expiration or termination will survive; (c) licenses and use rights granted to Customer with respect to the Prime Trust Services and related intellectual property will immediately terminate; (d) Prime Trust's obligation to provide any further Prime Trust Services to Customer under the Agreement will immediately terminate, except any such Prime Trust Services that are expressly to be provided following the expiration or termination of the Agreement; and (e) the Parties' rights and obligations under Sections 5.4, 7.1, 8.6, 9.3, and 11 through 14 will survive.

## 9.    WARRANTIES AND DISCLAIMERS

**9.1    Customer Warranties**. Customer represents and warrants that: (i) Customer meets the requirements for the legal age of majority in the applicable jurisdiction(s); (ii) Customer and its Authorized Users are  not barred by the laws of the United States or the Applicable Laws of another country from accessing and using the Prime Trust Services; (iii) that Customer shall provide (and keep up to date) information that is truthful, accurate and complete; (iv) if Customer is a business entity, then the Customer business entity is in good standing in its state, region or country of formation and has obtained or filed all requisite certifications, authorizations or licenses to offer its services in the jurisdictions where it does business; and Customer agrees to produce written evidence of such authority and good standing if requested by Prime Trust; (v) Customer will comply with all Applicable Laws to access and use the Prime Trust Services, and perform its obligations under this Agreement; (vi) Customer and its Authorized Users will not use the Prime Trust Services, directly, or indirectly for any fraudulent or illegal undertaking, or in any manner that interferes with the normal operation of the Prime Trust Services; and (vii) Customer shall maintain its Customer Identification Program ("CIP"), Know Your Customer ("KYC") and AML requirements in compliance with and as required by FINRA, the Securities Exchange Commission, Applicable Law and any securities regulations to which it is subject and will produce an annually certification to Prime Trust of its compliance.

**9.2    Mutual Warranties**. Each Party represents and warrants that: (a) the Agreement has been duly executed and delivered and constitutes a valid and binding agreement enforceable against it in accordance

**Prime Trust**

with the terms of the Agreement; and (b) no authorization or approval from any third party is required in connection with its execution of the Agreement.

**9.3   DISCLAIMER**. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES STATED IN THE AGREEMENT, PRIME TRUST SPECIFICALLY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. PRIME TRUST SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE, OR TRADE PRACTICE. PRIME TRUST MAKES NO WARRANTY OF ANY KIND THAT THE PRIME TRUST SERVICES, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL MEET CUSTOMER'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY OF CUSTOMER'S OR ANY THIRD PARTY'S SOFTWARE, SYSTEM OR OTHER SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR-FREE, OR THAT ANY ERRORS OR DEFECTS CAN OR WILL BE CORRECTED. PRIME TRUST DOES NOT WARRANT AGAINST INTERFERENCE WITH THE USE OF THE PRIME TRUST SERVICES OR SOFTWARE OR AGAINST INFRINGEMENT. PRIME TRUST EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY ARISING OUT OF THE FLOW OF DATA AND DELAYS ON THE INTERNET. CUSTOMER WILL NOT HAVE THE RIGHT TO MAKE OR PASS ON ANY REPRESENTATION OR WARRANTY ON BEHALF OF PRIME TRUST TO ANY THIRD PARTY. PRIME TRUST'S ACCESS TO AND USE OF THE PRIME TRUST SERVICES ARE AT CUSTOMER'S OWN RISK. CUSTOMER UNDERSTANDS AND AGREES THAT THE PRIME TRUST SERVICES ARE PROVIDED TO IT ON AN "AS IS" AND "AS AVAILABLE" BASIS. PRIME TRUST WILL NOT BE LIABLE TO CUSTOMER FOR ANY DAMAGES RESULTING FROM CUSTOMER'S RELIANCE ON OR USE OF THE PRIME TRUST SERVICES.

**10.   THIRD-PARTY CLAIMS**

**10.1   Indemnities**. Customer will defend, indemnify and hold harmless, in accordance with Section 10.2 (Procedures), Prime Trust, its Affiliates, employees, directors, officers, agents, members, shareholders, partners, vendors, successors and assigns and representatives (together, the "**Prime Trust Indemnified Parties**") from and against, any (a) third-party claim (including claims from Authorized Users) ; (b) third-party legal action; or (c) administrative agency action or proceeding (each, a "**Claim**") to the extent arising from: (i) misuse of the Prime Trust Services by Customer or its Authorized Users (ii) any breach by Customer of its obligations under the Agreement; (iii) Customer's violation of any Applicable Laws or the rights of any third party; (iv) Customer's failure to provide true and accurate information in connection with the registration process or any failure to promptly update such information;  (v) the nature and content of all Customer Data processed by the Prime Trust Services; or (vi) gross negligence, willful misconduct or fraudulent acts or omissions of Customer or its Authorized Users. Prime Trust will defend, indemnify and hold harmless, in accordance with Section 10.2 (Procedures), Customer, its Affiliates, employees, directors, officers, agents, members, shareholders, partners, vendors, successors and assigns and representatives (together, the "**Customer Indemnified Parties**") from and against, any Claim to the extent arising from: (i) gross negligence, willful misconduct or fraudulent acts or omissions of Prime Trust, its Affiliates, employees, directors, officers, agents, partners, vendors, successors and assigns and representatives; and (ii) any alleged infringement of any third-party intellectual property right occurring from Customer's use of the Prime Trust Services as authorized under the Agreement ("IP Claim"). Notwithstanding the foregoing, Prime Trust will not be responsible for any IP Claim due to Customer's combination of Prime Trust Services with goods or services provided by third parties or Customer's modification of the Prime Trust Services not expressly authorized by Prime Trust in writing.



**10.2    Procedures**. The indemnified party will (a) give the indemnifying party prompt written notice of the Claim, except that the failure to provide prompt notice will only limit the indemnifying party's indemnification obligations to the extent the indemnifying party is prejudiced by the delay or failure; (b) permit the indemnifying party to assume control over the defense and settlement of the Claim; and (c) provide assistance in connection with the defense and settlement of the Claim, as the indemnifying party may reasonably request. The indemnifying party will indemnify the other party's Indemnified Parties against: (i) all damages, costs, and attorneys' fees finally awarded against any of the other party's Indemnified Parties with respect to any Claim; (ii) all out-of-pocket costs (including reasonable attorneys' fees) reasonably incurred by any of the other party's Indemnified Parties in connection with the defense of the Claim (other than attorneys' fees and costs incurred without the indemnifying party's consent after it has accepted defense of such Claim); and (iii) all amounts that the indemnifying party agreed to pay to any third party in settlement of any Claims arising under this Section 10 (Third-Party Claims) and settled by the indemnifying party or with its approval. The indemnifying party shall not, without the indemnified party's prior written consent, agree to any settlement on behalf of the indemnified party which includes either the obligation to pay any amounts, or any admissions of liability, whether civil or criminal, on the part of any of the indemnified party.

## 11.    LIMITATION OF LIABILITY

**11.1    Exclusion of Damages.** EXCEPT FOR DAMAGES OR CAUSES OF ACTIONS RELATED TO OR ARISING OUT OF WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR EITHER PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THE AGREEMENT, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES, AND REGARDLESS OF THE NATURE OF THE CLAIM, SHALL PRIME TRUST (OR ITS AFFILIATES) BE LIABLE TO THE CUSTOMER FOR LOSS OF PROFITS, SALES OR BUSINESS, LOSS OF ANTICIPATED SAVINGS, LOSS OF USE OR CORRUPTION OF SOFTWARE, DATA OR INFORMATION, WORK STOPPAGE OR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, COVER, PUNITIVE, OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE AGREEMENT, EVEN IF APPRISED OF THE LIKELIHOOD OF SUCH LOSSES. OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION. THIS INCLUDES ANY LOSSES OR PROBLEMS OF ANY TYPE RESULTING FROM INCIDENTS OUTSIDE OF PRIME TRUST'S DIRECT CONTROL, INCLUDING BUT NOT LIMITED TO ERRORS, HACKS, THEFT OR ACTIONS OF ISSUERS, TRANSFER AGENTS, SMART CONTRACTS, BLOCKCHAINS AND INTERMEDIARIES OF ALL TYPES.

**11.2    Limitation of Liability**. TO THE EXTENT PERMITTED BY LAW, THE TOTAL, CUMULATIVE LIABILITY OF PRIME TRUST (AND ITS AFFILIATES) ARISING OUT OF OR RELATING TO THE PRIME TRUST SERVICES PROVIDED PURSUANT TO THE AGREEMENT WILL BE LIMITED TO TWO TIMES (2X) THE TOTAL AMOUNT PAID BY CUSTOMER FOR THE PRIME TRUST TECHNOLOGY LICENSE FEE UNDER THE APPLICABLE ORDER FORM OR SERVICES UNDER THE APPLICABLE SOW OUT OF WHICH LIABILITY AROSE, DURING THE TWELVE (12)  MONTH PERIOD PRECEDING THE FIRST EVENT GIVING RISE TO LIABILITY. THE FOREGOING LIMITATION WILL APPLY WHETHER AN ACTION IS IN CONTRACT, TORT (INCLUDING NEGLIGENCE), BREACH OF STATUTORY DUTY, OR ANY OTHER LEGAL OR EQUITABLE THEORY. HOWEVER, NOTWITHSTANDING THE FOREGOING, THE LIABILITY LIMITATION SHALL NOT INCLUDE DAMAGES OR CAUSES OF ACTIONS RELATED TO OR ARISING OUT OF WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR EITHER PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THE AGREEMENT.



**11.3    Independent Allocations of Risk**. Each provision of the Agreement that provides for a limitation of liability, disclaimer of warranties, or exclusion of damages represents an agreed allocation of the risks of the Agreement between the Parties. This allocation is reflected in the pricing offered by Prime Trust to Customer and is an essential element of the basis of the bargain between the Parties. Each of these provisions is severable and independent of all other provisions of the Agreement, and each of these provisions will apply even if the warranties in the Agreement have failed of their essential purpose.

## 12.    CONFIDENTIALITY

**12.1    Restricted Use and Nondisclosure**. During and after the Term, Recipient will: (a) use the Confidential Information of the disclosing Party solely for the purpose for which it is provided; (b) not disclose such Confidential Information to a third party, except on a need-to-know basis to its Affiliates, attorneys, auditors, consultants, and service providers who are under confidentiality obligations at least as restrictive as those contained herein; and (c) protect such Confidential Information from unauthorized use and disclosure to the same extent (but using no less than a reasonable degree of care) that it protects its own Confidential Information of a similar nature.

**12.2    Required Disclosure**. If Recipient is required by law to disclose Confidential Information of the disclosing Party, Recipient will give prompt written notice to the disclosing Party before making the disclosure, unless prohibited from doing so by legal or administrative process, and cooperate with the disclosing Party to obtain where reasonably available an order protecting the Confidential Information from public disclosure.

**12.3    Ownership**. Recipient acknowledges that, as between the Parties, all Confidential Information it receives from the disclosing Party, including all copies thereof in Recipient's possession or control, in any media, is proprietary to and exclusively owned by the disclosing Party. Nothing in the Agreement grants Recipient any right, title or interest in or to any of the disclosing Party's Confidential Information. Recipient's incorporation of the disclosing Party's Confidential Information into any of its own materials will not render Confidential Information non-confidential.

**12.4    Remedies**. Recipient acknowledges that any actual or threatened breach of this Section 12 (Confidentiality) may cause irreparable, non-monetary injury to the disclosing Party, the extent of which may be difficult to ascertain. Accordingly, the disclosing Party is entitled to (but not required to) seek injunctive relief in addition to all remedies available to the disclosing Party at law and/or in equity, to prevent or mitigate any breaches of the Agreement or damages that may otherwise result from those breaches. Absent written consent of the disclosing Party to the disclosure, the Recipient, in the case of a breach of this Section 12 (Confidentiality), has the burden of proving that the disclosing Party's Confidential Information is not, or is no longer, confidential or a trade secret and that the disclosure does not otherwise violate this Section 12 (Confidentiality).

## 13.    GOVERNING LAW AND VENUE

**13.1    Binding Arbitration, Applicable Law and Venue, Attorneys Fees**. The Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws. Any claim or dispute arising under the Agreement may only be brought in arbitration, with venue in Clark County, Nevada. Such action will be pursuant to the rules of the American Arbitration Association under its Commercial Arbitration Rules subject to one arbitrator. Customer and Prime Trust each agree to this method of dispute resolution, as well as jurisdiction, and to this being a convenient forum for any such claim or dispute and waives any right it may have to object to either the method or jurisdiction for such claim or dispute. In the event of any dispute among the Parties,

## Prime Trust

the prevailing Party shall be entitled to recover damages and the decision of the arbitrator shall be final, binding and enforceable in any court. Notwithstanding anything hereunder and/or whatever provided by the applicable laws, regulations and/or arbitration rules, both Parties expressly agree and confirm to exclude any confidentiality obligations on either Party during and/or in relation to the arbitration proceedings mentioned hereunder.

## 14.   GENERAL

**14.1    Relationship**. The Parties are independent contractors. The Agreement does not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the Parties. Except as set forth in the Agreement, nothing in the Agreement, expressed or implied is intended to give rise to any third-party beneficiary.

**14.2    Assignability**. Neither Party may assign its rights or obligations under the Agreement without the other Party's prior written consent. Notwithstanding the foregoing, either Party may assign its rights and obligations under the Agreement to an Affiliate as part of a reorganization, merger, consolidation or otherwise by operation of law, or to a purchaser of its business entity or substantially all of its assets or business to which rights and obligations pertain without the other Party's consent, provided that: (a) the purchaser is not insolvent or otherwise unable to pay its debts as they become due; (b) the purchaser is not a competitor of the other Party; (c) any assignee is bound hereby; and (d) if assigned by Customer, subject to such Customer assignee providing all information required to be provided pursuant to Section 2.1 (Account Registration) and approval by Prime Trust of such Customer assignee. Other than the foregoing, any attempt by either Party to transfer its rights or obligations under the Agreement will be void. The Agreement will be binding upon and will inure to the benefit of the proper successors and assigns.

**14.3    Notices**. Any notice required or permitted to be given in accordance with the Agreement will be effective only if it is in writing and sent using: (a) personal delivery; (b) certified or registered mail; (c) email; or (d) a nationally recognized overnight courier, to the appropriate Party at the address set forth on the Order Form, with a copy, in the case of Prime Trust, to Legal@primetrust.com. Each Party hereto expressly consents to service of process by registered mail. Either Party may change its address for receipt of notice by notice to the other Party through a notice provided in accordance with this Section 14.3 (Notices). Notices are deemed given upon receipt if delivered using personal delivery, five (5) business days following the date of mailing, or one (1) business day following delivery to a courier or email.

**14.4    Electronic Signature and Communications Notice and Consent**. Each Party hereby agrees that all current and future notices, confirmations and other communications regarding the Agreement specifically, and future communications in general between the Parties, may be made by email, sent to the email address of record, without necessity of confirmation of receipt, delivery or reading, and such form of electronic communication is sufficient for all matters regarding the relationship between the Parties. If any such electronically-sent communication fails to be received for any reason, including but not limited to such communications being diverted to the recipients' spam filters by the recipient's email service provider, or due to a recipients' change of address, or due to technology issues by the recipient's service provider, the Parties agree that the burden of such failure to receive is on the recipient and not the sender, and that the sender is under no obligation to resend communications via any other means, including but not limited to postal service or overnight courier, and that such communications shall for all purposes, including legal and regulatory, be deemed to have been delivered and received. No physical, paper documents will be sent to Customer, and if Customer desires physical documents then it agrees to be satisfied by directly and personally printing, at Customer's own expense, either the electronically-sent communication(s) or the electronically available communications by logging on to Customer's Account and then maintaining such physical records in any manner or form that Customer desires.

**Prime Trust**

**14.5   Counterparts; Email; Signatures**. The Agreement may be executed in counterparts, each of which will be deemed an original and all of which, taken together, will constitute one and the same instrument, binding on each signatory thereto. The Agreement may be executed by signatures, electronically or otherwise, delivered by email, and a copy hereof that is properly executed and delivered by a Party will be binding upon that Party to the same extent as an original executed version hereof.

**14.6   Force Majeure**. In the event that either Party is prevented from performing, or is unable to perform, any of its obligations under the Agreement due to any cause beyond the reasonable control of the Party invoking this provision (including, without limitation, for causes due to war, fire, earthquake, flood, hurricane, riots, pandemic, acts of God, telecommunications outage not caused by the obligated Party, or other similar causes) ("**Force Majeure Event**"), the affected Party's performance will be excused and the time for performance will be extended for the period of delay or inability to perform due to such occurrence; provided that the affected Party: (a) provides the other Party with prompt notice of the nature and expected duration of the Force Majeure Event; (b) uses commercially reasonable efforts to address and mitigate the cause and effect of such Force Majeure Event; (c) provides periodic notice of relevant developments; and (d) provides prompt notice of the end of such Force Majeure Event. Delays in fulfilling the obligations to pay hereunder are excused only to the extent that payments are entirely prevented by the Force Majeure Event. However, nothing in this Section 14.6 (Force Majeure) will affect or excuse a Party's liabilities or a Party's obligation to pay Fees, fines, disputes, refunds, reversals, or returns under the Agreement.

**14.7   Trade Restrictions**. The Prime Trust Services, Documentation, and the provision and any derivatives thereof are subject to the export control and sanctions laws and regulations of the United States and other countries that may prohibit or restrict access by certain Persons or from certain countries or territories ("**Trade Restrictions**").

(a) Each Party shall comply with all applicable Trade Restrictions in performance of the Agreement. For the avoidance of doubt, nothing in the Agreement is intended to induce or require either Party to act in any manner which is penalized or prohibited under any applicable laws, rules, regulations or decrees.

(b) Customer represents that it is not a Restricted Party. "**Restricted Party**" means any Person that is: (i) located or organized in a country or territory subject to comprehensive U.S. sanctions (currently including Cuba, Crimea, Iran, North Korea, Syria) ("**Sanctioned Territory**"); (ii) owned or controlled by or acting on behalf of the government of a Sanctioned Territory; (iii) an entity organized in or a resident of a Sanctioned Territory; (iv) identified on any list of restricted parties targeted under U.S., EU or multilateral sanctions, including, but not limited to, the U.S. Department of the Treasury, Office of Foreign Assets Control's ("**OFAC**") List of Specially Designated Nationals and Other Blocked Persons, the OFAC Sectoral Sanctions List, the U.S. State Department's Nonproliferation Sanctions and other lists, the U.S. Commerce Department's Entity List or Denied Persons List located at https://www.export.gov/article?id=Consolidated-Screening-List, the consolidated list of persons, groups and entities subject to EU financial sanctions from time to time; or (v) owned or controlled by, or acting on behalf of, any of the foregoing.

(c) Customer acknowledges and agrees that it is solely responsible for complying with, and shall comply with, Trade Restrictions applicable to any of its own or its Affiliates' or Authorized Users' or customers' content or Customer Data transmitted through the Prime Trust Services. Customer shall not and shall not permit any Authorized User to access, use, or make the Prime Trust Services available to or by any Restricted Party or to or from within any Sanctioned Territory.



**14.8   Anti-Corruption**. In connection with the Prime Trust Services performed under the Agreement and Customer's or Authorized Users' use of the Prime Trust Services, the Parties agree to comply with all applicable anti-corruption and anti-bribery related laws, statutes, and regulations.

