# **EXHIBIT 3**

**Sample End-User Agreement**

**PRIME TRUST USER AGREEMENT**

Agreement revision date: March 7, 2022

███████████ ("**Account Holder**", "**you**", "**your**") hereby requests and directs that Prime Trust, LLC, a Nevada chartered trust company ("**Prime Trust**", "**our**") (each, a "**Party**," and together, "**Parties**"), establish and maintain an account for and in the name of Account Holder in connection with the Services (the "**Account**"), and hold as custodian all property deposited to, or collected with respect to, the Account, upon the terms and conditions of this Prime Trust User Agreement (as amended or otherwise modified from time to time, and together with any schedules, annexes, exhibits hereto, this "**Agreement**").

If Account Holder has entered into a Prime Trust Master Services Agreement with Prime Trust, then the terms of that certain Master Services Agreement govern and the terms in this Agreement do not apply to Account Holder.

**1. ACCOUNT ACCEPTANCE AND AUTHORIZED SERVICES**

**1.1 Appointment**. Account Holder hereby appoints and authorizes Prime Trust to provide the Services in accordance with this Agreement, and Prime Trust hereby accepts such appointment subject to the Account acceptance process in accordance with **Section 2.1** below.

(a) The services that Prime Trust will provide include the Fiat Services, On-Chain Services, and any other services, including the holding, processing, and acting as custodian of all Custodial Property, provided from time to time by Prime Trust to Account Holder in accordance with this Agreement (the **"Services"**). Without limiting the generality of the foregoing, Prime Trust is authorized to collect into custody all Custodial Property while this Agreement is in effect (capitalized terms used in this sub-section are defined below).

(b) In its sole discretion, Prime Trust may custody, on Account Holder's behalf, any property delivered by Account Holder into the possession or control of Prime Trust (**"Custodial Property"**). For the avoidance of doubt, Custodial Property that Prime Trust may agree to accept and hold on Account Holder's behalf in accordance with this Agreement is limited to the following: (i) Digital Assets (defined below); (ii) Australian Dollars, Canadian Dollars, Euros, British Pounds, and Japanese Yen, and U.S. Dollars (**"USD"**), together with any other currencies made eligible for Fiat Services, as determined by Prime Trust from time to time, (collectively, **"Fiat Currencies"**); (iii) title to real estate; (iv) private securities and public securities listed on any U.S. securities exchange or alternative trading system; and (v) traditional and Roth individual retirement accounts (subject to applicable documentation in Prime Trust's sole discretion). Securities that have been issued in accordance with the regulations of countries other than the U.S. or which are listed on non-U.S. trading systems may be accepted for custody on a case-by-case basis upon approval by Prime Trust in its sole discretion.

(c) For the purposes of this Agreement, **"Digital Assets"** means Bitcoin and Ethereum, together with any other digital representation of value that may function as a medium of exchange or medium for investment, and which is evidenced on and can be electronically received and stored using distributed ledger technology, as determined by Prime Trust from time to time

**1.2 Provision of the Services.**

(a) Subject to Account Holder's completion of the Account acceptance process in accordance with

**Section 2.1** and so long as Account Holder is in compliance with this Agreement, Prime Trust will provide the Services.

(b) In providing the Services, Prime Trust will act only upon receipt of any direction, instruction, or request submitted by an Authorized Person (defined below) or through the Authorized Integrator's platform (an **"Authorized Instruction"**). **"Authorized Integrator"** means a third party that has: (i) entered into an agreement with the Account Holder to provide certain services (**"Account Holder Service Provider Agreement"**); and (ii) entered into an agreement with Prime Trust to allow its customers to access the Services.

(c) Prime Trust, in its sole discretion, will determine whether the provision of the Services or an Authorized Instruction complies with all applicable U.S. federal, state, local, and foreign laws, statutes, ordinances, regulations, rules, executive orders, circulars, opinions, agency guidance, interpretive letters, and other official releases or requests of or by any government, or any authority, department or agency thereof(**"Applicable Law"**) and may decline any Authorized Instruction, including if: (i) Account Holder is not in compliance with this Agreement; (ii) such Authorized Instruction may violate Applicable Law; or (iii) Account Holder has insufficient unencumbered, cleared Custodial Property in the Account available for executing such Authorized Instruction.

(d) Prime Trust is entitled to rely upon any information, data, and documents provided in connection with the Services. Account Holder acknowledges that Prime Trust has no duty to detect errors, or inquire into or investigate the legality, validity, completeness, or accuracy of any information, data, or documents provided to Prime Trust in connection with the Services.

(e) Prime Trust is entitled to rely upon any Authorized Instruction provided in connection with the Services and Account Holder acknowledges that Prime Trust has no duty to detect errors, or inquire into or investigate the legality, validity, completeness, or accuracy of any Authorized Instruction. Prime Trust will only act upon an Authorized Instruction and is released and held harmless by Account Holder for acting upon the Authorized Instruction, including acting upon conflicting, superseded, or otherwise varying Authorized Instructions from multiple Authorized Persons.

(f) Account Holder acknowledges that Prime Trust will not monitor Digital Assets for actions taken by the issuer of such Digital Asset, if any. Such actions may include an issuer instruction requiring the holder of a Digital Asset to transfer it to a certain location. For the avoidance of doubt, Account Holder is solely responsible for satisfying or responding to any such actions of an issuer.

(g) Prime Trust will collect and hold all funds when Custodial Property may mature, be redeemed, or sold. Prime Trust will hold the proceeds of such transaction(s) until receipt of an Authorized Instruction.

(h) Funds received in any currency other than USD may, pursuant to an Authorized Instruction or as needed for Prime Trust to carry out an Authorized Instruction or pay Fees (defined below), be converted to USD at exchange rates set in Prime Trust's sole discretion.

(i) Prime Trust shall process the investment and reinvestment of Custodial Property in accordance with Authorized Instructions only so long as, in the sole discretion of Prime Trust, such requested investments will not impose an unreasonable administrative burden on Prime Trust (which such determination by Prime Trust shall not to be construed in any respect as a judgment concerning the prudence or advisability of such investment).

