**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PRIME CORE TECHNOLOGIES, INC.,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF JAMES P. BRENNAN
IN SUPPORT OF THE PLAN ADMINISTRATOR'S
DISTRIBUTION MOTION AND ESTATE PROPERTY DETERMINATION**

Under 28 U.S.C. § 1746, I, James P. Brennan, declare as follows under the penalty of perjury:

I.     **My Background**

1.     I am a forensic accountant with over 20 years of experience conducting analyses and providing expert testimony in matters involving accounting fraud, Ponzi-schemes, financial crimes, and asset-tracing and recovery.  I have experience in forensic accounting and investigations in fiat and cryptocurrency.

2.     I am a Senior Managing Director and Global Head of Fintech, Payments, and Crypto Compliance and Investigations at J.S. Held.  J.S. Held is a global professional service firm which provides technical, scientific, and financial advisory services.

3.     Prior to working at J.S. Held, I held positions at other investigations firms, including FTI Consulting, Alvarez & Marsal, and Kroll.  In these positions, I managed teams

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Prime Trust, LLC (6823); Prime IRA, LLC (8346); and Prime Digital LLC (4528) (collectively "Prime" or the "Debtors").  The Debtors' mailing address is Prime Core Technologies, Inc. Plan Administrator, c/o Province Fiduciary Services, LLC, 2360 Corporate Circle, Suite 340, Henderson, Nevada 89074.

responsible for investigations involving money laundering, terrorist financing, Ponzi-schemes, asset theft, and other fraudulent activities, as well as asset-tracing and recovery.

4.      I hold both a B.S. and a M.S. in accounting from St. John's University.  I am a Certified Fraud Examiner and a Certified Bitcoin Professional.

5.      A copy of my resume is attached hereto as **Exhibit 1**.

6.      I specialize in accounting, forensic investigations, and disputes involving complex economic and financial transactions.  A significant amount of my practice and experience involves advising on crypto-related matters.

7.      I am routinely retained to perform analyses of information related to financial crimes, which includes forensic investigations and flow-of-funds analyses related to crypto wallet addresses and fiat bank accounts.

8.      I am familiar with the forensic tools and methodologies used for conducting investigations related to both fiat and cryptocurrency in criminal, civil, bankruptcy, and regulatory matters.

9.      I also train domestic and international government entities concerning cryptocurrency and financial crimes.  These entities include, among others, the U.S. Department of Justice, U.S. Department of Homeland Security, and U.S. bankruptcy courts.

10.     I submit this Declaration in support of *Plan Administrator's Motion for Entry of An Order (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief* (the "Distribution Motion").  This Declaration demonstrates how, based on the records I have reviewed

to date, Prime[2] historically commingled its own fiat currency and fiat currency transferred to Prime by its Customers in different Prime accounts, which is why it is impossible to trace, segregate, or otherwise identify specific assets transferred to Prime by any Account Holder or Customer.

11.    Except as otherwise indicated herein, all facts set forth in this Declaration are based on: (i) my personal knowledge and/or on information provided to me by Prime, former Prime management and employees, Wind-Down Debtor, the Plan Administrator and/or the Plan Administrator's professionals, or (ii) my review of relevant documents.

12.    Except as otherwise indicated herein, all conclusions and opinions set forth in this Declaration are based on: (i) the facts as known to me, including those set forth herein; (ii) my experience and knowledge of Prime's operations; and (iii) my experience and training as a professional.

13.    The opinions and conclusions expressed herein are subject to change based on additional data, facts, and information that may be received after this Declaration is executed, including, among other things, additional data, facts, and information that becomes available in the public domain or that is made available by the Wind-Down Debtor, the Plan Administrator or other parties during discovery or otherwise.

## II.    Prime's Commingling of Fiat and Recordkeeping Processes Generally

14.    As part of my analysis and research for this Declaration, I have reviewed bank accounts held by Prime at various banks including BMO Harris, N.A. ("BMO"), Cross River Bank ("CRB"), Signature Bank ("Signature"), and Royal Business Bank ("RBB").  Based on my review

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Distribution Motion or the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core, Inc. and its Affiliated Debtors*, dated December 14, 2023 (Docket No. 592), as modified by the Initial Plan Supplement (Docket No. 486), the First Amended Plan Supplement (Docket No. 511), the Second Amended Plan Supplement (Docket No. 540), the Third Amended Plan Supplement (Docket No. 594), the Fourth Amended Plan Supplement (Docket No. 615), and the Fifth Amended Plan Supplement (Docket No. 620) (collectively with the exhibits thereto, the "Plan").

of these bank accounts and Prime documents,[3] as well as the sworn testimony of former Prime employees, I have made several observations about how Prime managed and commingled their fiat.

