## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

RECEIVED

2025 JAN 29 AM 10: 14

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., et al. | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |

**Obj. Deadline: Feb. 5, 2025 at 4:00 p.m. (ET)**

**Hearing Date: Feb. 14, 2025 at 10:00 a.m. (ET)**

## <u>LIMITED OBJECTION TO PLAN ADMINISTRATOR'S DETERMINATION THAT THE DEBTORS' ASSETS ARE PROPERTY OF THE BANKRUPTCY ESTATES</u>

COMES NOW, the Creditors, Shyam Sundar Aswadha Narayanan (Prime Trust Account Number: ████1770; Email: a.n.shyamsundar@gmail.com), and Latha Narayanan (Prime Trust Account Number: ████4284; Email: lathanaru@gmail.com), acting pro se, and hereby file this limited objection in response to the Plan Administrator's determination that the Debtors' assets are property of the Bankruptcy estates (**Document 919**).

This objection is broadly based on the following grounds:

a. Plan Administrator's claims that neither a trust nor a fiduciary relationship existed between Prime Trust and the end-users is grounded neither in law nor in fact.

b. Fraud, mismanagement, commingling of trust assets and inability to trace at least some of trust assets do not automatically terminate a trust nor discharge obligations as under a trust.

c. Prime Trust had assumed fiduciary duties and responsibility towards end-users as to assets in their accounts through their conduct and representations as a regulated custodian and trustee to the public at large, with such representations particularly directed at the end-users, and reasonable detrimental reliance that the end-users have suffered as a result.

## PRELIMINARY STATEMENT

As is part of general public knowledge, it is a well-known trite fact that Prime Trust is a Trust Company, and is registered and regulated by the State of Nevada as such. Simply as a matter of legal definition, Prime Trust's core business role and responsibility was to act as the trustee and custodian of customer assets, while owing fiduciary responsibility towards end-users, who are beneficiaries of the trust.

It is puzzling and bizarre to see repeated factually untrue claims by the Plan Administrator that no such trustee or fiduciary duties existed and that Prime Trust had the ability to hypothecate customer assets, especially when copies of actual agreements and representations provided by Prime Trust itself to the Creditors who are end-users suggest just the opposite (**Exhibits 1, 2 and 4**). This had been reiterated by the Creditors to the Plan Administrator between February 9, 2024 and February 13, 2024 by means of zoom call(s),

emails and extensive supplementary documentation containing matters of law and fact. In addition, relevant facts pertaining to the Creditors as MyConstant (integrator) customers as trust beneficiaries have been previously made public via prior submissions before the Court (**Document 529**) in the present case. Any alternative supposition to that effect would be incredulous and akin to a bank in bankruptcy declaring that it had no banking relationship with its customers/clients whatsoever, and that by the virtue of its so-called "user agreements", the customers agree that there was no banking relationship whatsoever despite opening and maintaining checking/savings/deposit accounts for them.

Notwithstanding the foregoing, the Creditors present detailed case facts, arguments and analysis to refute any such assertions.

## ARGUMENT AND ANALYSIS

### A. Existence of trust and fiduciary duties

1. Contrary to claims in **Document 919** (Preliminary Statement, P.10, P.11 and P.76), the end-user agreement(s) proffered by Prime Trust to the Creditors do not contain any explicit language whatsoever to the effect that there was neither a fiduciary nor a trust relationship between the parties (**Exhibits 1 and 2**).

2. To the contrary, Prime Trust describes itself as a "Custodian" (**Exhibits 1 and 2**) and a "Directed Fiduciary" pursuant to Nevada regulations (**Exhibit 2, Section 12.1**). This directly displaces any notion that all property held by the Debtor as of the Petition date is property of the Bankruptcy estate. **Exhibit 2** appears to have been removed from Prime Trust's website and the exhibit shows the version of the document as of April 6, 2023.

3. NRS 163.554 explicitly states that *"Fiduciary" means a trustee or custodian under any instrument, or an executor, administrator or personal representative of a decedent's estate or any other person, including an investment trust adviser, trust protector or a trust committee which is acting in a fiduciary capacity for any person, trust or estate.*

4. In addition, Prime Trust declares that their duties are "ministerial in nature", and that they "shall collect and hold all funds when Custodial Property may mature, be redeemed or sold" (**Exhibit 1**).

   Both Creditors had specifically exercised an option through the integrator's website (MyConstant, alias, Const LLC) to automatically escrow all of their balances with Prime Trust. Thus, a trust was created with the appropriate funds in the Creditors' favor, or that such a trust of specific assets ought to have been duly created by Prime Trust. This option was exercised well prior to Prime Trust declaring bankruptcy (and additionally, also before MyConstant ceased operations) (**Exhibit 3**).

5. As previously elaborated in **Document 529**, Prime Trust has forged customer signatures on "Prime Trust New Account Agreement" fraudulently, and now appears to seek to rely on subsequent unilateral "agreement updates" to the original fraudulently executed agreement to claim rights to hypothecate customer assets. This is also directly at odds with Prime Trust's public representations (**Exhibit 4**) by means of a repost on Twitter/X that they do not hypothecate customer assets and that they are kept separate from corporate funds.

   In the present case, allegations of mismanagement, commingling of customer funds with corporate funds and widespread fraud by Prime Trust's management coupled

with a fraudulent internal ledger is echoed by Plan Administrator himself (**Document 919**, Preliminary Statement and P.87).

6. The absence of any binding contractual agreements is further corroborated by the course of dealing between Prime Trust and end-users. Contrary to the so-called contractual agreements (**Exhibits 1 and 2**), there were no fees directly payable or ever demanded by Prime Trust as under the contract. Prime Trust did not itself provide a dedicated portal for the end-users as to where they could monitor the status of their custodial accounts, but rather directed end-users to their respective integrators instead for any account-related queries (**Exhibit 5**). The absence of such binding contractual agreements is no bar for the existence of trust and accompanying trustee and/or fiduciary duties.

7. The evidence previously presented in **Document 529** coupled with the exhibits herein and case circumstances clearly suggest that Prime Trust, acting through its ex-CEO, Scott Purcell, or otherwise, not only intended to assume fiduciary responsibilities towards the end-users, but also act as a trustee and custodian of customer assets.

8. The crux of the Creditors' argument is that a trust and a fiduciary relationship arose as a result of the Prime Trust's manifest intent, conduct, representations and the Creditors' reasonable reliance to their detriment in circumstances, and not because of a direct contractual agreement between Prime Trust and the Creditors.

### B. Subsequent commingling of trust assets and practical inability to trace assets

9.  The substantive reason for existence of Prime Trust as a regulated trust company and a custodian of end-user account is for them to act as a trustee with fiduciary duties. This needs to be given an overriding effect given the overall intentions of the parties.

10. Equity continues regarding trust assets mixed with other property as separate property. Assets held in a trust are simply deemed to be not readily distinguishable in such a scenario. Misfeasance, malfeasance or nonfeasance by the trustee causing commingling of trust assets contrary to their duties cannot have the effect of extinguishing the trust, trustee duties or trustee liabilities itself. Any notion to the contrary would have the undesirable effect of allowing trustees to gain an undue benefit of discharging their liability and further duties through breach of trust and wrongful acts.

11. The Creditors do appreciate that subject matter certainty and specific identification is generally essential for formation and recognition of a trust. However, in the circumstances of immediate case, the Creditors present an argument that a trust ought to be found (either as an actual trust, or imposed as a constructive trust) as to the mass of the Debtors' possessions – both commingled possessions and separate possessions (if and when found or recovered in the future) with the end-users being the beneficiaries of such a trust. This would have a desirable dual effect of enabling pro rata distributions as to commingled assets, as well as preserve separate/individual interests for assets that aren't commingled. This would further afford the end-users the added benefit and protection of a trust, while preserving flexibility in distributions as circumstances evolve. In particular, this would help ensure that obligations to the

end-users as under the trust are preserved and survive liquidation of Prime Trust as a legal entity.

12. Fiduciaries and trustees owe a strict duty to ensure the beneficial owner's assets and interests are safeguarded. This duty has been clearly breached as in this case, and fiduciaries and trustees are personally liable to restore the value of the beneficiaries' assets.

13. Tracing is, in essence, a factual inquiry as to the value of the assets and not necessarily as to the assets themselves. Where equities between harmed end-users are equal, and application of any tracing rules is likely to result in haphazard results (as may be the present case), the Court may apportion the mass of traceable funds in a pro rata fashion, proportionate to end-user's individual interests. Thus, to that extent, the Creditors do not object to the practical end result of the Plan Administrator's proposal, but take issue with the reasoning and the legal treatment of the funds behind such a decision/evaluation.

14. Further, treatment of Debtor's assets as part of the bankruptcy estate would deprive the Creditors of any legal benefit the trust mechanism affords, which the Creditors are already entitled to. In particular, the Creditors assert exclusive interest in the funds that were escrowed (or ought to be) in their favor, and embezzled from the Creditors by the integrator (MyConstant) that Prime Trust is obligated to either recoup in the future or repay as the trustee of the assets. This duty can neither be discharged nor absolved unilaterally by Prime Trust merely by retroactively disavowing any trustee and fiduciary responsibilities owed by them to the end-users.

15. Accordingly, commingling of assets is no bar to finding of a trust, trustee and fiduciary duties all which ought to be found in the present case.

## SUMMARY

16. The Creditors do not necessarily object to the result of the Plan Administrator's proposal – that is to distribute "hopelessly commingled" assets currently in possession pro rata, subject to applicable case facts and relevant laws, including tracing rules.

17. However, the Creditors believe that the legal basis put forth by the Plan Administrator is deeply flawed, given case facts, where it would cause real harm and injustice to the end-users in general and affect recoveries in specific circumstances. A finding of trust with accompanying fiduciary duties is likely to do justice to the parties, while preserving their present and future interests.

18. The Creditors have been harmed by unlawful activities of both the integrator (MyConstant) and Prime Trust, which played a key role in facilitating the fraud.

## CONCLUSION AND PRAYER

19. The Creditors respectfully ask the Honorable Court for a specific declaration as to positively finding an existence of a trust in their favor, with Prime Trust as the trustee, owing fiduciary and trustee duties towards them.

20. Further, the Creditors ask the Honorable Court to direct the Plan Administrator to assume and execute on the responsibilities Prime Trust itself originally professed to have – that is to collect/repay all monies owed to the Creditors as under the trust that

were embezzled by the integrator (MyConstant) and reimburse them with the recouped funds.

21. The Creditors also plead before the Honorable Court for relief in being made financially as whole as possible, in particular, with respect to their funds that were or ought to have been fully escrowed by Prime Trust. While the Creditors do realize the maxim that "Equity deems as done that which ought to be done" isn't strictly legally binding per se, the Creditors request the Honorable Court's consideration as to relative equities between the victims who may be differently situated.

22. Given the scale of fraud (Roughly, $23 million in principal amounts), the number of victims involved in MyConstant alone (Over five thousand), and considerable public interest and harm involved, the Creditors respectfully urge the Honorable Court to take serious cognizance of the issues herein and render justice by all means at its disposal.

RECEIVED

2025 JAN 29  AM 10: 14

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the foregoing document is being served this day, January 24,

2025, on all counsel of record or pro se parties in a manner or procedure authorized by law.

By:

/s/ Shyam Sundar Aswadha Narayanan

Shyam Sundar Aswadha Narayanan

/s/ Latha Narayanan

Latha Narayanan


Mailing Address:

9170 Forest Lane, Apartment 225

Dallas, Texas – 75243

United States of America

Email: a.n.shyamsundar@gmail.com

Phone: +1-469-922-8547

# EXHIBIT 1: PRIME TRUST NEW ACCOUNT AGREEMENT

**Prime Trust New Account Agreement**

Shyam Sundar Aswadha Narayanan ("Account Holder", "Customer", "you", "your") hereby requests and directs that Prime Trust, LLC ("Prime Trust", "Custodian", "we", "our", "us"), a Nevada chartered trust company, establish a **Prime Asset Custody Account** ("Account") for and in the name of Account Holder, and to hold as custodian all assets deposited to, or collected with respect to such Account, upon the following terms and conditions:

## 1. APPOINTMENT OF CUSTODIAN:

Account Holder hereby appoints Prime Trust to be custodian of and to hold or process as directed all securities, currency, cryptocurrency, and other assets of Account Holder (hereinafter referred to as "Custodial Property") that are delivered to Custodian by Account Holder or Account Holder's Agent(s) (as defined below) to the Account in accordance with the terms of this Agreement.

