IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Prime Core Technologies, Inc. *et al[1].*, | ) | Case No. 23-11161 (JKS) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Re: D.I. 919, 920, 922** |

**OBJECTION OF COINBITS, INC. TO PLAN ADMINISTRATOR'S
MOTION FOR DETERMINATION**

Coinbits, Inc. ("Coinbits"), by its undersigned counsel, hereby files this objection (the "Objection") to the *Plan Administrator's Motion for Determination* [D.I. 919] (the "Motion"), and respectfully represents as follows:

1. Upon information and belief, Coinbits, as an account holder, together with other account holders that are customers of Coinbits, represent approximately 1/3 of the Bitcoin (BTC) held in this Case. Based upon the Debtors' initial accounting and statements made throughout these Cases, BTC is segregated in a wallet and can be fully accounted for. Unfortunately, Coinbits can only state this "upon information and belief" as the Trust has not provided (or perhaps has not completed) its analysis.

2. Despite Coinbits active involvement in the Receivership and these Cases, it remains a mystery what has been accomplished by the Trust, if anything, regarding the goal that they were entrusted with – distributing property back to Customers as directed by the Nevada

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). Prime Core Technologies Inc.'s service address is 330 South Rampart Blvd., Suite 260, Las Vega, Nevada 89144.

1

state court.  As is more fully discussed below – the Debtor should focus on distributing property to Customers that have been denied their property for over a year and a half.

3. Province, was appointed as the Plan Administrator in December of 2023 and the Plan went effective on January 5, 2024.  Since then, Fireblocks, a third-party vendor, is holding the Customer's Cryptocurrency in trust.  As was disclosed at the December 19, 2023 Confirmation Hearing, the Debtors pre-paid for Fireblocks services for two years – thus the Trust is faced with a December 2025 deadline to distribute/or sell the Cryptocurrency held by Fireblocks without incurring additional substantial costs.

4. During the over one year period since the Plan Effective Date, it is unclear how much closer the Plan Administrator is to completing its assigned tasks.

5. One of the primary tasks of the Wind-down Debtor was to follow an Account Treatment Procedure filed with this Court on December 12, 2023, which provided a noticing procedure regarding any determination as to whether Currency constitutes Property of the Estate.  The procedures provide that after notice is provided to each Customer as to the determination:

> "the Wind-Down Debtor and such Customer shall meet and confer with respect to formulating a proposed scheduling order to govern, among other things, the date by which the Wind-Down Debtor will file a motion with the Bankruptcy Court with respect to the Account Treatment Issues for such Customer (an "Account Treatment Motion"), and dates and deadlines relating to discovery and the adjudication of the Account Treatment Motion."

6. Here, the Plan Administrator has apparently combined the Notice and the Account Treatment Motion while not complying with the safeguards of (i) a procedure that addresses each customer (for instance through individualized adversary proceedings) and (ii) the basic meet and confer requirement for each Customer that was provided for under the procedures.

7. The Determination Motion makes no distinction between different kinds of Currency[2] and Cryptocurrency. Not only does this raise due process concerns and is not in compliance with the procedure approved at the Confirmation Hearing, the Determination Motion reflects (i) an incomplete forensic analysis, (ii) a dangerous generalization of individualized property rights and (iii) a conflation of the legacy wallet event which only related to Ethereum (ETH) and not other types of Cryptocurrency – such as Bitcoin (BTC).

8. This incomplete and faulty analysis manifests throughout the Determination Motion, unjustly shifting the burden to thousands of account holders to prove otherwise. The below are only a few of the failures in the Trust's analysis:

(a) The Determination Motion represents that there was "commingling" across all cryptocurrencies. However, the fundamental technological reality is that BTC, ETH, and other blockchains operate as wholly separate ledgers. It is physically and technologically impossible to mix BTC (governed by an Unspent Transaction Output Model (UTXO) with ETH or Solana (both account-based models) in a single omnibus balance. Coinbits and its customers used only BTC, and there is no evidence to suggest that BTC was part of any alleged "commingling" with other assets. The practical barriers to merging funds across distinct blockchains render the commingling claim untenable for BTC. Consequently, any BTC deposits should be identifiable and distributable on a pro-rata basis among actual BTC depositors, rather than treated as if they were lumped together with unrelated assets on other chains.

(b) There is no evidence that BTC balances were in fact commingled with other cryptocurrencies within the Fireblocks infrastructure. Despite repeated requests, the

---

[2] The Plan Administrator states in footnote 2 that it has excluded Foreign Currency from this Motion and intends to use an adversary proceeding to address disputed ownership.

exact BTC balance maintained in Fireblocks has not been disclosed. This omission inevitably raises concerns about whether revealing that number would undermine the claim that BTC assets were somehow commingled with different blockchains' tokens. While omnibus wallets might have blurred certain aspects of internal accounting, that fact does not alter the unique on-chain identity of Bitcoin or negate the capacity for precise asset tracing and distribution.

(c) The Determination Motion posits that tracing assets is unworkable at scale, yet this argument loses force for Customers who deposited only BTC. The notion that it is "impossible" to reconcile transactions contradicts the fact that each BTC deposit was associated with a unique address, with every on-chain transaction (including sweeps) remaining visible in the publicly verifiable Bitcoin ledger. Even if the Debtor's internal ledger was poorly maintained or incomplete, the opposing sides of each transaction—both on-chain for BTC and at the banks for USD—could be traced and matched. Thus, especially for BTC, robust forensic analysis is not only possible but routinely performed in other corporate insolvencies, fraud, and money laundering investigations. If Customers can show they controlled the depositing addresses and that the Debtor contractually promised to segregate BTC for custody—rather than treat it as fungible "credit"—the crux of the trust relationship remains intact despite the platform's operational mishandling.

