## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Prime Core Technologies, Inc. *et al.*,[1] | ) | Case No. 23-11161 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 919** |
| | ) | **Obj. Deadline: February 5, 2025 at 4:00 p.m. (ET)** |
| | ) | **Hearing Date: February 14, 2025 at 10:00 a.m. (ET)** |
| | ) | |

### OBJECTION OF SDM, INC. TO PLAN ADMINISTRATOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE PLAN ADMINISTRATOR'S DETERMINATION THAT THE DEBTORS' ASSETS ARE PROPERTY OF THE BANKRUPTCY ESTATES; (II) APPROVING DISTRIBUTIONS OF ESTATE PROPERTY; (III) ESTABLISHING PROCEDURES FOR SETTING A DISPUTED CLAIM RESERVE; AND (IV) GRANTING RELATED RELIEF

SDM, Inc. ("<u>SDM</u>"),[2] a party in interest in the above-captioned bankruptcy cases (the "<u>Bankruptcy Cases</u>"), hereby submits this objection (the "<u>Objection</u>") to the *Plan Administrator's Motion for Entry of an Order (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief* [Docket No. 919] (the "<u>Motion</u>")[3] filed by Province Fiduciary Services, LLC, in its capacity as plan administrator (the "<u>Plan Administrator</u>"). In support of the Objection, SDM relies on the *Declaration of David Shafrir*, a copy of which is attached hereto as **<u>Exhibit A</u>** and

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Prime, LLC (6823); Prime IRA, LLC (8346); and Prime Digital LLC (4528). The Debtors' mailing address is Prime Core Technologies, Inc. Plan Administrator, c/o Province Fiduciary Services, LLC, 2360 Corporate Circle, Suite 340, Henderson, Nevada 89047.

[2]   SDM is the successor by amalgamation to, among others, 1983283 Ontario Inc. and Secure Digital Markets Canada Inc.  References herein to SDM shall include the foregoing entities.

[3]   Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

incorporated by reference (the "Shafrir Declaration"). In further support of the Objection, SDM respectfully represents as follows:

**BACKGROUND**

1.    SDM is a corporation organized under the laws of Ontario, Canada.  SDM's principal place of business is 626 King Street W, Toronto, Ontario, Canada, M5V1M5.

2.    SDM provides comprehensive liquidity and settlement solutions for its customers who are buyers and sellers of cryptocurrency assets.

3.    SDM is party to three (3) contracts with Debtor Prime Trust, LLC ("Prime Trust"). Such contracts include: (a) API Technology Agreement Account Form dated May 28, 2020 (the "API Agreement"); (b) Prime Trust New Account Agreement dated January 8, 2021 (the "Account Agreement"); and (c) Prime Trust Order Form dated November 29, 2022 (the "Order Form").[4]

4.    Pursuant to the Account Agreement, Prime Trust established and maintained custodial accounts for the benefit of SDM (collectively, the "Custodial Account"). Importantly, SDM did not use the Custodial Account to engage in any cryptocurrency transactions between SDM and Prime Trust. Rather, SDM used the Custodial Account as its bank account to facilitate fiat currency transactions among SDM, its liquidity providers and its customers.

5.    On June 21, 2023, Nevada Department of Business and Industry Division of Financial Institutions (the "Nevada FID") issued a cease and desist order (the "Cease and Desist Order").  *See Declaration of Jor Law, Interim Chief Executive Officer and President of Prime Core Technologies Inc., et al., In Support of Chapter 11 Petitions and First Day Motions, filed August 24. 2023* [Docket No. 14] (the "Law Declaration") at ¶ 57.   According to the Debtors, the

---

[4] The Order Form provides, in part, that it "is governed by the Prime Trust Master Services Agreement," which purports to "supersede and replace any prior agreement[s]" between Prime Trust and SDM. SDM reserves all rights with respect to the issue of interpretation of the Order Form and all other agreements between Prime Trust and SDM.

Cease and Desist Order prohibited them from operating and/or engaging in the trust company business in violation of NRS Chapter 669, specifically 669.100(1) and NRS 669.2825(1)(a), (b), (c), (f) and (k), and further prohibited the Debtors "from accepting fiat currency from existing and new clients for custody purposes" and "from accepting cryptocurrency from existing and new clients for custody purposes."  Law Declaration at ¶ 57 note 32. A copy of the Cease and Desist Order is attached hereto as **Exhibit B**.

