**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies, *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 919** |

**BITTREX PLAN ADMINISTRATOR'S OBJECTION TO PLAN ADMINISTRATOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE PLAN ADMINISTRATOR'S DETERMINATION THAT THE DEBTORS' ASSETS ARE PROPERTY OF THE BANKRUPTCY ESTATES; (II) APPROVING DISTRIBUTIONS OF ESTATE PROPERTY; (III) ESTABLISHING PROCEDURES FOR SETTING A DISPUTED CLAIMS RESERVE; AND (IV) GRANTING RELATED RELIEF**

David Maria, as plan administrator ("Bittrex Administrator") in the chapter 11 cases of Bittrex, Inc. ("BUS"), Desolation Holdings LLC, Bittrex Malta Holdings Ltd., and Bittrex Malta Ltd. (collectively, the "Bittrex Debtors") hereby files this objection ("the Objection") to *Plan Administrator's Motion For Entry Of An Order (I) Approving The Plan Administrator's Determination That The Debtors' Assets Are Property Of The Bankruptcy Estates; (II) Approving Distributions Of Estate Property; (III) Establishing Procedures For Setting A Disputed Claims Reserve; And (IV) Granting Related Relief* (the "Motion"). In support of this Objection, the Bittrex Administrator states as follows:

## PRELIMINARY STATEMENT

1.      Currently, Prime Trust holds approximately $1.8 million of fiat owned by Bittrex, Inc. ("BUS") in two custodial accounts. Prime Trust holds those funds in trust, and, pursuant to the Bankruptcy Code, trust funds are not property of the estate.

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 330 South Rampart Blvd., Suite 260, Las Vegas, NV 89145.

2.      The Motion denies this reality.  After lumping BUS' funds with those of all of Prime Trust's customers, the Motion denies that *any* custodial accounts in the Debtors' possession are held in trust.  It bases this determination on one sentence from an agreement that does not even apply to the BUS and Prime Trust's relationship.  It then states, without cogent basis, that BUS' funds cannot be traced, providing no evidence to support this determination, except to state that Prime Trust commingled funds and failed to keep reliable records.

3.      Attempting to establish ownership of the funds in BUS' accounts requires evidence specific to BUS.  To determine whether BUS' funds were property of the estate, the Prime Administrator must consider the specific terms of Prime's agreements with BUS and determine i) whether BUS' funds are held in trust, and ii) whether those funds can be traced.  Both questions must be answered in the affirmative, and BUS' funds must be returned to BUS to distribute under its confirmed plan.

## **BACKGROUND**

### A.  The Bittrex Bankruptcy

4.      On May 8, 2023, BUS and three of its affiliates ("Bittrex Debtors") filed petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  *See In re Desolation Holdings, LLC*, Case No. 23-10597 (BLS).  On October 31, 2023, the Bankruptcy Court entered an order confirming the Bittrex Debtors' chapter 11 plan ("Bittrex Plan"), and the plan went effective on November 15, 2023.  *In re Desolation Holdings, LLC*, Case No. 23-10597 (BLS), D.I. 517, 563.  The Bittrex Administrator manages the Wind Down Entity that administers the Bittrex Plan.  *In re Desolation Holdings, LLC*, Case No. 23-10597 (BLS), D.I. 517 at 12.

5.      Before they filed bankruptcy, the Bittrex Debtors operated a cryptocurrency exchange. *In re Desolation Holdings, LLC*, Case No. 23-10597 (BLS), D.I. 11 at ¶ 1. In connection with operating the exchange, the Bittrex Debtors operated a cash and cryptocurrency management system for customers. *Id.* ¶¶ 20-31. As part of that system, BUS held two accounts at Prime Trust, LLC ("Prime Trust").

6.      The first account was a "FBO" account ("FBO Account"), which received ACH cash deposits from BUS' customers. *Id.* ¶ 25. The second account was an ACH reserve account ("Reserve Account"), which held an ACH reserve that could be used to offset faulty transactions. *Id.*

7.      As of May 8, 2023, BUS held $833,550.66 in the FBO Account and $1,000,000 in the Reserve Account (collectively, the "Bittrex Funds"). *In re Bittrex, Inc.*, Case No. 23-10597 (BLS), D.I. 5 at 33.

**B. The Prime Trust Bankruptcy**

8.      On August 14, 2023, Prime Core Technologies Inc. and three of its affiliates ("Prime Debtors") filed petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. D.I. 1.

