## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PRIME CORE TECHNOLOGIES, INC.,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Docket Ref. No. 919, 940, 945, 946, 949, 952, 953, 954, 963, 965** |

## PLAN ADMINISTRATOR'S OMNIBUS REPLY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE PLAN ADMINISTRATOR'S DETERMINATION THAT THE DEBTORS' ASSETS ARE PROPERTY OF THE BANKRUPTCY ESTATES; (II) APPROVING DISTRIBUTIONS OF ESTATE PROPERTY; (III) ESTABLISHING PROCEDURES FOR SETTING A DISPUTED CLAIMS RESERVE; AND (IV) GRANTING RELATED RELIEF

Province Fiduciary Services, LLC, as the Plan Administrator (the "Plan Administrator") appointed pursuant to the confirmed Plan (as defined herein) of the above-captioned debtors (the "Debtors" or "Prime"), hereby files this omnibus reply (the "Reply") in further support of the Motion [Docket No. 919] (the "Distribution Motion") for entry of an order under sections 105(a), 502, 541 and 1142(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and Rule 3021 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) approving the Plan Administrator's determination that the Debtors' Currency[2] is property of the Debtors' estates; (ii) approving distributions of estate property to

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Prime Core Technologies, LLC (5317); Prime Trust, LLC (6823); Prime IRA, LLC (8346); and Prime Digital LLC (4528). The Debtors' mailing address is Prime Core Technologies, Inc. Plan Administrator, c/o Province Fiduciary Services, LLC, 2360 Corporate Circle, Suite 340, Henderson, Nevada 89074. For the sake of convenience, unless otherwise indicated, this Motion refers to the Debtors as "Prime."

[2] For purposes of this Motion, "Cryptocurrency" is defined as a digital currency or Cryptocurrency asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens, and governance tokens. Further, "Currency" is defined as (i) Cryptocurrency and (ii) the USD (United States Dollar). For the avoidance of doubt, foreign currencies are not included and are not the subject of this Motion. On November 13,

Holders of Allowed Claims; (iii) establishing procedures for setting a Disputed Claims Reserve; and (iv) granting related relief.

Contemporaneously herewith, in further support of the Distribution Motion, the Plan Administrator files the (i) *Supplemental Declaration of David Dunn* (the "Dunn Declaration"); and (ii) *Supplemental Declaration of James P. Brennan* (the "Brennan Declaration"), and respectfully states as follows:

## PRELIMINARY STATEMENT[3]

The Plan Administrator was tasked with determining the most equitable and efficient manner to move forward with distributions based on the law and the facts of these cases, and the Distribution Motion achieves that.   The objections received to the Distribution Motion center around one theme: the end result of these Chapter 11 Cases is unfair.   While the Plan Administrator sympathizes and agrees that creditors are victims of the Debtors' grossly negligent mismanagement and fraudulent business practices, who were largely misled by Prime's management that their assets were secure and segregated – that is not the reality of how the Debtors' businesses were conducted.   As indicated in the Motion, the massive fraud and mismanagement by Prime's leadership resulted in substantial shortfalls in Prime's Currency versus the amounts due to its creditors.   With this shortfall in mind and guided by the clear and unequivocal terms of the Plan confirmed by this Court, the Plan Administrator proposes the most equitable solution to distributing funds to creditors in the Distribution Motion.

---

2023, the Debtors filed their *Motion for Entry of an Order Authorizing the Debtors to Sell Certain Foreign Currency Free and Clear of All Liens, Claims, Interests, and Encumbrances Pursuant to Bankruptcy Code Section 363* [Docket No. 413] (the "Foreign Currency Sale Motion").  Several parties objected to the Foreign Currency Sale Motion [Docket Nos. 460 & 461] (together, the "Foreign Currency Objections").  The Foreign Currency Sale Motion and the Foreign Currency Objections remain pending.   Accordingly, the Plan Administrator will seek a resolution regarding distribution of the Foreign Currency through the litigation of the Foreign Currency Sale Motion and/or a separately commenced adversary proceeding.

[3] Capitalized terms not defined herein shall have the meanings ascribed to them in the Distribution Motion.

It is important to remember that the Distribution Motion and its proposed *pro rata* distribution to creditors in US currency garnered wide support from creditors. Indeed, of the more than 46,000 creditors served with the Distribution Motion, the Plan Administrator received less than 20 responses. The responses mostly included collateral attacks on the undisputed terms of the confirmed Plan as well as personal and unjustified attacks on the Plan Administrator. Such collateral and personal attacks lack any evidentiary support and merit and should be overruled. Moreover, the bald assertions that the Plan Administrator has proposed the Distribution Motion to somehow financially enrich himself or the professionals is patently false and offensive and the Court should admonish the parties making such accusations for their lack of candor to the Court.

With respect to the collateral attacks on the confirmed Plan—the Plan Administrator is bound by the terms of the Plan, just as all creditors are, and the Plan Administrator has done his best to implement and abide by the Plan. Specifically, the confirmed Plan determined the appropriate classification of creditors (i.e. general unsecured creditors classified by Debtor and not by fiat or cryptocurrency type) and that distribution should be made utilizing the exchange rates as of the Petition Date. While creditors remain unhappy with the binding terms of the Plan, such concerns should have been raised and adjudicated during the confirmation process. Having failed to do so, the creditors now attempt to utilize this distribution process to re-litigate settled issues and the Court should not allow them to do so.

