**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PRIME CORE TECHNOLOGIES, INC.,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENTAL DECLARATION OF JAMES P. BRENNAN
IN SUPPORT OF THE PLAN ADMINISTRATOR'S
DISTRIBUTION MOTION AND ESTATE PROPERTY DETERMINATION**

Under 28 U.S.C. § 1746, I, James P. Brennan, declare as follows under the penalty of perjury:

**A. Prime's Commingling of Cryptocurrency.**

1. On January 15, 2025, I submitted a Declaration (the "Declaration") in support of *Plan Administrator's Motion for Entry of An Order (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief* [Docket No. 919] (the "Distribution Motion"). The Declaration identifies how, based on the records I have reviewed to date, Prime[2] historically

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Prime Core Technologies, LLC (5317); Prime Trust, LLC (6823); Prime IRA, LLC (8346); and Prime Digital LLC (4528) (collectively "Prime" or the "Debtors"). The Debtors' mailing address is Prime Core Technologies, Inc. Plan Administrator, c/o Province Fiduciary Services, LLC, 2360 Corporate Circle, Suite 340, Henderson, Nevada 89074.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Distribution Motion or the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core, Inc. and its Affiliated Debtors*, dated December 14, 2023 (Docket No. 592), as modified by the Initial Plan Supplement (Docket No. 486), the First Amended Plan Supplement (Docket No. 511), the Second Amended Plan Supplement (Docket No. 540), the Third Amended Plan Supplement (Docket No. 594), the Fourth Amended Plan Supplement (Docket No. 615), and the Fifth Amended Plan Supplement (Docket No. 620) (collectively with the exhibits thereto, the "Plan").

commingled its own Currency and Currency transferred to Prime by its customers in Prime accounts or digital wallets, which is why it is impossible to trace, segregate, or otherwise identify specific assets transferred to Prime by any Account Holder or customer.

2. I submit this Supplemental Declaration (the "Supplemental Declaration") to address an apparent misunderstanding by certain objections filed in response to the Distribution Motion concerning my testimony that Prime hopelessly commingled the cryptocurrency it held.

3. Specifically, in its Objection to the Distribution Motion [Docket No. 945], Coinbits, Inc. ("Coinbits") argues:

> "(a). The Determination Motion represents that there was "commingling" across all cryptocurrencies. However, the fundamental technological reality is that BTC, ETH, and other blockchains operate as wholly separate ledgers. It is physically and technologically impossible to mix BTC (governed by an Unspent Transaction Output Model (UTXO) with ETH or Solana (both account-based models) in a single omnibus balance. Coinbits and its customers used only BTC, and there is no evidence to suggest that BTC was part of any alleged "commingling" with other assets. The practical barriers to merging funds across distinct blockchains render the commingling claim untenable for BTC. Consequently, any BTC deposits should be identifiable and distributable on a pro- rata basis among actual BTC depositors, rather than treated as if they were lumped together with unrelated assets on other chains.
>
> (b) There is no evidence that BTC balances were in fact commingled with other cryptocurrencies within the Fireblocks infrastructure.

Coinbits Objection ¶¶ 8(a)-(b).

4. Electric Solidus, LLC d/b/a Swan Bitcoin ("Swan") similarly asserts in its Objection to the Distribution Motion [Docket No. 953] (the "Swan Objection") that:

> A key foundation of the [Distribution] Motion is that the cryptocurrency held by the Debtors has been "hopelessly commingled" and therefore cannot be traced and distributed to creditors and customers. This is absurd, and demonstrates a failure to either understand the nature of the cryptocurrency assets at issue and/or to properly analyze the Debtors' books and records.

