IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PRIME CORE TECHNOLOGIES INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-11161 (JKS)<br><br>(Jointly Administered)<br><br>Re: Docket No. 948 |

**PLAN ADMINISTRATOR'S OBJECTION TO COINBASE, INC.'S MOTION FOR LEAVE TO FILE AN AMICUS RESPONSE TO THE PLAN ADMINISTRATOR'S MOTION FOR ENTRY OF AN ORDER APPROVING THE PLAN ADMINISTRATOR'S DETERMINATION THAT THE DEBTORS' ASSETS ARE PROPERTY OF THE BANKRUPTCY ESTATES**

Province Fiduciary Services, LLC, solely in its capacity as the plan administrator (the "Plan Administrator") of the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 644-1] (as modified or amended and collectively with the exhibits thereto, the "Plan"),[2] by and through its undersigned counsel, hereby submits this objection (the "Objection") to *Coinbase, Inc.'s Motion for Leave to File an Amicus Response* (the "Amicus Brief") *to the Plan Administrator's Motion for Entry of an Order Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates* [Docket No. 948] (the "Amicus Motion").

In support of its Objection, the Plan Administrator respectfully states as follows:

**PRELIMINARY STATEMENT**

At the 11th hour, long after the creditors have spoken, the Debtors' Plan has gone effective, and while creditors have waited long enough for distributions in these Chapter 11 Cases,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8346); and Prime Digital, LLC (4528). The Debtors' mailing address is Prime Core Technologies, Inc. Plan Administrator, c/o Province Fiduciary Services, LLC, 2360 Corporate Circle, Suite 340, Henderson, Nevada 89074.

[2] Capitalized terms used but not defined herein are ascribed the definitions given to them in the Plan or the Distribution Motion (defined herein), as applicable.

Coinbase seeks leave to file an *Amicus* brief with the Court and offer its two-cents on the Plan Administrator's Distribution Motion. Coinbase is neither a creditor nor party-in-interest in these Chapter 11 Cases and holds no economic stake in the Cases or the proposed distributions sought to be made in the Distribution Motion. Instead, Coinbase seeks permission to file the *Amicus* Brief, not because of its reasoned reading of the binding terms of the confirmed Plan, or even a modest understanding of the unique facts and circumstances of these Cases which make them wholly distinguishable,[3] but rather because Coinbase appears to have a questionable, if not suspect, "concern" that the relief sought by the Distribution Motion will "have a profound impact on the application of Article 8 of the Uniform Commercial Code ("Article 8") to custody arrangements that would extend far beyond the confines of the instant case and harm the stability of the broader financial markets."[4] By requesting that this Court offer Coinbase the opportunity to litigate issues in these Chapter 11 Cases at the Court's, the Debtors', and the creditors' expense, Coinbase is steering the Court away from judicial efficiency and the goals of the Bankruptcy Code, the Plan and these overall Chapter 11 Cases.

Indeed, the simple solution to Coinbase's "concern" is inclusion of clear and unequivocal language to the form of order granting the Distribution Motion proposed by the Plan Administrator that limits the precedential value of the Court's order/opinion related to the Distribution Motion to the unique facts of these Chapter 11 Cases. Coinbase, however, is not interested in such a simple solution, choosing instead to press the Court to make findings wholly inconsistent with the relief requested by the Plan Administrator in the Distribution Motion.

---

[3] The facts in these Chapter 11 Cases include: pervasive fraud, gross mismanagement, director and officer malfeasance, negligence, self-dealing, deceit, non-compliance of applicable state and federal regulations and laws, the loss of access to a digital wallet holding tens of millions of dollars of cryptocurrency, and sizeable claims and causes of action, including preference and avoidance claims and causes of action, all of which remain to be litigated and which serve as significant sources of recovery for the Debtors' creditors, the victims in these cases.

[4] Amicus Motion at ¶2.

Findings, which if adopted by the Court, would throw these Cases into a prolonged tailspin and erode creditors' recoveries.

