**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 24-_____ (JKS) |
| Oval Labs, Inc., and Oval Finance, LLC, | |
| Defendants. | |

## COMPLAINT

The PCT Litigation Trust ("Plaintiff")[2] established in the above-captioned chapter 11 cases

(the "Chapter 11 Cases"), through its undersigned counsel, files this complaint (the "Complaint")

against Defendants Oval Labs, Inc. and Oval Finance, LLC (a/k/a "OvalFi") (together, "Oval")

(collectively, Oval and Prime are referred to herein as the "Parties"), pursuant to Sections 544,

547, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy

Code"), and Sections 1304 and 1305 of Title 6 of the Del. Code Ann. (the "Delaware Code"),

seeking to avoid and recover all preferential and/or constructive fraudulent transfers of property

made by the Debtors to or for the benefit of Oval plus interest, attorneys' fees, and costs. To the

---

[1]   The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]   The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

extent that Oval filed a proof of claim or has a claim listed by the Debtors on their schedules as undisputed, liquidated, and not contingent, or has otherwise requested payment from the Debtors or the Debtors' estate (collectively, the "Claims"), this Complaint is not intended to be, nor should it be construed as, a waiver of Plaintiff's right to object to any of such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j) ("Section 502"), and such rights are expressly reserved.  Notwithstanding this reservation of rights, certain relief pursuant to Section 502 is sought by Plaintiff herein as further stated in Count IV below.  Plaintiff alleges as follows:

## **INTRODUCTION**

1.      Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat, which is commonly referred to as "on-and-off ramp."  The Nevada Financial Institutions Division ("Nevada FID") shut down Prime in June 2023 and Prime filed for bankruptcy shortly thereafter in August 2023.  Most of Prime's customers suffered losses and have yet to receive any of the crypto or fiat owed to them.  However, in a series of transactions from May 16, 2023 to June 21, 2023, Prime transferred $26,644,776.49 USD, 1,000 Tether ("USDT"), 0.76 Ethereum ("ETH"), 12,138 USD Coin ("USDC"), and 0.95 Bitcoin ("BTC") to Oval (the "Transfers").

2.      Plaintiff brings this adversary proceeding (the "Adversary Proceeding") pursuant to Sections 547 and 550 of the Bankruptcy Code to avoid and recover all transfers of property and all obligations of Prime to or for the benefit of Oval, made in the 90-day period prior to the filing of the Debtors' Chapter 11 Cases.[3]  These transfers constitute preferential transfers and are

---

[3]     Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's non-insider preference period (the "Preference Period") occurred between May 16, 2023 and the Petition Date.

avoidable under Section 547 of the Bankruptcy Code. Additionally, and in the alternative, Plaintiff seeks to avoid these transfers as constructive fraudulent transfers pursuant to Sections 544, 548 and 550 of the Bankruptcy Code, and Sections 1304 and 1305 of Title 6 of the Delaware Code. Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiff also seeks to disallow any claims filed or held by Oval in these Chapter 11 Cases unless and until Oval has relinquished to Plaintiff all property it received in transfers that are determined by the Court to be avoidable and recoverable.

3.      Oval operates a platform which provides financial technology companies and financial institutions primarily located in Africa and India with access to decentralized finance ("DeFi") lending protocols for overcollateralized lending and yield generation opportunities. In Oval's own words, Oval "converts local currencies and US dollars into digital dollar stablecoins, then spreads these stablecoins across secure DeFi lending protocols to generate high interest yield." Oval Finance, *Introducing Oval*, MEDIUM (Mar. 7, 2022), https://medium.com/@ovalfi/introducing-oval-7c4a4c67513e.

4.      To effectuate these services, in 2022, Oval's CEO Chinedu Okpala ("Mr. Okpala") engaged Prime for liquidity purposes and to serve as an "on-and-off ramp" and "payment rail". Specifically, Oval transferred fiat and crypto to Prime (the "on ramp"). Prime then held and controlled the assets until either: (i) Oval instructed Prime to transfer fiat, or convert crypto to fiat for transfer, to others on behalf of and pursuant to Oval's directions for a fee (the "payment rail"); or (ii) Oval withdrew the value of certain fiat and crypto that it previously had transferred to Prime (the "off ramp").

5.      The agreements that governed Prime and Oval's relationship during the Preference Period were: (i) Prime Trust User Agreement (the "User Agreement"), revision date March 7,

2022;[4] and (ii) Prime Trust API Technology Agreement, effective March 31, 2022 (the "<u>API</u> <u>Agreement</u>")[5] (collectively, the User Agreement and the API Agreement are referred to herein as the "<u>Agreements</u>").

6.      Although Prime was a Nevada state-chartered trust company, Oval never sought or received any trust or fiduciary services from Prime.  Moreover, the Agreements make clear that no fiduciary relationship existed between the Parties.

7.      The API Agreement explicitly states: "This Agreement is not intended and ***shall not be construed . . . to create any fiduciary relationship or any other obligations other than those expressly imposed by this Agreement.*****"** <u>Ex. B</u>, API Agreement, § 9.4 (emphasis added).

8.      The User Agreement provides that Prime was entitled to "***pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such [assets]. . . with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]*****"** <u>Ex. A</u>, User Agreement, § 1.6(b) (emphasis added).

9.      The User Agreement further states that "***[Oval] may not loan, hypothecate, pledge, or otherwise encumber any Custodial Property. [Oval] grants Prime Trust a right of set-off against, and lien on and security interest in the Custodial Property for the payment of any Fees and any other amounts due to Prime Trust under and in accordance with this Agreement.*****"** <u>Ex. A</u>, User Agreement, § 6 (emphasis added).

10.     The User Agreement and API Agreement establish that the Parties always maintained a strictly debtor-creditor relationship.

---

[4]     A copy of the User Agreement is attached as <u>Exhibit A</u>.

[5]     A copy of the API Agreement is attached as <u>Exhibit B</u>.

11.    The fiat that Oval transferred to Prime was held in commingled "omnibus" bank accounts in Prime's name.  These omnibus bank accounts commingled the fiat Oval transferred to Prime with fiat from Prime's many other customers and with Prime's own fiat generated from its business operations.

12.    The crypto that Oval transferred to Prime was held in commingled "omnibus" digital wallets (the "Omnibus Wallets"), which also held crypto transferred to Prime by other customers and Prime's own crypto.

13.    Prime attempted to keep track of commingled fiat and crypto transferred by Oval (and other customers) with an internal, omnibus ledger (the "Internal Ledger").  But the Internal Ledger was errantly and later intentionally corrupted by Prime.

14.    Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries.  Accordingly, the Internal Ledger cannot be relied on to identify or trace the fiat and crypto that Oval transferred to Prime.

15.    The third-party expert retained by Plaintiff in this matter, James P. Brennan, also has confirmed that it is impossible to identify, trace, or otherwise distinguish the fiat and crypto that Oval transferred to Prime from the fiat and crypto transferred to Prime by Prime's other customers or from Prime's own fiat and crypto.  *See* Declaration of James P. Brennan (the "Brennan Decl.").[6]

16.    Bank account statements and blockchain data confirm that the fiat and crypto transferred from Prime to Oval during the Preference Period was not the original fiat and crypto that Oval had transferred to Prime.  *See id.* at ¶¶ 147, 159, 153.  Rather, these Transfers were fiat

---

[6]    A copy of the Brennan Decl. is attached as Exhibit C.

from the commingled, omnibus bank accounts in Prime's name and crypto from the commingled, Omnibus Wallets. *Id.*

17.    In December 2021, Prime discovered it was unable to access a digital wallet (the "98f Wallet")[7] holding more than 11,000 ETH that had been transferred by one of Prime's customers. Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet. *See id.* at ¶¶ 111-112.

