# EXHIBIT C

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust, [2] | |
| Plaintiff, | |
| v. | Adv. Proc. No. 24-_____ (JKS) |
| Oval Labs, Inc., and Oval Finance, LLC, | |
| Defendants. | |

## <u>DECLARATION OF JAMES P. BRENNAN</u>

Under 28 U.S.C. § 1746, I, James P. Brennan, declare as follows under the penalty of perjury:

---

[1]    The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "<u>Debtors</u>" or "<u>Prime</u>").  The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]    The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

## I.    My Background

1.    I am a forensic accountant with over 20 years of experience conducting analyses and providing expert testimony in matters involving accounting fraud, Ponzi-schemes, financial crimes, and asset-tracing and recovery.  I have experience in forensic accounting and investigations in fiat and cryptocurrency.

2.    I am a Senior Managing Director and Global Head of Fintech, Payments, and Crypto Compliance and Investigations at J.S. Held.  J.S. Held is a global professional service firm which provides technical, scientific, and financial advisory services.

3.    Prior to working at J.S. Held, I held positions at other investigation firms, including FTI Consulting, Alvarez & Marsal, and Kroll.  In these positions, I managed teams responsible for investigations involving money laundering, terrorist financing, Ponzi-schemes, asset theft, and other fraudulent activities, as well as asset-tracing and recovery.

4.    I hold both a B.S. and a M.S. in accounting from St. John's University.  I am a Certified Fraud Examiner and a Certified Bitcoin Professional.

5.    A copy of my resume is attached as **Exhibit A**.

6.    I specialize in accounting, forensic investigations, and disputes involving complex economic and financial transactions.  A significant amount of my practice and experience involves advising on crypto-related matters.

7.    I am routinely retained to perform analyses of information related to financial crimes, which includes forensic investigations and flow-of-funds analyses related to crypto digital wallets and fiat bank accounts.

8. I am familiar with the forensic tools and methodologies used for conducting investigations related to both fiat and cryptocurrency in criminal, civil, bankruptcy, and regulatory matters.

9. I also train domestic and international government entities concerning cryptocurrency and financial crimes. These entities include, among others, the U.S. Department of Justice, U.S. Department of Homeland Security, and U.S. Bankruptcy Courts.

10. I submit this Declaration in support of Plaintiff's complaint against Oval Labs, Inc. and Oval Finance, LLC (a/k/a "OvalFi") (together, "Oval").

11. In connection with this Declaration, I reviewed testimony from former Prime executives and employees.

12. I also reviewed Prime's bank account information at various financial institutions, including BMO Harris ("BMO"), Cross River Bank ("CRB"), Signature Bank ("Signature"), and Royal Business Bank ("RBB").

13. Except as otherwise indicated herein, all facts set forth in this Declaration are based on: (i) my personal knowledge and/or on information provided to me by Prime, former Prime management and employees, Wind-Down Debtor, the Plan Administrator and/or the Plan Administrator's professionals, or (ii) my review of relevant documents.

14. Except as otherwise indicated herein, all conclusions and opinions set forth in this Declaration are based on: (i) the facts as known to me, including those set forth herein; (ii) my experience and knowledge of Prime's operations; and (iii) my experience and training as a professional.

15. The opinions and conclusions expressed herein are subject to change based on additional data, facts, and information that may be received after this Declaration is executed,

including, among other things, additional data, facts, and information that becomes available in the public domain or that is made available by the Wind-Down Debtor, the Plan Administrator or other parties during discovery or otherwise.

## II.    Prime's Commingling of Fiat and Recordkeeping Processes Generally

16.    As part of my analysis and research for this Declaration, I have reviewed bank accounts held by Prime at various banks including BMO Harris, N.A. ("BMO"), Cross River Bank ("CRB"), Signature Bank ("Signature"), Royal Business Bank ("RBB") and Lexicon Bank ("Lexicon"). Based on my review of these bank accounts and Prime documents,[3] as well as the sworn testimony of former Prime employees, I have made several observations about how Prime managed and commingled its fiat.

17.    Prime held and commingled fiat that customers transferred to it in omnibus bank accounts with fiat transferred to it by thousands of Prime's other customers and with fiat Prime generated from its business operations.

18.    Since fiat that customers transferred to Prime was commingled with fiat from other customers and fiat Prime generated from its business operations, Prime was forced to rely on its internal ledger (the "Internal Ledger") to keep track of transactions to identify how much Prime owed each of its customers.[4] I was provided and reviewed Internal Ledger data.

19.    According to the Internal Ledger, bank account statements, and bank reconciliation data I reviewed, Prime regularly made internal transfers between Prime's bank accounts. Prime

---

[3]    Documents reviewed to date include Internal Ledger records for both fiat and crypto transactions, bank account statements, bank reconciliation data, deposition testimony, and Prime correspondence.

[4]    Deposition of ▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "▮▮▮▮▮"), 89: 19–25.

would move funds between its different bank accounts, regardless of the source of funds, on an as-needed basis to satisfy wire and Automated Clearing House ("ACH") requests.

20.    Prime also transferred funds between bank accounts that contained fiat transferred to Prime from customers and bank accounts that primarily held fiat Prime generated from Prime's business activities.  These internal transfers further commingled fiat.

21.    Prime had numerous bank accounts at different banks depending on the time period. Based on my review of the bank statements and conversations with former Prime staff, during a given period, certain bank accounts were primarily used depending on the type of transaction.

22.    For example, Prime predominantly used one omnibus bank account ("BMO x3077"), for incoming and outgoing wire transfers during 2023.

23.    BMO x3077 contained commingled funds that had been transferred to it from Prime's other bank accounts as well as directly from Prime customers.

24.    A large volume of debits and credits occurred almost daily to and from BMO x3077.  However, Prime's bank statements for BMO x3077 only include reference numbers regarding the movement of funds into or out of that account.  There are no other details within the bank statements.  This makes it difficult to determine who was transferring funds into Prime and who were the recipients of outbound transfers.

25.    Prime also would regularly make internal transfers from BMO x3077 into a different omnibus bank account at BMO ("BMO x9934") to earn a higher rate of interest.  Most of the unused funds left in BMO x3077 at the end of each day would then be transferred back to BMO x9934 as BMO x9934 provided a higher rate of interest than BMO x3077.  Transfers between the bank accounts were described in Prime's bank statements as "PC Transfers".

26.     It appears that the vast majority of funds contained in BMO x9934 were commingled funds that had been transferred into BMO x9934 from the commingled BMO x3077 account.  BMO x9934 also contained some funds that had been transferred into it from other commingled bank accounts held by Prime, such as CRB and Signature bank accounts.

27.     These CRB and Signature bank accounts operated in a largely similar manner as BMO x3077—*i.e.*, they contained commingled funds that had been transferred from other Prime bank accounts that contained funds transferred to Prime by other Prime customers.

28.     For instance, "<u>CRB x9892</u>" was another omnibus bank account utilized by Prime. This account consisted primarily of internal transfers and payments via automated clearing house ("<u>ACH</u>").  Thus, during 2023, it appears that Prime primarily utilized either BMO x3077 or CRB x9892 depending on whether Prime needed to make transfers via wire or ACH.  Due to the extensive commingling of funds within Prime's bank accounts, the funds held within these accounts cannot be traced to specific customer deposits or withdrawals.

29.     Prime bank statements reflect the movement of these funds between the Prime bank accounts but do not include details sufficient to identify where those funds originally came from, whom they were being transferred to, or for what reason they were being transferred.

30.     Transfers between Prime accounts usually occurred in round dollars, as opposed to specific amounts based on specific transactions.  This suggests that Prime likely estimated the amount of funds to transfer instead of transferring specific funds in response to specific transaction activity.  This practice further adds to the difficulty in connecting transfers with specific transactions reflected in Prime's Internal Ledger.

31.     Based on my experience, numerous internal transfers amongst bank accounts without accurate recordkeeping can be indicative of fraud.  It also can suggest that an entity is

facing cash shortfalls and is moving funds around to manage funds in a manner to satisfy withdrawals or other immediate, pressing cash needs.

