UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

                              .  Chapter 11
IN RE:                        .
                              .  Case No. 23-11161(JKS)
PRIME CORE TECHNOLOGIES,      .
INC., et al,                  .
                              .
                              .  824 Market Street
                              .  Wilmington, Delaware 19801
                 Debtors. .
. . . . . . . . . . . . . . .  Friday, February 14, 2025

                       TRANSCRIPT OF HEARING
                BEFORE THE HONORABLE J. KATE STICKLES
                  UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Plan
Administrator:                Donald J. Detweiler, Esq.
                              Morgan L. Patterson, Esq.
                              Marcy McLaughlin Smith, Esq.
                              WOMBLE BOND DICKINSON (US), LLP
                              1313 North Market Street
                              Suite 1200
                              Wilmington, Delaware 19801

                              Joseph B. Evans, Esq.
                              Jessica Greer Griffith, Esq.
                              James A. Pardo, Esq.
                              MCDERMOTT, WILL & EMERY, LLP
                              One Vanderbilt Avenue
                              New York, New York 10017




     (Appearances Continued)

     Audio Operator:          Electronically Recorded
                              by Gauri Patel, ECRO

     Transcription Company:   Reliable
                              1007 N. Orange Street
                              Wilmington, Delaware 19801
                              (302)654-8080
                              Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:  (Continued)

```
For the U.S. Trustee:          Timothy J. Fox, Jr., Esq.
                               OFFICE OF THE U.S. TRUSTEE
                               844 King Street, Suite 2207
                               Wilmington, Delaware 19801

For Realio, LLC and
Realio Technology, Ltd.:       Brian R. Lemon, Esq.
                               AKERMAN, LLP
                               222 Delaware Avenue, Suite 1710
                               Wilmington, Delaware 19801

For Electric Solidus,
Inc.:                          Lisa R. Hatfield, Esq.
                               CONNOLLY GALLAGHER, LLP
                               1201 North Market Street
                               20th Floor
                               Wilmington, Delaware 19801

For Coinbase, Inc.:            Jeremy W. Ryan, Esq.
                               POTTER, ANDERSON & CORROON, LLP
                               1313 North Market Street
                               6th Floor
                               Wilmington, Delaware 19801

                               Thomas S. Kessler, Esq.
                               CLEARY, GOTTLIEB, STEEN
                                & HAMILTON, LLP
                               One Liberty Plaza
                               New York, New York 10006

For Coinbits, Inc.:            Frederick B. Rosner, Esq.
                               THE ROSNER LAW GROUP, LLC
                               824 North Market Street
                               Suite 810
                               Wilmington, Delaware 19801

                               David M. Neumann, Esq.
                               MEYERS, ROMAN, FRIEDBERG
                                & LEWIS, LPA
                               28601 Chagrin Boulevard
                               Suite 600
                               Cleveland, Ohio 44122
```

(Appearances Continued)

APPEARANCES VIA ZOOM: (On the Record)

For Electric Solidus,
Inc.:                         Jacob Itzkowitz, Esq.
                              MANATT, PHELPS & PHILLIPS, LLP
                              2049 Century Park East
                              Suite 1700
                              Los Angeles, California 90067

For SDM, Inc.:                Bradford F. Englander, Esq.
                              WHITEFORD, TAYLOR & PRESTON, LLP
                              3190 Fairview Park Drive
                              Suite 800
                              Falls Church, Virginia 22042

                              Alexa Westmoreland
                              STRETTO

                              George Kushner, *Pro Se*

                              Colleen McClenaghan, *Pro Se*

                              Shyam Sundar Aswadha
                               Narayanan, *Pro Se*

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE PLAN ADMINISTRATOR | | | | |
| DAVID DUNN | 31 | 40 | 70 | |
| JAMES BRENNAN | 74 | 76 | | |
| By The Court | 115 | | | |
| ALEXA WESTMORELAND | 120 | 122 | | |
| FOR OBJECTOR COINBITS, INC. | | | | |
| DAVID BIRNBAUM | 145 | 179 | 188 | |
| By The Court | 189 | | | |
| FOR OBJECTOR KUSHNER | | | | |
| GEORGE KUSHNER | 191 | | | |

| | PAGE |
|---|---|
| Motion of Coinbase for Leave to File an Amicus Response to the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates [Docket No. 948] | 132 |

| EXHIBIT | | EVID. |
|---|---|---|
| Dunn Declaration at ECF 920 | | 30 |
| Brennan Declaration at ECF 921 | | 31 |
| Supplemental Dunn Declaration at ECF 968 | | 31 |
| Supplemental Brennan Declaration at ECF 969 | | 31 |
| Coinbits 2 | 8/8/23 Clark County Hearing Transcript | 152 |
| Coinbits 5 | Neumann/Detweiler Email and Attachments | 171 |
| Coinbits 6 | | 171 |
| Coinbits 7 | Coinbits Terms of Use | 172 |
| Coinbits 8 | | 171 |
| McClenaghan Exhibits at ECF 963 | | 195 |

1          (Proceedings commence at 10:11 a.m.)

2                    THE COURT:  Please be seated.

3                    How are you, Mr. Detweiler?

4                    MR. DETWEILER:  Good morning, Your Honor.

5                    THE COURT:  All right.  Give me a minute.  This is

6     not my courtroom, I am not used to this setup.  All right.

7     Okay.

8                    MR. DETWEILER:  Good morning, Your Honor.  May it

9     please the Court, Donald Detweiler and Morgan Patterson and

10    Marcy McLaughlin Smith on behalf of David Dunn, the plan

11    administrator from Province Fiduciary Services.  Mr. Dunn is

12    in the courtroom.

13                   THE COURT:  Okay.  Hold on.

14                   Can you all hear him?  I'm getting -- you're going

15    to have to speak louder.  I'm sorry.

16                   MR. DETWEILER:  Okay.  How is that?  Better, Your

17    Honor?

18                   THE COURT:  Yes.

19                   MR. DETWEILER:  Good morning, Your Honor.  May it

20    please the Court, Donald Detweiler, Morgan Patterson, and

21    Marcy McLaughlin Smith of Womble Bond Dickinson, on behalf of

22    the Plan Administrator, David Dunn from Province Fiduciary

23    Services.

24                   Just a few quick introductions.  In addition to Mr.

25    Dunn, Mr. Nathan Smith from Province Fiduciary is here today,

1    as well as a team from McDermott, Will & Emery, Joe Evans,

2    Greer Griffith, and James Pardo.  They are part of the

3    professional team representing the plan administrator in

4    these cases.

5             Happy Valentine's Day to Your Honor --

6             THE COURT:  Thank you.

7             MR. DETWEILER:  -- and to your staff and to

8    everybody on the phone.  It's certainly not a happy day for

9    the customers that have been really hurt by what these

10   debtors did in these cases.  But what's important is it

11   wasn't Mr. Dunn, it wasn't the plan administrator, it wasn't

12   his professionals.  And we're here to clean the mess up and

13   we're going to clean the mess up and continue to work hard to

14   get value back to those who have been so wronged in these

15   cases.

16            We want to thank Your Honor for your time today and

17   for the time you've given us for this hearing.

18            We filed an amended agenda with three items.  I

19   think the second item has been resolved, and so we have two

20   items, which is:  The distribution motion and then a motion

21   to file an amicus brief.

22            We propose today, Your Honor, to start with the

23   distribution motion.  And just so -- there's a number of

24   people on the phone.  The way we proposed to plan -- or plan

25   to move forward, Your Honor, is to start with the

1    distribution motion, just a very quick opening as to what we

2    think the evidence is going to say, put on our evidentiary

3    case.

4         We'd like to pause at that point and then take up

5    the amicus motion, as to whether or not the Court is going to

6    consider that or not.  If Your Honor is going to consider the

7    amicus brief, then we would like to put on some short

8    evidence as to, basically, why it's wrong, and so Your Honor

9    can then consider the amicus.

10        And then we would then go to -- after, we would

11   close our evidentiary case.  We would then move forward with

12   objector's evidentiary case.  And then, after all the

13   evidence is in, we then get to argument on the various

14   positions.  I don't know if that's acceptable to Your Honor,

15   but that's how we would like to proceed forward.

16        THE COURT:  Does anyone want to be respect with

17   respect with process?

18        MR. ROSNER:  Good morning, Your Honor.

19        THE COURT:  Good morning.

20        MR. ROSNER:  For the record, Fred Rosner, the

21   Rosner Law Group.  And I'm joined today by my co-counsel

22   David Neumann of the Meyers Roman firm in Ohio.  I have

23   orally moved his admission *pro hac vice* because we neglected

24   to do that, but we will file the papers after the hearing.

25   Together, we represent Coinbits, and we have filed a

1    response.  It's most, in the first instance, a procedural

2    objection to moving forward today.  And I'll turn the lectern

3    over to him.

4            THE COURT:  Okay.

5            MR. NEUMANN:  Thank you, Your Honor.  Just a point

6    of correction.  You were gracious enough to admit me *pro hac*

7    *vice* in 2023 in this case, and so I have been admitted.  I'm

8    a practicing attorney in Ohio, I'm licensed in Massachusetts.

9    I flew out here this morning under very short notice.

10           All I wanted to say, Your Honor, is that -- all I

11   wanted to say Your Honor is we -- and as I've preserved, both

12   in my objection and in my witness list and my exhibit list,

13   that we feel that this hearing should not be going forward

14   today.  Although I do have my witness here and it looks like

15   we have a number of Coinbits customers on the -- on a line.

16           And the fact is, is that, under the Fifth Amendment

17   of the Constitution, property can't be taken without due

18   process.  And the Third Circuit has been clear in

19   Mansaray-Ruffin, that's 530 F.3d 230, followed by the

20   Espinosa case in the Supreme Court, 559 U.S. 260, that there

21   needs to be proper due process when property rights are being

22   taken.

23           In this case, right -- and my daughter -- my oldest

24   daughter always says sort of a rewind.  This -- there was a

25   procedure, an account procedure, that was filed on the 12th,

1    as part of the memorandum in support of confirmation, just a

2    few days before the confirmation hearing.  That procedures

3    provides for a meet-and-confer and protections and due

4    process.

5            The debtor filed an amended plan.  The amended plan

6    has language associated with an account procedure, but it

7    doesn't change or get in the way of the procedures that were

8    filed with this Court, discussed at the confirmation hearing,

9    and was a concern specifically of my client.

10           So the debtor now is -- through the plan, is

11   reading in some truncated process.  We're here all to present

12   evidence today.  And frankly, Your Honor, I want to preserve

13   on appeal -- and I really think that we should really think

14   before we move forward with regards to taking away property

15   rights of thousands of digital holders, specifically holders

16   of bitcoin.

17           We have done everything to communicate with

18   Province with regards to -- with regards to finding out how

19   much Bitcoin is there, has any Bitcoin disappeared.  Bitcoin

20   is not a major factor in this case, other than its value.

21   There shouldn't be a lot of Bitcoin in this case.  And the

22   fact is, is that, from everything that I've read and the lack

23   of responses that I've received from the professionals in

24   this case, that forensic analysis has not been completed

25   after a year and a half, after multiple forensic analyses,

1    and that there's language throughout the pleadings that

2    everything is hopelessly commingled, hopelessly, when there

3    really has not been a proper accounting of just the digital;

4    in fact, in this case, the most valuable digital, but

5    probably the fewest tokens, and that's Bitcoin.

6          So I ask Your Honor that this does not go forward

7    today.  This should be proceeded through an adversary

8    proceeding or some other methodology, just like the debtor is

9    going to be doing with foreign currency.  Why they're trying

10   to do this in a truncated manner with regards to BTC is

11   beyond my comprehension.  But in light of Espinosa and

12   Mansaray-Ruffin and the Fifth Amendment of the U.S.

13   Constitution, the fact is, is that our due process rights

14   should not be taken away from us in this process.

15         THE COURT:  Let me ask you.  With respect to your

16   position that it's truncated, what portion of this do you

17   perceive as being truncated, *vis-a-vis* the approved plan

18   process?

19         MR. NEUMANN:  So the account procedure process, as

20   outlined in the memorandum in support of confirmation,

21   specifically required meet-and-confer and discussion with

22   regards to due process protections on an account-by-account

23   level.  So it may be that the debtor could look at this with

24   regards to a token-by-token level of analysis, BTC, looking

25   at BTC through an adversary.  But these were the procedures

1    that were presented to the Court on -- that are not stated

2    otherwise in the plan, and these are the protections that

3    were presented to this Court to protect customers and

4    holders.

5           So the truncation would be there should be some

6    procedure, maybe a motion to dismiss, or we can file an

7    answer.  There would be a meet-and-confer, there would be a

8    discovery schedule.

9           The debtor has sort of spent a year, over a year --

10   sorry, not the debtor.  The -- Province has spent over a year

11   supposedly analyzing the issue.  If you're, once again,

12   rewinding, Your Honor, at the confirmation hearing the

13   concern that I had was that fire -- what would the debtor do

14   if they couldn't maintain Fireblocks.  Fireblocks is how they

15   segregate the digital currency.  And they advised us at the

16   confirmation hearing that, pursuant to the procedures, that

17   they prepaid for Fireblocks for a two-year period.

18          So now they've used up a year, over a year, and

19   they've created, potentially, their own emergency.  I don't

20   understand why, once again, that this is not consistent with

21   the terms of the plan.  The plan doesn't cut off the due

22   process rights of customers.  It may be cumbersome.  It may

23   be that the estate ran out of money.  Perhaps, as Province

24   told us very early in the case, that this case was so

25   undercapitalized, right?  That perhaps they were restricted

1   in doing their analysis.  I don't know.  We haven't been able

2   to conduct any discovery.  We haven't seen any of the

3   underlying --

4               THE COURT:  Did you issue --

5               MR. NEUMANN:  -- forensic analysis.

6               THE COURT:  -- discovery?

7               MR. NEUMANN:  Excuse me?

8               THE COURT:  Have you issued discovery?

9               MR. DETWEILER:  No.

10              MR. NEUMANN:  Have I --

11              MR. DETWEILER:   They have not, Your Honor.

12  Absolutely not.

13              MR. ROSNER:  Your Honor, can I -- just to follow up

14  to Mr. Neumann's words.  We -- one, we feel that a motion is

15  the inappropriate way to proceed in this manner.  So we were

16  not going to take a step forward to embrace a motion by

17  issuing discovery.

18              We are entitled to due process under the

19  Constitution.  The plan, the contract, cannot override our

20  due process rights, so we're not embracing the motion.  We're

21  asking that the motion be withdrawn and we proceed in

22  accordance with the direction from the Third Circuit, which

23  is an adversary proceeding.  So we're not going to qualify or

24  limit our discovery rights, our rights to respond to a

25  complaint by going in the direction of a motion.  We're here

1   to say the Third Circuit has directed that certain types of

2   relief, like ownership of property, which is exactly the

3   relief they're seeking, should not be adjudicated this way.

4              THE COURT:  Okay.  Well, let me ask you, Ms.

5   Rosner, referring to Section 2.5 of the plan -- okay?  So

6   show -- explain to me how this process is inconsistent with

7   Section 2.5 --

8              MR. NEUMANN:  Okay.

9              THE COURT:  -- and the parties' right to object to

10  a distribution.

11             MR. NEUMANN:  Yes, Your Honor.  Once again, the --

12  like my daughter, my oldest daughter always says, just to

13  rewind, the disclosure statement was changed at the last

14  minute.  There was a lot of things that were going on.

15             THE COURT:  Okay.  But I'm -- we're now like 14

16  months --

17             MR. NEUMANN:  I understand.

18             THE COURT:  -- post-confirmation.

19             MR. NEUMANN:  The two -- the provision within the

20  plan doesn't discuss due process.  It talks about a motion.

21  It is a -- in essence, a process, but it doesn't change the

22  supplement that was filed in support of the plan.  The

23  supplement that was filed on the 12th, as part of the

24  debtors' case-in-chief, with regards to both a modification

25  of the disclosure statement and confirmation of the plan, for

1    the first time, we saw this procedure.

2            And it's not -- it is not -- it is not subsumed by

3    the Section 2.5 in the plan.  That only talks about filing a

4    motion; it doesn't talk about the due process procedures and

5    the adjudication of that motion.  And once again, the same

6    parallel language is in the supplement that was filed on the

7    12th and supported confirmation of this plan.  And once

8    again, I think it's part of the plan.  It compliments Section

9    2.5.  2.5 does not talk about due process rights, Your Honor.

10   The supplement did.

11       (Pause in proceedings)

12           MR. DETWEILER:  May it please the Court again, Your

13   Honor, Donald Detweiler.

14           Counsel could have moved to continue this hearing.

15   This motion has been out for over 30 days; they could have

16   moved to continue and acted appropriately.

17           With regard to the plan, the plan is clear and

18   unequivocal, and that's what was approved by this Court,

19   that's what the creditors voted on, and that's what's

20   binding.

21           What you have is Coinbits, who has less than 1

22   Bitcoin of their own claim, less than 1 Bitcoin of their own

23   claim, coming here into court saying they have 104.  They

24   don't have 104 Bitcoin; they have less than 1.  But they say

25   they're acting on behalf of their former customers or their

1    customers.  We have no evidence, and we've asked all along

2    give us the evidence you're representing the 104 people or

3    the 104 -- the people who hold the 104 Bitcoin.  We've never

4    received that, but -- so I just wanted to set that up for

5    Your Honor.

6          But going to the plan, perhaps counsel didn't pay

7    attention to the plan at the time of the confirmation.

8    Perhaps they overlooked things.  But the plan is clear an

9    unequivocal as to how the account procedures and account

10   treatment process was to unfold, 2.5 of the plan, non-estate

11   assets/account treatment issues.  2.5(a) says "account

12   treatment issues," and it goes into length about how account

13   treatment issues, which counsel was representing his own

14   client and purportedly people who had 104 Bitcoin, he was

15   there, and this is what was approved.

16         More importantly, Section 2.5(b)(3) says as

17   follows.  And he refers to well, there was an account --

18   there was a memo and there was a document out there.  And

19   what was made clear by the debtors and the committee is that

20   that document was under review and it was under continuing

21   discussion.  And everything culminated in this plan that the

22   creditors voted on and approved.  And 2.5(b)(3) is clear, and

23   I'm going to read it into the record:

24              "To the extent the wind-down debtor determines that

25              currency held in an account constitutes property of

1              the debtor's estate, the wind-down debtor shall

2              notify the applicable customer in writing, which

3              writing may be by email where possible, and

4              otherwise by publication to the wind-down website

5              of same."

6          And that would be the estate property determination

7   notice.

8          What did Mr. Dunn do?  We filed the estate property

9   determination notice.  We filed the motion for determination

10  notice, that went out on service, and you're going to hear

11  evidence about that.  It said:

12             "To the extent the customer disagrees with an

13             estate property determination notice, such customer

14             shall file an objection" --

15         Coinbits has filed its objection -- and serve --

16  then that's called an "estate property determination

17  objection."

18             "-- with the Bankruptcy Court and serve such estate

19             property determination objection on the wind-down

20             debtor no later than the date that is 21 days

21             following the filing of the applicable notice."

22         We filed this well in advance, the notice and what

23  was necessary.  They have objected.  They didn't bring up any

24  -- they didn't bring up the Fifth Amendment, they didn't

25  bring up a lot of what he's saying here today, but leave it

1    at that, Your Honor.

2              What is important is that:

3              "Upon receipt of estate property determination

4              objection, the wind-down debtor shall schedule a

5              hearing before the Bankruptcy Court with respect to

6              the estate property determination notice and any

7              related estate property determination objection."

8              We had to schedule a notice.  They were objecting,

9    other people had been objecting.  We scheduled the notice of

10   the hearing, put it out there.  This is the time that they

11   need to come forward and respond to the determination notice,

12   as well as the objection.

13             They can't do so.  Do you know why?  Because the

14   assets at issue here, hopelessly commingled.  That's going to

15   be the evidence today.

16             More importantly, they have a distorted view of the

17   plan.  And they're going to tell you this is an in-kind plan

18   and this in-kind plan says we, or his customers, get 104 of

19   their Bitcoin back.  That's not what the plan was, sir.

20   That's not the plan that was before the Court, that's not how

21   Class 3B was done.

22             Class 3B in this case is clear and unequivocal.  It

23   says holders of allowed claims, account holders.  That's

24   crypto people, that's fiat people.  They're all to be treated

25   equally.  They all get this pro rata share, Your Honor.

1    That's the plan that was confirmed by the Court.

2            It's not a plan -- what he wants to come here to

3    say is it's a Bitcoin, it's a pick-and-choose, and we get to

4    take our stuff out.  That's not what Your Honor approved and

5    that's not what people voted on, it's clear, and we'll have

6    evidence to support that.  And it talked about a crypto

7    allocation and it talks about a fiat allocation.

8            And what's happening, what Mr. Dunn has spent so

9    much time on, carefully reviewing everything, is he said I

10   got a -- I'm going to liquidate the crypto, I'm going to

11   liquidate the fiat, we've looked at all the issues that

12   people have raised.  And that's why he's the last guy

13   standing, other than -- with all due respect to the other

14   victims, the *pro se* victims, who are true victims here.  But

15   he's the last guy standing because he's got this unique

16   reading of the plan.

17           Your Honor, we can't countenance this last-minute

18   hijacking of a hearing that has been properly noticed.  The

19   simple solution, Your Honor, is -- he says you're taking

20   property of the estate, we don't think we are taking property

21   of the estate.  Your Honor should take -- continue forward

22   with the hearing, take the evidence, listen to the evidence,

23   make a determination as to whether or not the distribution

24   motion and the procedures are appropriate.  And if it's not,

25   you can say, well, maybe we need an adversary hearing and

1    maybe we need that.

2            But none of this nonsense was put in their

3    objection, Your Honor.  This is the time.  They can't prove

4    their case up.  We need to move forward.  And Your Honor can

5    exercise appropriate discretion as the evidence comes in.

6            THE COURT:  Well, Mr. Detweiler, why isn't this an

7    adversary proceeding?

8            MR. DETWEILER:  It's not an adversary proceeding

9    because, Your Honor, we have filed -- there was a plan that

10   was approved by the Court that gave notice to all creditors,

11   to everybody, as to how the account treatment procedures were

12   to proceed forward.  And the plan administrator has abided by

13   the terms of the plan and he's followed those account

14   treatment procedures and we're here today.  He --

15           THE COURT:  Let me ask you one other question.  So,

16   to the extent that the objector has issue with what was put

17   out in a memorandum before the plan was confirmed, do you

18   want to address that point?

19           MR. DETWEILER:  Yes, Your Honor.  The memorandum of

20   law -- well, there's two things:

21           There's the memorandum that he says that there were

22   these procedures, that were supposed to be a meet-and-confer,

23   a meet-and-confer, is basically what he's complaining about.

24           Your Honor, that document, account treatment

25   procedures, was memorialized and came into Article 2.5(b) of

1    the plan.  It was changed.  The meet-and-confer provisions of

2    the -- that document didn't get into what he's claiming there

3    had to be a meet-and-confer and then we had to have time and

4    we had to do X, Y, and Z.  It's all boiled down to, after the

5    committee -- which was, you know, represented by very skilled

6    crypto counsel -- negotiated it, creditors saw it, people had

7    the right to review it.  It all came down to what we just

8    did, Article 2.5(b).

9         More importantly, the debtors filed a memorandum of

10   law in support of confirmation.  I don't have the cite in

11   front of me, Your Honor.  But the memorandum of law made it

12   clear that things were still in discussion.  This may not be

13   the final piece of it.  I -- we can get a cite to Your Honor

14   on that point.

15        But it was clear you're moving to confirmation.

16   You know how this case was, Your Honor, with regard to

17   confirmation, all of the different issues that arose.  And

18   ultimately, what's memorialized in the plan is what's binding

19   and controlling.

20        I don't know if that answers your question, Your

21   Honor.

22        THE COURT:  I think it does.  I think I'm going to

23   pull up that document, but --

24        MR. DETWEILER:  And at a break, I'll try to get the

25   memorandum of law cite for you, the reference to that things

1   were --

2           THE COURT:  I have a note to myself about Paragraph

3   484 of that document.

4           MR. DETWEILER:  Okay.

5           THE COURT:  -- that, unfortunately, I don't have --

6           MR. DETWEILER:  So, Your Honor --

7           THE COURT:  -- the actual document in front of me.

8           MR. DETWEILER:  This is the time.  We've worked

9   hard, we've worked tirelessly.  The plan administrator was

10  tasked with this very job, to go out and look at the fraud,

11  look at how these people operated, look at all the wrong they

12  did, looking -- being guided by a plan that they misconstrue,

13  that they want to say we want to take our own stuff back to

14  the detriment of everybody else, despite all the fraud that

15  was going on here.  That ain't so.

16          The plan that's before this court is a pot plan, in

17  essence.  It says crypto allocation, fiat allocation, it all

18  gets liquidated.  Maybe you'll get it back in kind, maybe you

19  won't because there's the reasonable business judgment

20  discretion of the trustee.  And we'll put on our evidence

21  today to support our case with regard to why cash and the

22  proposed distribution procedures of the plan administrator

23  are the best for the creditors in this case.

24          Your Honor, I'll stop there because I really want

25  to get to the evidence.  That's what we're here for today.

1    And again, I think, Your Honor, if you want to give any

2    credence to this last-minute, you know, gamesmanship of

3    somebody who has less than one Bitcoin, you can say I'm not

4    comfortable.

5              But we are confident, Your Honor, and we know there

6    are thousands, tens of thousands of creditors who are waiting

7    for their distributions and who are going to get more

8    distributions, hopefully, as this case moves forward.  But we

9    need to get this going.  They've waited long enough.  And

10   somebody like less than one Bitcoin is here before the Court

11   to tell you stop, this ain't right?  That ain't right.  And

12   we respectfully request you deny it, exercise your control as

13   to the best of your discretion with regard to what the

14   evidence says, and we can go from there.

15             And as far as discovery, they didn't send any

16   discovery on us.  And I hear Mr. Rosner, he said oh, you

17   know, we didn't want to prejudice ourselves.  Well, a motion

18   is a contested matter, Mr. Rosner.  And in a contested

19   matter, you can serve discovery.  You didn't do that.

20   Coinbits didn't seek discovery.  Coinbits didn't file a

21   motion to continue this hearing.  Coinbits didn't do

22   anything.

23             They have continually -- and there will be evidence

24   from Mr. Dunn, and I'm not invading the purview of 408, but

25   this has been the game that's being played.  And Mr. Dunn is

1   going to clearly testify about this now, that this is the

2   game that's been played since the confirmation, since his

3   appointment to today.

4           THE COURT:  Okay.

5           MR. DETWEILER:  Enough is enough.

6           THE COURT:  Okay.  Let me -- I want to hear from

7   the objector because I'm actually -- my understanding of your

8   argument is that this memorandum of law contradicted what's

9   stated in 2.5 of the plan.

10          MR. NEUMANN:  I --

11          THE COURT:  Okay.  And as I look at Footnote 84, it

12  says:

13          "The debtors are discussing the exact parameters of

14          the account treatment procedures with the committee

15          and the DIP lender.  The debtors intend to include

16          the account treatment procedures in Article 2.5 of

17          the plan."

18          Tell me how this isn't, today, a collateral attack

19  on that provision.

20          MR. NEUMANN:  Yeah, absolutely, Your Honor.  The --

21  2.5 talks nothing -- talks about filing a motion.  It's not

22  like the debtor has the ability -- sorry -- the plan

23  administrator has the ability to, itself, determine whether

24  something is property of the estate or not -- property of the

25  estate or not.  It can present its opinion, right?  Its

1    analysis.  But that leads to another proceeding through due

2    process, through -- just there's nothing in 2.5 that talks

3    about that.

4           All it says is that they could file it, they have

5    to give notice.  They talked about notice to each account

6    holder.  There is nothing that talks about a meet-and-confer.

7    There's -- by not stating it, it doesn't mean that that due

8    process consideration disappears.  Okay?

9           And I think that the -- you know, a couple of other

10   things that were said.  I don't want to re-construe this

11   plan.  It's for the Court to make a determination whether

12   something is property of the estate or not.  It's not for

13   Province to make that determination.

14          This is a toggle plan.  So the toggle plan says, if

15   there's something that's not property -- is property of the

16   estate, it has to be dealt with in a certain way.  It's not

17   as if the debtor says well, some things are potentially not

18   property of the estate, some things are, we're going to do an

19   adversary for foreign currency, but we're not going to do it

20   for anything else.  It seems -- I mean, why are they doing an

21   adversary for foreign currency when they're not doing it for

22   Bitcoin?  It doesn't make any sense.

23          They can present their motion, they can argue it.

24   The Court can set up a time for those active objectors to

25   have their due process rights.  But there's nothing in 2.5

1    that takes that due process away.

2            And the -- this was all done at the very last

3    minute.  And in light of the fact that Espinosa -- the

4    Espinosa case, which -- from the Supreme Court, says well,

5    you know, if there's a plan, it's clear in the provision,

6    there -- counsel keeps on saying that creditors voted on this

7    plan.  This plan changed up to the very last minute.  And the

8    memorandum that they submitted on the 12th was the memorandum

9    that they used to support this plan, confirmation of this

10   plan.  So -- and frankly, in the -- in the concerns that were

11   raised with regards to the procedures being extended over a

12   one-year period, whether Fireblocks was prepaid for or not,

13   these were all last-minute concerns that Your Honor was

14   forced to deal with.

