# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| PRIME CORE TECHNOLOGIES INC., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | **Related D.I. No. 919** |

## OPINION

Before the Court is the Plan Administrator's motion (the "<u>Distribution Motion</u>")[2] seeking

an order (i) approving the Plan Administrator's determination that the Currency[3] held by the

Debtors is property of the Debtors' Estates[4]; (ii) approving distributions of Estate property to

Holders of Allowed Claims; and (iii) establishing procedures for setting a Disputed Claims

Reserve.  Several parties holding cryptocurrency (or "crypto") with the Debtors (collectively,

and as defined below, the "<u>Objectors</u>") oppose the relief, arguing (i) the Distribution Motion

violates their constitutional due process rights because (a) the Plan Administrator filed a motion

rather than an adversary proceeding and (b) the Plan Administrator did not comply with the

---

[1]  The debtors (collectively the "<u>Debtors</u>" or "<u>Prime</u>") in these cases, along with the last four digits of each Debtor's federal tax identification number are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528).  The Debtors' mailing address is Prime Core Technologies Inc. Plan Administrator, c/o Province Fiduciary Services, LLC, 2360 Corporate Circle, Suite 340, Henderson, Nevada 89074.

[2]  Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them below or in the Distribution Motion.

[3]  The Distribution Motion and the Plan (as defined below) define "cryptocurrency" as a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens, and governance tokens. "Currency," for purposes of the Distribution Motion is defined as (i) cryptocurrency and (ii) USD (United States Dollars).  Foreign currencies are not the subject of the Distribution Motion.

[4]  *See* D.I. 644 (Confirmation Order, Ex. A (Plan) at Art. 1(A)(1.73)) ("'<u>Estate</u>' or '<u>Estates</u>' means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.")

Account Treatment Procedures; and (ii) the funds held by the Debtors are held in trust and

traceable.[5]

    For the reasons set forth below, the Court will grant the Distribution Motion.[6]  First, the

Court finds that notice of the Distribution Motion was reasonably calculated to apprise the

Objectors of the pendency of the motion and afforded them the opportunity to present their

objections; and was compliant with the Account Treatment Procedures.  Second, the Court finds

that, even if there was a trust or fiduciary relationship between the parties, the Debtors

hopelessly commingled Currency such that the Currency is not traceable.  As a result, the

Currency held by the Debtors is property of the Debtors' Estates and may be distributed in

accordance with the confirmed Plan (as defined below).

---

[5]  The Court held an evidentiary hearing on the Distribution Motion on February 14 and 21, 2025 (the "Hearing").
*See* D.I. 1021 and 1022.  Multiple objections were filed to the Distribution Motion.  The Plan Administrator settled
or continued several objections.  At the hearing on the Distribution Motion, the following prosecuted their
objections: (i) Coinbits, Inc. ("Coinbits") (D.I. 945); (ii) George Kushner (D.I. 946); (iii) Shyam Sundar, Aswadha
Narayanan, and Latha Narayanan (D.I. 940), and (iv) Colleen McClenaghan (D.I. 963) (collectively, the
"Objectors").

Prior to the Hearing, the Plan Administrator submitted a revised proposed order (D.I. 982) that specifically carved
out (i) Zap Solutions, Inc. (d/b/a Strike) ("Zap"), any affiliate, insider of Zap, or any person who is a mediate or
immediate transferee by or on behalf of Zap, or person for whose benefit such transfer was made; (ii) Digital Asset
Redemption, LLC; (iii) SDM, Inc.; and (iv) Electric Solidus, Inc., f/k/a Electric Solidus, LLC d/b/a Swan Bitcoin
("Swan") or Swan's customers (collectively, the "Reserved Parties").  At the Hearing, the Court requested
clarification from Plan Administrator's counsel regarding the Reserved Parties.  Tr. Hr'g Feb. 21, 2025 (D.I. 1022)
at 102:6-103:12.  By agreement of the parties, the Reserved Parties' rights are not being adjudicated herein.

[6]  In making this ruling, the Court relies on the (i) Declaration of David Dunn in Support of the Distribution Motion
(D.I. 920) (the "Dunn Decl."); (ii) Declaration of James P. Brennan in Support of the Distribution Motion (D.I.
921(sealed); 922 (redacted)) (the "Brennan Decl."); (iii) Supplemental Declaration of David Dunn in Support of the
Plan Administrator's Distribution Motion and Estate Property Determination (D.I. 968) ("Supp. Dunn Decl.");
(iv) Supplemental Declaration of James P. Brennan in Support of the Plan Administrator's Distribution Motion and
Estate Property Determination (D.I. 969) ("Supp. Brennan Decl."); and (v) the testimony of Messrs. Dunn, Brennan
and Birnbaum and documents submitted into evidence at the Hearing.

## JURISDICTION

The Court has jurisdiction over the Distribution Motion pursuant to 28 U.S.C. §§ 157 and 1334, the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012, and Article 12 of the Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies, Inc. and Its Affiliated Debtors, dated December 19, 2023.[7] Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein are sections 105(a), 502, 541, and 1142(a) of the Bankruptcy Code and Bankruptcy Rule 3021.

## BACKGROUND

### A. General Background

Prior to the cessation of their operations and filing for bankruptcy, Prime was one of the cryptocurrency industry's largest market participants. Founded in 2016, Prime began as a trust and custodial services company for a variety of traditional financial assets. As the cryptocurrency markets and industry grew, Prime shifted its focus away from traditional financial assets towards providing services for cryptocurrency and other digital assets. Thousands of customers used Prime to gain access to the U.S. banking system by converting cryptocurrency to fiat. Prime provided these services through various contractual agreements

---

[7] The Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies, Inc. and Its Affiliated Debtors (D.I. 485), as modified by the Initial Plan Supplement (D.I. 486), the First Amended Plan Supplement (D.I. 511), the Second Amended Plan Supplement (D.I. 540), the Third Amended Plan Supplement (D.I. 594), the Fourth Amended Plan Supplement (D.I. 615), and the Fifth Amended Plan Supplement (D.I. 620) (collectively with the exhibits thereto, the "Plan"). The Plan was confirmed by, and attached as Exhibit A to, the Findings of Fact, Conclusions of Law, and Order (i) Approving the Disclosure Statement on a Final Basis and (ii) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11of the Bankruptcy Code (D.I. 644) (the "Confirmation Order").

with: (i) third party digital asset and cryptocurrency companies (the "Integrators"), as well as (ii) the Integrators' end-users (the "End-Users").[8]

In general, Prime's cryptocurrency and digital assets platform operated in the first instance as a business-to-business service platform, *i.e.*, Prime provided various cryptocurrency, fiat, and digital asset services and support to the Integrators.[9]

The Integrators procured Prime's services by entering into various service-related agreements with Prime (collectively, the "Agreements"). Integrators directly accessed services provided on Prime's platform through an application programming interface, also known as an API, provided to the Integrator.[10]

The End-Users did not directly procure Prime's services. Rather, End-Users accepted or agreed to a user agreement with Prime (the "End-User Agreement") that was presented to them by the Integrator through the Integrator's system.

A vast majority of the Integrators were subject to a Master Services Agreement (the "MSA").[11] The MSA specifically stated that the agreement did not "create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the Parties."[12] Most of Prime's Integrators were also subject to a Services Schedule for Prime Custodial

---

[8] Dunn Decl. ¶ 6.

[9] Dunn Decl. at ¶ 7.

[10] Dunn Decl. at ¶ 8.

[11] Dunn Decl. at ¶ 7.

[12] *See* Dunn Decl., Ex. 1 (Sample Integrator Master Services Agreement) at § 14.1.

Services (the "Custodial Agreement"), which provided Prime with the ability to invest, rehypothecate, and move cash or fiat at its sole discretion.[13]

Prime contracted with approximately 140 Integrators and thousands of End-Users, and, at its height, there were dozens of variations of the MSA, End-User Agreements, and other service-related agreements between Integrators and Prime.[14]  At its peak, the Debtors were processing over 300,000 transaction a day and held over $3.8 billion in cryptocurrency and fiat.[15]

## B. Events Leading to and the Bankruptcy[16]

### 1. The 98f Wallet

In March 2018, Prime created cold-storage wallets (the "Legacy Wallets"), one of which is the "98f Wallet," for purposes of maintaining cryptocurrency assets, including Bitcoin ("BTC") and Ether ("ETH").  In or around July 2019, Prime migrated its cryptocurrency assets to the digital asset security platform (the "Fireblocks Platform") maintained by Fireblocks LLC ("Fireblocks").  Prime believed it had completed the migration of its cryptocurrency assets in the first quarter of 2020.  Prime sought to deprecate the Legacy Wallets, such that customers should no longer deposit into the Legacy Wallets.

