## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-        (JKS) |
| Foris Capital US, LLC f/k/a Watchdog Capital, LLC, Watchdog Technologies Corporation d/b/a Watchdog Technologies Inc., and Bruce Fenton, | |
| Defendants. | |

## COMPLAINT

The PCT Litigation Trust ("PCT" or "Plaintiff")[2] established in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), through its undersigned counsel, files this complaint (the "Complaint") against Defendants Foris Capital US, LLC f/k/a Watchdog Capital, LLC ("Watchdog Capital"); Watchdog Technologies Corporation d/b/a Watchdog Technologies Inc. ("Watchdog Technologies"); and Bruce Fenton ("Mr. Fenton") (collectively, Defendants Watchdog Capital, Watchdog Technologies, and Mr. Fenton are referred to herein as "Defendants" or "Watchdog Group") (collectively, Watchdog Group and Prime are referred to herein as the

---

[1] The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2] The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

"Parties"), pursuant to Sections 544, 547, 548 and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and Sections 1304 and 1305 of Title 6 of the Del. Code. Ann. (the "Delaware Code"), seeking to avoid and recover all actual fraudulent transfers and/or preferential transfers of property made by the Debtors to or for the benefit of Watchdog Group plus interest, attorneys' fees, and costs.  To the extent that Watchdog Group filed a proof of claim or has a claim listed by the Debtors on their schedules as undisputed, liquidated, and not contingent, or have otherwise requested payment from the Debtors or the Debtors' estate (collectively, the "Claims"), this Complaint is not intended to be, nor should it be construed as, a waiver of PCT's right to object to any such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j) ("Section 502"), and such rights are expressly reserved. Notwithstanding this reservation of rights, certain relief pursuant to Section 502 is sought by PCT herein as further stated in Count IV below.  PCT alleges as follows:

## **INTRODUCTION**

1.      Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat.  The Nevada Financial Institutions Division ("Nevada FID") shut down Prime on June 21, 2023, and Prime filed for bankruptcy shortly thereafter in August 2023.  Most of Prime's customers suffered losses and have yet to receive any of the crypto or fiat owed to them.  But, in a series of transactions occurring between May 16, 2023, and the Petition Date,[3] Prime transferred 94.294437 Bitcoin ("BTC") to Watchdog Group (the

---

[3]    Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's non-insider preference period (the "Preference Period") occurred between May 16, 2023 and the Petition Date.

"<u>Transfers</u>").  These Transfers are actual fraudulent transfers and/or preferential transfers which must be returned to Prime.

2.      Watchdog Group, like other Prime customers who were able to withdraw funds prior to Prime's bankruptcy, had advance notice of the issues at Prime.  Leading up to and during the 90-day period prior to the filing of the Debtors' Chapter 11 Cases,  Watchdog Group and Mr. Fenton were in direct contact with ▮▮▮▮ ("▮▮▮▮"), one of Prime's long-serving executives and Prime's then CEO, regarding Prime's perilous financial condition and Watchdog Group withdrawing its assets from Prime prior to the filing of the Chapter 11 Cases.

3.      On June, 8, 2023 (during the Preference Period), Mr. Fenton and ▮▮▮▮ worked together to transfer all of Watchdog Group's assets from Prime at the expense of other Prime customers before "regulators tell [Prime] to stop and take [Prime] over" and before any impending "bank run[s]," as contemplated by ▮▮▮▮.[4]



<u>Ex. G</u>.

---

[4]    The June 8, 2023 communications are attached as <u>Exhibit G</u>.

4.      Mr. Fenton and ███████'s communications on June 8, 2023, made it clear that Watchdog Group was aware that Prime was facing regulatory scrutiny from Nevada FID well before news of Prime's losses and financial distress became public.



*Id.*

5.      Without regard or care for Prime's other customers, on June 8, 2023, Mr. Fenton pressured ███████ "friend to friend – man to man" to push the Transfers to Watchdog Group ***"even if the co[mpany] ends up in a tight spot [since] it would be ideal to have this settled it's just one customer for the whole firm and it happens to be me***."



*Id.*

6.      Mr. Fenton, because of his notoriety in the crypto community, determined that Watchdog Group's right to Prime's assets was superior to all of Prime's other customers. ███████

willingly agreed. The Transfers were made from Prime to Watchdog Group to the detriment of Prime's other customers, most of which have yet to receive any of the assets they claim they are owed.

7.      PCT brings this adversary proceeding (the "Adversary Proceeding") pursuant to Sections 544, 547, 548 and 550 Bankruptcy Code, and Sections 1304 and 1305 of Title 6 of the Delaware Code, to avoid and recover all transfers of property and all obligations of Prime to or for the benefit of Watchdog Group, made in the 90-day period prior to the filing of the Debtors' Chapter 11 Cases. These Transfers are actual fraudulent transfers and/or preferential transfers and are avoidable under Sections 544, 547, 548, and 550 of the Bankruptcy Code. Pursuant to Section 502(d) of the Bankruptcy Code, PCT also seeks to disallow any and all claims filed or held by Watchdog Group in these Chapter 11 Cases unless and until Watchdog Group has relinquished to PCT all property owed to it.

8.      Watchdog Group provided over-the-counter ("OTC") Bitcoin brokerage services and operated a custodial trading model. To effectuate these services, Watchdog Group engaged Prime for payment rails, liquidity, custody, settlement, and compliance services.

9.      The agreements that governed Prime and Watchdog Group's relationship during the Preference Period include: (i) Prime Trust Order Form, effective May 29, 2022 (the "Order Form");[5] (ii) Prime Trust Master Services Agreement, revision date August 30, 2022 (the "MSA");[6] and (iii) Service Schedule for Prime Trust Custodial Services, revision date May 13, 2022 (the "Custodial Agreement")[7] (collectively, the "Agreements").

---

[5]    A copy of the Order Form is attached as Exhibit A.

[6]    A copy of the MSA is attached as Exhibit B.

[7]    A copy of the Custodial Agreement is attached as Exhibit C.

10.     Although Prime was a Nevada state-chartered trust company, Watchdog Group never sought or received any trust or fiduciary services from Prime.

11.     The MSA explicitly states that it "***does not create a . . . fiduciary or employment relationship between the parties.***" Ex. B, MSA, § 14.1 (emphasis added).

12.     The Custodial Agreement provides that Prime was entitled to "***pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such [assets]. . .with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]***" Ex. C, Custodial Agreement, §2.7(b) (emphasis added).

13.     The Agreements establish that the Parties always maintained a strictly debtor-creditor relationship and that no fiduciary relationship existed between the Parties.

14.     The crypto that Watchdog Group transferred to Prime was held in commingled "omnibus" digital wallets (the "Omnibus Digital Wallets"), which also held crypto transferred to Prime by other customers and Prime's own crypto.

15.     Prime attempted to keep track of commingled assets transferred by Watchdog Group (and other customers) with an internal, omnibus ledger (the "Internal Ledger"). But the Internal Ledger was errantly and later intentionally corrupted by Prime.

