## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-_____ (JKS) |
| BKR International KB, | |
| Defendant. | |

## COMPLAINT

The PCT Litigation Trust ("PCT" or "Plaintiff")[2] established in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), through its undersigned counsel, files this complaint (the "Complaint") against Defendant BKR International KB d/b/a Bankor ("Defendant" or "Bankor"), pursuant to sections 547 and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), seeking to avoid and recover all preferential transfers of property made by the Debtors to or for the benefit of Defendant plus interest, attorneys' fees, and costs. To the extent that Defendant filed a proof of claim or has a claim listed by the Debtors on their schedules as undisputed, liquidated, and not contingent, or have otherwise requested payment from

---

[1] The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2] The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

the Debtors or the Debtors' estate (collectively, the "Claims"), this Complaint is not intended to be, nor should it be construed as, a waiver of PCT's right to object to any such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j) ("Section 502"), and such rights are expressly reserved.   Notwithstanding this reservation of rights, certain relief pursuant to Section 502 is sought by PCT herein as further stated in Count III below.  PCT alleges as follows:

## **INTRODUCTION**

1.       Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat.  The Nevada Financial Institutions Division ("Nevada FID") shut down Prime on June 21, 2023, and Prime filed for bankruptcy shortly thereafter in August 2023.  Most of Prime's customers suffered losses and have yet to receive any of the crypto or fiat owed to them.  But, in a series of transactions occurring between May 16, 2023 and the Petition Date,[3] Prime transferred $372,436.88 to Defendant (the "Transfers").

2.       After receiving certain of the Transfers during the Preference Period, Defendant transferred $51,277.00 of potential subsequent new value to Prime.  While it is Defendant's obligation to establish all possible affirmative defenses, including subsequent new value, Defendant's preference exposure is no less than $321,159.88.

3.       PCT brings this adversary proceeding (the "Adversary Proceeding") pursuant to sections 547 and 550 of the Bankruptcy Code to avoid and recover all preferential transfers of property and all obligations of Prime to or for the benefit of Defendant, made in the 90-day period prior to the filing of the Debtors' Chapter 11 Cases.  Pursuant to Section 502(d) of the Bankruptcy

---

[3]      Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's non-insider preference period (the "Preference Period") occurred between May 16, 2023 and the Petition Date.

Code, PCT seeks to disallow any and all claims filed or held by Defendant in these Chapter 11 Cases unless and until Defendant has relinquished to PCT all property owed to it.

4.      Defendant is a crypto trading and wealth management firm that operates through a single institutional account to manage and trade digital assets.  It conducts both large and small trades.  Defendant engaged Prime (collectively, Prime and Defendant are referred to herein as the "Parties") to gain access to Prime's over-the-counter ("OTC") desk for trades and for liquidity for smaller trades.

5.      The agreements that governed Prime and Defendant's relationship during the Preference Period include:  (i) Prime Trust Order Form, executed March 18, 2022 (the "Order Form");[4] (ii) Prime Trust Master Services Agreement, revision date August 30, 2022 (the "MSA");[5] and (iii) Service Schedule for Prime Trust Custodial Services, revision date May 13, 2022 (the "Custodial Agreement")[6] (collectively, the "Agreements").

6.      Although Prime was a Nevada state-chartered trust company, Defendant never sought or received any trust or fiduciary services from Prime.  To the contrary, Defendant engaged Prime to provide custodial, payment rails, liquidity, and compliance services.

7.      The MSA explicitly states that it "***does not create a . . . fiduciary or employment relationship between the parties.***"  Ex. B, MSA, § 14.1 (emphasis added).

---

[4]     A copy of the Order Form and amendment to the Order Form are attached as Exhibit A.  The Order Form provides that upon expiration, the agreement will automatically renew for an additional one year period, unless either party provides the other party notice of non-renewal at least thirty days prior to the expiration of the current term. Neither Defendant nor Prime provided notice of non-renewal.  The Order Form therefore extended for an additional one-year period.  An amendment to the Order Form to continue use of Prime's services was signed by Defendant on April 26, 2023, and by Prime on May 1, 2023.

[5]     A copy of the MSA is attached as Exhibit B.

[6]     A copy of the Custodial Agreement is attached as Exhibit C.

8.      The Custodial Agreement provides that Prime was entitled to "***pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such [assets]. . .with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]***" <u>Ex. C</u>, Custodial Agreement, §2.7(b) (emphasis added).

9.      The Agreements establish that the Parties always maintained a strictly debtor-creditor relationship and that no fiduciary relationship existed between the Parties.

10.     The fiat that Defendant transferred to Prime was held in commingled "omnibus" bank accounts in Prime's name.  These omnibus bank accounts commingled the fiat Defendant transferred to Prime with fiat from Prime's many other customers and Prime's own fiat generated from its business operations.

11.     Prime attempted to keep track of commingled fiat transferred by Defendant (and other customers) with an internal, omnibus ledger (the "<u>Internal Ledger</u>").  But the Internal Ledger was errantly and later intentionally corrupted by Prime.

12.     Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries.  Accordingly, the Internal Ledger cannot be relied on to identify or trace the fiat that Defendant transferred to Prime.

