**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-_____ (JKS) |
| Kbit Global Limited, | |
| Defendant. | |

## COMPLAINT

The PCT Litigation Trust ("<u>PCT</u>" or "<u>Plaintiff</u>")[2] established in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>"), through its undersigned counsel, files this complaint (the "<u>Complaint</u>") against Defendant Kbit Global Limited ("<u>Defendant</u>" or "<u>Kbit</u>"), pursuant to sections 547 and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), seeking to avoid and recover all preferential transfers of property made by the Debtors to or for the benefit of Defendant plus interest, attorneys' fees, and costs. To the extent that Defendant filed a proof of claim or has a claim listed by the Debtors on their schedules as undisputed, liquidated, and not contingent, or have otherwise requested payment from the Debtors

---

[1]  The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "<u>Debtors</u>" or "<u>Prime</u>"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]  The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

or the Debtors' estate (collectively, the "Claims"), this Complaint is not intended to be, nor should it be construed as, a waiver of PCT's right to object to any of such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j), and such rights are expressly reserved. Notwithstanding this reservation of rights, certain relief pursuant to section 502 of the Bankruptcy Code is sought by PCT herein as further stated in Count III below.  PCT alleges as follows:

## **INTRODUCTION**

1.      Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat.  The Nevada Financial Institutions Division ("Nevada FID") shut down Prime on June 21, 2023, and Prime filed for bankruptcy shortly thereafter in August 2023.  Most of Prime's customers suffered losses and have yet to receive any of the crypto or fiat owed to them.  But, on May 23, 2023 (*i.e.*, between May 16, 2023 and the Petition Date),[3] Prime transferred $18,156,442.00 USD to or for the benefit of Defendant (the "Transfer").  During the Preference Period, Defendant transferred no potential subsequent new value to Prime.  The Transfer is a preference payment which must be returned to Prime's estate.

2.      PCT brings this adversary proceeding (the "Adversary Proceeding") pursuant to sections 547 and 550 of the Bankruptcy Code to avoid and recover all transfers of property and all obligations of Prime to or for the benefit of Defendant, made in the 90-day period prior to the filing of the Debtors' Chapter 11 Cases.  The Transfer is avoidable under section 547 of the Bankruptcy Code.  Pursuant to section 502(d) of the Bankruptcy Code, PCT seeks to disallow any and all claims filed or held by Defendant in these Chapter 11 Cases unless and until Defendant has

---

[3]    Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's non-insider preference period (the "Preference Period") occurred between May 16, 2023 and the Petition Date.

relinquished to PCT all property owed to it.

3.       Defendant Kbit is a British Virgin Islands based crypto hedge fund and high frequency market maker.

4.       Defendant was an end-user ("End-User") of Prime—in other words, Defendant was a customer of a company (an "Integrator") which directly procured services from Prime. Defendant accessed Prime's services through its relationship with the Integrator.

5.       As an End-User, Defendant did not directly procure Prime's services.  Instead, Defendant accepted or agreed to an End-User agreement with Prime (the "Agreement") that was presented to Defendant through Defendant's Integrator.[4]

6.       Although Prime was a Nevada state-chartered trust company, Defendant never sought or received any trust or fiduciary services from Prime.

7.       The Agreement establishes that Prime and Defendant always maintained a strictly debtor-creditor relationship and that no fiduciary relationship existed between them.

8.       For example, the Agreement provided that Prime was to "act solely as custodian" of the fiat that Defendant transferred to Prime.  *See* Ex. A, Agreement, § 1.

9.       Additionally, the Agreement authorized Prime to "for convenience take and hold title to Custodial Property or any part thereof in its own name or in the name of its nominee (commonly known as 'street name'), with [Defendant] ownership of Custodial Property segregated on its books and records." *Id.* § 4(b).

10.      The Agreement also authorized Prime to "hold the proceeds" derived from the fiat that Defendant transferred to Prime.  *Id.* § 4(d).

---

[4]      A copy of the Agreement is attached as Exhibit A.

11.     The fiat that Defendant transferred to Prime was held in commingled "omnibus" bank accounts in Prime's name.  These omnibus bank accounts commingled the fiat Defendant transferred to Prime with fiat from Prime's many other customers and Prime's own fiat generated from its business operations.

12.     Prime attempted to keep track of commingled fiat transferred by Defendant (and other customers) with an internal, omnibus ledger (the "Internal Ledger").  But the Internal Ledger was errantly and later intentionally corrupted by Prime.

13.     Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries.  Accordingly, the Internal Ledger cannot be relied on to identify or trace the fiat that Defendant transferred to Prime.

14.     The third-party expert retained by PCT in this matter, James P. Brennan, has confirmed that it is impossible to identify, trace, or otherwise distinguish the fiat that Defendant transferred to Prime from fiat provided by Prime's other customers or from Prime's own fiat.  *See* Declaration of James P. Brennan (the "Brennan Decl.").[5]

15.     The fiat transferred from Prime to Defendant during the Preference Period was not the original fiat that Defendant had transferred to Prime.  Rather, the Transfer consisted of fiat from the commingled, omnibus bank accounts in Prime's name.

