## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. 23-11161 (JKS) |
| Prime Core Technologies Inc., *et al.*, | Chapter 11 |
| Debtors[1]. | (Jointly Administered) |

---

PCT LITIGATION TRUST, in its individual
capacity and on behalf of Prime Core,
Technologies Inc. and Prime Trust, LLC
                                Plaintiff,

v.

JON JILES, an individual; THOMAS PAGELER,
an individual; RODRIGO VICUNA, an individual;
GEORGE THOMAS LEWIS BRANDL, an
individual; ROGER WANG, an individual; and
MICHAEL SMITH, an individual,

                                Defendants.

Adv. No. **Refer to Summons**

---

## COMPLAINT FOR BREACHES OF FIDUCIARY DUTY, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AIDING AND ABETTING, DECLARATORY RELIEF AND OBJECTION TO CLAIMS

The PCT Litigation Trust (the "PCT Trust" or the "Plaintiff"), individually and on behalf of Prime Core Technologies, Inc. ("Prime Core") and Prime Trust, LLC ("Prime"), by and through its undersigned counsel, files this complaint (the "Complaint") against defendants Jon Jiles ("Jiles"), Thomas Pageler (Pageler"), Rodrigo Vicuna ("Vicuna"), George Thomas Lewis Brandl ("Brandl"), Roger Wang ("Wang"), and Michael Smith ("Smith," and with Pageler, Vicuna, Brandl, and Wang, collectively, "Defendants") and alleges as follows:

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, NV 89135.

## NATURE OF THE PROCEEDING

1.      Prime Core, a Delaware corporation and Prime, a Nevada limited liability company, the once leading crypto trust company and custodian of digital assets, are now in bankruptcy because of the misconduct of certain of their directors, managers and officers. The egregiousness of Defendants' misconduct includes not only the reckless deviation from Prime's approved institutional crypto wallet infrastructure (Fireblocks) to use of an inaccessible and previously-deprecated Multi-Sig legacy wallet (the "98f Wallet") without testing it or confirming possession of the blockchain wallet keys so that they could be sure to access any assets transferred into it, but also the subsequent intentional and knowing cover-up of the misconduct, all at the expense of Prime Core, Prime Trust, their creditors and stakeholders.

2.      Worse, once Defendants uncovered their reckless mistake, Brandl and Wang, at the instruction of Pageler, implemented a cover-up, which was then aided by Smith and Vicuna, that resulted in losses in excess of $100,000,000. First, they discovered the 98f Wallet issue in December 2021 after Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC (collectively, "Abra") had transferred an excess of 11,000 Ethereum ("ETH") to Prime. The discovery was prompted when Abra sought to withdraw some of the ETH it had transferred to Prime and Brandl and Wang realized that Prime did not have the amount of ETH to cover the transfer request, which led to the discovery of the 98f Wallet.

3.      Second, after Abra was informed to cease making transfers to Prime using the address previously provided to Abra, Abra proceeded (with Defendants' knowledge) to make additional transfers in excess of 12,000 ETH to Prime into the 98f Wallet.

4.      Third, Brandl and Wang (and, later, Smith), with Pageler's knowledge and acquiescence, withdrew and transferred over $76.0 million of fiat currency (fiat currency is government-issued currency that is not backed by a commodity such as gold) held by Prime in certain omnibus accounts) to purchase ETH crypto currency to cover Abra's withdrawal

2

requests.  The intentional, knowing and fraudulent withdrawal and use of the fiat currency by Prime to cover Abra's withdrawal requests created a dire liquidity crisis and insolvency given that the crypto in the 98f Wallet was inaccessible.  Further, the withdrawals and transfers to Abra favored Abra over other Prime customers.  At that time, Smith was brought into the fold of the scheme.  He, Brandl, and Wang expressly, and in writing, approved nine separate purchases of ETH using fiat from the omnibus accounts.

5.      Fourth, Defendants covered up the losses caused by the use of the fiat currency from Prime's omnibus accounts by having an underling (the "Underling") fabricate ten incoming wire transfers on Prime's internal ledger (the "Internal Ledger") to make it appear that no loss or depletion of fiat currency was apparent.   Indeed, the $76.0 million of fiat currency withdrawn and used by Defendants to purchase ETH to cover Abra's withdrawal requests were offset on Prime's books by these deceptive phantom deposits.  However, the loss remained evident insofar as Prime's bank account showed no such wire transfers or deposits.  Both Smith and Vicuna, who were on the operations side, would have known of this discrepancy, and Brandl, Wang and Pageler knew because they had instructed the Underling to insert those fabricated deposits on Prime's Internal Ledger.  It simply was not possible to hide internally the use of $76.0 million in omnibus funds to cover Abra's withdrawal requests, let alone by fabricated wire transfers with no corresponding bank deposits.

6.      Fifth, the cover up occurred at a time when Defendants were engaged in a Series B funding event designed to raise funds for Prime's continued operations.  Notwithstanding the admitted materiality of Prime's losses, Defendants failed to disclose to any investors, regulators, or the other members of the Prime Core board or other managers of Prime their reckless misconduct, actions and deceit, including but not limited to intentionally, knowingly and fraudulently: concealing the problems and issues arising and relating to the 98f Wallet; concealing their withdrawal and use of Prime's fiat currency; concealing the false and fraudulent

3

entries to Prime's Internal Ledger; concealing the false and fraudulent wire transfers; concealing the nature and extent of Prime's losses; and concealing Prime's liquidity crisis and insolvency.

7.      Sixth, Jiles, the Chairman of the Board of Prime Core and the Chairman of the Board of Managers of Prime, who, unlike the other Defendants, was it appears was not directly involved in the 98f Wallet issues, was advised of Prime's losses no later than early-2022. Yet, he never disclosed these losses to the other members of Prime Core's board or Prime Trust's managers, customers, regulators and prospective investors. Rather, Jiles stayed silent when he had a duty to speak and allowed Prime Core, Prime and their affiliated companies to continue to operate as "business as usual," including allowing Prime Core to continue to pursue preferred stock financing through the issuance of more than $100 million of Series B preferred stock. Jiles did so, despite knowing full well that Prime was insolvent and in violation of governing rules and regulations.

8.      Finally, none of the Defendants ever properly accounted for Prime's losses. Defendants' actions essentially resulted in Prime using the fiat currency in its Prime omnibus accounts to purchase additional ETH cryptocurrency to cover the full amount of ETH transferred to the 98f Wallet by Abra and Abra's withdrawal requests. To the extent that those Defendants responsible for the use of omnibus funds considered this an investment (a dubious claim), it caused Prime to assume the risk of price fluctuations in ETH (not to mention the inability to access the ETH in the first instance) without hedging to avoid the risk of any such price fluctuations (again assuming that, as an investment, the purchase of knowingly inaccessible ETH had any value). Moreover, the Defendants never identified the 98f Wallet as an asset on Prime's books and records and engaged in a knowing, intentional and fraudulent cover-up (i.e. false internal ledger entries and fabricated wire transfers) to hide the inaccessible 98f Wallet cryptocurrency from review and their resulting use of Prime's omnibus funds.

4

9.     Correct accounting, had it been done, would have shown a massive and ever increasing loss even assuming Defendants believed they had any realistic chance to access the 98f Wallet (*i.e.*, even if the contingent chance of recovering the wallet were properly recorded as an asset) insofar as the price of ETH plummeted after Defendants purchased replacement ETH to cover Abra's transfer requests.

10.     The excuse for favoring one Prime customer over other Prime customers, fabricating wire transfers, and hiding the 98f Wallet inaccessible crypto from the Prime Core and Prime boards, regulators, customers and investors, if you can label it as such, is that Brandl and Wang believed that they would regain access to the 98f Wallet. There were three infirmities with this belief. First, the loss was real, not contingent, as the fiat currency from the omnibus bank accounts was in fact spent to satisfy Abra's transfer requests; while the hope of recovering the ETH in the 98f Wallet, not the actual incurred loss, was, at best, a contingent asset, with no one ever reporting or recording the actual loss on Prime's financial books and records. Second, any hopes of recovery of the 98f Wallet were dashed almost immediately when Brandl had his Underling reach out to the former officers who Brandl believed most likely had the keys for access and each denied having such keys in their possession.  Thus, whatever chance of recovering the cryptocurrency was slim at best and grew less likely during the course of the four months that Prime had to purchase ETH to cover Abra's transfer requests. Finally, the 23,778 ETH in the 98f Wallet significantly decreased in value throughout 2022.  Prime spent approximately $3,200 per ETH to replace the 23,778 of ETH in the 98f Wallet between December 2021 and March 2022. By April 30, 2022, ETH was down to $2,730. By May 31, 2022, ETH was down to $1,942.33. By June 30, 2022, ETH was down to $1,067.30. Thus, even if by some miracle the ETH could have been recovered, by the end of June 2022, it was worth $25,377,192, reflecting an asset worth $50 million less than the purchase price paid for ETH to transfer to Abra by Prime.

11.     The only constant throughout this period was the Defendants' steadfast misconduct, deception and scheme to keep this information amongst a select group of Prime Core's board members and Prime's managers and executives and not to disclose the losses on Prime's financial books and records and certainly not to disclose these losses to customers, investors, the respective boards, or regulators or even, for that matter, the Debtors' outside auditors.

12.     On these facts, the business judgment rule has no application.  Each Defendant had a duty—at a minimum—to disclose these material events to the Board.  In fact, the very same Underling who had been instructed by Pageler, Brandl, Wang and Smith to purchase replacement ETH using fiat currency from Prime's omnibus accounts and to fabricate incoming wire transfers, provided pre-read write ups of material events to be presented to Prime Core and Prime's respective boards regarding the problems and issues surrounding the 98f Wallet and related losses.  He provided those write-ups to Smith, but they never made it to the Board presentation.  Vicuna, as the conduit to the auditors, had a duty to disclose these losses and the ongoing misconduct to Prime Core's board and Prime's managers.  But, on information and belief, Vicuna had to know about these losses (as the fabricated wire transfers did not appear in Prime's bank records) but failed to disclose them because he had one foot out the door.

13.     As discussed below, and even assuming that the initial transfers into the 98f Wallet were the result of mere negligence (based on the failure to ensure that the digital deposit address provided to Abra did not lead to an inaccessible wallet, and not malfeasance), it is clear that the cover up implemented by certain Defendants exacerbated the losses three-fold.

14.     Ultimately, certain Defendants' conduct resulted in almost immediate losses of $76.0 million, which rendered the Debtors insolvent.  This conduct included the diversion of assets to purchase ETH to hide this shortfall, the failure to reconcile accounts, the intentional falsification of financial records to conceal the misconduct, and the failure to disclose to

regulators, outside auditors, the board, customers, and investors. Jiles decision to keep these losses from the board and continue operations as business as usual (including preferred stock financing) simply served to increase the Debtors' losses.

