## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | Adv. Proc. No. 26-_____ (JKS) |
| v. | |
| Zap Solutions, Inc. d/b/a Strike, | |
| Defendant. | |

## **COMPLAINT**

PCT Litigation Trust ("Plaintiff" or "PCT")[2] established in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), through its undersigned counsel, files this complaint (the "Complaint") against Defendant Zap Solutions, Inc. d/b/a Strike ("Defendant" or "Zap") (collectively, Zap and PCT are referred to herein as the "Parties"), pursuant to Sections 547 and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), , seeking to avoid and recover all preferential transfers of property made by the Debtors to or for the benefit of Zap plus interest, attorneys' fees, and costs.

---

[1]   The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]   PCT was established for the primary purpose of pursuing litigation and distributing assets. PCT has been vested with claims and causes of actions previously held by the Debtors.

On October 18, 2023, Zap filed Proof of Claim No. 897, asserting a general unsecured, unliquidated claim.  On October 22, 2023, Zap filed Proof of Claim No. 1282, asserting a general unsecured claim in the amount of $1,239,328.76 in these Chapter 11 Cases (collectively, Claim No. 897 and Claim No. 1282 are referred to herein as the "Zap Claims").  On November 18, 2023, Prime objected to the Zap Claims.  *See Debtors' First (Substantive) Omnibus Objection to Certain Filed Proofs of Claim, In re Prime Core Technologies Inc., et al.*, Case No. 23-11161 [Docket No. 436].  This Complaint is not intended to be, nor should it be construed as, a waiver of PCT's right to further object to Zap Claims or any other payment that Zap has requested from the Debtors or the Debtors' estates for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j) ("Section 502"), and such rights are expressly reserved.  Notwithstanding this reservation of rights, certain relief pursuant to Section 502 is sought by PCT herein as further stated in Count III below. PCT alleges as follows:

## **INTRODUCTION**

1.      Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system.  The Nevada Financial Institutions Division ("Nevada FID") shut down Prime in June 2023 and Prime filed for bankruptcy shortly thereafter in August 2023.  Most of Prime's customers suffered losses and have yet to receive any of the fiat or crypto owed to them.  Zap was not among those customers.

2.      Instead, in a series of atypical transactions between May 16, 2023 and the Petition Date,[3] Zap directed Prime to transfer $29,481,000.99 USD and 1,939.50 Bitcoin ("BTC") to or for

---

[3]   Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's non-insider preference period (the "Preference Period") occurred between May 16, 2023 and the Petition Date.

the benefit of Zap (collectively, the "Transfers").  *See* Declaration of James P. Brennan (the "Brennan Decl."),[4] ¶¶ 130, 197.



3.        As one of Prime's most important customers, Zap had insight into Prime's regulatory and financial issues that other Prime customers did not.  As a result, Zap was able to foresee Prime's imminent collapse and take preventative measures to transfer fiat and crypto from Prime during this time—leaving other similarly situated creditors to bear the losses.

4.        Zap admits as much.  In its Addendum to Proof of Claim No. 1282, Zap acknowledges:  "During the period leading up to the issuance of the [Nevada FID's] Cease and Desist Order, as the Debtor's regulatory and legal problems became known in the market, and its ability to continue to provide the services bargained for under the MSA became uncertain, Zap took actions to protect its own and its customers' interests by ensuring the transfer of most of the funds held in the Customer Custody Accounts to a new, external bank account substantially titled

---

[4]        The Brennan Decl. is attached hereto as Exhibit A.

'Zap Solutions, Inc. for the benefit of its customers' (the "<u>FBO Account</u>") at a bank unrelated to the Debtor, so as to enable Zap to hold custody of customer assets without the Debtor's involvement."  *See* Addendum to Proof of Claim No. 1282, ¶9.

5.      These were not routine transfers made in the ordinary course of business.  Zap's conduct was exactly the type that section 547 of the Bankruptcy Code was enacted to prevent. After receiving certain of the Transfers during the Preference Period, Zap transferred $15,603,853.63 USD and 181.32 BTC of potential subsequent new value to Prime.  While it is Zap's obligation to establish all affirmative defenses, including subsequent new value, Zap's preference exposure is no less than $13,877,147.36 USD and 1,758.18 BTC (the "<u>Preferential Transfers</u>").

6.      Zap operates a platform called "Strike", which enables institutional and retail customers in the U.S. and in countries around the world to purchase Bitcoin and make fast payments via its "Lightning Network."[5]  *See* Jack Mallers, *Announcing Zap by Zap,* MEDIUM, (Jan. 30, 2020), https://jimmymow.medium.com/announcing-Zap-by-zap-4f578c7c8984.  Jack Mallers ("<u>Mr. Mallers</u>"), Zap's Founder and Chief Executive Officer, has stated, "Zap has become one of the most popular open-source, non-custodial, Lightning Network wallets."  Jack Mallers, *Zap is here to stay,* MEDIUM, (July 16, 2020), https://jimmymow.medium.com/zap-is-here-to-stay-6715cde5afa1.

7.      In 2019, to effectuate Zap's services, Mr. Mallers, on behalf of Zap, engaged Prime for liquidity purposes and to leverage its money-transmitter licenses (each, an "<u>MTL</u>"). Specifically, Zap transferred fiat and crypto to Prime.  Prime then held the fiat and crypto until either: (i) Zap instructed Prime to transfer fiat, or convert crypto to fiat for transfer, to others on

---

[5]     *Lightning network*, ZAP, https://strike.me/learn/what-is-the-lightning-network/ (last accessed March 2, 2026).

behalf of Zap and pursuant to Zap's directions for a fee; or (ii) Zap instructed Prime to transfer the value of certain fiat and crypto that it previously had transferred to Prime to or for the benefit of Zap and pursuant to Zap's directions for a fee.

8.      The agreements that governed Prime and Zap's relationship during the Preference Period include:  (i) Prime Trust Order Form, with an Order start date of August 1, 2022, the First Amendment to the Zap Solutions, Inc. Order Form, with an effective date of September 14, 2022, the Second Amendment to the Zap Solutions, Inc. Order Form, with an effective date of October 13, 2022, and the Third Amendment to the Zap Solutions, Inc. Order Form, with an effective date of June 1, 2023 (collectively, the "Order Form"); (ii) Prime Trust Master Services Agreement (the "MSA"); and (iii) the Service Schedule(s) and Attachment(s) that are applicable based on the services provided by Prime Trust under the Order Form and agreed between the Parties,[6] and the attached Fee Schedule, all of which are incorporated into the Order Form by reference (collectively, the "Agreements").[7]

9.      Although Prime was a Nevada state-chartered trust company, Zap never sought or received any trust or fiduciary services from Prime.  The Agreements make clear that no fiduciary relationship existed between the Parties.

---

[6]   The applicable Service Schedules include: (i) the Merchant Card Processing Services Attachment for Prime Trust API Services (the "MCP Services Attachment"); (ii) the Prime Trust Statement of Work (the "SOW"); (iii) the ACH Service Attachment for Prime Trust API Services ("ACH Services Attachment");  (iv) the Service Schedule for Prime Trust API Services (the "API Agreement"); (v) Service Schedule for Prime Trust Compliance Services ("Compliance Services Agreement"); (vi) the Service Schedule for Prime Trust Custodial Services ("Custodial Services Agreement"); (vii) Service Schedule for Prime Trust Settlement and Liquidity Services ("Settlement and Liquidity Services Agreement"); (viii) Socure Services Attachment for Prime Trust Compliance Services ("Socure Compliance Services Attachment"); (ix) Wire Services Attachment for Prime Trust API Services ("Wire Services API Attachment"); and (x) Wire Services Attachment for Prime Trust Custodial Services ("Wire Services Custodial Attachment").

[7]   The Agreements are attached as Exhibit B.

10.     The MSA provides that "[t]he Agreement ***does not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the Parties*** . . . ***nothing in the Agreement, expressed or implied is intended to give rise to any third-party beneficiary***." <u>Ex. B</u>, MSA, § 14.1.

11.     The Agreements establish that the Parties always maintained a strictly debtor-creditor relationship.

12.     Because the Agreements created a debtor-creditor relationship with Prime, the property that comprised the Transfers to Defendant consisted of estate property.

13.     Moreover, on July 18, 2025, the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") entered its *Order Granting Plan Administrator's Motion for Entry of an Order: (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief* [Docket No. 1086] (the "<u>Distribution Order</u>").  The Court also entered an opinion accompanying the Distribution Order [Docket No. 1085] (the "<u>Distribution Opinion</u>").[8]

14.     In its Distribution Opinion, the Court analyzed representative versions of agreements that integrators (like Zap) and end-users of integrators had with Prime.  The Court held that these agreements "do not establish that a trust relationship exists between End-Users, Integrators, and/or the Debtors."  *See* Distribution Opinion, at 25.

---

[8]     Zap objected to a was specifically carved out from the Distribution Opinion.  [*See* Distribution Opinion, at 2 n.5.]  Thus, while not binding on Zap *per se*, the Distribution Opinion is still highly instructive to this case.

15.     Additionally, the fiat and crypto which Prime's customers transferred to Prime were commingled to the extent that it is impossible for any party to specifically identify which funds were provided to Prime by any specific customer.

16.     The fiat that customers transferred to Prime was held by Prime in "omnibus" bank accounts in Prime's name.  These omnibus bank accounts commingled fiat that customers, including Zap, transferred to Prime with fiat from Prime's many other customers and with Prime's own fiat generated from its business operations.

17.     Likewise, the crypto that customers, including Zap, transferred to Prime was held in "omnibus" digital wallets in vaults ("Vaults") maintained by Prime, in Prime's name, at Fireblocks LLC ("Fireblocks").  These omnibus digital wallets commingled the crypto that customers transferred to Prime with Prime's own crypto that it used for corporate operations and purposes.

18.     Prime attempted to keep track of the commingled fiat and/or crypto transferred by its customers by use of an internal, omnibus ledger (the "Internal Ledger").  But the Internal Ledger was poorly maintained and later intentionally corrupted by Prime.

19.     Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries.  Accordingly, the Internal Ledger cannot be relied on to identify or trace the fiat and/or crypto that customers, including Zap, transferred to Prime.

20.     The third-party expert retained by PCT in this matter, James P. Brennan, has confirmed that it is impossible to identify, trace, or otherwise distinguish the fiat and/or crypto that Zap transferred to Prime from the fiat and crypto provided by Prime's other customers or from Prime's own fiat and crypto.  *See* Ex. A, Brennan Decl., ¶¶ 17– 204.

21.     In December 2021, Prime discovered it was unable to access a digital wallet (the "98f Wallet")[9] holding more than 11,000 ETH that had been transferred by one of Prime's customers.  Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet.  *See id.* at ¶¶ 107–111.

22.     Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customer's transfer requests, Prime went to the market to purchase ETH to cover the transfer requests.  To fund those market purchases, Prime used fiat from its omnibus bank accounts. *See id.* at ¶¶ 110–117.