**14.9   U.S. Government Rights**. All Prime Trust Services, including Documentation, and any software as may be provided under an applicable Service Schedule, are deemed to be "commercial computer software" and "commercial computer software documentation". "Commercial computer software" has the meaning set forth in Federal Acquisition Regulation ("**FAR**") 2.101 for civilian agency purchases and the Department of Defense ("**DOD**") FAR Supplement ("**DFARS**") 252.227-7014(a)(1) for defense agency purchases. If the software is licensed or the Prime Trust Services are acquired by or on behalf of a civilian agency, Prime Trust provides the commercial computer software and/or commercial computer software documentation and other technical data subject to the terms of the Agreement as required in FAR 12.212 (Computer Software) and FAR 12.211 (Technical Data) and their successors. If the software is licensed or the Prime Trust Services are acquired by or on behalf of any agency within the DOD, Prime Trust provides the commercial computer software and/or commercial computer software documentation and other technical data subject to the terms of the Agreement as specified in DFARS 227.7202-3 and its successors. Only if this is a DOD prime contract or DOD subcontract, the Government acquires additional rights in technical data as set forth in DFARS 252.227-7015. Except as otherwise set forth in an applicable Service Schedule, this Section 14.9 (U.S. Government Rights) is in lieu of, and supersedes, any other FAR, DFARS or other clause or provision that addresses U.S. Government rights in computer software or technical data.

**14.10   Publicity**. Neither Party shall refer to the identity of the other Party in promotional material, publications, public statements or press releases or other forms of publicity relating to the Prime Trust Services unless the prior written consent of the other Party has been obtained.

**14.11   No Legal, Tax or Accounting Advice**. Customer acknowledges and agrees without reservation that Prime Trust is not providing any legal, tax or accounting advice in any way, nor on any matter, regardless of the tone or content of any communication (oral, written or otherwise). Customer unconditionally agrees to rely solely on its legal, tax and accounting professionals for any such advice and on all matters.

**14.12   No Investment Advice, Underwriting or Recommendations**. Customer acknowledges and agrees that Prime Trust does not provide any investment advice, nor does Prime Trust make any recommendations to any issuer of, or investor in, any offering. Prime Trust does not provide any brokerage, underwriting or other advice in the structuring of any offering. Customer agrees that any communications from Prime Trust, whether written, oral or otherwise, regardless of content, will never be interpreted or relied upon as investment advice or securities recommendations; Customer agrees that it will only rely on the advice of its attorneys, accountants and other professional advisors, including any registered broker-dealers acting as an underwriter of an offering, if any.

**14.13   Waiver**. The waiver by either Party of any breach of any provision of the Agreement does not waive any other breach. The failure of any Party to insist on strict performance of any covenant or obligation in accordance with the Agreement will not be a waiver of such Party's right to demand strict compliance in the future, nor will the same be construed as a novation of the Agreement.

**14.14   Interpretation**. Each Party to the Agreement has been represented by or had adequate time to obtain the advice and input of independent legal counsel with respect to the Agreement and has contributed equally to the drafting of the Agreement. Therefore, the Agreement shall not be construed against either Party as the drafting Party. All pronouns and any variation thereof will be deemed to refer to all persons, and to the singular or plural as the identity of the person or persons may require for proper



interpretation of the Agreement. And it is the express will of the Parties that the Agreement is written in English and uses the font styles and sizes contained herein.

**14.15   Severability**. If any part of the Agreement is found to be illegal, unenforceable, or invalid, the remaining portions of the Agreement will remain in full force and effect.

**14.16   Entire Agreement**. The Agreement is the final, complete, and exclusive expression of the agreement between the Parties regarding the Prime Trust Services provided under the Agreement. The Agreement supersedes and replaces, and the Parties disclaim any reliance on, all previous oral and written communications (including any confidentiality agreements pertaining to the Prime Trust Services under the Agreement), representations, proposals, understandings, undertakings, and negotiations with respect to the subject matter hereof and apply to the exclusion of any other terms that Customer seeks to impose or incorporate, or which are implied by trade, custom, practice, or course of dealing. The Agreement may be changed only by a written agreement signed by an authorized agent of both Parties. The Agreement will prevail over terms and conditions of any Customer-issued purchase order or other ordering documents, which will have no force and effect, even if Prime Trust accepts or does not otherwise reject the purchase order or other ordering document.

**The below signatories are authorized to sign on behalf of their respective Party and agree to the terms of this MSA and any documents incorporated herein upon mutual agreement as of later signature date below.**

| CUSTOMER | | PRIME TRUST, LLC | |
|---|---|---|---|
| Signature: | ▓▓▓▓▓▓▓ | Signature: | ▓▓▓▓▓▓▓ |
| Name: | ▓▓▓▓▓▓▓ | Name: | ▓▓▓▓▓▓▓ |
| Title: | ▓▓ | Title: | SVP, Finance |
| Date: | 1/11/2023 | Date: | 1/11/2023 |



## APPENDIX 1
## PROHIBITED USE, PROHIBITED BUSINESSES AND CONDITIONAL USE

Revision date: November 12, 2021.

### 1.  PROHIBITED USE

**1.1**    Customer shall not use a Customer Custody Account(s) or any Prime Trust Services, and shall ensure that no Authorized User uses the Customer Custody Account, or any other Prime Trust Services, to engage in the categories of activity set forth herein or otherwise disclosed to Customer from time to time ("**Prohibited Uses**"), and Prime Trust may add modify or amend the list of Prohibited Uses at any time with notice to Customer. The Prohibited Uses apply to any third-party accessing the Customer Custody Account(s)or Prime Trust Services, regardless of whether such third party was authorized by Customer, Authorized User to use the Prime Trust Services associated with such custody account(s). Customer acknowledges and agrees that Customer will not use and will prevent any third-party from using the Customer Custody Account(s), or any Prime Trust Service to do any of the following:

(a) **Unlawful Activity**. Activity which would violate, or assist in violation of, any law, statute, ordinance, or regulation, or sanctions programs administered in the countries where Prime Trust conducts business, including but not limited to the U.S. Department of Treasury's Office of Foreign Assets Control ("**OFAC**"), or which would involve proceeds of any unlawful activity; publish, distribute or disseminate any unlawful material or information.

(b) **Abusive Activity**. Actions which impose an unreasonable or disproportionately large load on Prime Trust's infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data, or information; transmit or upload any material to the Prime Trust Services that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs; attempt to gain unauthorized access to the Prime Trust Services, other customers' custodial accounts with Prime Trust not contemplated by this Agreement, computer systems or networks connected to the Prime Trust Services through password mining or any other means; use  account information of another party to access or use the Prime Trust Services; or transfer Customer Custody Account access or rights to such account to a third party, unless by operation of law or with the express permission of Prime Trust.

(c) **Abuse of Other Users**. Interfere with another individual's or entity's access to or use of any Prime Trust Services; defame, abuse, extort, harass, stalk, threaten or otherwise violate or infringe the legal rights (such as, but not limited to, rights of privacy, publicity and intellectual property) of others; harvest or otherwise collect information from the Prime Trust Services about others, including without limitation email addresses, without proper consent.

(d) **Fraud.** Activity which operates to defraud Prime Trust, Prime Trust users, or any other Person; provide any false, inaccurate, or misleading information to Prime Trust.

(e) **Unlawful Gambling**. Lotteries; bidding fee auctions; sports forecasting or odds making; fantasy sports leagues with cash prizes; internet gaming; contests; sweepstakes; or games of chance that are not sanctioned by a governmental body or regulatory authority.

(f) **Intellectual Property Infringement**. Engage in transactions involving items that infringe or violate any copyright, trademark, right of publicity or privacy or any other proprietary right under the law,

Prime Trust

including but not limited to sales, distribution, or access to counterfeit music, movies, software, or other licensed materials without the appropriate authorization from the rights holder; use of Prime Trust intellectual property, name, or logo, including use of Prime Trust trade or service marks, without express consent from Prime Trust or in a manner that otherwise harms Prime Trust or the Prime Trust brand; any action that implies an untrue endorsement by or affiliation with Prime Trust.

(g) **Policies and Documentation**. Activity that would violate, or assist in violation of, or is otherwise inconsistent with, any operating instructions promulgated by Prime Trust.

## 2. PROHIBITED BUSINESSES

**2.1**    The following categories of businesses, business practices, and sale items are barred from the Prime Trust Services ("**Prohibited Businesses**"). Prime Trust may add, modify or amend the list of Prohibited Businesses at any time upon notice to Customer. Customer acknowledges and agrees that Customer will not use and will prevent any third-party from using the Customer Custody Account(s) or any service of Prime Trust in connection with any of the following businesses, activities, practices or items:

(a) **Investment and Credit Services:** Securities brokers; mortgage consulting or debt reduction services; credit counseling or repair; real estate opportunities; investment schemes.

(b) **Restricted Financial Services:** Check cashing, bail bonds; collections agencies.

(c) **Intellectual Property or Proprietary Rights Infringement:** Sales, distribution, or access to counterfeit music, movies, software, or other licensed materials without the appropriate authorization from the rights holder.

(d) **Counterfeit or Unauthorized Goods:** Unauthorized sale or resale of brand name or designer products or services; sale of goods or services that are illegally imported or exported or which are stolen.

(e) **Regulated Products and Services:**  Sale of tobacco, e-cigarettes, and e-liquid; online prescription or pharmaceutical services; age restricted goods or services; weapons and munitions; gunpowder and other explosives; fireworks and related goods; and toxic, flammable, and radioactive materials; products and services in states where the applicable state law prohibits the product and services.

(f) **Drugs and Drug Paraphernalia:** Sale of narcotics, controlled substances, and any equipment designed for making or using drugs, such as bongs, vaporizers, and hookahs.

(g) **Pseudo-Pharmaceuticals:** Pharmaceuticals and other products that make health claims that have not been approved or verified by the applicable local and/or national regulatory body.

(h) **Substances designed to mimic illegal drugs:** Sale of a legal substance that provides the same effect as an illegal drug (e.g., salvia, kratom).

(i) **Adult Content and Services:** Pornography and other obscene materials (including literature, imagery and other media); sites offering any sexually-related services such as prostitution, escorts, pay-per view, adult live chat features.

(j) **Multi-level Marketing:** Pyramid schemes, network marketing, and referral marketing programs.

(k) **Unfair, Predatory or Deceptive Practices:** Investment opportunities or other services that promise high rewards; sale or resale of a service without added benefit to the buyer; resale of government

DocuSign Envelope ID: A1E14A0F-6295-4A1F-A7F7-B25A68943946

▲ **Prime Trust**

offerings without authorization or added value; sites that we determine in our sole discretion to be unfair, deceptive, or predatory towards consumers.

(l) **High Risk Businesses:** Any businesses that Prime Trust believes poses elevated financial risk, legal liability, or violates card network or bank policies.

2.2    Customer will establish controls for preventing Digital Assets or Fiat Currency being transferred to or from individuals or entities operating as or in connection with, the specific types of individuals or entities listed below and Prime Trust may add modify or amend the list at any time upon notice to Customer:

- Entities or jurisdictions on the Prime Trust's prohibited list, which will be provided to Customer prior to program go-live and on an ongoing basis as changes to the list are made.
- Adult content, including, but not limited to, pornographic services and goods, adult entertainment related activities, or escort services
- Alcoholic beverages, including the facilitation, sale, or distribution of alcoholic beverages
- Bearer share corporations
- Chemicals, including the facilitation, sale, or distribution of chemicals
- Dietary supplements, including the facilitation, sale or distribution of dietary supplements
- Embassies and foreign consulates
- Financial institutions, where Prime Trust does not maintain a direct relationship with the financial institution or bank and a nested relationship is established, this is applicable only if Customer establishes custody accounts in the name of end-users,
- Foreign bulk shipment of currency
- Foreign casinos/gambling establishments/internet gambling or other betting related services
- Foreign governments
- Foreign offshore shell companies
- Foreign shell banks
- Jewels, precious metals, or stones, including the facilitation, sale, distribution, or exchange of jewels, precious metals or stones
- Medical devices and medications, including the facilitation, sale or distribution of drugs, prescription medications, or medical devices
- Online dating services
- Online payday lenders
- Stocks and other security interests, including the sale of stocks and other security interests
- Telemarketing activities
- Tobaccos goods, including the facilitation, sale or distribution of tobacco goods
- Unlawful or illegal activities, including, without limitation:
  - the creation, facilitation, sale or distribution of any prohibited or illegal good or service or an activity that requires a governmental license where the customer lacks such a license
  - the creation, facilitation, sale or distribution of goods or services that violate the intellectual property rights of a third party
  - any Ponzi-scheme or pyramid selling
- Violence related activities, including the creation, facilitation, sale, or distribution of any material that promotes violence or hatred
- Weapons, including the facilitation, sale or distribution of firearms or other weapons, military or semi-military goods, military software, or technologies

3.   **CONDITIONAL USE**

DocuSign Envelope ID: A1E14A9F-6295-4A1F-A7F7-B25A68943946

**Prime Trust**

**3.1**    Express written consent and approval from Prime Trust must be obtained prior to using Prime Trust Services for the following categories of business and/or use ("**Conditional Uses**"). Consent may be requested by contacting Prime Trust. Prime Trust may provide such consent in its sole and absolute discretion and may reject any such request for any reason. Customer acknowledges and agrees that Prime Trust may also require Customer to agree to additional conditions, make supplemental representations and warranties, complete enhanced on-boarding procedures, and operate subject to restrictions if Customer uses Prime Trust Services in connection with any of following businesses, activities, or practices:

(a) **Money Services:** Money transmitters, Digital Asset transmitters; currency or Digital Asset exchanges dealers; gift cards; prepaid cards; sale of in-game currency unless the merchant is the operator of the virtual world; act as a payment intermediary or aggregator or otherwise resell any of the services of a financial institution.

(b) **Charities:** Acceptance of donations for nonprofit enterprise.

(c) **Games of Skill:** Games which are not defined as gambling under the Agreement or by law, but which require an entry fee and award a prize.

(d) **Religious/Spiritual Organizations:** Operation of a for-profit religious or spiritual organization.

(e) **Regulated Products and Services:** Marijuana dispensaries and related businesses.

## 4.    RESTRICTED USE

**4.1**    The following activities are barred from the Prime Trust Services ("**Restricted Use**"). The specific types of use listed below are representative, but not exhaustive, and Prime Trust may add modify or amend the list of Restricted Use at any time with notice to Customer. Customer acknowledges and agrees that Customer will not use and will prevent any third-party from using the Customer Custody Account(s) or any service of Prime Trust in connection with any of the following businesses, activities, practices or items:

(a) **Circumvention:** Use the Prime Trust Services, or allow access to it, in a manner that circumvents contractual usage restrictions or that exceeds Customer's authorized use or usage metrics set forth in the Agreement, including the applicable Order Form or SOW.

(b) **Sublicense:** License, sub-license, sell, re-sell, rent, lease, transfer, distribute, time share, lend, convert, assign, exploit or otherwise make any portion of the Prime Trust Services or Documentation available for access by third parties except as otherwise expressly provided in the Agreement.

(c) **Competing Product:** Access or use the Prime Trust Services or Documentation for the purpose of: (i) developing or operating products or services intended to be offered to third parties in competition with the Prime Trust Services, (ii) monitoring availability, performance or functionality, or for any other benchmarking or competitive purposes or (iii) allowing access to its Account by a direct competitor of Prime Trust.

(d) **Reverse Engineer:** Reverse engineer, decompile, disassemble, or copy any of the Prime Trust Services or technologies, or otherwise attempt to derive source code or other trade secrets or create any derivative works from or about any of the Prime Trust Services or technologies, or use the machine-learning algorithm output generated from the Prime Trust Services to train, calibrate, or validate, in whole or in part, any other systems, programs or platforms, or for benchmarking, software-development, or

other competitive purposes, except pursuant to Customer's non-waivable rights under applicable law, without Prime Trust's written consent.

(e) **Interference:** Fail to use commercially reasonable efforts to avoid interference with or disruption to the integrity, operation, performance, or use or enjoyment by others of the Prime Trust Services.



**Exhibit A to the MSA**

**SERVICE SCHEDULE FOR
PRIME TRUST API SERVICES**

Service Schedule revision date: August 1, 2022

The terms in this Service Schedule apply to Customers that use Prime Trust API Services and also integrate Customer Applications with the Prime Trust API Services. Unless otherwise defined in this Service Schedule, capitalized terms will have the meaning given to them in the Agreement.

## 1.  DEFINITIONS

"**Customer Applications**" means any applications developed by Customer to interact with the API.

"**User**" means Customer and its Authorized Users.

## 2.  API SERVICES

**2.1    API Services**. Prime Trust will make the API Services available to Customer and Users subject to and in accordance with this Service Schedule. Customer may not use the API and/or API Services for any other purpose without Prime Trust's prior written consent. Unless otherwise approved by Prime Trust in writing and subject to additional terms agreed to by Customer, Customer shall not use the API Services or any other Prime Trust Services to generate any custody account for or in the name of an end-user. Customer acknowledges that some of the API Services, even though a la carte in the system, may be interdependent and not available except and unless combined with other API Services.

**2.2    Hosting & Management**. At all times, the API Services shall be hosted, managed and maintained by Prime Trust and its appointed third-party service providers. The API Services are accessible via the API and not by any separate and distinct software installation. Prime Trust provides API Services to other customers. Customer acknowledges and agrees that the API Services that Prime Trust provides are always evolving and the form and nature of the API Services that Prime Trust provides may change from time to time without prior notice to Customer, and that Prime Trust may update, modify, change or otherwise alter the hosting location(s) and/or methodology, as well as any or all features, functionality, user interface(s), business logic, policies, procedures, and/or the API, widgets or dashboards from time to time, in its sole discretion and without prior notice. In addition, Prime Trust may stop (permanently or temporarily) providing the API Services (or any specific component(s) or feature(s) of the API Services) to Customer or Users generally without prior notice, in Prime Trust's sole discretion.

**2.3.    Updates**. This Service Schedule does not entitle Customer to any support for the API. Customer acknowledges that Prime Trust may update or modify the API from time to time and at Prime Trust's sole discretion (each, an "**Update**"), and may require Customer to obtain and use the most recent version of the API and agree to any applicable terms. Customer is required to make any changes that are required for integration as a result of such Update at Customer's sole cost and expense.