**1.3 Storage of Digital Assets.**. Prime Trust will receive Digital Assets for storage by generating Private

Keys and their Public Key pairs, with Prime Trust retaining custody of such Private Keys. **"Private Key"** means an alphanumeric string known only to the holder of a Digital Asset, which must be used to transact the Digital Asset represented by the corresponding Public Key. **"Public Key"** means an alphanumeric string on a Blockchain that indicates ownership/possession of a specific amount of a Digital Asset by a specific network participant and is visible to all participants in a Blockchain's network. Upon receipt, Prime Trust will custody the Digital Assets in Account Holder's name or Accounts established for the benefit of Account Holder, unless otherwise specified in an Authorized Instruction. Prime Trust will be deemed to have received a Digital Asset after the Digital Asset's receipt has been confirmed on the relevant Blockchain or otherwise ledgered to Prime Trust's satisfaction. **"Blockchain"** means a software operating a distributed ledger which is maintained by a network of computers, and that records all transactions in a Digital Asset in theoretically unchangeable data packages known as blocks, each of which are timestamped to reference the previous block so that the blocks are linked in a chain that evidences the entire history of transactions in the Digital Asset.

**1.4 Forks, Airdrops**.

(a) For the purposes of this Agreement, **"Fork"** means: (i) that a Digital Asset network has been changed in a way that makes it incompatible with the unchanged version of the Digital Asset network; (ii) the changes have been widely accepted by users of the Digital Asset network; and (iii) that the two resulting Digital Asset networks have not been merged together at the time of any action to be taken by Prime Trust. A Fork may create two separate Digital Asset networks (each, a **"Forked Network"**), and may result in Prime Trust holding an identical amount of Digital Assets associated with each Forked Network.

(b) Should a Fork occur: (i) Prime Trust retains the right, in its sole discretion, to determine whether or not to support either Forked Network; (ii) in connection with determining to support or not to support a Forked Network, Prime Trust may suspend certain operations, in whole or in part (with or without advance notice), for however long Prime Trust deems reasonably necessary, in order to take the necessary steps, as determined in its sole discretion, to perform obligations hereunder with respect to supporting or not supporting a Forked Network; (iii) Account Holder hereby agrees that Prime Trust will determine, in its sole discretion, whether or not to support such Forked Network and that Account Holder will have no right or claim against Prime Trust related to value represented by any change in the value of any Digital Asset (whether on a Forked Network or otherwise), including with respect to any period of time during which Prime Trust exercises its rights described herein with respect to Forks and Forked Networks; (iv) Prime Trust will select, in its sole discretion, at least one of the Forked Networks to support and will identify such selection in a notice; (v) with respect to a Forked Network that Prime Trust chooses not to support, it may, in its sole discretion, elect to (A) abandon or otherwise not pursue obtaining the Digital Assets from that Forked Network, or (B) deliver the Digital Assets from that Forked Network to Account Holder within a time period as determined by Prime Trust in its sole discretion, together with any credentials, keys, or other information sufficient to gain control over such Digital Assets (subject to the withholding and retention by Prime Trust of any amount reasonably necessary, as determined in Prime Trust's sole discretion, to fairly compensate Prime Trust for the efforts expended to obtain and deliver such Digital Assets to Account Holder); (vi) with respect to Forked Networks that Prime Trust chooses to support, Account Holder may be responsible for Fees to be negotiated; and (vii) Account Holder acknowledges and agrees that Prime Trust assumes no responsibility or obligations with respect to any Forked Network and related Digital Assets that it chooses not to support.

(c) In the event that a Digital Asset network attempts to or does contribute (sometimes called "airdropping" or "bootstrapping") its Digital Assets (collectively, **"Airdropped Digital Assets"**) to holders of Digital Assets on an existing Digital Asset network and Account Holder notifies Prime Trust in writing of such event, Prime Trust may, in its sole discretion, elect to: (i) subject to an airdrop fee to be

determined, support the Airdropped Digital Asset for Custody and, if appropriate, reconcile Account; (ii) abandon or otherwise not pursue obtaining the Airdropped Digital Asset; or (iii) deliver the Airdropped Digital Assets from that Digital Asset network to Account Holder within a time period as determined by Prime Trust in its sole discretion, together with any credentials, keys, or other information sufficient to gain control over such Airdropped Digital Assets (subject to the withholding and retention by Prime Trust of any amount reasonably necessary, as determined in Prime Trust's sole discretion, to fairly compensate Prime Trust for the efforts expended to obtain and deliver such Airdropped Digital Assets to Account Holder). Airdropped Digital Assets do not create any relationship between the sender and/or Digital Asset network and Prime Trust and do not subject Prime Trust to any responsibilities or obligations as it relates to the sender and/or Digital Asset network.

**1.5 On-Chain Services**. Subject to any documentation requested by Prime Trust in its sole discretion, from time to time, Prime Trust may offer Account Holder additional Services involving on-chain transactions (other than deposits and withdrawals included in Prime Trust's basic custody Service), which may include staking, voting, inflation, signaling, and other activities requiring interaction with the applicable Blockchain **("On-Chain Services")**. Account Holder may be required to accept additional terms as a condition to receiving any On-Chain Services. Prime Trust may discontinue an On-Chain Service at any time without notice for any reason. If Prime Trust decides to discontinue an On-Chain Service, Prime Trust will endeavor to provide as much notice to Account Holder as reasonably possible.

**1.6 Fiat Currency Instructions and Acknowledgements; Disclosures.**. Prime Trust may, in its sole discretion, offer the custody of Fiat Currencies and foreign exchange transactions in Fiat Currencies (**"Fiat Services"**) to Account Holder. If Prime Trust offers Fiat Services, and Account Holder accepts Fiat Services, Prime Trust may:

(a) subject to Section 1.6(b), deposit any cash or Fiat Currency funds deposited by Account Holder with Prime Trust, for which Account Holder has not already provided transfer instructions, into deposit accounts at Federal Deposit Insurance Corporation (**"FDIC"**)-insured, regulated depository institutions selected by Prime Trust, which accounts will be held for the benefit of Prime Trust Account Holders (**"Deposit Accounts"**) and maintain the Deposit Accounts as omnibus accounts, which will not be segregated by Account Holder; enter into such sub-accounting agreements as may be required by the depository institution; and initiate wire or other transfer requests from time to time for the withdrawal of Account Holder funds from the Deposit Accounts, which requests are to be honored by the depository institution for withdrawal of Account Holder's funds from such Deposit Accounts for distributions, investments, Fees, and other disbursements pursuant to an Authorized Instruction. All applicable wire or other transfer Fees will be paid by Account Holder.