15.     Prime held and commingled fiat that customers transferred to it in omnibus bank accounts with fiat transferred to it by thousands of Prime's other customers and with fiat Prime generated from its business operations.

16.     Since fiat that customers transferred to Prime was commingled with fiat from other customers, Prime was forced to rely on its internal ledger (the "Internal Ledger") to keep track of transactions to identify how much Prime owed each of their customers.

17.     I was provided and reviewed spreadsheet versions of Internal Ledger records that included information concerning Prime's customer and internal accounts.

18.     I compared certain Internal Ledger records to the bank account deposits and withdrawals and confirmed that this is how Prime maintained the commingled fiat currency.

19.     I have observed instances where Prime moved funds between the bank accounts that held customer-transferred fiat and Prime's own corporate bank accounts.

20.     I have also observed instances where Prime appears to have paid its own corporate operating expenses from bank accounts which held fiat primarily funded by Prime's customers.

21.     Prime had numerous bank accounts held at different banks depending on the time period.  Based on my review of the bank statements and conversations with former Prime staff, during a given period, certain bank accounts were primarily used depending on the type of transaction.

---

[3]     Documents reviewed to date include incoming and outgoing Internal Ledger records for both fiat and asset transactions, Internal Ledger data, bank account statements, bank reconciliations, deposition testimony, correspondence.

4

22.     For example, Prime predominantly used one omnibus account ("BMO x3077"), for incoming and outgoing wire transfers during 2023.  A large volume of debits and credits occurred almost daily to and from BMO x3077.

23.     BMO x3077 contained commingled funds that had been transferred to it from Prime's other bank accounts as well as directly from customers.

24.     However, Prime's bank statements for BMO x3077 only include reference numbers regarding the movement of funds in or out of the bank accounts.  There are no other details within the bank statements.  This makes it difficult to determine who was transferring funds into Prime and the recipients of outbound fund transfers.

25.     Prime also regularly made internal transfers between Prime's bank accounts, which further commingled fiat funds.  These transfers usually occurred in round dollars, as opposed to specific amounts based on specific transactions.  Based on my experience, this suggests that Prime likely estimated the amount of funds to transfer instead of transferring specific funds in response to specific transaction activity.  This practice further adds to the difficulty in connecting transfers with specific transactions reflected in Prime's Internal Ledger.

26.     For example, Prime would regularly make internal transfers from BMO x3077 into a different account at BMO ("BMO x9934") to earn a higher rate of interest.  It was also Prime's regular practice to make internal transfers into BMO x3077 from other Prime bank accounts to provide fiat for outgoing wire transfers on an as-needed basis.  A review of Prime's bank statements demonstrates that many of these daily transfers into BMO x3077 came from BMO x9934.  Most of the unused funds left in BMO x3077 at the end of each day would then be transferred back to BMO x9934 as BMO x9934 provided a higher rate of interest than BMO x3077.

WBD (US) 4896-8946-1008v1

27.    Prime primarily used BMO x9934, an interest account, for transfers between the bank accounts, which are described in Prime's bank statements as "PC Transfers." These transfers usually occurred in round dollars.

28.    It appears that the vast majority of funds contained in BMO x9934 were commingled funds that had been transferred into BMO x9934 from the commingled BMO x3077 account. BMO x9934 also contained some funds that had been transferred into it from other commingled bank accounts held by Prime, such as CRB and Signature accounts.

29.    These CRB and Signature accounts operated in a largely similar manner as BMO x3077—*i.e.*, they contained commingled funds that had been transferred from other Prime bank accounts containing funds provided by other Prime customers.

30.    Prime bank statements reflect the movement of these funds between the Prime bank accounts but do not include details sufficient to identify where those funds originally came from, whom they were being transferred to, or for what reason they were being transferred.

31.    Based on my experience, numerous internal transfers amongst bank accounts can be indicative of fraud. It also can suggest that an entity is facing cash shortfalls and is moving funds around to manage funds in a manner to satisfy withdrawals or other immediate, pressing cash needs.

32.    "CRB x9892" was another omnibus account utilized by Prime. This account consisted primarily of internal transfers and payments via automated clearing house ("ACH"). Thus, it appears that Prime primarily utilized either BMO x3077 or CRB x9892 during 2023 depending on whether they needed to make transfers via wire or ACH. Due to the extensive commingling of funds within Prime's bank accounts, the funds held within these accounts cannot be traced to specific customer deposits or withdrawals.