## 2. SELF-DIRECTED INVESTMENTS:

a. This Account is a self-directed Account that is managed by Account Holder and/or Account Holder's Agents. Prime Trust will act solely as custodian of the Custodial Property and will not exercise any investment or tax planning discretion regarding your Account, as this is solely your responsibility and/or the responsibility of advisors, brokers and others you designate and appoint as your agent for your Account ("Agents"), if any. Prime Trust undertakes to perform only such duties as are expressly set forth herein, all of which are ministerial in nature.

b. As a self-directed Account, you acknowledge and agree that:

   i. The value of your Account will be solely dependent upon the performance of any asset(s) chosen by you and/or your Agents.

   ii. Prime Trust shall have no duty or responsibility to review or perform due diligence on any investments or other Custodial Property and will make absolutely no recommendation of investments, nor to supervise any such investments. You will perform your own due diligence on all investments and take sole responsibility for all decisions made for your Account.

   iii. Prime Trust does not provide any valuation or appraisals of Custodial Property, nor does it hire or seek valuations or appraisals on any Custodial Property, provided, however, it may, at its option and with no obligation or liability, to the extent available for any particular asset, include recent price quotes or value estimates from various third-party sources, including but not limited to SEC-registered exchanges and alternative trading systems, digital asset exchanges, and real estate websites on your statement for any such Custodial Property. Prime Trust will not be expected or obligated to attempt to verify the validity, accuracy or reliability of any such third-party valuation, valuation estimates or prices and you agree that Prime Trust shall in no way be held liable for any such valuation estimates or price quotations. Prime Trust shall simply act in a passive, pass-through capacity in providing such information (if any) on your Account statements and that such valuation estimates or price quotations are neither verified, substantiated nor to be relied upon in any way, for any purpose, including, without limitation, tax reporting purposes. You agree to engage a professional, independent advisor for any valuation opinion(s) you want on any Custodial Property.

c. Account Holder will not direct or permit its Agents to direct the purchase, sale or transfer of any Custodial Property which is not permissible under the laws of Account Holder's place of residence or illegal under US federal, state or local law. Account Holder hereby warrants that neither you nor your Agents will enter into a transaction or series of transactions, or cause a transaction to be entered into, which is prohibited under Section 4975 of the Internal Revenue Code. Pursuant to the directions of the Account Holder or Agent(s), Prime Trust shall process the investment and

reinvestment of Custodial Property as directed by Account Holder or its Agents only so long as, in the sole judgment of Prime Trust, such requested investments will not impose an unreasonable administrative burden on Prime Trust (which such determination by Prime Trust shall not to be construed in any respect as a judgment concerning the prudence or advisability of such investment). Custodian may rely upon any notice, instruction, request or other instrument believed by it to have been delivered from the Account Holder or its Agents, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein.

d. Buy and sell orders may, at Custodians discretion, be accepted verbally, including via telephone, or electronically, including email and internet-enabled devices and systems, provided, however, that Custodian may, but is not required to, require Account Holder or its Agents to promptly provide email, text or other confirmation to verify such instructions and any such instructions will not be deemed as received until verified in accordance with the Custodians then-in-effect policies and procedures. Account Holder acknowledges that any request to waive or change any policies or procedures for asset disbursements is done so at Account Holders risk. Prime Trust may decline to accept verbal asset transfer or trade instructions in its sole discretion and require written instructions, or instructions triggered from Account Holder or its Agents using tools while logged onto your account (either directly at www.primetrust.com or on any website or application that integrates into Prime Trust systems via API's ("Application Programming Interfaces"), which may or may not bear the Prime Trust brand. Account Holder bears complete and absolute responsibility for all buy, sell, transfer, and disbursement instructions for this Account and will immediately notify Prime Trust of any unauthorized transactions.

e. Account Holder acknowledges and agrees that the custody of digital assets is generally subject to a high degree of risk, including without limitation, the risk of loss due to the blockchain or smart contract defects as well as forks and other events outside of the Custodian's control. Such Custodial Property is not insured by the Federal Deposit Insurance Corporation or by any Prime Trust insurance policies and so you are advised to directly obtain, at your sole cost and expense, any separate insurance policies you desire for such Custodial Property. Account Holder agrees that transfer requests, as well as sale and purchase orders, for digital assets may be delayed due to security protocols, time-zone differences, communication technology delays or fails, and/or enhanced internal compliance reviews. Accordingly, Prime Trust shall not be liable for any losses or damages, including without limitation direct, indirect, consequential, special, exemplary or otherwise, resulting from delays in processing such transactions.

f. All instructions for the purchase and sale of securities and/or digital assets shall be executed through one or more broker-dealers or exchanges selected by either you or your Agents, or by Prime Trust, as an accommodation (and not in any capacity as a broker-dealer) and Prime Trust is hereby authorized to debit your account for any fees associated with such transaction(s) and remit those to the executing party.

## 3. SCHEDULE OF FEES:

The Custodian shall receive reasonable compensation in accordance with its usual Schedule of Fees then in effect at the time of service. The fees and charges initially connected with this Account may include:

- Account Fees: As detailed on Prime Trust's current fee schedule, which may change from time to time and is published on www.primetrust.com. Changes to the fee schedule shall not affect any charges for prior periods and will only be effective as of the date the changes were published.
- Statement Fee: $0.00 – there are no fees for electronically delivered and available statements
- Third-Party Fees – in the event that we are charged any fees by a third party in performing services on your behalf (e.g. transfer agent fees, legal fees, accounting fees, tax preparation fees, notary fees, exchange fees, brokerage fees, bank fees, blockchain settlement fees, etc.) then you

agree to reimburse us for such reasonable charges at cost plus 25% (excluding broker-dealer commissions), and that no prior approval is required from you in incurring such expense.

You agree to pay all fees and expenses associated with your Account. Prime Trust is hereby authorized, at its option, in its sole discretion, to electronically debit the Account for payment of fees and expenses, including charging any linked credit or debit card, pulling funds from any linked bank account, or liquidating any of the Custodial Property without prior notice or liability. Unpaid fees are subject to interest at a rate of 1.50% per month on the outstanding balance and may be applied as a first lien on any Custodial Property. Prime Trust reserves the right to make changes to its fees for custodial services in its sole and absolute discretion.

**4. ASSETS AND CUSTODY:**

   a. Custodial Property which Prime Trust will generally agree to accept and hold on Account Holder's behalf includes: United States Dollars ("USD"), foreign currencies at the sole discretion of Prime Trust, title to real estate, certain digital assets, private equity and debt securities issued pursuant to laws and regulations of the United States, as well as equity and debt securities which are listed on any US exchange or alternative trading system (e.g. OTC, NASDAQ, NYSE, AMEX, etc.). Securities which have been issued pursuant to regulations of countries other than the US or which are listed on non-US trading systems may be acceptable for custody on a case by case basis. Physical assets such as cash, art, coins, and rare books are generally not accepted for custody at Prime Trust. Acceptance and custody of digital assets such as cryptocurrency and other tokens are subject to the sole discretion of Prime Trust.

   b. USD in the Custodial Account are hereby directed by Account Holder to be invested in Prime Trust's "Secure Cash Sweep", as available, other than as needed for immediate funds availability. Interest paid from the Secure Cash Sweep BT will be credited to your Account.

   c. During the term of this Agreement, Custodian is responsible for safekeeping only Custodial Property which is delivered into its possession and control by the Account Holder or its Agents. Custodian may for convenience take and hold title to Custodial Property or any part thereof in its own name or in the name of its nominee (commonly known as "street name"), with Account Holder ownership of Custodial Property segregated on its books and records.

   d. Custodian shall keep accurate records of segregation of customer accounts to show all receipts, disbursements, and other transactions involving the Account. All such records shall be held indefinitely by Custodian.

   e. Custodian shall collect and hold all funds when Custodial Property may mature, be redeemed or sold. Custodian shall hold the proceeds of such transaction(s) until receipt of written or electronic (via our systems) disbursement instructions from Account Holder.

   f. Custodian shall process any purchase, sale, exchange, investment, disbursement or reinvestment of Custodial Property under this Agreement that Account Holder or its Agents may at any time direct, provided that sufficient unencumbered, cleared assets are available for such transaction.

   g. Funds received in any currency other than USD may, at your direction or as needed to fulfill investment directions or pay fees, be converted to USD at exchange rates set at Prime Trusts discretion.

   h. Without limiting the generality of the foregoing, Prime Trust is authorized to collect into custody all property delivered to Custodian at the time of execution of this Agreement, as well as all property which is hereafter purchased for your Account or which may hereafter to be delivered to Custodian for your Account pursuant to this Agreement, together with the income, including but not limited to interest, dividends, proceeds of sale and all other monies due and collectable attributable to the investment of the Custodial Property.

   i. Custodian is authorized, in its sole discretion, to comply with orders issued or entered by any court with respect to the Custodial Property held hereunder, without determination by Custodian of such

court's jurisdiction in the matter. If any portion of the Custodial Property held hereunder is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, Custodian is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action, and if Custodian complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

j.   Custodian does not warrant or guarantee that any buy or sell order by Account Holder will be executed at the best posted price or timely executed. Account Holder acknowledges and agrees that (i) Custodian does not have access to every market or exchange which a particular product or financial instrument may be traded and Custodian makes no representation regarding the best price execution of any instructions, (ii) other orders may trade ahead of Account Holder's order and exhaust available volume at a posted price, (iii) exchanges, market makers or other types of sellers or purchasers may fail to honor posted or otherwise agreed-upon prices, (iv) exchanges may re-route customer orders out of automated execution systems for manual handling (in which case, execution may be substantially delayed), (iv) system delays by exchanges or third-parties executing instructions may prevent Account Holders order from being executed, may cause a delay in execution or not to be executed at the best posted price or at all, and, (v) Custodian may not promptly or in a timely manner execute Customers order(s) due to internal delays, and Custodian makes no representation that its custody services are in any way suitable for active trading or any activity requiring prompt or exact execution. The Account is not a brokerage account.  Transactions may be subject to additional fees and charges by both Custodian and any third-party service providers or exchanges.

## 5. ACCOUNT ACCESS AND COMMUNICATIONS:

a.   Custodian shall provide you and your Agent(s) with access to your Account via our website at www.primetrust.com, via the "Banq" mobile app, and/or via API's that third-parties can write into (e.g. exchanges, broker-dealers, funding portals, trading platforms, investment advisors, registered transfer agents, banks, consumer and industrial financial application providers, etc.).

b.   Your Agent(s) shall be provided with access to the Account as chosen by you using the tools and settings provided to you for your Account, which may include Account information such as current and historic statements, transaction history, current asset positions, and account types and beneficiaries. It may, depending upon the settings and permissions you choose for your particular Agents, include the ability to instruct Prime Trust to take action with respect to the Custodial Property and Account, including without limitation to invest, sell, receive, deliver or transfer Custodial Property. Any actions undertaken by any of your Agents are deemed to be those of the Account Holder directly, and you agree to maintain the security of your login credentials and passwords, as well as Agent access lists and associated permissions, so only your authorized persons have access to your Account. Prime Trust shall also be entitled to rely and act upon any instructions, notices, confirmations or orders received from your Agent(s) as if such communication was received directly from the Account Holder without any required further review or approval. Account Holder is solely responsible for monitoring and supervising the actions of your Agents with respect to the Account and Custodial Property.

c.   Statements of assets, along with a ledger of receipts and disbursements of Custodial Property shall be available online at www.primetrust.com, in your Account, as well as via the websites and/or applications of third-party API integrators that you select and use.

d.   Custodian shall be under no obligation to forward any proxies, financial statements or other

literature received by it in connection with or relating to Custodial Property held under this agreement. Custodian shall be under no obligation to take any action with regard to proxies, stock dividends, warrants, rights to subscribe, plans of reorganization or recapitalization, or plans for exchange of securities.

e. Account Holder agrees that Custodian may contact you for any reason. No such contact will be deemed unsolicited. Custodian may contact Account Holder at any address, telephone number (including cellular numbers) and email addresses as Account Holder may provide from time to time. Custodian may use any means of communication, including but not limited to, postal mail, email, telephone, or other technology to reach Account Holder.

f. **ELECTRONIC STATEMENTS ELECTION:**
Account Holder agrees that Prime Trust will make statements available in electronic form only. Account Holder further agrees that you can and will log onto its Account at www.primetrust.com or on the websites or applications of its selected third-party API integrators at your discretion to view current or historic statements, as well as transaction history, assets and cash balances. Account Holder understands and agrees that under no circumstances may you request to have statements printed and mailed to you. If Account Holder desires printed statements, then you agree to log onto your Account at www.primetrust.com (or on the websites or applications of your selected third-party API integrators) and print them yourself.

### 6. TERM AND TERMINATION, MODIFICATION:

a. This Agreement is effective as of the date set forth below and shall continue in force until terminated as provided herein.

b. This Agreement may be terminated by either party at any time upon 30 days written notice to the other party (with email being an agreed upon method of such notice), provided, however, Prime Trust may immediately terminate this Agreement without notice or liability in the event that (i) Prime Trust becomes aware or has reason to believe that Account Holder may be engaged in illegal activity, or (ii) termination is deemed appropriate by Prime Trust to comply with its legal or regulatory obligations.

c. This Agreement may be amended or modified only by the Custodian, or with the written agreement from the Custodian. Such amendments or modifications shall be effective on the 30th day after the Account Holder receives notice of such revision electronically via the email address shown on the records of Prime Trust.

d. If this Agreement is terminated by either party then Custodian shall deliver the Custodial Property to Account Holder as soon as practicable or, at Account Holder's request to a successor custodian. Account Holder acknowledges that Custodial Property held in Custodian's name or nominee may require a reasonable amount of time to be transferred. Upon delivery of Custodial Property, Custodian's responsibility under this Agreement ceases.

e. Notwithstanding anything to the contrary herein, this agreement shall terminate immediately upon the occurrence of any of the following events:

i. Upon death of the Account Holder, the Custodian shall continue to hold Custodial Property until such time the Custodian receives instructions from Account Holder's executor, trustee or administrator pursuant to the probate process, as applicable, and has received advice of its legal counsel to transfer such assets (which costs shall be borne by the Account Holder). In the event that no beneficiaries claim this Account then the assets may be preserved in the Account for so long as possible, until a beneficiary makes itself known or as may be subject to "unclaimed property" regulations as promulgated by state and federal regulators (at which time assets on Account may be transferred or liquidated and proceeds forwarded to such authorities as required by law or regulation).

ii. Filing of a petition in bankruptcy (by the Account Holders or by a creditor of the Account Holders). If this Agreement terminates due to the filing of a petition in bankruptcy, termination or dissolution of Account Holder, Custodian shall deliver the Custodial Property to the Court

appointed representative for Account Holder. If no representative has been appointed by the Court, Custodian may deliver the Custodial Property to the person it deems to be an agent of the Account Holder and such delivery will release Custodian from any further responsibility for said Custodial Property.

iii.    The legal incompetency of Account Holder, unless there is in existence a valid durable power of attorney or trust agreement authorizing another to succeed or act for Account Holder with respect to this agreement.

iv.    Prime Trust becomes aware of or suspects that the Account Holder or any of its Agents are engaged in any criminal activity, material violation of the law or material breach of the terms of this Agreement.