9. Additionally, the Plan Administrator's focus on liquidating cryptocurrency at the Petition Date exchange rate overlooks the significant price appreciation in the Bitcoin market since that date. Treating all cryptocurrency claims as if they were merely USD obligations effectively deprives account holders of the substantial gains in asset value that have accrued to

BTC since the Petition Date. If, as the Determination Motion insists, the goal is to maximize creditor recovery, it is unclear why the Plan Administrator has not considered distributing BTC in kind or updating valuations. Where certain Customers (such as those of Coinbits) only held USD and BTC in their Prime Trust accounts, their BTC should be carved out and returned without forcing liquidation at an exchange rate far below current prices. In kind transfers of cryptocurrency is the preferred method of honoring property rights and is being done in the leading cryptocurrency bankruptcy cases in the Second Circuit, removing the incentive of the estate and its professionals to capitalize on the increase in value of Cryptocurrency.[3]

10. The Determination Motion contains sweeping statements and generalizations that further indicate that the Plan Administrator has not spent the time to address specific customer relationships in its analysis. Courts typically look to a party's specific contract with its particular customer, not vague summaries that might overlook vital language about property rights and intended custody.

11. For instance the Determination Motion suggests that end users did not directly procure the Debtor's services because Know Your Customer procedures (KYC) were ostensibly handled by Integrators, but this conflicts with both the Debtor's Application Programing Interface Agreement (API) and the KYC documents showing Prime Trust's own policies and direct collection of personal identification (including photographs of IDs). Coinbits had direct experience with the Debtor's KYC processes for their customers (who used Coinbits to access their individualized accounts with the Debtor). In practice, that direct vetting and record-keeping

---

[3] See *The Bankruptcy Court as Crypto Market Regulator*, Yesha Yadav and Robert J. Stark, 98 S. Cal. L. Rev. (2024), 1534-1537 - ; See generally *Crypto Volatility and the Pine Gate Problem*, Casey, Gotberg & Macey, Harvard L. Rev. (2023).

demonstrates a real one-to-one relationship between the Debtor and its end users—especially those holding BTC.

12. While the Debtor may be able to assert that no trust relationship arose for certain fiat (USD) deposits, the public-facing statements and direct KYC obligations strongly suggest that BTC was treated differently. The Custodial Agreement not only invokes trust-related language but also states that the Debtor must segregate assets, thereby acknowledging an ongoing fiduciary responsibility with respect to customer BTC.

13. The Determination Motion's insistence that there was no genuine trust or fiduciary relationship (and that "crypto" was hopelessly commingled) conflicts with multiple documents stating that customers' BTC would be separately tracked and maintained, with the Debtor acting as a custodian.

14. The Account End User License Agreement that each Coinbits' customer had with the Debtor (EULA) is clear and unambiguous as to a trust relationship regarding digital assets. This combined with the KYC materials and the FAQ's assurances paints a very different picture than what the court was faced with in *In Re Celsius Network LLC*, 647 B.R. 631 (Bankr. NYSD 2023). In this Case, the custody provisions all speak to a direct and segregated holding arrangement—one that Customers relied upon when they allowed the Debtor to hold their property on their behalf.

15. Even if the platform internally commingled assets contrary to those promises, that breach does not negate the underlying representations or the nature of the relationship. Case precedent relating to treatment of bailments of fungible materials such as grain and produce all indicate that when the bailment is not currency "courts ordinarily look to the intention of the parties as manifested from the whole transaction, including the agreement itself, the conduct of

the parties, the surrounding circumstances, and, in appropriate cases, usage or custom." 78 Am. Jur. 2d. Warehouses 78 § 23.

16. The technology behind BTC, with its UTXO model and on-chain settlement, supports tracing BTC transactions, an exercise that is done routinely nowadays by mature blockchain analysis firms. Thus, the Determination Motion focuses on disclaimers, supposed "commingling" across blockchains (a technological impossibility), and omnibus operations, but legal documents including the EULA, integrator agreements, and the platform's own public statements reinforce an expectation that each Customer's BTC was intended to remain segregated and identifiable, in direct contrast to the notion that no trust or custodian relationship was ever intended. There is no evidence shown thus far that this Bitcoin is not in fact segregated, as there is no information provided about the Fireblocks wallets and their balances.

17. In summary, the Plan Administrator, facing both financial and timing challenges, is attempting to shift the burden to thousands of Customers that were expecting an individualized analysis of their EULA and account relationship as outlined in the Account Treatment Procedures.

**WHEREFORE**, for the reason set forth above, Coinbits respectfully requests that the Determination Motion be withdrawn so that the Debtors follow the Account Treatment Procedures contained in the Plan and the Court should grant such other further relief as is just and proper.

Date:   February 3, 2025
        Wilmington, Delaware

**THE ROSNER LAW GROUP LLC**

By: */s/ Frederick B. Rosner*
Frederick B. Rosner (DE 3995)
824 N. Market Street, Suite 810
Wilmington, Delaware 19801


Tel: (302) 220-1007
Email: rosner@teamrosner.com

David M. Neumann (0068747)
*dneumann@meyersroman.com*
Meyers, Roman, Friedberg & Lewis
28601 Chagrin Blvd., Suite 600
Cleveland, Ohio 44122
Telephone:  216-831-0042

*Counsel for Coinbits, Inc.*