6.      On June 21, 2023, without knowledge of the Cease and Desist Order, a liquidity provider of SDM caused $301,440.33 US to be transferred to the Custodial Account as a part of a transaction settlement (the "June 21 Transfer").

7.      On June 22, 2023, the liquidity provider issued a recall notice with respect to the June 21 Transfer, and SDM communicated such request to Prime Trust in a series of emails that day.  Shafrir Declaration at ¶ 11. Prime Trust employees initially indicated that they would send the recall request to Prime Trust's funds processing team and would keep SDM updated regarding progress of the recall request.  *Id*. However, late on June 23, 2023, Prime Trust employees advised SDM that, due to the Cease and Desist Order, Prime Trust was not able to process wire recalls at that time. *Id*.

8.      The June 21 Transfer has not been returned to SDM or its liquidity provider to date.

## THE CHAPTER 11 PROCEEDINGS

9.      On August 14, 2023 (the "Petition Date"), Prime Trust and its affiliated debtors (the "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Cases.

10.     On August 24, 2023, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System*

*and (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related Thereto; (II) Authorizing the Debtors to (A) Continue to Perform Intercompany Transactions and (B) Granting Administrative Expense Status for Postpetition Intercompany Claims; (Iii) Extending the Time for the Debtors to Comply with Requirements Set Forth in 11 U.S.C. § 345(B); and (IV) Granting Related Relief* [Docket No. 20] (the "<u>Cash Management Motion</u>").

11.     At the first day hearing on, *inter alia*, the Cash Management Motion, parties similarly situated with SDM raised concerns about the Debtors' ability to access and use funds in Customer Accounts.[5]  As a result thereof, the Court's order granting the Cash Management Motion on an interim basis [Docket No. 42] (the "<u>Interim Cash Management Order</u>") included the following language (the "<u>Customer Account Restriction</u>") at decretal paragraph 7:

> Notwithstanding anything to the contrary in this Order, the Debtors shall not use or transfer funds from Customer Accounts to honor any prepetition obligations or pay for any postpetition obligations absent further order of the Court. All parties' rights are reserved regarding whether and to what extent any funds or other property are held by a Debtor in trust or constitute property of the Debtors' estates.

12.     On September 20, 2023, the Court entered the *Final Order (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, aAnd (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related Thereto; (II) Authorizing the Debtors to (A) Continue to Perform Intercompany Transactions and (B) Granting Administrative Expense Status for Postpetition  Intercompany Claims; (III) Extending the Time for the Debtors to Comply with Requirements Set Forth in 11 U.S.C. § 345(b); and (IV) Granting*

---

[5]     The Cash Management Motion defines "Customer Accounts" as "eighteen (18) bank accounts and lockbox accounts [ ] used in connection with customer funds"  Cash Management Motion, ¶ 10.

*Related Relief* [Docket No. 170] (the "Final Cash Management Order"). The Final Cash

Management Order reiterates the Customer Account Restriction, as follows,

> Notwithstanding anything to the contrary in this Final Order, the Debtors shall not use or transfer funds, except as otherwise required by Bankruptcy Code section 345, from Customer Accounts to honor any prepetition obligations or pay any postpetition obligations absent further order of the Court. All parties' rights are reserved regarding whether and to what extent any funds or other property are held by a Debtor in trust or constitute property of the Debtors' estates.

Final Cash Management Order, ¶ 8.

13.    On November 15, 2023, the Debtors filed the *Debtors' Second Omnibus Motion for*

*Entry of an Order (A) Authorizing the Debtors to Reject Certain Executory Contracts, Effective as*

*of November 15, 2023, and (B) Granting Related Relief* [Docket No. 428] (the "Motion to Reject").

Schedule 1 to the proposed form of order for the Motion to Reject includes an agreement with

SDM and identifies all of the agreements to be rejected as "Vendor Agreements."