9.      The Prime Debtors have acknowledged the existence of an ongoing issue regarding ownership of the Bittrex Funds, which led to the inclusion of the following prohibiting language in the Court's Cash Management Order:[2]

> Notwithstanding anything to the contrary in this Order, the Debtors shall
> not use or transfer funds from Customer Accounts to honor any prepetition

---

[2]   "Cash Management Order" refers to the *Final Order (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, and (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related Thereto; (II) Authorizing the Debtors to (A) Continue to Perform Intercompany Transactions and (B) Granting Administrative Expense Status for Postpetition Intercompany Claims; (III) Extending the Time for the Debtors to Comply with Requirements Set Forth in 11 U.S.C. §345(b); and (IV) Granting Related Relief* [D.I. 170].

obligations or pay for any postpetition obligations absent further order of the Court. All parties' rights are reserved regarding whether and to what extent any funds or other property are held by a Debtor in trust or constitute property of the Debtors' estates.

10.    On October 22, 2023, BUS filed a proof of claim, with reference number PC-111217, specifying that based on the terms of the parties' agreements, BUS owns the funds being held by Prime Trust, but was filing the proof of claim out of an abundance of caution.

11.    On December 5, 2023, the Bittrex Debtors filed the *Reservation Of Rights Of The Bittrex Plan Administrator Regarding Confirmation Of The Debtors' Amended Joint Chapter 11 Plan Of Reorganization* [D.I. 515], reserving their right to object in the event that the Prime Debtors attempted to use or transfer the Bittrex Funds.

12.    The Prime Debtors' confirmed Plan provided a period of time for the wind down debtors to make a determination as to whether the funds held by Prime Trust were property of the estate, and for interested parties to object. D.I. 644-1 at 28-30 (§ 2.5(b)).

13.    On January 15, 2025, the plan administrator ("Prime Administrator") filed the Motion requesting a determination that all cash and cryptocurrencies in its possession are property of the estate and requested permission to distribute such cash and cryptocurrencies to creditors pursuant to the priorities set forth in the plan.

**C.    The Agreements**

14.    The FBO Account is controlled by a March 2, 2023 Self-Directed Account Agreement with Prime Trust (the "Custodial Agreement"),[3] which, among other things, established a custodial account, required Prime Trust to "hold as custodian all assets deposited to,

---

[3]    The Custodial Agreement is attached hereto as **Exhibit A.**

or collected with respect to such Account," Custodial Agreement at 1, and stated that Prime Trust "will act solely as custodian" of the property in the account. *Id.* § 2(1)

15.    The Reserve Account is governed by a *ACH Services Attachment for Prime Trust Custodial Services* (the "ACH Agreement") with Prime Trust LLC, which is attached to the *Prime Trust Master Services Agreement* between BUS and Prime Trust LLC (the "MSA").[4]    In connection with the ACH services, BUS was required to fund the Reserve Account, which Prime Trust LLC could only use to "offset any deficiency in any amount owed to Prime Trust by [BUS] or any losses that [BUS] is liable for under this [ACH Agreement]." ACH Agreement § 10.3.  The ACH Agreement makes clear that BUS, and not Prime Trust, owns the funds in the Reserve Account, because it contains several provisions granting Prime Trust certain rights that could only belong to a creditor, not an owner.  For example, BUS granted Prime Trust a first lien, priority security interest in the Reserve Account and the funds therein.  *Id.* § 10.4.  Moreover, the ACH Agreement explicitly states that "Prime Trust shall have all of the rights and remedies of a secured party under Applicable Law with respect to the Reserve Account and the funds therein …." *Id.* There were never any deficiencies under the ACH Agreement thus nullifying any claim by Prime Trust against BUS.

16.    Moreover, it appears that at least some portion of the funds in the Reserve Account are traceable.  In its schedules, Prime Trust listed a "CRB Reserve Account" at Cross River Bank that held $1,000,000 as of the petition date—the exact amount of Bittrex Funds in the Reserve Account.  D.I. 176 at 29.  Prime Trust also identified $588,610.19 in a "ACH Clearing Account" at Cross River Bank.  *Id.*  The Bittrex Administrator is currently working with the Prime Administrator to understand the transactions within those accounts.

---

[4]    The MSA is attached hereto as **Exhibit B**.

**ARGUMENT**

**I.      The Bankruptcy Code Excludes Assets Held In Trust From A Debtor's Estate**

17.      The Prime Administrator cannot claim the Prime Debtors' estate owns the Bittrex Funds because the Prime Debtors lack equitable title in the funds.  Pursuant to 541(d), "property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a)(1) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."  11 U.S.C. § 541(d); *see In re SemCrude*, L.P., 418 B.R. 98, 106 (Bankr. D. Del. 2009) ("Any power that the debtor may exercise solely for the benefit of an entity other than the debtor, however, is excluded from the bankruptcy estate.") (citation omitted).