Certain of the responses assert—again, without evidence—that the assets are not commingled (or that commingling and tracing of assets is somehow irrelevant). However, the burden is on the parties asserting trust beneficiary status to prove their assets can be traced. None of the Objectors have met their burden and the undisputed evidence before the Court is a result of the Plan Administrator's exhaustive investigation into Prime, its assets, and its relationship with

3

its customers.  Unfortunately, the investigation led to the inescapable conclusion and result in these cases – that the assets held by the Wind-Down Debtors are property of the estates and the proposed *pro-rata* distribution to creditors is required pursuant to the undisputed terms of the Plan.

Finally, the Court should take note of what is strikingly missing in any of the Objections— an alternative. No creditor has offered the Plan Administrator or this Court an alternative mechanism or process for distributing the assets to thousands of creditors in an efficient and timely fashion while simultaneously maximizing recoveries for those creditors.  In short, after an exhaustive investigation and careful review of the terms of the confirmed Plan, the Distribution Motion achieves the Plan's goal of allowing distributions to creditors to move forward without further delay.

## **OMNIBUS REPLY**

1.      Through the Distribution Motion, the Plan Administrator seeks entry of an order among other things, approving the Plan Administrator's determination that the Debtors' Currency is property of the Debtors' estates and approving the Distribution Procedures as set forth therein. The Distribution Procedures, put simply, include liquidating all Prime assets and conducting *pro-rata* distributions to creditors in USD.

2.      The Plan Administrator received the following objections which remain outstanding as of the date hereof:

> i.    Objection of Coinbits, Inc. to Plan Administrator's Motion for Determination [Docket No. 945] (the "Coinbits Objection");
>
> ii.   Limited Objection of Shyam Sundar Aswadha Narayanan and Latha Narayanan to Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates [Docket No. 940] (the "Narayanan Objection");
>
> iii.  Objection of George Kushner to Plan Administrator's Motion for Determination [Docket No. 946] (the "Kushner Objection");

4

iv. Objection of SDM, Inc to Plan Administrator's Motion for Entry of an Order (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claim Reserve; and (IV) Granting Related Relief [Docket No. 949] (the "SDM Objection");

v. Realio LLC and Realio Technology, Ltd.'s Joinder in Objections to Plan Administrator's Motion for Determination [Docket No. 952] (the "Realio Joinder");

vi. Objection of Electric Solidus LLC d/b/a Swan Bitcoin to the Plan Administrator's Motion for Entry of an Order (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief [Docket No. 953] (the "Swan Objection");

vii. Limited Objection and Reservation of Rights of TrustToken, Inc. and TrueCoin, LLC to Plan Administrator's Motion for Entry of an Order (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief [Docket No. 954] (the "TrustToken and TrueCoin Objection");[4] and

viii. Objection of Claimant to Plan Administrator's Motion for Entry of Order Regarding Property of the Debtors' Estates and Distribution Motion [Docket No. 963] (the "Claimant Objection").

(collectively, the "Objections").

3.    For the reasons set forth below, the Objections should be overruled and the Distribution Motion granted.

**A.  The Objections are a Collateral Attack on the Confirmed Plan.**

4.    Several of the Objections can be characterized as collateral attacks on the confirmed Plan.[5] Specifically, the Objections make the following arguments which were already decided as

---

[4] TrustToken and TrueCoin's claims relate to Foreign Currency. As noted herein and in the Distribution Motion, the Distribution Motion does not pertain to Foreign Currency. Accordingly, the response is moot.

[5] The *Amended Joint Chapter 11 Plan of Reorganization for Prime Core, Inc. and its Affiliated Debtors*, dated December 14, 2023 (Docket No. 592), as modified by the Initial Plan Supplement (Docket No. 486), the First Amended Plan Supplement (Docket No. 511), the Second Amended Plan Supplement (Docket No. 540), the Third

5

part of Plan confirmation in December 2023:

    i.   Currency should be distributed to creditor classes by type of currency (Coinbits Objection ¶ 9); (Realio Joinder);

    ii.   Claims should be paid based on the exchange rate today instead of the Petition Date (Coinbits Objection ¶ 9); (Kushner Objection, pg. 1); (Realio Joinder); (Swan Objection, pg. 4 n.2); and

    iii.   Cryptocurrency should be distributed in-kind (Coinbits Objection ¶ 9); (Kushner Objection, pg. 1); (Realio Joinder).

As set forth below, each of these issues were settled by the confirmed Plan and the Objectors provide no legal support for upending these determinations at this point.

5.      On December 14, 2023, the Debtors filed the Plan, which was confirmed on December 21, 2023 with the entry of the *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644] (the "Confirmation Order").  The Plan became effective on January 5, 2024 (the "Effective Date").  See Docket No. 694.