> One of, if not the, key virtue of cryptocurrencies is that they are fundamentally impossible to commingle, because the on-chain identity of each token allows for precise asset tracing and distribution. Because cryptocurrencies such as Bitcoin are built on blockchain technology, they operate as separate ledgers and cannot be combined into a single account. Moreover, the blockchain technology allows for the tracing of cryptocurrencies, regardless of the negligent and intentional mishandling of records by the Debtors. Therefore, cryptocurrency deposits that are rightly the property of Swan and its customers should be identifiable and distributable on a pro rata basis. Moreover, there is no evidence (and none has been presented) that cryptocurrency balances were in fact commingled within the Fireblocks infrastructure.
>
> The Motion asserts that such tracing and distribution is impossible due to the volume of holdings, but this again fails to comprehend the nature of cryptocurrencies. Because each cryptocurrency deposit is associated with a unique address, with every on-chain transaction visible in the publicly verifiable ledger. Despite the Debtor's mismanagement of its records, the opposing sides of each transaction—for both cryptocurrency and fiat currency, or cash—can be traced and matched. Thus, robust forensic analysis is not only possible but routine and frequently performed in bankruptcies and other financial investigations.

Swan Objection ¶¶ 5-6.

5. Both Coinbits and Swan misunderstand, if not misread, the commingling analysis and testimony set forth in my Declaration.

6. As noted in my Declaration, the term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. Bitcoin ("BTC") and Ether ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

7. All cryptocurrencies exist on a "blockchain." A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency. All transactions are recorded on the blockchain and are publicly available. When market participants seek to transact in a particular cryptocurrency, those

3

transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks." Those "blocks" are publicly available and reflect all of the cryptocurrency transactions that occurred on the blockchain at a particular point in time. Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain"—a "block"-"chain."

8. There are a number of different blockchains.

9. Users generally hold crypto in digital wallets. On the blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."

10. "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain address. Like public keys, private keys similarly consist of multi-digit alphanumeric strings. However, unlike public keys—which are knowable by the public and used simply to identify a digital wallet—private keys are known only by the owner of the digital wallet and used by the owner to access and manage the digital wallet.

11. Many digital wallets and private keys are "custodial," which means that they are possessed by a third party, such as a centralized crypto exchange. In contrast, "self-hosted" digital wallets have no third party that is taking custody of the crypto.

12. Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

13. Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed. They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto. Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction. Most smart contracts are designed so they can never be changed. One example of the use of a smart contract is a "forwarder" address. If

someone sends crypto to a "forwarder" address, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet address.

14. It is impossible to identify a specific Cryptocurrency that was owned and transferred by a specific customer to Prime once there is commingling simply by looking at the blockchain—the tokens are fungible, just like fiat currency, and do not have identifying characteristics. Even though Bitcoin employs the Unspent Transaction Output ("UTXO") model, which allows for identification of certain Bitcoin involved in a transaction, the practicalities of how UTXOs are created, coupled with, among other things, the volume of Bitcoin at Prime, renders it impossible to trace specific Bitcoin currently held by Prime to any specific Bitcoin that a specific customer had transferred to Prime.

15. Moreover, Prime did not maintain separate or segregated digital wallets for crypto that was transferred to Prime. Instead, Prime held and commingled the crypto from its various customers in omnibus digital wallets ("Omnibus Wallets"), where the crypto of the same type (*i.e.* BTC, ETH) was commingled with crypto of the same type (i.e. BTC, ETH), including crypto of the same type (*i.e.* BTC, ETH) that Prime used for its own corporate operations and purposes.

16. The shared Omnibus Wallets were contained in Prime's vaults ("Vaults") with Fireblocks LLC ("Fireblocks").³ Prime used Vaults within its Fireblocks infrastructure to organize myriad wallets (including the Omnibus Wallets), to implement increased security measures, and to take advantage of efficiencies in transaction policies and other access controls.

---

³ Fireblocks is a third-party crypto security platform which provides infrastructure for moving, storing, and issuing crypto. Prime used Fireblocks to hold and manage its crypto. "Vaults" are not their own digital wallet to store crypto, but are instead a way of organizing accounts with Fireblocks by grouping multiple digital wallets in a single, central location. These "vaults" can be managed more efficiently as a group and provide enhanced security across all digital wallets within the vault.