The Plan Administrator, pursuant to the Plan and Plan Administrator Agreement, has been tasked with addressing Prime's fraud and malfeasance – which resulted in a significant shortfall in assets against considerable liabilities – while also administering the estates to ensure fair and equitable distributions to creditors.[5]  The Plan Administrator has accepted and met his tasks, under the watchful eye of the Wind-Down Debtor Oversight Committee. The Distribution Motion represents not only the culmination of his extensive efforts and consideration, but also represents the most equitable solution for all creditors in these Chapter 11 Cases.  For reasons unknown to the Plan Administrator, Coinbase seeks to upend the Plan Administrator's efforts and work.

As an initial matter, the Court should not countenance Coinbase's gamesmanship and should deny the *Amicus* Motion outright.  Coinbase's lead counsel, Cleary Gottlieb Steen & Hamilton LLP ("Cleary"), represents a potential preference defendant in these Cases who is in possession of assets which Prime has determined are property of Prime's estate and therefore subject to avoidance.  This potential defendant represented by Cleary stands to benefit from the position urged by Coinbase, while other existing and potential preference defendants have, with the Plan Administrator's consent, preserved the "property of the estate" issues as part of the proposed order granting the Distribution Motion and have not objected to the *pro rata* distribution to creditors sought by the Distribution Motion.  Lead counsel's dual representation of this potential defendant in avoidance litigation and Coinbase raises serious questions as to Coinbase's motives before the Court as well as the required "impartiality" of Coinbase as a proposed *amicus*.

---

[5] See Plan, Art. 6.10 (c) (Appointment of Plan Administrator), 6.10 (d) (Responsibility of the Plan Administrator) and Art. 7 (Distributions).

3

Leaving lead counsel and Coinbase's "impartiality" to the side, the Court should exercise its discretion and deny the *Amicus* Motion as a matter of fact and law because Coinbase: (i) fails to satisfy its heavy burden before the Court; (ii) offers a factually and legally flawed, if not incomplete, *Amicus* Brief to the Court; and (iii) seeks to supplant the efforts and responsibilities of the Plan Administrator and Wind-Down Debtor Oversight Committee, all to the detriment of Prime's creditors—the economic stakeholders in these Cases.

Lastly, other than possibly aiding the defense of potential preference defendants, causing needless delay and expense, and reducing creditor recoveries, the application of Article 8 of the Nevada Uniform Commercial Code, N.R.S. 104.8101 et. seq., including the priority of distribution provisions of N.R.S. 104.8511, when applied to the unique facts and circumstances of these Chapter 11 Cases, compel *pro rata* distributions to creditors no different than the *pro rata* distributions sought by the Plan Administrator's Distribution Motion. Consequently, the proposed *Amicus* Brief is of no assistance to the Court.

In sum, what is clear and undisputed, after considerable time, expense, analysis and investigation, is that the Plan Administrator seeks authority, pursuant to the Plan and the Plan Administrator Agreement, to finally, and fairly, make distributions to the victims of the Debtors' untoward business practices and conduct. Coinbase, neither a creditor, nor party-in-interest in these Chapter 11 Cases, has lied in wait to lodge a suspect, incomplete and unreliable *Amicus* Brief, that seeks to upset the "apple cart" for reasons that are far from pure. The net result is needless delay, expense, dissipation of estate assets and resources, and reduced recoveries to the Debtors' creditors. Accordingly, for the reasons set forth more fully below, the *Amicus* Motion should be denied.

**BACKGROUND**

1. The Plan Administrator incorporates the Plan, the Confirmation Order [Docket No. 644], the Memorandum of Law in Support of the Plan [Docket No. 557], as well as the facts set forth in the *Plan Administrator's Motion for Entry of an Order (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief* [Docket No. 919] (the "Distribution Motion") and the declarations filed in support thereof [Docket Nos. 920–922, 968, 969] as if more fully set forth herein.