18.    Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customer's transfer requests, Prime went to the market to purchase ETH to cover the transfer requests. To fund those market purchases, Prime used fiat from its omnibus bank accounts. *See id.* at ¶¶ 113-118.

19.    Prime executives have admitted under oath that Prime intentionally falsified its internal records to hide the truth about its replacement ETH purchases. To hide the fact that Prime was using fiat transferred to it by customers to pay for its replacement ETH purchases, Prime created fake wire transfer entries on the Internal Ledger to make it appear that Prime received fiat wire transfers from one of the liquidity providers ("Liquidity Provider") who sold Prime the replacement ETH. In fact, no such fiat wire transfer deposits ever occurred:



---

[7]    The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f".

A:   ████████████████████████

Deposition of ███████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "███████"), 164:22–165:10 (emphasis added).

20.    Prime's use of its fiat transferred by other customers to purchase replacement ETH left it with a nearly $82 million shortfall in the omnibus bank accounts that contained commingled fiat from Oval and other Prime customers.  *See infra*, ¶ 172.

21.    Prime's falsified wire transfer entries to cover its replacement ETH purchases, coupled with Prime's failure to properly reconcile and record other transactions on its Internal Ledger, have resulted in Prime being unable to trace fiat and crypto to any specific deposits, withdrawals, or transfers that were made by any particular customer, including Oval.  *See* Ex. C, Brennan Decl., ¶¶ 17, 47, 136, 155.

22.    Prime's Transfers to Oval during the Preference Period exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's Chapter 11 filing on the Petition Date.

23.    The Transfers also gave Oval an unfair advantage over Prime's many other creditors that did not, or could not, execute similar transactions to withdraw the fiat or crypto they had transferred to Prime.

24.    Because the Parties' relationship was strictly a debtor-creditor relationship, the Transfers to Oval during the Preference Period must be returned to the Debtors' estate pursuant to Sections 547 and 550 of the Bankruptcy Code, plus interest, attorneys' fees, and costs.  In the alternative, Plaintiff seeks to recover and avoid the transfers as constructive fraudulent transfers, plus interest, attorneys' fees and costs, pursuant to Sections 544, 548 and 550 of the Bankruptcy Code, and Sections 1304 and 1305 of Title 6 of the Delaware Code.

25.     During the course of this Adversary Proceeding, Plaintiff may learn (through formal discovery or otherwise) of additional transfers made to or obligations incurred by, Oval that are avoidable and/or recoverable under the Bankruptcy Code.  Plaintiff intends to avoid and/or recover all such transfers and obligations made to or for the benefit of Oval and, accordingly, reserves the right to amend this Complaint.

## **PARTIES**

26.     Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644].  The Plan was consummated on January 5, 2024 (the "Effective Date").[8]  On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust.  *See* Plan, § 6.21.  The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn.  *See id*. at § 1.118.

27.     Defendant Oval Labs, Inc. is a Delaware Corporation.  Oval Labs, Inc. maintains a registered address in Delaware.

28.     Defendant Oval Finance, LLC is a Delaware limited liability company.  Oval Finance, LLC maintains a registered address in Delaware.

---

[8]     *See* Docket No. 694.

29.     In the *Second Amended Plan Supplement with Respect to Debtors' Amended Joint Chapter 11 Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No. 539] (the "Plan Supplement"), Prime identified preference claims against Oval as "Exempted Preference Claims", and thus, these claims were not released on the Effective Date of the Plan.[9]

## JURISDICTION AND VENUE

30.     The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor."  *See* Plan, § 12(c).  This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust."  *Id.* at §§ 12(s), (u).  As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

31.     This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter final orders in connection with the matters contained herein.

32.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Plaintiff confirms its consent to the entry of a final order or

---

[9]    Prime filed the Plan Supplement under seal.  [*See* Docket No. 539.]  Prime reserves its right to maintain the confidentiality over the remainder the "Exempted Preference Claims" identified in the Plan Supplement.

judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the Parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

33.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

34.    This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Sections 105, 542, 547, and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

35.    The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Bitcoin ("BTC") and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies, including USD Coin ("USDC") and Tether ("USDT").

36.    All cryptocurrencies exist on a "blockchain."  A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all cryptocurrency transactions that occurred on the blockchain at a particular point in time.  The "blocks," in turn, are linked on the chain in chronological order — thus, a "block"-"chain."

37.     There are many different blockchains.  The first and most popular blockchain was the Bitcoin blockchain.  Another important blockchain is the Ethereum blockchain, which made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

38.     Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."  These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

39.     "Private keys" are essentially individual passwords used to denote ownership of a particular blockchain digital address.  Like public keys, private keys consist of multi-digit alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

40.     Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

41.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

42.     A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

43.    A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method.  These types of physical hardware devices are provided by companies such as Trezor:



44.    Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet. However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device.  To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to effectuate transactions in the crypto kept on the digital wallet.  Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

45.    Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed.  They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the

smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" digital wallet. If someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## **GENERAL ALLEGATIONS**

### I.  **Prime's Business Operations**

46.  Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

47.  Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

48.  In the years that followed, as the crypto markets and industry grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

49.  Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state money-transmitter licenses (each, a "MTL") required to conduct money transmission.

50.  Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service"—serving as an "on-and-off ramp" and "payment rail" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

51.  Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend the time, effort, and financial resources necessary to obtain their own MTLs.

52.    Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

## II.    Oval Engaged Prime for On-and-Off Ramp and Liquidity Services

53.    Oval operates a platform which provides fintech companies and financial institutions, largely headquartered in the U.S. but with operations in Africa and India, access to DeFi lending protocols for overcollateralized lending and yield generation opportunities.

 Prime Trust

> Describe your business model in at least three sentences so we can better understand the sources, uses and flow of funds. This should include the type of business you are and how money is sourced and used. Be specific and include information on all relevant countries. Attach a document if needed (examples of relevant attachments include a business plan, etc.)
>
> Oval enables the growing market of fintechs, neo-banks, and institutions to provide customers with DeFi products, while abstracting away the operational complexities involved in crypto. Oval's first product, "Yield", provides access to high-interest dollar denominated savings rates, powered by USD-stablecoin yield. Oval is targeting fintechs and institutions across Africa, and Oval's first set of customers operate in Nigeria. However, a large percentage of these customers have headquarters in the US.

54.    Oval described its business as follows: "[Oval] converts local currencies and US dollars into digital dollar stablecoins, then spreads these stablecoins across secure DeFi lending protocols to generate high interest yield.  These protocols aggregate and lend deposited funds to decentralized pools of borrowers at indicated interest rates.  For borrowers to access a loan on these protocols, they must provide liquid assets in excess of the loan's value as collateral to secure the principal, eliminating traditional credit risk."  Oval Finance, *Introducing Oval*, MEDIUM (Mar. 7, 2022), https://medium.com/@ovalfi/introducing-oval-7c4a4c67513e.  *See also* Ex. B, API Agreement ("WHEREAS, Integrator has a business that: provides fintechs and institutions abstracted access to decentralized finance.").

55.     Oval's approved user base for its Prime account activity includes customers in the

United States, India, Ghana, Kenya, and Nigeria:



56.     As part of Prime's compliance and onboarding process, Oval was required to

provide proof of requisite licensing in a given jurisdiction or a legal opinion which concluded,

with sufficient legal analysis, that Oval was exempt from such licensing.

57.     For its U.S. based activities, Oval obtained a legal opinion concluding that it was

not a money transmitter under Bank Secrecy Act regulations:

> ### V.    Conclusion
>
> Based on the foregoing, Oval is not a money transmitter under the regulations implementing the BSA and is not required to register as a MSB with FinCEN, because its activities do not constitute money transmission services.