32.     All of the fiat transfers between Prime and Oval during the Preference Period[5] were transferred from BMO x3077.

## III.    Background on Crypto

33.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Bitcoin ("BTC") and Ether ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

34.     All cryptocurrencies exist on a "blockchain."  A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all the cryptocurrency transactions that occurred on the blockchain at a particular point in time.  Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain"—a "block"-"chain."

35.     There are a number of different blockchains.  The first and most popular blockchain was the BTC blockchain.  Another important blockchain is the Ethereum blockchain, which

---

[5]     Prime and certain of its affiliates filed the above-captioned Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's preference period occurred between May 16, 2023, and August 14, 2023 (the "Preference Period").

launched the popular cryptocurrency ETH.  The Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

36.    Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique Ethereum digital addresses, which are derived from public keys. These Ethereum digital addresses are 40-character hexadecimal strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these digital addresses, including any time crypto is traded or any time a smart contract is used.

37.    Similarly, on the Bitcoin blockchain, digital wallets and their respective holdings are identifiable to the public by unique Bitcoin digital addresses, which are derived from public keys. Bitcoin digital addresses are shorter, hashed versions of public keys, which are digital addresses with long alphanumeric strings.  Using open-source platforms such as Blockchair, anyone can see the transaction activity of a specific digital address, as everything that occurs with BTC is recorded publicly on the blockchain.

38.    "Private keys" are essentially individual passwords used to denote ownership of a particular blockchain wallet.  Like public keys, private keys similarly consist of multi-digit alphanumeric strings.  However, unlike public keys—which are knowable by the public and used simply to identify a digital address—private keys are known only by the owner of the digital wallet and used by the owner to access and manage the digital wallet.

39.    Many digital wallets and private keys are "custodial," which means that they are possessed by a third party, such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets have no third party that is taking custody of the crypto.

40.    Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

41.    Transactions occurring on the blockchain incur fees.  On the Ethereum blockchain, these are referred to as "gas fees."  Gas fees refer to the costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain.  In other words, they are fees charged by the blockchain itself for successfully completing a transaction on the blockchain.  The exact amount of gas fees for a particular transaction can fluctuate based on factors such as the size of the transaction, supply, demand, and network activity at the time the transaction is made.

42.    However, on the Bitcoin blockchain, these are referred to simply as "transaction fees."  Transaction fees refer to the costs that blockchain users pay to bitcoin miners as an incentive for preventing network congestion and incorporating a transaction in the subsequent "block."[6]  In other words, they are rewards paid to miners for facilitating the successful completion of a transaction on the blockchain.  Similar to gas fees in the case of ETH, the exact price of the transaction fee for a particular Bitcoin transaction can fluctuate based on factors such as the size of the transaction (in terms of bytes), supply, demand, and network activity at the time the transaction is made.

43.    Furthermore, a key distinction in how transaction fees are determined on the Bitcoin network compared to other blockchains is the protocol's Unspent Transaction Output ("UTXO") model. [7]  While other blockchains such as Ethereum utilize an account-based system, where digital

---

[6]    *See* FIDELITY DIGITAL ASSETS, "Bitcoin and Ethereum Fees Explained," *available at*: https://www.fidelitydigitalassets.com/research-and-insights/bitcoin-and-ethereum-fees-explained.

[7]    A UTXO is the "unspent" amount of BTC or "change" that is left over from a digital wallet sending BTC to another digital wallet.

wallet balances are adjusted based on transaction activity, Bitcoin's system is often compared to physical cash because the "input"[8] for a Bitcoin transaction is typically compiled of various UTXOs (representing various amounts of BTC) that it previously received.  If the value of the UTXO is not the exact equivalent of the desired amount, "change" is then sent back to the sender in the form of a new UTXO.[9]



44.    The number of UTXOs in a transaction impacts its data size, and this in turn is reflected in the transaction fee.  The more UTXOs required to complete the transaction, the higher the cost of processing it will be.[10]  This is because transaction fees are calculated by a certain number of satoshis[11] (0.00000001 BTC) per byte of data.[12]  Oftentimes, sophisticated traders or

---

[8]    An "input" is the amount of BTC being sent from a digital wallet to another digital wallet.

[9]    *See* KRAKEN, "What is a Bitcoin unspent transaction output (UTXO)?", *available at*: https://www.kraken.com/learn/what-is-bitcoin-unspent-transaction-output-utxo.

[10]   *See* RIVER, "Bitcoin's UTXO Model: What Is It and How to Manage UTXOs", *available at*: https://river.com/learn/bitcoins-utxo-model/.

[11]   A satoshi is the smallest unit of Bitcoin and essentially measures the size of the transaction.

[12]   *See* BITSTAMP, "How are BTC transaction fees determined?", *available at*: https://www.bitstamp.net/learn/blockchain/how-are-btc-transaction-fees-determined/.

entities will consolidate their UTXOs by sending funds to themselves during off-peak hours, to reduce the transaction fee for when they send the funds outward in the future.

## IV.     Prime's Commingling of Crypto and Recordkeeping Processes Generally

45.     Prime did not maintain separate or segregated digital wallets for crypto that its customers transferred to Prime.  Rather, Prime held and commingled the crypto transferred by its various customers in omnibus digital wallets ("Omnibus Wallets"), where it was further commingled with crypto that Prime used for its own corporate operations and purposes.

46.     The shared Omnibus Wallets were contained in Prime's vaults ("Vaults") with Fireblocks LLC ("Fireblocks").[13]  Prime used Vaults within its Fireblocks infrastructure to organize digital wallets (including the Omnibus Wallets), to implement increased security measures, and to take advantage of efficiencies in transaction policies and other access controls.

47.     Each Prime customer was provided with its own unique deposit digital wallet address ("Deposit Digital Address") in order to transfer crypto to Prime.

48.     Prime would periodically "sweep," in other words, collect, all of the crypto that had been transferred to Deposit Digital Addresses and then transfer that crypto to one or more of the shared Omnibus Wallets controlled by Prime.  This "sweeping" or collection process commingled the crypto that various customers transferred to Prime.

49.     Prime utilized inconsistent methods for sweeping Deposit Digital Addresses. Prime maintained an application that could trigger a sweep based on certain events occurring such as a withdrawal request.  A Prime employee also could manually perform a sweep at any given time.

---

[13]    Fireblocks is a third-party crypto security platform which provides infrastructure for moving, storing, and issuing crypto.  Prime used Fireblocks to hold and manage its crypto.  "Vaults" are storage solutions for crypto that group multiple digital wallets in a single, central location.  "Vaults" can be managed more efficiently as a group and provide enhanced security across all digital wallets within a Vault.

50.     Prime regularly transferred crypto between its Omnibus Wallets, further commingling the crypto that customers transferred to Prime.  It does not appear that Prime used a consistent or defined process for transfers between its Omnibus Wallets.

51.     Since Prime did not maintain segregated digital wallets for each of its customers and the crypto at Prime was commingled (similar to fiat), Prime was forced to rely on its Internal Ledger to attempt to keep track of how much crypto Prime owed each of its customers.  Prime would credit a customer's balance on its Internal Ledger for any crypto that a customer sent to Prime through its unique Deposit Digital Address.

52.     The Internal Ledger did not (and could not) track which of the Omnibus Wallets held the specific crypto that a customer had originally transferred to Prime because that crypto was commingled with crypto other customers had transferred to Prime as well as with Prime's own crypto within and across multiple Omnibus Wallets.

53.     Based on my experience, Prime's haphazard transferring of crypto, lack of defined processes and procedures, and deficient record keeping are red flags of potential fraud.  At a minimum, it demonstrates poor asset management and suggests that Prime was moving crypto around to manage customers withdrawals or its own needs without consideration of the ultimate negative impact such management had on the business overall.

54.     Similar to its treatment of fiat, Prime did not perform regular reconciliations to compare the crypto recorded in its Internal Ledger with the crypto Prime actually held in its Omnibus Wallets.