15           But once again, there's nothing in the plan that

16   explicitly takes away due process rights in 2.5.  It talks

17   about a motion, it talks about giving notice.  It doesn't

18   talk about adjudication with evidence, without even a meet-

19   and-confer.

20           THE COURT:  Okay.  Well, I think you just said it,

21   that we should proceed with the motion and the Court should

22   determine accordingly, based on what's presented here today,

23   including consideration of your client's arguments as you've

24   set forth.

25           MR. NEUMANN:  Okay.  And we reserve rights with

1    regards to the due process issues, Your Honor.

2              THE COURT:  Yes.

3              MR. NEUMANN:  Thank you very much.

4              MR. DETWEILER:  Thank you, Mr. Neumann.  May I --

5              THE COURT:  Mr. Detweiler, before we get started --

6    and my apologies for this -- can we take just a two-minute

7    recess, so I can see if there's any lights in here?

8              MR. DETWEILER:  Yes, Your Honor.  Thank you, Your

9    Honor.

10         (Recess taken at 10:44 a.m.)

11         (Proceedings resume at 10:50 a.m.)

12              THE COURT:  I'm ready now.

13         (Laughter)

14              THE COURT:  But I see Mr. Kushner has his hand up.

15    So, sir, did you want to be heard quickly before we start?

16              MR. KUSHNER:  I did, and I appreciate it.  Good

17    morning, Your Honor --

18              THE COURT:  Good morning.

19              MR. KUSHNER:  -- and everyone else.

20              I don't want to sound and appear too caustic here,

21    but I'm sitting here beyond amazed and baffled at what I'm

22    hearing.  And I know, unfortunately, some of my comments

23    might be a little bit too late.

24              But I spent almost 30 years on Wall Street before

25    getting into the cryptocurrency world about 5, 6 years ago,

1  own my own exchange, our exchange used Prime Trust as our

2  bank and custodial partner.  Thank god we got out in time.

3  Unfortunately, I had several Bitcoin that were left in an IRA

4  account that did not.

5        What I'm hearing in a lot of the comments from

6  these people, I harken back to -- it sounds like first-year

7  medical students that are asked to perform brain surgery.

8  They're so out of their depth and out of their league, they

9  don't -- and again, I apologize if I'm sounding caustic.  But

10  ultimately, no one cares, unless you have vested skin in the

11  game.  What skin we're talking about here is capital, is

12  money.

13        And I think the lack of understanding of

14  blockchain, the forensics -- when I heard that they paid --

15  prepaid two years for Fireblocks -- again, it's not their

16  money, what do they care -- it blows me away.

17        I'm not sure if Mr. Detweiler or -- if I understood

18  this correct or he was being tongue-in-cheek.  I have heard

19  so many things about this case that, A, the private keys to

20  the wallets were lost forever.  He just made a comment that

21  said they were hopelessly commingled.  And I hope I, either

22  misunderstood him, or he was being tongue-in-cheek because

23  the reality is, Your Honor, I have documentation here that's

24  showing my name, my account, and my exact three-point-odd-

25  one-five Bitcoin that are sitting here.  So this notion of

1    that these coins are gone, are locked away forever or we

2    can't reconcile, that's absolutely not true.

3           And more importantly, the people that were looking

4    and doing the forensics apparently do not know what they were

5    doing.  I will absolutely offer up my service and can

6    probably get this rectified in 30 days, at least the coins,

7    if they're locked.

8           And the last thing I'll mention is I was told oh,

9    no coins have been sold, we're going to mark these assets

10   from the day Prime Trust or Prime Core Technologies filed

11   bankruptcy.  That is absolutely so incredibly sophomoric and

12   not professional, from a business standpoint.  If you have

13   the coins and they haven't been liquidated, you're talking

14   about a three-time-X multiple.  I think they marked Bitcoin

15   at maybe 29,000; today, I'm looking at my screen, it's almost

16   at 100,000, 96,700.

17          So, again, I'm not sure if a lot of this stuff is

18   too far gone.  But the reality is I think that everyone

19   involved in this case, up and to this point, they're lawyers,

20   they're lawyers.  They're not professional businesspeople,

21   they're not blockchain people, they're not cryptographers.

22   And it just kind of sickens me because, again, I'm not

23   knocking you, you guys might be the greatest attorneys on

24   Planet Earth, but you don't know this world.  And it's very

25   lazy and go get somebody else to do it, spend everybody

1   else's money, it doesn't matter, and I just wanted to state

2   it for the record.  And I've actually showed their firm my

3   Bitcoin holdings.

4           So, with that, I appreciate your time in allowing

5   me to speak.  Thank you very much.

6           THE COURT:  Okay.  We're going to move forward with

7   the evidentiary presentation.  Thank you.

8           MR. DETWEILER:  May it please the Court, Donald

9   Detweiler again on behalf of -- we're ready to move forward -

10  -

11          THE COURT:  Okay.

12          MR. DETWEILER:  -- with the presentation --

13          THE COURT:  Thank you.

14          MR. DETWEILER:  -- Your Honor.  I think that will

15  answer many of the complained of issues that were just

16  raised, and we're confident in what we're going to do.

17          So I'll turn this section over to my partner Morgan

18  Patterson.  We have two witnesses, Mr. David Dunn, the plan

19  administrator, and we also have J.P. Brennan who is an expert

20  in cryptocurrency and forensic accounting.  Thank you, Your

21  Honor.

22          THE COURT:  Okay.  Thank you.

23          Good morning, Ms. Patterson.

24          MS. PATTERSON:  Good morning, Your Honor.  Morgan

25  Patterson of Womble Bond Dickinson on behalf of the plan

1   administrator.  It's a pleasure to be here.  As Mr. Detweiler

2   indicated, we really appreciate the time Your Honor has given

3   us and your chambers working with us today.

4           Your Honor, I'm -- so I'm sure you saw we did two

5   declarations for Mr. Dunn and two declarations for Mr.

6   Brennan of J.S. Held.  Those are found at Docket Numbers 920

7   and 921, and then the supplemental declarations with our

8   reply were at 968 and 969.  As an initial matter, Your Honor,

9   I'd like to move those into evidence.

10          And then, because we do have, you know,

11  negotiations and things moving fast and furious, I do have

12  just a little bit of supplemental direct for each witness.

13          THE COURT:  Okay.

14          MS. PATTERSON:  And then they will both be offered

15  for cross-examination.

16          THE COURT:  Okay.  Does anyone object to the

17  admission into evidence of the Dunn or Brennan declarations

18  at Docket Number 920, 921, 968, and 969?

19      (No verbal response)

20          THE COURT:  Okay.  I hear no one, I see no hands

21  raised on Zoom.

22          Does anyone intend to cross-examine the declarants?

23      (No verbal response)

24          THE COURT:  Okay.  All right.  Let's proceed.

25      (Dunn Declaration at ECF 920 received in evidence)

1          (Brennan Declaration at ECF 921 received in evidence)

2          (Supplemental Dunn Declaration at ECF 968 received in

3     evidence)

4          (Supplemental Brennan Declaration at ECF 969 received in

5     evidence)

6               MS. PATTERSON:  Thank you, Your Honor.

7               So, as part of the supplemental direct, I will

8     call, first, Mr. Dunn to the stand.

9               THE COURT:  Okay.  We are now into the broadcasting

10    mode of -- thank you.

11              THE ECRO:  Due to our Court's broadcasting policy,

12    parties on Zoom that are listening by audio only will be

13    placed in the Zoom waiting room during witness testimony.

14    They will be allowed back in once the testimony has

15    concluded.  Thank you.

16              Please raise your right hand.

17       DAVID DUNN, WITNESS FOR THE PLAN ADMINISTRATOR, AFFIRMED

18              THE ECRO:  Please state your full name and spell

19    your last name for the record.

20              THE WITNESS:  David Dunn, D-u-n-n.

21              THE ECRO:  Thank you.

22              MS. PATTERSON:  Thank you.

23                         DIRECT EXAMINATION

24    BY MS. PATTERSON:

25    Q    Good morning, Mr. Dunn.

1    A    Good morning.

2    Q    For the record, could you just remind the Court and the

3    folks in the audience and on Zoom your role with the Prime

4    Core wind-down?

5    A    I have two roles, as the plan administrator and as of

6    the trustee of the PCT Litigation Trust.

7    Q    Thank you.

8         And did you have a role during the general bankruptcy

9    cases?

10   A    Yes, I was part of the team that advised the Official

11   Committee of Unsecured Creditors.

12   Q    So, for those two roles, how much time would you say

13   you've spent studying the issues and the company's assets and

14   liabilities here?

15   A    Well, the -- the committee was appointed in September in

16   2023, and we were retained shortly thereafter, so over two

17   years.

18   Q    So were you part of the negotiations related to the plan

19   during the confirmation process that we've talked about this

20   morning?

21   A    I -- I was, on behalf of the committee.

22   Q    Okay.  And I know that you're not acting as a lawyer in

23   this capacity, but would you say you're very familiar with

24   the content and the structure of the plan?

25   A    I am.

1    Q    And with respect to the wind-down, what is your

2    understanding of the classes of claims that remain to be paid

3    today under the plan?

4    A    Well, we've dealt with the -- the secured,

5    administrative, and priority claims previously or since

6    emergence.  So, really, now we have the unsecured claims, so

7    that's Class 3, and then we have an administrative class for

8    smaller -- sort of smaller claims in *de minimis* amounts.  But

9    -- but Class 3 is the general unsecured creditor claims.

10   Those are largely customer claims that have to be

11   administered and are -- are the subject of the distribution

12   motion that we have on today.

13            THE COURT:  Mr. Dunn, would you do me a favor and

14   pull the microphone a little closer to you?

15            THE WITNESS:  Sure.

16            THE COURT:  Thank you.

17            THE WITNESS:  No problem, Your Honor.

18   BY MS. PATTERSON:

19   Q    And just for the Court to have a full picture, does the

20   -- there remains a DIP exit financing to be paid.  Is that

21   correct?

22   A    Yeah, that's correct.  The -- the debtor-in-possession

23   facility that was put in place in the case rolled into an

24   exit facility.  That facility has been paid down, to some

25   extent, but still remains outstanding.

1   Q    And I believe you may have mentioned this, but there's

2   also a convenience class.  Is that correct?

3   A    Correct.

4   Q    And that remains to be paid, as well --

5   A    Yeah, that was --

6   Q    -- for distribution?

7   A    That was separately funded and that -- that will be paid

8   out, from a distribution standpoint, within, call it the next

9   six months.

10  Q    And you touched on this briefly, but going back to Class

11  3, the general unsecured claims.  What are -- what is that

12  class made of, if you know?

13  A    Well, it -- as I was saying, it's -- it's mostly

14  customer claims, a few vendor claims, but, by and large,

15  customer claims.  And there are in excess of 40,000.  I guess

16  we served -- we served this motion on 46,000 potential

17  claimants.

18  Q    And is Class 3 broken down, in any way, if you know?

19  A    Yeah, it's broken down by debtor, so there are three

20  subclasses in Class 3 or three different debtors.

21  Q    And if you know, is it broken down at all by currency

22  type?

23  A    No, just by debtor.

24  Q    And your team -- what is the guidelines and the plan for

25  your team to value these claims?

1    A    So there's a provision in the plan that provides for

2    dollarization [sic] of the claims as of the petition date,

3    and so we provided a schedule that pegged the various -- I

4    mean, dollars are dollars -- but pegged the various

5    cryptocurrencies, and we have quite a few with values as of

6    the petition date.

7    Q    And that schedule that you referred to, that was

8    attached to the motion here.  Is that correct?

9    A    That's correct.

10    Q    And if you recall, what were the updates to that

11    schedule that was attached to the motion?

12    A    There were -- there were six cryptocurrencies that were

13    not included in the initial dollarization schedule, so those

14    were added to this schedule with their as-of-the-petition-

15    date prices.

16    Q    And are you aware of whether or not the plan would allow

17    you to make distributions without getting a property of the

18    estate determination from the Court?

19    A    No.  My understanding of the plan is that the account

20    procedures we've been discussing this morning were required

21    to be the predicate to making distributions.  So we filed the

22    -- followed the procedures, filed the appropriate notices,

23    served this motion on, as I said, 46,000 people.  And we have

24    dealt with formal and informal objections from, I guess,

25    around 20 folks since, most of which have been resolved.

1    Obviously, we have Mr. Neumann's objection outstanding.

2    Q    And what is your understanding regarding your

3    obligations under the plan to distribute in cash versus in

4    kind?

5    A    Well, there's -- there's a discretion to do it in cash

6    or in kind, that's sort built into the plan.  But the plan

7    provides for a pro rata distribution of whatever currency we

8    have to all creditors.  So it doesn't distinguish between

9    crypto creditors versus fiat creditors, it's all general

10   unsecured creditors get a pro rata distribution of the

11   currency that we have, now and in the future.

12   Q    And some of this I know was in your declaration.  But if

13   you could remind the Court the process you went through to

14   determine whether or not to make cash versus in-kind

15   distributions?  You and your team, of course.

16   A    Sure.  Well, it -- so we -- we looked at -- we looked at

17   it from a number of angles, certainly from a cost

18   perspective.

19        So we went to -- we went to crypto exchanges and -- to

20   determine how much it would cost to onboard crypto clients,

21   run KYC, OFAC, AML, all of that, and then looked at

22   transaction fees that would be attendant to making in-kind

23   distributions.

24        We looked at regulatory issues.  So, as everyone knows,

25   this is a trust company without a license.  That happened in

1    -- in the Summer of '23.  We don't have money transmitter

2    licenses, as well.  So we looked at it from a regulatory

3    perspective, as far as hoops that might have be jumped to do

4    that and -- you know, and looked at also from a timing

5    standpoint.

6         And you know, we made the determination, based on the

7    conversations that we had, that it would be something on the

8    order of 18 months to make an in-kind distribution, where, in

9    the alternative, we could make an as-converted fiat

10   distribution in a much shorter period of time, and certainly,

11   from an equitable standpoint and from an opportunity cost

12   standpoint, made the determination that would be better for

13   all, certainly all creditors, to have their currency -- or

14   currency in hand sooner than later.

15   Q    And is that what you mean by an "opportunity cost"?

16   A    Right.  Well, I'd -- I'd rather have -- you know, I'd

17   rather have money in my hand in 6 months that I can invest

18   and -- and otherwise gain a return on, versus 18 months from

19   now.  So there's an opportunity cost, certainly, from a

20   present value standpoint.

21   Q    And when you started out your answer, you said that you

22   would need to "onboard" creditors.  What do you mean by

23   "onboard" them, in order to make an in-kind distribution?

24   A    Well, they would have to be onboarded onto a platform

25   that could make a, you know, crypto distribution.  We -- we

1    don't have that capability.

2    Q    And you're aware -- shifting now to the objection before

3    the Court.  In addition, I know you're aware of the remaining

4    objections from some claimants.  But you're aware of the

5    Coinbits objection, as well?

6    A    I am.

7    Q    And are you aware of Coinbits during the bankruptcy

8    case?

9    A    I was.

10   Q    Do you happen to know the amount of their claim?

11   A    The -- I believe the claim that Coinbits has filed is

12   several hundred thousand dollars, consisting of attorneys'

13   fees, brand damage, and I believe some portion of a Bitcoin.

14   Q    And do you know what they allege their claim to be in

15   their objection that they filed?

16   A    Well, I think they -- I think they say they're -- they

17   have a 104 Bitcoin that are, I guess, represented by their

18   members or customers.

19   Q    And do you happen to know if Coinbits has provided the

20   plan administrator any information that supports that they

21   can act on behalf of those 4,000 customers?

22   A    Well, at best, limited information, or -- or that they

23   have limited ability to act for those customers, which is

24   also consistent with my review of -- of their communications

25   with members, which is, you know, we don't represent you,

1    find your own counsel.  And so it -- you know, that's also

2    consistent with what we've heard from Mr. Neumann, when asked

3    on multiple occasions, you know, what -- what rights do you

4    have, who do you represent, what rights do you have to act

5    for customers.

6    Q    And if you know, did you receive any objections to the

7    distribution motion from any Coinbits customers, if you know?

8    A    Not that I'm aware of.

9    Q    Okay.  And are you aware of whether or not Coinbits

10   served any discovery on the plan administrator or made, you

11   know, discovery requests with respect to the distribution

12   motion?

13   A    None.

14   Q    And did you receive informal discovery from other

15   parties related to the motion?

16   A    We did.

17   Q    And what did -- how did we handle -- how did you handle

18   most of those discoveries -- discovery -- or the -- all of

19   those discovery requests?

20   A    Provided information on an informal basis and -- and,

21   otherwise, satisfied whatever their concerns were or

22   stipulated to a resolution of their, you know, informal

23   objection.

24        MS. PATTERSON:  Okay.  Your Honor, I have no

25   further questions for the supplemental direct.  I would just

1    reserve the right to redirect after cross.

2                    THE COURT:  Okay.

3                    MS. PATTERSON:  Thank you.

4                    THE COURT:  Does anyone wish to cross-examine Mr.

5    Dunn?

6                    MR. NEUMANN:  Thank you, Your Honor.

7                    THE COURT:  Just make sure you identify yourself

8    for the record.

9                    MR. NEUMANN:  Sure, absolutely, Your Honor.

10                           CROSS-EXAMINATION

11   BY MR. NEUMANN:

12   Q    Mr. Dunn, my name is David Neumann from Meyers Roman on

13   behalf of Coinbits.

14        And David, I'm going to ask you a number of questions.

15   Before I do, I just wanted to -- a couple of followups with

16   what you just said.

17        You said that -- and if I -- I don't want to summarize.

18   But it sounds like what you're saying --

19   A    I'll correct you if I believe you've --

20   Q    Thank you.

21   A    -- you've --

22   Q    Is that --

23   A    -- mischaracterized --

24   Q    -- on --

25   A    -- my testimony.

1    Q    You had -- you have a logistical issue associated with

2    working with integrators, getting in-kind transfers back to

3    customers.  Is that correct?

4    A    That's not what I said.

5    Q    You -- did you say that there are regulatory issues that

6    would prevent you from doing in-kind transfers?

7    A    I said there were regulatory issues that we considered,

8    yes, I did.

9    Q    Okay.  And then you considered timing issues associated

10   with conversion or the speed in which you could do an in-kind

11   transfer.  Can you explain that a little bit?

12   A    I -- I said I took a look at the -- what the returns

13   would be or the opportunity costs would be from making an in-

14   kind distribution, which I based -- based on the analysis we

15   did, would take somewhere on the order of 18 months from now

16   --

17   Q    Okay.

18   A    -- versus a -- versus a fiat distribution, which we

19   believe could be accomplished within 6 months.

20   Q    Okay.  So let's just -- let's back up.

21        So what you're saying is there's also a cost issue, you

22   said, there's just a general cost issue associated with doing

23   -- evaluating and doing any kind of transfer?

24   A    Yes.  Yeah, the costs are -- and it's variable, but the

25   in-kind transfer would be something on the order of four to

1    seven times more expensive than a fiat distribution.

2    Q    Okay.  Were these concerns -- were these thought through

3    with regards to the fact that the plan provides for a

4    determination by this Court and then an in-kind transfer;

5    that is, to the extent to which the Court determines that

6    these are -- that this is not -- that you haven't met your

7    burden with regards to this being property of the estate?

8    Okay?

9    A    Are you -- I don't understand your question.

10   Q    Sure.  No problem.

11        To the extent to which you don't -- that you're unable

12   to demonstrate and meet your burden to the Court that this is

13   property of the estate -- right?  That this is property of

14   each account holder, let's say as to a specific token, you'd

15   have no choice under the plan but to do an in-kind transfer,

16   correct?

17   A    Potentially.

18   Q    Well, can you explain what's the "potentially"?  What

19   would you do if the Court determined that a Bitcoin is --

20   that you didn't meet your burden to show the Bitcoin is --

21   that is property of the estate?  What other choice do you

22   have under the plan but to do an in-kind transfer?

23   A    The -- I got to think of it as an open question as to

24   sort of what we would be -- what we would be transferring in

25   kind, rather than a specific coin, or would it be, you know,

1    a number of different coins.  And -- and there's a --

2    ultimately, a shortfall in crypto, *vis-a-vis* accounts, and so

3    there were -- there are a number of legal questions that

4    would have to --

5    Q    Okay.

6    A    -- be answered.

7    Q    So let me ask you something.  That's a really good

8    point.  How much BTC is in Fireblocks?  "BTC" being Bitcoin.

9    How many Bitcoins are in Fireblocks?

10   A    I believe 300.

11   Q    Three hundred exactly?

12   A    I believe it's 299.

13   Q    Two ninety-nine.

14        Does that -- is that net of the 48 Bitcoins that you

15   transferred out in September?

16   A    That's what we have currently.

17   Q    Okay.  So the Bitcoin that -- you did a stipulation --

18        MR. NEUMANN:  I believe, Your Honor, it is Document

19   866 in this case, an order approving stipulation authorizing

20   turnover of certain cryptocurrency to Wintermute Trading.

21   BY MR. NEUMANN:

22   Q    Did that come out of the 288 -- to the 299?  Is now the

23   299 is net of that?

24   A    That's what I said we have currently.

25   Q    Okay.  But the crypto that you transferred to them, was

1    it held in a segregated wallet?

2    A    It was -- it was held in -- it as held in a wallet.  I

3    don't recall which wallet or if it was multiple wallets.

4    Q    Okay.  But -- so you -- on no notice, you entered into a

5    stipulation and you transferred 48 Bitcoins, so about five --

6    a little -- like approximately $5 million, on which could

7    have been my client -- that could have been Coinbits-specific

8    Bitcoin, correct?  It could have been.

9    A    I'm not sure I -- I'm not sure I would -- I understand

10   your question.

11   Q    The argument is that Bitcoin is fungible, right?  That

12   you've argued that Bitcoin is fungible, that each Bitcoin --

13   that, if you sent out 48 Bitcoins, it could be some other

14   customer's Bitcoin, it doesn't necessarily mean it was

15   Wintermute's Bitcoin, correct?

16           MS. PATTERSON:  Objection, Your Honor.  This is far

17   beyond the testimony of Mr. Dunn.  I believe he's maybe going

18   into some of the testimony of Mr. Brennan regarding the

19   commingling.

20           MR. NEUMANN:  I --

21           THE COURT:  I'm going to -- I'm going to sustain --

22   well, go ahead.

23           MR. NEUMANN:  No, no.  You, Your Honor.

24           THE COURT:  No, go ahead.

25           MR. NEUMANN:  I --

1      THE COURT:  Make your argument.

2      MR. NEUMANN:  He mentioned that he knows the amount

3  of Bitcoin in Fireblocks.  As we will show, I've been asking

4  for that number for a very, very long time.  I've also been

5  asking whether there's a shortage of Bitcoin because, to the

6  extent that there is Bitcoin that's equal to the claims of

7  those customers who have Bitcoin, then that Bitcoin should be

8  transferred; that is, that there is no shortage of Bitcoin.

9  And I don't believe there's a shortage of Bitcoin.

10  BY MR. NEUMANN:

11  Q    Are you aware of a shortage of Bitcoin?

12      THE COURT:  Well, wait a minute.  I --

13      MR. NEUMANN:  Yes, Your Honor.

14      THE COURT:  I want to look at his declaration

15  because I don't recall, off the top of my head, to what

16  extent, in his declaration, he talked about the amount of

17  Bitcoin.

18      MR. NEUMANN:  He doesn't, Your Honor.

19      THE COURT:  Okay.  Isn't that beyond the scope of

20  the declarations and the supplemental cross [sic] here this

21  morning?

22      MR. NEUMANN:  I think --

23      THE COURT:  He -- if he didn't talk about it, it's

24  not subject to cross-examination at this point.

25      MR. NEUMANN:  There are statements about hopelessly

1   commingling assets.

2             THE COURT:  Okay.  Well, you can steer your

3   questions to what's within the confines of the declaration --

4             MR. NEUMANN:  Understood.

5             THE COURT:  -- or supplemental testimony.  But

6   those particular questions with respect to Wintermute are

7   nowhere in those documents, nor did he supplement his

8   testimony with respect to that this morning.

9             MR. NEUMANN:  Okay.

10            THE COURT:  So I'll --

11            MR. NEUMANN:  Thank you.

12            THE COURT:  -- sustain --

13            MR. NEUMANN:  Thank you --

14            THE COURT:  -- the objection.

15            MR. NEUMANN:  -- Your Honor.

16   BY MR. NEUMANN:

17   Q    Okay.  So is it your understanding that there's a

18   minimal direct cost for transferring BTC to an external

19   wallet, other than gas fees?

20            MS. PATTERSON:  Your Honor, objection.  Again, I --

21   this is not something that Mr. Dunn has testified to

22   regarding gas fees or transaction costs regarding

23   transferring of crypto, only with respect to whether or not

24   we can make an in-kind distribution.

25            THE COURT:  Okay.  I think you need to limit it --

1              MR. NEUMANN:  Understood, Your Honor.

2              THE COURT:  -- to cost perspective that he

3     testified --

4              MR. NEUMANN:  Yeah.

5              THE COURT:  -- this morning --

6              MR. NEUMANN:  Okay.

7              THE COURT:  -- or is in his declaration.

8              MR. NEUMANN:  Uh-huh.

9     BY MR. NEUMANN:

10    Q    On -- there is missing Ethereum in this case, correct?

11             MS. PATTERSON:  Your Honor, objection.  I'm not

12    trying to be a best, but this is not something that Mr. Dunn

13    objected -- you know, testified to.

14             MR. NEUMANN:  Okay.

15         (Pause in proceedings)

16    BY MR. NEUMANN:

17    Q    Okay.  In your statement, Mr. Dunn, you state that:

18             "If the operative account treatment procedures

19             included a meet-and-confer or adversary proceeding

20             requirement with respect to each individual

21             customer creditor, substantially all of the

22             debtors' estate value would be lost and it will be

23             likely to take an additional more for

24             distributions, if any, to be made."

25         So when did you hire Mr. Brennan?

1   A    I hired him last year, I don't remember the month, but

2   early on.

3   Q    Okay.  And so last year, 2024, you -- the plan went

4   effective in January.  So how many months after the plan went

5   effective did you hire Mr. Brennan?

6   A    Well, I just said I don't recall the month, but it as

7   shortly after emergence.

8   Q    Okay.  And Mr. Brennan -- and Mr. Brennan has been

9   conducting that analysis ever since retention?

10  A    Which analysis are you referring to?

11  A    The analysis that's in his -- that -- his various

12  analyses associated with the commingling of cryptocurrency.

13  A    He's been conducting the analyses that are reflected in

14  his declarations since he was hired, yes.

15  Q    Okay.  So why has it taken so long, what -- to come up

16  with a conclusion?  Why has it taken over a year for him to

17  come up to a conclusion that he can't trace any assets, that

18  every single token is hopelessly commingled?

19        MS. PATTERSON:  Objection, Your Honor.  I don't

20  think that Mr. Dunn can testify to why it took Mr. Brennan

21  time to do his work.  Certainly, he can speak to the plan

22  administrator, but not why Mr. Brennan's time line was what

23  it was.

24        THE COURT:  Do you want to respond, Mr. Neumann?

25        MR. NEUMANN:  Your Honor, I believe that his

1    declaration is what I just specified.  He said that it would

2    take additional time, it would -- it -- and what I'm trying

3    to get at is they've had a year, they had a period of time

4    well before the retention of Mr. Brennan.  There are multiple

5    forensic analyses that have been done, as stated in the

6    receivership proceedings.  And I know the committee did an

7    analysis, I know that the debtor did an analysis.  So there's

8    been a lot of time for this analysis to occur.

9           And what Mr. Dunn is saying is that they're kind of

10   out of time, it would take a really long time to do an in-

11   kind distribution, that it will cost too much money to do any

12   kind of tracing, it would take -- and that there are

13   regulatory issues.

14          And once again, I'll state that my client has

15   offered our services --

16          THE COURT:  Okay.  I just wanted a response to her

17   --

18          MR. NEUMANN:  That's my --

19          THE COURT:  -- objection.

20          MR. NEUMANN:  -- response, Your Honor.

21          THE COURT:  Okay.  I'm going to allow the answer,

22   him to answer what he knows because he did say timing; so, to

23   the extent Mr. Dunn --

24          THE WITNESS:  Which questions am I answering?

25   BY MR. NEUMANN:

1    Q    You're answering with regards to the timing -- right?

2    Of when Mr. Brennan started and why has it taken so long,

3    what other information did he look at with regards to

4    previous forensic analyses.

5    A    It's a very extensive and very complicated process, and

6    it took quite a bit of time.  But I -- I can assure you that

7    it was a high priority work stream from the day that I was

8    appointed.

9    Q    The debtor rejected the API agreements.  Are you

10   familiar with the API technology agreements?