---

[13] *See* Dunn Decl., Ex. 2 (Sample Custodial Agreement).

[14] Dunn Decl. at ¶ 9.

[15] Dunn Decl. at ¶ 9.  *See* Declaration of Jor Law, Interim Chief Executive Officer and President of Prime Core Technologies, Inc., et al., in Support of Chapter 11 Petitions and First Day Motions (D.I. 14) at ¶ 11.

[16] The facts in this section are taken in large part from the Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with Respect to the Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors (D.I. 259) (the "Disclosure Statement") and are provided solely for context and history related to the Distribution Motion.  For a complete factual history of these cases, refer to the full text of the Disclosure Statement.

In January 2021, Prime inadvertently provided customers with the 98f Wallet deposit addresses, allowing customers to make contributions of cryptocurrency into the 98f Wallet. Certain customers deposited crypto into the 98f Wallet.

In December 2021, a customer requested a significant withdrawal of ETH that Prime could not fulfill using ETH from its omnibus digital wallets ("Omnibus Wallets") on the Fireblocks Platform. This prompted certain Prime employees to investigate and determine that cryptocurrency assets had been deposited to the 98f Wallet, which was outside the Fireblocks Platform. Around this time, it was discovered that Prime did not have access to the 98f Wallet, and therefore, it could not access the cryptocurrency stored in the 98f Wallet (the "Wallet Event").

### 2. Receivership

As a result of the Wallet Event, Prime was in violation of Nevada trust regulations and certain other state regulations due generally to a failure to maintain an adequate amount of shareholder equity or capital in the form of permissible investments. The Nevada Department of Business and Industry Division of Financial Institutions filed a *Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief* with the Eighth Judicial District Court of the State of Nevada.[17] The Nevada State Court granted the petition placing Prime in receivership. A special committee was formed and vested with authority to direct Prime to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code and to manage and oversee the Prime Entities during the pendency of their bankruptcy.

---

[17] *O'Laughlin v. Prime Core Tech., Inc.*, Case No. A-23-872963-B (8th Jud. Dist. Ct. of Nev.).

### 3. The Bankruptcy

On August 14, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief

under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

## C. The Plan

The Plan was confirmed on December 21, 2023, and became effective on January 5,

2024.[18]  Pursuant to the Plan, the Wind-Down Debtor was formed, and each of the Debtors

transferred "the Wind-Down Debtor Assets to the Wind-Down Debtor for distribution in

accordance with the terms of the Plan and the Plan Supplement."[19]  The Plan Administrator is the

manager of the Wind-Down Debtor vested with the powers of a debtor in possession and trustee

under sections 704, 1106, 1107, and 1123(b)(3) of the Bankruptcy Code.[20]  The Plan

Administrator is compelled to act in a fiduciary capacity on behalf of the interests of all Holders

of Claims and Interests that will receive distributions under the Plan.[21]

Article 4 of the Plan provides for the following four classes of general unsecured claims

(collectively, the "General Unsecured Claims"):[22]

> Class 3A (Prime Core General Unsecured Claims)
> Class 3B (Prime Trust General Unsecured Claims)
> Class 3C (Prime IRA General Unsecured Claims)
> Class 3D (Prime Digital General Unsecured Claims)

For each of these classes of General Unsecured Claims, Holders of Allowed Claims are entitled

to receive:

---

[18]  D.I. 644 (Confirmation Order) and 694 (Notice of Effective Date).

[19]  Plan, Art. 6.10(b).  *See also* Plan at Art. 6.10(b) ("All such [Wind-Down Debtor] assets shall automatically vest in the Wind-Down Debtor free and clear of all Claims, Liens, and other interests.").

[20]  Plan, Art. 6.10(a), (c), (d), Art. 8.7.

[21]  Plan, Art. 6.10(h).

[22]  Plan, Art. 4.4–4.7.

(i) following satisfaction of the DIP Claims, the Cash Allocation attributable to [each Debtor]; **and/or**

(ii) following satisfaction of the DIP Claims, the Cryptocurrency Allocation attributable to [each Debtor].[23]

The Plan provides for "dollarization" of the cryptocurrency and for valuation as of the

Petition Date:

As is required by section 502(b) of the Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the Cryptocurrency (based in United States dollars pursuant to the Cryptocurrency Conversion Table) held by the Account Holder at the Debtors as of the Petition Date at 11.59 p.m. UTC. This process is generally referred to as a "dollarization." Dollarization allows the Debtors to put all Account Holders' Claims on equal footing to calculate recoveries in accordance with the requirements of the Bankruptcy Code.

. . . (i) Distributions to Holders of Claims in Class 3 that allege claims arising from the Debtors' custody of Cryptocurrency in Accounts shall be made, subject to the Wind-Down Debtor's reasonable business judgment, in the form of the Cryptocurrency deposited by each respective Account Holder and from the Debtor with which such Cryptocurrency was deposited, and (ii) the Wind-Down Debtor shall liquidate Cryptocurrency solely to the extent it determines, within its reasonable business judgment, that such liquidation is reasonable and necessary to make payments in Cash as otherwise required under the Plan.[24]

Article 2.5(b) of the Plan also establishes Account Treatment Procedures, which provide in part:

To the extent the Wind-Down Debtor determines that Currency held in an Account constitutes property of the Debtors' Estates, the Wind-Down Debtor shall notify the applicable Customer in writing (which writing may be by email, where possible, and otherwise by publication to the Wind-Down Website) of same (the "Estate Property Determination Notice"). To the extent a Customer disagrees with an Estate Property Determination Notice, such Customer shall file an objection (an "Estate Property Determination Objection") with the Bankruptcy Court and serve such Estate Property Determination Objection on the Wind-Down Debtor no later than the date that is twenty-one (21) days following

---

[23] Plan, Art. 4.4–4.7 (emphasis added).

[24] Plan, Art. 7.6. The Debtors filed the Cryptocurrency Conversion Table with the Plan Supplement. *See* Initial Plan Supplement, Ex. I (D.I. 486), and Amended Cryptocurrency Conversion Table, Dunn Decl., Ex. 4.

the filing of the applicable Estate Property Determination Notice
by the Wind-Down Debtor.  Upon receipt of an Estate Property
Determination Objection, the Wind-Down Debtor shall schedule a
hearing before the Bankruptcy Court with respect to the Estate
Property Determination Notice and any related Estate Property
Determination Objections.[25]

As part of the Plan and confirmation process, to resolve certain objections, the Debtors

attached "Account Treatment Procedures" to their memorandum in support of confirmation

which differ slightly from the procedures set forth in Article 2.5 of the Plan.[26]  Ultimately,

however, the Debtors presented, and the Court approved, the Account Treatment Procedures in

the Plan.

The Account Treatment Procedures provide optionality that the Plan Administrator seeks

to exercise in the Distribution Motion.

## D.  Plan Administrator's Investigation and Evidence Presented

Following confirmation of the Plan and the appointment of the Plan Administrator, David

Dunn, a principal of Province, oversaw an investigation to determine whether the Currency held

---

[25]  Plan, Art. 2.5(b)(iii) (the "Account Treatment Procedures").

[26]  The revised Account Treatment Procedures attached to the memorandum state, in part:

> To the extent the Wind-Down Debtor determines that Currency held in an Account constitutes
> property of the Debtors' Estates, the Wind-Down Debtor shall notify the applicable Customer in
> writing (which writing may be by email, where possible, and otherwise by publication to the
> notice website to be established by the Plan Administrator for such purpose) of same (the "Estate
> Property Determination Notice").  Upon such determination, the Wind-Down Debtor and such
> Customer shall meet and confer with respect to formulating a proposed scheduling order to
> govern, among other things, the date by which the Wind-Down Debtor will file a motion with the
> Bankruptcy Court with respect to the Account Treatment Issues for such Customer (an "Account
> Treatment Motion"), and dates and deadlines relating to discovery and the adjudication of the
> Account Treatment Motion.