16.     Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries. Accordingly, the Internal Ledger cannot be relied on to identify or trace the crypto that Watchdog Group transferred to Prime.

17.     The third-party expert retained by PCT in this matter, James P. Brennan, has confirmed that it is impossible to identify, trace, or otherwise distinguish the crypto that Watchdog

Group transferred to Prime from crypto provided by Prime's other customers or from Prime's own crypto.  *See Declaration of James P. Brennan (the "Brennan Decl.").*[8]

18.     Blockchain data confirms that crypto transferred from Prime to Watchdog Group during the Preference Period was not the original crypto that Watchdog Group had transferred to Prime.  *See id.* at ¶ 90.  Rather, these transfers consisted of crypto from the commingled, Omnibus Digital Wallets.  *See id.* at ¶ 85.

19.     Moreover, in December 2021, Prime discovered it was unable to access a digital wallet (the "98f Wallet")[9] holding more than 11,082 ETH that had been transferred by one of Prime's customers.  Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet.  *See id.* at ¶¶ 68–69.

20.     Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customer's transfer requests, Prime went to the market to purchase ETH to cover the transfer requests.  To fund those market purchases, Prime used fiat from its omnibus bank accounts.  *See id.* at ¶¶ 70–75.

21.     Prime executives admitted under oath that Prime intentionally falsified its internal records to hide the truth about its replacement ETH purchases.  To hide the fact that Prime was using fiat transferred to it by customers to pay for its replacement ETH purchases, Prime created fake wire transfer entries on the Internal Ledger to make it appear that Prime received fiat wire transfers from one of the liquidity providers ("Liquidity Provider") who sold Prime the replacement ETH.  In fact, no such fiat wire transfer deposits ever occurred:

> Q:     When it says funds transfer. . . and it says "wire, wire, wire."  Do you see that?

---

[8]     A copy of the Brennan Decl. is attached as Exhibit D.

[9]     The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f."

A:      Yes.

Q:      *There were no wire transfers; right*?

A:      *Yes*.

Q:      *Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?*

A:      *Yes, there were no wire transfers*.

Deposition of ████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "██ Dep."), 164:22–165:10 (emphasis added).

22.     Prime's use of its fiat transferred by other customers to purchase replacement ETH left it with a nearly $82 million shortfall in the omnibus bank accounts that contained commingled fiat from Watchdog Group and other Prime customers.

23.     Prime's falsified wire transfer entries to cover its replacement ETH purchases, coupled with Prime's failure to properly reconcile and record other transactions on its Internal Ledger, have resulted in Prime being unable to trace any specific deposits, withdrawals, or transfers that were made by any particular customer, including Watchdog Group.  *See* Ex. D, Brennan Decl., at ¶ 90.

24.     Prime's Transfers to Watchdog Group during the Preference Period exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's Chapter 11 filing on the Petition Date.

25.     Thus, the Transfers from Prime to or for the benefit of Watchdog Group during the Preference Period must be returned to the Debtors' estate pursuant to Sections 544, 547, 548, and 550 of the Bankruptcy Code, and Sections 1304 and 1305 of Title 6 of the Delaware Code, plus interest, attorneys' fees, and costs.

26.     During the course of this Adversary Proceeding, PCT may learn (through formal discovery or otherwise) of additional transfers made to, or obligations incurred by, Watchdog Group that are avoidable and/or recoverable under the Bankruptcy Code.  PCT intends to avoid and/or recover all such transfers and obligations made to or for the benefit of Watchdog Group and, accordingly, reserves the right to amend this Complaint.

**PARTIES**

27.     Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644].  The Plan was consummated on January 5, 2024 (the "Effective Date").[10]  On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust.  *See* Plan, § 6.21.  The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn.  *See id.*, § 1.118.

28.     Defendant Watchdog Technologies is a corporation organized under the laws of the State of Wyoming, which has been administratively dissolved or is otherwise no longer active.  On information and belief, it continues to exist for the limited purpose of winding up its affairs and

---

[10]    *See* Docket No. 694.

remains subject to suit.  Watchdog Technologies maintains a principal office in Tyler, Texas, and a registered agent address for service of process in Cheyenne, Wyoming.

29.     Defendant Watchdog Capital is an LLC registered in Georgia and maintains a principal office in Tyler, Texas, and a registered agent address for service of process address in Peachtree Corners, Georgia.  In or around October 2024, Crypto.com acquired Watchdog Capital. Following that acquisition, Foris Capital US, LLC began operating as the successor-in-interest to Watchdog Capital, which maintains a registered agent address for service of process in Concord, New Hampshire.

30.     Watchdog Capital and Watchdog Technologies are affiliated entities under common ownership by Watchdog HODL Group LLC.  Both Watchdog Capital and Watchdog Technologies are named as Defendants in this Adversary Proceeding because they share the same principal office address, management, personnel, infrastructure, and business functions. Employees using email domains associated with both entities were authorized to initiate and approve transactions at Prime on behalf of Watchdog Group.

31.     Defendant Bruce Fenton is a natural person believed to reside in Durham, New Hampshire.  Upon information and belief, at all relevant times, Mr. Fenton served as the owner of Watchdog Group and exercised control over Watchdog Group and its assets.  Public and company records reflect that Mr. Fenton held a majority ownership interest in, and serves as the managing member of, Watchdog Capital and Watchdog Technologies.

## JURISDICTION AND VENUE

32.     The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code. Pursuant to the Plan, this Court "retain[ed]

jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor." *See* Plan, § 12(c). This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust." *Id.*, §§ 12(s), (u). As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

33.     This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2). The Court may enter final orders in connection with the matters contained herein.

34.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, PCT confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the parties to this action, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

35.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

36.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 105, 542, 544, 547, 548, 550 and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

37.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as

"cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. BTC and Ether ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies, including USD Coin ("USDC") and Tether ("USDT").

38.     All cryptocurrencies exist on a "blockchain." A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency. All transactions are recorded on the blockchain and are publicly available. When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks." Those "blocks" are publicly available and reflect all cryptocurrency transactions that occurred on the blockchain at a particular point in time. The "blocks," in turn, are linked on the chain in chronological order — thus, a "block"-"chain."

39.     There are many different blockchains. The first and most popular blockchain was the BTC blockchain. Another important blockchain is the Ethereum blockchain, which made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain. Cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

40.     Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."  These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

41.    "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain digital address.  Like public keys, private keys consist of multi-digit alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

42.    Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

43.    Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

44.    A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

45.    A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method. These types of physical hardware devices are provided by companies such as Trezor:



46.     Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet. However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device. To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to initiate transfers of crypto kept in the digital wallet. Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

47.     Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed. They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## GENERAL ALLEGATIONS

### I.     Prime's Business Operations

48.     Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

49.     Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

50.     In the years that followed, as the crypto markets and industry grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

51.     Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state money-transmitter licenses (each, a "MTL") required to conduct money transmission.

52.     Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

53.     Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend the time, effort, and financial resources necessary to obtain their own MTLs.