13.     The third-party expert retained by PCT in this matter, James P. Brennan, has confirmed that it is impossible to identify, trace, or otherwise distinguish the fiat that Defendant transferred to Prime from fiat provided by Prime's other customers or from Prime's own fiat.  *See* Declaration of James P. Brennan (the "<u>Brennan Decl.</u>").[7]

---

[7]      A copy of the Brennan Decl. is attached as <u>Exhibit D</u>.

14.    Bank account statements reflect that the fiat transferred from Prime to Defendant during the Preference Period was not the original fiat that Defendant had transferred to Prime.  *See id.* at ¶ 69.  Rather, these transfers consisted of fiat from the commingled, omnibus bank accounts in Prime's name.

15.    In December 2021, Prime discovered it was unable to access a digital wallet (the "98f Wallet")[8] holding more than 11,000 ETH that had been transferred by one of Prime's customers.  Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet.  *See id.* at ¶¶ 45–46.

16.    Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customer's transfer requests, Prime went to the market to purchase ETH to cover the transfer requests.  To fund those market purchases, Prime used fiat from its omnibus bank accounts.  *See id.* at ¶¶ 47–52.

17.    Prime executives admitted under oath that Prime intentionally falsified its internal records to hide the truth about its replacement ETH purchases.  To hide the fact that Prime was using fiat transferred to it by customers to pay for its replacement ETH purchases, Prime created fake wire transfer entries on the Internal Ledger to make it appear that Prime received fiat wire transfers from one of the liquidity providers ("Liquidity Provider") who sold Prime the replacement ETH.  In fact, no such fiat wire transfer deposits ever occurred:

Q:    When it says funds transfer. . . and it says "wire, wire, wire."  Do you see that?

A:    Yes.

Q:    ***There were no wire transfers; right***?

A:    ***Yes***.

---

8    The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f."

Q:      *Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?*

A:      *Yes, there were no wire transfers*.

Deposition of ▋▋▋▋▋, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "▋▋ Dep."), 164:22–165:10 (emphasis added).

18.     Prime's use of its fiat transferred by other customers to purchase replacement ETH left it with a nearly $82 million shortfall in the omnibus bank accounts that contained commingled fiat from Defendant and other Prime customers.

19.     Prime's falsified wire transfer entries to cover its replacement ETH purchases, coupled with Prime's failure to properly reconcile and record other transactions on its Internal Ledger, have resulted in Prime being unable to trace any specific deposits, withdrawals, or transfers that were made by any particular customer, including Defendant.  *See* Ex. D, Brennan Decl., at ¶ 69.

20.     Prime's Transfers to Defendant during the Preference Period exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's Chapter 11 filing on the Petition Date.

21.     Because the Parties' relationship was strictly a debtor-creditor relationship, the Transfers to Defendant during the Preference Period must be returned to the Debtors' estate pursuant to Sections 547 and 550 of the Bankruptcy Code, plus interest, attorneys' fees, and costs.

22.     During the course of this Adversary Proceeding, PCT may learn (through formal discovery or otherwise) of additional transfers made to, or obligations incurred by, Defendant that are avoidable and/or recoverable under the Bankruptcy Code.  PCT intends to avoid and/or recover

all such transfers and obligations made to or for the benefit of Defendant and, accordingly, reserves the right to amend this Complaint.

## PARTIES

23.     Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644].  The Plan was consummated on January 5, 2024 (the "Effective Date").[9]  On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust.  *See* Plan, § 6.21.  The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn.  *See id.*, § 1.118.

24.     Defendant BKR International KB is a Swedish Limited Partnership with a registered address and principal place of business in Solna, Sweden.

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the

---

[9]     *See* Docket No. 694.

fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor." *See* Plan, § 12(c). This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust." *Id.*, §§ 12(s), (u). As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

26.     This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2). The Court may enter final orders in connection with the matters contained herein.

27.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, PCT confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the parties to this action, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

28.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

29.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 105, 542, 547, and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

30.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens".

Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. Bitcoin ("BTC") and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies, including USD Coin ("USDC") and Tether ("USDT").

31.     All cryptocurrencies exist on a "blockchain." A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency. All transactions are recorded on the blockchain and are publicly available. When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks." Those "blocks" are publicly available and reflect all cryptocurrency transactions that occurred on the blockchain at a particular point in time. The "blocks," in turn, are linked on the chain in chronological order — thus, a "block"-"chain."

32.     There are many different blockchains. The first and most popular blockchain was the Bitcoin blockchain. Another important blockchain is the Ethereum blockchain, which made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain. Cryptocurrencies created on the Ethereum blockchain, are referred to as "ERC-20" tokens.

33.     Users generally hold crypto in digital wallets. On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys." These public keys are 40-digit alphanumeric strings. Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

34.     "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain digital address. Like public keys, private keys consist of multi-digit

alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

35.     Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

36.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

37.     A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

38.     A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method. These types of physical hardware devices are provided by companies such as Trezor:



39.     Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet.

However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device.  To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to initiate transfers of crypto kept in the digital wallet. Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

40.     Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed. They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## GENERAL ALLEGATIONS

### I.      Prime's Business Operations

41.     Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

42.     Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

43.     In the years that followed, as the crypto markets and industry grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

44.     Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state money-transmitter licenses (each, a "MTL") required to conduct money transmission.

45.     Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

46.     Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend the time, effort, and financial resources necessary to obtain their own MTLs.