16.     In December 2021, Prime discovered it was unable to access a digital wallet (the "98f Wallet")[6] holding more than 11,000 ETH that had been transferred by one of Prime's customers.  Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet.  *See* Ex. B, Brennan Decl., ¶¶ 48–49.

---

[5]     A copy of the Brennan Decl. is attached as Exhibit B.

[6]     The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f."

17.     Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customer's transfer requests, Prime went to the market to purchase ETH to cover the transfer requests.  To fund those market purchases, Prime used fiat from its omnibus bank accounts. *See id.* at ¶¶ 50–52.

18.     Prime executives admitted under oath that Prime intentionally falsified its internal records to hide the truth about its replacement ETH purchases.  To hide the fact that Prime was using fiat transferred to it by customers to pay for its replacement ETH purchases, Prime created fake wire transfer entries on the Internal Ledger to make it appear that Prime received fiat wire transfers from one of the liquidity providers ("<u>Liquidity Provider</u>") who sold Prime the replacement ETH.  In fact, no such fiat wire transfer deposits ever occurred:

Q:     When it says funds transfer. . . and it says "wire, wire, wire."  Do you see that?

A:     Yes.

Q:     ***There were no wire transfers; right***?

A:     ***Yes***.

Q:     ***Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?***

A:     ***Yes, there were no wire transfers***.

Deposition of ▮▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "▮▮ Dep."), 164:22–165:10 (emphasis added).

19.     Prime's use of its fiat transferred by other customers to purchase replacement ETH left it with a nearly $82 million shortfall in the omnibus bank accounts that contained commingled fiat from Defendant and other Prime customers.

20.     Prime's falsified wire transfer entries to cover its replacement ETH purchases, coupled with Prime's failure to properly reconcile and record other transactions on its Internal Ledger, have resulted in Prime being unable to trace any specific deposits, withdrawals, or transfers that were made by any particular customer, including Defendant.  *See* Ex. B, Brennan Decl., at ¶ 67.

21.     Prime's Transfer to Defendant during the Preference Period exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's Chapter 11 filing on the Petition Date.

22.     Because the relationship between Prime and Defendant was strictly a debtor-creditor relationship, the Transfer to Defendant during the Preference Period must be returned to the Debtors' estate pursuant to Sections 547 and 550 of the Bankruptcy Code, plus interest, attorneys' fees, and costs.

23.     During the course of this Adversary Proceeding, PCT may learn (through formal discovery or otherwise) of additional transfers made to, or obligations incurred by, Defendant that are avoidable and/or recoverable under the Bankruptcy Code.  PCT intends to avoid and/or recover all such transfers and obligations made to or for the benefit of Defendant and, accordingly, reserves the right to amend this Complaint.

## **PARTIES**

24.     Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the*

*Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644].  The Plan was consummated on January 5, 2024 (the "Effective Date").[7]  On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust.  *See* Plan, § 6.21.  The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn.  *See id*., § 1.118.

25.     Defendant Kbit is a British Virgin Islands based company which maintains an address in Road Town, British Virgin Islands.

## JURISDICTION AND VENUE

26.     The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor."  *See* Plan, § 12(c).  This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust."  *Id.*, §§ 12(s), (u).  As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

---

[7]     *See* Docket No. 694.

27.     This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2). The Court may enter final orders in connection with the matters contained herein.

28.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, PCT confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the parties to this action, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

29.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

30.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure and sections 105, 542, 547, and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

31.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. BTC and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies.

32.     All cryptocurrencies exist on a "blockchain." A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency. All transactions are recorded on the blockchain and are publicly available. When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called

"blocks." Those "blocks" are publicly available and reflect all cryptocurrency transactions that occurred on the blockchain at a particular point in time. The "blocks," in turn, are linked on the chain in chronological order — thus, a "block"-"chain."

33. There are many different blockchains. The first and most popular blockchain was the Bitcoin blockchain. Another important blockchain is the Ethereum blockchain, which made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain. Cryptocurrencies created on the Ethereum blockchain, are referred to as "ERC-20" tokens.

34. Users generally hold crypto in digital wallets. On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys." These public keys are 40-digit alphanumeric strings. Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

35. "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain digital address. Like public keys, private keys consist of multi-digit alphanumeric strings. However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

36. Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange. In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

37. Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

38.     A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

39.     A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method. These types of physical hardware devices are provided by companies such as Trezor:



40.     Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet. However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device.  To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to initiate transfers of crypto kept in the digital wallet. Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

41.     Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed. They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## GENERAL ALLEGATIONS

### I.     Prime's Business Operations

42.     Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

43.     Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

44.     In the years that followed, as the crypto markets and industry grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

45.     Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state money-transmitter licenses (each, a "MTL") required to conduct money transmission.

46.     Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

47.    Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend the time, effort, and financial resources necessary to obtain their own MTLs.