15. Despite Defendants advising Abra in December 2021 to change the deposit address it used to transfer ETH to Prime, Abra continued making transfers to the 98f Wallet. Abra assumed the risk and Prime had no obligation to honor Abra's transfer requests. Nevertheless, certain Defendants honored these transfer requests because Abra was a preferred customer and it was necessary to buy Abra's silence given that the disclosure of the 98f Wallet, which was material, would have resulted in the cratering of Prime's Series B preferred stock financing, as well as the Debtors' businesses.

16. The Trust submits that Pageler, Brandl, Wang, Vicuna and Smith all share in the conduct relating to the 98f Wallet and that these same Defendants share in the ongoing cover-up thereafter of the Debtors' financials so as to paint a misleading picture of solvency to investors, customers, regulators, the boards, and auditors, despite the fact that each of the Defendants knew better. Jiles, as the Chairman of both Prime and Prime Core, understood that the Debtors were insolvent, was advised of the 98f Wallet issues and cover-up, but kept this information from the boards, regulators, investors, and customers, so as to allow the Debtors to continue in business and incur substantially more losses.

17. This is not a case of the business judgment rule, for while there were rules in place those rules simply were not followed by Defendants. Defendants' individual and collective misconduct and malfeasance is not protected by the business judgment rule especially where, as here, there were falsified financials, one Prime customer was favored over other Prime customers in the midst of a liquidity crisis, and there were material non-disclosures to the boards, regulators, auditors, customers and investors solely for the purpose of allowing the Debtors to remain in business (and increase substantially their liabilities).

## JURISDICTION, VENUE AND STANDING

18.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.§§ 157 and 1334 because the claims for relief in this Complaint arise in or are related to the Debtors' bankruptcy cases pending under the Bankruptcy Code in this Court. This is a core proceeding under 28 U.S.C. § 157(b).

19.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409 because the Debtors' bankruptcy cases are pending in this district.

20.     Pursuant to Delaware Local Bankruptcy Rule 7008-1, the Trust consents to the entry of a final order or judgment on this adversary complaint (the "Complaint") and action by the Court.

21.     The PCT Litigation Trust (the "Trust") was created pursuant to the Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644]. The Plan was consummated on January 5, 2024 (the "Effective Date") [See Docket No. 694].

22.     Pursuant to an order entered by the United States Bankruptcy Court for the District of Delaware [Docket No. 644] (the "Confirmation Order") approving the Disclosure Statement on a final basis and confirming the *Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors* (the "Plan"), all Vested Causes of Action (as defined in the Plan) remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall, subject to the Plan and the PCT

Litigation Trust Agreement, be transferred to and vest in the Trust free and clear of all Claims, Liens, liabilities, encumbrances, charges, and other interests, including, without limitation, any and all claims, liens, encumbrances, and any and all right, title, and interests related thereto of governmental entities relating to any tax liabilities or similar liabilities.

23.     The Vested Causes of Action include, but are not limited to, (i) those causes of action enumerated on the Schedule of Vested Causes of Action as described in the Plan and (ii) all 98f Wallet causes action held by the Debtors. For the avoidance of doubt, all claims brought in this adversary complaint constitute Vested Causes of Action under the Plan and Confirmation Order.

24.     Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, subject to the terms of the Plan and the PCT Litigation Trust Agreement, the Trust shall have the right to pursue or not to pursue, compromise, or settle any Vested Causes of Action. From and after the Effective Date, the Trust may commence, litigate, and settle any Vested Causes of Action, except as otherwise expressly provided in the Plan and the PCT Litigation Trust Agreement. The Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

**PARTIES**

25.     Plaintiff Trust was established, and the Debtors' Vested Causes of Action were transferred and assigned to the Trust, as set forth herein. The Trust is being administered by the Trustee (as defined in the Plan), David Dunn.

26.     Prime Core is a Delaware corporation organized on January 1, 2021 pursuant to the Delaware General Corporation Law 8 Del.C. 101 *et.* seq. Prime Core is the sole, 100%, member of Prime. As reflected in Prime Core's board minutes, Jiles and Pageler were members

9

of Prime Core's Board with Jiles as the Chairman of the Board and Pageler the CEO thereof and Pageler, Vicuna, Brandl, Smith and Wang were each officers of Prime Core.

27.    Prime was a Nevada limited liability company organized on April 13, 2016, pursuant to the Nevada Limited Liability Companies Act, NRS 86.011 *et. seq.* Prime Trust also held a registered retail trust charter with the Financial Institutions Division of the Department of Business & Industry of the State of Nevada (the "NVFID".) Chapter 669 of the Nevada Revised Statute ("NRS"), entitled "Trust Companies," governs the scope and duties of a Nevada chartered retail trust company, including Prime Trust. Prime was the Debtors' primary operating company. Prime was formed on April 13, 2016 under the name NYTC, LLC. On January 19, 2017, NYTC, LLC filed an amendment to its articles of incorporation to change its name to Prime Trust. Prime provided administrative, fiat rail, asset custody, and trust services, as well as escrow services primarily to issuers of private placement.

28.    Prime is subject to the jurisdiction of the Nevada Department of Business and Industry Division of Financial Institutions (the "Nevada FID") and is regulated under Nevada Revised Statutes Chapter 669 – Trust Companies.

29.    Prime is the sole member and 100% owner of both Prime Digital, LLC ("Prime Digital") and Prime IRA LLC ("Prime IRA").

30.    Prime Digital was a Nevada limited liability company that was formed to comply with Nevada trust laws limiting out-of-state employment at Prime.

31.    Prime IRA was a Nevada limited liability company that was formed to provide Prime's historic personal checkbook IRA services.

32.    Under the Confirmed Plan Prime Core and Prime Trust was both reorganized. Prime Core was the sole member of Prime Trust, and under the restated bylaws of Prime Trust, the Plan Administrator is the surviving sole member of Prime Trust.

3079251

33.     Defendant Jon Jiles ("Jiles") was the Chairman of the Board of Prime Core, the Chairman of the Board of Managers of Prime, and a member of a special committee (the "Executive Committee") tasked with investigating the Prime's past practices related to the 98f Wallet, attempting to recover the passcodes to the 98f Wallet and remedying any liabilities that may be associated with the 98f Wallet.  On information and belief, Jiles resides in Las Vegas, Nevada.

34.     Defendant Thomas Pageler ("Pageler") was the Chief Operations Officer from May 2020 to August 2021, and Chief Executive Officer from August 2021 through November 2022.  Pageler held those positions in both Prime Core and Prime.  On information and belief, Pageler presently resides in Sunnyvale, California.

35.     Defendant Rodrigo Vicuna ("Vicuna") was the former Chief Financial Officer for Prime from January 2021 through August 2022. Vicuna held those positions in both Prime Core and Prime. On information and belief, Vicuna presently resides in Las Vegas, Nevada.

36.     Defendant George Thomas Lewis Brandl ("Brandl") was the Chief Risk and Security Officer for Prime from September 2021 through March 2022 and Chief Operating Officer from March 2022 through February 2023. Brandl held those positions in both the Prime Core and Prime. On information and belief, Brandl presently resides in Liberty Hill, Texas.

37.     Defendant Roger Wang ("Wang") was the Chief of Staff from Prime from August 2020 through February 2021, President of Global Sales for Prime from March 2021 through February 2022, and Chief Product Officer from February 2022 through February 2023. Wang held those positions in both Prime Core and Prime. On information and belief, Wang presently resides in Los Altos, California.

38.     Defendant Michael Smith ("Smith") was the Chief Operating Officer for Prime from March 2021 through March 2022 and President of Financial Operations for Prime from

March 2022 through February 2023. Smith held those positions in both Prime Core and Prime. On information and belief, Smith presently resides in Oakland, California.

## STATEMENT OF FACTS

### A.      The Debtors' Business Model

39.      Prime provided administrative, fiat rail, asset custody, and "money-transmission-as-a-service" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

40.      Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."  These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

41.      "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain digital address.  Like public keys, private keys consist of multi-digit alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

42.      Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

43.      Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

44.      A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer

12

device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

45.    A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method. These types of physical hardware devices are provided by companies such as Trezor:

 

46.    Digital wallet owners using hardware devices need to be in possession of their physical hardware devices to access their digital wallets. If owners lose a physical hardware device, they may still be able to access the crypto stored on their digital wallets by transferring the ability to sign transactions from the digital wallet to another physical hardware device. To do so, the owner must know the original digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as the password to access the private keys necessary to effectuate transactions in crypto. Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

47.    Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed. They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future

to make a payment or transfer crypto. Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction. Most smart contracts are designed so they can never be changed. One example of the use of a smart contract is a "forwarder" address. If someone sends crypto to a "forwarder" address, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet address.

48.     In or around March 2018, as part of Prime's custodial services, Prime created and implemented several self-hosted digital wallets (the "Legacy Wallets").

49.     Prime self-hosted the Legacy Wallets, meaning that Prime managed the Legacy Wallets on its own and without the assistance of any third party.

50.     Prime used the Legacy Wallets to maintain and store crypto transferred to it by Prime's customers.

51.     One such Legacy Wallet used by Prime was the 98f Wallet.[2]  The 98f Wallet is a "multi-sig" digital wallet, meaning that access to the 98f Wallet requires multiple digital "signatures" to execute a transaction.

52.     The 98f Wallet has six authorized "signers" in total, and the signatures of three of these six signers are required to access and transact from the 98f Wallet.

53.     Prime utilized a smart contract which governed several forwarder digital addresses (the "Forwarder Addresses") for customers to transfer crypto in connection with its Legacy Wallets.

54.     Prime designed the Forwarder Addresses such that they would immediately and automatically forward any crypto transferred to them to the Legacy Wallets, including the 98f Wallet.

---

[2]  This Legacy Wallet is referred to herein as the "98f Wallet" because it has an address ending in the characters "98f."

55.     Because Prime held the crypto that customers transferred to it in omnibus digital wallets, as opposed to in segregated digital wallets for each customer, the purpose of the Forwarder Addresses was for Prime to be able to determine which cryptocurrencies were sent to Prime by which customers for the purpose of figuring out how much crypto Prime owed each of its customers.

56.     In or about August 2018, the first transfers into one of Prime's Cold Wallets was made. The Multi-Sig Wallets were utilized until Prime migrated to Fireblocks.

## B.     The Debtors' Switch to Fireblocks

57.     In late 2018 and early 2019, former executives had raised significant concerns that Multi-Sig Wallets were neither secure nor appropriate wallet infrastructure for a scaling financial institution and had taken the initiative to perform diligence on alternative infrastructure providers. In 2019, following extensive diligence, Prime contracted with Fireblocks, LLC ("Fireblocks"), a third-party digital asset security platform, to store digital assets it held in custody. Prime began the process of ending its use of Multi-Sig Wallets in early 2019, just months after establishing Multi-Sig Wallets, to update its security with newer measures and security technology.

58.     Prime completed integration and full infrastructure migration to Fireblocks by July 2019. Today, Fireblocks is the leading crypto custody/wallet provider used by major regulated financial institutions in the United States and globally.   In July 2019, Prime successfully completed its infrastructure migration to Fireblocks and deprecated its Multi-Sig Wallets legacy infrastructure.