23.     To hide the fact that Prime was using fiat to pay for its replacement ETH purchases, Prime created fake wire transfer entries on the Internal Ledger to make it appear that Prime received certain fiat wire transfers from one of the liquidity providers ("Liquidity Provider") who sold Prime the replacement ETH.  *See id.* at ¶¶ 112–125.  In fact, none of those fiat wire transfers ever occurred.  *See id.* at ¶¶ 112–126.

24.     Prime's use of fiat from the commingled, omnibus bank accounts to purchase replacement ETH left it with a nearly $82 million shortfall in the omnibus bank accounts.  As a result, Prime lacked the amount and asset type necessary to back the deposits recorded on internal account entries on the Internal Ledger.

25.     Prime's falsified wire transfer entries to cover its replacement ETH purchases, coupled with Prime's failure to properly reconcile and record other transactions on its Internal Ledger, have resulted in Prime being unable to trace specific transfers that were made by any particular customer.  *See* Ex. A, Brennan Decl., ¶¶ 112–125.

---

[9]     The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f."

26.     Bank account statements and blockchain data confirm that the fiat and crypto transferred from Prime to or for the benefit of Zap during the Preference Period were not the same fiat and crypto Zap originally transferred to Prime. *See id.* at ¶¶147– 192, 202–204.  Rather, these Transfers to or for the benefit of Zap came from commingled bank accounts and omnibus digital wallets. *See id.*

27.     Further, in its Distribution Opinion, the Court also found that "[t]he overwhelming evidence establishes that the Debtors hopelessly commingled assets" such that "the fiat held by the Debtors is not traceable" and the "the hopeless commingling would not allow the cryptocurrency to be traced." *See* Distribution Opinion at 23–24, 27, 30.

28.     Prime's Transfers to or for the benefit of Zap during the Preference Period exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's Chapter 11 filing on the Petition Date.

29.     The Transfers also gave Zap an unfair advantage over Prime's many other creditors that did not execute similar transactions to withdraw fiat and/or crypto they had transferred to Prime.

30.     The Preferential Transfers to or for the benefit of Zap during the Preference Period must be returned to the Debtors' estates pursuant to Sections 547 and 550 of the Bankruptcy Code, plus interest, attorneys' fees, and costs.

31.     During the course of this Adversary Proceeding, PCT may learn (through formal discovery or otherwise) of additional transfers made to, or obligations incurred by, Zap that are avoidable and/or recoverable under the Bankruptcy Code.  PCT intends to avoid and/or recover all such transfers and obligations made to or for the benefit of Zap and, accordingly, reserves the right to amend this Complaint.

## PARTIES

32.     Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the Court confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644].  The Plan was consummated on January 5, 2024 (the "Effective Date").[10]  On the Effective Date, PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to PCT Litigation Trust.  *See* Plan, § 6.21.  PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn.  *See id.*, § 1.118.

33.     Defendant Zap Solutions, Inc.[11] is a corporation formed on May 21, 2019, under the laws of Delaware.  Defendant Zap Solutions, Inc. maintains a primary address in Dover, Delaware.

34.     In the *Second Amended Plan Supplement with Respect to Debtors' Amended Joint Chapter 11 Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No. 539] (the "Plan Supplement"), Prime identified preference claims against Zap as "Exempted Preference Claims" and, thus, these claims were not released on the Effective Date of the Plan.[12]

---

[10]   *See* Docket No. 694.

[11]   Zap Solutions, Inc. was originally "Zap Technologies, LLC," a corporation formed on May 21, 2019 under the laws of Illinois.  Zap Technologies, LLC merged with Zap Solutions, Inc. in June 2019.

[12]   Prime filed the Plan Supplement under seal.  [*See* Docket No. 539.]  Prime reserves its right to maintain the confidentiality over the other "Exempted Preference Claims" identified in the Plan Supplement.

## JURISDICTION AND VENUE

35.     The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor." *See* Plan, § 12(c).  This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust."  *Id.* at §§ 12(s), (u).  As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

36.     This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter final orders in connection with the matters contained herein.

37.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Plaintiff confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the Parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

38.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

39.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and sections 105, 542, 547, 548, 550 and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

40.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  BTC and Ethereum ("<u>ETH</u>") are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies.

41.     All cryptocurrencies exist on a "blockchain."  A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all cryptocurrency transactions that occurred on the blockchain at a particular point in time.  The "blocks," in turn, are linked on the chain in chronological order — a "block"-"chain."

42.     There are many different blockchains.  The first and most popular blockchain was the Bitcoin blockchain.  Another important blockchain is the Ethereum blockchain, which made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens, including ETH.

43.     Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys." These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

44.     "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain digital address.  Like public keys, private keys consist of multi-digit alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

45.     Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

46.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

47.     A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

48.     A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method.  These types of physical hardware devices are provided by companies such as Trezor:



49.      Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet. However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device.  To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to initiate transfers of crypto kept on the digital wallet.  Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

50.      Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed.  They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If

someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## GENERAL ALLEGATIONS

### I.    Prime's Business Operations

51.    Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

52.    Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

53.    In the years that followed, as the crypto markets and industry grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

54.    Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining the state money-transmitter licenses (each, an "MTL") required to conduct money transmission.

55.    Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

56.    Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend time, effort, and financial resources necessary to obtain their own MTLs.

57.    Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

**II.      Zap Engaged Prime and Quickly Became One of Prime's Most Important Customers**

58.      Zap operates a digital payments platform.  Zap provides institutional and retail customers with access to a variety of financial products and services for sending and receiving Bitcoin and multiple other types of fiat currencies "instantly and cheaply," with "no transaction fees" and "in as little as 5 seconds."  *See Secure Global Payments That Just Work*, STRIKE, https://strike.me/payments/ (last accessed Mar. 2, 2026); *Move Your Money Worldwide*, STRIKE, https://strike.me/sendglobally/ (last accessed Mar. 2, 2026).

59.      To effectuate these services, Mr. Mallers, Zap's founder, engaged Prime in 2019. Zap transferred fiat and crypto to Prime.  Prime then held the fiat and crypto until either: (i) Zap instructed Prime to transfer fiat, or convert crypto to fiat for transfer, to others on behalf of Zap and pursuant to Zap's directions for a fee; or (ii) Zap instructed Prime to transfer the value of certain fiat and crypto that it previously had transferred to Prime to or for the benefit of Zap and pursuant to Zap's directions for a fee.

60.      Prime also offered compliance services related to "anti-money laundering" and "know-your-client" laws and regulations (the "AML/KYC" Services).

61.      Once onboarded to Prime, Zap quickly became one of Prime's top customers.  By 2022, Prime projected Zap to account for 13% of Prime's total revenue.

**III.     The Agreements Make Clear that the Parties Had a Strictly Debtor-Creditor Relationship**

62.      At all relevant times, the Agreements were valid and enforceable contracts governed by Nevada law.  *See* Ex. B, MSA, § 13.1 ("This Agreement is governed by and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.").

63.     The Agreements and the parties' conduct make clear that Prime and Zap intended, formed, and maintained a debtor-creditor relationship—not a trust, fiduciary, or securities intermediary relationship.

64.     The Order Form specified that Prime would provide certain services to Zap, including but not limited to, API services, compliance services, custodial services, payment rails, and liquidity services.  *See* Ex. B, Order Form, 1–2.  The Order Form did not identify any trust or fiduciary services for Prime to provide to Zap.  *Id.*  The Order Form covered the period from August 1, 2022 to July 13, 2023, and was in effect at the time of the Transfers.

65.     The Order Form states: "This Order Form is governed by the Prime Trust Master Services Agreement agreed between the Parties ("MSA"), and the Service Schedule(s) and Attachment(s) that are applicable based on the services provided by Prime Trust under this Order Form and agreed between the Parties, and the attached Fee Schedule, all of which are incorporated into this Order Form by this reference (collectively, the "Agreements")."

66.     The MSA unequivocally disclaims any fiduciary or trust relationship.  The MSA provides that, "[t]he Agreement ***does not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the Parties*** . . . ***nothing in the Agreement, expressed or implied is intended to give rise to any third-party beneficiary***."  Ex. B, MSA, § 14.1.

67.     The Order Form also permitted Prime to "at all times during the Term hold such cash or Fiat Currency in a Deposit Account (as defined in the User Agreement); provided, however, that Customer acknowledges and agrees that any earnings, income or compensation received by Prime Trust in holding such cash or Fiat Currency in a Deposit Account ***shall be retained by Prime Trust and no portion of any such earning, income or compensation shall be paid to or for End-User***."  Ex. B, Order Form (emphasis added).

68.     The isolated reference in the MSA to Article 8 of the Nevada Uniform Commercial Code (the "UCC") does not change the debtor-creditor relationship between Prime and Zap.

69.     Prime never acted as, and was not treated as, a "securities intermediary" for Zap within the meaning of Article 8 during the course of Prime and Zap's relationship.

70.     Article 8 obligates securities intermediaries to "promptly obtain and thereafter maintain a financial asset in a quantity corresponding to the aggregate of all security entitlements it has established in favor of its entitlement holders with respect to that financial asset."  NRS § 104.8504(a).  This provision is known as the "perfect match requirement."

71.     A comparison of the fiat recorded on Prime's Internal Ledger with the fiat held in Prime's bank accounts established that Prime routinely had a significant shortfall in fiat.  *See* Ex. A, Brennan Decl., ¶¶ 205–18.

72.     As of June 30, 2022, Prime's Internal Ledger reflected a running balance of approximately $1.83 billion in fiat, while Prime only maintained approximately $1.28 billion in fiat in Prime's bank accounts.  Far from a perfect one-to-one match, Prime had a shortfall of nearly $600 million during this time.  *See id.* at ¶ 209.

73.     Similarly, as of May 31, 2023, Prime's Internal Ledger reflected a running balance of approximately $238 million in fiat, while Prime only maintained approximately $116 million in fiat in Prime's bank accounts.  In other words, during the Preference Period, Prime had a fiat shortfall of approximately $123 million.  *See id.*

74.     Prime likewise failed to maintain a one-to-one match of BTC.  The graph below shows the daily difference between BTC held across all Prime-controlled on-chain addresses and the corresponding Internal Ledger balance from December 2018 through May 2023.  When the

differences were below zero, Prime maintained fewer BTC in Prime-controlled wallets than it recorded on the Internal Ledger.  In other words, Prime failed to maintain the perfect one-to-one match of BTC that would be required by Article 8 (if Article 8 applied) for the vast majority of its existence.



*See id.* at ¶ 217.

75.     Prime failed to maintain the perfect match for crypto and fiat because, as noted above, the Agreements entitled Prime to take title to the assets and fiat and crypto transferred to Prime were commingled in Prime omnibus bank accounts and Prime omnibus digital wallets.