**2.4    API Restrictions**. Prime Trust may, in its sole discretion, set and enforce limits on Customers' and Users' use of the API. Except as expressly authorized under this Service Schedule, Customer will not directly itself, and will not permit or authorize third parties, including Customers' and/or Users', employees, agents, or officers to:

DocuSign Envelope ID: A1E14A8F-6295-4A1F-A7F7-B25A68943946

**Prime Trust**

(a) make more calls than allowed or any calls to the API that are not permitted by the Prime Trust applicable Documentation, API guidelines or in violation of any other restrictions in this Service Schedule;

(b) circumvent or disable any security or other technological features or measures of the API;

(c) alter, modify, convert, remove proprietary notices from or otherwise manipulate the API, software or code, or make derivative works of the API, in whole or in part;

(d) combine or integrate the API with any software, technology, services, or materials not authorized by Prime Trust;

(e) design or permit Customer Applications to disable, override, or otherwise interfere with any Prime Trust-implemented communications to Users, consent screens, disclosures, notices, forms, user settings, alerts, warning, or the like;

(f) use the API in any of Customer Applications to replicate or attempt to replace the user experience of Prime Trust's products and services;

(g) attempt to cloak or conceal Customer's identity or the identity of Customer Applications when requesting authorization to use the API;

(h) clone or otherwise copy, replicate or duplicate in any fashion any part of the API design, workflow, features or methodology, all of which Customer acknowledges are proprietary intellectual property wholly owned by Prime Trust. Customer shall supervise the use of the API Services and API by its Users and immediately notify Prime Trust of any breach of this Service Schedule. Customer agrees to monitor the use of Customer Applications for any activity that violates Applicable Laws, rules, and regulations or any terms and conditions of this Service Schedule, including any fraudulent, inappropriate, or potentially harmful behavior, and promptly restrict any offending users of Customer Applications from further use thereof. Customer agrees to provide a resource for Users to report abuse of Customer Applications. As between the Parties hereto, Customer is responsible for all acts and omissions of its Users in connection with Customer Applications and their use of the API, if any. Customer agrees that it is solely responsible for posting any privacy notices and obtaining any consents from Users required under Applicable Laws, rules, and regulations for their use of Customer Applications;

(i) reverse engineer or attempt to extract the source code from any API or any related software, except to the extent that this restriction is expressly prohibited by Applicable Law;

(j) scrape, build databases, or otherwise create permanent copies of content returned from the API, or keep cached copies longer than permitted by the cache header;

(k) copy, translate, modify, create a derivative work of, sell, lease, lend, convey, distribute, publicly display, or sublicense to any third party, the content returned from the API; or

(l) misrepresent the source or ownership of content returned from the API.

**2.5    Prime Trust Duties**. Prime Trust will operate its business in compliance with all Applicable Laws. Prime Trust will manage the API and all related engineering functions, including application maintenance, upgrades, hosting and modifications.

**3.    CUSTOMER RESPONSIBILITIES**



**3.1**    Customer acknowledges, represents, and warrants that:

(a) it will operate its business in compliance with all Applicable Laws, including the rules and regulations of any self-regulatory organization of which it is a member (if any);

(b) it will keep any API credentials (such as passwords, integration keys) confidential, and not share it with any third party. If Customer believes that its credentials have been obtained by any other Person or that its Account has been used in an unauthorized way, Customer agrees to notify Prime Trust immediately;

(c) it will present where required by Prime Trust and will not remove, obscure or alter any Prime Trust forms, notices, disclosures or Prime Trust terms and conditions or links to notices of those terms;

(d) it is duly authorized by all necessary and appropriate authorizations, such that: (i) Customer has the requisite power and authority to act on behalf of its Users, in relation to the Prime Trust Services; (ii) Customer has the requisite power and authority to provide instructions to Prime Trust on behalf of its Users, via the API or otherwise; (iii) the aforementioned power and authority are current and have not been revoked by the applicable User; and (iv) Prime Trust may reasonably rely on Customer's power and authority, as described above. Customer further warrants that any and all such instructions Customer provides to Prime Trust on behalf of Users will be promptly sent to Prime Trust and will be accurate and complete; and

(e) it will use the API Services in compliance with Applicable Laws, and refrain from any unethical conduct or any other conduct, use or misuse that may damage the reputation of Prime Trust.

**3.2    Content, Use and Protection Unauthorized Use**. Customer is solely responsible for the content of its postings, data and transmissions using the API, and any other use of the API by Customer or Users. Customer will use best efforts to prevent any unauthorized use of the API and immediately notify Prime Trust in writing of any unauthorized use that comes to Customer's attention. Customer will take all possible steps reasonably necessary to terminate the unauthorized use.

**3.3    Funds Hold & Clearance Policy**. Customer acknowledges and agrees that the receipt and clearance of funds in any account created via API is subject to Prime Trust's then in effect funds clearance policies. Exceptions to the policy, if and when made, do not constitute a change to the general policy nor a permanent exception for any account so affected.

**3.4    Regulatory Compliance**. Customer will cooperate with and provide assistance to Prime Trust in connection with satisfying or complying with any applicable regulatory requirements or requests, including, without limitation, providing any documentation or information reasonably available to Customer as necessary for Prime Trust to comply with any audit or investigation by a governmental or self-regulatory organization. Furthermore, Prime Trust may, without prior notice, modify, add, or discontinue any portion or all features, access to and/or use of the API Services to comply with legal or regulatory laws, rules, interpretations and/or directives.

**3.5    Collection and Use of Information**. Prime Trust may collect certain information through the API or the Prime Trust Services about Customer or any of its employees, contractors, or agents. By accessing, using, and providing information to or through the API or other Prime Trust products and services, Customer consents to all actions taken by Prime Trust with respect to such information in compliance with Prime Trust's Privacy Policy.

**Prime Trust**

**3.6    FCRA/GLBA**. Some information contained in or obtained through the Prime Trust Services is "non-public personal information," as defined in the GLBA, and is regulated by the GLBA.  Customer shall not obtain and/or use such non-public personal information in any manner that would violate the GLBA or any other similar law.  Customer acknowledges and agrees that it may be required to certify permissible use of such non-public personal information falling within an exception set forth in the GLBA from time to time and will recertify upon request by Prime Trust.  The Prime Trust Services provided pursuant to the Agreement are not provided by "consumer reporting agencies," as that term is defined by the Fair Credit Reporting Act ("FCRA"), and do not constitute "consumer reports" as that term is defined in the FCRA. The Prime Trust Services may not be used in whole or in part as a factor in determining eligibility for credit, insurance, employment, a permissible purpose under FCRA or any other purpose in connection with which a consumer report may be used under the FCRA.

**3.7    Records**. Customer shall keep current and accurate records relating to the Prime Trust Services and Customer Application, including, without limitation, the Prime Trust Services provided to Customer and Transactions processed using Prime Trust Services, all in accordance with Applicable Law and Prime Trust policies, or as otherwise reasonably required by Prime Trust ("**Records**"). Customer shall provide to Prime Trust any Records, including but not limited to data or other information in its possession or in the possession of its subcontractors which is required to reconcile accounts or substantiate information concerning fees, Transactions or settlement or as required by any Applicable Law.

**3.8    Audit**. Customer agrees (and shall cause each Authorized User) to cooperate with any examination, inquiry, audit, information request, site visit or the like, which may be required by any Regulatory Authority with audit examination or supervisory authority over Prime Trust, to the fullest extent requested by such Regulatory Authority or Prime Trust. Customer shall also (and shall cause each Authorized User to) provide to Prime Trust any information which may be required by Prime Trust or any Regulatory Authority in connection with such Regulatory Authority's audit or review of Prime Trust shall cooperate with such Regulatory Authority in connection with any audit or review of Prime Trust.  Customer shall also (and shall cause each Authorized User to) provide such other information as Prime Trust or Regulatory Authority may from time-to-time reasonably request with respect to the financial condition of Customer and such other information as Prime Trust may request from time to time with respect to third parties who have contracted with Customer to perform Customer services relating to or in connection with the Agreement.

**3.9    Complaints**. Customer will investigate, process, log and resolve all complaints, disputes, chargebacks transaction disputes (including errors, as defined by Regulation E (12 C.F.R. 1005) as amended from time to time), received by or referred to Customer relating to a Prime Trust Service, application for a Prime Trust Service, or use of a Prime Trust Service ("**Customer Complaint**") and otherwise do all things necessary to service the Prime Trust Services, on a timely basis and in accordance with the Prime Trust policies and Applicable Law. Without limiting the foregoing, Customer will conduct chargeback processing consistent with the data security standards set forth in the Agreement. Without limiting the foregoing, all Customer Complaints that are material shall be promptly reported to Prime Trust and addressed and resolved by Customer in accordance with Prime Trust policies, compliance policies and Applicable Law. Customer shall provide a copy of the forms of proposed standard responses to a Customer Complaint to Prime Trust for its approval, not to be unreasonably withheld, conditioned or delayed, prior to launch of the implementation.

**3.10    Fraud**. Customer shall adopt, implement, and maintain fraud monitoring practices consistent with customary, reasonable, and usual standards of fraud monitoring practices for well-managed, regulated financial institutions that originates or offers accounts and services that are similar to Prime Trust Services.  Customer shall: (a) monitor Authorized Users' usage of products and services, including any use of the Prime Trust Services, to track, review and report to Prime Trust any fraudulent use of such



products or services; (a) immediately report any suspicious activities in accordance with AML/OFAC Policy, Applicable Law and Prime Trust policies, including, but not limited to, reporting such suspicious activities related to Prime Trust Services in accordance with applicable timeframes contained within the AML/OFAC Policy or otherwise required by Applicable Law; (b) take appropriate steps to prevent or stop such fraudulent and/or suspicious activity; and (c) if required by Prime Trust, immediately terminate Customer's or Authorized User's access to the Prime Trust Services.  As between Customer and the Prime Trust, Customer is financially and operationally responsible for: (i) all chargebacks, dispute resolutions and associated services, including Network fees or fines; (ii) all compromised custody accounts or Transactions supported by Prime Trust in connection with a Prime Trust Service and any fraud losses in connection with unauthorized transactions or payment orders, "errors" (as defined by Regulation E), and all fraudulent or unauthorized transactions related to Prime Trust Services; (iii) any losses associated with the Prime Trust Services; and (iv) losses, fines, penalties, or assessments by a Regulatory Authority that may be incurred by Prime Trust in connection with a Prime Trust Service dispute or error or any other unauthorized transaction in connection with a Customer's or its Authorized Users' use of the Prime Trust Services (collectively, "**Transaction Losses**"). Customer shall immediately reimburse Prime Trust for Transaction Losses.

**3.11   Escheatment**. With respect to each Prime Trust Service, or asset maintained by Prime Trust that is subject to unclaimed property laws, Customer shall provide escheat recordkeeping services on Prime Trust's behalf for the Customer Applications and Prime Trust Services in compliance with all state unclaimed property laws. At Customer's expense, Prime Trust shall remit, or oversee remittance of, such unclaimed funds to the appropriate jurisdiction in compliance with Customer's instructions with respect to amounts. Customer shall be solely liable for any costs and fines related to any challenge by any Regulatory Authority with respect to escheat or unclaimed property laws or related to Customer's instructions, regardless of whether such cost is incurred by, or such fines are assessed to, Prime Trust or Customer; unless such challenge is directly related to Prime Trust's failure to remit to the appropriate jurisdiction any unclaimed funds, except where Prime Trust's failure to remit the funds was caused by Customer's failure to timely, completely or accurately submit instructions to Prime Trust. Customer shall be liable to Prime Trust for any amounts claimed by states under unclaimed property laws that represent "breakage" that has been previously paid to Customer by Prime Trust.

**4.   RESERVED**

**5.   ADDITIONAL WARRANTIES**

**5.1   Additional Customer Warranties**.

(a) By accessing the API or API Materials, Customer explicitly agrees that Customer and any Integration that Customer develops or supports shall comply with: (i) the applicable Prime Trust Documentation and API guidelines (as may be available from time to time); (ii) the applicable Order Form (if any); and (iii) any license agreement governing the software that Prime Trust makes available for use with the API;

(b) Customer hereby represents and warrants that the Customer API Materials comply with all Applicable Laws, and will not infringe the copyright, trade secret, privacy, publicity, or other rights of any third party. Customer will defend, indemnify and hold harmless Prime Trust Indemnified Parties for any and all violations or breaches of this Section 6.1 (Additional Customer Warranties). Customer acknowledges that it is sharing its Customer API Materials on a reasonably necessary basis with Prime Trust in order for Prime Trust to provide the API Services and perform under this Service Schedule;

(c) Customer will defend, indemnify and hold harmless the Prime Trust Indemnified Parties against any claim initiated by or on behalf of any User against any Prime Trust Indemnified Parties, and any losses or

DocuSign Envelope ID: A1E14A9F-6295-4A1F-A7F7-B25A68943946

## Prime Trust

liability incurred by any Prime Trust Indemnified Parties, related to any instruction given to Prime Trust by Customer, by, on behalf of or otherwise related to any such User; and

(d) The indemnities in Section 5.1(b) and (c) shall be subject to Section 10.2 of the MSA.

## 6.   RESERVED

## 7.   MISCELLANEOUS

**7.1    Monitoring**. Customer agrees that Prime Trust may monitor Customer's use of the API and API Services to ensure quality, improve Prime Trust's products and services, and verify Customer's compliance with the terms of this Service Schedule. This monitoring may include Prime Trust's access and use of Customer's products and services. Customer will not interfere with this monitoring.



**Exhibit B to the MSA**

**SERVICE SCHEDULE FOR
PRIME TRUST CUSTODIAL SERVICES**

Service Schedule revision date: May 13, 2022

Customer hereby requests and directs that Prime Trust establish and maintain a Customer Custody Account for and in the name of Customer in connection with the Custodial Services, and hold as custodian all property deposited to, or collected with respect to, the Customer Custody Account, upon the terms and conditions of this Service Schedule. Unless otherwise defined in this Service Schedule, capitalized terms will have the meaning given to them in the Agreement.

## 1. DEFINITIONS

"**Authorized Person**" means each Authorized User or person authorized to provide instructions (an "**Agent**") with respect to the Customer Custody Account designated upon acceptance of Customer as determined by Prime Trust. Authorized person may be one or more persons.

"**Custodial Property**" means any property delivered by Customer into the possession or control of Prime Trust.

"**Custodial Services**" means the Fiat Services, On-Chain Services, and any other services, including the holding, processing and acting as custodian of all Custodial Property, provided from time to time by Prime Trust in accordance with this Service Schedule. Without limiting the generality of the foregoing, Prime Trust is authorized to collect into custody all Custodial Property while this Service Schedule is in effect. For the avoidance of doubt, Custodial Services are Prime Trust Services.

"**Custody Transaction**" means a contribution of supported Digital Assets from a public Blockchain address Customer controls to the Customer Custody Account, and/or a disbursement of supported Digital Assets from Customer Custody Account to a public blockchain address Customer controls.

"**Fiat Services**" means the custody of Fiat Currencies and foreign exchange transactions in Fiat Currencies.

"**Fork**" means: (a) that a Digital Asset network has been changed in a way that makes it incompatible with the unchanged version of the Digital Asset network; (b) the changes have been widely accepted by users of the Digital Asset network; and (c) that the two resulting Digital Asset networks have not been merged together at the time of any action to be taken by Prime Trust. A Fork may create two separate Digital Asset networks (each, a "**Forked Network**"), and may result in Prime Trust holding an identical amount of Digital Assets associated with each Forked Network.

"**On-Chain Services**" means additional Services involving on-chain transactions (other than deposits and withdrawals) included in Prime Trust's basic Custodial Services, which may include staking, voting, inflation, signaling, and other activities requiring interaction with the applicable Blockchain.

## 2. CUSTOMER CUSTODY ACCOUNT ACCEPTANCE AND AUTHORIZED SERVICES

**2.1    Appointment**. Customer hereby appoints and authorizes Prime Trust to provide Custodial Services in accordance with this Service Schedule, and Prime Trust hereby accepts such appointment subject to the

DocuSign Envelope ID: A1E14A8F-6295-4A1F-A7F7-B25A68943946

## Prime Trust

Customer Custody Account acceptance process in accordance with 2.10 below. Prime Trust through the Custodial Services enables Customer to create one or more Customer Custody Accounts.

**2.2**   In its sole discretion, Prime Trust may custody Custodial Property on Customer's behalf. For the avoidance of doubt, Custodial Property that Prime Trust may agree to accept and hold on Customer's behalf in accordance with this Service Schedule is limited to the following: (a) Digital Assets, (b) Fiat Currencies; (c) title to real estate; (d) private securities and public securities listed on any U.S. securities exchange or alternative trading system; and (e) traditional and Roth individual retirement accounts (subject to applicable documentation in Prime Trust's sole discretion). Securities that have been issued in accordance with the regulations of countries other than the U.S. or which are listed on non-U.S. trading systems may be accepted for custody on a case-by-case basis.

**2.3    Provision of the Custodial Services.**

(a) Subject to Customer's completion of the Customer Custody Account acceptance process in accordance with Section 2.10 and so long as Customer is in compliance with this Service Schedule and the Agreement, Prime Trust will provide the Custodial Services.

(b) In providing the Custodial Services, Prime Trust will act only upon receipt of any direction, instruction, or request submitted by an Authorized Person or through the Customer's platform (an "**Authorized Instruction**").

(c) Prime Trust, in its sole discretion, will determine whether the provision of the Custodial Services or an Authorized Instruction complies with all Applicable Law and may decline any Authorized Instruction, including if: (i) Customer is not in compliance with this Service Schedule and the Agreement; (ii) such Authorized Instruction may violate Applicable Law; or (iii) Customer has insufficient unencumbered, cleared Custodial Property in the Customer Custody Account available for executing such Authorized Instruction.

(d) Prime Trust is entitled to rely upon any information, data, and documents provided in connection with the Custodial Services. Customer acknowledges that Prime Trust has no duty to detect errors, or inquire into or investigate the legality, validity, completeness, or accuracy of any information, data, or documents provided to Prime Trust in connection with the Custodial Services.

(e) Prime Trust is entitled to rely upon any Authorized Instruction provided in connection with the Custodial Services and Customer acknowledges that Prime Trust has no duty to detect errors, or inquire into or investigate the legality, validity, completeness, or accuracy of any Authorized Instruction. Prime Trust will only act upon an Authorized Instruction and is released and held harmless by Customer for acting upon the Authorized Instruction, including acting upon conflicting, superseded, or otherwise varying Authorized Instructions from multiple Authorized Persons.

(f) Customer acknowledges that Prime Trust will not monitor Digital Assets for actions taken by the issuer of such Digital Asset, if any. Such actions may include an issuer instruction requiring the holder of a Digital Asset to transfer it to a certain location. For the avoidance of doubt, Customer is solely responsible for satisfying or responding to any such actions of an issuer.

(g) Prime Trust will collect and hold all funds when Custodial Property may mature, be redeemed, or sold. Prime Trust will hold the proceeds of such transaction(s) until receipt of an Authorized Instruction.

## Prime Trust

(h) Funds received in any currency other than USD may, pursuant to an Authorized Instruction or as needed for Prime Trust to carry out an Authorized Instruction or pay Fees, be converted to USD at exchange rates set in Prime Trust's sole discretion.

(i) Prime Trust shall process the investment and reinvestment of Custodial Property in accordance with Authorized Instructions only so long as, in the sole discretion of Prime Trust, such requested investments will not impose an unreasonable administrative burden on Prime Trust (which such determination by Prime Trust shall not to be construed in any respect as a judgment concerning the prudence or advisability of such investment).