(b) otherwise use or invest such cash or Fiat Currency at Prime Trust's own risk. Without limiting the foregoing, Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency, subject to Prime Trust's obligation to return Fiat Currency to Account Holder in accordance with this Agreement. Prime Trust may receive earnings or compensation for an omnibus account either in the form of services provided at a reduced rate, the payment of any shareholder service fees, or similar compensation, and Prime Trust may receive earnings or income from using or investing cash or Fiat Currency as described herein. Account Holder agrees that any such earnings, income or compensation shall be retained by Prime Trust and no portion of any such earning, income or compensation shall be paid to or for Account Holder. Account Holder acknowledges and agrees that Prime Trust may hold some or any portion of Fiat Currency in accounts, including but not limited to

money market deposit accounts, that may or may not receive interest or earnings attributable to such Fiat Currency. Account Holder hereby agrees that the amount of such interest or earnings attributable to Fiat Currency may be retained by Prime Trust as additional consideration for its services

(c) Prime Trust will keep records for the purpose of obtaining pass-through FDIC insurance with respect to any sub-account held for the Account Holder that is part of the Custodial Property held in Deposit Accounts by Prime Trust to the extent provided by Applicable Law. Account Holder acknowledges and accepts that Prime Trust does not guarantee that pass-through FDIC coverage will be available for any such sub-account.

(d) if Account Holder elects to provide a card payment method to transfer funds into the Account, Account Holder hereby authorizes Prime Trust to debit the card payment method for the purpose of transferring the funds. Further, Account Holder hereby authorizes Prime Trust to store and file the card payment method and charge the card payment method on file in connection with any future transfers of funds by the Account Holder.

**1.7 Limitations on Services**. Account Holder agrees that Prime Trust will only perform the Services, and no additional duties or obligations will be implied. In particular, Prime Trust will not exercise any legal, investment, tax, or accounting planning, advice, discretion, or recommendation whatsoever regarding your Account. In providing the Services, Prime Trust has no duty to inquire as to the provisions of or application of any agreement or document other than this Agreement, notwithstanding Prime Trust's receipt of such agreement or document.

**1.8 Ownership of Custodial Property**. Account Holder owns all Custodial Property held by Prime Trust on behalf of Account Holder in accordance with this Agreement. Account Holder's Custodial Property will not be reflected on Prime Trust's balance sheet as assets of Prime Trust. Prime Trust may, for convenience, take and hold title to Custodial Property or any part thereof in its own name with Account Holder's ownership of Custodial Property segregated on Prime Trust's books and records.

**2. ACCOUNT ACCEPTANCE; AUTHORIZED PERSONS**

**2.1 Account Acceptance**. Services will be provided only upon the date of Account Holder's successful completion of the Account acceptance process (the **"Effective Date"**), as determined in Prime Trust's sole discretion and in accordance with this **Section 2.1**. To complete the acceptance process, Account Holder will provide Prime Trust with information and documents, which includes information necessary for Prime Trust's compliance with the Bank Secrecy Act (**"BSA"**), and other Applicable Law relating to anti-money laundering (**"AML"**), Know-Your-Customer (**"KYC"**), counter-terrorist financing, sanctions screening requirements, or any other similar legal obligations, in each case, as determined by Prime Trust in its sole discretion.

**2.2 Authorized Persons**.

(a) Upon acceptance of Account Holder as determined by Prime Trust, Account Holder will designate to Prime Trust one or more persons authorized to provide instructions with respect to the Account (each, an **"Authorized Person"**). Account Holder is solely responsible for designating to Prime Trust all Authorized Persons, for advising Prime Trust of the removal of any Authorized Persons, and for all actions of Authorized Persons.

(b) Account Holder shall notify Prime Trust of the termination of any Account Holder Service Provider Agreement, and Prime Trust will not be liable for acting on any instruction sent by any person with whom Account Holder no longer maintains an Account Holder Service Provider Agreement.

(c) You agree that Prime Trust may rely on an Authorized Person's email address currently on file with Prime Trust for the purposes of acting on an Authorized Instruction from an Authorized Person.

**2.3 Joint Accounts**. In the case of a joint Account, each person with an interest in the Account, who is a Party to this Agreement, is considered an Account Holder. The obligations and agreements applicable to each part to a joint Account under this Agreement shall be deemed to be joint and several.

**2.4 Acknowledgements**. Account Holder acknowledges that:

(a) Account Holder is an "Entitlement Holder" in a "Financial Asset," as defined by, and for purposes of, the Uniform Commercial Code, including Article 8 thereto, as adopted and implemented in accordance with Nevada law (**"UCC"**). Applicable Custodial Property are "Financial Assets" for purposes of the UCC and are not assets of Prime Trust.

(b) Account Holder is solely responsible for, and Prime Trust has no involvement in, determining whether any investment, investment strategy, or related transaction is appropriate for Account Holder. Prime Trust will have no duty or responsibility to review or perform due diligence on any investments or transactions and will make no recommendation of investments or transactions, nor supervise any such investments or transactions. You will perform your own due diligence on all investments and take sole responsibility for all decisions made for your Account.

(c) Prime Trust does not provide any valuation or appraisals of Custodial Property, nor does it hire or seek valuations or appraisals on any Custodial Property; provided, however, that Prime Trust may, at its option and with no obligation or liability, to the extent reasonably available for any particular asset, make available recent price quotes or value estimates from various third-party sources, including stock exchanges and alternative trading systems registered with the Securities and Exchange Commission, digital asset exchanges, and real estate websites. Prime Trust will not attempt to verify the validity, accuracy or reliability of any such third-party valuation, valuation estimates or price quotes (collectively, **"Valuation Data"**) and you agree that Prime Trust will have no liability in connection with any such Valuation Data, including for any unreliable, inaccurate, or misleading information. Any Valuation Data provided to you is furnished for general information purposes only, and should not be relied upon as a definitive determination of the market value of any Custodial Property, nor should such Valuation Data be used for tax reporting purposes. You understand and agree that you should engage an independent financial advisor, appraiser, or valuation firm in order to obtain a formal opinion or financial advice regarding the value of any Custodial Property.

(d) Prime Trust has no control over, and is not responsible or liable for, any services or technology supporting or used in connection with any Custodial Property, Service Provider, Authorized Integrator platform, or the markets in which Custodial Property is purchased, sold or otherwise traded, and any Custodial Property, Service Provider (defined below), Authorized Integrator platform or such markets, and any such services or technology, may be susceptible to, or limited or compromised by, errors, technology flaws or defects, viruses or other malicious code, manipulations, hacks, other attacks, outages, and other interruptions and limitations. For the purposes of this Agreement, **"Service Provider"** means any unaffiliated third-party entity retained by Prime Trust to provide any of the Services on behalf of Prime Trust to the Account Holder.