III.    **Prime's Inadequate Reconciliation Processes**

33.    Further complicating matters is the fact that, according to the records and Prime's former employees, Prime did not perform regular or timely reconciliations of accounts and, at least before March 2021, any reconciliations that Prime conducted were manual.

34.    Reconciliation processes are critical internal controls. They enable companies to identify potential errors or fraud so their books and records are accurate. They also permit companies to validate the amount of cash that the company holds. Reconciliation processes typically consist of comparing transactions or other financial activities between the company's internal records and the bank records to verify the data and the proper amount of account balances.

35.    For Prime's fiat, reconciliation processes generally consisted of comparing the amounts and transaction activity reflected on Prime's Ledger during a given time period with the bank account activity during that same time period.

36.    ▮▮▮▮▮▮ ("▮▮▮▮▮▮")*, Prime's former SVP of Operations and Reconciliations, largely designed Prime's reconciliations processes. ▮▮▮▮▮▮ explained:

> Q:    Okay. And when you moved into your new role in March of 2021 as operations and reconciliations, what was the reconciliations piece?
>
> A:    Prime Trust did not have reconciliation tools, essentially. So my responsibility was in kind of designing the reconciliation tools.
>
> Q:    What's a reconciliation tool?
>
> A:    Somebody makes a request for a transaction: How can you basically reconcile that it occurred. If that makes sense.
>
> Q:    Can you—can you expand a little bit? So a customer says, I want to buy Bitcoin?
>
> A:    Yeah. So, well, it wouldn't be necessarily for the purchases, but, for instance, a client's account says that they have one Bitcoin in their account. Can you confirm that it was received on the Ledger.

---

* Information categorized as "Confidential" and "Highly Confidential – Professionals' Eyes Only" in this Declaration has been redacted pursuant to the Stipulated Protective Order approved by the Court in the Chapter 11 Cases [Docket No. 323].

Q:    Okay.  So you're confirming that you actually have the assets that your client's accounts are reflecting they have; is that right?

A:    In a way, yeah.  So it was assuming that if we had assets displayed, you know, do we actually have them.[4]

37.    █████████ ("█████████"), Prime's former Chief of Regulatory Affairs, described "reconciliations" as "taking the general ledger and reconciling it to a bank statement; taking customer, you know, account statements and reconciling those to the bank statement wherever those assets may be held.  When I say assets, I'm talking about Fiat."[5]

38.    Both █████████ and █████████ testified as to the insufficiency of Prime's reconciliation processes during their tenures with Prime.

39.    █████████ testified: "Reconciliations were not being done in a timely manner."[6]

40.    █████████ discussed Prime's reconciliations processes both before and after March 2021:

A:    There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated . . .

. . .

Q:    Okay.  So you weren't—you weren't responsible for fixing whatever happened prior, you were responsible for forward-looking projects for reconciliation; is that the idea?

A:    Yeah, I was—I was put in that position to essentially build the automated systems for transactions looking forward.  Once the system was, I guess you can say, built, you know, I was let go of the responsibilities of building it, and there were teams that were brought on to essentially do the reconciliation. [7]

---

[4]    ██ Dep., 18:3–19:7.

[5]    ██ Dep., 16:4–9.

[6]    *Id.*, 38: 23–24.

[7]    ██ Dep., 19:25–20:5; 21:14 – 22:2.

WBD (US) 4896-8946-1008v1

41.     I also reviewed some internal Prime communications concerning commingling of assets and reconciliation.

42.     For example, on December 17, 2022, ███████ ("███████"), Prime's former General Counsel, sent an email to several Prime employees concerning a Nevada Financial Institutions Division ("Nevada FID") request for information regarding Prime's statement that it "███████████████████████████████████████."[8] Specifically, Nevada FID requested that Prime ███████████████████████████████ ███████████████████."[9]

43.     On December 19, 2022, ███████ responded: "███████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████."[10]

44.     On December 28, 2022, ███████████, former SVP and Head of Banking and Trust Operations, responded: "███ ███ ███████████████████████ ████████████████████████████████."[11]

45.     Thus, given how Prime commingled its fiat, constantly transferred funds between bank accounts, and maintained poor Internal Ledger records and reconciliation processes, it is impossible to identify and distinguish the specific assets that the customers transferred to Prime from the other commingled assets transferred to Prime by other customers or from Prime itself.