## 7. TERMS OF USE, PRIVACY POLICY:

Except as set forth in this Agreement, Account Holder agrees to be bound by the Prime Trust's most current, then in effect Terms of Use and Privacy Policy, as available via links at the bottom of the www.primetrust.com website. You represent that you have reviewed such policies and in using our services hereby agree to be bound by them. In the event of any conflict between any terms or provisions of the website Terms of Use or Privacy Policy and the terms and provisions of this Agreement, the applicable terms and provisions of this Agreement shall control.

## 8. DISCLAIMER:

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, PRIME TRUST MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHETHER EXPRESS, IMPLIED (EITHER IN FACT OR BY OPERATION OF LAW). PRIME TRUST EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, TITLE, AND NON-INFRINGEMENT. PRIME TRUST DOES NOT WARRANT AGAINST INTERFERENCE WITH THE USE OF THE SERVICES OR AGAINST INFRINGEMENT. PRIME TRUST DOES NOT WARRANT THAT THE SERVICES OR SOFTWARE ARE ERROR-FREE OR THAT OPERATION OR DATA WILL BE SECURE OR UNINTERRUPTED. PRIME TRUST EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY ARISING OUT OF THE FLOW OF DATA AND DELAYS ON THE INTERNET, INCLUDING BUT NOT LIMITED TO FAILURE TO SEND OR RECEIVE ANY ELECTRONIC COMMUNICATIONS (e.g. EMAIL). ACCOUNT HOLDER DOES NOT HAVE THE RIGHT TO MAKE OR PASS ON ANY REPRESENTATION OR WARRANTY ON BEHALF OF PRIME TRUST TO ANY THIRD PARTY. ACCOUNT HOLDER'S ACCESS TO AND USE OF THE SERVICES ARE AT ACCOUNT HOLDER'S OWN RISK. ACCOUNT HOLDER UNDERSTANDS AND AGREES THAT THE SERVICES ARE PROVIDED TO IT ON AN "AS IS" AND "AS AVAILABLE" BASIS. PRIME TRUST EXPRESSLY DISCLAIMS LIABILITY TO ACCOUNT HOLDER FOR ANY DAMAGES RESULTING FROM ACCOUNT HOLDER'S RELIANCE ON OR USE OF THE SERVICES.

## 9. LIMITATION OF LIABILITY; INDEMNIFICATION:

1.    Disclaimer of Liability and Consequential Damages.

CUSTODIAN SHALL NOT BE LIABLE FOR ANY ACTION TAKEN OR OMITTED BY IT IN GOOD FAITH UNLESS AS A RESULT OF ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN EACH CASE AS DETERMINED BY A COURT OF COMPETENT JURISDICTION, AND ITS SOLE RESPONSIBILITY SHALL BE FOR THE HOLDING AND DISBURSEMENT OF THE CUSTODIAL PROPERTY IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, SHALL HAVE NO IMPLIED DUTIES OR OBLIGATIONS AND SHALL NOT BE CHARGED WITH KNOWLEDGE OR NOTICE OF ANY FACT OR CIRCUMSTANCE NOT SPECIFICALLY SET FORTH HEREIN, ACCOUNT HOLDER HEREBY ACKNOWLEDGES AND AGREES, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, PRIME TRUST WILL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO ACCOUNT HOLDER FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO ANY INVESTMENT OR TRANSACTION OCCURRING

UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO, LOST PROFITS OR LOSS OF BUSINESS, EVEN IF PRIME TRUST HAS BEEN ADVISED OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION. THIS INCLUDES ANY LOSSES OR PROBLEMS OF ANY TYPE RESULTING FROM INCIDENTS OUTSIDE OF OUR DIRECT CONTROL, INCLUDING BUT NOT LIMITED TO ERRORS, HACKS, THEFT OR ACTIONS OF ISSUERS, TRANSFER AGENTS, SMART CONTRACTS, BLOCKCHAINS AND INTERMEDIARIES OF ALL TYPES.

2.    Cap on Liability.

ACCOUNT HOLDER HEREBY ACKNOWLEDGES AND AGREES UNDER NO CIRCUMSTANCES WILL PRIME TRUST'S TOTAL LIABILITY OF ANY AND ALL KINDS ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING BUT NOT LIMITED TO WARRANTY CLAIMS), REGARDLESS OF THE FORM AND REGARDLESS OF WHETHER ANY ACTION OR CLAIM IS BASED ON CONTRACT, TORT, OR OTHERWISE, EXCEED THE TOTAL AMOUNT OF FEES PAID, IF ANY, BY ACCOUNT HOLDER TO PRIME TRUST UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTH PERIOD PRIOR TO THE OCCURRENCE OF THE EVENT GIVING RISE TO SUCH LIABILITY.

3.    General Indemnification.

Account Holder hereby agrees to indemnify, protect, defend and hold harmless Prime Trust and its officers, directors, members, shareholders, employees, agents, partners, vendors, successors and assigns from and against any and all third party claims, demands, obligations, losses, liabilities, damages, regulatory investigations, recoveries and deficiencies (including interest, penalties and reasonable attorneys' fees, costs and expenses), which Prime Trust may suffer as a result of: (a) any breach of or material inaccuracy in the representations and warranties, or breach, non-fulfillment or default in the performance of any of the conditions, covenants and agreements, of Account Holder contained in this Agreement or in any certificate or document delivered by Account Holder or its agents pursuant to any of the provisions of this Agreement, or (b) any obligation which is expressly the responsibility of Account Holder under this Agreement, or (c) any other cost, claim or liability arising out of or relating to operation or use of the license granted hereunder, or, (d) any breach, action or regulatory investigation arising from Account Holder's failure to comply with any state blue sky laws or other securities laws any applicable laws, and/or arising out of any alleged misrepresentations, misstatements or omissions of material fact in the Account Holders' offering memoranda, general solicitation, advertisements and/or other offering documents. Account Holder is required to immediately defend Prime Trust including the immediate payment of all attorney fees, costs and expenses, upon commencement of any regulatory investigation arising or relating to Account Holder's offering and/or items in this Section 9.3(a) through (d) above. Any amount due under the aforesaid indemnity will be due and payable by Account Holder within thirty (30) days after demand thereof. The indemnity obligations of Account Holder hereunder shall survive any termination of this Agreement and the resignation or removal of Custodian hereunder.

4.    Limitation on Prime Trust's Duty to Litigate.

Without limiting the foregoing, Prime Trust shall not be under any obligation to defend any legal action or engage in any legal proceedings with respect to the Account or with respect to any property held in the Account unless Prime Trust is indemnified to Prime Trust's satisfaction. Whenever Prime Trust deems it reasonably necessary, Prime Trust is authorized and empowered to consult with its counsel in reference to the Account and to retain counsel and appear in any action, suit or proceeding affecting the Account or any of the property of the Account. All fees and expenses so incurred shall be for the Account and shall be charged to the Account.

5.    Third Party Claims.

i.    Account Holder agrees to bear sole responsibility for the prosecution or defense, including the employment of legal counsel, of any and all legal actions or suits involving the Account, which may arise or become necessary for the protection of the investments in that Account, including any actions lodged against the Custodian. Account Holder also agrees to bear sole responsibility for enforcing any judgments rendered in favor of the Account, including judgments rendered in

the name of Prime Trust as Custodian of the Account.

ii.    Account Holder agrees to be responsible for any and all collection actions, including contracting with a collection agency or institutional legal action, and bringing any other suits or actions which may become necessary to protect the rights of the Account. Account Holder understands that any legal filings made on behalf of this Investment are to be made on behalf of beneficial owners for whom Prime Trust acts as custodian. Account Holder agrees not to institute legal action on behalf of the Account without Custodian's written consent to litigate and that Account Holder shall prosecute any legal action. Account Holder agrees that any such legal action will be carried out in a manner that does not cause Custodian to incur any costs or legal exposure.

6.    Custodian may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or its duties hereunder, or relating to any dispute involving any disbursements or services contemplated herein, and shall incur no liability and shall be fully indemnified by you from any liability whatsoever in acting in accordance with the advice of such counsel. Account Holder shall promptly pay, upon demand, the reasonable fees and expenses of any such counsel and fees may be deducted from Customer's account, including the liquidation of assets if needed in order to make cash available to settle such costs.

**10. NOTICES:**

All notices permitted or required by this Agreement will be via electronic mail ("email"), and will be deemed to have been delivered and received upon sending via any SMTP delivery service chosen by Prime Trust. Notices shall be delivered to the addresses on record which, if to Prime Trust shall be to support@primetrust.com and if to Account Holder shall be to the email address on file in your Account.

**11. SEVERABILITY:**

If any provision of this Agreement is for any reason found to be ineffective, unenforceable, or illegal by any court having jurisdiction, such condition will not affect the validity or enforceability of any of the remaining portions hereof.

**12. NO LEGAL, TAX OR ACCOUNTING ADVICE:**

Account Holder agrees without reservation that Prime Trust is NOT providing any legal, tax or accounting advice in any way, nor on any matter, regardless of the tone or content of any communication (oral, written or otherwise). Account Holder shall rely solely on its own legal, tax, accounting and other professional advisors for any such advice and on all matters.

**13. NO INVESTMENT ADVICE OR RECOMMENDATIONS:**

Account Holder agrees that Prime Trust is not providing any investment advice, nor do we make any recommendations regarding any securities or other assets to Account Holder. Account Holder agrees that it will not construe any communications from Prime Trust or any person associated with Prime Trust, whether written or oral, to be legal, investment, due diligence, valuation or accounting advice and agrees to only and exclusively rely on the advice of Account Holder' s attorneys, accountants and other professional advisors, including any Agents, investment advisers or registered broker-dealers acting on your behalf.

**14. ELECTRONIC COMMUNICATIONS NOTICE AND CONSENT:**

Each of Account Holder and Prime Trust hereby agree that all current and future notices, confirmations and other communications regarding this Agreement specifically, and future communications in general between the parties, may be made by email, sent to the email address of record as set forth in the Notices section above or as otherwise from time to time changed or updated and disclosed to the other party, without necessity of confirmation of receipt, delivery or

reading, and such form of electronic communication is sufficient for all matters regarding the relationship between the parties. If any such electronically-sent communication fails to be received for any reason, including but not limited to such communications being diverted to the recipients' spam filters by the recipients email service provider, or due to a recipients' change of address, or due to technology issues by the recipients' service provider, the parties agree that the burden of such failure to receive is on the recipient and not the sender, and that the sender is under no obligation to resend communications via any other means, including but not limited to postal service or overnight courier, and that such communications shall for all purposes, including legal and regulatory, be deemed to have been delivered and received. No physical, paper documents will be sent to Account Holder, and if Account Holder desire physical documents then it agrees to be satisfied by directly and personally printing, at Account Holder's own expense, either the electronically-sent communication(s) or the electronically available communications by logging onto Account Holder's Account at www.primetrust.com and then maintaining such physical records in any manner or form that Account Holder desire. Account Holder's Consent is Hereby Given: By signing this Agreement electronically, Account Holder explicitly agrees to this Agreement and to receive documents electronically, including a copy of this signed Agreement as well as ongoing disclosures, communications and notices.

**15. ASSIGNMENT:**

No party may transfer or assign its rights and obligations under this Agreement without the prior written consent of the other parties. Notwithstanding the foregoing, without the consent of the other parties, any party may transfer or assign its rights and obligations hereunder in whole or in part (a) pursuant to any merger, consolidation or otherwise by operation of law, and (b) to the successors and assigns of all or substantially all of the assets of such assigning party, provided such entity shall be bound by the terms hereof. This Agreement will be binding upon and will inure to the benefit of the proper successors and assigns.

**16. BINDING ARBITRATION, APPLICABLE LAW AND VENUE, ATTORNEYS FEES:**

This Agreement is governed by and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws. Any claim or dispute arising under this Agreement may only be brought in arbitration, with venue in Clark County, Nevada, pursuant to the rules of the American Arbitration Association. Account Holder and Prime Trust each consent to this method of dispute resolution, as well as jurisdiction, and consent to this being a convenient forum for any such claim or dispute and waives any right it may have to object to either the method or jurisdiction for such claim or dispute. In the event of any dispute among the parties, the prevailing party shall be entitled to recover damages plus reasonable costs and attorney's fees and the decision of the arbitrator shall be final, binding and enforceable in any court.

**17. COUNTERPARTS, FACSIMILE, EMAIL, SIGNATURES:**

This Agreement may be executed in counterparts, each of which will be deemed an original and all of which, taken together, will constitute one and the same instrument, binding on each signatory thereto. This Agreement may be executed by signatures, electronically or otherwise, delivered by facsimile or email, and a copy hereof that is properly executed and delivered by a party will be binding upon that party to the same extent as an original executed version hereof.