14.    On November 21, 2023, the Prime Trust filed its amended schedules of assets and

liabilities [Docket No. 442-3]. The amended schedules employ confidential numbering that do not

identify customers by name. SDM is informed that the amended schedules identify SDM and/or

certain parties related to SDM as unsecured creditors in the aggregate amount of $307,085.68

(together, the "SDM Claim"). Prime Trust did not designate the SDM Claim as disputed, contested

or unliquidated.

15.    On November 29, 2023, SDM filed a limited opposition to the Motion to Reject

[Docket No. 491], asserting that the Motion to Reject failed to adequately identify the agreements

that the Debtors sought to reject and failed to address the parties' rights to the Custodial Funds.

16.    On December 15, 2023, the Court entered the *Second Omnibus Order (A)*

*Authorizing the Debtors to Reject Certain Executory Contracts, Effective as of November 15, 2023,*

*and (B) Granting Related Relief* [Docket No. 601] (the "<u>Rejection Order</u>"). As to the Custodial

Funds, the Rejection Order provides:

> Nothing set forth in this Second Omnibus Rejection Order shall be construed as abrogating paragraph 8 of the *Final Order (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, and (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related Thereto; (II) Authorizing the Debtors to (A) Continue to Perform Intercompany Transactions and (B) Granting Administrative Expense Status for Postpetition Intercompany Claims; and (III) Extending the Time for the Debtors to Comply with the Requirements Set Forth in 11 U.S.C. § 345(b); and (IV) Granting Related Relief,* which appears at Docket No. 170.

Rejection Order, ¶ 4.

17.    On December 21, 2023, the Court entered the *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644] (the "<u>Confirmation Order</u>"), confirming the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "<u>Plan</u>").  With respect to the Customer Account Restriction and the underlying issues related thereto, the Plan includes the following relevant definitions:

> "Account" means any active account identified in the Debtors' books and records as having a balance as of the Petition Date. For the avoidance of doubt, Accounts as used herein are not "accounts" within the meaning of Article 9 of the Uniform Commercial Code.

> "Account Holder" means any Person or Entity who maintains an Account with any of the Debtors as of the Petition Date.

> "Account Treatment Issues" has the meaning set forth in Article 2.5 of the Plan.

Plan, §§ 1.1-1.3.

18.     Section 2.5 of the Plan, in turn, provides as follows,

*Non-Estate Assets/Account Treatment Issues.*   Any Assets of a
Debtor that are determined by such Debtor or by the Bankruptcy
Court not to be property of such Debtor's Estate (the "Non-Estate
Assets") shall be (i) transferred, if necessary, to the Wind-Down
Debtor; and/or (ii) returned to the owner or owners of such Non-
Estate Assets in kind in accordance with Article 7 of the Plan,
subject to set-off for (a) any negative Account balances, including
for any ACH chargeback transactions and (b) any applicable
withdrawal fees. For the avoidance of doubt, subject to the outcome
of a final determination by the Debtors, the Wind-Down Debtors[6] or
the Bankruptcy Court, as applicable, (w) any such Assets shall not
be included as part of the Cash Allocation or the Cryptocurrency
Allocation, (x) any General Unsecured Claim against a Debtor shall
be net of Non-Estate Assets actually received by the Holder of such
General Unsecured Claim, (y) in no circumstance shall any such
Non-Estate Assets be transferred to or become property of the
Reorganized Debtors or the Wind-Down Debtor, and (z)
distributions pursuant to the terms of the Plan, including
distributions made in accordance with Article 7.6 of the Plan, shall
only be from Assets, or proceeds of Assets, determined to be
property of such Debtor's Estate. For the avoidance of doubt,
nothing set forth in the Plan, including in this Article 2.5, or the
Disclosure Statement, is intended to indicate that the Debtors or the
Wind-Down Debtor, as applicable, have made a determination or
taken a position with respect to whether any Accounts or the fiat or
Cryptocurrencies therein, are property of their respective Estates
(collectively, the "<u>Account Treatment Issues</u>"). <u>Pending a
determination of the Account Treatment Issues by the Bankruptcy
Court, the Debtors or the Wind-Down Debtors, as applicable, will
not use or transfer the funds subject to a Customer Agreement[7]
absent an order of the Bankruptcy Court.</u>

Plan, § 2.5 (emphasis added).