18.      "It is well-settled that 'debtors do not own an equitable interest in property ... [that they] hold[ ] in trust for another, and that therefore funds held in trust are not 'property of the estate.'" *In re Magna Ent. Corp.*, 438 B.R. 380, 386 (Bankr. D. Del. 2010) quoting *City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 95 (3d Cir. 1994).  This rule applies when two parties explicitly establish a trust, as well as when a trust relationship can be understood through the intent of the parties*.  In re Magna Ent. Corp.*, 438 B.R. 380, 387 (Bankr. D. Del. 2010) ("Funds that a debtor holds in trust are not property of the debtor's bankruptcy estate whether the trust is statutory or constructive"); *Columbia Gas Sys.*, 997 F.2d at 1059 (trust funds are excluded from a debtor's estate whether "held in express trust" or "in constructive trust.").

**II.     The FBO Account And The Reserve Account Were Held In Trust And Their Contents Belong To The Bittrex Debtors**

19.      Courts look "to state law to determine whether the claimant has shown a trust relationship, but look to federal law to determine whether the claimant has traced and identified

6

the trust funds." *City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 95-96 (3d Cir. 1994); s*ee also Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Congress has generally left the determination of property rights in the assets of a bankruptcy's estate to state law."). Under both agreements, Nevada law applies.[5]

20.    In both Nevada and Delaware, a trust exists when the parties demonstrate an intent to establish such a trust. *Matter of Living Tr. Of David Francis Davies III*, 522 P.3d 427, 429 (Nev. 2022) (a "valid express trust in Nevada requires a settlor, trust intent, trust property, and a beneficiary"); *Otto v. Gore*, 45 A.3d 120, 130 (Del. 2012). "The required manifestation of intention to create a trust may be expressed in writing or by conduct." *Id.*; *see Levin v. Smith*, 513 A.2d 1292, 1297 (Del. 1986) (the intent to create a trust can be demonstrated "by definite, explicit and unequivocal words, or by circumstances so revealing and compelling as to manifest the intention with all reasonable certainty."); *In re Cath. Diocese of Wilmington, Inc.*, 432 B.R. 135, 149 (Bankr. D. Del. 2010) ("A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein"). A trust relationship can exist even when funds held in trust are comingled. *See In re Penn Cent. Transp. Co.,* 486 F.2d 519, 525 (3d Cir. 1973) (trust imposed despite commingled funds).

21.    The Prime Administrator premises its determination that no trust relationship exists between the parties on a single sentence in the MSA stating that "[t]he Agreement does not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the Parties." Motion ¶ 76; *see* MSA § 14.1. However, the MSA does not apply to the Bittrex Funds in either the Reserve Account or the FBO Account. Moreover, intent to form a trust can exist even

---

[5]    MSA § 13.1; Custodial Agreement § 18.

when not found in the parties' express agreement. *See Cummings v. Tinkle*, 91 Nev. 548, 550, 539 P.2d 1213, 1214 (1975) (finding "a resulting trust based on the presumed intention of the parties."). *In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1060 (3d Cir. 1993) quoting *In re Penn Cent. Transp. Co.*, 486 F.2d 519, 524 (3d Cir. 1973) ("The parties, however, need not employ any talismanic language—'failure to expressly designate the relationship as one of trust does not necessarily negate its existence.'").

22.     Prime Trust's agreement with BUS requires that Reserve Account operate under the terms of the ACH Agreement, and "[t]o the extent of any conflict between the [MSA] Agreement and this Service Attachment, the terms of this Service Attachment shall govern over the conflicting terms of the [MSA] Agreement."[6]  Therefore, to determine whether the Reserve Account is held in trust, the Debtors must look to the ACH Agreement, which contains no disclaimer of fiduciary duty and overwhelmingly supports a trust relationship.  Prime Trust was not given free rein to use the funds as it saw fit but instead was obligated to use the funds only as dictated by the ACH Agreement.[7]  *See In re Bishop*, 276 B.R. 737, 742 (Bankr. W.D. Va. 2001) (finding a trust where funds could only be used "strictly in accordance with the provisions of the" parties' agreement).  There was also no requirement that Prime Trust pay any interest for its use of the funds, which remains "the hallmark of a debtor-creditor relationship."  *In re Columbia Gas*