6.      The Plan included a classification scheme by which creditors were able to vote on the Plan and receive distributions in accordance with.  It did not include classes by type of currency.  The Plan instead provided for four classes of general unsecured Claims regardless of currency type—Class 3A (Prime Core General Unsecured Claims), Class 3B (Prime General Unsecured Claims), Class 3C (Prime IRA General Unsecured Claims), and Class 3D (Prime Digital General Unsecured Claims).  See Plan, Art. 4.4-4.7.  The Objectors now seek to have this Court upend the classification scheme provided for (and voted on by) creditors by ordering the Plan Administrator to make distributions based on type of currency.  This would be wholly

---

Amended Plan Supplement (Docket No. 594), the Fourth Amended Plan Supplement (Docket No. 615), and the Fifth Amended Plan Supplement (Docket No. 620)  (collectively with the exhibits thereto, the "Plan").

inappropriate and contrary to Bankruptcy law.

7.      Coinbits and Realio also assert that the Plan Administrator has inappropriately focused on "liquidating cryptocurrency at the Petition Date exchange rate" which they assert "overlooks the significant price appreciation in the Bitcoin market since that date." Coinbits Objection ¶ 9. This concern should have been raised during confirmation. Specifically, the Plan provides in section 7.6 that "each Account Holder's Claim is determined by the fair market value of the Cryptocurrency (based in United States dollars pursuant to the Cryptocurrency Conversion Table) held by the Account Holder at the Debtors as of the Petition Date at 11.59 p.m. UTC." See Plan, Art. 7.6. To that end, the Debtors filed the Cryptocurrency Conversion Table with the Plan Supplement during the Confirmation process. **The Cryptocurrency Conversion Table was approved as part of the Plan and Confirmation Order and establishes the appropriate rates for conversion of the Cryptocurrency into U.S. dollars as of the Petition Date**. See Plan, Art. 1.45; Plan Supplement, Exh. I. Again, it would not be appropriate for the Court to order distributions to be made according to a different valuation at this point in the case and the Objectors provide no legal authority for doing so.

**B. Each Creditor Has Been Afforded Due Process During These Chapter 11 Cases.**

8.      Each of the Debtors' tens of thousands of creditors has been afforded due process in these Chapter 11 Cases generally, as well as specifically with respect to the Plan Administrator's reconciliation of claims and the relief sought in the Distribution Motion. Out of 46,097 parties served with the Distribution Motion, only 16 informal responses and formal objections to the Distribution Motion were received—a response rate of less than 1%. See *Affidavit of Service* [Docket No.924]. Additionally, the Plan Administrator has resolved many of the responses received, which resolutions will be reflected in a forthcoming revised proposed order approving

7

the Distribution Motion, to be filed by the Plan Administrator prior to the hearing.

9.     The Plan Administrator's resolutions of responses to the Distribution Motion are indicative of the Plan Administrator's overall approach to the administration of these post-confirmation estates.  The Plan Administrator has performed its obligations under the Plan and the Plan Administrator Agreement in earnest and diligently.

10.     Indeed, not only has the Plan Administrator engaged numerous professionals, including four (4) law firms, forensic accounting experts, accountants and Stretto as the claims and noticing agent to assist and aid the Plan Administrator with its analysis of the Account Treatment Issues, culminating in the Estate Property Determination Notice and Distribution Motion. The Plan Administrator and its professionals have also been effectively and efficiently handling other administrative tasks, a claims reconciliation process, government investigations, and extensive review, analysis and investigation of estate claims and causes of action.  See Dunn Declaration, ¶ 14. The Plan Administrator, and its professionals, have performed a nearly exhaustive review, analysis and investigation of the facts and issues raised by the Estate Property Determination Notice and Distribution Motion, including but not limited to: the nature, extent and enforceability of the Debtors' contractual and non-contractual relationship with its customers; the applicability of Article 8 of the Uniform Commercial Code to certain of the alleged customer agreements and issues before the Court; the willful and knowing failure of the Debtors to segregate customer Cryptocurrency and other cash currency in separate and segregated accounts for the benefit of the Debtors' customers; the false and misleading recording of alleged deposits and withdrawals to and from customer line items in the Debtors' internal ledger; the willful and wanton commingling of Debtor assets with customer deposits; and the willful and wanton use of commingled assets without the knowledge or consent of the Debtors' customers. See id.  The

WBD (US) 4910-0309-1479v2

objections to the Estate Property Determination Notice and Distribution Motion largely raise issues considered by the Plan Administrator and its counsel during its estate property determination investigation, but such positions were rejected in light of the facts and circumstances of these Chapter 11 Cases. See id. Therefore, such objections demonstrate the objecting parties' lack of factual insight, knowledge or understanding of the depth of the Debtors' mismanagement and incompetence or the relevant provisions of the Plan before the Court and should be overruled.