17. Each Prime customer had its own unique digital wallet addresses which it used to deposit crypto with Prime ("Deposit Addresses"). Prime would periodically sweep its customer's Deposit Addresses—in other words, collect all the crypto of the same type (*i.e.* BTC, ETH) that had been transferred to the Deposit Addresses and transfer that crypto to one or more of the shared Omnibus Wallets controlled by Prime. This process resulted in extensive commingling of crypto making it impossible to trace crypto back to specific customer deposits. The repeated process of condensing multiple UTXOs into new single UTXOs invalidates anyone's ability trace customer's specific crypto.

18. Prime utilized various and inconsistent methods for performing deposit sweeps. Specifically, Prime maintained an application that would trigger the sweep based on certain unknown events occurring (for example one customer's transaction request may result in a full sweep). Further, an employee could manually perform a sweep at any given time.

19. Prime also regularly transferred crypto of the same type (*i.e.* BTC and ETH) among its Omnibus Wallets, further commingling the crypto of the same (*i.e.* BTC, ETH) type that customers provided to Prime. It does not appear that Prime used a consistent or defined process regarding these transfers among its Omnibus Wallets either.

20. Since Prime did not maintain segregated digital wallets for each of its customers and the crypto of the same type it held was commingled (similar to its fiat), Prime was forced to rely on its Internal Ledger to attempt to keep track of how much crypto Prime owed each of its customers. Prime would credit a customer's balance on its Internal Ledger for any crypto that customer sent to Prime through its unique Deposit Address.

21. Prime's Internal Ledger did not (and could not) track which of the Omnibus Wallets held the specific crypto that a customer had originally transferred to Prime because that crypto was

commingled with crypto of the same type (*i.e.* BTC, ETH) that other customers had transferred to Prime and with Prime's own crypto of the same type within and across multiple Omnibus Wallets.

22. Based on my experience, Prime's haphazard transferring of crypto, lack of defined processes and procedures, and essentially nonexistent record keeping are red flags of potential fraud. At a minimum, it demonstrates poor asset management and suggests that Prime was moving assets around to manage customers withdrawals or its own needs without consideration of the ultimate negative impact such management had on the business overall.

23. When a customer requested a withdrawal, Prime relied on the Internal Ledger to validate that the specific customer had previously transferred an amount of crypto to Prime sufficient to support the withdrawal request. Prime then checked its multiple Omnibus Wallets to determine which one(s) held sufficient crypto of the same type to satisfy the customer's withdrawal request. Prime then transferred the crypto of the same type from the Omnibus Wallet(s) with sufficient crypto of the same type to the customer to complete the transfer. Prime did not transfer the specific crypto from the original Deposit Address the customer had used, or even from the original Omnibus Wallet(s) where that customer's crypto had initially been swept. In other words, the crypto Prime would send to a customer to satisfy a withdrawal request was of the same type (*i.e.* BTC, ETH) but not same specific crypto that the customer had originally sent to Prime.

24. As a result of the commingling of cryptocurrency, neither Account Holders, customers or Prime can specifically identify, trace, or segregate the specific crypto transferred to Prime from the commingled crypto of the same type (*i.e.* BTC, ETH).

B. **Reservation Regarding Conclusions and Opinion.**

25. The facts set forth in the Supplemental Declaration are based on: (i) my personal knowledge and/or on information provided to me by Prime, former Prime management and

employees, Wind-Down Debtor, the Plan Administrator and/or the Plan Administrator's professionals, or (ii) my review of relevant documents.

26. Except as otherwise indicated herein, all conclusions and opinions set forth in this Supplemental Declaration are based on: (i) the facts as known to me, including those set forth herein; (ii) my experience and knowledge of Prime's operations; and (iii) my experience and training as a professional. The opinions and conclusions expressed in this Supplemental Declaration are subject to change based on additional data, facts, and information that may be received, including, among other things, additional data, facts, and information that becomes available in the public domain or that is made available by the Wind-Down Debtor, the Plan Administrator or other parties during discovery or otherwise.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 11, 2025
Jupiter, Florida

/s/ *James P. Brennan*
James P. Brennan
Senior Managing Director
J.S. Held, LLC