**OBJECTION**

2. Under certain circumstances, courts will exercise their discretion to "allow an amicus curiae brief to be filed if … (1) the movant has an adequate interest in the appeal; (2) the information supplied is desirable; and (3) the information being provided is relevant." United States v. Walmart Inc., 2021 U.S. Dist. LEXIS 110721, *2 (D. Del. June 14, 2021) (internal citations omitted). As set forth below, Coinbase fails with respect to each of these criteria and, accordingly, the *Amicus* Motion should be denied.

**A.    Coinbase Fails to Demonstrate an Adequate Interest in the Matter Under Consideration.**

3. First, Coinbase's interest in the Distribution Motion is not adequate but instead represents a covert, impartial, and manipulative interest – seeking to influence the Court with respect to future adversary proceedings for the benefit of a select few creditors, including creditors represented by Coinbase's counsel. Indeed, bankruptcy courts have denied leave to file an amicus brief where the party seeking leave was in similar circumstances and could never be seen to be neutral. See, e.g., Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 550 B.R. 241 (Bankr. S.D.N.Y. 2016) (defendants in adversary proceedings initiated by the Madoff trustee moved to

5

intervene or in the alternative participate as *amicus curiae* in a Madoff adversary proceeding in which they were not defendants). Faced with similar facts, the Madoff court held that:

> [a]n amicus is not a party to the litigation, but participates only to assist the court. The usual rationale for amicus curiae submissions is that they are of aid to the court and offer insights not available from the parties. While there is certainly no requirement that amici be totally disinterested, the partiality of an amicus is a factor to consider in deciding whether to allow participation.

Id. (internal quotes and citations omitted). In that case, the court ultimately denied the motion for leave to file *amicus* brief because the movants were defendants in an unrelated Madoff adversary proceeding and the court realized that they could not provide neutral assistance. For the same reason alone, Coinbase's *Amicus* Motion here should be denied.

4.      Making matters worse, Coinbase correctly states that it has no financial interest in the claims against the estates that will be affected by this Court's decision on the Distribution Motion. Coinbase instead attempts to argue that if the Distribution Motion is granted the "sky will fall" above various financial markets and/or businesses like Coinbase. Such assertions are neither true nor realistic. The issues raised in the Distribution Motion are very clearly fact specific and any party would have an incredibly difficult time utilizing the outcome of the Distribution Motion as precedent – let alone binding precedent – in any other bankruptcy or financial market related cases. Further, without any financial stake in the matter, Coinbase seeks to stall the Plan Administrator's attempts to provide timely distributions to creditors who have waited years for their funds. Indeed, Coinbase supports its assertions that it should be able to file its *Amicus* Brief by citing to a case where a creditors' committee sought *amicus* relief; however, a committee with a fiduciary obligation to creditors is the opposite of Coinbase's interest here, which is to assist itself and a select few other parties in continuing to withhold estate assets through litigation. See In re Fam. Christian, LLC, 530 B.R. 417, 425 (Bankr. W.D. Mich. 2015) (granting a committee in the underlying bankruptcy case relief to file an amicus in an adversary proceeding). Coinbase

relies on a litany of other cases in the *Amicus* Motion where parties were permitted to file *amicus* briefs, however, each is factually inapposite to the circumstances of these Cases and cannot be relied on to support Coinbase's intrusion into this proceeding. See cf. In re W.R. Grace & Co., 2016 WL 6068092 at n.37 (Bankr. D. Del. Oct. 17, 2016), aff'd in part, vacated in part, remanded, 900 F.3d 126 (3d Cir. 2018) (granting asbestos trust leave to file an *amicus* in an adversary proceeding related to asbestos-related claims); In re Gawker Media LLC, 581 B.R. 754, n. 7 (Bankr. S.D.N.Y. 2017) (granting media organizations leave to file an amicus related to motion to enforce plan releases/injunctions that could affect potential causes of action against such organizations); In re FirstEnergy Sols. Corp., 2018 WL 2315916 at *6 (Bankr. N.D. Ohio May 18, 2018) aff'd in part, rev'd in part and remanded, 945 F.3d 431 (6th Cir. 2019) (granting leave to file an amicus to sponsoring companies of a group *previously granted* right to intervene); In re Karlinger-Smith, 544 B.R. 126, n. 31 (Bankr. W.D. Tex. 2016) (summarily granting *unopposed* motion for leave to file amicus); In re Stringer, 508 B.R. 669, 670 (Bankr. N.D. Miss. 2014) (granting *unopposed* motions for leave to file amicus related to chapter 13 plan dispute related to over-secured lienholder and contract interest rate).