58.     That same legal opinion confirmed that Oval had engaged and was relying on Prime

for fiat and cryptocurrency transmission services to avoid having to obtain an MTL itself:

> end users of the Platform. Oval has partnered with Prime Trust, LLC, a registered MSB, which provides custody services and facilitates the conversion and transfer of funds and cryptocurrencies between the end user's bank accounts, non-custodial wallets, and the DeFi protocols.

## III.   The Agreements Make Clear that the Parties' Relationship was Strictly a Debtor-Creditor Relationship

59.     The Agreements governed the Parties' relationship during the Preference Period.

60.     At all relevant times, the Agreements were valid and enforceable contracts governed by Nevada law.  *See* Ex. A, User Agreement, § 15.13 ("This Agreement is governed by, and construed exclusively in accordance with, the laws of the State of Nevada, without regard to its conflicts of laws provisions or rules."); Ex. B, API Agreement, § 9.11 ("This Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.")

61.     Oval executed the User Agreement on April 5, 2022, and Prime executed the User Agreement on September 1, 2022.  *See* Ex. A, User Agreement.

62.     Prime and Oval executed the API agreement on January 7, 2022.  *See* Ex. B, API Agreement.

63.     The Agreements make clear that the Parties had a strictly debtor-creditor relationship.

64.     The Agreements explicitly state that they do not create a trust or fiduciary relationship between Prime and Oval.

65.     The API Agreement explicitly states: "Performance by the parties under this Agreement will be as independent contractors. This Agreement ***is not intended and shall not be***

*construed as creating a joint venture or partnership, or as causing either party to be treated as the agent of the other party for any purpose or in any sense whatsoever or to create any fiduciary duty or relationship or any other obligations other than those expressly imposed by this Agreement*." <u>Ex. B</u>, API Agreement, § 9.4 (emphasis added).

66.     Once Oval transferred fiat or crypto to Prime, the User Agreement permitted Prime, "for convenience, [to] take and hold title to Custodial Property or any part thereof in [Prime's] own name with [Oval's] ownership of Custodial Property segregated on its books and records." *See* <u>Ex. A</u>, User Agreement, § 1.8.

67.     Prime, pursuant to the User Agreement, also had complete discretion to invest, rehypothecate, hold and register in its own name, and otherwise transfer or use the fiat or crypto transferred by Oval to Prime as well as retain the profits derived from the fiat or crypto that Oval transferred to Prime.

68.     For example, the User Agreement permitted Prime to:

> *[O]therwise use or invest such cash or Fiat Currency at Prime Trust's own risk.* Without limiting the foregoing, *Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency*[.]

<u>Ex. A</u>, User Agreement, § 1.6(b) (emphasis added).

69.     The User Agreement also provided that Oval expressly agreed "that any such earnings, income or compensation shall be retained by Prime Trust and no portion of any such earning, income or compensation shall be paid to or for [Oval]." <u>Ex. A</u>, User Agreement, § 1.6(b).

70.     The Parties' operative Agreements make clear that the relationship between Prime and Oval was, at all relevant times, strictly a debtor-creditor relationship.

### IV.    Prime Commingled Fiat in Omnibus Bank Accounts in Prime's Name

71.    The fiat that Oval and other customers transferred to Prime was not segregated into separate bank accounts.  *See* Ex. C, Brennan Decl., ¶ 17.  Instead, the fiat was held in omnibus bank accounts in Prime's name containing fiat other customers transferred to Prime as well as fiat that Prime generated from its own business operations.  *See id*.

72.    Prime maintained bank accounts primarily at BMO Harris Bank, N.A. ("BMO"), Cross River Bank ("CRB"), Signature Bank ("Signature"), Royal Business Bank ("RBB") and Lexicon Bank ("Lexicon").  *See id.* at ¶ 16.

73.    The Transfers from Prime to Oval during the Preference Period were transferred from one of Prime's accounts at BMO.  *See* Ex. C, Brennan Decl., ¶ 32.  *See also* Ex. D, Treasury Master Services Agreement, dated January 14, 2022, between Prime Trust, LLC and BMO Harris Bank N.A. (the "BMO Agreement").[10]

74.    The BMO Agreement specifically provides that the BMO Agreement  "***is not for the benefit of any other person and no other person shall have any right against [Prime] or [BMO Harris] hereunder.***"  See Ex. D, BMO Agreement, § 15(e) (emphasis added).

75.    The BMO Agreement does not state that fiat was held "in trust for" or "for the benefit of" any party other than Prime.  *See* Ex. D, BMO Agreement.

76.    Indeed, in Prime's onboarding documents with BMO, Prime designated "Prime Trust, LLC" as the sole "Legal Entity for Which Beneficial Ownership is Being Provided."  *See* Ex. E, Certification Regarding Beneficial Owners of Legal Entity Customers between Prime Trust, LLC and BMO Harris Bank N.A. (the "BMO Certification").[11]

---

[10]    A copy of the BMO Agreement is attached as Exhibit D.

[11]    A copy of the BMO Certification is attached as Exhibit E.

77.     Prime regularly transferred fiat between its various omnibus bank accounts, further commingling funds.  *See* <u>Ex. C</u>, Brennan Decl., ¶¶ 21-32.

78.     For example, Prime used BMO x3077 primarily to make wire transfers.  *See id.* at ¶ 22.

79.     BMO x3077 held commingled funds that it regularly received from other Prime omnibus bank accounts and from other Prime customers.  *See id.* at ¶¶ 23–28.

80.     At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("<u>BMO x9934</u>"), because the latter account offered a higher rate of interest.[12]  *See id.* at ¶¶ 25-26.

81.     The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077.  *See id.* at ¶ 26.  Because the funds in BMO x3077 were commingled, BMO x9934 also contained commingled funds.  *See id.* at ¶¶ 25-26.

82.     In addition to commingled funds from BMO x3077, BMO x9934 contained some funds transferred from other sources, such as Prime's accounts at CRB and Signature.  *See id.* at ¶ 26.

83.     Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and ACH transfer requests.  *See id.* at ¶¶ 19, 26.

84.     Prime typically made transfers between its omnibus bank accounts in round numbers, without reference to any specific transactions.  *See id.* at ¶ 30.  This suggests that Prime

---

[12]  BMO's terms and conditions provided that "interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion."  *See* BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions, dated July 2021, attached as <u>Exhibit F</u>, § 25.  Because Prime designated itself as the beneficial owner of its BMO accounts, Prime was entitled to the interest produced by these accounts (consistent with the Agreements).  *See* <u>Ex. E</u>, BMO Certification.

simply moved funds between its omnibus bank accounts on an estimated, as-needed basis instead of in response to specific transaction activity.  *Id.*

86. Prime would also transfer fiat between bank accounts that were primarily used for Prime's corporate operations and omnibus bank accounts that contained fiat transferred to Prime by its customers.  *See id.* at ¶ 20.

86. Because Prime did not segregate fiat transferred to it from one customer from fiat transferred to it from another customer, or from fiat generated from Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts it owed on its Internal Ledger.  *See id.* at ¶¶ 17–19.

87. However, Prime's internal cash management practices make identifying which bank account transfers correspond with which specific customer transactions reported on Prime's Internal Ledger extremely difficult.  *See id.* at ¶ 30.

88. ████████████ ("████"), Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Internal Ledger to determine the amounts that Prime owed to its customers:

> Q:  And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?

> A:  I would pull the general ledger record out of the Prime Trust Core system.

Deposition of ████████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "████████"), 89: 19–25.