55.     When a customer requested a withdrawal of crypto, Prime relied on the Internal Ledger to validate that the specific customer had previously transferred an amount of crypto to Prime sufficient to support the withdrawal request.  Prime then checked its multiple Omnibus

Wallets to determine which one(s) held sufficient crypto to satisfy the customer's withdrawal request. Prime would then transfer crypto from an Omnibus Wallet(s) with sufficient crypto to the customer to complete the withdrawal request. Prime did not transfer crypto to the customer from the original Deposit Digital Address the customer had used to transfer crypto to Prime, or even necessarily from the original Omnibus Wallet(s) where that customer's crypto had initially been swept. In other words, the crypto Prime would send to a customer to satisfy a withdrawal request was not the same crypto that the customer had originally sent to Prime.

56.     Based on my review of Prime's company records, such as the Internal Ledger, and blockchain data, I have identified several illustrative examples of the crypto commingling that occurred at Prime. The diagrams in this Declaration feature specific relevant examples to illustrate the concepts discussed in the Declaration and do not reflect the full scope of all of the blockchain activity in each diagram. These examples are described below.

**A. Prime Omnibus Wallet ~b2ea Illustration**

57.     One Omnibus Wallet frequently used by Prime has the digital address ending in ~b2ea (the "~b2ea Wallet").

58.     Like Prime's other Omnibus Wallets, the ~b2ea Wallet received crypto from Deposit Digital Addresses through the periodic sweeps that Prime conducted.

59.     The diagram[14] below (based on blockchain data) depicts three different Prime customers[15] transferring crypto into their respective unique Deposit Digital Addresses, followed by Prime sweeping this crypto into its omnibus ~b2ea Wallet:

---

[14]   In the diagrams in the Brennan Decl., all digital wallets and Deposit Digital Addresses are referred to by the last four digits of their digital addresses.

[15]   In the diagram below, Customer C transferred crypto from multiple external digital wallets to its Deposit Digital Address ~57c4 at Prime.



60.    Thus, as demonstrated above, the ~b2ea Wallet (like all of Prime's Omnibus Wallets) contained commingled crypto transferred to Prime by various customers.

61.    Another example of incoming transfers that the ~b2ea Wallet received were transfers from a different Prime digital wallet that Prime referred to as the "PT Segregated Assets" wallet ("PT Segregated Assets Wallet").

62.    The PT Segregated Assets Wallet was intended to keep Prime's corporate crypto separated from the crypto transferred to Prime by its customers, which would have been proper practice.  However, in practice, this segregation did not actually occur.  The PT Segregated Assets Wallet contained crypto transferred from a Prime Omnibus Wallet, which itself contained crypto transferred to Prime by thousands of customers via Deposit Digital Addresses

63.    Despite its internal label "PT Segregated Assets", I observed that ETH was transferred from the PT Segregated Assets Wallet to the omnibus ~b2ea Wallet which contained commingled crypto transferred to Prime by various customers.  For example, in March 2022, the PT Segregated Assets Wallet transferred 194 ETH to the ~b2ea Wallet.

64.    The diagram below illustrates how crypto transferred to Prime by Customer A was subsequently commingled in the ~b2ea Wallet with crypto from the PT Segregated Assets Wallet.

The same ~b2ea Wallet was then used to satisfy withdrawal requests of other Prime customers, including Customer B and Customer C. Therefore, in this example, the outgoing crypto transfers to Customers B and C may have included some of the crypto transferred by Customer A along with crypto from other customer deposits being transferred to the ~b2ea Wallet.



65.     Similarly, the below diagram provides an example of how five different Prime Omnibus Wallets transferred crypto amongst one another in a manner that appears entirely arbitrary and haphazard.



66.     In my experience, it is uncommon for such a high volume of transfers to occur amongst digital wallets controlled by a single entity.  I have been unable to ascertain a business

purpose or rationale for the frequent transfers of crypto that Prime conducted between its different Omnibus Wallets.

67.     The extensive commingling of crypto in Omnibus Wallets at Prime make it impossible to specifically attribute any of the crypto to a particular customer who transferred crypto to Prime.

### B.  Prime Omnibus Wallet ~73ck Illustration

68.     Another Omnibus Wallet frequently used by Prime has the digital address ending in ~73ck (the "~73ck Wallet").

69.     This omnibus ~73ck Wallet was used BTC transactions and held BTC transferred to Prime from numerous customers as well as BTC transferred into the ~73ck Wallet from other Prime Omnibus Wallets, which in turn also held BTC transferred to Prime by multiple customers and BTC transferred from other Prime Omnibus Wallets.  This resulted in extensive commingling of BTC within Prime's Omnibus Wallets.

70.     The diagram below illustrates an example of BTC being transferred between Prime Omnibus Wallets, including transfers to the ~73ck Wallet.



71.     Similar to the ~b2ea Wallet example discussed herein for ETH, I have been unable to ascertain a business purpose or rationale for the frequent transfers of BTC between Prime's different Omnibus Wallets.

**C.  Prime's Transaction Fees**

72.     Based on my experience, Prime likely performed crypto sweeps from the Deposit Digital Addresses into shared Omnibus Wallets to pool crypto together to create certain efficiencies.

73.     Crypto transfers between different Prime's Vaults within Fireblocks occur on-chain, meaning that Prime would have to incur transaction fees when transferring crypto between Vaults at Fireblocks.

74.     To avoid transaction fees, Prime could simply adjust crypto entries on its Internal Ledger to avoid conducting any actual transactions on the blockchain, which would have otherwise incurred transaction fees.  By doing this, crypto would technically remain in the same original Omnibus Wallet, but the Internal Ledger would now attribute a new value to the customer.

75.     To reduce transaction fees that could not be avoided entirely through Internal Ledger entries, Prime could pool transactions and perform them during off-peak hours when the blockchain network was less congested and thus less expensive.    Thus, by pooling and commingling crypto into Omnibus Wallets, Prime was able to reduce the number of UTXOs for the purpose of reducing transaction fees.

76.     The following example illustrates Prime's strategy to reduce transaction fees, including for fees related to Oval's BTC transactions.    When Oval, or another customer, requested a BTC withdrawal, a fee would be incurred since the transaction would occur on-chain.    Prime minimized these fees by sweeping UTXOs (representing various remaining amounts of BTC) from other customer Deposit Digital Addresses into the same withdrawal transaction.    Therefore, in this example, Prime would satisfy Oval's BTC withdrawal requests using crypto that had been transferred to Prime by other customers.

77.     The diagram below provides an example of a withdrawal transaction in which BTC transferred from a Prime Omnibus Wallet ~vk39 (represented by the green  node below) (the "~vk39 Wallet"), as well as BTC transferred to Prime from six unique customers (each represented by different color nodes below) using multiple Deposit Digital Addresses, was all swept together into a single transaction.    This example shows how Prime took advantage of a withdrawal request of 16.56 BTC by Customer A (represented by the yellow node below) to sweep UTXOs (representing various remaining amounts of BTC) from eleven Deposit Digital Addresses into the transaction.    In this example, Customer A receives 16.56 BTC as requested, and the remaining BTC left over from the transaction becomes a single UTXO, which is sent back to a Prime Omnibus Wallet.    The combination of transactions reduced transaction fees for the next withdrawal

request because twelve UTXOs (representing various amounts of BTC) from eleven customer Deposit Digital Addresses and one Prime Omnibus Wallet were combined.