11   A    Yeah, generally.

12   Q    Okay.  Would it be fair to say that the API technology

13   agreements governed the sort of relationship between Prime

14   Trust and the integrator?

15   A    Among other agreements.

16   Q    Yeah.  And that was rejected early on, you know, on -- I

17   think actually right around the time of confirmation, that

18   those API agreements were rejected.  Is that -- does that

19   ring a bell to you or you don't recall?

20        MS. PATTERSON:  Your Honor, I'm -- objection.  Mr.

21   Dunn did not testify to this, though we are -- you know,

22   we'll stipulate that the plan includes a rejection of all the

23   contracts that were remaining --

24        THE COURT:  Okay.

25        MS. PATTERSON:  -- as the company was not --

1          THE COURT:  Thank you.

2          MS. PATTERSON:  -- continuing to operate.

3     BY MR. NEUMANN:

4     Q    So if the contemplation was that there would be an

5     opportunity to do an in-kind transfer, you're stating -- I

6     believe, that you -- what you stated was that the difficulty

7     of doing the know your customer, the difficulty of really

8     coordinating with each of these customers is a prohibition

9     for you with regards to doing an in-kind transfer.  Is that

10    kind of accurate?

11    A    Those are among the reasons I stated, yes.

12    Q    Okay.  And an integrator who is willing to -- who does

13    know their customers and who is willing to facilitate the

14    transfer, absent an API agreement, is -- does that get around

15    your concern with regards to working with an integrator and

16    doing distributions on an in-kind basis?

17    A    No.  I think there would have to be -- there would have

18    -- there certainly would have to be that and other

19    arrangements made, to the extent that there was going to be,

20    I guess, renewal of a relationship in that -- in that context

21    --

22    Q    Okay.

23    A    -- with the integrator.

24    Q    So, in a -- so isn't -- aren't you really saying it's

25    like a *fait accompli*, that there wasn't ever going to be an

1    opportunity to do an in-kind transfer of anything?

2    A    That's not what I said.

3    Q    That's what I heard.

4         Did you ever contact a blockchain analysis firm?

5    A    Not that I recall.

6    Q    Okay.  Did Mr. Brennan prepare a blockchain analysis of

7    --

8         MS. PATTERSON:  Objection, Your Honor.  I don't

9    think that Mr. Dunn can testify to what Mr. Brennan did.

10        MR. NEUMANN:  Well, he's his trusted advisor, so I

11   -- he should know what Mr. Brennan did and didn't do as part

12   of his analysis.

13        MS. PATTERSON:  Your Honor, he'll most certainly

14   have the opportunity to ask Mr. Brennan.

15        THE COURT:  Yeah, the -- I mean, you can ask him,

16   but I -- you have a better opportunity to ask the question to

17   Mr. Brennan.

18        MR. NEUMANN:  Understood, Your Honor.

19   BY MR. NEUMANN:

20   Q    There's a statement in your declaration, reviewing the

21   service schedule, Prime Trust, that -- sorry -- that --

22   here's the statement:

23        "Customer owns all custodial" --

24        Sorry.

25        If you reviewed a service schedule in Prime Trust, would

1    you like to revise your statement that the agreements

2    explicitly state that no fiduciary relationship was intended

3    to exist between the parties?

4              MS. PATTERSON:  Your Honor -- could we know exactly

5    where you're reading that from, so I could provide the

6    document to Mr. Dunn?

7              MR. NEUMANN:  Yeah, it's in his statement in his

8    declaration that says that:

9                   "The agreements explicitly state that no fiduciary

10                  relationship was intended to exist between the

11                  parties."

12             THE COURT:  Can you refer to a docket number?

13             MR. NEUMANN:  Yes.  That is his declaration, Your

14   Honor -- let me pull it up.

15             THE COURT:  Are you referring to Docket Number 920?

16             MR. NEUMANN:  Yes, I am, Your Honor.  But I'll grab

17   it.

18        (Participants confer)

19             MR. NEUMANN:  One moment, Your Honor.

20        (Pause in proceedings)

21             MR. NEUMANN:  I'm referring to Docket 920, Your

22   Honor.  I'm referring to ...

23        (Pause in proceedings)

24             MR. NEUMANN:  I am referring to Paragraph 7, Your

25   Honor.  And it says:

1          "-- which explicitly stated that no fiduciary

2           relationship existed between the parties and

3           provided Prime with the ability to reinvest, re-

4           pledge, hypothecate, re-hypothecate, sell, and

5           utilize cash or fiat currency transferred to Prime

6           in Prime's absolute discretion."

7          THE COURT:  Thank you.

8    BY MR. NEUMANN:

9    Q    Does that apply to digital or is it only fiat?

10   A    Does what apply, sir?  I --

11   Q    Your statement that there was no trust relation -- no

12   fiduciary relationship existed between the parties.

13   A    I believe it applies to both.

14   Q    Excuse me?

15   A    I believe it applies to both digital and fiat.

16   Q    Okay.  Have you reviewed all the documents?  For

17   instance, the service schedule of Prime Trust states:

18          "Customer owns all custodial property held by Prime

19           Trust on behalf of the customer in accordance with

20           this service schedule.  Customer's custodial

21           property will not be reflected on Prime Trust's

22           balance sheets as assets of Prime Trust."

23          Are you familiar with that language?

24          MS. PATTERSON:  Your Honor, where -- I'm sorry.

25   Where are you reading that from, Mr. Neumann?

1            MR. NEUMANN:  That is in the service schedule, that

2    is in the Prime Trust service schedule.  I've also attached a

3    copy in my exhibit with regards to our end user agreement.

4            MS. PATTERSON:  So I'm sorry.  Is it an exhibit to

5    the declaration --

6            MR. NEUMANN:  Yeah, my --

7            MS. PATTERSON:  -- that you're reading from?

8            MR. NEUMANN:  I will grab it.  Here's the Prime

9    Trust master service agreement, though I don't know if

10   there's a reference in his statement because it's a broad

11   statement which I referenced.  And it doesn't refer to where

12   he's coming up with that.  But once again, I'm looking at the

13   attached documentation.  In the exhibits, it's -- there's a

14   sample, integrator master services agreement, which is

15   Exhibit 1 of 920.

16   BY MR. NEUMANN:

17   Q    I'm looking then again at -- these are all the documents

18   that I assume you've reviewed.  They have all the discussions

19   of fiduciary relationships as to digital.  But you're saying

20   that there is no fiduciary relationship in the documentation,

21   you didn't see any --

22           MS. PATTERSON:  Your Honor --

23           THE COURT:  I'm sorry.

24           MS. PATTERSON:  -- I'm going to object to this

25   question because I believe that he's referring to the two

1    sample contracts that were attached to Mr. Dunn's

2    declaration, and those documents speak for themselves.  And

3    the Court and the parties are certainly able to review the

4    documents and see what they say.  Mr. Dunn has -- he's

5    referring to the general statements in the declaration, but I

6    don't think there's an actual question here because the

7    documents speak for themselves.

8            MR. NEUMANN:  Oh, I -- he has a statement in his

9    declaration that he's saying that there's no fiduciary

10   relationship --

11           THE COURT:  I --

12           MR. NEUMANN:  -- in the documents.

13           THE COURT:  Where -- I'm -- I don't know what the

14   question is, but -- my apologies, Mr. Neumann.

15           MR. NEUMANN:  No, no.

16           THE COURT:  But I don't know what the question is.

17           MR. NEUMANN:  The -- I will repeat it, Your Honor.

18           THE COURT:  There was a discussion on documents,

19   but I never heard the question.

20           MR. NEUMANN:  Understood, Your Honor.

21       (Pause in proceedings)

22           MR. NEUMANN:  I said reviewing the service schedule

23   --

24           THE COURT:  Okay.  What is the "service schedule"?

25           MR. NEUMANN:  That's the master service agreement

1    that's --

2            THE COURT:  Okay.  Exhibit 1 to his declaration?

3            MR. NEUMANN:  Correct, Your Honor.

4            THE COURT:  Okay.

5    BY MR. NEUMANN:

6    Q    All right.  So, reviewing that -- okay?  I assume that

7    that's what you're referring to.  You say that:

8            "The agreements explicitly state that no fiduciary

9             relationship was intended to exist between the

10            parties."

11       I guess there would be an account holder agreement,

12   perhaps, or some other documents listed in here.  It's a

13   general statement that you made.  But once again, would you -

14   - I am referring to -- there are a number of statements

15   throughout the document saying there's a fiduciary

16   relationship.

17           THE COURT:  Okay.  I -- that is where her objection

18   is.  So where is the question?

19           MR. NEUMANN:  So the question, Your Honor, is does

20   he -- well, does he -- would he reconsider his statement that

21   the documents provide for no fiduciary relationship -- I just

22   posed my question -- and his review of the documentation,

23   specifically the reference throughout all documentation, that

24   the digital currency was -- at least the digital currency was

25   subject to a fiduciary relationship.

1          MS. PATTERSON:  Objection, Your Honor.  I'm still

2     not sure I understand the question.  And as I mentioned the

3     first time, the documents speak for themselves, they say what

4     they say.  And he does make a general statement about them,

5     but they are right there for Your Honor to consider.

6     BY MR. NEUMANN:

7     Q    Okay.  I mean, I'll say it -- Paragraph 76 of the

8     distribution motion, which I assume you reviewed, says:

9               "The agreements between Prime and its customers are

10              clear that no fiduciary relationship existed, so no

11              trust relationship existed.  Specifically, as

12              previously explained, the agreements stated that no

13              such fiduciary relationship existed or was intended

14              to exist between the parties."

15         And these are statements of Prime -- these are

16    statements in the motion.  Is that your understanding?  Is

17    that your understanding that the documents indicate that

18    there is no fiduciary relationship as to fiat and digital?

19         MS. PATTERSON:  Objection, Your Honor.  I just --

20    I'm not sure that Mr. Dunn can testify to everything that was

21    stated in the motion.  I mean, that's not his declaration.

22    This is his declaration, this is his testimony.

23         I also am just not totally clear on the question,

24    which I assume means Mr. Dunn is not, either.

25         MR. NEUMANN:  Okay, Your Honor.

1    BY MR. NEUMANN:

2    Q    I -- so, Mr. Dunn, it's my understanding that Nathan --

3    Nate Smith, he works with you, he's one of your partners?

4    A    Nathan Smith works at Province, yes.

5    Q    Yeah.  But are you Province, as well?

6    A    I am.

7    Q    Okay.  So he's one of your associates?

8    A    He's a director at Province.

9    Q    Okay.  Are you familiar with discussions that my client

10   had December of 2023, January of '24, February of '24, with

11   Mr. Smith, with regards to offering our services, providing

12   the know your client, integrator services, trying to build

13   that technological bridge to make in-kind transfers; are you

14   familiar with those conversations?

15          MS. PATTERSON:  Objection, Your Honor.  Mr. Dunn

16   cannot testify to what Mr. Smith -- the conversations Mr.

17   Smith had.

18          MR. NEUMANN:  I was just asking if he's familiar

19   with the conversations.

20          THE COURT:  He can answer that question, that

21   limited question.

22          THE WITNESS:  I -- yes, I'm aware that, either you

23   or -- and/or your client had conversations with Nathan over

24   time post-emergence.

25   BY MR. NEUMANN:

1    Q    Okay.  When did you hire Womble Carlyle -- Womble to

2    represent you in this matter with regards to these -- this

3    analysis; when were they engaged?

4    A    They were engaged in January of last year, when I was

5    appointed as the wind-down administrator --

6    Q    Okay.

7    A    -- or plan administrator.

8    Q    Would it surprise you that Mr. Smith would not share

9    with us who counsel was with regards to having discussions;

10   would that surprise you if I told you that?

11   A    I don't -- I don't understand your question.

12   Q    Would it surprise you that Mr. Smith would not advise

13   who your counsel was and if you had counsel, with regards to

14   discussions with integrators?

15   A    I mean, I guess, without the context of when that --

16   when that conversation would have occurred and further

17   context, I can't really answer that question.

18   Q    Are you familiar with Mr. Smith stating that -- are you

19   familiar -- are you familiar with the fact that Prime Trust -

20   - sorry -- that Stretto, the claims agent, their services

21   were terminated at some point in February?

22   A    That's incorrect.

23            THE COURT:  Sorry.  Did you want to be heard?

24            MS. PATTERSON:  No.  He's already -- thank you,

25   Your Honor.  He answered the question.

1    BY MR. NEUMANN:

2    Q    Would it surprise you to know that the public could not

3    longer access Stretto, the Prime Trust docket or claims

4    filings on Stretto, in the month of February; would that

5    surprise you?

6              MS. PATTERSON:  Objection, Your Honor.  This is far

7    beyond his testimony.

8              THE COURT:  I would agree.  This is -- I'm going to

9    sustain the objection.  This is way beyond the declaration or

10   the supplemental testimony this morning.

11             MR. NEUMANN:  Okay.

12        (Pause in proceedings)

13             MR. NEUMANN:  If I may have one second, Your Honor.

14             THE COURT:  Uh-huh.

15             MR. NEUMANN:  Once again, Your Honor, reserving

16   rights, as I said before, with regards to the due process

17   considerations, I have no further questions at this time.

18             THE COURT:  Okay.  Thank you.

19             Does anyone else wish to cross-examine the witness?

20   I see someone on Zoom who has their hand raised.

21             MS. PATTERSON:  Your Honor, just for the benefit of

22   the Court, Ms. McClenaghan and Mr. Kushner did both file

23   objections, and so just so you're aware of that, Your Honor.

24             THE COURT:  Okay.

25             MS. PATTERSON:  I don't know if that's why they

1   raised --

2            THE COURT:  All right.

3            MS. PATTERSON:  -- their hand.

4            THE COURT:  Well --

5            UNIDENTIFIED:  (Indiscernible)

6            THE COURT:  It's generally the policy of this Court

7    that parties who did not get advance participation appear by

8    Zoom.  For purposes of cross-examination, I'll allow it

9    today.  But let me be clear, in the future, if it is your

10   intent to cross-examine a witness, you need to be in the

11   courtroom.  So I'll proceed, but it's -- let me just say it's

12   very difficult under the circumstances.

13           MS. PATTERSON:  Just -- Your Honor, Morgan

14   Patterson of Womble for the plan administrator.  Just one

15   point.

16           There is another individual who is muting

17   themselves.  That individual did not file an objection, so I

18   would not -- I would object that person questioning --

19           THE COURT:  Okay.

20           MS. PATTERSON:  -- Mr. Dunn.

21           THE COURT:  Well, I only see two hands raised.

22           MS. PATTERSON:  Okay.

23           THE COURT:  So Ms. McClenaghan, do you want to go

24   first?

25           MS. MCCLENAGHAN:  Sure.  Thank you.  Thank you,

1    Judge Stickles.

2            The one question I have for the plan administrator

3    is -- you know, I think one of the main, fundamental actions

4    that must have happened before we got to this point was that

5    the creditors -- right?  The creditors that you say voted on

6    this plan, how many creditors actually voted on this plan.

7    Do you know?  And I don't know, Judge, I'm not an attorney.

8    I don't know if this is --

9            THE COURT:  Is this a question for the witness?

10           MS. MCCLENAGHAN:  Yes.

11           MS. PATTERSON:  Your Honor --

12           MS. MCCLENAGHAN:  Is the --

13           MS. PATTERSON:  -- I'm going to object just because

14   this is beyond this testimony and I just don't think that

15   he's aware of that number.

16           MS. MCCLENAGHAN:  He is the plan administrator,

17   correct?

18           MS. PATTERSON:  The plan administrator -- Your

19   Honor, the plan administrator is not appointed until after

20   the confirmation.

21           THE COURT:  Yes, this is beyond the scope of his

22   declarations or his testimony on supplemental direct this

23   morning.

24           MS. MCCLENAGHAN:  Okay.  And for somebody who is

25   not familiar with that wording, can you just explain a little

1    bit about what that means?  What is a "supplemental direct"?

2                THE COURT:  His supplemental direct testimony that

3    you heard this morning, Mr. Dunn testified this morning.

4                MS. MCCLENAGHAN:  Uh-huh.

5                THE COURT:  That --

6                MS. MCCLENAGHAN:  So the --

7                THE COURT:  You heard his direct examination.

8                MS. MCCLENAGHAN:  Uh-huh.  Okay.  So this has

9    nothing to do with what is in the motion that was filed.

10               THE COURT:  The question you asked has -- is

11   unrelated to his declaration or testimony.  Counsel -- that

12   is the objection that counsel has made, and the Court has

13   found that that objection -- the Court has sustained that

14   objection.

15               MS. MCCLENAGHAN:  Okay.  Okay.  One other question.

16   In statement is that, as a creditor, I found out from

17   somebody that is not a claimant about this, also about when

18   to file a claim.  I was never notified, ever, by email, when

19   I requested multiple times.  So knowing that less than 1

20   percent of the 40,000 people, claimants objected, I'm not

21   surprised because I am curious to know how many actually were

22   notified.  Is there evidence of that?

23               MS. PATTERSON:  Objection.

24               MS. MCCLENAGHAN:  Because I was never, ever

25   notified of anything about this case, ever.

1          MS. PATTERSON:  We are certainly happy to respond

2     to respond to Ms. McClenaghan's argument that she just made

3     during the argument section.  I just don't think that it's

4     part of the testimony.  I would object to Mr. Dunn being

5     questioned about it.

6          THE COURT:  I'm going to sustain the objection.

7          As I indicated earlier, Mr. Dunn -- questioning

8     relates to Mr. Dunn's testimony or his declaration, and there

9     is nothing in either declaration or his testimony this

10    morning about that issue.  But Ms. Patterson has offered to

11    communicate with you about that issue.

12         MS. MCCLENAGHAN:  Yes, I have -- I -- they have

13    confirmed by email, saying -- with a statement that they

14    confirmed that I was notified without providing any evidence,

15    so an email stating I confirm you were notified, to me, is

16    not evidence, so for the record --

17         MS. PATTERSON:  Your Honor, again, we're happy to

18    address that during argument.  We do have the affidavits of

19    service, and we also have Stretto on the line, a

20    representative from Stretto, to provide the Court all the

21    information that you require regarding service throughout the

22    case and of this motion.

23         THE COURT:  Okay.  And so, if she has questions at

24    that time, she can raise the issue.

25         MS. PATTERSON:  Absolutely.  Thank you, Your Honor.

1      THE COURT:  Okay.  Anything further, other

2  questions for this witness?

3      MS. MCCLENAGHAN:  No, Your Honor.  Thank you.

4      THE COURT:  Okay.

5      MS. MCCLENAGHAN:  No, Your Honor.  Thank you.

6      THE COURT:  Mr. Kushner.

7      MR. KUSHNER:  Thank you.

8                  CROSS-EXAMINATION

9  BY MR. KUSHNER:

10  Q    Hey, Mr. Dunn.  How are you this morning?

11  A    Good morning.

12  Q    Can I ask you a quick question?  You went to Southern

13  Illinois, and I see you have a Bachelor of Science.  What was

14  your degree in, if you don't mind me asking?

15  A    Communications.

16  Q    Okay.  So you studied communications.  And then you have

17  your J.D., congratulations.  You're a very smart guy,

18  obviously.  But you don't have any background in finance or

19  markets.  And I notice you made a statement early on that --

20  forgive me if it's not 100 percent verbatim, but something to

21  the effect of oh, I'd rather have money now than wait 18

22  months because of present value, and I appreciate that.

23      My only problem with that comment is -- and I'm sure you

24  know this, in your infinite financial wisdom, since you

25  decided this -- is that the markets have annualized at about

1   9 percent in the past 150 years.  If you use the rule of 72,

2   which means you divide the annualized number by 72, it tells

3   you how long before you double your money, and that would be

4   8 years.

5        In the year and a half since this case has been, Bitcoin

6   has now tripled in value, tripled.  So I politely disagree

7   with you, incredibly so, and I think that is where Mr.

8   Neumann keeps harkening back to these in-kind transfers, and

9   so I wanted to make that point.

10       I wanted to also find --

11            THE COURT:  Mister --

12  Q    -- or question you on this --

13            THE COURT:  Mr. Kushner.

14  Q    -- and I want to make sure I understood you.

15            MR. KUSHNER:  Pardon me?

16            THE COURT:  Mr. Kushner, now is the time to

17  question the witness.  There will be time for --

18            MR. KUSHNER:  I --

19            THE COURT:  -- argument later.  So if -- could you

20  please --

21            MR. KUSHNER:  Sure.

22            THE COURT:  Yeah.

23            MR. KUSHNER:  Sure.  Oh --

24            THE COURT:  Okay.

25  BY MR. KUSHNER:

1    Q    So you mentioned -- you mentioned costs associated with

2    in-kind distributions, if I understood correct.  You

3    mentioned AML, KYC, OFAC, all these things.  Did I understand

4    that correctly?

5    A    I did mention those, yes.

6    Q    Did I understand correctly there was associated costs?

7    A    There are.

8    Q    Okay.  And who are you saying is the bearer of these

9    costs?

10   A    The estate.

11   Q    Okay.  So the estate has crypto sitting in Fireblocks

12   wallets.  Is that correct?

13   A    Correct.

14   Q    And they're sending these coins out to their clients,

15   who have wallets of their own, whether they're cold storage

16   devices or on an exchange, which I presume most did, as they

17   owned cryptocurrency.  Where is the KYC?  Where is the AML?

18   Where is the OFAC?  It's already sitting in the block -- in

19   the Fireblocks wallets, correct?

20   A    I don't -- I don't know if it is or it isn't or to the

21   extent that it is.

22   Q    So I thought a few minutes ago someone questioned you

23   how many Bitcoin were there, and you said 300.  They said 300

24   exactly.  You said no, I think it's 299.  So, again, I'm not

25   trying to be difficult, I'm sure you're in a weird spot.  But

1    blockchain forensics is not rocket surgery, if I can mix

2    metaphors.  You see it or you don't, that's the beautiful

3    thing about it.

4         So, again, if these coins are sitting in a Fireblocks

5    wallet, these coins can be transferred and trans -- let me

6    ask you this.  How did the 48 Bitcoin go to Wintermute?

7              MS. PATTERSON:  Your Honor, I'm going to object.

8    Q    Who sent --

9              THE COURT:  Wait a minute.

10   Q    No --

11             THE COURT:  There's an objection.

12             MS. PATTERSON:  I'm going to object because this is

13   argument and, again, there's time to have that, but that's

14   not --

15             THE COURT:  Right.

16             MS. PATTERSON:  I'm going to object to this.

17             THE COURT:  Yeah, there's no question.  So please

18   refrain from argument.  This is time for questioning --

19   BY MR. KUSHNER:

20   Q    Okay.  How did the Bitcoin --

21             THE COURT:  -- of the witness.

22   Q    Where -- how did the -- how did Wintermute get 48

23   Bitcoin?

24             MS. PATTERSON:  Objection, Your Honor.  This is

25   beyond the scope of his testimony.  We have established that

1     with respect to Mr. Neumann's questions.

2          THE COURT:  Yes.

3          MR. KUSHNER:  He -- he is clearly stating that he

4     doesn't know where they are or how they are.  I'm strictly

5     asking a very simple question.  If 48 have already been

6     released and there's 300 left, how did those 48 first get

7     released?  That's all I wanted to know.

8          MS. PATTERSON:  Objection, Your Honor.  It's not

9     part of this witness' testimony.

10         MR. KUSHNER:  Okay.  I have no more questions.

11    Thank you very much.

12         THE COURT:  Thank you.

13         Was there anyone else in the courtroom?

14        (No verbal response)

15         MS. PATTERSON:  Thank you, Your Honor.  For the

16    record, Morgan Patterson of Womble Bond Dickinson on behalf

17    of the plan administrator.

18         Your Honor, I'll be very  brief.  I just have a few

19    questions on redirect.

20                    REDIRECT EXAMINATION

21    BY MS. PATTERSON:

22    Q    Mr. Dunn, do you recall your counsel, with your

23    guidance, sending out an integrator notice in May of 2024?

24    A    I do.

25    Q    And do you recall, just generally, what the request was

1    in that integrator notice when we sent it out?

2    A    Well, generally speaking, it was asking integrators to

3    respond as to whether or not they could act for end users or

4    customers.

5    Q    And do you recall, generally, what the response was that

6    we received?

7    A    We received a few yeses, some nos, and then a lot of

8    non-responsiveness, other than that.

9    Q    And Mr. Neumann spoke a lot about the cost, I know

10   you've gotten some other questions about the costs.

11        Do you recall that the plan provides that the costs for

12   any in-kind distribution is actually going to be borne by the

13   creditors themselves?

14   A    Now that you refresh my recollection, I -- I believe

15   that's correct, yes.

16   Q    So -- and also, you testified earlier, and just to

17   remind the Court, about your discretion for making in-kind

18   distributions, you recall that the plan provides that

19   discretion for you in each scenario in which you have to make

20   a distribution.  Is that correct?

21   A    It does.

22   Q    Thank you.

23             MS. PATTERSON:  Nothing further, Your Honor.

24             THE COURT:  Okay.  You are excused.  Thank you.

25             THE WITNESS:  Thank you, Your Honor.

1    (Witness excused)

2         MS. PATTERSON:  Your Honor, Morgan Patterson for

3    the record.

4         We are -- I'm going to call Mr. Brennan for

5    supplemental direct, but I believe it may be lengthy.  So I

6    don't know if Your Honor -- we've been going for a few hours

7    -- if Your Honor wanted to take a five-minute break before I

8    launch into the next witness.

9         THE COURT:  How long do you think he's going to be?

10        MS. PATTERSON:  Well, the supplemental direct is

11   not long, but I would anticipate, based on the subject matter

12   of his testimony, that there will be some cross.

13        THE COURT:  I think you're right.  I'm debating

14   whether we should break for lunch now or start him and then

15   break for lunch.

16        MS. PATTERSON:  We are certainly at Your Honor's

17   convenience, what you would prefer to do.

18        THE COURT:  Well, let's start by taking a five-

19   minute recess.

20        MS. PATTERSON:  Okay.

21        THE COURT:  And let me think about it while we're

22   out of the room because it's a little early, but at the same

23   time --

24        MS. PATTERSON:  Absolutely --

25        THE COURT:  Okay.

1          MS. PATTERSON:  -- Your Honor.

2          THE COURT:  So let's take --

3          MS. PATTERSON:  No problem.

4          THE COURT:  Let's come back on the record a couple

5    of minutes before noon.

6          MS. PATTERSON:  Thank you, Your Honor.

7       (Recess taken at 11:51 a.m.)

8       (Proceedings resume at 12:51 p.m.)

9       (Call to order of the Court)

10         THE COURT:  Thank you for your patience.

11         MS. PATTERSON:  Thank you, Your Honor.  Morgan

12   Patterson of Womble Bond Dickinson on behalf of the plan

13   administrator, for the record.

14         Your Honor, I have shortened my proposed

15   presentation.  I don't think that we need to take too much

16   time, so that we can hopefully get this last witness in

17   before the lunch break, if that's okay with Your Honor.

18         THE COURT:  Yes, absolutely.

19         MS. PATTERSON:  Okay.  Thank you.

20         Your Honor, I believe I moved in Mr. Brennan's

21   declaration before --

22         THE COURT:  Yes.

23         MS. PATTERSON:  -- before we broke.  And so I would

24   call Mr. Brennan to the stand.

25         THE COURT:  Okay.  Again, we're continuing on the

1    broadcast policy.  Yes.

2              THE ECRO:  Due to our Court's broadcasting policy,

3    parties on Zoom that are listening by audio only will be

4    placed in Zoom waiting room during the witness testimony.

5    They will be allowed back in once the testimony has

6    concluded.  Thank you.

7              Please raise your right hand.

8     JAMES BRENNAN, WITNESS FOR THE PLAN ADMINISTRATOR, AFFIRMED

9              THE ECRO:  Please state your full name and spell

10   your last name for the record.

11             THE WITNESS:  James Brennan, B-r-e-n-n-a-n.

12             THE ECRO:  Thank you.

13             THE COURT:  Before we begin, Mr. Brennan, can you

14   make sure the microphone is close?

15             THE WITNESS:  Sure.

16             THE COURT:  And let me just say, for those who are

17   on Zoom who are not participating, you do not have to have

18   your camera on.  Okay.

19             MS. PATTERSON:  Thank you, Your Honor.  And for the

20   record, Morgan Patterson of Womble Bond Dickinson on behalf

21   of the plan administrator.

22                     DIRECT EXAMINATION

23   BY MS. PATTERSON:

24   Q    Good morning -- or good afternoon now, Mr. Brennan.

25             I know that you have -- and the Court is aware that you

1    have submitted a substantial amount of testimony regarding

2    the debtors' assets in both of your declarations.  I have

3    just one followup question for you.

4         Are you aware of whether or not Prime held IRA accounts?

5    A    No, I'm not aware.

6    Q    Do you -- were you informed that they -- certain

7    objectors contend that they have IRA accounts --

8    A    Yes.

9    Q    -- at --

10   A    Yes.

11   Q    Okay.  And have you reviewed the assets of the company

12   to determine if the IRAs that these claimants hold or claim -

13   - are alleged to hold were treated any differently than the

14   remainder of the assets of Prime?