*See* D.I. 557, Ex. B.  The memorandum referred to these revised procedures as "in discussion."  *See* D.I. 557 at n.
84.  The Debtors did not adopt or present the revised procedures to the Court for approval.  *See* D.I. 639 and D.I.
644.

in an Account[27] constitutes property of the creditors or the Debtors' Estates.  The Plan

Administrator asserts that the various agreements between the Debtors and Integrators and End-

Users did not create a trust relationship and, even if they did, the Currency is hopelessly

commingled and not traceable by any particular creditor.[28]

### 1. Prime's Commingling of Fiat and Inadequate Recordkeeping

The Plan Administrator presented the Declaration and testimony of James P. Brennan, a

forensic accountant and Senior Managing Director and Global Head of Fintech, Payments, and

Crypto Compliance and Investigations at J.S. Held, who reviewed documents (incoming and

outgoing internal ledger ("Internal Ledger") records for both fiat and asset transactions, Internal

Ledger data, bank account statements, bank reconciliations, deposition testimony,

correspondence), bank accounts held by Prime at various banks, and sworn testimony of former

Prime employees, and made the following observations about Prime's management and

commingling of fiat:

- Prime historically commingled its own fiat and fiat transferred to Prime by its Customers in different Prime accounts, which is why it is impossible to trace, segregate, or otherwise identify specific assets transferred to Prime by any Account Holder or Customer.[29]

- Prime held and commingled fiat that customers transferred to it in omnibus bank accounts with fiat transferred to it by thousands of Prime's other customers and with fiat Prime generated from its business operations.[30]

---

[27] Pursuant to the Plan, "Account" means "any active account identified in the Debtors' books and records as having a balance as of the Petition Date.  For the avoidance of doubt, Accounts as used herein are not 'accounts' within the meaning of Article 9 of the Uniform Commercial Code."  Plan, Art.1.1.

[28] Dunn Decl. at ¶ 10.

[29] Brennan Decl. at ¶ 10.

[30] Brennan Decl. at ¶ 15.

- Since fiat that customers transferred to Prime was commingled with fiat from other customers, Prime was forced to rely on its Internal Ledger to keep track of transactions to identify how much Prime owed each of their customers.[31]

- Mr. Brennan reviewed spreadsheet versions of Internal Ledger records that included information concerning Prime's customer and internal accounts; and compared certain Internal Ledger records to the bank account deposits and withdrawals and confirmed that this is how Prime maintained the commingled fiat.[32]

- Prime moved funds between the bank accounts that held customer-transferred fiat and Prime's own corporate bank accounts.[33]

- Prime appears to have paid its own corporate operating expenses from bank accounts which held fiat primarily funded by Prime's customers.[34]

- Prime had numerous bank accounts held at different banks depending on the time period.  Based on a review of the bank statements and conversations with former Prime staff, during a given period, certain bank accounts were primarily used depending on the type of transaction.[35]

- Prime regularly made internal transfers between Prime's bank accounts, which further commingled fiat funds.  These transfers usually occurred in round dollars, as opposed to specific amounts based on specific transactions, suggesting Prime likely estimated the amount of funds to transfer instead of transferring specific funds in response to specific transaction activity.  This practice further adds to the difficulty in connecting transfers with specific transactions reflected in Prime's Internal Ledger.[36]

- Prime's bank statements reflect the movement of funds between the Prime bank accounts but do not include details sufficient to identify where funds originated, to whom they were being transferred, or the reason for the transfer.[37]

- Based on experience, numerous internal transfers amongst bank accounts can be indicative of fraud.  It also can suggest that an entity is facing cash shortfalls and moving funds around to manage funds in a manner to satisfy withdrawals or other immediate, pressing cash needs.[38]

---

[31] Brennan Decl. at ¶ 15.

[32] Brennan Decl. at ¶¶ 17–19.

[33] Brennan Decl. at ¶ 19.

[34] Brennan Decl. at ¶ 20.

[35] Brennan Decl. at ¶ 21.

[36] Brennan Decl. at ¶ 25.

[37] Brennan Decl. at ¶ 30.

[38] Brennan Decl. at ¶ 31.

- Further complicating matters is the fact that, according to the records and Prime's former employees, Prime did not perform regular or timely reconciliations of accounts and, at least before March 2021, any reconciliations that Prime conducted were manual.[39]

- Given how Prime commingled its fiat, constantly transferred funds between bank accounts, and maintained poor Internal Ledger records and reconciliation processes, it is impossible to identify and distinguish the specific assets that the customers transferred to Prime from the other commingled assets transferred to Prime by other customers or from Prime itself.[40]

- Prime further used commingled fiat transferred to it by its customers to fund the replacement ETH purchases which were locked in the inaccessible 98f Wallet.[41]

### 2. Prime's Commingling of Cryptocurrency

Mr. Brennan provided background regarding cryptocurrency[42] and further testified

regarding the cryptocurrency held by the Debtors:

- The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. BTC and ETH are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.[43]

---

[39] Brennan Decl. at ¶ 33.

[40] Brennan Decl. at ¶ 45.

[41] Brennan Decl. at ¶¶ 46–61.

[42] The Plan and Mr. Brennan have different definitions of the term "cryptocurrency." *Compare* Plan, Art. 1(A)(1.43) *and* Brennan Decl. at ¶ 62 ("Cryptocurrency" refers "to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as 'cryptocurrencies,' 'crypto,' 'virtual currencies,' 'digital assets,' 'coins,' or 'tokens.' Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay."). For the purposes of this Opinion, the Court refers to "cryptocurrency" or "crypto" (generically) as encompassing both of the definitional concepts herein.

[43] Brennan Decl. at ¶ 62.

- All cryptocurrencies exist on a "blockchain." A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency. All transactions are recorded on the blockchain and are publicly available. When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks." Those "blocks" are publicly available and reflect all of the cryptocurrency transactions that occurred on the blockchain at a particular point in time. Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain"—a "block"- "chain."[44]

- Users generally hold crypto in digital wallets.[45]

- Transactions occurring on the blockchain incur fees. On the Ethereum blockchain, these are referred to as "gas fees." Gas fees refer to the costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain.[46] For example, the pooling of crypto allowed Prime and its customers to bypass and save on various gas fees. For crypto transfers within a single Fireblocks Vault, Prime could simply move the funds around on its Internal Ledger and avoid conducting any transactions on the blockchain which would otherwise incur gas fees.[47] Prime set up additional wallets which it referred to collectively as the "Gas Stations." Prime funded the Gas Stations from various of its other wallets (including the Omnibus Wallets) and used the Gas Stations to pay gas fees when Prime conducted on-chain transactions.[48] Prime used a variety of sources to fund the Gas Stations, which resulted in Prime further commingling the crypto transferred to it by its various customers and Prime commingling the crypto transferred to it by its various customers with Prime's own crypto.[49]

- It is impossible to identify a specific Cryptocurrency that was owned and transferred by a specific customer to Prime once there is commingling simply by looking at the blockchain—the tokens are fungible, just like fiat, and do not have identifying characteristics. Even though Bitcoin employs the Unspent Transaction Output ("UTXO") model, which allows for identification of certain Bitcoin involved in a transaction, the practicalities of how UTXOs are created, coupled with, among other things, the volume of Bitcoin at Prime, renders it impossible to trace specific Bitcoin currently held by Prime to any specific Bitcoin that a specific customer had transferred to Prime.[50]

---

[44] Brennan Decl. at ¶ 63.

[45] Brennan Decl. at ¶ 65.

[46] Brennan Decl. at ¶ 70. For simplicity, the Court will refer to all transaction fees on the blockchain as "Transaction Fees."

[47] Brennan Decl. at ¶¶ 100–101.

[48] Brennan Decl. at ¶ 104.

[49] Brennan Decl. at ¶ 105.

[50] Brennan Decl. at ¶ 71.

- Prime did not maintain separate or segregated digital wallets for crypto that each of its customers transferred to it.[51]

- Prime held and commingled the crypto from its various customers in Omnibus Wallets, where it was further commingled with crypto that Prime used for its own corporate operations and purposes.[52]

- The shared Omnibus Wallets were contained in Prime's vaults ("Vaults") with Fireblocks. Prime used Vaults within its Fireblocks infrastructure to organize myriad wallets (including the Omnibus Wallets), to implement increased security measures, and to take advantage of efficiencies in transaction policies and other access controls.[53]

- Each Prime customer had its own unique digital wallet addresses which it used to deposit crypto with Prime ("Deposit Addresses"). Prime would periodically sweep its customer's Deposit Addresses—in other words, collect all the crypto that had been transferred to the Deposit Addresses and transfer that crypto to one or more of the shared Omnibus Wallets controlled by Prime. This process commingled the crypto Prime received from its various customers.[54] Mr. Brennan supplemented: Prime would periodically sweep its customer's Deposit Addresses—in other words, collect all the crypto of the same type that had been transferred to the Deposit Addresses and transfer that crypto to one or more of the shared Omnibus Wallets controlled by Prime. This process resulted in extensive commingling of crypto making it impossible to trace crypto back to specific customer deposits. **The repeated process of condensing multiple UTXOs into new single UTXOs invalidates anyone's ability trace customers' specific crypto.**[55]

- Prime utilized inconsistent methods for performing deposit sweeps. Prime maintained an application that could trigger the sweep based on certain unknown events occurring. Further, an employee could manually perform a sweep at any given time.[56]

- Prime regularly transferred crypto among its Omnibus Wallets, further commingling the crypto that customers provided to Prime. It does not appear that Prime used a consistent or defined process regarding these transfers among its Omnibus Wallets either.[57]

---

[51] Brennan Decl. at ¶ 72.