54.     Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

## II.     The Agreements Created a Strictly Debtor-Creditor Relationship Between Prime and Watchdog Group

55.     Watchdog Group was founded by Bruce Fenton, "a well-known figure in bitcoin since 2011 who also hosts the Satoshi Roundtable, a one-of-a-kind gathering of the leading developers, builders, CEOs, investors and founders in the Bitcoin industry."

From: **Michael** <Michael@watchdogcapital.com>
Date: Thu, Dec 9, 2021 at 4:57 PM
Subject: Watchdog Capital Flow-Of-Funds
To: ██████████████ @primetrust.com>

Hello ████

Circling around on our discussions, below is a high-level overview of Watchdog Capital and our growth plans.

**Watchdog Capital** is an SEC-registered FINRA member broker/dealer that offers high-net-worth and institutional investors access to securities brokerage, investment advisory services, alternative investments & private securities.

Watchdog was founded by Bruce Fenton, a well-known figure in bitcoin since 2011 who also hosts the Satoshi Roundtable, a one-of-a-kind gathering of the leading developers, builders, CEOs, investors and founders in the Bitcoin industry.

Our firm was built by bitcoiners, for bitcoiners; we believe in freedom of investment & free markets, and we believe Bitcoin is money – those corporate values are how we distinguish our products and services.

**Watchdog Technologies is being spun up as an affiliated firm of Watchdog Capital thru which we plan to provide clients access to bitcoin and a few other select cryptocurrencies, initially via an OTC desk and eventually thru an app.**

We believe that, with our contacts in the crypto world, this desk can be very profitable for both Watchdog and Prime Trust, so I appreciate your efforts in helping us sort out a compliant flow-of-funds process.

56.    Watchdog Capital, an affiliate of Watchdog Technologies, is "an SEC-registered FINRA member broker/dealer that offers high-net-worth and institutional investors access to securities brokerage, investment advisory services, alternative investments & Private securities."

57.    Company documents reflect that Mr. Fenton owns a majority stake in Watchdog Group, had the ability to exercise control over Watchdog Group and its assets, and had authority to act on behalf of Watchdog Group:

**WATCHDOG TECHNOLOGIES CORPORATION**

Action of Sole Director in Lieu of a First Meeting

_____, 2021

The undersigned, being the sole member of the Board of Directors (the "Board") of Watchdog Technologies Corporation, a Wyoming corporation (the "Corporation"), and acting in accordance with Section 17-16-821 of the Wyoming Business Corporation Act (the "WBCA") and Section 2.13 of the Corporation's By-Laws, consents to the adoption of the following resolutions:

I.     **Election of Officers**

RESOLVED:          That the following individuals are elected to the offices set forth opposite their names to serve, subject to the By-Laws of the Corporation, until the first annual meeting of stockholders and until their successor are elected and qualified:

| | | |
|---|---|---|
| Bruce Fenton | - | President |
| Bruce Fenton | - | Treasurer |
| Bruce Fenton | - | Secretary |

58.    Watchdog Group did not engage Prime for any fiduciary or trust services.

59.    The Agreements governed the Parties' relationship during the Preference Period.

60.    At all relevant times, the Agreements were valid and enforceable contracts governed by Nevada law.  *See* Ex. B, MSA, § 13.1 ("The Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.").

61.    Prime and Watchdog Group executed the Order Form on May 29, 2022.  *See* Ex. A, Order Form.

62.    The Agreements entered into by Prime and Watchdog Group did not name or include Mr. Fenton in his personal capacity.

63.    The Order Form specifically incorporates both the MSA and the Custodial Agreement by reference.  *Id*.  ("This Order Form is governed by the Prime Trust Master Services

Agreement set forth at: https://www.primetrust.com/legal/msa, the Service Schedule(s) and Attachment(s) that are applicable based on the services provided by Prime Trust under this Order Form (located at: https://www.primetrust.com/legal/msa-service-schedules), and the attached Fee Schedule, all of which are incorporated into this Order Form by this reference.").

64.     The Order Form states that the "[MSA] and any of its incorporated documents, including the Service Schedule(s). . . shall supersede and replace any prior agreement(s) that may be in place between [Watchdog Group] and Prime Trust with respect to Prime Trust's services." Ex. A, Order Form.

65.     The Agreements explicitly state that they do not create a trust or fiduciary relationship between Prime and Watchdog Group.

66.     The MSA explicitly states: "The Parties are independent contractors.    The Agreement does ***not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties***" and that "nothing in the Agreement, express or implied is intended to give rise to any third-party beneficiary."  Ex. B, MSA, § 14.1 (emphasis added).

67.     Prime, pursuant to the Custodial Agreement, also had complete discretion to invest, rehypothecate, hold and register in its own name, and otherwise transfer or use the assets provided by Watchdog Group to Prime as well as retain the profits derived from the assets that Watchdog Group transferred to Prime.

68.     For example, the Custodial Agreement permitted Prime to:

[O]therwise use or invest such cash or Fiat Currency at Prime Trust's own risk. Without limiting the foregoing, Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all

attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]

Ex. C, Custodial Agreement, § 2.7(b).

69.     The Custodial Agreement also provided that Watchdog Group expressly agreed "that any such earnings, income, or compensation shall be retained by Prime Trust, and no portion of any such earning, income, or compensation shall be paid to or for customer . . ." *Id.*

70.     The Agreements established that the Parties, at all relevant times, maintained a strictly debtor-creditor relationship.

## III.  Watchdog Group Learned Insider Information About Prime's Deepening Regulatory and Insolvency Crises From ███████ Immediately Prior To Having Its Assets Transferred From Prime

71.     In the weeks leading up to the Petition Date, it became apparent to regulators that Prime was having significant liquidity issues.  Prime personnel had multiple meetings with Nevada FID during this time to discuss how to handle the solvency issues Prime was facing.

72.     Prime's efforts to remedy its solvency problems were not successful.  Prime had not raised sufficient capital and had not been able to find a serious buyer prior to a May 26, 2023 Nevada FID meeting.

73.     Prime knew going into the May 26, 2023 Nevada FID meeting that it was facing an existential thread.

74.     As Prime's crisis deepened, ███████ disclosed to Watchdog Group highly confidential insider information, including information about Prime's deteriorating financial condition, meetings with Nevada FID, and impending bankruptcy.  ███████'s improper disclosures alerted Watchdog Group to Prime's financial crisis, causing Watchdog Group to request immediate transfers of crypto from Prime immediately prior to Prime filing for bankruptcy.

75.    Specifically, on June 8, 2023, Mr. Fenton directly asked ███████ if [Prime is] going to be okay on this transfer," referring to the Transfers that Watchdog Group requested from Prime:



Ex. G.

76.    ███████ responded, "I think so unless regulators tell [Prime] to stop and take [Prime] over". ███████ also discussed with Mr. Fenton that there could be an impending "bank run".

77.    In this same communication on June 8, 2023, well before news of Prime's financial losses and financial distress became public, ███████ informed Mr. Fenton that Prime was facing regulatory scrutiny from Nevada FID and that he was meeting with regulators.