47.     Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

## II.     The Agreements Created a Strictly Debtor-Creditor Relationship Between Prime and Defendant

48.     Defendant is a crypto trading and wealth management firm that manages its own portfolio of fiat and crypto.  It executes both large and small trades and does not offer custodial services or onboarding for individual or retail clients.

49.     Defendant did not engage Prime for any fiduciary or trust services.

50.     The Agreements governed the Parties' relationship during the Preference Period.

51.     At all relevant times, the Agreements were valid and enforceable contracts governed by Nevada law.  *See* Ex. B, MSA, § 13.1 ("The Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.").

52.     Prime and Defendant executed the Order Form on March 18, 2022.  *See* <u>Ex. A</u>, Order Form.  An amendment to the Order Form to continue use of Prime's services was signed by Defendant on April 26, 2023, and by Prime on May 1, 2023.  *Id.*

53.     The Order Form specifically incorporates both the MSA and the Custodial Agreement by reference.  *Id.*  ("This Order Form is governed by the Prime Trust Master Services Agreement set forth at: https://www.primetrust.com/legal/msa, the Service Schedule(s) and Attachment(s) that are applicable based on the services provided by Prime Trust under this Order Form (located at: https://www.primetrust.com/legal/msa-service-schedules), and the attached Fee Schedule, all of which are incorporated into this Order Form by this reference.").

54.     The Order Form states that the "[MSA] and any of its incorporated documents, including the Service Schedule(s). . . shall supersede and replace any prior agreement(s) that may be in place between [Defendant] and Prime Trust with respect to Prime Trust's services."  <u>Ex. A</u>, Order Form.

55.     The Agreements explicitly state that they do not create a trust or fiduciary relationship between Prime and Defendant.

56.     The MSA explicitly states: "The Parties are independent contractors.  The Agreement does ***not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties***" and that "***nothing in the Agreement, express or implied is intended to give rise to any third-party beneficiary***."  <u>Ex. B</u>, MSA, § 14.1 (emphasis added).

57.     Prime, pursuant to the Custodial Agreement, also had complete discretion to invest, rehypothecate, hold and register in its own name, and otherwise transfer or use the assets provided

by Defendant to Prime as well as retain the profits derived from the assets that Defendant transferred to Prime.

58.    For example, the Custodial Agreement permitted Prime to:

> [O]therwise use or invest such cash or Fiat Currency at Prime Trust's own risk. Without limiting the foregoing, Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]

Ex. C, Custodial Agreement, § 2.7(b).

59.    The Custodial Agreement also provided that Defendant expressly agreed "that any such earnings, income, or compensation shall be retained by Prime Trust, and no portion of any such earning, income, or compensation shall be paid to or for customer . . ." *Id.*

60.    The Agreements established that the Parties, at all relevant times, maintained a strictly debtor-creditor relationship.

## III.    Transfers From Prime to Defendant During the Preference Period Are Avoidable

61.    Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

62.    First, the transfer must be "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1).

63.    Second, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2).

64.    Third, the transfer must have been "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3).

65.    Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition. *See* 11 U.S.C. § 547(b)(4).

66.     Finally, the transfer must have enabled the creditor to whom the transfer was made
(or for whose benefit the transfer was made) to receive a greater recovery on account of its claim
than it would receive in a hypothetical case under chapter 7 of the Bankruptcy Code had such
transfer not been made.  *See* 11 U.S.C. § 547(b)(5)(A)–(C).

67.     In the weeks leading up to Nevada FID's decision to shut down Prime, rumors about
Prime's deteriorating financial condition and potential need to file for bankruptcy spread among
certain players in the crypto industry and financial markets.  Defendant had Prime transfer funds
to Defendant during this period of escalating financial distress.

68.     Specifically, Prime transferred $372,436.88 from Prime's BMO x3077 account to
or for the benefit of Defendant during the Preference Period.  *See* <u>Ex. D</u>, Brennan Decl., at ¶ 65.

69.     The API log audit data establishes that Todor Ivanov, using the email address
ivanov@bankor.com, directed each of the Transfers.  *See id*. at ¶ 67.

70.     The Transfers to Defendant were transfers of an interest of Prime's property to or
for the benefit of Defendant during the Preference Period.

71.     Prime executed the Transfers during the Preference Period to satisfy the debt Prime
owed to Defendant under the Agreements.

72.     The Transfers were made while Prime was insolvent.  As of the Petition Date, Prime
held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in
liabilities.[10]  If not avoided, the Transfers will enable Defendant to receive more than Defendant
would have received on account of its claim in a hypothetical liquidation under chapter 7 had

---

[10]     *See Schedules of Assets and Liabilities for Prime Core Technologies Inc. (Case No. 23-11161)* [Docket No. 175];
*Schedules of Assets and Liabilities for Prime Trust, LLC (Case No. 23-11162)* [Docket No. 176]; *Schedules of
Assets and Liabilities for Prime IRA LLC (Case No. 23-11164)* [Docket No. 177]; *Schedules of Assets and
Liabilities for Prime Digital, LLC (Case No. 23-11168)* [Docket No. 178].

Prime not made the Transfers in satisfaction of Prime's antecedent debt to Defendant. *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

73.     Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Transfers during the Preference Period performed by PCT and the third-party expert retained in this matter, PCT has determined that it may avoid many of the Transfers even after taking into account Defendant's alleged affirmative defenses.[11]  Accordingly, certain of the Transfers to Defendant must be returned.  *See* 11 U.S.C. §§ 547(b), 550.