48.    Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

49.    A significant number of Prime's customers were sophisticated crypto companies that contracted with Prime, usually by way of a master services agreement, which directly accessed Prime's services through an Application Programming Interface ("API").  Prime referred to these customers as Integrators.  These customers acted as integrators between their own respective customers (*i.e.*, the End-Users) and Prime, which allowed End-Users to also utilize Prime's services.

50.    End-Users did not directly procure Prime's services, but, instead, accepted or agreed to a user agreement with Prime (the "End-User Agreement") that was presented to them by the Integrator through the Integrator's system.

## II.    The Agreement Between Prime and Defendant Created a Debtor-Creditor Relationship

51.    Defendant was an End-User of Prime.

52.    Defendant entered into an End-User Agreement with Prime.

53.    Defendant transferred fiat currency to Prime pursuant to the Agreement.

54.    At all relevant times, the Agreement was a valid and enforceable contract governed by Nevada law.  *See* Ex. A, Agreement § 18 ("This Agreement is governed by and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.")

55.     The Agreement provided that Defendant "appoint[ed] Prime Trust to be custodian and to hold or process as directed all securities, cash, and other assets of [Defendant] . . . that are delivered to and accepted by [Prime]." *Id.* § 1.

56.     Under the Agreement, Prime was to "act solely as custodian of the Custodial Property." *Id.* § 2(a).

57.     Moreover, the Agreement authorized Prime to "for convenience take and hold title to Custodial Property or any part thereof in its own name or in the name of its nominee (commonly known as 'street name'), with [Defendant] ownership of Custodial Property segregated on its books and records." *Id.* § 4(b).

58.     Finally, the Agreement authorized Prime to "hold the proceeds" derived from the maturity, redemption, or sale of the fiat Defendant transferred to Prime. *Id.* § 4(d).

59.     There is no language in the Agreement providing or in any way suggesting that Prime owed a fiduciary duty to Defendant.

60.     The Agreement also lacks any terms that would suggest Prime held fiat in trust on behalf of Defendant.

61.     Accordingly, the Agreement established that the relationship created between Prime and Defendant was strictly debtor-creditor.

III.    **The Preferential Transfer to Defendant**

A.      **The Transfer**

62.     On May 23, 2023, during the Preference Period, Prime transferred $18,156,442.00 in fiat currency to or for the benefit of Defendant.[8]

---

[8]     The Prime entity which made the Transfer was Prime Trust, LLC.

63.     On May 23, 2023, Prime made the Transfer for the Defendant's benefit from Prime CRB account ("CRB x0547") to Defendant's account with its Integrator, which was an account "FBO Settlement (Wire)."  Defendant subsequently received that money from its account with the Integrator between May 24, 2023 and June 5, 2023.

64.     During the Preference Period, Defendant transferred no potential subsequent new value to Prime.  *See* Ex. B, Brennan Decl., ¶ 66.

65.     Thus, Defendant's preference exposure is no less than $18,156,442.00.

**B.      The Transfer is Avoidable**

66.     Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

67.     First, the transfer must be "to or for the benefit of a creditor."  11 U.S.C. § 547(b)(1).

68.     Second, the transfer must be "for or account of an antecedent debt owed by the debtor before such transfer was made."  11 U.S.C. § 547(b)(2).

69.     Third, the transfer must have been "made while the debtor was insolvent."  11 U.S.C. § 547(b)(3).

70.     Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition.  11 U.S.C. § 547(b)(4).

71.     Finally, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would have received in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made.  11 U.S.C. § 547(b)(5)(A)–(C).

72.     The Transfer was a transfer of an interest of Prime's property.  As established above, the Agreement did not create a trust or fiduciary relationship between Prime and Defendant.

-14-

73.     Prime made the Transfer to or for the benefit of Defendant, a creditor of Prime, by virtue of Prime's debtor-creditor relationship created by the Agreement.

74.     At the time of the Transfer, Prime owed Defendant fiat currency.  Thus, Prime made the Transfer on account of that antecedent debt.

75.     Prime made the Transfer while it was insolvent.  As of the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[9] Prime is nonetheless presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

76.     If not avoided, the Transfer would enable Defendant to receive more than Defendant would have received on account of its claim in a hypothetical liquidation under chapter 7 had Prime not made the Transfer during the Preference Period in satisfaction of Prime's antecedent debt owed to Defendant.[10]

77.     Prime made the Transfer to Defendant during the 90-day Preference Period immediately preceding the Petition Date (*i.e.*, between May 16, 2023 and August 14, 2023).

78.     Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Transfer during the Preference Period by PCT and the third-party expert retained in this matter, PCT has determined that it may avoid the Transfer even after taking into account Defendant's potential affirmative defenses.[11]

---

[9]    *See Schedules of Assets and Liabilities for Prime Core Technologies Inc.*, (Case No. 23-11161) [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC*, (Case No. 23-11162), [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC*, (Case No. 23-11164) [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC*, (Case No. 23-11168) [Docket No. 178].