59.     Prime began migrating the cryptocurrency stored in the Multi-Sig Wallets to the more secure Fireblocks platform. Once that migration was complete, the Multi-Sig Wallets continued to exist but had close to a zero ($0) balance and the addresses directed towards the

Multi-Sig Wallets were marked internally as inactive or invalid. As of mid- to late-2019, the infrastructure migration was successful, and all cryptocurrency was transferred to Fireblocks.

60.     However, even though the migration was considered complete, Prime still relied on some external features to transfers cryptocurrency to Fireblocks. Customers were directed to the new secure infrastructure for all deposits, custody, and movement of digital assets going forward. The old Multi-Sig wallets which were deprecated and marked as "invalid" internally at Prime. Later, these inactive Multi-Sig Wallets were referred to as "legacy" wallets.

61.     In March 2020, then-COO White was terminated for cause and Jiles became the interim-COO. Then, in June 2020, Pageler, who had extensive experience in cryptocurrency and blockchain technology as well as information and asset security, was hired as COO and President. Through 2020, Pageler filled out his new executive team as Prime started its rapid growth and earlier executives were either replaced or moved on to other job opportunities. This hiring included a new Chief Technology Officer and Chief Information Security Officer, both reporting to Pageler, who by the end of 2020 had cemented his control of the company and all of its operations. In January 2021, Pageler was promoted to Chief Executive Officer and made a member of the Board of Managers of Prime.

### C.    The Change in Prime's Management Team

62.     In early 2020, Prime's crypto custody business entered into a period of rapid growth and with it came a change of certain members of its executive management to meet the growing needs of the business. As noted above, in early 2020, White was terminated for cause from his positions of COO and CTO and Jiles assumed the role of Interim-Chief Operating Officer given his deep involvement in the daily affairs of Prime. Most departments reported directly to Jiles at this time. Jiles proceeded to interview and recommend hiring Thomas Pageler, former Chief Information & Security Officer of a well-established crypto trust company, to become permanent COO in May 2020. As the new COO, Pageler went on to hire an almost

16

completely new executive team including Brandl (Chief Information Security Officer),  Vicuna (Chief Financial Officer), Wang (Chief of Staff), Cheng (Chief Compliance Officer), Smith (later promoted to COO), Sara Xi (VP Product, later promoted to Chief Product Officer), Parrella (VP Compliance, later promoted to General Counsel) among other former colleagues and associates of Pageler, with whom he had prior relationships.

63.     Also in early 2020, Prime also established a new Audit Department that reported to the Board and Audit Committee led by Amanda Ortega, former Deputy Banking Commissioner of the State of Wyoming. Several former bank examiners were hired into this department, which was supposed to audit all of Prime's reconciliation procedures and ensure best practices. In October 2021, Ms. Ortega resigned from Prime.

64.     In December 2020, Pageler was offered the Chief Executive Officer position. Pageler was already effectively running Prime as its COO by that time.

65.     Just a few weeks later, in January 2021, Pageler was officially promoted to CEO and appointed to the Board of Managers.  That same month, a decision was made to commence using the previously-deprecated 98f Wallet, and it was not until December 2021 that key Prime executives realized that they had not confirmed the 98f Wallet's accessibility.

66.      Pageler claims he only knew about the then-current Fireblocks custody solution that was implemented in July 2019, and not of the legacy 98f Wallet.

67.     Yet, in reality, and at the very least, Smith, Vicuna, and Wang—all of whom reported up to Pageler—knew that the 98f Wallet held ETH as early as September 3, 2021 when they reviewed Patel's analysis.

68.     There is no evidence that any accounting was performed by the COO, CTO, CISO, or any other management regarding the Trezor Devices and Cryptosteel Backups prior to or in conjunction with the decision to start re-using the deprecated legacy wallets.

**D.     The Recycling of Legacy Wallet Addresses and Transfers into the 98f**
**        Wallet Prior to the Discovery that the 98f Wallet Was Inaccessible**

69.     In or around January 2021, Prime discovered that it was incurring significant

costs in connection with ETH transfers by its customers.

70.     While some members of Prime mistakenly believed that these costs were

associated with Ethereum gas fees associated with the generation of new digital addresses on the

Ethereum blockchain for Prime accounts, the costs appear to have actually been the result of fees

charged by Fireblocks.

71.     At that time, Pageler, Vicuna, Brandl, Wang, and others discussed the rising cost

issue and, further, discussed a variety of potential solutions. On information and belief, the

Underling, who reported to Brandl, Wang, and Smith raised the issue of reactivating legacy

wallet addresses.

72.     As stated in an internal discussion:

> I wanted to reach out to a broader audience about an urgent issue
> we are facing due to a rapid increase in ETH costs (resulting in
> increased gas costs).
>
> Over the month of December, our customers have generated a
> $175,000 bill due to our use of an Ethereum Smart Contract to
> generate new contract addresses for each PT account as well
> as take receipt of incoming assets of this type. Out of these
> costs, over 95% of them stem from generating new Ethereum
> contract addresses for Prime Trust accounts.
>
> As we cannot bleed money like this, we have disabled the ability
> for new accounts (via API or UI) to generate contracts of this type
> (- new asset transfer methods). The means new accounts will not
> be able to generate new wallet addresses for ETH or ERC20.
>
> While we work towards a long term solution (through Fireblocks
> hopefully) was have a pool of ~170 addresses that can be
> deployed….

73.     "Recycling" a digital wallet simply meant taking an old digital wallet address,

which was not currently in use but available to Prime and under Prime's control, and

reimplementing it into Prime's operations to store crypto.

18

74.     Recycled legacy wallet forwarding addresses were provided to at least five customers, including a large customer, Abra, or, alternatively, clients were told to use the addresses they already had in their possession.

75.     On information and belief, Brandl, Wang and others were involved in the decision to recycle legacy wallet addresses and both Brandl and Wang approved the request.

76.     In connection with the recycling of the Legacy Wallets, Prime also recycled some of the Forwarder Addresses that previously had been used to route crypto transfers to the Legacy Wallets.

77.     One such Forwarder Address recycled by Prime routed crypto to the 98f Wallet (the "98f Forwarder"). Prime provided this 98f Forwarder Address to Abra.

78.     At the time the decision was made to recycle legacy wallet addresses, no tests were run to see whether any of the Multi-Sig Wallets were accessible.  Such tests, which involve sending "dust," meaning a *de minimis* amount of crypto assets, to the wallet in order to validate the address and ensure access to it, were industry standard procedures at the time.  Had any of the Defendants, many of whom had extensive knowledge about and experience with cryptocurrency, performed such tests, they would have immediately realized that the 98f Wallet was inaccessible to them and, presumably, never directed any customer to transfer assets into it.

79.     In fact, the last known transfer out of the 98f Wallet occurred on January 13, 2020, a year before the decision to recycle legacy wallet addresses was made.

80.      From January 2021 through December 14, 2021, Abra alone made ten transfers using the digital address provided to it, which address forwarded to the 98f Wallet:

| Date | ETH transferred into 98f Wallet |
|------|----------------------------------|
| January 7 – April 21, 2021 | 39 |
| April 22, 2021 | 618 |
| April 23, 2021 | 86 |
| August 12, 2021 | 1,575 |

19

| August 13, 2021 | 805 |
|---|---|
| September 8, 2021 | 259 |
| September 21, 2021 | 312 |
| December 9, 2021 | 2,280 |
| December 10, 2021 | 4,770 |
| December 14, 2021 | 337 |
| Total | 11,081 |

81.     Notably, at this time, Prime had little or no operational controls, including as is relevant here, systematic reconciliation of cryptocurrency transactions to validate the integrity of the data on its Internal Ledger and to ensure that all cryptocurrency is tracked and monitored in real time.

82.     Had Vicuna, as CFO, or any responsible for reconciliations, had any protocols in place for reconciliation, the April 22, 2021, transfer by Abra would have raised a red flag that, in turn, would have exposed the problem then and there but no later than the end of April 2021 (assuming a monthly reconciliation)—with little damage to Prime. At the time, Prime's Finance team, under the leadership of Vicuna, not only received monthly statements about the company's balances, but had access to bank portals, Prime's Internal Ledger, and Fireblocks. In addition, Vicuna and the other Executives had access to dashboards that showed Prime's balances in real-time.

83.     Such simple procedures, customary for a custodian, would have placed Prime in a position to attempt to prevent the subsequent transfers by Abra of over 23,000 ETH into the inaccessible 98f Wallet.

84.     In point of fact, Vicuna and Wang (among others) were e-mailed the results of an analysis conducted by Vivek Patel ("Patel") in September 2021 that indicated that there was a difference of 3,999 ETH between Prime's ledger and Fireblocks.

**E.     The Discovery by Prime of the Inaccessibility of the 98f Wallet**

20

85.     Given the absence of real time tracking or even monthly reconciliation and commingling of addresses as between the old Multi-Sig Wallets once resurrected and the new Fireblocks, the issues regarding discrepancies in Abra's internal balance at Prime became known in approximately August 2021. At that time, Abra identified a discrepancy between their books and the balance Prime showed.[3]

86.     At that same time, Abra sought the ability to track the cryptocurrency it sent Prime to ensure security. To provide Abra with this functionality, Prime management considered creating a dedicated vault in Fireblocks. This project began in August 2021 but was extended several times.

87.     In a status report in September 2021, Prime was supposed to conduct "a full digital asset balance reconciliation…to ensure that funds displayed in Cloud for [Abra] match[] what is held in Fireblocks." Had such reconciliation been performed, it should have identified the 98f Wallet issue. But, no such reconciliation occurred.

88.     In late-October 2021, Abra sought a transfer from Prime of 3,500 ETH even though Prime's wallets indicated that there was only 3,200 ETH available. In November, Abra sought a 4,000 ETH transfer from Prime notwithstanding the fact that Prime could only locate 496 ETH.

89.     On information and belief, the October and November ETH transfer requests were satisfied by Prime using fiat and cryptocurrency from omnibus bank accounts and omnibus digital wallets that contained assets that had been transferred to Prime by other customers and assets generated from Prime's own business operations.

---

[3] Internal account names on Prime's Internal Ledger did not correspond with actual unique, segregated bank accounts.

90.     Nevertheless, during these conversations, the Underling identified the 98f Wallet.  The Underling made the determination by tracking a recent transfer by Abra that matched a transfer to the 98f Wallet.

91.     In December 2021, Abra sought to transfer 5,867.71 ETH from Prime.

92.     The Underling investigated and discovered a large balance discrepancy between Prime's Internal Ledger and Fireblocks, which discrepancy evidenced that Abra had a larger amount of ETH than what was shown in Fireblocks and that Abra's ETH appeared to be in a wallet that did not appear to be tied to Fireblocks.

93.     Further, discovery by the Underling and others revealed that Abra's ETH was being forwarded to the 98f Wallet, not Fireblocks.

94.     As explained to the Underling at the time, Prime was trying to free up some old addresses that had never been used in order to have available forwarding contracts, in lieu of creating new addresses, and in that process inexplicably freed up addresses that forwarded crypto to the 98f Wallet.

95.     Prime soon realized that it did not have access to any of the "signers" required to access the 98f Wallet and that it was not even able to identify who the "signers" were or if they still worked for the company.