76.     Other provisions of the Agreements contained provisions that were inconsistent with an intent to treat Prime as a securities intermediary.  For example, the Custodial Agreement contained a restriction on Zap's transfer rights: "Neither Party may assign its rights or obligations under the Agreement without the other Party's prior written consent. . . . [A]ny attempt by either Party to transfer its rights or obligations under the Agreement will be void."  <u>Ex. B</u>, Custodial Agreement, § 14.2.  This provision is inconsistent with the UCC's requirements that a securities

intermediary comply with all entitlement and change orders from the entitlement holder.  *See* NRS §§ 104.8507, 104.8508.

77.     The Custodial Agreement also limited Prime's liability for its customers' losses due to fraud.  "Customer is solely responsible for any losses Customer incurs due to erroneous or fraudulent Transactions that result solely from Customer's conduct in using of the Prime Trust Services."  Ex. B, Custodial Agreement, § 3.7(c).  This provision is inconsistent with the Nevada UCC's liability scheme for securities intermediaries.  *See* NRS § 104.8507(2).

78.     The Custodial Agreement also provides:  "[T]o the maximum extent permitted by Applicable Law, under no circumstances, and regardless of the nature of the claim, shall either party (or its affiliates) be liable to the other for loss of profits, sales or business, loss of anticipated savings, loss of use or corruption of software, data or information, work stoppage or any consequential, incidental, indirect, special, cover, punitive, or Exemplary damages arising out of or related to the agreement, even if apprised of the likelihood of such losses or damages and regardless of the form of action."  *Id.*, § 11.1.  This provision is inconsistent with the Nevada UCC's liability scheme for securities intermediaries.  *See* NRS § 104.8507(2).

79.     Finally, as explained more fully below, Prime hopelessly commingled fiat and crypto it received from Prime customers, making it impossible to trace any asset allegedly subject to a securities entitlement to that alleged entitlement holder.  Under these circumstances, fiat and crypto associated with Zap and its customers are property of Prime's estates, and Prime is entitled to recover the Preferential Transfers.

80.     Accordingly, the Agreements establish that the Parties intended, formed, and maintained at all relevant times a debtor-creditor relationship.

IV.   **Zap Knew Prime's Downfall Was Imminent, Took Measures to Protect Itself, and Accelerated Prime's Insolvency**

81.    Zap was aware of Prime's precarious financial position weeks—if not months—before Prime's other customers and the public became aware.  Having that early knowledge, Zap undertook deliberate measures to protect itself from Prime's impending collapse and took actions that directly contributed to Prime's insolvency and, ultimately, its filing for bankruptcy.

82.    In November 2022, in light of regulatory scrutiny concerning Prime's operations in certain states, such as South Dakota, Zap pushed Prime to consider adopting an "MTL Omnibus Model" whereby Zap would leverage its own MTL and partner with Prime such that Prime would no longer conduct KYC on behalf of Zap and its customers.

83.    As shown in the notes from a call on November 18, 2022 between Prime and Zap personnel, Mr. Mallers, acting on behalf of Zap, was aware of Prime's omnibus structure.  He wanted to control the KYC of Zap's customers and "repeatedly used the argument that Prime Trust does not have bank accounts for each end-user" but rather just "a bank account for Strike," as justification.  Mr. Mallers then warned that if Prime was not willing to "serve [Zap] in this capacity then that[] [would be] a problem."



84. On March 15, 2023, the Banking Commissioner of the State of Connecticut issued a consent order (the "CT Consent Order") requiring Prime to: (1) cease and desist from engaging in the business of money transmission in Connecticut, (2) pay a $10,000 penalty to the Connecticut Department of Banking, and (3) pay $3,375 to the Treasury as payment for bank licensing fees.

85. By no later than March 2023, Zap was working with Prime to restructure operations between Prime and Zap to navigate state regulator responses in several states, including Texas and Connecticut, whereby Zap would use its own MTL and Prime would retitle some internal account labels on the Internal Ledger to "Zap Solutions, Inc. FBO [customer name]".

86. Senior executives of both companies, including Zap's CEO Mr. Mallers and Prime's CEO ██████ ("██████"), met to discuss a "playbook" for proceeding in the face of imminent regulatory shut down of Prime's operations. Zap was therefore privy to highly sensitive

information regarding the regulatory challenges that Prime was facing in the period immediately prior to the Preference Period.

87.     Around this same time, Prime also was dealing with the consequences of its inability to access the ETH that was locked in the 98f Wallet, the use of fiat from its omnibus bank accounts to purchase replacement ETH, and its growing inability to cover outgoing transfer requests.  Rumors of Prime's financial difficulties reached Nevada FID regulators who, starting in late-2022, began pressing Prime for information.

88.     On May 26, 2023, several executives of Prime, including ███████, attended a meeting with Nevada FID regulators.

89.     Immediately preceding Prime's meeting with Nevada FID, Mr. Mallers, on behalf of Zap, demanded significant amendments to Zap's API Agreement with Prime.

90.     Mr. Mallers took his demands directly to Mr. Law and Prime's Senior Vice President, ███████ ("███████").  As ███████ reported in an internal email to ███████ and others, Zap wanted to "renegotiate their existing API agreement."  Mr. Mallers insisted that Zap be "convert[ed] to a month-to-month" contract and sought to reduce the number of its capacity blocks at Prime from four to one.  ███████ also noted that Zap had been "mov[ing] their BTC custody outside Prime Trust" and was "likely to continue to bifurcate their business further from PT."

91.     On May 25, 2023—the day before Prime's meeting with the Nevada FID—███████ agreed to Zap's amendment demands.  ███████ stated: "Initially Jack had told me he was interested in just extending and kicking the can down the road, but his team must have asked him for the amendment before then."



From: ▮▮▮ ▮ @primetrust.com>
Date: Thu, May 25, 2023 at 11:46 AM
Subject: Re: Zap Amendment Approval Needed
To: ▮▮▮▮▮▮ @primetrust.com>
Cc: ▮▮▮ @primetrust.com>, ▮▮▮▮ @primetrust.com>, ▮▮▮▮ @primetrust.com>, ▮▮▮ @primetrust.com>

I'm ok with the amendment then; adding ▮▮▮ as he's typically the one signing these things.
Initially Jack had told me he was interested in just extending and kicking the can down the road,
but his team must have asked him for the amendment before then.

92.    On June 6, 2023, in response to Prime's ongoing issues with state regulators, Zap urged Prime to "consult with [Zap] before [ ] submit[ting] a proposed plan to a regulator", "advocate for a *minimum* two-week notice period to all customers across the board", and demanded that Prime "confirm with the regulator that [Prime] intend[s] to enable FBO accounts for integrators that have money transmitter licenses (or are exempted) in the state in question."



From: **Adele Faure** <adele@strike.me>
Date: Tue, Jun 6, 2023 at 3:18 PM
Subject: Follow-up on regulatory call today
To: ▮▮▮▮ @primetrust.com>
Cc: Jack Mallers <jack@strike.me>, Michael O'Connor <michael.oconnor@strike.me>

Hi ▮▮▮
Thank you for our call a little earlier today. I'm summarizing in the email some of the items we discussed and next steps.
*Process for future state withdrawals*
We discussed that, going forward, for any states where Prime Trust loses the ability to operate, that Prime Trust would try to do the two following things in its discussions with regulators:

> **1. Withdrawal plan.** You indicated that regulators typically request you to submit a timeline for ceasing operations in the state for their approval. For example, the timeline you submitted to Idaho had a Friday, June 9 deadline (communicated to integrators on June 5). We would urge you to submit initial plans that have *longer* notice timelines, which can then be revised downward if you learn that the regulator deems these timelines to be too long.
> a. As you saw in Texas, there is precedent for regulators providing more time on the basis of consumer harm. Prime Trust should always advocate to obtain more time on this basis.
> b. Specifically, we would urge you to advocate for a *minimum* two-week notice period to all customers across the board, due to the customer harms caused by an overly hasty termination of services in the state. (See customer harm bullets below.) This time period is sufficiently short to be acceptable to regulators, but also matches the typical direct deposit cycle.
> c. *If* the regulator nonetheless comes back and indicates your proposed timelines are too long, then we'd recommend updating the proposal to reduce the timelines, *but with a specific carve-out for direct deposit*

*customers* – in particular, this smaller subset of customers should have a minimum two-week notice, due to most direct deposits being on a two-week cycle.

**2. Retitling**. Please confirm with the regulator that you intend to enable FBO accounts for integrators that have money transmitter licenses (or are exempted) in the state in question (i.e., the model that was adopted in Texas, etc.).
  a. Retitling should always be the "Plan A" any time Prime Trust loses the ability to operate a state.
  b. As a reminder, with retitling, the end customers are only customers of the integrator (here, Strike), and it is solely the integrator that's providing the money transmission services to those end consumers. (For convenience, I'm attaching the prior information / talking points we'd sent you on this point for Connecticut -- same points can be made here.)

In general, we would urge you to consult with us before you submit a proposed plan to a regulator, as we can help provide you with helpful input.
*Maine*
You indicated on the call that there was no specific hard timeline for customers in Maine yet, since discussions with the regulator were ongoing. However, ▮▮▮▮▮ yesterday provided a specific timeline for Maine customers that also blocked new contributions and accounts as of this Friday (see attached snippet from Slack). Can you please clarify who is correct, given these conflicting statements?
*Idaho & Maine next steps*
We understand that you already provided a proposed timeline to Idaho that had a very short timeline for customer contributions (specifically, no customer contributions after this Friday). On the call, you indicated that you would (1) go back to the regulator to ask for additional time for direct deposit customers (i.e., an extension of the block on contributions for direct deposits), given the severity of the impact of missing a paycheck. You also indicated that you (2) would broach the topic of retitling with them. If it turns out, after all, that Maine is also in this category – where Prime Trust has already communicated a specific timeline to the regulator – we'd appreciate it if you could also follow up with them on the same two items.
We would much appreciate it if you could let us know about the outcome of these discussions as soon as feasible, so that we can take the necessary steps to protect our customers.
*Consumer harms - bullets*
As discussed, to aid in your discussions with regulators, here are two bullets about the consumer harms that arise from an overly hasty service termination timeline:

  • Many of our customers receive direct deposits of their paychecks to their accounts. If customers are only given a very short notice period that they need to change the destination of their direct deposits, their paycheck will not reach their account and will get routed back to their employer, resulting in significant, potentially weeks-long delays. Many Americans live paycheck to paycheck, and

so can experience real harm from a delay in getting their paychecks. For example, such delays could cause someone to fail to make rent in a timely way, or otherwise be unable to afford daily necessities.

  • Customers rely on us for a range of services, including making payments to family members overseas, etc. Providing only a few days' notice that these services they depend on are being terminated gives them limited time to find alternative options.

There are a few other arguments to be made here as well, but I would start with the above.
Please let me know if you have questions about the above. I look forward to hearing updates from you, and will give you a call tomorrow to check in.
Thanks again,
Adele

--

**Adele Faure**
General Counsel
Menlo Park, CA

93.      Zap insisted that Prime enable "FBO accounts" to create the appearance that the

fiat and crypto Zap had transferred to Prime was held for the benefit of Prime's customers since

Zap knew that Prime did not hold fiat and crypto in segregated bank accounts or segregated digital wallets and instead held fiat and crypto in Prime omnibus bank accounts and omnibus digital wallets

94.     Zap was not merely preparing in case Prime lost additional MTLs; it was actively trying to safeguard the fiat and crypto that Zap had transferred to Prime from exposure in a potential insolvency proceeding.