**2.4    Storage of Digital Assets.**  Prime Trust will receive Digital Assets for storage by generating Private Keys and their Public Key pairs, with Prime Trust retaining custody of such Private Keys. "**Private Key**" means an alphanumeric string known only to the holder of a Digital Asset, which must be used to transact the Digital Asset represented by the corresponding Public Key. "**Public Key**" means an alphanumeric string on a Blockchain that indicates ownership/possession of a specific amount of a Digital Asset by a specific network participant and is visible to all participants in a Blockchain's network. Upon receipt, Prime Trust will custody the Digital Assets in Customer's name or Customer Custody Accounts established for the benefit of Customer, unless otherwise specified in an Authorized Instruction. Prime Trust will be deemed to have received a Digital Asset after the Digital Asset's receipt has been confirmed on the relevant Blockchain or otherwise ledgered to Prime Trust's satisfaction. "**Blockchain**" means a software operating a distributed ledger which is maintained by a network of computers, and that records all transactions in a Digital Asset in theoretically unchangeable data packages known as blocks, each of which are timestamped to reference the previous block so that the blocks are linked in a chain that evidences the entire history of transactions in the Digital Asset.

**2.5    Forks, Airdrops.**

(a) Should a Fork occur: (i) Prime Trust retains the right, in its sole discretion, to determine whether or not to support either Forked Network; (ii) in connection with determining to support or not to support a Forked Network, Prime Trust may suspend certain operations, in whole or in part (with or without advance notice), for however long Prime Trust deems reasonably necessary, in order to take the necessary steps, as determined in its sole discretion, to perform obligations hereunder with respect to supporting or not supporting a Forked Network; (iii) Customer hereby agrees that Prime Trust will determine, in its sole discretion, whether or not to support such Forked Network and that Customer will have no right or claim against Prime Trust related to value represented by any change in the value of any Digital Asset (whether on a Forked Network or otherwise), including with respect to any period of time during which Prime Trust exercises its rights described herein with respect to Forks and Forked Networks; (iv) Prime Trust will select, in its sole discretion, at least one of the Forked Networks to support and will identify such selection in a notice; (v) with respect to a Forked Network that Prime Trust chooses not to support, it may, in its sole discretion, elect to (A) abandon or otherwise not pursue obtaining the Digital Assets from that Forked Network, or (B) deliver the Digital Assets from that Forked Network to Customer within a time period as determined by Prime Trust in its sole discretion, together with any credentials, keys, or other information sufficient to gain control over such Digital Assets (subject to the withholding and retention by Prime Trust of any amount reasonably necessary, as determined in Prime Trust's sole discretion, to fairly compensate Prime Trust for the efforts expended to obtain and deliver such Digital Assets to Customer); (vi) with respect to Forked Networks that Prime Trust chooses to support, Customer may be responsible for Fees to be negotiated; and (vii) Customer acknowledges and agrees that Prime Trust assumes no responsibility or obligations with respect to any Forked Network and related Digital Assets that it chooses not to support.

**Prime Trust**

(b) In the event that a Digital Asset network attempts to or does contribute (sometimes called "airdropping" or "bootstrapping") its Digital Assets (collectively, "**Airdropped Digital Assets**") to holders of Digital Assets on an existing Digital Asset network and Customer notifies Prime Trust in writing of such event, Prime Trust may, in its sole discretion, elect to: (i) subject to an airdrop fee to be determined, support the Airdropped Digital Asset for custody and, if appropriate, reconcile Customer Custody Account; (ii) abandon or otherwise not pursue obtaining the Airdropped Digital Asset; or (iii) deliver the Airdropped Digital Assets from that Digital Asset network to Customer within a time period as determined by Prime Trust in its sole discretion, together with any credentials, keys, or other information sufficient to gain control over such Airdropped Digital Assets (subject to the withholding and retention by Prime Trust of any amount reasonably necessary, as determined in Prime Trust's sole discretion, to fairly compensate Prime Trust for the efforts expended to obtain and deliver such Airdropped Digital Assets to Customer). Airdropped Digital Assets do not create any relationship between the sender and/or Digital Asset network and Prime Trust and do not subject Prime Trust to any responsibilities or obligations as it relates to the sender and/or Digital Asset network.

**2.6    On-Chain Services.** Subject to any documentation requested by Prime Trust in its sole discretion, from time to time, Prime Trust may offer Customer On-Chain Services. Customer may be required to accept additional terms as a condition to receiving any On-Chain Services. Prime Trust may discontinue an On-Chain Service at any time without notice for any reason. If Prime Trust decides to discontinue an On-Chain Service, Prime Trust will endeavor to provide as much notice to Customer as reasonably possible.

**2.7    Fiat Currency Instructions and Acknowledgements; Disclosures**. Prime Trust may, in its sole discretion, offer Fiat Services to Customer. If Prime Trust offers Fiat Services, and Customer accepts Fiat Services, Prime Trust may:

(a) subject to subsection (b), deposit any cash or Fiat Currency funds deposited by Customer with Prime Trust, for which Customer has not already provided Authorized Instructions, into deposit accounts at Federal Deposit Insurance Corporation ("**FDIC**")-insured, regulated depository institutions selected by Prime Trust, which accounts will be held for the benefit of Prime Trust customers ("**Deposit Accounts**") and maintain the Deposit Accounts as omnibus accounts, which will not be segregated by Customer; enter into such sub-accounting agreements as may be required by such depository institutions; and initiate wire or other transfer requests from time to time for the withdrawal of Customer funds from the Deposit Accounts, which requests are to be honored by the depository institution for withdrawal of Customer's funds from such Deposit Accounts for distributions, investments, Fees, and other disbursements pursuant to an Authorized Instruction. All applicable wire or other transfer Fees will be paid by Customer,

(b) otherwise use or invest such cash or Fiat Currency at Prime Trust's own risk. Without limiting the foregoing, Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency, subject to Prime Trust's obligation to return Fiat Currency to Customer in accordance with this Service Schedule. Prime Trust may receive earnings or compensation for an omnibus account either in the form of services provided at a reduced rate, the payment of any shareholder service fees, or similar compensation, and Prime Trust may receive earnings or income from using or investing cash or Fiat Currency as described herein. Customer agrees that any such earnings, income or compensation shall be retained by Prime Trust and no portion of any such earning, income or compensation shall be paid to or for Customer. Customer acknowledges and agrees that Prime Trust may hold some or any portion of Fiat Currency in accounts, including but not limited to money market deposit accounts, that may or may not receive interest or earnings attributable to such Fiat Currency. Customer

DocuSign Envelope ID: A1E14A9F-6295-4A1F-A7F7-B25A68943946

Prime Trust

hereby agrees that the amount of such interest or earnings attributable to Fiat Currency may be retained by Prime Trust as additional consideration for its services.

(c) Prime Trust will keep records for the purpose of obtaining pass-through FDIC insurance with respect to any sub-account held for Customer that is part of the Custodial Property held in Deposit Accounts by Prime Trust to the extent provided by Applicable Law. Customer acknowledges and accepts that Prime Trust does not guarantee that pass-through FDIC coverage will be available for any such sub-account.

(d) if Customer elects to provide a card payment method to transfer funds into the Customer Custody Account, Customer hereby authorizes Prime Trust to debit the card payment method for the purpose of transferring the funds. Further, Customer hereby authorizes Prime Trust to store and file the card payment method and charge the card payment method on file in connection with any future transfers of funds by the Customer.

**2.8   Limitations on Services.** Customer agrees that Prime Trust will only perform the Custodial Services in accordance with this Service Schedule, and no additional duties or obligations will be implied. In particular, Prime Trust will not exercise any legal, investment, tax, or accounting planning, advice, discretion, or recommendation whatsoever regarding Customer's Customer Custody Account. In providing the Custodial Services, Prime Trust has no duty to inquire as to the provisions of or application of any agreement or document other than this Service Schedule, notwithstanding Prime Trust's receipt of such agreement or document.

**2.9   Ownership of Custodial Property.** Customer owns all Custodial Property held by Prime Trust on behalf of Customer in accordance with this Service Schedule. Customer's Custodial Property will not be reflected on Prime Trust's balance sheet as assets of Prime Trust. Prime Trust may, for convenience, take and hold title to Custodial Property or any part thereof in its own name with Customer's ownership of Custodial Property segregated on Prime Trust's books and records.

**2.10   Customer Custody Account Acceptance.** Custodial Services will be provided only upon the date of Customer's successful completion of the Customer Custody Account acceptance process, as determined in Prime Trust's sole discretion and in accordance with this Section 2.10. To complete the acceptance process, Customer will provide Prime Trust with information and documents, which includes information necessary for Prime Trust's compliance with the Bank Secrecy Act ("**BSA**"), and other Applicable Law relating to anti-money laundering ("**AML**"), Know-Your-Customer ("**KYC**"), counter-terrorist financing, sanctions screening requirements, or any other similar legal obligations, in each case, as determined by Prime Trust in its sole discretion.

**2.11   Authorized Persons.**

(a) Customer is solely responsible for designating to Prime Trust all Authorized Persons, for advising Prime Trust of the removal of any Authorized Persons, and for all actions of Authorized Persons.

(b) Customer agrees that Prime Trust may rely on an Authorized Person's email address currently on file with Prime Trust for the purposes of acting on an Authorized Instruction from an Authorized Person.

**2.12   Joint Customer Custody Accounts.** In the case of a joint Customer Custody Account, each person with an interest in the Customer Custody Account, who is a Party to the Agreement, is considered a Customer. The obligations and agreements applicable to each part to a joint Customer Custody Account under this Service Schedule shall be deemed to be joint and several.

**3.   CUSTOMER RESPONSIBILITIES**



**3.1**    Customer acknowledges that:

(a) Customer is an "Entitlement Holder" in a "Financial Asset," as defined by, and for purposes of, the Uniform Commercial Code, including Article 8 thereto, as adopted and implemented in accordance with Nevada law ("**UCC**"). Applicable Custodial Property are "Financial Assets" for purposes of the UCC and are not assets of Prime Trust.

(b) Customer is solely responsible for, and Prime Trust has no involvement in, determining whether any investment, investment strategy, or related transaction is appropriate for Customer. Prime Trust will have no duty or responsibility to review or perform due diligence on any investments or transactions and will make no recommendation of investments or transactions, nor supervise any such investments or transactions. Customer will perform its own due diligence on all investments and take sole responsibility for all decisions made for its Customer Custody Account.

(c) Prime Trust does not provide any valuation or appraisals of Custodial Property, nor does it hire or seek valuations or appraisals on any Custodial Property; provided, however, that Prime Trust may, at its option and with no obligation or liability, to the extent reasonably available for any particular asset, make available recent price quotes or value estimates from various third-party sources, including stock exchanges and alternative trading systems registered with the Securities and Exchange Commission, digital asset exchanges, and real estate websites. Prime Trust will not attempt to verify the validity, accuracy or reliability of any such third-party valuation, valuation estimates or price quotes (collectively, "**Valuation Data**") and Customer agrees that Prime Trust will have no liability in connection with any such Valuation Data, including for any unreliable, inaccurate, or misleading information. Any Valuation Data provided to Customer is furnished for general information purposes only, and should not be relied upon as a definitive determination of the market value of any Custodial Property, nor should such Valuation Data be used for tax reporting purposes. Customer understands and agrees that Customer should engage an independent financial advisor, appraiser, or valuation firm in order to obtain a formal opinion or financial advice regarding the value of any Custodial Property.

(d) Prime Trust has no control over, and is not responsible or liable for, any services or technology supporting or used in connection with any Custodial Property, Service Provider (defined below), Customer's platform, or the markets in which Custodial Property is purchased, sold or otherwise traded, and any Custodial Property, Service Provider, Customer's platform, or such markets, and any such services or technology, may be susceptible to, or limited or compromised by, errors, technology flaws or defects, viruses or other malicious code, manipulations, hacks, other attacks, outages, and other interruptions and limitations. For the purposes of this Service Schedule, "**Service Provider**" means any unaffiliated third-party entity retained by Prime Trust to provide any of the Custodial Services on behalf of Prime Trust to the Customer.

(e) The custody of Digital Assets is generally subject to a high degree of risk, and the nature of Digital Assets may lead to an increased risk of technology flaws, fraud or attacks.

(f) Prime Trust does not control and makes no guarantee as to the functionality of any Blockchain's decentralized governance, which could, among other things, lead to delays, conflicts of interest, or operational decisions that may impact Customer and/or its Custodial Property.

(g) Advancements in cryptography could render current cryptography algorithms utilized by a Blockchain supporting a specific Digital Asset inoperative.

# ◆ Prime Trust

(h) The supply of Digital Assets available as a result of a Forked Network and Prime Trust's ability to deliver Digital Assets resulting from a Forked Network may depend on Service Providers and other third-party providers that are outside Prime Trust's control. Prime Trust does not own or control any of the protocols that are used in connection with Digital Assets and their related Digital Asset networks, including those resulting from a Forked Network. Accordingly, Prime Trust disclaims all liability relating to such protocols and any change in the value of any Digital Assets (whether on a Forked Network or otherwise), and makes no guarantees regarding the security, functionality, or availability of such protocols or Digital Asset networks. Customer accept all risks associated with the use of the Custodial Services to conduct transactions.

(i) The price and liquidity of Digital Assets have fluctuated substantially in the past and may fluctuate substantially in the future, and such fluctuation may affect the value of Customer's Customer Custody Account, including a total loss of the value of Digital Assets. The value of Customer's Customer Custody Account will be solely dependent upon the performance of Custodial Property.

(j) Digital Assets held in Customer Custody Accounts are not entitled to deposit insurance protection by the FDIC. Digital Assets held in Customer Custody Accounts are not insured by Prime Trust insurance policies and are not entitled to protection afforded to customers under the Securities Investor Protection Act of 1970, as amended.

(k) Subject to Applicable Law, Digital Assets are not legal tender and are not backed by any government.

(l) Changes in Applicable Law may adversely affect the use, transfer, exchange, and value of Custodial Property.

(m) Transactions in Custodial Property may be irreversible, and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

(n) Some Digital Asset transactions will be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction was initiated.

(o) The value of Digital Assets may be derived from the continued willingness of market participants to exchange Fiat Currencies or Digital Assets for Digital Assets, which may result in the potential for permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

(p) There is no assurance that a Person who accepts Digital Assets as payment today will continue to do so in the future.

(q) Due to the volatility and unpredictability of the price of Digital Assets relative to Fiat Currencies, trading and owning Digital Assets may result in significant loss over a short period of time.

(r) The nature of Digital Assets means that technological difficulties experienced by Prime Trust may prevent the access to or use of Customer's Digital Assets. In addition, access to or transfers of Digital Assets may be delayed due to security protocols, time-zone differences, communication technology delays or fails, and/or enhanced internal compliance reviews.

(s) All instructions for the purchase and sale of securities and/or Digital Assets will be executed through one or more broker-dealers or exchanges selected by either Customer or another Authorized Person, or by Prime Trust, as an accommodation (and not in any capacity as a broker-dealer), and Prime Trust is hereby

DocuSign Envelope ID: A1E14A8F-6295-4A1F-A7E7-B25A68943046

**Prime Trust**

authorized to debit Customer's Customer Custody Account for any Fees associated with such transaction(s) and remit those to the executing party.

(t) With respect to Custodial Assets that are not securities, Customer acknowledges and agrees that: (i) Prime Trust does not have access to every market or exchange which a particular product or financial instrument may be traded and Prime Trust makes no representation regarding the best price execution of any instructions; (ii) other orders may trade ahead of Customer's order and exhaust available volume at a posted price; (iii) exchanges, market makers or other types of sellers or purchasers may fail to honor posted or otherwise agreed-upon prices; (iv) exchanges may reroute customer orders out of automated execution systems for manual handling (in which case, execution may be substantially delayed); (v) system delays by exchanges or third parties executing instructions may prevent Customer's order from being executed, may cause a delay in execution or not to be executed at the best posted price or at all; and (vi) Prime Trust may not promptly or in a timely manner execute Customer order(s) due to internal delays, and Prime Trust makes no representation that its Custodial Services are in any way suitable for active trading or any activity requiring prompt or exact execution. The Customer Custody Account is not a brokerage account. Transactions may be subject to additional Fees and charges by Prime Trust or any Service Provider or exchange.

**3.2**    Customer represents, warrants, and covenants at all times while this Service Schedule is in effect:

(a) it has all rights, power, and, if an entity, authority necessary to enter into this Service Schedule and perform its obligations hereunder;

(b) its entry into, and performance of its obligations under, this Service Schedule, and Prime Trust's exercise of its rights in accordance with this Service Schedule, will not conflict with, or result in a breach or violation of, any term or provision, or constitute a default under, any agreement by which it is bound or any Applicable Law;

(c) it will comply with all Applicable Law including the BSA and all other Applicable Laws related to AML, KYC, counter-terrorist financing, sanctions requirements, in performing its obligations in accordance with this Service Schedule;

(d) it will: (i) fully satisfy Prime Trust's information requests and other requirements, including those relating to Authorized Persons or Custodial Property, and keep current any provided information; (ii) notify Prime Trust if the Customer  becomes a target of any action, investigation or prosecution related to this Service Schedule, the Custodial Services, or Custodial Property; and (iii) provide Prime Trust full cooperation in connection with any inquiry or investigation of Prime Trust made or conducted by any Regulatory Authority. Prime Trust shall have no obligation to provide the Custodial Services if Customer or any Authorized Person(s) fail to comply with the foregoing to Prime Trust's satisfaction;

(e) the appointment of Prime Trust and the execution of the terms outlined in this Service Schedule by Customer will not violate any Applicable Law;

(f) Customer owns, and will at all times own, all Custodial Property, free and clear of all liens and encumbrances (other than those granted to Prime Trust in accordance with this Service Schedule or as otherwise created by applicable U.S. federal or state securities laws);

(g) neither Customer nor any other Authorized Person is, nor is directly or indirectly owned or controlled by, any person or entity (A) included on the Specially Designated Nationals and Blocked Persons or the Consolidated Sanctions List maintained by OFAC or any similar list maintained by any government

**Prime Trust**

entity from time to time, or (B) located, organized, or resident in a country or territory that is the target of sanctions imposed by OFAC or any government entity;

(h) Customer will not, and will not direct or permit its Authorized Persons to, direct the purchase, sale, or transfer of any Custodial Property which is (A) prohibited by Applicable Law, or (B) prohibited by Section 4975 of the Internal Revenue Code; and

(i) that all information provided to Prime Trust in accordance with this Service Schedule and Agreement is and will be complete, correct, current, and accurate in all respects. Customer will notify Prime Trust immediately in accordance with the Agreement if any such information, including Customer's email address on file with Prime Trust, is no longer complete, correct, current, and accurate in all respects.

## 4.   ELECTRONIC STATEMENTS

**4.1   Customer Custody Account Statements.** Customer agrees that Prime Trust will make current and prior Customer Custody Account statements available in electronic form only. Customer further agrees to access statements on the websites or applications of third party API integrators that Customer selects and uses. Customer understands and agrees that Prime Trust will not provide Customer hard-copy statements.

**4.2   Customer Custody Account Monitoring**. Customer is responsible for monitoring its Customer Custody Account, including transaction confirmations and Customer Custody Account statements, and reviewing these documents to see that information about Customer's Customer Custody Account is accurate. Customer agrees to review its monthly statements and promptly notify Prime Trust of any unusual or unauthorized activity. Customer will remain responsible for monitoring its Customer Custody Account and reconciling all balances, statements, and activity. Customer agrees to notify Prime Trust immediately in accordance with the Agreement if there is any type of discrepancy or suspicious or unexplained occurrence relating to Customer's Customer Custody Account, including any unauthorized transaction. If Customer fails to notify Prime Trust immediately, Prime Trust will not be liable for any consequences. If, through any error, Customer has received property that is not rightfully the Customer's, Customer agrees to notify Prime Trust and return the property immediately. If Prime Trust identifies an error in connection with property Customer has received from or through Prime Trust and determine it is not rightfully Customer's, Customer agrees that Prime Trust may take action to correct the error, which may include returning such property to the rightful owner.