(e) The custody of Digital Assets is generally subject to a high degree of risk, and the nature of Digital Assets may lead to an increased risk of technology flaws, fraud or attacks.

(f) Prime Trust does not control and makes no guarantee as to the functionality of any Blockchain's decentralized governance, which could, among other things, lead to delays, conflicts of interest, or operational decisions that may impact Account Holder and/or its Custodial Property.

(g) Advancements in cryptography could render current cryptography algorithms utilized by a Blockchain supporting a specific Digital Asset inoperative.

(h) The supply of Digital Assets available as a result of a Forked Network and Prime Trust's ability to deliver Digital Assets resulting from a Forked Network may depend on Service Providers and other third-party providers that are outside Prime Trust's control. Prime Trust does not own or control any of the protocols that are used in connection with Digital Assets and their related Digital Asset networks, including those resulting from a Forked Network. Accordingly, Prime Trust disclaims all liability relating to such protocols and any change in the value of any Digital Assets (whether on a Forked Network or otherwise), and makes no guarantees regarding the security, functionality, or availability of such protocols or Digital Asset networks. Account Holder accepts all risks associated with the use of the Services to conduct transactions.

(i) The price and liquidity of Digital Assets have fluctuated substantially in the past and may fluctuate substantially in the future, and such fluctuation may affect the value of your Account, including a total loss of the value of Digital Assets. The value of your Account will be solely dependent upon the performance of Custodial Property.

(j) Digital Assets held in Accounts are not entitled to deposit insurance protection by the FDIC. Assets held in Accounts are not insured by Prime Trust insurance policies and are not entitled to protection afforded to customers under the Securities Investor Protection Act of 1970, as amended.

(k) Subject to Applicable Law, Digital Assets are not legal tender and are not backed by any government.

(l) Changes in Applicable Law may adversely affect the use, transfer, exchange, and value of Custodial Property.

(m) Transactions in Custodial Property may be irreversible, and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

(n) Some Digital Asset transactions will be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction was initiated.

(o) The value of Digital Assets may be derived from the continued willingness of market participants to exchange Fiat Currencies or Digital Assets for Digital Assets, which may result in the potential for permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

(p) There is no assurance that a person who accepts Digital Assets as payment today will continue to do so in the future.

(q) Due to the volatility and unpredictability of the price of Digital Assets relative to Fiat Currencies, trading and owning Digital Assets may result in significant loss over a short period of time.

(r) The nature of Digital Assets means that technological difficulties experienced by Prime Trust may prevent the access to or use of Account Holder's Digital Assets. In addition, access to or transfers of Digital Assets may be delayed due to security protocols, time-zone differences, communication technology delays or fails, and/or enhanced internal compliance reviews.

(s) All instructions for the purchase and sale of securities and/or Digital Assets will be executed through one or more broker-dealers or exchanges selected by either you or another Authorized Person, or by Prime Trust, as an accommodation (and not in any capacity as a broker-dealer), and Prime Trust is hereby authorized to debit your account for any Fees associated with such transaction(s) and remit those to the executing party.

(t) With respect to Custodial Assets that are not securities, Account Holder acknowledges and agrees that: (i) Prime Trust does not have access to every market or exchange which a particular product or financial instrument may be traded and Prime Trust makes no representation regarding the best price execution of any instructions; (ii) other orders may trade ahead of Account Holder's order and exhaust available volume at a posted price; (iii) exchanges, market makers or other types of sellers or purchasers may fail to honor posted or otherwise agreed-upon prices; (iv) exchanges may reroute customer orders out of automated execution systems for manual handling (in which case, execution may be substantially delayed); (v) system delays by exchanges or third parties executing instructions may prevent Account Holders order from being executed, may cause a delay in execution or not to be executed at the best posted price or at all; and (vi) Prime Trust may not promptly or in a timely manner execute Account Holder order(s) due to internal delays, and Prime Trust makes no representation that its Services are in any way suitable for active trading or any activity requiring prompt or exact execution. The Account is not a brokerage account. Transactions may be subject to additional Fees and charges by Prime Trust or any Service Provider or exchange.

(u) As between you and Prime Trust, Prime Trust owns the Services and any improvements or modifications to the Services, and all intellectual property rights therein. All suggestions, comments, feedback, data (including metadata), insights, ideas or know-how, in any form, regarding the Service (including any of its functionality), including those derived from our monitoring and analysis of your use of the Service will be the sole property of Prime Trust. To the extent you have or obtain any right, title or interest in such feedback, you hereby assign to Prime Trust all right, title and interest to such feedback (including any intellectual property rights therein) and agree to perform such further acts as may be reasonably necessary to evidence such assignment.

## 3. REPRESENTATIONS AND WARRANTIES

**3.1**. Account Holder represents, warrants, and covenants at all times while this Agreement is in effect:

(a) if an entity, Account Holder is validly organized or formed, as applicable, and in good standing in accordance with Applicable Law and has all requisite authority to enter into this Agreement and perform its obligations hereunder;

(b) it has all rights, power, and, if an entity, authority necessary to enter into this Agreement and perform its obligations hereunder;

(c) its entry into, and performance of its obligations under, this Agreement, and Prime Trust's exercise of its rights in accordance with this Agreement, will not conflict with, or result in a breach or violation of, any term or provision, or constitute a default under, any agreement by which it is bound or any Applicable Law;

(d) it will comply with all Applicable Law including the BSA and all other Applicable Laws related to AML, KYC, counter-terrorist financing, sanctions requirements, in performing its obligations in accordance with this Agreement;

(e) it will: (i) fully satisfy Prime Trust's information requests and other requirements, including those relating to Authorized Persons or Custodial Property, and keep current any provided information; (ii) notify Prime Trust if the Account Holder becomes a target of any action, investigation or prosecution related to this Agreement, the Services, or Custodial Property; and (iii) provide Prime Trust full cooperation in connection with any inquiry or investigation of Prime Trust made or conducted by any U.S. federal or state authority. Prime Trust shall have no obligation to provide the Services if Account Holder or any Authorized Person(s) fail to comply with the foregoing to Prime Trust's satisfaction;