---

[8]    ███ Dep., Ex. 28 (internal quotations omitted).

[9]    *Id.*

[10]   *Id.*

[11]   *Id.*

## IV.    The 98f Wallet Caused Further Commingling of Funds

46.    The most notable example of Prime's commingling of fiat was when Prime used fiat by its customers to make purchases of ETH (a cryptocurrency) to replace ETH that was locked in an inaccessible "multi-sig" digital wallet (the "98f Wallet").[12]

47.    In December 2021, one of Prime's customers, Plutus Financial Inc. d/b/a Abra ("Abra"), requested a transfer from Prime of 5,867.71 ETH (approximately $23,600,000 USD at the time).  Prime realized that Abra had been depositing ETH into forwarder wallet, which forwarded the ETH into the 98f Wallet that Prime was no longer able to access.

48.    By December 2021, Abra had already transferred 11,081 ETH (approximately $44,550,000 at the time) into the 98f Wallet.

49.    Prime decided to satisfy Abra's December 2021 (and subsequent) ETH transfer requests by using fiat provided by other customers to purchase replacement ETH from a liquidity provider, DV Chain, LLC ("DV Chain").

50.    Regarding this decision to use commingled fiat to purchase replacement ETH from DV Chain, ███████, Prime's former Chief Operating Officer, testified as follows:

> Q:    So Abra's depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals. How does it do it?
>
> A:    I would defer to ███ on that. But essentially it was use of omnibus funds, is my understanding.
>
> Q:    What's use of omnibus funds?
>
> A:    As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.

---

[12]    A "multi-sig" digital wallet requires digital signatures of multiple individuals to access and transact with the crypto stored on the digital wallet.  The "98f Wallet" is referred to herein as such because it has a digital address ending in the characters "98f."

10

Q:      And which funds were used to make the purchases of the ETH to fund the transactions?

A:      Funds from the fiat account.    Fiat omnibus account.    Is my understanding.  Once again, ███ would know specifically.[13]

51.      In total, Prime recorded eight different wires to DV Chain's customer account between December 23, 2021 and March 19, 2022, which purportedly represented Prime transferring fiat into DV Chain's account at Prime to cover the ETH purchased from DV Chain, as shown in the table below.

| Date | USD Internal Ledger Transfer Amount | Cryptocurrency Equivalent as of Internal Ledger Transfer Date |
|---|---|---|
| 12/23/2021 | $11,958,000 | 3,000 ETH |
| 12/31/2021 | $12,158,250 | 3,250 ETH |
| 1/6/2022 | $10,071,700 | 2,900 ETH |
| 1/22/2022 | $5,000,000 | 1,930.5019305 ETH |
| 3/11/2022 | $4,644,000 | 1,800 ETH |
| 3/14/2022 | $8,524,750 | 3,250 ETH |
| 3/15/2022 | $8,043,000 | 3,000 ETH |
| 3/19/2022 | $15,967,847.90 | 4,647.22 ETH |
| **Total** | **$76,367,547.90** | **23,777.72 ETH** |

52.      As Prime did not actually receive any new funds, Prime used the commingled fiat transferred to it by its customers to fund the replacement ETH purchases from DV Chain.

53.      Certain executives at Prime seem to have undertaken steps to corrupt Prime's internal records in connection with the replacement ETH purchases to make it appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for DV Chain.

54.      Specifically, Prime settled the ETH purchases from DV Chain by "credit[ing]" DV Chain's customer account at Prime with fiat amounts equivalent to each ETH purchase.

---

[13] ███ Dep., 92:25–93:18.

WBD (US) 4896-8946-1008v1

55.    To "credit" DV Chain's fiat customer balance with Prime, Prime had to input a "contribution" on the Internal Ledger to make it appear as if DV Chain had wired fiat to Prime. However, DV Chain did not actually wire fiat to Prime in connection with the ETH purchases.

56.    ████ testified on this subject as follows:



57.    This method of settlement of the ETH purchases from DV Chain resulted in a discrepancy between the amount of assets that Prime's Internal Ledger reflected and the actual amount of fiat that Prime held in its bank accounts:



---

[14] ██ Dep., 155:11–156:9.

A: 

Q:

A:

Q:

A: .[15]

58.    The below entries to Prime's Internal Ledger falsely state that there were "incoming" wire transfers from DV Chain to Prime that were equivalent to the amounts of the replacement ETH purchases and that these "incoming" wire transfers went to a Signature Bank account held by Prime:



59.    Prime's bank account statements for this Signature Bank account do not reflect any of the above wire transfers ever occurring.