**18. FORCE MAJEURE:**

No party will be liable for any default or delay in performance of any of its obligations under this Agreement if such default or delay is caused, directly or indirectly, by fire, flood, earthquake or other acts of God; labor disputes, strikes or lockouts; wars, rebellions or revolutions; riots or civil

disorder; accidents or unavoidable casualties; interruptions in transportation or communications facilities or delays in transit or communication; supply shortages or the failure of any person to perform any commitment to such party related to this Agreement; or any other cause, whether similar or dissimilar to those expressly enumerated in this Section, beyond such party's reasonable control.

## 19. INTERPRETATION:

Each party to this Agreement has been represented by or had adequate time to obtain the advice and input of independent legal counsel with respect to this Agreement and has contributed equally to the drafting of this Agreement. Therefore, this Agreement shall not be construed against either party as the drafting party. All pronouns and any variation thereof will be deemed to refer to the masculine and feminine, and to the singular or plural as the identity of the person or persons may require for proper interpretation of this Agreement. And it is the express will of all parties that this Agreement is written in English and uses the font styles and sizes contained herein.

## 20. CAPTIONS:

The section headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

## 21. ENTIRE AGREEMENT, AMENDMENTS:

This Agreement sets forth the entire understanding of the parties concerning the subject matter hereof, and supersedes any and all prior or contemporaneous communications, representations or agreements between the parties, whether oral or written, regarding the subject matter of this Agreement, and may not be modified or amended, except by a written instrument executed after the effective date of this Agreement by the party sought to be charged by the amendment or modification.

## 22. CAPACITY:

Account Holder hereby represents that the signer(s) of this Agreement are over the age of 18 and have all proper authority to enter into the Agreement. Furthermore, if Account Holder is an entity (e.g. corporation, trust, partnership, etc. and not an individual) then the entity is in good standing in its state, region or country of formation; which Account Holder agrees to produce evidence of such authority and good standing if requested by Custodian. Account Holder agrees to provide Prime Trust with any additional information required to open the Account, including beneficial owners and other customer information. Account Holder represents that the information provided is complete and accurate and shall immediately notify Prime Trust of any changes.

## 23. SERVICES NOT EXCLUSIVE:

Nothing in this Agreement shall limit or restrict the Custodian from providing services to other parties that are similar or identical to some or all of the services provided hereunder.

## 24. INVALIDITY:

Any provision of this Agreement which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. In such case, the parties shall in good faith modify or substitute such provision consistent with the original intent of the parties.

**25. SUBSTITUTE IRS FORM W-9**

*Under penalties of Perjury, Account Holder certifies that:* (1) The tax identification number provided to Prime Trust by Account Holder, if Account Holder is a US person, is the correct taxpayer identification number and (2) Account Holder is not subject to backup withholding because: (a) Account Holder is exempt from backup withholding, or, (b) Account Holder has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding. Account Holder agrees to immediately inform Prime Trust in writing if it has been, or at any time in the future is notified by the IRS that Account Holder is subject to backup withholding. Account Holders acknowledge that failing to provide accurate information may result in civil penalties.

Agreed as of 11 of June, 2021 by and between:

SIGNATURE:

## Owner:

*Shyam Sundar Aswadha Narayanan*

| | |
|---|---|
| **Name:** | Shyam Sundar Aswadha Narayanan |
| **Email:** | A.N.SHYAMSUNDAR@GMAIL.COM |
| **Title:** | Owner |
| **Date:** | June 11, 2021, 11:22:58 AM UTC |
| **Signature ID:** | 0699746a-d924-46ff-8b35-4f76ed539fa3 |

**PRIME TRUST, LLC**

## Prime Trust:

*Scott Purcell*

| | |
|---|---|
| **Name:** | Scott Purcell |
| **Email:** | scott@primetrust.com |
| **Company:** | Prime Trust |

**Title:**      Chief Trust Officer

**Signature ID:** 17859984-3691-429c-b3c4-fb89b4030d64

## EXHIBIT 2: PRIME TRUST USER AGREEMENT



Prime Trust User Agreement

Agreement revision date: March 7, 2022

Welcome to Prime Trust!

This is a Prime Trust User Agreement between you ("**Account Holder**", "**you**", "**your**") and Prime Trust, LLC, a Nevada chartered trust company ("**Prime Trust**", "**our**")  (each, a "**Party**," and together, "**Parties**"). You hereby request and direct that Prime Trust establish and maintain an account for and in the name of Account Holder in connection with the Services (the "**Account**"), and hold as custodian all property deposited to, or collected with respect to, the Account, upon the terms and conditions of this Prime Trust User Agreement (as amended or otherwise modified from time to time, and together with any schedules, annexes, exhibits hereto, this "**Agreement**").

If Account Holder has entered into a Prime Trust Master Services Agreement with Prime Trust, then the terms of that certain Master Services Agreement govern and the terms in this Agreement do not apply to Account Holder.

### 1.    ACCOUNT ACCEPTANCE AND AUTHORIZED SERVICES

**1.1    Appointment**. Account Holder hereby appoints and authorizes Prime Trust to provide the Services in accordance with this Agreement, and Prime Trust hereby accepts such appointment subject to the Account acceptance process in accordance with Section 2.1 below.

(a) The services that Prime Trust will provide include the Fiat Services, On-Chain Services, and any other services, including the holding, processing, and acting as custodian of all Custodial Property, provided from time to time by Prime Trust to Account Holder in accordance with this Agreement (the "**Services**"). Without limiting the generality of the foregoing, Prime Trust is authorized to collect into custody all Custodial Property while this Agreement is in effect (capitalized terms used in this sub-section are defined below).

(b) In its sole discretion, Prime Trust may custody, on Account Holder's behalf, any property delivered by Account Holder into the possession or control of Prime Trust ("**Custodial Property**"). For the avoidance of doubt, Custodial Property that Prime Trust may agree to accept and hold on Account Holder's behalf in accordance with this Agreement is limited to the following: (i) Digital Assets (defined below); (ii) Australian Dollars, Canadian Dollars, Euros, British Pounds, and Japanese Yen, and U.S. Dollars ("**USD**"), together with any other currencies made eligible for Fiat Services, as determined by Prime Trust from time to time, (collectively, "**Fiat Currencies**"); (iii) title to real estate; (iv) private securities and public securities listed on any U.S. securities exchange or alternative trading system; and (v) traditional and Roth individual retirement accounts (subject to applicable documentation in Prime Trust's sole discretion). Securities that have been issued in accordance with the regulations of countries other than the U.S. or which are listed on non-U.S. trading systems may be accepted for custody on a case-by-case basis upon approval by Prime Trust in its sole discretion.

(c) For the purposes of this Agreement, "**Digital Assets**" means Bitcoin and Ethereum, together with any other digital representation of value that may function as a medium of exchange or medium for investment, and which is evidenced on and can be electronically received and stored using distributed ledger technology, as determined by Prime Trust from time to time.

**1.2    Provision of the Services.**

(a) Subject to Account Holder's completion of the Account acceptance process in accordance with Section 2.1 and so long as Account Holder is in compliance with this Agreement, Prime Trust will provide the Services.

(b) In providing the Services, Prime Trust will act only upon receipt of any direction, instruction, or request submitted by an Authorized Person (defined below) or through the Authorized Integrator's platform (an "**Authorized Instruction**"). "**Authorized Integrator**" means a third party that has: (i) entered into an agreement with the Account Holder to provide certain services ("**Account Holder Service Provider Agreement**"); and (ii) entered into an agreement with Prime Trust to allow its customers to access the Services.

(c) Prime Trust, in its sole discretion, will determine whether the provision of the Services or an Authorized Instruction complies with all applicable U.S. federal, state, local, and foreign laws, statutes, ordinances, regulations, rules, executive orders, circulars, opinions, agency guidance, interpretive letters, and other official releases or requests of or by any government, or any authority, department or agency thereof ("**Applicable Law**") and may decline any Authorized Instruction, including if: (i) Account Holder is not in compliance with this Agreement; (ii) such Authorized Instruction may violate Applicable Law; or (iii) Account Holder has insufficient unencumbered, cleared Custodial Property in the Account available for executing such Authorized Instruction.

(d) Prime Trust is entitled to rely upon any information, data, and documents provided in connection with the Services. Account Holder acknowledges that Prime Trust has no duty to detect errors, or inquire into or investigate the legality, validity, completeness, or accuracy of any information, data, or documents provided to Prime Trust in connection with the Services.

(e) Prime Trust is entitled to rely upon any Authorized Instruction provided in connection with the Services and Account Holder acknowledges that Prime Trust has no duty to detect errors, or inquire into or investigate the legality, validity, completeness, or accuracy of any Authorized Instruction. Prime Trust will only act upon an Authorized Instruction and is released and held harmless by Account Holder for acting upon the Authorized Instruction, including acting upon conflicting, superseded, or otherwise varying Authorized Instructions from multiple Authorized Persons.

(f) Account Holder acknowledges that Prime Trust will not monitor Digital Assets for actions taken by the issuer of such Digital Asset, if any. Such actions may include an issuer instruction requiring the holder of a Digital Asset to transfer it to a certain location. For the avoidance of doubt, Account Holder is solely responsible for satisfying or responding to any such actions of an issuer.

(g) Prime Trust will collect and hold all funds when Custodial Property may mature, be redeemed, or sold. Prime Trust will hold the proceeds of such transaction(s) until receipt of an Authorized Instruction.

(h) Funds received in any currency other than USD may, pursuant to an Authorized Instruction or as needed for Prime Trust to carry out an Authorized Instruction or pay Fees (defined below), be converted to USD at exchange rates set in Prime Trust's sole discretion.

(i) Prime Trust shall process the investment and reinvestment of Custodial Property in accordance with Authorized Instructions only so long as, in the sole discretion of Prime Trust, such requested investments will not impose an unreasonable administrative burden on Prime Trust (which such determination by Prime Trust shall not to be construed in any respect as a judgment concerning the prudence or advisability of such investment).

**1.3   Storage of Digital Assets.** Prime Trust will receive Digital Assets for storage by generating Private Keys and their Public Key pairs, with Prime Trust retaining custody of such Private Keys. "**Private Key**" means an alphanumeric string known only to the holder of a Digital Asset, which must be used to transact the Digital Asset represented by the corresponding Public Key. "**Public Key**" means an alphanumeric string on a Blockchain that indicates ownership/possession of a specific amount of a Digital Asset by a specific network participant and is visible to all participants in a Blockchain's network. Upon receipt, Prime Trust will custody the Digital Assets in Account Holder's name or Accounts established for the benefit of Account Holder, unless otherwise specified in an Authorized Instruction. Prime Trust will be deemed to have received a Digital Asset after the Digital Asset's receipt

has been confirmed on the relevant Blockchain or otherwise ledgered to Prime Trust's satisfaction. "**Blockchain**" means a software operating a distributed ledger which is maintained by a network of computers, and that records all transactions in a Digital Asset in theoretically unchangeable data packages known as blocks, each of which are timestamped to reference the previous block so that the blocks are linked in a chain that evidences the entire history of transactions in the Digital Asset.

### 1.4   Forks, Airdrops.

(a) For the purposes of this Agreement, "**Fork**" means: (i) that a Digital Asset network has been changed in a way that makes it incompatible with the unchanged version of the Digital Asset network; (ii) the changes have been widely accepted by users of the Digital Asset network; and (iii) that the two resulting Digital Asset networks have not been merged together at the time of any action to be taken by Prime Trust. A Fork may create two separate Digital Asset networks (each, a "**Forked Network**"), and may result in Prime Trust holding an identical amount of Digital Assets associated with each Forked Network.

(b) Should a Fork occur: (i) Prime Trust retains the right, in its sole discretion, to determine whether or not to support either Forked Network; (ii) in connection with determining to support or not to support a Forked Network, Prime Trust may suspend certain operations, in whole or in part (with or without advance notice), for however long Prime Trust deems reasonably necessary, in order to take the necessary steps, as determined in its sole discretion, to perform obligations hereunder with respect to supporting or not supporting a Forked Network; (iii) Account Holder hereby agrees that Prime Trust will determine, in its sole discretion, whether or not to support such Forked Network and that Account Holder will have no right or claim against Prime Trust related to value represented by any change in the value of any Digital Asset (whether on a Forked Network or otherwise), including with respect to any period of time during which Prime Trust exercises its rights described herein with respect to Forks and Forked Networks; (iv) Prime Trust will select, in its sole discretion, at least one of the Forked Networks to support and will identify such selection in a notice; (v) with respect to a Forked Network that Prime Trust chooses not to support, it may, in its sole discretion, elect to (A) abandon or otherwise not pursue obtaining the Digital Assets from that Forked Network, or (B) deliver the Digital Assets from that Forked Network to Account Holder within a time period as determined by Prime Trust in its sole discretion, together with any credentials, keys, or other information sufficient to gain control over such Digital Assets (subject to the withholding and retention by Prime Trust of any amount reasonably necessary, as determined in Prime Trust's sole discretion, to fairly compensate Prime Trust for the efforts expended to obtain and deliver such Digital Assets to Account Holder); (vi) with respect to Forked Networks that Prime Trust chooses to support, Account Holder may be responsible for Fees to be negotiated; and (vii) Account Holder acknowledges and agrees that Prime Trust assumes no responsibility or obligations with respect to any Forked Network and related Digital Assets that it chooses not to support.