---

[6]   For the avoidance of doubt, SDM objects to the Debtor's or the Wind-Down Debtors' ability to determine that
      Account funds are property of the estate.  Such determination should be reserved for the Court.
[7]   "Customer Agreement" means any contract, agreement, or other document existing between a Debtor and a
      Person or Entity governing the custodial relationship between the Debtor and such Person or Entity."  Plan, §
      1.50.  It would appear that SDM is a Customer and has Customer Agreements with the Debtors, but, as noted in
      SDM's limited opposition to the Motion to Reject, Schedule 1 to the proposed form of order for the Motion to
      Reject identifies one SDM contract as a "Vendor Agreement."  **SDM asserts that it is a Customer and its
      agreements are Customer Agreements which create a custodial relationship and reserves all rights related
      thereto.**

19.     The effective date of the Plan occurred on January 5, 2024 (the "Effective Date").
*See* Docket No. 694.

## OBJECTION

### A.  The Court should adjourn the hearing on the Motion with respect to SDM.

20.     Bankruptcy courts have authority to manage their own dockets, and scheduling is
within the scope of their discretion. *See Maxus Liquidating Trust v. YPF, S.A. (In re Maxus Energy
Corp.)*, Case No. 16-11501, 2021 Bankr. LEXIS 2575, at *10 (Bankr. D. Del. Sept. 20, 2021)
(enforcing scheduling order based on judge's "discretion to manage my docket"); *In re Wilson*,
830 F. App'x 392, 393 (3d Cir. 2020) (denying petition for writ of mandamus where bankruptcy
court took no action on pro se party's request for relief from stay for one year); *Armstrong v.
Rushton (In re Armstrong)*, 101 F. App'x 766, 768 (10th Cir. 2004) ("Other than in instances of
an abuse of discretion, which is not present here, the bankruptcy court has full authority to manage
its docket."); *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 373 (5th Cir. 1987)
(recognizing the bankruptcy judge's "responsibility of managing the cases before [them] in such a
way as to promote the objectives and goals of the Bankruptcy Code"); *Waske v. Lehman Bros.
Holdings, Inc.*, Case No. 20-CV-5083 (RA), 2021 U.S. Dist. LEXIS 189368, at *14 (S.D.N.Y.
Sept. 30, 2021) ("A bankruptcy court, like a district court, has wide latitude in determining how to
manage its docket most efficiently.").

21.     Adjournment as to SDM is appropriate because there are numerous material factual
issues raised by the Motion that SDM has not had any opportunity to investigate. SDM and
similarly situated creditors have raised the estate property issue throughout this case but have been
told that the Debtors, the Wind-Down Debtors, and/or the Plan Administrator would make a
determination vis-à-vis customer funds at some unspecified date, and that such determination

would be subject to discovery.[8] The Plan Administrator has had more than a year since the Effective Date to investigate the Debtors' affairs. During that time, the Plan Administrator had access to the Debtors' books, records, and representatives, whereas SDM has not. By the Motion, the Plan Administrator has presented its findings and given SDM and other parties in interest 21 days to conduct their own investigations, without the same level of access, and to formulate a response. Neither the Court nor targets of the Motion should be required to conduct an evidentiary hearing within 21 days, particularly when the Plan Administrator has had more than a year to investigate and prepare its arguments. Under these circumstances, the Court should exercise its discretion to adjourn the hearing on the Motion to allow parties to conduct discovery regarding the material factual issues raised by the Motion.

**B. The Custodial Funds are not property of the estate.**

22.     Pursuant to section 541(a) of the Bankruptcy Code, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 541(d) provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

---

[8] In connection with confirmation of the Plan, the Debtors proposed certain procedures (the "Account Treatment Procedures") that required the Wind-Down Debtor and/or the Plan Administrator to meet and confer with customers regarding a discovery schedule prior to any motion to determine whether customer funds were property of the estate. *See* Docket No. 557-2 at 3. The Account Treatment Procedures were intended, among other things, to specifically resolve SDM's objection to the Plan. *See* Docket No. 557 at 43 n.85. Neither the Wind-Down Debtor nor the Plan Administrator contacted SDM's counsel to arrange a meet and confer with SDM prior to filing the Motion.