---

[6]     ACH Agreement at 1.  In any event, the language of the MSA also overwhelmingly supports a trust relationship.  Notwithstanding the single sentence cited by the Prime Administrator, the MSA states that "Prime Trust must follow the directions of Customer, and is considered by this Service Schedule to be a 'directed fiduciary,'" MSA § 10.1, and further states that "[c]ustomer owns, and will at all times own, all Custodial Property."  MSA § 3.2(d).  Moreover, the MSA refers to the funds in the Reserve Account as "Custodial Property" throughout.  One sentence disclaiming a fiduciary duty cannot contravene the rest of the agreement.  *See IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1418 (9th Cir. 1997) ("putting the magic words in the contract, 'purely ministerial duties,' does not avoid fiduciary responsibility, if the characterization, 'purely ministerial duties,' is not correct. The issue is not just how the duties are characterized, but what they are.").

[7]     *Id.* § 4.1. ("Customer hereby authorizes Prime Trust, and Prime Trust agrees, to transmit any Entry received by Prime Trust from Customer in accordance with the Rules and the terms of this Service Attachment and to credit or debit the amount of such Entry to the accounts specified by Customer, subject to the terms of this Service Attachment.").

*Sys. Inc.*, 997 F.2d 1039, 1060 (3d Cir. 1993) ("the absence of interest payments of interline balances counseled in favor of finding a trust.").  Perhaps most telling, BUS granted Prime Trust a security interest in the Reserve Account;[8] a security interest cannot exist in funds that BUS does not own.

23.    The Motion fails to consider the purpose of the funds in the Reserve Account.  As mentioned, the ACH Agreement restricted Prime Trust's use of the funds in the Reserve Account: they were only to be used by Prime Trust to "offset any deficiency in any amount owed to Prime Trust by Customer or any losses that Customer is liable for under this Service Attachment."[9]  In analogous circumstances, courts have held that when a bank issues provisional credit, i.e. temporarily places funds into a costumer's account to cover a forthcoming transaction, the bank retains ownership, and no debtor-creditor relationship exists.  *See Laws v. United Missouri Bank of Kansas City,* 98 F.3d 1047, 1050-51 (8th Cir. 1996) ("A provisional credit, like a line of credit, is no more than the *opportunity* to obtain funds….advances against uncollected deposits do not create a 'debt' to the bank.") (emphasis in original); *In re Vendsouth, Inc.*, 2003 WL 22399581, at *8 (Bankr. M.D.N.C. Oct. 10, 2003) (a "bank's liability is premised on the presence of *collectible* funds. In the absence of good funds, a debtor-creditor relationship never arises.") (emphasis in original); *In re Spring Grove Livestock Exch., Inc.*, 205 B.R. 149, 156 (Bankr. D. Minn. 1997) ("Insofar as the funds represent advances against uncollected deposits, *Laws* is controlling.").  Here, BUS retained ownership because it deposited funds into the Reserve Account on a provisional basis—those funds were only to be used in the event Prime Trust was unable to clear BUS' ACH transactions.

---

[8]    ACH Agreement § 10.4.

[9]    *Id.* § 10.2

24.     The FBO Account was governed by the Custodial Agreement, which makes even more apparent that the parties intended a trust relationship.  As with the ACH Agreement, the Custodial Agreement contains no mention of interest payments and restricts Prime Trusts' use of the funds in the FBO Account.[10]  But the Custodial Agreement goes even further, mandating that the Bittrex Funds be "segregated."[11]  It also states "Prime Trust will act solely as custodian"[12] and "will not exercise any investment or tax planning discretion regarding your Account."[13]  The custodial nature of the parties relationship is emphasized numerous times throughout the agreement.[14]

### III.     The Bittrex Funds Are Traceable

25.     Having established a trust, the Bittrex Debtors must now trace those funds by establishing a "nexus" between the Bittrex funds and the funds in Prime Trusts' possession. *Begier v. I.R.S.*, 496 U.S. 53, 66–67 (1990) ("The debtor's act of voluntarily paying its trust-fund tax obligation therefore is alone sufficient to establish the required nexus between the 'amount' held in trust and the funds paid."); *In re Lexington Healthcare Group, Inc.,* 335 B.R. 570, 577 (Bankr. D. Del. 2005) (where funds are commingled, "Plaintiff must show some nexus between the withheld funds and the funds on which it seeks to impose a trust.").

26.     One way to establish that nexus is through the lowest intermediate balance test. This method "allows trust beneficiaries to assume that trust funds are withdrawn last from a

---

[10]     Custodial Agreement § 1, 2.1.

[11]     *Id.* § 4.2 ("Custodian may for convenience take and hold title to Custodial Property or any part thereof in its own name or in the name of its nominee (commonly known as "street name"), with Account Holder ownership of Custodial Property segregated on its books and records.").