11.    With respect to service of the Distribution Motion and Estate Property Determination Notice, the Plan Administrator complied with the Account Treatment Procedures as approved by the confirmed Plan. See generally Plan, Art. 2.5(b). Specifically, the relevant Account Treatment Procedures related to the Estate Property Determination Notice provide:

> To the extent the Wind-Down Debtor determines that Currency held in an Account constitutes property of the Debtors' Estates, the Wind-Down Debtor shall notify the applicable Customer in writing (which writing may be by email, where possible, and otherwise by publication to the Wind-Down Website)) of same (the "Estate Property Determination Notice"). To the extent a Customer disagrees with an Estate Property Determination Notice, such Customer shall file an objection (an "Estate Property Determination Objection") with the Bankruptcy Court and serve such Estate Property Determination Objection on the Wind-Down Debtor no later than the date that is twenty-one (21) days following the filing of the applicable Estate Property Determination Notice by the Wind-Down Debtor. Upon receipt of an Estate Property Determination Objection, the Wind-Down Debtor shall schedule a hearing before the Bankruptcy Court with respect to the Estate Property Determination Notice and any related Estate Property Determination Objections.

Plan, Art. 2.5(b)(iii). The reliance by some Objectors to the purported "Account Treatment Plan" filed on December 12, 2023 is misplaced and without merit, as the final form of the "Account Treatment Procedures" were specifically included in Article 2.5(b) of the Plan. See, Plan, art. 2.5(b)(iii) and the procedures proscribed with respect to the "Estate Property Determination Notice.

9

12.     On January 15, 2024, the Plan Administrator filed, and served as required,[6] the Estate Property Determination Notice, notifying parties of its determination that Currency is property of the Debtors' estates and incorporating the legal basis and argument underlying its determination from the Distribution Motion.  The Estate Property Determination Notice and Distribution Motion were both noticed with a 21-day objection period, as required by the Account Treatment Procedures.  While the Account Treatment Procedures provide that a hearing is to be scheduled before this Court with respect to the Estate Property Determination Notice and Estate Property Determination Objections, the Procedures do not dictate the timing of such a hearing. Therefore, the Plan Administrator scheduling a hearing 30 days after the Estate Property Determination Notice and Distribution Motion were filed fully complies with the Plan's confirmed Account Treatment Procedures.

13.     Certain of the objecting parties assert that the Plan Administrator failed to abide by alleged meet and confer requirements related to its estate property determination.  See Docket Nos. 945, 949, 952, 953.  Such objectors, however, are referring to meet and confer requirements that appeared in draft Account Treatment Procedures attached to the *Debtors' Memorandum of Law (I) in Support of (A) Approval of the Disclosure Statement on a Final Basis, and (B) Confirmation of the Debtors' Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors, and (II) in Response to Remaining Objections to Confirm*ation [Docket No. 557] (the "Confirmation Brief").  The Confirmation Brief provides that the intention behind the Account Treatment Procedures was to

> provide Customers with clarity concerning, among other things, (a) when the Wind-Down Debtor will notify Customers of how the

---

[6] In addition to first class mail and/or electronic mail service of the Estate Property Determination Notice and Distribution Motion, the Estate Property Determination Notice was also posted on the Wind-Down Trust website, https://primetrustwinddown.com, and emailed by the Plan Administrator to Integrator contacts.  See Dunn Declaration, ¶ 5.

> Wind-Down Debtor proposes to resolve the question of whether assets in Accounts constitute property of the estate, (b) what steps Customers can take if they disagree with the Wind-Down Debtor's conclusion, (c) where the issue will be decided, and (d) to the extent applicable when Customers can expect a distribution of the subject Currency.

Confirmation Brief, ⁋ 65.  Although draft Account Treatment Procedures were attached to the Confirmation Brief, the Debtors specifically noted that "[t]he Debtors are discussing the exact parameters of the Account Treatment Procedures with the Committee and the DIP Lender. The Debtors intend to include the Account Treatment Procedures in Article 2.5 of the Plan." Id. at n.84.  While the draft procedures contemplated a meet and confer requirement, the Account Treatment Procedures that were eventually confirmed in Article 2.5 of the Plan do not include such a meet and confer requirement.  As argued above that many of the objections to the Distribution Motion are collateral attacks on the Debtors' confirmed Plan, none of these objecting parties objected to the specific terms of the Account Treatment Procedures ultimately approved in the Plan—with which the Plan Administrator has fully complied.

14.     Furthermore, the meet and confer requirement that was initially included in draft Account Treatment Procedures would be impossible for the Plan Administrator to adhere to.  There are over 46,000 customer creditors in these Chapter 11 Cases whose treatment and distribution will be affected by the estate property determination sought in the Distribution Motion.  If the Plan Administrator was required (which it is not) to hold a meet and confer with every single one of the Debtors' customer creditors, substantially all of the Debtors' estates' value would be lost and it would likely take an additional year or more for distributions, if any, to be made. See Dunn Declaration, ⁋ 12.  In contrast, while abiding by the confirmed Account Treatment Procedures, the Plan Administrator has been able to investigate the Account Treatment Issues and bring the Distribution Motion before the Court in an efficient manner while preserving value to be

distributed to Holders of Allowed Claims as soon as possible.  Moreover, to the extent any creditors have contacted the Plan Administrator or its professionals with informal objections or questions, the Plan Administrator's team has responded and conferred with such parties in an attempt to resolve issues and move these Chapter 11 Cases forward to a hopeful conclusion. Indeed, the Plan Administrator has been successful in doing so, having resolved more than five (5) potential objections.