5.  The Court should not allow this interference.

**B.  Coinbase Fails to Demonstrate its Participation Would be Desirable.**

6.  Next, Coinbase's participation would not be desirable and would lead to an unnecessary distraction and waste of estate resources. Such wasted resources only further impact Prime's creditors, who have already suffered due to the mismanagement of the Debtors' pre-petition leadership. There will be no broader implications to various financial markets or Coinbase's business, as the Distribution Motion's proposed relief is narrow and unique to the present cases. Specifically, the relief sought applies solely in the bankruptcy context and is needed to address the Debtors' challenging issues – namely the commingling and shortfall of assets that

7

was uniquely caused by mismanagement and misconduct of the Debtors' pre-petition leadership – with the goal of allowing for a prompt, equitable distribution to the Debtors' stakeholders. This narrow relief unique to the present bankruptcy case will not have far-reaching effects as suggested by Coinbase.

**C.     Coinbase Fails to Demonstrate the *Amicus* Brief Would be Relevant to the Matter Before the Court.**

7.    Finally, the issues raised in Coinbase's proposed response to the Distribution Motion, particularly with respect to Article 8 of the Uniform Commercial Code ("Article 8"), are not relevant to the Court's decision on the Distribution Motion. Put simply, they are a distraction. No economic actor in these Chapter 11 Cases has raised these issues (most likely for the reasons set forth below). Further, Article 8 is one of a slew of legal issues the Plan Administrator and his counsel considered and discarded through its investigation. The insinuation by Coinbase that the Plan Administrator was obligated to place all legal theories considered and rejected by his team in front of the Court for consideration borders on absurd. It would be yet another waste of time and resources for the creditors and the Court.

8.    For the reasons set forth above, the Court should not exercise its discretion and the *Amicus* Motion should be denied.

## REPLY TO AMICUS RESPONSE

9.    If the Court is inclined to exercise its discretion to grant the *Amicus* Motion, the Article 8 issues raised therein are flawed in fact and law and should be rejected by the Court as meritless. The unique facts of these Chapter 11 Cases are such that it would be impossible to assert that each creditor (or any creditor) holds a security entitlement under Article 8 because Prime was not a securities intermediary for purposes of Article 8 and did not follow the procedures required by the statute to create a security entitlement for each customer. Further, no court has ruled that a digital asset is a security for purposes of Article 8 and it is clear that cash alone is *not* a security.

8

From every angle, it is evident that Article 8 does not apply to these facts or, at most, may apply to only a few customers, which would result in inequitable treatment for the entire creditor body, in direct contravention of the Plan's classification and treatment of General Unsecured Creditors in the same class by Debtor entity.  See Plan, Art. 4.4-4.7.

**A.      There is No Precedent for a Finding That Digital Assets are "Financial Assets" Under Article 8.**

10.     Despite Coinbase's comments as if it is a certainty, the truth is that no bankruptcy court has ever found that digital assets, such as cryptocurrency, are financial assets under Article 8. Nor does Coinbase offer any case law for such a finding. Rather, Coinbase's support is the 2022 Article 8 Comments to "Securities Intermediary," which state that a "cryptocurrency exchange that holds only cryptocurrencies (and not securities) for customers might be a securities intermediary." UCC § 8-102, Comment 9 (2022).  And it is telling that the comments themselves characterize this as only a possibility – not a certainty.

11.     Accordingly, Coinbase is asking this Court to rule on an issue of first impression in a case where the facts do not support such a finding and no party in interest has raised the issue. This is inappropriate interference with the Court and the Plan Administrator's complex and costly administration of these Cases.  By requesting that this Court offer Coinbase the opportunity to litigate this issue in these Cases at the Court's, the Debtors', and the creditors' expense, Coinbase is steering the Court away from judicial efficiency and the goals of these bankruptcy proceedings.