89. Prime maintained substandard reconciliation processes throughout its history, including with respect to its Internal Ledger.  *See* Ex. C, Brennan Decl., ¶¶ 98-109.  This further

hindered the ability of Prime or anyone else to specifically identify which funds were transferred to Prime by which customer. *Id.*

90.    Prime did not perform regular reconciliations of its assets and, at least prior to March 2021, any reconciliations that Prime did conduct were manual. *See id.* at ¶¶ 98, 100-105.

91.    Former Prime employees testified that Prime commingled fiat and crypto transferred to Prime by its customers and that Prime's reconciliation processes were poorly maintained.

92.    ███ testified that "[r]econciliations were not being done in a timely manner." ███, 38: 23–24.

93.    ███ ("███"), Prime's former Chief Financial Officer, testified:

Q:    Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?

A:    I think there were instances where that did happen based off of the management in the financial operations team where we might have had balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ███, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

94.    ███ also testified that "[i]t would not surprise" him if fiat and crypto transferred by customers were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been." *See id.* at 213:15–22.

95.    ███ ("███"), Prime's former Senior Vice President of Operations and Reconciliations, also testified about Prime's reconciliations processes both before and after March 2021:

Q:    When you say it was a problem, what do you mean?

A:    There just wasn't very good reconciliation tools.  Everything was done
manually.  So I was brought in to work on building these tools and making
them more automated. . .

███████, 19:23–20:5.                                          -

96.    ██████ prepared a report for a July 12, 2021, audit committee meeting which
identified the risks associated with Prime's handling of fiat and crypto, reconciliation practices,
and general mismanagement of corporate functions.  Most of these practices were considered to
present "high" or "extreme" levels of risk:

| 2 | Finding and Response Summary Matrix | | | | | |
|---|---|---|---|---|---|---|
| Risk | Reference | Finding | Target | Response | Completed | Verified |
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

97.    Thus, Prime's repeated transfers of funds between omnibus bank accounts and
Prime's failure to maintain proper tracking and reconciliation processes further exacerbated the
commingling of fiat transferred to Prime by Oval with fiat transferred to Prime by Prime's other
customers and fiat generated from Prime's own business operations.  *See* Ex. C, Brennan Decl.,
¶¶ 18-28, 100-105.

## V.    Prime Commingled Crypto in Omnibus Wallets in Vaults

98.    As was the case with Prime's commingling of fiat, Prime did not maintain separate
or segregated digital wallets for crypto.  *See id*. at ¶ 45.  Instead, Prime had Omnibus Wallets that

commingled crypto transferred to Prime from different customers with Prime's own crypto that it used for corporate operations and purposes. *See id*.

99.     Prime maintained its Omnibus Wallets in Prime's vaults ("Vaults") at Fireblocks LLC ("Fireblocks"), a third-party crypto security platform. *See id*. at ¶ 46.  Prime used Vaults within the Fireblocks' infrastructure to: (1) organize wallets (including the Omnibus Wallets), (2) enhance security measures, and (3) leverage efficient transaction policies and access controls. *See id*.  Vaults at Fireblocks were not separated or segregated by digital wallets. *See id*.

100.    Customers were each assigned unique deposit digital wallet addresses (the "Deposit Addresses") for sending crypto to Prime. *See id*. at ¶ 47.  From time to time, Prime would conduct "sweeps" of those different Deposit Addresses to transfer crypto from those Deposit Addresses into one or more of the shared Omnibus Wallets controlled by Prime. *See id*.  This process commingled crypto transferred to Prime by different customers together in the Omnibus Wallets. *See id*.

101.    Prime's internal process for performing sweeps was inconsistent and void of procedural safeguards. *See id*. at ¶ 49.  Prime's application could trigger a sweep based on certain unknown events occurring or an employee could manually perform a sweep at any given time. *See id*.

102.    Prime also regularly transferred crypto between its multiple Omnibus Wallets, only further commingling the already commingled crypto contained in the Omnibus Wallets. *See id*. at ¶ 50.

103.    In an attempt to track its crypto balances on behalf of its customers, Prime recorded its customers' transfers of crypto to Prime and its customers' withdrawals on its Internal Ledger. *See id*. at ¶ 51.  When a customer transferred crypto to Prime, Prime would credit that amount on

its Internal Ledger.  *See id.*  The Internal Ledger, however, did not track to which Omnibus Wallet(s) any specific crypto was transferred into when Prime swept Deposit Address(es).  *See id.* at ¶ 52.

104.    When a customer requested to withdraw crypto, Prime would first verify the crypto balance that the customer supposedly had from the Internal Ledger to determine whether the customer had previously transferred sufficient crypto to Prime to support the withdrawal amount. *See id.* at ¶ 55.  If the customer had transferred sufficient crypto, Prime would then check its multiple Omnibus Wallets to determine from which Omnibus Wallet(s) it could withdraw the requisite amount of crypto to satisfy the withdrawal request.  *See id.*  Prime would then transfer the requested amount of crypto to the customer.  *See id.*  In completing a transfer request, Prime did not transfer the same crypto that a customer had initially transferred to Prime via its respective Deposit Address because Prime's Omnibus Wallets did not segregate crypto by customer and, thus, could not be used to identify any original crypto transferred to Prime by a specific customer. *See id.*

### A.  Prime Commingled Crypto Transferred by Customers and Corporate Crypto

105.    To demonstrate the extent of Prime's commingling of crypto, the Brennan Declaration discusses and illustrates several examples of commingling taken from transaction, blockchain, and other data.  *See id.* at ¶¶ 56-97.

106.    For example, Prime frequently swept crypto from the Deposit Addresses into one of Prime's Omnibus Wallets ending in ~b2ea (the "~b2ea Wallet").  *See id.* at ¶¶ 57-67.

107.    The Brennan Declaration provides an example of how three separate Prime customers sent crypto to their respective, unique Deposit Addresses which Prime subsequently swept into the ~b2ea Wallet:



*See id*. at ¶¶ 57-61.

108.    Just this one example illustrates how Prime commingled crypto transferred to it from three different customers into a single Omnibus Wallet.  This type of transaction occurred multiple times with the ~b2ea Wallet and with other Omnibus Wallets.  *See id*. at ¶¶ 59-60.

109.    The Brennan Declaration also discusses how the crypto that customers transferred to Prime became further commingled with crypto that Prime used for its own corporate operations. Again using the ~b2ea Wallet as an example, Brennan describes how the ~b2ea Wallet received crypto from a Prime wallet that itself was funded from thousands of different wallets holding Prime's own crypto.  *See id*. at ¶ 62.  This resulted in Prime's crypto, which was used for its own corporate operations, becoming commingled with crypto that customers had transferred to Deposit Addresses which Prime had already previously swept and commingled into this Omnibus Wallet. *See id*. at ¶¶ 61-64.

110.    Prime's commingling of crypto was further compounded by Prime's movement of commingled crypto between multiple Omnibus Wallets.  Again, using the ~b2ea Wallet as an example, the Brennan Declaration discusses and illustrates how Prime transferred already commingled crypto between multiple Omnibus Wallets:



*See id.* at ¶¶ 66-67.

111.    The Brennan Declaration also discusses and illustrates how Prime's commingling of crypto in Omnibus Wallets makes it practically impossible to determine if the crypto transferred from Prime to a customer to satisfy a withdrawal request included any of the original crypto that specific customer had originally transferred to Prime.  *See id.* at ¶¶ 67, 69, 80, 93.

112.    The below illustration shows that while the ~b2ea Wallet received crypto swept from the Deposit Address of one of Prime's customers ("Customer A") and from Prime's "PT Segregated Assets" digital wallet that held corporate crypto (the "PT Segregated Assets Wallet"), Prime transferred crypto out of this ~b2ea Wallet to satisfy withdrawal requests from two completely different Prime customers.  *See id.* at ¶¶ 61-64.  These outgoing crypto transfers may have included some or none of the crypto originally transferred to Prime by Customer A or from Prime's other customers.  *See id.* at ¶ 64.