78.    In this single transaction depicted above and reflected in the chart below, although Prime swept BTC from six different customers and Prime's omnibus ~vk39 Wallet (totaling 12 UTXO amounts), only two digital wallets received BTC in this transaction: Customer A received 16.56 BTC and Prime's omnibus ~vk39 Wallet received the remaining 0.699 BTC from Customer A's transaction with Prime, which is now one UTXO.

| Transaction Parties | Amount of BTC Swept | UTXO Count | Amount of outgoing BTC transferred | Resulting UTXO Count |
|---|---|---|---|---|
| Customer A | 0.002 | 1 | 16.561 | 1 |
| Customer B | 0.0569 | 3 | 0 | 0 |
| Customer C | 0.0007 | 1 | 0 | 0 |
| Customer D | 2.9011 | 2 | 0 | 0 |
| Customer E | 0.1921 | 3 | 0 | 0 |
| Customer F | 5.5 | 1 | 0 | 0 |
| Prime ~vk39 Wallet | 8.6079 | 1 | 0.6997 | 1 |
| **Total** | **17.2607** | **12** | **17.2607** | **2** |

79.    As a result, the single UTXO remaining in Prime's ~vk39 Wallet contained a combination of BTC transferred from six different customers in addition to BTC transferred from Prime's omnibus ~vk39 Wallet.  Accordingly, for subsequent transactions involving this omnibus ~vk39 Wallet, it is practically impossible to distinguish which digital wallet the remaining 0.699 BTC originated from.

80.    This example demonstrates how BTC is commingled in a single transaction.  Prime conducted over one million BTC transactions, and therefore commingled BTC extensively, rendering it impossible to differentiate between the BTC that customers transferred to Prime.

**D.  Prime's Gas Fees**

81.    Similar to BTC transfers between Prime's Vaults within Fireblocks, crypto transfers of ETH between Prime's Vaults within Fireblocks also occur on-chain.  Prime thus incurred gas fees when transferring ETH between Vaults at Fireblocks.

82.    Gas fees can be reduced by pooling transactions and performing them during off-peak hours when the blockchain network is less congested.  Thus, by pooling crypto in Omnibus Wallets in Prime's Vaults at Fireblocks, Prime was able to conduct grouped transactions for the purpose of incurring reduced gas fees.

83.    To help pay for these gas fees, Prime set up additional digital wallets which it referred to collectively as "gas stations" ("Gas Stations").  Prime funded the Gas Stations from its other digital wallets (including the Omnibus Wallets) and used the Gas Stations to pay gas fees when Prime conducted on-chain transactions.

84.    Prime used a variety of sources to fund the Gas Stations, which resulted in Prime further commingling the crypto transferred to Prime by its various customers with Prime's own crypto.

85.    Within Prime's Fireblocks infrastructure, I have identified two Gas Stations (represented by the two bright green nodes in the below diagram):

(i)    Prime Gas Station ~6898

(ii)    Prime Gas Station ~575d

86.    These Gas Stations received ETH transferred from Prime's Omnibus Wallets (represented by the green nodes at the top of the below diagram), customers' external digital wallets (represented by the pink, blue, red and yellow nodes in the below diagram), as well as several external digital wallets that do not appear to be attributable to Prime or its customers (represented by the gray nodes in the below diagram).



87.    I also have observed instances where Prime's operations personnel used fiat from one of Prime's commingled bank accounts to purchase ETH to refill the Gas Stations.

88.    For example, on April 26, 2022, a former Prime operations team employee submitted a request form for $4,290 "to purchase 1.5 ETH to refill the gas station" (the "April 26, 2022 Request Form").[16]   The April 26, 2022 Request Form sought to transfer funds from one Santander bank account, with the account name "Prime Trust Operating Account," to a different

---

[16]    The April 26, 2022 Request Form is attached as **Exhibit F**.

Signature bank account, with an account name "T&C WIRE Clearing."[17]  Based on my review of bank records, this Signature bank account held commingled fiat transferred to Prime by customers and, as demonstrated by this request, also held fiat used for Prime's operations.

89.    The April 26, 2022 Request Form asked if the transfer required a "ledger update". The Prime employee who completed the April 26, 2022 Request Form indicated "No", which indicates that the internal transfer of fiat between operating and customer bank accounts would not be recorded in Prime's Internal Ledger.[18]

90.    The Gas Stations were funded by Prime's operational fiat, ETH from commingled Omnibus Wallets (including the ~b2ea Wallet described above), ETH transferred from customers' digital wallets, as well as other external wallets.

91.    The below diagram illustrates how Prime's Gas Stations functioned and provides two examples of crypto being transferred into Prime from several customers' external digital wallets.[19]  The three nodes on the far left depict customer digital wallets that are external to Prime. The nodes labeled as "Customer Deposit Digital Address" (in the middle of the chart) are Deposit Digital Addresses that were generated by Prime and used by customers to transfer crypto to Prime. After the crypto was transferred to the Deposit Digital Addresses, Prime performed a sweep.  Since the sweep involved transferring crypto on-chain, the sweep incurred a gas fee imposed by the Ethereum blockchain.  To pay the gas fee, the Gas Station (represented by the bright green node in the diagram below) transferred ETH to the specified Deposit Digital Addresses in advance of the sweep.

---

[17]    *Id.*

[18]    *Id.*

[19]    Specifically, this diagram depicts how the Gas Station transfers ETH to customer Deposit Digital Addresses to pay for gas fees incurred when Prime swept crypto from Deposit Digital Addresses into Prime Omnibus Wallets.



92.      In several instances, the amount of ETH sent to the Deposit Digital Addresses exceeded the amount of ETH required to pay the gas fees.  In those scenarios, Prime would either leave the excess ETH in the Deposit Digital Addresses to pay the gas fees for future crypto transfers or, in some instances, would send the excess amount of ETH back to the Omnibus Wallets.

93.      As a result, Prime's operational crypto was commingled with crypto transferred by Prime's customers.

**E.  Prime Omnibus Wallet – ~df94 Illustration**

94.      ETH also is used to pay gas fees associated with Tether stablecoin ("USDT") transactions, which were another type of crypto transactions that caused further commingling of crypto transferred to Prime by customers.

95.      The diagram below illustrates a customer transaction involving USDT.  The customer ("Customer A") purchases USDT on a crypto exchange and then transfers USDT to its

Deposit Digital Address at Prime.  The USDT is then swept into one of Prime's Omnibus Wallets

with the digital address ending in ~df94 (the "<u>~df94 Wallet</u>") where it is immediately commingled

with USDT that had been transferred to Prime by other customers.  Since USDT transactions occur

on the Ethereum network, ETH is needed to pay the gas fee to transfer the USDT from the Deposit

Digital Address into the Omnibus Wallet.  In this scenario, ETH from Prime's Omnibus Wallet is

used to cover the gas fees.  Since Customer A is only transacting in USDT, the ETH required for

the transaction must be supplied from other ETH already held in the ~df94 Wallet.



96.     As a result, in this example, not only is the USDT that Customer A transferred to

Prime commingled in the ~df94 Wallet, but also the ETH that was used to pay for the gas fees was

commingled ETH, which further commingled the crypto at Prime.

97.     This example demonstrates how transactions involving USDT resulted in

commingled USDT as well as further commingled ETH, making it practically impossible to

differentiate between USDT transferred to Prime by one customer as compared to another Prime customer.

## V.    Prime's Inadequate Reconciliation Processes

98.    Further complicating matters is the fact that, according to Prime's records and sworn testimony from former employees, Prime did not perform regular or timely reconciliations of accounts and, at least before March 2021, any reconciliations that Prime conducted were manual.[20]

99.    Reconciliation processes are critical internal controls.  They enable companies to identify potential errors or fraud so that their books and records are accurate.  They also permit companies to validate the amount of cash that the company holds.  Reconciliation processes typically consist of comparing transactions or other financial activities between the company's internal records and the bank records to verify the data and the proper amounts of account balances.

100.    For Prime's fiat, reconciliation processes generally consisted of comparing the amounts and transaction activity reflected on Prime's Internal Ledger during a given time period with the bank account activity during that same time period.

101.    ▉▉▉▉ ("▉▉▉▉"), Prime's former SVP of Operations and Reconciliations, largely designed Prime's reconciliations processes.  ▉▉▉▉ explained:

> Q:    Okay.  And when you moved into your new role in March of 2021 as operations and reconciliations, what was the reconciliations piece?

> A:    Prime Trust did not have reconciliation tools, essentially.  So my responsibility was in kind of designing the reconciliation tools.

> Q:    What's a reconciliation tool?