15   A    No.  Everything was commingled.

16   Q    Thank you.

17        MS. PATTERSON:  That's all I have, Your Honor.  So

18   we would offer Mr. Brennan for cross-examination.

19        THE COURT:  Okay.  Thank you.

20        Is there anyone in the courtroom who wants to

21   cross-examine Mr. Brennan?

22        MR. NEUMANN:  Yes, Your Honor.  David Neumann.

23        THE COURT:  Okay.  Thank you.

24        I will get the folks on Zoom after Mr. Neumann.

25   Okay?

1    MR. NEUMANN:  Thank you.

2                    CROSS-EXAMINATION

3    BY MR. NEUMANN:

4    Q    Mr. Brennan, my name is David Neumann and I am from

5    Meyers Roman in Cleveland, Ohio and I represent Coinbits.

6    A    I do [sic].

7    Q    Good afternoon.

8         Would you happen to be aware that we've been asking for

9    a very, very long time, up through yesterday, how much

10   Bitcoin was held in Fireblocks?

11             MS. PATTERSON:  Objection, Your Honor.  I don't

12   believe that there's any information regarding this in Mr.

13   Brennan's testimony.

14             THE COURT:  I don't recall, so if you can point me

15   to it, Mr. Neumann.

16             MR. NEUMANN:  No.  I think there's a -- in his

17   declaration, there's a lack of distinction with regards to

18   how much of each token there is.  It's a lack of information.

19   And once again, the -- I'm just asking if he's aware that my

20   client has been asking for quite a long time just to find out

21   how much Bitcoin was being held in Fireblocks.

22             MS. PATTERSON:  Your Honor, I think I would

23   continue to object.  I think that this is -- certainly it can

24   be part of Mr. Neumann's argument regarding the sufficiency

25   of the declarations.

1          THE COURT:  I'm going to sustain that objection.

2     BY MR. NEUMANN:

3     Q    Okay.  Well, have you determined how much Bitcoin is in

4     Fireblocks?

5          MS. PATTERSON:  Your Honor, again, I -- this is not

6     part of his testimony, so I would object to this question.

7          THE COURT:  Mr. Neumann?

8          MR. NEUMANN:  His -- he's a forensic analyst.  He

9     must have taken a notation of what were the tokens, how many

10    were there, and provide some sort of accounting whether

11    there's something missing or not.

12         THE COURT:  Okay.  Go ahead.

13         MS. PATTERSON:  Your Honor, I would just respond

14    that, just because Mr. Brennan may notice something doesn't

15    mean that that's what he would testify to here.  So we did

16    not hire him to testify to the asset pool.

17         THE COURT:  I --

18         MR. NEUMANN:  So you -- so you were --

19         THE COURT:  Mister -- wait.  Wait, wait, wait.

20         MR. NEUMANN:  Sorry.

21         THE COURT:  I'm going to overrule her objection,

22    but her questioning is limited to the investigation, is how I

23    understood your response.

24         MR. NEUMANN:  That's correct, Your Honor.

25    BY MR. NEUMANN:

1    Q    Answer, please.

2    A    Could you please repeat the question?

3    Q    So did you investigate how -- the debtors records and

4    how many tokens there were in Fireblocks, each type of token?

5    Did you compare the debtors' records to the information

6    within Fireblocks to confirm whether tokens were there or not

7    there?

8    A    We conducted an investigation to try and ascertain

9    whether there was commingling of those assets.

10   Q    Okay.  So -- that's very helpful.  So the actual scope

11   of what you did was just looking at commingling?

12   A    No.

13   Q    Okay.  That was your task, to look at just commingling

14   and determine whether you could have unraveled the

15   commingling?

16   A    No.

17   Q    Okay.  Can you tell me what the scope of your analysis

18   was then?

19   A    The scope of our analysis was to understand and review

20   the data and the information that was provided to us, that

21   was available to us by the debtors, speaking with former

22   employees, and speaking with counsel.

23   Q    Did you look at previous forensic analyses that were

24   done -- analyses that were done by other folks in this case?

25   A    I didn't look at other forensic analyses by other people

1   in this case.  I need to form my own opinion based on my

2   independent review --

3   Q    Okay.

4   A    -- of what I'm finding.

5   Q    Did you analyze the claims that asserted an interest in

6   the Bitcoin?

7           MS. PATTERSON:  Objection, Your Honor.  I don't

8   believe that the testimony here before in his declarations

9   regard anything to do with the claims.  It's a review of the

10  assets.

11  BY MR. NEUMANN:

12  Q    So you're not aware of any -- let's just pick Bitcoin

13  because we heard that there was 299 Bitcoins, a lot.  So do

14  we know why that -- whether there's been any loss since the

15  petition date?

16          MS. PATTERSON:  Your Honor, I would object.  This

17  is beyond the scope of the declarations, he did not testify

18  to any of this.

19          THE COURT:  You're -- Mr. Neumann, can you point me

20  to where he testified about this?  Because I don't recall it.

21          MR. NEUMANN:  I'm so sorry, Your Honor --

22          THE COURT:  I don't recall in the declarations

23  where he testified about value of Bitcoin.

24          MR. NEUMANN:  Right.  Actually, I think I've made

25  my point, Your Honor, that he had a limited scope of looking

1    at commingling.

2              THE COURT:  Okay.  Then I'm going to sustain her

3    objection.

4              MR. NEUMANN:  Thank you.

5    BY MR. NEUMANN:

6    Q    Okay.  Can the assets of different blockchains be

7    condensed or commingled together?

8    A    The assets within certain blockchains will stay within

9    those blockchains.

10   Q    Okay.  So you're saying it -- that only, for instance,

11   BTC could be commingled with BTC; BTC can't be commingled

12   with other assets?

13   A    Correct.

14   Q    Correct.

15        Okay.  So are aware how much Ethereum is in this case?

16             MS. PATTERSON:  Objection, Your Honor.  He did not

17   testify to the number of coins and the various coins.

18             THE COURT:  Sustained.

19   BY MR. NEUMANN:

20   Q    As tokens go, isn't it a fairly manageable task to see

21   if Bitcoin can be accounted for?

22             MS. PATTERSON:  Objection, Your Honor.  I don't

23   think that he testified to this, and also, I think it's

24   irrelevant whether the task is manageable.

25             MR. NEUMANN:  Your Honor, the -- Mr. Dunn testified

1  that his major concerns are cost and timing and the fact that

2  there's no, I guess, easy regulatory way of getting in-kind

3  transfers back to customers.  So I think my --

4                 THE COURT:  Is your --

5                 MR. NEUMANN:  -- question is, is an accounting for

6  BTC, 299 BTC, it's not really -- it's a fairly manageable

7  task.

8                 THE COURT:  You just told me that Mr. Dunn

9  testified.  This is Mr. Brennan.

10                MR. NEUMANN:  I understand, Your Honor.  I'm just

11 trying -- he did investigate, he did an extensive, it sounds

12 like year --

13                THE COURT:  Well --

14                MR. NEUMANN:  -- investigation.

15                THE COURT:  Then focus your questions on the

16 investigation.

17 BY MR. NEUMANN:

18 Q    Okay.  Okay.  In your declaration in support, in

19 Paragraph 71, you state:

20                "It's impossible to identify a specific

21                cryptocurrency that was owned and transferred by a

22                specific customer to Prime once there is

23                commingling simply by looking at the blockchain.

24                The tokens are fungible, just like fiat currency,

25                and do not have identifying characteristics."

1          That's from your declaration.  Okay?

2          So is it your testimony that, if a Prime Trust account

3     holder were to send Bitcoin to a Bitcoin address that was

4     controlled by Prime Trust, that it would be impossible to

5     identify whether that person's property was Bitcoin or

6     Ethereum simply by looking at the blockchain?

7     A    You would be able to see the transfer into the specific

8     wallet address.  But at a certain point in time, Prime Trust

9     transferred and swept all of those deposited BTC into their

10    Omnibus wallets, which, at that point in time, you would no

11    longer be able to attribute a specific Bitcoin to a specific

12    customer.

13    Q    So you're saying that the blockchain would be so

14    corrupted that you could no longer trace it?

15    A    No.  The Bitcoin would be commingled with one another.

16    Q    So what you're saying then is that it could be

17    traceable, you just didn't do that, right?

18          MS. PATTERSON:  Objection, Your Honor.  I don't

19    believe that was his testimony.

20          THE COURT:  Sustained.

21          Mr. Brennan, we're having a little difficulty

22    hearing you, so --

23          THE WITNESS:  Sorry.

24          THE COURT:  -- if you could, either get closer to

25    the microphone --

1          THE WITNESS:  Gotcha.

2          THE COURT:  -- or talk a little louder.

3          THE WITNESS:  Sure.

4    BY MR. NEUMANN:

5    Q    Can I ask, in your declaration, why wasn't this

6    separation of digital assets discussed; that is, the -- an

7    analysis associated with each type of bit -- token, like an

8    analysis on Bitcoin and an analysis on Ethereum?  Why didn't

9    you do an analysis on a digital-by-digital basis?

10   A    I don't really understand the question.

11   Q    Right.  Looking at specific wallets and what they

12   contained, you didn't do that analysis.

13   A    We reviewed all of the -- all of the wallets that were

14   available to us.

15   Q    Which -- are you referring to the 98f wallets that you

16   couldn't analyze?

17   A    That was part -- that was -- that was part of what we

18   reviewed.

19   Q    Are you saying that there are other wallets that are not

20   accessible to you?

21   A    I didn't say that.

22   Q    You just didn't analyze all the wallets.

23   A    We looked at all of the wallets that were available to

24   us.

25   Q    What would make a wallet not available to you?

1    A    The inability not to be able to see it on the

2    blockchain.

3    Q    So there are wallets that you can't see on the

4    blockchain?

5    A    No.  That was my point.

6    Q    I'm sorry.  Repeat that answer.

7    A    I said that was what I said.

8    Q    Okay.  Those wallets, did they contain BTC, Bitcoin?

9         MS. PATTERSON:  Objection, Your Honor.  I don't

10   understand the question, the -- what wallet he's referring

11   to.

12        THE COURT:  Just can you clarify the question?

13   BY MR. NEUMANN:

14   Q    The wallets that you're saying are inaccessible, would

15   those contain -- that you didn't analyze, would they contain

16   BTC?

17        MS. PATTERSON:  Objection.  I don't think that he

18   said that there were wallets that were inaccessible.  He said

19   he reviewed the wallets that were available to him.

20   BY MR. NEUMANN:

21   Q    What would make a wallet not available to you would be

22   your inability to look inside it, correct?

23   A    No.  As you -- as you may know, with wallets, you need

24   to have the public address of that wallet.  And so Prime

25   Trust provided us with the -- those wallets and we were able

1    to review the wallets associated with Prime Trust.

2    Q    Okay.  So there are assets, there are tokens that are

3    not available -- there are wallets that are not available for

4    you to analyze which could contain BTC, correct?

5            MS. PATTERSON:  Your Honor, objection.  That's not

6    what he testified.  I think what he said, he's testified that

7    he reviewed everything that he was given and he doesn't know

8    what he doesn't know.  I think -- I don't think that that's

9    what -- he's not -- his mischaracterizing his testimony.

10   BY MR. NEUMANN:

11   Q    Yeah.  So your analysis is not complete, correct?

12   A    I reviewed everything that was available to us.

13   Q    And not everything was made available to you.

14           MS. PATTERSON:  Objection, Your Honor.  I don't

15   think that's what he said and I'm not sure how he's supposed

16   to know that because he reviewed what was given to him, is

17   what he's saying.  I think he's said it multiple times now,

18   Your Honor.

19           MR. NEUMANN:  Okay.  Your Honor, I'll just move on.

20   Okay?

21           THE COURT:  Okay.  Thank you.

22   BY MR. NEUMANN:

23   Q    Okay.  In your declaration, you state:

24           "I am familiar with the forensic tools and

25           methodologies used for conducting investigations

1              related to both fiat and cryptocurrency in

2              criminal, civil, bankruptcy, and regulatory

3              matters."

4         That's Paragraph 8.  Is that accurate?

5    A    Could I --

6              THE COURT:  Is there an exhibit binder for the

7    witness?

8              MS. PATTERSON:  Yes, Your Honor.

9         (Participants confer)

10             MS. PATTERSON:  Yes, sorry.

11             THE WITNESS:  So where is it, on page --

12             MS. PATTERSON:  It's Tab 7.

13             UNIDENTIFIED:  Can you just let the witness know

14   what you want him to look at?

15   BY MR. NEUMANN:

16   Q    It's Paragraph 8 of your declaration.

17   A    Yes.

18   Q    Okay.  Can you list a few of the forensic tools you are

19   familiar with?

20   A    Specifically, what sort of forensic tools are you

21   referring to?

22   A    I'm referring to your statement.  It says you're

23   familiar with the forensic tools and methodologies used for

24   conducting investigations.

25   A    I'm --

1    Q    Can you list a few of the forensic tools you're familiar

2    with.

3    A    Correct.  TRM Labs, Elliptic, Chainalysis, to name a

4    few.

5    Q    Okay.  And so is Blockchain Analysis one of those tools?

6    A    When you say "Blockchain Analysis," what are you

7    referring to?

8    Q    Analyzing blockchain, analyzing the chain, and then

9    tracing the chain for each of the 299 Bitcoins.

10   A    So those three platforms that I just referenced do

11   exactly that.

12   Q    Understood.

13        So there are several companies -- right?  That offer

14   blockchain analysis.  You mentioned Elliptic.  Did you use

15   Elliptic?

16   A    We utilized TRM Labs, and I believe we also used

17   Elliptic.

18   Q    Did you use CipherTrace?

19   A    I didn't use CipherTrace.

20   Q    Okay.  And do you have the results from your analysis

21   for TRM Labs and Elliptic to support your analyses in your

22   declarations?  Do you have that, the results from those

23   tools, from that analysis; do you have a report?

24        MS. PATTERSON:  Objection, Your Honor.  His

25   declaration did not attach those reports, so I would say this

1   is not an appropriate line of questioning.  It's outside the

2   scope of the testimony.

3           THE COURT:  Mr. Neumann, do you want to respond?

4           MR. NEUMANN:  The fact that he left off the detail

5   goes to the --

6           THE COURT:  Okay.

7           MR. NEUMANN:  -- deficiencies --

8           THE COURT:  Okay.

9           MR. NEUMANN:  -- of the declaration, Your Honor.

10          THE COURT:  This is your argument, not -- okay.

11          MR. NEUMANN:  Understood, Your Honor.  Thank you.

12          THE COURT:  Okay.

13  BY MR. NEUMANN:

14  Q    In Paragraph 84 -- okay?  Of the distribution motion, it

15  states:

16          "Even though Bitcoin employs the unspent

17          transaction output model" --

18      That UTXO.

19          "-- which allows for identification of certain

20          Bitcoin involved in a transaction, the

21          practicalities of how UTXOs are created, coupled

22          with, among other things, the volume of Bitcoin at

23          Prime renders it impossible to trace specific

24          Bitcoin currently held by Prime to any specific

25          Bitcoin that a specific customer had transferred to

1          Prime."

2               MS. PATTERSON:  Objection.  Is that -- are you

3     referring to Paragraph 84 of his declaration?

4               MR. NEUMANN:  Of your distribution motion.

5               MS. PATTERSON:  That's outside the scope of his

6     testimony.

7               MR. NEUMANN:  It presumes that there's an analysis

8     of the volume of Bitcoin.  Well, if it didn't come from Mr.

9     Brennan, who would it come from?

10              MS. PATTERSON:  Objection, Your Honor.  I don't

11    know -- I don't know what -- exactly what's being asked, if

12    he's asking me or the witness.  We would -- I would object to

13    that question.

14              MR. NEUMANN:  Your Honor, I'm just trying to find

15    out --

16              THE COURT:  Maybe you should rephrase the question.

17              MR. NEUMANN:  Okay.

18    BY MR. NEUMANN:

19    Q    You didn't review the volume -- you didn't review the

20    volume of Bitcoin, correct?  How much Bitcoin there was.

21              MS. PATTERSON:  Objection, Your Honor.  I don't

22    know that we are saying that he didn't do that, it's just not

23    part of his testimony, so it's outside the scope of the

24    testimony on direct, the volume of various types of coins.

25              THE COURT:  Mr. Brennan?  I mean Mr. Neumann.  I'm

1    sorry.

2              MR. NEUMANN:  Yeah.  I'm just reading from the

3    distribution motion, which is based on the declaration of Mr.

4    Brennan, so I can only go by what I'm looking at.  I assume

5    that the conclusions that are in Paragraph 84 -- right?  It

6    seems to imply that there are things which are not

7    identifiable on --

8              THE COURT:  Why -- I'm sorry.  Mr. Neumann, why

9    don't you ask questions that -- the questions you have,

10   instead of making argument, asking --

11             MR. NEUMANN:  Understood, Your Honor.  Thank you.

12             THE COURT:  Thank you.

13   BY MR. NEUMANN:

14   Q    Okay.  As a blockchain expert, you know that every

15   Bitcoin transaction is made of inputs and outputs, correct?

16   A    Yes.

17   Q    Okay.  And these inputs and outputs consist of an amount

18   and an address, correct?

19   A    Yes.

20   Q    Okay.  So, in the case of inputs, the address tells you

21   where the Bitcoin came from in the immediately preceding

22   transaction, correct?

23   A    Yes.

24   Q    Okay.  So, in the case of outputs, the address tells you

25   where the Bitcoin went after the transaction was complete,

1    correct?

2    A    Correct.

3    Q    Okay.  Would you consider the inputs and outputs to a

4    Bitcoin transaction to be an identifying characteristic?

5    A    Yes.

6    Q    Okay.  And why?

7    A    Because you can see where it's coming from and where

8    it's going to.

9    Q    All right.  But you didn't do that analysis, did you?

10         MS. PATTERSON:  Objection, Your Honor.  I don't

11   understand that question, so I think if we could just ask Mr.

12   Neumann to clarify what "analysis" he's referring to.

13   BY MR. NEUMANN:

14   Q    A blockchain analysis, you didn't conduct a blockchain

15   analysis.

16   A    I'm sorry.  Could you be more specific, as far as what a

17   "blockchain analysis" is?

18   Q    Yeah.  Looking at the inputs and outputs and the various

19   addresses to trace BTC.

20   A    I looked at the various inputs and outputs of wallet

21   addresses.

22   Q    And you couldn't identify characteristics that would

23   lead to traceability of those -- of the transfers of those

24   Bitcoins or it was just too expensive or too cumbersome?

25   A    In my analysis, I was able to track various transfers to

1    and from wallet addresses.  Unfortunately, at a certain point

2    in time, there is a commingling of multiple transfers; and,

3    at that point in time, with that commingling, the Bitcoin is

4    unidentifiable or attributable to a specific entity,

5    customer, what have you.

6    Q    And you did that analysis for BTC?

7    A    Correct.

8    Q    So all the BTC -- all the BTC, I assume, that 299 BTC,

9    you did that analysis on those?

10           MS. PATTERSON:  Objection, Your Honor.  I'm not

11   sure I understand the question.  What "analysis" is he

12   referring to.

13   BY MR. NEUMANN:

14   Q    The blockchain analysis.

15   A    Please define "blockchain analysis."

16   Q    By looking at the inputs and outputs, the addresses, and

17   looking for the identifying characteristics.

18           MS. PATTERSON:  Objection, Your Honor.  He's

19   already testified to this.

20           MR. NEUMANN:  Okay.

21           MS. PATTERSON:  He -- this is the exact same line

22   of questioning we just did.

23   BY MR. NEUMANN:

24   Q    What are the practicalities of how UTXOs are created?

25   A    I don't understand the question.

1    Q    Okay.  I -- let me ask you this.  How does the volume of

2    Bitcoin transactions affect its traceability?  That is, the

3    number of coins and the number of transactions.  More

4    transactions, does it make it more difficult to trace?

5    A    I don't know if the amount of transactions or the volume

6    has any relationship to the tracing of it.

7    Q    So the concern that you had in your declaration with

8    regards to the time and the expense associated with looking

9    at the overall volume of transactions, really, that's not an

10   obstacle; the volume of transactions is not an obstacle to

11   your analysis, correct?

12            MS. PATTERSON:  Objection, Your Honor.  I believe

13   that that is not something that he testified to, that there

14   was time and expense involved in the analysis.  If Mr.

15   Neumann can point me to that --

16            MR. NEUMANN:  Your Honor, it's --

17            MS. PATTERSON:  -- I don't follow.

18            MR. NEUMANN:  It's the -- the references are that

19   it's -- these are inextricably commingled and combined.  The

20   testimony of Mr. Dunn was that it was very expensive to go

21   and unwind this, to do the analysis based on the volume of

22   transactions.  So I'm just trying to clarify that with the

23   expert, Mr. Brennan.

24            MS. PATTERSON:  Your Honor, I would object.  First,

25   I don't think that that's what Mr. Dunn testified.  And two,

1    this is beyond what Mr. Brennan has testified to.

2              THE COURT:  Yeah.  Please keep the questioning to

3    Mr. Brennan's declarations and Mr. Brennan's supplemental

4    testimony.

5              MR. NEUMANN:  Uh-huh.

6              THE COURT:  Thank you.

7    BY MR. NEUMANN:

8    Q    You're aware of the 48 coins, BTC coins, that left the

9    estates sometime in September; you're aware of that

10   transaction?

11             MS. PATTERSON:  Objection, Your Honor.  That was

12   not in part of his direct testimony regarding the -- that

13   transactions he's referring to.

14   BY MR. NEUMANN:

15   Q    If there's Bitcoin that left the estate, wouldn't it

16   make it more difficult to trace the remaining Bitcoin; that,

17   if there's Bitcoin that has left the estate, if a creditor

18   wanted to trace its own specific Bitcoin through looking at

19   input, outputs, and addresses, the fact that there's some

20   Bitcoin that left the estate, wouldn't that get in the way of

21   that analysis?

22             MS. PATTERSON:  Objection, Your Honor.  I think

23   this is beyond what Mr. Brennan testified to.

24             MR. NEUMANN:  I think it's well within the scope of

25   his analysis with regards to where the -- the generalizations

1    associated with his analysis.  I guess I'm trying to point

2    out there's a lot of specifics that are missing, Your Honor.

3    If that's argument, then you can sustain the --

4              THE COURT:  Well --

5              MR. NEUMANN:  -- objection.

6              THE COURT:  -- you can -- you -- I'm going to

7    actually overrule that objection.

8              MR. NEUMANN:  Okay.

9              THE WITNESS:  Sorry.  I don't know what your

10   question was.

11             MR. NEUMANN:  Can you read that question back?  I'm

12   so sorry.

13             THE COURT:  Can -- it's being recorded.  So I had

14   in my notes if 48 Bitcoins left -- you didn't say 48.  You

15   said if Bitcoins left the estate, does it make the analysis

16   more difficult.

17             MR. NEUMANN:  That's correct.

18             THE WITNESS:  What "analysis" are you referring to?

19   BY MR. NEUMANN:

20   Q    The looking at input -- inputs and outputs and addresses

21   to trace and track specific Bitcoin, to look at the

22   blockchain and analyze where it came from and where it went,

23   so that it -- that a customer could say yeah, that's my

24   Bitcoin, or no, my Bitcoin is gone.

25   A    I don't know if the incoming or leaving of Bitcoin into

1    the estate has any relevance to my analysis or the -- or the

2    -- the ability to try and understand what was going on.

3    Q    Right.  And isn't that because your analysis is just a

4    generalization?  Isn't it?

5                MS. PATTERSON:  Objection, Your Honor.  I think

6    that's argument, I think that's not a question for the

7    witness.

8                THE COURT:  I'm going to sustain.

9                MR. NEUMANN:  If I can check with my client for one

10   second?

11       (Pause in proceedings)

12               MR. NEUMANN:  Once again, Your Honor, reserving my

13   rights with regards to the due process considerations that I

14   expressed in the very beginning of this hearing, I have no

15   further questions for this witness.

16               THE COURT:  Okay.  Thank you.

17               Anyone else in the courtroom?

18       (No verbal response)

19               THE COURT:  Okay.  Ms. McClenaghan?

20               MS. MCCLENAGHAN:  Yes.  Thank you.  Thank you, Your

21   Honor.

22               You know, now that I know a little bit about how

23   this works, I'm looking at Mr. Brennan's supplemental

24   declaration.  One of the first questions that was asked was

25   regarding whether he was aware of -- and I don't know the

1    exact wording -- whether he was aware of, you know, any IRA

2    holdings, for lack of a better -- better word, and his

3    answer, I believe, was no.

4                        CROSS-EXAMINATION

5    BY MS. MCCLENAGHAN:

6    Q    Is that still your testimony, Mr. Brennan?

7    A    I'm aware that certain individuals had inquired about

8    IRA holdings, but I wasn't aware of any of that.

9              THE COURT:  I'm sorry, Mr. Brennan.  I couldn't

10   hear you.

11             THE WITNESS:  Oh, sorry.

12             I was aware that certain claimants had inquired

13   about IRA holdings.

14   BY MS. MCCLENAGHAN:

15   Q    Okay.  And I would like to point to Docket Number 969,

16   the definition of the "debtors," which you can read as the

17   first subscript.  It includes Prime Core Technologies, LLC,

18   Prime Trust, LLC, Prime IRA, LLC, and Prime Digital, LLC.

19        So my question is:  What did you think Prime IRA, LLC

20   was?

21             MS. PATTERSON:  Objection, Your Honor.  We -- I

22   don't think the footnote in the caption is part of Mr.

23   Brennan's testimony.  But the debtor -- I mean the plan

24   administrator will certainly stipulate that one of the

25   debtors is called Prime IRA, LLC.  We agree that it's in the

1    footnote.

2              THE COURT:  Okay.

3              MS. MCCLENAGHAN:  But Mr. Brennan wasn't aware of

4    the debtor as a whole, or he wasn't -- or he didn't connect

5    that Prime IRA meant that there were people that had IRAs --

6              MS. PATTERSON:  Your Honor, I --

7              MS. MCCLENAGHAN:  -- that's what was in --

8              MS. PATTERSON:  Yeah, objection.  I think that he's

9    already said in his testimony that he wasn't aware that there

10   were IRAs.

11             MS. MCCLENAGHAN:  Okay.  And the next question that

12   I have in reading this declaration, which I was objected to

13   before, and over the break, I did look, and my question was

14   part of the declaration of Mr. Dunn.  It is also part of the

15   declaration of Mr. Brennan, so I don't appreciate that

16   previous objection.

17   BY MS. MCCLENAGHAN:

18   Q    Mr. Brennan, part of your declaration on -- bear with

19   me.

20        (Pause in proceedings)

21             MS. MCCLENAGHAN:  Bear with me one moment, please.

22             THE COURT:  Take your time.

23             MS. MCCLENAGHAN:  Thank you.

24        (Pause in proceedings)

25   BY MS. MCCLENAGHAN:

1          MS. MCCLENAGHAN:  Okay.  So Doc. 768.  So is doc

2     seven six -- or Doc. 968, is that part of this, Judge?  Oh,

3     wait, that is David Dunn's, and Doc. 969 is Mr. Brennan's.

4     So, for the record, 968, where I was objected, Number 4 of

5     that declaration does talk about, you know, notifying the

6     claimants.  And Doc. 969, I thought that did, as well.  Let

7     me look again.  Let me see.  I'm looking at the affidavit of

8     service that was referenced in the declaration, talking about

9     notification to the claimants.

10    BY MS. MCCLENAGHAN:

11    Q    Mr. Brennan, are you -- you know, do you testify that

12    the claimants, you know, as Stretto being the -- you know,

13    the agent that notifies the claimant?  Do you have the

14    affidavit that, you know, over, I think, forty some thousand

15    confidential claimants were notified?  Is that your testimony

16    that you agreed with that affidavit?

17         THE COURT:  What -- I'm sorry.  I don't understand

18    what affidavit you're referring to.

19         MS. MCCLENAGHAN:  The affidavit is Doc. 980,

20    affidavit of service.

21         THE COURT:  Bear with me, please.

22         MS. MCCLENAGHAN:  Sure.

23         MS. PATTERSON:  Your Honor, I don't believe that

24    this is referred to in Mr. Brennan's declarations.  This is

25    not part of what he is testifying in support of the motion

1    about the affidavit of service.  I believe what she's

2    referring to is in Mr. Dunn's declaration, and that was

3    speaking just solely to the motion and not all the other

4    pleadings in the bankruptcy case that Ms. McClenaghan was

5    arguing about earlier.

6              THE COURT:  But what is Document 980?

7              MS. PATTERSON:  I believe it's the -- I -- well,

8    off the top of my head, Your Honor --

9              MS. MCCLENAGHAN:  It's the affidavit of service

10   that Andrew K. Fitzpatrick deposed, and it says in there

11   that, you know, under -- under --

12             MS. PATTERSON:  Yes, Your Honor.  That is --

13             MS. MCCLENAGHAN:  -- under penalty of perjury, that

14   over 40,000 claimants were notified via electronic email or

15   physical email, and then there's also exhibits of, you know,

16   I guess integrators that were non-confidential that were

17   notified.