[52] Brennan Decl. at ¶ 73 and Supp. Brennan Decl. at ¶ 15.

[53] Brennan Decl. at ¶ 74.

[54] Brennan Decl. at ¶ 75

[55] Supp. Brennan Decl. at ¶ 17 (emphasis added).

[56] Brennan Decl. at ¶ 75.

[57] Brennan Decl. at ¶ 76.

- Since Prime did not maintain segregated digital wallets for each of its customers and the crypto it held was commingled (and similar to its fiat), Prime was forced to rely on its Internal Ledger to attempt to keep track of how much crypto Prime owed each of its customers.  Prime would credit a customer's balance on its Internal Ledger for any crypto that customer sent to Prime through its unique Deposit Address.[58]

- The Internal Ledger did not (and could not) track which of the Omnibus Wallets held the specific crypto that a customer had originally transferred to Prime because that crypto was commingled with crypto that other customers had transferred to Prime and with Prime's own crypto within and across multiple Omnibus Wallets.[59]

- Prime did not perform regular reconciliations to compare the crypto recorded in its Internal Ledger with the crypto Prime actually held in its Omnibus Wallets.[60]

- When a customer requested a withdrawal, Prime relied on the Internal Ledger to validate that the specific customer had previously transferred an amount of crypto to Prime sufficient to support the withdrawal request.  Prime then checked its multiple Omnibus Wallets to determine which one(s) held sufficient crypto to satisfy the customer's withdrawal request.  Prime then transferred the crypto from the Omnibus Wallet(s) with sufficient crypto to the customer to complete the transfer.  Prime did not transfer the crypto from the original Deposit Address the customer had used, or even from the original Omnibus Wallet(s) where that customer's crypto had initially been swept.  In other words, the crypto Prime would send to a customer to satisfy a withdrawal request was not the same crypto that the customer had originally sent to Prime.[61]

At the Hearing, Mr. Brennan further testified:

- "[A] I was able to track various transfers to and from wallet addresses. Unfortunately, at a certain point in time, there was a commingling of multiple transfers; and, at that point in time, with that commingling, the Bitcoin is unidentifiable or attributable to a specific entity, customer, what have you. [Q] And you did that analysis for BTC?  [A] Correct."[62]

---

[58] Brennan Decl. at ¶ 78.

[59] Brennan Decl. at ¶ 79.

[60] Brennan Decl. at ¶ 81.

[61] Brennan Decl. at ¶ 82.

[62] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 91:25–92:7 (Brennan).

- "We interviewed many people at Prime Trust.  And one of the issues that we've uncovered was that the internal ledgers were corrupt, and so we wouldn't be able to rely on those internal ledgers because of the corruption, because of the fraud, because of what went on in Prime Trust."[63]

- "It was impossible to understand exactly where the – all of the fraud would have occurred and all of the inappropriate or fraudulent entries would have been made."[64]

- "The ledger was fraudulently manipulated, and so we can't rely upon that ledger, and that's why we rely on the blockchain records, as well as the bank statements."[65]

- "Simply tracing assets into a wallet doesn't necessarily define who or where it belongs to, especially when there are spends in addition to that.  And so, where there is a spend, they get combined and condensed into a single UTXO with the change going back to a specific wallet; and therefore, it's unable to actually trace any of those assets."[66]

- "There was no evidence that there was actual IRA-like account held at Prime Trust because all of the assets were comingled."[67]

- "Those funds would then come into the Prime Trust Omnibus Wallet, which would have commingled and collapsed all of those, which you wouldn't be able to identify them anymore.  Additionally, there would be fees associated with that on the . . . network . . . . And so those fees would have been paid and taken out of those specific transactions."[68]

In support of its objection, Coinbits presented the testimony of David Birnbaum, Vice President of Product at Coinbits.  Mr. Birnbaum testified to the following:

- Different types of blockchain cannot be comingled together, so any BTC should be able to be separated for customers, like Coinbits, who held BTC at the Debtors.[69]

---

[63] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 110:10–14 (Brennan).

[64] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 111:6–9 (Brennan).

[65] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 111:23–112:1 (Brennan).

[66] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 112:12–18 (Brennan).

[67] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 114:14–16 (Brennan).

[68] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 116:6–14 (Brennan).

[69] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 155:25–157:24 (Birnbaum).

- "So, when I saw the distribution motion, there was no amount of Bitcoin that was discussed, there was no addresses, Onchain addresses, that we can go check that was discussed. I -- to me, that is -- there's something missing there, and I don't know -- I don't know why that would have happened."[70]

- Blockchain makes tracing cryptocurrency much easier than tracing fiat.[71] "It's actually all public. You can go to a website -- I like the one that's called Mempool.space, it's a very, very prominent one -- and you can see every single Bitcoin transaction on there. And so, if I knew the addresses of where this Bitcoin is stored on Fireblocks, I can go on Mempool and I can validate that very -- in about two seconds."[72]

- Every Bitcoin transaction is visible on the blockchain.[73]

- "[Q] But digital, is it -- from what I've heard you testify, it shouldn't be terribly expensive with Bitcoin, especially with the small number in this case, to be able to track ownership. [A] I wouldn't think so."[74]

- "[Q] [I]f the UTXOs could be merged upon a sweep, would the blockchains be impossible to trace? [A] No, because you would still -- that UTXO that you would up with, it would still have these inputs. So then you'd -- all you'd have to do is rewind, go back -- back one step. Okay? Then go back a step, but -- before that. It's really amazing how -- how easy it is to just step through each stepping stone to find the path that certain funds followed."[75]

## ANALYSIS

### A.   The Requirements of Due Process are Satisfied.

Coinbits asserts two objections regarding process. First, Coinbits argues its constitutional due process rights were violated because the relief sought was brought by motion rather than an adversary proceeding in accordance with Bankruptcy Rule 7001. Second, Coinbits argues the Distribution Motion is contrary to the Account Treatment Procedures.[76]

---

[70] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 156:6–10 (Birnbaum).

[71] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 156:10 (Birnbaum).

[72] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 163:10–16 (Birnbaum).

[73] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 164:21–22 (Birnbaum).

[74] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 173:17–21 (Birnbaum).

[75] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 189:15–23 (Birnbaum).

[76] In addition to Coinbits' due process arguments, at the Hearing, for the first time, Ms. McClenaghan contested service of the Distribution Motion, among other pleadings. The Plan Administrator presented the testimony of Ms.

### 1. Coinbits Was Afforded Sufficient Constitutional Due Process.

At the Hearing, Coinbits argued, for the first time, that the proposed procedure in the

Distribution Motion is a taking of property without due process and that Coinbits should have the

opportunity for discovery and a trial.  Importantly, Coinbits did not serve discovery or seek

depositions in connection with its objection to the Distribution Motion or seek a continuance of

the hearing on the Distribution Motion until the Hearing.[77]

The Plan Administrator asserts that the Distribution Motion was properly filed in

accordance with Article 2.5 of the Plan and the Account Treatment Procedures.

Although the Court will address constitutional due process, Coinbits failure to raise the

issue until the Hearing is alone a basis for this argument to be rejected.[78]  Arguments raised for

the first time at oral argument are often waived.[79]  Here, Coinbits failure to brief the due process

---

Alexa Westmoreland from Stretto, Inc., the Court appointed claims and noticing agent.  *See* D.I. 51 and Tr. Hr'g
Feb. 14, 2025 (D.I. 1021) at 120:3–131:18.  Ms. Westmoreland testified that redacted affidavits of service filed with
the Court at D.I. 58, 496, 552, 924, and 713 contain Ms. McClenaghan's email address.  *See* D.I. 58, 496, 552, 924,
and 713.  Ms. Westmoreland testified, "I can confirm that [Ms. McClenaghan's] email address is included on all of
those affidavits of service, she was included in those email services that Stretto conducted, and the email address . . .
they were all redacted on the public proofs of service that we filed with the Court."  Tr. Hr'g Feb. 14, 2025 (D.I.
1021) at 121:9–13 (Westmoreland).  Ms. Westmoreland further testified that, in November 2023, Ms. McClenaghan
subscribed to receive docket notifications via email as documents were filed with the Court.  Tr. Hr'g Feb. 14, 2025
(D.I. 1021) at 121:20–122:9 (Westmoreland).  Based on the evidence, the Court finds that Ms. McClenaghan was
served with the Distribution Motion, among other pleadings in these cases.

[77] Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 12:13–17.