*Id*.

78.     In response, without regard or care for Prime's other customers, Mr. Fenton pressured ▮▮▮▮▮ "friend to friend – man to man" to push the Transfers "***even if the co[mpany] ends up in a tight spot [since] it would be ideal to have this settled it's just one customer for the whole firm and it happens to be me***."



*Id*.

79.     When ▮▮▮▮▮ asked if the request for the Transfers came from Watchdog Group, Mr. Fenton communicated, "Yes and my personal account". He also explained that he is Watchdog Group's "only client".



*Id*.

80.     In exchange for ▮▮▮▮▮'s assistance in pushing the Transfers, Mr. Fenton offered to "do all [he] can to promote the BitGo deal or anything else" that would help Prime's financial condition.



*Id.*

81.    The Transfers were then executed on this same day that ███████ and Mr. Fenton were discussing insider information – *i.e.*, June 8, 2023.



*Id.*

82.     After the Transfers were executed, Mr. Fenton continued making suggestions to

██████ to settle Prime's issues in the market.  For example, Mr. Fenton offered that Prime "could

do a statement that [it has] all the Bitcoin. . . or something that would help the market chill."

████████████████████████████████████████████████████████████

*Id.*

## IV.     Transfers From Prime To Watchdog Group Are Avoidable As Actual Fraudulent Transfers And/ Or Preferential Transfers

83.     During the Preference Period, Prime transferred 94.294437 BTC from Prime's

commingled Omnibus Digital Wallets to Watchdog Group.  *See* Ex. D, Brennan Decl., at ¶ 84.

Watchdog Group did not transfer any potential subsequent new value to Prime.  *See id.* at ¶ 89.

Thus, Watchdog Group's preference exposure is no less than 94.294437 BTC.  *See id.*

84.     Watchdog Group's crypto transactions with Prime prior to the Preference Period

differed markedly from Watchdog Group's crypto transactions with Prime during the Preference

Period.  *See id.* at ¶ 86.  For example, from February 14, 2023 through May 15, 2023, Watchdog

Group did not initiate *any* outgoing transfers of crypto from Prime or make transfers of crypto to

Prime.  However, during the Preference Period, Watchdog Group initiated three transfers totaling

94.294437 BTC.  *See id.*

85.     The API log audit data establishes that Trent Dudenhoeffer and Michael O'Connell,

utilizing the email addresses trent@watchdogcapital.com and michael@watchdogcapital.com,

respectively, directed each of the Transfers to or for the benefit of Watchdog Group.  *See id.* at

¶ 87.

A.      **The Transfers Are Avoidable As Actual Fraudulent Transfers**

86.     The Transfers to Watchdog Group constitute actual fraudulent transfers subject to avoidance.

87.     The Transfers to Watchdog Group occurred within two years of the Petition Date.

88.     The circumstances surrounding the Transfers demonstrate sufficient badges of fraud.

89.     Prime and Watchdog Group had a proximate relationship through continuous business dealings.  There also was a documented personal relationship, and insider information exchanged, between ▉▉▉▉ and Mr. Fenton.  The Transfers were executed as a result of these relationships and insider information sharing between ▉▉▉▉ and Watchdog Group.

90.     Watchdog Group sought to transfer crypto from Prime, and crypto was transferred from Prime to Watchdog Group, with the actual intent to hinder, delay, or defraud Prime's creditors after Watchdog Group learned insider information about Prime's financial condition from ▉▉▉▉.

91.     As evidenced by the communications between Mr. Fenton and ▉▉▉▉, Watchdog Group was aware that Prime was facing regulatory scrutiny from Nevada FID well before news of Prime's losses and financial distress became public.  Mr. Fenton pushed ▉▉▉▉ to make the Transfers requested by Watchdog Group "even if the co[mpany] ends up in a tight spot [since] it would be ideal to have this settled it's just one customer for the whole firm and it happens to be me."

92.     As a result of the Transfers, Prime became increasingly incapable of satisfying its obligations to other creditors.

93.    A significant amount of Prime's estate was transferred to Watchdog Group.  Prime transferred to Watchdog Group approximately 94.294437 BTC—*i.e.*, approximately $11,122,971.79 in USD equivalent pricing.[11]

94.    Prime's debts were greater than all of its property such that Prime was insolvent at the time of the Transfers.

95.    The Transfers were therefore actual fraudulent transfers subject to avoidance pursuant to Bankruptcy Code sections 544(b) and 548(a)(1)(A), and Sections 1304 and 1305 of Title 6 of the Delaware Code, and must be returned.

**B.    The Transfers Are Avoidable As Preferential Transfers**

96.    Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

97.    First, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made."  11 U.S.C. § 547(b)(1).

98.    Second, the transfer must be "for or account of an antecedent debt owed by the debtor before such transfer was made."  11 U.S.C. § 547(b)(2).

99.    Third, the transfer must have been "made while the debtor was insolvent."  11 U.S.C. § 547(b)(3).

100.    Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition.  11 U.S.C. § 547(b)(4).

101.    Finally, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim

---

[11]    Pricing data used for USD equivalent was obtained using the closing price of $117,960 to 1 BTC from CoinGecko on July 25, 2025.

than it would have received in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made.  11 U.S.C. § 547(b)(5)(A)–(C).

102.    The Transfers to Watchdog Group were transfers of an interest of Prime's property to or for the benefit of Watchdog Group during the Preference Period.

103.    Prime executed the Transfers during the Preference Period to satisfy the debt Prime owed to Watchdog Group under the Agreements.

104.    At the time of the Transfers, Prime owed crypto to Watchdog Group.  Thus, Prime made the Transfers on account of that antecedent debt.

105.    The Transfers were made while Prime was insolvent.  As of the Petition Date, Pime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[12]  Prime is nonetheless presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

106.    If not avoided, the Transfers will enable Watchdog Group to receive more than Watchdog Group would have received on account of its claim in a hypothetical liquidation under chapter 7 had Prime not made the Transfers during the Preference Period in satisfaction of Prime's antecedent debt owed to Watchdog Group.[13]

107.    Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Transfers during the Preference Period by PCT and the third-party expert retained in this matter, PCT has determined that it may avoid the Transfers even after taking

---

[12]    *See Schedules of Assets and Liabilities for Prime Core Technologies Inc. (Case No. 23-11161)* [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC (Case No. 23-11162)* [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC* (Case No. 23-11164) [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC* (Case No. 23-11168) [Docket No. 178].

[13]    *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

into account Watchdog Group's potential affirmative defenses.[14]   Accordingly, the Transfers to Watchdog Group must be returned.  *See* 11 U.S.C. §§ 547(b), 550.