74.     Defendant transferred $51,277.00 of potential subsequent new value to Prime after receiving certain of the Transfers during the Preference Period.  *See* Ex. D, Brennan Decl., at ¶ 68. Therefore, Defendant's preference exposure is no less than $321,159.88.  *See id.*

75.     During the course of this proceeding, PCT may learn (through discovery or otherwise) of additional transfers made to Defendant during the Preference Period.  It is PCT's intention to avoid and recover all transfers made by Prime of an interest of Prime in property that was made to or for the benefit of Defendant or any other transferee.  PCT reserves its right to amend this original Complaint to include:  (i) further information regarding the Transfers; (ii) additional transfers; (iii) additional defendants; and/or (iv) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to PCT at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

## IV.     The Transfers Contained Commingled Fiat

76.     The Transfers were comprised of commingled fiat that Prime had not previously segregated into separate bank accounts.

---

[11]     It is Defendant's obligation to establish all possible affirmative defenses, including subsequent new value.

77.     To complete the fiat transfers during the Preference Period, Prime transferred fiat from one of Prime's omnibus, commingled accounts at BMO Harris Bank, N.A. ("BMO") ending in 3077 ("BMO x3077").  *See id.*

78.     Prime's extensive commingling of fiat eliminates any hope of Defendant being able to attribute any transfer of fiat originally from Defendant to Prime with the Transfers.

79.     On July 18, 2025, the Court entered its *Order Granting Plan Administrator's Motion for Entry of an Order: (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief* [Docket No. 1086] (the "Distribution Order").  The Court also entered an opinion accompanying the Distribution Order [Docket No. 1085] (the "Distribution Opinion").

80.     In its Distribution Opinion, the Court analyzed whether fiat and crypto held by the Debtors were property of the Debtors' estates.  *See generally* Distribution Opinion.  Several parties (the "Objectors") objected to the Plan Administrator's request for the Court to rule that the fiat and crypto held by the Debtors constituted property of the Debtors' estates.  *See id.* at 1–2.

81.     In overruling these objections, the Court made several findings pertinent to the instant matter.

82.     First, the Court held that the agreements "submitted into evidence [by the Objectors] do not establish a trust relationship exists" between Prime and its customers.  *See id.* at 25; *see also id.* at 24 ("The Objectors have not established that a trust relationship was formed.").

83.     The agreements analyzed by the Court in the Distribution Order contain identical provisions to the Agreements at issue here and discussed above.  *See id.* at 24.

84.     Second, the Court held that "[t]he case ultimately turns on the fact that creditors'
assets cannot be separately identified, segregated, traced or otherwise specifically identified" and
that "[t]he overwhelming evidence establishes that the Debtors hopelessly commingled assets."
*Id.* at 23–24.  The Court found that "the fiat held by the Debtors is not traceable" and "the hopeless
commingling would not allow the cryptocurrency to be traced."  *Id.* at 27, 30.

85.     As set forth below, the fiat Transfers from Prime to Defendant cannot be traced to
Defendant's original fiat transfers to Prime.

### A.     Prime Commingled Fiat in Omnibus Bank Accounts in Prime's Name

86.     The fiat that Defendant and other customers transferred to Prime was not segregated
into separate bank accounts.  *See* <u>Ex. D</u>, Brennan Decl., at ¶ 16.  Instead, the fiat was held in
omnibus bank accounts in Prime's name containing fiat other customers transferred to Prime as
well as fiat that Prime generated from its own business operations.  *See id.*

87.     The fiat transfers from Prime to Defendant during the Preference Period were
transferred from BMO x3077.  *See id.* at ¶ 66; *see also* <u>Ex. E</u>, Treasury Master Services Agreement,
dated January 14, 2022, between Prime Trust, LLC and BMO Harris Bank N.A. (the "<u>BMO
Agreement</u>").[12]

88.     The BMO Agreement specifically provides that it "***is not for the benefit of any
other person and no other person shall have any rights against [Prime] or [BMO Harris]
hereunder.***"  *See* <u>Ex. E</u>, BMO Agreement, § 15(e) (emphasis added).

89.     The BMO Agreement does not state that the fiat was held "in trust for" or "for the
benefit of" any party other than Prime.  *See* <u>Ex. E</u>, BMO Agreement.

---

[12]     A copy of the BMO Agreement is attached as <u>Exhibit E</u>.

90.     Indeed, in Prime's onboarding documents with BMO, Prime designated "Prime Trust, LLC" as the sole "Legal Entity for Which Beneficial Ownership is Being Provided."  *See* Ex. F, Certification Regarding Beneficial Owners of Legal Entity Customers between Prime Trust, LLC and BMO Harris Bank N.A (the "BMO Certification").[13]

91.     Prime regularly transferred fiat between its various bank accounts, further commingling funds.  *See* Ex. D, Brennan Decl., ¶¶ 19–30.

92.     For example, Prime used BMO x3077 primarily to make wire transfers.  *See id.* at ¶ 20.

93.     BMO x3077 held commingled funds that it regularly received from other Prime bank accounts and from Prime customers.  *See id.* at ¶¶ 21–26.

94.     At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("BMO x9934"), because the latter account offered a higher rate of interest.[14]  *See id.* at ¶¶ 23–24.