[10]    *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

[11]    It is Defendant's obligation to establish all possible affirmative defenses, including the subsequent new value defense.

79.     Accordingly, the Transfer to Defendant during the 90-day Preference Period immediately preceding the Petition Date constitutes a preferential transfer pursuant to section 547(b) of the Bankruptcy Code that is subject to avoidance.

80.     During the course of this proceeding, PCT may learn (through discovery or otherwise) of additional transfers made to or for the benefit of Defendant during Preference Period. It is PCT's intention to avoid and recover all transfers made by Prime of an interest of Prime in property that were made to or for the benefit of Defendant or any other transferee.  PCT reserves its right to amend this original Complaint to include: (i) further information regarding the Transfer; (ii) additional transfers; (iii) modifications of and/or revisions to Defendant's name; (iv) additional defendants; and/or (v) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to PCT at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint

## IV.   Defendant Cannot Trace the Fiat It Transferred to Prime

### A.    Prime Commingled Fiat in Omnibus Bank Accounts in Prime's Name and Maintained Poor Reconciliations Processes

81.     The fiat that Defendant and other customers transferred to Prime was not segregated into separate bank accounts.  *See* Ex. B, Brennan Decl., ¶ 16.  Instead, the fiat was held in omnibus bank accounts in Prime's name containing fiat other customers transferred to Prime as well as fiat that Prime generated from its own business operations.  *See id.*

82.     Prime maintained bank accounts primarily at BMO Harris Bank, N.A. ("BMO"), Cross River Bank ("CRB"), Signature Bank ("Signature"), and Royal Business Bank ("RBB"). *See id.* at ¶ 12.  Prime maintained these bank accounts in its own name.

83.     Prime regularly transferred fiat between its various omnibus bank accounts, further commingling funds.  *See* Ex. B, Brennan Decl., ¶¶ 18-31.

84.     For example, Prime used one BMO account ("BMO x3077") primarily to make wire transfers. *See id.*, ¶ 20.

85.     BMO x3077 held commingled funds that it regularly received from other Prime omnibus bank accounts and from other Prime customers. *See id.*, ¶¶ 21–24.

86.     At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("BMO x9934"), because the latter account offered a higher rate of interest. *See id.*, ¶ 23.

87.     The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077. *See id.*, ¶ 24. Because the funds in BMO x3077 were commingled, BMO x9934 also contained commingled funds. *Id.*

88.     In addition to commingled funds from BMO x3077, BMO x9934 contained some funds transferred from other sources, such as Prime's accounts at CRB and Signature. *Id.*

89.     Prime's omnibus accounts at CRB operated in a similar manner to BMO x377. *See id.*, ¶ 25. Specifically, Prime's CRB accounts commingled funds that were transferred to them from Prime's other omnibus bank accounts and commingled funds that Prime customers had transferred to the accounts directly. *Id.*

90.     Prime used one CRB account ("CRB x9892") in the same way it used BMO x3077, except that Prime funded CRB x9892 on an as-needed basis to make transfers via automated clearinghouse ("ACH") instead of via wire. *See id.* ¶ 25.

91.     The Transfer from Prime to or for the benefit of Defendant during the Preference Period was transferred from CRB x0547. *See id.*, ¶ 66. Like Prime's other omnibus bank accounts, Prime held CRB x0547 in its own name:



92.     Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and ACH transfer requests.  *See id.*, ¶ 26.

93.     Prime typically made transfers between its omnibus bank accounts in round numbers, without reference to any specific transactions.  *See id.*, ¶ 31.  This suggests that Prime simply moved funds between its omnibus bank accounts on an estimated, as-needed basis instead of in response to specific transaction activity.  *Id.*

94.     Prime would also transfer fiat between bank accounts that were primarily used for Prime's corporate operations and omnibus bank accounts that contained fiat transferred to Prime by its customers.  *See id.*, ¶ 18.

95.     Because Prime did not segregate fiat transferred to it from one customer from fiat transferred to it from another customer, or from fiat generated from Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts it owed on its Internal Ledger.  *See id.*, ¶ 17.

96.     However, Prime's internal cash management practices make identifying which bank account transfers correspond with which specific customer transactions reported on Prime's Internal Ledger extremely difficult.  *See id.*, ¶¶ 33-46.

97.    ███████████ ("████"), Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Internal Ledger to determine the amounts that Prime owed to its customers:

Q:    And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?

A:    I would pull the general ledger record out of the Prime Trust Core system.

Deposition of ███████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "████ Dep."), 89: 19–25.

98.    Prime maintained substandard reconciliation processes throughout its history, including with respect to its Internal Ledger. *See* <u>Ex. B</u>, Brennan Decl., ¶¶ 33-46. This further hindered the ability of Prime or anyone else to specifically identify which funds were transferred to Prime by which customer. *Id.*

99.    Prime did not perform regular reconciliations of its assets and, at least prior to March 2021, any reconciliations that Prime did conduct were manual. *See id.*, ¶ 33.