96.     Prime further discovered that it did not possess and was unable to locate the physical hardware devices which stored the private keys necessary to access the 98f Wallet or the seed phrases associated with the physical hardware devices.

97.     Without access to the signers, physical hardware devices, and seed phrases, Prime had no way to access the 98f Wallet and the crypto stored therein.

98.     Because Prime could not access the crypto stored on the 98f Wallet, it did not possess sufficient ETH to satisfy Abra's December 21 withdrawal request (and subsequent ETH withdrawal requests made by Abra).

**F.** **Abra Ignores Prime's Instructions to Stop Transferring ETH to the 98f Forwarder**

99.     Once certain officers discovered the inaccessibility of the 98f Wallet, Abra was directed to deprecate usage of the 98f wallet address.

100.    Abra refused to comply with Prime's instructions to cease sending crypto to the 98f Forwarder and, ultimately, the 98f Wallet.

101.    Prime continued to instruct Abra to stop sending crypto to the 98f Forwarder and to use the new digital addresses for its transfers to Prime.

102.    Prime instructed Abra on a weekly, and sometimes even daily, basis to implement the new digital addresses for its transfers to Prime. Abra instead constantly delayed and pushed off in response.

103.    Notwithstanding the directive to Abra to stop transfers directed towards the 98f Waller, Abra made the following additional transfers of crypto into the 98f Wallet:

| Date | ETH transferred into 98f Wallet |
|------|----------------------------------|
| December 30, 2021 | 619 |
| January 7, 2022 | 315 |
| January 7, 2022 | 1,112 |
| January 11, 2022 | 384 |
| January 21, 2022 | 1,540 |
| January 22, 2022 | 1,543 |
| January 22, 2022 | 526 |
| January 23, 2022 | 1,465 |
| February 19, 2022 | 2,076 |
| February 24, 2022 | 3,116 |
| Total | 12,696 |

104.    Abra's refusal to comply with Prime's instructions resulted in Abra sending significantly more ETH (12,696 ETH) into the 98f Wallet than would have been transferred there had Abra followed Prime's repeated instructions.

105.    Thus, for a little more than one year—both before and after management at Prime became aware of the 98f Wallet inaccessibility issue, Abra transferred 23,378 in ETH, which to this day is sitting in the inaccessible 98f Wallet.

**G.    Defendants Used Prime Assets Held in an Omnibus Account to Purchase Replacement ETH to Transfer to Abra to Cover Up the 98f Wallet Issue**

106.    In transactions that Prime's executives described as "sketchy," Prime used fiat currency that had been transferred to it by other customers to purchase ETH from one of Prime's liquidity providers ("Liquidity Provider") to satisfy the transfer requests of Abra, which had been transferring ETH into the inaccessible 98f Wallet.

107.    Specifically, with Abra making demands beginning in October 2021 for fulfillment of its transfer request, Prime used fiat in the omnibus bank-accounts (an account containing fiat transferred to Prime by numerous Prime clients and fiat generated from Prime's own business operations) to purchase ETH to fulfill Abra's withdrawal requests.

108.    Prime decided to purchase ETH from the Liquidity Provider to satisfy Abra's transfer requests.  Contemporaneous documents reflect that each transaction was requested and approved by Brandl, Wang and/or Smith.

109.    Between December 2021 and March 2022, Prime executed ten (10) separate transactions to acquire a total of $76,367,548 worth of Ethereum (ETH) to fulfill Abra's transfer requests while the ETH in the 98f Wallet was inaccessible, as follows:

| Date | ETH Purchased | Cost |
|------|---------------|------|
| 12/23/2021 | 3,000 | $11,958,000 |
| 12/31/2021 | 3,250 | $12,158,250 |
| 01/06/2022 | 800 | $2,778,400 |
| 01/06/2022 | 2,100 | $7,293,300 |
| 01/22/2022 | 1,930.5019305 | $5,000,000 |
| 03/12/2022 | 1,800 | $4,644,000 |
| 03/15/2022 | 3,250 | $8,524,750 |
| 03/15/2022 | 3,000 | $8,043,000 |

30702251

| 3/29/2022 | 2,300 | $7,902,800 |
| 03/30/2022 | 2,347.22 | $8,065,047.90 |
| Total | 23,777.7 | $76,367,547.90 |

110.    Executives went on to falsify transactions, including creating fake internal deposits to cover their use of fiat from the omnibus bank accounts, to conceal their misconduct, and plotted to mislead regulators and other stakeholders.  Prime failed to disclose to its customers and investors the financial predicament caused by Prime's inability to access the 98f Wallet and the resulting $76 million loss.

111.    Specifically, the purchases of ETH to satisfy Abra's transfer requests were made and accounted for in a manner designed to conceal the source of the ETH purchases and to hide the 98f Wallet inaccessibility issue.

112.    In order to mask these purchases, Brandl, Wang and Smith accounted for these ETH purchases by settling "off ledger" and crediting the Liquidity Provider's account with Prime.

113.    In each instance, Prime executives falsified the company's business records by inputting fake wire transfer deposit entries onto Prime's Internal Ledger.  Prime executives did this to conceal from regulators, the general public, and even others at the company the fact that they had lost access to the 98f Wallet and were misusing fiat transferred to Prime by other customers to cover the crypto shortfall, as follows:

30793251

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ██████████████████0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ██████████████████0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ██████████████████b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ██████████████████5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ██████████████████6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ██████████████████777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ██████████████████2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ██████████████████1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ██████████████████113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ██████████████████ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | Total | 76,367,547.90 |

114.    These fake wire transfers made it appear on Prime's Internal Ledger as if Liquidity Provider had transferred sufficient fiat to Prime's bank accounts to cover the fiat Liquidity Provider was receiving as payment for the replacement ETH transferred to Abra.  The dates and amounts of the incoming fabricated wire transfers were designed to correspond with the value of the replacement ETH purchases.

115.    Prime employees and executives admitted in contemporaneous communications and sworn deposition testimony that Prime's ETH purchases from Liquidity Provider used to satisfy Abra's withdrawal requests were papered using fake wire transfer line entries to conceal the true circumstances surrounding the purchases.

116.    A review of Prime's bank account statements does not reflect any of these wire transfers occurring.  This is because there were no wire transfers.

117.    Prime's primary concern was to avoid detection by customers, creditors, regulators, and law enforcement. Prime wanted to protect its reputation in the crypto industry.

118.    As discussed internally, Prime executives believed that this method of settlement (creating fabricated wire transfers) would lead to less "scrutiny" from the Nevada Department of Business and Industry Division of Financial Institutions ("Nevada FID").  The efforts to hide the transactions, whereby they satisfied Abra's transfer requests so as to hide it from the FID,

were corroborated under oath by the Underling who took instructions directly from Brandl, Wang, and Smith.

119.    In total, and as instructed by his superiors, Brandl, Wang and Smith, the Underling executed ten separate ETH purchases. For his part, Brandl claimed that such transactions were not unusual. The Underling, on the other hand, could not identify any other time when fiat from omnibus bank accounts were used in this manner.

120.    There is no evidence that Wang, Brandl or Smith ever sought or obtained a formal opinion from Prime's counsel or outside counsel as to the propriety of their use of fiat from the omnibus bank accounts to purchase ETH to transfer to Abra (to favor Abra over other Prime customers) and secure Abra's silence in the midst of a liquidity crisis.

121.    Prime officers knew that they were using fiat from omnibus accounts to buy ETH from the Liquidity Provider to make up for the shortfall created by the inability to access the 98f Wallet, while keeping this inaccessibility issue largely hidden.

122.    In other words, when Prime officers became aware of the inaccessibility of the assets on the 98f Wallet they knew this posed an existential threat to Prime's survival. The inability to access those funds rendered Prime effectively insolvent.

123.    Had investors become aware that Prime was using assets from the omnibus bank accounts and potentially using funds from additional funding (discussed below) to satisfy the transfer requests of a customer over others, those investors likely would have not provided additional funding. At the very least, this conduct was material and should have been disclosed.

124.    Thus, Prime sought new investors to make up for this shortfall, which shortfall went undisclosed.

125.    In point of fact, Prime created exposure to a new risk: namely, Prime was now acting as a trader insofar as it was purchasing ETH to make up the shortfall owed to Abra and in doing so exposed itself to losses as a result of the drop in the market price of ETH.

126.    Later, Smith realized that there were no collars or hedges on the transactions to protect Prime from market volatility.

127.    In furtherance of the cover up, Prime's 2021 audited financial statement makes no mention of the fact that by December 2021—within the period covered by the audited financial statement—Prime had suffered a cognizable loss insofar as it could not access the 98f Wallet. The loss was no longer contingent insofar as Abra had started to make transfer requests for ETH, which demands needed to be satisfied. Rodrigo Vicuna was or should have been aware of both the losses and coverup.

128.    Indeed, beginning December 23, 2021, and ending before the audited financials were issued on May 3, 2022, Prime had spent over $76 million to cover the shortfall created as a result of transfer requests made by Abra. This was a material subsequent event that was tied to conditions that existed at the date of the balance sheet and necessarily affected the representations contained in the materials provided by Vicuna (who was admittedly responsible for work related to the financial audits to the health of Prime's financial statements, balance sheets, income statements, statement of cash flows and providing that information to the auditors to make sure there were not material misstatements).  There is no indication that Vicuna ever provided any material information to the auditors with respect to the 98f Wallet.

129.    At a minimum, the fact that Prime had to spend over $76 million should have at the very least been disclosed in its audited financial statement. In point of fact, given the robust investigation—discussed below—that concluded before the audited financial statements were issued and did not yield any credible leads as to the whereabouts of the missing Trezor Devices or the existence of Cryptosteel Backups, the liability incurred by Prime should have been disclosed to the auditors and included in the audited financial statement.

130.     On information and belief, this information and this liability was not included so as not to provide disclosure to Prime's customers, potential customers, investors and regulators, as it would have revealed Prime's insolvency.

### H.     Efforts to Recover the Assets in the 98f Wallet Were Unsuccessful

131.     When the Underling realized that Prime no longer had access to the 98f Wallet, he and Brandl initiated an investigation that purportedly ran from December 2021 through April 2022 to understand the technical wallet details and locate the Trezor Devices and/or Cryptosteel Backups. The Underling advised Wang of this issue at the time. In turn, Wang and Brandl (who reported to Pageler) told the Underling not to share this information outside their group of three. The Underling nevertheless and shortly thereafter advised Smith of the 98f Wallet inaccessibility issue in light of Abra's requested transfers.

132.     Notwithstanding the decision to limit disclosure, at least three people claim to have advised Pageler in December 2021 of the issue and the Underling likewise believes that Brandl and Wang took all instruction regarding the 98f issue from Pageler. On information and belief, the individual officers of Prime that were aware of the 98f issue did not inform the boards of Prime and Prime Core of the issue in 2021 or the first part of 2022 (except for Jiles).   They likewise did not inform Prime's regulators, instead opting to conceal their misconduct.

133.     By December 22, 2021, Brandl, Wang and the Underling discussed additional steps with Prime's general counsel at the time.