95.     Zap admits as much.  In the Addendum to Proof of Claim No. 1282, Zap states:

> During the period leading up to the issuance of the [Nevada FID's] Cease and Desist Order, as the Debtor's regulatory and legal problems became known in the market, and its ability to continue to provide the services bargained for under the MSA became uncertain, Zap took actions to protect its own and its customers' interests by ensuring the transfer of most of the funds held in the Customer Custody Accounts to a new, external bank account substantially titled "Zap Solutions, Inc. for the benefit of its customers" (the "FBO Account") at a bank unrelated to the Debtor, so as to enable Zap to hold custody of customer assets without the Debtor's involvement.

*See* Addendum to Proof of Claim No. 1282, ¶9.

96.     Thus, in Zap's own words, Zap accelerated outgoing transfers from Prime to protect its own interests.  By doing so, Zap exacerbated Prime's collapse and obtained an advantage over similarly situated creditors.

**V.      The Preferential Transfers**

97.     Only a few days after Prime's meeting with the Nevada FID, with a renegotiated API Agreement in hand and increased flexibility to terminate its relationship with Prime, Zap proceeded to rapidly offload its entire business from Prime.

98.     On May 30, 2023, Zap requested that Prime transfer 141.26 BTC to Zap.  On June 2, 2023, Zap requested Prime transfer 1,350 BTC to Zap.  These two requests alone accounted for approximately ~*70%* of the total BTC that Prime transferred to or for the benefit of Zap during

the Preference Period.  *See* <u>Ex. A</u>, Brennan Decl., ¶ 200.  Seven of the June 2 BTC transfers were the largest outgoing transfers Zap had ***ever*** requested from Prime.



*See id.* at ¶ 298.

99.      The pattern of Zap's transaction activity changed dramatically during the Preference Period.  In the 90-day pre-Preference Period, Prime conducted 134,820 outgoing transfers totaling 2,874 BTC to or for the benefit of Zap.  By contrast, during the course of just 28 days during the Preference Period, Prime conducted 19,251 outgoing transfers totaling 1,939.50 BTC to or for the benefit of Zap.  *See id.* at ¶ 197.

100.      Zap's average outgoing BTC transfers during the Preference Period increased significantly by 347.2%.  *See id.* at ¶ 199.

101.      At the same time, Zap's fiat activity shifted in a manner consistent with Zap offloading its entire business from Prime.  In the pre-Preference Period, the highest total outgoing transfer amount transferred to or for the benefit of Zap on any given day was $4,192,946.19 on

March 24, 2023. *See id.* at ¶ 133.  In stark contrast, the highest total outgoing transfer amount transferred to or for the benefit of Zap on any given day during the Preference Period was $12,418,006.92 on June 9, 2023.  *See id.* This represents an increase of 196% in the highest daily outgoing amount transferred to or for the benefit of Zap on any given day during the Preference Period compared to the Pre-Preference Period. *See id.*

102.    On June 9, 2023, Prime transferred $12,418,006.92 to or for the benefit of Zap, representing 41.12% of the total outgoing fiat to or for the benefit of Zap during the Preference Period.



103.    Around this same time, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and Prime's potential bankruptcy—were increasingly leaking to the crypto and financial markets.

104.     For example, on June 7, 2023, David Bailey posted on X.com: "Major custodian about to declare bankruptcy without last minute bailout. Take your Bitcoin off exchanges, even Bitcoin only platforms."



*See* https://x.com/DavidFBailey/status/1666573243879178246?s=20.

105.     Then, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime.  *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, CoinDesk (Jun. 8. 2023),        https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.   CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

106.     On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals."

*See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID

(Jun. 21, 2023).[13]  Nevada FID ordered Prime to cease accepting all fiat and crypto deposits.  *Id.*

107.    Two days after the Cease and Desist Order, BitGo canceled its acquisition of

Prime.  One report explained that Prime "ha[d] been losing clients and deposits to competitors for

weeks amid mounting concerns over its business."  *See* Jamie Crawley & Danny Nelson, *Crypto*

*Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023).[14]

108.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver,

Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth

Judicial District Court of the State of Nevada (the "Nevada Court").  *See Sandy O'Laughlin, in her*

*capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial*

*Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime*

*Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023).[15]  The Nevada FID

Petition directed Prime to cease and desist all retail trust activities.  *Id.*

109.    The Nevada FID Petition also contained factual findings made by Nevada FID

that further corroborate the fact that Prime held fiat transferred to it from customers in commingled,

omnibus accounts.

110.    Specifically, Nevada FID found that "P[rime] purchased additional digital

currency using customer money from its ***omnibus customer accounts***."  *Id.* at 6 (emphasis added).

---

[13]      *Available*      at      https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-
       %20C%20and%20D%206.21.23.pdf.

[14]    Available   at   https://www.coindesk.com/business/2023/06/22/cryptp-custody-firm-bitgo-cancels-prime-trust-
       acquisition/.

[15]    Available at https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime
       %20Core%20Technologies%20et%20al%20Petition.pdf.

111.     The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals." *Id.* at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)." *Id.* at 7.

112.     On July 14, 2023, the Nevada Court placed Prime under receivership.

113.     On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

## VI.     All Preferential Transfers To or For the Benefit of Zap During the Preference Period are Avoidable

114.     Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Transfers performed by PCT and the third-party expert it retained in this matter, PCT has determined that it may avoid many of the Transfers even after taking into account Zap's potential affirmative defenses.[16]   Accordingly, certain of the Transfers to Defendants must be returned.  *See* 11 U.S.C. §§ 547(b), 550.

115.     In total, Prime transferred $29,481,000.99 (the "Fiat Transfers") and 1,939.50 BTC (the "Crypto Transfers") to or for the benefit of Zap between May 15, 2023 and June 23, 2023.[17]  *See* Ex. A, Brennan Decl., ¶¶ 130, 197.  Zap transferred $15,603,853.63 and 181.32 BTC of potential subsequent new value to Prime after receiving certain of the Transfers during the Preference Period.  *See id.*, ¶¶ 131, 194.  Therefore, Zap's preference exposure is no less than $13,877,147.36 and 1,758.18 BTC.  *See id.*

---

[16]   It is Zap's obligation to establish any affirmative defenses it asserts in this action, including any potential subsequent new value defense.

[17]   The Prime entity which made the Transfers was Prime Trust, LLC.

116.     Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

117.     First, the transfer must be "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1).

118.     Second, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made."  11 U.S.C. § 547(b)(2).

119.     Third, the transfer must have been "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3).

120.     Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition.  11 U.S.C. § 547(b)(4).

121.     Fifth, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made.  11 U.S.C. § 547(b)(5)(A)–(C).

122.     The Preferential Transfers were transfers to or for the benefit of Zap of an interest of Prime's property during the Preference Period.

123.     Prime executed the Preferential Transfers during the Preference Period to satisfy the debt Prime owed to Zap under the Agreements.

124.     The Preferential Transfers were made while Prime was insolvent.  As of the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[18]  If not avoided, the Preferential Transfers will enable Zap to

---

[18]   *See Schedules of Assets and Liabilities for Prime Core Technologies Inc. (Case No. 23-11161)* [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC (Case No. 23-11162)* [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC (Case No. 23-11164)* [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC (Case No. 23-11168)* [Docket No. 178].

receive more than Zap would have received on account of its claim in a hypothetical liquidation under chapter 7 had Prime not made the Preferential Transfers in satisfaction of Prime's antecedent debt to Zap.[19]

125.    PCT's third-party expert in this matter confirmed that based on API log audit data, Jack Mallers, Casey Epton, and Anthony Cao, using the email addresses zap@jackmallers.com, casey@strike.me, and anthony@strike.me, respectively, directed each of the fiat Preferential Transfers to or on behalf of Zap from Prime and each of the crypto Preferential Transfers to or on behalf of Zap.  *See* Ex. A, Brennan Decl., ¶¶ 134, 195.

126.    While Zap's transactions were recorded in Prime's Internal Ledger under internal account names, including "Zap Solutions, Inc.", "Zap Solutions, Inc. (Customer Name)," and "(Customer Name) Account," these various internal account names did not correspond with unique, segregated bank accounts.  They were solely internal labels use in the Internal Ledger.

127.    During the course of this proceeding, PCT may learn (through discovery or otherwise) of additional transfers made to or for the benefit of Zap during the Preference Period.. It is PCT's intention to avoid and recover all transfers made by Prime of an interest of Prime in property that were made to or for the benefit of Zap or any other transferee during the Preference Period.

128.    PCT reserves its right to amend this original Complaint to include: (i) further information regarding the Transfers; (ii) additional transfers; (iii) modifications of and/or revisions to Zap's name; (iv) additional defendants; and/or (v) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to PCT at any time during this

---

[19]    *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

**VII.    Prime Commingled Fiat in Omnibus Bank Accounts in Prime's Name and Maintained Poor Reconciliations**

129.    The fiat that Zap and other customers transferred to Prime was not segregated into separate bank accounts by customer.  *See* <u>Ex. A</u>, Brennan Decl., ¶ 78.  Instead, the fiat was held in one or more omnibus bank accounts in Prime's name with fiat other customers transferred to Prime as well as fiat that Prime generated from its own business operations.  *See id*.

130.    Prime maintained bank accounts primarily at BMO Harris Bank, N.A. ("<u>BMO</u>"), Cross River Bank ("<u>CRB</u>"), Signature Bank ("<u>Signature</u>"), Royal Business Bank ("<u>RBB</u>"), and Lexicon Bank ("<u>Lexicon</u>").  *See id.* at ¶ 12.

131.    The majority of the Transfers from Prime to or for the benefit of Zap during the Preference Period were from one of Prime's omnibus accounts in its own name at BMO and CRB.[20]  *See* <u>Ex. A</u>, Brennan Decl., ¶ 136.  *See also* Treasury Master Services Agreement, dated January 14, 2022, between Prime Trust, LLC and BMO Harris Bank N.A. (the "<u>BMO Agreement</u>").[21]

132.    The BMO Agreement specifically provides that it "***is not for the benefit of any other person and no other person shall have any right against [Prime] or [BMO Harris] hereunder.***"  See <u>Ex. C</u>, BMO Agreement, § 15(e) (emphasis added).

133.    The BMO Agreement does not state that fiat was held "in trust for" or "for the benefit of" any party other than Prime.  *See* <u>Ex. D</u>, BMO Agreement.

---

[20]    The remaining transfers included incoming and outgoing ACH transactions and incoming credit card transactions through Prime's accounts held at CRB.  *See* <u>Ex. A</u>, Brennan Decl., ¶ 137.