## 5.   AUTHORITY TO PLEDGE; RIGHT TO SET OFF; LIEN

Except as otherwise provided in this Section 5, Customer may not loan, hypothecate, pledge, or otherwise encumber any Custodial Property. Customer grants Prime Trust a right of set-off against, and lien on and security interest in the Custodial Property for the payment of any Fees and any other amounts due to Prime Trust under and in accordance with this Service Schedule.

## 6.   APPLICATION OF UCC

Except as otherwise provided under Applicable Law, the Parties agree the relationship between Prime Trust and Customer is governed by Article 8 of the UCC and that for the purposes of this Service Schedule: Customer is an "entitlement holder" and any Custodial Property will be treated as a "Financial Asset" within the meaning of Nevada Revised Statutes ("**NRS**") 104.8102(h) and (j).

## 7.   BOOKS AND RECORDS



Prime Trust will record on its books and records (including records of receipts, disbursements, and other transactions) all Custodial Property and will segregate Customer's Custodial Property from the Custodial Property of any other Customer, person, or entity, unless otherwise specified in an Authorized Instruction. Prime Trust will hold such records in accordance with Applicable Law. Upon commercially reasonable notice by Customer, Prime Trust will provide Customer copies of the books and records pertaining to Customer that are in the possession or under the control of Prime Trust.

## 8.   TERM AND TERMINATION

**8.1**   This Service Schedule is effective as of the revision date set forth above and may be amended or modified only by Prime Trust, or with the written agreement from the Prime Trust. Such amendments or modifications shall be effective on the 30th day after Customer receives notice of such revision electronically via the email address on the records of Prime Trust.

**8.2**   **Obligations and Rights upon Termination or Expiration.**

(a) **Return of Custodial Property**. Upon termination or expiration of this Service Schedule or the Agreement, Customer will provide Authorized Instructions regarding the disbursement of Customer's Custodial Property and Prime Trust will, subject to Applicable Law, deliver Customer's Custodial Property in accordance with the Authorized Instructions. A Digital Asset will be deemed to have been delivered to Customer when a transfer of the Digital Asset initiated by Prime Trust has received a reasonable number of confirmations on the relevant Blockchain, or an alternative method has been mutually agreed between Prime Trust and Customer. To the extent Customer is unable to transfer Digital Assets out of the Customer Custody Account due to insufficient gas or network fees necessary for the transfer, Customer agrees to and abandons and forfeits any claims to such Digital Assets upon closure of the Customer Custody Account. Upon termination or expiration of this Service Schedule or the Agreement, Prime Trust will deliver other Custodial Property to Customer as soon as practicable or, at Customer's request, to a successor custodian. Customer acknowledges that Custodial Property, if any, held in Prime Trust's name requires a reasonable amount of time to be delivered. Upon delivery of Custodial Property, Prime Trust's responsibility under this Service Schedule ceases.

(b) **Reserved**.

(c) **Escheat**. Customer acknowledges that, in accordance with Applicable Law, Custodial Property that is presumed abandoned, including following termination or expiration of this Service Schedule, may under certain circumstances escheat to the government of the applicable jurisdiction. Prime Trust will have no liability to Customer, its heirs, legal representatives, or successors and assigns, or any other person in connection with any Custodial Property that escheats by operation of law.

## 9.   TAXES

**9.1**   **Responsibility for Taxes**. Customer will be liable for any Taxes relating to any Custodial Property held on behalf of Customer or any transaction related thereto, which are Customer's sole obligation to remit, unless otherwise mandated by Applicable Law. Customer will remit to Prime Trust the amount of any Taxes that Prime Trust is required by Applicable Laws (whether by assessment or otherwise) to pay on behalf of Customer, or in respect of activity in the Customer Custody Account of Customer. In the event that Prime Trust is required by Applicable Law to pay any Taxes on behalf of Customer, Customer will promptly transfer to Prime Trust the amount necessary to pay the Taxes.

## 10.   DISCLAIMERS

DocuSign Envelope ID: A1E14A8F-6295-4A1F-A7F7-B25A68943946



**10.1**   The Parties acknowledge and agree that Prime Trust has no obligation to inquire into, and will not be liable for any damages or other liabilities or harm to any person or entity relating to: (a) the ownership, validity or genuineness of any Custodial Property; (b) the authority of any Authorized Person to act on behalf of Customer with respect to Custodial Property; (c) the accuracy or completeness of any information provided by Customer or any other Authorized Person with respect to a Custodial Property or an Authorized Instruction; or (d) the collectability, insurability, effectiveness, marketability, or suitability of any Custodial Property. Customer additionally understands and agrees that Prime Trust must follow the directions of Customer, and is considered by this Service Schedule to be a "directed fiduciary" in accordance with NRS 163.5548 and will be released and held harmless for following the directions of Customer in accordance with NRS 163.5549.  Customer understands and agrees that Customer is considered by this Service Schedule to be a "Directing Trust Adviser" in accordance with NRS 163.5536 and has the authority to give directives to Prime Trust that must be followed by Prime Trust.

## 11.   LIMITATION OF LIABILITY

**11.1   Exception to Limitations of Liability for Custodial Services**. THE LIMITATION OF LIABILITY IN SECTION 11.2 OF THE MSA SHALL APPLY TO LIABILITY ARISING OUT OF ANY ACTION TAKEN OR OMITTED BY PRIME TRUST IN GOOD FAITH UNLESS THE LIABILITY IS A RESULT OF PRIME TRUST'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, AND IN SUCH EVENT PRIME TRUST'S SOLE RESPONSIBILITY SHALL BE FOR THE HOLDING AND DISBURSEMENT OF THE CUSTODIAL PROPERTY IN ACCORDANCE WITH THE TERMS OF THIS SERVICE SCHEDULE.

## 12.   INDEMNIFICATION

**12.1**   In addition to the indemnification obligations set forth in the Agreement, Customer hereby agrees to defend, indemnify and hold harmless the Prime Trust Indemnified Parties from and against any and all claims, demands, obligations, losses, liabilities, damages, regulatory investigations, recoveries and deficiencies (including interest, penalties and attorneys' fees, costs, and expenses), which Prime Trust may suffer arising out of or relating to: (a) this Service Schedule; (b) any breach, action, or regulatory investigation arising from Customer's failure to comply with Applicable Law and/or arising out of any alleged misrepresentation, misstatement, omission of fact, or inaccuracy in the representations and warranties and/or in Customer's interactions with Prime Trust, or breach, non-fulfillment or default in the performance of any of the conditions, covenants and agreements, of Customer contained in this Service Schedule or in any certificate or document delivered by Customer or any Authorized Person(s) or other agent(s) or in any Authorized Instruction in accordance with any of the provisions of this Service Schedule; (c) any breach, action or regulatory investigation arising from Customer's failure to comply with any state blue sky laws or other applicable securities laws, and/or arising out of any alleged misrepresentations, misstatements or omissions of material fact in the Customer's offering memoranda, general solicitation, advertisements and/or other offering documents; (d) any obligation which is expressly the responsibility of Customer in accordance with this Service Schedule; (e) any damages or claims resulting from equipment, software, or network malfunctions or interruptions outside of any Prime Trust's control; or (f) any misuse of the Custodial Services by an Authorized Person or through an Authorized Instruction; or (g) any loss or damages or claims resulting from(i) Prime Trust's execution of the Authorized Instruction instituted by Customer or anyone acting on Customer's behalf or at its direction (such as an Authorized Person); and (ii) Authorized Instructions submitted via the Prime Trust API.

**12.2   Limitation on Prime Trust's Duty to Litigate**. Without limiting the foregoing, Prime Trust will not be under any obligation to defend any legal action or engage in any other legal proceedings with respect to the Customer Custody Account or any property of the Customer Custody Account unless Prime

 **Prime Trust**

Trust is indemnified to Prime Trust's satisfaction. Notwithstanding anything in this Service Schedule, Prime Trust is authorized and empowered to consult with its counsel of its choice in reference to the Customer Custody Account and to retain counsel and appear in any action, suit, or other proceeding affecting the Customer Custody Account or any of the property of the Customer Custody Account. All fees and expenses so incurred will be for the Customer Custody Account and shall be charged to Customer.

**12.2    Third-Party Claims**.  Customer agrees to bear sole responsibility for the prosecution, defense, or enforcement of any judgment, including the employment of legal counsel, of any and all legal actions or suits involving the Customer Custody Account, which may arise or become necessary for the protection of the investments in that Customer Custody Account, including any actions lodged against the Prime Trust Indemnified Parties.



**Attachment 1 to Exhibit B of the MSA**

**WIRE SERVICES ATTACHMENT FOR
PRIME TRUST CUSTODIAL SERVICES**

Service Attachment revision date: November 12, 2021.

The terms in this Service Attachment apply whenever Customer submits or requests a Wire Transfer (defined below).  If approved by Prime Trust in writing, Prime Trust, through its bank partner ("**Bank**"), will provide Wire Services in accordance with the terms set forth in this Service Attachment and the terms of the Agreement.  Prime Trust will make available to Customer, from time to time, its and Bank's policies, procedures, guidelines and other writings governing the use of the Wire Services by Customer, as may be amended or supplemented by Prime Trust from time to time (the "**Wire User Guide**"). Customer shall comply with the terms set forth in this Service Attachment, Wire User Guide and the Agreement.  Unless otherwise defined in this Service Attachment, capitalized terms will have the meaning given to them in the Agreement, the Service Schedule for Prime Trust Custodial Services and Article 4A of the Uniform Commercial Code, as adopted by Nevada ("**UCC Article 4A**"). To the extent of any conflict between the Agreement and this Service Attachment, the terms of this Service Attachment shall govern over the conflicting terms of the Agreement. To the extent of any conflict between the Agreement, this Service Attachment and the Wire User Guide, the terms of the Wire User Guide shall govern over the conflicting terms of the Agreement or this Service Attachment, but only with respect to the Wire Services covered by this Service Attachment. All other nonconflicting terms of the Agreement shall remain valid and enforceable.  The Wire User Guide may be amended, modified or supplemented by Prime Trust by providing Customer with prior notice of such amendment.

**1.    DEFINITIONS**

"**Wire Services**" means the initiation or processing of Wire Transfers under this Service Attachment by Prime Trust.

"**Wire Transfer**" means a wire transfer submitted or requested by Customer to or from a Customer Custody Account (i.e., the balance of the Customer Custody Account related to Customer).

**2.    GENERAL DESCRIPTION OF WIRE SERVICES**

**2.1**    Subject to the terms, provisions and conditions of the Agreement, this Service Attachment and the Wire User Guide, Prime Trust will provide Wire Services as a means for Customer to initiate domestic or international Wire Transfers to or from the Customer Custody Account, subject to the terms of the Agreement and Prime Trust's instructions. Wire Transfers may be requested by Customer by delivering to Prime Trust a written wire transfer request, through an Authorized User, using Customer's Account. Any payment order, wire instruction or Wire Transfer requested pursuant to the terms of this Service Attachment may also be referred to herein as a "transfer request." Customer acknowledges that any incoming or outgoing Wire Transfers executed or processed by Prime Trust will be subject to the rules and regulations applicable to payment orders and payment networks, as well as the terms of the Agreement, this Service Attachment and the Wire User Guide, and Customer shall ensure all incoming and outgoing Wire Transfers and any transfer requests comply with all terms set forth herein and Applicable Law.  Customer shall ensure all information submitted to Prime Trust by and concerning Customer is true and complete.



**2.2**    Prime Trust is authorized to debit a Customer Custody Account for an amount equal to the transfer request and any applicable fees related to such transfer request. If more than one Customer Custody Account is designated, Prime Trust may charge any of the designated Customer Custody Accounts unless Customer or its Agent gives Prime Trust specific written instructions otherwise. Customer's transfer requests may involve the transfer of funds from any of the Customer Custody Account(s) to another account Customer has with Prime Trust, to an account with another financial institution, or to a third party or account of a third party maintained with Prime Trust or with any other financial institution. Prime Trust is under no obligation to process any transfer request if a Customer Custody Account balance is insufficient to cover the entire transfer request amount, plus fees. Customer shall contribute sufficient funds to Prime Trust for implementation of any transfer request. Prime Trust will have no obligation to honor any transfer request which exceeds the balance of Customer's immediately collected funds.

**2.3**    Wire Transfers made from a Customer Custody Account are processed through the Board of Governors of the Federal Reserve System or correspondent financial institutions and are governed by Applicable Law, including Regulation J and UCC Article 4A, which determines the rights and liabilities of the parties to the transfer. Prime Trust is under no obligation to follow any transfer request or initiate any Wire Transfer, nor is Prime Trust obligated to follow instructions cancelling or amending any transfer request that does not afford Prime Trust sufficient time to verify the authenticity of the instructions. Customer acknowledges and agrees that it will not use Wire Services for any personal, family, or household purposes and all transfer requests are commercial in nature and for commercial purposes.

**2.4**    Once Prime Trust receives a transfer request, it may not be able to be cancelled or amended, subject to Applicable Law. However, at Prime Trust's discretion, Prime Trust may use reasonable efforts to act on any request for cancellation or amendment, provided that the method by which Prime Trust is notified of a request for cancellation or amendment complies with the Security Procedure provisions in Section 4 (Security Provisions) of this Service Attachment and Prime Trust is afforded a reasonable amount of time to act on any request prior to the transmission or release of the transfer. Notwithstanding, Prime Trust shall have no liability if such cancellation or amendment is not effected. Customer agrees to indemnify and hold Prime Trust harmless from any and all liabilities, claims, damages, costs and expenses Prime Trust may incur in attempting to cancel or amend the transfer request. Any cancellation or amendment of a Wire Transfer by Prime Trust pursuant to this Section 2.4 shall relieve Prime Trust of any obligation to act on the original transfer request.

**2.5**    It is Customer's responsibility to ensure that Prime Trust is provided with accurate, clear, and correct transfer requests and instructions, including beneficiary name and account number, and that such transfer requests are given only by Customer or its Agent who has an ownership interest in the Customer Custody Account used in connection the Wire Transfer. Customer is liable for any incorrect, inaccurate or unclear information. If Customer or its Agent provides Prime Trust with the name and account number of a beneficiary, Prime Trust and other financial institutions may process the payment order based on the account number alone, even though the number may identify a Person other than the beneficiary named. Neither Prime Trust nor Bank will be liable if the beneficiary's financial institution does not accept the Wire Transfer or accepts the Wire Transfer and then places the funds in a suspense or holding account because of the discrepancy. Unless required by Applicable Law, neither Prime Trust nor Bank will be liable to Customer or any other Person for any losses resulting from the beneficiary's financial institution accepting and posting any Wire Transfer to an incorrect account, whether based on Customer's or for other reasons unrelated directly to the grossly negligent or willful misconduct of Prime Trust. Incorrect, unclear or incomplete transfer requests may delay the processing of a Wire Transfer request. If a transfer request does not designate the beneficiary's financial institution, Prime Trust may, in its sole discretion (i) accept the transfer request and make payment to any financial institution at which Prime Trust has reason to believe the beneficiary maintains an account, or (ii) not accept the transfer request and seek further direction from Customer. In either of the foregoing situations, unless Applicable Law requires otherwise,



neither Prime Trust nor Bank will be liable for losses resulting from Customer's failure to properly identify the financial institution where the beneficiary maintains an account. If a transfer request does not specify routing instructions, Prime Trust or Bank may send the wire through such correspondents as Prime Trust determines, and Customer authorizes Prime Trust and Bank to do so. Unless otherwise required by Applicable Law, Prime Trust is not required to accept transfer requests from Customer or any Person acting or purporting to act on Customer's behalf in a representative or fiduciary capacity, and Prime Trust may refuse to accept any transfer requests in its sole and absolute discretion. Prime Trust may also reject any incoming wire transfer. If Prime Trust determines, in its sole discretion, not to honor, execute or accept a transfer request, Prime Trust shall promptly notify Customer. A transfer request is considered accepted by Prime Trust when Prime Trust executes it.

**3. INTERNATIONAL AND DOMESTIC WIRE TRANSFERS**.  Wire Transfers may be either domestic or international, provided, however, international Wire Transfers may not be sent by Prime Trust through or into any country in violation of Applicable Laws. All international Wire Transfers will be routed by Prime Trust through one of Bank's correspondent financial institutions. Domestic Wire Transfers will settle only in USD, and international Wire Transfers will be sent in USD or a foreign currency if accepted at Prime Trust's discretion. Such international Wire Transfer may be converted to the currency of the destination country at a rate of currency exchange established by the correspondent financial institution or the beneficiary financial institution. Even if Customer tells Prime Trust that it wants the Wire Transfer sent in USD, neither Prime Trust nor Bank can guarantee that the beneficiary institution will receive the funds in U.S. currency or will not convert the Wire Transfer into another currency. The actual amount that the beneficiary/designated recipient receives may be reduced by fees and taxes imposed by the beneficiary bank, or a correspondent bank, including currency conversion charges. Notwithstanding, international Wire Transfers are prohibited unless approved by Prime Trust in writing.

**4. SECURITY PROCEDURES**

**4.1**    Customer will ensure that any Wire Transfer request is secure and that unauthorized access or issuance of transfer requests is prevented. The Parties agree that the Wire Services are subject to the commercially reasonable security procedure governing the origination, processing and/or submission of payment orders, as defined by UCC § 4A-103, and Wire Transfers, which is set forth in this Section 4 (the "**Security Procedures**"). Customer shall remit valid transfer requests hereunder in compliance with Applicable Laws and the Security Procedures. Customer agrees that any Wire Transfer requests shall comply with the Security Procedures, which are subject to change with reasonable prior written notice to Customer. Only Authorized Users or Customer's Agents may submit Wire Transfer requests hereunder on behalf of Customer. Prime Trust shall be entitled to deem any Person having knowledge of any Security Procedure to be an Authorized User and/or Agent. Authorized User(s) and/or Agents shall transmit or deliver Wire Transfers to Prime Trust in computer readable form to the locations(s) specified by Prime Trust. The Parties agree that the Wire Transfers, payment orders and transactions initiated, processed or submitted in connection with the Prime Trust Services are subject to the Security Procedures as set forth in this Service Attachment. Customer represents, warrants and agrees that the Security Procedures constitute a "security procedure" for purposes of UCC § 4A-201.  Customer further represents and warrants that: (i) it considers itself qualified to have, and has, independently evaluated the risks presented by the Security Procedures; (ii) it has determined that the Security Procedures are no less protective than other security procedures in use by similarly situated companies; and (iii) the Security Procedures are commercially reasonable under Applicable Law, including within the meaning of UCC § 4A-202, for the initiation, submission, processing and/or origination of Wire Transfers, transaction requests, payment orders, and any payment instructions related to the Prime Trust Services (each a, "**Covered Transaction**" and collectively, "**Covered Transactions**").