(f) the appointment of Prime Trust and the execution of the terms outlined in this Agreement by Account Holder will not violate any Applicable Law;

(g) Account Holder owns, and will at all times own, all Custodial Property, free and clear of all liens and encumbrances (other than those granted to Prime Trust in accordance with this Agreement or as otherwise created by applicable U.S. federal or state securities laws);

(h) neither Account Holder nor any other Authorized Person is, nor is directly or indirectly owned or controlled by, any person or entity (i) included on the Specially Designated Nationals and Blocked Persons or the Consolidated Sanctions List maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury (**"OFAC"**) or any similar list maintained by any government entity from time to time, or (ii) located, organized, or resident in a country or territory that is the target of sanctions imposed by OFAC or any government entity;

(i) Account Holder will not, and will not direct or permit its Authorized Persons to, direct the purchase, sale, or transfer of any Custodial Property which is (a) prohibited by Applicable Law, or (b) prohibited by Section 4975 of the Internal Revenue Code;

(j) if an individual, Account Holder is over the age of 18 and has all personal power or capacity to enter into this Agreement and perform its obligations hereunder; and

(k) that all information provided to Prime Trust in accordance with this Agreement is and will be complete, correct, current, and accurate in all respects. Account Holder will notify Prime Trust immediately in accordance with Section 15.3 if any such information, including Account Holder's email address on file with Prime Trust, is no longer complete, correct, current, and accurate in all respects.

**4. PRIVACY AND DATA POLICIES**
To the extent permitted by Applicable Law and our privacy and data policies, Prime Trust may share information about you and your Account with affiliates and third parties. Account Holder agrees to Prime Trust's privacy and data policies, available at www.primetrust.com/privacy. Prime Trust may modify these policies at any time without prior notice of liability, and any modification will be effective following thirty (30) days after posting to Prime Trust's website.

**5. ELECTRONIC STATEMENTS**

**5.1 Account Statements.**. Account Holder agrees that Prime Trust will make current and prior Account statements available in electronic form only. Account Holder further agrees to access statements on the websites or applications of the Authorized Integrator. Account Holder understands and agrees that Prime

Trust will not provide Account Holder hard-copy statements.

**5.2 Monitoring Your Account.**. As an Account Holder, you are responsible for monitoring your Account, including transaction confirmations and Account statements, and reviewing these documents to see that information about your Account is accurate. You agree to review your monthly statements and promptly notify Prime Trust of any unusual or unauthorized activity. You remain responsible for monitoring your Account and reconciling all balances, statements, and activity. You agree to notify Prime Trust immediately in accordance with Section 15.3 if there is any type of discrepancy or suspicious or unexplained occurrence relating to your Account, including any unauthorized transaction. If you fail to notify Prime Trust immediately, no Indemnitee (defined below) will be liable for any consequences. If, through any error, you have received property that is not rightfully yours, you agree to notify Prime Trust and return the property immediately. If Prime Trust identifies an error in connection with property you have received from or through Prime Trust and determine it is not rightfully yours, you agree that Prime Trust may take action to correct the error, which may include returning such property to the rightful owner.

**6. AUTHORITY TO PLEDGE; RIGHT TO SET-OFF; LIEN**

Except as otherwise provided in this Section 6, Account Holder may not loan, hypothecate, pledge, or otherwise encumber any Custodial Property. Account Holder grants Prime Trust a right of set-off against, and lien on and security interest in the Custodial Property for the payment of any Fees and any other amounts due to Prime Trust under and in accordance with this Agreement.

**7. APPLICATION OF UCC**

Except as otherwise provided under Applicable Law, the Parties agree the relationship between Prime Trust and Account Holder is governed by Article 8 of the UCC and that for the purposes of this Agreement: Account Holder is an "entitlement holder" and any Custodial Property will be treated as a "Financial Asset" within the meaning of Nevada Revised Statutes (**"NRS"**) 104.8102(h) and (j).

**8. BOOKS AND RECORDS**

Prime Trust will record on its books and records (including records of receipts, disbursements, and other transactions) all Custodial Property and will segregate Account Holder's Custodial Property from the Custodial Property of any other Account Holder, person, or entity, unless otherwise specified in an Authorized Instruction. Prime Trust will hold such records in accordance with Applicable Law. Upon commercially reasonable notice by Account Holder, Prime Trust will provide Account Holder copies of the books and records pertaining to Account Holder that are in the possession or under the control of Prime Trust.

**9. FEES**

**9.1** Account Holder will pay Prime Trust the Fees, if any, in connection with the Services. "Fees" means any monthly custody fee for Custodial Property, statement fee, third-party fee, and all other applicable fees and other charges as made available on Prime Trust's website and as may be modified from time to time. Changes to Fees will not affect any Fees for prior periods and will only be effective as of the date changes are published on Prime Trust's website. All Fees are payable no later than thirty (30) days after the Fee is incurred.

**9.2** In the event that Prime Trust is charged any Fees (e.g., transfer agent fees, legal fees, accounting fees,

tax preparation fees, notary fees, exchange fees, brokerage fees, bank fees, Blockchain settlement fees, etc.) by a third party in performing Services, Account Holder agrees to reimburse Prime Trust for such Fees at cost-plus 25% (excluding broker-dealer commissions).

## 10. TERM AND TERMINATION

**10.1 Term**. This Agreement is effective as of the Effective Date, and will continue in full force and effect until terminated as provided herein (the **"Term"**).

**10.2 Termination**. This Agreement may be terminated by either Party at any time upon thirty (30) days' prior written notice to the other Party; provided, however, that Prime Trust may immediately terminate this Agreement without notice in the event that: (i) Prime Trust becomes aware or has reason to believe that Account Holder may be engaged in illegal activity, has violated Applicable Law, or has breached its obligations under this Agreement; (ii) termination is deemed appropriate by Prime Trust to comply with Applicable Law; or (iii) Prime Trust terminates its agreement with an Authorized Integrator, in which case, Prime Trust, in its sole discretion, may choose to continue to provide Services to the Account Holder but will no longer accept Authorized Instructions using the Authorized Integrator platform under the terminated agreement.

**10.3 Termination of an Account Holder Service Provider Agreement**. In the event an Account Holder intends to terminate its Account Holder Service Provider Agreement, the Account Holder must provide thirty (30) days' prior written notice to Prime Trust in accordance with Section 15.3, which notice shall include the effective date of termination. In the event of termination of the Account Holder Service Provider Agreement, Prime Trust will no longer accept Authorized Instructions using the Authorized Integrator platform.