60.    For example, the above Internal Ledger entries reflect that Prime received the following incoming wire transfers: (i) $11,958,000 on December 23, 2021; and (ii) $12,158,250 on December 31, 2021.  These transfers correspond with the first two replacement ETH purchases from DV Chain.  However, these two transfers are not reflected in Prime's December 2021 bank account statement for the identified Signature Bank account.[16]

---

[15]    *Id.*, 144:11–20; 146:7–15.

[16]    Attached to this Declaration as **Exhibit 2** and **Exhibit 3** are the relevant portions of Prime's December 2021 Signature Bank account statement.

61.    ▇▇▇▇▇ confirmed that these purported incoming wire transfers would not be identifiable in any of Prime's bank account statements:



## V.    Prime's Commingling of Crypto

### A.    Background on Crypto

62.    The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Bitcoin ("BTC") and Ether ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

---

[17]    ▇▇▇ Dep., 164:22–165:10; 166:5–15.

63.     All cryptocurrencies exist on a "blockchain."  A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all of the cryptocurrency transactions that occurred on the blockchain at a particular point in time.  Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain"—a "block"-"chain."

64.     There are a number of different blockchains.  The first and most popular blockchain was the BTC blockchain.  Another important blockchain is the Ethereum blockchain, which launched the popular cryptocurrency ETH.  The Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

65.     Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."  These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded, or any time a smart contract is used.

66.     "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain address.  Like public keys, private keys similarly consist of multi-digit alphanumeric strings.  However, unlike public keys—which are knowable by the public and used simply to identify a digital wallet—private keys are known only by the owner of the digital wallet and used by the owner to access and manage the digital wallet.

WBD (US) 4896-8946-1008v1

67.     Many digital wallets and private keys are "custodial," which means that they are possessed by a third party, such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets have no third party that is taking custody of the crypto.

68.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

69.     Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed.  They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If someone sends crypto to a "forwarder" address, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet address.

70.     Transactions occurring on the blockchain incur fees.  On the Ethereum blockchain, these are referred to as "gas fees."  Gas fees refer to the costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain.  In other words, they are fees charged by the blockchain itself for successfully completing a transaction on the blockchain.  The exact amount of gas fees for a particular transaction can fluctuate based on factors such as the size of the transaction, supply, demand, and network activity at the time the transaction is made.

## B.     Prime's Commingling of Crypto Generally

71.     It is impossible to identify a specific Cryptocurrency that was owned and transferred by a specific customer to Prime once there is commingling simply by looking at the blockchain—the tokens are fungible, just like fiat currency, and do not have identifying

16

characteristics. Even though Bitcoin employs the Unspent Transaction Output ("UTXO") model, which allows for identification of certain Bitcoin involved in a transaction, the practicalities of how UTXOs are created, coupled with, among other things, the volume of Bitcoin at Prime, renders it impossible to trace specific Bitcoin currently held by Prime to any specific Bitcoin that a specific customer had transferred to Prime.

72.    Prime did not maintain separate or segregated digital wallets for crypto that each of its customers transferred to it.

73.    Instead, Prime held and commingled the crypto from its various customers in omnibus digital wallets ("Omnibus Wallets"), where it was further commingled with crypto that Prime used for its own corporate operations and purposes.

74.    The shared Omnibus Wallets were contained in Prime's vaults ("Vaults") with Fireblocks LLC ("Fireblocks").[18]   Prime used Vaults within its Fireblocks infrastructure to organize myriad wallets (including the Omnibus Wallets), to implement increased security measures, and to take advantage of efficiencies in transaction policies and other access controls.

75.    Each Prime customer had its own unique digital wallet addresses which it used to deposit crypto with Prime ("Deposit Addresses").  Prime would periodically sweep its customer's Deposit Addresses—in other words, collect all the crypto that had been transferred to the Deposit Addresses and transfer that crypto to one or more of the shared Omnibus Wallets controlled by Prime.  This process commingled the crypto Prime received from its various customers.

---

[18]    Fireblocks is a third-party crypto security platform which provides infrastructure for moving, storing, and issuing crypto.  Prime used Fireblocks to hold and manage its crypto.  "Vaults" are not their own digital wallet to store crypto, but are instead a way of organizing accounts with Fireblocks by grouping multiple digital wallets in a single, central location.  These "vaults" can be managed more efficiently as a group and provide enhanced security across all digital wallets within the vault.