(c) In the event that a Digital Asset network attempts to or does contribute (sometimes called "airdropping" or "bootstrapping") its Digital Assets (collectively, "**Airdropped Digital Assets**") to holders of Digital Assets on an existing Digital Asset network and Account Holder notifies Prime Trust in writing of such event, Prime Trust may, in its sole discretion, elect to: (i) subject to an airdrop fee to be determined, support the Airdropped Digital Asset for Custody and, if appropriate, reconcile Account; (ii) abandon or otherwise not pursue obtaining the Airdropped Digital Asset; or (iii) deliver the Airdropped Digital Assets from that Digital Asset network to Account Holder within a time period as determined by Prime Trust in its sole discretion, together with any credentials, keys, or other information sufficient to gain control over such Airdropped Digital Assets (subject to the withholding and retention by Prime Trust of any amount reasonably necessary, as determined in Prime Trust's sole discretion, to fairly compensate Prime Trust for the efforts expended to obtain and deliver such Airdropped Digital Assets to Account Holder). Airdropped Digital Assets do not create any relationship between the sender and/or Digital Asset network and Prime Trust and do not subject Prime Trust to any responsibilities or obligations as it relates to the sender and/or Digital Asset network.

**1.5   On-Chain Services.** Subject to any documentation requested by Prime Trust in its sole discretion, from time to time, Prime Trust may offer Account Holder additional Services involving on-chain transactions (other than deposits and withdrawals included in Prime Trust's basic custody Service), which may include staking, voting, inflation, signaling, and other activities requiring interaction with the applicable Blockchain ("**On-Chain Services**"). Account Holder may be required to accept additional terms as a condition to receiving any On-Chain

Services. Prime Trust may discontinue an On-Chain Service at any time without notice for any reason. If Prime Trust decides to discontinue an On-Chain Service, Prime Trust will endeavor to provide as much notice to Account Holder as reasonably possible.

**1.6    Fiat Currency Instructions and Acknowledgements; Disclosures.** Prime Trust may, in its sole discretion, offer the custody of Fiat Currencies and foreign exchange transactions in Fiat Currencies ("**Fiat Services**") to Account Holder. If Prime Trust offers Fiat Services, and Account Holder accepts Fiat Services, Prime Trust may:

(a) subject to <u>Section 1.6(b)</u>, deposit any cash or Fiat Currency funds deposited by Account Holder with Prime Trust, for which Account Holder has not already provided Authorized Instructions, into deposit accounts at Federal Deposit Insurance Corporation ("**FDIC**")-insured, regulated depository institutions selected by Prime Trust, which accounts will be held for the benefit of Prime Trust Account Holders ("**Deposit Accounts**") and maintain the Deposit Accounts as omnibus accounts, which will not be segregated by Account Holder; enter into such sub-accounting agreements as may be required by such depository institutions; and initiate wire or other transfer requests from time to time for the withdrawal of Account Holder funds from the Deposit Accounts, which requests are to be honored by the depository institution for withdrawal of Account Holder's funds from such Deposit Accounts for distributions, investments, Fees, and other disbursements pursuant to an Authorized Instruction. All applicable wire or other transfer Fees will be paid by Account Holder.

(b) otherwise use or invest such cash or Fiat Currency at Prime Trust's own risk. Without limiting the foregoing, Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency, subject to Prime Trust's obligation to return Fiat Currency to Account Holder in accordance with this Agreement. Prime Trust may receive earnings or compensation for an omnibus account either in the form of services provided at a reduced rate, the payment of any shareholder service fees, or similar compensation, and Prime Trust may receive earnings or income from using or investing cash or Fiat Currency as described herein. Account Holder agrees that any such earnings, income or compensation shall be retained by Prime Trust and no portion of any such earning, income or compensation shall be paid to or for Account Holder. Account Holder acknowledges and agrees that Prime Trust may hold some or any portion of Fiat Currency in accounts, including but not limited to money market deposit accounts, that may or may not receive interest or earnings attributable to such Fiat Currency. Account Holder hereby agrees that the amount of such interest or earnings attributable to Fiat Currency may be retained by Prime Trust as additional consideration for its services

(c) Prime Trust will keep records for the purpose of obtaining pass-through FDIC insurance with respect to any sub-account held for the Account Holder that is part of the Custodial Property held in Deposit Accounts by Prime Trust to the extent provided by Applicable Law. Account Holder acknowledges and accepts that Prime Trust does not guarantee that pass-through FDIC coverage will be available for any such sub-account.

(d) if Account Holder elects to provide a card payment method to transfer funds into the Account, Account Holder hereby authorizes Prime Trust to debit the card payment method for the purpose of transferring the funds. Further, Account Holder hereby authorizes Prime Trust to store and file the card payment method and charge the card payment method on file in connection with any future transfers of funds by the Account Holder.

**1.7    Limitations on Services.** Account Holder agrees that Prime Trust will only perform the Services, and no additional duties or obligations will be implied. In particular, Prime Trust will not exercise any legal, investment, tax, or accounting planning, advice, discretion, or recommendation whatsoever regarding your Account. In providing the Services, Prime Trust has no duty to inquire as to the provisions of or application of any agreement or document other than this Agreement, notwithstanding Prime Trust's receipt of such agreement or document.

**1.8    Ownership of Custodial Property.** Account Holder owns all Custodial Property held by Prime Trust on behalf of Account Holder in accordance with this Agreement. Account Holder's Custodial Property will not be reflected on Prime Trust's balance sheet as assets of Prime Trust. Prime Trust may, for convenience, take and hold

title to Custodial Property or any part thereof in its own name with Account Holder's ownership of Custodial Property segregated on Prime Trust's books and records.

## 2. ACCOUNT ACCEPTANCE; AUTHORIZED PERSONS

**2.1   Account Acceptance.** Services will be provided only upon the date of Account Holder's successful completion of the Account acceptance process (the "**Effective Date**"), as determined in Prime Trust's sole discretion and in accordance with this Section 2.1. To complete the acceptance process, Account Holder will provide Prime Trust with information and documents, which includes information necessary for Prime Trust's compliance with the Bank Secrecy Act ("**BSA**"), and other Applicable Law relating to anti-money laundering ("**AML**"), Know-Your-Customer ("**KYC**"), counter-terrorist financing, sanctions screening requirements, or any other similar legal obligations, in each case, as determined by Prime Trust in its sole discretion.

**2.2   Authorized Persons.**

(a) Upon acceptance of Account Holder as determined by Prime Trust, Account Holder will designate to Prime Trust one or more persons authorized to provide instructions with respect to the Account (each, an "**Authorized Person**"). Account Holder is solely responsible for designating to Prime Trust all Authorized Persons, for advising Prime Trust of the removal of any Authorized Persons, and for all actions of Authorized Persons.

(b) Account Holder shall notify Prime Trust of the termination of any Account Holder Service Provider Agreement, and Prime Trust will not be liable for acting on any instruction sent by any person with whom Account Holder no longer maintains an Account Holder Service Provider Agreement.

(c) You agree that Prime Trust may rely on an Authorized Person's email address currently on file with Prime Trust for the purposes of acting on an Authorized Instruction from an Authorized Person.

**2.3   Joint Accounts.** In the case of a joint Account, each person with an interest in the Account, who is a Party to this Agreement, is considered an Account Holder. The obligations and agreements applicable to each part to a joint Account under this Agreement shall be deemed to be joint and several.

**2.4   Acknowledgements.** Account Holder acknowledges that:

(a) Account Holder is an "Entitlement Holder" in a "Financial Asset," as defined by, and for purposes of, the Uniform Commercial Code, including Article 8 thereto, as adopted and implemented in accordance with Nevada law ("**UCC**"). Applicable Custodial Property are "Financial Assets" for purposes of the UCC and are not assets of Prime Trust.

(b) Account Holder is solely responsible for, and Prime Trust has no involvement in, determining whether any investment, investment strategy, or related transaction is appropriate for Account Holder. Prime Trust will have no duty or responsibility to review or perform due diligence on any investments or transactions and will make no recommendation of investments or transactions, nor supervise any such investments or transactions. You will perform your own due diligence on all investments and take sole responsibility for all decisions made for your Account.

(c) Prime Trust does not provide any valuation or appraisals of Custodial Property, nor does it hire or seek valuations or appraisals on any Custodial Property; provided, however, that Prime Trust may, at its option and with no obligation or liability, to the extent reasonably available for any particular asset, make available recent price quotes or value estimates from various third-party sources, including stock exchanges and alternative trading systems registered with the Securities and Exchange Commission, digital asset exchanges, and real estate websites. Prime Trust will not attempt to verify the validity, accuracy or reliability of any such third-party valuation, valuation estimates or price quotes (collectively, "**Valuation Data**") and you agree that Prime Trust will have no liability in connection with any such Valuation Data, including for any unreliable, inaccurate, or misleading information. Any

Valuation Data provided to you is furnished for general information purposes only, and should not be relied upon as a definitive determination of the market value of any Custodial Property, nor should such Valuation Data be used for tax reporting purposes. You understand and agree that you should engage an independent financial advisor, appraiser, or valuation firm in order to obtain a formal opinion or financial advice regarding the value of any Custodial Property.

(d) Prime Trust has no control over, and is not responsible or liable for, any services or technology supporting or used in connection with any Custodial Property, Service Provider, Authorized Integrator platform, or the markets in which Custodial Property is purchased, sold or otherwise traded, and any Custodial Property, Service Provider (defined below), Authorized Integrator platform or such markets, and any such services or technology, may be susceptible to, or limited or compromised by, errors, technology flaws or defects, viruses or other malicious code, manipulations, hacks, other attacks, outages, and other interruptions and limitations. For the purposes of this Agreement, "**Service Provider**" means any unaffiliated third-party entity retained by Prime Trust to provide any of the Services on behalf of Prime Trust to the Account Holder.

(e) The custody of Digital Assets is generally subject to a high degree of risk, and the nature of Digital Assets may lead to an increased risk of technology flaws, fraud or attacks.

(f) Prime Trust does not control and makes no guarantee as to the functionality of any Blockchain's decentralized governance, which could, among other things, lead to delays, conflicts of interest, or operational decisions that may impact Account Holder and/or its Custodial Property.

(g) Advancements in cryptography could render current cryptography algorithms utilized by a Blockchain supporting a specific Digital Asset inoperative.

(h) The supply of Digital Assets available as a result of a Forked Network and Prime Trust's ability to deliver Digital Assets resulting from a Forked Network may depend on Service Providers and other third-party providers that are outside Prime Trust's control. Prime Trust does not own or control any of the protocols that are used in connection with Digital Assets and their related Digital Asset networks, including those resulting from a Forked Network. Accordingly, Prime Trust disclaims all liability relating to such protocols and any change in the value of any Digital Assets (whether on a Forked Network or otherwise), and makes no guarantees regarding the security, functionality, or availability of such protocols or Digital Asset networks. Account Holder accepts all risks associated with the use of the Services to conduct transactions.

(i) The price and liquidity of Digital Assets have fluctuated substantially in the past and may fluctuate substantially in the future, and such fluctuation may affect the value of your Account, including a total loss of the value of Digital Assets. The value of your Account will be solely dependent upon the performance of Custodial Property.

(j) Digital Assets held in Accounts are not entitled to deposit insurance protection by the FDIC. Assets held in Accounts are not insured by Prime Trust insurance policies and are not entitled to protection afforded to customers under the Securities Investor Protection Act of 1970, as amended.

(k) Subject to Applicable Law, Digital Assets are not legal tender and are not backed by any government.

(l) Changes in Applicable Law may adversely affect the use, transfer, exchange, and value of Custodial Property.

(m) Transactions in Custodial Property may be irreversible, and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

(n) Some Digital Asset transactions will be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction was initiated.

(o) The value of Digital Assets may be derived from the continued willingness of market participants to exchange Fiat Currencies or Digital Assets for Digital Assets, which may result in the potential for permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

(p) There is no assurance that a person who accepts Digital Assets as payment today will continue to do so in the future.

(q) Due to the volatility and unpredictability of the price of Digital Assets relative to Fiat Currencies, trading and owning Digital Assets may result in significant loss over a short period of time.

(r) The nature of Digital Assets means that technological difficulties experienced by Prime Trust may prevent the access to or use of Account Holder's Digital Assets. In addition, access to or transfers of Digital Assets may be delayed due to security protocols, time-zone differences, communication technology delays or fails, and/or enhanced internal compliance reviews.

(s) All instructions for the purchase and sale of securities and/or Digital Assets will be executed through one or more broker-dealers or exchanges selected by either you or another Authorized Person, or by Prime Trust, as an accommodation (and not in any capacity as a broker-dealer), and Prime Trust is hereby authorized to debit your account for any Fees associated with such transaction(s) and remit those to the executing party.

(t) With respect to Custodial Assets that are not securities, Account Holder acknowledges and agrees that: (i) Prime Trust does not have access to every market or exchange which a particular product or financial instrument may be traded and Prime Trust makes no representation regarding the best price execution of any instructions; (ii) other orders may trade ahead of Account Holder's order and exhaust available volume at a posted price; (iii) exchanges, market makers or other types of sellers or purchasers may fail to honor posted or otherwise agreed-upon prices; (iv) exchanges may reroute customer orders out of automated execution systems for manual handling (in which case, execution may be substantially delayed); (v) system delays by exchanges or third parties executing instructions may prevent Account Holders order from being executed, may cause a delay in execution or not to be executed at the best posted price or at all; and (vi) Prime Trust may not promptly or in a timely manner execute Account Holder order(s) due to internal delays, and Prime Trust makes no representation that its Services are in any way suitable for active trading or any activity requiring prompt or exact execution. The Account is not a brokerage account. Transactions may be subject to additional Fees and charges by Prime Trust or any Service Provider or exchange.