23.     The June 21 Transfer is not property of the Debtors' estate because Prime Trust's exercise of an equitable interest in the June 21 Transfer is in direct violation of the Cease and Desist Order. The Cease and Desist Order expressly prohibits Prime Trust, as of June 21, 2023, from "accepting fiat currency from existing and new clients for custody purposes." Cease and Desist Order at 6. Under these circumstances, the June 21 Transfer, which occurred contemporaneously with the Cease and Desist Order, is not property of the Debtors' estate but instead is appropriately held by Prime Trust in constructive trust for the benefit of SDM. *See, e.g., Locken v. Locken*, 650 P.2d 803, 804-05 (Nev. 1982) ("A constructive trust is a remedial device by which the holder of legal title to property is held to be a trustee of that property for the benefit of another who in good conscience is entitled to it."); *In re Bake-Line Grp, LLC*, 359 B.R. 566, 571-72 (Bankr. D. Del. 2007) ("The Third Circuit has held that [§ 541(d)] serves to exclude from the debtor's bankruptcy estate any of the debtor's property held in constructive trust for another party at the time of a bankruptcy filing.").

24.     Whether a constructive trust arises is a matter of state law. *Bake-Line*, 359 B.R. at 571. Under Nevada law, "a constructive trust exists where: '(1) a confidential relationship exists between the parties; (2) the retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice.'" *Bemis v. Estate of Bemis*, 967 P.2d 437, 442 (Nev. 1998) (quoting *Locken*, 650 P.2d at 804). "The constructive trust is no[t] . . . limited to fraud and misconduct cases; it redresses unjust enrichment, not wrongdoing." *Id*. at 441.

25.     Applying these principles, the June 21 Transfer is subject to a constructive trust on the grounds that: (a) SDM and Prime Trust maintained a confidential relationship for the custody of funds by Prime Trust on behalf of SDM; (b) the retention of legal title to the June 21 Transfer

by Prime Trust would be in direct violation of the Cease and Desist Order and Nevada law; and (c) the existence of a constructive trust is essential to the effectuation of justice given that the June 21 Transfer has not been returned to SDM and is now within the Plan Administrator's control. Accordingly, the June 21 Transfer is not property of the Debtors' estate and not subject to distribution to the Debtors' creditors pursuant to the Motion.

26. There are at least two additional reasons why the June 21 Transfer is not property of the estate. First, the parties did not intend for the June 21 Transfer to become the property of Prime Trust.

27. Even in cryptocurrency cases, there is a distinction between assets held by the debtor as a custodian, which are not property of the estate, and assets invested with the debtor, which may be property of the estate depending on the operative agreements. In the *Celsius* case, the United States Bankruptcy Court for the Southern District of New York ordered the debtors to return certain cryptocurrency deposited by customers into the debtors' so-called "Custody Program" on the grounds that such assets were not property of the bankruptcy estate. *Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief*, In re Celsius Network LLC, Case No. 22-10964-MG, Docket No. 1767 (Bankr. S.D.N.Y. Dec. 20, 2022) (the "Celsius Custody Order"). A copy of the Celsius Custody Order is attached hereto as **Exhibit C**. By contrast, only assets held in so-called "Earn Accounts" were found to be property of the estate under the debtors' terms of use. *In re Celsius Network LLC*, 647 B.R. 631, 657 (Bankr. S.D.N.Y. 2023). This determination was a matter of contract interpretation and did not depend on whether the assets were commingled or traceable. *See id*. at 652 (discussing contract interpretation issue).

28.     Under Nevada law, which governed the contractual relationship between Prime Trust and SDM, any contractual provision purporting to transfer ownership of the June 21 Transfer to Prime Trust cannot apply where there was no meeting of the minds. *See Raymond G. Schreiber Revocable Trust v. Estate of Knievel*, 984 F. Supp. 2d 1099, 1103 (D. Nev. 2013) ("If more than two persons are intended to be parties to a proposed contract, the contract does not come into being unless all parties manifest their asset.").