[12]     *Id.*, at § 2.1.

[13]     *Id.*

[14]     *See, e.g., Id.*, at § 4.1 ("Custodial Property which Prime Trust will generally agree to accept and hold on Account Holder's behalf includes…"); 4.3 ("Assets under custody are held for benefit of Account holders").

commingled account." *In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1063 (3d Cir. 1993). However, "[a]lthough using the lowest intermediate balance test will satisfy the nexus requirement, it is not the only way it can be met." *In re Edison Bros., Inc.*, 243 B.R. 231, 240 (Bankr. D. Del. 2000). ("The Supreme Court and the Third Circuit have held that the nexus must be determined in light of all circumstances.…Just as commingling of funds does not defeat a constructive trust, so too the application of funds to pay down a line of credit, which immediately thereafter has sufficient availability, may provide a sufficient nexus to permit the recovery of the trust funds."). "The nexus requirement should be liberally interpreted, as it should be 'determined in light of all circumstances,' after 'an examination of the commercial realities of how the Debtors conducted business' and taking into consideration 'the broader policy against allowing a party unilaterally to make a trust unenforceable by commingling assets.'" *In re Magna Ent. Corp.*, 438 B.R. 380, 395 (Bankr. D. Del. 2010) quoting *In re Edison Bros., Inc.,* 243 B.R. 231, 240 (Bankr. D. Del. 2000).

27.    The Motion does not even attempt to trace the funds, even by its own standards. Instead of identifying the lowest value of the funds in each of the Bittrex Accounts and returning what remains of the trust funds to the Bittrex Debtors, the Motion gestures to the omnibus accounts and uses claims of inadequate record keeping to handwave away any possibility that the funds could be traced.  But it appears that at least some portion the funds in the Reserve Account are traceable to a Cross River account holding exactly the same amount: $1 million, or to the Cross River account holding $588,610.19.  Moreover, as to the funds in the FBO Account, Prime Trust's schedules list $24.1 million in funds in various bank accounts as of the petition date, including $737,331.09 in a "USD Account," and nearly $4 million in a "Money Market Account."  D.I. 176 at 28-30.  The Bittrex Administrator must be given an opportunity to identify a nexus between the

funds in the Custodial Account and funds remaining in Prime Trust's accounts, whether through the intermediate balance test or some other means.

28.    Prime Trust's inadequate record keeping also does not result in the forfeiture of the Bittrex Funds.  Prime Trust currently holds funds in a Cross River account in the exact amount as was in the Reserve Account, and another account identified as an ACH clearing account.  *See, e.g., In re Cath. Diocese of Wilmington, Inc.*, 432 B.R. 135, 162 (Bankr. D. Del. 2010) ("St. Ann's made its only deposit under the pooled investment program directly into the PIA….The balance in the PIA never remotely came close to dipping below the amount invested by St. Ann's. Thus, St. Ann's has met its burden of establishing that its funds in the PIA…are property of the estate.") (emphasis in original).  Prime Trust's Motion now seeks to use the original sin of some commingling of some accounts to justify a ham-fisted approach to all custodial account holders. Prime Trust cannot use shorthand and short cuts to violate the rights of Bittrex and its ability to specifically trace its funds to specific identifiable accounts.[15]

## CONCLUSION

For the reasons set forth herein, the Court should deny the Debtors' Motion and require the Prime Administrator to return the Bittrex Funds.[16]

---

[15]    The Bittrex Administrator is currently working with the Prime Administrator to identify the transactions within the Cross River accounts and will supplement this objection if necessary.

[16]    The Bittrex Debtors did not hold any cryptocurrencies with the Prime Debtors and therefore do not take a position as to whether cryptocurrencies are property of the Prime Debtors' estates.

Date:   February 10, 2025
        Wilmington, DE

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ Kenneth J. Enos
Kenneth J. Enos (Delaware Bar No. 4544)
Robert S. Brady (Delaware Bar No. 2847)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: 302-571-6600
Facsimile: 302-571-1253
Email: kenos@ycst.com
Email: rbrady@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani *(admitted pro hac vice)*
Patricia B. Tomasco *(admitted pro hac vice)*
Daniel Holzman *(admitted pro hac vice)*
Alain Jaquet *(admitted pro hac vice)*
Razmig Izakelian *(admitted pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
Email: susheelkirpalani@quinnemanuel.com
Email: pattytomasco@quinnemanuel.com
Email: danielholzman@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com

**COUNSEL FOR THE BITTREX PLAN ADMINISTRATOR**