15.    At least one of the objecting parties also posits that the Plan Administrator was required to create "a procedure that addresses each customer (for instance through individualized adversary proceedings) . . . ."  Coinbits Objection, ¶ 6; Swan Objection, pg. 6.   First, even the draft Account Treatment Procedures attached to the Confirmation Brief do not require individualized procedures for each of the tens of thousands of Prime customers—the draft contemplated meet and confers with respect to scheduling and discovery related to a motion to be filed by the Wind-Down Debtor related to Account Treatment Issues.   Second, as with the meet and confer requirement, it would not be feasible to bring adversary proceedings against each and every customer in order to determine that Currency is estate property.   Any such adversary proceeding requirement would result in a substantial (to potentially complete) loss of value for these estates to the detriment of all creditors.   See Dunn Declaration, ¶ 12.   Third, the Plan specifically contemplated how Account Treatment Issues related to estate property determinations were to be governed and it was through the Estate Property Determination Notice and objection procedure in these Chapter 11 Cases—not through individual adversary proceedings.   See generally Plan, Art. 2.5(b).

16.    As with any motion in a bankruptcy case, objecting parties were free to serve discovery on the Plan Administrator related to its estate property determination, including the

Currency's commingled nature and the inability to trace specific fiat or Cryptocurrency. Yet no party sought any formal discovery from the Plan Administrator related to the Distribution Motion and Estate Property Determination Notice and the Plan Administrator more than complied with the informal information requests received. Indeed, a factual case such as this could've easily devolved into a multi-front discovery fight but it did not because of the Plan Administrator's transparency and willingness to provide any creditor with the information it requested. The Plan Administrator clearly complied with all of the confirmed Plan's requirements related to making, and noticing creditors of, its estate property determination and afforded all of the Debtors' customers and creditors with appropriate due process under the Plan and the Bankruptcy Code. The Court should not allow objecting parties to argue objections to the Distribution Motion and Estate Property Determination Notice based on conjecture about how such party can trace and identify its alleged property held by the Debtors without putting forth any evidence to support such arguments. Moreover, the Court should not adjourn its consideration of the Distribution Motion to give a handful of objecting parties more time to litigate issues when such parties had adequate notice of the Distribution Motion and, instead of seeking timely discovery, chose to file a procedural objection in an attempt to delay distributions to the vast majority of over 46,000 creditors, who have already waited years to see any return on their claims.

### C. The Currency is Hopelessly Commingled.

17. The Plan Administrator sympathizes with customers' frustrations at how the Debtors conducted business. Such frustrations, however, cannot overcome the hopelessly commingled nature of the Currency—both fiat currency and Cryptocurrency—deposited by customers and held by Prime. No objecting party has offered any evidence to the contrary to prove that the Currency held by Prime was not hopelessly commingled with assets deposited by other

WBD (US) 4910-0309-1479v2

customers and Prime's own assets. Nor has any objecting party put forth evidence (or indicated at this time that they intend to do so at the hearing) to support that such party is able to trace and specifically identify the Currency deposited by the party.

18.    Certain objecting parties assert, without evidentiary or legal support, that, among other things, (a) the Debtors represented throughout these cases that Bitcoin is segregated and can be fully accounted for; (b) the Plan Administrator's analysis is incomplete and too generalized; (c) the Distribution Motion does not distinguish between different types of fiat currency or Cryptocurrency; and (d) the Plan Administrator's analysis does not provide evidence that different types of Cryptocurrency tokens were commingled within FireBlocks.    See, e.g., Coinbits Objection; Realio Joinder; Swan Objection.

19.    As to issues (b) and (c), the Distribution Motion, Dunn Declaration and Brennan Declaration support that the Plan Administrator took its obligations related to the estate property determination seriously and committed extensive resources to researching and analyzing the facts and case law related to its determination. Additionally, the Distribution Motion does distinguish between fiat currency and Cryptocurrency when the nature of the Currency affects the determination issue. Again, the Plan Administrator committed significant resources to its legal and forensic analyses of these Account Treatment Issues and believes that its determination as supported by the Distribution Motion, this Reply and the supporting declarations is the correct outcome—as well as the outcome that maximizes value for estate creditors as a whole.

20.    As to issues (a) and (d) above—that Bitcoin held by Prime is segregated and the Plan Administrator's analysis does not evidence that different types of Cryptocurrency tokens were commingled within Fireblocks—such arguments demonstrate a fundamental misunderstanding as to how Cryptocurrency is held and the nature of how the Cryptocurrency is commingled and unable

14

to be specifically identified within Prime's accounting systems. This business practices and processes utilized by the Debtors resulted in extensive commingling of cryptocurrency making it impossible to trace crypto back to specific customer deposits. Indeed, the repeated process of condensing like crypto currency (i.e. BTC, ETH) with like crypto currency invalidates anyone's ability trace customer's specific crypto. See Brennan Supplemental Declaration ¶ 17.

21.     As addressed in more detail in the Brennan Declaration, all Cryptocurrencies exist on a "blockchain," which is a string of code (the underlying technology) that facilitates the creation of, and subsequent transaction in, a particular Cryptocurrency. See Brennan Declaration, ¶ 7. All transactions are recorded on the blockchain, are publicly available, and reflect all of the Cryptocurrency transactions that occurred on the blockchain at a particular point in time. See id.