12.     It would be inappropriate for this Court to make such a finding in a case of this nature—where a finding on Article 8 is not necessary to decide the relief sought in the Distribution Motion and no actual party in interest (out of 46,000 parties served with the Motion) has raised the issue— and should decline to do so.

**B.    The Fiat Assets are Not Subject to Article 8.**

13.    Cash, including the Debtors' fiat cash, is not intended to be a standalone financial asset covered by Article 8. Article 8 affords no rights as to purely cash assets. The Debtors accounts in which Fiat cash was held were not by definition "securities accounts" and the Debtors took no steps to cause their accounts in which fiat cash was held to become "securities accounts." Cash is only considered a financial asset when it is incidental to securities in security accounts – which was never the case here.

**C.    The Terms of the Prime Agreements and the Facts of these Cases Make Clear that Prime Was Not a "Securities Intermediary" and Fiat and Cryptocurrency Subject to the Distribution Motion Were Not "Financial Assets" that Were Held in a "Securities Account" by a "Securities Intermediary."**

14.    Prime had numerous agreements with its customers (both Integrators and some End-Users). Certain of the Custodial Agreements and End-User Agreements (collectively, the "Prime Agreements"), contained language stating that "Custodial Property" should be treated as "Financial Assets" pursuant to Article 8 of the UCC. This mere recitation does not and cannot change the real-world, undisputed *facts* which establish that Prime was not a "securities intermediary" and the assets transferred to it were not "securities" nor "financial assets" that were held in a "securities account" by a "securities intermediary" within the mean of Article 8.

15.    Specifically, it is clear that the Prime Agreements and the facts of these Cases contradict Article 8. In particular, (i) Prime was not a securities intermediary because it did not maintain securities accounts or provide securities intermediary services to its customers – nonetheless in the ordinary course of its business; (ii) Prime did not perform securities intermediary duties with respect to fiat or crypto; and (iii) Prime did not maintain fiat or crypto in securities accounts within the meaning of Article 8.

16.    As an initial matter, a securities intermediary under Article 8 is a "financial institution" that maintains securities accounts for others and is acting in that capacity. See N.R.S.

§ 8-102(a)(14). The UCC defines a securities intermediary as "a person, including a bank or broker, that **in the ordinary course of its business** maintains securities accounts for others and **is acting in that capacity**[,]" UCC § 8-102(a)(14)(ii)[6] and a "securities account" is defined as an "account to which a financial asset is or may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat the person for whom the account is maintained as entitled to exercise **the rights that comprise the financial asset**." UCC § 8-501(a) (emphasis added). Additionally, the Official Comments to the 2022 Amendments to Article 8 recognize, with respect to securities intermediaries, that "[t]his 'ordinary course' requirement does not have a fixed quantitative requirement and is determined by the facts of each case… Law other than the UCC may determine who may legally engage in such a business." See UCC § 8-102, Comment 14 (2022).

17. *First,* the facts of these Cases make clear that Prime was not a securities intermediary and never was acting in the capacity as a securities intermediary. It is not enough for an entity to simply hold itself out as a securities intermediary without more – *i.e.*, without also *acting* as a securities intermediary. See, e.g., Parseghian v. Frequency Therapeutics, Inc., 2023 WL 3533479, at *2 (Del. Super. May 18, 2023) (holding that there are limits to what constitutes a "securities intermediary").

18. Prime did not, in its ordinary course of business, or in any capacity, maintain securities accounts for its customers or provide security intermediary services to its customers. Coinbase does not allege otherwise.

19. Prime never marketed that it was in the ordinary course of business of establishing and maintaining securities accounts and providing security intermediary services, so there was also

---

[6] "Securities intermediary" is also defined to include a clearing corporation (UCC § 8-102(a)(14)(i)), but Prime is not a clearing corporation.