*Id.*

113.    Similarly, Prime often used the digital wallet with a digital address ending in ~73ck ("~73ck Wallet") for BTC transferred to Prime from numerous customers as well as BTC transferred from other Prime Omnibus Wallets, which also held BTC transferred to Prime by multiple customers.  *See id.* at ¶¶ 68-71.  This resulted in extensive commingling of BTC *See id.* at ¶ 69.

**B.  Prime Pooled Crypto Together to Reduce Transaction Fees**

114.    Prime generally swept crypto from the Deposit Addresses into shared Omnibus Wallets to pool crypto together for a number of reasons.  *See id.* at ¶¶ 72-75.

115.    One primary reason for pooling crypto together was that Prime and its customers could bypass and save on various transaction fees[13] that would otherwise be incurred by conducting transactions on the blockchain.  *See id.* at ¶¶ 75-79.  Specifically, for crypto transfers within a single Prime Vault at Fireblocks, Prime could simply move the funds around on its Internal Ledger rather than conduct any transactions on the blockchain which would otherwise

---

[13]   "Transactions occurring on the blockchain incur fees.  On the Ethereum blockchain, these are referred to as 'gas fees.'  Gas fees refer to the costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain.  In other words, they are fees charged by the blockchain itself for successfully completing a transaction […]  However, on the Bitcoin blockchain, these are referred to simply as 'transaction fees.'  Transaction fees refer to the costs that blockchain users pay to bitcoin miners as an incentive for preventing network congestion and incorporating a transaction in the subsequent "block."  In other words, they are rewards paid to miners for facilitating the successful completion of a transaction on the blockchain."  *See* Ex. C, Brennan Decl., ¶¶ 42-44.  We use "transaction fees" to refer to both "gas fees" and BTC transaction fees herein but only use the term "gas fees" to refer to transaction fees incurred on the Ethereum network.

incur transaction fees.  *See id.* at ¶¶ 73-74.  When Prime did conduct on-chain transactions, it reduced transaction fees by pooling transactions and performing them during off-peak hours when the blockchain network was less congested as illustrated in the below diagram.  *See id.* at ¶¶ 75-77.



*Id.* at ¶ 77.

116.    By sweeping BTC together that had been transferred to Prime by multiple customers, Prime's commingling of BTC makes distinguishing the original digital wallet from which the BTC originated from nearly impossible.  *See id.* at ¶¶ 78-80.

117.    To help account for the gas fees Prime incurred for transacting on the Ethereum blockchain, Prime set up additional digital wallets it referred to collectively as the "Gas Stations." *See id.* at ¶ 83.  Prime funded the Gas Stations from its various other wallets (including the Omnibus Wallets) and used the Gas Stations to pay gas fees when Prime conducted on-chain transactions.  *See id.* at ¶¶ 83, 86.  Prime used a variety of sources to fund the Gas Stations, which

resulted in Prime further commingling crypto transferred to Prime by customers with Prime's own crypto.  *See id.* at ¶ 90.

118.    As demonstrated below, funding sources for the Gas Stations (represented by bright green nodes) included Prime's Omnibus Wallets (represented by green nodes at the top), customers' external digital wallets (represented by the pink, blue, red and yellow nodes) and several external digital wallets that appear to be unattributable to Prime or its customers (represented by gray nodes):



*See id.* at ¶ 86.

119.    Prime communications, as shown below, also reflect instances where Prime operations personnel used fiat from one of Prime's commingled omnibus bank accounts to purchase ETH to refill the Gas Stations.  *See also id.* at ¶¶ 87-89.



120.    Therefore, the Gas Stations were funded by Prime's corporate fiat, crypto from commingled Omnibus Wallets (including the ~b2ea Wallet described above), and crypto from external wallet addresses. *See id.* at ¶ 90.

121.    Prime also swept Tether stablecoin ("USDT") transactions from various Deposit Addresses into one of Prime's Omnibus Wallets to reduce gas fees on the Ethereum blockchain, which meant that a Prime customer receiving USDT from Prime not only received commingled USDT but also received commingled ETH to pay for the transaction fees from Prime's Gas Stations. *See id.* at ¶¶ 94-97.

122.    Thus, by sweeping and pooling crypto together, Prime was able to reduce transaction fees but commingled crypto transferred to Prime by customers with Prime's corporate crypto in several different ways throughout the process. *See id.* at ¶¶ 94-97.

### C. Prime Did Not Reconcile Crypto Transactions

123.    Similar to Prime's handling of fiat, Prime also did not conduct regular, timely or accurate reconciliations to compare the crypto recorded in its Internal Ledger with the crypto that Prime actually held in its Omnibus Wallets. *See id*. at ¶¶ 54-55, 89, 101, 108-109, 110, 119-124.

124.    All crypto of value held by Prime is in Prime's Vaults with Fireblocks, and none of that crypto has clear ownership provenance. *See id*. at ¶¶ 59-72, 78-100.

125.    Prime's own internal data presents conflicting information regarding how certain digital wallets were attributed to different entities as well as falsified entries in Prime's Internal Ledger. *See id*. at ¶¶ 61, 119-124.

126.    Because of the commingling and poor reconciliations' processes described above and confirmed in the Brennan Declaration, it is impossible to specifically identify, trace, or segregate crypto that specific customers transferred to Prime from crypto provided by other customers or crypto generated from Prime's business operations. *See id*. at ¶¶ 57-97, 119-124.

## VI.    The 98f Wallet

127.    In December 2021, one of Prime's largest customers ("Customer 1") requested a transfer of 5,867.71 ETH (worth approximately $24,000,000 at the time) from Prime. *See id.* at ¶¶ 111-112.  Subsequently, between December 2021 and March 2022, Customer 1 continued to request that Prime transfer ETH totaling 48,034.57 ETH (worth approximately $145,000,000 at the time). *See id.* at ¶ 115.

128.    In attempting to satisfy Customer 1's transfer requests, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its digital wallets:



129.    Further investigation revealed that, for approximately eight months, Prime had been permitting Customer 1 to transfer significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.

130.    Specifically, in December 2021, Prime discovered that Customer 1 had already transferred more than 11,000 ETH (worth approximately $45,000,000 at the time) to the 98f Wallet.  *See* <u>Ex. C</u>, Brennan Decl., ¶ 112.

131.    In or around December 2021, Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet.  *See id.* at ¶ 111.

132.    It was unclear to those at Prime who the signers for the 98f Wallet were or how Prime could access the 98f Wallet.  *See* ███████, 69:17–71:22.  Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet. *See* ███████, 181:6–8.  Prime also did not possess and could not locate the passwords, which are called "seed phrases," that were associated with these physical hardware devices.  *See id.*

133.    As such, Prime had no way of accessing the 98f Wallet.  The crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

134.    Prime was concerned about the negative impact and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a wallet containing a significant amount of crypto.  *See infra*, ¶¶ 141-143.

135.    To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("<u>Liquidity Provider</u>") to satisfy Customer 1's transfer requests as reflected below.  *See id.*

136.    Between December 23, 2021, and March 30, 2022, Prime conducted ten different on-chain purchases of ETH from Liquidity Provider to attempt to satisfy Customer 1's withdrawal requests as reflected in the chart below.  *See* <u>Ex. C</u>, Brennan Decl., ¶ 115.

| Date | ETH On-Chain Transfers |
|---|---|
| 12/23/2021 | 2,999.99 |
| 12/31/2021 | 3,250 |
| 1/6/2022 | 800 |
| 1/6/2022 | 2,100 |
| 1/21/2022 | 1,930.50 |
| 3/11/2022 | 1,800 |
| 3/14/2022 | 3,049.98 |
| 3/15/2022 | 3,000 |
| 3/29/2022 | 2,347.22 |
| 3/30/2022 | 2,300 |

137.    The funds for each of these ETH purchases came from Prime's omnibus bank accounts, which held commingled fiat transferred to Prime from Prime's customers.  *See id.* at ¶¶ 116-118.