---

[20] *See* Deposition of ▉▉▉▉, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "▉▉▉▉"), 19:23 - 20:13.

A:    Somebody makes a request for a transaction: How can you basically reconcile that it occurred. If that makes sense.

Q:    Can you—can you expand a little bit? So a customer says, I want to buy Bitcoin?

A:    Yeah. So, well, it wouldn't be necessarily for the purchases, but, for instance, a client's account says that they have one Bitcoin in their account. Can you confirm that it was received on the Ledger.

Q:    Okay. So you're confirming that you actually have the assets that your client's accounts are reflecting they have; is that right?

A:    In a way, yeah. So it was assuming that if we had assets displayed, you know, do we actually have them.[21]

102.    ███████████ ("███████"), Prime's former Chief of Regulatory Affairs, described "reconciliations" as "taking the general ledger and reconciling it to a bank statement; taking customer, you know, account statements and reconciling those to the bank statement wherever those assets may be held. When I say assets, I'm talking about Fiat."[22]

103.    Both ██████████ and ██████████ testified as to the insufficiency of Prime's reconciliation processes during their tenures with Prime.

104.    ██████████ testified: "Reconciliations were not being done in a timely manner."[23]

105.    ██████████ discussed Prime's reconciliations process both before and after March 2021:

A:    There just wasn't very good reconciliation tools. Everything was done manually. So I was brought in to work on building these tools and making them more automated . . .

. . .

---

[21]  ██████, 18:3–19:7.

[22]  ██████, 16:4–9.

[23]  *Id.* at 38: 23–24.

Q:     Okay.  So you weren't—you weren't responsible for fixing whatever happened prior, you were responsible for forward-looking projects for reconciliation; is that the idea?

A:     Yeah, I was—I was put in that position to essentially build the automated systems for transactions looking forward.  Once the system was, I guess you can say, built, you know, I was let go of the responsibilities of building it, and there were teams that were brought on to essentially do the reconciliation.[24]

106.    I also reviewed internal Prime communications concerning commingling of fiat and crypto as well as asset reconciliation.

107.    For example, on December 17, 2022, ████████ ("████████"), Prime's former General Counsel, sent an email to several Prime employees concerning a Nevada Financial Institutions Division ("Nevada FID") request for information regarding Prime's statement that it "████████████████████████████████████████"[25] Specifically, Nevada FID requested that Prime ████████████████████████████ ████████████████"[26]

108.    On December 19, 2022, ████████ responded: "████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████"[27]

109.    On December 28, 2022, ████████, former SVP and Head of Banking and Trust Operations, responded: "████████████████████████████████████

---

[24]    ████, 19:25–20:5; 21:14–22:2.

[25]    ████, Ex. 28 (internal quotations omitted).

[26]    *Id.*

[27]    *Id.*

████████████████████████████████████████████████████"[28]  Given the above

testimony from former executives, it is clear that Prime did not perform regular or timely

reconciliations of accounts, which demonstrates that Prime lacked critical internal controls.  Based

on my experience, without such controls, companies cannot readily identify potential errors or

fraud to verify and ensure that their data and records are accurate.  Therefore, Prime did not have

adequate safeguards or processes in place to validate the amount of cash that the company held

and accurately attribute the proper account balances to Prime customers.

## VI.    The 98f Wallet Caused Further Commingling of Fiat and Crypto

110.    The most notable example of Prime's commingling of both fiat and crypto and its

failure to reconcile its Internal Ledger was when Prime used fiat transferred to it by its customers

to make purchases of ETH to replace ETH that was locked in an inaccessible "multi-sig" digital

wallet (the "98f Wallet").[29]

111.    In December 2021, one of Prime's customers ("Customer 1") requested a transfer

from Prime of 5,867.71 ETH (worth approximately $24,000,000 at the time[30]).  At this time, Prime

realized that Customer 1 had been transferring ETH into a forwarder digital wallet[31], which

automatically forwarded the ETH into the 98f Wallet that Prime was no longer able to access.

---

[28]  *Id.*

[29]  A "multi-sig" digital wallet requires digital signatures of multiple individuals to access and transact with the crypto stored on the digital wallet.  The "98f Wallet" is referred to herein as such because it has a digital address ending in the characters "98f."

[30]  Price data was obtained from CoinGecko.com between the dates of December 23, 2021 and March 30, 2022.  The monthly closing price for ETH (which was approximately $3,031) was calculated by adding each day's closing price and dividing the daily closing price by the number of days in the month.

[31]  A "forwarder digital wallet" is a type of digital wallet that automatically sends crypto that the digital wallet receives to another digital wallet.  This is often used by businesses to enhance security and streamline operations.

112.    By December 2021, Customer 1 had already transferred more than 11,000 ETH (worth approximately $45,000,000 at the time[32]) into the 98f Wallet.

113.    Prime decided to satisfy Customer 1's December 2021 (and subsequent) ETH transfer requests by using fiat transferred to Prime by other customers to purchase replacement ETH from a liquidity provider ("Liquidity Provider").

114.    Regarding this decision to use commingled fiat to purchase replacement ETH from Liquidity Provider, ▇▇▇ ("▇▇▇"), Prime's former Chief Operating Officer, testified as follows:



115.    Customer 1 continued to request ETH transfers, meanwhile the ETH in the 98f Wallet remained inaccessible.  Between December 23, 2021 and March 30, 2022, Customer 1 requested that Prime transfer a total of 48,034.57 ETH (worth approximately $145,000,000 at the

---

[32]    Price data was obtained from CoinGecko.com between the dates of December 23, 2021 and March 30, 2022.  The monthly closing price for ETH (which was approximately $3,031) was calculated by adding each day's closing price and dividing the daily closing price by the number of days in the month.

[33]    Deposition of ▇▇▇, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "▇▇▇"), 92:25–93:18.

time[34]).  Prime continued to use commingled fiat to purchase replacement ETH from Liquidity

Provider.  During that same period, Prime recorded ten different wires to Liquidity Provider's

account, which purportedly represented new fiat transferred into Liquidity Provider's account to

cover the ETH purchased from Liquidity Provider, as shown in the table below.

| Date | USD Internal Ledger "Wire" Transfer[35] Amount | ETH On-Chain Transfers |
|---|---|---|
| 12/23/2021 | $11,958,000 | 2,999.99 |
| 12/31/2021 | $12,158,250 | 3,250.00 |
| 1/6/2022 | $2,778,400 | 800.00 |
| 1/6/2022 | $7,293,300 | 2,100.00 |
| 1/22/2022 | $5,000,000 | 1,930.50 |
| 3/12/2022 | $4,644,000 | 1,800.00 |
| 3/15/2022 | $8,524,750 | 3,049.98 |
| 3/15/2022 | $8,043,000 | 3,000.00 |
| 3/29/2022 | $7,902,800 | 2,300.00 |
| 3/30/2022 | $8,065,048 | 2,347.22 |

116.    As Prime did not actually receive any new funds, Prime used the commingled fiat

transferred to it by its customers to fund the replacement ETH purchases from Liquidity Provider.

117.    The below diagram illustrates ten of the replacement ETH purchases that Prime

made from Liquidity Provider, which it ultimately used to satisfy the withdrawal requests of

Customer 1.

---

[34]    Price data was obtained from CoinGecko.com between the dates of December 23, 2021 and March 30, 2022.  The monthly closing price for ETH (which was approximately $3,031) was calculated by adding each day's closing price and dividing the daily closing price by the number of days in the month.

[35]    Prime did not actually execute any of these wire transfers.  *See* ███████, 164:22–165:10.



118. Because the ETH that Customer 1 had originally transferred to Prime was (and still is to this day) locked away in the inaccessible 98f Wallet, it is indisputable that the ETH that Prime transferred to Customer 1 to satisfy its withdrawal requests could not be the same ETH that Customer 1 had originally transferred to Prime. The ETH that Customer 1 received was purchased by Prime using commingled fiat that had been transferred to Prime by other customers. Moreover, prior to Prime transferring ETH to Customer 1, the ETH was commingled with other ETH (transferred to Prime by Customer 1, Liquidity Provider, and other Prime customers) in the ~b2ea Wallet discussed above. In short, (i) commingled fiat was used to purchase ETH, (ii) this ETH was then commingled with other ETH that other customers had transferred to Prime, and (iii) commingled ETH was then transferred to Customer 1.