18             MS. PATTERSON:  Your Honor, 980 is the affidavit of

19   service for our reply, which was, I will tell the Court, not

20   served on 46,000 people, so -- but we're certainly happy, as

21   I said, to address service issues with the Court and during

22   Ms. McClenaghan's argument.

23             THE COURT:  Okay.  Well, are you putting on a

24   witness with respect to service?

25             MS. PATTERSON:  Your Honor, if she -- is Ms.

1    McClenaghan is objecting to service, we do have a Stretto

2    representative on the Zoom, which we are happy to put on if

3    Your Honor would like us to do so.

4              THE COURT:  Okay.  Do you understand that that

5    affidavit of service relates to the reply that the debtor

6    filed and it's not part of Mr. Brennan's declaration or

7    supplemental declaration?

8              MS. MCCLENAGHAN:  There -- I mean, there was a

9    reference -- I thought I saw -- there's so many documents.  I

10   thought I saw -- and I have a couple open here, but I thought

11   that I saw, in the declaration, as there is -- that it is

12   stated in Mr. Dunn's declaration, the same thing.  Maybe

13   there was -- and that's what I was looking for.

14             So if it specifically stated in the declaration

15   that Mr. Brennan or Mr. Dunn will testify, you know, under --

16   you know, and not perjure, and it lists Number 1 through X,

17   does that mean that I can ask a question on 1 through X?

18   That would seem to be part of the declaration that --

19             THE COURT:  Is it part of Mr. Brennan's

20   declaration, ma'am?

21             MS. MCCLENAGHAN:  That's what I'm looking for.

22             THE COURT:  Okay.

23             MS. MCCLENAGHAN:  And the declaration is --

24             THE COURT:  Would you like -- I'm going to take a

25   five-minute break, so you can look at the declaration --

1          MS. MCCLENAGHAN:  Okay.

2          THE COURT:  -- of Mr. Brennan and see where that

3    is.  Okay?  And then we'll resume cross-examination.

4          And in that five minutes, Mr. Brennan, please do

5    not speak to anyone regarding your testimony?

6          MS. MCCLENAGHAN:  Yeah.

7          THE COURT:  Okay?  SO we're going to resume at

8    12:45.

9          (Recess taken at 12:40 p.m.)

10         (Proceedings resume at 12:46 p.m.)

11         (Witness resumes stand)

12         THE COURT:  Please be seated.

13         Okay.  Are we ready to resume?  Okay.

14         MS. MCCLENAGHAN:  Yes, Your Honor.

15         THE COURT:  Okay.

16         MS. MCCLENAGHAN:  Would -- would somebody be able

17   to tell me what that doc number is for Mr. Brennan's

18   declaration?  And is there a declaration and then a

19   supplemental declaration?  Just for my clarification.

20         THE COURT:  The sup --

21         MS. MCCLENAGHAN:  I see a supplemental declaration.

22         THE COURT:  The supplemental declaration is Docket

23   969; the original declaration is --

24         MS. MCCLENAGHAN:  921?

25         THE COURT:  922.

1          MS. MCCLENAGHAN:  (Indiscernible)

2          THE COURT:  922.

3          MS. MCCLENAGHAN:  922.  And is that sealed?

4          THE COURT:  922 is not a sealed document.

5          MS. MCCLENAGHAN:  Okay.  I think I tried to access

6    921, which was sealed.

7          MS. PATTERSON:  Your Honor, the redacted version is

8    922.

9          THE COURT:  922.

10          MS. PATTERSON:  That's correct, yes.

11          THE COURT:  Which is publicly available.

12          MS. PATTERSON:  It is.  Yes, it is.

13          MS. MCCLENAGHAN:  Okay.  Okay.  I -- you know, I

14   don't want to take up any more of the Court's time, so I will

15   -- you know, I will look at this.  But it was part of Mr.

16   Dunn's and I was objected, for the record, again.

17          THE COURT:  Okay.  Well, you -- Ms. Patterson,

18   would you like to be heard?

19          MS. PATTERSON:  Yes, Your Honor.  Two things:

20          I believe that the objection was to the argument of

21   -- regarding service, and also that Mr. Dunn's declaration

22   specifically had to do with service of the motion and not the

23   other documents that Ms. McClenaghan was talking about.

24          That being said, after Mr. Brennan has concluded, I

25   will move the affidavits of service that Ms. McClenaghan has

1   concerns about into evidence and then call the Stretto

2   witness, if that is okay with Your Honor.  And then Ms.

3   McClenaghan certainly can ask questions of that witness --

4           THE COURT:  Okay.

5           MS. PATTERSON:  -- who assisted us with the

6   service.

7           THE COURT:  Does that -- do you understand what the

8   -- what she has offered?  She is going to allow you --

9           MS. MCCLENAGHAN:  I --

10          THE COURT:  -- to question the entity that actually

11  effectuated service in this case.

12          MS. MCCLENAGHAN:  I do understand that and I  --

13  again, for the record, part of the sup -- part of the

14  declaration Mr. Brennan did list, as I believe Number 4, on

15  certain dates, that the claimants were notified.  And my

16  understanding is that I can ask questions related to what is

17  in the declaration.

18          THE COURT:  You are speaking about Mr. Dunn,

19  correct?

20          MS. MCCLENAGHAN:  Yes.  Yes, Your Honor.  So I

21  will, you know --

22          THE COURT:  Well, I want to clarify the record on

23  this.  You said Paragraph 4?

24          MS. MCCLENAGHAN:  Doc. 168, Number 4:

25          "On January 15th and 16th, 2025, Stretto, the

1                    claims and noticing agent appointed in these

2                    Chapter 11 cases, served the estate property

3                    determination notice and distribution notice and

4                    supporting declaration, Docket Numbers 918, 919,

5                    920, and 922, by either first class mail or

6                    electronic service for" -- "on 46,097 creditors or

7                    parties requesting notice of service in these

8                    Chapter 11 cases."

9                    THE COURT:  Okay.  And --

10              MS. MCCLENAGHAN:  Then it refers to the affidavit,

11     which then has "confidential."  So there's no way to know

12     whether they actually sent notifications to these 46,000

13     people.  And I did request --

14              THE COURT:  Okay.

15              MS. MCCLENAGHAN:  -- during the last -- yeah, so

16     that's --

17              THE COURT:  So I understand your objection.  Now

18     I'm going to hear from the debtor -- or the plan

19     administrator.

20              MS. PATTERSON:  Thank you, Your Honor.  For the

21     record, Morgan Patterson of Womble Bond Dickinson on behalf

22     of the plan administrator.

23              So, with respect to Mr. Dunn's declaration, I do

24     agree that we referenced the service of the determination

25     notice and distribution motion.  During Ms. McClenaghan's

1    questioning, I believe she was referring to other documents

2    in the case, bar date, effective date, things like that, that

3    she has previously told us she did not think she was served

4    with.  And also, Your Honor, my objection was that it was

5    argument.

6         But all that being said, I will call the claims

7    agent witness after Mr. Brennan has concluded and move the

8    affidavits of service into evidence, and then Ms. McClenaghan

9    can certainly question the claims agent representative about

10   the service.

11        She is correct that we do list "confidential

12   customer" on them to not reveal the names of thousands of

13   customers, but the representative from Stretto will be able

14   to definitively tell the Court who was served, including Ms.

15   McClenaghan.

16        THE COURT:  Okay.  And that is consistent with the

17   Court's prior ruling, in the sense that argument was being

18   made that you had not received service.  So, in order for you

19   to question specifically about service and what you may or

20   may not have received, after this witness is concluded, there

21   will be a witness that will allow you to pursue that line of

22   questioning.

23        MS. MCCLENAGHAN:  Thank you, Your Honor.

24        And I was objected so I actually couldn't actually

25   ask any further questions related to that, so the -- your

1   assumption, Ms. Morgan, ends with your objection, so you

2   didn't give me a chance to speak, for the record.

3           THE COURT:  Okay.  Well --

4           MS. MCCLENAGHAN:  Previously.

5           THE COURT:  Okay.  Do you have further questions

6   right now with respect to Mr. Brennan?

7           MS. MCCLENAGHAN:  No, I do not, Your Honor.

8           THE COURT:  Okay.  All right.  We're going to -- we

9   understand your rights to reserve -- is reserved to question

10  the claims agent regarding service with respect to

11  documentation.

12          So I'll move on to Mr. Kushner.

13          MR. KUSHNER:  Thank you, Your Honor.  I appreciate

14  it.

15                      CROSS-EXAMINATION

16  BY MR. KUSHNER:

17  Q    Mr. Brennan, good afternoon.  Quick -- I just wanted to

18  --

19  A    Good afternoon.

20  Q    Thank you very much.  I appreciate it.

21       So you did all of the forensic work for the crypto, it

22  sounds like, your firm.  When you got to the case, for lack

23  of better words, was the sweeping in the Bitcoin in the

24  commingled account, had that already occurred?

25  A    Could you be more specific as to the sweeping, as far

1  as, you know, what dates or -- or times or --

2  Q    So it's real easy.  But before Prime Trust swept all of

3  the Bitcoin into one commingled account, it was in each and

4  every individual account owner.  So I'm asking:  When you got

5  to the case, was it already in a commingled account under

6  Prime Trust's control or was it under each and every person

7  that owned Bitcoin?

8         MS. PATTERSON:  Objection, Your Honor.  I don't

9  believe that there's testimony that it was ever held under

10  each individual account.  It was never held that way, Your

11  Honor, so I don't believe that's the testimony.

12         MR. KUSHNER:  Well, then can I ask a question?

13  Then how do you sweep it because --

14         THE COURT:  I'm sorry, Mr. Kushner.  You got cut

15  off.  Ask your question.

16         MR. KUSHNER:  Sure.  I was asking -- so Ms.

17  Patterson's contention was it was never held in individual.

18  So I'm asking, if that's not the case, then how could it

19  possibly been swept.  An omnibus account is nothing more than

20  an aggregation of all clients into one account, as opposed to

21  segregated and separate accounts.  She's saying it was never

22  segregated and separate; thus, it means it has to always have

23  been in an omnibus account.  Is that accurate?

24         THE COURT:  Well, let's let the witness answer the

25  question.

1          MS. PATTERSON:  Yeah, gotcha.  Yes.

2          MR. KUSHNER:  Okay.

3          THE WITNESS:  Could you repeat the question and

4    just slow down?  Sorry.

5          MR. KUSHNER:  Sure.

6    BY MR. KUSHNER:

7    Q    So we understand what an omnibus account is, correct?

8    It's the aggregation of all clients into one account.  Do we

9    agree with that?

10   A    Yes.

11   Q    Okay.  So the opposite, the antithesis, would be

12   segregated accounts, Sally has an account, Fred has an

13   account, Mary has an account, so forth and so on, correct?

14   A    Correct.

15   Q    Okay.  All I'm asking is:  When you showed up to this

16   case, was -- was the Bitcoin specifically, was it already in

17   an omnibus account?

18   A    Could you be more specific, though, as far as like when

19   I came onto this case, like as -- do you have like specific

20   dates and time or --

21   Q    You did forensic block -- you did forensic blockchain

22   analysis, you identified the Bitcoin.

23   A    Uh-huh.

24   Q    And I'm asking, when you identified them, were they in

25   one wallet or were they in several wallets?  Maybe that's

1    easier to address.

2    A    The Bitcoin that I reviewed would have been in the

3    Omnibus wallets.

4    Q    Well, ah-hah.  Okay.  So what -- so, when you found that

5    one -- because the whole contention through the case that I'm

6    hearing is it's helplessly -- you know, nobody can track who

7    owns what.

8         Did you happen to ask the people at Prime Trust do you

9    have a ledger of who owns what?

10   A    We interviewed many people at Prime Trust.  And one of

11   the issues that we've uncovered was that the internal ledgers

12   were corrupt, and so we wouldn't be able to rely upon those

13   internal ledgers because of the corruption, because of the

14   fraud, because of what went on in Prime Trust.

15   Q    And how was this corruption ascertained?  Like how did

16   you validate or refute that?

17   A    We interviewed employees and we also, not only just

18   trusted what they had to say, but we verified exactly, you

19   know, what they did.  So we reviewed the -- the blockchain,

20   we reviewed the customer fiat accounts and how those monies

21   were used to purchase cryptocurrencies --

22   Q    Okay.

23   A    -- for customers that were no longer in those accessible

24   to the company.

25   Q    So was there any point in time that someone said look,

1    we obviously have this ledger, although, quote, it might be

2    "corrupted," let's take that ledger and try and cross-

3    reference it versus the omnibus account and see if we can

4    figure out actually who owns what?  So was that ever done?

5    A     Again, I think one of -- one of the issues that we

6    encountered because of the fraudulent nature of this case, it

7    was impossible to understand exactly where the -- all of the

8    fraud would have occurred and all of the inappropriate or

9    fraudulent entries would have been made.  And so what we

10   relied upon was blockchain information for the crypto pieces

11   of this, as well as bank statements for the fiat side of

12   this.

13   Q     So what I'm referring to -- and now I'll be real

14   specific -- this has zero to do with blockchain, what I'm

15   asking you, really.  Where I'm going is, again, I was a

16   client, I had an exchange, there was a client.  And that's

17   not why I'm calling, I'm calling personally.  But my point is

18   we knew exactly which client owned what.  And clearly, Prime

19   Trust had a ledger.  Forget about the crypto.  I'm just

20   saying this ledger is going to tell Sally owns one Bitcoin,

21   Fred owns half a Bitcoin, so forth and so on.  Did you ever

22   get your hands on that ledger?

23   A     We have the ledger.  But as I mentioned earlier, the

24   ledger was fraudulently manipulated, and so we can't rely

25   upon that ledger, and that's why we rely on the blockchain

1   records, as well as the bank statements.

2   Q    Okay.  So, if, quote, a "claimant," if a creditor showed

3   you a blockchain wallet address, you could, obviously, track

4   that and say yes, this is -- this should be for them.

5   A    No.

6   Q    No.  Why?  And why is that?

7   A    Because there could possibly be other assets related to

8   other customers, as well as Prime Trust, within that

9   particular wallet.

10  Q    I'm not sure what that means.  Could you simplify that

11  for me, please?

12  A    So, stated differently, simply tracing assets into a

13  wallet doesn't necessarily define who or where it belongs to,

14  especially when there are spends in addition to that.  And

15  so, when there is a spend, they get combined and condensed

16  into a single UTXO with the change going back to a specific

17  wallet; and, therefore, it's unable to actually trace any of

18  those assets.

19  Q    Uh-huh.  Okay.  All right.

20       MR. KUSHNER:  And I guess -- Your Honor, did you

21  say the IRA component of this is not really salient to this

22  part of the discussion?

23       THE COURT:  No, I didn't say that.

24       MR. KUSHNER:  Okay.  Okay.  Thank you for

25  clarifying.

1    BY MR. KUSHNER:

2    Q    So, real quick, as Mrs. McClenaghan mentioned about the

3    IRA was -- the IRA accounts were at least a part of the

4    documentation, that was never -- because I believe Ms.

5    Patterson had said some type of comment about, quote,

6    "alleged" IRA accounts, where I personally have proof and a

7    twenty-four-page custody documentation.

8         But when you saw that hey, there's IRA accounts here,

9    was it ever thought of maybe we should look into or research

10   into this, or are they -- do they say that wasn't there, or

11   did you not even go any further?

12              MS. PATTERSON:  Your Honor, objection.  I think

13   what I was referring to was that, you know, the debtor names,

14   we agreed that the debtor had a name IRA.  I think the

15   question to the witness was were you aware, in your work of

16   reviewing the crypto and the fiat, that there was IRAs.  And

17   through that work, I think he testified that he did not know

18   that, he did not know that there were IRAs.  And so I think -

19   -

20              MR. KUSHNER:  But the point is --

21              MS. PATTERSON:  -- (indiscernible) is

22   mischaracterizing.

23              THE COURT:  So you can re-ask the question, Mr.

24   Kushner.

25              MR. KUSHNER:  Sure.

1   BY MR. KUSHNER:

2   Q    Did, at any time, you know anything about potential IRA

3   accounts holding crypto at Prime Trust?  Did you ever hear

4   about it?

5   A    I'm not aware of IRA accounts holding crypto until

6   recently.

7   Q    And were you the lead, head investigator of all of this?

8   A    I had myself and I had a staff and a team that helped

9   me.

10  Q    Okay.  So I'll try and ask another question and we'll

11  see if I get shot down.

12      When you saw the Prime Trust IRA, just the verbiage of

13  that, was there any inquisition into hey, what is this?

14  A    No, because there was no evidence that there was actual

15  IRA-like account held at Prime Trust because all of the

16  assets were commingled.

17  Q    So -- okay.  Well, I will furnish and be happy to

18  provide evidence.

19      But whether Bitcoin is held in, quote, an "IRA account"

20  or held in a commingled account, as an attorney said earlier,

21  it's still fungible, it doesn't really matter; it's really a

22  matter of a ledger.

23      But anyways, that is it, and I thank you for your time.

24  A    Thank you.

25           THE COURT:  Okay.  Thank you.

1              Is there anyone else?

2              MS. PATTERSON:  Thank you, Your Honor.

3              THE COURT:  Okay.  I'm looking at my notes.  Can

4    you bear with me a second because this -- I have a question.

5    I'm not sure I understand your testimony.

6              THE WITNESS:  Sure.

7                        EXAMINATION

8    BY THE COURT:

9    Q    You mentioned tracking inputs and outputs to trace

10   specific Bitcoin from one point in the chain to another

11   point.  And I don't want to put words in your mouth, so, if I

12   misunderstood it, you can tell me I did.

13        What is the -- what is different about the Omnibus

14   wallet that makes tracking each individual chain of the

15   transaction for each specific Bitcoin different?

16   A    So, with Bitcoin specifically, most of the customers,

17   when they deposited or transferred Bitcoin into the Prime

18   Trust ecosystem, they sent it to one of their unique wallet

19   addresses, right?

20   Q    Uh-huh.

21   A    And then, from there, there would have been a sweeping

22   mechanism that would have occurred.  And based on our

23   analysis and work, we're still trying to understand better

24   the cadence of how those sweeps worked.

25        But we did see and understand better that, when there

1    were actual additional transfers made, that there would be a

2    sweep of all of the available Bitcoin that, either,

3    potentially, would have gone out to another customer, or that

4    would have come into Prime Trust.

5         And so when that would have occurred, all of those --

6    those -- those funds would then come into the Prime Trust

7    Omnibus wallet, which would have commingled and collapsed all

8    of those, which you wouldn't be able to identify them

9    anymore.

10        Additionally, there would be fees associated with that

11   on the -- on the -- on the network.

12   Q    Uh-huh.

13   A    And so those fees would have been paid and taken out of

14   those specific transactions.

15   Q    Okay.  Thank you.

16   A    You're welcome.

17            MR. NEUMANN:  Your Honor, just a followup on your

18   question, his answer.  May I?

19            THE COURT:  Yes.  But --

20            MR. NEUMANN:  Very briefly, a question.

21            THE COURT:  Yeah, I was going to say and they

22   haven't had an opportunity to redirect.

23            MR. NEUMANN:  Oh, okay.  Then I can wait.

24            MS. PATTERSON:  Your Honor, I have no redirect.

25   Thank you.

1          MR. NEUMANN:  I think, from the --

2          THE COURT:  You may.  You're reserving --

3          MS. PATTERSON:  That's true.  I don't right now.

4          But Your Honor, I'm not sure I understand.  Is this

5     further cross-examination?

6          THE COURT:  Yeah, I --

7        (Participants confer)

8          MR. NEUMANN:  It's a clarification on what was --

9          MS. PATTERSON:  Oh --

10          MR. NEUMANN:  -- just asked --

11          THE COURT:  Okay.

12          MR. NEUMANN:  -- and what he just said.  Your

13     Honor, it's, I mean, just to clarify.

14                    FURTHER CROSS-EXAMINATION

15     BY MR. NEUMANN:

16     Q    So your investigation is still ongoing, correct?

17     A    It --

18     Q    You haven't completed your investigation and it's still

19     ongoing?

20     A    If we learn new information, based on our analysis, we

21     will continue to conduct analysis.

22     Q    Thank you.

23          THE COURT:  Okay.  Any redirect?

24          MS. PATTERSON:  No, Your Honor.

25          THE COURT:  Okay.  All right.  We're going to take

1    a lunch break.  But let's talk about what we anticipate this

2    afternoon.

3              MR. DETWEILER:  May it please the Court, Donald

4    Detweiler again, Your Honor.

5              What we anticipated next was taking up the motion

6    to file the amicus brief.

7              THE COURT:  After Stretto?

8              MR. DETWEILER:  After -- yes.  Yes.

9              THE COURT:  Okay.

10             MR. DETWEILER:  Yes, after Stretto.  And if the

11   Court is inclined to take -- consider the amicus brief, we

12   want to put in very brief evidence as to the unreliability,

13   et cetera, of that brief.

14             After the motion to file the amicus brief, that

15   issue is resolved by the Court or testimony is concluded, we

16   would rest our case, we would be done with our evidentiary

17   presentation.  It would then turn to the various objectors to

18   put on their evidentiary presentations.  I don't know how

19   long that's going to take.

20             And then, after the evidentiary presentations, we

21   would suggest moving to argument on both the motion for --

22   the distribution the motion, as well as the amicus, if it's -

23   - if the -- if Your Honor is going to be considering the

24   amicus brief.

25             THE COURT:  Okay.  All right.  Let's break until

1    2:15, and we'll resume at 2:15.  Okay?

2              MR. DETWEILER:  Thank you, Your Honor.

3              THE COURT:  So we stand in recess.

4              COUNSEL:  Thank you, Your Honor.  Thank you, Your

5    Honor.  Thank you.

6         (Luncheon recess taken at 1:08 p.m.)

7                       AFTERNOON SESSION

8         (Proceedings resume at 2:19 p.m.)

9         (Call to order of the Court)

10             THE COURT:  Please be seated.

11        Okay.  We're back on the record in fair point --

12   excuse me -- Prime Core.  Sorry.

13             MS. PATTERSON:  Thank you very much, Your Honor.

14   Morgan Patterson of Womble Bond Dickinson on behalf of the

15   plan administrator.

16             Your Honor, if it's okay with you, at this time, I

17   will call Alexa Westmoreland from Stretto --

18             THE COURT:  Okay.

19             MS. PATTERSON:  -- to address the previously

20   discussed service concerns.

21             THE COURT:  Thank you.

22             THE ECRO:  Due to our court -- due to our

23   courtroom's broadcasting policy, parties on Zoom that are

24   listening by audio only will be placed in the Zoom waiting

25   room during witness testimony.  They will be allowed back in

1    once the testimony has concluded.  Thank you.

2              Please raise your right hand.

3        ALEXA WESTMORELAND, WITNESS FOR THE PLAN ADMINISTRATOR,

4                           AFFIRMED

5              THE ECRO:  Please state --

6              THE COURT:  Wait.  Could you hear her?

7              THE ECRO:  I did.

8              THE COURT:  Oh, okay.

9              THE ECRO:  Please state your full name and spell

10   your last name for the record.

11             THE WITNESS:  My name is Alexa Westmoreland.  My

12   last name is spelled W-e-s-t-m-o-r-e-l-a-n-d.

13             THE ECRO:  Thank you.

14             MS. PATTERSON:  Thank you.

15             Your Honor, as an initial matter, I would note for

16   the record the affidavits of service that have been filed

17   related to the following documents:  The notice of

18   commencement, the bar date, the effective date notice, the

19   confirmation hearing notice, and the distribution motion and

20   determination notice.  And I will reference the docket

21   numbers, Your Honor, for the record.  But as I mentioned,

22   each of these affidavits of service indicate "confidential

23   customer," versus the actual names.  So those are Docket

24   Numbers 58, 496, 552, 496, 924, and 713.

25                      DIRECT EXAMINATION

1    BY MS. PATTERSON:

2    Q    Ms. Westmoreland, you heard me reference the affidavits

3    of service.  Can you confirm that one of the confidential

4    customers listed on each of those affidavits of service is

5    Ms. McClenaghan?  And while I don't want you to say her email

6    address, can you note whether or not it's the email address

7    that she has provided us and whether service was commenced at

8    that email address?

9    A    Yeah, I can confirm that her email address is included

10   on all of those affidavits of service, she was included in

11   those email services that Stretto conducted, and the email

12   address -- and as you stated, they were all redacted on the

13   public proofs of service that we filed with the Court.

14   Q    Thank you.

15        And was there any other information that your team

16   provided Ms. McClenaghan during this case?

17   A    There -- outside of the services that we instructed to

18   serve to all of the creditors, we did not have any additional

19   services specifically for -- to her.

20   Q    Ms. Westmoreland, did Ms. McClenaghan sign for the

21   subscription emails from this case?

22   A    Yes, she did.  Stretto does offer a docket subscription

23   feature on our website, where users can subscribe to receive

24   docket notifications via email.  They can select the

25   frequency of how often they receive those materials.  And her

1    subscription was set to the receive the materials as they

2    were filed with the Court, so the -- the email gets pushed --

3    email notification gets pushed to the email address that she

4    used to subscribe.

5    Q    And which date did Ms. McClenaghan sign up for that

6    subscription service?

7    A    Apologies.  That would have been in November 2023.

8    Unfortunately, I don't have the exact date ahead of me.  I

9    apologize.

10   Q    That's fine.  Thank you.

11        And so, just to clarify, so any time something is filed

12   in these cases, that email address would be sent to -- I mean

13   that -- my apologies -- that pleading would be sent to Ms.

14   McClenaghan, regardless of whether she was -- needed to be

15   served with it.

16   A    Correct.

17   Q    Thank you.

18        MS. PATTERSON:  I have no further questions, Your

19   Honor, but I am -- I offer Ms. Westmoreland for cross-

20   examination.

21        THE COURT:  Okay.  Does anyone want to cross-

22   examine Ms. Westmoreland?  Okay.  You may proceed.

23        MS. MCCLENAGHAN:  Thank you, Judge.

24                      CROSS-EXAMINATION

25   BY MS. MCCLENAGHAN:

1    Q     Hi, Ms. Westmoreland.  How are you?

2          So are you able to provide proof that you -- or

3    actually, what is the email address that you would have sent

4    these notices to my email address.

5                THE COURT:  Okay.  Ms. Westmoreland, before you

6    answer that question -- Ms. McClenaghan, those -- this is a

7    public proceeding, and so, if you have her answer the

8    question, I just want you to know that there are 48 people on

9    Zoom and there are another probably 20 people in the

10   courtroom, and this will also be transcribed and available on

11   the Court's docket.  I just want you to be aware of that

12   fact.

13               MS. MCCLENAGHAN:  Okay.  Thank you.

14   BY MS. MCCLENAGHAN:

15   Q     So, yes, I'm asking what email address was it sent from,

16   not to reveal my email address.

17   A     Certainly.  So the email address that we sent our email

18   services -- and to confirm, email services are, when a notice

19   or a document is filed with the Court that needs to be sent

20   out to creditors -- that email address comes from no-

21   reply@cases-cr.stretto-services.com.

22         And then the docket subscription emails, those come from

23   a separate domain.  That comes from no-reply --

24   Q     Yeah, that's fine, because I do get the Stretto

25   documents, and I believe we're up to almost 1,000 documents

1    over the last, you know, two years.  So I appreciate that --

2    that your team has identified certain documents that you

3    should be sending to the creditors, specifically, that -- you

4    know, that those are the more important ones that they need

5    to act on.

6        So I find it interesting that I was made aware -- as a

7    credit -- I was made aware to file a claim from somebody that

8    is not a claimant because I did not receive anything.  I can,

9    you know, take a second to check my emails because I have

10   been requesting for, you know, multiple, multiple times, I

11   have requested.  So, if you give me one second, I will add

12   this into my search real quick.  No-reply@cases-

13   cr.stretto/services --

14   A    And then dash, not a slash, just to confirm.

15   Q    -- -services -- not /services -- -services --

16   A    Dot com.

17            MS. PATTERSON:  Your Honor, I would object.  I just

18   -- I think --

19            MS. MCCLENAGHAN:  Zero findings, I have zero

20   emails.

21            THE COURT:  Okay.

22            MS. MCCLENAGHAN:  And --

23            THE COURT:  They're going to --

24            MS. MCCLENAGHAN:  So I'd like proof that you

25   actually sent this because, like I said before, less than one

1    percent objected, and I find it hard to believe that, out of

2    46,000 people, less than one percent objected.  And I'm

3    objecting because I found out from somebody who isn't even a

4    claimant --

5              THE COURT:  Okay.

6              MS. MCCLENAGHAN:  -- about this.  So I think this

7    may --

8              THE COURT:  Ma'am, let me just ask.  Are you

9    talking about you're objecting with respect to the motion

10   with -- being heard today or are you objecting with respect

11   to the bar date?  I'm a little confused.

12             MS. MCCLENAGHAN:  I am -- I mean, the beginning of

13   this is the plan, that they are saying the -- the creditors

14   agreed on the plan.  If I don't receive notification

15   specifically, hey, I mean, there's a thousand email -- a

16   thousand notifications, right?  I am not an attorney, I'm not

17   going to read a thousand email notifications.  But if there

18   is something very important that they are saying that they

19   sent to each claimant that I don't have proof of in my email

20   saying -- you know, in their motion, it says the creditors

21   had a chance to, you know, agree on the plan at the time of

22   the plan, but I was not made aware of the plan.