[78] *Krakowski v. American Airlines, Inc. (In re AMR Corp.)*, 598 B.R. 365, 384 (Bankr. S.D.N.Y. 2019).  "To
countenance such action would promote litigation by ambush and, in any case, deprive defendant of a fair
opportunity to respond." *White v. First Am. Registry*, 592 F.Supp.2d 681, 683 (S.D.N.Y. 2009) (refusing to hear
arguments that were raised for the first time in reply papers); *Maxus Liquidating Trust v. YPF S.A. (In re Maxus
Energy Corp.)*, 641 B.R. 467, 523 (Bankr. D. Del. 2022) ("It is well-settled that it is improper to argue or raise new
issues in reply.").  "In the absence of such a rule, parties would have an incentive to withhold certain claims or
defenses until the last moment, lying in wait to spring onto their opponents unanticipated arguments in reply briefs
or in the final moments of oral argument.  Such an outcome would not only be inefficient, but also manifestly
unjust." *Goldberg v. UBS AG*, 690 F.Supp.2d 92, 98-99 (E.D.N.Y. 2010); *see also United States v. Barnes*, 158 F.3d
662, 672 (2d Cir. 1998) ("Normally, we will not consider arguments raised for the first time in a reply brief, let
alone at or after oral argument.").

[79] *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008) ("As to [defendant's] second
argument . . . this argument was raised for the first time at oral argument and so was waived in terms of this
motion.").

issue is essentially trial by surprise to both the Plan Administrator and the Court.  Nevertheless, the Court independently reviews whether reasonably calculated notice of the Distribution Motion, and the relief sought therein, was provided.[80]

Federal Rule of Bankruptcy Procedure 7001 sets forth matters that may only be resolved through an "adversary proceeding," including the determination of "a proceeding to recover money or property."[81]  At the Hearing, Coinbits cited to *In re Mansaray-Ruffin,*[82] which involved a chapter 13 debtor who amended her plan and filed a claim on behalf of a mortgagee in an effort to invalidate the lien upon her property without filing an adversary proceeding.  The Third Circuit held that the proof of claim did not invalidate the secured lender's lien, and the debtor could not disregard Bankruptcy Rule 7001(2) and include a provision in her plan that would run afoul of the Bankruptcy Rules.  The Third Circuit held the Bankruptcy Rules establish "less exacting requirements for the confirmation of a bankruptcy plan, a process which entails virtually none of the procedural safeguards of an adversary proceeding."[83]

---

[80]  *Jackson v. Barris (In re Jackson)*, No. BAP NC-11-1683-HPAMK, 2012 WL 5416529, at *5 (B.A.P. 9th Cir. Nov. 6, 2012) (*citing Owens–Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale, Inc.)*, 759 F.2d 1440, 1448 (9th Cir. 1985) (an order is void or unenforceable against a party if it was entered or obtained without due process); *GMAC Mortg. Corp. v. Salisbury (In re Loloee)*, 241 B.R. 655, 661 (B.A.P. 9th Cir. 1999).

[81]  Fed. R. Bankr. P. 7001(1).  Rule 7001 provides, in part:

> An adversary proceeding is governed by the rules in this Part VII.  The following are adversary proceedings:
>
> (a) a proceeding to recover money or property–except a proceeding to compel the debtor to deliver property to the trustee, a proceeding by an individual debtor to recover tangible personal property under §542(a), or a proceeding under § 554(b), § 725, Rule 2017, or Rule 6002;
>
> (b) a proceeding to determine the validity, priority, or extent of a lien or other interest in property–except a proceeding under Rule 3012 or Rule 4003(d); . . .

[82]  *SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*, 530 F.3d 230, 235 (3d Cir. 2008).

[83]  *Id.* at 237.

19

Case 23-11161-JKS    Doc 1085    Filed 07/18/25    Page 20 of 34

The *Mansaray-Ruffin* court also observed:

> The level of process due to a party prior to the deprivation of a property interest, such as a lien, is highly dependent on the context. As the Supreme Court has repeatedly emphasized, **"[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."** Thus, process that may be constitutionally sufficient in one setting may be insufficient in another.[84]

Unlike in *Mansaray-Ruffin*, here, neither Coinbits nor any of the Objectors has liens in the fiat or cryptocurrency. Coinbits' challenge is a collateral attack on the confirmed Plan provisions that provide for (i) the value ascribed to the cryptocurrency as of the Petition Date, and (ii) the Plan Administrator's investigation and determination of how to proceed with in-kind versus dollarization of the cryptocurrency.[85]

As explained by the Supreme Court in *Espinosa*: while it is important to ensure litigants have a full and fair opportunity to litigate a dispute, "Where, as here, a party is notified of a plan's contents and fails to object to confirmation of the plan before the time for appeal expires, that party has been afforded a full and fair opportunity to litigate, and the party's failure to avail itself of that opportunity" does not entitle a party to relief from a judgment or order.[86]

*Espinosa* instructs that due process requirements are satisfied if a party is notified of a pleading's contents and fails to object or litigate. Coinbits had notice of the Debtors' Plan and the hearing on confirmation of the Plan, as well as notice of the Distribution Motion and the hearing on the motion, and was afforded a full and fair opportunity to litigate both the Plan and

---

[84] *Id.* at 239 (emphasis added).

[85] *See* Plan, Art. 2.5(b)(iii) and 7.6, and Account Treatment Procedures.

[86] *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 276 (2010) (referring to Fed. R. Civ. P. 60(b)(4), which is made applicable to bankruptcy cases, with certain exceptions, by Fed. R. Bankr. P. 9024).

20

the Distribution Motion.[87]  Coinbits did not serve discovery or seek a continuance with respect to the Plan or Distribution Motion.  Coinbits had the right to seek discovery in accordance with Bankruptcy Rule 9014(c) which provides the litigation tools set forth in Bankruptcy Rule 7001, *et seq.*, apply in a contested matter.[88]

Consistent with *Espinosa*, the Plan Administrators' decision to proceed by motion and not adversary proceeding, did not amount to a violation of Coinbits' constitutional due process rights.  The Supreme Court counsels: "[d]ue process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[89]  Coinbits received actual notice of the filing and the contents of the Plan and Distribution Motion, as well as an opportunity to object and be heard, thus, satisfying Coinbits' due process rights.

### 2. The Plan Administrator Followed the Account Treatment Procedures as Set Forth in the Plan.

Coinbits' written objection to the Determination Motion argues the following with respect to process:

---

[87] Coinbits has been an active participant in these cases.  Coinbits, through counsel, entered its appearance in these cases four days after the Petition Date.  *See* D.I. 12.  Coinbits objected to or joined in an objection to (i) confirmation of the Plan (D.I. 218); (ii) approval of the Disclosure Statement (D.I. 219); (iii) the Motion to Amend the Plan Administrator Agreement (D.I. 923, which was later withdrawn, D.I. 932); and (iv) the Distribution Motion (D.I. 945).  Additionally, Coinbits' counsel attended several hearings.  *See* D.I. 261, 873, and 1069.

[88] Fed. R. Bankr. P. 7014(c) ("Unless this rule or a court order provides otherwise, the following rules apply in a contested matter: 7709, 7017, 7021, 7025-26, 7028-37, 7041-42, 7052, 7054-7056, 7064, 7069, and 7071.  At any stage of a contested matter, the court may order that one or more other Part VII rules apply."); Fed. R. Bankr. P. 7014(d) ("Taking Testimony on a Disputed Factual Issue.  A witness's testimony on a disputed material factual issue must be taken in the same manner as testimony in an adversary proceeding."); Fed. R. Bankr. P. 9014(e) ("Determining Whether a Hearing Will Be an Evidentiary Hearing.  The court must provide procedures that allow parties--at a reasonable time before a scheduled hearing--to determine whether it will be an evidentiary hearing at which witnesses may testify.").  Additionally, the Local Rules of the United States Bankruptcy Court for the District of Delaware clarify that Rule 7001, *et seq.*, apply in contested matters.  *See*, *e.g.*, Del. Bankr. L.R. 7026-3(a-b), 9013-1(d), and 9018(a).

[89] *Espinosa*, 559 U.S. at 272 (cleaned up).

6. . . . the Plan Administrator has apparently combined the Notice
and the Account Treatment Motion while not complying with the
safeguards of (i) a procedure that addresses each customer (for
instance through individualized adversary proceedings) and (ii) the
basic meet and confer requirement for each Customer that was
provided for under the procedures.[90]

7.  The Determination Motion makes no distinction between
different kinds of Currency and Cryptocurrency.  Not only does
this raise due process concerns and is not in compliance with the
procedure approved at the Confirmation Hearing . . . .[91]

Cointbits' argument that an adversary proceeding and a meet and confer is required is a

collateral attack on the Plan and Confirmation Order.  The Account Treatment Procedures[92]

establish a process of notice and time to object to the Plan Administrator's determination that

Currency is property of the Debtors' Estates.  The Plan Administrator gave notice and

opportunity to object to the Determination Motion in accordance with the Plan's Account

Treatment Procedures.