108.    During the course of this proceeding, PCT may learn (through discovery or otherwise) of additional transfers made to or for the benefit of Watchdog Group during the Preference Period.  It is PCT's intention to avoid and recover all transfers made by Prime of an interest of Prime in property that were made to or for the benefit of Watchdog Group or any other transferee.   PCT reserves its right to amend this original Complaint to include: (i) further information regarding the Transfers; (ii) additional transfers; (iii) modifications of and/or revisions to Watchdog Group 's name; (iv) additional defendants; and/or (v) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to PCT at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

## V.    Watchdog Group Cannot Trace the Crypto It Transferred to Prime

109.    The Transfers were comprised of commingled crypto that Prime had not previously segregated into separate digital wallets.

110.    To complete the crypto transfers during the Preference Period, Prime transferred crypto from Omnibus Digital Wallets that held commingled crypto.  *See* Ex. D, Brennan Decl., at ¶ 85.

111.    Prime's extensive commingling of crypto eliminates any hope of Watchdog Group being able to attribute any transfer of crypto originally from Watchdog Group to Prime with the Transfers.

---

[14]    It is Watchdog Group's obligation to establish all possible affirmative defenses, including the subsequent new value defense.

112.     On July 18, 2025, the Court entered its *Order Granting Plan Administrator's Motion for Entry of an Order: (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief* [Docket No. 1086] (the "<u>Distribution Order</u>").  The Court also entered an opinion accompanying the Distribution Order [Docket No. 1085] (the "<u>Distribution Opinion</u>").

113.     In its Distribution Opinion, the Court analyzed whether fiat and crypto held by the Debtors were property of the Debtors' estates.  *See generally* Distribution Opinion.  Several parties (the "<u>Objectors</u>") objected to the Plan Administrator's request for the Court to rule that the fiat and crypto held by the Debtors constituted property of the Debtors' estates.  *See id.* at 1–2.

114.     In overruling these objections, the Court made several findings pertinent to the instant matter.

115.     First, the Court held that the agreements "submitted into evidence [by the Objectors] do not establish a trust relationship exists" between Prime and its customers.  *See id.* at 25; *see also id.* at 24 ("The Objectors have not established that a trust relationship was formed.").

116.     The agreements analyzed by the Court in the Distribution Order contain identical provisions to the Agreements at issue here and discussed above.  *See id.* at 24.

117.     Second, the Court held that "[t]he case ultimately turns on the fact that creditors' assets cannot be separately identified, segregated, traced or otherwise specifically identified" and that "[t]he overwhelming evidence establishes that the Debtors hopelessly commingled assets."  *Id.* at 23–24.  The Court found that "the fiat held by the Debtors is not traceable" and "the hopeless commingling would not allow the cryptocurrency to be traced."  *Id.* at 27, 30.

118.    As set forth below, the Transfers to Watchdog Group cannot be traced to Watchdog Group's crypto transfers to Prime.

### A.    Prime Commingled Crypto in Omnibus Digital Wallets in Vaults

119.    Prime did not maintain separate or segregated digital wallets for crypto. *See id.* at ¶ 28.  Instead, Prime had Omnibus Digital Wallets that commingled crypto transferred to Prime from different customers with Prime's own crypto that it used for corporate operations and purposes. *See id.*

120.    Prime maintained its Omnibus Digital Wallets in Prime's vaults ("Vaults") at Fireblocks LLC ("Fireblocks"), a third-party crypto security platform. *See id.* at ¶ 29.  Prime used Vaults within the Fireblocks' infrastructure to: (1) organize wallets (including the Omnibus Digital Wallets), (2) enhance security measures, and (3) leverage efficient transaction policies and access controls. *See id.*  Vaults are Fireblocks were not separated or segregated by digital wallets. *See id.*

121.    Customers were provided with deposit digital wallet addresses (the "Deposit Digital Addresses") for sending crypto to Prime. *See id.* at ¶ 30.  From time to time, Prime would conduct "sweeps" of those different Deposit Digital Addresses to transfer crypto from those Deposit Digital Addresses into one or more of the shared Omnibus Digital Wallets controlled by Prime. *See id.* at ¶ 31.  This process commingled crypto transferred to Prime by different customers together in the Omnibus Digital Wallets. *See id.*

122.    Prime's internal process for performing sweeps was inconsistent and void of procedural safeguards. *See id.* at ¶¶ 32–34.  Prime's application could trigger a sweep based on certain unknown events occurring or an employee could manually perform a sweep at any given time. *See id.*

123.    Prime also regularly transferred crypto between its multiple Omnibus Digital Wallets, only further commingling the already commingled crypto contained in the Omnibus Digital Wallets.  *See id.* at ¶ 33.

124.    In an attempt to track its crypto balances on behalf of its customers, Prime recorded its customers' transfers of crypto to and from Prime on its Internal Ledger.  *See id.* at ¶ 34.  When a customer transferred crypto to Prime, Prime would credit that amount on its Internal Ledger.  *See id*.  The Internal Ledger, however, did not track to which Omnibus Digital Wallet(s) any specific crypto was transferred into when Prime swept Deposit Digital Address(es).  *See id*. at ¶ 35.

125.    When a customer requested to transfer crypto from Prime, Prime would first verify the crypto balance that the customer supposedly had from the Internal Ledger to determine whether the customer had previously transferred sufficient crypto to Prime to support the outgoing transfer amount.  *See id.* at ¶ 39.  If the customer had transferred sufficient crypto, Prime would then check its multiple Omnibus Digital Wallets to determine from which Omnibus Digital Wallet(s) it could transfer the requested amount of crypto to the customer.  *See id.*  In completing a transfer request, Prime did not transfer the same crypto that a customer had initially transferred to Prime via its respective Deposit Digital Address because Prime's Omnibus Digital Wallets did not segregate crypto by customer and, thus, could not be used to identify any original crypto transferred to Prime by a specific customer.  *See id.*

126.    To demonstrate the extent of Prime's commingling of crypto, the Brennan declaration discusses and illustrates examples of commingling taken from transaction, blockchain, and other data.  *See id.* at ¶¶ 41–52.

127.    For example, Prime often used the digital wallet with a digital address ending in ~73ck ("<u>~73ck Wallet</u>") for BTC transferred to Prime from numerous customers as well as BTC

transferred from other Prime Omnibus Digital Wallets, which also held BTC transferred to Prime

by multiple customers.  *See id.* at ¶¶ 41–43.  This resulted in extensive commingling of BTC.



*See id.* at ¶ 42.

## B.    Prime Pooled Crypto Together to Reduce Transaction Fees

128.    Prime generally swept crypto from the Deposit Digital Addresses into shared

Omnibus Digital Wallets to pool crypto together for a number of reasons.  *See id.* at ¶¶ 44–52.