95.     The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077.  *See id.* at ¶ 24.  Because the funds in BMO x3077 were commingled, BMO x9934 also contained commingled funds.  *See id.* at ¶¶ 23–24.

96.     In addition to commingled funds from BMO x3077, BMO x9934 contained some funds transferred from other sources, such as Prime's accounts at Cross River Bank ("CRB") and Signature Bank ("Signature").  *See id.* at ¶ 24.

---

[13]   A copy of the BMO Certification is attached as Exhibit F.

[14]   BMO's terms and conditions provided that "interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion."  *See* BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions, dated July 2021, attached as Exhibit G, § 25.  Because Prime designated itself as the beneficial owner of its BMO accounts, Prime was entitled to the interest produced by these accounts (consistent with the Agreements).  *See* Ex. F, BMO Certification.

97.     Prime's accounts at CRB and Signature operated in a largely similar manner as BMO x3077—*i.e.*, they contained commingled funds that had been transferred from other Prime bank accounts containing funds transferred to Prime by other Prime customers. *See id.* at ¶ 25.

98.     For instance, CRB x4453 and CRB x9892 were omnibus bank accounts at CRB utilized by Prime. *See id.* at ¶ 26. These accounts were used primarily for internal transfers and payments via ACH. Prime used BMO x3077, CRB x9892, or CRB x4453 depending on whether Prime needed to make transfers via wire or ACH. *See id.*

99.     Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and ACH transfer requests. *See id.* at ¶¶ 19, 26.

100.    Prime typically made transfers between its omnibus bank accounts in round numbers, without reference to any specific transactions. *See id.* at ¶ 29. This suggests that Prime simply moved funds between its omnibus bank accounts on an estimated, as-needed basis instead of in response to specific transaction activity. *Id.*

101.    Prime would also transfer funds between bank accounts that were primarily used for Prime's corporate operations and omnibus bank accounts that contained fiat transferred to Prime by its customers. *See id.* at ¶ 18.

102.    Because Prime did not segregate fiat transferred to it from one customer from fiat transferred to it from another customer, or from fiat generated from Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts it owed on its Internal Ledger. *See id.* at ¶¶ 17–19.

103.    ████████ ("████████"), Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Internal Ledger to determine the amounts that Prime owed to its customers:

Q:      And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?

A:      I would pull the general ledger record out of the Prime Trust Core system.

Deposition of ███████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "███████."), 89: 19–25.

104.    However, Prime's internal cash management practices make identifying which bank account transfers correspond with which specific customer transactions reported on Prime's Internal Ledger extremely difficult.  *See* <u>Ex. D</u>, Brennan Decl., at ¶ 30.

**B.      Prime Did Not Reconcile Fiat Transations**

105.    Prime did not conduct regular, timely or accurate reconciliations to compare the fiat recorded in its Internal Ledger with the fiat Prime actually held in omnibus bank accounts.  *See id.* at ¶¶ 31–39.

106.    Prime maintained substandard reconciliation processes throughout its history, including with respect to its Internal Ledger.  *See id.* at ¶¶ 31–39.  This further hindered the ability of Prime or anyone else to specifically identify which funds were transferred to Prime by which customer.  *Id.*

107.    Prime did not perform regular reconciliations of its assets and, at least prior to March 2021, any reconciliations that Prime did conduct were manual.  *See id.* at ¶¶ 31, 33–38.

108.    Former Prime employees testified that Prime commingled fiat transferred to it by customers and that Prime's reconciliation processes were poorly maintained.

109.    ████████ testified that "[r]econciliations were not being done in a timely manner." ██████ Dep., 38: 23–24.

110.    ████████████ ("███████"), Prime's former Chief Financial Officer, testified:

Q:      Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?

A:      I think there were instances where that did happen based off of the management in the financial operations team where we might have had balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ▮▮▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

111.    ▮▮▮▮▮ also testified that "[i]t would not surprise" him if fiat and crypto transferred by customers were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been."  *See id.*, 213:15-22.

112.    ▮▮▮▮▮▮ ("▮▮▮▮"), Prime's former Senior Vice President of Operations and Reconciliations, also testified about Prime's reconciliations processes both before and after March 2021:

Q:      When you say it was a problem, what do you mean?

A:      There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

▮▮ Dep., 19:23–20:5.

113.    ▮▮▮▮▮ prepared a report for a July 12, 2021, audit committee meeting which identified the risks associated with Prime's handling of assets, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

| 2 Finding and Response Summary Matrix | | | | | | |
|---|---|---|---|---|---|---|
| Risk | Reference | Finding | Target | Response | Completed | Verified |
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

114.    As described above and confirmed in the Brennan Declaration, Prime's repeated transfers of fiat between omnibus bank accounts, and Prime's failure to maintain proper tracking and reconciliation processes, further exacerbated the commingling of fiat that Defendant had transferred to Prime with the fiat transferred to Prime by Prime's other customers and the fiat generated from Prime's own business operations. *See* Ex. D, Brennan Decl., at ¶¶ 16–43.

### C.    Defendant Cannot Trace the Fiat it Transferred to Prime

115.    Because Prime held fiat transferred to it from customers in an omnibus, commingled manner, Prime's own employees were incapable of determining where any fiat transferred by a particular customer to Prime was located.  As ▮▮▮▮▮ testified:

Q:    And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—

A:    It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.