100.    Former Prime employees testified that Prime commingled fiat and crypto transferred to Prime by its customers and that Prime's reconciliation processes were poorly maintained.

101.    ████ testified that "[r]econciliations were not being done in a timely manner." ████ Dep., 38: 23–24.

102.    ███████████ ("████"), Prime's former Chief Financial Officer, testified:

Q:    Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?

A:    I think there were instances where that did happen based off of the management in the financial operations team where we might have had

balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ███████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

103.    ██████ also testified that "[i]t would not surprise" him if fiat and crypto transferred by customers were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been." *See id.*, 213:15–22.

104.    ██████ also testified about Prime's reconciliations processes both before and after March 2021:

> Q:    When you say it was a problem, what do you mean?
>
> A:    There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

██████ Dep., 19:23–20:5.

105.    ██████ prepared a report for a July 12, 2021, audit committee meeting which identified the risks associated with Prime's handling of fiat and crypto, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

**2   Finding and Response Summary Matrix**

| Risk | Reference | Finding | Target | Response | Completed | Verified |
|---|---|---|---|---|---|---|
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

106.    The below testimony from ▮▮▮ demonstrates that Prime's regular practices of commingling assets and maintaining poor records resulted in Prime's own employees being incapable of determining exactly where assets transferred by a particular party were located:

Q:    And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—

A:    It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.

Q:    And what does that mean to you, a client to have an omnibus account?

A:    It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:    And that was done at Prime Trust?

A:    It was done at Prime Trust.  It wasn't done very frequently, but there were— there were omnibus accounts at Prime Trust.

Q:    And do you know who was responsible for those accounts?

A:    I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed

-21-

customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

███ Dep., 205:19–207:3.

**B.    The 98f Wallet**

107.    In December 2021, Plutus Financial Inc. d/b/a Abra ("Abra") requested a transfer of 5,867.71 ETH (worth approximately $24,000,000 at the time) from Prime.  *See* Ex. B., Brennan Decl., ¶ 48.  Subsequently, between December 2021 and March 2022, Abra continued to request that Prime transfer ETH totaling 48,034.57 ETH (worth approximately $145,000,000 at the time).  *See id.*, ¶ 52.

108.    In attempting to satisfy Abra's transfer requests, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its digital wallets:

> ███@primetrust.com                                    2021-12-22 07:16:57.000 PM
> Hey ** - Expanding this to a larger audience as this has become a priority issue that was brought up earlier today: We have uncovered a large balance discrepancy between our ledger and Fireblocks where we are showing a larger amount of ETH (~9000) than what is shown in Fireblocks. This was a result of a larger disbursement requested by Abra which requires us to aggregate ETH; upon running a balance check on our incoming wallet address, we noticed the amount was not enough to send out the request. We are double checking to confirm that this is not a result of double spend(s) but from our first pass, it appears to not be a result of manually sending ETH transactions incorrectly. I know @███ and @███ ███ are investigating but not sure what are the other possibilities could result in this difference that we see. It may also be worth it to ask FB of an audit of their side if we can confirm nothing is incorrectly processed on our side.

109.    Further investigation revealed that, for approximately eight months, Abra had been transferring significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.

110.    Specifically, in December 2021, Prime discovered that Abra had already transferred more than 11,000 ETH (worth approximately $45,000,000 at the time) to the 98f Wallet.  *See* Ex. B, Brennan Decl., ¶ 49.

111.    In or around December 2021, Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet.

112.    It was unclear to those at Prime who the signers for the 98f Wallet were or how Prime could access the 98f Wallet.  *See* ███ Dep., 69:17–71:22.  Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet. *See* ███ Dep., 181:6–8.  Prime also did not possess and could not locate the passwords (called "seed phrases") that were associated with these physical hardware devices connected to the 98f Wallet.  *See id.*

113.    As such, Prime had no way of accessing the 98f Wallet.  The crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

114.    Prime was concerned about the negative impact and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a wallet containing a significant amount of crypto.

115.    To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy Abra's transfer requests as reflected below.  *See* Ex. B, Brennan Decl., ¶ 50.

116.    Between December 23, 2021, and March 30, 2022, Prime conducted ten different on-chain purchases of ETH from Liquidity Provider to attempt to satisfy Abra's withdrawal requests as reflected in the chart below.  *See id.*, ¶ 50.

| Date | ETH On-Chain Transfers |
|---|---|
| 12/23/2021 | 2,999.99 |
| 12/31/2021 | 3,250 |
| 1/6/2022 | 800 |
| 1/6/2022 | 2,100 |

| 1/21/2022 | 1,930.50 |
|-----------|----------|
| 3/11/2022 | 1,800 |
| 3/14/2022 | 3,049.98 |
| 3/15/2022 | 3,000 |
| 3/29/2022 | 2,347.22 |
| 3/30/2022 | 2,300 |

117.    The funds for each of these ETH purchases came from Prime's omnibus bank accounts, which held commingled fiat transferred to Prime from Prime's customers. *See id.*, ¶ 53.