134.     Among other things, the Underling immediately reached out to former executives in an effort to locate the Trezor Devices and/or Cryptosteel Backups to the 98f Wallet so as to regain access.

135.     In point of fact, Brandl and Wang never had any reasonable basis to believe that the Trezor Keys or Cryptosteel Backups were recoverable and any hopes were quickly dashed by initial interviews where prior executives, including those identified as most likely to be in

possession thereof, denied having said keys or backups. This was especially true given that the prior management was identified by the Underling as the most likely to have the devices or seed phrases needed to access the 98f Wallet.

136.    For example, pursuant to requests from Brandl and Wang, the Underling reached out to several former officers of Prime in December 2021. Early in the investigation, the former officer identified as the person most likely to have or know the whereabouts of the Trezor Keys or Cryptosteel Backups denied having any hardware in response to the Underling's inquiry, which information was passed on to Brandl and Wang.

137.    Inexplicably, over three months later, Brandl reached out to that same former officer as if the prior effort by the Underling had not transpired and Brandl expected a different result or was feigning the fact that he was unaware of the Underling's prior inquiry and the former officer's prior response, which had been provided to him.

138.    Even hoping for a better outcome, Brandl never explained why he waited more than three months to reengage with the former officer (after the Underling reached out to the former officer in December 2021) given his significance to this issue.

139.    In March 2022, Prime's general counsel also became involved in the investigation and reached out to former employees to investigate how to access the 98f Wallet. Further reflecting certain Defendants' lack of hope in accessing the ETH in the 98f Wallet, Prime reached out to the U.S. Secret Service at least four times beginning in May 2022 with respect to this issue.

140.    The investigation spearheaded by Wang and Brandl was unsuccessful.  The executives responsible for operations and cybersecurity had no standard offboarding practices documenting the return and/or current location of such devices.  There was never any realistic hope of recovery of the keys, let alone one that would support the cover up and misuse of funds described herein.

J.    **Series B Funding**

141.    Notwithstanding the knowledge of at least Pageler, Brandl, Wang and Smith of the inaccessibility of the 98f Wallet and the ongoing losses associated therewith, such inaccessibility was not disclosed to potential investors during the Series B round of financing, which Prime began to pursue in September 2021 and which closed on March 18, 2022. In turn, when Jiles and Vicuna were informed, neither made any disclosures to the boards or to prospective investors during the Series B funding efforts.

142.    Notwithstanding at least Brandl and Wang's knowledge of the 98f Wallet issue, they did not flag this issue as a potential concern even though they were provided with a disclosure schedule relating to the Series B funding.

143.    By the time of the Series B financing, the inability to access the 98f Wallet was clearly material and, thus, should have been disclosed. It should have been disclosed because key management had not only conducted sufficient interviews to raise serious concerns about the recoverability of either the Trezor Devices or the Cryptosteel Backups but, further, Prime had already begun using fiat from its omnibus bank accounts to cover and hide the shortfall created by the inaccessibility of the ETH in the 98f Wallet.

144.    Stated another way, Prime had now suffered a loss (and had not hedged this loss in the event of market volatility of ETH), which loss it did not disclose to potential investors based, it appears, on the contingency that Prime might in the future recover the cryptocurrency in the 98f Wallet, which belief had no basis in fact and was inconsistent with their own investigation (an investigation that inexplicably went dormant during a critical fund raising period).

145.    Although the Underling was not involved in the Series B funding, on information and belief the Underling was instructed by Wang and Brandl to remain silent in order to avoid potential public dissemination and any resulting impact on the Series B funding.

146.    Critically, in obtaining this funding, Prime violated numerous representations and warranties it made to potential investors in its Series B Preferred Stock Purchase Agreement dated March 18, 2022 (the "SPA").

147.    Among other things, Prime had made the following representations and warranties regarding the financial health of the company in the SPA:

- **Section 2.10(a)** ("there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $500,000");

- **Section 2.14** ("Except as set forth in the Financial Statements, the Company has no material liabilities or obligations, contingent or otherwise, other than (a) liabilities incurred in the ordinary course of business subsequent to the Balance Sheet Date; (b) obligations under contracts and commitments incurred in the ordinary course of business; and (c) liabilities and obligations of a type or nature not required under GAAP to be reflected in the Financial Statements, which, in all such cases, individually and in the aggregate would not have a Material Adverse Effect.");

- **Section 2.15** ("since the Balance Sheet Date, there has not been (a) any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except changes in the ordinary course of business that have not caused, in the aggregate, a Material Adverse Effect; (b) any damage, destruction or loss, whether or not covered by insurance, that would have a Material Adverse Effect"); and

- **Section 2.27** ("The Company has made available to the Purchasers all the information that the Purchasers have requested for deciding whether to acquire the Shares. No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchasers at the Closing contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.").

148.    By about June 2022, Prime obtained more than $100 million in Series B funding. Despite all of the representations it made to those investors in the SPA, Prime did not have access

to the 98f Wallet during the entirety of the fundraising period or any time thereafter, Prime did not disclose to investors their use of $76 million in omnibus funds to satiate Abra in the meantime, and that Prime was insolvent with a massive loss that was not carried or even mentioned in Prime's financials.

### K.   The Ongoing Cover Up

149.   In order to avoid having to make a disclosure to investors in the first quarter of 2022, Defendants labeled their investigation into the 98f Wallet as "informal."

150.   However, by April 2022 Defendants purported to launch a more formal investigation.   Notwithstanding this label, Defendants continued to hide these losses from investors, regulators, the boards and even Prime Core and Prime's own outside auditors.

151.   Indeed, notwithstanding the launch of a formal investigation in April 2022, Prime issued its consolidated financial statement on May 3, 2022 for the year ended December 2021 and did not include any mention of the 98f Wallet inaccessibility issue—either as a current or contingent loss (pursuant to ASC 450) or even as a note to the financials under subsequent events—given that the use of fiat from Prime's omnibus accounts to purchase replacement ETH to satisfy Abra's transfer requests began in earnest in December 2021. As set forth in the consolidated financials:

> Note 15 – Subsequent Events
>
> The Company evaluated all subsequent events through May 2, 2022, which is the date that the financial statements were available for issuance.
>
> *Prime Core Series B Financing*
>
> The Company is completing a Series B capital raise in the second quarter of 2022 ("Series B Financing"). At completion of the Series B Financing, the Company expects proceeds of $100 million to $150 million. Upon the approval of the board and management, a certain portion of the proceeds will be allocated for the operations of the Company.

No other material subsequent events were identified that would have required recognition of disclosure in the Consolidated Financial Statements.

152.    Thus, as of May 2022, five months after Defendants discovered the 98f Wallet, and months after they had spent over $76 million on ETH to satisfy Abra's transfer requests, Defendants were still hiding these material events from the world.

**L.    Board Notification and Claims Raised with Prime**

153.    Defendants' efforts to hide the 98f Wallet issue from the board is memorialized in the board meeting minutes.  Notwithstanding the fact that Pageler, Smith, Brandl, Jiles and Vicuna attended the February 1, 2022 board meeting and Pageler, Smith, Brandl, Jiles, Vacuna, and Wang attended the May 3, 2022 board meeting, the matter was not addressed in either of those meetings.

154.    Further, and although at least Pageler, Wang and Brandl had been aware of the 98f Wallet issue since at least December 2021 (and ETH discrepancies as early as October 2021) and Jiles and Vicuna knew no later than February 2022 (but likely earlier) and, further, that management had authorized the use of approximately $76 million of fiat from omnibus bank accounts to address this shortfall, Defendants did not disclose this issue to the full Prime Core Board until August 2, 2022, eight months after it first came to light. This omission was intentional, as multiple attempts to add the information to Q4 2021 and Q1 2022 board reports were done by way of pre-reads provided to Smith, but none of the pre-read material ever made it to the official board reports.

155.    For example, Smith was provided the following information relating to the fourth quarter 2021 board report:

Deprecating old Ethereum services and recovering access to old wallet(s). As part of a reconciliation project, it was identified that some of our digital asset services were automatically forwarding Ethereum assets to an old wallet which was unknown before the recon was completed. Upon further investigation the wallet was

> setup by the prior executive team and was never transitioned over. We are working on regaining access to the old wallet and have taken proactive measures to stop new assets from being sent to it by reaching out to customers who were using it. Lastly, we are in the process of trying to identify any other possible wallets or digital asset services that were not transitioned over correctly.

Yet, the board report for this period makes no mention of the 98f Wallet.

156.    Likewise, Smith was provided the following pre-read for the first quarter 2022 board report:

> Update on Old Ethereum Services - We are still actively pursuing remediation and access to the old Ethereum wallet to recover the assets. Additional internal resources have been pulled in outside of the Operations team to lead the recovery of access to the wallet. We have mitigated any future deposits going to this wallet and confirmed no other digital asset services were at risk.

This information, incomplete as it was, did not make it into the board report.

157.    In point of fact, these pre-reads only told half the story, as it omitted when Defendants found out about the 98f Wallet, how much additional ETH was transferred into the 98f Wallet after Defendants found out and, critically, that Defendants had to use $76 million of fiat from omnibus bank accounts as a result of the 98f Wallet. Smith knew, but he withheld this information from the boards. On information and belief, he did so with the knowledge and acquiescence of the other Defendants who, along with Smith, conspired to keep this information from being properly disclosed.

158.    A special Prime Core Board meeting was held on August 2, 2022. The Board presentation materials for the August 2, 2022, Prime Core Board meeting evidence no written disclosure to the Board of the particulars of the 98f Wallet issue or Prime management's investigation to date (let alone the results thereof).

159.    Rather, the sum and substance of the disclosure that appears in the minutes is as follows:

Mr. Pageler provided an update to the Board regarding the Company's efforts to recover certain passcodes necessary to access a digital wallet held by the Company. Mr. Pageler and Mr. Jiles discussed certain events related to the past management team and their potential custody of such passcodes. Mr. Lao and Mr. Parrella informed the Board of potential legal and regulatory risks in the event the Company was unable to access the digital wallet. Mr. Vicuna explained certain risks to the Company's financial statements and cash runway that could be implicated by such digital wallet. A full discussion ensued.

160.    Based thereon, the Prime Core Board, including specifically Chairman Jiles who controlled the Board, issued a resolution not directed at resolving the current crisis or correcting the record or fully informing regulators, customers, investors, and the public, but instead aimed at falsely directing blame on others who had no role in the misdeeds cataloged herein. They resolved to create a special committee "to investigate the Company's past practices relating to a certain digital wallet (the "Wallet") held by the Company and the custody of certain passcodes necessary to access such Wallet." Thus, Jiles and Pageler plotted a course of deception over transparency. They did not even take any steps to inform the investors who had just provided them with more than $100 million in Series B funding, which was a more than sufficient sum to solve the asset shortfall at that time. Thus, Jiles and Pageler, and other Defendants here, made a deliberate decision to double-down on a cover-up, thus ensuring Prime's ultimate collapse.