[21]    A copy of the BMO Agreement is attached as <u>Exhibit C</u>.

134.     Indeed, in Prime's onboarding documents with BMO, Prime designated "Prime Trust, LLC" as the sole "Legal Entity for Which Beneficial Ownership is Being Provided."  *See* Ex. D, Certification Regarding Beneficial Owners of Legal Entity Customers between Prime Trust, LLC and BMO Harris Bank N.A. (the "BMO Certification").[22]

135.     Prime regularly transferred fiat between its various omnibus accounts, further commingling the funds.  *See* Ex. A, Brennan Decl., ¶¶ 78–94.

136.     For example, Prime used one BMO account ("BMO x3077") primarily to make wire transfers.  *See id.* at ¶ 83.

137.     BMO x3077 held commingled funds that it regularly received from other Prime omnibus bank accounts and from other Prime customers.  *See id.* at ¶¶ 84.

138.     At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("BMO x9934"), because the latter account offered a higher rate of interest.[23]  *See id.* at ¶¶ 86.

139.     The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077.  *See id*. at ¶ 85.  Because the funds in BMO x3077 were commingled, BMO x9934 also contained commingled funds.  *See id.* at ¶¶ 87–89.

140.     In addition to commingled funds from BMO x3077, BMO x9934 contained some funds transferred from other sources, such as Prime's accounts at CRB and Signature.  *See id.* at ¶ 87.

---

[22]   A copy of the BMO Certification is attached as Exhibit D.

[23]   BMO's terms and conditions provided that "interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion." *See* BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions, dated July 2021, attached as Exhibit E, § 25.  Because Prime designated itself as the beneficial owner of its BMO accounts, Prime was entitled to the interest produced by these accounts (consistent with the Agreements). *See* Ex. D, BMO Certification.

141.    Prime's omnibus accounts at CRB and Signature operated in a largely similar manner as BMO x3077—i.e., they contained commingled funds that had been transferred from other Prime bank accounts containing funds transferred to Prime by other Prime customers. *See id.* at ¶ 88.

142.    For instance, CRB account ("CRB x9892") and CRB account ("CRB x4453") were omnibus bank accounts at CRB utilized by Prime. *See id.* at ¶ 89.  These accounts were used primarily for internal transfers and payments via automated clearinghouse ("ACH"). *See id.*  Prime used BMO x3077, CRB x9892, or CRB x4453 depending on whether Prime needed to make transfers via wire or ACH.  *See id.*

143.    Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and ACH transfer requests.  *See id.* at ¶ 82.

144.    Prime typically made transfers between its omnibus bank accounts in round numbers, without reference to any specific transactions.  *See id.* at ¶ 92.  This suggests that Prime simply moved funds between its omnibus bank accounts on an estimated, as-needed basis instead of in response to specific transaction activity.  *Id.*

145.    Prime would also transfer fiat between bank accounts that were primarily used for Prime's corporate operations and omnibus bank accounts that contained fiat transferred to Prime by its customers.  *See id.* at ¶ 28.

146.    Because Prime did not segregate fiat and crypto transferred to it by one customer from fiat and crypto transferred to it by another customer, or from the fiat or crypto generated by Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts owed on its Internal Ledger.  *See id.* at ¶¶ 32–34.

147.    However, Prime's inadequate internal cash management practices make identifying which bank account transfers corresponded with which specific customer transactions reported on Prime's Internal Ledger extremely difficult.  *See id.* at ¶ 37.

148.    █████████ ("████████"), Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Internal Ledger to determine the amounts of fiat or crypto that Prime owed to its customers:

> Q:    And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?

> A:    I would pull the general ledger record out of the Prime Trust Core system.

Deposition of █████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "████ Dep."), 89: 19–25.

149.    Prime maintained substandard reconciliation processes throughout its history, including with respect to its Internal Ledger.  *See* Ex. A, Brennan Decl., ¶¶ 95–108.  This further hindered the ability of Prime or anyone else to specifically identify which fiat or crypto had been transferred to Prime by which customer.  *Id*.

150.    Prime did not perform regular reconciliations of its assets and, at least prior to March 2021, any reconciliations that Prime did conduct were manual.  *See id*.

151.    Former Prime employees testified that Prime commingled fiat and crypto transferred to Prime by its customers and that Prime's assets, and its reconciliation processes were poorly maintained.

152.    █████████ testified that "[r]econciliations were not being done in a timely manner." ████Dep., 38: 23–24.

153.        ██████████ ("████████"), Prime's former Chief Financial Officer,

testified:

> Q:    Are you aware of any instances in which what would be considered
>       customer assets were commingled with company assets in an account?
>
> A:    I think there were instances where that did happen based off of the
>       management in the financial operations team where we might have had
>       balances that they might have commingled, but I don't remember the—I
>       don't remember how that happened.

Deposition of ██████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del.

Nov. 16, 2023) (the "██████Dep."), 41:19–42:4.

154.        ██████████ also testified that "[i]t would not surprise" him if fiat and crypto

transferred by customers were commingled with company assets because "the hygiene of the

financial operations team, in retrospect, was not as good as it should have been." *See id.* at 213:15–

22.

155.        ██████████ ("████████"), Prime's former Senior Vice President of Operations

and Reconciliations, also testified about Prime's reconciliations processes both before and after

March 2021:

> Q:    When you say it was a problem, what do you mean?
>
> A:    There just wasn't very good reconciliation tools.  Everything was done
>       manually.  So I was brought in to work on building these tools and making
>       them more automated. . .

██████ Dep., 19:23–20:5.

156.        ██████████ prepared a report for a July 12, 2021, audit committee meeting which

identified the risks associated with Prime's handling of fiat and crypto, reconciliation practices,

and general mismanagement of corporate functions.  Most of these practices were considered to

present "high" or "extreme" levels of risk:

| 2 | | Finding and Response Summary Matrix | | | | |
|---|---|---|---|---|---|---|
| Risk | Reference | Finding | Target | Response | Completed | Verified |
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

157.    Prime's repeated transfers of already commingled funds between omnibus bank accounts, and Prime's persistent failure to maintain proper asset tracking and reconciliation processes, further exacerbated the commingling of fiat transferred to Prime by Zap with fiat transferred to Prime by Prime's other customers and fiat generated from Prime's own business operations. *See* <u>Ex. A</u>, Brennan Decl., ¶¶ 95-108.

## VIII.  Prime Transferred Commingled Fiat to or for the Benefit of Zap During the Preference Period

158.    Prime transferred commingled fiat to or for the benefit of Zap via 280 transfers totaling $29,481,000.99 from Prime's bank accounts at BMO Harris and CRB during the Preference Period. *See id.* at ¶ 138.

159.    90.7% of the total fiat Transfers were transferred to or for the benefit of Zap from Prime's BMO x3077 account. *See id.* at ¶ 136.  The remaining fiat Transfers, amounting to $2,754,670.95, were sent to or for the benefit of Zap from other Prime accounts, including CRB x4453. *See id.*

160.    The fiat in Prime's omnibus BMO x3077 account was commingled. *See id.*

161.    The Brennan Declaration examines three days (May 22, 2023, June 6, 2023, and June 9, 2023) of incoming and outgoing transfers from Prime's BMO x3077, CRB x4453, CRB x9892 and CRB x9647 accounts to illustrate the extensive commingling that occurred and how the fiat Transfers to or for the benefit of Zap were comprised of commingled fiat. *See id.* ¶¶ 144–92.

###    A.    Prime's Fiat Transactions on May 22, 2023

162.    On May 22, 2023, ss reflected in the bank records for BMO x3077, and as explained by the Brennan Declaration, the beginning balance of BMO x3077 was $41,283.55 and the ending balance was $147,179.23. *See id*. at ¶ 144–59.

163.    On May 22, 2023, there were 194 incoming transfers totaling $79,665,497.20 into BMO x3077. *See id*. at ¶ 144. However, none of these incoming transfers were transferred from Zap to Prime. *See id.*

164.    Yet, on May 22, 2023, Prime transferred 83 outgoing transfers of $79,559,601.52 from BMO x3077, including four outgoing transfers totaling $1,609,414.72, to or for the benefit of Zap. *See id*.

165.    This means that the $1,609,414.72 that Prime transferred from BMO x3077 to Zap on May 22, 2023, was entirely comprised of fiat transferred to Prime that day by other Prime customers or Prime's own fiat. *See id*.

166.    On May 22, 2023, there were 79 incoming transfers totaling $27,232.39 from Zap to Prime's CRB x9892 account. *See id*. While there were $40,092,793.98 in outgoing ACH transfers from CRB x9892 to other sources on May 22, 2023, and two internal Prime transfers totaling $40,000,000 between CRB x9892 and BMO x3077, none of the outgoing ACH transfers from CRB x9892 were transferred to or for the benefit of Zap. *See id*.

167.    This means that the $27,232.39 that Zap transferred to CRB x9892 on May 22, 2023, was commingled in the outgoing ACH transfers to other recipients.

168.    On May 22, 2023, there were 3,210 incoming ACH transfers totaling $1,022,149.31 from Zap to Prime's CRB x4453 account. *See id*. at ¶ 154. That same day, CRB x4453 received an additional $1,654,371.05 in incoming ACH transfers from other sources. *See id*.

169.    This means that the $231,801.83 transferred from Prime to or for the benefit of Zap on May 22, 2023, was commingled with incoming ACH transfers from other sources.

170.    While Prime transferred 333 outgoing ACH transfers totaling $231,801.83 from CRB x4453 to or for the benefit of Zap on May 22, 2023, Prime also transferred an additional $12,036,641.45 from CRB x445 to other recipients. *See id*.

171.    This means that at least some of the $1,022,149.31 that Zap transferred to CRB x4453 on May 22, 2023, was commingled in the outgoing ACH transfers to other recipients that day.

172.    Also on May 22, 2023, there was 764 incoming credit card transfers totaling $94,769.56 from Zap to Prime's CRB x9647 account. *See id*. at ¶¶ 157–158. While there was one outgoing transfer totaling $1,000,000 from CRB x9647 to CRB x9892 on May 22, 2023, none of the outgoing credit card transfers from CRB x9647 were transferred to or for the benefit of Zap. *See id*.

173.    This means that the $94,769.56 that Zap transferred to CRB x9647 on May 22, 2023, was commingled in the outgoing credit card transfers to other recipients that day.

### B.    Prime's Fiat Transactions on June 6, 2023

174.    On June 6, 2023, as reflected in the bank records and as explained by the Brennan Declaration, the beginning balance of BMO x3077 was $40,439.26 and the ending cash balance was $90,871.27.  *See id*. at ¶¶ 160–73.

175.    On June 6, 2023, there were 226 incoming transfers totaling $20,290,363.53 into BMO x3077.  *See id*.  However, none of these incoming transfers were transferred from Zap to Prime.  *See id.*

176.    There were no transfers from CRB x4453, CRB x9892, or CRB x9647 to BMO x3077 on June 6, 2023.

177.    That same day, there were 99 outgoing transfers totaling $20,239,931.52 from BMO x3077, including two outgoing wire transfers totaling $2,068,931.68, from Prime to or for the benefit of Zap.  *See id*.