**4.2**    The Parties agree to the Security Procedures set forth below:

(a) If Customer has been given access to and otherwise uses the Prime Trust API, any requests for Covered Transactions submitted to Prime Trust through the API shall be considered authorized by Customer. Customer acknowledges and agrees that the submission of a request for a Covered Transaction to Prime Trust's API shall constitute a commercially reasonable means to verify that the request for a Covered Transaction is that of Customer's.  No request for a Covered Transaction will be considered delivered to Prime Trust until the Prime Trust's API receives the request for the Covered Transaction and the request for the Covered Transaction enters the Prime Trust's environment. Prime Trust may rely on any transfer request or payment order submitted through the API.

(b) For any non-API requests for a Covered Transaction, Customer and Prime Trust agree that Prime Trust shall verify the Covered Transaction request by e-mailing Customer for whom the Covered Transaction is being submitted on behalf of and request e-mail verification of such request or by using callback verification to Customer for whom the Covered Transaction is being submitted on behalf of to verify the submission of such request. Prime Trust will use the e-mail address or phone number maintained by it in its ordinary course of business. Customer acknowledges and agrees that the procedures set forth herein shall constitute a commercially reasonable means to verify that the request for a Covered Transaction.  If e-mail verification is not obtained or verbal verification cannot be obtained by Prime Trust, the transfer will not be released. If Prime Trust uses either method to obtain a verification of the request, the request will be deemed effective and authorized by Customer, regardless of whether it actually was or was not.

**4.3**    Customer and Prime Trust shall comply with the Security Procedures with respect to Covered Transactions that Customer submits or will submit to Prime Trust.  Customer acknowledges that the purpose of the Security Procedures is to verify authenticity and not to detect an error in the transmission or content of Covered Transactions.  No Security Procedures have been agreed upon between Prime Trust and the Customer for the detection of any such error, and Customer shall be solely responsible for any errors, including transmission errors.  If Customer believes or suspects that any such information or instructions have been known or accessed by unauthorized Persons, Customer agrees to notify Prime Trust within one (1) day, followed by written confirmation.  The occurrence of unauthorized access will not affect any Covered Transactions made in compliance with the Security Procedures prior to receipt of such notification and within a reasonable time period to prevent unauthorized transfers or requests.

**4.4**    Customer must ensure that no individual will be allowed to initiate transfers in the absence of proper supervision and safeguards and agrees to take reasonable steps to maintain the confidentiality of the Security Procedures and any passwords, codes, security devices and related instructions provided by Prime Trust in connection with the Security Procedures.  If Customer believes or suspects that any such information has been accessed by an unauthorized individual, Customer will verbally notify Prime Trust immediately, followed by written confirmation.  The occurrence of unauthorized access will not affect any Covered Transactions or any other transfers in connection with the Prime Trust Services made in good faith by Prime Trust prior to receipt of notification and within a reasonable time period to prevent unauthorized transfers.

**4.5**    If a Covered Transaction (or a request for cancellation or amendment of a Covered Transaction) received by Prime Trust purports to be transmitted or authorized by Customer or its Agent, it will be deemed effective as Customer's Covered Transaction (or initiated Entry), and Customer shall be obligated to pay Prime Trust the amount of such Covered Transaction (or initiated Entry) even though the Covered Transaction (or initiated Entry) was not authorized by the Customer or the Person with authority to authorize such Covered Transaction, provided Prime Trust acted in compliance with the Security Procedures.



**5.    INDEMNIFICATION**.  In addition to other indemnification obligations in the Agreement, Customer agrees to defend, indemnify and hold harmless Prime Trust, Bank and their respective officers, directors, agents, and employees ("**Indemnified Parties**") from any and all claims, demands, liability, actions, losses, costs, damages and/or expenses, including but not limited to fines, penalties, attorneys' fees, costs and expenses (collectively, "**Losses**") resulting from, related to or arising out of Customer's actions or omissions or those of any other Person under Customer's control, any breach by Customer of this Service Attachment or Applicable Law, any action or failure to act by the receiving bank, Prime Trust's performance of the Wire Services under this Service Attachment or refusing to perform any transfer request in accordance with a transfer request, any delay, suspension or cancellation of arrangements Prime Trust made with respect to any transfer request when the rejection, suspension or cancellation is for any reason permitted under this Service Attachment, including Customer's cancellation of a Wire Transfer or transfer request for any reason, or any crediting or debiting of the Customer Custody Account, except where Applicable Law requires otherwise. Without limiting the foregoing, if Prime Trust complies with the provisions of this Service Attachment, Customer agrees that Prime Trust shall not be responsible for any communication or miscommunication by Customer or its representatives.

**6.    LIMITATION OF LIABILITY**.  Subject to the limitations on Prime Trust's liability set forth in the Agreement, Prime Trust will only have liability to Customer for any Losses suffered or incurred by Customer as a direct result of Prime Trust's (i) gross negligence, willful misconduct or fraudulent acts or omissions of Prime Trust, its Affiliates, employees, directors, officers, agents, partners, vendors, successors and assigns and representatives; (ii) Prime Trust's violation of any Applicable Laws or the rights of any third party. Prime Trust shall not be liable to any third party or for any act or omission of Customer or any third party, including, but not limited to, third parties used by Prime Trust in executing a Wire Transfer or performing a related act and no such third party shall be deemed to be Prime Trust's agent. Without limiting the generality of the foregoing, Prime Trust will not be liable for failure to comply with the terms of this Service Attachment caused by interruption or failure of transmission and/or communications facilities, labor disputes, war emergency, act of nature, force majeure, or other circumstances beyond the control of the Prime Trust. Notwithstanding anything in this Service Attachment to the contrary, unless applicable law requires otherwise, Prime Trust will not be liable to Customer or any other Person for, and Customer releases Prime Trust from liability with respect to (i) attorneys' fees or fees of other professionals, and (ii) any delay or total or partial failure in providing the services set forth herein to Customer if, in Prime Trust's opinion or the opinion of any third party service provider we may use, the provision of the service would result in the violation of any rules or any applicable laws or regulations. Except as otherwise provided by applicable law, the maximum period for which Prime Trust shall be liable for interest on any amount to be refunded or paid to Customer with respect to an unauthorized, erroneous or other wire request is thirty (30) days. Customer agrees that in no event shall Bank be liable for any Losses related to Wire Transfers, and Customer releases Bank of any liability it may have to Customer in connection with Wire Transfers or a transfer request.

**7.    STATEMENTS AND ERRORS**.  Prime Trust will include Wire Transfers on Customer's periodic account statement provided in accordance with Section 4.1 of the Service Schedule for Prime Trust Custodial Services. Customer agrees to reconcile Customer Custody Accounts transactions monthly and notify Prime Trust promptly of any discrepancy between its records and the information provided by Prime Trust. Customer should review Customer's statement for any discrepancies, unauthorized transactions or errors in connection with any Wire Transfer. Except as otherwise provided herein, if Customer believes a Wire Transfer is wrong or if more information about a Wire Transfer is needed, Customer may contact Prime Trust in writing upon discovery or notice of the error and Prime Trust will provide any reasonably requested information. Failure to do so will relieve Prime Trust of any obligation for an unauthorized or erroneous Wire Transfer for which Prime Trust may be liable under the Agreement, and Customer shall be responsible and liable for any damages or losses Prime Trust incurs as



a result of Customer's failure to notify Prime Trust within the time period stated in this section or as otherwise required by Applicable Law. If Customer fails to notify Prime Trust in writing of any discrepancy between its records and the information provided by Prime Trust or any unauthorized or erroneous Wire Transfer that is reflected on its periodic statement within thirty (30) days of receipt of such periodic statement, Customer will be precluded from asserting a claim related to such discrepancy or erroneous or unauthorized Wire Transfer against Prime Trust and agrees to waive any such claim.

**8.   CUT-OFF TIMES**.  Transfer requests for Wire Transfers must be received and verified in accordance with the terms of the Wire User Guide, as amended from time to time, or other writing provided to Customer by Prime Trust. Prime Trust may treat any transfer request received at or after its cut-off time as if it were received that Business Day or may treat it as if it were received at the opening of the next Business Day. Prime Trust is not required to make a Wire Transfer on the day a transfer request is received, unless the properly completed transfer request is received within a reasonable time before any cut-off hour Prime Trust has established. Prime Trust may use any means and routes that Prime Trust, in its sole discretion, considers suitable for the transmission of funds, and Prime Trust may make use of correspondents, agents, subagents and funds transfer and communication systems.  Prime Trust shall not be responsible for delays or mistakes caused by other parties through whom Prime Trust transmits funds unless Applicable Law says otherwise

**9.   AUTHORIZED USERS**.  Authorized Users may take on Customer's behalf any action under this Service Attachment that Customer may have taken and any action taken by an Authorized User shall be fully binding on Customer. Customer may remove or disable any Authorized User at any time by giving prior notice of termination to Prime Trust, pursuant to the Agreement. No notice of termination of authority will be effective unless and until it is received by Prime Trust and until Prime Trust has sufficient reasonable time to act upon the notice. Notice of termination of authority must be submitted to the Prime Trust in writing.

**10.   RECORD KEEPING AND INFORMATION TRANSMITTAL REQUIREMENTS UNDER THE BANK SECRECY ACT AND ITS IMPLEMENTING REGULATIONS**.  Prime Trust is required to report certain transactions to certain Regulatory Authorities. Customer acknowledges and agrees that Prime Trust may capture and transmit or disclose information collected from or about Customer in connection with this Service Attachment, including information regarding Customer and Customer Custody Account (for example, name, address, and account number) and regarding beneficiaries (for example beneficiary's name, address and account number) as part of the processing of a payment order. Customer agrees to assist Prime Trust in connection with any requirements imposed on Prime Trust in fulfilling Prime Trust's obligations under law. Customer agrees to observe and comply with all Applicable Law, including, without limitation, Trading with the Enemy Act, as amended, and each of the foreign assets control and economic and trade sanctions regulations of the United States Treasury Department, and Bank Secrecy Act and USA PATRIOT Act, as amended, and its implementing regulations, in connection or related to any Wire Transfer.

**11.   NETWORK SECURITY AND PROTECTED INFORMATION**

**11.1**   Customer is responsible for establishing and maintaining safeguards, policies and procedures that ensure Customer's computer systems and networks and information stored on or transmitted through Customer's network are not accessed or used by any unauthorized Person and that no Person, other than Customer or Authorized Users with a need to know and subject to the terms herein, has access to or the ability to use any information that is protected under state and federal financial and healthcare information privacy laws. Customer further agree to implement measures to ensure no intrusion of Customer's computer systems and networks. Such measures include, but are not limited to, data security audits, promptly installing security patches, anti- virus, spyware, malware, key logger detection software,

DocuSign Envelope ID: A1E14A9F-6295-4A1F-A7F7-B25A68943946

◊ **Prime Trust**

firewalls, and any other crimeware protective action, software programs or hardware solutions. Customer is solely responsible for the maintenance and protection of Customer's computer and network systems against unauthorized access. Customer is solely responsible for any and all losses and damages arising from any unauthorized transfer request through the use of Customer's computers, networks or access codes, as hereinafter defined.

**12.   MISCELLANEOUS**.  In the event Prime Trust is liable to Customer for interest compensation related to or in connection with the Wire Services under Applicable Law, interest shall be calculated at the average of the federal funds rate published by the Federal Reserve for the period involved; or at such other rate that Prime Trust may agree to, in writing, from time to time.



**Attachment 2 to Exhibit B to the MSA**

**ACH SERVICES ATTACHMENT FOR
PRIME TRUST CUSTODIAL SERVICES**

Service Attachment revision date: November 12, 2021.

The terms in this Service Attachment apply to Customers that use the ACH Services (as defined below) offered by Prime Trust. Unless otherwise defined in this Service Attachment, capitalized terms will have the meaning given to them in the Agreement and the Service Schedule for Prime Trust Custodial Services.  Prime Trust will make available to Customer, from time to time, its and Bank's policies, procedures, guidelines and other writings governing the use of the ACH Services by Customer, as may be amended or supplemented by Prime Trust from time to time (the "**ACH User Guide**"). Customer shall comply with the terms set forth in this Service Attachment, ACH User Guide and the Agreement. To the extent of any conflict between the Agreement and this Service Attachment, the terms of this Service Attachment shall govern over the conflicting terms of the Agreement. To the extent of any conflict between the Agreement, this Service Attachment and the ACH User Guide, the terms of the ACH User Guide shall govern over the conflicting terms of the Agreement or this Service Attachment, but only with respect to the ACH Services covered by this Service Attachment. All other nonconflicting terms of the Agreement shall remain valid and enforceable.

1.  **DEFINITIONS**

"**Effective Entry Date**" means the date included in any Entry as the date upon or after which such Entry is to be effective.

"**Entry**" has the meaning given in the Rules, except that it shall also include an "On-Us Entry."

"**On-Us Entry**" means (i) any order or request relating to an account maintained at Prime Trust that would constitute an "Entry" for purposes of the Rules if it related to an account maintained at another financial institution and was transmitted to such other financial institution by Prime Trust or Bank pursuant to the Rules, and (ii) any information received by Prime Trust for use in preparing any such order or request Prime Trust.

"**Protected Information**" has the meaning set forth in the Rules.

"**Rules**" means the rules of NACHA and any corresponding appendices to the rules, as amended from time to time.

"**Third-Party Sender**" means "Nested Third-Party Sender," "Third-Party Sender" or "Third-Party Service Provider" as defined by the NACHA Rules, as the case may be.

2.  **ACH PROCESSING**

**2.1**   Prime Trust offers to, and Customer agrees to, use the ACH processing services offered by Prime Trust through its bank partner ("**Originating Depository Financial Institution**" or "**ODFI**" or "**Bank**") and any other services offered by Prime Trust in connection with this Service Attachment (collectively, the "**ACH Services**") pursuant to the terms herein and in compliance with Applicable Law. In the event of inconsistency between a provision of Article 4A of the Uniform Commercial Code as adopted by Nevada (the "**UCC**") and this Service Attachment, the provisions of this Service Attachment shall prevail. Customer acknowledges that Prime Trust's ability to submit or process Entries under this Service

◆ **Prime Trust**

Attachment is subject to: (a) Bank's approval; (b) receipt by the Bank of all required and properly executed forms, authorizations (including authorizations for Receiver, as defined under the Rules), and such other information as Bank may reasonably request from time to time in connection with this Service Attachment; and (c) Customer's compliance with the terms of this Service Attachment and all Applicable Laws.

Bank imposes additional obligations on Customer when it acts as the ODFI with respect to Entries that Customer submits.  In addition to any other duties, responsibilities, warranties, representations and liabilities under other sections of this Service Attachment, for each and every Entry transmitted by Customer, Customer represents and warrants to Prime Trust and agrees that Customer shall: (i) perform all of the duties of and assume all of the responsibilities of ODFIs under the Rules; and (ii) assume all of the liabilities, including, but not limited to, liability for indemnification for failure of it to perform its obligations in accordance with the Rules.

**2.2**    Subject to Customer's compliance with the Agreement, Prime Trust will process Entries received from Customer in connection with the Prime Trust Services through the National Automated Clearing House Network ("**ACH Transactions**").

**2.3**    Prime Trust reserves the right to: (a) increase the clearing period or suspend the acceptance of ACH Transactions; and (b) require the adoption of additional anti-fraud or contribution verification tools, in each case, because of reversals, returns, fraud or regulatory requirements as well as to prevent the violation of the Rules.

**2.4**    Prime Trust may, from time to time, request financial information from Customer, and Customer shall promptly provide such information to Prime Trust.  Customer authorizes Prime Trust to obtain a credit report(s) on Customer from time to time. Prime Trust may, upon reasonable prior written notice to Customer, reasonably modify one or more limits representing the maximum dollar amount and frequency of Entries that may be initiated by Customer each day or over any other period determined by Prime Trust (collectively, "**Exposure Limits**"). Customer acknowledges that the Exposure Limits are solely for the protection of Prime Trust, Bank and their respective assets. Customer shall comply with the Exposure Limits. Any File (as defined by the Rules) or Entry that exceeds the approved Exposure Limits is subject to suspension and return to Customer. Customer agrees to notify Prime Trust prior to submitting a File or Entry that exceeds the approved Exposure Limits. For the avoidance of doubt, such prior notice by Customer does not limit Prime Trust's ability to suspend, review, reject and/or return Files or Entries. Prime Trust may increase or decrease the Exposure Limits in its sole discretion and at any time.

**3.    VERIFICATION OF RULES COMPLIANCE**.  Prime Trust reserves the right to verify Customer's compliance with this Service Attachment and/or the Rules in any manner it deems appropriate, including a complete audit of Customer's activities in connection with this Service Attachment.

**4.    TRANSMITTAL OF ENTRIES; SECURITY PROCEDURES**

**4.1**    Customer shall transmit any debit or credit Entries permitted by Prime Trust in writing to Prime Trust in accordance with the Rules and this Service Attachment. Customer hereby authorizes Prime Trust, and Prime Trust agrees, to transmit any Entry received by Prime Trust from Customer in accordance with the Rules and the terms of this Service Attachment and to credit or debit the amount of such Entry to the accounts specified by Customer, subject to the terms of this Service Attachment.

**4.2**    The Parties agree that the ACH Services are subject to the commercially reasonable security procedure governing the origination, processing and/or submission of payment orders, as defined by UCC

DocuSign Envelope ID: A1E14A8F-6295-4A1F-A7F7-B25068943946

§ 4A-103, and Entries, which is set forth in this Section 4 (the "**Security Procedures**"). Customer agrees that any Entries transmitted shall comply with the Security Procedures, which are subject to change with reasonable prior written notice to Customer. Only Authorized Users or Customer's Agents may submit debit or credit Entries hereunder on behalf of Customer. Prime Trust shall be entitled to deem any Person having knowledge of any Security Procedure to be an Authorized User and/or Agent. Authorized User(s) and/or Agents shall transmit or deliver Entries to Prime Trust in computer readable form to the locations(s) specified by Prime Trust. The Parties agree that the Entries, payment orders and transactions initiated, processed or submitted in connection with the Prime Trust Services are subject to the Security Procedures as set forth in this Service Attachment. Customer represents, warrants and agrees that the Security Procedures constitute a "security procedure" for purposes of UCC § 4A-201. Customer further represents and warrants that: (i) it considers itself qualified to have, and has, independently evaluated the risks presented by the Security Procedures; (ii) it has determined that the Security Procedures are no less protective than other security procedures in use by similarly situated companies; and (iii) the Security Procedures are commercially reasonable under Applicable Law, including within the meaning of UCC § 4A-202, for the initiation, submission, processing and/or origination of Entries, transaction requests, payment orders, and any payment instructions related to the Prime Trust Services (each a, "**Covered Transaction**" and collectively, "**Covered Transactions**").

**4.3**    The Parties agree to the Security Procedures set forth below:

(a) If Customer has been given access to and otherwise uses the Prime Trust API, any requests for Covered Transactions submitted to Prime Trust through the API shall be considered authorized by Customer. Customer acknowledges and agrees that the submission of a request for a Covered Transaction to Prime Trust's API shall constitute a commercially reasonable means to verify that the request for a Covered Transaction is that of Customer's. No request for a Covered Transaction will be considered delivered to Prime Trust until the Prime Trust's API receives the request for the Covered Transaction and the request for the Covered Transaction enters the Prime Trust's environment. Prime Trust may rely on any transfer request or payment order submitted through the API.