**10.4 Effect of Termination**. Upon termination of this Agreement, Account Holder will pay Prime Trust all Fees and any other amounts due and owing hereunder.

**10.5 Obligations and Rights upon Termination**.

(a) Return of Custodial Property. Upon termination of this Agreement, Account Holder will provide Authorized Instructions regarding the disbursement of the Account Holder's Custodial Property and Prime Trust will, subject to Applicable Law, deliver Account Holder's Custodial Property in accordance with the Authorized Instructions. A Digital Asset will be deemed to have been delivered to Account Holder when a transfer of the Digital Asset initiated by Prime Trust has received a reasonable number of confirmations on the relevant Blockchain, or an alternative method has been mutually agreed between Prime Trust and Account Holder. To the extent Account Holder is unable to transfer Digital Assets out of the Account due to insufficient gas or network fees necessary for the transfer, Account Holder agrees to and abandons and forfeits any claims to such Digital Assets upon closure of the Account. Upon termination of this Agreement, Prime Trust will deliver other Custodial Property to Account Holder as soon as practicable or, at Account Holder's request, to a successor custodian. Account Holder acknowledges that Custodial Property, if any, held in Prime Trust's name requires a reasonable amount of time to be delivered. Upon delivery of Custodial Property, Prime Trust's responsibility under this Agreement ceases.

(b) Death or Incompetency of Account Holder. Upon the death or incompetency of Account Holder, Prime Trust will continue to hold Custodial Property until such time Prime Trust receives instructions from Account Holder's executor, trustee, administrator, guardian, or person holding a valid power of attorney in accordance with the probate process or otherwise in accordance with Applicable Law and has received

advice of its legal counsel to transfer such Custodial Property (which costs will be borne by Account Holder). In the event that no beneficiaries claim this Account, then the assets may be preserved in the Account for so long as possible, until a beneficiary makes itself known or until the Custodial Property may be subject to escheat, as set forth in Section 10.5(c) below.

(c) Escheat. Account Holder acknowledges that, in accordance with Applicable Law, Custodial Property that is presumed abandoned, including following termination of this Agreement, may under certain circumstances escheat to the government of the applicable jurisdiction. Prime Trust will have no liability to Account Holder, its heirs, legal representatives, or successors and assigns, or any other person in connection with any Custodial Property that escheats by operation of law.

## 11. TAXES

**11.1 Responsibility for Taxes**. Account Holder will be liable for all and any taxes, assessments, duties, and other governmental and similar charges ("Taxes") relating to any Custodial Property held on behalf of Account Holder or any transaction related thereto, which are Account Holder's sole obligation to remit, unless otherwise mandated by Applicable Law. Account Holder will remit to Prime Trust the amount of any Tax that Prime Trust is required by Applicable Laws (whether by assessment or otherwise) to pay on behalf of Account Holder, or in respect of activity in the Account of Account Holder. In the event that Prime Trust is required by Applicable Law to pay any Tax on behalf of Account Holder, Account Holder will promptly transfer to Prime Trust the amount necessary to pay the Tax.

**11.2 Substitute Internal Revenue Service of the U.S. Department of the Treasury ("IRS") Form W-9**. Under penalties of perjury, Account Holder certifies that: (a) the tax identification number provided to Prime Trust by Account Holder is the correct and current taxpayer identification number for Account Holder; and (b) Account Holder is not subject to backup withholding because: (i) Account Holder is exempt from backup withholding; or (ii) Account Holder has not been notified by the IRS that it is subject to backup withholding. Account Holder agrees to immediately inform Prime Trust in writing if it has been, or at any time in the future is notified by the IRS that Account Holder is subject to backup withholding. Account Holder acknowledges that failing to provide accurate information may result in civil penalties.

## 12. DISCLAIMERS

**12.1**. ACCOUNT HOLDER'S ACCESS TO AND USE OF THE SERVICES ARE AT ACCOUNT HOLDER'S OWN RISK. THE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE," WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PRIME TRUST EXPLICITLY DISCLAIMS ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF THE COURSE OF DEALING OR USAGE OF TRADE. The Parties further acknowledge and agree that Prime Trust has no obligation to inquire into, and will not be liable for any damages or other liabilities or harm to any person or entity relating to: (i) the ownership, validity or genuineness of any Custodial Property; (ii) the authority of any Authorized Person to act on behalf of Account Holder with respect to Custodial Property; (iii) the accuracy or completeness of any information provided by Account Holder or any other Authorized Person with respect to a Custodial Property or an Authorized Instruction; or (iv) the collectability, insurability, effectiveness, marketability, or suitability of any Custodial Property. Account Holder additionally understands and agrees that Prime Trust must follow the directions of Account Holder, is considered by this Agreement to be a "directed fiduciary" in accordance with NRS 163.5548 and will be released and held harmless for following the directions of Account Holder in accordance with NRS 163.5549. Account Holder understands and agrees that Account Holder is considered by this

Agreement to be a Directing Trust Adviser in accordance with NRS 163.5536 and has the authority to give directives to Prime Trust that must be followed by Prime Trust.

**12.2**. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, PRIME TRUST MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHETHER EXPRESS, IMPLIED (EITHER IN FACT OR BY OPERATION OF LAW). PRIME TRUST EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, TITLE, AND NON-INFRINGEMENT. NO AUTHORIZED INTEGRATOR HAS BEEN AUTHORIZED BY PRIME TRUST NOR HAS THE AUTHORITY TO MAKE REPRESENTATIONS OR WARRANTIES ON PRIME TRUST'S BEHALF. PRIME TRUST DOES NOT WARRANT AGAINST INTERFERENCE WITH THE USE OF THE SERVICES OR AGAINST INFRINGEMENT. PRIME TRUST DOES NOT WARRANT THAT THE SERVICES OR SOFTWARE ARE ERROR-FREE OR THAT OPERATION OR DATA WILL BE SECURE OR UNINTERRUPTED. PRIME TRUST EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY ARISING OUT OF THE FLOW OF DATA AND DELAYS ON THE INTERNET, INCLUDING FAILURE OR DELAY TO SEND OR RECEIVE ANY ELECTRONIC COMMUNICATIONS (e.g., EMAIL). ACCOUNT HOLDER DOES NOT HAVE THE RIGHT TO MAKE OR PASS ON ANY REPRESENTATION OR WARRANTY ON BEHALF OF PRIME TRUST TO ANY THIRD PARTY.