76.     Prime utilized inconsistent methods for performing deposit sweeps.   Prime maintained an application that could trigger the sweep based on certain unknown events occurring. Further, an employee could manually perform a sweep at any given time.

77.     Prime also regularly transferred crypto among its Omnibus Wallets, further commingling the crypto that customers provided to Prime.  It does not appear that Prime used a consistent or defined process regarding these transfers among its Omnibus Wallets either.

78.     Since Prime did not maintain segregated digital wallets for each of its customers and the crypto it held was commingled (and similar to its fiat), Prime was forced to rely on its Internal Ledger to attempt to keep track of how much crypto Prime owed each of its customers. Prime would credit a customer's balance on its Internal Ledger for any crypto that customer sent to Prime through its unique Deposit Address.

79.     The Internal Ledger did not (and could not) track which of the Omnibus Wallets held the specific crypto that a customer had originally transferred to Prime because that crypto was commingled with crypto that other customers had transferred to Prime and with Prime's own crypto within and across multiple Omnibus Wallets.

80.     Based on my experience, Prime's haphazard transferring of crypto, lack of defined processes and procedures, and essentially nonexistent record keeping are red flags of potential fraud.  At a minimum, it demonstrates poor asset management and suggests that Prime was moving assets around to manage customers withdrawals or its own needs without consideration of the ultimate negative impact such management had on the business overall.

81.     Importantly, and also similar to its treatment of fiat, Prime did not perform regular reconciliations to compare the crypto recorded in its Internal Ledger with the crypto Prime actually held in its Omnibus Wallets.

WBD (US) 4896-8946-1008v1

82.     When a customer requested a withdrawal, Prime relied on the Internal Ledger to validate that the specific customer had previously transferred an amount of crypto to Prime sufficient to support the withdrawal request.  Prime then checked its multiple Omnibus Wallets to determine which one(s) held sufficient crypto to satisfy the customer's withdrawal request.  Prime then transferred the crypto from the Omnibus Wallet(s) with sufficient crypto to the customer to complete the transfer.  Prime did not transfer the crypto from the original Deposit Address the customer had used, or even from the original Omnibus Wallet(s) where that customer's crypto had initially been swept.  In other words, the crypto Prime would send to a customer to satisfy a withdrawal request was not the same crypto that the customer had originally sent to Prime.

83.     Based on my review of records provided, blockchain data, the Internal Ledger, and other financial data from Prime, I have identified several illustrative examples of the crypto commingling that occurred at Prime.  These examples are described below.

### C.     Omnibus Wallet ~b2ea Illustration

84.     One Omnibus Wallet frequently used by Prime has the digital address 0x352e0242a58c4f43dc40f3ee9a2ea14ccc6bb2ea (the "b2ea Wallet").

85.     Like Prime's other Omnibus Wallets, the b2ea Wallet received crypto from the Deposit Addresses through the periodic sweeps Prime conducted.

86.     The diagram below (which is based on blockchain data) shows three different Prime customers transferring crypto into their respective unique Deposit Addresses, followed by Prime sweeping these assets into its omnibus b2ea Wallet:



87.    Thus, as demonstrated above, the b2ea Wallet (like all of Prime's Omnibus Wallets) contained and commingled crypto transferred to Prime by various of its customers.

88.    Another example of incoming transfers that the b2ea Wallet received were transfers from another Prime wallet internally named "PT Segregated Assets." This wallet appears to have been intended to hold Prime's segregated assets in attempt to keep Prime's own crypto segregated from its crypto provided to Prime by customers, which would have been proper practice. The "PT Segregated Assets" wallet was funded by a single Prime digital wallet, which itself was funded by over 6,000 unique Prime digital wallets.

89.    Despite its internal labeling, I have observed that the "PT Segregated Assets" wallet transferred ETH to the omnibus b2ea Wallet. For example, I have observed transactions during March 2022 where the "PT Segregated Assets" wallet sent 194 ETH to the b2ea Wallet.

90.    The diagram below is based on actual transactions and illustrates how crypto was commingled from both Prime customers and from the "PT Segregated Assets" wallet into an Omnibus Wallet. In this example, crypto from a specific Prime customer, GTH-Trade Group Kft ("GTH") and from Prime itself though the "PT Segregated Assets" wallet was sent to the b2ea

Wallet, where it became commingled with crypto from multiple other Prime customers.  The same b2ea Wallet was then used to satisfy withdrawal requests of other Prime customers, including DV Chain and Abra.