(u) As between you and Prime Trust, Prime Trust owns the Services and any improvements or modifications to the Services, and all intellectual property rights therein. All suggestions, comments, feedback, data (including metadata), insights, ideas or know-how, in any form, regarding the Service (including any of its functionality), including those derived from our monitoring and analysis of your use of the Service will be the sole property of Prime Trust. To the extent you have or obtain any right, title or interest in such feedback, you hereby assign to Prime Trust all right, title and interest to such feedback (including any intellectual property rights therein) and agree to perform such further acts as may be reasonably necessary to evidence such assignment.

## 3.   REPRESENTATIONS AND WARRANTIES

**3.1**   Account Holder represents, warrants, and covenants at all times while this Agreement is in effect:

(a) if an entity, Account Holder is validly organized or formed, as applicable, and in good standing in accordance with Applicable Law and has all requisite authority to enter into this Agreement and perform its obligations hereunder;

(b) it has all rights, power, and, if an entity, authority necessary to enter into this Agreement and perform its obligations hereunder;

(c) its entry into, and performance of its obligations under, this Agreement, and Prime Trust's exercise of its rights in accordance with this Agreement, will not conflict with, or result in a breach or violation of, any term or provision, or constitute a default under, any agreement by which it is bound or any Applicable Law;

(d) it will comply with all Applicable Law including the BSA and all other Applicable Laws related to AML, KYC, counter-terrorist financing, sanctions requirements, in performing its obligations in accordance with this Agreement;

(e) it will: (i) fully satisfy Prime Trust's information requests and other requirements, including those relating to Authorized Persons or Custodial Property, and keep current any provided information; (ii) notify Prime Trust if the Account Holder becomes a target of any action, investigation or prosecution related to this Agreement, the Services, or Custodial Property; and (iii) provide Prime Trust full cooperation in connection with any inquiry or investigation of Prime Trust made or conducted by any U.S. federal or state authority. Prime Trust shall have no obligation to provide the Services if Account Holder or any Authorized Person(s) fail to comply with the foregoing to Prime Trust's satisfaction;

(f) the appointment of Prime Trust and the execution of the terms outlined in this Agreement by Account Holder will not violate any Applicable Law;

(g) Account Holder owns, and will at all times own, all Custodial Property, free and clear of all liens and encumbrances (other than those granted to Prime Trust in accordance with this Agreement or as otherwise created by applicable U.S. federal or state securities laws);

(h) neither Account Holder nor any other Authorized Person is, nor is directly or indirectly owned or controlled by, any person or entity (i) included on the Specially Designated Nationals and Blocked Persons or the Consolidated Sanctions List maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**") or any similar list maintained by any government entity from time to time, or (ii) located, organized, or resident in a country or territory that is the target of sanctions imposed by OFAC or any government entity;

(i) Account Holder will not, and will not direct or permit its Authorized Persons to, direct the purchase, sale, or transfer of any Custodial Property which is (a) prohibited by Applicable Law, or (b) prohibited by Section 4975 of the Internal Revenue Code;

(j) if an individual, Account Holder is over the age of 18 and has all personal power or capacity to enter into this Agreement and perform its obligations hereunder; and

(k) that all information provided to Prime Trust in accordance with this Agreement is and will be complete, correct, current, and accurate in all respects. Account Holder will notify Prime Trust immediately in accordance with Section 15.3 if any such information, including Account Holder's email address on file with Prime Trust, is no longer complete, correct, current, and accurate in all respects.

## 4.  PRIVACY AND DATA POLICIES

To the extent permitted by Applicable Law and our privacy and data policies, Prime Trust may share information about you and your Account with affiliates and third parties. Account Holder agrees to Prime Trust's privacy and data policies, available at www.primetrust.com/privacy. Prime Trust may modify these policies at any time without prior notice of liability, and any modification will be effective following thirty (30) days after posting to Prime Trust's website.

## 5.  ELECTRONIC STATEMENTS

**5.1   Account Statements.** Account Holder agrees that Prime Trust will make current and prior Account statements available in electronic form only. Account Holder further agrees to access statements on the websites or applications

of the Authorized Integrator. Account Holder understands and agrees that Prime Trust will not provide Account Holder hard-copy statements.

**5.2    Monitoring Your Account.** As an Account Holder, you are responsible for monitoring your Account, including transaction confirmations and Account statements, and reviewing these documents to see that information about your Account is accurate. You agree to review your monthly statements and promptly notify Prime Trust of any unusual or unauthorized activity. You remain responsible for monitoring your Account and reconciling all balances, statements, and activity. You agree to notify Prime Trust immediately in accordance with Section 15.3 if there is any type of discrepancy or suspicious or unexplained occurrence relating to your Account, including any unauthorized transaction. If you fail to notify Prime Trust immediately, no Indemnitee (defined below) will be liable for any consequences. If, through any error, you have received property that is not rightfully yours, you agree to notify Prime Trust and return the property immediately. If Prime Trust identifies an error in connection with property you have received from or through Prime Trust and determine it is not rightfully yours, you agree that Prime Trust may take action to correct the error, which may include returning such property to the rightful owner.

## 6.  AUTHORITY TO PLEDGE; RIGHT TO SET-OFF; LIEN

Except as otherwise provided in this Section 6, Account Holder may not loan, hypothecate, pledge, or otherwise encumber any Custodial Property. Account Holder grants Prime Trust a right of set-off against, and lien on and security interest in the Custodial Property for the payment of any Fees and any other amounts due to Prime Trust under and in accordance with this Agreement.

## 7.  APPLICATION OF UCC

Except as otherwise provided under Applicable Law, the Parties agree the relationship between Prime Trust and Account Holder is governed by Article 8 of the UCC and that for the purposes of this Agreement: Account Holder is an "entitlement holder" and any Custodial Property will be treated as a "Financial Asset" within the meaning of Nevada Revised Statutes ("**NRS**") 104.8102(h) and (j).

## 8.  BOOKS AND RECORDS

Prime Trust will record on its books and records (including records of receipts, disbursements, and other transactions) all Custodial Property and will segregate Account Holder's Custodial Property from the Custodial Property of any other Account Holder, person, or entity, unless otherwise specified in an Authorized Instruction. Prime Trust will hold such records in accordance with Applicable Law. Upon commercially reasonable notice by Account Holder, Prime Trust will provide Account Holder copies of the books and records pertaining to Account Holder that are in the possession or under the control of Prime Trust.

## 9.  FEES

**9.1**    Account Holder will pay Prime Trust the Fees, if any, in connection with the Services. "**Fees**" means any monthly custody fee for Custodial Property, statement fee, third-party fee, and all other applicable fees and other charges as made available on Prime Trust's website and as may be modified from time to time. Changes to Fees will not affect any Fees for prior periods and will only be effective as of the date changes are published on Prime Trust's website. All Fees are payable no later than thirty (30) days after the Fee is incurred.

**9.2**    In the event that Prime Trust is charged any Fees (e.g., transfer agent fees, legal fees, accounting fees, tax preparation fees, notary fees, exchange fees, brokerage fees, bank fees, Blockchain settlement fees, etc.) by a third party in performing Services, Account Holder agrees to reimburse Prime Trust for such Fees at cost-plus 25% (excluding broker-dealer commissions).

## 10.  TERM AND TERMINATION

**10.1   Term.** This Agreement is effective as of the Effective Date, and will continue in full force and effect until terminated as provided herein (the "**Term**").

**10.2   Termination.** This Agreement may be terminated by either Party at any time upon thirty (30) days' prior written notice to the other Party; provided, however, that Prime Trust may immediately terminate this Agreement without notice in the event that: (i) Prime Trust becomes aware or has reason to believe that Account Holder may be engaged in illegal activity, has violated Applicable Law, or has breached its obligations under this Agreement; (ii) termination is deemed appropriate by Prime Trust to comply with Applicable Law; or (iii) Prime Trust terminates its agreement with an Authorized Integrator, in which case, Prime Trust, in its sole discretion, may choose to continue to provide Services to the Account Holder but will no longer accept Authorized Instructions using the Authorized Integrator platform under the terminated agreement.

**10.3   Termination of an Account Holder Service Provider Agreement.** In the event an Account Holder intends to terminate its Account Holder Service Provider Agreement, the Account Holder must provide thirty (30) days' prior written notice to Prime Trust in accordance with Section 15.3, which notice shall include the effective date of termination.  In the event of termination of the Account Holder Service Provider Agreement, Prime Trust will no longer accept Authorized Instructions using the Authorized Integrator platform.

**10.4   Effect of Termination.** Upon termination of this Agreement, Account Holder will pay Prime Trust all Fees and any other amounts due and owing hereunder.

**10.5   Obligations and Rights upon Termination.**

(a) **Return of Custodial Property**. Upon termination of this Agreement, Account Holder will provide Authorized Instructions regarding the disbursement of the Account Holder's Custodial Property and Prime Trust will, subject to Applicable Law, deliver Account Holder's Custodial Property in accordance with the Authorized Instructions. A Digital Asset will be deemed to have been delivered to Account Holder when a transfer of the Digital Asset initiated by Prime Trust has received a reasonable number of confirmations on the relevant Blockchain, or an alternative method has been mutually agreed between Prime Trust and Account Holder. To the extent Account Holder is unable to transfer Digital Assets out of the Account due to insufficient gas or network fees necessary for the transfer, Account Holder agrees to and abandons and forfeits any claims to such Digital Assets upon closure of the Account.  Upon termination of this Agreement, Prime Trust will deliver other Custodial Property to Account Holder as soon as practicable or, at Account Holder's request, to a successor custodian. Account Holder acknowledges that Custodial Property, if any, held in Prime Trust's name requires a reasonable amount of time to be delivered. Upon delivery of Custodial Property, Prime Trust's responsibility under this Agreement ceases.

(b) **Death or Incompetency of Account Holder**. Upon the death or incompetency of Account Holder, Prime Trust will continue to hold Custodial Property until such time Prime Trust receives instructions from Account Holder's executor, trustee, administrator, guardian, or person holding a valid power of attorney in accordance with the probate process or otherwise in accordance with Applicable Law and has received advice of its legal counsel to transfer such Custodial Property (which costs will be borne by Account Holder). In the event that no beneficiaries claim this Account, then the assets may be preserved in the Account for so long as possible, until a beneficiary makes itself known or until the Custodial Property may be subject to escheat, as set forth in Section 10.5(c) below.

(c) **Escheat**. Account Holder acknowledges that, in accordance with Applicable Law, Custodial Property that is presumed abandoned, including following termination of this Agreement, may under certain circumstances escheat to the government of the applicable jurisdiction. Prime Trust will have no liability to Account Holder, its heirs, legal representatives, or successors and assigns, or any other person in connection with any Custodial Property that escheats by operation of law.

## 11.   TAXES

**11.1   Responsibility for Taxes.** Account Holder will be liable for all and any taxes, assessments, duties, and other governmental and similar charges ("**Taxes**") relating to any Custodial Property held on behalf of Account Holder or

any transaction related thereto, which are Account Holder's sole obligation to remit, unless otherwise mandated by Applicable Law. Account Holder will remit to Prime Trust the amount of any Tax that Prime Trust is required by Applicable Laws (whether by assessment or otherwise) to pay on behalf of Account Holder, or in respect of activity in the Account of Account Holder. In the event that Prime Trust is required by Applicable Law to pay any Tax on behalf of Account Holder, Account Holder will promptly transfer to Prime Trust the amount necessary to pay the Tax.

**11.2   Substitute Internal Revenue Service of the U.S. Department of the Treasury ("IRS") Form W-9.** Under penalties of perjury, Account Holder certifies that: (a) the tax identification number provided to Prime Trust by Account Holder is the correct and current taxpayer identification number for Account Holder; and (b) Account Holder is not subject to backup withholding because: (i) Account Holder is exempt from backup withholding; or (ii) Account Holder has not been notified by the IRS that it is subject to backup withholding. Account Holder agrees to immediately inform Prime Trust in writing if it has been, or at any time in the future is notified by the IRS that Account Holder is subject to backup withholding. Account Holder acknowledges that failing to provide accurate information may result in civil penalties.

## 12.   DISCLAIMERS

**12.1**   ACCOUNT HOLDER'S ACCESS TO AND USE OF THE SERVICES ARE AT ACCOUNT HOLDER'S OWN RISK. THE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE," WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PRIME TRUST EXPLICITLY DISCLAIMS ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF THE COURSE OF DEALING OR USAGE OF TRADE. The Parties further acknowledge and agree that Prime Trust has no obligation to inquire into, and will not be liable for any damages or other liabilities or harm to any person or entity relating to: (i) the ownership, validity or genuineness of any Custodial Property; (ii) the authority of any Authorized Person to act on behalf of Account Holder with respect to Custodial Property; (iii) the accuracy or completeness of any information provided by Account Holder or any other Authorized Person with respect to a Custodial Property or an Authorized Instruction; or (iv) the collectability, insurability, effectiveness, marketability, or suitability of any Custodial Property. Account Holder additionally understands and agrees that Prime Trust must follow the directions of Account Holder, is considered by this Agreement to be a "directed fiduciary" in accordance with NRS 163.5548 and will be released and held harmless for following the directions of Account Holder in accordance with NRS 163.5549. Account Holder understands and agrees that Account Holder is considered by this Agreement to be a Directing Trust Adviser in accordance with NRS 163.5536 and has the authority to give directives to Prime Trust that must be followed by Prime Trust.