29.     As set forth in the Shafrir Declaration, a liquidity provider of SDM, without knowledge of the Cease and Desist Order, transferred the June 21 Transfer to Prime Trust substantially contemporaneously with Prime Trust's cessation of operations. Under the Cease and Desist Order, Prime Trust was not authorized by law to accept the Custodial Funds. Under these circumstances, there was not, and could not legally have been, any intent on either side of the transaction to transfer ownership of the June 21 Transfer to Prime Trust.

30.     Indeed, the lack of intent to transfer ownership of the June 21 Transfer to Prime Trust is evidenced by the parties' post-transfer conduct. *See Az. Laborers, Teamsters and Cement Masons Local 395 Health and Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1519 (9th Cir. 1985) ("In resolving the question of the parties' intent, district courts give 'great weight' to 'the parties' conduct subsequent to contract formation.'"). Following the transfer of funds, SDM promptly requested return of the June 21 Transfer, and Prime Trust initially indicated that it would process such return, thereby acknowledging that Prime Trust did not intend to accept ownership of the June 21 Transfer. Prime Trust did not say that the funds belonged to Prime Trust.  Rather, it justified its refusal to return the June 21 Transfer on the grounds that the Cease and Desist Order prevented it from doing so.

31.     Under these circumstances, Prime Trust did not have a legal or equitable interest in the June 21 Transfer as of the Petition Date because there was no agreement to transfer ownership of the June 21 Transfer to Prime Trust following entry of the Cease and Desist Order. Accordingly, the June 21 Transfer is not property of the Debtors' estate and must be returned to SDM.

32.     Second, the June 21 Transfer was at all times since the Petition Date required to be set aside from the Debtors' operating funds. Pursuant to the Interim Cash Management Order, the Final Cash Management Order, the Rejection Order, and the Confirmation Order, June 21 Transfer, as part of SDM's Customer Account, was reserved from use by the Debtors. Although the Plan Administrator now claims that all customer funds were "hopelessly commingled" with the Debtors' own assets, the Court's prior orders had the effect of requiring segregation. These orders are binding unless vacated by the Court. *See, e.g., In re Trade Secret Inc.*, 609 F. App'x 98, 102 (3d Cir. 2015) ("Where the plain terms of a court order unambiguously apply, they are entitled to their effect."); *In re Kreger*, 307 B.R. 106, 110 (B.A.P. 8th Cir. 2004) (Bankruptcy court orders entered with the debtors' consent create a binding obligation on the debtors.); *Jarecki v. Comm'n of Pa. Unemployment Compensation Fund*, 202 B.R. 385, 388 (W.D. Pa. 1995) (holding that bankruptcy court's confirmation order "was binding on the parties absent a subsequent vacating order by the bankruptcy court or a stay of the confirmation order pending a timely appeal"); *Peterkin v. Jeffes*, 1991 WL 137122, at *2 (E.D. Pa. July 19, 1991) (Court orders that impose future obligations on the parties are binding on the parties.). Accordingly, the June 21 Transfer has been set aside since the Petition Date, notwithstanding the Plan Administrator's arguments regarding traceability, and should be returned to SDM.

WHEREFORE, SDM, Inc. respectively objects to the Motion as set forth herein and requests that the Court: (i) deny the Motion as to the June 21 Transfer; (ii) order the June 21 Transfer to be returned to SDM; and (iii) grant such further relief as is just and proper.

Dated: February 5, 2025
Wilmington, Delaware

Respectfully submitted,

/s/ *William F. Taylor, Jr.*
William F. Taylor, Jr., Esq. (DE No. 2936)
WHITEFORD, TAYLOR & PRESTON LLC[9]
600 King Street, Suite 300
Wilmington, Delaware 19801
Phone: (302) 353-4144
Facsimile: (302) 661-7950
E-mail: wtaylor@whitefordlaw.com

-and-

Bradford F. Englander, Esq. (admitted *pro hac vice*)
WHITEFORD TAYLOR & PRESTON L.L.P.
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia 22042
Phone: (703) 280-9081
E-mail: benglander@whitefordlaw.com

*Counsel for SDM, Inc.*

---

[9] Whiteford, Taylor & Preston LLC operates as Whiteford Taylor & Preston L.L.P. in jurisdictions outside of Delaware.