22.     It is impossible to identify a specific Cryptocurrency that was owned and transferred by a specific customer to Prime once there is commingling simply by looking at the blockchain—the tokens are fungible, just like fiat currency, and do not have identifying characteristics. Id., ¶ 14. Even though Bitcoin employs the Unspent Transaction Output ("UTXO") model, which allows for identification of certain Bitcoin involved in a transaction, the practicalities of how UTXOs are created, coupled with, among other things, the volume of Bitcoin at Prime, renders it impossible to trace specific Bitcoin currently held by Prime to any specific Bitcoin that a specific customer had transferred to Prime. Id.

23.     Moreover, Prime did not maintain separate or segregated digital wallets for Cryptocurrency that was transferred to Prime. Id., ¶ 15. Instead, Prime held and commingled the Cryptocurrency from its various customers in omnibus digital wallets ("Omnibus Wallets"), where Cryptocurrency of the same type (i.e., BTC, ETH) was commingled with Cryptocurrency of the

same type (*i.e.*, BTC, ETH), including Cryptocurrency of the same type (*i.e.*, BTC, ETH) that Prime used for its own corporate operations and purposes. Id.

24.    The shared Omnibus Wallets were contained in Prime's vaults ("Vaults") with Fireblocks LLC ("Fireblocks").[7] Id., ⁋ 16.   Prime used Vaults within its Fireblocks infrastructure to organize myriad wallets (including the Omnibus Wallets), to implement increased security measures, and to take advantage of efficiencies in transaction policies and other access controls. Id.

25.    Each Prime customer had its own unique digital wallet addresses which it used to deposit Cryptocurrency with Prime ("Deposit Addresses"). Id., ⁋ 17.   Prime would periodically sweep its customer's Deposit Addresses—in other words, collect all the Cryptocurrency of the same type (*i.e.*, BTC, ETH) that had been transferred to the Deposit Addresses and transfer that Cryptocurrency to one or more of the shared Omnibus Wallets controlled by Prime. Id. This process resulted in extensive commingling of Cryptocurrency making it impossible to trace Cryptocurrency back to specific customer deposits. Id. The repeated process of condensing multiple UTXOs into new single UTXOs invalidates anyone's ability trace customer's specific crypto. Id.

26.    Prime utilized various and inconsistent methods for performing deposit sweeps. Id., ⁋ 18.   Specifically, Prime maintained an application that would trigger the sweep based on certain unknown events occurring (for example one customer's transaction request may result in a full sweep). Id. Further, an employee could manually perform a sweep at any given time. Id.

---

[7] Fireblocks is a third-party Cryptocurrency security platform which provides infrastructure for moving, storing, and issuing Cryptocurrency. See Brennan Declaration, n.3. Prime used Fireblocks to hold and manage its Cryptocurrency. Id.  "Vaults" are not their own digital wallet to store Cryptocurrency, but are instead a way of organizing accounts within Fireblocks by grouping multiple digital wallets in a single, central location. Id.  These "vaults" can be managed more efficiently as a group and provide enhanced security across all digital wallets within the vault. Id.

WBD (US) 4910-0309-1479v2

27.     Prime also regularly transferred Cryptocurrency of the same type (*i.e.*, BTC and ETH) among its Omnibus Wallets, further commingling the Cryptocurrency of the same (*i.e.*, BTC, ETH) type that customers provided to Prime.  Id., ¶ 19.  It does not appear that Prime used a consistent or defined process regarding these transfers among its Omnibus Wallets either.  Id.

28.     Since Prime did not maintain segregated digital wallets for each of its customers and the Cryptocurrency of the same type it held was commingled (and similar to its fiat), Prime was forced to rely on its Internal Ledger to attempt to keep track of how much Cryptocurrency Prime owed each of its customers.  Id., ¶ 20.  Prime would credit a customer's balance on its Internal Ledger for any Cryptocurrency that customer sent to Prime through its unique Deposit Address.  Id.

29.     Prime's Internal Ledger did not (and could not) track which of the Omnibus Wallets held the specific Cryptocurrency that a customer had originally transferred to Prime because that Cryptocurrency was commingled with Cryptocurrency of the same type (*i.e.*, BTC, ETH) that other customers had transferred to Prime and with Prime's own Cryptocurrency of the same type within and across multiple Omnibus Wallets. Id., ¶ 21

30.     When a customer requested a withdrawal, Prime relied on the Internal Ledger to validate that the specific customer had previously transferred an amount of Cryptocurrency to Prime sufficient to support the withdrawal request.  Id., ¶ 23.  Prime then checked its multiple Omnibus Wallets to determine which one(s) held sufficient Cryptocurrency of the same type to satisfy the customer's withdrawal request.  Id.  Prime then transferred the Cryptocurrency of the same type from the Omnibus Wallet(s) with sufficient Cryptocurrency of the same type to the customer to complete the transfer.  Id.  Prime did not transfer the specific Cryptocurrency from the original Deposit Address the customer had used, or even from the original Omnibus Wallet(s)

WBD (US) 4910-0309-1479v2

where that customer's Cryptocurrency had initially been swept.  Id.  In other words, the Cryptocurrency Prime would send to a customer to satisfy a withdrawal request was of the same type (i.e., BTC, ETH) but not same specific Cryptocurrency that the customer had originally sent to Prime.  Id.