11

no actual expectation by any Prime customers that this was Prime's ordinary course of business and that Prime was a securities intermediary.

20. Prime's customers engaged Prime to serve as an "on-and-off ramp" and "payment rail". Specifically, Prime's customers transferred fiat and crypto to Prime (the "on ramp"). Prime then held and controlled the fiat and/or crypto until either: (i) Prime's customers instructed Prime to transfer fiat, or convert crypto to fiat for transfer, to others on behalf of and pursuant to Prime customers' directions for a fee (the "payment rail"); or (ii) Prime's customers withdrew the value of certain fiat and crypto that Prime's customers previously had transferred to Prime (the "off ramp").

21. *Second*, even if the Court were to find that Prime was a securities intermediary (which it should not), Prime did not perform securities intermediary duties with respect to any fiat or cryptocurrency in its possession.

22. As the UCC official comments note, simply having a financial asset or security held in an arrangement with an intermediary is not enough to create a "securities account" within the meaning of UCC section 8-501. See UCC § 8-501, Comment 1 (2022).

> [T]here are many arrangements between intermediaries and other persons concerning securities or other financial assets which do not fall within the definition of 'securities account' because the intermediaries have not undertaken to treat the other persons as entitled to exercise the ordinary rights of an entitlement holder specified in the Part 5 rules . . . [Rather,] whether the relationship between an institution and a person on whose behalf the institution holds an asset falls within the scope of the term securities account as defined in Section 8-501 . . . turns in large measure on whether it makes sense to apply the Part 5 [duties] to the relationship.

UCC § 8-102, Comment 9 (2022). Therefore, the UCC places a heavy emphasis on the Part 5 duties to determine whether an Article 8 relationship exists between the parties.

23. Prime's duties associated with the fiat and cryptocurrency transferred to it by its customers did not correlate to the Part 5 duties. In particular, the recitation of rights and

responsibilities of Prime and its counterparties in the Prime Agreements cited by Coinbase, establish that Prime has no, and was not intended to have, a "perfect match" obligation as anticipated by Section 8-504, a duty to obtain payment or distribution under Section 8-505, a duty to exercise its counterparties rights as directed by it under Section 8-506, or a duty to exchange any asset to another form of holding Section 8-508.

24. *Third*, the facts of these Cases make clear that Prime did not maintain any fiat or cryptocurrency in any "securities accounts" as defined by Article 8, Prime failed to abide by industry standards for what is required to establish a "securities account" as defined by Article 8, and Prime failed to use language in the Prime Agreements pertaining to Article 8 that are industry norm. Coinbase has failed to produce any evidence to the contrary.

25. Importantly, given the rampant fraud that was occurring at Prime, it is unclear whether securities accounts or securities entitlements could ever have been created. Even if one assumes that fiat and digital assets can be securities and that Prime was a securities intermediatory, a securities entitlement is created pursuant to Article 8 only if a securities intermediary

> (i) indicates by book entry that a financial asset has been credited to his or her securities account; (ii) receives a financial asset from the person or acquires a financial asset the person and, in either case, accepts it for credit to the person's securities account; or (iii) becomes obligated under other law, regulation or rule to credit a financial asset to the person's securities account.

UCC § 8-501(b).

26. The Plan Administrator's evidence in support of the Distribution Motion establishes that the Prime ledgers were falsified and Prime would not (and could not) track the fiat and Cryptocurrency transferred to Prime by any particular customer. See Declaration of James P. Brennan In Support of the Plan Administrator's Distribution Motion And Estate Property Determination [Docket No. 969] (the "Brennan Declaration") ¶ 79. Accordingly, for a vast majority of Prime's customers, even if their Prime Agreements referenced Article 8, a security

entitlement could never have been created because of Prime's abject failure to properly account for the assets transferred to it. See contra In re Cnty. of Orange, 219 B.R. 543, 554 (Bankr. C.D. Cal. 1997) (holding that two financial services companies, DTC and Goldman Sechs, were securities intermediaries under Article 8 where they acquired a security entitlement and indicated by book entry that it was holding Notes on behalf of the holder as required by §8-501, and where such Notes were "clearly" securities). And, even such a securities entitlement was intended to be created for certain customers – and there is no evidence it was – the Plan Administrator has no way of deciphering which customers might hold such an entitlement because he cannot rely on the Debtors' falsified ledgers. The results for creditors would be wildly inequitable.