138.    The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider is described in the below deposition testimony of Prime's former Chief Operating Officer, ▮▮▮▮▮:



Q:

A:

Q: 

A:

Q:

A:

Deposition of ████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023), 92:25–93:18.

139. The ETH that Customer 1 had initially transferred to Prime was (and still is to this day) locked away in the 98f Wallet. *See id.* at ¶ 118. Thus, it is "indisputable" that the ETH that Prime transferred to Customer 1 to satisfy its withdrawal requests could not be the same ETH that Customer 1 had originally transferred to Prime. *See id.*

## VII. Prime Ultimately Corrupted and Falsified its Internal Ledger to Hide Its Actions with Respect to the 98f Wallet

140. Executives at Prime made the decision to falsify entries in the Internal Ledger to conceal the fact that Prime had used fiat that had been transferred to it by other customers to satisfy Customer 1's withdrawal requests related to the 98f Wallet. *See id.* at ¶ 119.

141. Prime executives discussed how to hide these transactions from auditors at Nevada FID:



142.    ████ confirmed in his deposition that Prime executives intentionally chose to settle and record the purchases of ETH from the Liquidity Provider on Prime's Internal Ledger as opposed to externally transferring funds to the Liquidity Provider.  *See* ████, 153:8–13.

143.    Specifically, Prime settled its ETH purchases from the Liquidity Provider by "credit[ing]" Liquidity Provider's customer balance at Prime with fiat amounts equivalent to each ETH purchase.  *See id.* at 204:16–21.  To "credit" Liquidity Provider's fiat balance with Prime, Prime had to input a "contribution" on its Internal Ledger to make it appear as if Liquidity Provider had wired fiat to Prime.  *See id.* at 155:11–156:9.  In reality, no funds were moving from one account to another in connection with the ETH purchases.

144.    ████ testified:

A:    ████████████████████████████

A: 

Q:

A:

Q:

A:

Q:

A:

*Id.*

145.    These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Internal Ledger and the amount of fiat that Prime held in its omnibus bank accounts.  *See id.*



146.    ▓▓▓▓ further testified about Prime's internal "inflat[ed]" Internal Ledger compared to the fiat in Prime's omnibus bank accounts:

Q: 

A:



▮, 144:11–20, 146:7–15.

147.    ▮ explained that Prime chose to record its purchases of ETH from Liquidity Provider to satisfy the transfer requests of Customer 1 on Prime's Internal Ledger because that approach made it easier for Prime to avoid detection from Nevada FID:



▮, 152:18–153:13.

148.    Prime executives seem to have undertaken efforts to make Internal Ledger entries appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for Liquidity Provider.  *See* <u>Ex. C</u>, Brennan Decl., ¶¶ 119-127.

149.    As demonstrated by the illustrative chart below[14], Prime's Internal Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases between December 23, 2021, and March 30, 2022:



*See id.* at ¶¶ 115, 124.

150.    Prime's bank account statements do not reflect any of these wire transfers because they did not actually occur.[15]  *See id.* at ¶¶ 125-127.

151.    Prime's Internal Ledger shows incoming wire transfers to Prime, and specifically to Liquidity Provider's balance with Prime, in the amounts of $11,958,000.00 on December 23, 2021, and $12,158,250.00 on December 31, 2021.  *See id.* at ¶ 124.

---

[14]    This illustrative chart is not an image directly copied from Prime's Internal Ledger.  Rather, this chart contains data from Prime's Internal Ledger related to certain transaction entries.

[15]    The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 23, 2021, is attached as <u>Exhibit G</u>.  The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 31, 2021, is attached as <u>Exhibit H</u>.

152.   These transfers correspond exactly with the value of the first two ETH purchases that occurred on these two days. *Id.*

153.   However, these incoming wire transfers are not recorded in Prime's bank account statement for December 2021. *See id.* at ¶ 126.

154.   The reason for this is simple: these incoming wire transfers never occurred and instead were manufactured by Prime to conceal its use of customer-transferred, commingled fiat to fund the purchases of ETH from Liquidity Provider to satisfy Customer 1's transfer requests.

155.   These false accounting entries were confirmed by ▮▮▮, who also recognized that Prime's bank account statements would not reflect incoming wire transfers shown on Prime's Internal Ledger:



████, 164:22–165:10; 166:5–15.

156.    Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally obfuscate Prime's internal records simply compounded the already impossible task of untangling or segregating fiat or crypto transferred to Prime by different customers and fiat or crypto that Prime generated from its business operations.  *See* Ex. C, Brennan Decl., ¶ 128.

## VIII.    Oval Cannot Trace the Fiat and Crypto It Transferred to Prime

157.    Prime held fiat and crypto transferred to it from customers in an omnibus, commingled manner.  *See id.* at ¶¶ 17-97; *supra,* Sections IV and V.  This approach resulted in Prime's own employees being incapable of determining where any fiat or crypto transferred by a particular customer to Prime was located, as ████ testified:

> Q:    And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—
>
> A:    It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.
>
> Q:    And what does that mean to you, a client to have an omnibus account?
>
> A:    It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.
>
> Q:    And that was done at Prime Trust?
>
> A:    It was done at Prime Trust.  It wasn't done very frequently, but there were— there were omnibus accounts at Prime Trust.
>
> Q:    And do you know who was responsible for those accounts?

A:      I don't. There was probably ten or 12 accounts. . . While I was at Prime
        Trust it was very concerning to me and frustrating that nobody could ever
        tell me the exact number of omnibus accounts that the company allowed
        customers to have.· It was like an Easter egg hunt finding them.· It was not
        a clear, documented—I mean, it was a product offering.· I mean, you could
        have the segregated account model or this omnibus account model.· And it
        just was not clearly defined who was operating in an omnibus account and
        who those people were.

████████, 205:19–207:3.

158.    Another example of the confusion in tracing specific fiat and crypto that customers transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from another customer:



159.     ▮▮▮▮ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":



160.     ▮▮▮▮▮▮, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which fiat or crypto and that Prime was "***not able to specify what customer is out the funds due to our omnibus structure***":



161.     Because of Prime's commingling of fiat and crypto and Prime's poor recordkeeping procedures, it is impossible for Plaintiff, Oval, or anyone else to trace and specifically identify the fiat and crypto that Oval originally had transferred to Prime.  *See* <u>Ex. C</u>, Brennan Decl., ¶¶ 17-128.

## IX.    Prime's Financial Conditions Spiraled Downward and Culminated in Prime Filing the Chapter 11 Cases

162.     Prime ultimately reported the 98f Wallet issues to Nevada FID between September and November 2022.

163.     In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency issues Prime was experiencing.

164.    At the same time, and again during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing—were leaking to the crypto and financial markets.

165.    For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime. *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK (Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.  CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

166.    On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals." *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21, 2023),        https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf.  Nevada FID ordered Prime to cease accepting all fiat and crypto deposits. *Id.*

167.    The next day, BitGo canceled its acquisition of Prime.  One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns over its business." *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023),

https://www.coindesk.com/business/2023/06/22/cryptp-custody-firm-bitgo-cancels-prime-trust-acquisition/.

168.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court"). *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime%20Core%20Technologies%20et%20al%20Petition.pdf.    The Nevada FID Petition directed Prime to cease and desist all retail trust activities. *Id.*

169.    The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

170.    Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its ***omnibus customer accounts***." *Id.* at 6 (emphasis added).