119. Certain executives at Prime seem to have undertaken steps to corrupt Prime's internal records in connection with the replacement ETH purchases to make it appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for Liquidity Provider.

120.    Specifically, Prime settled the ETH purchases from Liquidity Provider by "credit[ing]" the Liquidity Provider's customer account at Prime with fiat amounts equivalent to each ETH purchase.

121.    To "credit" Liquidity Provider's fiat customer balance with Prime, Prime had to input a "contribution" on Prime's Internal Ledger to make it appear as if Liquidity Provider had wired fiat to Prime. However, Liquidity Provider did not actually wire fiat to Prime in connection with the ETH purchases.

122.    ████████ testified on this subject as follows:



123.    This method of settlement of the ETH purchases from Liquidity Provider resulted in a discrepancy between the amount of fiat that Prime's Internal Ledger reflected and the actual amount of fiat that Prime held in its bank accounts:

---

[36] ████████, 155:11–156:9.

Q: 
A:
Q:
A:
Q:
A:
Q:
A: [37]

124.    The illustrative chart below[38] shows that Prime's Internal Ledger falsely indicated that there were "incoming" wire transfers to Liquidity Provider between December 23, 2021 and March 30, 2022:



125.    Prime's bank account statements do not reflect any of the above wire transfers ever occurring.

---

[37]    *Id.* at 144:11–20; 146:7–15.

[38]    This illustrative chart is not an image directly copied from Prime's Internal Ledger. Rather, this chart contains data related to certain transactions that was pulled from Prime's Internal Ledger.

126.    For example, the above data reflects that Prime received the following incoming wire transfers:  (i) $11,958,000.00 on December 23, 2021; and (ii) $12,158,250.00 on December 31, 2021.  These transfers correspond with the first two replacement ETH purchases from Liquidity Provider.  However, these wires are not reflected in Prime's relevant bank account statements.[39]

127.    ████████ confirmed that these purported incoming wire transfers would not be identifiable in any Prime bank account statements:



128.    As discussed herein, certain executives at Prime seem to have undertaken steps to corrupt Prime's internal record keeping.  The false entries to Prime's Internal Ledger further add

---

[39] *See* Prime's December 23, 2021, and December 31, 2021, bank account statements from Signature Bank attached as **Exhibits B and C**, respectively.

[40] ████████, 164:22–165:10; 166:5–15.

to the difficulty in connecting transfers with specific transactions reflected on Prime's Internal Ledger.

VII.    **Transactions between Prime and Oval**

129.    To analyze the fiat and crypto transactions between Prime and Oval, I reviewed Prime's Internal Ledger, API log audit data, bank statements, and blockchain data.

130.    I identified Oval's transactions recorded in Prime's Internal Ledger by searching for Oval's customer account numbers ████5101, ██████0033, ██████8687, ██████8663, ████████6523, ████████2077, and ██████6549.  These various customer account numbers on the Internal Ledger did not correspond with unique, segregated bank accounts.

131.    I observed incoming and outgoing transactions between Prime and Oval from March 29, 2022 to June 21, 2023.

### A.  Oval's Fiat Transfers During the Preference Period

132.    During the Preference Period, Oval's fiat transactions differed markedly from fiat transactions prior to the Preference Period.  For example, in the period prior to the Preference Period, from February 14, 2023 to May 15, 2023, the average number of fiat transactions per month between Prime and Oval was 63 transactions.  In stark contrast, during the Preference Period, the average number of fiat transactions per month between Prime and Oval was 114 transactions.

133.    In my review of fiat transactions that occurred during the Preference Period, I confirmed based on Prime's bank data that there were 78 outgoing wires from Prime to Oval that totaled $26,644,776.49 (the "Fiat Transfers").

134.    I verified that each of the Fiat Transfers was directed by Oval based on API log audit data.[41]  Using API log audit data, I confirmed that Chinedu Okpala, utilizing the email

---

[41]    API log audit data identifies which customer's email initiated a transaction providing an audit trail.

address chinedu@ovalfi.com, directed each of the Fiat Transfers for or on behalf of Oval.[42]   The

API log audit data also reflects the "Activities User Name" for these Fiat Transfers as Oval

Labs, Inc.

135.    I identified that Oval transferred $21,882,783.36 of potential subsequent new value

to Prime after receiving certain of the Fiat Transfers.  I thus calculated the fiat preference claim

against Oval to be not less than $4,761,993.13.   My calculation considers Oval's transaction

activity with Prime over the course of their relationship, including the transaction date and time

provided in the bank data for each incoming and outgoing wire transfer during the Preference

Period.

136.    All incoming and outgoing wires attributed to Oval during the Preference Period

flowed through the commingled, omnibus BMO x3077 bank account.

137.    Monthly account statements for BMO x3077 summarize transaction information.

For example, below is a chart illustrating the number, total amount, and general description of the

transfers in and out of the commingled, omnibus BMO x3077 bank account for the month of June

2023, which included the transfers to and from Oval in June 2023:

---

[42]    API log audit data for the Fiat Transfers is attached as **Exhibit E**.



138.   To have enough funds available in BMO x3077 to satisfy transfers to customers during the Preference Period, including transfers to Oval, Prime would transfer funds from other accounts into BMO x3077 (and vice-versa) which would further commingle fiat.

139.   Primarily, Prime would transfer funds between BMO x9934 and BMO x3077.  As discussed above, BMO x9934 contained commingled funds from BMO x3077, CRB bank accounts, and various Prime customers.  BMO x9934—like BMO x3077—did not segregate fiat by customer.

140.   To demonstrate the commingling in BMO x3077, I will provide a representative example of one day of transfers between Prime and Oval during the Preference Period—*i.e.*, June 13, 2023.

141.   On June 13, 2023, there were 234 total transfers in and out of BMO x3077, which consisted of 165 incoming transfers and 69 outgoing transfers:

| BMO x3077 Total Transaction Activity June 13, 2023 | | |
|---|---|---|
| **Transaction** | **Count** | **Amount** |
| Transfer In | 165 | $26,204,498.54 |
| Transfer Out | 69 | $25,833,360.59 |

142.    On June 13, 2023, two of the total 234 transactions in and out of BMO x3077 involved Oval.  Specifically, there was one incoming transfer from Oval to Prime and one outgoing transfer from Prime to Oval:

| BMO x3077 Oval's Transaction Activity June 13, 2023 | | |
|---|---|---|
| **Transaction** | **Count** | **Amount** |
| Transfer In | 1 | $180,582.63 |
| Transfer Out | 1 | $1,000,000.00 |

143.    The BMO x3077 bank statement reflects the one incoming wire transfer totaling $180,582.63 from Oval to Prime on June 13, 2023:



144.    The BMO x3077 bank statement also reflects the one outgoing wire transfer from

Prime to Oval totaling $1,000,000.00 on June 13, 2023:



145.    As demonstrated by the above excerpts of the BMO x3077 bank statements, the BMO bank statements do not identify the sender or recipient of specific transfers. However, bank data[43] from the BMO bank reconciliation data, entries in the Internal Ledger, and API log audit data[44] provide details sufficient to piece together this information.

146.    On June 13, 2023, the beginning cash balance in BMO x3077 was $380,946.46 and the ending cash balance was $752,084.41. Given that the total amount transferred into BMO x3077 on June 13, 2023 was $26,204,498.54, which includes the $180,582.63 incoming wire transfer

---

[43]    Extracts of bank data are included in the BMO bank reconciliation data.

[44]    The API log audit data for June 13, 2023, is attached as **Exhibit D**.

from Oval, and the total amount transferred out of BMO x3077 on June 13, 2023 was $25,833,360.59, which includes the $1,000,000.00 outgoing wire transfer to Oval, it is evident Prime was commingling and transferring funds into and out of BMO x3077 throughout the day from various bank accounts and sources.