23             THE COURT:  Okay.  You -- go ahead, miss --

24             MS. PATTERSON:  Your Honor, Morgan Patterson, for

25   the record.

1              I think that this is part of Ms. McClenaghan's

2     argument, which, you know, there's a -- you know, certainly -

3     -

4              THE COURT:  Right.

5              MS. PATTERSON:  -- what we heard at the end, and

6     that's fine.

7              MS. MCCLENAGHAN:  And I didn't -- we're not arguing

8     yet, so --

9              THE COURT:  Right.  I understand that.

10             MS. PATTERSON:  Yes.

11             MS. MCCLENAGHAN:  We have -- we have Ms.

12    Westmoreland, you know, she is representing Stretto;

13    therefore, this is -- was the time to ask these questions, so

14    --

15             THE COURT:  Oh, absolutely.  But she -- right now,

16    we're saying we haven't heard a question.  We understand that

17    -- your argument.  But do you have further questions for Ms.

18    Westmoreland.

19             MS. MCCLENAGHAN:  Right.  I have a question --

20             THE COURT:  Because you'll have --

21             MS. MCCLENAGHAN:  -- how can you provide --

22             THE COURT:  --- an opportunity --

23             MS. MCCLENAGHAN:  -- evidence --

24             THE COURT:  Okay.

25             MS. MCCLENAGHAN:  -- that they actually sent the

1    email because I do not see it in my email.  On the -- you

2    know, the list of note -- you know, the list that they

3    provided, several notifications that they spent specifically,

4    that it's noted in their motion that they sent these -- you

5    know, the motion specifically to object by a certain date.  I

6    didn't receive that, either.

7              THE COURT:  Okay.  That's argument, and you will

8    have a chance to make argument.

9              Do you have any other questions of Ms.

10   Westmoreland?

11             MS. MCCLENAGHAN:  To -- I --

12             THE COURT:  I'm not trying to truncate it, but --

13             MS. MCCLENAGHAN:  Maybe --

14             THE COURT:  -- she's the witness.  You need to ask

15   her questions.

16   BY MS. MCCLENAGHAN:

17   Q    Okay.  Ms. Westmoreland --

18             MS. MCCLENAGHAN:  Or maybe I have to ask you,

19   Judge, because how do I get evidence that it was sent to me,

20   besides her saying it was.  I -- I'm not sure how this works

21   here.  Her saying it was and then me saying I don't see it,

22   how do I -- how do you show proof of evidence that you sent

23   these notifications to me?

24             MS. PATTERSON:  Your Honor, our evidence that we've

25   provided is the affidavits of service throughout the case and

1    with Ms. Westmoreland's testimony.  And I -- you know,

2    obviously, I'll address this in argument, but I -- you know,

3    there was no evidence to the contrary or reason not to

4    believe the evidence that we've put forward regarding this

5    service.

6            MS. MCCLENAGHAN:  Well, I do solemnly swear, as

7    well, that I did not receive it, and my brother does solemnly

8    swear he did not receive it.  So -- and I'm sure, if we go

9    and send an email to the 46,000 people, hey, have you

10   received this -- these notifications, I am sure they -- they

11   will -- some will come back and say I did not receive it,

12   either.

13           THE COURT:  Okay.  I wonder if --

14           MS. MCCLENAGHAN:  Hence, they had less than one

15   percent objection.

16           THE COURT:  Okay.  I understand your position and I

17   understand --

18           MS. MCCLENAGHAN:  Yeah.

19           THE COURT:  -- your position is you did not receive

20   the information.

21           Do you have any other questions for Ms.

22   Westmoreland?

23           MS. MCCLENAGHAN:  Not at this time, Your Honor.

24           THE COURT:  Well, this is -- ma'am, this is the --

25           MS. MCCLENAGHAN:  Not at all.

1          THE COURT:  -- opportunity.

2          MS. MCCLENAGHAN:  Thank you.

3          THE COURT:  Okay.

4          MS. MCCLENAGHAN:  Thank you.

5          THE COURT:  Because she is --

6          MS. MCCLENAGHAN:  I can't ask a question about how

7   can you provide evidence that you sent it to me, besides your

8   testimony, and she didn't answer the question.

9          THE WITNESS:  I can answer that, Your Honor.

10  BY MS. MCCLENAGHAN:

11  Q    Can you forward it to me, where it shows that you sent

12  it to me on a certain date, all of the items that you listed?

13  That would -- that would be evidence.

14  A    We do have that information.

15      So our email system -- our email service (indiscernible)

16  reports back if we send out a service, it reports back to me

17  if the email sent to a specific email address has been

18  deliverable or if it was undeliverable.  If it was

19  deliverable, we also have insight into whether or not that

20  email was opened or if the recipient clicked on any of those

21  links within the body of that email.

22      However, as soon as we send out that email and it's sent

23  to your internet service provider, we don't have any

24  additional insight into that.  So what I mean by that is, if

25  an email is flagged by your domain as being spam or it

1    blacklists it or things like that, I don't have that insight.

2    The platform doesn't allow us to do that.  And actually,

3    there's really no platforms that allow you to do that.

4         So we -- the only information that we can say is we have

5    a list of the emails and the service that we sent to them,

6    and then we have a record of whether or not it was reported

7    back to Stretto as deliverable or undeliverable.  And your

8    email address was reported back to us as deliverable, so we

9    did not follow up with a hard copy service to -- to complete

10   the process.

11   Q    Did you say my email address came back as deliverable?

12   A    For -- yes, for all of the services, our records

13   indicate that the email address was delivered to the email

14   address that we have on file.  The email address was the same

15   email address that was associated with your scheduled amount,

16   which was provided to us by the debtors, and it matches the

17   email address that was included in your submitted proof of

18   claim form.

19   Q    And can you submit that as evidence?

20   A    If necessary, we would absolutely be able to create a

21   declaration with all of that evidence, if it --

22   Q    I would like that.

23        MS. MCCLENAGHAN:  I'm not sure,  Judge, how that

24   works.  I've never had an issue receiving emails before from

25   anybody else.  I get hundreds a day, spam.

1              THE COURT:  I'm sure --

2              MS. PATTERSON:  Your Honor, we're happy to follow

3     up with an additional affidavit if that's helpful to Your

4     Honor.

5              THE COURT:  That would be fine.  Thank you.

6              MS. PATTERSON:  No problem.  We will get that

7     filed.

8              THE COURT:  And ma'am, you might want to check the

9     docket yourself to see that declaration when it's filed, if

10    your position is you're not receiving emails, so -- do you

11    have any further questions for Ms. Westmoreland?

12             MS. MCCLENAGHAN:  No, Your Honor.

13             THE COURT:  Does anyone else have any questions for

14    Ms. Westmoreland?

15         (No verbal response)

16             THE COURT:  Thank you very much for your time this

17    afternoon.  You are excused.

18             THE WITNESS:  Thank you.

19             MS. PATTERSON:  Thank you very much, Your Honor.

20             I'll cede the podium now to Mr. Detweiler.

21             MR. DETWEILER:  May it please the Court, Your

22    Honor, Donald Detweiler again.

23             This was the time that we wanted to take up the

24    motion for leave to file the amicus brief that was filed by

25    Coinbase.  It's their motion.  I'll let them go first.

1          THE COURT:  Good afternoon.

2          MR. KESSLER:  Good afternoon, Your Honor.  For the

3    record, Thomas Kessler of Cleary, Gottlieb, Steen & Hamilton

4    on behalf of Coinbase.

5          As Mr. Detweiler noted, we're here on Coinbase's

6    motion for leave to file an amicus.  That's because Coinbase

7    is not a creditor of the debtors, it doesn't have an interest

8    in the accounts that are the subject of the determination

9    motion that's before Your Honor, but it does have a stake in

10   the outcome of the question that's been raised by the plan

11   administrator.

12         Coinbase is a global provider of digital asset and

13   custody services, and it and its customers rely on Article 8

14   of the Uniform Commercial Code to clearly define the personal

15   property and ownership rights of the assets that are given to

16   Coinbase, much the same way that custodians and financial

17   intermediaries do around the world.

18         As described in our motion for leave, we have

19   serious concerns that the relief sought by the plan

20   administrator is flatly inconsistent with the provisions of

21   Article 8, as enacted by the Nevada Legislature.  And we

22   worry that, if granted, the relief requested would introduce

23   uncertainty into the securities markets and into the

24   financial intermediary system itself.

25         Your Honor, I'm happy to go through the legal basis

1    for filing an amicus.

2            Of course, Your Honor has broad discretion under

3    Rule 105(a) and under the Court's inherent powers as a

4    tribunal to hear for amicus.

5            Courts in this District allow amicus submissions

6    where the amicus has an adequate interest, where the amicus

7    submission is desirable, and where it's relevant to the

8    issues that are up for determination.  We submit that all

9    three of those elements are met.

10           Coinbase clearly has an interest in the outcome of

11   this motion because it necessarily implicates the application

12   of Article 8 to custody of assets, which is the heart of what

13   Coinbase does, along with other financial intermediaries and

14   custodians.

15           And it's desirable and relevant because Coinbase,

16   as the plan administrator points out, is the only party who's

17   raised the Article 8 issue, and is here standing to

18   vindicate, not only the rights that are in the myriad of

19   agreements that are issue and we'll get to on the merits, I

20   suspect, but to assure that Article 8 is respected is not

21   used or vitiated in the way that is being proposed here.

22           Your Honor, I'll close by saying I'm aware of the

23   allegation that has been levied at my firm, and I think,

24   candidly, me, that something about this amicus is part of a

25   plot or a conspiracy with another of my firm's clients, who

1    may have an interest, at some point, in this case.  I'm happy

2    to go through that sort of point by point, Your Honor.  But I

3    think it's pretty clear from the face of the allegation that

4    it's factually incorrect, logically flawed, and legally

5    irrelevant.

6            THE COURT:  But let me ask you.  Is the interest

7    with respect to a potential future cause of action?

8            MR. KESSLER:  Your Honor, our other client is --

9    has received a demand letter from the plan administrator.  As

10   far as I'm aware, they are not a claimant and so they are not

11   seeking to receive distributions from the estates.

12           THE COURT:  Okay.

13           MR. KESSLER:  So, if there aren't any other

14   questions that you have, Your Honor, I'll cede the podium

15   back to Mr. Detweiler.

16           THE COURT:  Okay.

17           MR. DETWEILER:  May it please the Court, Your

18   Honor, we respectfully disagree.  They have not shown --

19   Coinbase has not met the elements necessary to invoke your

20   discretion to file an amicus brief.

21           The adequate interest in the matter, they do not

22   have an adequate interest in the matter.

23           The info supplied is desirable or the info is

24   relevant.  What you have is Coinbase -- and what -- I guess

25   altruistically saying it wanted to raise Article 8 here.  The

1    document that they propose to file with the Court -- you had

2    no evidence from them as to any statements in there are

3    verified, true, or correct.  There's no evidence.  They

4    didn't put anything in to support it.  When they say that it

5    applied to all of the debtors' contracts, it could apply to

6    none of the contracts.  It -- there's nothing to verify what

7    they say.

8          What is important, Your Honor, is, as was -- Mr.

9    Kessler admitted, they're not a creditor, they're not a

10   party-in-interest, they have no economic stake in these

11   cases.  They simply seek to file this amicus because they

12   have a concern that it may have profound impact on the

13   markets, no evidence as to that.

14         But what is simple is if Your Honor enters an order

15   or if you enter an opinion, you can limit the scope, the

16   precedential effect of that order.

17         THE COURT:  Okay.  So let me stop you there, Mr.

18   Detweiler, because I did have an opportunity this morning to

19   look at the form of order, and it was an issue that raised

20   concern yesterday when I was looking at documents.

21         To the extent that the plan administrator has

22   adjourned objections or carved out in -- with respect to

23   certain objectors, in the form of order, that the form of

24   order that is being proposed today will not affect their

25   future rights to argue property of the estate, how does that

1    interplay with the proposed amicus and how does that

2    interplay with what you're asking the Court to approve?

3              MR. DETWEILER:  Yes, Your Honor.

4              So what those carveouts are, Your Honor, is -- and

5    they're from substantial preference defendants; thus --

6              THE COURT:  And there's been -- have preference

7    actions been filed?

8              MR. DETWEILER:  There have been some filed --

9              THE COURT:  Okay.

10             MR. DETWEILER:  -- and there are more coming.  And

11   those preference defendants, where actions have been filed,

12   have said we don't have a problem with pro rata distribution,

13   we basically want to preserve our right, though, to argue

14   property of the estate in connection with any claim you may

15   assert against us.  So, in connection with any claim that may

16   be asserted against that preference defendant, and that's it,

17   not with respect to distribution, but with respect to the

18   estate clawing back a preference claim from them, they want

19   to be able to say we can -- we think we might be able to

20   trace, so we want to preserve that defense for down the road.

21             Your Honor, what's important here, just so you

22   know, the preference claims for the victims in this case are

23   estimated about a billion dollars, a billion dollars of

24   transfers in 90 days.  So you have to ask yourself, those

25   preference defendants have said, basically, as long as I have

1    the right to do that, you know, to assert the tracing and

2    property of the estate in my defense of your claim, you can

3    have all the pro rata you want, distribution, and that's

4    important.

5         They don't have a distribution.  They have no

6    economic stake, right?  There's something going on here.

7    They want Article 6 [sic] to apply, they won't take that this

8    is non-precedential.  What is important is that property of

9    the estate has been reserved by those who sought it for

10   purposes of a defense in a preference case where there's over

11   a billion dollars, roughly -- that's what I'm told -- of

12   preference claims that are going to make these creditors

13   whole, and somehow they want to say Article 8 applies.

14         But let's just -- Your Honor, if I can, and I

15   apologize -- well, stopping.  Did I answer your question?

16         THE COURT:  I think you did.

17         MR. DETWEILER:  Okay.  So where are we?  Why are we

18   here?  Because, after you go through the whole analysis of

19   Article 8, at the end of the day, you heard testimony that

20   there is not enough to go around to give to everybody.  So,

21   if you're an Article 8 creditor, you get a pro rate

22   distribution under 8-511, a pro rata distribution.  That's

23   what Mr. Dunn has proposed here, a pro rata distribution.

24         They don't talk about that.  They're looking for

25   something more.  They want you, where no court has yet ruled

1    on digital assets and cryptocurrency and Article 8, they're

2    asking you to make some type of -- you know, applying it

3    there.  Your Honor, no creditor in this case came forward,

4    objecting, because they know what the plan says, they know

5    how the plan is done.

6              So what's important is they clearly have no

7    adequate interest in this matter.  They're not getting a

8    distribution.  Those who wanted to have the defense

9    preserved, they got it.  Everybody else said we want our

10   money, and so property of the estate moves forward.

11             If the information supplied is desirable.  That's,

12   you know, your discretion, Your Honor.  Is it desirable, is

13   it going to help you, and what does it all mean?  Well, what

14   we know is there are some people who may have Article 8

15   accounts and there are some people who don't have Article 8

16   accounts.  But the testimony is all clear, everything is

17   commingled when it got in the Omnibus wallet.  Being

18   commingled, it's -- you got to establish, you got to come

19   forward and show you can trace.  Nobody has done that today,

20   and those who want to preserve it for a defense have done so.

21             So assets commingled, not enough to go around, and

22   nothing that they want changes the clear import of the plan,

23   which is this is a pot plan, asset allocation.  Those with

24   crypto, those with fiat get pro rata share.  And it's a pro

25   rata share when you talk commingling and it's a pro rata

1   share when you talk Article 8.  So why are they here?

2          If we have to go down Article 8, then there's all

3   kinds of issues with respect to Article 8.  All of this has

4   been considered by the trustee, it's not necessary to go down

5   the whole Article 8 road.

6          Your Honor, with regard to the last point that's

7   before the Court, there is a -- is the info relevant?  And

8   all they do is cite to it, Article 8.  There's no evidence to

9   support how it applies in this case.  It might apply to some;

10  it might apply to others.  It's pro rata, all that.  They

11  don't talk about how it's relevant to the plan, which governs

12  here before every -- before the creditors and what Mr. Dunn

13  has done here.

14         Your Honor, we simply, respectfully, disagree that

15  they have provided you with the necessary testimony and

16  evidence that they have satisfied the three elements

17  necessary to file an amicus brief here.  We don't think it's

18  desirable.  We think it's asking this Court to make a

19  decision that may or may not benefit or could, you know, help

20  them.

21         But what is clear and what wasn't fully explained

22  by the Cleary counsel is -- and he said they would stipulate

23  to that -- is they represent -- Mr. Kessler has represented a

24  large preference defendant in this case for a sizeable

25  preference claim.  And if the Court were somehow to adopt the

1    -- what the amicus is urging, it would benefit Mr. Kessler's

2    client, if they get sued.  So a preference -- we can tell you

3    a preference demand has been made.  They entered -- or

4    advised the plan trustee that they represent that creditor.

5    And so all of that would go to, Your Honor, weighing on the

6    credibility and the elements that you look at as to whether

7    or not this amicus is truly independent or the impartiality

8    of the amicus.

9         At the end of the day, it doesn't matter because

10   Mr. Dunn has done all the work.  It's under eight fifty

11   eleven, it's pro rata on what he's doing.  We got to get the

12   distributions out to creditors.  We have to go and pursue the

13   remaining assets, including those large preference claims

14   that Mr. Kessler represents one of the defendants in -- or

15   potential defendants in.

16        So, Your Honor, I would leave it there, unless you

17   have any questions.

18        THE COURT:  I do not.

19        Let me hear from Coinbase.

20        MR. KESSLER:  Thank you, Your Honor.  Just a couple

21   of points, very briefly.

22        I think, as I explained -- or -- and I should say I

23   think maybe the lion's share of Mr. Detweiler's presentation

24   this afternoon is sort of more geared toward the merits of

25   our position, and I'm happy to respond to those if and when

1    we get there.

2          So sticking sort of to the motion for leave, I

3    think it's incorrect to suggest that our interest here is

4    altruistic.  Certainly, I think these are rights that the

5    individual creditors deserve to have vindicated.  But our

6    concern is the collateral consequences of an order like this,

7    particularly where, before our amicus submission, there's

8    been no discussion of the impact of Article 8 of the UCC,

9    which is squarely implicated by the agreements that Prime

10   Trust has signed with its customers that are already in the

11   record.

12         That leads me to my second point, which is Mr.

13   Detweiler is correct that we have not undertaken to adduce

14   new or different evidence in this matter.  We are more than

15   happy to rely on the evidence that's before Your Honor that's

16   been adduced today in the courtroom, through the

17   declarations, through the exhibits.  The rest of it is legal

18   argument.  It's a question of law and not a question of fact.

19         The third point, that our position can't be

20   desirable or relevant because Article 8 doesn't comply is a

21   bit of an end run around the question.  In order for Your

22   Honor to make that determination, you have to look into

23   whether Article 8 applies to this dispute or not, which is

24   necessarily a merits-based analysis.

25         And the last point I'll make, just to follow up on

1   the issue of my other client, if my other client were

2   interested in pursuing this right at this time, in this way,

3   I'd be here representing them.  Certainly, it's not lost on

4   me that I've been communicating with the plan administrator's

5   counsel on behalf of another client.  It's not as though I

6   didn't think they were going to notice that it's the same

7   person at the same law firm.  These are different interests

8   represented by different parties, and so I'm here on behalf

9   of Coinbase.  And we think we should proceed to the merits,

10   and Your Honor can consider our argument for whatever it's

11   worth.

12          But your concern here has to do with future cases -

13   -

14          MR. KESSLER:  That's right.

15          THE COURT:  -- and not necessarily procedural

16   distribution in this case.

17          MR. KESSLER:  That's exactly right.  So the concern

18   is how an order -- to step back for a second, I think our

19   position is not that we are asking you to make determinations

20   under Article 8, but that those determinations are necessary

21   in order to decide the determination motion, and so that any

22   order on the determination motion, and certainly the order

23   that's sought by the plan administrator, necessarily is a

24   statement about the applicable of Article 8.  That's the

25   concern that Coinbase has.

1          THE COURT:  Your concern is Paragraph 2 of the

2     proposed form of order is going to be used as the law of the

3     case going forward in any future litigation --

4          MR. KESSLER:  That's right.

5          THE COURT:  -- or in any future case.

6          MR. KESSLER:  That's right, Your Honor.  So not so

7     much law of the case here, so much as another custodian goes

8     bankrupt and takes the argument that Article 8 doesn't apply,

9     even though it's squarely elected, if it's account holders,

10    to comply with Article 8, and they will take Your Honor's

11    order and say here's a precedent from a court, here's an

12    example, even if it's non-precedential or even if it's not on

13    Westlaw, here's an example of where a court looked at this

14    issue, looked at the agreements that contained Article 8

15    elections, and decided, notwithstanding those elections, that

16    the property at issue is property of the estate.  That's our

17    fear.  And I don't see a good way -- other than exempting all

18    Article 8 elected contracts from Your Honor's order, I simply

19    don't see a good way to avoid that.

20          If there's nothing else, I'll cede the podium back.

21          THE COURT:  Mr. Detweiler.

22          MR. DETWEILER:  Your Honor --

23          THE COURT:  Did you have --

24          MR. DETWEILER:  -- we definitely disagree.

25          THE COURT:  Okay.  Well --

1          MR. DETWEILER:  Thank you.

2          THE COURT:  -- I'm going to deny the motion.

3          The issue raised by Coinbase is not specifically

4     the context of this distribution motion.  Coinbase doesn't

5     have an adequate interest with respect to this procedural

6     motion.  The concern that Coinbase raises here is a concern

7     that's industry-specific and not the distribution motion

8     before the Court.  So I am going to, in my discretion, deny

9     the motion.

10          MR. DETWEILER:  Thank you, Judge Stickles.  Thank

11     you, Mr. Kessler.  I appreciate that.

12          Your Honor, at this time, that closes the plan

13     administrator's portion of his case with regard to the

14     distribution motion.  It is time, to the extent that any

15     objector has evidence, before argument, that they could

16     proceed accordingly with putting in their evidence.  So I'll

17     --

18          THE COURT:  Okay.

19          MR. DETWEILER:  -- sit down for that.

20          THE COURT:  And I very much would like to get the

21     evidence in today because court staff needs to depart today

22     around four o'clock, so I am not cutting anyone short, but we

23     may have to conclude argument on another date.

24          So what witnesses do we have?

25          MR. NEUMANN:  Your Honor, I have one witness.

1          THE COURT:  Okay.

2          MR. NEUMANN:  Should I call him?

3          THE COURT:  Yes, please.

4          MR. NEUMANN:  I call David -- Dave Birnbaum, Vice

5    President at Coinbits, Your Honor.

6          THE COURT:  Okay.

7          THE ECRO:  Due to our court's broadcasting policy,

8    parties on Zoom that are listening by audio only will be

9    placed in the Zoom waiting room during witness testimony.

10   They will be allowed back in once the testimony has

11   concluded.  Thank you.

12          Please raise your right hand.

13     DAVID BIRNBAUM, WITNESS FOR OBJECTOR COINBITS, AFFIRMED

14          THE ECRO:  Please state your full name and spell

15   your last name for the record.

16          THE WITNESS:  My name is David Birnbaum.  My last

17   name is spelled B-i-r-n-b-a-u-m.

18          THE ECRO:  Thank you.

19                     DIRECT EXAMINATION

20   BY MR. NEUMANN:

21   Q    David --

22   A    Hi.

23   Q    -- as you know, I'm David Neumann, I represent Coinbits.

24   We've been working with -- together for quite awhile.

25   A    Yes.

1    Q    So, for the Court, I know some of the answers to these

2    questions, but I think everybody should understand them.

3         Can you tell me, David, about your educational

4    background, please?

5    A    Sure.  I did my undergraduate degree at University of

6    Southern California in a combination of like sound recording

7    and music business.  I then a Master's Degree and completed

8    that at McGill University in music technology, which combined

9    computer science, human physiology, and electrical

10   engineering.

11   Q    Okay.  And tell me a bit about your work experience.

12   A    Sure.  I worked for a decade and a half in Silicon

13   Valley at a company that was researching and developing new

14   user interfaces.  During the course of that time, I was able

15   to be involved in the patenting process; I have over a

16   hundred patents where I'm named as an inventor.  I also

17   researched blockchain technology and Bitcoin and wound up at

18   Coinbits, developing Bitcoin.

19   Q    Okay.  And we'll get to Coinbits in a bit.

20        Tell me, have you -- you're a journalist, correct?

21   A    I don't know if I get that title.  I write things and I

22   send them to platforms, and they like them and they publish

23   them.  So I've been published on Forbes.com, American

24   Institute for Economic Research, Foundation for Economic

25   Education, Reason.com, many others.

1    Q    Okay.  And typically, what do you write about?

2    A    Bitcoin.

3    Q    So tell me about Coinbits.  Give me an idea.  Tell what

4    it is --

5    A    Yeah.

6    Q    -- before you were there, now that you're there.  Tell

7    me a bit about it.

8    A    Sure.  Bitcoin -- sorry.  Coinbits is a roundups app, so

9    it's an app that helps you save for the future.

10        One of the things that we found when we talked to people

11   is that they're intimidating by Bitcoin because they think

12   they have to be rich in order to get Bitcoin, but they like

13   the idea of using Bitcoin for saving for their future.  So

14   Coinbits is an innovative app which allows you to save your

15   spare change in Bitcoin.  So, in other words, it rounds up

16   your transactions from your cards and it kind of saves your

17   spare change in a jar and it turns that it into Bitcoin.  So

18   most of our users are people who are, you know, maybe middle

19   class, working class people who are using Bitcoin to save for

20   their future.

21   Q    Okay.  I -- and you -- have you been regularly in

22   communications with Coinbits users?

23   A    Oh, yeah.  So I'm VP of Product.  So, if you are a

24   product person that's not talking to users, you're not very

25   good at your job.  So, ever since I came onboard to Coinbits

1    in 2021, I've been in touch with our users, I've been aware

2    of the relationships that we've developed with them.  And

3    even today, with our users currently and the ones that had

4    accounts with Prime Trust, I'm in communication with them and

5    keeping them updated on -- on what's happening here.

6    Q    Okay.  And on -- did you -- I know there's quite a lot

7    of people online here, 48 people.  From the pictures that you

8    saw earlier this morning, did you recognize any of your

9    customers?

10   A    A few of them, yes.

11   Q    Okay.  So tell me about what -- what is your role,

12   again, not your just title, but what do you do in

13   relationship to the software, user interface?  Can you give

14   me an idea of what you do at Coinbits?

15   A    Sure.  So I help define new features.  I -- I speak to

16   users.  And I look at new, emerging technologies, and I speak

17   to my team and we prioritize features for making the platform

18   better for people.

19        Since I came to Coinbits, we created a new way of saving

20   a Bitcoin, where you could put aside like $5 every week or,

21   you know, $100 every month, just small amounts that help

22   people build up Bitcoin over time.

23   Q    And how many users are there presently?

24   A    Approx -- well, it depends how you define them.  But

25   over the course, since we started the company -- well, I

1    wasn't there when it started, but it was -- it started in

2    2018, and I think over 10,000 or 11,000 over the course of

3    that time.

4    Q    Okay.  And currently, how many users do you have that

5    are somehow locked into this case?

6    A    Around twenty-two, 2,300.

7    Q    Okay.  So you have personal knowledge of these

8    proceedings relating to Prime Trust.  Tell me what your

9    experience has been, like start -- explain when sort of

10   everything came down in --

11   A    Sure.

12   Q    Yeah.

13   A    Yeah, it was an early morning.  A message came in that -

14   - that told me on my phone that Prime Trust was no longer

15   being able to be connected to through their API.  So we

16   investigated and found out what had happened, they had --

17   they had stopped operating.  So we immediately hired counsel

18   in Nevada and sort of went through that process.

19        And you know, it was unpleasant for our -- our users.

20   Again, these are people who don't have much.  And you know, a

21   few hundred dollars, a few thousand dollars means the world

22   to them.  So we got a lot of questions coming in from our

23   users, we did our best to, you know, kind of tell them we

24   can't control this process, it's out of our hands, but we'll

25   do our best.

1       And so, you know, that brings us all -- all the way to

2   today, where, you know, we -- we don't represent our users,

3   but we have these relationships with them.  We take that

4   really seriously.  And these are really good people.  So, you

5   know, we're here sort of -- we have -- we're -- we're

6   obligated to communicate to them what's happening, so that's

7   why I'm here.  Yeah.

8            MR. NEUMANN:  Okay.  So -- and I'm going to -- I

9   have to give the witness -- it's my exhibit book, Your Honor.

10  And I believe that debtors' counsel -- sorry -- the plan

11  administrator's counsel has already received one.  But I have

12  another one for them, if they need one.

13       (Participants confer)

14            MR. NEUMANN:  I believe, Your Honor, you have one,

15  as well.  May I approach?