Coinbits argues the Plan Administrator should follow the procedures attached to Prime's

memorandum in support of confirmation, which provides for a meet and confer before filing any

distribution motion or adversary proceeding with the court.  The Confirmation Order provides

"Account Treatment Issues shall be determined in accordance with the Account Treatment

Procedures set forth in Article 2.5 of the Plan."[93]  The Confirmation Order continues, "In the

event of any conflict between this Confirmation Order and the Plan or any other agreement,

---

[90]  D.I. 945 at ¶ 6.

[91]  D.I. 945 at ¶ 7.

[92]  Plan, Art. 2.5(b)(iii) and 7.6.

[93]  Confirmation Order at ¶ 36.

instrument, or document intended to implement the provisions of the Plan, the terms of this Confirmation Order shall govern."[94]

The Account Treatment Procedures set forth in the Plan establish a process to determine whether Currency held in an Account constitutes property of the Debtors' Estates, including notice, opportunity to object, and a hearing. The Plan Administrator followed the procedures. If Coinbits disputed the procedures or thought that such process was insufficient, Coinbits could have challenged the process by continuing to prosecute its objection to the Plan and seeking approval of modified procedures in the Plan, arguing for a change to the Confirmation Order, appealing the Confirmation Order, or filing a Rule 60 motion seeking relief from the Confirmation Order.

The Court finds that the process afforded by the Determination Motion provided sufficient due process to the holders of claims against the Debtors and is consistent with the Plan and Confirmation Order.

## B. Under The Facts, the Hopelessly Commingled Currency is Property of the Debtors' Estates.

The Plan Administrator asserts that the Debtors did not form a trust or fiduciary relationship with their Integrators or End-Users. The Objectors assert that a trust relationship was formed. The case ultimately turns on the fact that creditors' assets cannot be separately identified, segregated, traced or otherwise specifically identified.[95] The overwhelming evidence

---

[94] *Id.* at ¶ 47.

[95] *See Alameda Research Ltd v. Giles (In re FTX Trading Ltd.)*, No. 22-11068 (JTD), 2024 WL 4562675, at *6 (Bankr. D. Del. Oct. 23, 2024) (holding that the evidence in the record reflected "the Debtors' mishandling of money, including an entire report devoted just to the issue of commingling").

establishes that the Debtors hopelessly commingled assets.  "Money paid from a bank account

containing commingled funds under a debtor's control is presumptively property of the

debtor."[96]  Therefore, the Currency is property of the Debtors' Estates.

*Even if* a trust relationship could be established, a trust beneficiary has the burden to

identify its specific trust property or funds.[97]  "When attempting to establish rights to

commingled funds, a claimant must make two showings: (1) demonstrate that the trust

relationship and its legal source exists, and (2) identify and trace the trust funds if they are

commingled."[98]

### 1.  No Trust Relationship was Formed.

The Objectors have not established that a trust relationship was formed.  The only evidence

presented by the Objectors is the End-User Agreement, which states:

> Prime Trust may . . .  otherwise use or invest such cash or Fiat
> Currency at Prime Trust's own risk. . . . Prime Trust may use such
> Fiat Currency to purchase securities or other assets that it may hold
> and register **in its own name . . . , and pledge, repledge,
> hypothecate, rehypothecate, sell, or otherwise transfer or use
> any amount of such securities or other assets with all attendant
> rights of ownership and without any obligation to maintain in
> its possession or control a like amount of cash of Fiat
> Currency**, subject to Prime Trust's obligation to return Fiat
> Currency to Account Holder in accordance with this
> Agreement . . . .  Prime Trust may also receive earnings or income

---

[96] *Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)*, No. 06-10894(PJW), 2009 WL 2004226, at *2 (Bankr. D. Del. July 9, 2009)).

[97] *First Fed. of Michigan v. Barrow*, 878 F.2d 912, 915 (6th Cir. 1989) ("Since the purported constructive trust consisted of money, which had no extrinsic identifiable characteristics of its own, that was initially deposited and commingled into the Salem Depository Account with unidentifiable funds received from innumerable and diverse other sources and daily redeposited and again commingled in the negative balance Salem Central Account, appellants' funds irretrievably lost their identity and 'tracing' became a futile pursuit . . . ."). *See also Off. Comm. of Unsecured Creditors v. Cath. Diocese of Wilmington, Inc. (In re Cath. Diocese of Wilmington, Inc.)*, 432 B.R. 135, 147 (Bankr. D. Del. 2010) (footnote and citations omitted) ("The Non-Debtor Defendants bear the burden of (1) demonstrating that the trust relationship and its legal source exist, and (2) identifying and tracing the trust funds if they have been commingled with non-trust funds.").

[98] *Halperin v. Moreno (In re Green Field Energy Servs., Inc.)*, 585 B.R. 89, 105 (Bankr. D. Del. 2018) (cleaned up).

> from using or investing cash or Fiat Currency. . . . Account Holder
> agrees that any earnings or income or compensation shall be
> retained by Prime Trust and no portion of such earning, income or
> compensation shall be paid to or for Account Holder.[99]

Additionally, the Custodial Agreement provides:

> [O]therwise use or invest such cash or Fiat Currency at Prime
> Trust's own risk. Without limiting the foregoing, Prime may use
> such Fiat Currency to purchase securities or other assets that it may
> hold and register in its own name or in the name of its nominee and
> pledge, repledge, hypothecate, rehypothecate, sell, or otherwise
> transfer or use any amount of such securities or other assets with
> all attendant rights of ownership and without any obligation to
> maintain in its possession or control a like amount of cash or Fiat
> Currency, subject to Prime Trust's obligation to return Fiat
> Currency to Customer in accordance with this Service Schedule.[100]

Other than the corporate name of "Prime Trust, LLC, a Nevada chartered trust company," the

End-User Agreement and the Custodial Agreement submitted into evidence do not establish that

a trust relationship exists between End-Users, Integrators, and/or the Debtors.

### 2. Commingling of Fiat.

In *First Federal of Michigan v. Barrow*, the bankruptcy trustee sought to recover as

preferential certain payments made by the debtor out of its commingled bank account.[101]  The

---

[99]  User Agreement at ¶ 1.6(b) (emphasis added).

[100]  Custodial Agreement, § 2.7(b).

[101]  *First Fed. of Michigan*, 878 F.2d at 914.  As described in *First Federal*:

> The situation frequently occurs where trust funds have been traced into a general
> bank account of the debtor. The following general principles have been applied.
> The bankruptcy court will follow the trust fund and decree restitution where the
> amount of the deposit has at all times since the intermingling of funds equaled or
> exceeded the amount of the trust fund.  But where, after the appropriation and
> mingling, all of the moneys are withdrawn, the equity of the cestui is lost,
> although moneys from other sources are subsequently deposited in the same
> account.  In the intermediate case where the account is reduced to a smaller sum
> than the trust fund, the latter must be regarded as dissipated, except as to the
> balance, and funds subsequently added from other sources cannot be subject to the
> equitable claim of the cestui que trust.  If new money is deposited before the
> balance is reduced, the reduction should be considered to be from the new

payment recipients defended on the basis that the payments were not property of the debtor because the funds were held in trust by the debtor and argued that tracing was unnecessary.[102] The Sixth Circuit rejected this defense holding: "It is beyond peradventure that, as a general rule, any party seeking to impress a trust upon funds for purposes of exemption from a bankruptcy estate must identify the trust fund in its original or substituted form."[103]  Although *First Federal* involved a constructive trust, the court's reasoning for its holding applies with equal force to a statutory trust such as the one alleged in the present case.  In both instances trust money, having "no extrinsic identifiable characteristics of its own," becomes unidentifiable when it is commingled with a debtor's non-trust monies in a general account.[104]  The *First Federal* court held that the beneficiaries did not attempt to trace their funds beyond the deposits into the commingled account, "which evidence, standing alone, is insufficient to support their constructive trust theory of recovery."[105]

---

money and not from monies held in trust.  This analysis may be referred to as the lowest intermediate balance test.

*Id.* at 916 (citing Collier on Bankruptcy ¶ 541.13 (15th ed.1988)).  *See also In re R.W. Leet Elec., Inc.*, 372 B.R. 846, 857 (B.A.P. 6th Cir. 2007).

[102]  *First Fed. of Michigan*, 878 F.2d at 915.

[103]  *Id.* (citing *Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214 (9th Cir.1988) (requiring tracing for express trust where funds had been commingled)).

[104]  *Id.*; *see also In re R.W. Leet Elec., Inc.*, 372 B.R. at 854.