129.    One primary reason for pooling crypto together was that Prime and its customers

could bypass and save on various transaction fees[15] that would otherwise be incurred by

---

[15]    Transactions occurring on the blockchain incur fees.  On the Ethereum blockchain, these are referred to as "gas fees."  Gas fees refer to costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain.  In other words, they are fees charged by the blockchain itself for successfully completing a transaction.  However, on the Bitcoin blockchain, these are referred to simply as "transaction fees."  Transaction fees refer to the costs that blockchain users pay to bitcoin miners as an incentive for preventing network congestion and incorporating a transaction in the subsequent "block."  In other words, they are rewards paid to miners for facilitating the successful completion of a transaction on the blockchain."  *See*

conducting transactions on the blockchain.  *See id.* at ¶¶ 45–47.  Specifically, for crypto transfers within a single Prime Vault at Fireblocks, Prime could simply move the funds around on its Internal Ledger rather than conduct any transactions on the blockchain which would otherwise incur transaction fees.  *See id.* at ¶¶ 46–47.  When Prime did conduct on-chain transactions, it reduced transaction fees by pooling transactions and performing them during off-peak hours when the blockchain network was less congested as illustrated in the below diagram:



*See id.* at ¶ 49.

130.    By sweeping BTC together that had been transferred to Prime by multiple customers, including Watchdog Group, Prime's commingling of BTC makes distinguishing the original digital wallet from which the BTC originated from nearly impossible.  *See id.* at ¶¶ 48-52.

### C.    Prime Did Not Reconcile Crypto Transactions

Ex. D, Brennan Decl., at ¶¶ 24–25.  We use "transaction fees" to refer to both "gas fees" and BTC transaction fees herein, but only use the term "gas fees" to refer to transaction fees incurred for ETH and USDT on the Ethereum network.

131.    Prime did not conduct regular, timely or accurate reconciliations to compare the crypto recorded in its Internal Ledger with the crypto that Prime actually held in its Omnibus Digital Wallets.  *See id.* at ¶¶ 53–61.

132.    All crypto of value held by Prime is in Prime's Vaults with Fireblocks, and none of that crypto has clear ownership provenance.  *See id.*

133.    Because Prime did not segregate crypto transferred to it from one customer from crypto transferred to it from another customer, and crypto generated from Prime's own business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts it owed on its Internal Ledger.  *See id.* at ¶¶ 55–61.

134.    However, Prime's own internal data presents conflicting information regarding how certain digital wallets were attributed to different entities as well as falsified entries in Prime's Internal Ledger.  *See id.* at ¶¶ 61–65.

135.    Prime maintained substandard reconciliation processes throughout its history, including with respect to its Internal Ledger.  *See id.* at ¶¶ 53–66.  This further hindered the ability of Prime or anyone else to specifically identify which funds were transferred to Prime by which customer.  *Id.*

136.    Prime did not perform regular reconciliations of its assets and, at least prior to March 2021, any reconciliations that Prime did conduct were manual.  *See id.* at ¶¶ 53, 55–60.

137.    Former Prime employees testified that Prime commingled fiat and crypto transferred to it by customers and that Prime's reconciliation processes were poorly maintained.

138.    ██████████ ("██████"), Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Internal Ledger to determine the amounts that Prime owed to its customers:

Q:      And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?

A:      I would pull the general ledger record out of the Prime Trust Core system.

Deposition of ███████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "████████."), 89: 19–25.

139.    ██████ further testified that "[r]econciliations were not being done in a timely manner." ████ Dep., 38: 23–24.

140.    ████████████ ("█████"), Prime's former Chief Financial Officer, testified:

Q:      Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?

A:      I think there were instances where that did happen based off of the management in the financial operations team where we might have had balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ██████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

141.    ██████ also testified that "[i]t would not surprise" him if fiat and crypto transferred by customers were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been." *See id.*, 213:15–22.

142.    ███████████ ("█████"), Prime's former Senior Vice President of Operations and Reconciliations, also testified about Prime's reconciliations processes both before and after March 2021:

Q:      When you say it was a problem, what do you mean?

A:      There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

████ Dep., 19:23–20:5.

143.    ████ prepared a report for a July 12, 2021, audit committee meeting which identified the risks associated with Prime's handling of assets, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

### 2  Finding and Response Summary Matrix

| Risk | Reference | Finding | Target | Response | Completed | Verified |
|------|-----------|---------|--------|----------|-----------|----------|
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

144.    As described above and confirmed in the Brennan Declaration, Prime's repeated transfers of funds between Omnibus Digital Wallets, and Prime's failure to maintain proper tracking and reconciliation processes, further exacerbated the commingling of crypto transferred to Prime by Watchdog Group with crypto transferred to Prime by Prime's other customers and crypto generated from Prime's own business operations.  *See* Ex. D, Brennan Decl., at ¶¶ 28–66.

### D.    Watchdog Group Cannot Trace the Crypto It Transferred To Prime

145.    Because Prime held crypto transferred to it from customers in an omnibus,

commingled manner, Prime's own employees were incapable of determining where any crypto

transferred by a particular customer to Prime was located.  As ████ testified:

> Q:    And you've now said—just to make sure we're talking the same language,
> omnibus, the structure, omnibus environment, omnibus product, is that all
> meaning the same thing, or what do you mean—
>
> A:    It is.  It is. I don't like calling it any of those things.  I don't really know
> what else to call it, but it's basically the same thing, for the client to have
> an omnibus account.
>
> Q:    And what does that mean to you, a client to have an omnibus account?
>
> A:    It means that rather than having all their end users with a segregated account
> model to where each end user would have their own account at Prime Trust,
> all of their funds would be comingled in one account that's in the
> integrator's name.
>
> Q:    And that was done at Prime Trust?
>
> A:    It was done at Prime Trust.  It wasn't done very frequently, but there were—
> there were omnibus accounts at Prime Trust.
>
> Q:    And do you know who was responsible for those accounts?
>
> A:    I don't. There was probably ten or 12 accounts. . . While I was at Prime
> Trust it was very concerning to me and frustrating that nobody could ever
> tell me the exact number of omnibus accounts that the company allowed
> customers to have.· It was like an Easter egg hunt finding them.· It was not
> a clear, documented—I mean, it was a product offering.· I mean, you could
> have the segregated account model or this omnibus account model.· And it
> just was not clearly defined who was operating in an omnibus account and
> who those people were.

████ Dep., 205:19–207:3.

146.    Another example of the confusion in tracing specific assets that customers

transferred to Prime is demonstrated in the below internal Prime correspondence from

December 2022.  In this correspondence, individuals at Prime attempted to respond to a request

from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from another customer:



147.    ███ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":

> On Mon, Dec 19, 2022 at 9:28 AM ███████████ @primetrust.com> wrote:
>
> Hey ███,
> Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger? If so, I don't believe any specific bank accounts were used, as management considered all funds tangible in our omnibus model. In their decision, no bank movements were needed/done before the credits were requested to the ledger.

148.    ███████████, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which fiat and crypto and that Prime was "***not able to specify what customer is out the funds due to our omnibus structure***":

> On Wed, Dec 28, 2022 at 10:56 AM ███████████████ @primetrust.com> wrote:
>
> ███████, ████, and I met today. We are in agreement that we are not able to specify what customer is out the funds due to our omnibus structure. Please let us know if we need to have another conversation to align how to position this with the FID.

(Emphasis added).