Q:      And what does that mean to you, a client to have an omnibus account?

A:      It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:      And that was done at Prime Trust?

A:      It was done at Prime Trust.  It wasn't done very frequently, but there were— there were omnibus accounts at Prime Trust.

Q:      And do you know who was responsible for those accounts?

A:      I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

████ Dep., 205:19–207:3.

116.    Another example of the confusion in tracing specific assets that customers transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from another customer:



On Sat, Dec 17, 2022 at 11:16 AM ▮▮▮▮▮▮▮▮▮▮▮ @primetrust.com> wrote:

▮▮▮▮▮

Do you know which banking account was used to see if we can determine what customer funds were utilized?

On Sat, Dec 17, 2022 at 2:12 PM ▮▮▮▮▮▮▮▮▮▮ @primetrust.com> wrote:

All:
Yesterday I received another follow-up request from the NV FID and I'm requesting your assistance in preparing the response. ▮▮▮▮ s out of the office for a couple weeks so please send responses to me and cc him.

I have added names of the PT folks who I think are best suited to provide the information. If you think otherwise, please forward this request to the proper person and cc me and ▮▮▮▮

1. Regarding the User Agreement stated in the October 14, 2022 letter to the NFID, is this a disclosure on the website only or does every client sign acknowledgement of the User Agreement terms and conditions?
2. As stated in the letter, "the Company invested in additional Etherium using fiat currency from its omnibus accounts." Please provide a list of clients impacted from the investment and which omnibus accounts were utilized. - ▮▮▮▮
3. With the formation of the Executive Committee at the August 2, 2022 Board meeting, please provide Executive Committee minutes from the first meeting up through the most readily available minutes up to November 30, 2022. - ▮▮▮▮▮▮▮▮

Thanks for your help here.

--
▮▮▮▮▮▮▮▮
General Counsel
Prime Trust LLC
408-430-9109
primetrust.com
☒

117.    ▮▮▮▮▮▮▮ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":

On Mon, Dec 19, 2022 at 9:28 AM ▮▮▮▮▮▮▮▮▮▮ @primetrust.com> wrote:

Hey▮▮▮▮
Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger? If so, I don't believe any specific bank accounts were used, as management considered all funds tangible in our omnibus model. In their decision, no bank movements were needed/done before the credits were requested to the ledger.

118. ███████████, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which fiat and crypto and that Prime was "***not able to specify what customer is out the funds due to our omnibus structure***":

On Wed, Dec 28, 2022 at 10:56 AM ███████████ @primetrust.com> wrote:

███████ and I met today.  We are in agreement that we are not able to specify what customer is out the funds due to our omnibus structure.  Please let us know if we need to have another conversation to align how to position this with the FID.

(Emphasis added).

119. Because of Prime's commingling of fiat and poor recordkeeping procedures, it is impossible for PCT, Defendant, or anyone else to trace and specifically identify the fiat that Defendant originally had transferred to Prime. *See* <u>Ex. D</u>, Brennan Decl., ¶¶ 16–43.

## V.    The 98f Wallet

120. In December 2021, one of Prime's customers, Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC ("<u>Abra</u>"), requested a transfer from Prime of 5,867.71 ETH (worth approximately $24,000,000.00 at the time) from Prime.  *See id.* at ¶¶ 45–46.  Subsequently, between December 2021 and March 2022, Abra continued to request that Prime transfer ETH totaling 48,034.57 ETH (worth approximately $145,000,000.00 at the time).  *See id.* at ¶ 49.

121. In attempting to satisfy Abra's transfer request, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its digital wallets:

███ @primetrust.com

2021-12-22 07:16:57.000 PM

Hey ** - Expanding this to a larger audience as this has become a priority issue that was brought up earlier today: We have uncovered a large balance discrepancy between our ledger and Fireblocks where we are showing a larger amount of ETH (~9000) than what is shown in Fireblocks. This was a result of a larger disbursement requested by Abra which requires us to aggregate ETH; upon running a balance check on our incoming wallet address, we noticed the amount was not enough to send out the request. We are double checking to confirm that this is not a result of double spend(s) but from our first pass, it appears to not be a result of manually sending ETH transactions incorrectly. I know @███ and @███ ███ are investigating but not sure what are the other possibilities could result in this difference that we see. It may also be worth it to ask FB of an audit of their side if we can confirm nothing is incorrectly processed on our side.

122.    Further investigation revealed that, for approximately eight months, Prime had been permitting Abra to transfer significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.

123.    Specifically, in December 2021, Prime discovered that Abra had already transferred more than 11,000 ETH (approximately $45,000,000.00 at the time) to the 98f Wallet.  *See* Ex. D, Brennan Decl., ¶ 46.

124.    In or around December 2021, Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet.  *See id*. at ¶ 45.

125.    It was unclear to those at the company who the signers for the 98f Wallet were or how Prime could access the 98f Wallet.  *See* ███ Dep., 69:17–71:22.  Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet.  *See* ███ Dep., 181:6–8.  Prime also did not possess and could not locate the passwords, which are called "seed phrases," that were associated with these physical hardware devices.  *See id*.

126.    Because Prime had no way of obtaining the private keys necessary to access the 98f Wallet, Prime had no way of accessing that wallet.  The crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

127. Prime was concerned about the negative impacts and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a wallet containing a significant amount of crypto.