118.    The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider is described in the below deposition testimony of Prime's former Chief Operating Officer, ███████:

> Q:    So Abra's depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?
>
> A:    I would defer to ████ on that.  But essentially it was use of omnibus funds, is my understanding.
>
> Q:    What's use of omnibus funds?
>
> A:    As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.
>
> Q:    And which funds were used to make the purchases of the ETH to fund the transactions?
>
> A:    Funds from the fiat account.  Fiat omnibus account.  Is my understanding. Once again, ████ would know specifically.

Deposition of ██████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023), 92:25–93:18.

119.    The ETH that Abra had initially transferred to Prime was (and still is to this day) locked away in the 98f Wallet.

**C.    Prime Ultimately Corrupted and Falsified its Internal Ledger to Conceal Its Actions with Respect to the 98f Wallet**

120.    Executives at Prime made the decision to falsify entries in the Internal Ledger to conceal the fact that Prime had used fiat that had been transferred to it by other customers to satisfy Abra's withdrawal requests related to the 98f Wallet.  *See id*., ¶ 52.

121.    Prime executives discussed how to hide these transactions from auditors at Nevada FID:



122.    ▇▇▇ confirmed in his deposition that Prime executives intentionally chose to settle and record the purchases of ETH from the Liquidity Provider on Prime's Internal Ledger as opposed to externally transferring funds to the Liquidity Provider.  *See* ▇▇▇ Dep., 153:8–13.

123.    Specifically, Prime settled its ETH purchases from the Liquidity Provider by "credit[ing]" Liquidity Provider's customer balance at Prime with fiat amounts equivalent to each ETH purchase.  *See id.* at 204:16–21.  To "credit" Liquidity Provider's fiat balance with Prime,

Prime had to input a "contribution" on its Internal Ledger to make it appear as if Liquidity Provider had wired fiat to Prime. *See id.* at 155:11–156:9. In reality, no funds were moving from one account to another in connection with the ETH purchases.

124.    ▮▮▮ testified:

A:    So let me—let me make sure I understand what you said. You said how to get money to Abra. You meant how to get money to [Liquidity Provider]; right?

A:    Sorry, yeah, that's what I meant. [Liquidity Provider].

Q:    Okay. So in order to credit [Liquidity Provider]'s cash account at Prime, there needed to be a contribution on the internal Ledger; is that right?

A:    Correct.

Q:    And once there is a contribution to the internal Ledger, then when [Liquidity Provider] goes to its account, it looks like there is more cash in the account; isn't that right?

A:    Correct.

Q:    There's not actually any more cash in the bank account; right?

A:    No, there is no—there is no credit of that money to the bank accounts, only to the Ledger.

*Id.*

125.    These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Internal Ledger and the amount of fiat that Prime held in its omnibus bank accounts. *See* <u>Ex. B</u>, Brennan Decl., ¶ 58.



126.    ██████ further testified about Prime's internal "inflat[ed]" Internal Ledger compared to the fiat in Prime's omnibus bank accounts:

Q:    [T]here's going to be cash reflected in [Liquidity Provider]'s account, but that cash is not actually in the bank; is that right?

A:    Correct.  Correct.

Q:    And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?

A:    Correct . . .

Q:    I see.  But the Ledger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?

A:    Exactly.

Q:    That's ultimately what happened; right?

A:    Yeah, that's exactly what happened.

██████ Dep., 144:11–20, 146:7–15.

127.    ██████ explained that Prime chose to record its purchases of ETH from Liquidity Provider to satisfy the transfer requests of Abra on Prime's Internal Ledger because that approach made it easier for Prime to avoid detection from Nevada FID:

Q:    And FID is Nevada Financial Institution Division; right?

A:    I think so.  Yeah.

Q:    And so, what is ██████ talking about when he's saying "minimizing FID scrutiny during audit time"?

A:    It wasn't a—I think what he's saying is, you know, when FID comes to do their regular—regulatory reviews with us, you know, how do—how do they get around—or not get around, but how do they minimize, you know, the scrutiny that FID would come down on Prime Trust for doing this.

Q:    So ██████'s saying, it sounds like, it would be easier to hide it from FID if we do it internally as opposed to externally; is that right?

A:      That's—that's what he was trying to do, yeah.

█████ Dep., 152:18–153:13.

128.    Prime executives seem to have undertaken efforts to make Internal Ledger entries appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for Liquidity Provider.  *See* <u>Ex. B</u>, Brennan Decl., ¶¶ 54-62.

129.    As demonstrated by the illustrative chart below[12], Prime's Internal Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases between December 23, 2021, and March 30, 2022:

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ~0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ~0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ~b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ~5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ~6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ~777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ~2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ~1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ~113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ~ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | Total | 76,367,547.90 |

*See id.*, ¶ 59.

130.    Prime's bank account statements do not reflect any of these wire transfers because they did not actually occur.  *See id.*, ¶ 60.

131.    Prime's Internal Ledger shows incoming wire transfers to Prime, and specifically to Liquidity Provider's balance with Prime, in the amounts of $11,958,000.00 on December 23, 2021, and $12,158,250.00 on December 31, 2021.  *See id.*, ¶ 61.