161.    To this day, the Trezor Devices and Cryptosteel Backups have not been recovered and the ETH in the 98f Wallet is still inaccessible.

162.    When investors found out about the 98f Wallet, Prime received demand letters, including from Series B investors demanding the return of funds invested, including one alleging fraud as follows:

We write on behalf of our clients, Quantum Partners LP and Palindrome Master Fund LP (collectively, the "Funds"), regarding alarming developments at Prime Core Technologies, Inc. (the "Company") and Prime Trust, LLC ("Prime Trust"), its wholly-owned subsidiary. In short, the Funds were defrauded. The investment manager of the Funds has a fiduciary duty to obtain a

36

full and complete recovery on behalf of the charitable foundations which are the majority beneficial owners of the Funds, and therefore feels compelled to take the actions set forth in this letter in an effort to do so.

Specifically, the Funds recently learned that the Company fraudulently concealed a massive loss at Prime Trust from the Funds and other Series B investors, which, if disclosed, would have caused the Funds to refrain from purchasing the Company's Series B Preferred Stock. That wrongful act also violated the federal securities laws and breached numerous representations and warranties in the Series B Preferred Stock Purchase Agreement, dated March 18, 2022 (the "SPA").

163.     Despite these realities, the Company under the leadership of Pageler, Vicuna, and other Defendants named here continued to ramp up spending, at times incurring stunningly excessive expenditures. By way of example, in the month of October 2022 (after receiving this letter), Prime spent approximately $10.5 million against revenues of approximately $3.1 million for a net loss of approximately $7.4 million.  In November 2022, Prime spent approximately $11.1 million against revenues of approximately $2.7 million for a net loss of approximately $8.4 million.  Some, but by no means all, of this spending included Pageler's excessive and unjustified private security detail which he insisted having on hand at practically all times.

164.     Notably, by the beginning of October 2022, ETH was valued at $1,311.64. Thus, even if recovered and sold at that time to reduce the shortfall caused by Abra's transfers in late-2021 and early-2022, the ETH would only have been worth $31 million.

165.     Notwithstanding the massive losses incurred by Prime as a result of the 98f Wallet, Vicuna and the other Defendants never restated Prime and/or Prime Core's financials, never accounted for the losses incurred, never accounted for the dramatic value of the ETH Prime was left holding (albeit without the ability to access it) and never accounted for the potential liability to investors who had been duped into investing in an otherwise sinking ship at a time when Defendants withheld material financial information.

M.     **The Debtors Forced into Bankruptcy**

166.    As a result of the transfer of assets to satisfy the inaccessibility of the ETH in the 98f Wallet, Prime failed to maintain an adequate amount of shareholder equity or capital in the form of permissible investments. Prime Core and Prime were insolvent at that time.

167.    Despite efforts with the Nevada FID to resolve these issues and bring Prime into compliance, those efforts proved futile.

168.    Among other things, Prime experienced a multiple "runs on the bank," which led to the entry of a Memorandum of Understanding between Prime and the Nevada FID on June 16, 2023, pursuant to which the Nevada FID placed additional oversight over Prime.

169.    On June 21, 2023, the Nevada FID issued a cease and desist order (the "Cease and Desist Order") against Prime.

170.    Pursuant to the Cease and Desist Order, the Nevada FID ordered the Company to cease and desist all retail trust activities.

171.    Shortly thereafter, the Debtors filed for bankruptcy protection.

**N.    Defendants Owed Prime Core and Prime Fiduciary Duties and the Managers of Prime Were Also Subject to the Implied Covenant of Good Faith and Fair Dealing**

172.    The Prime Operating Agreement dated as of February 1, 2017, identified Jiles as a Manager. The Second Amended and Restated Articles of Incorporation dated as of October 1, 2021 added Pageler as a Manager. The Third Amended and Restated Articles of Incorporation dated December 7, 2021 added Smith as a Manager. At the time, the Prime Operating Agreement sets forth specific duties owed by Managers and reaffirms that the Managers owed a "fiduciary duty" to Prime. Specifically, section 6.6 of the Prime Operating Agreement, Duties to the Company, provides as follows:

> (a) Without receiving the informed, written consent of a Majority-In-Interest of the (other non-interested or non-conflicted) Members, no Member or Manager shall utilize any assets or confidential information of the Company other than for the benefit of the Company; or for, a purpose reasonably related to protecting such

38

Person's Interest (in a manner not inconsistent with the interests of the Company), or to comply with the requirements of applicable law. For purposes of the preceding sentence, a business opportunity within the scope of the Business which is made available to a Manager directly in consequence of such Person's status as a Manager of the Company shall be deemed an asset of the Company.

(b) The Managers shall devote to the Company such reasonable amounts of time, effort and attention as shall be necessary to cause the Company and its business to be diligently and prudently managed.

173.    The Operating Agreement in Section 6.2, Designation of Managers, subsection (a), also required each Manager to be bound by the Manager Agreement attached as Schedule E. Id., at Section 6.2(a). In relevant part, the Manager Agreement provides as follows:

1. Board Duties.

a. Manager is hereby engaged to provide services to the Company as a member of the Board of Managers ("Managers"). Manager shall have a fiduciary duty to the Company and shall at all times act in good faith and represent the Company in an ethical and professional manner in all matters related to the Company and the Company's business.

174.    The Manager Agreement also provides that the "terms, duties, and obligations herein are in addition to, and not in limitation of, the terms, duties and obligations set forth in the Operating Agreement."

175.    After the 98f Wallet issue was discovered and after omnibus funds had been used to purchase ETH to transfer to Abra, Prime amended the Operating Agreement on February 3, 2022. The Amended and Restated Operating Agreement replaced Section 6.6 of the Prime Operating Agreement with Section 4.5, which provided as follows:

Performance of Duties; Liability of Manager. A Manager shall not be liable to the Company or to the Members for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, reckless or intentional misconduct, knowing and intentional breach of this Agreement, or a knowing violation of law by the Manager. Each Manager shall perform its, his or her managerial duties in good faith, in a manner it, he or she reasonably believes to be in the best interests of the Company and its Members, and with such care,

39

including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. A Manager shall be fully protected in relying in good faith upon such information, opinions, reports or statements by any of the Members, or agents, or by any other person, as to matters the Manager reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

176. Such amendments designed to benefit Defendants were made without full disclosure to the Prime Core board, constituted an interested director transaction and are otherwise ineffective as inherently unreasonable to Prime. In any event, the allegations contained herein evidence the type of conduct proscribed in the Amended and Restated Operating Agreement.

177. Likewise, Prime Core had bylaws dated as of January 26, 2021, which restricted indemnification and payment of expenses to officers and directors of Prime Core including precluding such advancement where, as here, "to a person against whom the Corporation directly brings a claim, in a Proceeding, alleging that such person has breached such person's duty of loyalty to the Corporation, committed an act or omission not in good faith or that involves intentional misconduct or a knowing violation of law, or derived an improper personal benefit from a transaction."

178. Notably, after the 98f Wallet issue arose and after Defendants used omnibus funds to purchase ETH to transfer to Abra, the bylaws were amended on March 16, 2022 to materially alter Defendants' indemnification right. Such amendments designed to benefit Defendants were made without full disclosure to the Prime Core board, constituted an interested director transaction and are otherwise ineffective as inherently unreasonable to Prime Core. In any event, as reflected herein Defendants acted in bad faith and in a manner that was not in the

40

best interests of Prime Core and, thus, would not be entitled to an advancement even assuming such right as a result of Prime and Prime Core's bankruptcy.

179.    The Defendants that were appointed as officers of Prime and Prime Core, owed fiduciary duties to Prime and Prime Core, respectively, as agents of Prime and Prime Core. Likewise, the directors of Prime Core owed fiduciary duties to Prime Core.

180.    None of the agreements eliminate or restrict the fiduciary duties owed by officers to their respective corporations and any amendments to corporate governing agreements made after the 98f Wallet issue was discovered (and not fully disclosed to the respective boards) have no force and effect. In any event, the allegations of malfeasance contained herein sound in fraud, deceit, gross negligence, reckless or intentional misconduct, knowing and intentional breach of this Agreement, and/or a knowing violation of law. The breaches do not rest in simple negligence.

181.    Moreover, the PCT Litigation Trust is unaware of any advice of counsel received by any of the Defendants from December 2021 through August 2022 when they finally informed the boards (or thereafter) upon which Defendants contemporaneously relied on beginning in December 2021 that approved the use of fiat currency from Prime's omnibus accounts or Defendants' non-disclosure thereof. To the contrary, the only advice received by Defendants was that their conduct most likely breached their fiduciary duties insofar as, among other things, they favored Abra to the exclusion of all other customers. That advice came in August 2022 once Defendants actually engaged counsel to review the 98f Wallet issue.

## FIRST CLAIM FOR RELIEF

### (For Breach of Fiduciary Duty against All Defendants under Delaware Corporate Law)

182.    PCT Litigation Trust realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

183.    As directors, officers, and/or agents of Prime Core, each of the Defendants—Jiles, Pageler, Vicuna, Brandl, Wang, and Smith—owed Prime Core a fiduciary duty. Jiles and Pageler were directors of Prime Core and Smith, Vicuna, Brandl and Wang were officers thereof and thus were charged with oversight responsibilities and owed a fiduciary duty of care, loyalty and disclosure, among other fiduciary obligations.

184.    Following the transfer of assets in the deprecated 98f Wallet commencing in 2021 and Defendants' discovery of the 98f Wallet no later than December 2021, each of the Defendants thereafter participated in malfeasance that served both to exacerbate Prime's losses, mislead investors, and result in the demise of Prime and Prime Core.

185.    Among other things, Defendants engaged in a series of acts that breached their fiduciary duties to the Debtors, including without limitation:

a.    Failing to implement basic reconciliation mechanisms, which could have avoided losses.

b.    Failing to implement basic testing procedures to validate accessibility of any legacy wallet they intended to use on a going-forward basis, which would have demonstrated the inaccessibility of the 98f Wallet.

c.    Using $76 million held in Prime's omnibus account to purchase replacement ETH from the Liquidity Provider to satisfy Abra's transfer requests knowing that Prime faced a liquidity crisis and insolvency risk because the crypto in the 98f Wallet was

inaccessible and that these transfers to Abra would favor Abra over other Prime customers;

d.      Using $76 million held in Prime's omnibus account to purchase replacement ETH from the Liquidity Provider to satisfy Abra's transfer requests in a manner designed to keep these losses hidden from investors, customers, auditors, the boards, and regulators especially given the ongoing Series B funding efforts;

e.      Failing to properly account on Prime's financials the use of fiat from omnibus bank accounts to purchase replacement ETH to transfer to Abra;

f.      Failing to hedge against price drops in the value of ETH essentially purchased by Prime when it used $76 million to transfer ETH to Abra assuming, in the first instance, the ETH would ever be accessible;

g.      Falsely claiming that their actions in using omnibus fiat to purchase ETH to transfer to Abra constituted an investment (which was not documented as an investment);

h.      Falsifying Prime's business records by means of inputting fabricated wire transfer entries onto Prime's Internal Ledger. Defendants did this (or caused this to be done) to conceal from regulators, the general public, and even others at the company the fact that they had lost access to the 98f Wallet and were misusing fiat transferred to Prime by other customers to cover the crypto shortfall;

i.      Lying to investors about the financial health of the company in the SPA and failing to update said representations as losses mounted during the pendency of the Series B funding efforts;

j.      Deciding to continue to solicit investors by means of the $107 million Series B funding efforts knowing that Prime and its parent were insolvent as a result of the use of $76 million to purchase replacement ETH to cover the shortfall created by the inaccessibility of the ETH in the 98f Wallet and not disclosing same to prospective investors;

k.      Failing to disclose to certain members of the board, investors or regulators that their initial efforts to recover the keys necessary to access the 98f Wallet were unsuccessful, and that Defendants had no reasonable belief that they would be able to access the 98f Wallet, as evidenced not only by responses they received immediately from prior executives denying possession of the keys and Defendants' efforts to employ the secret service to help recover the keys;

l.      Failing to identify to Prime and Prime Core's outside auditors the $76 million hole caused by Defendants' use of fiat other customers had transferred to Prime and then used by Prime to purchase replacement ETH from a liquidity provider to satisfy Abra's transfer requests; and, otherwise;

m.      Approving audited financials that failed to monetize nor even mention the losses suffered by Prime beginning in December 2021 and continuing thereafter; and

44

n.   Taking affirmative and improper actions to hide a massive loss from customers, investors, other Prime board members, parent company board and audit committee members, and regulators.