178.    This means that the $2,068,931.68 transferred from Prime to or for the benefit of Zap on June 6, 2023, was entirely comprised of commingled fiat transferred to Prime that day by other Prime customers.  *See id.*

179.    On June 6, 2023, Zap transferred $387,559.51 into CRB x9892 via over 178 transfers, whereas an additional $9,612,811.67 in incoming ACH transfers was transferred into CRB x9892 by other sources.  *See id*.  While Prime transferred $26,932.03 in outgoing ACH transfers from CRB x9892 on June 2, 2023 to other recipients, none of the outgoing ACH transfers from CRB x9892 were transferred to or for the benefit of Zap.  *See id*.

180.    This means that the $387,559.51 that Zap transferred to CRB x9892 on May 22, 2023, was commingled in the outgoing ACH transfers from CRB x9892 to other recipients.

181.    On June 6, 2023, Zap transferred $615,438.84 into CRB x4453 via over 1,330 ACH transfers.  *See id*.  While Prime transferred $47,627.70 to or for the benefit of Zap over 112

outgoing ACH transfers from CRB x4453 on June 2, 2023, Prime also transferred $1,810,832.8 from CRB x4453 to other recipients.

182. This means that the $615,438.84 that Zap transferred to CRB x4453 on June 6, 2023, was commingled in the outgoing ACH transfers from CRB x4453 to other recipients that day.

165. Also on June 6, 2023, there were 662 incoming credit card transfers totaling $98,445.46 from Zap to CRB x9647. *See id.* While there were periodic transfers in round dollars from CRB x9647 to other Prime accounts, the Internal Ledger did not reflect or otherwise suggest that the fiat Zap transferred to Prime's CRB x9647 account was segregated from any other fiat held by Prime.

### C.     Prime's Fiat Transactions on June 9, 2023

183. On June 9, 2023, as reflected in the bank records and as explained by the Brennan Declaration, the beginning balance of BMO x3077 was $83,639.82. *See id.* ¶¶ 174–92.

184. On June 9, 2023, there were 184 incoming transfers totaling $26,308,334.84 into BMO x3077. *See id.* However, none of these incoming transfers were from Zap. *See id.*

185. That same day, there were fourteen outgoing wire transfers totaling $12,202,671.74 from Prime's BMO x3077 account to or for the benefit of Zap in addition to 93 outgoing transfers totaling $26,353,089.06 from Prime's BMO x3077 account to other recipients. *See id.*

186. This means that the $12,202,671.74 transferred from Prime to or for the benefit of Zap on June 9, 2023, was entirely comprised of fiat transferred to Prime that day by other Prime customers. *See id.*[24]

---

[24] The Brennan Declaration states that Zap made several other transfers to Prime on June 9, 2023, and that those funds were transferred to CRB x9892, CRB x4453, or CRB x9647. *See id.* ¶¶ 147–150, 154. There were no

187.    Specifically, 13 wires totaling $12,199,992 were transferred from Prime to Zap

Solutions, Inc. as the beneficiary at an account held at Lead Bank as reflected in the below chart.

*See id.*

| Transfers to Zap | | |
|---|---|---|
| June 9, 2023 | | |
| **Date** | **Type** | **Amount** |
| 6/9/2023 | wire | ($600,001.00) |
| 6/9/2023 | wire | (800,000.00) |
| 6/9/2023 | wire | (899,999.00) |
| 6/9/2023 | wire | (900,001.00) |
| 6/9/2023 | wire | (999,995.00) |
| 6/9/2023 | wire | (999,996.00) |
| 6/9/2023 | wire | (999,997.00) |
| 6/9/2023 | wire | (999,998.00) |
| 6/9/2023 | wire | (999,999.00) |
| 6/9/2023 | wire | (1,000,000.00) |
| 6/9/2023 | wire | (1,000,001.00) |
| 6/9/2023 | wire | (1,000,002.00) |
| 6/9/2023 | wire | (1,000,003.00) |
| | **Total** | **($12,199,992.00)** |

188.    Zap's transactions with Prime on June 9, 2023, show that Prime commingled fiat

in BMO x3077 from various internal and external sources (including Zap), on a daily or near-daily

---

transfers between the CRB x4453, CRB x9892, or CRB x9647 accounts and the BMO x3077 account on June
9, 2023.  *See id.* ¶ 156.  Therefore, none of the funds that Zap transferred to Prime that ended up in the any of
these CRB accounts can be certain to have been included in the transfers from Prime's BMO x3077 account to
Zap on June 9, 2023.  *See id.*

basis. Thus, all of the fiat Transfers that Prime transferred to or for the benefit of Zap from BMO x3077 during the Preference Period were comprised of commingled fiat. *See id.*

189.    On June 9, 2023, Zap transferred $61,611.37 via 92 incoming ACH transfers into CRB x9892, whereas an additional $4,372,392.15 in incoming ACH transfers were transferred into CRB x9892 from other sources. *See id.* While Prime transferred $1,026,101.82 in outgoing ACH transfers from CRB x9892 to other recipients on June 9, 2023, none of the outgoing ACH transfers from CRB x9892 that day were transferred from Prime to or for the benefit of Zap. *See id.*

190.    This means that the $61,611.37 that Zap transferred to CRB x9892 on June 9, 2023, was commingled in the outgoing ACH transfers from CRB x9892 to other recipients that day.

191.    On June 9, 2023, Zap transferred $700 via four incoming ACH transfers into CRB x4453, whereas an additional $1,876,334.66 in incoming ACH transfers were transferred into CRB x4453 from other sources. *See id.* at ¶¶ 180–190. Prime transferred $215,335.18 via 266 outgoing ACH transfers from CRB x4453 to or for the benefit of Zap on June 9, 2023, and $427,051.4 from CRB x4453 to other recipients. *See id.*

192.    This means that at least some of the $215,335.18 that Prime transferred from CRB x4453 to or for the benefit Zap on June 9, 2023, was comprised of commingled fiat transferred to Prime by other customers that day.

166.    Also on June 9, 2023, Zap transferred 729 incoming credit card transfers totaling $116,142.51 to CRB x9647. *See id.* While there were periodic transfers in round dollars from CRB x9647 to other Prime accounts, including one transfer to CRB x4453 of $700,000, the

Internal Ledger did not reflect or otherwise suggest that the fiat Zap transferred to Prime's CRB x9647 account was segregated from any other fiat held by Prime. *See id.*

## IX.  Prime Commingled Crypto in Omnibus Digital Wallets in Vaults and Maintained Poor Reconciliations

193.    As was the case with Prime's commingling of fiat, Prime did not maintain separate or segregated digital wallets for crypto transferred to it by its customers. *See id.* at ¶ 28. Instead, Prime had Omnibus Digital Wallets that commingled crypto transferred to Prime from different customers with Prime's own crypto that it used for corporate operations and purposes. *See id.*

194.    Prime maintained its Omnibus Digital Wallets in Prime's vaults ("Vaults") at Fireblocks LLC ("Fireblocks"), a third-party crypto security platform. *See id.* at ¶ 29.  Prime used Vaults within the Fireblocks' infrastructure to: (1) organize wallets (including the Omnibus Digital Wallets), (2) enhance security measures, and (3) leverage efficient transaction policies and access controls. *See id.*  Vaults at Fireblocks were not separated or segregated by digital wallets. *See id.*

195.    Prime's customers were provided with deposit digital wallet addresses (the "Deposit Digital Addresses") to send crypto to Prime. *See id.* at ¶ 30.  But the Deposit Digital Addresses did not actually cause the crypto for each customer to be segregated because Prime "swept" crypto from those different Deposit Digital Addresses into one or more of the Omnibus Digital Wallets controlled by Prime. *See id* at ¶31.  This process resulted in crypto transferred to Prime by different customers being commingled together in the Omnibus Digital Wallets. *See id.*

196.    Prime's internal process for performing sweeps was inconsistent and void of procedural safeguards. *See id.* at ¶ 32.  Prime's application could trigger a sweep based on certain unknown events occurring or an employee could manually perform a sweep at any given time. *See id.*

197.     Prime also regularly transferred crypto between its multiple Omnibus Digital Wallets, only further commingling the already commingled crypto contained in the Omnibus Digital Wallets. *See id*. at ¶ 33.

198.     In an attempt to track its crypto balances on behalf of customers, Prime recorded its customers' transfers to Prime and Prime's transfers to its customers on its Internal Ledger. *See id*. at ¶ 34.  When a customer transferred crypto to Prime, Prime would credit that amount on the Internal Ledger.  *See id*.  The Internal Ledger, however, did not track which Omnibus Digital Wallet(s) any specific crypto was transferred to when Prime swept Deposit Digital Address(es). *See id*. at ¶ 35.

199.     When a customer requested an outgoing crypto transfer, Prime would check the Internal Ledger to determine if the customer's reported crypto balance was sufficient to support the requested transfer.  *See id*. at ¶ 39.  If the customer was shown to have transferred sufficient crypto to Prime, Prime would then check its multiple Omnibus Digital Wallets to determine from which one(s) it could transfer the crypto required to satisfy the transfer request.  *See id*.  Prime would then transfer the requested amount of crypto to the customer.  *See id*.  In completing a transfer request, Prime did not transfer the same crypto that a customer had initially transferred to Prime via a Deposit Digital Address because Prime's Omnibus Digital Wallets did not segregate crypto by customer and, thus, could not be used to identify any specific crypto transferred to Prime by a specific customer.  *See id*.

### A.     The ~b2ea Wallet (BTC Commingling Example)

200.     To demonstrate the extent of Prime's crypto commingling, the Brennan Declaration provides several illustrative examples of commingling.  *See id*. at ¶¶ 28–76.

Commingling was a constant occurrence at Prime. While the Brennan Declaration provides some good examples, it is by no means exhaustive as to all of the commingling that occurred at Prime.

201.    For example, Prime frequently swept crypto from the Deposit Digital Addresses into one of Prime's Omnibus Digital Wallets ending in ~b2ea (the "<u>~b2ea Wallet</u>"). *See id.* at ¶¶ 41–51.

202.    To illustrate how this worked, the Brennan Declaration depicts how three different Prime customers sent crypto to their respective Deposit Digital Addresses, each of which Prime subsequently swept to the ~b2ea Wallet:



*See id.* at ¶¶ 43-44.

203.    This single example, taken from real-world transaction and other data, illustrates how the crypto transferred to Prime from different customers became commingled into a single Omnibus Digital Wallet. This type of transaction and commingling occurred multiple times with the ~b2ea Wallet and with other Omnibus Digital Wallets. *See id.* at ¶¶ 41–76.