(b) For any non-API requests for a Covered Transaction, Customer and Prime Trust agree that Prime Trust shall verify the Covered Transaction request by e-mailing Customer for whom the Covered Transaction is being submitted on behalf of and request e-mail verification of such request or by using callback verification to Customer for whom the Covered Transaction is being submitted on behalf of to verify the submission of such request. Prime Trust will use the e-mail address or phone number maintained by it in its ordinary course of business. Customer acknowledges and agrees that the procedures set forth herein shall constitute a commercially reasonable means to verify that the request for a Covered Transaction. If e-mail verification is not obtained or verbal verification cannot be obtained by Prime Trust, the transfer will not be released. If Prime Trust uses either method to obtain a verification of the request, the request will be deemed effective and authorized by Customer, regardless of whether it actually was or was not.

**4.4**    Customer and Prime Trust shall comply with the Security Procedures with respect to Covered Transactions that Customer submits or will submit to Prime Trust. Customer acknowledges that the purpose of the Security Procedures is to verify authenticity and not to detect an error in the transmission or content of Covered Transactions. No Security Procedures have been agreed upon between Prime Trust and the Customer for the detection of any such error, and Customer shall be solely responsible for any errors, including transmission errors. If Customer believes or suspects that any such information or instructions have been known or accessed by unauthorized Persons, Customer agrees to notify Prime Trust within one (1) day, followed by written confirmation. The occurrence of unauthorized access will not affect any Covered Transactions made in compliance with the Security Procedures prior to receipt of such notification and within a reasonable time period to prevent unauthorized transfers or requests.



4.5   Customer must ensure that no individual will be allowed to initiate transfers in the absence of proper supervision and safeguards and agrees to take reasonable steps to maintain the confidentiality of the Security Procedures and any passwords, codes, security devices and related instructions provided by Prime Trust in connection with the Security Procedures. If Customer believes or suspects that any such information has been accessed by an unauthorized individual, Customer will verbally notify Prime Trust immediately, followed by written confirmation. The occurrence of unauthorized access will not affect any Covered Transactions or any other transfers in connection with the Prime Trust Services made in good faith by Prime Trust prior to receipt of notification and within a reasonable time period to prevent unauthorized transfers.

4.6   If a Covered Transaction (or a request for cancellation or amendment of a Covered Transaction) received by Prime Trust purports to be transmitted or authorized by Customer or its Agent, it will be deemed effective as Customer's Covered Transaction (or initiated Entry), and Customer shall be obligated to pay Prime Trust the amount of such Covered Transaction (or initiated Entry) even though the Covered Transaction (or initiated Entry) was not authorized by the Customer or the Person with authority to authorize such Covered Transaction, provided Prime Trust acted in compliance with the Security Procedures.

4.7   Prime Trust has no obligation to discover and shall not be liable to Customer for errors made by Customer, including but not limited to errors made in identifying the Receiver, or an Intermediary or RDFI or for errors in the amount of an Entry or for errors in Settlement Dates.

## 5.   CUSTOMER'S REPRESENTATIONS, WARRANTIES AND AGREEMENTS

5.1   Customer represents and warrants that each Entry provided to Prime Trust complies in all respects with the Rules and this Service Attachment. Customer acknowledges and agrees that, pursuant to the Rules, Prime Trust makes certain warranties to other financial institutions and Bank and that such warranties are made in reliance on: (a) the representations and warranties of Customer, including but not limited to those contained in this section of this Service Attachment and (b) Customer's agreement to be bound by the Rules and Applicable Laws.  Customer also makes all representations and warranties set forth in the Rules applicable to an Originator each time it submits a File or Entry to Prime Trust. Customer shall indemnify Prime Trust and Bank against any claims, alleged claims, loss, liability or expense (including attorneys' fees and expenses) resulting directly or indirectly from, related to or arising out of: (i) any breach of Customer's warranties or the Agreement; (ii) Customer's gross negligence in connection with its duties hereunder; (iii) any action by the Receiving Depository Financial Institution ("**RDFI**") (as defined by the Rules) arising from Customer's noncompliance with the Rules or Applicable Law; (iv) any actions by a service provider or agent of Customer that results in a breach of the Agreement by Customer; (v) to the extent that it involves Prime Trust or Bank, any litigation by an ACH Operator, an RDFI or any Receivers asserting noncompliance on Customer's part with the Rules or Applicable Law. In addition, Customer warrants: (1) each Entry is authorized pursuant to the Rules and the authorization has not been revoked; (2) each authorization is clear and readily understandable by the Receiver; (3) copies of authorizations will be made available when requested by Prime Trust; (4) each credit Entry is timely and accurate; (5) each debit Entry is for a sum which, on the Settlement Date will be due and owing to Customer from the party whose account will be debited, is for a sum specified by such party or is to correct a previously transmitted erroneous credit Entry; (6) no Entry has been reinitiated in violation of the Rules; (7) Customer will comply with the terms of the Electronic Funds Transfer Act, if applicable, and UCC Article 4A, if applicable, and shall otherwise perform its obligations under this Service Attachment in accordance with all applicable laws and regulations; (8) Customer has used commercially reasonable procedures to verify that all information contained in an Entry, including but not limited to routing numbers, is accurate and valid; and (9) Customer acknowledges and agrees that it is only



authorized to generate Entries using the SEC Codes authorized by Prime Trust in writing, and covenants that it will not generate any other form of Entry without the written approval of Prime Trust, which approval may be withheld by Prime Trust in its sole and absolute discretion. Customer will comply with all applicable special warranties relating to such Entries as set forth in the Rules and shall make all warranties set forth in the Rules associated with such Entries.

**5.2**    Prime Trust's performance hereunder is conditioned on the Customer's acknowledgment of, and agreement to, the following: (a) ACH Transactions are subject to returns or reversals for reasons, including, without limitation, insufficient funds, no authorization or fraud; (b) Customer is liable for all ACH Transactions subject to returns or reversals; and (c) Prime Trust has no obligation to monitor the Customer's use of Prime Trust Services; provided, however, Prime Trust reserves the right to decline to execute any ACH Transaction that Prime Trust believes violates the terms of this Service Attachment.

**5.3**    Customer represents, warrants, and covenants to Prime Trust, Customer will not deliver any Entries to Prime Trust or ODFI, that if accepted by Prime Trust or ODFI, will cause Prime Trust or ODFI to be in violation of Applicable Law.

**5.4**    Customer acknowledges it has a copy or has access to a copy of the current Rules, which may also be purchased online at www.nacha.org. Customer agrees to comply with and be subject to Applicable Law.  Customer will comply with and be bound by Rules whether or not an Entry is sent through the ACH network.  It shall be the responsibility of Customer that each Entry originated or submitted complies with Applicable Law. Customer agrees and warrants to Prime Trust that all actions by Customer contemplated by this Service Attachment, including the preparation, transmittal, and settlement of Entries and payment orders, and Origination in connection with any ACH Transaction shall comply in all respects with Applicable Law.  Prime Trust will charge Customer with any fines or penalties imposed by any Regulatory Authority which are incurred as a result of the actions or omissions of the Customer, and Customer agrees to fully reimburse and/or indemnify Prime Trust for such charges or fines assessed against or incurred by Prime Trust. The specific duties of Customer provided in this Service Attachment in no way limits the foregoing undertaking.  Prime Trust reserves the right to suspend Customer for breach of the Rules or to terminate this Service Attachment for any violation of Applicable Law. Prime Trust reserves the right to audit the Customer for compliance with this Service Attachment and with the Rules.

**5.5**    Customer acknowledges that it will only submit Entries on its own behalf and will not act as a Third-Party Sender.

**5.6**    In order to submit Entries to Prime Trust, Customer must designate at least one Authorized User. Authorized User(s) shall be responsible for designating other users who Customer authorizes to issue or submit Entries on its behalf (each to be considered an Authorized User).  Prime Trust shall be entitled to rely on the designations made by the Authorized Users.

**5.7**    Customer hereby indemnifies Prime Trust against any claim arising out of or in connection with any refund by any Receiver related to this Service Attachment.

**5.8**    Customer must obtain Third-Party Services from Plaid Inc. ("**Plaid**", and such Third-Party Services, the "**Plaid Services**") prior to using or accessing ACH Services. Any acquisition by Customer of Plaid Services is solely between Customer and Plaid, and Prime Trust does not warrant, support, or assume any liability or other obligation with respect to such Plaid Services. Customer's use of Plaid Services may result in the Prime Trust Services interoperating with Plaid Services and may otherwise result in the receipt and/or delivery of Customer Data to and/or from Plaid or Plaid Services or Plaid. In connection with such interoperability and Customer Data transfers, Customer: (a) grants Prime Trust permission to

Prime Trust

allow the Plaid Services and Plaid to access Customer Data and information about Customer's usage of the Plaid Services as appropriate and necessary to enable the interoperation of that Plaid Services with the Prime Trust Services; (b) acknowledges that any exchange of data between Customer and any Plaid Services is solely between Customer and Plaid and is subject to Plaid's terms and conditions governing the use and provision of such Plaid Services (the presentation and manner of acceptance of which is controlled solely by Plaid); (c) agrees that Prime Trust is not responsible for any disclosure, modification or deletion of Customer Data resulting from access to such data by Plaid Services and Plaid; and (d) agrees that is responsible for any liability associated with the transfer of Customer Data to and/or from Plaid or Plaid Services.

**6.    STANDARD ENTRY CLASS CODES**. Customer agrees to originate transactions using the correct Standard Entry Class ("**SEC**") Code, and to limit use of such codes to those specifically authorized by Prime Trust in writing.

**7.    INTERNATIONAL TRANSACTIONS**

**7.1**    IAT Entries:

(a) Customer is responsible for compliance with foreign payment system rules, regarding the authorization of an Entry, of the receiving country(s) involved with the international payments Customer processes or submits to Prime Trust.  Customer is responsible for understanding the foreign law or payments system rules that prohibit the processing of certain transactions, and shall ensure they comply with such laws.

(b) Customer is obligated to use the SEC code "**IAT**" for debit or credit entries that are part of a payment transaction involving a financial agency's office that is not located in the territorial jurisdiction of the United States.  An office of a financial agency is involved in the payment transaction if it: (i) holds an account that is credited or debited as part of the payment transaction; (ii) receives payment directly from a Person or makes payment directly to a Person as part of the payment transaction; or (iii) serves as an intermediary in the settlement of any part of the payment transaction.

(c) Formatting Requirements:

(i) Customer agrees that IAT entries are not eligible for same day processing.

(ii) Customer has the obligation to include the following specific data elements defined within the Bank Secrecy Act's ("**BSA**") "Travel Rule": (A) Name and physical address of the Customer; (B) Name and physical address of the Receiver; (C) Account number of Receiver; (D) Identity of the Receiver's bank; and (E) Foreign Correspondent Bank(s) name, Bank ID number and Bank Branch Country Code.

(iii) Customer is required to provide seven mandatory addenda records to accompany each IAT entry in order to convey the information listed above.

(iv) Customer is permitted a maximum of five additional addenda records to accompany an IAT entry (i.e., remittance and foreign correspondent bank detail): (A) a maximum of two optional addenda records will be able to accompany an IAT entry for remittance information without formatting specifications. For inbound IAT entries the gateway should ensure the proper use of the two allowed optional addenda records for remittance information, this field must be populated with the ultimate foreign beneficiary or payers name, street address, city, state/province, postal code and two-character country codes. The identification of the ultimate foreign beneficiary (of the debit) or ultimate foreign payer (of the credit) takes priority of the inclusion of other payment related information); and (B) a separate addenda record

DocuSign Envelope ID: A1E14A0F-6295-4A1F-A7F7-B25A68943946

**Prime Trust**

must be added for each foreign correspondent bank.  A maximum of five foreign correspondent bank addenda records may accompany an IAT entry.

(d) Customer and Receiver agree to specific terms and conditions for the allocation of gains, losses, and the assumption of risk for foreign exchange conversion. Prime Trust shall not be liable for any risk or losses related to foreign exchange conversions.

(e) Prime Trust assumes no responsibility for duplicate entries or errors transmitted by the Customer and not detected in the course of normal processing. Customer assumes all responsibility for the accuracy of submitted files and information.

(f) Customer is responsible for review of all IAT transactions prior to submission to Prime Trust for processing:

(i) All parties to the transaction will be reviewed.

(ii) Suspect transactions will be investigated and cleared before the transactions is submitted to Prime Trust.

(iii) Violation of OFAC-encountered sanctions detected by Customer will be frozen or rejected (depending on the specifics of the particular sanctions program.

(iv) Transactions involving blocked parties will be reported to OFAC's compliance division.

(g) To the extent required by Applicable Law, Prime Trust will notify Customer of a Stop Payment Request received within two banking days of receipt by any means Prime Trust deems reasonable. Customer acknowledges and agrees that Entries returned as Stop Payment may not be reinitiated without consent of Receiver.

(h) Prime Trust reserves the right to monitor activity and audit Customer's internal administrative and accounting controls for international transactions at will.  Customer agrees to provide information requested by Prime Trust promptly upon request and understands findings by Prime Trust must be corrected within a reasonable period as agreed to by both parties.

(i) In addition to all other requirements imposed on Customer under Applicable Law, Customer understands its requirements to comply with OFAC obligations and that the penalties for ignoring those obligations can be both criminal and civil.  Non-compliance may result in significant fines and in situations of conscious disregard, even imprisonment.  Customer agrees to accept liability for the failure of the Customer to comply with OFAC obligations and the Rules for IAT origination.  This liability includes full reimbursement of fines charged to Prime Trust caused by a Customer's negligence.

(j) Prime Trust may amend any of the terms and conditions contained in this Section 7.1, without limitation.  Such amendments shall become effective thirty (30) days after receipt of notice by Customer or such later date as may be stated in Prime Trust's notice to Customer.

**7.2**    With respect to any origination or submission of transactions identified with the SEC code of WEB for internet-initiated/mobile entries ("**WEB**"), Customer agrees to comply with Rules in originating WEB Entries (either recurring or by single-entry) to a consumer's account pursuant to the consumer's authorization that is obtained via the internet or wireless network as follows:

(a) Risk Management Requirements for WEB Entries:

Prime Trust

(i) Customer has performed or will perform an annual audit that satisfies the Rules before initiating a WEB Entry.

(ii) Pursuant to the Rules, Customer will establish and implement commercially reasonable: (A) fraudulent transaction detection systems to screen debit WEB Entries that, at a minimum, can verify the account number to be debited on the first use and that can detect any subsequent changes to such account thereafter; (B) methods of authentication to verify the identity of Receivers of debit WEB Entries; (C) procedures to verify that the routing number used in the debit WEB Entry is valid; and (D) security technology for communications between Customer and Receivers over the internet or wireless networks. Each time Customer submits to Prime Trust or processes using the ACH Services a Web Entry, in addition to its other representations and warranties under this Service Attachment, Customer warrants that the Web Entry was screened by its fraudulent transaction detection system and that Customer has used commercially reasonable methods to authenticate and verify the Receiver's identity and to verify that the account number used in the Web Entry is valid.

(iii) In accordance with Applicable Law, Customer must maintain records such as logs from an internet ordering system as proof of each Receiver's authorization. Prime Trust from time to time may require Customer to make such records available for Prime Trust's review.

(b) Customer shall obtain a consumer's authorization prior to initiating a WEB debit Entry which shall meet the following requirements:

(i) The consumer must be able to read the authorization language displayed on a computer screen or other visual display and it is suggested the Receiver be prompted to print and retain a copy and should be instructed to accept the terms of the authorization. The Customer must be able to provide a hard copy of the authorization, if requested.

(ii) Customer must prompt the Receiver to print the authorization and retain a copy.

(iii) Customer must be able to provide the Receiver with a hard copy of the authorization if requested to do so.

(iv) Only the Receiver may authorize the WEB Entry, and not Customer or any third-party service provider on behalf of the Receiver.

(v) The authentication method chosen must not only identify the Receiver but must demonstrate the consumer's assent to the authorization.

**8.    PRIME TRUST OBLIGATIONS**.  Prime Trust shall process and transmit any Entry to Bank, provided that Prime Trust shall have no obligation to transmit an Entry if Customer fails to comply with the Rules or any terms of this Service Attachment.

**9.    CUSTOMER'S ACCOUNT; PAYMENT OF ENTRIES**

Customer shall at all times maintain a balance of available funds in the Customer Custody Account sufficient to cover Customer's obligations under this Service Attachment. If collected balances in the Customer Custody Account are insufficient to cover the aggregate amount of Entries, Prime Trust shall have no obligation to transmit such Entries. Customer authorizes Prime Trust to debit or credit Customer Custody Account for each credit or debit Entry submitted to or processed through Prime Trust. Any debit Entries initiated by Customer will be credited to Customer Custody Account and available when the



Entries settle. Credited amounts may be reversed if the Entry is reversed or returned. Customer agrees to pay for all credit Entries issued by Customer, Authorized Representative(s), or credit Entries otherwise made effective against Customer. All credit payments made shall be debited from the Customer Custody Account. Customer shall pay Prime Trust for the amount of each debit Entry returned by a RDFI or debit Entry return that is contested  RDFI.

## 10.   RESERVE ACCOUNT

**10.1**    To the extent applicable, on or before the Order Start Date, Customer shall fund the reserve account established at Prime Trust or a financial institution in the name of Prime Trust (the "**Reserve Account**") with an amount set forth in an applicable Order Form (the "**Initial Reserve Amount**"). Thereafter, the amount in the Reserve Account shall be evaluated on the first Business Day of each month starting on the first full calendar month after the Order Start Date (the "**Evaluation Date**"). Customer shall maintain a reserve amount in the Reserve Account, with a balance in the amount equal to or greater than the total amount of all ACH Transactions executed by Customer for a 120-calendar day period that have been returned multiplied by the return/reversal rate ("**Reserve Amount**"). Notwithstanding anything to the contrary, the Reserve Amount shall never be less than the Initial Reserve Amount. Prime Trust may suspend ACH Transactions if the Customer fails to establish and maintain the Reserve Amount pursuant to this Section 10 (Reserve Account).

**10.2**    At all times, it shall be Customer's responsibility to maintain funds in the Reserve Account equal to the Reserve Amount (or Initial Reserve Amount for the first month following the Order Start Date). In the event that the actual balance in the Reserve Account is at any time less than the amount required hereunder, Customer shall within three (3) Business Days of receipt of notice of insufficient balance make a payment into the Reserve Account in an amount equal to the difference between the reserve amount required hereunder and the actual balance in the Reserve Account. In the event the actual balance in the Reserve Account shall be less than the amount required hereunder and Customer shall fail to pay the difference within three (3) Business Days as specified in the immediately preceding sentence, Prime Trust may charge Customer interest on the amount of the deficiency at a rate equal to the Wall Street Journal Prime Rate plus three percent (3%) per annum. In the event the actual balance in the Reserve Account shall be less than the amount required hereunder and the deficiency shall not be cured within five (5) Business Days after Customer's receipt of notice from Prime Trust, then Customer shall be in default and, without limiting its other remedies, Prime Trust shall have the right to terminate the Agreement.

**10.3**    Prime Trust will have the right to access the funds in the Reserve Account to offset any deficiency in any amount owed to Prime Trust by Customer or any losses that Customer is liable for under this Service Attachment. Customer authorizes Prime Trust, and irrevocably appoints Prime Trust as its attorney-in-fact, to disburse funds from the Reserve Account to cover any amounts due under this Service Attachment, including but not limited to actual and potential losses, or any amounts owed under this Service Attachment or under other agreements between Prime Trust and Customer.