**13. LIMITATION OF LIABILITY; INDEMNIFICATION**

**13.1 Disclaimer of Liability and Consequential Damages**. PRIME TRUST AND PRIME TRUST'S AFFILIATES AND ITS AND THEIR OFFICERS, DIRECTORS, MEMBERS, SHAREHOLDERS, EMPLOYEES, AGENTS, SUCCESSORS, AND ASSIGNS (COLLECTIVELY, THE " INDEMNITEES") SHALL NOT BE LIABLE FOR ANY ACTION TAKEN OR OMITTED BY ANY INDEMNITEE UNLESS AS A RESULT OF ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN EACH CASE AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION. INDEMNITEES SHALL NOT BE LIABLE FOR ANY ACTION TAKEN OR OMITTED BY ANY SERVICE PROVIDER OR OTHER THIRD PARTY. PRIME TRUST'S SOLE RESPONSIBILITY SHALL BE FOR PROVIDING THE SERVICES IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT. PRIME TRUST SHALL HAVE NO IMPLIED DUTIES OR OBLIGATIONS AND SHALL NOT BE CHARGED WITH KNOWLEDGE OR NOTICE OF ANY FACT OR CIRCUMSTANCE NOT SPECIFICALLY SET FORTH HEREIN. YOU HEREBY ACKNOWLEDGE AND AGREE, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, THAT PRIME TRUST WILL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO YOU FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE SERVICES OR ANY TRANSACTION OCCURRING IN ACCORDANCE WITH THIS AGREEMENT, INCLUDING LOST REVENUE OR PROFITS OR LOSS OF BUSINESS OR LOSS OF DATA, EVEN IF PRIME TRUST HAS BEEN ADVISED, HAD REASON TO KNOW, OR IN FACT KNEW OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF SUCH ACTION. THIS INCLUDES ANY LOSSES OR PROBLEMS OF ANY TYPE RESULTING FROM INCIDENTS OUTSIDE OF PRIME TRUST'S DIRECT CONTROL, INCLUDING ERRORS, HACKS, THEFT, OR ACTIONS OF ISSUERS, TRANSFER AGENTS, SMART CONTRACTS, BLOCKCHAINS AND INTERMEDIARIES OF ALL TYPES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING PROVISIONS, EACH INDEMNITEE SHALL BE EXCUSED FROM FAILING TO ACT OR DELAY IN ACTING IF SUCH FAILURE OR DELAY IS CAUSED BY ANY FORCE MAJEURE EVENT (DEFINED BELOW), INCLUDING LEGAL OR GOVERNMENTAL CONSTRAINT, INTERRUPTION OF TRANSMISSION OR COMMUNICATION FACILITIES, UNAVAILABILITY OF THE INTERNET, EQUIPMENT FAILURE, WAR, TERRORIST ACTS, EMERGENCY CONDITIONS OR OTHER CIRCUMSTANCES BEYOND THE INDEMNITEE'S CONTROL. THESE TERMS SHALL SURVIVE ANY TERMINATION OF THIS AGREEMENT.

**13.2 Cap on Liability**. TO THE EXTENT PERMITTED BY APPLICABLE LAW, ACCOUNT HOLDER HEREBY ACKNOWLEDGES AND AGREES UNDER NO CIRCUMSTANCES WILL INDEMNITEES' TOTAL LIABILITY OF ANY AND ALL KINDS ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING WARRANTY CLAIMS), REGARDLESS OF THE FORM AND REGARDLESS OF WHETHER ANY ACTION OR CLAIM IS

BASED ON CONTRACT, TORT, NEGLIGENCE OR OTHERWISE, EXCEED THE GREATER OF $500.00 OR THE TOTAL AMOUNT OF FEES PAID, IF ANY, BY ACCOUNT HOLDER TO PRIME TRUST IN ACCORDANCE WITH THIS AGREEMENT DURING THE 12-MONTH PERIOD PRIOR TO THE OCCURRENCE OF THE EVENT GIVING RISE TO SUCH LIABILITY.

**13.3 Indemnification**. Account Holder hereby agrees to indemnify, protect, defend, and hold harmless the Indemnitees from and against any and all claims, demands, obligations, losses, liabilities, damages, regulatory investigations, recoveries and deficiencies (including interest, penalties and attorneys' fees, costs, and expenses), which an Indemnitee may suffer arising out of or relating to: (i) this Agreement; (ii) any breach, action, or regulatory investigation arising from your failure to comply with Applicable Law and/or arising out of any alleged misrepresentation, misstatement, omission of fact, or inaccuracy in the representations and warranties and/or in your interactions with Prime Trust, or breach, non-fulfillment or default in the performance of any of the conditions, covenants and agreements, of Account Holder contained in this Agreement or in any certificate or document delivered by Account Holder or any Authorized Person(s) or other agent(s) or in any Authorized Instruction in accordance with any of the provisions of this Agreement; (iii) any breach, action or regulatory investigation arising from Account Holder's failure to comply with any state blue sky laws or other applicable securities laws, and/or arising out of any alleged misrepresentations, misstatements or omissions of material fact in the Account Holders' offering memoranda, general solicitation, advertisements and/or other offering documents; (iv) any obligation which is expressly the responsibility of Account Holder in accordance with this Agreement; (v) any loss or damage to any third party, direct or consequential, arising out of or in any way related to acts or omissions of any Indemnitee relating to the Services; (vi) any damages or claims resulting from equipment, software, or network malfunctions or interruptions outside of any Indemnitee's control; or (vii) any misuse of the Services by an Authorized Person or through an Authorized Instruction.

**13.5 Third-Party Claims**. Account Holder agrees to bear sole responsibility for the prosecution, defense, or enforcement of any judgment, including the employment of legal counsel, of any and all legal actions or suits involving the Account, which may arise or become necessary for the protection of the investments in that Account, including any actions lodged against Prime Trust. However, Prime Trust, in its sole discretion, may, upon notice to Account Holder, participate in, or assume and control, the prosecution or defense, or enforcement of any judgment of such legal actions or suits, at Account Holder's expense.