91.    The above diagram also illustrates what commingling means in terms of the crypto that was transferred out of Prime's Omnibus Wallets.  While in this illustration the b2ea Wallet received crypto from GTH and Prime's "PT Segregated Assets" wallet, the crypto it sent out was to satisfy withdrawal requests from two completely different Prime customers, DV Chain and Abra.  Those outgoing crypto transfers may have included some or none of the crypto originally transferred to Prime by GTH, or from any of the myriad of other customers whose crypto also was swept into, or transferred into, this Omnibus Wallet.  In sum, it is impossible to determine whether any of the outgoing crypto included any of the original crypto GTH transferred to Prime because the crypto in the b2ea Wallet is hopelessly commingled.

92.    The below diagram depicts how five different Prime Omnibus Wallets transferred crypto amongst one another.



93.     As illustrated in the diagram, Prime transferred crypto to and from its various Omnibus Wallets in a manner that appears entirely arbitrary and haphazard.

94.     In my experience, it is uncommon for such a high volume of transfers to occur amongst wallets controlled by a single entity.  I have been unable to ascertain a business purpose or rationale for the frequent transfers of crypto transfer that Prime conducted between its different Omnibus Wallets.

95.     This resulted in extensive commingling of crypto, making it impossible to trace crypto back to specific customer deposits.

**D.    The 98f Wallet and ETH Withdrawals**

96.     Prime's response to its mishandling of the 98f Wallet is one of the most striking examples of Prime's commingling of crypto.

22

97.    The below diagram illustrates four of the replacement ETH purchases that Prime made from DV Chain and ultimately used to satisfy the withdrawal requests of Abra:



98.    Because the ETH that Abra had originally provided to Prime was (and still is to this day) locked away in the inaccessible 98f Wallet, it is indisputable that the ETH that Prime transferred to Abra to satisfy Abra's withdrawal requests could not be the same ETH that Abra originally transferred to Prime.   The ETH Abra received was purchased by Prime using commingled fiat entrusted to it by other customers and, prior to transfer, it was commingled with other ETH (from Abra, DV Chain or other Prime customers) in the b2ea Omnibus Wallet discussed above.  In short:  commingled fiat was used to purchase crypto that was commingled with crypto that other customers sent to Prime (or Prime's own crypto) and then transferred to Abra.

**E.    Prime's Gas Station**

99.    Based on my experience, Prime performed the crypto sweeps from the Deposit Addresses into shared Omnibus Wallets to pool crypto together to create certain efficiencies.

100.    For example, the pooling of crypto allowed Prime and its customers to bypass and save on various gas fees.

101.    For crypto transfers within a single Fireblocks Vault, Prime could simply move the funds around on its Internal Ledger and avoid conducting any transactions on the blockchain which would otherwise incur gas fees.

102.    Crypto transfers between Prime's Vaults within Fireblocks occur on-chain, meaning that Prime incurred gas fees when transferring crypto between Fireblocks Vaults.

103.    Gas fees can be reduced by pooling transactions and performing them during off-peak hours when the blockchain network is less congested.  Thus, by pooling crypto in shared Omnibus Wallets in Prime Vaults at Fireblocks, Prime was able to conduct bulk transactions for the purpose of incurring reduced gas fees.

104.    To help account for these gas fees, Prime set up additional wallets which it referred to collectively as the "Gas Stations."  Prime funded the Gas Stations from various of its other wallets (including the Omnibus Wallets) and used the Gas Stations to pay gas fees when Prime conducted on-chain transactions.

105.    Prime used a variety of sources to fund the Gas Stations, which resulted in Prime further commingling the crypto transferred to it by its various customers and Prime commingling the crypto transferred to it by its various customers with Prime's own crypto.

106.    Within Prime's Fireblocks infrastructure, I have identified two Gas Station addresses (represented by the orange-colored nodes in the below diagram):

(i)      0xd8b81f6849dfbbe7b8f3c32bbb3a15ad2adb6898, and

(ii)     0x33fe7ad77394281e43cc82d86ad0cbb5b9e9575d.

107.    These Gas Stations received funding from Prime's internal Omnibus Wallets (represented by the green-colored nodes in the below diagram) as well as several external digital addresses completely outside of Prime's ecosystem (as represented by the blue-colored nodes in the below diagram).

WBD (US) 4896-8946-1008v1



108.    Another important item of note is the attribution and the sources of funding for the wallets providing liquidity to the Gas Stations.

109.    Prime's own internal data presents conflicting information regarding how certain wallet addresses were attributed to different entities.