**12.2**   EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, PRIME TRUST MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHETHER EXPRESS, IMPLIED (EITHER IN FACT OR BY OPERATION OF LAW). PRIME TRUST EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, TITLE, AND NON-INFRINGEMENT. NO AUTHORIZED INTEGRATOR HAS BEEN AUTHORIZED BY PRIME TRUST NOR HAS THE AUTHORITY TO MAKE REPRESENTATIONS OR WARRANTIES ON PRIME TRUST'S BEHALF. PRIME TRUST DOES NOT WARRANT AGAINST INTERFERENCE WITH THE USE OF THE SERVICES OR AGAINST INFRINGEMENT. PRIME TRUST DOES NOT WARRANT THAT THE SERVICES OR SOFTWARE ARE ERROR-FREE OR THAT OPERATION OR DATA WILL BE SECURE OR UNINTERRUPTED. PRIME TRUST EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY ARISING OUT OF THE FLOW OF DATA AND DELAYS ON THE INTERNET, INCLUDING FAILURE OR DELAY TO SEND OR RECEIVE ANY ELECTRONIC COMMUNICATIONS (e.g., EMAIL). ACCOUNT HOLDER DOES NOT HAVE THE RIGHT TO MAKE OR PASS ON ANY REPRESENTATION OR WARRANTY ON BEHALF OF PRIME TRUST TO ANY THIRD PARTY.

## 13.   LIMITATION OF LIABILITY; INDEMNIFICATION

**13.1   Disclaimer of Liability and Consequential Damages.** PRIME TRUST AND PRIME TRUST'S AFFILIATES AND ITS AND THEIR OFFICERS, DIRECTORS, MEMBERS, SHAREHOLDERS, EMPLOYEES,

AGENTS, SUCCESSORS, AND ASSIGNS (COLLECTIVELY, THE "**INDEMNITEES**") SHALL NOT BE LIABLE FOR ANY ACTION TAKEN OR OMITTED BY ANY INDEMNITEE UNLESS AS A RESULT OF ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN EACH CASE AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION. INDEMNITEES SHALL NOT BE LIABLE FOR ANY ACTION TAKEN OR OMITTED BY ANY SERVICE PROVIDER OR OTHER THIRD PARTY. PRIME TRUST'S SOLE RESPONSIBILITY SHALL BE FOR PROVIDING THE SERVICES IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT. PRIME TRUST SHALL HAVE NO IMPLIED DUTIES OR OBLIGATIONS AND SHALL NOT BE CHARGED WITH KNOWLEDGE OR NOTICE OF ANY FACT OR CIRCUMSTANCE NOT SPECIFICALLY SET FORTH HEREIN. YOU HEREBY ACKNOWLEDGE AND AGREE, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, THAT PRIME TRUST WILL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO YOU FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE SERVICES OR ANY TRANSACTION OCCURRING IN ACCORDANCE WITH THIS AGREEMENT, INCLUDING LOST REVENUE OR PROFITS OR LOSS OF BUSINESS OR LOSS OF DATA, EVEN IF PRIME TRUST HAS BEEN ADVISED, HAD REASON TO KNOW, OR IN FACT KNEW OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF SUCH ACTION. THIS INCLUDES ANY LOSSES OR PROBLEMS OF ANY TYPE RESULTING FROM INCIDENTS OUTSIDE OF PRIME TRUST'S DIRECT CONTROL, INCLUDING ERRORS, HACKS, THEFT, OR ACTIONS OF ISSUERS, TRANSFER AGENTS, SMART CONTRACTS, BLOCKCHAINS AND INTERMEDIARIES OF ALL TYPES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING PROVISIONS, EACH INDEMNITEE SHALL BE EXCUSED FROM FAILING TO ACT OR DELAY IN ACTING IF SUCH FAILURE OR DELAY IS CAUSED BY ANY FORCE MAJEURE EVENT (DEFINED BELOW), INCLUDING LEGAL OR GOVERNMENTAL CONSTRAINT, INTERRUPTION OF TRANSMISSION OR COMMUNICATION FACILITIES, UNAVAILABILITY OF THE INTERNET, EQUIPMENT FAILURE, WAR, TERRORIST ACTS, EMERGENCY CONDITIONS OR OTHER CIRCUMSTANCES BEYOND THE INDEMNITEE'S CONTROL. THESE TERMS SHALL SURVIVE ANY TERMINATION OF THIS AGREEMENT.

**13.2    Cap on Liability.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, ACCOUNT HOLDER HEREBY ACKNOWLEDGES AND AGREES UNDER NO CIRCUMSTANCES WILL INDEMNITEES' TOTAL LIABILITY OF ANY AND ALL KINDS ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING WARRANTY CLAIMS), REGARDLESS OF THE FORM AND REGARDLESS OF WHETHER ANY ACTION OR CLAIM IS BASED ON CONTRACT, TORT, NEGLIGENCE OR OTHERWISE, EXCEED THE GREATER OF $500.00 OR THE TOTAL AMOUNT OF FEES PAID, IF ANY, BY ACCOUNT HOLDER TO PRIME TRUST IN ACCORDANCE WITH THIS AGREEMENT DURING THE 12-MONTH PERIOD PRIOR TO THE OCCURRENCE OF THE EVENT GIVING RISE TO SUCH LIABILITY.

**13.3    Indemnification.** Account Holder hereby agrees to indemnify, protect, defend, and hold harmless the Indemnitees from and against any and all claims, demands, obligations, losses, liabilities, damages, regulatory investigations, recoveries and deficiencies (including interest, penalties and attorneys' fees, costs, and expenses), which an Indemnitee may suffer arising out of or relating to: (i) this Agreement; (ii) any breach, action, or regulatory investigation arising from your failure to comply with Applicable Law and/or arising out of any alleged misrepresentation, misstatement, omission of fact, or inaccuracy in the representations and warranties and/or in your interactions with Prime Trust, or breach, non-fulfillment or default in the performance of any of the conditions, covenants and agreements, of Account Holder contained in this Agreement or in any certificate or document delivered by Account Holder or any Authorized Person(s) or other agent(s) or in any Authorized Instruction in accordance with any of the provisions of this Agreement; (iii) any breach, action or regulatory investigation arising from Account Holder's failure to comply with any state blue sky laws or other applicable securities laws, and/or arising out of any alleged misrepresentations, misstatements or omissions of material fact in the Account Holders' offering memoranda, general solicitation, advertisements and/or other offering documents; (iv) any obligation which is expressly the responsibility of Account Holder in accordance with this Agreement; (v) any loss or damage to any third party, direct or consequential, arising out of or in any way related to acts or omissions of any Indemnitee relating to the Services; (vi) any damages or claims resulting from equipment, software, or network malfunctions or interruptions outside of any Indemnitee's control; or (vii) any misuse of the Services by an Authorized Person or through an Authorized Instruction.

**13.4    Limitation on Prime Trust's Duty to Litigate.** Without limiting the foregoing, Prime Trust will not be under any obligation to defend any legal action or engage in any other legal proceedings with respect to the Account or any property of the Account unless Prime Trust is indemnified to Prime Trust's satisfaction. Notwithstanding anything in this Agreement to the contrary (including Section 13.2 and Section 13.3), Prime Trust is authorized and empowered to consult with its counsel of its choice in reference to the Account and to retain counsel and appear in any action, suit, or other proceeding affecting the Account or any of the property of the Account. All fees and expenses so incurred will be for the Account and shall be charged to the Account.

**13.5    Third-Party Claims.** Account Holder agrees to bear sole responsibility for the prosecution, defense, or enforcement of any judgment, including the employment of legal counsel, of any and all legal actions or suits involving the Account, which may arise or become necessary for the protection of the investments in that Account, including any actions lodged against Prime Trust. However, Prime Trust, in its sole discretion, may, upon notice to Account Holder, participate in, or assume and control, the prosecution or defense, or enforcement of any judgment of such legal actions or suits, at Account Holder's expense.

## 14.   ARBITRATION

Any dispute, potential claim, question, or disagreement arising from or relating to this Agreement or the breach thereof (collectively, a "**Dispute**"), will be finally settled by binding arbitration administered by the American Arbitration Association in Clark County, Nevada. Account Holder consents to this method of dispute resolution, as well as jurisdiction, and consent to this being a convenient forum for any such Dispute and waives any right it may have to object to either the method or jurisdiction for such Dispute. In the event of any Dispute between the Parties, the prevailing Party shall be entitled to recover damages plus reasonable costs and attorney's fees. The decision of the arbitrator shall be final, binding, and enforceable in any court. For the avoidance of doubt, Account Holder hereby waives any right to trial by jury in any lawsuit, action, proceeding, or counterclaim arising out of this Agreement. Account Holder agrees that it will not bring or participate in any putative or certified class action.

## 15.   GENERAL PROVISIONS

**15.1    No Third-Party Beneficiaries.** This Agreement is not intended to and will not be construed to give any third party, including, for the avoidance of doubt, any Authorized Integrator or Service Provider, any interest or rights (including any third-party beneficiary rights) with respect to or in connection with any agreement or provision contained herein or contemplated hereby, except as otherwise expressly provided in this Agreement.

**15.2    Force Majeure.** Prime Trust will not be liable to any extent to Account Holder, including for any costs or expenses, for any failure to perform or delay in the performance by Prime Trust or any Service Provider, in each case, of its obligations under this Agreement to the extent such failure or delay is caused by or results from a Force Majeure Event. For the purposes of this Agreement, a "**Force Majeure Event**" means an event caused by a circumstance beyond Prime Trust's reasonable control, including natural catastrophes, fire, flood, earthquake, explosion, pandemic or local epidemic, war, hostilities, or other action by a state actor, public power outages, civil unrests and conflicts, labor strikes or extreme shortages, acts of terrorism or espionage, supply shortages, interruptions or delays in transportation or communications, Domain Name Server issues outside Prime Trust's direct control, technology attacks, cyberattack or malfunction on the Blockchain network or protocol, or governmental action rendering performance illegal or impossible.

**15.3    Notices.**

(a) All notices required or permitted in accordance with this Agreement will be in writing and delivered by courier or electronic mail (except for service of legal process, which will be by courier). Any notice or other communications Prime Trust sends in accordance with this Section 15.3 will be deemed to have been delivered, whether you actually receive them or not: (i) if sent by email or any other SMTP delivery service chosen by Prime Trust, when sent; and (ii) if sent to a physical address by courier, when delivered to such address.

(b) Notices will be delivered to the addresses on record, which:

(i) if to Prime Trust will be to by email to support@primetrust.com; if by courier, to:

Prime Trust, LLC330 S. Rampart Blvd.Las Vegas, NV, 89145

(ii) if to Account Holder, to the email address or physical address on file for your Account. A Party's email addresses or physical address may be changed from time to time by either Party by providing written notice to the other in the manner set forth above.

**15.4    Execution in Counterparts and by Electronic Means.** This Agreement may be executed in counterparts and by electronic means, and the Parties agree that such electronic means and delivery will have the same force and effect as delivery of an original document with original signatures.

**15.5    Entire Agreement.** This Agreement includes any exhibits, schedules, and attachments referenced herein, all of which are incorporated herein by this reference. This Agreement is the final, complete, and entire agreement of the Parties. This Agreement supersedes any prior written agreements or oral agreements between the Parties.

**15.6    Amendments.** This Agreement may be amended or otherwise modified by Prime Trust in its sole discretion at any time. Such amendments or modifications will be effective thirty (30) days after Account Holder receives notice of such revision electronically via the email address for the Account shown on the records of Prime Trust.

**15.7    Remedies Cumulative.** Prime Trust will have all of the rights and remedies provided by Applicable Law in addition to the rights and remedies set forth in this Agreement. All of Prime Trust's rights and remedies are cumulative and may be exercised from time to time, and the pursuit of one right or remedy will not constitute an exclusive election or otherwise preclude or limit its pursuit of any other or additional right or remedy.

**15.8    Severability.** Any provision of this Agreement that is determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. In such case, such provision will be interpreted to accomplish the objectives of the provision to the greatest extent possible under Applicable Law.

**15.9    Assignment.** Account Holder may not assign, or otherwise transfer, including by operation of law, any of its rights, obligations, or performance under this Agreement. Any such attempted transfer by Account Holder will be void. For the avoidance of doubt, Prime Trust may assign, hypothecate, or otherwise transfer, including by operation of law, any of its rights, obligations, or performance under this Agreement at any time without notice to Account Holder.

**15.10    Use of Affiliates and Service Providers.** Prime Trust may provide Services through any affiliate or Service Provider as directed by Prime Trust from time to time.

**15.11    No Waiver of Contractual Right.** The failure of Prime Trust to enforce any provision of this Agreement will not be construed as a waiver or limitation of Prime Trust's right to subsequently enforce and compel strict compliance with every provision of this Agreement. A waiver or consent given on one occasion is effective only in that instance and will not be construed as a bar to or waiver of any other right on any other occasion.

**15.12    Non-Exclusivity.** Nothing in this Agreement will limit or restrict Prime Trust from providing services to any other person, including any services that are similar or identical to some or all of the Services.

**15.13    Governing Law.** This Agreement is governed by, and construed exclusively in accordance with, the laws of the State of Nevada, without regard to its conflicts of laws provisions or rules.