31.    As a result of the commingling of cryptocurrency, neither Account Holders, customers or Prime can specifically identify, trace, or segregate the specific Cryptocurrency transferred to Prime from the commingled Cryptocurrency of the same type (i.e. BTC, ETH).  Id., ¶ 24.

32.    Additionally, the SDM Objection cites to (i) In re Celsius Network LLC, 647 B.R. 631, 657 (Bankr. S.D.N.Y. 2023), arguing that the Celsius court found assets in investment Earn Accounts to be estate property based on a contract interpretation without an analysis of whether the assets were commingled or traceable; and (ii) the Celsius Custody Order (as defined in the SDM Objection), which SDM asserts resulted in the Celsius court "order[ing] the debtors to return certain cryptocurrency deposited by customers into the debtors' so-called 'Custody Program' on the grounds that such assets were not property of the bankruptcy estate."  See SDM Objection, ¶ 27.  The Celsius decision and Custody Order, however, do not dictate SDM's asserted conclusion that assets held by a debtor as custodian are automatically, and always, not estate property.

33.    First, as acknowledged by SDM, the Celsius decision was factually-driven based on an interpretation of the relevant contracts. See id. at 652.  After holding that "cryptocurrency assets deposited in Earn Account are presumptively property of the estate" based on the terms of the parties' agreement, the Celsius court had no reason to perform a commingling or tracing analysis. See id at 651.  In these Chapter 11 Cases, the Court should similarly hold that the assets are presumptively property of the estate based on the interpretation of the relevant contracts and

18

for the reasons set forth in the Distribution Motion which would moot the need for an analysis of whether the assets are commingled or traceable.  If, on the other hand, the Court were to find a trust relationship existed between the Debtors and certain customers (which it should not), then the Court in these Chapter 11 Cases would need to perform the next layer of analysis required by case law—whether the assets at issue were commingled by the Debtors and, if so, whether such purported trust beneficiaries could trace and identify their specific alleged property.  See Distribution Motion, ¶¶ 77-85; see supra, Section D.

34.    Second, with respect to the Celsius Custody Order, such order was entered upon the Celsius debtors' request for authority to reopen withdrawals for certain customers and certain assets held in the Custody Program and in Withhold Accounts and the rationale underlying the Celsius debtors' request is based on the specific facts and circumstances of the Celsius case and such parties' agreements.  See Celsius Custody Order, recitals; see also Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief, In re Celsius Network LLC, Case No. 22-10964-MG, Docket No. 949 (Bankr. S.D.N.Y. Sept. 1, 2022).  The Celsius Custody Order contains no holding by the Celsius court related to whether assets subject to the Custody Order are estate property.  In contrast, the Celsius Custody Order contains a specific reservation that withdrawals authorized by the order would be different (pro rata distribution versus a withdrawal of all such assets) if "the Court issues an opinion or order finding that digital assets transferred into the Custody Program are not property of the Debtors' estates under section 541 of the Bankruptcy Code . . . ."  In these Chapter 11 Cases, however, even if the Currency was determined to be non-estate property (which is not the case), there is no ability for a toggle between a pro rata distribution to customers versus a distribution of

19

all such assets deposited by each customer to Prime because there are insufficient assets (either

fiat currency or Cryptocurrency by token type) to make a full distributions to customer creditors

(or to other non-customer General Unsecured Creditors).

**D. Even if a Trust Relationship Was Established Between Certain Prime Customers and Prime, None of the Objectors Have Met the Burden of Proving the Currency is not Commingled.**

35.      Coinbits asserts that the Plan Administrator is inappropriately shifting the burden

to thousands of creditors to trace their assets through the Distribution Motion. See Coinbits

Objection ¶ 17.  However, under the circumstances, the burden to prove assets can be traced does

rest with the Objectors.  In re Cath. Diocese of Wilmington, Inc., 437 B.R. 488, 489 n.6 (Bankr.

D. Del. 2010) (stating that purported trust beneficiaries bear the burden of proof with respect to

tracing).  Here, no objector has come close to bearing such a burden. Accordingly, the Court must

find that, based on the Plan Administrator's extensive investigation into Prime's books, records

and accounting, the Currency at Prime was hopelessly commingled and cannot be traced.

36.      While it remains the Plan Administrator's position that Integrators and End-Users

have a debtor/creditor relationship with Prime, not a trust relationship, this Court does not need to

make a determination on the objecting parties' trust relationship arguments in order rule on the

Plan Administrator's distribution relief.  Even if a trust relationship existed between Prime and

certain of its Integrators or End-Users, no objecting party will be able to overcome the second

requirement for establishing a fiduciary or trust exception to the presumption that all creditor assets

in the Debtors' possession at the time of the filing are property of the estate: *i.e.*, that each creditor's

assets can be separately identified and specifically traced.