**D.    Application of Article 8 to the Facts of these Cases Would Result in Serious Inequities for Creditors.**

27.    Finally, Coinbase arguments, if accepted, would create serious equitable problems by undermining the fair distribution of funds to creditors and disproportionately favoring a few creditors that were able to withdraw the vast majority – if not all of – their assets from Prime immediately prior to the bankruptcy. Where an entity has engaged in fraudulent practices such as commingling customer and corporate funds, not keeping segregated accounts, and or failing to maintain proper accounting, granting relief to a party seeking full recoupment of their losses under the auspice of Article 8 "would necessarily come at the expense of the remaining victims." S.E.C. v. Credit Bancorp, Ltd., No. 99 CIV. 11395 RWS, 2000 WL 1752979, at *16 (S.D.N.Y. Nov. 29, 2000), aff'd, 290 F.3d 80 (2d Cir. 2002) (finding that equitable concerns may supersede other alleged property rights).

28.    This is exactly the inequitable result Coinbase seeks here. Problems that existed in SEC v. Credit Bancorp, Ltd. occurred at Prime (along with other problems): rampant commingling of customer and corporate funds; failure to keep segregated accounts, for both fiat and crypto; failure to maintain proper records or follow proper accounting practices; intentional, fraudulent

tracking and reporting of assets. Prime's failures ultimately affected all of its customers and neither Coinbase nor any other creditor – under the guise of an Article 8 reference in an agreement that was never followed, never could have been followed, and contradicted other language in agreements and the facts of these Cases – should be able to profit from that mere reference to the prejudice of its fellow creditors.[7] Bankruptcy law not only ensures that such inequitable distributions do not occur, it provides for the *pro rata* distributions to a debtor's assets – which ultimately would be the same result even if Article 8 applied in this case.

## RESERVATION OF RIGHTS

The Plan Administrator reserves all rights to assert further objections and replies to the *Amicus* Motion and Coinbase's proposed *amicus* response, including the hearing on the *Amicus* Motion.

---

[7] Indeed, such a result would directly contradict the Plan classification and treatment of General Unsecured Creditors Specifically, the Plan classifies customers with all other General Unsecured Creditors by Debtor entity with each such holder of an allowed claim entitled to its *pro rata* share of either the Cash Allocation or Cryptocurrency Allocation. See Plan, Art. 4.4-4.7.[7] The Plan also provides that all holders of allowed General Unsecured Claims are to receive "an equivalent percentage of recovery on account of their Claims . . . ." Plan, Art. 4.4(d), 4.5(d), 4.6(d), 4.7(d). This classification and equitable treatment does not include a potential carve-out under Article 8 and, critically, such treatment was voted on by Prime's creditors and confirmed by this Court. Out of over 46,000 parties served with the Distribution Motion, including customers and creditors with a direct stake in the outcome of the Plan Administrator's estate property determination, no party (other than Coinbase) objected to the Distribution Motion based on Article 8 arguments—further evidencing that the Debtors' creditors in these Chapter 11 Cases, by and large, understand the Plan's treatment and do not object on this basis.

15

## **CONCLUSION**

WHEREFORE, the Plan Administrator respectfully requests that the Court enter an order denying leave to file the proposed Amicus Brief and granting such further relief as the Court deems appropriate.

Dated: February 12, 2024  
Wilmington, Delaware

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Morgan L. Patterson*
Donald J. Detweiler (Del. Bar No. 3087)
Morgan L. Patterson (Del. Bar No. 5388)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone (302) 252-4320
Facsimile: (302) 252-4330
Email:   don.detweiler@wbd-us.com
          morgan.patterson@wbd-us.com

*Counsel to the Plan Administrator*