171.    The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals." *Id.* at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)." *Id.* at 7.

172.    On July 14, 2023, the Nevada Court placed Prime under receivership.

173.    On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court.

## X.    Transfers From Prime to Oval During the Preference Period Are Avoidable

174.    Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

175.    First, the transfer must be "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1).

176.    Second, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2).

177.    Third, the transfer must have been "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3).

178.    Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition. 11 U.S.C. § 547(b)(4).

179.    Finally, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would receive in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made. 11 U.S.C. § 547(b)(5)(A)–(C).

180.    Mr. Okpala understood that Prime's solvency was in question. He was also knew that Prime was experiencing liquidity "shortages" and attempting a potential "acquisition" of funds.

181.    Faced with outgoing transfer delays, Mr. Okpala communicated to Prime that the circumstances around outgoing wires were "very fishy":



182.    Indeed, Mr. Okpala acknowledged that Oval was "literally sitting at [their] desks and refreshing every few minutes" to see whether transfers were received due to their concerns about Prime's solvency.

To Address: customersupport@primetrust.zendesk.com
Attachments:
Subject: Outgoing wires still pending
Body: Hey ▮▮▮-

Still nothing yet? Morning sweep has passed, and we have we received any response or acknowledgement from customer service.

If you want us to pause using Prime Trust at the moment until the shortages and/or acquisition is completed, we can do that. But you don't have to keep assuring us that the service is available when it is not. Monday was a bank holiday and it's already Wednesday, meaning if it goes into tomorrow it would be 4 days for certain transactions to go through.

We are literally sitting at our desks and refreshing every few minutes as certain operations are paused until these open transactions are closed.

**Chinedu Okpala |** CEO, Oval Labs Inc.

+1 (917) 412-7973

183.    Oval insisted on transferring as much fiat and crypto as possible from Prime to Oval

during the Preference Period:





184.    The fiat transactions between Prime and Oval during the Preference Period were

notably different from prior transactions. Prior to the Preference Period, from February 14, 2023,

to May 15, 2023, the average number of monthly fiat transactions between Prime and Oval was 63

transactions.   During the Preference Period, the average number of monthly fiat transactions between Prime and Oval increased to 114 transactions.[16]  *See* Ex. C, Brennan Decl., ¶ 132.

185.    Specifically, Prime transferred $26,644,776.49 USD from Prime's BMO x3077 account to Oval during the Preference Period ("Fiat Transfers").  *See id.*

| Oval Labs, Inc. / Oval Finance - Fiat Preferential Transfers | | | |
|---|---|---|---|
| Date | Currency | Transfer Count | Transfer Amount ($) |
| 5/16/2023 | USD | 6 | $            2,217,000 |
| 5/18/2023 | USD | 2 | 905,519 |
| 5/19/2023 | USD | 1 | 430,000 |
| 5/23/2023 | USD | 4 | 850,000 |
| 5/24/2023 | USD | 1 | 45,000 |
| 5/25/2023 | USD | 4 | 1,044,448 |
| 5/26/2023 | USD | 3 | 1,081,633 |
| 5/30/2023 | USD | 2 | 977,000 |
| 5/31/2023 | USD | 3 | 625,000 |
| 6/1/2023 | USD | 5 | 1,613,027 |
| 6/2/2023 | USD | 1 | 305,000 |
| 6/5/2023 | USD | 2 | 450,618 |
| 6/6/2023 | USD | 7 | 1,443,426 |
| 6/7/2023 | USD | 4 | 1,630,093 |
| 6/8/2023 | USD | 5 | 1,061,527 |
| 6/12/2023 | USD | 5 | 1,163,919 |
| 6/13/2023 | USD | 1 | 1,000,000 |
| 6/14/2023 | USD | 2 | 345,652 |
| 6/15/2023 | USD | 6 | 1,970,000 |
| 6/16/2023 | USD | 5 | 2,723,923 |
| 6/21/2023 | USD | 9 | 4,761,993 |
| **Total** | | | **$            26,644,776** |

186.    As previously alleged (*see supra*, ¶¶ 78-92), the fiat in Prime's BMO x3077 account commingled fiat transferred to Prime by multiple Prime customers, including Oval.

187.    The Brennan Declaration examines a single day (June 13, 2023) of deposits and withdrawals from this BMO account to illustrate the extensive commingling that occurred and what it meant for Preference Period fiat transactions such as Oval's.  *See* Ex. C, Brennan Decl., ¶¶ 140-146.  As reflected in the bank records for this account and as explained by Brennan, on June 13, 2023, the beginning balance of BMO x3077 was $380,946.46.  *See id.* at ¶ 146.  On June 13, 2023, deposits totaling $26,204,498.54 were transferred into BMO x3077.  *See id.*  However,

---

[16]    A copy of Oval's Outgoing API Data is attached as **Exhibit I**.

only one of these deposits totaling $180,582.63 was transferred to Prime from Oval. Conversely, on June 13, 2023, withdrawals totaling $25,833,360.59 were transferred out of BMO x3077, including one withdrawal of $1,000,000.00 from Prime to Oval. *See id*. Even if one assumed that the entire beginning balance of BMO x3077 on June 13, 2023 included only fiat previously transferred to Prime by Oval, that would make Oval's total "balance" $561,529.09 in BMO x3077 on June 13, 2023 (*i.e.*, adding the beginning balance of $380,946.46 and Oval's transfer of $180,582.63); meaning the $1,000,000.00 transfer from Prime to Oval would have had to include at least $438,470.91 of fiat deposited that day by other Prime customers. *See id*. Thus, the fiat transferred by Prime to Oval on June 13, 2023, was not only fiat that had been commingled with fiat transferred to Prime by other customers, but also likely included fiat that had been transferred to Prime by other customers.

188.    Oval's transactions on June 13, 2023, illustrate that Prime commingled fiat in BMO x3077 from various internal and external sources (including Oval), on a daily or near-daily basis. Thus, all of the Fiat Transfers that Prime transferred to Oval from BMO x3077 during the Preference Period were commingled fiat. *See id*. at ¶¶ 146-147.

189.    Prime also transferred to Oval 1,000 USDT, 0.76 ETH, 12,138 USDC, and 0.95 BTC from its Omnibus Wallets during the Preference Period ("Crypto Transfers"). *See id*. at ¶¶ 148, 152-153.

| Oval Labs, Inc. / Oval Finance - Crypto Preferential Transfers | | | | | |
|---|---|---|---|---|---|
| Date | Tether (USDT) | Ethereum (ETH) | Circle (USDC) | Bitcoin (BTC) | Transfer Count |
| 6/9/2023 | 1,000 | | | | 1 |
| 6/14/2023 | | 1 | 2,151 | 1 | 3 |
| 6/21/2023 | | | 9,987 | | 1 |
| Total | 1,000 | 1 | 12,138 | 1 | 5 |

190.    As detailed above (*see supra*, ¶¶ 100-122, 189), Prime's Omnibus Wallets contained commingled crypto that included crypto swept from multiple Deposit Addresses and

Prime's own corporate crypto. Therefore, the Crypto Transfers to Oval were not the same crypto that Oval had originally transferred to Prime.

191. The Transfers to Oval were transfers of an interest of Prime's property to or for the benefit of Oval during the Preference Period.

192. Prime executed the Transfers during the Preference Period to satisfy the debt Prime owed to Oval under the Agreements.