147.    The transaction data, coupled with Prime's gross failures in fiat segregation, reconciliation and Prime's inability to distinguish fiat or crypto transferred to Prime by certain customers from crypto transferred to Prime by other customers or company fiat, make it clear that neither Oval nor Prime can specifically identify or segregate:  (i) the specific fiat that Oval transferred to Prime from other commingled fiat held by Prime; or (ii) the original source of the fiat that Prime transferred to Oval during the Preference Period.

**B.  Oval's Crypto Transfers During the Preference Period**

148.    In my review of crypto transactions that occurred during the Preference Period, I observed that Prime transferred to Oval 1,000 USDT, 0.76 ETH, 12,138 USDC, and 0.95 BTC (the "Crypto Transfers").

149.    I compared the Crypto Transfers to blockchain data to confirm these transactions occurred and identified the digital wallets associated with such transactions.

150.    Like other Prime customers, crypto transferred to Prime by Oval was held in the Omnibus Wallets – not segregated digital wallets.  The diagram below provides examples of USDT transferred from Oval's Deposit Digital Address and USDT transferred from Deposit Digital Addresses of multiple other Prime customers into the commingled, omnibus ~b2ea Wallet discussed herein.



151.    To satisfy Oval's BTC withdrawal request during the Preference Period, Prime transferred BTC from a commingled Prime Omnibus Wallet ending in ~f907 ("~f907 Wallet"). The diagram below illustrates Oval receiving 0.9518928 BTC from the omnibus ~f907 Wallet.



152.    In reviewing Oval related transactions, I identified that Oval transferred 2,151 USDC of potential subsequent new value to Prime after receiving certain Crypto Transfers. Other than USDC, Oval did not transfer any other types of crypto to Prime after the Crypto Transfers. Thus, I calculated the crypto preference claim against Oval to be not less than 1,000 USDT, 0.76 ETH, 9,987 USDC, and 0.95 BTC. This calculation considers Oval's transaction activity with Prime during the course of their relationship, including the date and time as recorded on-chain for each transaction during the Preference Period.

153.    All Crypto Transfers to Oval during the Preference Period came from Prime Omnibus Wallets that contained commingled crypto.[45]  I was able to trace each of these transfers to the blockchain.

*\*\**

154.    In sum, blockchain data, Prime's Internal Ledger, Prime's bank account data, Prime's repeated transfers of fiat between commingled omnibus bank accounts, Prime's repeated transfers of crypto between commingled Omnibus Wallets in the Vaults at Fireblocks, Prime's use of fiat transferred to Prime by other customers to purchase ETH because Prime lost access to the 98f Wallet, Prime's falsified Internal Ledger wire transfer entries covering Prime's replacement ETH purchases, and Prime's gross failures in fiat and crypto segregation, reconciliation processes, and the inability to distinguish fiat or crypto transferred to Prime by certain customers from crypto transferred to Prime by other customers or company fiat, make it clear that Oval and Prime:  (i) cannot trace the specific fiat or crypto that Oval transferred to Prime; (ii) cannot identify which specific funds in the commingled, omnibus BMO x3077 account were used for the Fiat Transfers from Prime to Oval during the Preference Period; and (iii) cannot identify which specific crypto in the commingled Omnibus Wallets were used for the Crypto Transfers from Prime to Oval during the Preference Period.

Dated: March 13, 2025
      Jupiter, Florida

/s/ *James P. Brennan*
James P. Brennan
Senior Managing Director
J.S. Held, LLC

---

[45]    There were three digital addresses used during the Preference Period for Crypto Transfers to Oval: (i) digital address ending in ~b2ea; (ii) digital address ending in ~2e53; and (iii) digital address ending in ~f907.

# Exhibit A

**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



## Key Expertise



- Forensic Accounting
- Anti-money Laundering ("AML")
- Compliance
- Investigations
- Damages
- Financial Crime
- Fraud
- Asset Tracing (Crypto + Traditional)
- Money Services Business ("MSBs")
- Operational Due Diligence
- Cryptocurrency Security Standard ("CCSS")
- KYC / Onboarding
- Managed / Outsourced Services

## Education

Master of Science (MS), St. John's University, 2002

Bachelor of Science (BS), St. John's University, 2001

## Project Geographical Experience

U.S., UK, Singapore, Bermuda, Canada, Bahamas, Gibraltar, Cyprus, Switzerland

## Languages

English

## Summary of Experience

JP Brennan is the Global Head of Fintech, Payments, Crypto Compliance and Investigations at J.S. Held. He brings over 20 years of experience in forensic accounting, damage calculation, auditing, litigation consulting, anti-money laundering ("AML") compliance, cryptocurrency regulatory compliance, OFAC/sanctions review, complex enhanced and operational due diligence, and bankruptcy. He has an in-depth understanding of the complexities that many FinTech's are faced with concerning their regulatory framework as well as those issues from a financial crime compliance perspective.

Mr. Brennan has substantial experience in providing complex forensic accounting and financial fraud investigative services, cryptocurrency asset / wallet tracing, development and implementation of AML programs, outsourced Chief Compliance Officer services, as well as providing managed services for large scale remediation and compliance projects. His clients include major law firms, cryptocurrency exchanges (centralized / decentralized), digital asset issuers, custodians, multinational banks, funds, payment processors, financial institutions, and investors.

His expert experience includes such high-profile matters such as Bernard L. Madoff Investment Securities (investigation), Lehman Brothers (bankruptcy investigation), Caesars Entertainment Operating Corp. (examiner report), Bank of New York-Mellon (compliance monitorship), Quadriga CX (crypto asset tracing), and LUNA Foundation Guard (crypto asset tracing).

## Speaking Engagements

Mr. Brennan has presented in various forums as well as moderated multiple cryptocurrency related panels that included topics such as investigations, risk and regulatory, asset recovery, crypto in bankruptcy as well as complex forensic tracing.

## Professional Affiliations/Memberships/Licenses/Training

Association of Certified Fraud Examiners

Certified Bitcoin Professional

## Role at J.S. Held

JP is involved with matters in consulting as well testifying expert capacity. These matters include fiat and digital asset forensic and tracing investigations, recovery of assets, the development, implementation and assessment of regulatory programs, monitorships, training for law enforcement agencies, government licensing, investigations on behalf of examiners, receivers, forensic accounting, and trustees.

## Contact

48 Wall Street, New York, NY 100436 | +1 212-952-5000 (O) | +1 917-244-8931 (M) | jp.brennan@jsheld.com

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



## Work Experience

J.S. Held, LLC, Senior Managing Director, 2022 – Present

Kroll, LLC (f/k/a Duff & Phelps), Associate Managing Director, 2017 – 2022

Alvarez & Marsal Holdings, LLC, Director, 2012 – 2017

FTI Consulting, Inc., Director, 2004 – 2012

Deloitte & Touche LLP, Audit Staff, 2002 – 2004

## Select Litigation and Project Experience

### Cryptocurrency and Blockchain Related:

- Retained as the cryptocurrency expert in the Chapter 11 Bankruptcy Proceedings for Prime Trust due to insolvency. Provides litigation consulting and expert witness services, related to the investigation of the company as well as performance of other analysis including but not limited fraudulent conveyances and preference payments.

- Retained by a U.S. cryptocurrency exchange as an expert to defend against customer allegations involving the exchanges breach of fiduciary duty and lack of an appropriate AML program.

- Retained in the Voyager Digital Bankruptcy to investigate and recover fraudulent ACH customer payments.

- Retained by a Web3 company that provides infrastructure and applications to be built using its platform. Perform expert and litigation services to defend against allegations of market manipulations, inappropriate disclosure for sources and uses of funds, unjust enrichment, and breach of fiduciary duty.

- Luna Foundation Guard / Terraform Labs / Do Kwon – retained to produce an audit report and cryptocurrency tracing of the assets used to defend the peg of the UST algorithmic stablecoin. Additional work related to market manipulation, wash trading, improper public disclosures, and manipulation of transactions on the Terra network.