16            THE COURT:  Yes.

17            MR. NEUMANN:  Thank you.

18       (Participants confer)

19            THE COURT:  Can you wait one minute?

20            MR. NEUMANN:  Uh-huh.

21       (Pause in proceedings)

22            MR. NEUMANN:  Thank you.

23  BY MR. NEUMANN:

24  Q    So, David, if you can turn to Tab 2.

25  A    Yes.

1    Q    Okay.  Are you familiar with this?

2    A    Yes, I am.  I read it back when it came out.

3    Q    What is that?

4    A    It's the -- it seems to be the transcript of the

5    receiver hearing from way back.

6    Q    Okay.  And it seems to indicate in a number of places --

7    and we can walk through that briefly.  What was the primary

8    objective of both receivership and putting it into

9    bankruptcy?  And you can take your time, look at Pages 8 and

10   9 and 10, I think.

11            MS. PATTERSON:  Objection, Your Honor.  I think

12   that this document here is hearsay, and I'm not sure that the

13   witness can testify to the purpose of putting the company in

14   receivership.  That being said, assuming it's an authentic

15   copy, I think we could --

16            THE COURT:  Uh-huh.

17            MS. PATTERSON:  -- we would be okay with letting

18   the Court take whatever weight on it that you would prefer.

19   But I wanted to note for the record that this is -- this

20   document is hearsay, I believe.

21            THE COURT:  Response?

22            MR. NEUMANN:  Your Honor, I'm not admitting it for

23   the truth of what it says.  What I'm presenting it is these

24   were the statements of the receiver and his counsel during

25   the receivership.

1    THE COURT:  Okay.  Isn't that something that you

2    could submit -- stipulate to entry?

3    MR. NEUMANN:  Yeah.  So I --

4    THE COURT:  Is there an objection to the exhibit?

5    (Participants confer)

6    MS. PATTERSON:  No, Your Honor, I think it's fine.

7    MR. NEUMANN:  Okay.  Then we'd like that submitted.

8    THE COURT:  Okay.  Any opposition to the entry into

9    evidence of Coinbits Exhibit 2, a hearing transcript date --

10    from August 8th, 2023, before the Clark County Nevada Court?

11    (No verbal response)

12    THE COURT:  Okay.  It is admitted.

13    (Coinbits Exhibit 2 received in evidence)

14    MR. NEUMANN:  Thank you, Your Honor.

15    BY MR. NEUMANN:

16    Q    So, David, in general, is it your understanding from

17    this document that forensic analyses were done and commenced,

18    either prior -- during the receivership?

19    A    Absolutely.  That was one of the reasons --

20    MS. PATTERSON:  Your Honor, I don't think that the

21    witness has personal knowledge about -- if he did an

22    analysis, I think that that's appropriate, but I'm not sure

23    that this is admissible.

24    THE WITNESS:  Well, I was just saying what I'm

25    reading here.  This would be Page 10, Line 14.  It says that:

1           "We've begun a review of the forensic work that was

2    done" --

3           THE COURT:  This has been objected to.  I was

4    waiting for your counsel's response --

5           THE WITNESS:  Oh, I'm sorry.

6           THE COURT:  -- to the objection.

7           THE WITNESS:  Sorry.

8           MR. NEUMANN:  Once again, I am -- what's at issue

9    today is the analysis that's been done.  I asked questions

10   earlier with regards to whether Mr. Brennan considered other

11   forensic analysis.  And once again, I'm just pointing out --

12   I think he's pointing out that there are analyses that were

13   done prior to the bankruptcy.

14          THE COURT:  Okay.  Well, it -- this -- well, I'm

15   sorry, Counsel.

16          MS. PATTERSON:  Your Honor, I would just note that

17   we're fine with -- we think the document can speak for

18   itself.  Whatever it says, Your Honor can certainly review

19   and take into account.  I don't think it's --

20          THE COURT:  I was going to say --

21          MS. PATTERSON:  -- necessarily --

22          THE COURT:  -- you can refer to this in argument.

23          MR. NEUMANN:  Yeah, understood.  Thank you, Your

24   Honor.

25   BY MR. NEUMANN:

1    Q    There's a reference in here to Joseph Dunn.  Is that any

2    relation to David Dunn, are you aware?

3    A    I don't know.  Is it?

4    Q    Okay, David.  At some point in October 2023, are you

5    aware that the debtor filed a plan and Coinbits objected to

6    that plan?

7    A    Yes.

8    Q    Okay.  And are you aware that, on December 12th, the

9    debtor filed a plan supplement that outlined the procedures

10   associated with determining ownership of digital and fiat

11   assets?

12   A    Yes.

13   Q    Okay.  What is your understanding of that -- of that

14   procedure as it relates to the expectations of customers with

15   regards to meet-and-confer, talking with counsel for the plan

16   administrator?

17   A    Sure.  I mean, so the original document that I think all

18   of our customers, based on what they told me when I was

19   interacting with them, that had the most significance was the

20   document that explained the wallet event.  All right?

21   Because, in that document, it went into depth about how the

22   fraud and the -- and the negligence had happened with respect

23   to Ethereum and how dollars were used to buy Ethereum and to

24   make people -- allow people -- withdrawals to continue to

25   happen, but the -- you know, those transactions weren't --

1    weren't kosher.

2         So, upon reading that, you know, I think I breathed a

3    sigh of relief, along with a lot of our members, because bit

4    -- Bitcoin was not involved at all in any of that.  And so,

5    you know, because the plan, originally, says that, you know,

6    we're trying to return assets to people in kind, as possible,

7    so I took that, and then I took well, the whole story of the

8    fraud and the negligence has to do with Ethereum and dollars.

9         You know, we're not involved in that.  We -- we --

10   actually, the only time that our members ever hold dollars

11   with us is sort of as a stepping stone to get in or out of --

12   of Bitcoin.  Really had very little -- of our members had

13   very little fiat.  We had a little bit, too, but that's just,

14   you know, secondary to our concern.  And so, when we saw that

15   Bitcoin was not involved at all in any of this, you know, it

16   really gave us a sigh of relief.

17        Now, then, when the distribution motion was filed,

18   Bitcoin doesn't make an appearance.  And in fact, this word

19   "hopelessly commingled" keeps coming up over and over again,

20   without any discussion about how much of each asset there

21   actually is.  So, for me, I was very surprised by that

22   because, if it were me, I would -- I would do that

23   differently.  I would -- I would certainly think that the

24   scope of analysis would lead you to realize that, you know,

25   different bit -- different blockchains can't be combined or

1   commingled together.

2        In fact, I think we just heard again "the omni wallet,"

3   but that's -- there's no such thing as that.  There's

4   blockchains, they're public, publicly accessible, publicly

5   visible.

6        So, when I saw the distribution motion, there was no

7   amount of Bitcoin that was discussed, there was no addresses,

8   Onchain addresses, that we can go check that was discussed.

9   I -- to me, that is -- there's something missing there, and I

10  don't know -- I don't know why that would have happened.

11  Q    Okay.  And then so -- I mean, have you asked at least

12  once, if not more, how much Bitcoin does the debtor have,

13  what are the addresses, is there a shortage?  Are those

14  questions that you have been asking?

15  A    Coinbits has asked that several times, first, right

16  after the initial report that talked about the Ethereum and

17  the wallet event.  Great, so Bitcoin wasn't affected, so how

18  much is there, how do we get it back to people, right?  So it

19  was just very -- it -- I -- I just expected it would be

20  almost, you know, just an operational process.  I already --

21  I started to put together a technical plan, okay, we're going

22  to get the Bitcoin, we have to figure out how to onboard

23  people back on, we have to do diligence probably with this

24  new entity, we have to figure that whole thing out.  I

25  started mapping all of that out, expecting that we would be

1    able to get Bitcoin back to people pretty much right away.

2    Q    Yeah.  So let's go back.

3         You heard testimony today from Mr. Brennan and Mr. Dunn.

4    And Mr. Brennan gave his report and we -- you heard the

5    testimony.

6         What kind of information would you think should be

7    available to customers to make -- to understand, or for this

8    Court to understand the hopeless commingling, the fact that

9    the debtor utilized a million dollars and has thrown up his

10   hands and can't give an answer?  What would you be looking

11   for that would support their determination with regards to

12   their position that that -- that everything, all digital, all

13   fiat is property of the estate?

14   A    Well, I would want to see -- I mean, I -- and I wouldn't

15   -- it's not a "would" question, it's a "did" question.  I

16   read that report and I did not see -- and I -- it struck me

17   as very bizarre -- any discussion -- and not to say that

18   there's a lack of understanding, technically, but that that

19   understanding was not included, if there is one, was not

20   included in that, in the distribution motion.  And so it was

21   just very confusing to me.

22        So what I would want to see is I would want to know, for

23   example, that a chain -- a chain -- a blockchain analysis

24   contractor, external contractor, was used.

25   Q    Do you remember who those were that he mentioned?

1   A      I will -- what were they?  It started with an E?

2   Q      Elliptic?

3   A      Elliptic, right.  And the other one started with a T --

4   Q      Tan --

5   A      -- T something else.

6   Q      TRM Labs?

7   A      Yeah, that's right.

8          So the -- the -- what those companies do is they provide

9   you with a comprehensive and very detailed and very technical

10  analysis.  Like we heard earlier, Bitcoin does have

11  identifying characteristics.  It has inputs and outputs.  It

12  has addresses where Bitcoin came from and where it combined

13  or split apart and then where -- where Bitcoin is going.

14         And so the -- what those blockchain firms do, as a

15  matter of course, is they study the blockchain to try to

16  determine the flow of funds, and they're very familiar with

17  fraud cases and money laundering cases because that's what

18  they do because bad actors are trying to use crypto all the

19  time to launder money.  So they have sophisticated tools to

20  track funds on the blockchain.

21         And I would assume that these two -- that these two

22  firms would have generated a report because, again, that's

23  what you pay for.  They -- a deliverable is a report.  And

24  you know, I would think that the -- well, I would know that

25  the -- that the Coinbits members would be very happy to read

1   that report, I would have been happy to read it.

2           And so my question would just be why -- why -- why the

3   amount of detail in the distribution motion was truncated

4   because the information does exist, obviously, if those -- if

5   those firms completed their analysis, so where is it.

6   Q    But you've heard argument of opposing counsel saying

7   it's their toggle, they make a determination whether there's

8   property of the estate or not property of the estate.

9           MR. DETWEILER:  Objection, Your Honor.  I don't

10  think counsel on this side of the table has said what he just

11  said.  Mischaracterization of --

12          THE COURT:  Rephrase your question, please.

13          MR. NEUMANN:  Okay.

14  BY MR. NEUMANN:

15  Q    In the testimony that you heard, what was your

16  impression with regards to the debtor determining that the

17  only route that they have is to turn everything into fiat and

18  distribute it in a pro rata basis?

19  A    Well, it just sounds like it should -- can -- it's like

20  putting the cart before the horse, to me, because, you know,

21  if -- you know, it's really up to the Honorable Judge. And if

22  -- if it turns out that they say they cannot provide the

23  assets in kind for some reason, which I haven't seen, but

24  let's say they cannot provide it; and, yet, that is what is

25  required, then I'm a little bit confused as to what -- what

1    they would do next.

2    Q    Okay.  So, David, I heard some discussion, it's in the

3    pleadings, with regards to like know your client issues,

4    right?

5    A    Uh-huh.

6    Q    Know your customer issues.  And I -- are you -- and I

7    think we also heard, in fact, confirmation that the API

8    technology agreement was rejected, right?  As part of the

9    plan.

10       Tell me how that gets in the way, I guess, of an in-kind

11   distribution, if at all.

12   A    Sure.  It could get in the way.

13       So "KYC" means know your customer, and it means that,

14   you know, any -- any time that you're moving money around,

15   you need to know that the person you're -- you're sending or

16   receiving money, that you're interacting with, is, I suppose,

17   able to be served, whether they're on the OFAC list or they

18   have some other issue.  So you need to take their ID, it's

19   kind of on you to make sure that you identify this person,

20   they are who they say they are, and so on.

21       There are companies that do this, it's so standard.  We

22   have used several in the past.  And usually, it costs -- you

23   know, depending on volume, it could be a few cents or it

24   could be a dollar or two per -- per user.

25       I know this because Prime Trust, actually, had KYC.

1    That was another inconsistency that I found.  It was saying

2    that their -- Prime Trust had no direct relationship with

3    account holders.  But we know that they required of us that

4    we -- we helped get them the KYC information, so, certainly,

5    they were qualifying their own account holders.

6    Q    What was the K -- what is "KYC information"?  What do

7    they need to collect?

8    A    First and last name, address.  Usually, there's, either

9    a photo ID, front and back, sometimes there's a face scan.

10   There's actually no standard set of procedures, that's still

11   evolving.

12   Q    Yeah.

13   A    So it's sort of like you do your best until your risk --

14   you're comfortable with your own risk level.

15   Q    Right.  But Prime Trust followed those procedures?

16   A    They had their own KYC policy and we built an interface

17   that allowed people who were members of Coinbits, when they

18   opened their Prime Trust account, they would take picture of

19   their IDs and submit them, and those would wind up in Prime

20   Trust servers through the API.

21   Q    Tell me about the onboarding process at Coinbits.  And

22   did each customer have their own account agreement?

23   A    Yes.  When you go to the -- when you -- back in the day,

24   when we bridged with Prime Trust, when you would go to start

25   a prime -- a Coinbits membership, you would go through a step

1     where you would have access the Prime Trust end user

2     agreement and then proceed through KYC.

3     Q     Okay.  Out of our 2,400 customers that seemed to have

4     Coinbits, any idea, in general, for the most part, when they

5     were onboarded?

6     A     They would have been onboarded any time between 2018 and

7     -- and the shutdown, so it's that entire chunk of people.

8     Although, you know, throughout that entire time, they were

9     accepting end user license agreements.  The way that the end

10    -- or not the end user license, but the -- the user

11    agreement.

12    Q     Uh-huh.

13    A     Throughout that whole time, I know that there were a few

14    different versions of the user agreement.  But the language

15    for how they handled digital assets and Bitcoin didn't

16    change.

17    Q     Yeah.  So let's -- digital fiat, digital fiat.

18    A     Yeah.

19    Q     Can you explain to me a couple of things about the

20    difference within those agreement between digital and fiat,

21    but also how does tracing -- is it more difficult or less

22    difficult to trace fiat than digital?

23    A     It's more difficult.  Fiat is not on a blockchain.  So

24    the way that you trace fiat is you, basically, look at the

25    books of the institutions that are holding the money.  You're

1    looking at how the ledgers are changing.  And you know, a lot

2    of that is opaque and so it's really hard to kind of like

3    track that down.  Now it happens, right?  Because any time

4    there's a money laundering investigation where millions of

5    dollars are being, you know, funneled to drugs or terrorism

6    or something, it's going through different bank accounts,

7    it's going to different countries.  But there are -- as a

8    forensic investigator, you would, you know, try to trace

9    that.

10        Blockchain is much, much easier.  It's actually all

11   public.  You can go to a website -- I like the one that's

12   called Mempool.space, it's a very, very prominent one -- and

13   you can see every single Bitcoin transaction on there.  And

14   so, if I knew the addresses of where this Bitcoin is stored

15   on Fireblocks, I can go on Mempool and I can validate that

16   very -- in about two seconds.

17   Q    Okay.  So we've been saying this in this case, like we

18   think we represent one-third of the Bitcoin that is our users

19   and ourselves, of 104, and we were trying to verify that

20   forever.  Actually, when was the first time you ever heard

21   that there was a number of how much Bitcoin there was in the

22   wallets?

23   A    It was this morning, and I heard two different numbers,

24   300 and then 299.  And neither of those are precise, right?

25   Because Bitcoin has a long string of decimal points after it,

1    so I still don't actually know the precise number.

2    Q    How did we think -- how did we think, from the very

3    beginning, that we represented approximately one-third of the

4    Bitcoin?

5    A    Sure.  There was a Tweet that was posted by a company

6    called Arkham Research, and they are a blockchain analysis

7    company.  And because the Prime Trust bankruptcy was in the

8    press, I would assume, they did their own sort of analysis

9    and tried to -- tried to figure it out.  I believe the number

10   they published was 245 or so.  I -- I can't remember exactly.

11   It was literally just a Tweet that we were going off of.  And

12   I -- like I said, I should -- I would want to rely on the

13   source of the information; I don't want to rely on what

14   somebody says on the internet.

15   Q    Understood.

16       If we added in 48 Bitcoin that just, I guess, apparently

17   came in -- we don't know exactly when it came in, but it was

18   definitely sent out just recently in September of '24 --

19   would that be -- would that be typically in a separate

20   wallet, would it be in this Omnibus wallet?

21   A    It -- I don't know.  It's somewhere on chain.  Okay?  So

22   every Bitcoin transaction is visible on chain.  It could have

23   been -- if it was a single transaction, then that would mean

24   that those 49 Bitcoin would have landed in a single Bitcoin

25   address --

1    Q    Okay.

2    A    -- that you could see on chain.

3    Q    But as you stand here, based on the testimony, you don't

4    know whether that 48 Bitcoin that was sent back was

5    commingled or not, correct?

6    A    I -- I have no idea.

7    Q    All right.  Understanding the addresses, understanding

8    that information, looking at the report of Mr. Brennan, that

9    would help you, wouldn't it?

10   A    Of course.

11   Q    Okay.  I'm going to draw your attention, I guess, just

12   to authenticate some documents.  If you can turn to Tab 9.

13   There's an email -- well, can you -- it's an email, it looks

14   from you -- well, can you verify what Exhibit 9 is, please?

15          MS. PATTERSON:  Your Honor, we don't need to go --

16   in the interest of time, we're happy to stipulate that this

17   is an email that was received by the trust representatives.

18   We don't have to authenticate it, if you don't want to, in

19   the interest of time.

20          MR. NEUMANN:  It shouldn't take very long to

21   authenticate, Your Honor.

22          THE COURT:  Okay.  You may then.  Okay.

23          MR. NEUMANN:  Thank you so much.

24   BY MR. NEUMANN:

25   Q    So, David, what was the purpose of this email?

1    A    It was to get the ball rolling, right.  So -- oh, no,

2    I'm sorry.

3        This email was actually a response to -- it was

4    triggered by a question that I got from one of our members.

5    They were tracking the case closely and they were concerned.

6    They went to Stretto and the case could no longer be found

7    there.

8    Q    So what did you do?

9    A    So I emailed Nate Smith at Province and asked what was

10   happening, and he said that the wind-down trust is not

11   capitalized enough to fund a hosting of the Stretto website

12   after the effective date, and that they should look at Pacer.

13       And I did look at Pacer, but it was -- you need a

14   subscription service, it's too hard to use.  There was no way

15   our members were going to do that.

16   Q    Okay.  Did they eventually turn Stretto back on?

17   A    They did.

18   Q    Okay.  Did turning it off for quite a while confuse any

19   customers?

20   A    Yes.  Thus, the email.

21   Q    What does it mean to you that they didn't have enough

22   money to pay the claims agent, that they weren't capitalized

23   with enough?  What does that mean to you?

24   A    Well, it sounds like they're running out of money.

25   Q    In February?

1   A   Yeah, I guess so.

2   Q   Okay.  What other communications did you have with Mr.

3   Smith, before that, actually?

4   A   Sure.  Well, I -- I think the main -- the main

5   communication began after they went active.  And I was just,

6   in good faith, being like all right, let's work together and

7   figure this out and figure out how to -- how to get this

8   Bitcoin back.  The first question is:  How much is there,

9   right?

10   Q   Right.  Which you couldn't get an answer for.

11   A   No.

12   Q   Okay.  And then what -- anything else from your

13   conversations with Mr. Smith with regards to what their

14   challenges were?

15   A   I'm not sure.

16   Q   Okay.  Was there any discussions with regards to the SEC

17   and their concern with regards to in-kind transfers?

18   A   I think there may have been.  I think that I -- I think

19   that there -- there may have been -- that was used as like a

20   reason that it was difficult to get going and to communicate

21   with me proactively because they were dealing with this other

22   issue.

23   Q   And what were you working on while you were having

24   discussions with Mr. Smith; what were you working on?

25   A   At Coinbits?

1   Q    Yes.

2   A    Oh, we were -- I mean, we had to figure out a new

3   solution, so we had to find a new provider and we had to

4   communicate with our users.  And basically, we were shut down

5   for months and we had to get up and running.  It was a really

6   difficult time.

7   Q    Okay.  And did you have discussions with regards to

8   being an integrator and providing in-kind distributions to

9   your customers?

10  A    Oh, absolutely.  I mean, we -- that was the first thing,

11  is we -- we offered -- we offered our services in that way.

12  Q    And did you do any other work associated with that?

13  A    We started talking to our new provider and explaining

14  the situation and sort of started to brainstorm a technical

15  plan for how to transfer Bitcoin back to our end users, given

16  the challenges around KYC and everything else with -- they're

17  all solvable problems.  And because of this relationship that

18  we have with our members, we're happy to, you know, sort of

19  absorb some of the expense associated with that.  We know

20  them, we can communicate with them.  You know, it's -- it's

21  been a difficult process, but we -- we were happy to help in

22  any way.  And we kind of extended a hand to Province and said

23  we're here if you need technical support, if you need

24  advisement, we're here to help out.

25  Q    Did they get back and take your offer?

1    A    No.

2    Q    Okay.  If you can turn to Exhibit 3, please.

3              MR. NEUMANN:  Will the plan administrator stipulate

4    as to this email?

5              MS. PATTERSON:  Yes.

6              MR. NEUMANN:  Okay.

7              THE COURT:  What was the answer?  I didn't hear.

8              MR. DETWEILER:  Yes, Your Honor.

9              MS. PATTERSON:  I'm sorry, Your Honor.  Yes.

10             THE COURT:  Okay.

11             MR. NEUMANN:  Can I ask for the admission --

12             THE COURT:  Did you pick that up -- excuse me.  Did

13   you pick that up on the record?  Okay.

14   BY MR. NEUMANN:

15   Q    Okay.  On -- okay.  So I want to ask you to summarize

16   it, just that -- what was the confusion, I guess, with your

17   customers, with regards to our inability to get a

18   confirmation of how much BTC there was?

19   A    I mean, I -- I had no explanation for it, so they were

20   confused.

21   Q    Yeah.

22             MR. NEUMANN:  Will you also stipulate to the

23   authenticity of 4, please, as well?

24             MS. PATTERSON:  Yes, sure.

25   BY MR. NEUMANN:

1   Q    Okay.  And that says the same thing, another followup,

2   David?

3   A    Yeah, it does.  And the beautiful thing about Bitcoin

4   and -- and blockchains is it's there or it's not.  We heard

5   that from somebody earlier on Zoom, it's there or it's not.

6   It really takes only a few seconds to -- to check and to

7   write a number in an email.

8   Q    Have we got any kind of confirmation on whether there's

9   not enough Bitcoin for those parties that claim to own

10  Bitcoin?

11  A    We have not.

12  Q    Okay.  Did you hear anything in the testimony today, in

13  the scope of Mr. Brennan's engagement, that he was

14  reconciling claims or trying to match claims to the ledger of

15  the debtor?

16  A    I haven't heard any specifics about the Omnibus wallet

17  or wallets.  Again, the word "wallet" is not even a real

18  technical term, to be honest with you; it's an address.  It

19  should be very simple to provide a list of Bitcoin addresses

20  and their amounts, and we just haven't seen that anywhere.

21          MR. NEUMANN:  All right.  Also, will you guys

22  stipulate to the authenticity of Number 5 and the attachment

23  -- at least the attachments that were attached to that email?

24  That would be 7, 8, and -- 7 -- 6, 7, and 8 and 5.

25          MS. PATTERSON:  Yes, except, Your Honor, Number 7,

1    I think is a Coinbits document, so I can't stipulate to the

2    authenticity --

3              MR. NEUMANN:  Understood.

4              MS. PATTERSON:  -- of their own personal documents.

5    BY MR. NEUMANN:

6    Q    David, can you turn --

7              THE COURT:  You're going to --

8              MR. NEUMANN:  Thank you so much.

9              THE COURT:  -- stipulate -- excuse me, I want to

10   clarify the record.  So you're stipulation -- stipulating to

11   the admission of 5, 6, and 8.  Is that right?

12             MS. PATTERSON:  Yes, Your Honor.

13             MR. NEUMANN:  Thank you so much.

14        (Coinbits Exhibits 5 and 6 received in evidence)

15        (Coinbits Exhibit 8 received in evidence)

16   BY MR. NEUMANN:

17   Q    Okay.  So, with regards to 7, David, can you turn to

18   that?

19   A    Uh-huh.

20   Q    And what is this document?

21   A    It's the terms of use for Coinbits.

22   Q    Okay.  And it's -- can you verify that is a regular

23   document used by Coinbits?

24   A    Yep.

25             MR. NEUMANN:  Okay.  I'd also like to submit that

1   into the record, Your Honor, together with the other

2   exhibits.

3            THE COURT:  Any objection?

4            MS. PATTERSON:  No, Your Honor.

5            MR. NEUMANN:  Thank you.

6            THE COURT:  It's admitted.

7        (Coinbits Exhibit 7 received in evidence)

8   BY MR. NEUMANN:

9   Q    So, David, if you look at Page 6 -- sorry -- Exhibit 5.

10  A    Uh-huh.

11  Q    What is this?  Can you -- you don't have to -- the Judge

12  can read it herself.  But can you tell me what this is and,

13  you know, what was the purpose of this letter?

14  A    Sure.  It's an email from you to Don over here, and it's

15  a -- it sort of -- several documents are attached that

16  describe like the API technology agreement and the -- the

17  scope of BTC in the case.

18  Q    Okay.  And does that adequately reflect our willingness

19  to work with the debtor as an integrator to get in-kind

20  transfers back to our customers?

21  A    Yes, I believe so.

22  Q    Okay.  All right.  Dave, I'm just going to -- I guess I

23  want to ask you just a couple of questions.

24       The distribution motion talks about "hopelessly

25  commingled."

1    A    Uh-huh.

2    Q    It uses it, actually, three times.  Okay?  And any idea

3    what "hopelessly" means, in light of your testimony that

4    tracing and looking at wallets, there's nothing hopeless

5    about it?

6    A    Well, hopeless, if something is hopeless, that means

7    it's impossible.  So the -- that's my interpretation, is that

8    it is impossibly -- impossible to ever -- to ever untangle or

9    ever trace.

10        You know, again, the -- the distribution motion doesn't

11   talk about the difference between different blockchains, so

12   the idea that assets across different blockchains would be

13   hopelessly commingled just doesn't really make sense.

14   Q    Do you understand their argument, I guess, with regards

15   to maybe fiat?

16   A    Sure.

17   Q    But digital, is it -- from what I've heard you testify,

18   it shouldn't be terribly expensive with Bitcoin, especially

19   with the small number in this case, to be able to track

20   ownership.

21   A    I wouldn't think so.

22   Q    Yeah.

23   A    I wouldn't know until I saw the report, and that's not

24   forthcoming, so --

25   Q    Right.

1    A    -- if not --

2    Q    The Judge hasn't seen that report --

3    A    No.

4    Q    -- and it hasn't been presented.

5    A    No.

6    Q    Okay.

7        (Pause in proceedings)

8    Q    Out of all the tokens that -- you looked at the list, I

9    assume, of all of the various tokens that the debtor has in

10   their possession.  Out of those tokens, what would you say

11   are the most marketable, easily saleable of all the tokens?

12   I mean, that is, give me a few, give me a few of the tokens

13   that are generally traded and easily -- or is there -- are

14   there any tokens that are not easily tradeable?

15   A    Well, Bitcoin is, by far, by far, the most liquid

16   digital asset in the world.  I believe it has almost a

17   trillion-dollar market cap right now, it's used by over 200

18   million people, is the estimate.  It's estimated that

19   somewhere between like 5 and 15 percent of Americans have

20   Bitcoin.  So it's a very mainstream form of asset, and so

21   it's easy to -- it's easy to use.  It's easy to trace, it's

22   easy to -- to trade, it's easy to sell, easy to buy.

23       The other tokens I'm not an expert, honestly, on any

24   other tokens.  I'm aware of them, but I'm not an expert.

25   Q    Okay.  Thanks for that answer.

1    Do you -- is Ethereum and Bitcoin the -- kind of the

2    same?

3    A    No.  Ethereum uses a completely different model.  It's a

4    -- it's a centralized token that is managed by the Ethereum

5    Foundation.  Its monetary policy changes.  It's an account-

6    based model.  So it's totally incompatible with Bitcoin, it

7    has a totally different use case.

8    Q    Okay.  And it's your understanding from the report that

9    you read initially, you said that you -- that Ethereum was a

10   token that was caught up in this wallet event.

11   A    It sounds like that was the only one.  My reading and my

12   recollection is that it was only Ethereum that was lost and

13   only Ethereum that was purchased with fiat deposits.

14   Q    Okay.  So, I mean, other than the value of Bitcoin

15   because it's a highly recognized of, I guess, currency --

16   right?  Well, let me ask you this.  Why do -- why don't your

17   clients have Ethereum in their accounts?  You only do

18   Bitcoin?

19   A    We only do Bitcoin because, like I said, Bitcoin is, in

20   our view and my strong opinion -- and you can look at my

21   writings on this topic -- Bitcoin is money, it's a bare

22   asset, it's not issued by anyone, it's decentralized, making

23   it a digital commodity and the only digital commodity that I

24   believe is worthy of that name.

25       All of these other crypto tokens are projects or

1    companies, and you can think of them a lot more like sort of

2    a security, in the sense that you have to believe in the

3    management team, you have to believe in the business

4    strategy, and that maybe it's a good investment.

5         Bitcoin just is, it's not issued by anybody.  It's --

6    it's a neutral digital asset.

7    Q    Okay.  Tell me what is your concern with regards to

8    where we are today on -- in light of the fact that, I guess,

9    we're here today presenting evidence on, I guess, fairly

10   truncated notice.  Do you have any comments with regards to

11   kind of where we are and the challenges that we're facing

12   today?

13   A    Well, sure.  I mean, the challenge that we have is there

14   is Bitcoin that belongs to people, it's their property, and

15   the price in the distribution motion that is -- is laid out,

16   at which, you know, people are owed fiat is way low, and then

17   that's going to be further diluted and taken.  And I am

18   concerned -- and you know, there's this -- there's this idea

19   oh, we have to get people money quickly.  I don't -- I don't

20   think that's true because our members don't want a tiny

21   fraction of what Bitcoin they have -- they have saved; they

22   want their digital property back.

23   Q    And have you heard from any of your customers saying,

24   you know, can just get me my fiat -- can you get me that fiat

25   portion or get me fiat instead of the Bitcoin, have you heard

1    anything like that?

2    A    I actually have not heard that, no.

3    Q    Okay.

4    A    People know how Bitcoin works, so they know it's that

5    hard.

6    Q    David, did you have anything else that you want to

7    testify as to?  Is there anything that I didn't ask you that

8    you wanted to testify?

9    A    I just hope that -- I just hope that -- that people

10    aren't really adversely affected by something that is not

11    their fault.  And you know, you had -- this fraudulent

12    activity didn't involve them.  And I just -- I just really

13    hope and pray that we come to a resolution where people --

14    people's savings is returned to them.

15    Q    All right.  And thank you very much for your testimony.

16         We have a number, I guess, of Coinbits people on the

17    line.  What would you want to say like -- what would you want

18    to say to them?

19              MS. PATTERSON:  Objection, Your Honor.

20              THE COURT:  Yeah.

21              MS. PATTERSON:  I think he has his own medium to

22    communicate with his customers.

23              THE COURT:  How is that relevant to the motion?

24              MR. NEUMANN:  Oh, no.  I just -- I think, Your

25    Honor, with regards to the motion, we're here and my client

1    is faced, once again, with a proceeding that should be under

2    Bankruptcy Rule 7001.  There should be more evidence provided

3    to Your Honor.  And I know there's a lot of people --

4            THE COURT:  Yeah, this --

5            MR. NEUMANN:  -- who could not afford a counsel.

6    So, with regards to us being here, my client is in a position

7    to coordinate with the debtor on the option under the plan

8    with regards to in-kind transfers, and I just wanted -- I

9    wanted -- really, I just wanted people on the line to, if

10   they had any questions for David, they could ask.

11           THE COURT:  Okay.  Well, that can be done offline.

12   Right now, I'm going to go forward -- are you done with

13   direct exam?

14           MR. NEUMANN:  Yes.

15           THE COURT:  Okay.  Because, if that's the case, I

16   want to move forward with cross-examination because it's 20

17   minutes to 4 on Friday afternoon.

18           MR. NEUMANN:  Thank you, Your Honor.

19           THE COURT:  And I just don't -- I want to make sure

20   that, unless the witness is willing to come back again in a

21   week or two, I want to just move forward.

22           MR. NEUMANN:  Yeah, this is a real burden on us.

23   We'd like to --

24           THE COURT:  That's what I presumed, Mr. Neumann.

25           MR. NEUMANN:  Plus, I reserve all my rights with

1    regards to our due process argument, Your Honor.  I don't

2    think that you have been given enough evidence to make a

3    determination.

4              THE COURT:  Okay.  Well, you'll have your

5    opportunity to argue.

6              MR. NEUMANN:  Thank you, Your Honor.

7              THE COURT:  I just want to make sure that we don't

8    inconvenience this witness.

9              MR. NEUMANN:  Understood, Your Honor.

10             MS. PATTERSON:  Thank you, Your Honor.  Morgan

11   Patterson of Womble Bond Dickinson on behalf of the plan

12   administrator.

13                      CROSS-EXAMINATION

14   BY MS. PATTERSON:

15   Q    Good afternoon.  Thank you for being here.

16        I just want to go back to the earlier part of your

17   testimony.  You talked about how you noticed that Prime had

18   shut down, and then the Nevada case occurred.  And so it

19   sounds like you knew very early on that there were issues

20   with Prime.  Is that right?

21   A    Yes.

22   Q    And then it sounds like you really followed the

23   receivership.  Would that be correct?  And then following --

24   A    Yes.

25   Q    -- the bankruptcy?

1    A    Sure, yeah.

2    Q    So, when the bankruptcy filed, that was -- does -- like

3    mid-August of 2023.  So, at that point, you were following

4    the case.  Is that right?

5    A    I would assume so, but I don't remember what happened in

6    that month.

7    Q    But -- and you hired counsel very quickly.  Is that

8    right?

9    A    We had -- yes.  Yeah.

10    Q    And was that Mr. Neumann?

11    A    No.  Our first attorney was out in Nevada.

12    Q    Okay.  I'm -- I apologize.  Who did -- you hired counsel

13    at the start of the bankruptcy case.  Is that right?

14    A    Yes.

15    Q    And was that Mr. Neumann?

16    A    Yes.

17    Q    And was that just a few days after the bankruptcy filed,

18    right?

19    A    I -- I don't remember.

20    Q    So, when the bankruptcy was first filed, were you

21    following the pleadings that were being put in and what was

22    happening and attending hearings like this at the start of

23    the case?

24    A    I -- I attended one hearing remotely via Zoom, that's

25    all I remember.

1  Q    Okay.  And do you recall reviewing pleadings that were

2  put in and things like that?

3  A    I remember seeing Mr. Dunn before Judge Stickles, and I

4  remember him -- we were -- we were sort of waiting with bated

5  breath to see what would -- what would be said, and it wasn't

6  really -- nothing really new or substantial was really said,

7  so we just kind of went back and said okay, I guess they're

8  not ready.

9  Q    Okay.  Do you recall reviewing the schedules of assets

10  liabilities that the debtors filed, which included all of the

11  debts and all of the Bitcoin they held and all of this

12  information?

13          MR. NEUMANN:  Objection, Your Honor.  I -- is she

14  referring to the redacted versions or unredacted?

15          MS. PATTERSON:  I'm referring to the schedules that

16  are online that have the Bitcoin and other information in

17  them that's unredacted.

18          THE COURT:  Okay.  So they're publicly available?

19          MS. PATTERSON:  I'm just asking, Your Honor, did

20  you review those when they were filed.

21          THE WITNESS:  I don't remember.

22          MS. PATTERSON:  Okay.

23  BY MS. PATTERSON:

24  Q    But you did say that you had searched for that

25  information during the entire two years of the bankruptcy

1    case.  So you, you know, would have reviewed that if it was

2    available, correct?

3    A    Yeah.  I wanted to know how much Bitcoin was held and

4    how much was owed.  It was never clear.  So there was never a

5    clear number told to us was there Bitcoin missing, for

6    example.  The first report was all about Ethereum being

7    missing; Bitcoin wasn't mentioned.  Great.  Is there missing

8    Bitcoin or is there enough to go around?  That -- that answer

9    never came.

10   Q    Okay.  And you didn't look for that information in the

11   filings that the creditors did -- or I mean, I'm sorry, that

12   the debtors did?

13   A    I don't think it's there.

14   Q    Okay.  So, moving on, as the case progressed, do you

15   remember there being a plan that was filed?  Is that right?

16   A    The distribution motion?

17   Q    No.

18   A    Oh --

19   Q    That's what we're here for today.

20   A    Yeah, yeah.

21   Q    I mean the -- like a year ago --

22   A    Sure.

23   Q    -- the confirmation process.

24   A    Yeah.

25   Q    And do you remember that your counsel objected to the

1    plan and participated in the process?

2    A    Yes.

3    Q    And were you part of that process, as well, with your

4    counsel?

5    A    Sure, yeah.

6    Q    So do you generally recur -- recall the terms of the

7    plan, that it included, you know, that the claims would be

8    valued as of the petition date?

9    A    Yes.

10   Q    So you recall that at the time of the confirmation.

11   A    Yes.

12   Q    And you recall the plan being confirmed and it going

13   effective.

14   A    Sure.  But again, the plan included a stipulation for

15   in-kind assets being -- being returned, to the extent

16   possible, right?  And so my focus was on that because the

17   valuation doesn't matter so much for us because we have this

18   digital property.  And so, because the plan said in kind, as

19   possible, well, Bitcoin, it's certainly possible because you

20   can see it online.  It -- you can -- it's a physical digital

21   asset.  It has a -- has a robust existence.

22       And so in kind is the most logical, straightforward way

23   of returning people's Bitcoin.  Selling it and then giving

24   them dollars is actually harder and more complicated than

25   simply sending them Bitcoin.  I know this because I

1   understand the technology.

2        So I wasn't focused on the valuation at all.  I'm

3   focused on it today because what seems to be happening here

4   is that now we're going to value it for much less than it's

5   valued today, not return it in kind, and -- and so on and so

6   forth, which, to me, doesn't -- doesn't make any sense.

7   Q    So did you understand that the plan called for the

8   valuing of the claims as of the petition date, regardless of

9   distribution in kind or cash?

10            MR. NEUMANN:  Your Honor, I have -- Your Honor,

11   objection.  The plan speaks for itself.  And specifically, it

12   is -- I think counsel is referring to in the event that

13   digital is turned into fiat and distributed to creditors.

14            MS. PATTERSON:  It's fine, Your Honor.  In the

15   interest of time, I'll withdraw the question.

16            THE COURT:  Okay.

17            MS. PATTERSON:  I believe we're on a schedule.

18   BY MS. PATTERSON:

19   Q    So moving on, you mentioned that you are in contact with

20   your customers regularly, both, I would assume, about other

21   items, but about this case, as well.

22   A    Yes.

23   Q    And you posted -- did you post about this hearing today,

24   you said?

25   A    Yes.

1  Q    And did you say in that posting that your attorney is

2  not their attorney?

3  A    Yes.

4  Q    And so do you know exactly what claim Coinbits itself

5  holds?

6  A    It's -- yes, I think, roughly, I do, yeah.

7  Q    And roughly, how much do you --

8  A    I think it's about one Bitcoin.

9  Q    One Bitcoin?

10  A    Yeah.

11  Q    So not the 104 that you represent in your pleading.

12  A    No.

13  Q    And you don't represent all of those customers.

14  A    No, I do not.  I have a relationship with them and I run

15  a business, and it's important to me that they feel taken

16  care of.

17  Q    Do you know if any of your customers objected to the

18  motion?

19  A    I am not sure.

20  Q    And I know that you testified that many of your

21  customers were concerned they couldn't afford counsel.  But

22  you have seen the claimants participating today without

23  counsel, correct?

24  A    I don't -- seen who, the claimants?

25  Q    Claimants participating without counsel.

1   A    You mean on Zoom?

2   Q    Yeah, uh-huh.

3   A    I am sure.

4   Q    So one of the things you also talked about in your

5   testimony was about the blockchain analysis that you thought

6   should have been attached to Mr. Brennan's declaration.

7        Did you serve discovery related to those reports that

8   you thought should exist?

9   A    I don't know what "serve discovery" means, technically.

10  Q    So did you ask your counsel to get information from the

11  plan administrator about our report?

12  A    I asked again how much Bitcoin there is and -- and

13  whether there's enough to go around, I think.  I don't

14  remember what -- the sequence of events.  But that's the only

15  thing I've been concerned with this whole time:  How much is

16  there, is there enough to go around, what are the Bitcoin

17  addresses, I want to go see it online.

18  Q    And on a different topic, I apologize for skipping

19  around, but in the interest of time.

20       But you said that you have a provider that you work

21  with.  Is that correct?

22  A    Yes.

23  Q    So Coinbits itself doesn't have the money transmitter

24  license or other licensures to be sending out Bitcoin or

25  whatever to their customers, does it?

1    A     No, that's not what we do.  No, we -- we build software

2    that orchestrates money flows.  So what happens is you link

3    your bank accounts, you link your Prime Trust account, you

4    link this other provider account that we now work with, and

5    so on.  You can use our interface to move money among your

6    own custodial accounts that are your KYC'ed accounts, and you

7    can -- you can set -- you can set up routines and automations

8    and so on.

9    Q     Okay.  So, when you say that you offered to help make

10   in-kind distributions to the plan administrator, it would

11   really be your provider who's helping the plan administrator

12   distribute to 40,000 creditors in 150 countries.  Is that

13   correct?

14   A     Yeah, you would need that.  And we have our current one,

15   we also have relationships with others in the industry.  It

16   would not be, you know, too -- too difficult for us to help

17   orchestrate that relationship.

18          MS. PATTERSON:  If I can just have one minute, Your

19   Honor.  No further questions, Your Honor.

20          THE COURT:  Okay.  Thank you.

21          Is there anyone else who wishes to cross-examine

22   the witness?  And I'm particularly speaking to people on

23   Zoom.

24      (No verbal response)

25          THE COURT:  Okay.  I hear no one, I see no hands.

 1                    Are there other --

 2                    MR. NEUMANN:  Just to follow up, Your Honor?

 3                    THE COURT:  Yep.  Redirect.

 4                           REDIRECT EXAMINATION

 5    BY MR. NEUMANN:

 6    Q    From everything that you heard today, in your opinion,

 7    did the debtor ever intend to do an in-kind transfer?

 8    A    Well --

 9    Q    The plan administrator.

10    A    From what I've heard today, I didn't -- I mean, not in

11    particular.  They rejected our API agreement, so we couldn't

12    -- you know, it was pretty clear that -- that they weren't

13    going to be engaging us in that activity or hadn't, at that

14    point, thought about it.  They could always sign a new one, I

15    guess, but it just adds more time and more expense to the

16    process.

17    Q    What about expense, timing?  I know we heard a million

18    dollars spent in the last year and hopeless.

19    A    Yeah.  I mean, a million dollars were spent.  I mean, I

20    get emails what's going on in the Prime Trust case, how can

21    you help.  We can't help, this is a process, it has to play

22    out, the gears of justice turn slowly, but they ultimately do

23    turn.

24         And you know, we waited a really long time.  It was a

25    big moment when that report finally came out.  And it was --

1   you know, there were technical concepts confused within it

2   and it didn't contain very much information about the

3   blockchain analysis.  And you know, it was basically I don't

4   know what has been going on for the last year and a half.

5   Q    The key questions, we've been asking those questions for

6   how long, David?

7   A    Since they went live, so I think that would have been in

8   January 2024 or so, yeah.

9           MR. NEUMANN:  No further questions, Your Honor.

10          THE COURT:  Anyone else?

11      (No verbal response)

12          THE COURT:  I have one question for you.

13                      EXAMINATION

14  BY THE COURT:

15  Q    If -- after reading your pleading, if the UTXOs could be

16  merged upon a sweep, would the blockchains be impossible to

17  trace?

18  A    No, because you would still -- that UTXO that you would

19  up with, it would still have these inputs.  So then you'd --

20  all you'd have to do is rewind, go back -- back one step.

21  Okay?  Then go back a step, but -- before that.  It's really

22  amazing how -- how easy it is to just step through each

23  stepping stone to find the path that certain funds followed.

24          THE COURT:  Okay.  Thank you.  You're excused.

25          THE WITNESS:  Thank you.

1          (Witness excused)

2                    THE COURT:  Other witnesses?

3                    MR. NEUMANN:  No, Your Honor.

4                    THE COURT:  Okay.  Is there anybody on Zoom that

5     has any witness to present?  Okay.  I hear no one.

6                    MR. KUSHNER:  Anybody that has what?  I apologize.

7     What was the --

8                    THE COURT:  A witness --

9                    MR. KUSHNER:  -- question?

10                   THE COURT:  -- to present, any evidence to present?

11                   MR. KUSHNER:  Yes, I did.  I absolutely do, if --

12    on my camera.  Okay.  So let me ask you a couple of questions

13    before I start, if that's okay.  Is this the part -- again,

14    unlike most people here --

15                   THE COURT:  This is where --

16                   MR. KUSHNER:  -- this is my first time --

17                   THE COURT:  Yeah.  This is the part, we're on the

18    portion of parties putting in their evidence.  So do you have

19    a witness to present now?

20                   MR. KUSHNER:  Okay.  I have myself.  Is that

21    acceptable?

22                   THE COURT:  Well, you'll have to be sworn in.

23                   MR. KUSHNER:  Absolutely.

24                   THE ECRO:  Please raise your right hand.

25                        GEORGE KUSHNER, OBJECTOR, AFFIRMED

1          THE ECRO:  Please state your full name and spell

2     your last name for the record.

3          MR. KUSHNER:  George Kushner, K-u-s-h-n-e-r.

4          THE ECRO:  Thank you.

5               DIRECT TESTIMONY OF GEORGE KUSHNER:

6          MR. KUSHNER:  Okay.  I should be relatively quick

7     here, and I appreciate the time, Your Honor.

8          I'm going to harken back on what a lot of folks

9     have mentioned today with Mr. Detweiler continuing to try and

10    throw the Court off track and offset.  And he's used the word

11    "hopelessly commingled," he actually doubled down just a

12    little while ago and said nobody has done this, when

13    referring to providing any type of evidence of proof of claim

14    of crypto possession.

15         I actually corresponded with Mr. Detweiler and his

16    firm on Tuesday of this week, providing him a screenshot of

17    my Bitcoin holdings with Prime Trust.  Unbeknownst to me how

18    things go during this proceeding, I have subsequently sent

19    the clerk two other screenshots.

20         One is a correspondence with Melissa Westoff

21    (phonetic), who was a Prime Trust employee in their IRA, I

22    believe this is pertaining to my IRA account.  And I just

23    shot over correspondence with her saying yes, you have this

24    many Bitcoin, and yes, you should be receiving an in-kind

25    transfer.

1        And then, finally, I also provided the Court, since

2   nobody seems to know that Prime Trust offered an IRA account,

3   I also sent them a twenty-four-page PDF document of my

4   account, signed by myself and a representative from Prime

5   Trust.

6        I can tell you that I will absolutely cut people

7   off at the pass if they ask me did I object, did I do this,

8   do that.  I would say no.  I did speak with several attorneys

9   when this case started first going down, but I'm not an

10   attorney; I'm a financial services person.  I did explain to

11   them my objection, that I had proof.  But this is really my

12   first time understanding how this works, and this is my first

13   time trying to prove that we have this.

14        And this whole notion of commingled, I have to

15   think -- I feel horrible for everyone else in this case.  But

16   I have to feel that, somewhere, someone has got this ledger.

17   And I was appalled and disgusted by a lot of these, quote,

18   "experts" that were acting quite obtuse on the most simple,

19   basic, simplistic questions.  And I just ask the Court to

20   please do as much due diligence as possible.  And I

21   appreciate your time.

22        THE COURT:  Thank you, Mr. Kushner.

23        Does anyone want to cross-examine Mr. Kushner?

24        MR. DETWEILER:  No, Your Honor.

25        THE COURT:  Okay.

1          MR. DETWEILER:  (Indiscernible) to Mr. Kushner.

2          MR. KUSHNER:  Likewise, Mr. Detweiler.

3          THE COURT:  Okay.  Any other evidence?  And parties

4    will have the opportunity to do closing statements.

5          Yes, Ms. McClenaghan.

6          MS. MCCLENAGHAN:  Thank you, Judge.  And again,

7    like Mr. Kushner, this is the first time --

8          THE COURT:  Oh, are you going to testify?  Then you

9    need to be sworn in.

10         MS. MCCLENAGHAN:  I have a question.  Is this --

11   well, yeah, you know, where we present our argument?

12         THE COURT:  No, we're not at argument yet.

13         MS. MCCLENAGHAN:  Okay.  Thank you.  Okay.  I think

14   I'm on the agenda for that, so okay.  Thank you.

15         THE COURT:  You --

16         MS. MCCLENAGHAN:  But I -- no.

17         THE COURT:  You have no testimony?  You'll be

18   presenting argument later?

19         MS. MCCLENAGHAN:  What is the difference?  I mean,

20   I do agree with what Mr. Kushner said, and I have evidence,

21   as well.  So, if that's included as part of my argument or if

22   you think I should be --

23         THE COURT:  If you have evidence, you need to

24   present the evidence now.

25         MS. MCCLENAGHAN:  I did submit it to the Court

1    yesterday --

2              THE COURT:  I -- okay.  Can --

3              MS. MCCLENAGHAN:  -- the exhibits.

4              THE COURT:  Let me just ask you because certain

5    documents have been redacted.  I can't easily ascertain who

6    some objectors are.  Are -- bear with me one second.  Do you

7    know what document number the document you filed is?  Is it

8    Document Number 963?

9              MS. MCCLENAGHAN:  Yes, Your Honor.

10             THE COURT:  Okay.  I have your exhibits.

11             MS. MCCLENAGHAN:  Okay.  And I believe you should

12   have the unredacted and the redacted, as well, you know, both

13   of those.

14             THE COURT:  Okay.

15             MR. DETWEILER:  And may I --

16             MS. MCCLENAGHAN:  Okay.  So then I'm good for --

17             THE COURT:  Okay.

18             MS. MCCLENAGHAN:  -- later.

19             THE COURT:  Okay.

20             MS. MCCLENAGHAN:  Thank you.

21             THE COURT:  Thank you.

22             MR. DETWEILER:  May it please the Court, we'll

23   stipulate to the admission of the documents that were

24   attached to her objection.

25             THE COURT:  I'm sorry.  I didn't hear what you

1    said, Mr. Detweiler.  You have to turn the volume up when you

2    speak.

3              MR. DETWEILER:  The plan administrator stipulates

4    to the documents she put in.

5              THE COURT:  Okay.  So those doc --

6              MR. DETWEILER:  We have no objection to those.

7              THE COURT:  Okay.  They're admitted.  Thank you.

8         (McClenaghan Exhibits at ECF 963 received in evidence)

9              THE COURT:  Any other evidence?

10         (No verbal response)

11             THE COURT:  Okay.  Were -- all the exhibits the

12   parties stipulated are in?

13             MS. PATTERSON:  I believe so, Your Honor.  Yes.

14   The exhibits that the plan administrator admitted were

15   attached to our declarations, which were admitted.

16             THE COURT:  Okay.  So all of the plan

17   administrator's exhibits are in?

18             MS. PATTERSON:  Yes.  Thank you, Your Honor.

19             THE COURT:  Okay.  I have Mr. Kushner's or I will

20   have his and -- okay.  All right.

21             MR. NEUMANN:  And mine all have been admitted, Your

22   Honor.

23             THE COURT:  Okay.  We need to pick a time for

24   closing arguments.  And how long do we think they're going to

25   take?

1          MR. DETWEILER:  May it please the Court.  Your

2     Honor, we would try to sum up within a half-hour to 45

3     minutes.  I think it's pretty clear, the evidence, but we'll

4     try to stick to, you know, 30 to 45 minutes, to sum up the

5     evidence before the Court.

6          Sir?  Mr. Neumann?

7          MR. NEUMANN:  Your Honor, I think my argument is

8     pretty straightforward, so I don't need anywhere near that

9     amount of time.

10          MR. DETWEILER:  Mr. Kushner and Ms. McClenaghan, if

11     you have potential arguments.  Ms. McClenaghan, you indicated

12     about how much time would you need for your arguments, ma'am?

13          MS. MCCLENAGHAN:  If it is me just explaining, then

14     I would say seven minutes.

15          MR. DETWEILER:  Okay.  We'll put you down for ten.

16          THE COURT:  Ten.

17        (Laughter)

18          MR. DETWEILER:  Nobody will hold you to it, nobody

19     will hold you to it.

20          THE COURT:  I just want to --

21          MR. DETWEILER:  But to say --

22          THE COURT:  -- know how much time we need to

23     schedule.

24          MR. DETWEILER:  Yeah.  Mr. Kushner, you, sir?

25          MR. KUSHNER:  I think -- I think I agree with that,

1    somewhere around ten -- you know, ten minutes max.

2            THE COURT:  Okay.  There are other objectors, you

3    know, wh I haven't heard from, and that doesn't mean they

4    don't want to be heard at argument.  So others who objected,

5    if you're on the line, I just want to make clear that we're

6    scheduling the time for argument.  So, if you want to give an

7    indication of how much time you think your argument is going

8    to take?  Okay.  I guess we'll see what --

9            MR. ENGLANDER:  Your Honor, if I may be heard?

10           THE COURT:  Yes.

11           MR. ENGLANDER:  Brad Englander, representing SDM.

12           We did file an objection, but we have resolved that

13   objection on procedural grounds with the plan administrator.

14   I don't think, of course, we'd be presenting arguments, but

15   we do have an interest in appearing at the hearing.

16           THE COURT:  Understood.  The closing arguments will

17   be noticed.

18           MR. ENGLANDER:  Well, thank you, Your Honor.

19           MR. NARAYANAN:  Your Honor, Shyam Sundar of

20   Document Numbers 940 and 941 --

21           THE COURT:  Yes.

22           MR. NARAYANAN:  -- filed jointly with my mother.

23           THE COURT:  Yes.

24           MR. NARAYANAN:  And I would like to present my

25   arguments when I get a chance.

1    THE COURT:  Okay.  All right.  Then, when we are

2    rescheduled, that's when we're going to hear everyone's

3    arguments, so --

4    MR. NARAYANAN:  Thank you.

5    (Pause in proceedings)

6    THE COURT:  Three hours?

7    MR. DETWEILER:  Sounds great.  I think it will

8    probably be less, but it probably makes sense to block that

9    time.

10   (Pause in proceedings)

11   THE COURT:  I can't view the right calendar.

12   (Court and court personnel confer)

13   (Off the record.  Back on the record)

14   THE COURT:  Okay.  We could do, either Wednesday

15   morning, starting at 10, or -- which is the 19th, or Friday

16   the 21st, starting at 10.  And I will say ...

17   (Pause in proceedings)

18   THE COURT:  Wednesday, we'd have to start at 9:30

19   because I actually have a twelve o'clock, or we could do

20   Friday.

21   MR. ENGLANDER:  Friday works for me.

22   MR. DETWEILER:  What would others prefer, Your

23   Honor?  We'll be available either day.

24   THE COURT:  Okay.

25   MR. KUSHNER:  Friday would be preferable.

1          UNIDENTIFIED:  (Indiscernible)

2          MR. NEUMANN:  Yes.

3          MR. NARAYANAN:  Friday does work for me, Your

4    Honor.

5          MR. NEUMANN:  Thank you, Your Honor.  Friday would

6    work.  I would love to make the argument on Zoom, rather than

7    come in here, but I can --

8          THE COURT:  Okay.  Well, you can follow my

9    courtroom procedures for making a request for a Zoom

10   appearance.

11         MR. NEUMANN:  Thank you, Your Honor.

12         THE COURT:  Who said they were not available

13   Friday?

14         MR. DETWEILER:  Mr. Narayanan, I believe, was, Your

15   Honor.

16         MR. NARAYANAN:  I can be available on Friday.  This

17   is Shyam Sundar Aswadha Narayanan.

18         THE COURT:  Okay.  Who said they couldn't be

19   available Friday?  I thought I heard somebody say they

20   weren't.

21      (No verbal response)

22         THE COURT:  Hold on one second.

23      (Off the record at 4:05 p.m.)

24      (Proceedings resume at 4:06 p.m.)

25         MR. DETWEILER:  Thank you, Your Honor.

1        THE COURT:  If the plan administrator could just

2   get either a notice of continued hearing or a --

3        MR. DETWEILER:  We will endeavor to try to get that

4   out over the weekend, Your Honor, given it's Valentine's Day

5   and our sweethearts are waiting for us.  No, I'm kidding.

6   We'll try to get it out today, if we can.

7        THE COURT:  Okay.

8        MR. DETWEILER:  We will work hard to get that out

9   and, for those who are on the agenda, to personally get it

10  out to them, so they know the time of the hearing, and then a

11  general notice, as well.

12       THE COURT:  Okay.  Terrific.

13       Thank you all for your time today, I appreciate

14  your arguments.  And we'll pick up on Friday and proceed

15  then.  Okay?  Thank you, all.  Have a great afternoon.

16       MR. NEUMANN:  Thank you for letting me appear here

17  today.

18       PARTICIPANTS:  Thank you, Your Honor.  Thank you

19  for your time.

20       THE COURT:  We stand adjourned.

21       PARTICIPANTS:  Thank you, Your Honor.  Thank you.

22     (Proceedings concluded at 4:07 p.m.)

23                              * * * * *

24

25

1                        CERTIFICATION

2         I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10   _____        March 28, 2025

11   Coleen Rand, AAERT Cert. No. 341

12   Certified Court Transcriptionist

13   For Reliable

14

15

16

17

18

19

20

21

22

23

24

25