[105]  *First Fed. of Michigan*, 878 F.2d at 915.  *Stoebner v. Consumers Energy Co. (In re LGI Energy Sols., Inc.)*, 460 B.R. 720, 729 (B.A.P. 8th Cir. 2011) ("Money deposited in a bank to be commingled with its other funds loses its identity and the depositor ceases to be the owner of the deposit, even if the deposit is to be used for the benefit of the depositor.").  *See also Gulfstream Aerospace Corp. v. Calascibetta (In re Strategic Techs.), Inc.*, 142 F. App'x 562, 566 (3d Cir. 2005) ("While the [lowest intermediate balance test] is helpful in identifying one party's assets commingled with the trustee, its value is significantly lessened when the assets are commingled with many other similarly situated individuals."); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994) (cleaned up) ("In general, to establish rights as a trust recipient, a claimant must make two showings: (1) demonstrate that the trust relationship and its legal source exist, and (2) identify and trace the trust funds if they are commingled."); *Off Comm. of Unsecured Creditors v. v. Columbia Gas Sys Inc. (In re Columbia Gas Sys. Inc.)*, 997 F.2d 1039, 1063 (3d Cir. 1993) ("When a trustee commingles trust funds with other monies in a single account, the lowest intermediate balance rule aids beneficiaries in tracing trust property.").

In *In re Columbia Gas Systems, Inc.*, while the Third Circuit acknowledged that it has never specifically accepted or rejected the lowest intermediate balance test, the Court acknowledged that "a trust beneficiary . . . loses property rights in a commingled account *to the extent* that the account drops below the amount held in trust.  This is the essence of the lowest intermediate balance test."[106]  As a result, when a trust account is commingled, trust beneficiaries lose rights in accounts that have been dissipated.[107]

Messrs. Brennan and Dunn submitted declarations and provided live testimony regarding the extensive commingling of fiat as described above.  No contrary evidence was presented regarding the LIBT.  The Court finds the fiat held by the Debtors is not traceable.  Therefore, consistent with the reasoning set forth in *First Federal*, the fiat is property of the Debtors' Estate.

### 3.   Commingling of Cryptocurrency.

While *First Federal* addressed the tracing of fiat, which has no extrinsic identifiable characteristics of its own, the Sixth Circuit's reasoning is instructive as to cryptocurrency.  The Objectors allege that cryptocurrency has identifiable characteristics, such as UTXOs, and is

---

[106] *In re Columbia Gas Sys. Inc.*, 997 F.2d at 1064 (emphasis supplied).  *See also In re Strategic Techs., Inc.*, 142 F. App'x at 566 (holding that the lower court property ordered pro rata distribution, reasoning that "the lowest intermediate balance in a commingled account represents trust funds that have never been dissipated and which are reasonably identifiable."); *Sharon Steel Corp.*, 41 F.3d at 102 (while not formally adopting the lowest intermediate balance test, recognizing that the LIBT may constitute a "reasonable assumption" to demonstrate that amount are still in the possession of the debtor at the commencement of a case); *Coronation Sheet Metal Co., Inc. v. Interchange Bank (In re KI Liquidation, Inc.)*, No. 05-60002 (KCF), 2008 WL 5109369, at *5 (D.N.J. Dec. 1, 2008) (cleaned up) ("Where trust funds are commingled with non-trust funds, the lowest intermediate balance test is used to trace the trust funds.  Under this test, the trust beneficiary may assume that trust funds are withdrawn last from a commingled account.  However, trust money that has been removed from the commingled account is not replenished by subsequent deposits.  Therefore, the lowest intermediate balance in a commingled account represents trust funds that have never been dissipated and which are reasonably identifiable.  Trust beneficiaries lose all rights in the trust funds when the commingled account is entirely dissipated."); *In re Green Field Energy Servs., Inc.*, 585 B.R. at 105 ("While the Third Circuit has not formally adopted a procedure to trace commingled funds, the lowest intermediate balance test ('LIBT') has routinely been applied by the Court and other federal courts around the country.").

[107] *In re KI Liquidation, Inc.*, No. 05-60002 (KCF), 2008 WL 5109369 at *5.

traceable.  However, the Objectors only submitted their account statements which reflect

deposits but provide no showing or tracing of funds beyond those statements (*i.e.* they did not

provide those identifiable characteristics).

A UTXO is created when BTC is transferred from one holder to another.[108]  The

Objectors assert that each BTC transfer should be traceable via its identifying UTXO.  The

Objectors, however, did not present any evidence regarding the specific BTC that they

transferred to the Debtors.  Contrary to the Objectors assertions, Mr. Brennan testified:

- Even though Bitcoin employs the UTXO model, which allows for identification of certain Bitcoin involved in a transaction, the practicalities of how UTXOs are created, coupled with, among other things, the volume of Bitcoin at Prime, renders it impossible to trace specific Bitcoin currently held by Prime to any specific Bitcoin that a specific customer had transferred to Prime.[109]

- Prime did not maintain separate or segregated digital wallets for crypto that was transferred to Prime.  Instead, Prime held and commingled the crypto from its various customers in omnibus digital wallets, where the crypto of the same type was commingled with crypto of the same type, including crypto of the same type that prime used for its own corporate operations and purposes.[110]

- Prime periodically swept its customer's Deposit Addresses—in other words, collected all the crypto of the same type that had been transferred to the Deposit Addresses and transferred that crypto to one or more of the shared Omnibus Wallets controlled by Prime.  This process resulted in extensive commingling of crypto making it impossible to trace crypto back to specific customer deposits. The repeated process of condensing multiple UTXOs into new single UTXOs invalidates anyone's ability trace customer's specific crypto.[111]

---

[108]  Brennan Decl. at ¶ 71 (". . . Bitcoin employs the Unspent Transaction Output ("UTXO") model, which allows for identification of certain Bitcoin involved in a transaction . . . .").

[109]  Brennan Decl. at ¶ 71.

[110]  Supp. Brennan Decl. at ¶ 15.

[111]  Supp. Brennan Decl. at ¶ 17.

- Since Prime did not maintain segregated digital wallets for each of its customers and the crypto of the same type it held was commingled (similar to its fiat), Prime was forced to rely on its Internal Ledger to attempt to keep track of how much crypto Prime owed each of its customers. Prime would credit a customer's balance on its Internal Ledger for any crypto that customer sent to Prime through its unique Deposit Address.[112]

- Prime's Internal Ledger did not (and could not) track which of the Omnibus Wallets held the specific crypto that a customer had originally transferred to Prime because that crypto was commingled with crypto of the same type that other customers had transferred to Prime and with Prime's own crypto of the same type within and across multiple Omnibus Wallets.[113]

As a result of the commingling of cryptocurrency, Mr. Brennan concluded that neither account holders, customers or Prime can specifically identify, trace, or segregate the specific crypto transferred to Prime from the commingled crypto of the same type.[114] Despite the Objectors' arguments, there is no conclusive evidence to support their claims that the cryptocurrency can be traced. Mr. Birnbaum did not personally review or investigate the Debtors' books, records, and/or accounts;[115] as a result, Mr. Birnbaum's testimony is theoretical and not instructive as to the specifics of the commingling that occurred at the Debtors. At best, Coinbits and the other Objectors assert a conclusory argument that the Plan Administrator was simply incorrect, and that the cryptocurrency the Debtor holds can be traced. The argument is not supported by the factual circumstances present in this case, including the mismanagement, the manipulated Internal Ledger, and the volume of transactions.

The Court is persuaded by the testimony of Mr. Brennan, who specializes in forensic investigations, advises on crypto-related matters, and is routinely retained to perform analyses of

---

[112] Supp. Brennan Decl. at ¶ 20.

[113] Supp. Brennan Decl. at ¶ 21.

[114] Supp. Brennan Decl. at ¶ 24.

[115] As explained *infra*, Coinbits did not serve discovery or seek depositions of the Plan Administrator's witnesses.

information related to financial crimes, including forensic investigations and flow-of-funds

analyses related to crypto wallet addresses and fiat bank accounts, and reviewed Prime's

accounts and documents.  Based on the evidence presented, the Court finds that the

cryptocurrency was commingled, condensed multiple times such that the cryptocurrency held by

the Debtors, including the BTC, is unable to be traced.  As a result, *even if*, the funds were held

in trust, the hopeless commingling would not allow the cryptocurrency to be traced, nor did any

Objector attempt to trace such cryptocurrency.[116]

## C.  The Distribution Procedures Proposed by the Plan Administrator will be Implemented with Changes by the Court.

Article 7.6 of the Plan states: the Plan Administrator proposes to liquidate the

cryptocurrency and distribute the funds to claimants in USD.  The Plan Administrator asserts that

the Debtors no longer maintain the appropriate licensure and systems to transfer any form of

Currency to creditors.  The Objectors assert that the distributions should be made in-kind, and

several Objectors contend that they could assist or facilitate distributions with or for the Plan

Administrator.

Article 7.6 of the Plan continues: "each Account Holder's Claim is determined by the fair

market value of the Cryptocurrency (based in United States Dollars pursuant to the

---

[116] Unfortunately, instances of commingling are not novel to these cases.  Commingling of cryptocurrency also occurred in *In re FTX Trading Ltd.*, where the court found

> the Debtors' commingling of funds was so prolific that even the team of experts hired post-petition to disentangle the mess had difficulty doing so.  As the report explains, "notwithstanding extensive work by experts in forensic accounting, asset tracing and recovery, and blockchain analytics, among other areas, it is extremely challenging to trace substantial assets of the Debtors to any particular source of funding, or to differentiate between the FTX Group's operating funds and deposits made by its customers."

*In re FTX Trading Ltd.*, No. 22-11068 (JTD), 2024 WL 4562675 at *6 (finding that the comingling was sufficient to establish an interest in the account for the purpose of standing).

Cryptocurrency Conversion Table) held by the Account Holder at the Debtors as of the Petition

Date at 11:59 p.m. UTC."[117]  Article 7.6 further provides that the value of the claims as of the

Petition Date would be distributed either in cryptocurrency or would be liquidated into USD,

"within the reasonable business judgment" of the Wind-Down Debtor, and such value would be

distributed in USD.[118]

    With this backdrop, the Court evaluates the Plan Administrator's decision to convert the

cryptocurrency into USD for distribution based on the fair market value of the cryptocurrency

held by the Account Holder as of the Petition Date.  The Plan Administrator maintains that it

would need to partner with a crypto exchange service to affect an in-kind crypto distribution.[119]

The Plan Administrator located one potential distribution partner, however, the cost associated

with collecting the Know Your Customer ("KYC") information for in-kind distributions would

be substantially higher than the cost of the KYC collection needed for USD transfers.[120]

Additionally, due to commingling and the fraudulent Internal Ledger, the portfolio does not

contain the types and amount of cryptocurrency necessary to make full, in-kind distributions to

all creditors.[121]  Mr. Dunn explained that making an in-kind cryptocurrency distribution would

result in creditors incurring the costs of multiple rounds of Transaction Fees.[122]  Due to the

difficulty and expense of engaging an exchange partner, distributions would not begin for

---

[117]  Plan, Art. 7.6 (cleaned up).

[118]  Plan, Art. 7.6.

[119]  Dunn Decl. at ¶ 11.

[120]  Dunn Decl. at ¶ 11.

[121]  Dunn Decl. at ¶ 11.

[122]  Dunn Decl. at ¶ 11.

another year and a half compared to USD distributions that may begin in less than six months. [123]

Ultimately, Mr. Dunn evaluated a multitude of potential paths forward and determined that the

procedures in the Distribution Motion maximizes value for Estate creditors as a whole, promotes

the equitable treatment of creditors and will result in a distribution to Holders of Allowed Claims

in the most efficient manner.[124]

　　　　To rebut Mr. Dunn's testimony, Mr. Birnbaum explained that Coinbits has current

relationships with others in the industry and that it would not be difficult for Coinbits to help

orchestrate a relationship so the Plan Administrator could make in-kind distributions.[125]  In other

words, Mr. Birnbaum was offering to help find a partner for the Plan Administrator to collect the

KYC information and distribute cryptocurrency.  The Objectors did not provide any conclusive

proof or specific offers that rebut Mr. Dunn's statements, including the expenses that would be

incurred for the additional year and a half it would take to distribute the cryptocurrency or the

cost of such distribution, or whether the distribution would benefit all creditors.

　　　　The Plan Administrator Agreement, which is governed by and construed in accordance

with Delaware law, states at Article 2.2: "on and after the Effective Date, the Plan Administrator

shall be the sole officer and director of the Wind-Down Debtor."[126]  "In Delaware, the business

judgment rule is a presumption that directors act in good faith, on an informed basis, honestly

believing that their action is in the best interests of the company."[127]  To overcome the

---

[123]  Dunn Decl. at ¶ 12.

[124]  Supp. Dunn Decl. at ¶ 15.

[125]  Tr. Hr'g Feb. 14, 2025 (D.I. 1021) at 187:9–17 (Birnbaum).

[126]  D.I. 539, Ex. E-1 (Plan Administrator Agreement) at Art. 9.3 and 2.2.

[127]  *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005).

presumption that the Plan Administrator acted within his business judgment "is a near-Herculean task."[128]

> Delaware courts have said that it may be accomplished by showing either irrationality or inattention. A plaintiff may overcome the presumption that directors and officers acted in good faith by establishing that a decision was so egregious as to constitute corporate waste.  The burden here is to show irrationality: a plaintiff must demonstrate that no reasonable business person could possibly authorize the action in good faith. Put positively, the decision must go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith.[129]

Mr. Dunn explained that the Plan Administrator's rationale for dollarization of the cryptocurrency having relied on the advice of professionals following an extensive investigation.[130]  The evidence presented by the Objectors does not rebut the presumption that the Plan Administrator is acting in good faith, on an informed basis, and in the best interests of all creditors.

As a result, the Court will approve the dollarization of the cryptocurrency held and a pro rata distribution to all unsecured creditors.

---

[128] *Id.*

[129] *Id.*

[130] The Plan Administrator engaged numerous professionals, including four law firms, forensic accounting experts, accountants and the claims and noticing agent to assist and aid the Plan Administrator with its analysis of the account treatment issues, culminating in the Estate Property Determination Notice and Distribution Motion.  D.I. 968 at ¶ 14.  Mr. Dunn explained that the Plan Administrator and its professionals performed a nearly exhaustive review, analysis and investigation of the facts and issues raised by the Estate Property Determination Notice and Distribution Motion, including but not limited to: the nature, extent and enforceability of the Debtors' contractual and non-contractual relationship with its customers; the applicability of Article 8 of the Uniform Commercial Code to certain of the alleged customer agreements and issues before the Court; the willful and knowing failure of the Debtors to segregate customer cryptocurrency and other cash currency in separate and segregated accounts for the benefit of the Debtors' customers; the false and misleading recording of alleged deposits and withdrawals to and from customer line items in the Debtors' internal ledger; the willful and wanton commingling of Debtor assets with customer deposits; and the willful and wanton use of commingled assets without the knowledge or consent of the Debtors' customers.  *Id.*  The objections to the Estate Property Determination Notice and Distribution Motion largely raise issues considered by the Plan Administrator and its counsel during its Estate property determination investigation, but such positions were rejected in light of the facts and circumstances of these Chapter 11 Cases.  *Id.*

## CONCLUSION

The Distribution Motion will be granted.[131]  "Property held by a debtor is presumed to be property of the estate . . . ."[132]  Here, through no fault of the Plan Administrator or the creditors, the evidence shows the mismanagement and commingling of creditor assets.  Although the result may be disappointing to certain creditors, the Court is bound by the evidence before it and the law governing the issues.  For the reasons stated above, the Currency is property of the Debtors' Estates and may be distributed to satisfy general unsecured claims against the Debtors pursuant to the Plan and as set forth in the Order issued herewith.


Dated:  July 18, 2025

_____
J. Kate Stickles
United States Bankruptcy Judge

---

[131]  As set forth *supra*, nothing herein affects the Reserved Parties.

[132]  *Asurion Ins. Servs., Inc. v. Kings Road Inv. Ltd. (In re Amp'd Mobile, Inc.)*, 377 B.R. 478, 483 (Bankr. D. Del. 2007) (citations omitted); *In re Cath. Diocese of Wilmington, Inc.*, 432 B.R. at 161 (finding that pooled investment account was held solely in debtor's name, such account funds were estate property, unless alleged trust beneficiaries could trace trust funds).  *See also Hopkins Hosp. Invs, LLC v. Guttman (In re Star Dev. Grp., LLC)*, 660 B.R. 750, 757 (Bankr. D. Md. 2023), *aff'd sub nom. Hopkins Hosp. Invs., LLC v. Guttman*, No. CV RDB-23-2768, 2024 WL 3252958 (D. Md. July 1, 2024), *aff'd sub nom. In re Star Dev. Grp., LLC*, No. 24-1722, 2025 WL 1135009 (4th Cir. Apr. 17, 2025) ("In line with the broad definition of 'property of the estate,' money held in a bank account in the name of a debtor is presumed to be property of the bankruptcy estate."); *Notinger v. Migliaccio (In re Fin. Res. Mortg., Inc.)*, 468 B.R. 487, 502 (Bankr. D.N.H. 2012) ("Money held in a bank account in the name of a debtor is presumed to be property of the estate."); *Millard Refrigerated Servs., Inc. v. Landamerica 1031 Exchange Servs., Inc. (In re LandAmerica Fin. Grp., Inc.)*, 412 B.R. 800, 809 (Bankr. E.D. Va. 2009) (holding that "money held in a bank account in the name of a debtor is presumed to be property of the bankruptcy estate").