149.    Because of Prime's commingling practices and poor recordkeeping procedures, it is impossible for PCT, Watchdog Group, or anyone else to trace and specifically identify the crypto that Watchdog Group originally had transferred to Prime. *See* Ex. D, Brennan Decl., at ¶¶ 28–66.

## VI.    The 98f Wallet

150.    In December 2021, one of Prime's customers, Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC ("Abra"), requested a transfer from Prime of 5,867.71 ETH (worth approximately $24,000,000.00 at the time) from Prime. *See id.* at ¶¶ 68–69. Subsequently, between December 2021 and March 2022, Abra continued to request that Prime transfer ETH totaling 48,034.57 ETH (worth approximately $145,000,000.00 at the time). *See id.* at ¶ 71.

151.    In attempting to satisfy Abra's transfer request, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its digital wallets:

> ████@primetrust.com
>                                                 2021-12-22 07:16:57.000 PM
> Hey ** - Expanding this to a larger audience as this has become a priority issue that was brought up earlier today: We have uncovered a large balance discrepancy between our ledger and Fireblocks where we are showing a larger amount of ETH (~9000) than what is shown in Fireblocks. This was a result of a larger disbursement requested by Abra which requires us to aggregate ETH; upon running a balance check on our incoming wallet address, we noticed the amount was not enough to send out the request. We are double checking to confirm that this is not a result of double spend(s) but from our first pass, it appears to not be a result of manually sending ETH transactions incorrectly. I know @████ and @████ ████ are investigating but not sure what are the other possibilities could result in this difference that we see. It may also be worth it to ask FB of an audit of their side if we can confirm nothing is incorrectly processed on our side.

152.    Further investigation revealed that, for approximately eight months, Prime had been permitting Abra to transfer significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.

153.    Specifically, in December 2021, Prime discovered that Abra had already transferred more than 11,000 ETH (approximately $45,000,000.00 at the time) to the 98f Wallet. *See id.* at ¶ 69.

154.    In or around December 2021, Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet. *See id.* at ¶ 68.

155.    It was unclear to those at the company who the signers for the 98f Wallet were or how Prime could access the 98f Wallet. *See* ████ Dep., 69:17–71:22. Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet. *See* ████ Dep., 181:6–8. Prime also did not possess and could not locate the passwords, which are called "seed phrases," that were associated with these physical hardware devices. *See id.*

156.     Because Prime had no way of obtaining the private keys necessary to access the 98f Wallet, Prime had no way of accessing the 98f Wallet.  The crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

157.     Prime was concerned about the negative impacts and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a wallet containing a significant amount of crypto.

158.     To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy Abra's transfer requests as reflected below.  *See* Ex. D, Brennan Decl., at ¶ 70.

159.     Between December 23, 2021, and March 30, 2022, Prime conducted ten different on-chain purchases of ETH from Liquidity Provider in an attempt to satisfy Abra's mutlitple outgoing transfer requests.  These purchases are summarized in the chart below.

| Date | USD Internal Ledger "Wire" Transfer[16] Amount | ETH On-Chain Transfers |
|---|---|---|
| 12/23/2021 | $11,958,000 | 2,999.99 |
| 12/31/2021 | $12,158,250 | 3,250 |
| 1/6/2022 | $2,778,400 | 800 |
| 1/6/2022 | $7,293,300 | 2,100 |
| 1/22/2022 | $5,000,000 | 1,930.50 |
| 3/12/2022 | $4,644,000 | 1,800 |
| 3/15/2022 | $8,524,750 | 3,049.98 |
| 3/15/2022 | $8,043,000 | 3,000 |
| 3/29/2022 | $7,902,800 | 2,300 |
| 3/30/2022 | $8,065,048 | 2,347.22 |

*See id*. at ¶ 71.

---

[16]   Prime did not actually execute any of these wire transfers.  *See* ■■■ Dep, 164:22–165:10.

160.    The funds for each of these ETH purchases came from Prime's omnibus bank accounts, which held commingled fiat transferred to Prime from Prime's customers.  *See id.* at ¶¶ 114–116.  The ETH purchased with those commingled funds was then transferred to Abra.  *See id.* at ¶¶ 72–74.

161.    The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider was described by ████████, Prime's former Chief Operating Officer, at his deposition:

> Q:    So [Customer's] depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?
>
> A:    I would defer to ███ on that.  But essentially it was use of omnibus funds, is my understanding.
>
> Q:    What's use of omnibus funds?
>
> A:    As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.
>
> Q:    And which funds were used to make the purchases of the ETH to fund the transactions?
>
> A:    Funds from the fiat account.  Fiat omnibus account.  Is my understanding.  Once again, ███ would know specifically.

Deposition of ██████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023), 92:25–93:18.

162.    The ETH that Abra had initially transferred to Prime was (and still is to this day) locked away in the 98f Wallet.  *See* Ex. D, Brennan Decl., at ¶ 74.

163.    Executives at Prime made the decision to falsify entries in the Internal Ledger to conceal the fact that Prime had used fiat that had been transferred to it by other customers to satisfy Abra's outgoing transfer requests.  *See id.* at ¶ 75.

164.   ████ confirmed in his deposition that Prime executives intentionally chose to settle and record ETH purchases from Liquidity Provider on Prime's Internal Ledger as opposed to externally transferring funds to Liquidity Provider.  *See* ████ Dep., 153:8–13.

165.   These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Internal Ledger and the amount of fiat that Prime held in its omnibus bank accounts.  *See* <u>Ex. D</u>, Brennan Decl., at ¶ 79.

| | |
|---|---|
| ████@primetrust.com | 2021-12-23 03:40:01.000 AM |
| If we don't credit our ledger to settle, our bank account is plus the difference compared to the bank | |
| ████@primetrust.com | 2021-12-23 03:42:16.000 AM |
| The difference is are we okay with inflating our ledger vs having our bank account be out the difference compared to our ledger | |
| ████@primetrust.com | 2021-12-23 03:44:15.000 AM |
| Whatever you think is easier to reconcile once we get access to the locked ETH | |

166.   ████ further testified about Prime's "inflat[ed]" Internal Ledger compared to the fiat in Prime's omnibus bank accounts:

Q:   [T]here's going to be cash reflected in [Liquidity Provider]'s account, but that cash is not actually in the bank; is that right?

A:   Correct.  Correct.

Q:   And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?

A:   Correct . . .

Q:   I see.  But the [l]edger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?

A:   Exactly.

Q:   That's ultimately what happened; right?

A:   Yeah, that's exactly what happened.

▇▇ Dep., 144:11–20; 146:7–15.

167.    Desperate to hide the hole in its balance sheet, Prime executives discussed how to
hide these transactions from auditors at Nevada FID:



168.    As demonstrated by the illustrative chart below,[17] Prime's Internal Ledger falsely
displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that
Prime credited to Liquidity Provider to fund the ETH Purchases between December 23, 2021, and
March 30, 2022:

---

[17]    This illustrative chart is not an image directly copied from Prime's Internal Ledger. Rather, this chart contains
data from Prime's Internal Ledger related to certain transaction entries.

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ████████████████0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ████████████████0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ████████████████b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ████████████████5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ████████████████6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ████████████████777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ████████████████2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ████████████████1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ████████████████4113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ████████████████ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | Total | 76,367,547.90 |

169.    None of these wire transfers appear on Prime's bank account statements because they did not actually occur.[18]  *See* Ex. D, Brennan Decl., at ¶¶ 80–81.

170.    Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally obfuscate Prime's internal records simply compounded the already impossible task of untangling or segregating fiat or crypto transferred to Prime by different customers and fiat or crypto that Prime generated from its business operations.  *See id.* at ¶ 82.

## VII.    Prime's Financial Conditions Spiraled Downward and Culminated in Prime Filing the Chapter 11 Cases

171.    Prime ultimately reported the 98f Wallet issues to Nevada FID between September and November 2022.

172.    In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency issues Prime was experiencing.

---

[18]    The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 23, 2021, is attached as Exhibit E.  The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 31, 2021, is attached as Exhibit F.

173.    For example, on May 26, 2023, Prime's CEO met in person with Nevada FID during which Prime was told that they would likely be shut down in the near future.

174.    During the lead up to the May 26, 2023 meeting with Nevada FID and shortly thereafter, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing—were leaking to the crypto and financial markets.

175.    For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime.  *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, CoinDesk (Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.  CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

176.    On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals." *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21, 2023), https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf.  Nevada FID ordered Prime to cease accepting all fiat and crypto deposits. *Id.*

177.    The next day, BitGo canceled its acquisition of Prime.  One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns over its business." *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels*

*Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023), https://www.coindesk.com/business/2023/06/22/cryptp-custody-firm-bitgo-cancels-prime-trust-acquisition/.

178.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court"). *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime%20Core%20Technologies%20et%20al%20Petition.pdf.    The Nevada FID Petition directed Prime to cease and desist all retail trust activities. *Id.*

179.    The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

180.    Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its ***omnibus customer accounts***." *Id.* at 6 (emphasis added).

181.    The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals." *Id.* at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)." *Id.* at 7.

182.    On July 14, 2023, the Nevada Court placed Prime under receivership.

183.    On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

## CAUSES OF ACTION

### Count I
### Avoidance of Actual Fraudulent Transfers
### DEL. CODE ANN. tit. 6, §§ 1304(a)(2) and 1305 and 11 U.S.C. §§ 544(b) and 548

184.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

185.    On or within two (2) years before the Petition Date, PCT made the Transfers to or for the benefit of Watchdog Group.

186.    Each of the Transfers was a transfer of an interest in property of Prime.

187.    Each of the Transfers was made with an actual intent to hinder, delay, or defraud PCT's creditors.

188.    The actual fraudulent transfers are avoidable pursuant to Bankruptcy Code Sections 544(b) and 548 and other applicable law, including the Delaware Uniform Fraudulent Transfers Act, 6 Del. C. § 1301, *et seq*.

189.    Accordingly, each of the Transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(1) and 1305, and 11 U.S.C. §§ 544(b) and 548, and PCT may recover from Watchdog Group the full amount of the Transfers, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law

### Count II
### Avoidance of Preferential Transfers
### 11 U.S.C. § 547(b)

190.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

191.    The Transfers were made on account of a demand by Watchdog Group.

192.    Each of the Transfers was a transfer of an interest in property of Prime.

193.    Prime made the Transfers to or for the benefit of Watchdog Group.

194.    At the time of the Transfers, Watchdog Group was a creditor of Prime within the meaning of section 101(10) of the Bankruptcy Code. Watchdog Group received the Transfers, or, alternatively, the Transfers were made for Watchdog Group's benefit.

195.    Each of the Transfers was made for or on account of an antecedent debt owed by Prime.

196.    Each of the Transfers was made within ninety days of the Petition Date

197.    At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code. If not avoided, the Transfers would enable Watchdog Group to receive more than Watchdog Group would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

198.    Watchdog Group has not repaid or returned any of the Transfers to PCT.

199.    Pursuant to 11 U.S.C. § 547(b), PCT has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses that Watchdog Group could assert, including Watchdog Group's potential defenses under section 547(c) of the Bankruptcy Code, and believes that certain of the Transfers are avoidable.

200.    Accordingly, PCT is entitled to recover from Watchdog Group 94.294437 BTC as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law.

**Count III**
**Recovery of Avoided Transfers**
**11 U.S.C. § 550**

201.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

202.    PCT is entitled to avoid each of the Transfers with respect to Watchdog Group addressed herein pursuant to Sections 544(b), 547(b), and/or 548 of the Bankruptcy Code.

203.    Because Watchdog Group was the initial transferee of such Transfers, or the immediate or mediate transferee of such initial transferee, or the entity for whose benefits the Transfers were made, PCT is entitled to recover from Watchdog Group the full value of the Transfers pursuant to 11 U.S.C. § 550(a), plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

**Count IV**
**Claim Objection**
**11 U.S.C. § 502**

204.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

205.    As alleged above, Watchdog Group was the initial transferee of the Transfers, or the immediate or mediate transferee of such initial transferee, or the entity for whose benefit the Transfers were made, and PCT is entitled to avoid the Transfers described above pursuant to Sections 544(b), 547(b), and/or 548 of the Bankruptcy Code, which are recoverable from Watchdog Group under Section 550 of the Bankruptcy Code.

206.    Pursuant to section 502(d) of the Bankruptcy Code, any claim(s) of Watchdog Group that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until Watchdog Group

pays PCT the value of the Transfers, for which and to the extent that the Court has determined Watchdog Group is liable pursuant to 11 U.S.C. § 550.

## PRAYER FOR RELIEF

**WHEREFORE**, PCT requests that this Court grant the following relief:

A.     Enter an order finding that the Transfers addressed herein are avoidable actual fraudulent transfers under 11 U.S.C. §§ 544 and 548 and DEL. CODE ANN. tit. 6, §§ 1304, 1305 and/or avoidable preferential transfers under 11 U.S.C. § 547;

B.     Award PCT:  (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable actual fraudulent transfers and/or avoidable preferential transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable actual fraudulent transfers and/or avoidable preferential transfers alleged herein, plus the value of any additional avoidable transfers that PCT learns, through discovery or otherwise, were made to Watchdog Group;

C.     Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by Watchdog Group against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until Watchdog Group relinquishes to PCT the amount ordered as an award for avoidable transfers;

D.     Award PCT its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

E.     Grant PCT all other relief, at law or equity, to which it may be entitled.

Dated:  July 28, 2025
          Wilmington, Delaware

MCDERMOTT WILL & EMERY LLP

/s/ David R. Hurst
David R. Hurst (No. 3743)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
dhurst@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
James A. Pardo (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
Magali M. Duque (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
dazman@mwe.com
jbevans@mwe.com
jpardo@mwe.com
ggriffith@mwe.com
pkennedy@mwe.com
jaminov@mwe.com
mduque@mwe.com

*Counsel to PCT Litigation Trust*