128. To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy Abra's transfer requests as reflected below. *See* Ex. D, Brennan Decl., ¶ 47.

129. Between December 23, 2021, and March 30, 2022, Prime conducted ten different on-chain purchases of ETH from Liquidity Provider in an attempt to satisfy Abra's multiple outgoing transfer requests. These purchases are summarized in the chart below.

| Date | USD Internal Ledger "Wire" Transfer[15] Amount | ETH On-Chain Transfers |
|---|---|---|
| 12/23/2021 | $11,958,000 | 2,999.99 |
| 12/31/2021 | $12,158,250 | 3,250 |
| 1/6/2022 | $2,778,400 | 800 |
| 1/6/2022 | $7,293,300 | 2,100 |
| 1/22/2022 | $5,000,000 | 1,930.50 |
| 3/12/2022 | $4,644,000 | 1,800 |
| 3/15/2022 | $8,524,750 | 3,049.98 |
| 3/15/2022 | $8,043,000 | 3,000 |
| 3/29/2022 | $7,902,800 | 2,300 |
| 3/30/2022 | $8,065,048 | 2,347.22 |

*See id.* at ¶ 119.

130. The funds for each of these ETH purchases came from Prime's omnibus bank accounts, which held commingled fiat transferred to Prime from Prime's customers. *See id.* at ¶¶

---

[15] Prime did not actually execute any of these wire transfers. *See* ██ Dep, 164:22–165:10.

50–52.  The ETH purchased with those commingled funds was then transferred to Abra.  *See id.*

at ¶ 52.

131.    The decision to use this commingled fiat to fund Prime's purchase of replacement

ETH from Liquidity Provider was described by ███████, Prime's former Chief Operating

Officer, at his deposition:

> Q:    So [Customer's] depositing into a wallet that you don't have access to and
>       is requesting withdrawals.  Prime funds those withdrawals.  How does it do
>       it?
>
> A:    I would defer to ███ on that.  But essentially it was use of omnibus funds,
>       is my understanding.
>
> Q:    What's use of omnibus funds?
>
> A:    As I mentioned before, my understanding is we maintained omnibus
>       accounts, meaning fiat accounts and crypto accounts, crypto wallets that had
>       basically commingling of customer funds.
>
> Q:    And which funds were used to make the purchases of the ETH to fund the
>       transactions?
>
> A:    Funds from the fiat account.  Fiat omnibus account.  Is my understanding.
>       Once again, ███ would know specifically.

Deposition of ██████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov.

10, 2023), 92:25–93:18.

132.    The ETH that Abra had initially transferred to Prime was (and still is to this day)

locked away in the 98f Wallet.  *See* Ex. D, Brennan Decl., at ¶ 52.

133.    Executives at Prime made the decision to falsify entries in the Internal Ledger to

conceal the fact that Prime had used fiat that had been transferred to it by other customers to satisfy

Abra's outgoing transfer requests.  *See id.* at ¶ 53.

134.     ▮▮▮▮▮ confirmed in his deposition that Prime executives intentionally chose to settle and record ETH purchases from Liquidity Provider on Prime's Internal Ledger as opposed to externally transferring funds to Liquidity Provider.  *See* ▮▮▮ Dep., 153:8–13.

135.     These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Internal Ledger and the amount of fiat that Prime held in its omnibus bank accounts.  *See* <u>Ex. D</u>, Brennan Decl., at ¶ 57.

---

▮▮ @primetrust.com

2021-12-23 03:40:01.000 AM

If we don't credit our ledger to settle, our bank account is plus the difference compared to the bank

▮▮ @primetrust.com

2021-12-23 03:42:16.000 AM

The difference is are we okay with inflating our ledger vs having our bank account be out the difference compared to our ledger

▮▮ @primetrust.com

2021-12-23 03:44:15.000 AM

Whatever you think is easier to reconcile once we get access to the locked ETH

---

136.     ▮▮▮▮▮ further testified about Prime's "inflat[ed]" Internal Ledger compared to the fiat in Prime's omnibus bank accounts:

> Q:     [T]here's going to be cash reflected in [Liquidity Provider]'s account, but that cash is not actually in the bank; is that right?
>
> A:     Correct.  Correct.
>
> Q:     And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?
>
> A:     Correct . . .
>
> Q:     I see.  But the [l]edger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?
>
> A:     Exactly.
>
> Q:     That's ultimately what happened; right?
>
> A:     Yeah, that's exactly what happened.

▆▆▆ Dep., 144:11–20; 146:7–15.

137.    Desperate to hide the hole in its balance sheet, Prime executives discussed how to hide these transactions from auditors at Nevada FID:



138.    As demonstrated by the illustrative chart below,[16] Prime's Internal Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases between December 23, 2021, and March 30, 2022:

---

[16]   This illustrative chart is not an image directly copied from Prime's Internal Ledger. Rather, this chart contains data from Prime's Internal Ledger related to certain transaction entries.

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ~0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ~0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ~b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ~5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ~6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ~777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ~2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ~1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ~113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ~ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | **Total** | **76,367,547.90** |

139.    None of these wire transfers appear on Prime's bank account statements because they did not actually occur.[17]  *See* Ex. D, Brennan Decl., at ¶¶ 59–61.

140.    Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally obfuscate Prime's internal records simply compounded the already impossible task of untangling or segregating fiat transferred to Prime by different customers and fiat that Prime generated from its business operations.  *See id*. at ¶ 62.

## VI.    Prime's Financial Conditions Spiraled Downward and Culminated in Prime Filing the Chapter 11 Cases

141.    In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency issues Prime was experiencing.

---

[17]    The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 23, 2021, is attached as Exhibit H.  The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 31, 2021, is attached as Exhibit I.

142.    At the same time, and again during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing—were leaking to the crypto and financial markets.

143.    On May 25, 2023, Prime's CEO met in person with Nevada FID during which Prime was told that they would likely be shut down in the near future.

144.    Prior to May 25, 2023, documentary evidence reflects that Prime's CEO had been relaying to other market participants Prime's bleak financial condition and the likelihood that Nevada FID would shut them down.

145.    During the lead up to the May 25, 2023 meeting with Nevada FID and shortly thereafter, in response to confirmed rumors of Prime's financial condition, many of the industry's largest market participants were demanding transfers from Prime.

146.    For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime.  *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK (Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.  CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

147.    On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals." *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21,

2023), https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf.  Nevada FID ordered Prime to cease accepting all fiat and crypto deposits.  *Id.*

148.    The next day, BitGo canceled its acquisition of Prime.  One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns over its business."  *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023), https://www.coindesk.com/business/2023/06/22/cryptp-custody-firm-bitgo-cancels-prime-trust-acquisition/.

149.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court").  *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime%20Core%20Technologies%20et%20al%20Petition.pdf.   The Nevada FID Petition directed Prime to cease and desist all retail trust activities.  *Id.*

150.    The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

151.    Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its ***omnibus customer accounts***."  *Id.* at 6 (emphasis added).

152.    The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals." *Id.* at 10. Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)." *Id.* at 7.

153.    On July 14, 2023, the Nevada Court placed Prime under receivership.

154.    On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

## CAUSES OF ACTION

### Count I
### Avoidance of Preferential Transfers,
### 11 U.S.C. § 547(b)

155.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

156.    The Transfers were made on account of a demand by Defendant.

157.    Each of the Transfers was a transfer of an interest in property of Prime.

158.    Prime made the Transfers to or for the benefit of Defendant.

159.    At the time of the Transfers, Defendant was a creditor of Prime within the meaning of section 101(10) of the Bankruptcy Code. Defendant received the Transfers, or, alternatively, the Transfers were made for Defendant's benefit.

160.    Each of the Transfers was made for or on account of an antecedent debt owed by Prime.

161.    Each of the Transfers was made within ninety days of the Petition Date

162.    At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.  If not avoided, the Transfers would enable Defendant to receive more than Defendant would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

163.    Defendant has not repaid or returned any of the Transfers to PCT.

164.    Pursuant to 11 U.S.C. § 547(b), PCT has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses that Defendant could assert, including Defendant's potential defenses under section 547(c) of the Bankruptcy Code, and believes that certain of the Transfers are avoidable.

165.    Accordingly, PCT is entitled to recover from Defendant no less than $321,159.88 of the Transfers as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law.

**Count II**
**Recovery of Avoided Transfers from the Defendant,**
**11 U.S.C. § 550**

166.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

167.    PCT is entitled to avoid preferential transfers described above pursuant to section 547(b) of the Bankruptcy Code.  Defendant was the initial transferee of such transfer, or the immediate or mediate transferee of such initial transferee, or the person for whose benefit such transfer was made.

168.    Accordingly, pursuant to section 550 of the Bankruptcy Code, PCT is entitled to recover from Defendant no less than $321,159.88 of the Transfers as preferences pursuant to

section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

### Count III
### Claim Objection, 11 U.S.C. § 502

169.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

170.    As alleged above, Defendant was the initial transferee of the Transfers, or the immediate or mediate transferee of such initial transferee, or the persons for whose benefit the Transfers were made, and PCT is entitled to avoid the Transfers described above pursuant to Section 547(b) of the Bankruptcy Code, which are recoverable from Defendant under Section 550 of the Bankruptcy Code.

171.    Pursuant to section 502(d) of the Bankruptcy Code, any claim(s) of Defendant that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until Defendant pays PCT the value of the Transfers, for which and to the extent that the Court has determined Defendant is liable pursuant to 11 U.S.C. § 550.

## PRAYER FOR RELIEF

**WHEREFORE**, PCT requests that this Court grant the following relief:

A.       Enter an order finding that certain of the Transfers addressed herein are avoidable preferential transfers under 11 U.S.C. § 547;

B.       Award PCT:  (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable preferential transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable preferential transfers alleged herein, plus the value of any additional avoidable transfers that PCT learns, through discovery or otherwise, were made to Defendant;

C.       Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by Defendant against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until Defendant relinquishes to PCT the amount ordered as an award for avoidable transfers;

D.       Award PCT its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

E.       Grant PCT all other relief, at law or equity, to which it may be entitled.

Dated:  July 31, 2025
        Wilmington, Delaware

MCDERMOTT WILL & EMERY LLP

/s/ David R. Hurst
David R. Hurst (No. 3743)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
dhurst@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
James A. Pardo (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
Magali M. Duque (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
dazman@mwe.com
jbevans@mwe.com
jpardo@mwe.com
ggriffith@mwe.com
pkennedy@mwe.com
jaminov@mwe.com
mduque@mwe.com

*Counsel to PCT Litigation Trust*