---

[12]  This illustrative chart is not an image directly copied from Prime's Internal Ledger.  Rather, this chart contains data from Prime's Internal Ledger related to certain transaction entries.

132.    These transfers correspond exactly with the value of the first two ETH purchases that occurred on these two days.  *Id.*

133.    However, these incoming wire transfers are not recorded in Prime's bank account statement for December 2021.  *See id.*, ¶¶ 60-62.

134.    The reason for this is simple: these incoming wire transfers never occurred and instead were manufactured by Prime to conceal its use of customer-transferred, commingled fiat to fund the purchases of ETH from Liquidity Provider to satisfy Abra's transfer requests.

135.    These false accounting entries were confirmed by ███ who also recognized that Prime's bank account statements would not reflect incoming wire transfers shown on Prime's Internal Ledger:

> Q:    When it says funds transfer in column F and it says "wire, wire, wire."  Do you see that?
>
> A:    Yes.
>
> Q:    There were no wire transfers; right?
>
> A:    Yes.
>
> Q:    Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?
>
> A:    Yes, there were no wire transfers.
>
> . . .
>
> Q:    And we can take you through—we've looked at it, but it wouldn't surprise you that there were no wire transfers reflected in the bank account statements for Prime Trust concerning these transactions; right?
>
> A:    Correct.
>
> Q:    And that's because there were no wire transfers out to [Liquidity Provider] in connection with these transactions; right?
>
> A:    No wire transfers in.

███ Dep., 164:22–165:10; 166:5–15.

136.    Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally obfuscate Prime's internal records simply compounded the already impossible task of untangling or segregating fiat or crypto transferred to Prime by different customers and fiat or crypto that Prime generated from its business operations.

137.    For example, another example of the confusion in tracing specific fiat and crypto that customers transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from Abra:



138.  ████ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":

> On Mon, Dec 19, 2022 at 9:28 AM ████████ @primetrust.com> wrote:
>
> Hey ████
> Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger? If so, I don't believe any specific bank accounts were used, as management considered all funds tangible in our omnibus model. In their decision, no bank movements were needed/done before the credits were requested to the ledger.

139.  ████████████, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which fiat or crypto and that Prime was "***not able to specify what customer is out the funds due to our omnibus structure***":



**D.    The Fiat Defendant Transferred to Prime Cannot be Traced**

140.    Because of Prime's commingling of fiat, Prime's poor recordkeeping procedures, and Prime's intentional falsification of its own records, it is impossible for Plaintiff, Defendant, or anyone else to trace and specifically identify the fiat that Defendant originally had transferred to Prime.  *See generally* <u>Ex. B</u>, Brennan Decl.

141.    Moreover, on July 18, 2025, the Court entered its *Order Granting Plan Administrator's Motion for Entry of an Order: (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief* [Docket No. 1086] (the "<u>Distribution Order</u>").  The Court also entered an opinion accompanying the Distribution Order [Docket No. 1085] (the "<u>Distribution Opinion</u>").

142.    In its Distribution Opinion, the Court analyzed whether fiat and crypto held by the Debtors was property of the Debtors' estates.  *See generally* Distribution Opinion.  Several parties (the "<u>Objectors</u>") objected to the Plan Administrator 's request for the Court to rule that the fiat and crypto held by the Debtors constituted property of the Debtors' estates.  *See id.* at 1–2.

143.    In overruling these objections, the Court made several findings pertinent to the instant matter.

144.    First, the Court held that the agreements "submitted into evidence [by the Objectors] do not establish a trust relationship exists" between Prime and its customers. *See id.* at 25; *see also id.* at 24 ("The Objectors have not established that a trust relationship was formed.").

145.    The agreements analyzed by the Court in the Distribution Opinion included a version of the End-User Agreement. *See id.* at 25 ("[T]he End-User Agreement . . . do[es] not establish that a trust relationship exists between End-Users . . . and[] the Debtors").

146.    Similar to the Agreement here, the End-User Agreement analyzed in the Distribution Opinion also permitted Prime to hold fiat currency in accounts in Prime's own name and to hold proceeds derived from such fiat currency. *See id.* at 24–25.

147.    Second, the Court held that "[t]he case ultimately turns on the fact that creditors' assets cannot be separately identified, segregated, traced or otherwise specifically identified" and that "[t]he overwhelming evidence establishes that the Debtors hopelessly commingled assets." Id. at 23–24. The Court found that "the fiat held by the Debtors is not traceable." *Id.* at 27.

148.    For the reasons found by the Court in its Distribution Opinion, and as alleged above, the fiat that Defendant transferred to Prime is impossible to trace.

## V.    Prime's Financial Conditions Spiraled Downward and Culminated in Prime Filing the Chapter 11 Cases

149.    In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency issues Prime was experiencing.

150.    At the same time, and again during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing— were leaking to the crypto and financial markets.

151.     On May 25, 2023, Prime's CEO met in person with Nevada FID during which Prime was told that they would likely be shut down in the near future.

152.     Prior to May 25, 2023, documentary evidence reflects that Prime's CEO had been relaying to other market participants Prime's bleak financial condition and the likelihood that Nevada FID would shut them down.

153.     During the lead up to the May 25, 2023 meeting with Nevada FID and shortly thereafter, in response to confirmed rumors of Prime's financial condition, many of the industry's largest market participants were demanding transfers from Prime.

154.     For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime.  *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK (Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.  CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

155.     On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals."  *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21, 2023),          https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf.  Nevada FID ordered Prime to cease accepting all fiat and crypto deposits. *Id.*

156.    The next day, BitGo canceled its acquisition of Prime.  One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns over its business."  *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023), https://www.coindesk.com/business/2023/06/22/crypt-custody-firm-bitgo-cancels-prime-trust-acquisition/.

157.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court").  *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime%20Core%20Technologies%20et%20al%20Petition.pdf.   The Nevada FID Petition directed Prime to cease and desist all retail trust activities.  *Id.*

158.    The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

159.    Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its **omnibus customer accounts**."  *Id.* at 6 (emphasis added).

160.    The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals."  *Id.* at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its

clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)." *Id.* at 7.

162.    On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

161.    On July 14, 2023, the Nevada Court placed Prime under receivership.

162.    On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

## CAUSES OF ACTION

### Count I
### Avoidance of Preferential Transfer,
### 11 U.S.C. § 547(b)

163.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

164.    The Transfer was a transfer of an interest in property of Prime.

165.    Prime made the Transfer to or for the benefit of Defendant.

166.    At the time of the Transfer, Defendant was a creditor of Prime within the meaning of section 101(10) of the Bankruptcy Code.  Defendant received the Transfer, or, alternatively, the Transfer was made for Defendant benefit.

167.    The Transfer was made for or on account of an antecedent debt owed by Prime.

168.    The Transfer was made within ninety days of the Petition Date

169.    At the time of the Transfer, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.  If not avoided, the Transfer would enable Defendant to receive more than Defendant would have received in a hypothetical chapter 7 case had Prime not made the Transfer.

170.    Defendant has not repaid or returned any of the Transfer to PCT.

171.    Pursuant to 11 U.S.C. § 547(b), PCT has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses that Defendant could assert, including Defendant's potential defenses under section 547(c) of the Bankruptcy Code, and believes the Transfer is avoidable.

172.    Accordingly, PCT is entitled to avoid the Transfer to Defendant as a preference pursuant to section 547(b) of the Bankruptcy Code.

**Count II**
**Recovery of Avoided Transfer from the Defendant,**
**11 U.S.C. § 550**

173.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

174.    PCT is entitled to avoid the preferential transfer described above pursuant to section 547(b) of the Bankruptcy Code.  Defendant was the initial transferee of such transfer, or the immediate or mediate transferee of such initial transferee, or the person for whose benefit such transfer was made.

175.    Accordingly, pursuant to section 550 of the Bankruptcy Code, PCT is entitled to recover from Defendant no less than $18,156,442.00 USD as a preference pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

**Count III**
**Claim Objection, 11 U.S.C. § 502**

176.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

177.    As alleged above, Defendant was the initial transferee of the Transfer, or the immediate or mediate transferee of such initial transferee, or the persons for whose benefit the Transfer was made, and PCT is entitled to avoid the Transfer described above pursuant to section 547(b) of the Bankruptcy Code, which is recoverable from Defendant under section 550 of the Bankruptcy Code.

178.    Pursuant to section 502(d) of the Bankruptcy Code, any claim(s) of Defendant that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until Defendant pays PCT the value of

the Transfer, for which and to the extent that the Court has determined Defendant is liable pursuant to section 550 of the Bankruptcy Code.

## PRAYER FOR RELIEF

**WHEREFORE**, PCT requests that this Court grant the following relief:

A.    Enter an order finding that the Transfer addressed herein is an avoidable preferential transfer under 11 U.S.C. § 547;

B.    Award PCT:  (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable preferential transfer alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable preferential transfer alleged herein, plus the value of any additional avoidable transfers that PCT learns, through discovery or otherwise, were made to Defendant;

C.    Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by Defendant against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until Defendant relinquishes to PCT the amount ordered as an award for the avoidable transfer;

D.    Award PCT its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

E.    Grant PCT all other relief, at law or equity, to which it may be entitled.

Dated: August 6, 2025
Wilmington, Delaware

**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Sᴄʜᴜʟᴛᴇ LLP**

*/s/ David R. Hurst*
David R. Hurst (No. 3743)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
dhurst@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
James A. Pardo (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
Magali M. Duque (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
dazman@mwe.com
jbevans@mwe.com
jpardo@mwe.com
ggriffith@mwe.com
pkennedy@mwe.com
jaminov@mwe.com
mduque@mwe.com

*Counsel to PCT Litigation Trust*