186.   Once the 98f Wallet issue was uncovered, every action taken by Defendants in order to hide these losses served to (i) exacerbate the losses, (ii) favor one Prime customer over other Prime customers (iii) defraud investors while Prime and Prime Core were hopelessly insolvent (iv) allow Prime to continue to operate (and continue to incur additional liabilities) even though it was in violation of Nevada FID regulations, and (v) insulate themselves from liability or provide them with greater rights in the event their malfeasance was discovered.

187.   The above breaches are not protected by the business judgment rule insofar as they are not consistent with Defendants' duties of care, loyalty and disclosure in light of the materiality of the losses, and Defendants placed their own interests and those of Abra's ahead of Prime and Prime Core in derogation of their duty of loyalty.

188.   Jiles at all times exercised controlling interest and decision-making power over Prime by virtue of his role as Prime Core's Board Chairman and because he enjoyed a voting majority with his ownership shares and the control he exerted over the shares held by his father and through proxies he held. At one point, Jiles even attempted to have the company records proclaim that he was "Chairman for Life." Jiles regularly exercised his power to approve or deny many key executive decisions, including the decisions discussed herein.

189.   The breach by Jiles was broader than and not co-extensive with the 98f Wallet or the 98f Wallet Cause of Action, as defined in the operative plan (the "Plan"). For his part, Jiles was aware of the $76 million loss, was aware of the ongoing Series B funding efforts, was aware of the liquidity crisis and Prime's insolvency, but Jiles nevertheless as the chairman of the board of both Prime Core and Prime failed to disclose these material facts to regulators, investors, customers, auditors or even the other board members. Time and time again, Jiles attended board

meetings after Prime suffered this liquidity event and prior to the disclosure to the board in August 2022 but failed to advise the other board members of the Debtors' insolvency.

190.    Jiles allowed the Debtors to continue to operate notwithstanding the fact that the Debtors were in violation of Nevada regulations and certain other state regulations as a result of the failure to maintain an adequate amount of shareholder equity or capital.

191.    Jiles, along with Pageler, also oversaw amendments to corporate governing agreements created after the 98f issue arose that were designed to potentially limit the exposure of managers and officers of Prime Core without fully disclosing the existence of the 98f issue. These amendments constituted interested director transactions and were inherently unreasonable to Prime Core assuming, for argument's sake, they actually serve to provide the managers and officers of Prime Core with greater rights or insulation from any claims of malfeasance.

192.    Jiles allowed the Debtors to incur substantially more debt after he became aware of this liquidity event to the detriment of the Debtors and their creditors.

193.    As a result of Defendants' breaches of fiduciary duty, Prime Core has been damaged in an amount exceeding $100 million.

### SECOND CLAIM FOR RELIEF

**(For Breach of Fiduciary Duty Against All Defendants under Nevada Law)**

194.    PCT Litigation Trust realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

195.    As managers, officers or agents of Prime, each of the Defendants—Jiles, Pageler, Vicuna, Brandl, Wang, and Smith—owed Prime Core and Prime a fiduciary duty of care.

196.    Jiles, Pageler and Smith were managers of Prime and Vicuna, Brandl and Wang officers.

197.    Following the transfer of assets in the deprecated 98f Wallet commencing in 2021 and Defendants' discovery of the 98f Wallet no later than December 2021, each of the Defendants thereafter participated in malfeasance that served both to exacerbate Prime's losses, mislead investors, and result in the demise of Prime and Prime Core.

198.    Among other things, Defendants engaged in a series of acts that breached their fiduciary duties to Prime, including without limitation:

a.    Failing to implement basic reconciliation mechanisms, which could have avoided losses.

b.    Failing to implement basic testing procedures to validate accessibility of any legacy wallet they intended to use on a going-forward basis, which would have demonstrated the inaccessibility of the 98f Wallet.

c.    Using $76 million held in Prime's omnibus account to purchase replacement ETH from the Liquidity Provider to satisfy Abra's transfer requests knowing that Prime faced a liquidity crisis and insolvency risk because the crypto in the 98f Wallet was inaccessible and that these transfers to Abra would favor Abra over other Prime customers;

d.    Using $76 million held in Prime's omnibus account to purchase replacement ETH from the Liquidity Provider to satisfy Abra's transfer requests in a manner designed to keep these losses hidden from investors, customers, auditors, the boards, and regulators especially given the ongoing Series B funding efforts;

e.      Failing to properly account on Prime's financials the use of fiat from omnibus bank accounts to purchase replacement ETH to transfer to Abra;

f.      Failing to hedge against price drops in the value of ETH essentially purchased by Prime when it used $76 million to transfer ETH to Abra assuming, in the first instance, the ETH would ever be accessible;

g.      Falsely claiming that their actions in using omnibus fiat to purchase ETH to transfer to Abra constituted an investment (which was not documented as an investment);

h.      Falsifying Prime's business records by means of inputting fabricated wire transfer entries onto Prime's Internal Ledger. Defendants did this (or caused this to be done) to conceal from regulators, the general public, and even others at the company the fact that they had lost access to the 98f Wallet and were misusing fiat transferred to Prime by other customers to cover the crypto shortfall;

i.      Lying to investors about the financial health of the company in the SPA and failing to update said representations as losses mounted during the pendency of the Series B funding efforts;

j.      Deciding to continue to solicit investors by means of the $107 million Series B funding efforts knowing that Prime and its parent were insolvent as a result of the use of $76 million to purchase replacement ETH to cover the shortfall

48

created by the inaccessibility of the ETH in the 98f Wallet and not disclosing same to prospective investors;

k.　Failing to disclose to certain members of the board, investors or regulators that their initial efforts to recover the keys necessary to access the 98f Wallet were unsuccessful, and that Defendants had no reasonable belief that they would be able to access the 98f Wallet, as evidenced not only by responses they received immediately from prior executives denying possession of the keys and Defendants' efforts to employ the secret service to help recover the keys;

l.　Failing to identify to Prime and Prime Core's outside auditors the $76 million hole caused by Defendants' use of fiat other customers had transferred to Prime and then used by Prime to purchase replacement ETH from a liquidity provider to satisfy Abra's transfer requests; and, otherwise;

m.　Approving audited financials that failed to monetize nor even mention the losses suffered by Prime beginning in December 2021 and continuing thereafter; and

n.　Taking affirmative and improper actions to hide a massive loss from customers, investors, other Prime board members, parent company board and audit committee members, and regulators.

199.　Once the 98f Wallet issue was uncovered, every action taken by Defendants in order to hide these losses served to (i) exacerbate the losses, (ii) favor one Prime customer over other Prime customers (iii) defraud investors while Prime and Prime Core were hopelessly

insolvent (iv) allow Prime to continue to operate (and continue to incur additional liabilities) even though it was in violation of Nevada FID regulations, and (v) insulate themselves from liability or provide them with greater rights in the event their malfeasance was discovered.

200.    The above breaches are not protected by the business judgment rule insofar as they are not consistent with Defendants' duties of care, loyalty and disclosure in light of the materiality of the losses, and Defendants placed their own interests and those of Abra's ahead of Prime and Prime Core in derogation of their duty of loyalty and, as relevant here.

201.    Jiles at all times exercised controlling interest and decision-making power over Prime by virtue of his role as Prime Core's Board Chairman and because he enjoyed a voting majority with his ownership shares and the control he exerted over the shares held by his father and through proxies he held.  At one point, Jiles even attempted to have the company records proclaim that he was "Chairman for Life."  Jiles regularly exercised his power to approve or deny many key executive decisions, including the decisions discussed herein.

202.    The breach by Jiles was broader than and not co-extensive with the 98f Wallet or the 98f Wallet Cause of Action, as defined in the operative plan (the "Plan").  For his part, Jiles was aware of the $76 million loss, was aware of the ongoing Series B funding efforts, was aware of the liquidity crisis and Prime's insolvency, but Jiles nevertheless as the chairman of the board of both Prime Core and Prime failed to disclose these material facts to regulators, investors, customers, auditors or even the other board members.  Time and time again, Jiles attended board meetings after Prime suffered this liquidity event and prior to the disclosure to the board in August 2022 but failed to advise the other board members of the Debtors' insolvency.

203.    Jiles allowed the Debtors to continue to operate notwithstanding the fact that the Debtors were in violation of Nevada regulations and certain other state regulations as a result of the failure to maintain an adequate amount of shareholder equity or capital.

204.    Jiles also oversaw amendments to corporate governing agreements created after the 98f issue arose that were designed to potentially limit the exposure of managers and officers of Prime without fully disclosing the existence of the 98f issue.  These amendments constituted interested director transactions and were inherently unreasonable to Prime assuming, for argument's sake, they actually serve to provide the managers and officers of Prime with greater right or insulation from any claims of malfeasance.

205.    Jiles allowed the Debtors to incur substantially more debt after he became aware of this liquidity event to the detriment of the Debtors and their creditors.

206.    As a result of Defendants' breaches of fiduciary duty and implied covenant of good faith and fair dealing, Prime has been damaged in an amount exceeding $100 million.

### THIRD CLAIM FOR RELIEF

#### (Breach of the Implied Covenant of Good Faith and Fair Dealing against Jiles, Pageler, and Smith)

207.    PCT Litigation Trust realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

208.    As managers of Prime, each of the Defendants—Jiles, Pageler, and Smith—not only owed fiduciary duties to Prime but also pursuant to NRS, 86.298 of the Nevada Limited-Liability Companies Act, the manager defendants of Prime were subject to the implied covenant of good faith and fair dealing.

209.    These Defendants breach the implied covenant of good faith and fair dealing by, among other things:

  a.      Failing to implement basic reconciliation mechanisms, which could have avoided losses.

  b.      Failing to implement basic testing procedures to validate accessibility of any legacy wallet they intended to use on a

51

going-forward basis, which would have demonstrated the inaccessibility of the 98f Wallet.

c.   Using $76 million held in Prime's omnibus account to purchase replacement ETH from the Liquidity Provider to satisfy Abra's transfer requests knowing that Prime faced a liquidity crisis and insolvency risk because the crypto in the 98f Wallet was inaccessible and that these transfers to Abra would favor Abra over other Prime customers;

d.   Using $76 million held in Prime's omnibus account to purchase replacement ETH from the Liquidity Provider to satisfy Abra's transfer requests in a manner designed to keep these losses hidden from investors, customers, auditors, the boards, and regulators especially given the ongoing Series B funding efforts;

e.   Failing to properly account on Prime's financials the use of fiat from omnibus bank accounts to purchase replacement ETH to transfer to Abra;

f.   Failing to hedge against price drops in the value of ETH essentially purchased by Prime when it used $76 million to transfer ETH to Abra assuming, in the first instance, the ETH would ever be accessible;

g.   Falsely claiming that their actions in using omnibus fiat to purchase ETH to transfer to Abra constituted an investment (which was not documented as an investment);

52

h.  Falsifying Prime's business records by means of inputting fabricated wire transfer entries onto Prime's Internal Ledger. Defendants did this (or caused this to be done) to conceal from regulators, the general public, and even others at the company the fact that they had lost access to the 98f Wallet and were misusing fiat transferred to Prime by other customers to cover the crypto shortfall;

i.  Lying to investors about the financial health of the company in the SPA and failing to update said representations as losses mounted during the pendency of the Series B funding efforts;

j.  Deciding to continue to solicit investors by means of the $107 million Series B funding efforts knowing that Prime and its parent were insolvent as a result of the use of $76 million to purchase replacement ETH to cover the shortfall created by the inaccessibility of the ETH in the 98f Wallet and not disclosing same to prospective investors;

k.  Failing to disclose to certain members of the board, investors or regulators that their initial efforts to recover the keys necessary to access the 98f Wallet were unsuccessful, and that Defendants had no reasonable belief that they would be able to access the 98f Wallet, as evidenced not only by responses they received immediately from prior executives denying possession of the keys and Defendants' efforts to employ the secret service to help recover the keys;

l.   Failing to identify to Prime and Prime Core's outside
auditors the $76 million hole caused by Defendants' use of
fiat other customers had transferred to Prime and then used
by Prime to purchase replacement ETH from a liquidity
provider to satisfy Abra's transfer requests; and, otherwise;

m.   Approving audited financials that failed to monetize nor
even mention the losses suffered by Prime beginning in
December 2021 and continuing thereafter; and

n.   Taking affirmative and improper actions to hide a massive
loss from customers, investors, other Prime board members,
parent company board and audit committee members, and
regulators.

210.   Once the 98f Wallet issue was uncovered, every action taken by Defendants Jiles, Pageler and Smith in order to hide these losses served to (i) exacerbate the losses, (ii) favor one Prime customer over other Prime customers (iii) defraud investors while Prime and Prime Core were hopelessly insolvent (iv) allow Prime to continue to operate (and continue to incur additional liabilities) even though it was in violation of Nevada FID regulations, and (v) insulate themselves from liability or provide them with greater rights in the event their malfeasance was discovered.

211.   The above breaches are not protected by the business judgment rule insofar as they are not consistent with Defendants' duties of care, loyalty and disclosure in light of the materiality of the losses, and Defendants placed their own interests and those of Abra's ahead of Prime and Prime Core in derogation of their duty of loyalty and, as is relevant here, in breach of the implied covenant of good faith and fair dealing.

212.     Jiles at all times exercised controlling interest and decision-making power over Prime by virtue of his role as Prime Core's Board Chairman and because he enjoyed a voting majority with his ownership shares and the control he exerted over the shares held by his father and through proxies he held.  At one point, Jiles even attempted to have the company records proclaim that he was "Chairman for Life."  Jiles regularly exercised his power to approve or deny many key executive decisions, including the decisions discussed herein.

213.     The breach by Jiles was broader than and not co-extensive with the 98f Wallet or the 98f Wallet Cause of Action, as defined in the operative plan (the "Plan").  For his part, Jiles was aware of the $76 million loss, was aware of the ongoing Series B funding efforts, was aware of the liquidity crisis and Prime's insolvency, but Jiles nevertheless as the chairman of the board of both Prime Core and Prime failed to disclose these material facts to regulators, investors, customers, auditors or even the other board members.  Time and time again, Jiles attended board meetings after Prime suffered this liquidity event and prior to the disclosure to the board in August 2022 but failed to advise the other board members of the Debtors' insolvency.

214.     Jiles allowed the Debtors to continue to operate notwithstanding the fact that the Debtors were in violation of Nevada regulations and certain other state regulations as a result of the failure to maintain an adequate amount of shareholder equity or capital.

215.     Jiles, as well as Pageler and Smith, oversaw amendments to corporate governing agreements created after the 98f issue arose that were designed to potentially limit the exposure of managers and officers of Prime without fully disclosing the existence of the 98f issue.  These amendments constituted interested director transactions and were inherently unreasonable to Prime assuming, for argument's sake, these modifications were designed to provide the managers and officers of Prime with greater rights or insulation from any claims of malfeasance.

216.     Jiles allowed the Debtors to incur substantially more debt after he became aware of this liquidity event to the detriment of the Debtors and their creditors.

217.    As a result of Defendants' breaches of fiduciary duty and implied covenant of good faith and fair dealing, Prime has been damaged in an amount exceeding $100 million.

### FOURTH CLAIM FOR RELIEF

**(For Aiding And Abetting Breaches of Fiduciary Duty
Against All Defendants Under Delaware Law and Nevada Law)**

218.    PCT Litigation Trust realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

219.    As alleged above, each of the Defendants breached his, her, or its respective fiduciary duties of loyalty and care owed to Prime Core and Prime, among other fiduciary duties owed. Each of the other Defendants aided and abetted the foregoing breaches by knowingly participating in these breaches of fiduciary duties and by providing material assistance.

220.    As a direct and/or proximate result of the aiding and abetting of the other Defendants' breaches of fiduciary duties, the Company suffered damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF

### (Declaratory Relief Against Defendant Jiles)

221.    PCT Litigation Trust realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

222.    Pursuant to Article 12 of the Plan, this Court retained jurisdiction to, among other things, "…(k) to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation."

223.    Separately, the Plan provided a limitation of recovery against Current Officers and Directors, which states as follows:

> Notwithstanding the foregoing or anything set forth in the Plan to
> the contrary,

> (i) any recovery by the Wind-Down Debtor or the PCT Litigation Trust on account of any 98f Wallet Cause of Action (except for Avoidance Actions) against any Current Directors or Current Officers, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available Insurance Policies after payment from such Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the 98f Wallet Causes of Action.

Plan, Article 6.9(b)(i) (hereinafter, the "Litigation Recovery Limitation").

224.    Further, the Plan defines "98f Wallet Causes of Action" as "any Claim or Cause of Action arising from or related to the Debtors' loss of, or loss of access to, assets held within, the 98f Wallet, and/or the Debtors' use of Cash or other assets to satisfy redemptions or withdrawals by Customers following the loss of access to assets in the 98f Wallet."

225.    On information and belief, a dispute arises as a result of this Complaint as between Defendant Jiles, on the one hand, and the PCT Litigation Trust, on the other hand, as to whether the breach of fiduciary duty claim, as alleged against Jiles, falls within the definition of 98f Wallet Causes of Action.

226.    The PCT Litigation Trust contends that, as against Jiles, the claims set forth herein is much broader than the Debtors or even this Court intended to include under the definition of "98f Wallet Causes of Action." Indeed, Jiles's acts and omissions did not relate to Prime's loss of access to the 98f Wallet or the decision to use omnibus funds to satisfy Abra's transfer requests. Instead, and as to Jiles, the breach of fiduciary duty relates to Jiles's failure to disclose to—and indeed active misleading of—investors, creditors, and others regarding the true financial condition of Prime during a critical period of Series B funding and thereafter.

227.    On information and belief, Jiles disputes the PCT Litigation Trust's contentions.

228.    Accordingly, the PCT Litigation Trust is entitled to a declaratory judgment that the breach of fiduciary duty claim as against Jiles brought herein is broader than the "98f Wallet

Causes of Action" as defined in the Plan, and thus the Litigation Recovery Limitation does not apply to this action or any recoveries sought therein.

## SIXTH CLAIM FOR RELIEF

### (Claim Objection against Jiles, Pageler, Vicuna, Brandl, Wang, and Smith under 11 U.S.C. § 502)

229.    PCT Litigation Trust realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

230.    Pursuant to section 502(d) of the Bankruptcy Code, any claim(s) of the Defendants that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until the Defendants pay the PCT Litigation Trust for which and to the extent that the Court has determined the Defendants are liable pursuant to 11 U.S.C. § 550.

## PRAYER FOR RELIEF

Based on the foregoing, the PCT Litigation Trust respectfully requests that the Court enter judgment in favor of the PCT Litigation Trust and against the Defendants as follows:

1.      On the First Claim for Relief, for a judgment in the amount of no less than $100 million, the exact amount according to proof at trial.

2.      On the Second Claim for Relief, for a judgment in the amount of no less than $100 million, the exact amount according to proof at trial.

3.      On the Third Claim for Relief, for a judgment in the amount of no less than $100 million, the exact amount according to proof at trial.

4.      On the Fourth Claim for Relief, for a judgment in the amount of no less than $100 million, the exact amount according to proof at trial.

5.      On the Fifth Claim for Relief, for a declaratory judgment that the breach of fiduciary duty claim, as it relates to Jiles, is broader than the "98f Wallet Causes of Action" as defined in the Plan, and thus the Litigation Recovery Limitation does not apply to this action or any recoveries sought therein as against Jiles.

6.      On the Sixth Claim for Relief, an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by the Defendants against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until the Defendants relinquishes to PCT Litigation Trust the amount ordered as an award for the Vested Causes of Action set further herein.

7.      On all Claims for Relief, for costs and such other and further relief as the Court deems just and proper.

Dated: August 14, 2025                    **WOMBLE BOND DICKINSON (US) LLP**
Wilmington, Delaware

*/s/ Morgan L. Patterson*
Donald J. Detweiler (DE Bar No. 3087)
Morgan L. Patterson (De Bar. 5388)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile:  (302) 252-4330
Email:  don.detweiler@wbd-us.com
Email:  morgan.patterson@wbd-us.com

and

Jason B. Komorsky (*pro hac vice* to be filed)
Jessica Bagdanov (*pro hac vice* to be filed)
**BG LAW**
21650 Oxnard St., Suite 500
Woodland Hills, CA 9167
Telephone: (818) 827-9000
Facsimile:  (818) 8279155
Email:  jkomorsky@bg.law
Email:  jbagdanov@bg.law

*Counsel to the PCT Litigation Trust*