204.    The Brennan Declaration also discusses how the crypto that customers transferred to Prime became further commingled with crypto that Prime used for its own corporate operations. Using the ~b2ea Wallet as an example again, Brennan describes how the ~b2ea Wallet received

crypto from a Prime wallet that itself was funded from thousands of different wallets holding Prime's own crypto. *See id*. at ¶ 46. This resulted in Prime's crypto becoming commingled with the already commingled crypto transferred from customers into Prime Deposit Digital Addresses which Prime had already previously swept and commingled into this same Omnibus Digital Wallet. *See id*. at ¶¶ 45–47.

205.    Prime's commingling of crypto was further compounded by Prime's movement of commingled crypto between multiple Omnibus Digital Wallets. Again, using the ~b2ea Wallet as an example, the Brennan Declaration discusses and illustrates how Prime transferred already commingled crypto between multiple Omnibus Digital Wallets:



*See id*. at ¶¶ 49–50.

206.    The Brennan Declaration illustrates and explains how Prime's commingling of crypto in Omnibus Digital Wallets makes it practically impossible to determine if the crypto

transferred from Prime to a customer to satisfy a withdrawal request included any of the crypto that specific customer had originally transferred to Prime. *See id*. at ¶¶ 51, 55.

207.      Again using the ~b2ea Wallet as illustrative, the Brennan Declaration explains how that wallet received crypto swept from the Deposit Digital Address of a Prime customer ("Customer A") and also from Prime's "PT Segregated Assets" digital wallet that held corporate crypto (the "PT Segregated Assets Wallet"), but how Prime then transferred crypto out of this ~b2ea Wallet to satisfy withdrawal requests from two completely different Prime customers. *See id*. at ¶¶ 47–51.  These outgoing crypto transfers may have included some or none of the crypto originally transferred to Prime by Customer A; some or none of the crypto swept from Prime's PT Segregated Assets Wallet; or some or none of the crypto from any number of Prime's other customers. *See id*. at ¶ 48.



*Id*.

## B.    The ~73ck Wallet (BTC Commingling Example)

208.      Similarly, Prime often used the digital wallet with a digital address ending in ~73ck (the "~73ck Wallet") for BTC transferred to Prime from numerous customers, including Zap, as well as BTC transferred from other Prime Omnibus Digital Wallets, which also held BTC transferred to Prime by multiple customers. *See id*. at ¶¶ 53–55.



*Id.* at 53.

209.    This resulted in extensive commingling of BTC, including the BTC that Zap transferred to Prime.  *See id.* at ¶ 55.

### C.    Prime Commingled Crypto to Reduce Transaction Fees

210.    Prime generally swept crypto from the Deposit Digital Addresses into shared Omnibus Digital Wallets to pool crypto together for a number of reasons.  *See id.* at ¶¶ 57-60.

211.    One primary reason for pooling crypto was that Prime and its customers could bypass and save on various transaction fees[25] that would otherwise be incurred by conducting transactions on the blockchain.  *See id.* at ¶¶ 61–64.

---

[25]    "Transactions occurring on the blockchain incur fees.  On the Ethereum blockchain, these are referred to as 'gas fees.'  Gas fees refer to the costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain.  In other words, they are fees charged by the blockchain itself for

212.    Specifically, for crypto transfers within a single Prime Vault at Fireblocks, Prime could simply move the funds around on its Internal Ledger instead of transacting them on the blockchain and incurring transaction fees.  *See id*. at ¶¶ 57–58.

213.    When Prime did conduct on-chain transactions, it reduced transaction fees by pooling transactions and performing them all at once during off-peak hours when the blockchain network was less congested, as illustrated in the below diagram.  *See id*. at ¶¶ 65–76.



*Id*. at ¶ 61.

---

successfully completing a transaction […]  However, on the Bitcoin blockchain, these are referred to simply as 'transaction fees.'  Transaction fees refer to the costs that blockchain users pay to bitcoin miners as an incentive for preventing network congestion and incorporating a transaction in the subsequent "block."  In other words, they are rewards paid to miners for facilitating the successful completion of a transaction on the blockchain."  *See* Ex. A, Brennan Decl., ¶¶ 24–26.  We use "transaction fees" to refer to both "gas fees" and BTC transaction fees herein but only use the term "gas fees" to refer to transaction fees incurred on the Ethereum network.

214.     In this example, Prime has pooled BTC transfers from two Deposit Digital Addresses attributed to Zap totaling about 55 BTC, two Deposit Digital Addresses attributed to other Prime Customers, and from one of Prime's existing Omnibus Digital Wallets (already commingled) to satisfy an outgoing transfer request by Zap for 150 BTC. *See id.* at ¶¶ 60–62. These transactions all occurred contemporaneously with each other and therefore reduced the fees paid by Prime, but they also had the effect of commingling BTC from at least three Prime customers and from Prime itself, which makes determining the source of the BTC received by Zap nearly impossible to determine.   However, what the diagram does make clear is that this single transaction illustrates how the BTC Zap received could not have consisted of just the BTC it provided.

215.     To help account for the gas fees Prime incurred for transacting on the Ethereum blockchain, Prime set up additional digital wallets it referred to collectively as "Gas Stations." *See id.* at ¶ 67.  Prime funded the Gas Stations from its various other wallets (including the Omnibus Digital Wallets) and used the Gas Stations to pay gas fees when Prime conducted on-chain transactions. *See id.* at ¶¶ 65–67.  Prime used a variety of sources to fund the Gas Stations, which resulted in Prime further commingling the crypto transferred to it by customers with Prime's own crypto. *See id.* at ¶ 68.

216.     As demonstrated below, funding sources for the Gas Stations (represented by bright green nodes) included Prime's Omnibus Digital Wallets (represented by green nodes at the top), customers' external digital wallets (represented by the pink, blue, red and yellow nodes), and the several external digital wallets that appear to be unattributable to Prime or its customers (represented by gray nodes):



*See id.* at ¶ 70.

217.    Prime communications, as shown below, reflect instances where Prime operations personnel used fiat from one of Prime's commingled omnibus bank accounts to purchase ETH to refill the Gas Stations.  *See also id.* at ¶¶ 71–73.



218.     Therefore, the Gas Stations were funded by Prime's corporate fiat, crypto from commingled Omnibus Digital Wallets (including the ~b2ea Wallet described above), and crypto from external digital wallet addresses. *See id.* at ¶ 74.

219.     By sweeping and pooling crypto together, Prime was able to reduce its transaction fees but throughout the transaction process, this practice only further commingled the crypto provided by customers with Prime's own crypto. *See id.* at ¶¶ 56–59, 64, 76.

### D.     Prime Falsified Its Internal Ledger to Cover Up the Hole in Its Balance Sheet Due to Its Loss of Access to the 98f Wallet

220.     In December 2021, Prime's customers, Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC (collectively, "Abra"), requested a transfer of 5,867.71 ETH (worth approximately $24,000,000 at the time) from Prime. *See id.* at ¶¶ 109–27. Subsequently, between December 2021 and March 2022, Abra continued to request that Prime transfer ETH totaling 48,034.57 ETH (worth approximately $145,000,000 at the time). *See id.*

221.     In attempting to satisfy Abra's transfer requests, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its Omnibus Digital Wallets:

> ▮▮@primetrust.com
>                                                           2021-12-22 07:16:57.000 PM
> Hey ** - Expanding this to a larger audience as this has become a priority issue that was brought up earlier today: We have uncovered a large balance discrepancy between our ledger and Fireblocks where we are showing a larger amount of ETH (~9000) than what is shown in Fireblocks. This was a result of a larger disbursement requested by Abra which requires us to aggregate ETH; upon running a balance check on our incoming wallet address, we noticed the amount was not enough to send out the request. We are double checking to confirm that this is not a result of double spend(s) but from our first pass, it appears to not be a result of manually sending ETH transactions incorrectly. I know @▮▮ and @▮▮ ▮▮ are investigating but not sure what are the other possibilities could result in this difference that we see. It may also be worth it to ask FB of an audit of their side if we can confirm nothing is incorrectly processed on our side.

222.     Further investigation revealed that, for approximately eight months, Abra had been transferring significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.

223.     Specifically, in December 2021, Prime discovered that Abra had already transferred more than 11,000 ETH (worth approximately $45,000,000 at the time) to the 98f Wallet.  *See* Ex. A, Brennan Decl., ¶ 109–27.

224.     In or around December 2021, Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet.  *See id*.

225.     It was unclear to those at Prime who the signers for the 98f Wallet were or how Prime could access the 98f Wallet.  *See* ███ Dep., 69:17–71:22.  Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet.  *See id*., 181:6–8.  Prime also did not possess and could not locate the passwords called "seed phrases" that were associated with these physical hardware devices.  *See id*.

226.     As such, Prime had no way of accessing the 98f Wallet.  The crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

227.     Prime was concerned about the negative impact and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a wallet containing a significant amount of crypto.

228.     To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy Abra's transfer requests.  *See* Ex. A, Brennan Decl., ¶¶ 109–27.

229.     Between December 23, 2021, and March 30, 2022, Prime conducted ten different on-chain purchases of ETH from Liquidity Provider in an attempt to satisfy Abra's multiple outgoing transfer requests.  *See id*.

| Date | ETH On-Chain Transfers |
|------|------------------------|

| 12/23/2021 | 2,999.99 |
|------------|----------|
| 12/31/2021 | 3,250 |
| 1/6/2022 | 800 |
| 1/6/2022 | 2,100 |
| 1/21/2022 | 1,930.50 |
| 3/11/2022 | 1,800 |
| 3/14/2022 | 3,049.98 |
| 3/15/2022 | 3,000 |
| 3/29/2022 | 2,347.22 |
| 3/30/2022 | 2,300 |

230.    The funds for each of these ETH purchases came from Prime's omnibus, commingled bank accounts prior to being transferred to Abra.  *See id.*

231.    The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider is described in the below deposition testimony of Prime's former Chief Operating Officer, █████████:

> Q:    So Abra's depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?
>
> A:    I would defer to ████ on that.  But essentially it was use of omnibus funds, is my understanding.
>
> Q:    What's use of omnibus funds?
>
> A:    As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.
>
> Q:    And which funds were used to make the purchases of the ETH to fund the transactions?
>
> A:    Funds from the fiat account.  Fiat omnibus account.  Is my understanding. Once again, ████ would know specifically.

██████ Dep., 92:25–93:18.

232.    The ETH that Abra had initially transferred to Prime was (and still is to this day) locked away in the 98f Wallet.

233.     Prime executives made the decision to falsify entries in the Internal Ledger to conceal the fact that Prime had used fiat from omnibus bank accounts to purchase ETH to satisfy Abra's outgoing transfer requests. *See id.*

234.     Prime executives discussed how to hide these transactions from auditors at Nevada FID:



235.     ████████ confirmed in his deposition that Prime executives intentionally chose to settle and record the purchases of ETH from Liquidity Provider on Prime's Internal Ledger as opposed to externally transferring funds to the Liquidity Provider. *See* ████ Dep., 152:18–153:13.

236.     These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected in Prime's Internal Ledger and the amount of fiat that Prime held in its omnibus bank accounts. *See* Ex. A, Brennan Decl., ¶¶ 109–27.



237.         [REDACTED]         further testified about Prime's internal "inflat[ed]" Internal Ledger

compared to the fiat in Prime's omnibus bank accounts:

Q:    [T]here's going to be cash reflected in [Liquidity Provider]'s account, but
      that cash is not actually in the bank; is that right?

A:    Correct.  Correct.

Q:    And the cash that [Liquidity Provider] would have had, if they were to
      withdraw, that's just in the omnibus cash account, that has everybody
      else's—all other customers' cash in it, too; right?

A:    Correct . . .

Q:    I see.  But the Ledger would show an amount owed to your customers that's
      higher than the amount that you're holding in your bank?

A:    Exactly.

Q:    That's ultimately what happened; right?

A:    Yeah, that's exactly what happened.

[REDACTED] Dep., 144:11–20, 146:7–15.

238.         Ultimately, Prime's Internal Ledger falsely displayed "incoming" wire transfers

from Liquidity Provider equivalent to the fiat amounts that Prime credited to Liquidity Provider to

fund Prime's purchases of replacement ETH between December 23, 2021, and March 30, 2022:



| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ~0457 | | wire | 11,958,000.00 |
| 12/31/2021 | ~0902 | | wire | 12,158,250.00 |
| 1/6/2022 | ~b83d | | wire | 2,778,400.00 |
| 1/6/2022 | ~5aaa | | wire | 7,293,300.00 |
| 1/22/2022 | ~6c81 | | wire | 5,000,000.00 |
| 3/12/2022 | ~777d | | wire | 4,644,000.00 |
| 3/15/2022 | ~2910 | | wire | 8,043,000.00 |
| 3/15/2022 | ~1b2e | | wire | 8,524,750.00 |
| 3/29/2022 | ~113f | | wire | 7,902,800.00 |
| 3/30/2022 | ~ecc3 | | wire | 8,065,047.90 |
| | | | **Total** | **76,367,547.90** |

*See* <u>Ex. A</u>, Brennan Decl., at ¶¶ 109–27. [26]

239.    Prime's bank account statements do not reflect any of these wire transfers because they did not actually occur.  *See id.*

240.    Prime's Internal Ledger shows two incoming wire transfers to Prime, and specifically to Liquidity Provider's balance with Prime, in the amounts of $11,958,000.00 on December 23, 2021, and $12,158,250.00 on December 31, 2021.  *See id.*

241.    These two incoming transfers correspond exactly with the value of the first two ETH purchases that occurred on these two days.  *Id.*

242.    However, these two incoming wire transfers are not recorded in Prime's bank account statement for December 2021.  *See id.*

243.    The reason these two incoming wire transfers are not recorded in Prime's bank account statement is because the transfers never occurred but, instead, were falsely manufactured by Prime to conceal its use of commingled fiat to fund the purchases of ETH from Liquidity Provider to satisfy Abra's transfer requests.

---

[26]    The chart herein is illustrative.  It contains data from Prime's Internal Ledger related to certain transaction entries but is not directly copied from Prime's actual Internal Ledger.

244.     Prime's false Internal Ledger entries were confirmed by ▮▮▮▮▮, who also recognized that Prime's bank statements would not reflect the transfers shown on Prime's Internal Ledger:

> Q:     When it says funds transfer in column F and it says "wire, wire, wire."  Do you see that?
>
> A:     Yes.
>
> Q:     There were no wire transfers; right?
>
> A:     Yes.
>
> Q:     Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?
>
> A:     Yes, there were no wire transfers.
>
> . . .
>
> Q:     And we can take you through—we've looked at it, but it wouldn't surprise you that there were no wire transfers reflected in the bank account statements for Prime Trust concerning these transactions; right?
>
> A:     Correct.
>
> Q:     And that's because there were no wire transfers out to [Liquidity Provider] in connection with these transactions; right?
>
> A:     No wire transfers in.

▮▮ Dep., 164:22–165:10; 166:5–15.

245.     Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally falsify Prime's internal records compounded the already impossible task of untangling or segregating the fiat and crypto transferred to Prime by different customers and the fiat and crypto that Prime generated from its business operations.  *See* Ex. A, Brennan Decl..

## X.    Prime Transferred Commingled Crypto to or for the Benefit of Zap During the Preference Period

246.    During the Preference Period, Prime transferred 1,939.50 BTC to or for the benefit of Zap through 19,251 transfers.  *See* Ex. A, Brennan Decl., ¶ 202.

247.    Prime transferred 1,350 of this BTC—or approximately 70% of the total amount of the Crypto Transfers—from Prime Omnibus Digital Wallet ending in ~z6hg (the "~z6hg Wallet") to Zap's external digital address ending in ~McTd via 8 separate transfers all occurring on June 2, 2023.  *See id.*

248.    To supply the necessary amount of BTC to complete the crypto Transfers, Prime executed the crypto Transfers to or on behalf of Zap from the~z6hg Wallet, which received funds from multiple other commingled Prime Omnibus Digital Wallets as shown below.



*See id.* at ¶ 208.

249.    Therefore, during the Preference Period, the BTC that Prime transferred to or for the benefit of Zap was comprised of BTC from four different commingled Prime Omnibus Digital Wallets.  *See id.* at ¶ 209.

**XI.   The Fiat and Crypto Transferred to Prime Cannot be Traced by Prime or Zap and is Property of the Debtors' Estates**

250.     In its Distribution Opinion, the Court found that "[t]he overwhelming evidence establishes that the Debtors hopelessly commingled assets" such that "the fiat held by the Debtors is not traceable" and the "hopeless commingling would not allow the cryptocurrency to be traced." *See* Distribution Opinion at 23–24, 27, 30.

251.     As discussed herein, Prime held the fiat and crypto that customers transferred to it in an omnibus, commingled manner.  This approach resulted in Prime's own employees being incapable of determining where any fiat or crypto transferred by a particular customer to Prime was located, as ▮▮▮▮▮▮ testified:

> Q:   And that was done at Prime Trust?
>
> A:   It was done at Prime Trust.  It wasn't done very frequently, but there were— there were omnibus accounts at Prime Trust.
>
> Q:   And do you know who was responsible for those accounts?
>
> A:   I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

▮▮▮▮▮ Dep., 205:19–207:3.

252.     Another example of the confusion in tracing specific fiat and crypto that customers transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were

impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy Abra's transfer requests:



253.              responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":

> On Mon, Dec 19, 2022 at 9:28 AM              @primetrust.com> wrote:
>
> Hey
> Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger? If so, I don't believe any specific bank accounts were used, as management considered all funds tangible in our omnibus model. In their decision, no bank movements were needed/done before the credits were requested to the ledger.

254.              , Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which fiat or crypto and that Prime was "***not able to specify what customer is out the funds due to our omnibus structure***":



255.     Prime's commingling of fiat and crypto, coupled with its years of poor and even fraudulent recordkeeping, make it impossible for PCT, Zap, or anyone else to trace and specifically identify the fiat and crypto that Zap transferred to Prime.  *See* <u>Ex. A,</u> Brennan Decl., ¶ 210.

## CAUSES OF ACTION

### Count I

### Avoidance of Preferential Transfers,
### 11 U.S.C. § 547(b)

256.     PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

257.     The Transfers were made on account of a demand by Zap.

258.     Each of the Transfers was a transfer of an interest in property of Prime.

259.     Prime made the Transfers to or for the benefit of Zap.

260.     At the time of the Transfers, Zap was a creditor of Prime within the meaning of section 101(10) of the Bankruptcy Code.  Zap received the Transfers, or, alternatively, the Transfers were made for Zap's benefit.

261.     Transfers were made for or on account of an antecedent debt owed by Prime.

262.     Transfers were made within ninety days of the Petition Date

263.     At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.  If not avoided, the Transfers would enable Zap to receive more than Zap would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

264.     Zap has not repaid or returned any of the Transfers to PCT.

265.     Pursuant to 11 U.S.C. § 547(b), PCT has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses that Zap could assert, including Zap's potential defenses under Section 547(c) of the Bankruptcy Code, and believes that certain of the Transfers are avoidable.

266.     Accordingly, PCT is entitled to avoid the Preferential Transfers pursuant to section 547(b) of the Bankruptcy Code.

## Count II

### Recovery of Avoided Transfers from the Defendants,
### 11 U.S.C. § 550

267.     PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

268.     PCT is entitled to avoid the Preferential Transfers described above pursuant to sections 547(b) of the Bankruptcy Code.  Zap was the initial transferee of such transfer, or the immediate or mediate transferee of such initial transferee, or the person for whose benefit such transfer was made.

269.     Accordingly, pursuant to section 550 of the Bankruptcy Code, PCT is entitled to recover from Zap:  not less than $13,877,147.36 and 1,758.18 BTC of the Transfers as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

## Count III

### Claim Objection,
### 11 U.S.C.  § 502

270.     PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

271.     As alleged above, Zap was the initial transferees of the Transfers, or the immediate or mediate transferees of such initial transferees, or the persons for whose benefit the Transfers were made, and PCT is entitled to avoid certain of the Transfers described above pursuant to section 547(b) of the Bankruptcy Code, which is recoverable from Zap under section 550 of the Bankruptcy Code.

272.     Pursuant to section 502(d) of the Bankruptcy Code, the Zap Claims and any other claim(s) of Zap that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until Zap pays PCT the value of the Transfers, for which and to the extent that the Court has determined Zap is liable pursuant to 11 U.S.C. § 550 of the Bankruptcy Code.

## PRAYER FOR RELIEF

**WHEREFORE**, PCT requests that this Court grant the following relief:

A.     Enter an order finding that the Transfers addressed herein are avoidable preferential transfers under 11 U.S.C. § 547;

B.     Award PCT: (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable preferential transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable preferential transfers alleged herein, plus the value of any additional avoidable transfers that PCT learns, through discovery or otherwise, were made to or for the benefit of Zap;

C.     Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by Zap against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until Zap relinquishes to PCT the amount ordered as an award for the avoidable transfers;

      D.      Award PCT its attorneys' fees, pre- and post-judgment interests, and costs of suit;

and

      E.      Grant PCT all other relief, at law or equity, to which it may be entitled.

Dated:  March 2, 2026
        Wilmington, Delaware

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ David R. Hurst*
David R. Hurst (No. 3743)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Facsimile: (302) 351-8711
Email:     dhurst@mcdermottlaw.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
James A. Pardo (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Benjamin F. Cooper (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Cris Ray (admitted *pro hac vice*)
Magali M. Duque (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email:     dazman@mcdermottlaw.com
            jbevans@mcdermottlaw.com
            jpardo@mcdermottlaw.com
            ggriffith@mcdermottlaw.com
            bcooper@mcdermottlaw.com
            pkennedy@mcdermottlaw.com
            cray@mcdermottlaw.com
            mduque@mcdermottlaw.com
            jaminov@mcdermottlaw.com

*Counsel to PCT Litigation Trust*