**10.4**    To secure Customer's obligations under the Agreement, Customer hereby grants Prime Trust a first priority security interest in the Reserve Account and the funds therein or proceeds thereof, and agrees that Prime Trust has control of the Reserve Account for purposes of the UCC, Article 9-314. Customer further agrees to take such steps as Prime Trust may reasonably require to perfect or protect such first priority security interest.  Prime Trust shall have all of the rights and remedies of a secured party under Applicable Law with respect to the Reserve Account and the funds therein or proceeds thereof, and shall be entitled to exercise those rights and remedies in its discretion upon a default by Customer. Customer agrees that it will maintain the lien against the Reserve Account in favor of Prime Trust and agrees that it will not grant any other party an interest in the Customer Reserve Account.

 **Prime Trust**

**10.5**   If any Regulatory Authority with jurisdiction over Prime Trust notifies Prime Trust that the Reserve Amount or Initial Reserve Amount is inadequate, Prime Trust shall provide notice to Customer of the amount that Prime Trust or such Regulatory Authority determines will be a sufficient reserve (the "**New Required Balance**"). Customer shall have five (5) Business Days to increase the balance in the Reserve Account to the New Required Balance, and the New Required Balance shall then become the Reserve Amount.

**10.6**   Customer authorizes and consents (all as required by and in accordance with Applicable Law) for Prime Trust to debit a Customer Custody Account for any amount owed under the Agreement.

**11.   PROVISIONAL CREDIT NOTICE.**   In the case of a credit Entry, credit given by the RDFI for the Entry is provisional until the RDFI has received final settlement through a Federal Reserve Bank or has otherwise received payment. If the RDFI does not receive such payment for the Entry, the RDFI is entitled to a refund from the Receiver in the amount of the credit to the Receiver's account, and Customer will not be considered to have paid the amount of the credit Entry to the Receiver.

**12.   NOTIFICATIONS OF CHANGE (NOC).**   Prime Trust shall notify Customer of all Notification of Change ("**NOC**") Entries received by Prime Trust relating to Entries transmitted by Customer in accordance with Prime Trust's policies. It is the responsibility of Customer to make the requested changes within the time period specified by Prime Trust or prior to the initiation of the next live Entry, whichever is later with the following exceptions. If the NOC is incorrect, Customer will generate a refused NOC and deliver it to Prime Trust. If Customer does not comply with the requirements to make changes requested by the NOC, Prime Trust may charge Customer for any and all Rule violations fines resulting from such rule infraction or cease processing Entries until the changes are made.

**13.   CANCELLATION OR AMENDMENT OF AN ENTRY**. Customer shall have no right to cancel or amend any Entry after its receipt by Prime Trust. However, Prime Trust shall use commercially reasonable efforts to act on a request by Customer to cancel an Entry/File before transmitting it to the Bank. Any such request shall be in writing and comply with this Service Attachment, including the Security Procedures. Prime Trust shall have no liability if it fails to effect the cancellation or amendment. Customer shall reimburse, indemnify and hold harmless Prime Trust for any expenses (including attorneys' fees), losses or damages Prime Trust incurs in effecting or attempting to effect Customer's request for the cancellation or amendment of an Entry.

**14.   REJECTION OF ENTRIES**. Prime Trust may reject any Entry, including an On-Us Entry, that does not comply with the requirements of the Agreement and may reject any Entry if Customer is not otherwise in compliance with the terms of the Agreement and the Rules. Prime Trust will provide timely written notice to Customer of any such rejection. Prime Trust shall have no liability to Customer by reason of the rejection of any such Entry. Customer agrees to correct the Entry to comply with applicable terms prior to resubmission.

**15.   RETURNED ENTRIES**. Prime Trust shall notify Customer of the receipt of a returned Entry from the Bank no later than two (2) Business Days of receiving such returned Entry. Prime Trust shall have no obligation to re- transmit a returned Entry if Prime Trust complied with the terms of the Agreement with respect to the original Entry or if Customer is not in compliance with the Rules. Customer agrees to be knowledgeable about specific return codes, and not reinitiate any returns except as noted below. Customer also agrees to abide by all operating rules with respect to returned Entries. If an Entry is returned, then it is Customer's responsibility to collect any funds that are owed. In the event an Entry is returned for correction, Customer agrees to make said corrections before transmitting another Entry to the Receiver. Customer agrees not to originate a transaction where authorization has been revoked. In the event a

DocuSign Envelope ID: A1E14A0F-6295-4A1F-A7F7-B25068943946

returned Entry or NOC sent to Customer is in error, Customer will notify Prime Trust within two (2) Business Days of receipt of such notice.

**16.    RE-INITIATION OF RETURNED ENTRIES**. Customer agrees it shall not reinitiate a returned Entry unless: (i) the Entry has been returned for insufficient or uncollected funds; (ii) the Entry has been returned for stopped payment and re-initiation has been authorized by the Receiver; or (iii) Prime Trust has taken corrective action to remedy the reason for the return; provided, however, in each (i) through (iii), such re-initiation complies with and is permitted under the Rules. Customer also agrees that Entries returned for insufficient or uncollected funds will only be reinitiated the lesser of (a) two times and (b) the amount permitted under the Rules.

**17.    UNAUTHORIZED RETURNS**. In the event the rate of unauthorized returns of Entries, administrative returns of Entries or overall return rates of Entries submitted by Customer exceeds the threshold rates identified or established by Prime Trust from time to time or the Rules, based on the calculations or measurements determined by Prime Trust or the Rules, Customer will take immediate steps to revisit its authorization procedures to reduce the unauthorized return rates, administrative return rates or overall return rate below the threshold rate and shall further promptly prepare and submit a written plan and timeline to Prime Trust noting Customer's intended plan to reduce unauthorized returns, administrative returns or its overall return rate. Prime Trust may be required to provide reporting information to NACHA regarding Customer, if Customer's return rate for unauthorized Entries exceeds the Unauthorized Entry Return Rate Threshold, the Administrative Return Rate Level or Overall Return Rate Level as required by and defined under the Rules.  Prime Trust may suspend ACH Services in the event that the rate of unauthorized or returned Entries poses a risk to Prime Trust. Prime Trust will make all reasonable efforts to notify Customer in advance of any such suspension.

**18.    ENTRIES RETURNED AS UNAUTHORIZED**. In the event that an Entry is returned as unauthorized or authorization revoked, Customer will contact the necessary parties and resolve any dispute. During this process, Customer may ask Prime Trust to request from the RDFI a copy of the "Written Statement of Unauthorized Debit." Prime Trust will use reasonable effort to obtain the form and will deliver it to Customer when received. Customer agrees not to re- originate any transaction returned as unauthorized or as authorization revoked unless the customer reauthorized the Entry.

**19.    DISHONORED RETURNS**. Customer acknowledges that it may have Prime Trust dishonor a return for two reasons: (i) the Entry has been returned later than the deadline established for accepting returns and either Customer or Prime Trust has suffered a loss, or (ii) the return Entry contains incorrect information. Within twenty-four (24) hours following the Settlement Date (as defined by the Rules) of a return Entry, Customer must timely notify Prime Trust of its desire to dishonor a return so it can be sent within five (5) Business Days of the Settlement Date of the return Entry. Both Prime Trust and Customer acknowledge that failure to utilize the dishonored return process does not preclude its right to seek recovery against an RDFI outside of the ACH return process for a late return.

**20.    REVERSALS**. If Customer has mistakenly initiated a duplicate Entry or File or a File contains an Entry or Entries with the types of erroneous data specified in the Rules relating to reversing files, Customer may reverse the File or Entry pursuant to the Rules. If Customer reverses an Entry or File, Customer shall indemnify Prime Trust against any claim, demand, loss, liability or expense resulting directly or indirectly from such reversal.

**21.    DUPLICATE ENTRIES**. Prime Trust shall have no duty to discover and shall not be liable for duplicate Entries issued by Customer. If Customer discovers that any Entry it has initiated was in error, it shall notify Prime Trust of such error. If such notice is received no later than four (4) hours prior to the ACH receiving deadline, Prime Trust will utilize commercially reasonable efforts to initiate an adjusting



Entry or stop payment of any "On-Us" credit Entry within the time limits provided by the Rules. In the event that Customer makes an error or issues a duplicate Entry, Customer shall indemnify, defend all claims, and hold Prime Trust harmless from any loss, damages, or expenses, including but not limited to attorney's fees, incurred by Prime Trust as result of the error or issuance of duplicate Entries.

**22.    PERIODIC STATEMENT**. Prime Trust will include ACH Transactions on Customer's periodic account statement provided in accordance with Section 4.1 of the Service Schedule for Prime Trust Custodial Services. Customer agrees to reconcile Customer Custody Accounts transactions monthly  and notify Prime Trust promptly of any discrepancy between its records and the information provided by Prime Trust. Customer should review Customer's statement for any discrepancies, unauthorized transactions or errors in connection with any ACH Transactions. Except as otherwise provided herein, if Customer believes a ACH Transaction is wrong or if more information about a ACH Transaction is needed, Customer may contact Prime Trust in writing upon discovery or notice of the error and Prime Trust will provide any reasonably requested information. Failure to do so will relieve Prime Trust of any obligation for an unauthorized or erroneous ACH Transaction for which Prime Trust may be liable under the Agreement, and Customer shall be responsible and liable for any damages or losses Prime Trust incurs as a result of Customer's failure to notify Prime Trust within the time period stated in this section or as otherwise required by Applicable Law. If Customer fails to notify Prime Trust in writing of any discrepancy between its records and the information provided by Prime Trust or any unauthorized or erroneous ACH Transaction that is reflected on its periodic statement within thirty (30) days of receipt of such periodic statement, Customer will be precluded from asserting a claim related to such discrepancy or erroneous or unauthorized ACH Transaction against Prime Trust and agrees to waive any such claim.

**23.    LIABILITY**. In addition to any other limitations of liability set forth in the Agreement, in the performance of the services required by this Service Attachment, Prime Trust shall be entitled to rely solely on the information, representations and warranties provided by Customer pursuant to this Service Attachment and shall not be responsible for the accuracy or completeness of such information. Except as otherwise specifically provided by Applicable Law, Prime Trust shall be responsible only for performing the services expressly provided for in this Service Attachment, and shall be liable only in the event of loss due to its gross negligence or willful misconduct in performing those services. To the extent allowed by Applicable Law, Prime Trust shall not be liable for and shall be excused from failing to transmit or any delay in transmitting an Entry: (a) if such transmittal would result in Prime Trust's having exceeded any limitation upon Bank's intra-day net funds position established pursuant to present or future Federal Reserve guidelines; (b) if, for any reason, the ACH Operator or Bank fails or declines to process an Entry; or (c) if, in Prime Trust's sole discretion, processing an Entry would or may violate or contribute to the violation of any present or future risk control program of the Federal Reserve or any Rule, law, regulation or regulatory requirement.

**24.    RULES ENFORCEMENT**. In the event that a report of possible Rules violation is filed on Customer, Customer will take appropriate steps to correct the problem within the timeframes suggested by Prime Trust. In the event that a fine is levied against Prime Trust for a violation of the Rules, Customer agrees to make Prime Trust whole for the value of the fine.

**25.    RECORD AND DATA RETENTION**. Customer agrees to maintain acceptable quality, permanent and electronically accessible records of all transactions in accordance with the Rules and Applicable Law, which records shall be made available to Prime Trust, Bank or to those regulatory agencies having jurisdiction over such parties upon request. Customer shall retain data on file adequate to permit the remaking of Entries for five (5) Business Days following the date of their transmittal by Prime Trust as provided herein, and shall provide such data to Prime Trust upon its request.

DocuSign Envelope ID: A1E14A8F-6295-4A1E-A7E7-B25A68943946

**26.    AUTHORIZATIONS**. The Customer agrees that: (a) each Person shown as the Receiver on an Entry received by Prime Trust from Customer has authorized the initiation of such Entry and the crediting or debiting of its account in the amount and on the effective date shown on such Entry; (b) such authorization is operative at the time of transmittal for crediting or debiting by Bank; and (c) Entries transmitted to Prime Trust by Customer are limited to those types of credit and debit Entries permitted in writing by Prime Trust. Customer shall obtain an authorization ("**Authorization Agreement**") as required by the Rules and/or Applicable Law from the Person whose account will be debited or credited as the result of a debit or credit Entry initiated by Customer and Customer shall retain the Authorization Agreement in original form while it is in effect and the original or a copy of each authorization for two (2) years after termination or revocation of such authorization as stated in the Rules. It is the sole responsibility of Customer to verify that the individual signing the Authorization Agreement is, in fact, entitled to use the specified account. Customer's obligation to pay the amount of the Entry to Prime Trust is not excused if the party that signed the Authorization Agreement is not entitled to use of the specified account. Customer must provide a copy of such Authorization Agreement upon request from Prime Trust or any RDFI in response to an alleged unauthorized transaction or error. Such Authorization Agreement, at a minimum, shall include: (i) date of authorization; (ii) Receiver name; (iii) Receiver account number and type of account; (iv) a description of the Entry type; (v) posting date and posting frequency, if applicable; and (vi) expiration date or information on how the Receiver can revoke their authorization, such as a mailing address or telephone number for Customer.

**27.    COOPERATION IN LOSS RECOVERY EFFORTS**. In the event of any damages for which Prime Trust or Customer may be liable to each other or to a third party pursuant to the services provided under this Service Attachment, Prime Trust and Customer will undertake reasonable efforts to cooperate with each other, as permitted by applicable law, in performing loss recovery efforts and in connection with any actions that the relevant party may be obligated to defend or elects to pursue against a third party.

**28.    INCONSISTENCY OF NAME AND ACCOUNT NUMBER**. The Customer acknowledges and agrees that, if an Entry describes the Receiver inconsistently by name and account number, payment of the Entry transmitted by Prime Trust to the RDFI may be made by the RDFI (or by Prime Trust in the case of an On-Us Entry) on the basis of the account number supplied by the Customer, even if it identifies a Person different from the named Receiver, and the Customer is obligated to pay the amount of the Entry to Prime Trust in such circumstances. Similarly, if an Entry describes an RDFI inconsistently by name and routing number, payment of such Entry may be made based on the routing number, and Customer shall be liable to pay the amount of that Entry to Prime Trust. Customer is liable for and must settle with Prime Trust for any Entry submitted by Customer that identifies the Receiver by account or identifying number or by name and account or identifying number.

**29.    ACH RULE COMPLIANCE REVIEW**. Customer shall implement a risk management system on or prior to the Order Start Date and shall maintain a risk management system designed to ensure compliance with this Service Attachment and Applicable Law throughout the term of this Service Attachment (the "**Risk Management System**"). No more than once each  year, Customer shall provide Prime Trust with a risk assessment and ACH audit performed by a qualified third party in accordance with the Rules ("**Risk Assessment**"). The Risk Assessment must consist of a comprehensive evaluation of Customer's ACH policies, procedures, processes, operations and activities against potential risk vulnerabilities (including, but not limited to, potential threats to its operations, controls, access points and other potential risk vulnerabilities) and shall take into consideration IT security, continuity plans, implementation of Customer's Risk Management System, compliance with Applicable Law, and oversight of each Customer subcontractor. The Risk Assessment must be maintained for review by Prime Trust for not less than six (6) years. Customer agrees to provide documentation supporting such Risk Assessment within five (5) Business Days of request from Prime Trust. Any exceptions noted on the audit

 **Prime Trust**

reports will be promptly addressed with the development and implementation of a corrective action plan by Customer's management. Customer shall retain data on file adequate to permit remaking of Entries for 365 days following the date of their transmittal by Prime Trust as provided herein and shall provide such data to Prime Trust upon its request.

**30.    AUDIT AND FINANCIAL INFORMATION**. Upon request by Prime Trust, no more than one request per year, Customer hereby authorizes upon thirty (30) days' prior written notice Prime Trust and Bank to audit, inspect and review  Customer's policies and processes to ensure Customer's compliance with this Service Attachment and Customer specifically authorizes Prime Trust to perform an audit of Customer's ACH policies, procedures, operational controls, risk management practices, and information technology infrastructure related to the ACH Services and this Service Attachment against potential risk vulnerabilities. Customer hereby acknowledges and agrees that Prime Trust shall have the right to mandate specific internal controls at Customer's location(s) and Customer shall comply with any such mandate. In addition, Customer hereby agrees to allow Prime Trust to review available reports of independent audits performed at Customer's location(s) related to information technology, the ACH Origination Service or any associated operational processes. Customer agrees that if requested by Prime Trust, Customer will complete a self-assessment of Customer's operations, management, staff, systems, internal controls, training and risk management practices that would otherwise be reviewed by Prime Trust in an audit of Customer under this Section 30. If Customer refuses to provide the requested financial information, , or if Prime Trust concludes that the risk associated with the Customer following the results of the audit, or if Customer refuses to implement Prime Trust's mandated internal controls or if Customer refuses to give Prime Trust access to Customer's any information requested hereunder, Prime Trust may terminate this Service Attachment or suspend the ACH Services immediately.

**31.    THIRD PARTY SERVICE PROVIDERS**. Customer may not use special equipment, services or software provided by a third party to assist it in processing Files (as defined under the NACHA Rules) hereunder in accordance ("**Service Provider**"), without Prime Trust's written approval. If Customer uses Service Provider to transmit Files to Prime Trust, Customer agrees: (a) that Service Provider is acting as Customer's agent in the delivery of Files to Prime Trust and (b) to assume full responsibility and liability for any action or omission of Service Provider. Prime Trust will not be liable for any losses or additional costs incurred by Customer as a result of any action or omission of Service Provider or a malfunction of equipment provided by Service Provider. All of Customer's obligations and responsibilities under this Service Attachment that are applicable to the services performed by a Service Provider will apply to the Service Provider, and Customer must enter into a separate agreement with the Service Provider that must so provide. Any Service Provider will be considered an Authorized User. Customer hereby indemnifies and holds Prime Trust harmless for any losses, damages, fines, assessments, costs and expenses incurred or suffered by Prime Trust or any other Person as a result of or arising from Customer's use of Service Provider or the actions or omissions of Service Provider.

**32.    ON-US ENTRIES**. Except as provided in Section 14 (Rejection of Entries), in the case of an Entry received for credit to an account maintained with Prime Trust, Prime Trust shall credit the Receiver's account in the amount of such Entry on the Effective Entry Date contained in such Entry, provided the requirements set forth in this Service Attachment are met.

**33.    PRENOTIFICATION**. Customer, at its option, may send prenotification that it intends to initiate an Entry or Entries to a particular account within the time limits prescribed for such notice in the Rules. Such notice shall be provided to Prime Trust in the format and on the medium approved by Prime Trust and in compliance with the Rules. If Customer receives notice that such prenotification has been rejected by an RDFI within the prescribed period, or that an RDFI will not receive Entries without having first received a copy of an authorization signed by its customer, Customer will not initiate any corresponding

DocuSign Envelope ID: A1E14A8F-6295-4A1F-A7E7-B25A68943946



Entries to such accounts until the cause for rejection has been corrected or until providing the RDFI with such authorization within the time limits provided by the Rules.