**14. ARBITRATION**

Any dispute, potential claim, question, or disagreement arising from or relating to this Agreement or the breach thereof (collectively, a **"Dispute"**), will be finally settled by binding arbitration administered by the American Arbitration Association in Clark County, Nevada. Account Holder consents to this method of dispute resolution, as well as jurisdiction, and consent to this being a convenient forum for any such Dispute and waives any right it may have to object to either the method or jurisdiction for such Dispute. In the event of any Dispute between the Parties, the prevailing Party shall be entitled to recover damages plus reasonable costs and attorney's fees. The decision of the arbitrator shall be final, binding, and enforceable in any court. For the avoidance of doubt, Account Holder hereby waives any right to trial by jury in any lawsuit, action, proceeding, or counterclaim arising out of this Agreement. Account Holder agrees that it will not bring or participate in any putative or certified class action.

**15. GENERAL PROVISIONS**

**15.1 No Third-Party Beneficiaries**. This Agreement is not intended to and will not be construed to give

any third party, including, for the avoidance of doubt, any Authorized Integrator or Service Provider, any interest or rights (including any third-party beneficiary rights) with respect to or in connection with any agreement or provision contained herein or contemplated hereby, except as otherwise expressly provided in this Agreement.

**15.2 Force Majeure**. Prime Trust will not be liable to any extent to Account Holder, including for any costs or expenses, for any failure to perform or delay in the performance by Prime Trust or any Service Provider, in each case, of its obligations under this Agreement to the extent such failure or delay is caused by or results from a Force Majeure Event. For the purposes of this Agreement, a **"Force Majeure Event"** means an event caused by a circumstance beyond Prime Trust's reasonable control, including natural catastrophes, fire, flood, earthquake, explosion, pandemic or local epidemic, war, hostilities, or other action by a state actor, public power outages, civil unrests and conflicts, labor strikes or extreme shortages, acts of terrorism or espionage, supply shortages, interruptions or delays in transportation or communications, Domain Name Server issues outside Prime Trust's direct control, technology attacks, cyberattack or malfunction on the Blockchain network or protocol, or governmental action rendering performance illegal or impossible.

**15.3 Notices**

(a) All notices required or permitted in accordance with this Agreement will be in writing and delivered by courier or electronic mail (except for service of legal process, which will be by courier). Any notice or other communications Prime Trust sends in accordance with this Section 15.3 will be deemed to have been delivered, whether you actually receive them or not: (i) if sent by email or any other SMTP delivery service chosen by Prime Trust, when sent; and (ii) if sent to a physical address by courier, when delivered to such address.

(b) Notices will be delivered to the addresses on record, which:

(i) if to Prime Trust will be to by email to support@primetrust.com; if by courier, to:

Prime Trust, LLC
330 S. Rampart Blvd.
Las Vegas, NV, 89145

(ii) if to Account Holder, to the email address or physical address on file for your Account. A Party's email addresses or physical address may be changed from time to time by either Party by providing written notice to the other in the manner set forth above.

**15.4 Execution in Counterparts and by Electronic Means**. This Agreement may be executed in counterparts and by electronic means, and the Parties agree that such electronic means and delivery will have the same force and effect as delivery of an original document with original signatures.

**15.5 Entire Agreement**. This Agreement includes any exhibits, schedules, and attachments referenced herein, all of which are incorporated herein by this reference. This Agreement is the final, complete, and entire agreement of the Parties. This Agreement supersedes any prior written agreements or oral agreements between the Parties.

**15.6 Amendments**. This Agreement may be amended or otherwise modified by Prime Trust in its sole discretion at any time. Such amendments or modifications will be effective thirty (30) days after Account Holder receives notice of such revision electronically via the email address for the Account shown on the

records of Prime Trust.

**15.7 Remedies Cumulative**. Prime Trust will have all of the rights and remedies provided by Applicable Law in addition to the rights and remedies set forth in this Agreement. All of Prime Trust's rights and remedies are cumulative and may be exercised from time to time, and the pursuit of one right or remedy will not constitute an exclusive election or otherwise preclude or limit its pursuit of any other or additional right or remedy.

**15.8 Severability**. Any provision of this Agreement that is determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. In such case, such provision will be interpreted to accomplish the objectives of the provision to the greatest extent possible under Applicable Law.

**15.9 Assignment**. Account Holder may not assign, or otherwise transfer, including by operation of law, any of its rights, obligations, or performance under this Agreement. Any such attempted transfer by Account Holder will be void. For the avoidance of doubt, Prime Trust may assign, hypothecate, or otherwise transfer, including by operation of law, any of its rights, obligations, or performance under this Agreement at any time without notice to Account Holder.

**15.10 Use of Affiliates and Service Providers**. Prime Trust may provide Services through any affiliate or Service Provider as directed by Prime Trust from time to time.

**15.11 No Waiver of Contractual Right**. The failure of Prime Trust to enforce any provision of this Agreement will not be construed as a waiver or limitation of Prime Trust's right to subsequently enforce and compel strict compliance with every provision of this Agreement. A waiver or consent given on one occasion is effective only in that instance and will not be construed as a bar to or waiver of any other right on any other occasion.

**15.12 Non-Exclusivity**. Nothing in this Agreement will limit or restrict Prime Trust from providing services to any other person, including any services that are similar or identical to some or all of the Services.

**15.13 Governing Law**. This Agreement is governed by, and construed exclusively in accordance with, the laws of the State of Nevada, without regard to its conflicts of laws provisions or rules.

**15.14 Survival**. Any expiration or termination of this Agreement will not affect any accrued claims, rights or liabilities of Prime Trust, and all provisions which must survive to fulfill their intended purposes, or by their nature are intended to survive such expiration or termination will survive, including Section 3, Section 9, Section 10, Section 11, Section 12, Section 13, Section 14, and this Section 15.

**15.15 Interpretation**. All pronouns and any variation thereof will be deemed to refer to the all persons, and to the singular or plural, as the identity of the person or persons may require for proper interpretation of this Agreement. The section headings in this Agreement are intended solely for convenience of reference and will be given no effect in the construction or interpretation of this Agreement.

Agreed as of 19 of June, 2023 by and between:

SIGNATURE:

## Account Holder:

Name: ███
Email: ███
Title: Account Holder
Date: June 19, 2023, 9:36:46 AM UTC
Signature ID: f1747add-c0b0-4f77-a057-7cb0f1cfcbb9

## Prime Trust, LLC:

Name: ███
Company: Prime Trust, LLC
Title: Trust Officer
Signature ID: caa4aa80-947c-4e25-a1de-3e1f690195db