110.    Wallet address 0xaca0ef9b17a7c023902555164bac0b13eec964c3 is attributed to both "Prime Trust Trading" and customer "Const LLC" in Prime's internal data.  This wallet address not only funds the Gas Station wallets but also sends and receives ETH with 0x73204d0d40de3dbd0ba659c8a07129d8116b3eb7, one of the other six eternal addresses funding the Gas Station.

111.    Additionally, wallet address 0xe3ea1b8bd9c0744a331e340e7cb1777cdd6b054c is attributed to both "Prime Trust Trading" and "One World Services" in Prime's internal data.

25

112.    Wallet address 0x7ddf81d5e9c477e60a86cce7ece44dae9f91a679 receives funding from address 0xe081abb7d9e327e89a13e65b3e2b6fcaf2eceb97, which is attributed to DV Chain in Prime's internal data.

113.    Wallet Address 0xf60c2ea62edbfe808163751dd0d8693dcb30019c is publicly attributed to Binance US.

114.    Wallet address 0x8e2e59ccc136367dcf78a8f769fee3965d2cc37e receives funds from a PrimeTrust Omnibus address 0x9416fd2bc773c85a65d699ca9fc9525f1424df94.

115.    In reviewing just these six wallets that funded the Gas Stations, funds originated from customers' wallets, including DV Chain and Binance, and Prime's own Omnibus Wallets, as well as wallets labelled by Prime as customers along with Prime's trading account.

116.    I have also observed instances where Prime's operations personnel used fiat from one of Prime's commingled bank accounts to purchase ETH to refill the Gas Stations.  For example, on April 26, 2022, a former Prime operations team employee submitted a request for $4,290 "to purchase 1.5 ETH to refill the gas station"[19].

117.    The form requested to transfer funds from one Santander bank account, with the account name "Prime Trust Operating Account," to a different Signature bank account, with an account name "T&C WIRE Clearing."[20]  Based on my review of bank records, this Signature bank account held commingled customer funds and, as demonstrated by this funds transfer request, also held fiat used for Prime's operations.

---

[19]    Reference Pink Sheet $4290.00 (002) approved.pdf, attached as **Exhibit 4**.

[20]    *Id.*

WBD (US) 4896-8946-1008v1

118.    The request form also asked if the transfer required a "ledger update" and the Prime employee indicated "No" demonstrating that the internal transfer of fiat between operating and customer bank accounts would not be recorded in Prime's Internal Ledger.[21]

119.    As described in this example, the Gas Stations included funding from Prime's operational fiat, commingled Omnibus Wallets (including the b2ea Wallet described above), and external wallet addresses.

120.    The following chart illustrates how Prime's Gas Stations functioned and provides two examples of crypto being transferred into Prime's ecosystem from external customer addresses.  The three nodes on the far left are the customer addresses that are external to Prime. The nodes labeled as "PrimeTrust Deposit Addresses" (in the middle of the chart) are addresses generated by Prime to facilitate the transfer of crypto provided by customers within Fireblocks. After the crypto was received by the PrimeTrust Deposit Addresses in Fireblocks, a sweep process was performed.

---

[21]    *Id.*

WBD (US) 4896-8946-1008v1



121.    Since the sweeping operation involved transferring Ethereum assets on-chain, it incurred a gas fee imposed by the blockchain.  To pay the gas fee, the Gas Station transferred an amount of the required crypto to the specified Deposit Addresses in advance of the sweeping operation.

122.    In several cases, the amount of crypto sent to the Deposit Addresses exceeded the amount required to satisfy the gas fees.  In that scenario, Prime would either leave the excess crypto in the Deposit Addresses to cover the gas fees of future transfers or, in some instances, send the excess amounts back to the Omnibus Wallets.

123.    As demonstrated above, the Gas Stations resulted in the commingling of Prime's operational assets with crypto that was provided by Prime's customers.

## VI.    Conclusion

124.    As detailed in this Declaration, Prime's internal auditing functions reflected gross failures in asset segregation, reconciliation, and the ability to distinguish customer provided assets from company assets.  These failures, along with the commingling of assets, were so extensive

WBD (US) 4896-8946-1008v1

that it resulted in regulators placing Prime under receivership and Prime's ultimate descent into bankruptcy.

125.    As a result, neither Account Holders, customers or Prime can specifically identify, trace, or segregate the assets that specific customers transferred to Prime from other commingled assets.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 15, 2025
            Jupiter, Florida

/s/ *James P. Brennan*
James P. Brennan
Senior Managing Director
J.S. Held, LLC

WBD (US) 4896-8946-1008v1