**15.14    Survival.** Any expiration or termination of this Agreement will not affect any accrued claims, rights or liabilities of Prime Trust, and all provisions which must survive to fulfill their intended purposes, or by their nature are intended to survive such expiration or termination will survive, including Section 3, Section 9, Section 10, Section 11, Section 12, Section 13, Section 14, and this Section 15.

**15.15    Interpretation.** All pronouns and any variation thereof will be deemed to refer to the all persons, and to the singular or plural, as the identity of the person or persons may require for proper interpretation of this Agreement. The section headings in this Agreement are intended solely for convenience of reference and will be given no effect in the construction or interpretation of this Agreement.

## EXHIBIT 3: ENABLED ESCROW OPTION AND ACCOUNT BALANCES

11/23/22, 1:57 PM                                    Me - MyConstant

MyConstant is unable to continue to operate as usual. As such, we're pausing customer withdrawals as allowed under our Terms of Service. No deposit or investment request will be processed at this time.

We understand this will be a worrying time. For further questions, please feel free to contact our team or keep an eye on our updates on this page.

Invest ▾      Borrow ▾      Spend ▾      Accounts      About ▾
                            & NFT

**Get started**
(KYC & LINK BANK ACCOUNT)

# Your account details

**Settings**

Account settings

SS

Email
a.n.shyamsundar@gmai

Notification settings

Max file size is 5MB

What should we call you?
**A.N.SHYAMSUNDAR**

**Security**

Account security

Save

Save

Login activities

Saved wallet addresses

Old password                    👁

**NFT**

Rewards

New password                    👁

Collection  NEW

**History**

Change password

Overview

Deposits

Withdrawals

Transfers

# Your account number

Open Orders

▇▇▇▇ 1770

Interest

11/23/22, 1:57 PM                                                    Me - MyConstant

Lottery Tickets

Crypto Swap

MCT Airdrop  Invest ▾     Borrow       Membership ▾

MCT Staking

MCT Prize Wheel

## Earn 4% APY on your balance with Instant-access investing

**Your balance at Prime Trust:** 0 ❷

**What would you like to do with your balance?** ❷

Earn 4% APY through Instant-access investing

Your balance is <mark>escrowed</mark> with Prime Trust and insured to $130,000,000.

## Crypto Lend – earn up to 12.5% APR on your idle cryptos

**Which cryptocurrency would you like to update?**

◆ Tether  USDT12.5% APY ▾

**Pay interest in:**

◆ USDT
(12.5% APY) ❷

Save

**MyConstant**    **Invest**       **Borrow**       **About us**

Deposit USD



11/18/22, 1:02 AM

Me - MyConstant

MyConstant is unable to continue to operate our business as usual. As such, we're pausing customer withdrawals as allowed under our Terms of Service. No deposit or investment request will be processed at this time. For further questions, please feel free to **contact** our Client Success team.

Borrow ▼     Speed ▼     Membership & NFT ▼     Accounts     About ▼



**Get started**
(KYC & LINK BANK ACCOUNT)

**Settings**
Account settings

Notification settings

**Security**
Account security

Login activities

Saved wallet addresses

**NFT**
Rewards

Collection (NEW)

**History**
Overview

Deposits

Withdrawals

Transfers

Open Orders

Interest

## Your account details

LN

Max file size is 5MB

Save

Email
lathanaru@gmail.com

What should we call you?
**lathanaru**

Save

Old password 👁

New password 👁

Change password

## Your account number

████ 4284

Lottery Tickets

Crypto Swap

MCT Airdrop

MCT Staking

MCT Prize Wheel



## Earn 4% APY on your balance with Instant-access investing

**Your balance at Prime Trust:** 0

**What would you like to do with your balance?**

Earn 4% APY through Instant-access investing

Your balance is escrowed with Prime Trust and insured to $130,000,000.

## Crypto Lend – earn up to 12.5% APR on your idle cryptos

**Which cryptocurrency would you like to update?**

Tether  USDT12.5% APY

**Pay interest in:**

USDT (12.5% APY)

Save



MyConstant alternative logo

**Invest**

Deposit USD

**Borrow**

**About us**

**Help & Sup**

Email





## EXHIBIT 4: PRIME TRUST'S PUBLIC REPRESENTATIONS

**Swan Bitcoin Client Services** ✓ Ⓑ @SwanBitcoin · Nov 15, 2022  𝕏 ···
1/ Last week a large off-shore crypto exchange, FTX, went bankrupt.

We've received inquiries from Swan members wondering if the FTX fallout might affect us.

Your Bitcoin is safe.

💬 10          🔁 20          ♡ 158          ılıl                    🔖  ⬆️

**Swan Bitcoin Client Services** ✓ Ⓑ @SwanBitcoin · Nov 15, 2022  𝕏 ···
2/ Neither Swan nor Prime Trust engages in any lending or borrowing services, nor rehypothecation of customer assets.

💬 3          🔁 1          ♡ 35          ılıl                    🔖  ⬆️

🔁 **PrimeTrust reposted**

**Swan Bitcoin Client Services** ✓ Ⓑ                                        ···
@SwanBitcoin

3/ Prime Trust is a licensed and regulated trust company and custodian located in the USA and is subject to US laws, unlike FTX. The trust structure legally requires that your funds are held separately from company funds, and solely in your name.

> 🔷 **PrimeTrust** @PrimeTrustCo · Nov 11, 2022
> Replying to @PrimeTrustCo
> Your assets belong ONLY to you. All assets held on behalf of customers are tracked via an audited ledger and earmarked for each customer. This means customers' assets will always be owned by and available to that customer. Customer funds and corporate funds are kept separate.

4:47 PM · Nov 15, 2022

💬 3          🔁 7          ♡ 29          🔖 1                    ⬆️

## EXHIBIT 5: COMMUNICATIONS BETWEEN CREDITORS AND PRIME TRUST



**A N Shyamsundar**
Dec 8, 2022, 16:58 PST

Hello,

I am writing to report a theft of my funds through your client, MyConstant. They have illegally appropriated my funds to make reckless bets on crypto market without my authorization. And this is despite the escrow option with Prime Trust enabled through MyConstant's account. Further, they have illegally transferred my funds to MyConstant's sister company, Autonomous Labs Inc. through Duy Huynh, the founder of both of these companies.

This is a criminal case, and would be a felony offense in Texas. My understanding is that it was Prime Trust's job to guard my funds against theft, and here your client has directly stolen my money. DFPI also mentioned that they are an unlicensed entity operating in California. Does Prime trust do its due diligence on the kind of clients it accepts?

What can Prime Trust do to get my money back?

Please let me know.

Shyam

---



**Logan** (Prime Trust- Customer Success)
Dec 8, 2022, 17:18 PST

Hello,

Thank you for reaching out. For questions regarding your MyConstant account/transactions, please contact their Support Team directly by emailing them at hello@myconstant.com.  A member of their team will be more than happy to assist you.

We also have a FAQ on MyConst here: https://support.primetrust.com/hc/en-us/articles/10743893427739-MyConstant-FAQ-

Please note that Prime Trust cannot comment directly on end user accounts. We apologize for any inconvenience this may cause, but we greatly appreciate your understanding.

Respectfully,

Logan



330 S. Rampart, Suite 260
Summerlin, NV 89145



**Shyam Sundar Aswadha Narayanan** <a.n.shyamsundar@gmail.com>
to Prime ▾

Dec 8, 2022, 8:01 PM (7 days ago)   ☆   ↩   ⋮

Hi Logan,

Your client, MyConstant, does not even respond. They are under investigation by DFPI (https://dfpi.ca.gov/2022/12/05/dfpi-announces-investigation-into-crypto-lending-company-myconstant/) and your client isn't even licensed to operate in California per the official finding

As a custodian, my understanding is that Prime Trust has a fiduciary duty to safeguard customer assets. Is my complaint even being taken seriously?

I only invested in MyConstant because of Scott Purcell, ex-CEO and founder of Prime Trust - he had publicly explained how Prime Trust guarantees funds' safety. What does Prime Trust have to say about it?

(https://web.archive.org/web/20220609042240/https://www.myconstant.com/blog/myconstant-building-a-financial-ecosystem-for-digital-assets/)

Shyam

---



**Logan** (Prime Trust– Customer Success)
Dec 8, 2022, 19:07 PST

Hello Shyam,

Please note that Prime Trust cannot comment directly on end user accounts/transactions. Our MyConst FAQ provides some responses to questions regarding the situation and what Primetrust is doing. https://support.primetrust.com/hc/en-us/articles/10743893427739-MyConstant-FAQ- . Any other inquiries related should be directed to the MyConst support Team. A previous communication from a MyConst representative has let PrimeTrust know they are are still responding to inquiries from end users.

We apologize for any inconvenience this may cause, but we greatly appreciate your understanding.

Respectfully,

Logan

 **Prime Trust**

330 S. Rampart, Suite 260
Summerlin, NV 89145

---



**Shyam Sundar Aswadha Narayanan** <a.n.shyamsundar@gmail.com>
to Prime ▾

Thu, Dec 8, 10:34 PM (7 days ago)   ☆   ↩   ⋮

Hi Logan,

Is there a reason as to why I can't get information pertaining to my own account? Is it because I am considered a third party by Prime Trust?

Shyam



**Shyam Sundar Aswadha Narayanan** <a.n.shyamsundar@gmail.com>    Fri, Dec 9, 12:21 PM (6 days ago)    ☆    ↰    ⋮
to Prime ▾

Hi Logan,

As some additional information, to my recollection, MyConstant never sent me or even showed me any terms and conditions as far as my Prime Trust account is concerned at the time when I signed up with them. Could you let me know what terms and conditions apply to my Prime Trust account, if any?

I looked at MyConstant's Terms of Service and I couldn't find the appropriate, relevant information. Can you please help?

Thank you,
Shyam

---



**Logan** (Prime Trust– Customer Success)
Dec 14, 2022, 15:09 PST

Hello Shyam,

After talking with our internal teams, I am able to provide the Account Agreement. Here is a secure link to the agreement.

https://drive.google.com/file/d/█████████████████████████
**This link will expire on 12/20/2022

Respectfully,

Logan

 **◊ Prime Trust**

330 S. Rampart, Suite 260
Summerlin, NV 89145

---



**Shyam Sundar Aswadha Narayanan** <a.n.shyamsundar@gmail.com>    Wed, Dec 14, 6:21 PM (1 day ago)    ☆    ↰    ⋮
to Prime ▾

Logan,

I signed up for an account with MyConstant in the first half of 2020 and had been making deposits even before that. I did NOT sign anything on June 11, 2021 AT ALL. In fact, my accounts were through MyConstant and NOT directly with Prime Trust. How on the earth was this document even generated? It doesn't even have my signature on it. I am in a state of utter shock.

Second, Prime Trust sent a similar document to my mother and said this agreement was between MyConstant and Prime Trust. Can you please clarify what is going on?

Shyam



**Shyam Sundar Aswadha Narayanan** <a.n.shyamsundar@gmail.com>
to Prime

Wed, Dec 14, 6:52 PM (1 day ago)    ☆    ↩    ⋮

Just to clarify on my previous email that was written in a state of utter shock, by "similar document", I mean, they sent across a webpage with the user agreement with similar sounding contents as the document you sent me with the claim that "I signed them". Except that, in my mother's case, Prime Trust claimed the agreement was between Prime Trust and MyConstant.

This is NOT my signature. I'd really like to know what is going on behind the scenes.

Thanks,
Shyam



**Shyam Sundar Aswadha Narayanan** <a.n.shyamsundar@gmail.com>
to Prime

Dec 14, 2022, 8:07 PM (1 day ago)    ☆    ↩    ⋮

Logan,

As I mentioned in my previous email, there is no reason to believe that I signed or even saw this document on June 11, 2021. I have been a MyConstant customer since early 2020, when the Prime Trust account should have been created by MyConstant.

I have one more question: Tom Pageler was the CEO of Prime Trust on June 11, 2021 (He took over in January 2021, https://www.crowdfundinsider. com/2021/01/171688-prime-trust-changes-tom-pageler-promoted-to-ceo-scott-purcell-named-ceo-of-holding-company-prime-core-technologies/) and remained Prime Trust's CEO until November 29, 2022  (https://www.crowdfundinsider.com/2022/11/199278-prime-trust-changes-leadership-tom-pageler-out-as-ceo-jor-law-steps-in-as-interim-ceo/)

How did Scott Purcell, Prime Trust's ex-CEO come into picture here in the agreement? Also, at the time when the document was allegedly signed, I am not even normally awake. I would like to request an audit of the signature trail on this document to prove that it was indeed me who signed it. Can you please go ahead with this process?

Shyam

12/17/22, 7:33 PM                                          Gmail - (no subject)

 Gmail                                LATHA NARAYANAN <lathanaru@gmail.com>

**(no subject)**
1 message

**noreply@api.primetrust.com** <noreply@api.primetrust.com>          Sat, Dec 17, 2022 at 7:33 PM
To: lathanaru@gmail.com

## PrimeTrust

### **Account Does not Exist**

You are receiving this e-mail because you requested a password
reset, but your email address is not associated with an existing
account.

---

12/17/22, 3:41 PM                                          Gmail - (no subject)

 Gmail                         Shyam Sundar Aswadha Narayanan <a.n.shyamsundar@gmail.com>

**(no subject)**
1 message

**noreply@api.primetrust.com** <noreply@api.primetrust.com>          Sat, Dec 17, 2022 at 3:40 PM
To: a.n.shyamsundar@gmail.com

## PrimeTrust

### **Account Does not Exist**

You are receiving this e-mail because you requested a password
reset, but your email address is not associated with an existing
account.