37.      Case law is clear that, even if a trust relationship existed and could be established,

a trust beneficiary still has the burden to identify its specific trust property or trust funds and, if

commingled with other assets, to trace its particular property or funds.  See Distribution Motion,

20

¶¶ 78-85.  Many objecting parties also overlook that, where purported trust funds have been commingled with other funds in an account held by an alleged trustee, the mere showing that the purported trust funds were deposited into the trustee's commingled account is not sufficient to establish an exception to the presumption that assets are property of the estate.  See First Federal of Michigan v. Barrow, 878 F.2d 912, 915 (6th Cir. 1989).  Instead, purported beneficiaries must trace the specific property allegedly held in trust.  See United States v. Henshaw, 388 F.3d 738 (10th Cir. 2004); In re Schick, 234 B.R. 337, 343–44 (Bankr. S.D.N.Y. 1999); Connecticut General Life Ins. Co. v. Universal Ins. Co., 838 F.2d 612, 620 (1st Cir. 1988).[8]

38.    Although objecting parties have argued that they can trace and identify specific Currency deposited with Prime, such arguments have been made without an evidentiary basis.  Such baseless assertions about tracing and identification hold no water because any such tracing analysis would require that an objecting party analyze all deposits into Prime's accounts—not just that objecting party's deposits alone.

39.    In contrast, the Plan Administrator has provided this Court with support for its determination that the assets are hopelessly commingled. The supporting declarations of James P. Brennan, the Plan Administrator's forensic accounting expert, make clear that all of the Currency in Prime's accounts was hopelessly commingled with no way for any creditor to be able to segregate and identify their specific assets.  See also Distribution Motion, ¶¶ 80-85.

40.    Furthermore, there can be no recovery "where all that can be shown is enrichment

---

[8] These objections also ignore case law specifically holding that property will not be excluded from estate property because it is allegedly held in trust for someone else where mismanagement, fraud, or bad business practices resulted in the commingling of property in violation of the debtor's alleged fiduciary duties.  See In re Sprint Mortgage Bankers Corp., 164 B.R. 224, 229 (Bankr. E.D.N.Y. 1994) (finding that 11 U.S.C. § 541(d) did not apply where the debtor's bad business practices led to the commingling of investor funds into one general operating account rather than establishing separate accounts).  For this same reason, Prime's status as a Nevada trust company does not alter the property of the estate analysis.  Again, while the Plan Administrator is sympathetic to creditors' concerns about the consequences of Debtors' mismanagement, it is simply not the law that customer funds must be excluded as estate property if Debtors committed fraud or misappropriated customer funds.  See Swan Objection, pgs. 4-5, 6.

of the trustee. [The trust property] must be clearly traced and identified in specific property. It is insufficient to show that trust property went into the general estate and increased the amount and value thereof." Connecticut General Life Ins., 838 F.2d at 619 (quoting In re United Cigar Stores Co., 70 F.2d 313, 316 (2d Cir. 1934)). Again, the Plan Administrator agrees with the objecting parties that Prime committed fraud in its dealings with customers, however, the relief sought in the Distribution Motion by the Plan Administrator is not in any way an attempt to enrich the Plan Administrator. In contrast, the Plan Administrator has evaluated a multitude of potential paths forward to making distributions to Holders of Allowed Claims and believes that a determination that Currency is estate property subject to *pro rata* distribution to all Allowed creditors is the correct conclusion under the law and facts of these Chapter 11 Cases. See Dunn Declaration, ¶ 15. More importantly, it promotes the equitable treatment of creditors and will result in a distribution to Holders of Allowed Claims in the most efficient and timely manner. See id.

41. While the Plan Administrator understands objecting parties' frustration at such a determination, attempts to blame the Plan Administrator for Prime's misrepresentations of its trust and fiduciary obligations, as well as its policies and procedures related to customer deposits, do not address the heart of the commingling and tracing issues. The Currency is hopelessly commingled in Prime accounts and no creditor has been, or will be, able to separately identify and specifically trace any trust asset held for such creditor's benefit. Therefore, creditors fail to meet their burden of proof of establishing a fiduciary or trust exception to the presumption that all such assets in the Debtors' possession at the time of the filing are property of the estates. As a result, all of the Debtors' USD and Cryptocurrency assets are property of the Debtors' estates and subject to liquidation and distribution pursuant to the Distribution Procedures and Plan on a *pro rata* basis to all Holders of Allowed Claims against the Debtors pursuant to the Plan.

22

## <u>CONCLUSION</u>

WHEREFORE, the Plan Administrator respectfully requests the Objections, that are not otherwise resolved, be overruled and the Court enter the Proposed Order related to the Distribution Motion and grant the Plan Administrator such further relief as is just and proper.

Dated: February 11, 2025          **WOMBLE BOND DICKINSON (US) LLP**
         Wilmington, Delaware

*/s/ Morgan L. Patterson*
Donald J. Detweiler (Del. Bar No. 3087)
Morgan L. Patterson (Del. Bar No. 5388)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone:    (302) 252-4320
Facsimile:    (302) 252-4330
Email:        don.detweiler@wbd-us.com
              morgan.patterson@wbd-us.com

*Counsel to the Plan Administrator*

23