193. The Transfers were made while Prime was insolvent. As of the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[17] If not avoided, the Transfers will enable Oval to receive more than Oval would have received on account of their claim in a hypothetical liquidation under chapter 7 had Prime not made the Transfers in satisfaction of Prime's antecedent debt to Oval. *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

194. Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Transfers during the Preference Period performed by Plaintiff and the third-party expert retained in this matter, Plaintiff has determined that it may avoid many of the Transfers even after taking into account Oval's alleged affirmative defenses.[18] Accordingly, certain of the Transfers to Defendants must be returned. *See* 11 U.S.C. §§ 547(b), 550.

195. Oval transferred $21,882,783.36 USD and 2,151 USDC of potential subsequent new value to Prime after receiving certain of the Transfers during the Preference Period. *See*

---

[17] *See Schedules of Assets and Liabilities for Prime Core Technologies Inc. (Case No. 23-11161)* [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC (Case No. 23-11162)* [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC (Case No. 23-11164)* [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC (Case No. 23-11168)* [Docket No. 178].

[18] It is Oval's obligation to establish all possible affirmative defenses, including subsequent new value.

<u>Ex. C</u>, Brennan Decl., ¶¶ 135, 152.   Therefore, Oval's preference exposure is no less than $4,761,993.13 USD, 1,000 USDT, 0.76 ETH, 9,987 USDC, and 0.95 BTC.  *See id.*

196.     During the course of this proceeding, Plaintiff may learn (through discovery or otherwise) of additional transfers made to Oval during the Preference Period.   It is Plaintiff's intention to avoid and recover all transfers made by Prime of an interest of Prime in property that was made to or for the benefit of Oval or any other transferee.   Plaintiff reserves its right to amend this original Complaint to include: (i) further information regarding the Transfers; (ii) additional transfers; (iii) modifications of and/or revision to Oval's name; (iv) additional defendants; and/or (v) additional causes of action, if applicable (collectively, the "<u>Amendments</u>"), that may become known to Plaintiff at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

## CAUSES OF ACTION

### Count I

### Avoidance of Preferential Transfers,
### 11 U.S.C. § 547(b)

197.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

198.     The Transfers were made on account of a demand by Oval.

199.     Each of the Transfers was a transfer of an interest in property of Prime.

200.     Prime made the Transfers to or for the benefit of Oval.

201.     At the time of the Transfers, Oval was a creditor of Prime within the meaning of Section 101(10) of the Bankruptcy Code.   Oval received the Transfers, or, alternatively, the Transfers were made for Oval's benefit.

202.    Each of the Transfers was made for or on account of an antecedent debt owed by Prime.

203.    Each of the Transfers was made within ninety days of the Petition Date

204.    At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to Section 547(f) of the Bankruptcy Code.  If not avoided, the Transfers would enable Oval to receive more than Oval would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

205.    Oval has not repaid or returned any of the Transfers to Plaintiff.

206.    Pursuant to 11 U.S.C. § 547(b), Plaintiff has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses that Oval could assert, including Oval's potential defenses under Section 547(c) of the Bankruptcy Code, and believes that certain of the Transfers are avoidable.

207.    Accordingly, Plaintiff is entitled to recover from Oval not less than $4,761,993.13 USD, 1,000 USDT, 0.76 ETH, 9,987 USDC, and 0.95 BTC of the Transfers as preferences pursuant to Section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law.

## Count II

### Avoidance of Constructive Fraudulent Transfers,
### DEL. CODE ANN. tit. 6, §§ 1304(a)(2) and 1305 and 11 U.S.C. §§ 544(b) and 548

208.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

209.    In the alternative to Count I, pursuant to Sections 1304(a)(2) and 1305 of Title 6 of the Delaware Code and Sections 544(b) and 548 the Bankruptcy Code, Plaintiff may avoid the Transfers as constructive fraudulent transfers.

210.    On or within two (2) years before the Petition Date, Prime made the Transfers to or for the benefit of Oval.

211.    Each of the Transfers was a transfer of an interest in property of Prime.

212.    Prime received less than reasonably equivalent value from Oval in exchange for the Transfers to Oval.

213.    At the time each of the Transfers was executed:  (i) Prime was insolvent or became insolvent as a result of the Transfers; (ii) Prime was about to engage in business or a transaction for which any property remaining with Prime was an unreasonably small capital; or, alternatively, (iii) Prime intended to incur, or believed that it would incur, debts that would be beyond Prime's ability to pay as such debts matured.

214.    The constructive fraudulent transfers are avoidable pursuant to Bankruptcy Code Sections 544(b) and 548 and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301, *et seq.*

215.    Accordingly, each of the Transfers to Oval should be avoided as constructive fraudulent transfers pursuant to DEL. CODE ANN. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. §§ 544(b) and 548, and Plaintiff may recover from Oval the full amount of the Transfers, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law.

### Count III

**Recovery of Avoided Transfers from the Defendants,**
**11 U.S.C. § 550**

216.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

217.    Plaintiff is entitled to avoid preferential transfers and/or constructive fraudulent transfers described above pursuant to Sections 544(b), 547(b), and/or 548 of the Bankruptcy Code. Oval was the initial transferee of such transfer, or the immediate or mediate transferee of such initial transferee, or the person for whose benefit such transfer was made.

218.    Accordingly, pursuant to Section 550 of the Bankruptcy Code, Plaintiff is entitled to recover from Oval: not less than $4,761,993.13 USD, 1,000 USDT, 0.76 ETH, 9,987 USDC, and 0.95 BTC of the Transfers as preferences pursuant to Section 547(b) of the Bankruptcy Code, or in the alternative, the full amount of the Transfers of not less than $26,644,776.49 USD, 1,000 USDT, 0.76 ETH, 12,138 USDC, and 0.95 BTC as constructive fraudulent transfers pursuant to Sections 544(b) and 548 of the Bankruptcy Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

### Count IV

**Claim Objection,**
**11 U.S.C. § 502**

219.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

220.    Oval has not filed any claims in these Chapter 11 Cases.

221.    As alleged above, Oval was the initial transferees of the Transfers, or the immediate or mediate transferees of such initial transferees, or the persons for whose benefit the Transfers

were made, and Plaintiff is entitled to avoid the Transfers described above pursuant to Sections 547(b) and/or 548 of the Bankruptcy Code, which are recoverable from Oval under Section 550 of the Bankruptcy Code.

222.    Pursuant to Section 502(d) of the Bankruptcy Code, any claim(s) of Oval that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until Oval pays Plaintiff the value of the Transfers, for which and to the extent that the Court has determined Oval is liable pursuant to 11 U.S.C. § 550.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Court grant the following relief:

A.    Enter an order finding that the Transfers addressed herein are avoidable preferential transfers under 11 U.S.C. § 547 and/or avoidable constructive fraudulent transfers under 11 U.S.C. §§ 544 and 548 and DEL. CODE ANN. tit. 6, §§ 1304, 1305;

B.    Award Plaintiff: (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable preferential transfers and/or avoidable constructive fraudulent transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable preferential transfers and/or avoidable constructive fraudulent transfers alleged herein, plus the value of any additional avoidable transfers that Plaintiff learns, through discovery or otherwise, were made to Oval;

C.    Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by Oval against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until Oval relinquishes to Plaintiff the amount ordered as an award for avoidable transfers;

      D.      Award Plaintiff its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

      E.      Grant Plaintiff all other relief, at law or equity, to which it may be entitled.

Dated:  March 13, 2025
        Wilmington, Delaware

**MᶜDERMOTT WILL & EMERY LLP**

*/s/ David R. Hurst*
David R. Hurst (No. 3743)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711
Email:    dhurst@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
James A. Pardo (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Magali M. Duque (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email:    dazman@mwe.com
          jbevans@mwe.com
          jpardo@mwe.com
          ggriffith@mwe.com
          pkennedy@mwe.com
          mduque@mwe.com
          jaminov@mwe.com

*Counsel to the PCT Litigation Trust*