- Retained by the Brazilian gov't to conduct the cryptocurrency asset tracing and recovery in the INDEAL pyramid scheme.

- Retained as the expert in a cryptocurrency employment dispute related to the payment of assets at genesis and calculation the associated staking rewards and airdrops on the Cosmos Network.

- Retained as the expert by the Cred Inc. Liquidation Trust to trace and investigate the theft and fraudulent transfer of assets by Company executives.

- Retained by Bo Shen in the recovery of over $40 million stolen from his personal wallet.

- QuadrigaCX – retained by the receiver (E&Y) to conduct the tracing of cryptocurrency assets.

- Retained as the financial adviser in the EminiFX bankruptcy and investigation.

- Retained by the Canadian courts in the Index Finance hack as the custodian for the cryptocurrency assets stolen.

- Retained as the expert in a well-known international gambling site dispute.

- Retained in the USA v. Ian Freeman (formerly Ian Bernard) and Aria DiMezzo (formerly James Baker) to assist with various litigation support services.

- Conducted and performed operational due diligence for financial and crypto related platforms including but not limited to: trade execution, custody, and third-party providers.

- Often retained by bitcoin atm operators, crypto lenders, crypto funds, crypto exchanges, payment processors, and funds to conduct independent AML reviews.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JP Brennan** 
Senior Managing Director, Global Investigations, Cryptocurrency

- Developed and implemented tracing and monitoring processes and technologies for a crypto money servicer business ("MSBs").
- Retained by the receiver in a Canadian cryptocurrency exchange investigation and recovery of assets.
- Retained by a large Seychelles-based cryptocurrency exchange to provide a report on proper OTC related procedures.
- Successfully performed an investigation into the fraudulent theft of cryptocurrency related assets of a crypto lender.
- Member of an international FATF committee working on the Travel Rule for Virtual Asset Providers ("VASPs").
- Performed the outsourcing of cryptocurrency asset reviews for a major US Cryptocurrency Exchange.
- Provide Managed Services for enhanced due diligence procedures for a major US Cryptocurrency Exchange.
- Retained by a U.S. Cryptocurrency Exchange to address regulatory concerns regarding their geo-fencing of IP addresses.
- Retained by a U.S. crypto lender in connection with their 2017 initial coin offering ("ICO") to provide recission payments to investors.
- Conducted cryptocurrency security standard ("CCSS") implementations and assessments.
- Conduct annual FBI Training – "How to Conduct Cryptocurrency Investigations."

**Non-Cryptocurrency and Blockchain Related:**

- Provided investigative services and litigation support to the court-appointed trustee for the liquidation of Bernard L. Madoff Investment Securities and his counsel.  Engagement assistance to date has included the day-to-day direction and supervision of teams in areas including forensic investigation, data analysis and litigation consulting.
- Retained by the US Federal Reserve Bank to review AML Programs for their 12 branches.
- Served on the team selected by the U.S. Attorney offices in the Eastern and Southern Districts of New York and Western Pennsylvania to support the monitoring of the non-prosecution agreements of both The Bank of New York and Mellon Financial Corporation, to monitor and report on the state of the banks' suspicious activity reporting practices and AML procedures.
- Served on the monitorship team for the Standard Chartered Bank.
- Provided litigation consulting and expert witness services, including expert report preparation and deposition and trial preparation for a multi-billion-dollar accounting malpractice case filed in a class action against one of the major accounting firms. The case involved review and analysis of several years of audit work papers as well as research and analysis.
- Provided litigation consulting, including expert report preparation and deposition and trial preparation for an oil and gas company to determine whether a series of corporate transactions constituted a fraudulent conveyance and as a result rendered the company insolvent.
- Created onboarding policies and procedures for banks, hedge funds, as well as crypto funds and exchanges.
- Served on the investigations team, retained by Caesars Entertainment Operating Company, Inc. ("CEOC"), Richard J. Davis, to investigate and determine whether fifteen transactions between CEOC and the leveraged buyout sponsors ("LBO") arose to constituted constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary duty.
- Expert support work on the determination of payments to creditors in the Nortel Networks bankruptcy.
- Expert support work on the calculation of damages / lost profits for a pharmaceutical dispute.
- Expert support in the investigation into various matters within the Lehman bankruptcy.
- Expert support in the investigation of Allen Stanford.
- Provided and oversaw a team of 350+ compliance professionals to help meet a New York State Department of Financial Services remediation for a large US-based cryptocurrency exchange.
- Hired as the outsourced CCO multiple payment processors that are going through the money transmission licensing process.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

## JP Brennan
Senior Managing Director, Global Investigations, Cryptocurrency



### Speaking Engagements and Articles

- Law360 article, Using Data To Arm Against Future Crypto Market Turbulence", December 16, 2022.

- Luna Foundation Guard release, "Today, LFG releases the technical audit report conducted by JS Held, an experienced third-party auditing firm, providing full transparency into the trading, blockchain records, and efforts of LFG and TFL to defend the price of TerraUSD ($UST) between May 8th & May 12th, 2022", November 16, 2022.

- Brave NewCoin article, "The Cryptocurrency Regulatory Framework: How Countries are Approaching the Virtual Currency", March 2022.

- Wolters Kluwer Banking and Financial Services Policy Report – April 30, 2019, "The Curios Case of Crypto."

- Kroll article, "Cryptocurrencies: Protecting Your Downside in the Face of Uncertainty", May 2018.

- Medium Article Contributor: https://medium.com/@james.p.brennan1.

- Official Monetary and Financial Institutions Forum ("OMFIF") Digital Monetary Institute Symposium 2021, "Cryptocurrency's Regulatory Impact", September 2021.

- MIT: Center for Real Estate," Real Disruption - How Technology is Changing and Challenging Real Estate", 2017.

- Kroll, "Examining the Anti-Money Laundering (AML) Risks and Red Flags of Crypto Exchanges", October 2021.

- BPP Continuing Education, "What you need to know when your clients are considering crypto", 2021.

- Association of Certified Fraud Examiners, "The Future of AML and Blockchain", May 2021.

- JS Held Thought Leadership Related Articles.

### Testimony

- *Michael Sofaer v. BKCM, LLC*, Supreme Court of the State of New York, Country of New York.

- *Paul Merkley v. Gemini Trust Company, LLC*, JAMS Arbitration.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

# Exhibit B

**[REDACTED]**

# Exhibit C

**[REDACTED]**

# Exhibit D

## API Data for Outgoing Transaction on June 13, 2023

| cash_transactions_ created_date | cash_transactions_id | organization_label | account_number | cash_transactions_ amount | incoming_or_ outgoing | activities_user_email | activities_user_ name |
|---|---|---|---|---|---|---|---|
| 6/13/2023 | ███████████████ | Oval Custodial Account | ████████ | (1,000,000.00) | Outgoing | chinedu@ovalfi.com | Oval Labs Inc |

# Exhibit E

**[REDACTED]**

# Exhibit F



## FUNDS MOVEMENT REQUEST

REQUEST DATE: 4/26/22

REQUESTED BY: ▇▇▇▇▇▇▇

Please prepare this form prior to any funds movement requested by the Operations Team. This includes funds movement on the bank level, PrimeCore, and/or Fund America.

1. Reason:

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Operating : We would like to purchase 1.5 ETH to refill the gas station

Request Approved By: ▇▇▇▇▇        Request Approved On: 5/3/2022

2. Bank Movement Requested:

| Bank Name | Bank Account Number | Credit Amount (+) | Debit Account (-) |
| --- | --- | --- | --- |
| Santander | 7422 | | $ 4,290.00 |
| Signature | 6126 | $ 4,290.00 | |

3. Ledger Movement Requested

Does this funds movement request require a ledger update? No

If selected "Yes" to the above question, what is the account type? PrimeCore

| Account Name | Account Number | Credit Amount (+) | Debit Amount(-) |
| --- | --- | --- | --- |

Processed By:        Processed On: